# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE, <br><br> Defendants. | 20 Civ. 9713 (LLS) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS

Dated: January 29, 2021

Jeff E. Butler
John P. Alexander
Minji Reem
Karleene Diaz
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants AMCK Aviation Holdings Ireland Limited, Accipiter Investments Aircraft 4 Limited, Vermillion Aviation (Two) Limited, UMB Bank, N.A., and Wells Fargo Trust Company*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ........................................................................................2

    A.    The Original 14 Leases. ...............................................................2

    B.    The Framework Agreement. .........................................................4

    C.    Lease of MSN 10038. ...................................................................5

    D.    Frontier's Request for a Rent Deferral.......................................5

    E.    Termination of the Framework Agreement. .................................7

    F.    The Instant Lawsuit......................................................................8

ARGUMENT .................................................................................................................8

    I.    Frontier's Claims for Breach of the Framework Agreement (First and Second Claims) Should Be Limited to AMCK....................................8

    II.    Frontier Fails to State a Claim for Breach of the Lease Agreements (Third Claim). ...........................................................................................9

    III.    Frontier's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Fourth Claim) Should Be Dismissed. ........................12

    IV.    Frontier Fails to State a Claim for Breach of the Covenant of Quiet Enjoyment (Fifth Claim)....................................................................13

    V.    Frontier's Promissory Estoppel Claim (Sixth Claim) Should Be Dismissed...................................................................................................15

    VI.    Frontier's Fraud Claim (Seventh Claim) Should Be Dismissed..........17

    VII.    For the Avoidance of Doubt, Accipiter, Vermillion, UMB and Wells Fargo Should Be Dismissed from the Case. ......................................20

CONCLUSION..............................................................................................................21

- i -

# TABLE OF AUTHORITIES

Page(s)

Cases

*A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*,
  No. 17 Civ. 3529, 2018 WL 10517080 (E.D.N.Y. Mar. 6, 2018) .............................................. 14

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...................................................................................... 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 8, 9

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) .................................................................................................. 9

*B & M Linen, Corp. v. Kannegiesser, USA, Corp.*,
  679 F. Supp. 2d 474 (S.D.N.Y. 2010) ............................................................................... 18, 19

*Bader v. Wells Fargo Home Mortg. Inc.*,
  773 F. Supp. 2d 397 (S.D.N.Y. 2011) .................................................................................... 16

*Barash v. Pa. Terminal Real Estate Corp.*,
  26 N.Y.2d 77 (1970) ...................................................................................................... 13, 14

*Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*,
  346 F. Supp. 3d 432 (S.D.N.Y. 2018) ................................................................................... 16

*Benson v. RMJ Sec. Corp.*,
  683 F. Supp. 359 (S.D.N.Y. 1988) ....................................................................................... 21

*Boehner v. Heise*,
  734 F. Supp. 2d 389 (S.D.N.Y. 2010) ................................................................................... 10

*Colina v. One E. River Place Realty Co., LLC*,
  No. 99 Civ. 5173, 2000 WL 1171126 (S.D.N.Y. Aug. 17, 2000) .............................................. 15

*Dave Herstein Co. v. Columbia Pictures Corp.*,
  4 N.Y.2d 117 (1958) ............................................................................................................ 13

*Edwards v. Sequoia Fund, Inc.*,
  938 F.3d 8 (2d Cir. 2019) ..................................................................................................... 10

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004) ............................................................................................17-18

*Ferring B.V. v. Allergan, Inc.*,
    4 F. Supp. 3d 612 (S.D.N.Y. 2014) ........................................................................................ 9

*Fink v. Time Warner Cable*,
    714 F.3d 739 (2d Cir. 2013) .................................................................................................... 8

*Foxley v. Sotheby's Inc.*,
    893 F. Supp. 1224 (S.D.N.Y. 1995) ...................................................................................... 16

*Gas Nat., Inc. v. Iberdrola, S.A.*,
    33 F. Supp. 3d 373 (S.D.N.Y. 2014) ..................................................................................... 15

*Goldblatt v. Englander Commc'ns, L.L.C.*,
    No. 06 Civ. 3208, 2007 WL 148699 (S.D.N.Y. Jan. 22, 2007) ............................................. 13

*Harris v. Provident Life & Acc. Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002) .................................................................................................... 12

*House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
    No. 13 Civ. 519, 2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014) .......................................11-12

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
    157 F. Supp. 3d 352 (S.D.N.Y. 2016) ................................................................................... 13

*Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*,
    No. 07 Civ. 432, 2008 WL 650403 (S.D.N.Y. Mar. 7, 2008) ........................................... 9, 16

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
    No. 08 Civ. 9116, 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009)............................................... 13

*Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*,
    494 F. App'x 153 (2d Cir. 2012) ........................................................................................... 16

*Kleinberg v. Radian Grp., Inc.*,
    240 F. Supp. 2d 260 (S.D.N.Y. 2002) ................................................................................... 16

*Larson v. Eney*,
    No. 08 Civ. 3513, 2009 WL 321256 (S.D.N.Y. Feb. 10, 2009)............................................. 17

*Martinez v. Vakko Holding A.S.*,
    No. 07 Civ. 3413, 2008 WL 2876529 (S.D.N.Y. July 23, 2008) ........................................... 11

*N.Y. Military Academy v. NewOpen Group*,
   142 A.D.3d 489 (2d Dep't 2016).........................................................................19

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
   No. 12 Civ. 2837, 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ...................................9

*Pu v. Russell Publ'g Grp., Ltd.*,
   683 F. App'x 96 (2d Cir. 2017)...........................................................................11

*Red Fort Capital, Inc. v. Guardhouse Prods. LLC*,
   397 F. Supp. 3d 456 (S.D.N.Y. 2019) ..................................................................10

*Saewitz v. Epstein*,
   6 F. Supp. 2d 151 (N.D.N.Y. 1998).....................................................................13

*Sauer v. Xerox Corp.*,
   95 F. Supp. 2d 125 (W.D.N.Y. 2000)...............................................................13, 14

*St. Paul Fire & Marine Ins. Co. v. Rivkin*,
   110 F. App'x 169 (2d Cir. 2004) .........................................................................14

*StarVest Partners II, L.P. v. Emportal, Inc.*,
   101 A.D.3d 610 (1st Dep't 2012) ........................................................................19

*Telecom Int'l Am., Ltd. v. AT & T Corp.*,
   280 F.3d 175 (2d Cir. 2001) ..............................................................................17

*Value Time, Inc. v. Windsor Toys, Inc.*,
   700 F. Supp. 6 (S.D.N.Y. 1988) .........................................................................17

*Wiederman v. Spark Energy, Inc.*,
   No. 19 Civ. 4564, 2020 WL 3965258 (S.D.N.Y. Mar. 9, 2020) ..................................9

*Wolff v. Rare Medium, Inc.*,
   210 F. Supp. 2d 490 (S.D.N.Y. 2002) ..................................................................10

<u>Rules</u>

Fed. R. Civ. P. 9(b) ................................................................................................18

Defendants AMCK Aviation Holdings Ireland Limited ("AMCK"), Accipiter

Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited

("Vermillion"), UMB Bank, N.A. ("UMB"), and Wells Fargo Trust Company, N.A. ("Wells

Fargo") (collectively, "Defendants") submit this Memorandum of Law in support of their Partial

Motion to Dismiss. Defendants seek dismissal in part of the First and Second Claims, and

dismissal in full of the Third, Fourth, Fifth, Sixth and Seventh Claims. This Motion is supported

by the accompanying Declaration of Jeff E. Butler dated January 29, 2021 ("Butler Decl.").

## PRELIMINARY STATEMENT

At the beginning of 2020, plaintiff Frontier Airlines, Inc. ("Frontier") operated 14 Airbus

A320 aircraft leased from AMCK, an aircraft leasing company based in Ireland, through its

affiliate and certain owner trusts. Each of these leases is documented in an individual aircraft

lease agreement requiring Frontier to make monthly payments of rent.

In March 2020, Frontier and AMCK entered into a Framework Agreement for the sale

and leaseback of six additional A320 aircraft. The first aircraft delivery under this agreement

(being the 15th aircraft leased by Frontier) was made on March 16, 2020.

Beginning in April 2020, Frontier stopped making payments due under the first 14 lease

agreements, citing disruption to its business from the COVID-19 pandemic. AMCK agreed not

to take any action with respect to Frontier's payment defaults for a period of 10 working days

running from April 6, 2020 to April 21, 2020. More than two weeks later, on May 8, 2020,

AMCK terminated the Framework Agreement with respect to future deliveries based on

Frontier's still-continuing payment defaults.

This action arises from the termination of the Framework Agreement. Frontier claims

that AMCK had no right to terminate based on Frontier's payment defaults because AMCK

supposedly had agreed to a rent deferral period that would continue until May 15, 2020. AMCK,

on the other hand, maintains that there was no such deferral agreement.  The only promise made by AMCK with respect to Frontier's payment defaults was to take no action on these payment defaults for 10 working days, and that time period expired on April 21, 2020.  Accordingly, AMCK's termination of the Framework Agreement on May 8, 2020 was entirely valid and fully justified based on Frontier's continuing failures to make payments under the leases.

Frontier could have chosen to litigate this dispute through a straightforward claim for breach of contract against AMCK.  Instead, Frontier has larded its Complaint with duplicative and meritless quasi-contract and tort claims against AMCK, and claims against collateral entities not involved in the termination of the Framework Agreement.  These extraneous claims are legally flawed and should be dismissed, leaving only the breach of contract claims against AMCK for further proceedings.[1]

## FACTUAL BACKGROUND

Plaintiff Frontier is a passenger airline based in Denver, Colorado.  (Compl. ¶ 27.) Frontier relies on leased aircraft for 100% of its aircraft fleet.  (*Id.*)  Frontier leases these aircraft from aircraft leasing companies pursuant to "sale and leaseback" transactions.  (*Id.*)  In such a transaction, an airline with an existing agreement to purchase an aircraft from a manufacturer, instead of taking delivery of the aircraft itself, enters into an arrangement for an aircraft leasing company to purchase the aircraft and then lease it back to the airline.  (Compl. ¶ 27.)

### A.     The Original 14 Leases.

At the beginning of 2020, Frontier operated 14 Airbus A320 aircraft leased from AMCK,

---

[1] The Complaint contains two claims for breach of contract against AMCK (First and Second Claims).  These claims are virtually identical in substance and could be consolidated into a single claim for breach of contract.  AMCK has no objection at this time, however, to proceeding with two claims for breach of contract instead of one.

through its affiliate and certain owner trusts.  (Compl. ¶¶ 11, 30.)  These 14 leases (the "Original Leases") were governed by separate, but in all relevant respects similar, lease agreements. (Compl. ¶¶ 30, 92; Butler Decl. ¶¶ 2-3 & Exs. 1-2.)  Frontier is the lessee under each agreement, and the lessor is either UMB or Wells Fargo.  (Compl. ¶¶ 25-26.)  However, UMB and Wells Fargo are not lessors in their individual capacities.  Rather, UMB and Wells Fargo are "owner trustees" acting for the benefit of the "owner participant," an affiliate of AMCK called Accipiter. In addition, Accipiter serves as "lessor guarantor" under some of these leases, guaranteeing the performance by the lessor under each such Original Lease.  (Compl. ¶¶ 22-24; Butler Decl. ¶ 4 & Ex. 3.)

Each of the 14 Original Leases gives Frontier the right to possess and operate an individual aircraft (identified by its manufacturer's serial number or "MSN").  In exchange, Frontier is required to make monthly payments of rent to the lessor.  Each lease agreement includes a "hell or high water" clause specifying that Frontier's obligation to pay monthly rent was "absolute and unconditional."  (*See, e.g.*, Butler Ex. 2, § 6.4.)

Each of the 14 Original Leases also includes a standard provision for "quiet enjoyment" of the aircraft.  For instance, most of the lease agreements state:

> Subject to the provisions of this Agreement, including the provisions for early termination, or unless compelled to do so by any applicable law, so long as no Event of Default has occurred and is continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term.

(*See, e.g., id.* § 4.3.)  The other lease agreements similarly state:

> [P]rovided no Event of Default has occurred and is continuing, neither Lessor, any Financing Party, nor Lessor, any Financing Party, nor any person lawfully claiming through or under Lessor or any Financing Party shall interfere with the quite use, possession and enjoyment of the Aircraft by Lessee . . . .

(Butler Ex. 1, § 9.1.)

B.    **The Framework Agreement.**

On March 16, 2020, Frontier and AMCK entered a Framework Agreement for the sale

and leaseback of six additional Airbus A320 aircraft.  (Compl. ¶ 33; Butler Ex. 4.)  Under a

separate purchase agreement, these aircraft were scheduled for delivery from Airbus to Frontier

in 2020.  (Compl. ¶ 34.)  The Framework Agreement provides for the completion of the purchase

from Airbus and for the leasing of these aircraft back to Frontier.  (Butler Ex. 4, §§ 1.1, 2.1.)

The Framework Agreement specifies a number of possible "Framework Events of

Default" by Frontier.  (*Id.* § 6.)  These include any event of default under a lease agreement

entered pursuant to the Framework Agreement.  (*Id.* § 6.1.7.)  If a Framework Event of Default

has occurred and is continuing, the Framework Agreement gives AMCK various non-exclusive

remedies, including terminating its obligations under the Framework Agreement.  (*Id.* § 6.2.)

The Framework Agreement contains a standard non-waiver clause providing that its

terms can be amended or waived only in writing.  Section 8.4.1 provides in relevant part:

> The rights of both parties against the other or in relation to the Aircraft
> (whether arising under this Agreement or the general law) *shall not be*
> *capable of being waived or varied otherwise than by an express waiver or*
> *variation in writing*; and in particular any failure to exercise or any delay in
> exercising any such rights shall not operate as a waiver or variation of that
> or any other such right; any defective or partial exercise of any of such
> rights shall not preclude any other or further exercise of that or any other
> such right; and no act or course of conduct or negotiation on the part of such
> party or on its behalf shall in any way preclude it from exercising any such
> right or constitute a suspension or any variation of any such right.

(*Id.* § 8.4.1 (emphasis added).)  The Framework Agreement further states that "[t]he provisions

of this Agreement *shall not be varied otherwise than by an instrument in writing* executed by or

on behalf of AMCK Aviation and Frontier." (*Id.* § 8.4.2 (emphasis added).)[2]

### C.    Lease of MSN 10038.

On the date that the Framework Agreement was entered, AMCK and Frontier took delivery of MSN 10038, the first of the six aircraft deliveries covered by the Framework Agreement. (Compl. ¶ 35.) This was the 15th aircraft leased by Frontier pursuant to a lease involving AMCK.

This lease is documented in an aircraft lease agreement between Frontier and UMB, as owner trustee, dated as of March 16, 2020 (the "MSN 10038 Lease" and, together with the 14 Original Leases, the "Lease Agreements"). (Butler Ex. 5.) In this case, AMCK's affiliate, Vermillion, is the owner participant and guarantor under the MSN 10038 Lease. (Compl. ¶ 24; Butler Exs. 5-6.) Like the 14 Original Leases, the MSN 10038 Lease provides that the obligation to pay rent for the leased aircraft is absolute and unconditional. (Butler Ex. 5, § 6.4.) The MSN 10038 Lease specifies a number of events of default, including Frontier's failure to pay rent under any "Other Agreements." (*Id.* § 16.1(l).) "Other Agreements" is defined to include any other aircraft lease agreement between Frontier and lessor, Vermillion, or a Vermillion affiliate (*i.e.*, any of the 14 Original Leases). (*Id.* § 1.1.)

### D.    Frontier's Request for a Rent Deferral.

Immediately after entering the Framework Agreement and the MSN 10038 Lease, Frontier sent a letter to AMCK requesting a three-month rent deferral based on disruptions caused by the COVID-19 pandemic. (Compl. ¶ 40.) This letter triggered some discussion between AMCK and Frontier over a potential rent deferral. In the context of these discussions,

---

[2] The Original Leases have substantially similar clauses prohibiting oral waiver or modification, and requiring amendments to be signed and in writing. (*See, e.g.*, Butler Ex. 1, §§ 23.1, 23.13 & Butler Ex. 2, §§ 20.4(a)-(b).)

AMCK proposed that Frontier negotiate with Airbus for a delay of upcoming aircraft deliveries. (Compl. ¶ 41.)  For example, in an April 3, 2020 email, AMCK advised Frontier:

> We have been authorised to grant you the 3 months' rent deferral requested, on 14 of the 15 aircraft leased by AMCK (excluding the A320neo delivered on 16th March), with repayment over the subsequent 4 months (at 6% interest), but strictly on the basis that we suspend the SLB for six months, by when we hope the market to return to more normal conditions. . . .

(Compl. ¶ 47; Butler Ex. 7.)  Following the April 3, 2020 email, the Complaint alleges that Frontier "took immediate action and started to negotiate with Airbus for aircraft delivery deferrals on April 4, 2020[.]"  (Compl. ¶ 51.)

To facilitate these rent deferral discussions, AMCK agreed not to take any action with respect to Frontier's payment defaults for a period of 10 working days running from April 6, 2020 to April 21, 2020.  Specifically, in an April 6, 2020 email, AMCK stated:

> Mindful of the time it might take you to reach agreement with Airbus or to make some other arrangements and therefore of the ability for us to reach a deferral agreement, we can confirm that *we won't take any actions or call any defaults linked to non payment of rents on any aircraft where the rent is due from today to 21 April (ie, for the next 10 working days)*.

(Compl. ¶ 54; Butler Ex. 7 (emphasis added).)  Around this time, Frontier suspended its monthly rent payments on the 14 Original Leases.  (Compl. ¶¶ 57, 74.)

By April 30, 2020, the 10-day period had expired, but Frontier still failed to make any payment under the 14 Original Leases.  AMCK was therefore free to take action based on the continuing payment defaults by Frontier.  On that date, AMCK sent an email to Frontier that proposed several conditions (all of which would have been required) for keeping the Framework Agreement in place for future deliveries.  (Compl. ¶ 58; Butler Ex. 7.)  One of the conditions was:  "All payments to be current on May 15 2020 and to remain current."  (*See* Butler Ex. 7.)  Other conditions included lease extensions for 12 of the Original Leases and the removal of early termination options for leases under the Framework Agreement.  (*See id.*)  The email specified

that it was "for discussion purposes only" and was not intended to create any binding obligations. (*See id.*)

### E.     Termination of the Framework Agreement.

On May 8, 2020, AMCK terminated the Framework Agreement with respect to future deliveries by providing a Notice of Termination to Frontier.  (Compl. ¶ 63.)  The Notice of Termination refers to Frontier's non-payment of rent under each of the Original Leases, which outstanding amounts came to a total of approximately $4.79 million.  (Butler Ex. 9, ¶ 2 & Schedule 1.)  The Notice of Termination states:

> By reason of the occurrence and continuation of the above-described Framework Event of Default, AMCK Aviation hereby notifies Frontier pursuant to Clause 6.2.1 of the Framework Agreement that it treats such Framework Event of Default as a repudiation by Frontier of its obligations under the Framework Agreement and **AMCK AVIATION HEREBY TERMINATES ITS OBLIGATIONS UNDER THE FRAMEWORK AGREEMENT** without prejudice to any indemnity or other obligation of Frontier, or any claims of AMCK Aviation, which survive such termination in accordance with the terms of the Framework Agreement, including, without limitation, as provided in Clause 6.2.2 and Clause 6.2.3 of the Framework Agreement.

(Butler Ex. 9, ¶ 5.)

Following AMCK's issuance of the Notice of Termination on May 8, 2020, Frontier belatedly paid all rent amounts due under the Original Leases on or about May 15, 2020. (Compl. ¶ 68.)

Following the termination by AMCK, Frontier obtained alternative financings from other lessors to acquire the remaining five Airbus aircraft.  (Compl. ¶ 21.)  Frontier alleges that the terms for these alternative financings were worse than those under the Framework Agreement. (Compl. ¶¶ 21, 75-77.)  On that basis, Frontier alleges that it has been damaged "in the amount of not less than $53,000,000 securing alternative sale leaseback arrangements to acquire aircraft necessary to meet its operational needs."  (Compl. ¶ 108.)

F.    **The Instant Lawsuit.**

Frontier commenced this action on November 18, 2020.  In addition to claims for breach of contract based on termination of the Framework Agreement, the Complaint includes multiple other claims, including claims for breach of the Lease Agreements and a claim for common law fraud.  The Complaint names as defendants not only AMCK, but also Accipiter, Vermillion, UMB and Wells Fargo.  With respect to UMB and Wells Fargo, the Complaint names them only as "nominal defendants," and not in their individual capacities, but solely as owner trustees.  (*See* Compl. ¶¶ 5-7.)

## ARGUMENT

To survive a motion to dismiss, a pleading must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim meets this requirement "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Plausibility depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (internal alterations and quotation marks omitted).  A pleading is insufficient when it contains only "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]"  *Iqbal*, 556 U.S. at 678.

I.    **Frontier's Claims for Breach of the Framework Agreement (First and Second Claims) Should Be Limited to AMCK.**

Frontier's claims for repudiation and breach of the Framework Agreement (First and Second Claims) are asserted not only against AMCK, but also against Accipiter and Vermillion.

These claims against Accipiter and Vermillion fail for the simple reason that neither Accipiter nor Vermillion is a party to the Framework Agreement.

"It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wiederman v. Spark Energy, Inc.*, No. 19 Civ. 4564, 2020 WL 3965258, at *8 (S.D.N.Y. Mar. 9, 2020) ("It is black letter law that non-parties ordinarily cannot be held liable for a breach of contract." (internal alteration and quotation marks omitted)).  This is so even with respect to related corporate entities.  Indeed, "New York law respects corporate separateness," and so a plaintiff seeking to hold non-party affiliates liable must plausibly allege facts to support the "heavy burden" of piercing the corporate veil.  *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 432, 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008).

Here, there are no allegations that Accipiter or Vermillion assumed AMCK's obligations under the Framework Agreement, and there is no alleged basis for disregarding the corporate form of these entities.  Frontier tries to skirt this problem by lumping Accipiter and Vermillion into an overbroad definition of "AMCK."  (*See* Compl. ¶ 7.)  This is impermissible.  As the Second Circuit has explained, a complaint fails to meet the requirements of Rule 8 when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct[.]"  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001); *see also Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 Civ. 2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("This failure to isolate the key allegations against each defendant supports dismissal under the standards set forth in *Twombly* and *Iqbal*.").

## II.    Frontier Fails to State a Claim for Breach of the Lease Agreements (Third Claim).

In the Third Claim, Frontier asserts that Defendants breached the Lease Agreements by

"wrongfully declaring Events of Default" under those contracts.  (Compl. ¶¶ 95-97.)  This claim fails as a matter of law because no actionable breach of the Lease Agreements has been alleged.

For a breach of contract claim under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (internal quotation marks omitted).  In addition, "[w]hen pleading these elements, a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002); *see also Boehner v. Heise*, 734 F. Supp. 2d 389, 408 (S.D.N.Y. 2010) ("Under New York law, a plaintiff must allege the specific provisions within a contract upon which the breach of contract claim is based.").

The Complaint in this case fails to allege that any Defendant breached any provision of the Lease Agreements.  Rather, the Complaint alleges that AMCK "wrongfully" declared a default under the Lease Agreements.  (Compl. ¶¶ 95-97.)  Declaring a default, however, is not the same as failing to perform one's own obligations under a contract.  To the contrary, by declaring that an event of default had occurred and was continuing with respect to Frontier, AMCK took the position that *Frontier* was in breach of its obligation to pay rent under the Lease Agreements.  This cannot plausibly be construed as a breach of contract by AMCK.  *See Red Fort Capital, Inc. v. Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 470 (S.D.N.Y. 2019) (finding that accusations that a party has breached an agreement are not equivalent to failure to perform by the accusing party).

Even if Frontier could state a claim based on AMCK's assertion that Frontier was in default, this does not imply any claim against the other Defendants.  The Complaint does not

allege that Accipiter, Vermillion, UMB or Wells Fargo took any position with respect to

Frontier's default.  *See Martinez v. Vakko Holding A.S.*, No. 07 Civ. 3413, 2008 WL 2876529, at

*2 (S.D.N.Y. July 23, 2008) (dismissing contract claim against one party where the alleged

breach was committed by a different party).

Frontier also alleges that "[v]arious AMCK entities" guaranteed performance under the

Lease Agreements.  (Compl. ¶ 96.)  This does not save Frontier's claim.  *First*, there is no

allegation that UMB or Wells Fargo agreed to guarantee anything, so they cannot be liable on

this theory.  *Second*, while Accipiter and Vermillion did provide guarantees in connection with

some of the Lease Agreements, those guarantees applied only to the "due and punctual payment

and performance of all of the obligations of Lessor under the Lease . . . ."  (Butler Exs. 3, 6, § 1;

*see also* Compl. ¶¶ 23-24)  The "Lessor" is defined as the owner trustee, not AMCK.  The

guarantees provided by Accipiter and Vermillion therefore do not have any application here.

Finally, Frontier fails to allege any plausible theory of damages arising from alleged

breach of the Lease Agreements.  The only damages Frontier identifies in the Third Claim are

those "arising from AMCK's wrongful termination of the March 2020 Framework Agreement."

(Compl. ¶ 96.)  Consistent with this, Frontier seeks the same $53 million as damages on this

claim that it does on all of its other claims.  (*See* Compl. ¶¶ 84, 90, 96, 103, 108, 113, 119.)  In

other words, the harm alleged by Frontier comes not from a breach of the *existing* leases, but

from AMCK's alleged failure to deliver aircraft with respect to *future* leases.  The Third Claim

should be dismissed for this reason as well.  *See, e.g., Pu v. Russell Publ'g Grp., Ltd.*, 683 F.

App'x 96, 97 (2d Cir. 2017) ("[Plaintiff] was required to allege facts showing that the

complained-of activity caused him damages in order to state a claim for breach of contract.");

*House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, No. 13 Civ. 519, 2014 WL

1383703, at *10 (S.D.N.Y. Mar. 31, 2014) ("Factual allegations showing damages are essential . . . .").

### III.    Frontier's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Fourth Claim) Should Be Dismissed.

Frontier's First and Second Claims are for breach of contract arising from AMCK's termination of the Framework Agreement.  The Fourth Claim asserts that AMCK also breached the implied covenant of good faith and fair dealing by repudiating the Framework Agreement. (Compl. ¶¶ 100-03.)  This Fourth Claim duplicates the breach of contract claims and should be dismissed.

Breach of the implied covenant of good faith and fair dealing "is merely a breach of the underlying contract."  *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (internal quotation marks omitted).  Therefore, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* at 81; *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016) ("An implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract." (internal quotation marks omitted)).

Here, Frontier already has two breach of contract claims arising from the termination of the Framework Agreement.  Frontier's breach of the implied covenant claim is based on the same allegations.  (*Compare* Compl. ¶¶ 81-83, 88-89 *with* Compl. ¶¶ 101-102.)  Moreover, Frontier seeks the same $53 million as damages on the implied covenant claim that it seeks on its breach of contract claims.  (*Compare* Compl. ¶¶ 84, 90 *with* Compl. ¶ 103.)  The Fourth Claim

therefore should be dismissed as duplicative. *See, e.g.*, *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.,* 157 F. Supp. 3d 352, 369 (S.D.N.Y. 2016) (dismissing good faith and fair dealing claims as duplicative of breach of contract claim); *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116, 2009 WL 321222, at *6 (S.D.N.Y. Feb. 9, 2009) (same); *Goldblatt v. Englander Commc'ns, L.L.C.*, No. 06 Civ. 3208, 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007) (same).

## IV.    Frontier Fails to State a Claim for Breach of the Covenant of Quiet Enjoyment (Fifth Claim).

Frontier's Fifth Claim asserts that Defendants breached the covenant of quiet enjoyment contained in each of the Lease Agreements. The Complaint, however, does not contain any allegation that Frontier's use of the aircraft leased under those agreements was interrupted or curtailed in any way by the Defendants. Accordingly, this claim fails as a matter of law.

The covenant of quiet enjoyment is a promise that a lessor "will not interfere with the rights granted" to a lessee. *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000) (internal quotation marks omitted). The doctrine frequently arises in the context of landlord-tenant disputes. *See id.* at 132-33. To show a breach of the covenant, "the plaintiff must show actual or constructive eviction" from the leased property. *Id.*; *see also Saewitz v. Epstein*, 6 F. Supp. 2d 151, 158–59 (N.D.N.Y. 1998) (same); *Dave Herstein Co. v. Columbia Pictures Corp.*, 4 N.Y.2d 117, 121 (1958) ("[U]nless there is an eviction, actual or constructive, there is no breach of the covenant of quiet enjoyment[.]"). An "actual eviction" occurs when the lessor "ousts the tenant from physical possession" by "physical expulsion or exclusion." *Barash v. Pa. Terminal Real Estate Corp.*, 26 N.Y.2d 77, 82-83 (1970). "Constructive eviction" occurs when:

> [A]lthough there has been no physical expulsion or exclusion of the tenant, the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises. *The tenant, however, must abandon possession in order to claim that there was a constructive eviction.*

*Id.* at 83 (emphasis added).

In this case, Frontier does not allege that it was actually or constructively evicted from any of the 15 leased aircraft.  For example, there is no allegation that Defendants re-possessed the aircraft or prevented Frontier from using them.  This is fatal to Frontier's claim.  *See, e.g., St. Paul Fire & Marine Ins. Co. v. Rivkin*, 110 F. App'x 169, 171 (2d Cir. 2004) (rejecting quiet enjoyment claim where plaintiff "has not shown evidence of an actual or constructive eviction through an ouster or abandonment of the premises"); *A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*, No. 17 Civ. 3529, 2018 WL 10517080, at *8 (E.D.N.Y. Mar. 6, 2018) ("Plaintiffs' pleadings as to this claim are insufficient as a matter of law because they fail to establish an actual or constructive eviction."); *Sauer*, 95 F. Supp. 2d at 132 (rejecting claim where "Xerox remained in possession of the equipment throughout its dispute").

Frontier complains that, by declaring a default under the Lease Agreements and terminating the Framework Agreement, AMCK "disturb[ed] Frontier's fleet plans" and "negatively affected its ability to effectively utilize its aircraft fleet, including the existing 15 AMCK aircraft."  (Compl. ¶¶ 106-107.)  This is insufficient.  Without an alleged eviction, it is irrelevant that a lessee may "experience a diminution in their enjoyment" of the leased property.  *A&L Auto Repair*, 2018 WL 10517080, at *8 (no breach of covenant even though "defendants have asked plaintiffs to leave and have 'done everything they could to make business unpleasant'"); *Sauer*, 95 F. Supp. 2d at 133 (no breach even though conduct may have caused "problems" or "delays").

Moreover, Frontier fails to allege any damages arising from an alleged breach of the covenant of quiet enjoyment.  Frontier says that it suffered $53 million in damages "securing alternative sale leaseback arrangements to acquire aircraft necessary to meet its operational

needs." (Compl. ¶ 108.) This alleged harm has nothing to do with Frontier's use of the 15 leased aircraft, but rather is duplicative of the alleged harm in the First and Second Claims. The quiet enjoyment claim therefore also should be dismissed based on this "fail[ure] to allege any damages arising out of the alleged breach." *Colina v. One E. River Place Realty Co., LLC*, No. 99 Civ. 5173, 2000 WL 1171126, at *8 (S.D.N.Y. Aug. 17, 2000).

## V.    Frontier's Promissory Estoppel Claim (Sixth Claim) Should Be Dismissed.

Frontier's Sixth Claim for promissory estoppel is merely a re-hash of its two claims for breach of contract arising from the termination of the Framework Agreement. Frontier alleges that AMCK agreed to defer rent payments due under the Lease Agreements through May 15, 2020 and, therefore, should be estopped from terminating the Framework Agreement. This claim fails as a matter of law for several reasons.

*First*, the claim is duplicative of the breach of contract claims arising from the termination of the Framework Agreement. On the promissory estoppel claim, Frontier asserts that AMCK's alleged promise means that it should be "estopped from asserting that Frontier was in breach of the March 2020 Framework Agreement." (Compl. ¶ 112.) This is also the basis of Frontier's claim that AMCK wrongfully terminated the contract. (*See* Compl. ¶ 88 (alleging that "[t]here were no Events of Default" because the parties "had valid temporary rent payment suspensions in place that were established expressly in writing and further affirmed by the parties' conduct and course of dealing").) Consistent with this, the damages Frontier seeks on its promissory estoppel claim are exactly the same as the damages it seeks on the breach of contract claims. (Compl. ¶ 113.) The promissory estoppel claim therefore should be dismissed as duplicative of the breach of contract claim. *See Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 386 (S.D.N.Y. 2014) (dismissing duplicative promissory estoppel claim).

*Second*, a promissory estoppel claim generally is not permitted where, as here, an express

- 15 -

written contract governs the subject matter of the dispute.  *See, e.g., Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 157 (2d Cir. 2012) (affirming dismissal of promissory estoppel claim because "[u]nder New York law, quasi-contractual relief is unavailable where as here an express contract covers the subject matter" (internal alterations and quotation marks omitted)); *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1234 (S.D.N.Y. 1995) ("Because . . . an express contract was in effect, this [promissory estoppel] claim must be dismissed.").  In this case, of course, the Framework Agreement between AMCK and Frontier governs the matter in dispute.

*Third*, promissory estoppel requires reasonable reliance by the plaintiff.  *See Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 469 (S.D.N.Y. 2018).  Frontier fails to allege reasonable reliance on any alleged promise to defer rent obligations.  Importantly, the Framework Agreement and the Lease Agreements each require that any waiver or modification of terms be in a writing executed by both parties.  (*See* Butler Ex. 4, §§ 8.4.1-8.4.2; *see also* Butler Ex. 1, §§ 23.1, 23.13 & Butler Ex. 2, §§ 20.4(a)-(b).) Frontier nevertheless seeks to base its estoppel claim on its interpretation of emails from AMCK and unspecified "representations" and "conduct."  (Compl. ¶¶ 57, 74)  In these circumstances, any reliance on informal statements such as these was unreasonable as a matter of law.  *See, e.g., Ixe Banco*, 2008 WL 650403, at *12 (dismissing promissory estoppel claim where "oral representations [were] inconsistent with the provision in the contract forbidding oral modifications"); *Kleinberg v. Radian Grp., Inc.*, 240 F. Supp. 2d 260, 262 (S.D.N.Y. 2002) (same); *see also Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 415 (S.D.N.Y. 2011) ("[W]here the terms of an unambiguous contract are inconsistent with the statements that form the basis of the [promissory estoppel] claim, the claiming party could not have reasonably

relied on those statements as a matter of law." (internal quotation marks omitted)).

## VI.  Frontier's Fraud Claim (Seventh Claim) Should Be Dismissed.

Frontier's final claim for fraud arises from the same circumstances as the breach of contract claims. Frontier asserts that AMCK falsely represented that "it would consider retracting its repudiation if Frontier could defer new aircraft deliveries and that Frontier would receive temporary rent deferrals on 14 of 15 aircraft," and that AMCK knew this was false "because it had no intention to honor the temporary rent deferrals." (Compl. ¶ 117.) AMCK then allegedly "contrived an Event of Default" to terminate the Framework Agreement. (Compl. ¶ 118.) Frontier calls this a "scheme to repudiate" the Framework Agreement. (Compl. ¶ 115.) This claim fails on multiple grounds.

As an initial matter, the overlap between Frontier's fraud claim and the breach of contract claims precludes any claim for fraud. "New York courts have held that a cause of action for fraud will not arise when the only fraud charged relates to a breach of contract." *Value Time, Inc. v. Windsor Toys, Inc.*, 700 F. Supp. 6, 7 (S.D.N.Y. 1988) (internal quotation marks omitted); *see also Larson v. Eney*, No. 08 Civ. 3513, 2009 WL 321256, at *2 (S.D.N.Y. Feb. 10, 2009) ("[I]t is well established that the sole remedy for a fraudulent breach of contract is an action sounding in contract, not fraud." (internal quotation marks omitted)). Similarly, when a fraud claim "arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant[.]" *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (internal quotation marks omitted).

Frontier also has failed to allege the basic elements of fraud. To state a claim for fraud, a plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the

representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted). The circumstances must be pleaded with particularity. Fed. R. Civ. P. 9(b). Specifically, a plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity*, 375 F.3d at 187.

Here, Frontier fails to allege any fraudulent statement with particularity and fails to allege any plausible theory of reasonable reliance. As a general observation, many of Frontier's allegations lack specificity and detail. For example, Frontier alleges: "AMCK, on various occasions, represented that Frontier did not need to make rent payments on 14 of the 15 aircraft while the parties were working out a solution . . . ." (Compl. ¶ 56.) These and other such unspecified statements are insufficient to support a fraud claim. *See, e.g., B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 482 (S.D.N.Y. 2010) (dismissing fraud claim that "does not identify what specific representations were made or at what time, and it does not say why these representations turned out to be fraudulent").

The Complaint does identify a handful of specific communications from AMCK. In each case, however, the Complaint fails to allege how any of these statements was misleading or how Frontier could have reasonably relied upon them:

AMCK's April 3, 2020 Email. Frontier says that AMCK's April 3 email "led [Frontier] to believe that AMCK would offer rent deferrals . . . as long as Frontier obtained the new aircraft delivery deferrals from Airbus." (*See* Compl. ¶¶ 47, 51). However, AMCK did not make any misleading statement in this email. Rather, AMCK stated clearly and accurately that it had been

"*authorised* to grant" a rent deferral, and that the email was "*for discussion purposes only*" and was "*not intended to create (and do[es] not create) any binding obligations.*"  (Butler Ex. 7.) (emphasis added).)  Accordingly, this email does not support a claim for fraud.  *See B & M Linen*, 679 F. Supp. 2d at 481 (dismissing fraud claim where emails "only reflect negotiations between the parties about when and how to resolve various problems"); *N.Y. Military Academy v. NewOpen Group*, 142 A.D.3d 489, 491 (2d Dep't 2016) (dismissing fraud claim because "the language of the letter of intent" made any reliance unreasonable as a matter of law); *StarVest Partners II, L.P. v. Emportal, Inc.*, 101 A.D.3d 610, 613 (1st Dep't 2012) ("Where a term sheet or other preliminary agreement explicitly requires the execution of a further written agreement before any party is contractually bound, it is unreasonable as a matter of law for a party to rely upon the other party's promises to proceed with the transaction in the absence of that further written agreement.").

AMCK's April 6, 2020 Email.  In its April 6 email, AMCK stated that it would not take any action on Frontier's defaults before "21 April (ie, for the next 10 working days)."  (Butler Ex. 7.)  AMCK did not terminate the Framework Agreement until May 8, 2020 (*see* Compl. ¶ 63), so there is nothing misleading about AMCK's statement in the April 6 email.  Frontier asserts that "[i]t was the parties' clear understanding" that April 21, 2020 was "only a suggested date" meant to "cover the on-going Frontier/Airbus negotiations" (Compl. ¶ 54).  However, the words used in this email do not reflect any such "understanding."

AMCK's April 9, 2020 Email.  Frontier also references an April 9 email in which AMCK provided a "draft deferral agreement."  (Compl. ¶ 56.)  Nothing in the text of this email promised any rent deferral.  (*See* Butler Ex. 8.)  The email only attached a potential draft forbearance letter for discussion, and Frontier does not allege the parties entered such an agreement.

AMCK's April 30, 2020 Email. Finally, Frontier asserts that AMCK's April 30 email "ma[de] clear that the rent deferral was still in place and would continue until May 15, 2020." (Compl. ¶ 58). This allegation blatantly mischaracterizes the email. When the email was sent, Frontier was in default under the Original Leases and, as a result, was also in default under the MSN 10038 Lease, and AMCK therefore had the right to terminate the Framework Agreement immediately. The email explained that AMCK wanted "additional security" to keep the Framework Agreement in place for future deliveries and identified "[a]ll payments to be current on May 15 2020" as one of several "conditions" for keeping the Framework Agreement in place. (Butler Ex. 7.) This email did not reflect any agreement to defer rent that was already due and payable under the Lease Agreements. In case of any doubt, the email expressly stated that it was "*for discussion purposes only*" and was "*not intended to create (and do[es] not create) any binding obligations[.]*" (*Id.* (emphasis added)). For these reasons, Frontier could not reasonably have interpreted this email to be an agreement for payment deferral.

In the absence of a specific alleged misrepresentation and a plausible case for reasonable reliance tied to such representation, Frontier's claim for fraud should be dismissed.

## VII. For the Avoidance of Doubt, Accipiter, Vermillion, UMB and Wells Fargo Should Be Dismissed from the Case.

For the foregoing reasons, all of Frontier's claims should be dismissed except for the First and Second Claims against AMCK. This means that Accipiter, Vermillion, UMB and Wells Fargo all should be dismissed from the case entirely.

As discussed above, Frontier improperly lumps Accipiter and Vermillion together with AMCK. However, these entities are not parties to the Framework Agreement, so the First and Second Claims should be dismissed as to them. Moreover, as set forth above, the Third through Seventh Claims are not valid claims against any Defendants.

As for UMB and Wells Fargo, the only claims that appear to be asserted against them are the Third and Fifth Claims.  Since those claims should be dismissed, UMB and Wells Fargo also should be dismissed.  Moreover, UMB and Wells Fargo should be dismissed for the additional reason that Frontier does not even allege any wrongdoing by them or seek any relief from them.  Frontier describes these entities as "nominal defendants" and purports to name each "not in its individual capacity, but solely as Owner Trustee."  (*See* Compl. ¶¶ 5-7.)[3]  However, Frontier alleges no reason for these entities to be parties at all.  Accordingly, UMB and Wells Fargo should not be parties in this case.  *See Benson v. RMJ Sec. Corp.*, 683 F. Supp. 359, 378 (S.D.N.Y. 1988) (noting that defendants can be dismissed when, *e.g.*, "no relief is demanded from" them, or when "a defendant's presence is not necessary to afford all the requested relief").

## CONCLUSION

For the reasons set forth above, Defendants' Partial Motion to Dismiss should be granted.

Dated: January 29, 2021          Respectfully submitted,
New York, New York

                                          /s/ Jeff E. Butler

                                         Jeff E. Butler
                                         John P. Alexander
                                         Minji Reem
                                         Karleene Diaz
                                         CLIFFORD CHANCE US LLP
                                         31 West 52nd Street
                                         New York, New York 10019

                                         *Attorneys for Defendants AMCK Aviation Holdings Ireland Limited, Accipiter Investments Aircraft 4 Limited, Vermillion Aviation (Two) Limited, UMB Bank, N.A., and Wells Fargo Trust Company, N.A.*

---

[3] Owner trustees are commonly used for leasing transactions in respect of US registered aircraft where the owner would not otherwise meet the citizenship requirements to permit an aircraft to be registered in the US.  The owner trustee, which must be a qualifying US citizen, receives title to the aircraft and leases the aircraft to the airline.  However, the owner trustee holds its interest in the aircraft and the lease in trust for the owner participant, as the beneficial owner, and generally acts in accordance with the instructions of the owner participant.