EXECUTION VERSION

UMB BANK, N.A.,
NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS OWNER TRUSTEE,
AS LESSOR

AND

FRONTIER AIRLINES, INC.,
AS LESSEE

AIRCRAFT LEASE AGREEMENT

LEASE OF ONE AIRBUS MODEL A320-251N
AIRCRAFT, MANUFACTURER'S SERIAL NO: 9177
UNITED STATES REGISTRATION MARK: N359FR
MAKE AND MODEL OF ENGINES: CFM
INTERNATIONAL, INC. MODEL LEAP-1A26
SERIAL NUMBERS OF ENGINES:
599290 AND 599307

COUNTERPART NO. ___ OF TWELVE (12) CONSECUTIVELY NUMBERED, MANUALLY EXECUTED COUNTERPARTS.  TO THE EXTENT THAT THIS AIRCRAFT LEASE AGREEMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE IN THE UNITED STATES OF AMERICA OR ANY CORRESPONDING LAW IN ANY FOREIGN JURISDICTION, NO SECURITY INTEREST IN THIS AIRCRAFT LEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HERETO OTHER THAN COUNTERPART NO. 1.

**THIS AIRCRAFT LEASE AGREEMENT** (this "**Agreement**") is made this 30th day of September, 2019.

**BETWEEN**:

(1)     **UMB BANK, N.A.,** a national banking association organized under the laws of the United States of America having its principal office at 6550 S. Millrock Drive, Suite 150, Salt Lake City, UT 84121, not in its individual capacity but solely as owner trustee under the Trust Agreement (the "**Lessor**"); and

(2)     **FRONTIER AIRLINES, INC.**, a corporation under the laws of the State of Colorado having its principal place of business at 4545 Airport Way, Denver, Colorado 80239, United States of America (the "**Lessee**").

**IT IS AGREED** as follows:

1.     **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

In this Agreement the following words and expressions have, except where the context otherwise requires, the following meanings:

"**6Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (i) the 6-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks, (ii) the relevant C-Check and lower checks, (iii) any CPCP tasks falling due at that interval and (iv) all Supplementary Structural Inspection (SSI) items.

"**12Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (a) the 12-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks; (b) the relevant C-Check and lower checks; (c) any CPCP tasks falling due at that interval; and (d) all Supplementary Structural Inspection (SSI) items.

"**Acceptance Certificate**" means the acceptance certificate substantially in the form set out in Schedule 11.

"**Additional Insured**" has the meaning specified in Section 14.5(b)(i).

"**AHDAC**" means Accipiter Holdings DAC.

"**Affiliate**" means, in respect of any person, any person directly or indirectly controlling, controlled by, or under common control with such first person or within the same corporate group as such first person; and a person shall be deemed to control another person if such first person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, contract or otherwise.

"**Owner Participant**" means Accipiter Investments Aircraft 4 Limited.

"**Part**" means each part, component, appliance, accessory, instrument or other item of equipment (other than complete Engines or other engines) for the time being installed or incorporated in or attached to the Airframe or an Engine or which, having been removed therefrom, remains the property of Lessor pursuant to this Agreement, including, for the avoidance of doubt, all LLPs.

"**Permitted Lien**" means (a) any Lien in respect of Taxes which are either not yet assessed or, if assessed, not yet due and payable or if due and payable are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves are maintained by or an adequate bond has been provided by Lessee); (b) any Lien of an airport hangar-keeper, mechanic, material-man, carrier, employee or other similar Lien arising in the ordinary course of business by statute or by operation of law, in respect of obligations that are not overdue or that are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves have been maintained by or an adequate bond has been provided by Lessee); (c) any Lien created by, or which is expressly permitted under, the terms of any of the Operative Documents; and (d) any Lessor's Liens; **provided that** (in relation to (a) and (b) above), any such proceedings, or the continued existence of such Lien, do not involve any likelihood of the sale, forfeiture or loss of the Aircraft or an Engine or any interest therein or the imposition of any criminal or unindemnified civil liability upon the Lessor or any Indemnitee.

"**Permitted Transferee**" has the meaning set forth in Schedule 6.

"**PMA Part**" means a Part manufactured in accordance with a parts manufacturer approval under FAR Part 21, but excludes Parts that are manufactured with the license or approval of the OEM and are included in the illustrated parts catalogue.

"**Purchase Agreement**" means the A320 Family Aircraft Purchase Agreement dated as of September 30, 2011 between the Lessee and the Manufacturer, together with its various exhibits and appendices, as assigned, amended and supplemented from time to time.

"**Purchase Agreement Assignment**" means the Purchase Agreement Assignment in respect of the Aircraft to be entered into and dated as of the Delivery Date between Lessor and Lessee, and the related consent thereto by Manufacturer.

"**Quotation Date**" means, in relation to any period for which an interest rate is to be determined hereunder, the day on which quotations would ordinarily be given by prime banks in the London Interbank Market for deposits in the currency in relation to which such rate is to be determined for delivery on the first day of that period (the time on such day on which such quotations are given being 11:00 a.m. London time); **provided that**, if, for any period, quotation would ordinarily be given on more than one date, the Quotation Date for that period shall be the last of those dates.

"**RDAS**" has the meaning specified in Section 10.3(g).

"**Redelivery**" means the redelivery of the Aircraft to Lessor in compliance with the terms of this Agreement.

(b) *Risk of Loss*. After Delivery, the Aircraft, the Engines and every Part will be in every respect at the sole risk of Lessee, who will bear all risk of loss, theft, damage or destruction to the Aircraft, any Engine or any Part from any cause whatsoever.

(c) *Condition of the Aircraft at Delivery*. THE LESSEE SHALL ACCEPT DELIVERY OF THE AIRCRAFT IN "AS IS, WHERE IS" CONDITION (SUBJECT TO ALL FAULTS AND DEFECTS AND SUBJECT TO EACH AND EVERY DISCLAIMER AND WAIVER SET FORTH IN CLAUSE 5 OF THIS AGREEMENT).

4.2 **Licenses**

Lessee will at its expense obtain all licenses, permits and approvals which may be necessary to export and/or transport the Aircraft from the Delivery Location to the State of Registration and/or the Habitual Base.

4.3 **Quiet Enjoyment; Lessor's Obligations**

(a) *Quiet Enjoyment*. Subject to the provisions of this Agreement, including the provisions for early termination, or unless compelled to do so by any applicable law, so long as no Event of Default has occurred and is continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term. Lessor will procure that the Lender (or, in the case of multiple Lenders, the agent or security trustee on behalf of the Lenders) and any other assignee or transferee of Lessor pursuant to Clause 20.2 will give a direct covenant to Lessee substantially similar to the terms set out in this paragraph (a). Notwithstanding anything to the contrary in this Agreement or any other Lessee's Document, any exercise by Lessor of its rights following an Event of Default shall not constitute a breach of this paragraph.

(b) *Lessor Obligations Following Termination Date*. Within fifteen (15) Business Days after (i) redelivery of the Aircraft to Lessor in accordance with and in the condition required by this Agreement; (ii) payment to Lessor of the Agreed Value following a Total Loss after the Delivery Date; or (iii) such later time as Lessee has irrevocably paid to Lessor all amounts which may then be outstanding under this Agreement and the other Lessee's Documents and has paid all other amounts that are then due and owing under any Other Lessee's Document, Lessor will, provided no Event of Default has occurred which is then continuing, Lessor shall pay to Lessee an amount equal to the Security less amounts applied pursuant to Clause 6.2 and will return any Letter of Credit provided pursuant to Clause 6.2(c); **provided that**, Lessor may set off against the Security any amounts that are or may be due to Lessor pursuant to the terms of any of the Lessee's Documents or any Other Lessee's Documents. If any additional amounts become payable by Lessee after the Termination Date, Lessee will pay such amounts to Lessor within fifteen (15) Business Days of receipt of a notice and reasonable supporting documentation from Lessor of such amounts owed.

(c) *Airworthiness Directive*. If Lessee complies on a terminating action basis with an Airworthiness Directive applicable to the Aircraft on the terms set forth in

6.4 **Payment Obligations Unconditional**

Lessee's obligation to pay Rent in accordance with this Agreement shall be absolute and unconditional irrespective of any contingency whatsoever, including (a) any right of set-off, counterclaim, recoupment, defense, withholding or other right Lessee may have against Lessor or any other person; (b) any unavailability of the Aircraft for any reason, (including a requisition thereof not constituting a Total Loss of the Aircraft including all Engines) or any prohibition or interruption of or other restriction against Lessee's use, operation or possession of the Aircraft, any interference with such use, operation or possession or any lack or invalidity of title or any other defect in the title, airworthiness, merchantability, fitness for any purpose, condition, design or operation of any kind or nature of the Aircraft, or the ineligibility of the Aircraft for any particular use or trade, or for registration or documentation under the laws of any relevant jurisdiction, or the Total Loss of, or any damage (not constituting a Total Loss) to, the Aircraft; (c) any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against Lessor or Lessee or any other person; (d) any invalidity or unenforceability or lack of due authorization of, or other defect in, this Agreement or any of the other Operative Documents or any Other Lessee's Documents; (e) any failure or delay on the part of any party hereto or of Lessor or any Lender or any other person to duly to perform or comply with its obligations under this Agreement or any Operative Document or any Other Lessee's Document; and (f) any other cause that, but for this provision, would or might have the effect of terminating, discharging or in any way affecting any obligation of Lessee hereunder. Nothing in this Clause 6.4 will be construed to extinguish or otherwise limit Lessee's right to institute legal proceedings against Lessor in the event of Lessor's breach of this Agreement.

6.5 **Currency of Payments**

All funds due from Lessee shall be paid by interbank ACH transfers in immediately available US Dollars to a bank account advised by Lessor, free and clear of any and all taxes and deductions. At any time when an Event of Default has occurred and is continuing, Lessor will have complete discretion to allocate all payments by Lessee as Lessor determines.

6.6 **Currency Indemnity**

If, under any applicable law, whether as a result of judgment against Lessee or the liquidation of Lessee or for any other reason, any payment under or in connection with this Agreement is made or is recovered in a currency (the "**other currency**") other than the currency (the "**currency of obligation**") in which it is payable pursuant to this Agreement then:

(a) to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount unpaid under this Agreement, Lessee shall, as a separate and independent obligation, fully indemnify Lessor and any other person entitled to such payment against the amount of the shortfall;

> Lessee shall pay all reasonable out-of-pocket costs and expenses incurred by each Lessor Party and Lender (including reasonable legal fees and expenses) in relation to such consolidation or merger. Nothing contained herein shall permit any lease, sublease or other arrangement for the use, operation or possession of the Aircraft except in compliance with the applicable provisions of this Agreement.

(e) Subject to mutual agreement between the parties as to schedule, location, duration, confidentiality arrangements and procedures, Lessee will make the Aircraft and the Aircraft Documents available for inspection by any potential transferee or assignee of Lessor or Owner Participant; **provided further that**, the arrangements for such inspection are made through Lessor, such inspection does not interfere with the operations of Lessee and that such potential transferee or assignee shall be accompanied by Lessor during such inspection.

(f) Lessor holds the benefit of any disclaimer, indemnity or other provision of this Agreement expressed to be for the benefit of any or all of its, or the Owner Participant's, Affiliates and its and their respective officers, directors, agents, shareholders, partners and employees (the "**Lessor Parties**") in trust for each such person so that such disclaimers, indemnities or other provisions can be enforced by Lessor on behalf of Lessor Parties.

20.3   **Further Assurances**

Lessee agrees from time to time to promptly do and perform such other and further acts and promptly execute and deliver and, if applicable, consent electronically to, any and all such other instruments and registration as may be required by law or reasonably requested by Lessor to establish, maintain and protect the rights and remedies of Lessor, Owner Participant and the Lender(s) under the Operative Documents and to carry out and effect the intent and purpose of the Operative Documents, including, if requested by Lessor and at Lessee's expense, the execution and delivery of supplements or amendments hereto subjecting to this Agreement any Replacement Engine in accordance with the laws of any appropriate jurisdiction.

20.4   **Rights Cumulative; Waivers; Variation; Counterparts; Language; Delivery by E-mail**

(a) The rights of both parties under this Agreement are cumulative, may be exercised as often as the relevant party considers appropriate and are in addition to its rights under the general law. The rights of both parties against the other or in relation to the Aircraft (whether arising under this Agreement or the general law) shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing; and in particular any failure to exercise or any delay in exercising any such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

(b) The provisions of this Agreement shall not be varied otherwise than by an instrument in writing executed by or on behalf of Lessor and Lessee.

(c) This Agreement may be executed in counterparts each of which will constitute one and the same document.

(d) All documents delivered to Lessor or required to be delivered pursuant to this Agreement shall be in English, or if not in English, will be accompanied by a certified English translation. If there is any inconsistency between the English version of this Agreement or any document delivered hereunder and any other version in any other language, the English version will prevail.

(e) This Agreement and the other Operative Documents (and the counterparts thereof) may be delivered by a party thereto by way of e-mail transmission to the other party and delivery shall be deemed completed for all purposes upon the completion of such e-mail transmission. A party that so delivers this Agreement or any of the other Operative Documents (and the counterparts thereof) by way of e-mail transmission agrees to promptly thereafter deliver to the other parties thereto an original signed counterpart. The e-mail signature of any party shall be considered for these purposes as an original document, and any e-mail document shall be considered to have the same binding legal effect as an originally executed document. In consideration of the mutual covenants herein contained, the parties agree that neither of them shall raise the use of e-mail as a defense to this Agreement or any of the other Operative Documents and forever waive any such defense.

20.5 **Delegation**

Lessor hereby delegates to the Servicer, all of the rights, powers or discretions vested in it by this Agreement and Lessor hereby further designates the Servicer as its fully authorized representative to deal directly with Lessee with respect to all legal, financial, insurance and technical matters with respect to this Agreement and the transactions contemplated hereby with the same effect as if Lessee was dealing directly with Lessor, and Lessee shall been entitled to rely on such delegation for all purposes until it has received a written notice of revocation from Lessor.

20.6 **Evidence of Indebtedness**

Except where expressly otherwise provided in this Agreement, any certificate or determination by Lessor as to any rate of interest or as to any amount payable under this Agreement shall contain reasonable details of the calculation of such rate or, as the case may be, amount and, if appropriate, the circumstances giving rise thereto and shall, in the absence of manifest error, be conclusive and binding on Lessee.

20.7 **Applications of Moneys**

If any sum paid or recovered in respect of the liabilities of Lessee under this Agreement is less than the amount then due, Lessor may apply such sum to Rent, interest, fees or any other amount due under this Agreement in such proportions and order and generally in such manner as Lessor shall determine.

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement to be executed as of the date first above written.

UMB BANK, N.A.,
not in its individual capacity, but solely as owner trustee

By: ...............................................
Name:   Scott Rosevear
Title:    Senior Vice President

*[Signature Page – Aircraft Lease Agreement (MSN 9177)]*

FRONTIER AIRLINES, INC.

By: ..................................................
Name:
Title:
       James G. Dempsey
       Chief Financial Officer