EXECUTION VERSION

UMB BANK, N.A.,
NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS OWNER TRUSTEE,
AS LESSOR

AND

FRONTIER AIRLINES, INC.,
AS LESSEE

AIRCRAFT LEASE AGREEMENT

LEASE OF ONE AIRBUS MODEL A320-251N
AIRCRAFT, MANUFACTURER'S SERIAL NO: 10038
UNITED STATES REGISTRATION MARK: N370FR
MAKE AND MODEL OF ENGINES: CFM
INTERNATIONAL, INC. MODEL LEAP-1A26
SERIAL NUMBERS OF ENGINES: 599709 AND 599720

COUNTERPART NO. ___ OF SIX (6) CONSECUTIVELY NUMBERED, MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT THAT THIS AIRCRAFT LEASE AGREEMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE IN THE UNITED STATES OF AMERICA OR ANY CORRESPONDING LAW IN ANY FOREIGN JURISDICTION, NO SECURITY INTEREST IN THIS AIRCRAFT LEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HERETO OTHER THAN COUNTERPART NO. 1.

**THIS AIRCRAFT LEASE AGREEMENT** (this "**Agreement**") is made this 16 day of March, 2020.

**BETWEEN**:

(1)  **UMB BANK, N.A.,** a national banking association organized under the laws of the United States of America having its principal office at 6550 S. Millrock Drive, Suite 150, Salt Lake City, UT 84121, not in its individual capacity but solely as owner trustee under the Trust Agreement (the "**Lessor**"); and

(2)  **FRONTIER AIRLINES, INC.**, a corporation under the laws of the State of Colorado having its principal place of business at 4545 Airport Way, Denver, Colorado 80239, United States of America (the "**Lessee**").

**IT IS AGREED** as follows:

1.  **DEFINITIONS AND INTERPRETATION**

1.1  **Definitions**

In this Agreement the following words and expressions have, except where the context otherwise requires, the following meanings:

"**6Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (i) the 6-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks, (ii) the relevant C-Check and lower checks, (iii) any CPCP tasks falling due at that interval and (iv) all Supplementary Structural Inspection (SSI) items.

"**12Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (a) the 12-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks; (b) the relevant C-Check and lower checks; (c) any CPCP tasks falling due at that interval; and (d) all Supplementary Structural Inspection (SSI) items.

"**Acceptance Certificate**" means the acceptance certificate substantially in the form set out in Schedule 11.

"**Additional Insured**" has the meaning specified in Section 14.5(b)(i).

"**Affiliate**" means, in respect of any person, any person directly or indirectly controlling, controlled by, or under common control with such first person or within the same corporate group as such first person; and a person shall be deemed to control another person if such first person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, contract or otherwise.

"**After-Tax Basis**" means, in respect of an amount (the "**base amount**") with respect to a person, the base amount supplemented by a future payment (the "**additional amount**"), if necessary, to such person such that, after the sum of the base amount and

"**Minimum Liability Coverage Amount**" means the amount specified in Schedule 6.

"**Module**" means any of the Core Module, the Fan Module or the LPT Module, as the context may require.

"**Module Apportionment Percentage**" has the meaning specified in Schedule 6.

"**MRO**" means a maintenance and repair organization that is certified pursuant to FAR Part 145.

"**OEM**" means an original equipment manufacturer.

"**OEM Parts**" means any part that has been produced, approved or licensed for production by or on behalf of an OEM and is included in the illustrated parts catalogue.

"**Operative Documents**" means Lessee's Documents and the Financing Documents and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into pursuant to or in connection with any thereof.

"**Other Agreement**" means (a) any lease agreement relating to an Other Aircraft or (b) any other agreement that Lessee, on the one hand, and Lessor or the Servicer on behalf of the Lessor, on the other hand, agree is an "Other Agreement" for purposes of this Agreement.

"**Other Aircraft**" means any aircraft (other than the Aircraft) leased by Lessor or Owner Participant or an Affiliate of Owner Participant, on the one hand, to Lessee or Holdings or any of their respective subsidiaries, on the other hand.

"**Other Lessee's Documents**" has the meaning given to the term "Lessee's Documents" (or any functionally similar term) in any Other Agreement, and includes each Other Agreement.

"**Other Second Group Aircraft**" means any of the six (6) aircraft (other than the Aircraft) leased by Lessor or Owner Participant or an Affiliate of Owner Participant, on the one hand, to Lessee or Holdings or any of their respective subsidiaries, on the other hand, with scheduled delivery months, in the case of two aircraft April 2020, in the case of one aircraft May 2020, in case of one aircraft October 2020.

"**Owner Participant**" means Vermillion Aviation (Two) Limited.

"**Part**" means each part, component, appliance, accessory, instrument or other item of equipment (other than complete Engines or other engines) for the time being installed or incorporated in or attached to the Airframe or an Engine or which, having been removed therefrom, remains the property of Lessor pursuant to this Agreement, including, for the avoidance of doubt, all LLPs.

"**Permitted Lien**" means (a) any Lien in respect of Taxes which are either not yet assessed or, if assessed, not yet due and payable or if due and payable are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves are maintained by or an adequate bond has been provided by Lessee); (b) any Lien of an airport hangar-keeper, mechanic, material-man, carrier, employee or other similar Lien arising in the ordinary course of business by statute or by operation

4.3 **Quiet Enjoyment; Lessor's Obligations**

(a) *Quiet Enjoyment*. Subject to the provisions of this Agreement, including the provisions for early termination, or unless compelled to do so by any applicable law, so long as no Event of Default has occurred and is continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term. Lessor will procure that the Lender (or, in the case of multiple Lenders, the agent or security trustee on behalf of the Lenders) and any other assignee or transferee of Lessor pursuant to Clause 20.2 will give a direct covenant to Lessee substantially similar to the terms set out in this paragraph (a). Notwithstanding anything to the contrary in this Agreement or any other Lessee's Document, any exercise by Lessor of its rights following an Event of Default shall not constitute a breach of this paragraph.

(b) *Lessor Obligations Following Termination Date*. Within fifteen (15) Business Days after (i) redelivery of the Aircraft to Lessor in accordance with and in the condition required by this Agreement; (ii) payment to Lessor of the Agreed Value following a Total Loss after the Delivery Date; or (iii) such later time as Lessee has irrevocably paid to Lessor all amounts which may then be outstanding under this Agreement and the other Lessee's Documents and has paid all other amounts that are then due and owing under any Other Lessee's Document, Lessor will, provided no Event of Default has occurred which is then continuing, Lessor shall pay to Lessee an amount equal to the Security less amounts applied pursuant to Clause 6.2 and will return any Letter of Credit provided pursuant to Clause 6.2(c); **provided that**, Lessor may set off against the Security any amounts that are or may be due to Lessor pursuant to the terms of any of the Lessee's Documents or any Other Lessee's Documents. If any additional amounts become payable by Lessee after the Termination Date, Lessee will pay such amounts to Lessor within fifteen (15) Business Days of receipt of a notice and reasonable supporting documentation from Lessor of such amounts owed.

(c) *Airworthiness Directive*. If Lessee complies on a terminating action basis with an Airworthiness Directive applicable to the Aircraft on the terms set forth in Clause 10.7, Lessor will pay to Lessee an amount calculated in accordance with Clause 10.7 of this Agreement.

4.4 **Early Termination Option**

(a) *Early Termination*. Subject to the provisions of this Agreement, so long as no Event of Default has occurred and is continuing, and **provided that** Lessee delivers to Lessor a notice (the "**Early Termination Notice**") no later than 24 months prior to the Early Termination Date, Lessee shall have the option (the "**Early Termination Option**") to terminate the leasing of the Aircraft hereunder on the Early Termination Date.

(b) If Lessee exercises the Early Termination Option, Lessee shall pay to Lessor the Early Termination Fee and the Engine Shortfall on the Expiry Date (which shall be the Early Termination Date). For the avoidance of doubt, any payments due from Lessee to Lessor under this Clause 4.4(b) shall be in addition to any Maintenance Adjustment Payments due under Clause 18.7 herein.

    (b)    *Maintenance Status Report*.  Lessee shall provide Lessor with a written report in respect of the related calendar month substantially in the form of Schedule 5 in accordance with the terms of Clause 9.4(c).

6.4    **Payment Obligations Unconditional**

Lessee's obligation to pay Rent in accordance with this Agreement shall be absolute and unconditional irrespective of any contingency whatsoever, including (a) any right of set-off, counterclaim, recoupment, defense, withholding or other right Lessee may have against Lessor or any other person; (b) any unavailability of the Aircraft for any reason, (including a requisition thereof not constituting a Total Loss of the Aircraft including all Engines) or any prohibition or interruption of or other restriction against Lessee's use, operation or possession of the Aircraft, any interference with such use, operation or possession or any lack or invalidity of title or any other defect in the title, airworthiness, merchantability, fitness for any purpose, condition, design or operation of any kind or nature of the Aircraft, or the ineligibility of the Aircraft for any particular use or trade, or for registration or documentation under the laws of any relevant jurisdiction, or the Total Loss of, or any damage (not constituting a Total Loss) to, the Aircraft; (c) any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against Lessor or Lessee or any other person; (d) any invalidity or unenforceability or lack of due authorization of, or other defect in, this Agreement or any of the other Operative Documents or any Other Lessee's Documents; (e) any failure or delay on the part of any party hereto or of Lessor or any Lender or any other person to duly to perform or comply with its obligations under this Agreement or any Operative Document or any Other Lessee's Document; and (f) any other cause that, but for this provision, would or might have the effect of terminating, discharging or in any way affecting any obligation of Lessee hereunder. Nothing in this Clause 6.4 will be construed to extinguish or otherwise limit Lessee's right to institute legal proceedings against Lessor in the event of Lessor's breach of this Agreement.

6.5    **Currency of Payments**

All funds due from Lessee shall be paid by interbank ACH transfers in immediately available US Dollars to a bank account advised by Lessor, free and clear of any and all taxes and deductions. At any time when an Event of Default has occurred and is continuing, Lessor will have complete discretion to allocate all payments by Lessee as Lessor determines.

6.6    **Currency Indemnity**

If, under any applicable law, whether as a result of judgment against Lessee or the liquidation of Lessee or for any other reason, any payment under or in connection with this Agreement is made or is recovered in a currency (the "**other currency**") other than the currency (the "**currency of obligation**") in which it is payable pursuant to this Agreement then:

    (a)    to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount unpaid under this Agreement, Lessee shall, as a

15.4 **Requisition**

(a) If there is a requisition for use or hire of the Aircraft or any part thereof, then, unless and until the Aircraft becomes a Total Loss and Lessee shall have paid all sums due pursuant to Clause 15.1, the leasing of the Aircraft to Lessee under this Agreement shall continue in full force and effect, and Lessee shall remain fully responsible for performance and observance of all its obligations under this Agreement, other than obligations (which shall not include reporting requirements and payment of Rent) with which Lessee is unable to comply solely by virtue of such requisition.

(b) Lessee shall, as soon as practicable after the end of any requisition for use or hire, cause the Aircraft to be put into the condition required by this Agreement.

15.5 **Replacement**

If the Airframe or the Aircraft suffers a Total Loss during the Term, Lessee, with the approval of Lessor (which approval may be given or withheld in Lessor's sole discretion), may elect either to promptly substitute the Airframe or the Aircraft with an appropriate substitute airframe or aircraft approved by Lessor (which approval may be given or withheld in Lessor's sole discretion), in which case, this Agreement shall continue on such terms and with such modifications as the Lessor may require in its sole discretion. Nothing in this Clause 15.6 shall prejudice or limit the obligation of Lessee to make the payments required under Clause 15.1 when required to do so under such provision or otherwise affect the operation of such provision unless and solely to the extent that the Lessor (in its sole discretion) agrees otherwise in connection with its acceptance of a replacement Airframe or Aircraft under and in accordance with this Clause 15.6. If Lessee substitutes an Airframe or Aircraft which is subject to a Total Loss with a replacement Airframe or Aircraft, Lessor and Lessee shall amend this Agreement to subject such replacement Airframe or Aircraft to the terms of this Agreement and Lessor will, subject to there being no Event of Default which has occurred and is continuing, procure at Lessee's expense that there is transferred to Lessee or its designee without recourse or warranty (except as to good title and freedom from Lessor's Liens) all of Lessor's right, title and interest in and to the replaced Airframe or Aircraft, on an "as-is where-is" basis, and will procure such bills of sale and other documents and instruments as Lessee may reasonably request to evidence (on the public record or otherwise) such transfer, free and clear of all rights of Lessor and Lessor's Liens. Lessee shall indemnify each Tax Indemnitee for all fees, expenses and Taxes incurred by it in connection with any such transfer.

16. **DEFAULT**

16.1 **Classes of Events**

Each of the following shall constitute an Event of Default:

(a) *Non-Payment*. Lessee fails to pay (i) any Basic Rent or Security when due in the currency and in the manner stipulated in this Agreement within three (3) Business Days of the respective due date, or (ii) any other sum due from it under this Agreement or any other Operative Document, including Maintenance Adjustment Payments or Agreed Value, in the currency and in the manner

|     |     |
| --- | --- |
|     | stipulated within five (5) Business Days of written notice of such failure from Lessor; |
| (b) | *Insurances.* The insurances required by this Agreement are not obtained and maintained in full force and effect in accordance with the provisions of Clause 14, or the Aircraft is operated such that any of such insurances are not in full force and effect, or the Lessee breaches Clause 14 of this Agreement; |
| (c) | *Other Obligations.* Lessee fails to comply with any provision of this Agreement or any other Lessee's Document not described in another provision of this Clause 16.1 and such failure, if capable of being remedied, continues for fifteen (15) days after receipt of written notice thereof from Lessor to Lessee (or, if earlier, Lessee becoming aware of the same); **provided**, **however**, **that**, if Lessee shall be diligently undertaking to remedy any such failure and notwithstanding the diligence of Lessee in attempting to remedy such failure, such failure is not cured within said fifteen (15) day period, and in addition, (i) such failure is not capable of being cured within said fifteen (15) day period but is capable of being cured within an additional fifteen (15) days, and (ii) such failure may not be cured by a monetary payment by Lessee and does not adversely affect the airworthiness or registration of the Aircraft or give rise to any increased liability for any Indemnitee, then there shall exist no Event of Default under this subsection unless such failure is not remedied within thirty (30) days after such written notice (or awareness by Lessee); |
| (d) | *Misrepresentation.* Any representation or warranty made or deemed to be made or repeated by Lessee in any Lessee's Documents or any other document delivered by or on behalf of Lessee under or in connection with any Lessee's Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made or repeated and, if by remedying any situation or circumstance such representation or warranty would cease to be false or incorrect and such situation or circumstance is capable of remedy, and Lessee fails to remedy the same within fifteen (15) days after written notice thereof is given by Lessor to Lessee (or if earlier Lessee becoming aware of the same); |
| (e) | *Receivership; Bankruptcy; Insolvency Proceedings, etc.* |
|     | (i) Lessee consents to the appointment of a custodian, receiver, trustee, liquidator, administrative receiver, administrator, compulsory manager or other similar officer of itself or any material part of Lessee's property (or takes any action with respect to the appointment of the same), or Lessee admits in writing its inability to, or is unable to, or does not, pay its debts generally as they come due, or suspends its debts, or makes a general assignment for the benefit of creditors, or Lessee files a voluntary petition in bankruptcy or voluntary petition seeking liquidation or reorganization in a proceeding under any bankruptcy or insolvency or similar laws (as now or hereafter in effect), or an answer admitting the material allegations of a petition filed against Lessee in any such proceeding, or Lessee by voluntary petition, answer or consent seeks relief under the provisions of any bankruptcy, insolvency or other |

        similar law, or provides for or takes any action in connection with an agreement, composition, extension or adjustment with its creditors; or

    (ii)    an order, judgment or decree is entered by any court appointing a custodian, receiver, trustee or liquidator or sequestering all or substantially all or any material part of Lessee's property or at any time an order for relief is granted; or

    (iii)    a petition (or equivalent) against Lessee or any material part of its assets relating to bankruptcy, insolvency or other similar laws (as now or hereafter in effect) is filed (other than by Lessee), including with respect to the appointment of a custodian, receiver, trustee, liquidator, administrative receiver, administrator, compulsory manager or other similar officer, to other relief, in a court of competent jurisdiction and is not withdrawn or dismissed within sixty (60) days thereafter or at any time an order for relief is granted in such proceeding, or if, under the provisions of any law providing for reorganization or winding-up of corporations which may apply to Lessee, any court of competent jurisdiction assumes jurisdiction over, or custody or control of, Lessee or a material part of Lessee's property, and such jurisdiction custody or control remains in effect, unrelinquished, unstayed, undismissed, unvacated and unterminated for a period of sixty (60) days; or

    (iv)    the appointment of a custodian, trustee, liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of Lessee or any material part of its assets or the commencement of any moratorium in respect of any of its indebtedness; or

    (v)    any analogous procedure or step is taken in any jurisdiction;

(f) *Cessation of Business.* Lessee permanently suspends or ceases to carry on its business as a scheduled air carrier;

(g) *Registration of Aircraft.* The registration of the Aircraft is cancelled (other than as a result of a breach by Lessor of its obligations hereunder) and the Aircraft is not immediately thereafter reregistered in accordance with applicable law in the State of Registration and in compliance with this Agreement;

(h) *Arrest of Aircraft.* The Aircraft is arrested, confiscated, seized, taken in execution, impounded, forfeited or detained, in each case, in exercise or purported exercise of any possessory lien or other claim, or otherwise taken from the possession of Lessee or any other person entitled to possession of the same in accordance with this Agreement (other than in circumstances which constitute, or would with the passage of time constitute, a Total Loss (including for the avoidance of doubt any requisition of the Aircraft by any Government Entity)) and Lessee fails to procure the release of the Aircraft within a period of ten (10) days from the date on which the Aircraft is arrested, confiscated, seized, taken in execution, impounded, forfeited or detained (or such shorter period as Lessor shall specify if Lessor determines in its sole discretion that such continued loss of possession would prejudice Lessor's, Owner Participant's or

any Lender's rights under or in connection with any of the Operative Documents or jeopardize the interest of Lessor, Owner Participant or any Lender in the Aircraft); **provided that**, such grace period shall only apply if Lessee shall immediately upon such loss of possession provide Lessor with collateral or a letter of credit that is satisfactory to Lessor in its sole discretion and thereafter use diligent and continuous efforts to procure the release of the Aircraft within such 10-day period;

(i) *Authorizations*. Any consent, authorization, license, permit, certificate or approval of, or registration with or declaration to any Government Entity required to be obtained or made by Lessee to authorize, or required to be obtained or made by Lessee in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of any of the Operative Documents or the performance by Lessee of its obligations under such Operative Documents or the use or operation of the Aircraft for the carriage, for hire or reward, of passengers or the certificate of airworthiness or registration of the Aircraft or maintenance of Lessee's status as a Certificated Air Carrier is modified or is revoked, suspended, canceled, withdrawn or terminated or expires and is not renewed, or otherwise ceases to be in full force and effect, and Lessor reasonably determines that such modification, revocation, suspension, cancellation, withdrawal, termination, expiration, non-renewal, cessation may (i) prejudice Lessor's, Owner Participant's or any Lender's rights under or in connection with any of the Operative Documents, (ii) have a material adverse effect on Lessee's ability to perform its obligations thereunder, (iii) jeopardize the interest of Lessor, Owner Participant or any Lender in the Aircraft, or (iv) give rise to criminal or civil liability of Lessor, Owner Participant or any Lender;

(j) *Redelivery*. Lessee fails to redeliver the Aircraft to Lessor in accordance with Clause 18 on the Expiry Date;

(k) *Letters of Credit*.

   (i) Any issuing or confirming bank in respect of a Letter of Credit (an "**LC Bank**") fails to make any payment under the relevant Letter of Credit when due or demanded or otherwise breaches its obligations under a Letter of Credit, and within five (5) days of notice of such event Lessee has not replaced the Letter of Credit with a new Letter of Credit from another LC Bank in accordance with Clause 6.2(c);

   (ii) Any Letter of Credit is not in full force or, for any reason, ceases to constitute the legal, valid and binding obligations of the relevant LC Banks that issued or confirmed it;

   (iii) Any of the events listed in Clauses 16.1(e) or 16.1(f) apply to any LC Bank (with references to "Lessee" in those Clauses being deemed to be references to the relevant LC Bank) and within five (5) days of notice of such event Lessee has not replaced the Letter of Credit with a new Letter of Credit from another LC Bank in accordance with Clause 6.2(c); or

(iv) Where applicable, a Letter of Credit is not renewed or replaced as required, and within the time required by this Agreement;

(l) *Events of Default under Other Agreements*. An "Event of Default" under, and as defined in, any Other Agreement (or any equivalent event, howsoever defined) has occurred and is continuing;

(m) *Failure to Accept Delivery*. Lessee fails to accept delivery of the Aircraft in accordance with the terms of this Agreement, fails to satisfy any conditions precedent or condition subsequent set out in Clause 3 in accordance with the terms of this Agreement or in either case notifies Lessor that Lessee will not do the same;

(n) *Parts with Possession*. Lessee parts with possession of the Aircraft save as permitted by this Agreement;

(o) *Liens*. The Aircraft (or any Engine) becomes subject to any Lien, other than a Permitted Lien, and Lessee fails to procure the release of such Lien within a period of ten (10) days from the date on which such Lien arose (or such shorter period as Lessor shall specify if Lessor determines in its sole discretion that such Lien would prejudice Lessor's, Owner Participant's or any Lender's rights under or in connection with any of the Operative Documents or jeopardize the interest of Lessor, Owner Participant or any Lender in the Aircraft); **provided that**, (i) such grace period shall only apply if Lessee shall immediately upon such Lien arising provide Lessor with collateral or a letter of credit that is satisfactory to Lessor in its sole discretion and thereafter use diligent and continuous efforts to procure the release of such Lien within such 10-day period; and (ii) such 10-day period may be extended by Lessor if Lessee provides Lessor with evidence and assurances satisfactory to Lessor (in its sole discretion) as to the frivolousness of such Lien and that Lessee is using diligent and continuous efforts to procure the release of such Lien;

(p) *Aircraft Charges*. Navigation, flight, airport or other operational charges are not paid by the Lessee when due or, if late, within five (5) days of the due date thereof (except that such five (5) day cure period will not apply if there is any risk of seizure, detention, interference with the use or operation, sale, forfeiture or loss of the Aircraft or the APU or any Engine or Part or the imposition of civil or criminal penalties on Lessor or Owner Participant;

(q) *Repudiation.* Lessee repudiates this Agreement or any other Lessee's Document (or any of its obligations hereunder or thereunder) or challenges the existence, validity or enforceability of the same, of Lessor's, Owner Participant's or any Lender's interest in the Aircraft;

(r) *Mergers*. The Lessee ceases to be wholly-owned and controlled by Holdings, except as otherwise expressly permitted in this Agreement; or

(s) *Other Cross Defaults*. The Lessee (i) defaults in any payment of any indebtedness (other than intra-group indebtedness) having an aggregate outstanding value of more than US$15,000,000 (or the equivalent thereof) beyond the period of grace if any, provided in the instrument or agreement under

which such indebtedness was created or (ii) any such indebtedness having an aggregate outstanding value of more than US$15,000,000 (or the equivalent thereof) of Lessee shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required repayment, prior to the stated maturity thereof;

(t) *Judgments*. A final, non-appealable judgment for the payment of money in excess of US$15,000,000 (or the equivalent thereof), or in the aggregate, final non-appealable judgments for the payment of money in excess of US$15,000,000 (or the equivalent thereof) not covered by insurance shall be rendered against Lessee and the same shall remain undischarged for the later of thirty (30) days or the deadline for payment thereof as set forth in such judgment or judgments during which neither execution of such judgment or judgments shall be effectively stayed nor adequate bonding fully covering such judgment or judgments shall exist; or

(u) *Asset Sales*. Lessee disposes or takes any action to dispose of all or a material part of its assets, whether by one or a series of transactions, related or not, other than in the ordinary course of business, except that no Event of Default shall occur where such disposal takes place as expressly permitted in this Agreement.

16.2 **Lessor's Rights**

Upon the occurrence of any Event of Default and any time thereafter so long as the same shall be continuing, Lessor may at its option by notice in writing to Lessee treat such event as a repudiation by Lessee of its obligations under this Agreement or declare this Agreement to be in default; **provided that**, upon the occurrence of any Event of Default specified in Clause 16.1(e) of this Agreement shall automatically be deemed to have been repudiated by Lessee and declared in default. Once this Agreement has been repudiated by Lessee or declared in default, or is deemed to have been repudiated by Lessee or declared in default, in accordance with the foregoing sentence then, and at any time thereafter, Lessor shall be entitled automatically to exercise any of the following remedies as Lessor in its sole discretion shall elect, to the extent permitted by applicable law then in effect without making demand or giving notice or the taking of any other action:

(a) proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of Lessee hereunder and to recover damages for the breach thereof and/or to rescind this Agreement; and/or

such person so that such disclaimers, indemnities or other provisions can be enforced by Lessor on behalf of Lessor Parties.

20.3   **Further Assurances**

Lessee agrees from time to time to promptly do and perform such other and further acts and promptly execute and deliver and, if applicable, consent electronically to, any and all such other instruments and registration as may be required by law or reasonably requested by Lessor to establish, maintain and protect the rights and remedies of Lessor, Owner Participant and the Lender(s) under the Operative Documents and to carry out and effect the intent and purpose of the Operative Documents, including, if requested by Lessor and at Lessee's expense, the execution and delivery of supplements or amendments hereto subjecting to this Agreement any Replacement Engine in accordance with the laws of any appropriate jurisdiction.

20.4   **Rights Cumulative; Waivers; Variation; Counterparts; Language; Delivery by E-mail**

(a)   The rights of both parties under this Agreement are cumulative, may be exercised as often as the relevant party considers appropriate and are in addition to its rights under the general law.  The rights of both parties against the other or in relation to the Aircraft (whether arising under this Agreement or the general law) shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing; and in particular any failure to exercise or any delay in exercising any such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

(b)   The provisions of this Agreement shall not be varied otherwise than by an instrument in writing executed by or on behalf of Lessor and Lessee.

(c)   This Agreement may be executed in counterparts each of which will constitute one and the same document.

(d)   All documents delivered to Lessor or required to be delivered pursuant to this Agreement shall be in English, or if not in English, will be accompanied by a certified English translation.  If there is any inconsistency between the English version of this Agreement or any document delivered hereunder and any other version in any other language, the English version will prevail.

(e)   This Agreement and the other Operative Documents (and the counterparts thereof) may be delivered by a party thereto by way of e-mail transmission to the other party and delivery shall be deemed completed for all purposes upon the completion of such e-mail transmission. A party that so delivers this Agreement or any of the other Operative Documents (and the counterparts thereof) by way of e-mail transmission agrees to promptly thereafter deliver to the other parties thereto an original signed counterpart. The e-mail signature of any party shall be considered for these purposes as an original document, and

any e-mail document shall be considered to have the same binding legal effect as an originally executed document. In consideration of the mutual covenants herein contained, the parties agree that neither of them shall raise the use of e-mail as a defense to this Agreement or any of the other Operative Documents and forever waive any such defense.

20.5 **Delegation**

Lessor hereby delegates to the Servicer, all of the rights, powers or discretions vested in it by this Agreement and Lessor hereby further designates the Servicer as its fully authorized representative to deal directly with Lessee with respect to all legal, financial, insurance and technical matters with respect to this Agreement and the transactions contemplated hereby with the same effect as if Lessee was dealing directly with Lessor, and Lessee shall been entitled to rely on such delegation for all purposes until it has received a written notice of revocation from Lessor.

20.6 **Evidence of Indebtedness**

Except where expressly otherwise provided in this Agreement, any certificate or determination by Lessor as to any rate of interest or as to any amount payable under this Agreement shall contain reasonable details of the calculation of such rate or, as the case may be, amount and, if appropriate, the circumstances giving rise thereto and shall, in the absence of manifest error, be conclusive and binding on Lessee.

20.7 **Applications of Moneys**

If any sum paid or recovered in respect of the liabilities of Lessee under this Agreement is less than the amount then due, Lessor may apply such sum to Rent, interest, fees or any other amount due under this Agreement in such proportions and order and generally in such manner as Lessor shall determine.

20.8 **Notices**

Any notice or communication under or in connection with this Agreement shall be in English and in writing and shall be delivered personally or by e-mail transmission (confirmed, orally or in writing, as received by the recipient) or sent by express courier or certified, registered or express mail, postage prepaid to the respective addresses given below or such other address or e-mail as the recipient may have notified to the sender in writing. Notices or communications shall be deemed received:

(a) in the case of an e-mail on the Business Day immediately following the date of dispatch;

**IN WITNESS WHEREOF,** the parties hereto have caused their duly authorized officers to execute and deliver this Agreement to be executed as of the date first above written.

UMB BANK, N.A.,
not in its individual capacity, but solely as owner trustee

By: ...................................................
Name:  Scott Rosevear
Title:   Senior Vice President

*[Signature Page – Aircraft Lease Agreement (MSN 10038)]*

FRONTIER AIRLINES, INC.

By: ...................................................
Name:
Title:

**James G. Dempsey**
**Chief Financial Officer**

*[Signature Page – Aircraft Lease Agreement (MSN 10038)]*