EXECUTION VERSION

AMCK AVIATION HOLDINGS IRELAND LIMITED

AND

FRONTIER AIRLINES, INC.

FRAMEWORK AGREEMENT
RELATING TO
THE PURCHASE AND LEASING OF
SIX (6) NEW AIRBUS MODEL A320-251N AIRCRAFT

## TABLE OF CONTENTS

Page

1.  Definitions and Interpretation ........................................................................ 2
2.  Purchase and Lease .................................................................................... 10
3.  Certain Agreements .................................................................................... 13
4.  Definitive Document Terms ......................................................................... 18
5.  Representations and Warranties ................................................................. 19
6.  Framework Events of Defaults .................................................................... 23
7.  Indemnities .................................................................................................. 27
8.  Further Provisions ....................................................................................... 31

**Schedules**

Schedule 1    Delivery Schedule
Schedule 2    Specification
Schedule 3    Purchase Price

**Exhibits**

Exhibit A    Form of Lease Agreement
Exhibit B    Form of Airframe Warranties Agreement
Exhibit C    Form of Engine Warranties Assignment
Exhibit D    Form of Purchase Agreement Assignment
Exhibit E    Form of Notice, Acknowledgment and Consent Agreement
Exhibit F    Form of Lessor Guarantee
Exhibit G    Form of Assignment of Insurances

**THIS FRAMEWORK AGREEMENT** (this "**Agreement**") is made this  16  day of March, 2020.

**BETWEEN**:

(1)    **AMCK AVIATION HOLDINGS IRELAND LIMITED**, a company limited by shares incorporated under the laws of Ireland having its registered office at 28-29 Sir John Rogerson's Quay, Dublin 2, Ireland ("**AMCK Aviation**"); and

(2)    **FRONTIER AIRLINES, INC.**, a corporation duly incorporated and existing under the laws of the State of Colorado having its principal place of business at Frontier Center One, 4545 Airport Way, Denver, Colorado 80239, United States of America ("**Frontier**").

**BACKGROUND:**

(A)    Frontier has requested that AMCK Aviation finance the Aircraft by the purchase and lease transactions provided for herein and in the Transaction Documents.

(B)    Subject to the terms and conditions set forth herein and in the Transaction Documents, Frontier is willing to assign its right to purchase each Aircraft to each Lessor (acting in its capacity as owner trustee under the Trust Agreement) designated by AMCK Aviation, AMCK Aviation is willing to cause each Lessor to accept such assignment and to purchase such Aircraft from the Manufacturer on the applicable Delivery Date and lease such Aircraft to Frontier and Frontier is willing to thereupon lease such Aircraft from such Lessor. For the avoidance of doubt, the Lessor shall undertake the actions as described herein solely in its capacity as owner trustee under the applicable Trust Agreement for the benefit of Owner Participant, who will be the owner participant under the Trust Agreement and the beneficial owner of each Aircraft.

**IT IS AGREED as follows:**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

In this Agreement the following words and expressions have, except where the context otherwise requires, the following meanings:

"**Affiliate**" means, in respect of any person, any person directly or indirectly controlling, controlled by, or under common control with such first person or within the same corporate group as such first person; and a person shall be deemed to control another person if such first person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, contract or otherwise.

"**After-Tax Basis**" means, in respect of an amount (the "**base amount**") with respect to a person, the base amount supplemented by a future payment (the "**additional amount**"), if necessary, to such person such that, after the sum of the base amount and the additional

amount is reduced for all Taxes, if any, imposed on such person in respect of the sum of the base amount and the additional amount, the resulting amount shall be equal to the original base amount.

"**Aircraft**" means each of the six (6) new Airbus A320-251N aircraft scheduled to be delivered under the Purchase Agreement in the Scheduled Delivery Quarters or Scheduled Delivery Months specified in Schedule 1, in each case equipped with two (2) CFM International, Inc. model LEAP-1A26 engines and all BFE, and in conformance with the Specification.

"**Airframe Warranties Agreement**" means, in respect of each Aircraft, the Airframe Warranties Agreement dated as of the relevant Delivery Date substantially in the form of Exhibit B, entered into by the Manufacturer, together with the initial notice thereunder specifying Frontier as the "Initial Entitled Party" and specifying AMCK Aviation as the "Initial Controlling Party", together with each and every further notice issued thereunder in accordance with the terms of such agreement, or such other agreement relating to the Manufacturer's airframe warranties in respect of the Aircraft entered into (or consented to, as the case may be) by AMCK Aviation, Frontier and the Manufacturer.

"**Assignment of Insurances**" means, in respect of each Aircraft, the Assignment of Insurances for such Aircraft, substantially in the form of Exhibit G, or in such other form as Frontier and AMCK Aviation may agree, dated as of the Delivery Date, between AMCK Aviation and Frontier together with the Notice and Acknowledgment relating thereto and entered into among each of the foregoing persons and acknowledged by Frontier's insurer or insurance broker, as the case may be.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Base Fixed Rental**" means with respect to each Aircraft, US$ ███████

"**BFE**" means buyer furnished equipment supplied or purchased by or on behalf of Frontier in respect of each Aircraft for installation by the Manufacturer pursuant to the Purchase Agreement on or before the Delivery Date or by Frontier following the Delivery Date, in each case as agreed by AMCK Aviation and Frontier, it being agreed that such buyer furnished equipment for each Aircraft will include the buyer furnished equipment specified in Schedule 1 to the relevant Lease Agreement.

"**Business Day**" means a day, other than a Saturday or Sunday, on which banks are open in Dublin, Ireland, the State of New York and the State of Colorado, USA for the transaction of business of the nature required by this Agreement.

"**Certificated Air Carrier**" means any person (except the United States government) that: (a) is a "citizen of the United States", as defined in Section 40102(a)(15)(c) of the Title 49 of the United States Code and (b) holds both (i) a Certificate of Public Convenience and Necessity issued under Section 41102 of Title 49 of the United States Code by the Department of Transportation or predecessor or successor agency thereto, or in the event such certificates are no longer issued, a person meeting the requirements set forth immediately above holding all necessary certificates, authorizations and licenses and

legally engaged in the business of transporting passengers or cargo for hire by air predominantly to, from or between points within the United States of America, and (ii) an air carrier operating certificate issued pursuant to Chapter 447 of Title 49 of the United States Code for aircraft capable of carrying ten or more individual or 6,000 pounds or more of cargo thus entitling Lessor to the benefits of Section 1110.

"**CFM RPFH Agreement**" means the CFM Rate Per Flight Hour Agreement #1-2494673211 dated October 17, 2011, as assumed and amended, between Frontier and the Engine Manufacturer.

"**CFM Tripartite Agreement**" means the CFM Rate Per Flight Hour Services Tri-partite Agreement dated on or about the first Delivery Date to occur pursuant to this Agreement among Frontier, Accipiter Holdings DAC and the Engine Manufacturer relating to the CFM RPFH Agreement.

"**CFM Lessor Maintenance Agreement**" means the Lessor Maintenance Agreement dated as of March 6, 2018, between Accipiter Holdings DAC and the Engine Manufacturer, together with the LSA Addendum thereto relating to the Engines between the Lessor and the Engine Manufacturer.

"**Definitive Documents**" means, in respect of each Aircraft, the execution versions of the Lease Agreement, Lessor Guarantee, Purchase Agreement Assignment, Notice, Acknowledgement and Consent Agreement, Assignment of Insurances, Airframe Warranties Agreement and Engine Warranties Assignment, completed in accordance with the instructions set forth in the agreed forms of such documents and this Agreement, and with such other changes as AMCK Aviation and Frontier may agree.

"**Delivery**" means the transfer of title to an Aircraft to the relevant Lessor in accordance with the Purchase Agreement and Purchase Agreement Assignment for such Aircraft and the Delivery (as defined in the relevant Lease Agreement) of such Aircraft to Frontier under the Lease Agreement in respect of such Aircraft, in each case pursuant to this Agreement.

"**Delivery Date**" means, in respect of each Aircraft, the date on which Delivery occurs in respect of such Aircraft.

"**Delivery Notice**" has the meaning specified in Clause 3.2.

"**Engine**" or "**Engines**" means, individually or collectively as the context may require, each of the engines installed on or furnished with each Aircraft at Delivery and listed in the Lease Agreement for such Aircraft.

"**Engine Manufacturer**" means CFM International, Inc.

"**Engine Warranties Assignment**" means, in respect of each Aircraft, the engine warranties agreements for such Aircraft, substantially in the form of Exhibit C, or in such other form as Frontier, AMCK Aviation and Engine Manufacturer may agree, dated as of the Delivery Date, between the Engine Manufacturer and Frontier and any consent and acknowledgement or notice related thereto.

"**Framework Event of Default**" means any of the events referred to in Clause 6.1.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Government Entity**" means (a) any national government, political subdivision thereof or local jurisdiction therein; (b) any instrumentality, board commission, court or agency of any of the foregoing, however constituted; and (c) any association, organization or institution of which any of the foregoing is a member or to whose jurisdiction any thereof is subject or in whose activities any of the above is a participant.

"**Holdings**" means Frontier Airlines Holdings, Inc., a Delaware corporation.

"**Indemnitee**" means AMCK Aviation, each Lessor, the Servicer, each Owner Participant and each of their respective successors, permitted assigns and their respective officers, directors, agents, shareholders, partners, members, managers, contractors, Affiliates and employees.

"**Lease Agreement**" means, in respect of each Aircraft, the Aircraft Lease Agreement and lease supplement for such Aircraft, substantially in the form of Exhibit A and completed in compliance with the terms of this Agreement, or in such other form as Frontier and AMCK Aviation may agree, to be entered into between Frontier and the applicable Lessor on or prior to the Delivery Date in respect of such Aircraft.

"**Lessor**" means, in respect of each Aircraft, the Trust Company, not in its individual capacity, but solely as owner trustee under the Trust Agreement.

"**Lessor Guarantee**" means in respect of each Aircraft, the Guarantee Agreement for such Aircraft, substantially in the form of Exhibit F, or in such other form as Frontier and AMCK Aviation may agree, to be entered into between Frontier and the applicable Lessor Guarantor in respect of such Lessor's obligations under the applicable Lease Agreement on or prior to the Delivery Date in respect of such Aircraft.

"**Lessor Guarantor**" means, in respect of each Aircraft, the Owner Participant or, if required under the terms of Clause 4.5, AMCK Aviation.

"**Lien**" means any mortgage, charge, pledge, lien, right of detention, right of set-off, right of de-registration or export, any "international interest" or "national interest" as defined in the Cape Town Convention or any encumbrance or security interest whatsoever, howsoever created or arising.

"**Manufacturer**" means Airbus S.A.S., a *société par actions simplifiée* organized and existing under the law of the France, or Airbus Americas, Inc., a corporation incorporated and existing under the law of Delaware, United States, as applicable.

"**Notice, Acknowledgement and Consent Agreement**" means the notice, acknowledgment and consent agreement to each Purchase Agreement Assignment in substantially the form set forth in Exhibit E, to be entered into between Frontier, as assignor, the applicable Lessor, as assignee, and the Manufacturer.

"**Notified Delivery Date**" has the meaning specified in Clause 3.4.1.

"**Owner Participant**" means, in respect of each Aircraft, AMCK Aviation or an Affiliate thereof selected by AMCK Aviation in its sole discretion.

"**Purchase Agreement**" means the A320 Family Aircraft Purchase Agreement dated as of September 30, 2011 between Frontier and the Manufacturer, together with its various exhibits and appendices, as assigned, amended and supplemented from time to time.

"**Purchase Agreement Assignment**" means, in respect of each Aircraft, the Purchase Agreement Assignment for such Aircraft, substantially in the form of Exhibit D, or in such other form as Frontier, AMCK Aviation and the Manufacturer may agree, to be entered into between Frontier, the applicable Lessor and the Manufacturer on or prior to the Delivery Date in respect of such Aircraft.

"**Purchase Price**" means in respect of an Aircraft, the amount determined in respect of such Aircraft in accordance with Schedule 3.

"**Scheduled Delivery Date**" means, in respect of each Aircraft, the date notified by the Manufacturer to Frontier as being the scheduled date for delivery of such Aircraft under the Purchase Agreement.

"**Scheduled Delivery Month**" means, in respect of each Aircraft, the month notified by the Manufacturer to Frontier as being the scheduled month for delivery of such Aircraft under the Purchase Agreement.

"**Scheduled Delivery Quarter**" means, in respect of each Aircraft, the calendar quarter notified by the Manufacturer to Frontier as being the scheduled quarter for delivery of such Aircraft under the Purchase Agreement.

"**Servicer**" means AMCK Aviation or such other person that AMCK Aviation or Lessor may notify Frontier in writing as being the servicer from time to time.

"**Specification**" means, with respect to each Aircraft, the specification set forth in Schedule 2 hereto and its applicable attachments, as such specification may be modified in respect of such Aircraft from time to time in accordance with this Agreement.

"**State of Incorporation**" means the State of Colorado, U.S.A.

"**Target Delivery Period**" means, in respect of each Aircraft, the month or quarter specified in respect of such Aircraft in Schedule 1 as of the date hereof without regard to any subsequent changes in the Scheduled Delivery Date, Scheduled Delivery Month or Scheduled Delivery Quarter.

"**Tax Indemnitee**" means each of AMCK Aviation, each Lessor, each Owner Participant, the Servicer and any Affiliate of any of the foregoing and if any such entity is treated as a partnership, a disregarded entity or other pass-through entity for tax purposes (each, a "**Pass-Through Entity**"), any person who owns, directly or indirectly through one or more

Pass-Through Entities, an interest in the Pass-Through Entity and each of the respective successors and assigns of the foregoing.

"**Taxes**" means all present and future taxes, levies, imposts, duties, withholdings, fees or charges of any nature whatsoever, and wheresoever imposed, including value added tax, consumption tax or any other tax in respect of added value or any income (including gross income, minimum, alternative minimum, capital gains income, gross receipts and net receipts), franchise, transfer, sales, use, business, occupation, excise, personal property, real property, stamp or other tax imposed by a taxing authority of any country, or governmental subdivision thereof or therein or by any international authority, together with any penalties, additions to tax, fines or interest with respect to any of the foregoing; and "tax" and "taxation" shall be construed accordingly.

"**Transaction Documents**" means this Agreement, the CFM RPFH Agreement, the CFM Tripartite Agreement, each "Operative Document", as defined in each Lease Agreement, and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into pursuant to or in connection with any thereof, and any document which Frontier and AMCK Aviation agree is a "Transaction Document".

"**Trust Agreement**" means, in respect of each Aircraft, the Trust Agreement (including each supplement thereto) relating to such Aircraft entered into on or prior to the Delivery Date in respect of such Aircraft, between the Trust Company, as owner trustee, and the Owner Participant.

"**Trust Company**" means, in respect of each Aircraft and the related Trust Agreement: (a) UMB Bank, N.A., a national banking association organized under the laws of the United States of America having its principal office at 6550 S. Millrock Drive, Suite 150, Salt Lake City, UT 84121, in its individual capacity or (b) such other qualified U.S. Citizen as AMCK Aviation and Frontier may agree. If AMCK Aviation and Frontier agree an alternative Trust Company in respect of any Aircraft, all references to the Trust Company in the Lease Agreement prepared for such Aircraft shall be modified accordingly.

"**U.S. Citizen**" has the meaning given to such term in Section 40102(a)(15)(c) of Title 49 of the United States Code.

"**Warranty Bill of Sale**" means, in respect of each Aircraft, the bill of sale in respect of such Aircraft, in form and substance satisfactory to AMCK Aviation, executed and delivered by the Manufacturer to the applicable Lessor.

## 1.2    Interpretation

1.2.1    References in this Agreement to:

(a)    a Framework Event of Default includes (except in relation to Clause 6.2) references to any event that, with the giving of notice and/or lapse of time and/or the making of a relevant decision contemplated by Clause 6.1 would constitute a Framework Event of Default;

(b)    Clauses, Schedules and Exhibits are, unless otherwise specified, references to Clauses of, and Schedules to, Exhibits to, this Agreement;

(c)    any statutory or other legislative provision shall be construed as including any statutory or legislative modification or re-enactment thereof, or any provision enacted in substitution therefor;

(d)    an Aircraft include any part of the Aircraft, and, where the context so admits, any of the Aircraft Documents (as defined in Exhibit A), and references to any part of the Aircraft include any part of any Engine;

(e)    the word "**person**" or "**persons**" or to words importing persons include individuals, partnerships, limited liability companies, corporations, Government Entities and other bodies, corporate or unincorporated, whether having distinct legal personality or not;

(f)    "**AMCK Aviation**" or "**Frontier**" includes each of their respective successors, assigns and transferees, subject, in each case, to any provisions hereof (if any) relating to permissible successions, transfers and assignments;

(g)    any "**agreement**" shall include such agreement as it may from time to time be amended, restated, modified, supplemented, novated or substituted;

(h)    an "**agreement**" also includes a concession, contract, deed, instrument, franchise, license, treaty or undertaking (in each case, whether oral or written);

(i)    the "**assets**" of any person shall be construed as a reference to the whole or any part of its business, undertaking, property, assets and revenues (including any right to receive revenues);

(j)    "**indebtedness**" with respect to any person includes any obligation of that person (whether present or future, actual or contingent, secured or unsecured, as principal or surety or otherwise) for the payment or repayment of money, including (A) under acceptances, bills, bonds, debentures, notes or similar instruments; (B) under guarantees, indemnities or other assurances against financial loss; (C) under any finance or operating lease relating to any asset; or (D) in respect of any liability for the payment of any purchase price for any asset or services, payment of which is deferred for more than 180 days;

(k)    "**law**" shall include common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, rule, statute, treaty, convention or other legislative measure in any jurisdiction or any present or future directive, regulation, procedure, request or requirement, or official or judicial interpretation of any of the foregoing, in each case having the force of law;

(l) **"month"** are references to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month (and references to **"months"** shall be construed accordingly) except that, where any such period would otherwise end on a non-Business Day, it shall end on the preceding Business Day; **provided that**, if there is no numerically corresponding day in the month in which that period ends, that period shall end on the last Business Day in such month;

(m) a **"guarantee"** also includes any other obligation (whatever called) of any person to pay, purchase, provide funds (whether by way of the advance of money, the purchase of or subscription for shares or other securities, the purchase of assets or services, or otherwise) for the payment of, to indemnify against the consequences of default in the payment of, or otherwise to be responsible for, any indebtedness of any other person;

(n) the words **"include"**, **"includes"** and **"including"** shall be deemed to be followed by the phrase **"without limitation"**;

(o) the word **"will"** shall be construed to have the same meaning and effect as the word **"shall"**;

(p) the words **"herein"**, **"hereof"** and **"hereunder"**, and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(q) **"gross negligence"** means, in relation to any person, intentional, conscious or voluntary acts or decisions of that person taken with wanton, reckless or flagrant disregard for the consequences of such act or decision; and

(r) **"material"** means the subject matter of the statement or concealment related to a fact or circumstance which would be important to the decision to be made as distinguished from an insignificant, trivial or unimportant detail.

1.2.2 Headings are for ease of reference only.

1.2.3 Where the context so admits, words importing the singular number shall include the plural and vice versa, and words importing neuter gender shall include the masculine or feminine gender.

## 1.3 **Lessee's Document**

AMCK Aviation and Frontier agree that (i) this Agreement is a "Lessee's Document" and an "Other Agreement" as defined in, and for all purposes of, each Lease Agreement and (ii) a Framework Event of Default under this Agreement is an "event of default" within the contemplation of Clause 16.1(l) of each Lease Agreement.

## 1.4 **Terms not defined herein**

Any capitalized terms or expressions used herein without definition shall have the meanings ascribed thereto in the form of Lease Agreement attached hereto as Exhibit A.

2.    **PURCHASE AND LEASE**

2.1    **Purchase and Lease Commitments**

Subject to the terms and conditions of this Agreement:

2.1.1    AMCK Aviation hereby undertakes to: (a) cause the applicable Lessor (acting in its capacity as owner trustee under the Trust Agreement) to execute and deliver the Purchase Agreement Assignment in respect of each Aircraft and purchase such Aircraft from the Manufacturer; (b) cause the applicable Lessor to execute and deliver the Lease Agreement and the other Definitive Documents in respect of each Aircraft and the other Lessee's Documents (as defined in each Lease Agreement) to which the Lessor is a party; (c) cause the applicable Lessor to lease each Aircraft to Frontier pursuant to the terms of the applicable Lease Agreement; and (d) execute and deliver, or cause the applicable Lessor Guarantor (if not AMCK Aviation) to execute and deliver, the Lessor Guarantee in respect of each Aircraft; and

2.1.2    Frontier hereby undertakes to: (a) execute and deliver the Purchase Agreement Assignment in respect of each Aircraft and assign and transfer to the applicable Lessor (acting in its capacity as owner trustee under the Trust Agreement) its right to purchase each Aircraft from the Manufacturer; (b) execute and deliver the Lease Agreement and the other Definitive Documents in respect of each Aircraft and the other Lessee's Documents (as defined in such Lease Agreement) to which Frontier is a party; (c) satisfy the conditions precedent described in Clause 2.2 and 2.3 hereof; and (d) accept each Aircraft on lease from the Lessor pursuant to the terms of the applicable Lease Agreement.

2.2    **Initial Conditions Precedent**

AMCK Aviation shall have no obligations under this Agreement unless and until each of the following conditions has been satisfied:

2.2.1    AMCK Aviation shall have received the following documents, each in form and substance reasonably acceptable to AMCK Aviation:

(a)    an opinion or opinions of independent counsel to Frontier acceptable to AMCK Aviation with respect to the laws of the United States and the State of New York with respect to the due authorization and enforceability of this Agreement and such other matters as AMCK Aviation may request;

(b)    this Agreement, duly executed by each party thereto, other than AMCK Aviation;

(c)    a certificate substantially in the form of Schedule 3 to the form Lease Agreement attached hereto as Exhibit A signed by a duly authorized officer

or director of Frontier together with the documents referred to in such certificate, but with references therein to the Lease Agreement being replaced by references to this Agreement;

(d)    a letter from the process agent appointed by Frontier accepting that appointment as contemplated by Clause 8.10.2;

(e)    the most recent consolidated annual financial reports of Frontier and Holdings, audited by independent, certified public accountants in accordance with GAAP consistently applied, and the most recent unaudited quarterly consolidated financial reports of Frontier and Holdings; and

2.2.2    each of the representations and warranties contained in Clause 5.1 of this Agreement shall be true and accurate on the date hereof.

## 2.3    Conditions Precedent to Delivery

AMCK Aviation's obligations under Clause 2.1.1 in respect of each Aircraft are subject to fulfillment of each of the conditions precedent set forth in Clause 2.2 and fulfillment of each of the following conditions on or prior to the Delivery Date in respect of such Aircraft:

2.3.1    each of conditions precedent set forth in Clause 3.1 of the form Lease Agreement set forth in Exhibit A hereto shall be satisfied in respect of such Aircraft;

2.3.2    each of the representations and warranties contained in Clause 5.1 of this Agreement shall be true and accurate on the Delivery Date as if made on such date;

2.3.3    Frontier shall have performed in full all of its obligations under this Agreement and under the Purchase Agreement (other than payment of the balance of the purchase price of the Aircraft due on Delivery) in respect of such Aircraft;

2.3.4    the Aircraft shall have been tendered by the Manufacturer for delivery to the applicable Lessor new "ex-factory" and in material conformance with the Specification;

2.3.5    no Framework Event of Default shall have occurred or be continuing or would result from the Delivery of the Aircraft;

2.3.6    prior to, or simultaneously with, the applicable Lessor's purchase of the Aircraft from the Manufacturer and performance by AMCK Aviation of its obligations under Section 2.1.1, Frontier shall have performed, or shall perform, its obligations under Section 2.1.2;

2.3.7    neither Frontier nor any Affiliate of Frontier shall have amended or modified (except as expressly permitted hereby) or rescinded, cancelled or terminated the Purchase Agreement insofar as it relates to the Aircraft;

2.3.8    no change shall have occurred since the date of this Agreement in any applicable law or in the interpretation thereof that, in AMCK Aviation's opinion, would make it illegal for AMCK Aviation or the relevant Lessor and/or Frontier to perform any of their respective obligations under this Agreement or would make this Agreement unenforceable in whole or in part; and

2.3.9    the Manufacturer has confirmed in writing to AMCK Aviation and the applicable Lessor that it will execute and deliver the Warranty Bill of Sale and the FAA Bill of Sale to the applicable Lessor upon payment of the Purchase Price (for the avoidance of doubt, as defined herein) in respect of such Aircraft by or behalf of the Lessor to the Manufacturer.

2.4    **Waiver**

The conditions precedent set forth in Clause 2.2 and 2.3 are for the sole benefit of AMCK Aviation and may be waived or deferred by AMCK Aviation in whole or in part and with or without conditions. If any of such conditions precedent are not satisfied on the Delivery Date and AMCK Aviation (in its absolute discretion) nonetheless agrees to perform its obligations under Clause 2.1.1, Frontier shall ensure that such conditions precedent are satisfied within ten (10) days of the Delivery Date or such other period as may be agreed in writing between Frontier and AMCK Aviation and failure of Frontier to do so shall constitute a Framework Event of Default.

2.5    **Obligation to Lease**

Frontier acknowledges that AMCK Aviation has agreed to cause the relevant Lessor to purchase each Aircraft from the Manufacturer pursuant to the Purchase Agreement Assignment for the purpose of leasing such Aircraft to Frontier pursuant to the relevant Lease Agreement. Accordingly, and regardless of any provision to the contrary herein, in the relevant Lease Agreement, in the relevant Purchase Agreement Assignment or in any other Transaction Document, (i) Frontier acknowledges that none of AMCK Aviation, the Lessor or any Affiliate of AMCK Aviation shall have any responsibility whatsoever in respect of the condition of the Aircraft and Frontier shall not be entitled for any reason whatsoever to refuse to accept delivery of the Aircraft under the Lease Agreement once the Lessor accepts delivery of the Aircraft under the Purchase Agreement Assignment (with the concurrence of the Lessee) and (ii) AMCK Aviation agrees that it shall cause the Lessor to lease the Aircraft to Frontier once the Lessor accepts delivery of the Aircraft from the Manufacturer.

2.6    **Total Loss Preceding Delivery; Delay; Failure to Deliver**

2.6.1    If Frontier is unwilling or unable to accept delivery of an Aircraft when obligated to do so in accordance with the terms of this Agreement or if Frontier fails to fulfill any of the conditions precedent hereunder or under the relevant Lease Agreement, then without prejudice to any other right that AMCK Aviation may have hereunder or under applicable law, AMCK Aviation shall have no obligation to purchase such Aircraft from the Manufacturer.

2.6.2   None of AMCK Aviation, the Lessor or any Affiliate of AMCK Aviation shall have any obligations or liability whatsoever to Frontier or any other Person whether arising in contract, tort or otherwise and whether arising by reference to negligence or strict liability or otherwise for any liability, claim, proceeding, loss, damage (consequential or otherwise), fee, cost or expense of any kind caused directly or indirectly by, arising from any delay in the delivery of, or failure to deliver the Aircraft to Frontier.

2.6.3   If a Total Loss occurs with respect to an Aircraft prior to its Delivery hereunder, Frontier shall promptly notify Lessor in writing and the respective commitments of AMCK Aviation and Frontier under Clause 2.1 with respect to such Aircraft shall terminate on the date of receipt of such notice.

2.7   **Certain Agreements concerning the Bankruptcy Code**

The parties acknowledge and agree that this Agreement, each Purchase Agreement Assignment and each Lease Agreement and the other Transaction Documents are intended to, and do constitute, one integrated agreement among the parties hereto for purposes of Clause 365 of the Bankruptcy Code.  The parties hereto further acknowledge and agree that this Agreement, each such Purchase Agreement Assignment and each such Lease Agreement and the other Transaction Documents constitutes a "sale-leaseback" financing and extension of credit provided by AMCK Aviation in respect of Frontier's acquisition of the applicable Aircraft and that such agreements are intended to and do constitute an agreement by AMCK Aviation to extend "financial accommodations", within the meaning of Clause 365 (e)(2)(B) of the Bankruptcy Code, to Frontier (it being agreed that after Delivery of an Aircraft under the relevant Lease Agreement for such Aircraft has occurred, such Lease Agreement no longer constitutes such a "financial accommodation").

3.   **CERTAIN AGREEMENTS**

3.1   **Delivery Dates**

3.1.1   The current Scheduled Delivery Quarter or Scheduled Delivery Month, as the case may, of each Aircraft is set forth on Schedule 1. Frontier and AMCK Aviation will use their diligent good faith efforts to mutually agree on an amendment to Schedule 1 to insert identifiers in the form of final Delivery quarters or months, as the case may be, contract rank numbers and Manufacturer CAC ID numbers for each of Aircraft nos 1-6. Frontier will keep AMCK Aviation fully informed regarding, and will promptly notify AMCK Aviation upon receiving notice from the Manufacturer of (or of any changes to), the Scheduled Delivery Quarter, Scheduled Delivery Month or Scheduled Delivery Date of each Aircraft, and will notify AMCK Aviation of any actual or anticipated delays in respect of any of the foregoing. Without limiting the foregoing, Frontier will give AMCK Aviation written notice of the Scheduled Delivery Date of each Aircraft within two (2) Business Days of receipt of notice of the same from the Manufacturer which is expected to be approximately one (1) month prior to the actual Delivery Date. Following receipt of such notice AMCK Aviation will instruct its counsel to prepare drafts of the

Definitive Documents in respect of each Aircraft and the parties will diligently work towards finalizing such Definitive Documents in accordance with the terms hereof and thereof.

3.1.2    Frontier shall not take any actions or omit to take any actions that would cause the Delivery Dates for any Aircraft to be earlier or later than the relevant Target Delivery Period set forth on Schedule 1 hereto without the written consent of AMCK Aviation. For the avoidance of doubt, changes to the Delivery Date of an Aircraft that do not result from actions or omissions of Frontier and which do not require the consent or agreement of Frontier under the Purchase Agreement shall not be considered changes that require AMCK Aviation's consent under this Clause 3.1.2. If AMCK Aviation gives its consent to a change in the relevant Scheduled Delivery Quarter or Scheduled Delivery Month for an Aircraft, then the Target Delivery Period for such Aircraft shall, solely for purposes of this Clause 3.1.2, be deemed amended to mean such changed Scheduled Delivery Quarter or Scheduled Delivery Month.

3.1.3    If the Scheduled Delivery Quarter or Scheduled Delivery Month of any Aircraft is delayed beyond the first day of the Target Delivery Period for such Aircraft specified on Schedule 1 by more than six (6) months for any reason, then either party may, by giving not less than ten (10) days prior written notice to the other party, terminate its applicable commitment under Clause 2.1 in respect of such Aircraft. At the request of the non-terminating party by written notice to the terminating party received prior to the effectiveness of such notice of termination, the parties shall consult with each other in good faith for a period not exceeding one (1) week to determine whether a mutually acceptable alternative Delivery Date for such Aircraft can be agreed.

## 3.2    Inspection and Acceptance

3.2.1    Not less than two (2) months prior to the Delivery Date in respect of each Aircraft or such later date that may be agreed by AMCK Aviation, and subject to execution and delivery of a participation agreement based on the Manufacturer's standard form (the "**Participation Agreement**") (which may cover more than one Aircraft **provided that** AMCK Aviation has the ability to change the identified personnel thereunder), Frontier shall cause the Manufacturer to provide AMCK Aviation or an Affiliate of AMCK Aviation (as designated agent of the Lessor) with access to the Aircraft and the Aircraft's documentation (subject to the terms of the Participation Agreement) for the purpose of inspecting the Aircraft during the build and delivery process.  Pursuant to the terms of the Participation Agreement, Lessor shall be permitted to inspect the Aircraft and the Aircraft's documentation, at the sole cost and expense of AMCK Aviation, to verify the Aircraft's condition during the build and delivery process and its compliance with the Purchase Agreement, and to have at least two (2) observers participate on a flight test for the Aircraft and observe all usual ground acceptance tests. Subject to the foregoing having been made available to AMCK Aviation, AMCK Aviation shall complete the delivery

inspection of the Aircraft within a reasonable amount of time according to reasonable commercial standards so as to not delay the Delivery of the Aircraft.

3.2.2   If AMCK Aviation has any technical issues with the Aircraft, Frontier will work in good faith with the Manufacturer to rectify such technical issues to the reasonable satisfaction of AMCK Aviation, but so as not to cause undue delay to the manufacture and to the delivery process, unless such technical issues are such that the Aircraft is not in compliance with the Specification or the future value or re-marketability of the Aircraft is materially impacted.

3.2.3   If the Manufacturer notifies AMCK Aviation and Frontier that the Manufacturer does not intend to deliver any Aircraft because Airbus cannot correct any technical issues of the Aircraft or because in the opinion of the Manufacturer it is impracticable or prohibitively expensive to do so, and no other solution can be agreed between AMCK Aviation, Frontier and/or the Manufacturer, within five (5) days of receiving such notice AMCK Aviation will be entitled to terminate this Agreement, solely in respect of such Aircraft, by written notice to Frontier and neither AMCK Aviation nor Frontier shall have any further obligation or liability under this Agreement in respect of such Aircraft.

3.2.4   Frontier will not accept the Aircraft from the Manufacturer unless it has first consulted with AMCK Aviation, and AMCK Aviation has confirmed that it is also prepared to accept the Aircraft.

3.2.5   Neither AMCK Aviation nor any Indemnitee shall be liable for any losses arising from death or injury to any observer, representative or employee of Frontier in connection with any pre-Delivery demonstration flight or inspection of the Aircraft by Frontier or otherwise under the Purchase Agreement, unless caused by the willful misconduct or gross negligence of AMCK Aviation.

3.2.6   Frontier shall be liable for any losses arising from death or injury to any observer, representative or employee of AMCK Aviation in connection with any pre-Delivery demonstration flight or inspection of the Aircraft by AMCK Aviation or otherwise under the Purchase Agreement, unless caused by the willful misconduct or gross negligence of Frontier.

3.3   **Purchase Price and Conveyance of Title**

3.3.1   Subject to Clauses 2.2 and 2.3, AMCK Aviation will cause the relevant Lessor to make a payment to the Manufacturer on the relevant Delivery Date for each Aircraft in the amount of the Purchase Price for such Aircraft. Such payment shall be paid to the Manufacturer in satisfaction of the relevant Lessor's obligation under the Purchase Agreement Assignment for such Aircraft. Immediately upon payment of the relevant Purchase Price to the Manufacturer, Frontier shall cause the Manufacturer to deliver title to each Aircraft to the relevant Lessor as evidenced by delivery of the Warranty Bill of Sale for such Aircraft to the relevant Lessor. Frontier shall continue to perform and be solely liable for all obligations of the

buyer under the Purchase Agreement, including to make any advance payments or additional payments (other than the Purchase Price), if any, and Frontier shall otherwise take all actions as shall be necessary, to cause the Manufacturer to be paid the purchase price of the relevant Aircraft in full under the Purchase Agreement as and when due and to cause Manufacturer to deliver title to the Aircraft to the Lessor. Any excess of the Purchase Price due to Frontier over the amount due as purchase price to the Manufacturer under the Purchase Agreement and the relevant Purchase Agreement Assignment will be paid by Manufacturer to Frontier and handled separately between them.

3.3.2    At the time of purchase of an Aircraft by the relevant Lessor, simultaneously with and as a condition to Delivery, at no additional cost to AMCK Aviation or the relevant Lessor, Frontier shall cause good and marketable title to all BFE installed on or associated with such Aircraft at Delivery, including the BFE described in the Specification installed on the Aircraft at Delivery or to be installed immediately following Delivery, to be transferred to the Lessor free and clear of any Lien, pursuant to a warranty bill of sale in such form as is customary for such transfers, and reasonably acceptable to AMCK Aviation.

3.3.3    Frontier acknowledges and agrees that the Purchase Price for each Aircraft constitutes reasonably equivalent value within the meaning of Section 548(a) of the Bankruptcy Code and that AMCK Aviation and each Lessor are bona fide purchasers within the meaning of such Section of the Bankruptcy Code.

## 3.4    Delivery Notice and Funding Indemnity

3.4.1    Not less than four (4) Business Days prior to the Delivery Date in respect of an Aircraft (or such shorter period as AMCK Aviation may agree in its sole discretion), Frontier will give to AMCK Aviation a written notice of delivery (the "**Delivery Notice**") in respect of such Aircraft which will specify the proposed Delivery Date (the "**Notified Delivery Date**"). Such Delivery Notice may be revoked and re-issued in accordance with the terms of this Clause 3.4.1, but such revocation and re-issuance shall be without prejudice to Frontier's obligations under Clause 3.4.2 below.

3.4.2    If the Delivery Date in respect of an Aircraft does not occur on the Notified Delivery Date specified in any Delivery Notice in respect of such Aircraft, and such notice has not been revoked more than two (2) Business Days prior to such Notified Delivery Date, Frontier will indemnify AMCK Aviation and its Affiliates against, and within five (5) Business Days of written demand pay to AMCK Aviation and its Affiliates an amount equal to, any and all costs, expenses, losses or liabilities suffered or incurred by AMCK Aviation as a result of the Delivery Date not having occurred on the Notified Delivery Date, including any such costs, expenses or losses relating to AMCK Aviation's or any such Affiliate's raising of funds for the payment of the Purchase Price or breaking any such funding arrangements.

## 3.5    Rights and Obligations concerning the Purchase Agreement

3.5.1   Neither AMCK Aviation nor any Lessor shall have any obligation or liability under the Purchase Agreement by reason of or arising out of this Agreement or any Purchase Agreement Assignment other than to the extent expressly set out in each Purchase Agreement Assignment and only as and when executed and delivered by the relevant Lessor. Frontier confirms that it has performed and agrees that it will continue to perform all of its duties and obligations under the Purchase Agreement.

3.5.2   Neither this Agreement nor the assignment referred to in any Purchase Agreement Assignment shall constitute a novation of or delegation of obligations contained in the Purchase Agreement. Notwithstanding this Agreement and the Purchase Agreement Assignment, Frontier shall remain fully liable to the Manufacturer (to the same extent as if the Purchase Agreement Assignments and this Agreement had not been entered into) to perform all the obligations and duties of the buyer under the Purchase Agreement.  For the avoidance of doubt, Frontier acknowledges that AMCK Aviation shall not assume or be responsible in any way for any pre-delivery payment arrangements made by Frontier, any of its Affiliates or any third party in respect of any Aircraft. In addition, Frontier is, and shall at all times remain, responsible for the procurement and timely delivery to the Manufacturer of, and payment for, all BFE set out in the Specification, and Frontier shall ensure that such BFE (except for the BFE expressly contemplated hereby to be delivered and installed on the Aircraft after the Delivery Date) shall be installed on the Aircraft on or prior to the Delivery Date.

3.5.3   Frontier shall comply in all respects with all laws to which it may be subject to compliance with which is necessary to ensure the continuing validity and enforceability of the Purchase Agreement with respect to the Aircraft and the relevant Purchase Agreement Assignment.

3.5.4   Neither Frontier nor any Affiliate of Frontier shall amend or modify (except with the prior written consent of AMCK Aviation) or rescind, cancel or terminate the Purchase Agreement insofar as it relates to the Aircraft.

3.6     **Aircraft Specification**

3.6.1   Frontier undertakes that it will not take any action or omit to take any action that would result in the specifications of an Aircraft (including as to BFE installed thereon or delivered therewith) on the relevant Delivery Date varying in any material respect from the Specification, without AMCK Aviation's prior written consent.  Any changes to the agreed Specification shall require the prior written consent of each party and shall be at Frontier's sole cost and expense. For the avoidance of doubt, any changes to the Specification shall not increase the Purchase Price for any Aircraft.

3.6.2   Revisions to the specification of an Aircraft that are made by the Manufacturer in accordance with the terms of the Purchase Agreement without the need for any consent by Frontier (any such revision being a "**Development and Certification Change**") shall not be considered revisions that require AMCK Aviation's consent

under Clause 3.6.1. Frontier shall as soon as reasonably practicable provide AMCK Aviation with a written copy of any such Development and Certification Change.

3.6.3   Frontier shall deliver to AMCK Aviation, promptly and in any event within three (3) Business Days after Frontier's receipt thereof, copies of all notices and other relevant correspondence from Manufacturer under the Purchase Agreement with respect to the Aircraft which affect or relate to the condition of the Aircraft or the delivery status.

3.6.4   Following the Delivery Date in respect of each Aircraft, Frontier will purchase and arrange for the installation on the Aircraft in accordance with the Specification (as the same may be updated by agreement between AMCK Aviation and Frontier in accordance with the terms hereof) each item of BFE which is scheduled to be purchased and installed by Frontier post-Delivery. Frontier and AMCK Aviation (for itself and on behalf of each Lessor) agree that the installation of such pre-agreed BFE as part of the Specification shall not be construed as a Change (as defined in each Lease Agreement).

## 4.    DEFINITIVE DOCUMENT TERMS

The Definitive Documents in respect of each Aircraft shall be prepared in accordance the drafting notes set forth in the forms thereof attached hereto and in accordance with the following provisions of this Clause 4.

### 4.1   Basic Rent

Two (2) Business Days prior to the Notified Delivery Date, AMCK Aviation will determine the "Basic Rent" applicable to the Lease Agreement in respect of each Aircraft in accordance with the following formula:

Basic Rent = A + [L * N], where:

A       is the Base Fixed Rental in respect of such Aircraft;

L



N

### 4.2   Security

The "Security" specified in each Lease Agreement shall be a cash deposit equal to one (1) month of the Base Fixed Rental amount applicable to such Aircraft.

4.3     **Agreed Value**

The initial "Agreed Value" specified in each Lease Agreement shall be 110% of the Purchase Price of the applicable Aircraft.

4.4     **Owner Participant**

The "Owner Participant" in respect of each Aircraft shall be AMCK Aviation or an Affiliate thereof selected by AMCK Aviation.

4.5     **Lessor Guarantor**

The "Lessor Guarantor" in respect of each Lease Agreement shall be the applicable Owner Participant; **provided that** on the Delivery Date in respect of each Aircraft, if AMCK Aviation is not the Owner Participant, and the Owner Participant does not have a minimum net worth of US$▓▓▓▓▓ then AMCK Aviation shall be the "Lessor Guarantor".

4.6     **Specification**

If, pursuant to modifications permitted or agreed under the terms of this Agreement, the specification of any Aircraft (including the BFE) on the Delivery Date, or specification agreed by the parties concerning post-Delivery BFE installation, is different in any respect from the Specification set forth in this Agreement on the date hereof (which specification is set forth in the form Lease Agreement attached hereto as Exhibit A), then Schedule 1 to such Lease Agreement shall be updated to reflect the actual specification of the Aircraft.

4.7     **Delivery Location**

The "Delivery Location" specified in the Lease Agreement in respect of each Aircraft shall be the delivery location specified in accordance with the Purchase Agreement in relation to such Aircraft; **provided that** such location is in either (a) Mobile, Alabama, (b) Toulouse, France or (c) Hamburg, Germany; and **provided**, **further**, **that** if there are any sales taxes, VAT or any other taxes which may affect AMCK Aviation's economics, such delivery location shall be altered to avoid such cost, unless such sales taxes, VAT or any other taxes are borne by Frontier and Frontier indemnifies AMCK Aviation in respect thereof to its reasonable satisfaction.

4.8     **Audited Accounts**

The audited accounts of Frontier and Holdings referenced in Clause 2.1(k) of the Lease Agreement shall be the most recent audited annual financial statements of Frontier and Holdings.

5.      **REPRESENTATIONS AND WARRANTIES**

5.1     **Frontier's Representations and Warranties**

Frontier acknowledges that AMCK Aviation has entered into this Agreement and the other Transaction Documents in full reliance on the representations and warranties by Frontier in Clause 5.1; and Frontier now represents and warrants to AMCK Aviation that the following statements are on the date hereof, and on each Delivery Date will be, true and accurate:

5.1.1    Frontier is duly incorporated under the laws of the State of Incorporation and is validly existing and in good standing, and has full corporate power and authority to conduct its business as presently conducted, to own or hold under lease its assets, to enter into and perform its obligations under the Transaction Documents to which it is a party, to satisfy the conditions precedent set forth in Clause 2 and to consummate the transactions contemplated by the Transaction Documents to which it is a party;

5.1.2    Frontier's organizational documents incorporate provisions that permit, and all necessary authorizations, approvals, consents, licenses, permits and orders of and registrations with any Government Entity, including, but not limited to, those relating to foreign exchange controls, have been duly and unconditionally obtained and are now in full force and effect that are required to authorize, Frontier to sign and deliver, and perform its obligations under and the transactions contemplated by, the Transaction Documents to which Frontier is a party and satisfy the conditions precedent set forth in Clauses 2.2 and 2.3;

5.1.3    Frontier holds all licenses, certificates and permits from all relevant Government Entities for the conduct of its business (as presently conducted) as a Certificated Air Carrier and the performance of its obligations hereunder;

5.1.4    the Transaction Documents to which Frontier is a party constitute, or when entered into will constitute, legal, valid and binding obligations of Frontier, enforceable in accordance with their respective terms, except to the extent that enforceability may be limited any applicable bankruptcy or insolvency by laws affecting creditors' rights generally and/or general principles of equity;

5.1.5    neither the execution and delivery of the Transaction Documents to which Frontier is a party, the performance of any of the transactions contemplated herein and therein nor the satisfaction of the conditions precedent set forth in Clauses 2.2 and 2.3 will:  (i) contravene or constitute a violation or breach of or a default under any existing law or agreement by which Frontier or any of its assets is bound, any agreement to which it is a party or Frontier's organizational documents; (ii) cause any limitation on Frontier or its assets or the powers of its directors or officers, whether imposed by or contained in Frontier's organizational documents or any existing law, agreement or otherwise, to be exceeded; or (iii) result in the creation or imposition of, or oblige Frontier to create, any Lien (other than a Permitted Lien) over its undertaking or any of its assets, rights or revenues;

5.1.6    the obligations of Frontier under the Transaction Documents to which Frontier is a party are, or upon execution thereof by Frontier will be, direct, general and

unconditional obligations of Frontier and rank, or will rank, at least *pari passu* with all other present and future unsecured and unsubordinated obligations (including contingent obligations) of Frontier except for obligations mandatorily preferred by law and not by reason of any Lien;

5.1.7  no event has occurred that constitutes a contravention of, or default under, any agreement by which Frontier or any of its assets is bound or affected, and that could reasonably be expected to have a material adverse effect on the financial condition, business, assets, operations or prospects of Frontier or an adverse effect on its ability to observe or perform its obligations under the Transaction Documents to which Frontier is a party;

5.1.8  no litigation, arbitration or administrative proceeding that could (by itself or together with any other such proceedings or claims) reasonably be expected to have an adverse effect on Frontier's ability to observe or perform its obligations under the Transaction Documents to which Frontier is a party or a material adverse effect upon its financial condition, business, assets, operations or prospects is presently in progress or pending or threatened against Frontier or any of its assets;

5.1.9  the audited consolidated accounts of Frontier and Holdings for the fiscal year ended December 31, 2018  have been prepared in accordance with GAAP and give a true and fair view of the results of its operations for that period and its financial condition at such date and, in particular, to the extent required by GAAP, accurately disclose or reserve against all the liabilities (actual or contingent) of Frontier, and there has been no material adverse change in the financial condition, business, assets or operations of Frontier since such date;

5.1.10  Frontier is not delinquent to the applicable taxation authorities on any tax returns, Frontier is not in default in the payment of any Taxes, no claim is being asserted with respect to Taxes that is not disclosed in the audited accounts referred to in Clause 5.1.9 above that, if paid, could reasonably be expected to have a material adverse effect on the financial condition, business, assets, operations or prospects of Frontier or an adverse effect on Frontier's ability to observe or perform any of its obligations under the Transaction Documents to which it is a party, taking into account all other obligations that Frontier must observe or perform at that time, and any supply for value added tax purposes from AMCK Aviation to Frontier under or pursuant to this Agreement shall be exempt from value added taxes;

5.1.11  the financial and other information furnished by or on behalf of Frontier to AMCK Aviation and its Affiliates in writing does not contain any untrue statement or omit to state any fact the omission of which makes the statements therein, in the light of the circumstances under which they were made, misleading, nor omits to disclose any material matter and all expressions of expectation, intention, belief and opinion contained therein were honestly made on reasonable grounds after due and careful inquiry by Frontier;

5.1.12   Frontier, under applicable law, is subject to private commercial law and suit, and neither Frontier nor its properties or assets have any right of immunity from suit or execution on the grounds of sovereignty in the State of Incorporation or any other jurisdiction or on any other grounds;

5.1.13   no Framework Event of Default has occurred and is continuing;

5.1.14   the execution, delivery and performance of the Transaction Documents to which Frontier is a party will not of themselves result in AMCK Aviation (i) having any liability for any indirect or sales Taxes in the United States, the State of Incorporation, the State of Registration or the Habitual Base or (ii) having or being deemed to have a place of business in the United States, the State of Incorporation, the State of Registration or the Habitual Base;

5.1.15   [Intentionally omitted]; and

5.1.16   the Purchase Agreement is in full force and effect and is enforceable in accordance with its terms and Frontier is not in default thereunder, including as to any advance payment obligations in respect of any Aircraft and, to Frontier's knowledge, the Manufacturer is not in default under the Purchase Agreement to the extent it relates to any Aircraft and neither the execution and delivery of this Agreement nor the performance hereof will result in a default under the Purchase Agreement.

## 5.2     AMCK Aviation's Representations and Warranties

AMCK Aviation represents and warrants to Frontier that the following statements are, at the date hereof, and on the Delivery Date will be, true and accurate:

5.2.1   AMCK Aviation is a company limited by shares duly incorporated and validly existing under the Laws of Ireland and has full corporate power and authority to conduct its business as presently conducted, to enter into and perform its obligations under the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby;

5.2.2   AMCK Aviation's organizational documents incorporate provisions that permit, and all necessary action has been taken to authorize, and all necessary authorizations of any Government Entity have been duly and unconditionally obtained and are now in full force and effect that are required to authorize, AMCK Aviation to sign and deliver, and to perform the transactions contemplated by, the Transaction Documents to which AMCK Aviation is a party;

5.2.3   the Transaction Documents to which AMCK Aviation is a party constitute, or when entered into will constitute, legal, valid and binding obligations of AMCK Aviation, enforceable in accordance with their respective terms, except to the extent that enforceability may be limited by any applicable bankruptcy or insolvency laws affecting creditors' rights generally and/or general principles of equity;

5.2.4   neither the execution and delivery of the Transaction Documents to which AMCK Aviation is a party nor the performance of any of the transactions contemplated herein and therein will:  (i) contravene or constitute a violation or breach of or a default under any existing law or agreement by which AMCK Aviation or any of its assets is bound, any agreement to which AMCK Aviation is a party or AMCK Aviation's organizational documents; (ii) cause any limitation on AMCK Aviation, or the power of its directors and officers, whether imposed by or contained in AMCK Aviation's organizational documents or any existing law, agreement or otherwise, to be exceeded; or (iii) result in the creation or imposition of, or oblige AMCK Aviation to create, any AMCK Aviation's Lien (other than pursuant to the Financing Documents); and

5.2.5   no litigation, arbitration or administrative proceeding that could reasonably be expected (by itself or together with any other such proceedings or claims) to have an adverse effect on AMCK Aviation's ability to observe or perform its obligations under the Transaction Documents to which it is a party is presently in progress or pending or threatened against AMCK Aviation or any of its assets.

## 5.3   **No Prejudice**

The rights of either party hereto in relation to any misrepresentation or breach of warranty by the other party shall not be prejudiced by any investigation by or on behalf of the first party into the affairs of the other party, by the performance of this Agreement and the other Transaction Documents to which it is a party or by any other act or thing done or omitted by the first party that would, but for this Clause 5.3, prejudice such rights.

## 6.   **FRAMEWORK EVENTS OF DEFAULTS**

## 6.1   **Classes of Events**

Each of the following shall constitute a Framework Event of Default:

6.1.1   *Non-Payment*. Frontier fails to pay any amount due under any of the Transaction Documents in the currency and in the manner stipulated within five (5) Business Days of  written notice of such failure from AMCK Aviation;

6.1.2   *Other Obligations*.  Frontier fails to comply with any provision of this Agreement (other than the provisions or obligations mentioned in sub-clauses 6.1.1 or 6.1.2) or any other Transaction Document and such failure, if capable of being remedied, continues for fifteen (15) days after receipt of written notice thereof from AMCK Aviation to Frontier (or, if earlier, Frontier becoming aware of the same); **provided, however, that**, if Frontier shall be diligently undertaking to remedy any such failure and notwithstanding the diligence of Frontier in attempting to remedy such failure, such failure is not cured within said fifteen (15) day period, and in addition, (i) such failure is not capable of being cured within said fifteen (15) day period but is capable of being cured within an additional fifteen (15) days, and (ii) such failure may not be cured by a monetary payment by Frontier and does not give rise to any increased liability for any Indemnitee, then there shall exist no Framework Event

of Default under this subclause unless such failure is not remedied within thirty (30) days after such written notice (or awareness by Frontier);

6.1.3    *Misrepresentation*.  Any representation or warranty made or deemed to be made or repeated by Frontier in any Transaction Document or any other document delivered by or on behalf of Frontier under or in connection with any Transaction Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made or repeated and, if by remedying any situation or circumstance such representation or warranty would cease to be false or incorrect and such situation or circumstance is capable of remedy, and Frontier fails to remedy the same within fifteen (15) days after written notice thereof is given by AMCK Aviation to Frontier (or if earlier Frontier becoming aware of the same);

6.1.4    *Receivership; Bankruptcy; Insolvency Proceedings, etc.*

(a)    Frontier consents to the appointment of a custodian, receiver, trustee, liquidator, administrative receiver, administrator, compulsory manager or other similar officer of itself or any material part of Frontier's property (or takes any action with respect to the appointment of the same), or Frontier admits in writing its inability to, or is unable to, or does not, pay its debts generally as they come due, or suspends its debts, or makes a general assignment for the benefit of creditors, or Frontier files a voluntary petition in bankruptcy or voluntary petition seeking liquidation or reorganization in a proceeding under any bankruptcy or insolvency or similar laws (as now or hereafter in effect), or an answer admitting the material allegations of a petition filed against Frontier in any such proceeding, or Frontier by voluntary petition, answer or consent seeks relief under the provisions of any bankruptcy, insolvency or other similar law, or provides for or takes any action in connection with an agreement, composition, extension or adjustment with its creditors; or

(b)    an order, judgment or decree is entered by any court appointing a custodian, receiver, trustee or liquidator or sequestering all or substantially all or any material part of Frontier's property or at any time an order for relief is granted; or

(c)    a petition (or equivalent) against Frontier or any material part of its assets relating to bankruptcy, insolvency or other similar laws (as now or hereafter in effect) is filed (other than by Frontier), including with respect to the appointment of a custodian, receiver, trustee, liquidator, administrative receiver, administrator, compulsory manager or other similar officer, to other relief, in a court of competent jurisdiction and is not withdrawn or dismissed within sixty (60) days thereafter or at any time an order for relief is granted in such proceeding, or if, under the provisions of any law providing for reorganization or winding-up of corporations which may apply to Frontier, any court of competent jurisdiction assumes jurisdiction over, or custody or control of, Frontier or a material part of Frontier's

property, and such jurisdiction custody or control remains in effect, unrelinquished, unstayed, undismissed, unvacated and unterminated for a period of sixty (60) days; or

(d)    the appointment of a custodian, trustee, liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of Frontier or any material part of its assets or the commencement of any moratorium in respect of any of its indebtedness; or

(e)    any analogous procedure or step is taken in any jurisdiction;

6.1.5    *Cessation of Business*.  Frontier permanently suspends or ceases to carry on its business as a scheduled air carrier;

6.1.6    *Authorizations*.  Any consent, authorization, license, permit, certificate or approval of, or registration with or declaration to any Government Entity required to be obtained or made by Frontier to authorize, or required to be obtained or made by Frontier in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of any of the Transaction Documents or the performance by Frontier of its obligations under such Transaction Documents or the use or operation of the Aircraft for the carriage, for hire or reward, of passengers or the certificate of airworthiness or registration of the Aircraft or maintenance of Frontier's status as a Certificated Air Carrier is modified or is revoked, suspended, canceled, withdrawn or terminated or expires and is not renewed, or otherwise ceases to be in full force and effect, and AMCK Aviation reasonably determines that such modification, revocation, suspension, cancellation, withdrawal, termination, expiration, non-renewal, cessation may (i) prejudice AMCK Aviation's rights under or in connection with any of the Transaction Documents, (ii) have a material adverse effect on Frontier's ability to perform its obligations thereunder or (iii) give rise to criminal or civil liability of AMCK Aviation;

6.1.7    *Events of Default under Lease Agreements*.  An "Event of Default" under, and as defined, in any Lease Agreement (or any equivalent event, howsoever defined) has occurred and is continuing;

6.1.8    *Failure to Accept Delivery*.  Frontier fails to accept delivery of any Aircraft in accordance with the terms of this Agreement and the applicable Lease Agreement, or notifies AMCK Aviation or any Lessor that Frontier will not do the same;

6.1.9    *Repudiation*.  Frontier repudiates this Agreement or any other Transaction Document (or any of its obligations hereunder or thereunder) or challenges the existence, validity or enforceability of the same; of AMCK Aviation's or Lessor's interest in any Aircraft;

6.1.10    *Mergers*.  Frontier ceases to be wholly-owned and controlled by Frontier Airlines Holdings, Inc., except as otherwise expressly permitted in this Agreement;

6.1.11 *Other Cross Defaults*.  Frontier (i) defaults in any payment of any indebtedness (other than intra-group indebtedness) having an aggregate outstanding value of more than US$15,000,000 (or the equivalent thereof) beyond the period of grace if any, provided in the instrument or agreement under which such indebtedness was created or (ii) any such indebtedness having an aggregate outstanding value of more than US$15,000,000 (or the equivalent thereof) of Frontier shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required repayment, prior to the stated maturity thereof;

6.1.12 *Judgments*. A final, non-appealable judgment for the payment of money in excess of US$15,000,000 (or the equivalent thereof), or in the aggregate, final non-appealable judgments for the payment of money in excess of US$15,000,000 (or the equivalent thereof) not covered by insurance shall be rendered against Frontier and the same shall remain undischarged for the later of thirty (30) days or the deadline for payment thereof as set forth in such judgment or judgments during which neither execution of such judgment or judgments shall be effectively stayed nor adequate bonding fully covering such judgment or judgments shall exist; or

6.1.13 *Asset Sales*.  Frontier disposes or takes any action to dispose of all or a material part of its assets, whether by one or a series of transactions, related or not, other than in the ordinary course of business, except that no Framework Event of Default shall occur where such disposal takes place as expressly permitted in the Lease Agreement.

## 6.2    **AMCK Aviation's Rights**

6.2.1    Upon the occurrence of any Framework Event of Default and any time thereafter so long as the same shall be continuing, AMCK Aviation may at its option by notice in writing to Frontier treat such event as a repudiation by Frontier of its obligations under this Agreement or declare this Agreement to be in default; **provided that**, upon the occurrence of any Framework Event of Default specified in Clause 6.1.4 of this Agreement shall automatically be deemed to have been repudiated by Frontier and declared in default. Once this Agreement has been repudiated by Frontier or declared in default, or is deemed to have been repudiated by Frontier or declared in default, in accordance with the foregoing sentence then, and at any time thereafter, AMCK Aviation shall be entitled to terminate its obligations under this Agreement and/or proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Frontier of the applicable covenants of Frontier hereunder and to recover damages for the breach thereof and/or to rescind this Agreement.

6.2.2    No remedy referred to in this Clause 6.2 is intended to be exclusive, but, to the extent permissible hereunder or under applicable law, each shall be cumulative and in addition to any other remedy referred to above or otherwise available to AMCK Aviation at law or in equity; and the exercising or beginning of exercise by AMCK Aviation of any one or more of such remedies shall not preclude the simultaneous or later exercise by AMCK Aviation of any or all of such other remedies.  No

express or implied waiver by AMCK Aviation of any Framework Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Framework Event of Default.

6.2.3   Notwithstanding any termination or failure of Frontier to meet conditions precedent to AMCK Aviation's obligation hereunder to purchase and lease the Aircraft as set forth in Clause 2.2 and 2.3, AMCK Aviation shall retain its claims against Frontier for damages and all other rights and remedies provided for herein and in the other Transaction Documents or at law or in equity for a breach of any representation, warranty, covenant or condition contained herein and in the other Transaction Documents, including as set forth in the Lease Agreements in respect of an Event of Default.

## 7.   INDEMNITIES

### 7.1   Default Indemnity

Frontier hereby agrees at all times to indemnify, protect, defend and hold harmless each Indemnitee from and against all and any liabilities, losses, claims, proceedings, damages, penalties, fines, fees, costs and expenses whatsoever (any of the foregoing being referred to as a **"Claim"**) that any of them at any time suffers or incurs arising, directly or indirectly out of or in any way connected with a breach by Frontier of any of its obligations under the Transaction Documents or any Framework Event of Default.

### 7.2   General Tax Indemnity

7.2.1   Frontier shall pay and discharge or cause to be paid or discharged, within the period for payment permitted by law (and shall, if requested by a Tax Indemnitee, produce to such Tax Indemnitee evidence of the payment and discharge thereof), and indemnify each Tax Indemnitee and keep each Tax Indemnitee fully indemnified at all times from and against all Taxes payable by such Tax Indemnitee at any time in respect of the Transaction Documents or in respect of any transaction contemplated by the Transaction Documents. The preceding sentence shall not apply to, and Frontier shall have no liability to a Tax Indemnitee pursuant to this Clause 7.2 with respect to any Taxes imposed on such Tax Indemnitee (i) with respect to, or measured by, the net income, capital gain, profits, capital, net worth, corporate franchise, conduct of business or privilege or conducting business of such Tax Indemnitee or in the nature of a minimum income tax, (ii) by the jurisdiction (including a state or locality thereof) of its organization, except in the case of either clause (i) or clause (ii), Taxes (A) imposed if and to the extent that such Taxes result from (1) the negotiation, presence, execution, enforcement, registration or delivery of any of the Transaction Documents in such jurisdiction; (2) the presence, use, operation, maintenance, alteration, registration, repair or replacement of any Aircraft or any part thereof in such jurisdiction; or (3) the presence or organization of Frontier or other user of any Aircraft in, or payment of any amount under the Transaction Documents from, such jurisdiction or (B) imposed as a result of (1) the repair, replacement or, maintenance of any Aircraft or any part thereof; (2) the

recklessness or willful misconduct of Frontier or other user of any Aircraft; or (3) the breach by Frontier of any of its representations or covenants under this Agreement or any Transaction Document; **provided that**, the foregoing exclusions shall not be interpreted to exclude the making of any payment on an After-Tax Basis.

7.2.2    If a written notice of any claim is made against any Tax Indemnitee for any Taxes for which Frontier is required to pay or against which Frontier is required to indemnify such Tax Indemnitee pursuant to Clause 7.2.1, such Tax Indemnitee shall promptly notify Frontier thereof in writing. If reasonably requested by Frontier in writing within thirty (30) days of Frontier's receipt of notice of such claim, and to the extent that there are means available by which to do so, such Tax Indemnitee shall, **provided that** no Framework Event of Default shall have occurred and be continuing, in good faith diligently contest by pursuing all administrative appeals in the name of such Tax Indemnitee or, in such Tax Indemnitee's discretion if requested by Frontier, contest in the name of Frontier (or permit Frontier, in such Tax Indemnitee's discretion if requested by Frontier, to contest in the name of Frontier) the validity, applicability or amount of such Taxes by (a) resisting payment thereof, if practicable; (b) paying the same only under protest, if protest is necessary and proper; or (c) if payment shall be made, seeking a refund thereof in appropriate administrative and judicial proceedings; **provided that** (i) prior to taking such action Frontier shall have agreed to indemnify, and shall indemnify on an After-Tax Basis on demand, such Tax Indemnitee in a manner reasonably satisfactory to such Tax Indemnitee for all costs and expenses reasonable in amount and not improperly incurred which such Tax Indemnitee may incur in connection with contesting such claim (including all legal and accountants' fees and disbursements and the amount of any interest, penalties or additions to tax which may be payable as a result of contesting such claim) and shall have acknowledged in writing to such Tax Indemnitee its obligations hereunder to indemnify such Tax Indemnitee in respect of such Tax; (ii) AMCK Aviation shall have determined in good faith that such contest shall not result in a risk of sale, forfeiture or loss of, or creation of any lien on, the Aircraft; (iii) if such contest is to be initiated by the payment of, and the claiming of a refund for, such Taxes, Frontier shall have advanced to such Tax Indemnitee sufficient funds (on an interest-free basis and, if such Tax Indemnitee shall have determined in good faith that such advance results in taxable income to such Tax Indemnitee, on an After-Tax Basis) to make such payment; (iv) Frontier shall have received (and provided a copy to AMCK Aviation of) an opinion of independent tax counsel selected by Frontier (and reasonably acceptable to AMCK Aviation) that a reasonable basis exists for such contest; (v) Frontier shall have delivered to such Tax Indemnitee a written undertaking of Frontier's obligation to indemnify such Tax Indemnitee for the Tax being contested if the contest is not successful; (vi) the amount of the potential indemnity for which Frontier may be liable to pay such Tax Indemnitee under this Clause 7.2.1 exceeds US$15,000 or the equivalent thereof; and (vii) the contest is not for a Tax the imposition of which has been previously contested by Frontier or such Tax Indemnitee, and such contest (including all allowable appeals) was decided adversely to Frontier or such Tax Indemnitee; and **provided further**

**that**, no Tax Indemnitee shall be under any obligation to take any action otherwise required of it under this paragraph if, in its bona fide opinion, to do so would, or would be likely, to have an adverse effect upon its business, operation or financial condition or any be prejudicial to it in any other respect. Nothing contained in this Clause 7.2.2 shall require such Tax Indemnitee to contest, or permit Frontier to contest in the name of Frontier, a claim which such Tax Indemnitee would otherwise be required to contest pursuant to Clause 7.2.2 if such Tax Indemnitee shall waive payment by Frontier of any amount that might otherwise be payable by Frontier under this Clause 7.2.1 in connection with such claim.

7.2.3   If Frontier is obligated to make any payment under this Clause 7.2, then without in any way limiting, reducing or otherwise qualifying the rights of the Tax Indemnitees under such provisions, each Tax Indemnitee shall consult in good faith with Frontier with a view to taking such reasonable steps as may be open to it (a) to avoid the effects of such circumstances; or (b) to avoid the need for Frontier to make payment pursuant to Clause 7.2 or to reduce the amount of any such payment; **provided that**, no Tax Indemnitee shall be under any obligation to take any such action if, in its bona fide opinion, to do so would, or would be likely, (i) to have an adverse effect upon its business, operation or financial condition; (ii) to result in its rights, interests or position under or in relation to the Transaction Documents being less favorable to it than would otherwise have been the case; (iii) to involve it in any unlawful activity or any activity that is contrary to any official directive, concession, guideline, request or requirement of any competent authority; (iv) to result in a breach of any of its representations, warranties, covenants or other undertakings under this Agreement or any other agreement to which it is, at the time, a party thereto; (v) to have an adverse effect on the registration of the Aircraft, or on AMCK Aviation's interest in any Aircraft or in the Transaction Documents; or (vi) to involve any expense, loss or liability (including transaction expenses) or tax disadvantage (unless indemnified or secured to such party's satisfaction).

7.3   **Value Added Tax**

7.3.1   For purposes of this clause;

(a)   "**VAT**" means value added tax and any sales or turnover tax, imposition or levy of a like nature; and

(b)   "**supply**" includes anything on which VAT is chargeable;

7.3.2   Frontier will pay to AMCK Aviation the amount of any VAT chargeable in respect of any supply for VAT purposes under this Agreement; and

7.3.3   Each amount which Frontier must pay under this Agreement does not include VAT and if VAT is payable in respect of any amount, Frontier shall pay all such VAT and shall indemnify AMCK Aviation against any claims for the same (and where appropriate Frontier shall increase the payments which would otherwise be required to be made hereunder so that AMCK Aviation is left in the same position as it would

have been in had no VAT been payable); and Frontier shall provide evidence to AMCK Aviation in respect of payment of any such VAT.

7.4    **Payments on After-Tax Basis**

Each payment and indemnity made by Frontier under this Clause 7 shall be made on an After-Tax Basis.

7.5    **No Deductions or Withholdings**

Frontier shall ensure that all payments to be made under this Agreement shall be made in full without any deduction or withholding (whether in respect of set-off, counterclaim, duties, Taxes, charges or otherwise) unless such deduction or withholding is required by law, in which event Frontier shall:

7.5.1    ensure that any deduction or withholding by it does not exceed the minimum amount legally required;

7.5.2    on the due date for such payment pay to the payee such additional amount as shall result in the net amount received by such payee being equal on an After-Tax Basis to that amount which would have been received by such payee had no such deduction or withholding been made;

7.5.3    pay to the applicable taxation or other authorities within the period for payment permitted by law the full amount of the deduction or withholding legally required to be paid by it (including, but without prejudice to the generality of the foregoing, the full amount of any deduction or withholding from any additional amount paid pursuant to this paragraph); and

7.5.4    furnish to such payee, within thirty (30) days of payment of such Taxes by it either (A) an official receipt of the applicable taxation or other authorities for all amounts deducted or withheld as aforesaid or (B) if such receipts are not issued by the taxation or other authorities concerned on payment to them of amounts so deducted or withheld, a certificate of deduction or equivalent evidence of the relevant deduction or withholding.

7.6    **Reports**

Frontier will provide such information as may be requested by a Tax Indemnitee to enable it to fulfill its Tax filing or other information reporting requirements with respect to the transactions contemplated by Frontier's Documents.  If any report, return or statement is required to be filed with respect to any Tax which is subject to indemnification under this Clause 7, to the extent legally permitted to do so Frontier shall timely file or cause to be filed the same (except for any such report, return or statement which such Tax Indemnitee has notified Frontier that it intends to file, or for income tax returns or any other return, report or statement which AMCK Aviation is required by law to file in its own name). Frontier shall either file or cause to be filed such report, return or statement required to be filed by it pursuant to the preceding sentence and send a copy of such report, return or

statement to such Tax Indemnitee, or, where Frontier is not so permitted to file such report, return or statement, it shall notify such Tax Indemnitee of such requirement and prepare and deliver, such report, return or statement to such Tax Indemnitee in a manner satisfactory to it within a reasonable time prior to the time such report, return or statement is to be filed and such Tax Indemnitee shall file such report, return or statement; **provided that**, the only consequence hereunder for failure to file such report, return or statement pursuant to this Clause 7.6 by such Tax Indemnitee shall be a loss of indemnification from Frontier in respect of Taxes resulting from such failure.

## 7.7    Continuation of Indemnities

The rights of each Indemnitee and Tax Indemnitee in respect of the indemnities contained in this Agreement, including in this Clause 7, shall continue in full force and effect in favor of each such Indemnitee notwithstanding the termination of this Agreement, any other Transaction Documents and/or the leasing of any Aircraft under any Lease Agreement for any reason whatsoever, and notwithstanding cessation of business of such Indemnitee or Tax Indemnitee, dissolution of such Indemnitee, Tax Indemnitee or Frontier, any change in the constitution of such Indemnitee, Tax Indemnitee or Frontier, any transfer or assignment by an Indemnitee or Tax Indemnitee of its interest hereunder, or any other fact, event or circumstance of any kind whatsoever, whether similar to any of the foregoing or not.

## 7.8    Computations

The results of all computations required to be made by a Tax Indemnitee pursuant to Clauses 7.2, 7.3, 7.4, 7.5 and 7.6, together with a statement describing in reasonable detail the manner in which such computations were made, shall be delivered to Frontier in writing which statement shall be conclusive and binding absent any manifest error in such certificate.

## 7.9    Forms

Each Indemnitee agrees to furnish from time to time to Frontier or to such other person as Frontier may designate, at Frontier's request and expense, such duly executed and properly completed forms as such Indemnitee may be permitted and legally able to deliver and as may be necessary or appropriate in order to claim any reduction of, or exemption from any Tax which Frontier may be required to indemnify against hereunder, unless such Indemnitee determines that furnishing such forms may have an adverse effect on the business or operations of such Indemnitee.

## 7.10    Survival

The indemnities and other obligations of Frontier under this Clause 7 shall survive the expiration or other termination of this Agreement.

## 8.    FURTHER PROVISIONS

## 8.1    Nature of Frontier's Obligations

All obligations of Frontier under this Agreement shall constitute conditions, and the time for the performance of such conditions shall be of the essence.

### 8.2 Benefit of Agreement

Neither party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other party.

### 8.3 Further Assurances

Each of the parties agrees that at any time and from time to time it shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as may be reasonably necessary in order to give full effect to this Agreement and the rights and powers herein granted.

### 8.4 Rights Cumulative; Waivers; Variation; Counterparts; Language; Delivery by E-mail

8.4.1 The rights of both parties under this Agreement are cumulative, may be exercised as often as the relevant party considers appropriate and are in addition to its rights under the general law. The rights of both parties against the other or in relation to the Aircraft (whether arising under this Agreement or the general law) shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing; and in particular any failure to exercise or any delay in exercising any such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

8.4.2 The provisions of this Agreement shall not be varied otherwise than by an instrument in writing executed by or on behalf of AMCK Aviation and Frontier.

8.4.3 This Agreement may be executed in counterparts each of which will constitute one and the same document.

8.4.4 All documents delivered to AMCK Aviation or required to be delivered pursuant to this Agreement shall be in English, or if not in English, will be accompanied by a certified English translation. If there is any inconsistency between the English version of this Agreement or any document delivered hereunder and any other version in any other language, the English version will prevail.

8.4.5 This Agreement and the other Transaction Documents (and the counterparts thereof) may be delivered by a party thereto by way of e-mail transmission to the other party and delivery shall be deemed completed for all purposes upon the completion of such e-mail transmission. A party that so delivers this Agreement or any of the other Transaction Documents (and the counterparts thereof) by way of

e-mail transmission agrees to promptly thereafter deliver to the other parties thereto an original signed counterpart. The e-mail signature of any party shall be considered for these purposes as an original document, and any e-mail document shall be considered to have the same binding legal effect as an originally executed document. In consideration of the mutual covenants herein contained, the parties agree that neither of them shall raise the use of e-mail as a defense to this Agreement or any of the other Transaction Documents and forever waive any such defense.

8.5    **Evidence of Indebtedness**

Except where expressly otherwise provided in this Agreement, any certificate or determination by AMCK Aviation as to any rate of interest or as to any amount payable under this Agreement shall contain reasonable details of the calculation of such rate or, as the case may be, amount and, if appropriate, the circumstances giving rise thereto and shall, in the absence of manifest error, be conclusive and binding on Frontier.

8.6    **Notices**

Any notice or communication under or in connection with this Agreement shall be in English and in writing and shall be delivered personally or by e-mail transmission (confirmed, orally or in writing, as received by the recipient) or sent by certified, registered or express mail, postage prepaid to the respective addresses given below or such other address or e-mail as the recipient may have notified to the sender in writing.  Notices or communications shall be deemed received:

8.6.1    in the case of an e-mail on the Business Day immediately following the date of dispatch;

8.6.2    in the case of certified, registered or express mail, on the date received:

to AMCK Aviation at:

AMCK AVIATION HOLDINGS IRELAND LIMITED
28-29 Sir John Rogerson's Quay
Dublin 2
Ireland
E-mail:  notices@amck.aero
Attention:  The Directors

to Frontier at:

FRONTIER AIRLINES, INC.
4545 Airport Way
Denver, CO 80239-7312
Email: spencer.thwaytes@flyfrontier.com
Attention:  Treasurer

with a copy to:

FRONTIER AIRLINES, INC.
4545 Airport Way
Denver, CO 80239-7312
Email: howard.diamond@flyfrontier.com
Attention: General Counsel

8.7  **Invalidity of any Provision**

If any of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

8.8  **Entire Agreement**

This Agreement constitute the entire agreement between the parties hereto in relation to the subject matter hereof and supersedes all previous proposals, agreements and other written and oral communications in relation thereto.

8.9  **Governing Law**

This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York. This Agreement has been delivered in the State of New York.

8.10  **Submission to Jurisdiction**

8.10.1  With respect to any suit, action or proceedings relating to this Agreement or any matter between the parties arising under or in connection with this Agreement ("**Proceedings**"), each party irrevocably: (i) submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York, and any appellate court from any thereof; and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. Each party hereby agrees that, subject to any rights of appeal, a final judgment in any such Proceedings shall be conclusive and may be enforced in other jurisdictions otherwise having jurisdiction over such party by suit on such final judgment or in any other manner provided by law. Nothing in this Agreement precludes any party from bringing Proceedings in any other jurisdiction, nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

8.10.2  Frontier shall designate, appoint and empower Corporation Service Company (CSC) of 1180 Avenue of the Americas, Suite 210, New York, NY 10036 as its

authorized agent solely to receive and acknowledge, for and on its behalf, service of any writ, summons, order, judgment or other notice of legal process in any Proceedings.  As long as this Agreement remains in force, Frontier shall maintain a duly appointed and authorized agent to receive and acknowledge, for and on its behalf, service of any writ, summons, order, judgment or other notice of legal process in any Proceedings.  Frontier shall keep AMCK Aviation advised of the identity and location of such agent.  Frontier irrevocably undertakes not to revoke the authority of such agent and, in the event of the termination of such appointment, or if for any reason Frontier's process agent is unable to act as such, Frontier will appoint a substitute process agent acceptable to AMCK Aviation.

8.10.3   Frontier further agrees that service of process in any Proceedings also may be effected by mailing a copy thereof by registered or certified mail or by overnight courier service, postage prepaid, to it at its address specified in Clause 8.6. Notwithstanding anything herein to the contrary, Frontier hereby waives, to the fullest extent permitted by applicable law, the right to object to the service of process by AMCK Aviation, with respect to any Proceedings.  Nothing in this Agreement will affect the right of AMCK Aviation to serve process in any other manner permitted by applicable law or to bring any legal action or proceeding or to obtain execution of judgment in any jurisdiction.

8.10.4   Frontier irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, with respect to itself and its property (irrespective of its use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 8.11   Waiver of Jury Trial

EACH OF AMCK AVIATION AND FRONTIER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS.  Each of the parties hereby (a) certifies that no representative, agent or attorney of any other parties has represented, expressly or otherwise, that such other parties would not, in the event of a Proceeding, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this paragraph.

## 8.12   Confidentiality

Each of AMCK Aviation and Frontier shall keep confidential any confidential information furnished or made available to them hereunder by the other party hereto, except:

8.12.1   each of AMCK Aviation and Frontier may make disclosure to the extent necessary to comply with the law, the valid order of a court of competent jurisdiction or the request of a regulatory authority;

8.12.2   each of AMCK Aviation and Frontier may make disclosure as part of its normal reporting or review procedure to its parent companies (and, in the case of Lessor, to the Owner Participant and its Affiliates), its auditors, its attorneys, its regulators and its advisors; **provided that**, such parent companies (and, in the case of Lessor, to the Owner Participant and its Affiliates), auditors, attorneys and advisors will be bound by the provisions of this Clause;

8.12.3   each of AMCK Aviation and Frontier may make disclosure to enforce its rights and remedies under this Agreement;

8.12.4   AMCK Aviation may make disclosures to any Lender or any potential Lender and to potential assignees and transferees and their respective auditors, attorneys and advisors, so long as AMCK Aviation obtains an undertaking of confidentiality from such persons in the terms substantially no less strict mutatis mutandis than this Clause; or

8.12.5   each of AMCK Aviation and Frontier may disclose such information as is in the public domain.

Notwithstanding the foregoing provisions of this Clause 8.12, each of AMCK Aviation and Frontier (and any employee, representative, or agent of AMCK Aviation or Frontier) is expressly authorized to disclose to any and all persons, without limitation of any kind, the U.S. federal and state tax treatment and U.S. federal and state tax structure of the transactions contemplated by this Agreement and the other Transaction Documents, and all materials of any kind (including opinions or other tax analyses, if any) that are provided to it related to such tax treatment and tax structure.

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement to be executed as of the date first above written.

**AMCK AVIATION HOLDINGS IRELAND LIMITED**

By: ..................................................................
Name: Shigeru Kizawa
Title: Attorney-in-fact

By: ..................................................................
Name:
Title: **Mitsuhiro Umino**
Attorney-in-fact

**FRONTIER AIRLINES, INC.**

By: .......................................................................

Name:

Title:

James G. Dempsey
Chief Financial Officer