**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FRONTIER AIRLINES, INC.,

                Plaintiff,

     v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION (TWO)
LIMITED, WELLS FARGO TRUST COMPANY,
N.A., solely in its capacity as OWNER TRUSTEE,
and UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE,

                Defendants.

20 Civ. 9713 (LLS)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: November 11, 2022

Jeff E. Butler
John P. Alexander
Gege Weinberg
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

Introduction ...........................................................................................................1

Factual Background ...............................................................................................2

    A.    The Principal Parties. ................................................................ 2

    B.    The 14 Original Leases. ........................................................... 2

    C.    The Framework Agreement. ..................................................... 3

    D.    Lease of MSN 10038. .............................................................. 4

    E.    Frontier's Request for a Rent Deferral. .................................... 5

    F.    AMCK Grants Frontier a 10-Day Grace Period. ..................... 5

    G.    Termination of the Framework Agreement. .............................. 8

    H.    The Instant Lawsuit. ................................................................ 9

Legal Standard .....................................................................................................9

Argument .............................................................................................................10

    I.    FRONTIER'S CLAIMS FOR BREACH OF THE FRAMEWORK
        AGREEMENT SHOULD BE REJECTED AS A MATTER OF
        LAW. ...................................................................................10

        A.    There Is No Genuine Issue of Material Fact Concerning the
            Events Leading up to the Termination by AMCK. ....................10

        B.    As a Matter of Law, AMCK's Termination of the Framework
            Agreement Was Valid. ..............................................................11

        C.    Frontier's Claim of an Earlier Repudiation (First Claim)
            Should Be Rejected as a Matter of Law. ...................................13

        D.    Frontier's Claim for Breach of the Implied Covenant of Good
            Faith and Fair Dealing (Fourth Claim) Should Be Rejected as a
            Matter of Law. .........................................................................14

        E.    There Is No Valid Claim Under the Framework Agreement
            Against Any Other Defendant. ..................................................15

II.     FRONTIER'S NON-CONTRACT CLAIMS REGARDING THE
FRAMEWORK AGREEMENT SHOULD BE REJECTED AS A
MATTER OF LAW..................................................................................16

      A.     Frontier's Promissory Estoppel Claim Should Be Rejected as a
Matter of Law. .......................................................................16

      B.     Frontier's Fraud Claim Should Be Rejected as a Matter of Law..............17

III.    FRONTIER'S CLAIMS FOR BREACH OF THE LEASE
AGREEMENTS SHOULD BE REJECTED AS A MATTER OF
LAW. ..................................................................................................19

      A.     There Is No Evidence that Defendants Breached the Lease
Agreements. ............................................................................19

      B.     There Is No Evidence of Damages from Any Alleged Breach
of the Lease Agreements...........................................................21

Conclusion ....................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

Cases

*A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC,*
No. 17 Civ. 3529, 2018 WL 10517080 (E.D.N.Y. Mar. 6, 2018) ........................................... 20

*Alaska Elec. Pension Fund v. Bank of Am. Corp.,*
175 F. Supp. 3d 44 (S.D.N.Y. 2016).......................................................................................... 15

*ARP Films, Inc. v. Marvel Entm't Grp.,*
952 F.2d 643 (2d Cir. 1991)........................................................................................................ 14

*B & M Linen v. Kannegiesser, USA, Corp.,*
679 F. Supp. 2d 474 (S.D.N.Y. 2010)........................................................................................ 18

*Barash v. Pa. Terminal Real Estate Corp.,*
26 N.Y.2d 77 (1970) .................................................................................................................... 20

*Benson v. RMJ Sec. Corp.,*
683 F. Supp. 359 (S.D.N.Y. 1988) ............................................................................................. 21

*Brown v. Eli Lilly & Co.,*
654 F.3d 347 (2d Cir. 2011)........................................................................................................... 9

*Dave Herstein Co. v. Columbia Pictures Corp.,*
4 N.Y.2d 117 (1958) .................................................................................................................... 20

*DiFolco v. MSNBC Cable L.L.C.,*
622 F.3d 104 (2d Cir. 2010)........................................................................................................ 13

*Exceed Holdings LLC v. Chicago Bd. Options Exch. Inc.,*
No. 17 Civ. 8078, 2018 WL 4757961 (S.D.N.Y. Sept. 30, 2018)........................................... 17

*Ferring B.V. v. Allergan, Inc.,*
4 F. Supp. 3d 612 (S.D.N.Y. 2014) ........................................................................................... 15

*Foxley v. Sotheby's Inc.,*
893 F. Supp. 1224 (S.D.N.Y. 1995)........................................................................................... 16

*Gas Nat., Inc. v. Iberdrola, S.A.,*
33 F. Supp. 3d 373 (S.D.N.Y. 2014).......................................................................................... 16

*Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.,*
No. 08 Civ. 7956, 2013 WL 395096 (S.D.N.Y. Feb. 1, 2013) ................................................ 11

*Harris v. Provident Life & Acc. Ins. Co.*,
   310 F.3d 73 (2d Cir. 2002)...............................................................................14-15

*HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*,
   994 F. Supp. 2d 520 (S.D.N.Y. 2014)................................................................. 11

*In re Best Payphones, Inc.*,
   432 B.R. 46 (S.D.N.Y. 2010)............................................................................... 13

*Int'l Gateway Exch., LLC v. W. Union Fin. Servs., Inc.*,
   333 F. Supp. 2d 131 (S.D.N.Y. 2004)................................................................. 21

*Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*,
   No. 07 Civ. 432, 2008 WL 650403 (S.D.N.Y. Mar. 7, 2008) ........................... 15, 17

*Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*,
   494 F. App'x 153 (2d Cir. 2012) ........................................................................ 16

*Kleinberg v. Radian Grp., Inc.*,
   240 F. Supp. 2d 260 (S.D.N.Y. 2002)................................................................. 17

*Larson v. Eney*,
   No. 08 Civ. 3513, 2009 WL 321256 (S.D.N.Y. Feb. 10, 2009)............................. 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   13 F.4th 247 (2d Cir. 2021) ............................................................................... 18

*Lucente v. Int'l Bus. Machines Corp.*,
   310 F.3d 243 (2d Cir. 2002)............................................................................... 13, 14

*McElwee v. County of Orange*,
   700 F.3d 635 (2d Cir. 2012)................................................................................. 9

*N.Y. Military Academy v. NewOpen Group*,
   142 A.D.3d 489 (2d Dep't 2016) ........................................................................ 18

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
   392 F.3d 520 (2d Cir. 2004)............................................................................... 21

*Paxi, LLC v. Shiseido Americas Corp.*,
   636 F. Supp. 2d 275 (S.D.N.Y. 2009)................................................................. 16

*Red Fort Capital, Inc. v. Guardhouse Prods. LLC*,
   397 F. Supp. 3d 456 (S.D.N.Y. 2019)................................................................. 19

*Sauer v. Xerox Corp.*,
 95 F. Supp. 2d 125 (W.D.N.Y. 2000) ...................................................................... 20

*StarVest Partners II, L.P. v. Emportal, Inc.*,
 101 A.D.3d 610 (1st Dep't 2012) ............................................................................ 18

*Towers Charter & Marine Corp v. Cadillac Ins. Co.*,
 894 F.2d 516 (2d Cir. 1990) ................................................................................... 12

*Value Time, Inc. v. Windsor Toys, Inc.*,
 700 F. Supp. 6 (S.D.N.Y. 1988) .............................................................................. 18

*Verus Pharms., Inc. v. Astrazeneca AB*,
 No. 09 Civ. 5660, 2010 WL 3238965 (S.D.N.Y. Aug. 16, 2010) ........................... 14

*Village on Canon v. Bankers Trust Co.*,
 920 F. Supp. 520 (S.D.N.Y. 1996) .......................................................................... 13

<u>Rules</u>

Fed. R. Civ. P. 56 ............................................................................................................. 9

Defendants AMCK Aviation Holdings Ireland Limited ("AMCK"), Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), UMB Bank, N.A., not in its individual capacity but solely as owner trustee ("UMB"), and Wells Fargo Trust Company, N.A., not in its individual capacity but solely as owner trustee ("Wells Fargo") submit this Memorandum of Law in support of their Motion for Summary Judgment.  This Motion is supported by the accompanying Declaration of Paul Sheridan dated November 10, 2022 ("Sheridan Decl."), Declaration of Jane O'Callaghan dated November 10, 2022 ("O'Callaghan Decl.") and Declaration of Jeff E. Butler dated November 11, 2022 ("Butler Decl.").

## **Introduction**

The parties do not disagree about the material facts of this case, almost all of which occurred during the short period of time between March 16, 2020 and May 8, 2020.  In other words, *what happened* is not in dispute, and the only controversy relates to whether the undisputed events support a legal claim against AMCK or any of the other Defendants.  In the rare instances in which the parties disagree about what happened, the Court may grant judgment as a matter of law in favor of Defendants under either version of events.  This is just another way of saying that the occasional disputed fact in this case is not *material* to the outcome.  In the absence of any material, disputed fact, the Court can and should rule as a matter of law in favor of Defendants.

## Factual Background

### A.    The Principal Parties.

Plaintiff Frontier is a passenger airline based in Denver, Colorado.  (SMF ¶ 1.)[1]  Jimmy Dempsey is the Executive Vice President and Chief Financial Officer of Frontier.  Spencer Thwaytes is Frontier's Vice President and Treasurer, ███████████████████.  Robert Fanning is Vice President of Fleet Transactions.███████████████████████████████████ █████████████████████████.  Sharath Sashikumar Bindu ████████████████, and is Frontier's manager of fleet and strategic sourcing ███████████████████████████. (*Id.* ¶ 2.)

Defendant AMCK is an aircraft leasing company organized under the laws of Ireland and with its principal place of business in Ireland.  (*Id.* ¶ 3.)  During the relevant time, Paul Sheridan was AMCK's Chief Executive Officer.  Jane O'Callaghan was AMCK's Chief Commercial Officer.  (*Id.*)

### B.    The 14 Original Leases.

Frontier relies on leased aircraft for 100% of its aircraft fleet.  (*Id.* ¶ 4.)  At the beginning of 2020, Frontier operated 14 Airbus A320 aircraft on leases associated with AMCK.  (*Id.* ¶ 5.) These 14 leases were governed by separate, but in all relevant respects similar, lease agreements. (*Id.* ¶¶ 5-6; O'Callaghan Decl. ¶¶ 4-7 & Exs. 1-2.)  Frontier is the lessee under each agreement, and the lessor is either UMB or Wells Fargo.  (SMF ¶¶ 5-6.)  However, UMB and Wells Fargo are not lessors in their individual capacities.  Rather, UMB and Wells Fargo are "owner trustees"

---

[1] In citations, "SMF" refers to Defendants' Statement of Material Facts dated November 11, 2022.  Reference is also made to transcripts of the depositions of Spencer Thwaytes ("Thwaytes Tr."), Sharath Sashikumar Bindu ("Bindu Tr."), Robert Fanning ("Fanning Tr.") and Jimmy Dempsey ("Dempsey Tr."), attached as Exhibits 23-26, respectively, of the Butler Declaration.

acting for the benefit of the "owner participant," a former affiliate of AMCK called Accipiter. (*Id.*) Accipiter also acts as "guarantor" under some of the leases. (*Id.* ¶ 8.)

Each of the 14 original leases gives Frontier the right to possess and operate an individual aircraft, which is identified by its manufacturer's serial number or "MSN." (*Id.* ¶¶ 5, 7.) In exchange, Frontier is required to make monthly payments of rent to the lessor. The amount of monthly rent varies by lease between $320,000 and $360,000 per aircraft. (*See* O'Callaghan Decl. ¶¶ 8, 23.) Each lease agreement includes a "hell or high water" clause specifying that Frontier's obligation to pay monthly rent is "absolute and unconditional." (*See, e.g.*, *id.* Ex. 2, § 6.4.)

### C.    The Framework Agreement.

On March 16, 2020, Frontier and AMCK entered a Framework Agreement for the sale and leaseback of six Airbus A320neo aircraft. (SMF ¶ 9; O'Callaghan Decl. Ex. 4.) Under a separate purchase agreement between Airbus and Frontier, these aircraft were scheduled for delivery from Airbus to Frontier in 2020. (SMF ¶ 9.) The Framework Agreement provides for the purchase of the aircraft by an affiliate of AMCK and for the lease of these aircraft back to Frontier. (O'Callaghan Decl. Ex. 4, §§ 1.1, 2.1.)

The Framework Agreement describes a number of possible "Framework Events of Default" by Frontier. (*Id.* § 6.) These include any event of default under a lease agreement entered pursuant to the Framework Agreement. (*Id.* § 6.1.7.) If a Framework Event of Default has occurred and is continuing, the Framework Agreement gives AMCK various non-exclusive remedies, including terminating its obligations under the Framework Agreement. (*Id.* § 6.2.)

The Framework Agreement expressly provides that its terms can be amended or waived only in writing. Section 8.4.1 provides in relevant part:

> The rights of both parties against the other or in relation to the Aircraft

(whether arising under this Agreement or the general law) *shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing*; and in particular any failure to exercise or any delay in exercising any such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and *no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right*.

(*Id.* § 8.4.1 (emphasis added).)  The Framework Agreement further states that "[t]he provisions of this Agreement *shall not be varied otherwise than by an instrument in writing* executed by or on behalf of AMCK Aviation and Frontier." (*Id.* § 8.4.2 (emphasis added).)[2]

### D.    Lease of MSN 10038.

On the date the Framework Agreement was entered, Frontier took delivery from Airbus of MSN 10038, the first of the six aircraft deliveries covered by the Framework Agreement. (O'Callaghan Decl. ¶ 11 & Ex. 5.)  On the same date, Frontier sold the aircraft to AMCK's affiliate, Vermillion, for a cash payment of $51 million and leased the aircraft back for a 12-year term.  (O'Callaghan Decl. ¶ 11.)  This was the 15th aircraft leased by Frontier pursuant to a lease involving AMCK.

The lease of MSN 10038 is documented in an aircraft lease agreement between Frontier and UMB, as owner trustee, dated as of March 16, 2020 (the "MSN 10038 Lease"). (O'Callaghan Decl. Ex. 6.)  In this lease, Vermillion is the owner participant and guarantor. (SMF ¶ 12; O'Callaghan Decl. ¶ 13 & Ex. 7.)  The MSN 10038 Lease specifies a number of events of default, including Frontier's failure to pay rent under any "Other Agreements." (O'Callaghan Decl. Ex. 6,. § 16.1(l).)  The term "Other Agreements" is defined to include any

---

[2] The lease agreements have substantially similar clauses prohibiting oral waiver or modification, and requiring amendments to be signed and in writing.  (*See, e.g.*, O'Callaghan Decl. Ex. 1, §§ 23.1, 23.13 & *id.* Ex. 2, §§ 20.4(a)-(b)).)

other aircraft lease agreement between Frontier and the lessor, Vermillion or a Vermillion affiliate.  (*Id.* § 1.1.)

**E.      Frontier's Request for a Rent Deferral.**

On March 16, 2020—shortly after entering the Framework Agreement, receiving $51 million from Vermillion for MSN 10038 and entering the MSN 10038 Lease—Frontier sent a letter to AMCK requesting a three-month rent deferral and return of security deposit for all aircraft on lease.  (*See* O'Callaghan Decl. ¶ 15 & Ex. 8.)  In the letter, Frontier cited the disruptions caused by the COVID-19 pandemic, and stated that, in these circumstances, its "devotion" to stakeholders like AMCK "should not be taken for granted."  The letter continued:

> Accordingly, we request the prompt implementation of the following measures:
>
> 1.   All lease rent payments due between the date of this letter and June 30, 2020 will be deferred; and
>
> 2.   Return of one month's rent security deposit.
>
> The above concessions would be documented in a mutually agreed deferral and concession agreement.

(O'Callaghan Decl. Ex. 8.)  ████████████████████████████████████

████████████████████████████████████████████████  (*See* SMF ¶ 14.)

Frontier's request triggered discussions between Frontier and AMCK over the terms of a potential rent deferral.  (*See, e.g.*, O'Callaghan Decl. ¶¶ 19, 21 & Exs. 11-15.)  As a general matter, AMCK was not willing to grant Frontier the requested deferral without some sort of quid pro quo from Frontier in return.  (O'Callaghan Decl. ¶ 18; Sheridan Decl. ¶ 5; Dempsey Tr. 33:13-34:7, 35:15-21.)

**F.      AMCK Grants Frontier a 10-Day Grace Period.**

On April 6, 2020, Frontier was due to pay monthly rent on two of the 14 original leases.

(SMF ¶¶ 17, 20.)[3] ███████████████████████████████████████████

████████████████████████  (Butler Decl. Exs. 4-5; SMF ¶ 21.)  Later that day, Mr. Fanning had a

phone call with Paul Sheridan of AMCK.  During the call, Mr. Sheridan agreed to a grace period

of 10 business days.  (Sheridan Decl. ¶¶ 8-9 & Exs. 4-5; Fanning Tr. 125:9-127:24 &

O'Callaghan Decl. Ex. 15.)  Shortly thereafter, in an April 6, 2020 email to Frontier,

Mr. Sheridan confirmed:

> Mindful of the time it might take you to reach agreement with Airbus or to
> make some other arrangements and therefore of the ability for us to reach a
> deferral agreement, we can confirm that we won't take any actions or call
> any defaults linked to non payment of rents on any aircraft where the rent is
> due from today to 21 April (ie, for the next 10 working days).

(Sheridan Decl. Ex. 4.)  Frontier understood that this grace period was to last only for 10

business days.  (SMF ¶ 23.)

Taking full advantage of the grace period, Frontier ceased making monthly rent payments

on the 14 original leases beginning on April 6, 2020.  (*Id.* ¶ 24.)

One day later, on April 7, 2020, Mr. Sheridan and Mr. Dempsey had a conversation by

telephone.  (SMF ¶ 25.)  ████████████████████████████████████

████████████████████████████████  (Dempsey Tr. 75:11-17.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  (*Id.* 75:11-23; 77:15-79:15.)  ████████████

████████████████████████████████████████████████

--------------------------------------------------

[3] The rent payment amounts and due dates varied under the original leases.  (SMF ¶¶ 7, 17.)

██████████████████████████████████████████████████████████

██████████████. (SMF ¶ 18.) ███████████████████████████████

(SMF ¶ 19; Butler Decl. Exs. 1-2, 17-18.)

- 6 -

████████████████████████████████████████████
██████████████

(*Id.* 79:10-15.) ███████████████████████████████████████

███████████████████████ (*Id.* 79:22-80:12.)  Mr. Sheridan, in contrast, recalls discussing a

month-to-month deferral with Mr. Dempsey, but without reaching an agreement on such

deferral.  (*See* Sheridan Decl. ¶ 11 & Ex. 6.)

There was never a written agreement entered to document a month-to-month deferral.

(SMF ¶¶ 15, 26.) █████████████████████████████████████

████████████████████████████████████████████████

████████████████ (SMF ¶ 26; Butler Decl. Ex. 7.)

On April 9, 2020, AMCK sent Frontier a draft rent forbearance letter.  (SMF ¶ 27;

O'Callaghan Decl. ¶ 25 & Ex. 16.)  Subject to the terms described in the letter, AMCK stated

that it would agree "temporarily to forbear from exercising its rights and remedies" for the rent

owed in April.  (O'Callaghan Decl. Ex. 16, § 2.1.)  The deferred rent would have to be repaid at

6% interest by July 24, 2020.  (*Id* § 2.1.)  The draft also stated:

> The Forbearance set forth herein shall (x) be *effective upon the signing of
> the acknowledgement to this Letter by the Lessee* and (y) be subject to the
> terms and conditions set forth in this Letter.

(*Id.* § 2.2 (emphasis added).)  Frontier never responded to AMCK concerning this draft.  (SMF

¶ 27.)

Discussions continued in April about the terms of a potential rent deferral.  During this

time, AMCK repeatedly emphasized that it would not finance future aircraft deliveries under the

Framework Agreement if Frontier remained in default under its leases.  (*See, e.g.*, SMF ¶ 28;

Sheridan Decl. ¶ 14 & Ex. 9; O'Callaghan Decl. ¶ 26 & Ex. 15.)  Similarly, AMCK urged

Frontier to get up-to-date on its lease payments. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(Fanning Tr. 98:11-100:19 & Butler Decl. Ex. 14 (emphasis added); Dempsey Tr. 131:9-132:6.)

On April 30, 2020, AMCK sent an email to Frontier that proposed an arrangement to defer rent to May 15, 2020 while keeping the Framework Agreement in place for future deliveries. (Sheridan Decl. ¶ 15 & Ex. 10.) One of the conditions proposed was the removal of early termination options under the Framework Agreement. (*Id.*) ████████████████

████████████████████████████████████████████

(SMF ¶ 30.) Nevertheless, Frontier did not agree to this proposal. (*Id.* ¶ 31.) Mr. Dempsey replied by email to Mr. Sheridan on April 30, saying "[t]his is an overreach." (Sheridan Decl. Ex. 11; Dempsey Tr. 142:8-24.) Mr. Sheridan and Mr. Dempsey had a phone call later that day, in which Mr. Dempsey re-emphasized his disagreement with the proposal. (Dempsey Tr. 142:25-144:11; Sheridan Decl. ¶ 16.) On May 8, 2020, Mr. Dempsey sent additional replies to Mr. Sheridan's April 30 email, reiterating his disagreement with AMCK's proposal regarding early termination options. (Sheridan Decl. Ex. 12; Dempsey Tr. 153:13-155:14, 156:18-158:9.)

### G.   Termination of the Framework Agreement.

During this early part of May 2020, Frontier did not make any of the 14 rent payments that had been due in April under the original leases. (SMF ¶ 24.) Frontier also did not make additional rent payments due on May 5, 2020 and May 6, 2020. (*Id.* ¶ 32.)

On May 8, 2020, AMCK terminated the Framework Agreement with respect to future deliveries by providing a Notice of Termination to Frontier. (Sheridan Decl. ¶ 18 & Ex. 13.) The Notice of Termination refers to Frontier's non-payment of rent under each of the original leases, which totaled approximately $4.79 million. (Sheridan Decl. Ex. 13, Schedule 1.)

- 8 -

Following AMCK's issuance of the Notice of Termination, Frontier belatedly paid all outstanding rent amounts due under the original leases on or about May 13, 2020.  (SMF ¶ 34.) Importantly, the lessors have *not* terminated any of the original leases or the MSN 10038 Lease. These leases remain in force, and Frontier continues to make the required monthly rent payments on these leases.  (*Id.* ¶ 35.)

### H.    The Instant Lawsuit.

Frontier commenced this action on November 18, 2020.  In addition to claims for breach of contract based on AMCK's termination of the Framework Agreement, the Complaint includes multiple other claims, including claims for breach of the lease agreements and a claim for common law fraud.  The Complaint names as defendants not only AMCK, but also Accipiter, Vermillion, UMB and Wells Fargo.  With respect to UMB and Wells Fargo, the Complaint names them only as "nominal defendants," and not in their individual capacities, but solely as owner trustees.  (*See* Compl. ¶¶ 5-7.)

### Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, a court must view the evidence "in the light most favorable to the nonmoving party and draw[] all reasonable inferences in his favor."  *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).  The party opposing summary judgment must "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks omitted).

**Argument**

I.    **FRONTIER'S CLAIMS FOR BREACH OF THE FRAMEWORK AGREEMENT SHOULD BE REJECTED AS A MATTER OF LAW.**

Frontier asserts three different claims alleging breach of the Framework Agreement (First, Second and Fourth Claims).  For the reasons discussed below, these claims all should be rejected as a matter of law.

A.    **There Is No Genuine Issue of Material Fact Concerning the Events Leading up to the Termination by AMCK.**

The communications and actions by the parties leading up to the termination of the Framework Agreement are not in dispute.

The 14 original leases require Frontier to pay monthly rent of between $320,000 and $360,000 per aircraft.  Beginning on April 6, 2020, there were 14 payments due in the month of April 2020 and two payments due in the first week of May 2020.  Frontier knew exactly when these payments were due and how much was owed.  (SMF ¶¶ 7, 17-19, 32.)

On March 16, 2020, Frontier asked AMCK for a temporary rent deferral for all aircraft on lease to Frontier.  (*Id.* ¶ 13.)  Negotiations ensued concerning the requested deferral. ███

██████████████████████████████████████████████  (*Id.* ¶ 14; Sheridan Decl. ¶ 4; O'Callaghan Decl. ¶ 20 .)

In an email on April 6, 2020, AMCK granted Frontier a rent grace period of 10 business days, expiring on April 21, 2020.  (SMF ¶¶ 20-23.)  On the basis of this grace period, Frontier stopped making rent payments under the original leases as of April 6, 2020.  (*Id.* ¶ 24.)  Frontier did not pay any amounts owed under the original leases for the rest of April and into early May 2020.  (*Id.* ¶¶ 24, 32.)

During a telephone call on April 7, 2020, Frontier's CFO, Jimmy Dempsey, and AMCK's CEO, Paul Sheridan, discussed a "month to month" deferral that would allow Frontier

- 10 -

to defer rent for the rest of April 2020.  (*Id.* ¶ 25.) ███████████████████

████████████████████████████████████████████████████████

██████    (*Id.*)  Thus, even if this discussion is deemed to be an oral agreement, the rent

deferral came to an end on April 30, 2020.

On April 30, 2020, AMCK sent Frontier an email with a new proposal, which included

rent deferral through May 15, 2020.  Frontier immediately rejected this proposal.  (*Id.* ¶¶ 29-31.)

On May 8, 2020, AMCK terminated the Framework Agreement, citing Frontier's failure to pay

more than $4 million in rent for the month of April.  (*Id.* ¶ 33.)

**B.    As a Matter of Law, AMCK's Termination of the Framework Agreement Was Valid.**

In the Second Claim, Frontier asserts that AMCK breached the Framework Agreement by

terminating it.  Summary judgment should be granted in favor of AMCK on this claim.

The Framework Agreement allows AMCK to terminate in the event of a "Framework

Event of Default" by Frontier.  (O'Callaghan Decl. Ex. 4, § 6.)  This includes any event of

default under the MSN 10038 Lease.  (*Id.* § 6.1.7.)  The MSN 10038 Lease specifies that

Frontier's failure to pay rent under any "Other Agreements" constitutes a default.  (*Id.* Ex. 6,

§ 16.1(l).)  The definition of "Other Agreements" encompasses the original leases.  (*Id.* § 1.1.)

Thus, Frontier's failure to pay rent under the original leases constitutes a cross-default under the

MSN 10038 Lease and a Framework Event of Default under the Framework Agreement.

Accordingly, AMCK's termination of the Framework Agreement was fully justified by

payment defaults under the original leases, and summary judgment should be granted on the

Second Claim.  *See, e.g., HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*,

994 F. Supp. 2d 520, 537 (S.D.N.Y. 2014) (granting defendant's summary judgment motion

because it had a "valid legal basis for terminating" the agreement); *Gun Hill Rd. Serv. Station,*

*Inc. v. ExxonMobil Oil Corp.*, No. 08 Civ. 7956, 2013 WL 395096, at *7 (S.D.N.Y. Feb. 1, 2013) (same).

Frontier contends that AMCK was not entitled to terminate the Framework Agreement because AMCK allegedly had granted Frontier a deferral of rents under the original leases. This argument should be rejected based on the undisputed factual record.

As an initial matter, the Framework Agreement provides that no modification or waiver is effective unless it is in writing, and further that "no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right." (*See* O'Callaghan Decl. Ex. 4, § 8.4.1.) Such clauses are enforceable. *See Towers Charter & Marine Corp v. Cadillac Ins. Co.*, 894 F.2d 516, 521-22 (2d Cir. 1990). Here, it is undisputed that the parties never entered a written agreement to defer Frontier's rent payment obligations. Frontier's argument may be rejected as a matter of law on this basis alone.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

██████████████████ (SMF ¶ 25.) Thereafter, Frontier did not pay the April rent and the April rent remained unpaid through the termination date of May 8, 2020. This was a clear default justifying termination of the Framework Agreement by AMCK.

Frontier has argued that the April 30 email from Mr. Sheridan extended the month-to-month deferral until May 15, 2020. (*See* Compl. ¶ 58; Dempsey Tr. 140:9-17; Thwaytes Tr. 165:25-166:15.) However, the April 30 email speaks for itself, and cannot reasonably be interpreted in the way proposed by Frontier. The email states that Frontier's rent payments being

current by May 15 was one of several conditions for AMCK to waive Frontier's payment

defaults and to finance future deliveries under the Framework Agreement.  (*See* Sheridan Decl.

Ex. 10; Fanning Tr. 108:18-109:17.)  It is undisputed that Frontier did not agree to this proposal.

(SMF ¶ 31.)  Moreover, the April 30 email expressly states that it is "for discussion purposes

only" and does not create "any binding obligations."  (Sheridan Decl. Ex. 10.)  Thus, Frontier's

strained interpretation of this email as a further "agreement" can and should be rejected as a

matter of law.  *See Village on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 529 (S.D.N.Y.

1996) (rejecting claim that defendant's letter had extended a loan because "[plaintiff] did not

agree to the terms proposed in the [] letter and wanted further negotiations").

### C. Frontier's Claim of an Earlier Repudiation (First Claim) Should Be Rejected as a Matter of Law.

In its First Claim, Frontier alleges that AMCK repudiated the Framework Agreement

when, following Frontier's request for a rent deferral, AMCK allegedly refused to perform

absent concessions from Frontier.  (Compl. ¶¶ 41-48, 81-83.)  This claim should be rejected as a

matter of law.

A repudiation occurs when, "before the time for performance has arisen, a party to a

contract declares his intention not to fulfill a contractual duty."  *Lucente v. Int'l Bus. Machines

Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (internal quotation marks omitted).  A repudiation must

be "positive and unequivocal."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.

2010); *In re Best Payphones, Inc.*, 432 B.R. 46, 56 (S.D.N.Y. 2010) (noting that a "demand for

more than the contract calls for is not in itself a repudiation" absent an "*absolute, definite and

unequivocal refusal*" to perform (internal quotation marks omitted)).  When confronted with a

repudiation, the other party has two "mutually exclusive" options: (a) "treat the repudiation as an

anticipatory breach and seek damages," or (b) "continue to treat the contract as valid and await

the designated time for performance before bringing suit." *Lucente*, 310 F.3d at 258 (internal quotation marks, citations and alterations omitted).

In this case, there is no evidence of an unequivocal statement by AMCK that it would not perform the Framework Agreement. This alone should be sufficient to reject Frontier's repudiation claim as a matter of law.

In addition, Frontier did not treat AMCK's alleged repudiation as an anticipatory breach. Instead, Frontier alleges that it "*chose to await AMCK's performance* upon receiving AMCK's notice of anticipatory repudiation." (Compl. ¶ 83 (emphasis added).) Having made this election, Frontier cannot assert a separate claim for repudiation. *See Lucente*, 310 F.3d at 259 ("a plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs"); *Verus Pharms., Inc. v. Astrazeneca AB*, No. 09 Civ. 5660, 2010 WL 3238965, at *12 (S.D.N.Y. Aug. 16, 2010) ("As [plaintiff] determined that, in its view, the Agreements had already been breached and as [plaintiff] has brought this action for breach of contract, it cannot simultaneously pursue a claim for anticipatory breach.").[4]

### D. Frontier's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Fourth Claim) Should Be Rejected as a Matter of Law.

The Fourth Claim asserts that AMCK also breached the implied covenant of good faith and fair dealing by repudiating the Framework Agreement. (Compl. ¶¶ 100-103.)

Breach of the implied covenant of good faith and fair dealing "is merely a breach of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)

---

[4] For similar reasons, any alleged repudiation by AMCK prior to the termination of the Framework Agreement does not affect the validity of the termination itself. Because Frontier elected to keep the contract in force, it was required to perform its own obligations. Thus, when Frontier failed to pay rent, AMCK was allowed to terminate. *See ARP Films, Inc. v. Marvel Entm't Grp.*, 952 F.2d 643, 646-48 (2d Cir. 1991) (despite defendant's alleged repudiation, its termination of agreement was valid based on plaintiff's own subsequent failure to perform).

(internal quotation marks omitted).  There is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* at 81; *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016) ("An implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract." (internal quotation marks omitted)).

Here, Frontier's breach of the implied covenant claim is based on the same allegations as the First and Second Claims and seeks the same damages.  (*Compare* Compl. ¶¶ 81-84, 88-90 *with id.* ¶¶ 101-103.)  The Fourth Claim therefore should be rejected as a matter of law.

### E.    There Is No Valid Claim Under the Framework Agreement Against Any Other Defendant.

Frontier's First, Second and Fourth Claims appear to be asserted not only against AMCK, but also against Accipiter and Vermillion.  (*See* Compl. ¶ 7 (defining "AMCK" to include Accipiter and Vermillion).)  "It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract."  *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) (internal quotation marks omitted).  This is so even with respect to related corporate entities. Indeed, "New York law respects corporate separateness," and so a plaintiff seeking to hold non-party affiliates liable must meet the "heavy burden" of piercing the corporate veil.  *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 432, 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008).

There is no evidence that Accipiter or Vermillion assumed AMCK's obligations under the Framework Agreement, and there is no alleged basis for disregarding the corporate form of

these entities.  Summary judgment therefore should be granted in favor of these Defendants on the First, Second and Fourth Claims.

## II.    FRONTIER'S NON-CONTRACT CLAIMS REGARDING THE FRAMEWORK AGREEMENT SHOULD BE REJECTED AS A MATTER OF LAW.

The Complaint asserts claims for promissory estoppel (Sixth Claim) and fraud (Seventh Claim) relating to the termination of the Framework Agreement.  These claims merely duplicate Frontier's breach of contract claims, and they are not supported by the factual record.

### A.    Frontier's Promissory Estoppel Claim Should Be Rejected as a Matter of Law.

In the Sixth Claim, Frontier asserts that the doctrine of promissory estoppel prevented termination because AMCK allegedly agreed to defer rent payments.  (Compl. ¶¶ 110, 112.) Promissory estoppel is "a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason."  *Paxi, LLC v. Shiseido Americas Corp.*, 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009).  The claim requires: "(1) a clear and unambiguous promise, (2) a reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained by the party asserting the estoppel by reason of the reliance."  *Id.* (internal quotation marks omitted).  Frontier's claim should be rejected for several reasons.

*First*, the claim is duplicative of the breach of contract claims and seeks exactly the same relief.  (*See* Compl. ¶ 113.)  This is enough to reject the claim.  *See Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 386 (S.D.N.Y. 2014) (dismissing duplicative promissory estoppel claim).

*Second*, a promissory estoppel claim generally is not permitted "where as here an express contract covers the subject matter."  *Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 157 (2d Cir. 2012) (internal alterations and quotation marks omitted)); *Foxley v.*

*Sotheby's Inc.*, 893 F. Supp. 1224, 1234 (S.D.N.Y. 1995) (dismissing promissory estoppel claim because "an express contract was in effect"). In this case, of course, the Framework Agreement between AMCK and Frontier governs the matter in dispute.

*Third*, as discussed above in Section I, there is no evidence of an unambiguous promise to defer rent payments beyond April 21, 2020. The mere fact that AMCK and Frontier were negotiating a potential rent deferral is insufficient to give rise to estoppel. *See, e.g., Exceed Holdings LLC v. Chicago Bd. Options Exch. Inc.*, No. 17 Civ. 8078, 2018 WL 4757961, at *3 (S.D.N.Y. Sept. 30, 2018) (rejecting promissory estoppel claim because "mere willingness to execute a contract or enter into a transaction is insufficient" and alleged statements were "too vague and ambiguous due to the absence of any definite terms of such a transaction").

*Fourth*, Frontier could not have reasonably relied on any alleged informal promise to defer rent. Importantly, the Framework Agreement requires that any waiver or modification of terms be in a writing executed by both parties. (*See* O'Callaghan Decl. Ex. 4, §§ 8.4.1-8.4.2; *see also id.* Ex. 1, §§ 23.1, 23.13 & *id.* Ex. 2, §§ 20.4(a)-(b).) In these circumstances, any reliance should be deemed unreasonable as a matter of law. *See, e.g., Ixe*, 2008 WL 650403, at *12 (dismissing promissory estoppel claim where "oral representations [were] inconsistent with the provision in the contract forbidding oral modifications"); *Kleinberg v. Radian Grp., Inc.*, 240 F. Supp. 2d 260, 262 (S.D.N.Y. 2002) (same).

## B.    Frontier's Fraud Claim Should Be Rejected as a Matter of Law.

Frontier's fraud claim alleges that AMCK engaged in a "scheme to repudiate" the Framework Agreement by falsely promising to grant rent deferrals with "no intention to honor the temporary rent deferrals." (Compl. ¶¶ 115, 117-18.)

"Under New York law, the five elements of fraud are (1) a material misrepresentation or omission of fact (2) made by a defendant with knowledge of its falsity (3) and intent to defraud;

(4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259-60 (2d Cir. 2021)

(internal quotation marks and alterations omitted). "At the summary judgment stage, a plaintiff

must offer enough evidence to allow a reasonable jury to find by clear and convincing evidence

that each of the elements is met." *Id.* As set forth in more detail below, Frontier cannot establish

the necessary elements of fraud.

    *First*, the overlap between Frontier's fraud claim and the breach of contract claims

precludes any claim for fraud. "New York courts have held that a cause of action for fraud will

not arise when the only fraud charged relates to a breach of contract." *Value Time, Inc. v.

Windsor Toys, Inc.*, 700 F. Supp. 6, 7 (S.D.N.Y. 1988) (internal quotation marks omitted); *see

also Larson v. Eney*, No. 08 Civ. 3513, 2009 WL 321256, at *2 (S.D.N.Y. Feb. 10, 2009)

("[T]he sole remedy for a fraudulent breach of contract is an action sounding in contract, not

fraud." (internal quotation marks omitted)).

    *Second*, as discussed in Section I, there is not clear and convincing evidence that AMCK

made a promise to defer rent. This precludes Frontier's theory of fraud. *See B & M Linen v.

Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 481 (S.D.N.Y. 2010) (dismissing fraud claim

where emails "only reflect negotiations between the parties about when and how to resolve

various problems").

    *Third*, for similar reasons, Frontier could not have reasonably relied on the parties'

ongoing discussions as constituting a promise to defer rent. *See N.Y. Military Academy v.

NewOpen Group*, 142 A.D.3d 489, 491 (2d Dep't 2016) (dismissing fraud claim because "the

language of the letter of intent" made any reliance unreasonable); *StarVest Partners II, L.P. v.

Emportal, Inc.*, 101 A.D.3d 610, 613 (1st Dep't 2012) (no reasonable reliance "[w]here a term

sheet or other preliminary agreement explicitly requires the execution of a further written agreement before any party is contractually bound").

### III.   FRONTIER'S CLAIMS FOR BREACH OF THE LEASE AGREEMENTS SHOULD BE REJECTED AS A MATTER OF LAW.

Frontier asserts two claims for breach of the lease agreements.   In the Third Claim, Frontier alleges that Defendants breached the contracts by "wrongfully declaring Events of Default." (Compl. ¶¶ 95-97.)  The Fifth Claim relates to the covenant of quiet enjoyment. Specifically, the lease agreements include a standard provision that the lessor may not disturb Frontier's "quiet use, possession and enjoyment of the Aircraft." (O'Callaghan Decl. Ex. 1, § 9.1; *id.* Ex. 2, § 4.3.)  Frontier asserts that Defendants violated this covenant because the declaration of payment defaults and associated termination of the Framework Agreement "disturb[ed] Frontier's fleet plans." (Compl. ¶¶ 106-107.)

These claims improperly conflate the lease agreements with the Framework Agreement. They should be rejected as a matter of law because (1) there is no evidence that Defendants breached the lease agreements; and (2) the alleged harm arises from the termination of the Framework Agreement, not the lease agreements.

### A.   There Is No Evidence that Defendants Breached the Lease Agreements.

Frontier's Third Claim is legally defective because there is no evidence that Defendants failed to perform any of their obligations under the lease agreements.  (SMF ¶ 35.)  Merely stating that another party is in default—even if incorrect—is not the same as failing to perform one's own obligations. *See Red Fort Capital, Inc. v. Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 470 (S.D.N.Y. 2019) (finding that accusations that a party has breached an agreement are

not equivalent to failure to perform by the accusing party).[5]

The quiet enjoyment claim (Fifth Claim) also should be rejected as a matter of law. The covenant of quiet enjoyment is a promise that a lessor "will not interfere with the rights granted" to a lessee. *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000). To be actionable, a lessor's conduct must result in an "*actual or constructive eviction*" from the leased property. *Id.* (emphasis added; internal quotation marks omitted); *see also Dave Herstein Co. v. Columbia Pictures Corp.*, 4 N.Y.2d 117, 121 (1958) (same). This means that the lessor must oust the lessee by "physical expulsion or exclusion" or otherwise deprive the lessee of the use of the property causing the lessee to "abandon possession." *Barash v. Pa. Terminal Real Estate Corp.*, 26 N.Y.2d 77, 82-83 (1970).

Here, there is no evidence that Frontier was actually or constructively prevented from using any of the 15 leased aircraft. On the contrary, Frontier admits that it has had continuous possession and use of the aircraft. (SMF ¶ 35.) These facts are fatal to Frontier's quiet enjoyment claim. *See, e.g., A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*, No. 17 Civ. 3529, 2018 WL 10517080, at *8 (E.D.N.Y. Mar. 6, 2018) (rejecting quiet enjoyment claim because there was no eviction, even though lessee may "experience a diminution in their enjoyment"); *Sauer*, 95 F. Supp. 2d at 133 (same, notwithstanding "problems" or "delays").

For similar reasons, there is no evidence of a breach of any lessor guarantees provided by Accipiter and Vermillion. (*See* Compl. ¶¶ 96-97.) The guarantees apply only when the lessor (or owner participant) "fails to perform" under the lease agreements. (O'Callaghan Decl. Exs. 3, 7, § 1.) Because there is no underlying failure to perform, the guarantees are not implicated.

---

[5] In addition, as discussed in Section I, the declaration of default was fully justified based on Frontier's non-payment of rent.

**B.    There Is No Evidence of Damages from Any Alleged Breach of the Lease Agreements.**

The only damages Frontier seeks in this case relate to the termination of the Framework Agreement.  Specifically, Frontier alleges that when AMCK did not take delivery of the five additional aircraft under the Framework Agreement, Frontier was required to secure alternative financing for those five aircraft on worse terms.  (*See* Compl. ¶¶ 95-96, 108.) ███████████

█████████████████████████████████  (SMF ¶ 37.)  In other words, the harm alleged by Frontier comes not from a breach of the *existing* lease agreements, but from AMCK's alleged failure to deliver aircraft with respect to five *future* leases.  This should be fatal to the Third and Fifth Claims.  *See Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (noting that a breach of contract claim requires showing that defendant's breach "directly and proximately caused his or her damages."); *Int'l Gateway Exch., LLC v. W. Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y. 2004) ("Courts grant summary judgment dismissing a breach of contract claim where plaintiff has put forth no evidence of damages that are recoverable under New York law.").[6]

---

[6] The claims against UMB and Wells Fargo should be rejected for the additional reason that they are merely "nominal defendants" from whom Frontier seeks no relief at all.  There is no reason for these entities to be parties.  *See Benson v. RMJ Sec. Corp.*, 683 F. Supp. 359, 378 (S.D.N.Y. 1988) (noting that defendants can be dismissed when "no relief is demanded from" them, or when their presence "is not necessary to afford all the requested relief").

## Conclusion

For the reasons set forth above, summary judgment should be granted dismissing all claims against Defendants. It should be noted that AMCK has asserted a counterclaim for the recovery of legal fees and expenses in this litigation, as provided in the Framework Agreement, and further proceedings may be necessary to address this counterclaim.

Dated: November 11, 2022        Respectfully submitted,
       New York, New York

         s/ Jeff E. Butler

Jeff E. Butler
John P. Alexander
Gege Weinberg
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants*