Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------------X

5    FRONTIER AIRLINES, INC.,

6                        Plaintiff,

7        - against -

8    AMCK AVIATION HOLDINGS IRELAND
     LIMITED, ACCIPITER INVESTMENT 4
9    LIMITED, VERMILLION AVIATION (TWO)
     LIMITED, WELLS FARGO TRUST COMPANY,
10   N.A., solely in its capacity as OWNER
     TRUSTEE, and UMB BANK, N.A., solely in
11   its capacity as OWNER TRUSTEE,
12                        Defendants.
13   CASE NO.: 1:20-cv-09713-LLS
     ---------------------------------------X
14

15       * * * C O N F I D E N T I A L * * *

16

17              ZOOM VIDEOCONFERENCE

18

                     March 30, 2022
19                   9:04 a.m.  MDT

20

21              DEPOSITION of SPENCER THWAYTES,

22   before Melissa Gilmore, a Stenographic Reporter

23   and Notary Public of the State of New York.

24

25   Job No. NY5155592

Page 2

```
1
2  A P P E A R A N C E S :
3  LANE POWELL PC
4  Attorneys for Plaintiff
5     601 SW Second Avenue, Suite 2100
6     Portland, Oregon 97204-3158
7  BY:  DAVID G. HOSENPUD, ESQ.
8       E-MAIL hosenpudd@lanepowell.com
9
10
11 CLIFFORD CHANCE US LLP
12 Attorneys for Defendants
13    31 West 52nd Street
14    New York, New York 10019-6131
15 BY: JOHN P. ALEXANDER, ESQ.
16    GEGE WANG, ESQ.
17    JEFF BUTLER, ESQ. (Afternoon Session Only)
18    E-MAIL john.alexander@cliffordchance.com
19       gege.wang@cliffordchance.com
20       jeff.butler@cliffordchance.com
21
22
23
24
25
```

Page 3

```
1
2         FEDERAL STIPULATIONS
3
4        IT IS STIPULATED AND AGREED by
5  and between the attorneys for the respective
6  parties herein, that the filing, sealing,
7  and certification of the within deposition
8  be waived.
9        IT IS FURTHER STIPULATED AND
10 AGREED that all objections, except as to the
11 form of the question, shall be reserved to
12 the time of the trial.
13       IT IS FURTHER STIPULATED AND
14 AGREED that the within deposition may be
15 sworn to and signed before any officer
16 authorized to administer an oath, with the
17 same force and effect as if signed to before
18 the Court.
19
20
21        - oOo -
22
23
24
25
```

Page 4

```
1              THWAYTES - CONFIDENTIAL
2  S P E N C E R   T H W A Y T E S ,   called as
3     a witness, having been duly placed under
4     oath by a Notary Public, was examined and
5     testified as follows:
6  EXAMINATION BY
7  MR. ALEXANDER:
8     Q.   Good morning, Mr. Thwaytes.  My name
9  is Jack Alexander.  I'm from the law firm of
10 Clifford Chance, and with me is Gege Wang, also
11 from Clifford Chance, and we represent the
12 defendants in the litigation called Frontier
13 versus AMCK and others.
14        Mr. Thwaytes, is this the first time
15 you have had your deposition taken?
16    A.   It is.
17    Q.   Could you please tell us what your
18 role is at Frontier Airlines?
19    A.   Sure.  I'm the vice president and
20 treasurer at Frontier Airlines.
21    Q.   And what are your job
22 responsibilities?
23    A.   I oversee the treasury department,
24 fleet department, strategic sourcing department
25 and tax department.
```

Page 5

```
1              THWAYTES - CONFIDENTIAL
2        (Reporter clarification.)
3     Q.   Mr. Thwaytes, so you mentioned that
4  your job responsibilities, just to confirm, are
5  you oversee the treasury department, the fleet
6  department, strategic sourcing and tax.
7        Do I have that right?
8     A.   Correct.
9     Q.   Okay.  And, generally speaking, what
10 is your role with respect to overseeing the
11 treasury department?
12    A.   Are you asking what the treasury --
13 treasury department's roles and
14 responsibilities are or what are my
15 interactions with the department?
16    Q.   Generally -- that's a fair request.
17       Generally, what are the
18 responsibilities of the treasury department?
19    A.   We make all of the payments.  We
20 receive all of the inflows of cash.  We invest
21 excess cash.  We buy and manage all the
22 insurance policies, buy and manage all of the
23 physical fuel.  We place letters of credit and
24 surety bonds.  We finance the business outside
25 of aircraft leases.
```

2 (Pages 2 - 5)

Page 6

THWAYTES - CONFIDENTIAL

1
2    Those are the main responsibilities
3  of the treasury department.
4    Q.  You also mentioned the fleet
5  department.
6        What are the main responsibilities
7  of the fleet department?
8    A.  Financing the aircraft with --
9  financing the aircraft with leases, managing
10  the relationships with Airbus and the engine
11  manufacturer and other aircraft-related
12  relationships; seats, BPUs, all of the other
13  tangential aspects of speccing out aircraft and
14  all of the components of all of the aircraft.
15    Q.  You mentioned managing the
16  relationship with Airbus.
17        Is Airbus the only manufacturer that
18  Frontier deals with?
19    A.  Yes.  The only manufacturer that
20  Frontier does business with at this time.
21    Q.  You also mentioned the strategic
22  sourcing department.
23        What are the main responsibilities
24  of that department?
25    A.  Negotiating contracts for many of

Page 7

THWAYTES - CONFIDENTIAL

1
2  the defendants within the business across a
3  wide range of disciplines; commercial, IT, tech
4  ops, ground handling.  Just kind of across a
5  swath of the business.
6        There are some contracts that are
7  managed outside of strategic sourcing, but many
8  of them are managed within strategic sourcing.
9    Q.  Mr. Thwaytes, do you understand that
10  this lawsuit relates to the termination of a
11  Framework Agreement between AMCK and Frontier
12  dated March 16, 2020?
13    A.  Yes.
14    Q.  Just going forward, I will refer to
15  that as the Framework Agreement.
16        Will you understand what I'm
17  referring to?
18    A.  I will.
19    Q.  Does the Framework Agreement concern
20  a sale-leaseback transaction?
21    A.  Yes, Framework Agreement
22  contemplates a number of sale-leaseback
23  transactions for the aircraft.
24    Q.  Just generally speaking, what does a
25  sale-leaseback transaction consist of?

Page 8

THWAYTES - CONFIDENTIAL

1
2    A.  It's a transaction where an airline
3  takes delivery of an aircraft from its order
4  book, and then sells the aircraft to a lessor,
5  and then the lessor leases the aircraft back to
6  the airline for a period of time.
7    Q.  You said that the Framework
8  Agreement concerns a number of sale-leaseback
9  transactions.
10        Do you know how many?
11    A.  Five sale-leaseback transactions,
12  but I'm not a hundred percent certain.  We're
13  doing many sale-leaseback transactions with
14  many lessors, so...
15    Q.  If I told you it was six, would that
16  also --
17    A.  Yeah, five or six.  I know that
18  there was a number contemplated, and then there
19  was one aircraft delivered under this Framework
20  Agreement, and then a number of aircraft that
21  had not been delivered at the time that these
22  dealings were going on.
23    Q.  Prior to the Framework Agreement
24  between AMCK and Frontier, did Frontier already
25  lease a number of aircraft from AMCK or its

Page 9

THWAYTES - CONFIDENTIAL

1
2  affiliates through owner trusts?
3    A.  Yes.
4    Q.  Do you know how many other aircraft
5  Frontier leased?
6    A.  AMCK.  Was it 12 or 14?  I forget.
7  I may be mixing AMCK up with another lessor
8  that at the same time that we ran an RFP for a
9  number of aircraft, and then AMCK, I believe,
10  may have purchased some additional aircraft,
11  the Innovation.
12        So I'm not sure the exact amount at
13  the time, but more than ten.
14    Q.  Do you understand that each of those
15  leases is governed by an individual Lease
16  Agreement?
17    A.  I understand that they are governed
18  by an individual Lease Agreement.  I am not
19  sure whether the individual Lease Agreement --
20  I'm not sure to the extent that the individual
21  Lease Agreements are interacting with each
22  other.
23    Q.  Those agreements are generally in --
24  those agreements -- strike that.
25        Frontier is the lessee in those

Page 10

THWAYTES - CONFIDENTIAL

1  THWAYTES - CONFIDENTIAL
2  Lease Agreements, correct?
3      A.   Frontier is the lessee.
4      Q.   And the lessor is an owner trust
5  entity that's either UMB or Wells Fargo, right?
6      A.   Yes, there's been -- that's correct.
7  There's an owner trustee involved.
8      Q.   Going forward today, I'm going to
9  refer to those 14 Lease Agreements -- or 12 or
10 14, whatever it is, as the 14 Lease Agreements
11 or the 14 original leases.
12      Will you understand what I'm
13 referring to?
14      A.   Yes.
15      Q.   Frontier was required to pay rent in
16 connection with each of those Lease Agreements,
17 correct?
18      A.   Yes.
19      Q.   The rent was due monthly?
20      A.   Yes.
21      Q.   And for each Lease Agreement, would
22 the monthly rent amount be due on the same
23 calendar day each month?
24      A.   I'm not certain, in these leases, if
25 it's the same calendar day each month or

Page 11

1  THWAYTES - CONFIDENTIAL
2  exactly how it was determined which day it was
3  each month.
4      I assume that it was the same
5  calendar day each month, but I'm not certain.
6      Q.   Did you understand whether there was
7  any grace period associated with rent payments
8  made after a due date?
9      A.   Yes.
10      Q.   And what was your understanding of
11 any applicable grace periods under the Lease
12 Agreements?
13      A.   Under the Lease Agreements, the
14 grace period, after the due date, I believe is
15 three days.
16      Q.   Sorry.  You cut out a bit.
17      Three days you said?
18      A.   Three days.  And I would like to
19 add, three business days.
20      Q.   Do you know when a payment would be
21 due if a due date fell on a weekend?
22      A.   You would start -- I believe you
23 would start counting from the first business
24 day -- well, I'm not sure in this lease,
25 frankly, if the -- if the way that it would be

Page 12

THWAYTES - CONFIDENTIAL

1  THWAYTES - CONFIDENTIAL
2  calculated would be starting from the next --
3  from the Monday after the weekend or if the
4  payment would fall on the Friday before the
5  weekend.  I'm not sure in this case -- or in
6  these leases.
7      Q.   As part of your job of overseeing
8  the treasury department, I believe you said you
9  were responsible for overseeing the making of
10 payments on leases, right?
11      A.   I have a team of analysts that put
12 together all of the payments that are due every
13 month for all of the aircraft leases, and every
14 month they bring those payments through an
15 approval process that I'm involved in reviewing
16 and approving, and then a separate -- my
17 treasury team then processes those payments.
18      So my responsibility is making those
19 payments in a timely manner, but I have
20 infrastructure in place to make sure that the
21 payments are done when they are required to be
22 paid.
23      Q.   You mentioned your team.
24      Who on your team had responsibility
25 for leases relating to the AMCK leases that we

Page 13

1  THWAYTES - CONFIDENTIAL
2  have been discussing?
3      A.   At the time, Sharath was the
4  fleet -- I think he was a manager at the time
5  or an analyst at the time.  I'm not certain
6  when he was promoted.
7      Q.   And what's Sharath's full name?
8      A.   Sashikumar Bindu.
9      THE REPORTER:  Can you spell that,
10 please?
11      THE WITNESS:  S-A-S-H-I-K-U-M-A-R,
12 and then another part of his name is
13 Bindu, B-I-N-D-U.  I hope he doesn't get
14 mad at me for misspelling his name.
15      Q.   We won't tell him.
16      And Mr. Bindu reported to you?
17      A.   No, he reports to Robert Fanning,
18 and then Robert Fanning reported to me at the
19 time.
20      Q.   When it came time to make payments
21 of rent, how did Frontier know what days to
22 make those payments on?
23      A.   We have a schedule that is kept
24 after leases are entered into that records when
25 payments are due and the amounts that are due.

4 (Pages 10 - 13)

Page 14

THWAYTES - CONFIDENTIAL
1
2     Q.    And who is responsible for keeping
3  track of that schedule?
4     A.    Sharath.
5     Q.    Did you also receive invoices from
6  lessors?
7     A.    I don't see the invoices from
8  lessors.  I believe lessors often send
9  invoices, but we have a schedule to determine
10  when payments are due regardless of the day
11  they send them.
12     Q.    Is there anyone on your team who is
13  responsible for receiving or monitoring
14  invoices from lessors?
15     A.    Sharath.
16     Q.    Mr. Thwaytes, through the end of
17  March 2020, to your knowledge, did Frontier
18  make all rent payments that were due under the
19  14 original leases?
20     A.    Through the end of March 2020 or the
21  beginning of March of 2020?
22     Q.    Well, let me break that down.
23        So prior to the beginning of
24  March 2020, to your knowledge, had Frontier
25  made all rent payments that were due under the

Page 15

THWAYTES - CONFIDENTIAL
1
2  14 original leases?
3     A.    Yes, to my knowledge.
4     Q.    To your knowledge, did Frontier make
5  all rent payments that were due on the 14
6  original leases during the month of March 2020?
7     A.    To my knowledge, we made all of the
8  payments that were due unless we were told by
9  AMCK that we did not need to make the payments
10  while we were discussing payment deferrals and
11  other things.
12     Q.    Did you have any discussions with
13  AMCK in March 2020 related to any payment
14  deferrals?
15     A.    We had correspondence via e-mail and
16  documents attached to e-mail.  I don't recall
17  if we had conversations in March 2020.
18     Q.    You mentioned e-mail and
19  documentation.
20        Did you have any oral discussions
21  with anyone at AMCK during March 2020
22  concerning any rent deferral?
23     A.    I don't know if the oral discussions
24  that we had took place in March or early April.
25  I don't recall the dates of when the

Page 16

THWAYTES - CONFIDENTIAL
1
2  discussions took place.
3     Q.    And were you personally involved in
4  those discussions?
5     A.    I thought that your question was did
6  I have any discussions with them.
7        I am saying that I am not -- I don't
8  remember if I had discussions with them in --
9  if it was in late March or March or early
10  April, and other people that work for me,
11  Robert, for example, probably did have -- or
12  did have discussions with AMCK in March of
13  2020.
14        I thought your question was asking
15  me if I did.
16     Q.    Just to confirm, you don't recall
17  personally having any discussions with AMCK in
18  March 2020?
19     A.    Correct.
20     Q.    Do you recall personally having any
21  discussions with AMCK about a rent deferral or
22  grace period in April 2020?
23     A.    Yes.  We did have discussions.
24     Q.    When were those discussions?
25     A.    I don't remember the dates.

Page 17

THWAYTES - CONFIDENTIAL
1
2     Q.    And were those written e-mail
3  discussions?
4     A.    There was e-mail correspondence and
5  I believe phone conversations as well.
6     Q.    I appreciate that you don't recall
7  the dates, but just to confirm, your testimony
8  is you do recall having phone discussions in
9  April 2020 with AMCK about rent grace periods?
10     A.    Yes.
11     Q.    All right.  Let's --
12        MR. ALEXANDER:  Gege, can we please
13  put up Exhibit 1?
14        MS. WANG:  Can everybody see this?
15        THE WITNESS:  Yes.
16        MR. HOSENPUD:  Can you give me the
17  Bates number?
18        MR. ALEXANDER:  Will do.  This is a
19  compilation of documents which we will
20  send to you.  It's got a series of Bates
21  numbers starting with FRONTIER0002245.
22        Gege, could you please send a copy
23  of this to David when you have a chance?
24        MS. WANG:  Sure.
25        (Thwaytes Exhibit 1, Compilation of

5 (Pages 14 - 17)

Page 18

1        THWAYTES - CONFIDENTIAL
2     Invoices, Bates Stamped FRONTIER0002245,
3     marked for identification.)
4     Q.   Mr. Thwaytes, I would like to call
5  your attention to the first page of this
6  document.
7        MR. ALEXANDER:  And, Gege, maybe we
8     could zoom out a bit so we can see more of
9     it.  There we go.
10    Q.   So, Mr. Thwaytes, this is an
11 invoice, invoice date 07 Jan 2020.  It relates
12 to an aircraft Lease Agreement dated 5
13 June 2018 in respect of Airbus A320-251N
14 aircraft with MSN 8239.
15       Do you see that?
16    A.   I do.
17    Q.   What does MSN mean?
18    A.   That's the manufacturer serial
19 number for the aircraft.
20    Q.   Do you understand that MSN 8239 is
21 an aircraft that Frontier leases under one of
22 the 14 Lease Agreements we discussed earlier?
23    A.   I don't remember all of the MSNs
24 with all of the lessors.  So I don't know that
25 besides looking at it on this page.

Page 19

1        THWAYTES - CONFIDENTIAL
2     Q.   The invoice describes a payment date
3  of April 3, 2020.
4        Do you see that?
5     A.   I do.
6     Q.   And it describes the amount due in
7  this invoice as $342,532.39.
8        Do you see that?
9     A.   I see that.
10    Q.   Do you have any reason to believe
11 that this information is inaccurate?
12    A.   I don't have any reason to believe
13 that.
14    Q.   Is this the sort of invoice that the
15 treasury department maintained?
16    A.   These are the invoices that are sent
17 to our fleet analyst from lessors.  It's like a
18 relatively standard form.
19    Q.   Could we please look at the next
20 page?  And you will see this is another
21 invoice.  This one dated January 7, 2020.
22       It describes an aircraft Lease
23 Agreement dated 6 March 2018 in respect of one
24 Airbus A320-251N aircraft with MSN 8102.
25       Do you see that?

Page 20

1        THWAYTES - CONFIDENTIAL
2     A.   I do.
3     Q.   Is MSN 8102 an aircraft leased by
4  Frontier from AMCK or affiliated entities?
5     A.   According to this document.  But
6  like I said previously, I don't recall all of
7  the MSNs for all of the aircraft and what
8  lessors they are all associated with.
9     Q.   Do you have any reason to believe
10 that MSN 8102 is not an aircraft leased from
11 AMCK?
12    A.   I don't have any reason to believe
13 that.
14    Q.   The invoice describes a payment due
15 date of April 6, 2020, and a total amount due
16 of $354,139.30.
17       Do you see that?
18    A.   I do.
19    Q.   Do you have any reason to believe
20 that information is inaccurate?
21    A.   I don't have any reason to believe
22 that.
23    Q.   Let's go to the next page.  This is
24 an invoice dated January 7, 2020, and it
25 concerns an aircraft Lease Agreement dated 9

Page 21

1        THWAYTES - CONFIDENTIAL
2  May 2019 in respect of one Airbus A320-251N
3  aircraft with MSN 8913.
4        Do you see that?
5     A.   I do.
6     Q.   Is MSN 8913 an aircraft that
7  Frontier leases from AMCK or affiliated
8  entities?
9     A.   I don't recall which MSN is
10 associated with which lessor, but based off of
11 what I'm seeing in this invoice, it appears to
12 be.
13    Q.   The invoice describes a payment due
14 date of April 9, 2020, and a total amount due
15 of $344,568.92.
16       Do you see that?
17    A.   I do.
18    Q.   Do you have any reason to believe
19 that information is inaccurate?
20    A.   No.
21    Q.   Let's go to the next page.
22       Mr. Thwaytes, this is an invoice
23 dated November 12, 2019, with a payment due
24 date of April 17, 2020, and it relates to
25 aircraft operating Lease Agreement dated as of

6 (Pages 18 - 21)

Page 22

THWAYTES - CONFIDENTIAL
1
2   June 9, 2014, in respect of one Airbus A320-200
3   aircraft with MSN 06184.
4       Do you see that?
5   A.   I do.
6   Q.   And the total amount due on
7   April 17, 2020, was $343,186.
8       Do you see that?
9   A.   I do.
10  Q.   Do you have any reason to believe
11  that information is inaccurate?
12  A.   I don't, except it seems odd the
13  invoice date is in November of 2019 and the
14  payment due date is in April of 2020.  I notice
15  that, but it just seems odd.
16  Q.   Do you have an understanding of when
17  invoices typically would be sent in connection
18  with the Lease Agreements?
19  A.   Based on the previous invoices you
20  just showed me, there were invoices that were
21  sent in 2020, for payments due in 2020.  So
22  this has an invoice date of 2019 and a payment
23  date in 2020.  So it just seems odd.
24      (Reporter Clarification.)
25  A.   The previous invoices you showed me

Page 23

THWAYTES - CONFIDENTIAL
1
2   were all -- all had an invoice date of Jan 2020
3   or more recent with payment dates in
4   April 2020, and this is -- this invoice has an
5   invoice date of November 2019.
6       So it just comes off as odd that the
7   invoice date is so far in advance of the
8   payment due date, but I don't have any -- I
9   don't know why or have any feedback that it's
10  incorrect.  It just looks odd.
11  Q.   Let's go to the next page.
12      This is an invoice dated January 7,
13  2020.  It relates to an aircraft Lease
14  Agreement dated 19 August 2019 in respect of
15  one Airbus A320-251N aircraft with MSN 9068.
16      Do you see that?
17  A.   I do.
18  Q.   And it describes a payment due date
19  of 17 April 2020 and a total amount due of
20  $323,126.20.
21      Did I read that correctly?
22  A.   You did.
23  Q.   Do you have any reason to believe
24  that information is inaccurate?
25  A.   No.

Page 24

THWAYTES - CONFIDENTIAL
1
2   Q.   Mr. Thwaytes, we have just looked at
3   a number of invoices that described payment due
4   dates of April 3, 2020, April 6, 2020, April 9,
5   2020, April 17, 2020, and then finally again on
6   April 17, 2020.
7       Do you know if Frontier paid any of
8   these invoices on those due dates described
9   therein?
10  A.   I believe Frontier did not pay these
11  invoices on these -- on the due dates described
12  herein because of conversations and
13  interactions with AMCK that led us to believe
14  that we did not need to make these payments on
15  these due dates.
16  Q.   But just to confirm, whatever the
17  reason, Frontier did not make payment on those
18  dates, right?
19  A.   Correct.
20  Q.   I'm not asking you to calculate, but
21  it looks roughly like $1.7 million on those
22  first five invoices we looked at.  I don't know
23  if you were able to get a sense, but does that
24  sound correct to you?
25  A.   Five invoices, 300 grand, 1.5 plus

Page 25

THWAYTES - CONFIDENTIAL
1
2   some change.  You can get to 1.6, 1.7, just
3   doing rough math.
4   Q.   Can we go to the next page, please?
5       This is an invoice dated
6   November 25, 2019, with a payment due date of
7   April 22, 2020.  It relates to aircraft Lease
8   Agreement dated 22 March 2019 in respect of one
9   Airbus A320-251N aircraft with MSN 8766.
10      Do you see that?
11  A.   I do.
12  Q.   And it describes a payment due on
13  April 22, 2020, of $347,864.42.
14      Do you see that?
15  A.   I do.
16  Q.   Do you have any reason to believe
17  that information is inaccurate?
18  A.   No.  But, again, the invoice date
19  and the payment date are pretty spread out,
20  which just comes off as odd, but I don't know
21  why off the top.
22  Q.   Let's look at the next page.
23      This is an invoice dated January 7,
24  2020.  It's a payment due date of April 23,
25  2020.  It concerns aircraft Lease Agreement

7 (Pages 22 - 25)

Page 26

THWAYTES - CONFIDENTIAL
1
2  dated 23 April 2019 in respect of one Airbus
3  A320-251N aircraft with MSN 8857.
4       Q.    Do you see that?
5       A.    I do.
6       Q.    And it describes a total amount due
7  on April 23, 2020, of $347,600.78.
8       Did I read that correctly?
9       A.    You did.
10      Q.    Do you have any reason to believe
11  that information is inaccurate?
12      A.    I don't.
13      Q.    Let's look at the next page.
14      This is an invoice dated March 19,
15  2020. It concerns aircraft operating Lease
16  Agreement dated as of February 19, 2016, in
17  respect of one Airbus A321-200 aircraft with
18  MSN 7524.
19      Do you see that?
20      A.    I do.
21      Q.    This invoice and all the prior ones
22  appear to be from Accipiter Investments
23  Aircraft 4 Limited.
24      Do you see that?
25      A.    It appears that way in the account

Page 27

THWAYTES - CONFIDENTIAL
1
2  name.
3       Q.    Do you know who Accipiter
4  Investments Aircraft 4 Limited is?
5       A.    I don't know specifically who it is,
6  but I assume that it is a entity that is part
7  of AMCK's corporate structure that is the
8  lessor for these aircraft.
9       Q.    Does Frontier have any business with
10  Accipiter Investments Aircraft 4 Limited?
11      A.    It appears that we do, based off of
12  this invoice naming them as -- as the account
13  name for a payment that is due to -- for one of
14  the aircraft that, per this invoice, is leased
15  to Frontier from AMCK.
16      Q.    And this invoice concerning MSN 7524
17  describes a payment due on April 24, 2020, of
18  $362,630.80.
19      Did I read that correctly?
20      A.    You did.
21      Q.    Do you have any reason to believe
22  that information is inaccurate?
23      A.    I don't have any reason to believe
24  that.
25      Q.    Let's turn to the next page.

Page 28

THWAYTES - CONFIDENTIAL
1
2       This is an invoice dated 25
3  November 2019. It concerns aircraft Lease
4  Agreement dated 27 June 2019 in respect of one
5  Airbus A320-251N aircraft with MSN 8977.
6       Do you see that?
7       A.    I do.
8       Q.    It describes a payment due date of
9  April 27, 2020, in the amount of $331,694.50.
10      Do you see that?
11      A.    Yes.
12      Q.    Do you have any reason to believe
13  that information is inaccurate?
14      A.    No, except for the odd gap between
15  the invoice date and the payment due date
16  again.
17      Q.    Let's look at the next page.
18      This is an invoice dated
19  November 25, 2019. It concerns aircraft Lease
20  Agreement dated 28 June 2019 in respect of one
21  Airbus A320-251N aircraft with MSN 9026.
22      Do you see that?
23      A.    I do.
24      Q.    It describes a payment due date of
25  April 28, 2020, and a total amount due of

Page 29

THWAYTES - CONFIDENTIAL
1
2  $332,243.75.
3       Did I read that correctly?
4       A.    You did.
5       Q.    Do you have any reason to believe
6  that information is inaccurate?
7       A.    No, except, again, for the odd gap
8  between the invoice date and the payment date.
9       Q.    And as you testified earlier, that's
10  just -- you're noticing the dates. You don't,
11  yourself, have an understanding of when
12  invoices were sent, correct?
13      A.    I don't receive the invoices. They
14  are received by -- by people on the fleet team.
15  I would just look at an invoice like this and
16  question why the invoice date is in
17  November 2019, almost six months prior to when
18  the payment due date is and wonder why.
19      And you're asking me if all of this
20  is accurate to the best of my knowledge by
21  looking at this, and it appears so, but I would
22  question why there is such a gap in the invoice
23  date and the payment date naturally, as I
24  review things like this.
25      But I don't know why there is that

Page 30

1          THWAYTES - CONFIDENTIAL
2   gap, and I don't know if there is an issue with
3   that gap.
4        Q.   Let's go to the next page, please.
5            This is an invoice dated
6   November 25, 2019.  It concerns aircraft Lease
7   Agreement dated 29 August 2018 in respect of
8   one Airbus A320-251N aircraft with MSN 8307.
9            Do you see that?
10       A.   I do.
11       Q.   It describes a payment due date of
12  April 29, 2020, and a total amount due of
13  $342,554.02.
14           Do you see that?
15       A.   I do.
16       Q.   And do you have any reason to
17  believe that information is inaccurate other
18  than the invoice date that you've mentioned
19  before?
20       A.   Other than the gap between the
21  invoice date and the payment date, looking at
22  it quickly, I don't see anything that would
23  appear to be inaccurate.
24       Q.   Let's go to the next page, which is
25  an invoice dated November 12, 2019.  It

Page 31

1          THWAYTES - CONFIDENTIAL
2   concerns aircraft Lease Agreement dated 30
3   September 2019 in respect of one Airbus
4   A320-251N aircraft with MSN 9177.
5            Do you see that?
6        A.   I do.
7        Q.   Do you know if MSN 9177 is an
8   aircraft that Frontier leases from AMCK or
9   affiliated entities?
10       A.   I don't know off the top, as I don't
11  know which MSN is associated with each lessor,
12  but according to this invoice that I'm looking
13  at, it appears to be associated with AMCK.
14       Q.   The invoice describes a payment due
15  date of April 30, 2020, and a total due of
16  $326,641.40.
17           Do you see that?
18       A.   I do.
19       Q.   Do you have any reason to believe
20  that information is inaccurate?
21       A.   No, other than the odd gap between
22  the invoice date and the payment due date.
23       Q.   Let's go to the next page.
24           This is an invoice dated
25  November 25, 2019.  It concerns aircraft Lease

Page 32

1          THWAYTES - CONFIDENTIAL
2   Agreement dated 31 July 2018 in respect of one
3   Airbus A320-251N aircraft with MSN 8357.
4            Do you see that?
5        A.   I do.
6        Q.   It describes a payment due date of
7   April 30, 2020, and a total amount due of
8   $345,236.14.
9            Did I read that right?
10       A.   You did.
11       Q.   Do you have any reason to believe
12  that information is inaccurate?
13       A.   No, other than the odd gap between
14  the invoice date and the payment date.
15       Q.   Let's go to the next page.
16           This is an invoice dated 25
17  November 2019.  It concerns aircraft Lease
18  Agreement dated 30 August 2018 in respect of
19  one Airbus A320-251N aircraft with MSN 8402.
20           Do you see that?
21       A.   I do.
22       Q.   It describes a payment due date of
23  April 30, 2020, and a total amount due of
24  $343,181.29.
25           Do you see that?

Page 33

1          THWAYTES - CONFIDENTIAL
2        A.   I do.
3        Q.   Do you have any reason to believe
4   that information is inaccurate?
5        A.   I don't, except for the odd gap
6   between the invoice date and the payment due
7   date.
8        Q.   Let's go to the next page.
9            This is an invoice dated January 7,
10  2020.  It concerns aircraft Lease Agreement
11  dated 5 June 2018 in respect of Airbus
12  A320-251N aircraft with MSN 8239.
13           Do you see that?
14       A.   I do.
15       Q.   And it describes a payment due date
16  of May 5, 2020, and a total amount due of
17  $342,532.39.
18           Do you see that?
19       A.   I do.
20       Q.   Do you have any reason to believe
21  that information is inaccurate?
22       A.   I don't, except for the almost five
23  month gap between the invoice date and the
24  payment due date.
25       Q.   Let's go to the next page.

9 (Pages 30 - 33)

Page 34

THWAYTES - CONFIDENTIAL

1
2    This is an invoice dated January 7,
3    2020. It concerns aircraft Lease Agreement
4    dated 6 March 2018 in respect of one Airbus
5    A320-251N aircraft with MSN 8102.
6        Do you see that?
7    A.   I do.
8    Q.   And it describes a payment due date
9    of May 6, 2020, and a total amount due of
10   $354,139.30.
11       Do you see that?
12   A.   I do.
13   Q.   Do you have any reason to believe
14   that information is inaccurate?
15   A.   I don't.
16   Q.   Let's go to the next page.
17       This is an invoice dated January 7,
18   2020, concerning aircraft Lease Agreement dated
19   9 May 2019 in respect of one Airbus A320-251N
20   aircraft with MSN 8913.
21       Do you see that?
22   A.   I do.
23   Q.   And this describes a payment due
24   date of May 8, 2020, and a total amount due of
25   $344,568.92.

Page 35

THWAYTES - CONFIDENTIAL

1
2        Do you see that?
3    A.   I do.
4    Q.   Do you have any reason to believe
5    that information is inaccurate?
6    A.   No, except for the gap between the
7    invoice date and the payment due date again.
8    Q.   Mr. Thwaytes, what we have been
9    looking at is a collection of invoices with
10   different payment due dates. The very first
11   invoice we looked at had a payment due date of
12   April 3, 2020, and the most recent invoice, at
13   the end of the document that we looked at, had
14   a payment due date of May 8, 2020.
15       Do you know or did you have a chance
16   to get a sense of the total amount of invoice
17   amounts involved?
18   A.   I didn't. I wasn't calculating the
19   amounts while we were going through them, but
20   it looks like they are averaging around 340,000
21   per invoice. And I didn't count how many we
22   just went through, but you could do the math to
23   get an idea. Somewhere in the three and a
24   half, $4 million range it seems.
25   Q.   To your knowledge, did Frontier pay

Page 36

THWAYTES - CONFIDENTIAL

1
2    any of these invoices during the month of
3    April 2020?
4    A.   No, to my knowledge, we didn't.
5    Q.   To your knowledge, did Frontier pay
6    any --
7    A.   Actually, we may have paid one of
8    the invoices. There was one aircraft where
9    Accipiter or AMCK had asked us to continue to
10   be current on, and we made the payment on the
11   due date for that aircraft.
12   Q.   And do you know what the MSN for
13   that aircraft was?
14   A.   I don't off the top, no.
15   Q.   Do you know if that aircraft related
16   to one of the 14 original leases we have been
17   discussing or a newer aircraft delivered under
18   the Framework Agreement?
19   A.   I'm trying to recall if it was one
20   of the 14 that was in the process of being
21   novated or if it was the first aircraft
22   delivered under the Framework Agreement, and I
23   don't recall which aircraft it was. I just
24   recall that there was one aircraft that AMCK
25   requested that we pay on the due date and we

Page 37

THWAYTES - CONFIDENTIAL

1
2    did.
3    Q.   And you don't know whether the
4    aircraft you are thinking of is one of the
5    aircraft numbers that we just looked at, right?
6    A.   I don't.
7    Q.   Other than that one aircraft that
8    you are thinking of, did Frontier pay invoices
9    for any other leases to AMCK during the month
10   of April 2020?
11   A.   I don't believe so.
12       MR. ALEXANDER: Let's put up, as
13   Exhibit 2, FRONTIER00328.
14       (Thwaytes Exhibit 2, E-Mail, Bates
15   Stamped FRONTIER0002245 through 332,
16   marked for identification.)
17   Q.   Mr. Thwaytes, this is an e-mail
18   dated May 8, 2020, from Paul Sheridan to you,
19   Howard Diamond and others.
20       Do you see that?
21   A.   I do.
22   Q.   And in the e-mail, Mr. Sheridan
23   says, "Dear Spencer and Howard, please find
24   attached notice for your attention."
25       Did I read that correctly?

10 (Pages 34 - 37)

Page 38

1                THWAYTES - CONFIDENTIAL
2      A.   You did.
3      Q.   Let's look at the next page of the
4  document, which describes itself as a Notice of
5  Termination dated May 8, 2020.
6           Do you see that?
7      A.   I do.
8      Q.   Do you recall receiving this
9  document?
10     A.   I do.
11     Q.   Do you see in the second paragraph
12  the notice states, "Frontier has failed to make
13  payment of basic rent when due under various
14  Other Agreements (as defined in the MSN 10038
15  Lease Agreement), and the grace periods for
16  payment of such amounts has expired under the
17  terms of such agreements."
18          Do you see that?
19     A.   I do.
20     Q.   It goes on to state "Details of the
21  past due amounts are set forth in the schedule
22  to this notice."
23          Do you see that?
24     A.   I do.
25     Q.   Let's go to the last page of this

Page 39

1                THWAYTES - CONFIDENTIAL
2  document, which is Bates number page
3  FRONTIER00332.  This is Schedule 1, payment
4  delinquencies.
5           Do you see that?
6      A.   Yes.
7      Q.   And it's a list of various MSN.
8           Do you understand those to be MSN
9  that Frontier leases from AMCK?
10     A.   I don't have the ability to
11  cross-check them at the moment, so I can't
12  confirm that.
13     Q.   You said you recalled receiving this
14  notice.
15          Have you ever gone back and checked
16  whether any of these MSNs are not leased by
17  Frontier?
18     A.   I have never personally went and
19  cross-checked whether these MSNs were not
20  leased by -- from AMCK or Accipiter.
21     Q.   These -- each row of this chart in
22  Schedule 1 identifies an MSN, a payment type,
23  an invoice reference, a due amount in US
24  dollars and a due date.
25          Do you see that?

Page 40

1                THWAYTES - CONFIDENTIAL
2      A.   I do.
3      Q.   Have you ever checked any of the
4  information in this schedule to see whether it
5  was accurate?
6      A.   I personally have not checked this
7  information to make sure that it was accurate.
8      Q.   Have you asked anyone at Frontier to
9  do any kind of check like that?
10     A.   When I received this documentation,
11  I forwarded it to counsel and then proceeded to
12  discuss this document with counsel.
13     Q.   Without getting into your
14  discussions with counsel, has anyone at
15  Frontier, to your knowledge, ever checked any
16  of the information in this Schedule 1 for
17  accuracy?
18     A.   The discussions around this document
19  were with counsel.
20     Q.   Do you have any reason to believe
21  that any of the information describing invoices
22  and payment amounts and payment due dates is
23  inaccurate?
24     A.   I don't have any reason to believe
25  that it's inaccurate.

Page 41

1                THWAYTES - CONFIDENTIAL
2           MR. ALEXANDER:  Let's look at
3  Exhibit 3, FRONTIER8058.
4           (Thwaytes Exhibit 3, E-Mail Chain,
5  Bates Stamped FRONTIER0008058 through
6  8059, marked for identification.)
7      Q.   Let's look at the very top of this
8  document.
9           Mr. Thwaytes, this is a Wednesday,
10  May 13 e-mail from Erik Hauglid, H-A-U-G-L-I-D,
11  to Mr. Bindu and you and others.
12          Do you see that?
13     A.   I do.
14     Q.   Who is Eric Hauglid?
15     A.   He's a director on my treasury team
16  that works for me.
17     Q.   And if you look down on the
18  document, you will see that there is a series
19  of e-mails on May 13, including at the bottom
20  of the page an e-mail from Mr. Sashikumar Bindu
21  on May 13 to Jimmy Dempsey, you and others.
22          Do you see that?
23     A.   I do.
24     Q.   The e-mail says, "Hi Jimmy, please
25  approve the following payments to AMCK in light

11 (Pages 38 - 41)

```
1          THWAYTES - CONFIDENTIAL
2    of recent discussions with them. 14 payments
3    are from April and 3 from May thus far."
4          Do you see that?
5       A.   I do.
6       Q.   So that's a total of 17 payments
7    that Mr. Bindu is describing here, right?
8       A.   If you scroll up, 1 through 8, 9
9    through 17. Looks like 17 payments.
10      Q.   And do you understand those payments
11   to relate to the 14 original leases for the due
12   dates of payments in April and the due date of
13   payments in May prior to this e-mail?
14      A.   It would be helpful if I could
15   review to see if any of the aircraft or MSNs
16   are repeated to see if -- it's difficult to do
17   in this document, but...
18      Q.   Take your time. We can pause and go
19   as slowly as you like.
20      A.   So zoom out if you could. I just
21   don't have scratch paper or anything with me,
22   but -- out if you could, so I could see it all
23   at the same time.
24          MS. WANG: I see. I'm sorry. So
25   zoom out a little further like this?
```

```
1          THWAYTES - CONFIDENTIAL
2          THE WITNESS: There you go.
3       A.   (Document review.)
4          It looks like there's two payments
5    for each of three aircraft. So what you're
6    describing seems accurate.
7       Q.   Do you know if, in fact, these
8    payments were ever paid to AMCK?
9       A.   Yes, I know that the wires were
10   released from Frontier through our bank
11   account, and so I am aware that the payments
12   were made.
13      Q.   Do you know when the payments were
14   made?
15      A.   On May 13, I believe is the date.
16      Q.   Do you know when AMCK received that
17   payment?
18      A.   I don't have access to AMCK's bank
19   accounts, so I don't know when they received
20   the payment, but I know the standard process
21   for wire payments being sent and the funds are
22   very close to immediate. There is a latency in
23   between, but I don't know when they received
24   them. But they are paid by wire.
25          MR. ALEXANDER: I'm going to head
```

```
1          THWAYTES - CONFIDENTIAL
2    into a new topic, David. We can take a
3    break now, or, Mr. Thwaytes, whatever your
4    preference is.
5          MR. HOSENPUD: Yes, I agree let's
6    take a break. Thank you.
7          (Recess taken.)
8    BY MR. ALEXANDER:
9       Q.   Mr. Thwaytes, we have been talking
10   about the 14 original leases that Frontier had
11   for Airbus A320 aircraft with AMCK or its
12   affiliates before entering the Framework
13   Agreement with AMCK in March 2020.
14          Do you understand that Frontier
15   began leasing an additional aircraft from AMCK
16   in March 2020?
17      A.   Yes.
18      Q.   Was that MSN 10038 or do you know?
19      A.   I don't recall the MSN.
20      Q.   But the new aircraft that Frontier
21   began leasing in March 2020, that was pursuant
22   to the Framework Agreement, to your
23   understanding?
24      A.   Yes.
25      Q.   Do you know when that aircraft was
```

```
1          THWAYTES - CONFIDENTIAL
2    delivered?
3       A.   I don't remember the delivery date.
4          MR. ALEXANDER: Gege, can you please
5    put up FRONTIER0238, and we will make that
6    Exhibit 4.
7          (Thwaytes Exhibit 4, E-Mail Chain,
8    Bates Stamped FRONTIER0000238 through 239,
9    marked for identification.)
10      Q.   Mr. Thwaytes, this is a March 16,
11   2020, e-mail from you to Jane O'Callaghan and
12   others.
13          Do you see that?
14      A.   Yep.
15      Q.   And if you look down at the second
16   e-mail on the page, this is an e-mail from Jane
17   O'Callaghan to you and others on March 16,
18   Monday, at 6:59 a.m.
19          Do you see that?
20      A.   I do.
21      Q.   And she says, the subject, "Delivery
22   of MSN 10038." And Ms. O'Callaghan states,
23   "Congratulations to the Frontier team on the
24   successful delivery and sale/leaseback to AMCK
25   of MSN 10038 a short while ago. Great teamwork
```

Page 46

1           THWAYTES - CONFIDENTIAL
2    across the board over the last three days."
3           Do you see that?
4      A.   Yes.
5      Q.   Does that refresh your recollection
6    as to when the new aircraft in March 2020 was
7    delivered?
8      A.   Yeah, I recall it was sometime in
9    the middle of March 2020.  So it says March 16.
10   That makes sense.
11     Q.   And you reply in your e-mail shortly
12   thereafter at 7:18 a.m. to say, "Thank you,
13   Jane and team."  Is that right?
14     A.   Yep.
15     Q.   So do you have any reason to believe
16   this is wrong, this information?
17     A.   No.
18     Q.   So is it fair to say that the
19   aircraft delivered in mid March 2020 was
20   delivered in the morning of March 16?
21     A.   I don't know if the transfer of
22   title took place in the morning of March 16 or
23   if it took place at the Airbus facility on
24   March 15 and received an e-mail on March 16.
25         So I'm not certain of those dates.

Page 47

1           THWAYTES - CONFIDENTIAL
2    I'm assuming the same or pretty close together.
3    I just don't recall the exact date that the
4    aircraft transferred title.
5      Q.   Do you understand that this aircraft
6    that was delivered was the first aircraft
7    delivered pursuant to the Framework Agreement?
8      A.   Yep.
9      Q.   Do you know what the schedule of
10   delivery was from the remaining aircraft under
11   the Framework Agreement?
12     A.   I know the delivery dates for those
13   aircraft changed as we went through that period
14   of time.  So I have a lot of months in my head.
15         So I don't recall the original
16   delivery months for those aircraft.  And then
17   I -- so I don't recall the original delivery
18   months for those aircraft, if that's what your
19   question is asking, and the original or the
20   delivery dates were unknown at this time, the
21   actual dates because they were in the future.
22         MR. ALEXANDER:  Gege, could we
23     please put up AMCK0040, and we will make
24     this Exhibit 5.
25         MS. WANG:  0040?

Page 48

1           THWAYTES - CONFIDENTIAL
2          MR. ALEXANDER:  Yes, this is the
3      Framework Agreement.
4          (Thwaytes Exhibit 5, Framework
5      Agreement, Bates Stamped AMCK000001
6      through 53, marked for identification.)
7      Q.   Mr. Thwaytes, the document that you
8    can see on screen is a Framework Agreement
9    relating to the purchase and leaseback of six
10   new Airbus model A320-251N aircraft, and it's
11   between AMCK Aviation Holdings Ireland Limited
12   and Frontier Airlines, Inc.
13         Do you see that?
14     A.   I see that.
15     Q.   Have you ever seen this document
16   before?
17     A.   I have.
18     Q.   And do you understand this is the
19   Framework Agreement that we have been
20   discussing today?
21     A.   Based off of the front page that
22   you're showing me, it is.
23     Q.   Let's please turn to AMCK0040.
24         This is Schedule 1 to the Framework
25   Agreement.  It lists six aircraft with six

Page 49

1           THWAYTES - CONFIDENTIAL
2    scheduled delivery quarter or scheduled
3    delivery months.
4          Do you see that?
5      A.   I see that.
6      Q.   The aircraft number 1, which is not
7    identified, has a scheduled delivery quarter or
8    month of March 2020.
9          Do you see that?
10     A.   I do.
11     Q.   Aircraft number 2, which is not
12   identified, has a scheduled delivery quarter or
13   delivery month of March 2020.
14         Do you see that?
15     A.   Yes.
16     Q.   Aircraft number 3, which is not
17   identified, also lists March 2020 as the
18   scheduled delivery quarter or month.
19         Do you see that?
20     A.   I do.
21     Q.   Aircraft number 4 is not identified
22   but has a scheduled delivery quarter or month
23   of May 2020.
24         Do you see that?
25     A.   I do.

Page 50

```
 1          THWAYTES - CONFIDENTIAL
 2      Q.   Aircraft number 5, not identified,
 3   has a scheduled delivery quarter or month of
 4   June 2020.
 5          Do you see that?
 6      A.   I do.
 7      Q.   Aircraft number 6, not identified,
 8   has a scheduled delivery quarter or delivery
 9   month of August 2020.
10          Do you see that?
11      A.   I do.
12      Q.   Does that refresh your recollection
13   as to the original schedule for the six
14   aircraft covered by the Framework Agreement?
15      A.   Yes, I -- we take delivery of 15, 20
16   aircraft a year, so I don't recall the months
17   and quarters for each aircraft going back
18   numbers of years, but this refreshes my memory.
19      Q.   Let's take a step back generally and
20   just talk through the basic mechanics of the
21   purchase and sale of this aircraft MSN 10038 or
22   any of the aircraft in a sale-leaseback
23   transaction.
24          So correct me if I'm wrong, but
25   Frontier has a Purchase Agreement with Airbus,
```

Page 51

```
 1          THWAYTES - CONFIDENTIAL
 2   right?
 3      A.   Correct.
 4      Q.   And under that Purchase Agreement,
 5   Frontier was required to purchase aircraft at
 6   various times from Airbus; is that right?
 7      A.   Yes.
 8      Q.   How many aircraft are covered by the
 9   Airbus Purchase Agreement?
10      A.   It varies depending on how many
11   aircraft -- at what point in time we are
12   talking, as we are taking delivery of aircraft
13   throughout every year and ordering additional
14   aircraft at different points in time.  So the
15   number varies.
16      Q.   As of the beginning of 2020, how
17   many aircraft remained to be purchased by
18   Frontier under the Airbus Purchase Agreement?
19      A.   I don't recall the exact number at
20   the beginning of 2020.  I haven't looked at
21   that to prepare for that question.
22      Q.   Is it more than ten?
23      A.   Yes.
24      Q.   More than 20?
25      A.   Yes.
```

Page 52

```
 1          THWAYTES - CONFIDENTIAL
 2      Q.   More than 30?
 3      A.   Yes.
 4      Q.   More than 50?
 5      A.   Yes.
 6      Q.   More than 100?
 7      A.   Yes.
 8      Q.   More than 150?
 9      A.   At that time, yes, more than 150.
10      Q.   More than 200?
11      A.   I don't believe so at that time, but
12   I could be wrong.  There are two order books
13   that were under the Purchase Agreement at that
14   time, and I don't recall how many of the first
15   order book had been delivered by that point in
16   time, so...
17          MR. HOSENPUD:  Okay.  I'm going to
18      designate this testimony as confidential
19      subject to the protective order.
20      Q.   So just to sum up, if I have it
21   right, Mr. Thwaytes, as of early 2020, Frontier
22   had somewhere between 150 and 200 aircraft to
23   purchase under the Airbus Purchase Agreement;
24   is that right?
25      A.   That's right.
```

Page 53

```
 1          THWAYTES - CONFIDENTIAL
 2      Q.   Not all of those aircraft related to
 3   aircraft covered by the Framework Agreement,
 4   correct?
 5      A.   You stated the Framework Agreement
 6   covered six aircraft.  So, obviously, it
 7   doesn't cover all of those aircraft.
 8      Q.   Did Frontier have other sale and
 9   leaseback counterparties in early 2020?
10      A.   We had sale and leaseback
11   counterparties from aircraft that had delivered
12   prior to that period of time, and we had sale
13   and leaseback counterparties for aircraft that
14   were going to deliver post that period of time
15   at that point in time.
16      Q.   When you say post that period of
17   time, what time period are you referring to
18   there?
19      A.   Going forward, AMCK wasn't the only
20   lessor that we had sale and leaseback
21   agreements in place with for future delivery.
22      Q.   Did you have any scheduled
23   deliveries relating to sale and leaseback
24   transactions in 2020 other than with AMCK?
25      A.   Before -- I think originally we did,
```

14 (Pages 50 - 53)

Page 62

THWAYTES - CONFIDENTIAL
1
2    Q.   And then the lessor would pay some
3    amount to Airbus?
4    A.   It's like closing a loan where it
5    all goes into title and then everybody releases
6    the payments that they need to and releases the
7    assets, and the lease is in force and the
8    aircraft is owned by AMCK and the owner
9    trustee.  So generally, yes.
10    Q.   And if there was a difference
11    between the amount of money Frontier was
12    required to pay Airbus and the amount of money
13    that a sale and leaseback counterparty agreed
14    to pay, then Frontier was allowed to keep that
15    difference; is that right?
16    A.   Yes.
17    Q.   So assuming that MSN 10038 was
18    delivered in March 2020, then Frontier was able
19    to book a profit of approximately $4 million on
20    that transaction; is that right?
21         MR. HOSENPUD:  Object to the form of
22         the question.  Assumes facts not in
23         evidence.
24         You can answer.
25    A.   It depends on the accounting

Page 63

THWAYTES - CONFIDENTIAL
1
2    treatment at that time.  Accounting treatment
3    changed for when you could book the gain for a
4    transaction whether it was up-front or over a
5    period of time.
6         I just don't recall when that
7    accounting treatment changed, whether it was
8    before or after this.
9         So I'm not certain as to what the
10    profit -- how it would be booked.  There are
11    some other accounting implications that are
12    involved that don't make it that
13    straightforward and may not result in that
14    number.
15    Q.   Whatever the precise number, which I
16    appreciate may depend on accounting methods,
17    there was some profit for Frontier to book in
18    connection with that transaction, correct?
19    A.   That's correct.  Frontier ran a RFP
20    process amongst many lessors, and AMCK competed
21    in that and won based off of the terms that
22    you're seeing here.
23    Q.   AMCK was not a party to the Purchase
24    Agreement with Airbus and Frontier, correct?
25    A.   That's correct.

Page 64

THWAYTES - CONFIDENTIAL
1
2    Q.   Do you know if AMCK had a copy of
3    the Purchase Agreement with Airbus?
4    A.   I don't know if they had one, but
5    that's a confidential document that lessors do
6    not have a copy of, that I'm aware of.
7    Q.   Do you know if AMCK knew the terms
8    of Frontier's Purchase Agreement with Airbus in
9    2020?
10    A.   I don't know if they knew the terms
11    because I don't know of their dealings with
12    Airbus or potentially getting the terms from
13    some source, but that's a confidential document
14    that they should not have the terms of.
15    Q.   Do you have an understanding that
16    AMCK asked Frontier to ask Airbus for a delay
17    in deliveries scheduled for 2020?
18    A.   Yes.
19    Q.   Was AMCK involved in any discussions
20    with Airbus concerning any delivery delays in
21    2020?
22    A.   I understand that AMCK was
23    independent of Frontier discussing the matter
24    with Airbus, but I was not involved in those
25    conversations and don't have knowledge of them

Page 65

THWAYTES - CONFIDENTIAL
1
2    besides being aware that I believe there were
3    some.
4         And if I could add to that, Airbus
5    manages its relationships with its airlines and
6    it also manages its relationships with the
7    lessors.  So I assume that via that
8    relationship management they probably had
9    conversations with Airbus.
10    Q.   Do you know if AMCK negotiated
11    directly with Airbus concerning any amendment
12    to the Purchase Agreement?
13    A.   I am not aware of them doing that.
14    Q.   You testified that you were aware
15    that AMCK had some kind of discussions with
16    Airbus in 2020.
17         What gives you that belief?
18         MR. HOSENPUD:  I'm going to instruct
19         you not to answer if it is anything
20         related to attorney/client communications.
21         Separate and apart from that, you may
22         respond.
23    A.   I'm trying to recall if outside of
24    conversations with counsel I was made aware of
25    communications with AMCK and Airbus, and I'm

17 (Pages 62 - 65)

Page 66

THWAYTES - CONFIDENTIAL
1  THWAYTES - CONFIDENTIAL
2  not able to recall if outside of discussions
3  with counsel there were any conversations.
4      Q.  Do you know when AMCK first asked
5  Frontier to seek delays in deliveries of
6  aircraft covered by the Purchase Agreement?
7      A.  I don't recall the exact date, but I
8  believe it was in late March.  AMCK proposed a
9  number of -- made a number of proposals to
10  Frontier in late March through April and into
11  early May regarding Frontier delaying the
12  delivery of the five aircraft remaining to be
13  delivered under the Framework Agreement.
14      I don't recall when that first
15  request was made, but I recall a first request
16  by Jane or a response by Jane to a letter that
17  I sent her requesting a deferral of rent.  I
18  just don't recall if that response included a
19  request to delay the deliveries, and I don't
20  recall the date that I received that response.
21      MR. ALEXANDER:  Let's put up
22  Exhibit 7, which is a document bearing
23  Bates number FRONTIER001974.
24      (Thwaytes Exhibit 7, E-Mail Chain,
25  Bates Stamped FRONTIER0001974 through

Page 67

1  1976, marked for identification.)
2      Q.  And, Mr. Thwaytes, this is an e-mail
3  from Jane O'Callaghan to you, dated March 18,
4  2020.
5      Do you see that?
6      A.  I do.
7      Q.  And if you scroll on to the next
8  page, to the very bottom of the next page, it
9  looks like Ms. O'Callaghan is replying to an
10  e-mail that you sent on March 16, 2020; is that
11  right?
12      A.  That's right.
13      Q.  And in your March 16 e-mail you say,
14  "Please see the attached concession request
15  letter."
16      Is that what you were referring to,
17  the request for deferral that you sent?
18      A.  Yes.
19      Q.  Ms. O'Callaghan replies on March 18
20  to say, "Dear Spencer, thank you for your
21  letter dated March 16th.  As you rightly state,
22  the situation at the moment is very troubling,"
23  and she goes on.
24      The next paragraph, "You may

Page 68

1  THWAYTES - CONFIDENTIAL
2  appreciate that we are receiving numerous
3  requests for assistance from our clients.  As a
4  mid-sized leasing company with secured banking
5  facilities, we have some limits to our ability
6  to forego rental payments completely.  Our
7  approach is to be constructive," and she goes
8  on.
9      In the third paragraph, "We would
10  like to make Frontier a proposal for assistance
11  on your rental payments."  She goes on to list
12  a number of numbered bullet points.
13      "This is our proposal on the 15
14  aircraft we have leased to Frontier."
15      Take a moment to read that, but do
16  you see any requests for delivery delays
17  relating to the Airbus Purchase Agreement in
18  this March 18 e-mail?
19      A.  (Document review.)  No.
20      Q.  And in fact point 3 says, "No
21  deferral on the remaining 5 A320neo," correct?
22      A.  Yes, except I think she's referring
23  to rent deferral.
24      Q.  There's no reference in any of these
25  points to a delay of deliveries in aircraft to

Page 69

1  THWAYTES - CONFIDENTIAL
2  be purchased from Airbus, correct?
3      A.  That's correct.
4      MR. ALEXANDER:  Let's look at what
5  we will call Exhibit 8, FRONTIER00198.
6      (Thwaytes Exhibit 8, E-Mail Chain,
7  Bates Stamped FRONTIER0001198 through
8  1200, marked for identification.)
9      Q.  And, Mr. Thwaytes, this is a
10  March 22 e-mail from you to Jane O'Callaghan,
11  and it appears to be in response to the e-mail
12  that we just looked at.
13      Do you see that?
14      A.  I do.
15      Q.  And you respond in the e-mail, "Hi
16  Jane, we appreciate your understanding of this
17  grave situation," and you continue.
18      In the third paragraph of your
19  e-mail you state, "As our largest lessor, it's
20  very important that AMCK provide the requested
21  payment deferral, so I respectfully request
22  that you please reevaluate our request."
23      Do you see that?
24      A.  I do.
25      Q.  There is no discussion in this

18 (Pages 66 - 69)

Page 74

THWAYTES - CONFIDENTIAL
2    Q.    And she goes on to describe a
3    proposed delay in the delivery schedule of
4    those remaining four SLB aircraft, right?
5    A.    Right.
6    Q.    So Ms. O'Callaghan wasn't proposing
7    any kind of delivery delay with respect to the
8    second aircraft, MSN 9549, correct?
9    A.    Not in this letter.
10    Q.    Was this the first communication
11    from AMCK requesting any delay in deliveries of
12    aircraft under the Purchase Agreement with
13    Airbus?
14    A.    I believe so, unless there were
15    communications between AMCK and Robert Fanning
16    outside of this letter that I'm not aware of or
17    don't recall.
18    Q.    But as you sit here today, you're
19    not aware of any other requests from AMCK up to
20    this point concerning --
21    A.    I don't recall any others prior to
22    this.
23    MR. ALEXANDER:  Let's pull up the
24    next exhibit, which will be Exhibit 10,
25    FRONTIER005663.

Page 75

THWAYTES - CONFIDENTIAL
2    (Thwaytes Exhibit 10, E-Mail With
3    Attachment, Bates Stamped FRONTIER0005663
4    through 5678, marked for identification.)
5    MR. HOSENPUD:  Could you please
6    repeat that again, the Bates number -- I
7    see it now.
8    MR. ALEXANDER:  Certainly.  05663,
9    Frontier.
10    Q.    Mr. Thwaytes, this is a May 5 e-mail
11    from Ray Bishop to Paul Lambert and copying you
12    and others.
13    Do you see that?
14    A.    I do.
15    Q.    Who is Ray Bishop?
16    A.    He is a contracts director at
17    Airbus.
18    Q.    Mr. Bishop states, "Hi Paul, Spencer
19    and Sharath, attached is a compiled version of
20    Amendment No. 9 with the Frontier and Airbus
21    signature appended."
22    Do you see that?
23    A.    I do.
24    Q.    And if you flip down, or scroll down
25    to the page with Bates number FRONTIER005667,

Page 76

THWAYTES - CONFIDENTIAL
2    the attachment is an Amendment No. 9 to A320
3    Family Aircraft Purchase Agreement, dated as of
4    September 30, 2011, between Airbus S.A.S. and
5    Frontier Airlines, Inc.
6    Do you see that?
7    A.    I do.
8    Q.    And are you familiar with this
9    Amendment No. 9 to the Airbus Purchase
10    Agreement?
11    A.    I am familiar with it, generally.
12    Q.    Would you please turn to the next
13    page -- or rather page 3 of the agreement with
14    the Bates number FRONTIER5669.
15    Mr. Thwaytes, is it your
16    understanding that in this Amendment No. 9 to
17    the Airbus Purchase Agreement, Airbus and
18    Frontier were agreeing on a change in the
19    delivery schedule of aircraft covered by the
20    Purchase Agreement?
21    A.    Yes.
22    Q.    In the first numbered paragraph
23    there, 1, delivery schedule, it states "The
24    delivery schedule table set forth in Clause 9.1
25    of the Agreement is deleted in its entirety and

Page 77

THWAYTES - CONFIDENTIAL
2    replaced with the delivery schedule table
3    attached hereto as Appendix A."
4    Do you see that?
5    A.    I do.
6    Q.    Did the original Purchase Agreement
7    with Airbus have a delivery schedule in it?
8    A.    The delivery schedule in the
9    Purchase Agreement -- the original Purchase
10    Agreement did and then has been amended from
11    time to time.
12    Q.    How many times has that delivery
13    schedule been amended?
14    A.    I don't -- I don't recall how many
15    times it's been amended.
16    Q.    This document that we are looking at
17    is Amendment No. 9 to the Purchase Agreement.
18    Is it fair to assume that there were
19    eight amendments to the delivery schedule?
20    A.    No.
21    MR. HOSENPUD:  Excuse me.  Object to
22    the form of the question, assumes facts
23    not in evidence.
24    A.    No, amendments could be for other
25    reasons than changing the delivery schedule.

20 (Pages 74 - 77)

Page 82

THWAYTES - CONFIDENTIAL
1   THWAYTES - CONFIDENTIAL
2       So I believe those are AMCK
3   aircraft, but I'm not able to tie the two
4   together because there is no unique identifier
5   that is the same in the two agreements.
6       Q.   So let's go back to Exhibit 10,
7   which we were just looking at, which is
8   Amendment No. 9 to the Purchase Agreement.
9       And if we look at, again, row 52,
10  which was the aircraft we were just talking
11  about, that has a scheduled delivery of
12  July 2020.
13      Do you know which, if any, of the
14  aircraft listed in this table are aircraft
15  covered by the Framework Agreement?
16      A.   I believe aircraft rank 54, that was
17  delivered in March 2020.  Without being able to
18  tie the agreements together, I am basing this
19  off of my recollection of the dates that the
20  aircraft under the Framework Agreement were
21  scheduled to be delivered after we amended the
22  Airbus Purchase Agreement.
23      So based off of that, aircraft rank
24  52, 53, 55 and 57, and I'm not sure if 59 or 60
25  because I don't recall after the amendment

Page 83

1   THWAYTES - CONFIDENTIAL
2   which aircraft were moved out of the --
3   originally, when we amended it out of 2020, if
4   they were the Accipiter aircraft or not after
5   the amendment was completed.  I don't recall
6   after that because it's easy to deduce the July
7   and the September aircraft, but not after that
8   without being able to tie the aircraft between
9   the agreements.
10      Q.   Did you ever tell AMCK that you had
11  reached this Amendment No. 9 with Airbus?
12      A.   I don't know if we explicitly told
13  AMCK that we had reached an agreement number
14  9 -- or Amendment No. 9 with Airbus.
15      Q.   If you go back to the first page of
16  this document, it's a May 5 e-mail from Ray
17  Bishop.
18      Do you recall when, if at all, you
19  told AMCK that you had reached any amendment
20  with Airbus on delivery schedules regardless of
21  calling it Amendment No. 9?
22      A.   I'm not sure if we ever told AMCK
23  that we had reached an agreement on an
24  amendment with Airbus, but I do recall
25  corresponding with AMCK about what delay in

Page 84

1   THWAYTES - CONFIDENTIAL
2   delivery months were possible relative to their
3   request for delays in delivery.
4       Q.   Is that correspondence you're
5   referring to -- did that take place prior to
6   this amendment actually being reached?
7       A.   I don't recall.  I don't recall if
8   it was prior or subsequent to.  There was -- so
9   there was many -- there was a lot of
10  correspondence between us and AMCK from the
11  middle of -- middle -- second half of March
12  through, call it the first half of May
13  regarding this situation, and particularly
14  related to delaying aircraft.  And I just don't
15  recall when we initially told them what we
16  thought we could achieve based off of our
17  negotiations with Airbus.
18      Q.   But you don't recall, as you sit
19  here today, when, if ever, you told AMCK what
20  Frontier actually did achieve in its amendment
21  with Airbus, correct?
22      A.   We don't ever tell anybody what we
23  achieve in our amendments with Airbus.  That's
24  confidential.
25      Q.   Do you know if anyone else at

Page 85

1   THWAYTES - CONFIDENTIAL
2   Frontier told anyone at AMCK that this
3   amendment had been reached with Airbus?
4       A.   I am not aware of all of the
5   conversations that may have occurred or text
6   messages that may have been exchanged outside
7   of my purview.
8       So I am not aware, but I am also
9   potentially not aware of correspondence that
10  may have taken place.
11      MR. ALEXANDER:  David, I'm happy to
12  keep going, but if you all want to break
13  we can take one, otherwise I'm happy to
14  take one.
15      MR. HOSENPUD:  Why don't we do five?
16      MR. ALEXANDER:  Sure.  Off the
17  record.
18      (Recess taken.)
19  BY MR. ALEXANDER:
20      Q.   All right.  Mr. Thwaytes, we have
21  been looking at Amendment No. 9 to the Purchase
22  Agreement between Frontier and Airbus.
23      That amendment was the result of
24  negotiations between Frontier and Airbus,
25  right?

22 (Pages 82 - 85)

Page 86

1    THWAYTES - CONFIDENTIAL
2    A.    Correct.
3    Q.    Was AMCK a party to those
4    negotiations?
5    A.    No, as far as I'm aware, unless they
6    were independent of Frontier.
7    Q.    When did those negotiations
8    concerning the Airbus Purchase Agreement begin?
9    A.    During this very fluid time, we're
10   having conversations with most of our major
11   suppliers frequently.  So it's difficult to say
12   when those negotiations began, but if I had to
13   pick a time frame, I would say the beginning of
14   April.
15        MR. ALEXANDER:  Let's look at the
16   next Exhibit 11, which is FRONTIER004009.
17        (Thwaytes Exhibit 11, E-Mail With
18   Attachment, Bates Stamped FRONTIER0004009
19   through 4010, marked for identification.)
20   Q.    Mr. Thwaytes, this is an April 2
21   e-mail from you to Matthew Saks and Ray Bishop.
22        Do you see that?
23   A.    I do.
24   Q.    Who is Matthew Saks?
25   A.    He was the sales director at the

Page 87

1    THWAYTES - CONFIDENTIAL
2    time at Airbus.
3    Q.    You testified a moment ago that
4    there were negotiations between Frontier and
5    Airbus concerning an amendment to the Purchase
6    Agreement.
7        What was your involvement in those
8    negotiations?
9    A.    I'm trying to think how to
10   categorize involvement or describe involvement,
11   but directly involved.
12   Q.    So you were involved in discussions
13   with Airbus, correct?
14   A.    Correct.
15   Q.    Did you play any particular role or
16   deal with particular subject areas or were you
17   generally involved in the discussions?
18   A.    I would say generally involved in
19   the discussions.  Some others on our team may
20   have been specifically involved in doing
21   calculations and our counsel involved in -- in
22   the legal aspects of things as well.  So more
23   generally involved.
24   Q.    So you were generally involved.  You
25   referenced your counsel.

Page 88

1    THWAYTES - CONFIDENTIAL
2        Who else from the Frontier side was
3    involved in the negotiations with Airbus?
4    A.    Jimmy Dempsey, Sharath Sashikumar
5    Bindu.  Besides counsel, those would be the
6    main people involved.
7    Q.    So looking at this Exhibit 11, you
8    state in the e-mail, "Mat and Ray, the
9    indefinite delay in delivering aircraft MSN
10   9549 (see notice attached)."
11        Do you see that?
12   A.    I do.
13   Q.    What are you referring to there?
14   A.    Without seeing that notice and what
15   is in that notice, which would be helpful to
16   determine exactly what I'm referencing, I am
17   going to assume that the notice referenced a
18   delay of that aircraft that was for an
19   indefinite period of time, based off of what
20   I've written here, related to that "see notice
21   attached," and the indefinite period of the
22   delay notice was problematic for us from a cash
23   flow perspective.
24   Q.    Why was it problematic from a cash
25   flow perspective?

Page 89

1    THWAYTES - CONFIDENTIAL
2    A.    We have PDP payments with Airbus
3    that we receive back when aircraft are
4    delivered.  We have money borrowed under a
5    credit facility to finance a portion of those
6    PDP payments as well as our equity, and that
7    is -- that facility is paid down by the amount
8    that they have outstanding on an aircraft when
9    the aircraft is delivered.  And we, as we saw
10   in a previous document, have a gain on sale of
11   aircraft, which is another source of cash.
12        So there's three main reasons why,
13   from a cash flow perspective, it's problematic.
14   Q.    Why don't we look at the attached
15   notice, which is the next page of this
16   document, and this is a notice from Airbus.
17   "Subject:  Postponement of the Delivery
18   Schedule."
19        Do you see that?
20   A.    I do.
21   Q.    And in the second paragraph, it
22   states, "We regret to inform you that a damaged
23   bracket was discovered in the right hand wing
24   on the aircraft."
25        Do you see that?

23 (Pages 86 - 89)

Page 90

```
1            THWAYTES - CONFIDENTIAL
2      A.   I do.
3      Q.   So was there -- there was a
4  technical problem with MSN 9549; is that right?
5      A.   According to this document, there
6  was.
7      Q.   When Frontier began discussing
8  potential changes in the delivery schedule in
9  the spring of 2020 with Airbus, did Frontier
10 ask to reschedule all deliveries or only some
11 deliveries?
12     A.   At that time, I think we have
13 concluded the assumption that we had 150 to 200
14 deliveries with Airbus.  The conversation was
15 not to delay all of the deliveries, all of
16 those 150 to 200 aircraft.
17     Q.   Was there some subset that you chose
18 to discuss a delivery delay regarding?
19     A.   Near-term aircraft and near term
20 over -- near-term aircraft.
21     Q.   Did you discuss with Airbus only
22 changing the delivery schedule for aircraft
23 covered by the Framework Agreement?
24     A.   No, outside of -- in addition to
25 that.
```

Page 91

```
1            THWAYTES - CONFIDENTIAL
2      Q.   Just to make sure I understand.  In
3  addition to the aircraft covered by the
4  Framework Agreement, Frontier and Airbus were
5  discussing a change in the delivery schedule
6  for other aircraft not covered by the Framework
7  Agreement, correct?
8      A.   That's right.
9      Q.   How many other aircraft not covered
10 by the Framework Agreement was Frontier seeking
11 a delivery change for?
12     A.   I don't -- I don't recall how many.
13     Q.   Was it more than 50?
14     A.   It's hard to -- it's hard to
15 determine how many because change in delivery
16 schedule for some aircraft can have a cascading
17 effect that causes a change in the delivery
18 schedule for other aircraft.
19          So I think that the discussions for
20 aircraft delivering in 2020 and into 2021, I
21 believe it's that period of time, but the
22 impact of that it appeared to be more because
23 it kind of cascades the delivery stream.
24     Q.   Understood.  Were there particular
25 aircraft deliveries that Frontier requested a
```

Page 92

```
1            THWAYTES - CONFIDENTIAL
2  change in the delivery schedule for?
3      A.   Not -- only particular aircraft in
4  relation to periods of time.  So we did not
5  pick and choose aircraft within a period of
6  time.  We just chose the aircraft that were in
7  a period of time.
8      Q.   Let's go back to the first page of
9  this Exhibit 11.
10          So as we spoke about in the first
11 paragraph of this e-mail, you reference the
12 indefinite delay in delivering aircraft MSN
13 9549.
14          And just to confirm, that delay was
15 not the result of any request for a change in
16 schedule by AMCK, correct?
17          MR. HOSENPUD:  Object to the form of
18     the question, assumes facts not in
19     evidence, misstates the document.
20          You can answer.
21     A.   Based off of the notice, the delay
22 was because of a manufacturing issue.
23     Q.   In the second paragraph, you say,
24 "We received verbal notice this afternoon that
25 our financier is uncomfortable funding aircraft
```

Page 93

```
1            THWAYTES - CONFIDENTIAL
2  deliveries in 2Q 2020, so we anticipate that
3  Airbus will work with us to manage the timing
4  of upcoming aircraft deliveries."
5          Do you see that?
6      A.   I do.
7      Q.   Is the financier you're referring to
8  AMCK?
9      A.   Yes, I believe so.
10     Q.   Did you get a response to this
11 e-mail?
12     A.   I don't -- I don't recall if I did.
13     Q.   Did anyone at Airbus threaten you
14 with a default under the Purchase Agreement?
15     A.   During this time, when we were in
16 discussions with Airbus about deliveries of
17 aircraft and about making PDP payments, we were
18 told by Airbus numerous times that if we did
19 not fulfill our obligations that we risk being
20 put into default.
21     Q.   Who at Airbus said that?
22     A.   Matt Saks to me.  I'm aware of other
23 correspondence with others that I can't point
24 to but are generally aware of.
25     Q.   When Matt Saks told you, was that
```

24 (Pages 90 - 93)

Page 94

THWAYTES - CONFIDENTIAL
1
2  over the phone?
3      A.   That was.
4      Q.   You referred to correspondence with
5  others.
6          Do you know if that correspondence
7  was written correspondence?
8      A.   I don't know if it was written or
9  verbal.  I don't know if it was written or
10  verbal.
11         But we were made very aware by
12  Airbus that if we didn't fulfill our
13  obligations that there was a risk of default
14  and that they were taking that very seriously.
15      Q.   In the first paragraph there, you
16  refer to "deferring the scheduled April PDP
17  payment" in the middle of that paragraph.
18         Do you see that?
19      A.   I do.
20      Q.   Was that part of the discussions
21  regarding a change in delivery schedule?
22      A.   No, that was in relation to this
23  aircraft being -- delivery being delayed and
24  the cash inflow that we would have received
25  from this aircraft not happening because of the

Page 95

THWAYTES - CONFIDENTIAL
1
2  delay.
3          So in order to negate that negative
4  impact, something that Airbus could do would be
5  to delay the -- or defer the scheduled April
6  PDP payment, so that we were cash neutral or --
7  I don't remember if it would be cash neutral,
8  but it would make up for some of the
9  difference.
10      Q.   The April PDP payment you're
11  referring to there, would that be a PDP payment
12  relating to MSN 9549 or some other aircraft --
13      A.   No, PDP payments at certain points
14  in time are for a number of MSNs that are
15  delivering at either -- since the contract was
16  signed or from a point in time until the
17  aircraft will be delivered.
18         So it could be for one aircraft or
19  usually for a number of aircraft at once.
20      Q.   Would delaying a delivery of an
21  aircraft also defer Frontier's PDP payment
22  obligations relating to that aircraft?
23      A.   No.  Well, let me clarify.
24         If an aircraft is going to be
25  delivered in a short period of time like MSN

Page 96

THWAYTES - CONFIDENTIAL
1
2  9549, all of the PDP payments have been made on
3  that aircraft.  We wouldn't delay the PDP
4  payments on that aircraft.
5          Aircraft that are delivering further
6  out in the future that still have PDP payments
7  due on that aircraft, it would.  If you delay
8  those aircraft, it would delay a PDP payment
9  for that aircraft.
10      MR. HOSENPUD:  Continue to lean in
11  because you're dropping slightly at the
12  end of your statements.
13      THE WITNESS:  Will do.
14      MR. ALEXANDER:  Let's look at
15  Exhibit 12, which is FRONTIER003978.
16      (Thwaytes Exhibit 12, E-Mail Chain,
17  Bates Stamped FRONTIER0003978 through
18  3985, marked for identification.)
19      Q.   All right.  Mr. Thwaytes, this is an
20  e-mail from you to Ashok Shah, Thomas Frey and
21  Sharath Sashikumar Bindu on April 15, 2020.
22         Do you see that?
23      A.   I do.
24      Q.   And this is the top e-mail on a
25  chain, but if you go over to the next page, you

Page 97

THWAYTES - CONFIDENTIAL
1
2  can see that there is a back and forth
3  discussion between Frontier folks and Airbus;
4  is that right?
5      A.   That's right.
6      Q.   In the second page of the document
7  Bates number 3979, at the top of the page,
8  there's an e-mail from Christopher Jones on
9  April 11, 2020, to Jimmy Dempsey and others.
10         Do you see that?
11      A.   I do.
12      Q.   Who is Christopher Jones?
13      A.   He is -- I believe at the time was
14  Matt Saks' boss.  So the SVP of sales or
15  customers or something for the Americas at
16  Airbus.
17      Q.   Mr. Jones says, "Jimmy.  Thanks for
18  taking the time to chat this morning.  In
19  response to your request that Airbus consider
20  delaying a number of your 2020 deliveries to
21  facilitate third-party financing with AMCK,
22  Airbus could contemplate the following starting
23  in 2020."
24         Do you see that?
25      A.   I do.

25 (Pages 94 - 97)

Page 98

THWAYTES - CONFIDENTIAL
2  Q.  And then below that there are a
3 couple charts.
4       Do you see that?
5  A.  I do.
6  Q.  In the second chart with the
7 introductory language, "In terms of delivery
8 months, this would translate to."
9       Do you see that?
10  A.  I do.
11  Q.  In the left column of the chart is
12 "type," all of which is A320.  In the next
13 column, "CACID," there are a number of entries.
14 The next column is "MSN," which lists certain
15 MSN numbers, 9549, 10031, 10089, 10119, 10298
16 and 10327.
17       Did I read those correctly?
18  A.  You did.
19  Q.  And then there are four rows that
20 don't have any MSN listed for them; is that
21 right?
22  A.  That's right.
23  Q.  In the next column to the right, it
24 shows a planned delivery, and it lists various
25 dates in that column for each of the MSN and

Page 99

THWAYTES - CONFIDENTIAL
2 the unidentified aircraft in the column to the
3 left, right?
4  A.  Yes.
5  Q.  What does planned delivery mean?
6  A.  I believe that means the scheduled
7 delivery month that Airbus had notified the
8 aircraft would be delivered in prior -- well,
9 as it stood at this point in time.
10  Q.  In the column to the right, it shows
11 a revised delivery.
12       Do you see that?
13  A.  I do.
14  Q.  And what do you understand that
15 column to represent?
16  A.  The proposal from Airbus to change
17 the delivery month of the aircraft.
18  Q.  This chart has ten aircraft listed.
19       Do you agree?
20  A.  Yes.
21  Q.  Which of those aircraft are aircraft
22 covered by the Framework Agreement with AMCK?
23  A.  Without being able to
24 cross-reference the MSNs to another document,
25 unfortunately, I believe the first three, the

Page 100

THWAYTES - CONFIDENTIAL
2 fourth and then I assume the fifth.
3       I just don't remember off the top if
4 there was any -- there was another lessor
5 delivering aircraft in 2020.  I just don't
6 recall if AMCK's were all in a row or if there
7 was -- if one was delivering sooner than the
8 other.
9       So I'm not sure on the 10298 and
10 10327, I believe.  And then that
11 September 2020, that would also potentially be
12 one of the AMCK aircraft because it looked like
13 it was planned to be delivered before those
14 other two.
15       Again, it's difficult to recall and
16 then I can't cross-reference the MSNs with what
17 you're showing me.
18  Q.  What would you need -- strike that.
19       Where would you look if you wanted
20 to determine which aircraft subject to the
21 Framework Agreement -- strike that.
22  A.  I think in the Framework Agreement
23 it states that what the expected delivery month
24 was and that should, I assume, align with this
25 planned delivery month here.  That may be a

Page 101

THWAYTES - CONFIDENTIAL
2 good way to cross-reference the two.
3  Q.  Well, why don't we put back up
4 Exhibit 5, which is AMCK -- there we go.
5       This is Schedule 1 to the Framework
6 Agreement, which we looked at previously in
7 Exhibit 5, and this shows six aircraft and
8 scheduled delivery months for each.
9       Do you see that?
10  A.  I can see that.
11  Q.  Does that help you to assess which
12 aircraft --
13       MR. HOSENPUD:  Wait, wait, wait.
14 Let him finish your question before you
15 answer.  Thank you.
16       THE WITNESS:  Sure.
17  Q.  Does that help you to assess which
18 aircraft in the April communication from Airbus
19 is covered by the Framework Agreement?
20  A.  It doesn't because I believe that
21 between when the Framework Agreement was put in
22 place and that schedule that you're showing me,
23 Airbus had already issued some delivery delay
24 notices that changed the scheduled delivery
25 month for these aircraft from what you're

26 (Pages 98 - 101)

Page 102

1       THWAYTES - CONFIDENTIAL
2   seeing here to what you're seeing in that
3   e-mail from Chris Jones under the column
4   "Planned Delivery Month," I believe is what it
5   said.
6       Q.   Did Frontier ever provide AMCK with
7   those delivery notices from Airbus that you
8   referenced?
9       A.   Those are -- I don't believe we
10  provide those delivery notices to the lessors.
11  We do notify the lessors of delivery delays.
12  Those are -- that's correspondence that's
13  between Frontier and Airbus.
14      Q.   Did anyone at Frontier ever notify
15  AMCK about a delivery delay regarding MSN 9549?
16      A.   I believe so, yes.
17      Q.   When?
18      A.   I don't know when, but I assume
19  after the delivery -- I'm not sure when, but I
20  recall correspondence where AMCK was relieved
21  that the aircraft had been delayed a month
22  enabling them to provide us a rent deferral for
23  a longer period of time while we continued to
24  work with Airbus to meet the request that AMCK
25  was making for further delaying some of the

Page 103

1       THWAYTES - CONFIDENTIAL
2   other aircraft -- well, all of the aircraft
3   left under the Framework Agreement.
4       Q.   My question was a bit different,
5   Mr. Thwaytes.
6            It was just are you aware of any
7   communication by Frontier to AMCK providing
8   notice that Airbus had delayed the delivery of
9   MSN 9549?
10      A.   I don't recall when or who provided
11  that correspondence, but in -- but there was
12  probably correspondence between Frontier and
13  AMCK at the Robert or Sharath level notifying
14  them of changes in delivery schedules.
15      Q.   But as you sit here today, you,
16  yourself, don't recall any such communication
17  that you were involved in, correct?
18      A.   No, I'm not usually involved in
19  those types of communications.
20      Q.   Going back to the chart here, we
21  have the ten aircraft with various planned
22  delivery dates and then ten revised delivery
23  dates for those ten aircraft; is that right?
24      A.   Yes.
25      Q.   MSN 9549, the first aircraft

Page 104

1       THWAYTES - CONFIDENTIAL
2   identified with a planned delivery of
3   April 2020, that's not an aircraft that AMCK
4   had requested Frontier postpone delivery of,
5   right?
6       A.   I'm not sure if they requested or
7   not. I believe they requested a delay in -- I
8   don't recall if that was included in the
9   request of delaying the delivery date.
10      Q.   There were -- at this point in
11  April 2020, there were only five aircraft
12  remaining to be delivered pursuant to the
13  Framework Agreement, correct?
14      A.   Correct.
15      Q.   So at least five of the aircraft in
16  this chart reflecting a proposed revised
17  delivery date were not related to aircraft
18  covered by the Framework Agreement, correct?
19      A.   That's correct.
20      Q.   Why was Frontier proposing to change
21  those delivery dates?
22      A.   To -- because the belief that --
23  well, we were trying -- this was a very fluid
24  time trying to understand capacity when a
25  recovery would take place and our -- at the

Page 105

1       THWAYTES - CONFIDENTIAL
2   time we believed that it was prudent to push
3   out the delivery of the aircraft so that we
4   didn't have too much capacity later in the year
5   and then also so that we could alleviate some
6   of the PDP payments that were required on
7   aircraft leading up to their delivery, if there
8   was still enough time between this period of
9   time and when that aircraft would be delivered
10  to preserve cash.
11      Q.   Did any other lessors ask Frontier
12  to seek a delay in delivery schedules with
13  Airbus?
14      A.   No.
15      Q.   Let's turn back to the first page of
16  this document.
17           At the bottom of the first page is
18  an e-mail from Mr. Dempsey dated April 14,
19  2020, to Christopher Jones and others.
20           And he says, "Chris/Robert, can you
21  copy Spencer and Sharath in the response so we
22  can analyze the changes. They are copied
23  above."
24           Do you see that?
25      A.   I do.

27 (Pages 102 - 105)

THWAYTES - CONFIDENTIAL
1
2     Q.   Do you recall analyzing changes to
3  the delivery schedule proposed by Airbus?
4     A.   Yeah, I don't recall the particulars
5  of it, but I recall doing this -- or being
6  involved in this analysis.
7     Q.   What was the analysis you were
8  involved in?
9     A.   Looking at what the PDP payment
10  requirement would be based off of these
11  changes, looking at what the cash flows would
12  be in total based off of these changes
13  including the changes in PDP requirements,
14  looking at capacity.
15       So how many aircraft and available
16  seat miles we had to fly -- or available to fly
17  over the delivery stream currently and then
18  after these proposed changes.
19       So basically looking at the current
20  state and then the revised state and the
21  changes in cash flow and the changes in
22  capacity.
23     Q.   In the e-mail above that on the
24  page, Mr. Bishop replies to Mr. Dempsey and
25  others and you stating, "Jimmy, further to your

THWAYTES - CONFIDENTIAL
1
2  recent discussions with Chris and Robert,
3  please find attached a delivery schedule
4  scenario for Frontier review.  Please let us
5  know if you have time this afternoon to discuss
6  and we can set up a call, when we can share our
7  preliminary estimate the attached delivery
8  schedule change would have on Frontier's 2020
9  PDP obligations."
10       Do you see that?
11     A.   I do.
12     Q.   Was this proposed revised schedule
13  related to a discussion that you were having
14  regarding Frontier's PDP obligations?
15     A.   This looks like it was a response to
16  a discussion that Jimmy had with Robert -- or
17  with Chris and Robert.
18     Q.   Do you recall any changes to the
19  delivery schedule being discussed during these
20  negotiations as a result of your analysis of
21  PDP obligations?
22     A.   We probably gave them feedback on
23  the aircraft delivering in the second half of
24  2020 into the first half of 2021 on adjustments
25  to those aircraft and when they were being

THWAYTES - CONFIDENTIAL
1
2  delivered because of the resulting PDP
3  obligations that would result from the changes
4  in when the aircraft would be delivered.
5     Q.   I asked you a moment ago whether any
6  other lessors asked Frontier to seek a change
7  in delivery schedule, and I believe you
8  testified no.  I have a follow-up question on
9  that.
10       Did any sale and leaseback
11  counterparties to Frontier ask for Frontier to
12  delay any deliveries scheduled with Airbus?
13     A.   No, not that I'm aware of, no.
14     Q.   How did Frontier choose -- strike
15  that.
16       Other than the aircraft subject to
17  the Framework Agreement, how did Frontier
18  choose what other aircraft to seek delivery
19  changes for?
20     A.   Based off of the impact on PDP
21  payments and impact on cash flows from the
22  delivery of the aircraft.  So the total cash
23  flow impact, and then also looking at capacity.
24  Really a cash flow exercise and then a capacity
25  exercise.

THWAYTES - CONFIDENTIAL
1
2     Q.   In the e-mail at the top of the
3  page, you reply to Ashok Shah and others.
4       First of all, who is Ashok Shah?
5     A.   He was VP of finance at the time.
6     Q.   At Frontier?
7     A.   That's right.
8     Q.   And who is Thomas Frey?
9     A.   He was the senior manager on the
10  strategic sourcing team, who had just moved
11  over from being a senior manager on Ashok's
12  finance team.  And in his role there, he was
13  responsible for managing the fleet plan model.
14     Q.   In your e-mail, you state, "Looping
15  Thomas into this to assist needs be as we need
16  to run through the FP&A fleet plan."
17       Do you see that?
18     A.   Yep.
19     Q.   What did you mean by that?
20     A.   So our financial planning and
21  analysis team that Ashok was responsible for
22  was responsible for keeping our fleet plan,
23  which includes a forecast of the aircraft to be
24  delivered and the resulting cash flows that
25  come out of it and capacity that comes out of

28 (Pages 106 - 109)

Page 110

THWAYTES - CONFIDENTIAL

1  it.
2
3      Q.    Do you recall discussing the result
4  of running this through the FP&A fleet plan?
5      A.    I don't recall any particular
6  discussion, but I'm sure we had discussions
7  around the result of this.
8      Q.    Do you recall any general
9  discussions?
10     A.    I don't recall any specific things
11 discussed, but generally, I'm sure we discussed
12 this and -- and reviewed the output of it and
13 made recommendations accordingly.
14     Q.    You say that you're sure you did
15 that but just don't recall what you actually
16 did; is that fair to say?
17     A.    Yeah, that's fair to say.
18     Q.    Let's turn to the attachment to this
19 document with the Bates 3981.  And just to
20 place it in context, this is the attachment to
21 the Ray Bishop e-mail on April 15, which it
22 looks like you included in your reply to your
23 Frontier team.
24         If you look here at the page 3981,
25 you see a chart that shows rank, CACID, type

Page 111

THWAYTES - CONFIDENTIAL

1  and then delivery dates in purple color for the
2  delivery dates as of Amendment 8 and yellow
3  color for delivery dates as of -- or the new
4  delivery schedule.
5      A.    I see that.
6      Q.    In the purple column, "Current as of
7  Amendment 8," what does SDM/SDQ mean?
8      A.    Scheduled delivery month, scheduled
9  delivery quarter.
10     Q.    As you look at this chart -- strike
11 that.
12         In the column on the right, it shows
13 the new delivery schedule.  If we look at rank
14 52, the first row in the chart, it shows a
15 March 2020 delivery date as of Amendment 8 and
16 a June 2020 new delivery schedule date.
17         Do you see that?
18     A.    I do.
19     Q.    Can you tell by looking at this
20 chart which, if any, of these aircraft were
21 covered by the Framework Agreement?
22     A.    52 and 53.  Again, it's hard to tie
23 directly because of not having the same unique
24 identifier for each, but 52 and 53.  I think --

Page 112

THWAYTES - CONFIDENTIAL

1  well, 54 was I believe that, but it doesn't say
2  the date it was delivered.  I'm assuming that
3  that's that March aircraft that was the first
4  aircraft delivered under the agreement --
5      Q.    You cut out there, Mr. Thwaytes.
6      A.    I said that the one that says
7  delivered doesn't say when it was delivered,
8  but I'm assuming that that's the March aircraft
9  that was the first aircraft delivered under the
10 Framework Agreement.
11         55 and 56.  And then I don't know if
12 57 or 58, as they are both June deliveries, one
13 of those two.
14     Q.    So there were other aircraft
15 scheduled to be delivered in the spring 2020
16 time period that were not covered by the
17 Framework Agreement, is that correct?
18     A.    Yes, I believe so, like one.
19     Q.    And Frontier was requesting a change
20 in the delivery schedule for that aircraft as
21 well, right?
22     A.    So there were two things going on.
23 One was Frontier was making requests.
24         Second was Airbus was shutting down

Page 113

THWAYTES - CONFIDENTIAL

1  its delivery, they call them their fall, for a
2  period of time because of the height of COVID
3  into -- I forget if they shut it down for all
4  of April, something like that.
5
6      So there were some complications as
7  well as a result of Airbus and Airbus needing
8  to delay the delivery of some aircraft in order
9  to manage their industrial process given that
10 they had to stop people from coming to work
11 because of COVID.
12     Q.    My question was, did Frontier
13 request a change in delivery schedule for
14 aircraft during the spring of 2020 other than
15 aircraft covered by the Framework Agreement?
16     A.    I don't believe Frontier requested a
17 change in the delivery schedule for aircraft in
18 the spring of 2020 other than aircraft in the
19 Framework Agreement, but Airbus may have
20 requested that because they needed to -- they
21 were unable to complete manufacturing the
22 aircraft due to COVID restraints on their
23 manufacturing facility.
24         I think I mentioned earlier that
25 Frontier was focused on delaying aircraft in

29 (Pages 110 - 113)

Page 114

THWAYTES - CONFIDENTIAL

1    THWAYTES - CONFIDENTIAL
2  the second half of 2020 and into 2021 to
3  provide cash flow relief and to manage
4  capacity.
5      Q.   So just looking at this page, there
6  looks to be roughly 20 aircraft identified.
7          All of those involve change in
8  delivery dates in this proposal; is that right?
9      A.   (Document review.)
10         I'm just looking through to make
11  sure that that's accurate for all of them, but
12  yes, it looks accurate for all of them.
13     Q.   And no more than five of those
14  still-to-be-delivered aircraft related to the
15  Framework Agreement, correct?
16     A.   That's -- well, there is a sixth,
17  which I believe is that "delivered" one there.
18  So I think six total of these were related to
19  the Framework Agreement.
20     Q.   All right.
21         MR. ALEXANDER:  Let's pull up
22  FRONTIER009068, which I believe will be
23  Exhibit 13.
24         (Thwaytes Exhibit 13, E-Mail Chain,
25  Bates Stamped FRONTIER009068 through 9076,

Page 115

1    THWAYTES - CONFIDENTIAL
2  marked for identification.)
3      Q.   Mr. Thwaytes, this is an April 20,
4  2020, e-mail from Jimmy Dempsey to Ray Bishop,
5  you and others.
6          Do you see that?
7      A.   I do.
8      Q.   And in this top e-mail Mr. Dempsey
9  says, "Please see attached the delivery
10  schedule that we believe provides Frontier with
11  the appropriate growth levels to close this
12  conversation.  We need to have a manageable
13  growth rate in 2022/3/4 and by sliding 7
14  aircraft we achieve this."
15         Did I read that correctly?
16     A.   You did.
17     Q.   What did you understand appropriate
18  growth levels for Frontier to be?
19     A.   That gets back to what I was talking
20  about earlier where our analysis is on capacity
21  and cash flow.  And capacity results in growth
22  level.
23     Q.   Let's look at page 9071, which
24  includes the attachment to Mr. Dempsey's
25  e-mail.

Page 116

1    THWAYTES - CONFIDENTIAL
2          And you see, similar to the charts
3  that we have looked at, this shows a list of
4  different aircraft delivery dates by Airbus
5  Rank, CACID, Aircraft Type, Original SDM,
6  Original Year, Revised (From Airbus).  Then in
7  columns I and J, (From Airbus V2) and in column
8  L, Revised (F9 Counter).
9          Can you tell, from looking at this
10  chart, which of the aircraft reflected here are
11  covered by the Framework Agreement?
12     A.   This chart looks similar to the
13  chart we looked at recently with that delivered
14  aircraft noted as the third one.
15         So based off of that, I would say
16  the first five aircraft and then one of the
17  June aircraft, probably the first one, but,
18  again, I can't tie that directly based off of
19  the information here.
20     Q.   You understand that the column from
21  Airbus in yellow reflects Airbus' latest
22  proposal for the delivery schedule, right?
23     A.   Right.
24     Q.   And then the column to the right of
25  that, Revised (F9 Counter), you understand that

Page 117

1    THWAYTES - CONFIDENTIAL
2  to be Frontier's counterproposal to what Airbus
3  was proposing in the previous column, right?
4      A.   That's right.
5      Q.   Was Frontier proposing to change any
6  of the delivery dates concerning the aircraft
7  covered by the Framework Agreement?
8      A.   Originally, Jane had sent me an
9  e-mail that asked for a three to six-month
10  delay in the aircraft under -- that were to be
11  delivered under the Framework Agreement, and we
12  were working to achieve, at the minimum, a
13  three-month delay in the aircraft under the
14  Framework Agreement to meet her request.
15         Airbus was very motivated to get the
16  aircraft delivered as soon as possible because
17  they also had a cash flow problem, and they
18  don't get paid for the aircraft besides the PDP
19  payments until they are delivered.  And these
20  aircraft were fully assembled or very close to
21  it, mostly in Mobile, Alabama, where they have
22  a small facility where there isn't a lot of
23  room to park the aircraft.
24         So we made the request to delay all
25  of these aircraft including the five that are

30 (Pages 114 - 117)

Page 118

THWAYTES - CONFIDENTIAL
2 AMCK aircraft for a minimum of three months,
3 and the feedback we got from Airbus was that
4 that's all that they could accommodate.
5      So our counter stuck with that, met
6 Airbus' requirement and Jane's request of three
7 to six months.
8      Q.   So just to make sure I understand,
9 in this counterproposal from Frontier, Frontier
10 was not proposing to change any of the most
11 recent proposals from Airbus regarding the
12 delivery date for the aircraft covered by the
13 Framework Agreement, correct?
14     A.   I believe, in conversations with
15 Airbus, we had already concluded that they
16 would not delay the aircraft any further than
17 this, at this point in time.
18     Q.   So I'm looking just for a yes-or-no
19 answer.
20      In this counterproposal from
21 Frontier, did Frontier propose to change any of
22 the delivery dates for the aircraft covered by
23 the Framework Agreement?
24     A.   Not between the Frontier Airbus V2
25 and the revised F9 counter.

Page 119

THWAYTES - CONFIDENTIAL
2     Q.   So this chart with some revisions
3 from Frontier relates to aircraft not covered
4 by the Framework Agreement, correct?
5      MR. HOSENPUD:  Object to the form of
6      the question, misstates the chart and
7      information in it.
8      You can answer.
9     A.   It appears to cover aircraft in the
10 Framework Agreement and outside of the
11 Framework Agreement.
12     Q.   The proposed changes that Frontier
13 was making as reflected in this chart, those
14 changes do not relate to aircraft covered by
15 the Framework Agreement, correct?
16     A.   (Document review.)  Correct.
17     Q.   Let's go back to the first page of
18 this document, to Mr. Dempsey's e-mail.
19      He says -- well, he includes an AC
20 count comparison with years of 2020 and 2021,
21 and there's other information that's
22 redacted underneath that.
23      Do you see that?
24     A.   I do.
25     Q.   For 2020, there's an original SDM of

Page 120

THWAYTES - CONFIDENTIAL
2 15 aircraft listed; is that right?
3     A.   That's right.
4     Q.   And then there is a new SDM (Airbus)
5 for 2020 of six aircraft; is that right?
6     A.   That's right.
7     Q.   What does that column mean?
8     A.   That means the new number of
9 aircraft that are scheduled to be delivered in
10 2020.
11      (Reporter Clarification.)
12     Q.   And then the column to the right is
13 new SDM (Frontier), and it shows six; is that
14 right?
15     A.   That's right.
16     Q.   So both Airbus and Frontier were
17 proposing six aircraft to be delivered during
18 2020; is that right?
19     A.   That's right.
20     Q.   As opposed to the original plan for
21 there to be 15 aircraft to be delivered in
22 2020, right?
23     A.   That's right.
24     Q.   Those aircraft that were originally
25 scheduled for 2020 but not to be included in

Page 121

THWAYTES - CONFIDENTIAL
2 2020 according to this proposal, when would
3 those be delivered?
4     A.   What you're not seeing here, and in
5 that chart below that we were looking at
6 because it's redacted, are the delivery years
7 post 2021 where there were changes in aircraft
8 delivery periods.
9      So to answer your question, you
10 would see that flow down further into other
11 years that are redacted in this document.
12     Q.   Mr. Dempsey goes on to say, "This
13 proposal is dependent on the following," and he
14 lists four numbered points there.
15      Do you see that?
16     A.   I do.
17     Q.   The first point is "Extension of XLR
18 election by six months to year end
19 (December 31, 2020)."
20      Do you see that?
21     A.   I do.
22     Q.   What do you understand that to mean?
23     A.   We have --
24      THE WITNESS:  David, this is a bit
25 confidential as well.

31 (Pages 118 - 121)

Page 138

THWAYTES - CONFIDENTIAL
1
2    Q.   So if you could please look at this
3    document, you will see it's a March 16, 2020,
4    e-mail from you to Jane O'Callaghan, subject,
5    "Concession Request Letter."
6         Do you see that?
7    A.   I do.
8    Q.   Do you recall sending a concession
9    request letter to AMCK at this time?
10   A.   Yes.
11   Q.   If we could go to the next page of
12   the document with Bates number 241, there's a
13   letter dated March 16, 2020, to Jane
14   O'Callaghan.
15        And if you scroll to the next page,
16   you'll see it's signed by you; is that right?
17   A.   That's right.
18   Q.   What were you asking for in this
19   letter?
20   A.   I was asking for the rent payments
21   between the upcoming rent payments -- well, the
22   rent payments due between the date of this
23   letter and I believe the end of June of 2020 to
24   be deferred and then return of one-month
25   security deposit.

Page 139

THWAYTES - CONFIDENTIAL
1
2    Q.   In the third paragraph of your
3    letter, you say, "Unlike some other companies,
4    against the back drop of today's rapidly
5    changing landscape, Frontier is determined to
6    continue delivering our growth strategy and
7    fulfilling expectations of our shareholders,
8    including yourselves.  Our devotion should,
9    however, not be taken for granted."
10        Do you see that?
11   A.   I do.
12   Q.   What did you mean by your devotion
13   should not be taken for granted?
14   A.   I believe that what I meant was,
15   even though we were requesting these, the
16   points 1 and 2 here, that our devotion to
17   fighting through this crisis that we were in
18   should not be taken for granted.  Meaning that
19   we would try to find all means to be successful
20   through the COVID crisis and its impact on the
21   airline industry.
22   Q.   Were you saying, absent some kind of
23   assistance, you wouldn't be able to make rent
24   payments?
25   A.   No.  I was saying that -- I'll leave

Page 140

THWAYTES - CONFIDENTIAL
1
2    it at no.
3    Q.   In the paragraph just below numbered
4    points 1 and 2, which you described as, "1. All
5    lease rent payments due between the date of
6    this letter and June 30, 2020 will be deferred;
7    and 2. Return of one month's rent security
8    deposit."
9         In that next paragraph, you say,
10   "The above concessions would be documented in a
11   mutually agreed deferral and concession
12   agreement."
13        Do you see that?
14   A.   I do.
15   Q.   What did you mean by that?
16   A.   That once we came to an agreement,
17   we would document that agreement.
18   Q.   So you expected that if your request
19   for a deferral was granted, that would be
20   documented in an agreement?
21   A.   Yeah, once the final agreement on
22   the deferral was granted, it would be
23   documented.
24   Q.   Did you send substantially similar
25   letters to other lessors of Frontier?

Page 141

THWAYTES - CONFIDENTIAL
1
2    A.   I did.
3    Q.   Did you send substantially similar
4    letters to all of Frontier's other lessors?
5    A.   I believe so.
6    Q.   How many other lessors are there?
7    A.   At this point in time, I don't
8    remember the exact number, but I would guess
9    somewhere around 15.
10   Q.   Did there come a point in time when
11   Frontier made the decision to send this letter
12   or substantially similar letters to all of its
13   lessors?
14   A.   Yes.
15   Q.   When did Frontier make that
16   decision?
17   A.   When the gravity of the situation
18   got to the point where we believed that we
19   needed to take this action with all of our
20   lessors and other significant suppliers.
21   Q.   Do you recall what time that
22   decision was?
23   A.   I don't remember what time it was,
24   but I recall that it was -- I don't recall what
25   time it was, no.

36 (Pages 138 - 141)

Page 158

1          THWAYTES - CONFIDENTIAL
2    Accipiter?
3        A.   I don't remember specifically, no,
4    but as one of our lessors, I'm sure we
5    considered potential cross-defaults in their
6    agreement, just like all of the others.
7        Q.   Mr. Thwaytes, we looked earlier at
8    the concession letter that you wrote to Jane
9    O'Callaghan, and you referred in that letter to
10   your expectation that any agreement would be in
11   writing; is that right?
12       A.   Any -- yeah, the final agreement
13   would be in writing, documented.  I forget the
14   language exactly.
15       Q.   And that was your expectation as
16   well?
17       A.   Yes.  And that was the result of
18   negotiations with other lessors, we put the
19   agreements in writing once we came to a final
20   agreement.
21       Q.   How many other lessors did you reach
22   such agreements with?
23       A.   I don't know the number.  I don't
24   recall the number.
25            MR. ALEXANDER:  Let's look at

Page 159

1          THWAYTES - CONFIDENTIAL
2    AMCK16504, and we will call this
3    Exhibit 22.
4            (Thwaytes Exhibit 22, E-Mail Chain
5        With Attachment, Bates Stamped AMCK16504
6        through 16531, marked for identification.)
7        Q.   Mr. Thwaytes, this is an April 1
8    e-mail from a Ms. Miao to Jane O'Callaghan and
9    copying others including you.
10           Do you see that?
11       A.   I do.
12       Q.   Apologies if I'm mispronouncing the
13   name, but Ms. Miao, do you understand to be
14   Frontier's counsel at Lane Powell?
15       A.   Yes.
16       Q.   She writes, "Hi Jane, we circulated
17   a draft lease payment waiver and deferral
18   agreement form on March 24.  To facilitate
19   document execution, we created two omnibus
20   agreements to include multiple aircraft.  One
21   agreement is for the aircraft currently owned
22   by WFT."
23           Do you understand that to be Wells
24   Fargo?
25       A.   Wells Fargo Trust, I assume.

Page 160

1          THWAYTES - CONFIDENTIAL
2        Q.   And she goes on, "and the other
3    agreement is for the aircraft owned by UMB.
4    The substance of the omnibus agreement is the
5    same was the one aircraft agreement that we
6    circulated prior."
7            Do you see that?
8        A.   I do.
9        Q.   And attached to this e-mail, if you
10   go to the page Bates numbered 16508, you'll see
11   a draft Omnibus Lease Payment Deferral and
12   Waiver Agreement, and that document relates to,
13   in the first paragraph, UMB; is that right?
14       A.   Yes.
15       Q.   And these are the -- of the 14
16   original leases, these are the leases that deal
17   with UMB as owner trustee, right?
18       A.   I don't recall the owner trustee for
19   all of our leases, but we are -- in this
20   document, UMB is listed as the owner trustee.
21       Q.   Would you please look at page 16517?
22           This is Schedule 2 of that same
23   draft agreement, and it lists, in different
24   charts, seven different aircraft, if you scroll
25   through to the next few pages.

Page 161

1          THWAYTES - CONFIDENTIAL
2            And if we could go back up to the
3    top of Schedule 2 and just call your attention
4    to the form of the chart.  There's a rent date
5    in the left column, which for the first
6    aircraft listed there, MSN 8766, describes rent
7    dates on April 22, May 22, June 22, July 22 and
8    it goes on.
9            Do you see that?
10       A.   I do.
11       Q.   And an amount of rent payable, in
12   the next column, which shows zero dollars for
13   April 22, May 22 and June 22, right?
14       A.   That's right.
15       Q.   And then starting on July 22, the
16   amount of rent payable is listed as
17   $347,864.42.
18           Do you see that?
19       A.   I do.
20       Q.   And that same number repeats for
21   each payment date listed in the chart
22   thereafter, right?
23       A.   That's right.
24       Q.   Do you have any reason to believe
25   that the rent dates listed there are different

41 (Pages 158 - 161)

THWAYTES - CONFIDENTIAL
1
2    from the rent dates for payment under the Lease
3    Agreement for MSN 8766?
4        A.   I don't have -- I don't remember
5    what the rent dates are and the amounts in that
6    Lease Agreement, but I would have to assume
7    that if these are the dates we put in here,
8    it's because those are the dates that are in
9    the Lease Agreement.
10       Q.   And if you flip forward to the
11   page 16520.
12       MS. WANG:  Sorry, Jack, which Bates
13   number?
14       MR. ALEXANDER:  16520.  So later in
15   the document.  There we go.
16       Q.   This is another draft Omnibus Lease
17   Payment Deferral and Waiver Agreement.  This
18   one, if you look at the first page, with Wells
19   Fargo, right?
20       A.   Yep.
21       Q.   And if we flip forward to the page
22   with Bates number 16529, you see a similar
23   Schedule 2, which lists charts for seven
24   different aircraft.
25       Do you see that?  We can scroll down

THWAYTES - CONFIDENTIAL
1
2    through the charts to give you a sense.
3        A.   I get a sense for it.
4        Q.   Okay.  And these charts look similar
5    to the charts we just looked at, but do you
6    have any reason to believe that any of the rent
7    dates or rent payment amounts in any of these
8    charts are wrong?
9        A.   No, I don't have any reason to
10   believe that they're wrong.
11       Q.   Are these the type of documentation
12   that you were expecting would be the result of
13   your request for a concession?
14       A.   I believe we had our counsel draft a
15   template that we would use to document these
16   rent deferrals, and this is that template.
17       Q.   Mr. Thwaytes, do you understand
18   that, in April of 2020, AMCK agreed to a
19   ten-day grace period for Frontier's rent
20   payment obligations?
21       A.   I understand that they provided us
22   with a ten-day grace period.
23       Q.   Do you know the end date of that
24   grace period?
25       A.   The end date of the grace period was

THWAYTES - CONFIDENTIAL
1
2    undetermined because we continued to have
3    dealings with AMCK the first part of May.
4        So it was kind of an ambiguous end
5    date that continued to be pushed out as we
6    continued to pursue what AMCK had requested us
7    to pursue with Airbus.
8        MR. ALEXANDER:  Let's pull up
9    AMCK16622.  This will be Exhibit 23.
10       (Thwaytes Exhibit 23, E-Mail Chain,
11   Bates Stamped AMCK16622 through 16624,
12   marked for identification.)
13       Q.   This is an April 6, 2020, e-mail
14   from Jimmy Dempsey to Paul Sheridan, and he's
15   copying you and others.
16       Do you see that?
17       A.   I do.
18       Q.   And he's replying to a Paul Sheridan
19   e-mail on April 6 in which Mr. Sheridan says,
20   "Hi Jimmy, we just got off the phone with
21   Robert, and so I would like to confirm what we
22   discussed.  Mindful of the time it might take
23   you to reach agreement with Airbus or to make
24   some other arrangements and, therefore, of the
25   ability for us to reach a deferral agreement,

THWAYTES - CONFIDENTIAL
1
2    we can confirm that we won't take any actions
3    or call any defaults linked to nonpayment of
4    rents on any aircraft where the rent is due
5    from today to 21 April; i.e., for the next ten
6    working days."
7        Do you see that?
8        A.   Unfortunately, that's not what's on
9    the screen right now.
10       MR. HOSENPUD:  You have not shown
11   that in the document.
12       MR. ALEXANDER:  I'm sorry.  Let's
13   make that visible.
14       Q.   Have a look at it.
15       A.   (Document review.)  I see that.
16       Q.   So Mr. Sheridan was saying there was
17   a ten-day grace period until 21 April, correct?
18       A.   In his e-mail that's what he states.
19       Q.   And did you understand that that's
20   when the grace period he was talking about
21   ended?
22       A.   At the point in time when he sent
23   this e-mail, we understood that that's when the
24   grace period ended.
25       Q.   Did anyone at AMCK ever state in

42 (Pages 162 - 165)

Page 166

```
 1         THWAYTES - CONFIDENTIAL
 2  writing that that grace period was extended?
 3      A.   There was some communication around
 4  the grace period being extended to May 15, that
 5  I recall.  That's all I recall in writing
 6  related to a different end of the grace period.
 7      Q.   What can you recall about that
 8  communication that you referenced?
 9      A.   Without seeing it, I think it was --
10  I think it was a counterproposal of some type
11  from -- I don't know if it was Paul or Jane.  I
12  don't recall.  I think it was a counterproposal
13  from them.  I don't remember the date that it
14  was sent, but I think it was probably later in
15  April.  I don't remember.
16      Q.   Do you know if Frontier accepted
17  that counterproposal?
18      A.   Frontier acted on that
19  counterproposal and went to -- continued to try
20  to achieve what I think Accipiter was
21  requesting in it, but I don't believe Frontier
22  accepted the counterproposal.
23      Q.   Apart from that e-mail that you're
24  thinking of, do you recall any other written
25  communications from AMCK that you think
```

Page 167

```
 1         THWAYTES - CONFIDENTIAL
 2  extended the ten-day grace period that ended,
 3  in this e-mail, on April 21?
 4      A.   Yes, there were a lot of
 5  communications back and forth with AMCK asking
 6  us to continue to negotiate with Airbus, to
 7  delay the delivery dates of the aircraft that
 8  were under the Framework Agreement, a number of
 9  new proposals, updates on where AMCK was in
10  their dealings with -- internally.
11         So there were a number of
12  communications to us that encouraged us to
13  continue to try to progress -- to achieve the
14  request that they had made to us in order to
15  put the rent deferral in place.
16      Q.   But were there any communications
17  that stated in writing that the ten-day grace
18  period was extended?
19      A.   There was no communication that
20  explicitly stated that the ten-day grace period
21  was extended, that I recall.
22      Q.   Apart from written communications,
23  were you a part of any discussions orally where
24  anyone at AMCK extended the ten-day grace
25  period?
```

Page 168

```
 1         THWAYTES - CONFIDENTIAL
 2      A.   Not where they explicitly extended
 3  the ten-day grace period, but conversations
 4  around us continuing to work to achieve what
 5  they had requested that we achieve in order to
 6  get the rent deferral.
 7      Q.   Apart from the ten-day grace period
 8  referred to in Mr. Sheridan's e-mail, are you
 9  aware of any other grace period that anyone at
10  AMCK granted to Frontier at this time?
11      A.   Besides the grace period that we had
12  in our agreements with them, which were already
13  in place at this time, I'm not aware of any
14  additional grace periods explicitly being
15  provided to us.
16      Q.   And that's both in writing or
17  orally, you're not aware of any, right?
18         MR. HOSENPUD:  Object to the form of
19  the question, assumes facts not in
20  evidence.
21         You can answer.
22  A.  No.
23         MR. ALEXANDER:  Let's mark the next
24  Exhibit 24, Frontier's interrogatory
25  responses.
```

Page 169

```
 1         THWAYTES - CONFIDENTIAL
 2         (Thwaytes Exhibit 24, Plaintiff
 3  Frontier Airlines, Inc.'s Response to
 4  Defendants' First Interrogatories, marked
 5  for identification.)
 6      Q.   Mr. Thwaytes, I will represent to
 7  you that this document is a document that
 8  Frontier provided to defendants in this
 9  litigation responding to various
10  interrogatories, which are requests by AMCK.
11         MR. ALEXANDER:  If we could, Gege,
12  please go to interrogatory number 6.
13  Okay.
14      Q.   Do you see interrogatory number 6
15  there, Mr. Thwaytes, asks "For each claim for
16  relief set forth in the Complaint, describe
17  each category of damages claimed by Frontier
18  including by (a) identifying the amount of each
19  category of damages (or, if presently unknown,
20  an estimate of the amount of damages, (b),
21  describing with specificity how Frontier has
22  incurred or will incur such damages, (c),
23  providing the dates on which such damages were
24  incurred and (d) identifying all persons with
25  knowledge of such damages."
```

43 (Pages 166 - 169)

Page 170

1    THWAYTES - CONFIDENTIAL
2        Do you see that?
3    A.  I do.
4    Q.   And then what follows in the next
5 paragraph is an answer, which includes a number
6 of objections.
7        In the last sentence on that page,
8 it says, "Plaintiff responds as follows:
9 Plaintiff claims damages related to its
10 agreements with CDB Aviation and Jackson Square
11 Aviation, which agreements specifically reduced
12 purchase price per aircraft, increased rent per
13 aircraft, and provided less favorable return
14 condition provisions, less favorable early
15 termination options, and less favorable
16 on-watch burden.  Damages associated with
17 Plaintiff's agreement with CDB Aviation total
18 approximately $31,313,400.  Damages associated
19 with Plaintiff's agreement with Jackson Square
20 Aviation total approximately $21,866,100.
21 Plaintiff incurred such damages in or around
22 June 2020.  Individuals with knowledge of such
23 damages include Jimmy Dempsey, Robert Fanning,
24 Spencer Thwaytes, and Sharath Sashikumar
25 Bindu."

Page 171

1    THWAYTES - CONFIDENTIAL
2        Do you see that?
3    A.  I do.
4    Q.   Would you please explain your
5 understanding of the financial harm suffered by
6 Frontier as a result of the termination of the
7 Framework Agreement?
8    A.   The difference between the sales
9 price that Accipiter was obligated to pay per
10 the Framework Agreement and the sales price
11 that we were able to negotiate with CDB and
12 Jackson Square, the difference in the present
13 value of the rent payments that we would have
14 been obligated to pay under Accipiter's
15 obligation under the Framework Agreement
16 compared to the rent we were able to negotiate
17 with CDB and with Jackson Square, the
18 difference in return conditions.
19        So I don't know the specific
20 difference in the returns conditions.  There's
21 a lot of different returns conditions, but the
22 differences could be the amount of hours and
23 cycles that are required to be on certain
24 components of the aircraft including the engine
25 at return, and the rate that you pay per hour

Page 172

1    THWAYTES - CONFIDENTIAL
2 or cycle that you've utilized on the aircraft
3 and the engines at return, since those
4 components were last overhauled or the aircraft
5 went into a heavy check.
6        And then -- and then the early
7 termination options, I think that that has
8 to -- I'm not sure what that has to do with off
9 the top.  The less favorable on-watch burden is
10 a condition where we have to resolve an issue
11 on the aircraft and/or engine prior to lease
12 return, if there is a condition that is on
13 watch.  That was not in the AMCK Framework
14 Agreement or the AMCK leases.
15        Does that answer your question?
16    Q.   Well, apart from the harm you've
17 just described resulting from the termination
18 of the Framework Agreement, has Frontier
19 suffered any other financial harm that it's
20 seeking to recover in this case?
21    A.   I'm not -- there is additional
22 financial harm that Frontier was exposed to
23 that I'm not certain is contemplated in the
24 damages here.
25        For example, extending the delivery

Page 173

1    THWAYTES - CONFIDENTIAL
2 date of the aircraft or delaying the delivery
3 date of the aircraft required that Frontier
4 have a -- have borrowings under its PDP credit
5 facility for a longer period of time, and there
6 was interest expense that had to be paid on
7 that.
8        The cash that Frontier had on
9 deposit in support of the PDP payments could
10 not be utilized to be invested if it was excess
11 or to pay other obligations, pushing out
12 some -- or delaying aircraft.
13        Also, during this period of time, it
14 did not -- that isn't something that -- never
15 mind.  Strike that last part what I was saying.
16        I don't believe that resulted in any
17 financial harm, just the change in the delivery
18 schedule on the utilization of the aircraft.
19        Was I clear there?  Sorry.  I was
20 just thinking through it in my head.
21    Q.   Thank you.
22        Were any of the Lease Agreements for
23 the 14 original leases or the more recent lease
24 for MSN 10038, were any of those leases
25 terminated?

44 (Pages 170 - 173)

Page 174

THWAYTES - CONFIDENTIAL
1
2    A.    Those leases were not terminated.
3    Q.    Frontier still possesses the
4    aircraft under those leases, right?
5    A.    Frontier still possesses the
6    aircraft under those leases.
7    Q.    Did defendants ever prevent Frontier
8    from using those aircraft?
9    A.    No.
10    Q.    Let's go back to the category of
11    damages you discussed when describing the
12    termination of the Framework Agreement.
13        First, you referred to the
14    difference between sale price that Accipiter
15    was under the obligation to pay and the sales
16    price negotiated with CDB and JSA.
17        Is that related to the different
18    purchase price owed by Frontier to Airbus and
19    then whatever price was agreed to in the
20    sale-leaseback transactions?
21    A.    There's two components to it.  One
22    is the difference in what Accipiter was
23    obligated to pay and what CDB and Jackson
24    Square were, again, willing to pay.
25        And then the second part is the

Page 175

THWAYTES - CONFIDENTIAL
1
2    continued escalation in the purchase price of
3    the aircraft as a result of delaying the
4    aircraft.
5    Q.    You also referred to the present
6    value of the rent payments compared to the
7    rents under the CDB and JSA contracts; is that
8    right?
9    A.    That's right.
10    Q.    Is it fair to say that the rents
11    that will be paid over the life of those
12    contracts Frontier is not paying all at once
13    today, right?
14    A.    No.  And that's why we did a net
15    present value of it.  So that you get -- you
16    arrive at today's dollars.
17    Q.    Do you know if the dollar amounts
18    reflected in this interrogatory response
19    reflect that discount to present value?
20    A.    I don't -- I don't know that because
21    I don't have the math in front of me, but I
22    believe that what made it into this document is
23    what we calculated as the damages that included
24    the net present value of the rent.
25    Q.    We just spoke about the different

Page 176

THWAYTES - CONFIDENTIAL
1
2    sale price and the different rent values.
3        Did you calculate dollar amounts
4    related to any of the other categories of
5    damages you discussed?
6    A.    This would be a better question for
7    Sharath who was responsible for calculating
8    these amounts, but if they are listed in this
9    agreement, they should be included in those
10    dollar amounts.
11    MR. ALEXANDER:  Let's pull up
12    FRONTIER008478.
13        (Thwaytes Exhibit 25, E-Mail With
14    Attachment, Bates Stamped FRONTIER008478,
15    marked for identification.)
16    Q.    This is an e-mail from
17    Mr. Sashikumar Bindu to you, copying Robert
18    Fanning.
19        He says, "Hi Spencer, please see
20    attached the file updated per our discussion."
21        And then, if we go to the next page,
22    you see there's a document attached, which is a
23    bit difficult to read, but do you see that --
24    if we can zoom in, you'll see that there's a
25    chart that shows different damages

Page 177

THWAYTES - CONFIDENTIAL
1
2    calculations; is that right?
3    A.    That looks right.
4    Q.    What we have done is we have taken
5    that chart on the left, and we'll put that in
6    its own document so you can see it a bit more
7    clearly.
8    A.    Sure.
9        (Thwaytes Exhibit 26, Blown-Up
10    Chart, Bates Stamped FRONTIER008479,
11    marked for identification.)
12    Q.    But you see there's three columns
13    there, AMCK, CDB and JSA.  There's a purchase
14    price listed for AMCK of 51 million, and that's
15    the purchase price provided for in the
16    Framework Agreement, right?
17    A.    Correct.
18    Q.    And then for CDB, there's a purchase
19    price listed of 48.5 million.  And for JSA,
20    there's a purchase price listed of 49 million,
21    right?
22    A.    Correct.
23    Q.    And then below that, there's a B/W
24    to AMCK.
25        What does B/W mean?

45 (Pages 174 - 177)