UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------
FRONTIER AIRLINES, INC,

Plaintiff,

vs.

Case No.: 1:20-CV-09713-LLS

AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,

Defendants.
------------------------------

April 4, 2022
9:59 a.m. MDT

***TRANSCRIPT CONTAINS CONFIDENTIAL AEO SECTION***

Remote video-teleconference deposition of ROBERT FANNING, taken by Defendants, held at Denver, Colorado, pursuant to notice, before Elizabeth F. Tobin, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

On behalf of the Plaintiff:
LANE POWELL, P.C.
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
503.778.2100
BY: DAVID G. HOSENPUD, ESQ.
hosenpudd@lanepowell.com
(via video-teleconference)

On behalf of the Defendants:
CLIFFORD CHANCE, LLP
31 West 52nd Street
New York, New York 10019-6131
212.878.8000
BY: JEFF E. BUTLER, ESQ.
jeff.butler@cliffordchance.com
GEGE WANG, ESQ.
(via video-teleconference)

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

COURT REPORTER: Will you be ordering a copy of the transcript today?

MR. HOSENPUD: Yes, I will.

COURT REPORTER: Good morning. My name is Elizabeth Tobin. I am a New York State stenographic reporter and a registered professional reporter. Today's date is April 4, 2022 and the time is approximately 10:59 a.m. This is the deposition of Robert Fanning in the matter of Frontier versus AMCK, et al. This case is venued in the United States District Court, Southern District of New York. The case number is 1:20-CV-09713-LLS.

At this time I will ask counsel to identify yourself, state whom you represent and agree on the record that there is no objection to this deposition officer administering a binding oath to the witness remotely via video-teleconference.

MR. BUTLER: On behalf of Frontier Airlines no objection.

MR. HOSENPUD: Agreed.

R O B E R T F A N N I N G,
of lawful age, called by the Defendants for

examination pursuant to the Federal Rules of Civil Procedure, having been first duly sworn remotely upon agreement of all counsel, as hereinafter certified, was examined and testified as follows:

EXAMINATION OF ROBERT FANNING

BY MR. BUTLER:

MR. BUTLER: Why don't we just introduce ourselves for the record. My name is Jeff Butler from Clifford Chance. I represent the defendants in the case. With me is my colleague Gege Wang.

MR. HOSENPUD: David Hosenpud on behalf of Frontier Airlines, the plaintiff, in this case.

Q. Good morning, Mr. Fanning.
A. Good morning.
Q. Are you employed by Frontier Airlines?
A. I am.
Q. What is your current position?
A. I'm vice-president for fleets transactions.
Q. How long have you been at Frontier?
A. Since November 2013.
Q. Can you briefly describe your career

Page 6

R. Fanning

before you joined Frontier?
A. So I've been in the aviation finance space for 26 years. I started with corporate jets. Through corporate jets I was down in Florida for 16 years, 10 years selling/buying/financing corporate jets. And then in '99 I started getting involved in commercial transactions. I worked for various private banks, lessors and then subsequently joined Frontier in 2013.
Q. Which lessors have you worked for?
A. AWAS.
Q. Is that the only one or have you worked for more than one?
A. No. I worked for AWAS and Republic Financial.
Q. I'm sorry. I couldn't hear the last part of that answer.
A. Republic Financial.
Q. Republic Financial was at that time also an aircraft leasing question company?
A. Yes; correct.
Q. When did you work for AWAS?
A. 2009.
Q. How long did you work for AWAS?

Page 7

R. Fanning

A. Two years.
Q. So did you finish in 2009 or begin in 2009?
A. I believe I began in 2009.
Q. What were your responsibilities when you worked for AWAS?
A. To assist Rubin and Walter in their sales companies that they had going on at that time regarding aircraft leasing.
Q. So you had an sales function for aircraft leasing, is that right, at AWAS?
A. Yes.
Q. Were you interfacing with airlines and other potential lessees?
A. With Rubin and Walter, yes.
Q. What about Republic Financial, when did you work for them?
A. 2007, 2009.
Q. 2007 to 2009.
Were your responsibilities similar at Republic?
A. Director of remarketing.
Q. So, again, part of your responsibility was interfacing with potential lessees including

Page 8

R. Fanning

airlines; is that right?
A. Correct.
Q. What are your responsibilities now as VP of fleet transactions?
A. So just a back story, I started as a manager at Frontier. I was responsible for the day-to-day administration and maintenance reserves, claims maintenance, reserve payments, lease payments. Got promoted to senior manager, then subsequently to director, senior director and now VP.
So my current responsibility is I'm responsible for all our lessors in terms of lease negotiations, aircraft financing and then oversee the administration of the rent payments due, any maintenance reserve claims that need to be repaid to Frontier. Basically, the overall from the finance side. Basically responsible for the finance side of the aircraft for Frontier.
Q. Who do you report to at Frontier?
A. Jimmy Dempsey.
Q. Who reports to you or who are your direct reports?
A. Sharath.

Page 9

R. Fanning

Q. Is that Sharath Sashikumar -- I may be mispronouncing?
A. Yes.
Q. Where does Spencer Thwaytes fit into that organizational structure?
A. So, just -- so I got promoted to -- we had a change in structure this year. I reported to him prior to me reporting to Jimmy Dempsey when I was senior director for fleets transactions. I was also responsible for the strategic sourcing side along with Spencer. This year I got promoted to vice-president and there was a shift on my responsibilities exclusively with aircraft financing. And Spencer, being the treasurer, was responsible for strategic sourcing going forward.
Q. So you described the hierarchy today. Can I take you back in time to 2020 then? Who were you reporting to in 2020?
A. Spencer Thwaytes.
Q. Did he in turn report to Jimmy Dempsey at that time?
A. Correct.
Q. And in 2020 did you have any direct -- did you have anyone reporting to you other than

R. Fanning

the lessor.

Q. Setting outside how it works in practice, a person could tell just by looking at the final lease payment when the lease payments are due; is that right?

A. If you wanted to access the lease agreements, which I typically do not, yes, that is correct.

Q. And you mentioned -- and I think described a little bit -- the system that Frontier uses to keep track of the rent payments.

Is that the spreadsheet you described or is there some other system?

A. No, that's the spreadsheet I described.

Q. Frontier maintains -- in your group at Frontier a spreadsheet is maintained showing all of the lease payments due for the aircraft leased from AMCK; is that right?

A. Correct.

Q. Did Frontier also receive invoices from AMCK for rent payments due?

A. Yes. That is correct.

Q. And do you recall -- did those invoices go out, you know, well before the payment or right

R. Fanning

before the payment? Do you remember what the practice was of receiving invoices?

A. Depending on the lessor, some lessors sent 12 months in advance of invoices. I can't recall what AMCK did for invoices.

Q. Focusing on the time period before March of 2020, did Frontier do its best to always make its lease payments on the day that they're due?

A. That is correct. We have never missed a lease payment since I began in 2013. We always paid on the due dates.

Q. Again, focusing on the time period before March of 2020, were there times when Frontier might have been a little bit late in making a lease payment?

A. No.

Q. Not to your memory; is that right?

A. No. The answer is no.

Q. When you say the answer is no, then your testimony is that Frontier was very strict about making its rent payments on or before the day that they're due; is that right?

A. That's correct.

MR. HOSENPUD: Objection. Misstates the

R. Fanning

testimony. You can answer.

Q. I'm not sure I heard the answer.

(Record read.)

Q. Now, I want to ask you about the framework agreement that's at issue in this case. So are you aware that in March of 2020 Frontier and AMCK entered into a framework agreement for the sale and leaseback of a total of six additional aircraft?

A. That is correct.

Q. I want to make sure I have a basic understanding of how that framework agreement was supposed to work. Is it correct that these six aircraft were aircraft that Frontier had previously ordered from Airbus as part of a larger purchase agreement with Airbus; is that right?

A. Part of the AD aircraft --

(Court reporter requested clarification.)

A. Before my time, yes. There was AD -- Airbus A220neos ordered, yes, but it was before my time at Frontier.

Q. You understood at that time in March, that there was an AD aircraft order from Airbus between Frontier and Airbus; correct?

A. Yes.

R. Fanning

Q. And the six aircraft that were part of the framework agreement they were six that were due under that purchase agreement; is that correct?

A. That is correct.

Q. Did AMCK have anything to do with Frontier's purchase agreement with Airbus?

A. No.

Q. In the framework agreement, though, AMCK agreed to purchase each of those six aircraft and then lease those aircraft immediately back to Frontier; is that your understanding?

A. That is correct.

Q. Was this a kind of common or typical form of financing for aircraft deliveries?

A. That is correct.

Q. Do I understand correctly that in effect AMCK was providing the money to pay for the aircraft and then Frontier would pay AMCK back in the form of monthly rent payments?

A. That is correct.

Q. What happens at the end of the lease? Does AMCK get the aircraft back?

A. That is simplistically, yes, at the end of the lease term, they would get the aircraft back.

R. Fanning

Q. And they would be free at that time to do whatever they wanted? They could lease it to another lessee or sell the aircraft; is that your understanding?

A. They own the aircraft, yes, that is correct.

MR. BUTLER: I'd like to show you the first exhibit in the case. Gege, can you pull up what we're going to mark as Exhibit 1 or Fanning Exhibit 1 which is a document bearing Bates Number Frontier 238 to 239.

(Fanning Exhibit 1, 3/16/20 email chain; 2 pages, marked for identification.)

Q. Let me direct your attention to the second email on this page. It appears to be an email from Jane O'Callaghan to you and Mr. Sashikumar and some others dated March 16, 2020. And it indicates that's a Monday.

Did you receive this email from Ms. O'Callaghan on Monday, March 16th?

A. Appears to be the case given the email is addressed to me.

Q. This email looks like it's confirming delivery of an aircraft, MSN 10038; is that correct?

R. Fanning

A. That is correct.

Q. Is it consistent with your memory that that aircraft was delivered on Monday, March 16th?

A. I do not recall. If that's the date you're telling me, then I'll take that as the delivery date.

Q. Based on this email which you have here in front of you, does that refresh your memory that that delivery took place on March 16?

A. The email looks familiar but I don't recall the dates of this specific delivery.

Q. Do you have any reason to doubt that it was on Monday, March 16?

A. No.

Q. This MSN 10038, do you understand that to be the first delivery of aircraft under the framework agreement with AMCK?

A. That is correct.

Q. So AMCK provided the funds to purchase this aircraft or purchase the aircraft from Frontier, rather, and then there was a lease applicable to this aircraft; is that right?

A. Correct.

MR. BUTLER: Let me show you what we've

R. Fanning

marked as Exhibit 2 which is a document bearing Bates Number Frontier 240 to 242.

(Fanning Exhibit 2, 3/16/20 email with attached letter; 3 pages, marked for identification.)

MR. BUTLER: If you could just show the top of the email, Gege.

Q. This appears to be an email from Spencer Thwaytes to Jane O'Callaghan dated Monday, March 16, 2020. It refers at the top to please see the attached concession requested letter.

MR. BUTLER: Gege, if you go to the second page.

Q. You'll see there's a letter from Frontier to Ms. O'Callaghan dated March 16, 2020.

Have you seen this letter before?

A. Yes.

Q. What is it?

A. It's basically a request to deferments for a specific given time.

Q. It was a request to AMCK for a deferral of rent for a three-month time period; is that right?

A. That is correct.

R. Fanning

Q. And it looks like there's also a request in this letter, if you look down the page to number 2, for return of one month's rent security deposit.

Do you see that?

A. Yes.

Q. What is that asking for?

A. So typically when we sign a lease, depending on the lessor, they may request a one month's rent that is paid on a monthly basis. That amount is held by the lessor for the term of the lease.

Q. And in this letter you are asking or Frontier was asking in addition to the rent deferral to have a refund of that security deposit; is that right?

A. That is my understanding, yes.

Q. And it refers to one month's rent security deposit, but that would be, if I understood you correctly, the whole amount of the security deposit; is that right?

A. Correct.

Q. Just below that text, it says, quote, the above concessions would be documented in a mutually agreed deferral and concession agreement, end quote.

Page 22

R. Fanning

Do you see that text?
A. Yes.
Q. Was it your understanding that if there was agreement on this deferral and refund that would be documented in a normal agreement signed by both parties?
A. Yes. As it was with other lessors; correct.
Q. Were you involved in drafting this letter?
A. I was involved in what the ask would be with myself, Spencer and Jimmy Dempsey. So, yes.
Q. Do you know who drafted it, who drafted the texts?
A. I don't recall, no.
Q. Do you know when this letter was drafted?
A. I have -- a specific date, no.
Q. Do you remember roughly how long this letter was sent on March 16th that the letter was drafted?
A. I do not.
Q. Was this letter -- does it follow the same format of letters that Frontier sent to other lessors around this time?

Page 23

R. Fanning

A. That is correct.
Q. Did Frontier send a letter similar to this to all of its lessors?
A. Correct.
Q. How many lessors were there at that time?
A. I can't give you an exact number, but 16 would come to mind.
Q. Did all of these letters go out on the same day or did they go out on different days?
A. They all went out on the same day, from what I can recall.
Q. So your recollection is they all went out on Monday, March 16?
A. That is my understanding, yes.
MR. BUTLER: Let me show you what we're going to mark as Fanning Exhibit 3.
(Fanning Exhibit 3, text messages; 3 pages, marked for identification.)
Q. This is a three-page document and the first two pages bear Bates numbers Frontier 12162 to 63. The third page is not consecutive. It's Frontier 12260.
Let me direct your attention to the very top of this exhibit. That would be on Frontier

Page 24

R. Fanning

12162. This appears to be part of a text message from Spencer Thwaytes. If you scroll down a little bit, does this look like a text message from Mr. Thwaytes?
A. If you can Zoom in. I can't see what the context of the text message.
Q. We'll show you the screenshot which I agree you can't read.
MR. BUTLER: Maybe you can scroll down, Gege, so Mr. Fanning can see some of the other ones.
Q. Do these appear to be text messages either from yourself or Mr. Thwaytes?
A. Which texts are you referring to?
Q. All of these boxes on the page, do they appear to be texts?
A. Well, without me looking at the context, I see my number. It does appear to be I'm texting Spencer. But to the context, I can't see, so I don't know what you're asking. What is the question, Mr. Butler?
Q. Let me ask it this way. On this page there are some boxes.
Do you see those?

Page 25

R. Fanning

A. Yes.
Q. Just on the screen you're looking at, there's a box?
MR. BUTLER: Gege, maybe you can just hold it there.
Q. It appears in the middle of the page bearing Bates Number Frontier 12162. And it says at the top in the box, it says, "Robert Fanning" and then there's a telephone number.
Is that your telephone number?
A. That is correct.
Q. And then there's one word. It says "interesting."
Do you see that?
A. Yes.
Q. Then there's a date March 15, 2020 and there's a time of 3:48 p.m.
Do you see that?
A. Yes.
Q. Would you interpret that to be a text that you sent on March 15, 2020?
A. Yes.
Q. And going up the page then to the top, there's a similar box that contains what appears to

R. Fanning

neos that were the subject of the framework agreement and not to put them in long-term storage?

A. So, this is later on in the discussions. I know Paul would have asked Jimmy about that. Obviously Jimmy would have gave assurances that we were going to fly the A320 neos. At this specific point in time, I don't believe a decision was made.

Q. My question, sir, was whether you recall giving Ms. O'Callaghan a similar kind of assurance in response to this concern that she's raising.

A. Mr. Butler, I mean, the plan -- the only way we make money is by flying airplanes, putting customers inside the airplanes and flying from point A to point B. I'm not sure. I can't recall if I gave her assurances. The only reason why I say that is because at this specific point in time we probably wouldn't have made a decision or a decision was made what airplanes were going to fly and what airplanes were going to go into storage.

I do remember it was a conversation. My recollection would have been that that decision wasn't made whether these airplanes were going into storage or not.

Q. I think you said before you do recall

R. Fanning

Mr. Dempsey giving some assurance to Paul Sheridan that the intent was not to put these particular aircraft into storage; did I remember that correctly?

A. Let me put it a different way. The aircraft that was delivered on March 16th, to the best of my recollection, flew during the pandemic. It was not put into storage.

MR. BUTLER: Let me show you the next exhibit.

MR. HOSENPUD: Are we at a good rest break, Jeff?

MR. BUTLER: Sure. This is a perfect time. I have 12:11 on my phone. Should we resume at 12:20?

MR. HOSENPUD: Yes.

(A recess was taken from 11:11 a.m. MDT to 11:20 a.m. MDT)

Q. Mr. Fanning, I'd like to show you what we're going to mark as Fanning Exhibit 6.

(Fanning Exhibit 6, text messages; 3 pages, marked for identification.)

Q. This is a document bearing Bates numbers Frontier 3480 to 82.

R. Fanning

MR. BUTLER: Gege, can you go to the top of the first page.

Q. It appears to be a series of text messages from you, Mr. Fanning, dated April 6, 2020.

Do these appear to be texts that you sent?

A. Yes.

Q. The first text on this page says, quote, Hi Jimmy, when you have time this morning, need to talk about AMCK. We have a rent payment due today, end quote.

Do you see that?

A. Yes.

Q. Did you know that a rent payment was due to AMCK because of the spreadsheet that you used to track when rent payments are due?

A. That's correct.

Q. As you look down the page, it looks like there are a number of other texts on this page from you.

Do these appear to be texts that you sent to Jimmy Dempsey?

A. That's correct.

Q. Can you see Mr. Dempsey's responses to

R. Fanning

your texts on this page?

A. No.

Q. Is that what texts between you and Mr. Dempsey look like on your phone?

A. These specific texts?

Q. Well, let me ask the question this way. On your phone when you're texting Mr. Dempsey, can you see both your texts and his responses?

A. Yes.

Q. And normally your text would appear on one side and his text would appear on the other side; is that right?

A. That's correct.

Q. And on your phone are the texts generally displayed in chronological order?

A. That's correct.

Q. Does it happen sometimes that you send two or three texts before Mr. Dempsey responds?

A. Yes. He -- correct.

Q. And so on your phone, I gather, it's pretty easy to follow the conversation back and forth because you can see both sides of the conversation in chronological order; is that right?

A. Correct.

Page 62

R. Fanning

Q. But in this document it looks like we only have one side of the conversation, just your texts; is that right?

MR. HOSENPUD: Object to the form. You can answer.

A. They are my texts. Whether Jimmy replied, I don't recall whether he did or did not.

Q. Let me direct your attention to the second page of this document and I'll ask you about a particular text that's about halfway down the page. It's actually right at the bottom of this page.

MR. BUTLER: Gege, if you want to blow it up a little bit.

Q. It looks like it's a text from you at 11:32 a.m. on April 6, 2023. And you say, quote, we have two Accipiter lease payments due today, end quote.

Did I read that correctly?

A. That's what it says; correct.

Q. Does Accipiter refer to one of -- I guess in this case, two of the AMCK leases?

A. That's correct.

Q. And does this text clarify that they were

Page 63

R. Fanning

actually rent payments for two aircraft due on April 6, 2020?

A. That's correct.

Q. And, as you said earlier, you would have known about that from the internal tracking that Frontier does; correct?

A. Correct.

Q. If you go to the last page of this exhibit, I want to ask you about the very last text from you in this document.

It appears to be a text again on April 6, 2020. It looks like 1:38 p.m. And you write, quote, Paul Sheridan will sending your an email deferring all rent payments for 10 business days to give us room to work out a solution, end quote.

Do you recall sending that text?

A. I don't recall sending it. But if it has my number, that appears to be correct.

Q. You don't have any reason to doubt that you sent this text to Mr. Dempsey on April 6, 2020; correct?

A. Correct.

Q. Does this text reflect a phone conversation that you had with Paul Sheridan on that

Page 64

R. Fanning

date?

A. Either Paul or Jane. I don't recall.

Q. Is it possible that Jane told you that Paul Sheridan would be sending an email?

A. That is most likely the case, yes.

Q. Do you think it's most likely because Jane was your main point of contact at AMCK?

A. Correct.

Q. So this is really summarizing a conversation that you had with Jane O'Callaghan on April 6th, 2020; correct?

MR. HOSENPUD: Object to the form. You can answer.

A. Again, many conversations with Jane. That would appear correct.

Q. This is a summary of that conversation you had with Ms. O'Callaghan that you sent to your boss' boss, Jimmy Dempsey, on that date; correct?

A. Correct.

Q. Do you remember anything else about the conversation that you had with Jane O'Callaghan on that particular day?

A. No.

Q. Do you remember anything about the

Page 65

R. Fanning

context in which she told you that Paul Sheridan would be sending an email with a 10 business day grace period?

A. I don't recall, no.

Q. Do you know, did you ask for that from Ms. O'Callaghan?

A. I don't recall what I asked Jane.

MR. BUTLER: Let me show you the next exhibit. We'll mark it as Fanning Exhibit 7.

(Fanning Exhibit 7, email chain; 3 pages, marked for identification.)

Q. It's a document bearing Bates numbers Frontier 251 to 253. This looks like --

MR. BUTLER: If you go to the top, Gege.

Q. This looks like an email from you to Sharath Sashikumar dated April 6, 2020. You're sending along an email from Paul Sheridan also dated April 6, 2020, and copied to you, among others.

Do you see that?

A. Yes.

Q. Do you recall focusing on the second email, the one from Paul Sheridan, do you recall receiving this email on April 6, 2020?

A. No.

Page 66

R. Fanning

Q. Do you have any reason to doubt that you did receive it on that date?

A. No.

Q. In this email, Mr. Sheridan states that he's giving Frontier a grace period of 10 working days, he says, to 21 April.

Do you see that?

A. Yes.

Q. Did you understand that to mean that AMCK would not take any action against Frontier during that time period?

A. That's correct.

MR. BUTLER: Let me show you the next exhibit, which we'll Mark as Fanning Exhibit 8.

(Fanning Exhibit 8, 4/6/20 text message, marked for identification.)

Q. It's a document pairing Bates Number Frontier 3606. It's a one-page document.

This appears to be a text message and in a somewhat different format from the text messages we've seen before. But you can tell me if I'm misunderstanding that.

It looks like a message from -- and it says "mine" and there's a telephone number. My

Page 67

R. Fanning

first question is: Do you know who that is?

A. I don't recall -- I don't know whose phone number that is.

Q. Is it possible that it is Mr. Sashikumar's number?

MR. HOSENPUD: Object to the form.

A. It's possible based on what I see here.

Q. Just based on this document, it looks like it's a message sent on April 6, 2020 at 6:54 p.m. and it looks like it's sent both to Mr. Sashikumar's Gmail account and then it says "Robert personal" followed by a telephone number.

Is that your personal cell phone number?

A. Yes.

Q. So does it appear to you this is a text you received on your personal phone?

A. Yes.

Q. And whoever is sending it, I guess we don't know, says, quote, Are we paying AMCK, question mark, end quote.

Do you see that?

A. Yes.

Q. Do you remember somebody asking you that question on April 6, 2020?

Page 68

R. Fanning

A. No.

Q. Would Mr. Sashikumar be a natural person to be asking that question at that time?

A. It's possible, yes.

Q. Would he have been the person responsible for making the payment or at least getting approval for the payment?

A. Yes.

MR. BUTLER: Let me show you the next exhibit which is Fanning Exhibit 9. It's a one-page document bearing Bates Number Frontier 3493.

(Fanning Exhibit 9, text messages, marked for identification.)

MR. BUTLER: Gege, perfect, if you could go to the top.

Q. This looks like a series of text messages similar to the ones we saw from you in a previous exhibit but now all the boxes are on the other side of the page and it looks like they're originating from a number, particular telephone number, it begins with the number 720.

Do you recognize that number?

A. No. I recognize the name.

Page 69

R. Fanning

Q. Sorry. The name?

A. Yeah, Jimmy Dempsey.

Q. I guess I don't see -- I see there's a Jimmy Dempsey Gmail account referenced. But let me ask the question this way, does this appear to be a series of text messages from Jimmy Dempsey to you?

A. Yes.

Q. It looks like from the very top of the page where it says "parties," it looks like these texts also went to Spencer Thwaytes.

Let me ask you this: Was it Jimmy Dempsey's practice at the time to send text messages that went both to you and to Mr. Thwaytes?

A. From time to time.

Q. And the first email that is shown on this page appears to be dated April 7, 2020, sent at 10:33 a.m. And it says, quote, Just spoke to Paul Sheridan. He has agreed to do the deferral on a month-to-month basis, end quote.

Do you see that?

A. Yes.

Q. What did you understand that to mean?

A. That Paul Sheridan has spoke to Jimmy Dempsey and that Paul had agreed to defer the rent

Page 70

R. Fanning

for all aircraft on a month-to-month basis.

Q. I'm sorry. I'm not sure I perfectly heard your answer. To defer the rent on a month-to-month basis?

A. For all aircraft, yes, that were leased from AMCK.

Q. For all the aircraft?

A. Yes.

Q. All 15?

A. Yes.

Q. And did you understand that to mean deferral on a month-to-month basis indefinitely?

A. As long as we -- yes. Yes.

Q. Do you remember hearing from Mr. Dempsey separate from this text message anything about that supposed agreement?

A. I don't recall.

Q. Do you know whether that agreement was ever documented anywhere apart from this text message?

A. So based on these texts, I either would have contacted Jane, most likely by telephone, to start the process of what Jimmy had agreed with Paul.

Page 71

R. Fanning

Q. And do you remember anything about the conversation with Jane about this month-to-month deferral?

A. No.

Q. Do you remember there being any agreement on a month-to-month deferral with AMCK?

A. So, in the context of the ask from AMCK, and the general discussion of the -- I mean, in the context of a month-to-month agreement with Paul that Jimmy had come to an agreement with I just -- I don't recall.

Q. After you received this text from Jimmy Dempsey, did you subsequently learn that AMCK had not agreed to an indefinite month-to-month deferral of rent under the 15 lease agreements with Frontier?

A. I don't recall.

Q. You don't remember whether that was an agreement, yes or no?

A. Based on the texts -- based on the texts that I'm reading right now, as Jimmy spoke to Paul and had agreed to a month-to-month deferral on an ongoing basis, then I wasn't party to what exactly they discussed and how their interpretation, whether it was ongoing or it was reviewed on a

Page 72

R. Fanning

month-to-month basis.

Q. And do you have any memory of such an agreement actually being entered?

A. No.

Q. Do you have any memory of discussing this supposed agreement with Ms. O'Callaghan?

A. No.

MR. BUTLER: I'd like to show you what we're going to mark as Fanning Exhibit 10. Before we take this down, can you go back to the previous one.

Q. We can't put up more than one exhibit at the same time but I just want to --

MR. BUTLER: That's the new one. I can you go back to Exhibit 9.

Q. I just want to remind you at the beginning of Exhibit 9 the email from Jimmy Dempsey is April 7th at 10:33 a.m. And now let's go to Exhibit 10.

(Fanning Exhibit 10, text messages, marked for identification.)

Q. This is a document bearing Bates Number Frontier 12172. I want to focus your attention on the top box of this page. It appears to be a text

Page 73

R. Fanning

from you, Mr. Fanning, dated April 7, 2020, at 10:59 a.m., so a little while after that text from Mr. Dempsey.

MR. HOSENPUD: Bates Number, please.

MR. BUTLER: I think I read it before, it's Frontier 12172.

MR. HOSENPUD: Thank you.

Q. Mr. Fanning, in this text message -- well, do you interpret this to be a response to the text from Mr. Dempsey that we saw on the previous exhibit?

A. Appears to be the case.

Q. And you write in this first text, quote, Okay, good. Anything mentioned on the repayment period, question mark. And are they going to send our revised agreement over, question mark, end quote.

Did I read that correctly?

A. Yes.

Q. What were you asking Mr. Dempsey here?

A. So I would have been asking him what he agreed with Paul Sheridan and how far the month-to-month, whether it was reciprocal, you know, what the month-to-month looked like in terms of when

Page 74

R. Fanning

it would have -- when it would have been agreed that it was going to be continuing on a month-to-month basis.

And then obviously AMCK sending over the revised agreement based on discussion with Jimmy and Paul.

Q. So would a repayment period be a part of any agreement on a rent deferral?

A. Yes.

Q. And I take it that's because you're agreeing on a time period for rent deferral but all that rent would be repaid at some point; is that right?

A. Yes.

Q. And usually there's a time period specified for that repayment in the agreement; is that right?

A. Yes.

Q. Are you really asking here for clarification on the agreement that Mr. Dempsey said he had reached with Mr. Sheridan?

A. That's correct.

Q. Did you ever get any answer to these questions?

Page 75

R. Fanning

A. I don't recall.

Q. How would it work on a month-to-month deferral? How would the repayment period work?

A. So depending on the term of the deferral of the -- you know, we went out with a request for three months. So on that basis, at the end of the third month, then obviously we would have started to pay the back owed amount plus the amount that's due at that time, with interest.

Q. Did you expect this issue of the repayment period to be something that would be resolved in a formal agreement with AMCK?

A. Well, yes, but it would have started with a verbal discussion on what was going to be agreed or what was agreed.

Q. So you expect there to be a further verbal discussion with AMCK on these terms; is that right?

A. No. There would have been a prior discussion verbally on what was agreed at that point. That's my interpretation.

Q. You say something here about sending a revised agreement over.

Did you expect these terms of the

Page 76

R. Fanning

month-to-month deferral to be captured in a written agreement?

A. Yes.

Q. Was there ever such written agreement?

A. So do I remember, no. But if what I'm reading here, that we would have got a revised agreement from AMCK at some point in time thereafter based on these texts.

Q. And do you know whether you ever received such a written draft from AMCK?

A. I don't recall.

MR. BUTLER: Let me show you the next exhibit. It's going to be Fanning Exhibit 11.

(Fanning Exhibit 11, 4/9/20 email with attached letter; 6 pages, marked for identification.)

Q. It's a document bearing Bates numbers AMCK 16647 to 16651. This appears to be an email from Jane O'Callaghan to you and some others dated April 9th, 2020. And it attaches a draft deferral agreement.

MR. BUTLER: Gege, could you maybe just zoom out a little and show the next couple of pages.

Page 77

R. Fanning

Q. Feel free to look at any of this. We can show you particular pages if you want to read it over.

My question, sir, is: Did you receive this from Jane O'Callaghan on April 9th, 2020?

A. Based on the subject line and the date, yes, I did.

Q. And in the email Ms. O'Callaghan writes to you, "Herewith a draft of the deferral letter for one of the 14 aircraft."

Do you see that?

A. Yes.

Q. Do you understand that this was a draft deferral agreement for one of the 14 aircraft?

A. So under this context, we would have received 13 other deferral agreements for each aircraft. So, yes.

Q. Is it your understanding she's just sending you one because they're probably all going to be the same once you reach agreement on the terms for the first one?

A. Yes.

MR. BUTLER: Gege, could you go to the second page of this.

R. Fanning

Q. Does this look -- I understand you're just seeing the top half of the first page, but does this look like the kind of written agreement that you expected to sign in order to formalize any deferral agreement that you reached with AMCK?

MR. HOSENPUD: Object to the form. You can review it if you wanted.

A. It looks consistent to an agreement we would sign for deferral.

MR. BUTLER: Let me show you the next exhibit. We're going to mark this as Fanning Exhibit 12.

(Fanning Exhibit 12, 4/16/20 email chain; 2 pages, marked for identification.)

Q. It's a two-page document bearing Bates numbers Frontier 4084 to 85. It appears to be a series of emails. The last email in the series is from you, Mr. Fanning, to Spencer Thwaytes and Sharath Sashikumar dated April 16, 2020. I want to ask you first about the oldest email of this series. It's at the bottom of the page.

It appears to be an email from Mr. Sashikumar to you also dated April 16, 2020. And it looks like it's a request for approval for a

R. Fanning

rent payment due on April 16.

Is that your interpretation of this as well?

A. That's correct.

Q. And there's a reference here to 10038. Was this a payment for the first aircraft that was delivered under the framework agreement on March 16th?

A. It appears to be the case, yes.

Q. And it looks consistent with what you told me at the very beginning of the deposition, there's a payment that's due on April 16th, so that would be one month after the delivery date; is that right?

A. Correct.

Q. Was that payment made by Frontier?

A. Yes.

Q. To your knowledge, was it made on April 16, 2020?

A. To the best of my knowledge, yes.

Q. Let's go up to the next email. I see consistent with your testimony, Mr. Fanning, you approved the payment on April 16th; is that correct?

A. Yes.

R. Fanning

Q. Going up, there's an email from Spencer Thwaytes responding to your approval and he writes, quote, So the agreement with AMCK doesn't include this aircraft, question mark, end quote.

Do you see that?

A. Yes.

Q. What did you understand him to mean when he said the agreement?

A. So based on the evidence that you've shown, I assume the conversation that Jimmy had with Paul on an ongoing month-to-month basis that this aircraft was excluded from that agreement.

Q. So you believe this agreement he's referring to here is the month-to-month deferral referenced in that Jimmy Dempsey text?

A. Correct.

Q. Do you remember -- strike that.

Let me just ask you about your response. So at the top of this page there's an email from you back to Mr. Thwaytes and you write, quote, Correct, Jimmy is aware this was part of the deal, end quote.

Do you see that?

A. Yes.

Q. And the deal you're referring to here, is

R. Fanning

that the month-to-month deferral?

A. From what I read, that would appear to be the case.

Q. So at least at this point in time you seem to understand what the deal was; is that correct?

A. Yes.

Q. So did you get some clarity on how long the month-to-month deferral was going to last?

A. Well, I mean, originally our ask was three months. So I assume it was going to be somewhere around three months initially.

Q. Well, maybe I should just clarify the terminology, what does a month-to-month deferral mean?

A. For every -- so month-to-month, 30 days, so from the day after the delivery date, 30 days subsequent to that is one month.

Q. I understand what a month is. I'm asking what does a month-to-month deferral mean? Does that mean an indefinite deferral?

A. You would have to ask Jimmy what exactly to the context of an indefinite month-to-month. My assumption, my thinking, is that it's based off the

R. Fanning

of the initial three-month ask that we had requested for deferral. Beyond that, I don't know.

Q. So you interpret -- when Mr. Dempsey says Paul Sheridan has agreed to a month-to-month deferral, your understanding is that that refers to a three-month deferral; is that correct?

A. Based on what I remember; correct.

Q. Did you get some understanding of what the repayment period would be for that three-month deferral?

A. I don't recall.

Q. You don't recall getting any clarification on that?

A. I don't remember, Mr. Butler.

Q. Do you recall whether Mr. Sheridan placed any other conditions on that three-month deferral?

A. I'm not aware of any other conditions.

Q. So your understanding was that Mr. Sheridan communicated to Mr. Dempsey that he just agreed to the three-month deferral that Frontier was requesting without requesting anything in return?

A. It would have been a request. But obviously that's not what Jimmy had discussed with

R. Fanning

me whether it be on a month-to-month basis.

Q. Did you ever see any email or text from Mr. Sheridan confirming the supposed agreement that he reached with Mr. Dempsey?

A. I don't recall.

Q. Do you recall ever seeing any email or text from Mr. Dempsey, apart from the text to you, any email or text to Mr. Sheridan purporting to confirm that agreement?

A. I don't recall.

Q. I think you testified that your understanding was that the month-to-month deferral applied to all 15 aircraft.

Did I hear you correctly?

A. That was my understanding before Jimmy had sent that text, yes.

Q. But here you seem to be saying it was part of a deal that the March 16 delivery would be excluded from the month-to-month deferral; is that right?

A. Well, we had paid, obviously -- Mr. Sashikumar had asked us to pay the rent for that aircraft on the due date, which we did. My assumption -- well, my recollection is that it was

R. Fanning

part of the -- that aircraft was part of the 15 aircraft.

But subsequent to Jimmy speaking to Paul, obviously they came to an agreement that that aircraft was excluded. So prior to that discussion -- my recollection that prior to that discussion that that aircraft was part of the agreement.

Q. I just want to ask about the chronology here. We've seen from the documents I've shown you that on April 6 Mr. Sheridan sent an email confirming a 10-day grace period through April 21, 2020.

Do you recall that?

A. Based on what you showed me, yes.

Q. And then on the next day, April 7th, there's a text from Jimmy Dempsey saying that Mr. Sheridan had agreed to a month-to-month deferral, right, we just saw that exhibit? Do you recall that?

A. Yes.

Q. Was there any discussion -- how do you reconcile those two things? One day there's a 10-day grace period, and the next day there's

R. Fanning

agreement to everything Frontier was asking for, a three-month deferral with no strings attached?

MR. HOSENPUD: Objection, form. You can answer.

A. Mr. Butler, like anything, it's negotiations. Right. One day you may have one agreement. The next day you come to another agreement. That's between, obviously, Jimmy and Paul. I wasn't part of that conversation.

Q. And that was going to be my next question: Do you remember any discussion internally at Frontier about that apparent change of heart on the AMCK side?

A. I don't.

Q. Did anyone express surprise that they seemed to have changed their mind so quickly, to your recollection?

A. I don't recall. But in the context of a discussion, I mean, things can change overnight and that's obviously what appeared to be the case.

MR. BUTLER: Let me show you the next exhibit which we're going to mark as Fanning Exhibit 13. It's a one-day document bearing Bates Number Frontier 3504.

R. Fanning

(Fanning Exhibit 13, text messages, marked for identification.)

Q. This appears to be an exchange of texts between you and Spencer Thwaytes. Unlike a lot of the texts we've seen, it looks like both sides of the conversation are shown in this document.

Do you see that?

A. Yeah.

Q. Does this look like the way texts would appear on your phone with your text followed by Mr. Thwaytes' texts?

A. Based on what I see, yes.

Q. The first text you send in this conversation refers to a reply from Jane. This is April 23, 2020. And it looks like it's quoting a text from Jane O'Callaghan.

I guess my question is: Is it correct to say that you're sending Mr. Thwaytes a part of a text that you received from Jane O'Callaghan?

A. Correct.

Q. Mr. Thwaytes responds to your text and he writes, and it's the same day, April 23, 2020, quote, We are willing to true-up the deferred payments, end quote.

R. Fanning

What did you understand Mr. Thwaytes to be saying here?

A. Pay what we owe.

Q. Well, does the deferred payments here refer to the payments that were due in April for the 14 aircraft?

A. I'm sorry. Say that again, Mr. Butler.

Q. When he refers to deferred payments, is he referring to the payments that were due earlier in April for the 14 aircraft leased from AMCK?

MR. HOSENPUD: Object to the form. You can answer.

A. That appears to be correct.

Q. And by true-up, he just means Frontier is willing to pay them? Is that what it means?

A. Well, I had offered to -- in text and conversation to pay Jane or to pay AMCK what they're owed. So that is correct.

Q. And Mr. Thwaytes here is expressing his willingness to just go ahead and pay those deferred amounts; correct?

A. Correct.

Q. And is it your recollection that at this time it wasn't only Mr. Thwaytes but others at

R. Fanning

Frontier were willing to pay those amounts that had been due in April?

A. As part of the ongoing negotiations; that is correct.

Q. Was there any discussion within Frontier about just going ahead and making those payments?

A. In the context of internal discussions, it would have been related to the conversations that I had with Jane and obviously Jimmy had with Paul. It didn't appear that we need to make -- from my recollection, it didn't appear that we needed to make a payment based on the negotiations that were going on at that time and their willingness to try and resolve the asks that Accipiter were asking at that time.

Q. My question was: Was there any internal discussion you can recall at Frontier about just going ahead and paying the amounts due in April?

A. If AMCK had asked for us to make the payment, we would have made the payment.

Q. Well, you said that before March of 2020 Frontier had always made its rent payments on time; is that correct?

A. That is correct.

R. Fanning

Q. And they made those rent payments on time, I assume, even though there wasn't a specific request for those payments; is that right?

A. No. In this regard we had requested a payment deferment schedule with all lessors. What you're inferring is that -- what you're inferring is that we had -- so, yes, we had paid our rent payments on time. But during March it became apparent that we need to set up a schedule or send out an ask to our vendors, including lessors, for a rent payment schedule or deferment on that obligation.

Q. Well --

A. There's a difference, in my opinion, on making rent prior to March of 2020.

Q. I understand there's a difference. I'm not trying to suggest it's exactly the same. But with that track record of always paying rent on time, I just wonder if there was any discussion about maybe we should just stop this deferral request and just go ahead and pay the amounts.

Do you recall any discussion like that?

A. The only parts that I recall was the understanding that we had an agreement whether it

Page 90

R. Fanning

was me with Jane or Jimmy with Paul that we did not have to make payments at that time because of the ongoing discussion.

Q. In this email that you quote from Jane, she's expressing the view that AMCK or -- or expressing the position that AMCK is not comfortable with the remaining deliveries under the framework agreement unless Frontier gets current on all of its rent payments.

Is that your understanding of AMCK's position at that time?

A. Yes.

Q. And, in fact, were there a number of communications where Jane O'Callaghan said to you or texted you or emailed you that AMCK did not want to take new deliveries if there was any overdue rent on the other aircraft?

A. No. My recollection is that I had sent -- and it was probably after the 23rd, I think it was on the 25th, that I had expressed to Jane that we would pay what we had owed. But she never responded back to me in a text.

Q. Well, my question is: Sir, do you recall that being a position that AMCK was taking at this

Page 91

R. Fanning

time, that Frontier needed to get current on all of its rent payments in order for a new delivery to be accepted?

MR. HOSENPUD: Object to the form.

A. Repeat yourself, Mr. Butler.

Q. My question is: Do you remember that being AMCK's position? You were negotiating with them at this time. Was one of their positions that they expected Frontier to be current on all of its payments before the next delivery to be funded under the framework agreement?

A. That is my understanding, yes.

Q. And in the context of that understanding, did you consider just paying the rent, because then that would obviate the concern this is being raised by AMCK?

A. Well, I did. I sent a text to Jane on the basis of, do you want us to pay the rent. I never got a response, Mr. Butler.

Q. Didn't AMCK always want you to pay the rent?

MR. HOSENPUD: Object to the form. You can answer.

A. Not after the negotiations. Our belief

Page 92

R. Fanning

was we weren't required based on the discussions going on at that time that there was an understanding -- hold on, Mr. Butler. That there was an understanding that if AMCK wanted us to make the payments, there is a process that they have internally that they would have sent us, which they didn't, and we -- the payments weren't made based on, again, the discussions that we were having with Paul and Jane at that time that we were not required.

Q. Mr. Fanning, it wasn't AMCK's idea for Frontier to stop paying the rent under those 14 lease agreements; isn't that right?

A. Well, we had made a request back in March for a deferment.

Q. Right. It wasn't their idea, you made the request; right?

A. Yes.

Q. Didn't you believe at all times that AMCK wanted Frontier to pay the rent on the date that it's due?

A. Under the discussions at that time, no. They were willing to work with us and understood why we weren't making those payments.

Page 93

R. Fanning

Q. So your understanding at that time was that AMCK didn't really care that much about the rent, they were willing to go along as long as the negotiations continued without being paid rent?

A. In good faith, yes, absolutely.

Q. So that's --

A. Let me put it another way. Let me put it another way, Mr. Butler. If AMCK had asked us to pay the rent, we would pay the rent. And I had asked Jane, do you want me to pay the rent. We never got an answer.

Q. When did you ask her that question?

A. Two days after this text, the 23rd -- the 25th. So the 25th of April. I never received an answer.

Q. And you interpret that to mean that AMCK did not want you to pay the rent?

A. My understanding was at that time that they knew we were in discussions of resolving what AMCK's ask was. And that in the grand scheme of the negotiation, it was understood that if we were required to make the payment, we would have made the payment. We had the ability to make the payment and our attention would have been to make -- if

R. Fanning

Q. I just want to clarify, when it talks about paying between 50 and 75 percent, that's not talking about actually getting a discount off of the rent? You're interpretation of that is it's spreading part of it over time?

A. That is correct. Whether it be -- so we would always pay 100 percent, but that hundred percent would be paid over time.

Q. Got it. Thank you.

MR. BUTLER: Let's go on to the next exhibit which is Exhibit 14.

(Fanning Exhibit 14, text messages; 2 pages, marked for identification.)

Q. It's a two-page document bearing Bates numbers Frontier 12176 to 77.

It appears from this document that this is a series of your texts; is that how you would interpret this?

A. Yes.

Q. Who are you sending these texts to?

A. It looks like Jimmy -- it looks like Spencer and Jimmy, it looked like. So Spencer -- just looking at the texts, it looks like I'm speaking to Jimmy. But on the top it looks like

R. Fanning

it's to Spencer. Okay, it just looks like it's to Jimmy.

Q. I'm sorry. Did you say it was to both Jimmy and Spencer?

A. It looks like that's the case, yes.

Q. Do you recall that -- I'm sure it didn't happen every time, but sometimes you did text Mr. Dempsey and Mr. Thwaytes together?

A. Depending on the conversation, whether Spencer needed to be included or not.

Q. I want to focus your attention at the bottom text on the first page which is Frontier 12176. I guess in the text just above that, you indicate that you're talking to Jane now, and that's a text on April 29th, 2020.

Do you interpret that to mean you had a phone conversation with Jane O'Callaghan on that date?

A. Yeah.

Q. And then in the next text it looks like you're describing that conversation because you say in the beginning, you say, quote, I told her we're at the end of the line as far as options go, end quote.

R. Fanning

Do you recall saying that to Ms. O'Callaghan?

MR. HOSENPUD: Objection, form. You can answer.

A. Based on the text, that would be correct.

Q. And then a little further along in the text you describe Jane's reply. It's the second line from the bottom.

It says, quote, Jane's reply was could we pay the April rent and May when it's due? If we can agree to that, she would be willing to go to the shareholder and now she believes it would be enough to get them over the line, end quote.

Did I read that correctly?

A. That's correct.

Q. Does that accurately describe Ms. O'Callaghan's reply to you on that call?

A. It looks correct, yes.

Q. Did Ms. O'Callaghan ask you on that call to pay the April rent and to make May rent payments on time?

A. Well, they wouldn't have been paid on time. They wouldn't be paid -- again, part of the discussion at that time -- and there were many

R. Fanning

discussions about what that arrangement would look like. This was certainly one option. Yeah, we would pay the rent for April and May when it's due.

Q. And that's something that Jane O'Callaghan asked you to do in a call on April 29th; correct?

A. So my recollection would be were we able to do it. I don't think it was in the context of whether we were asked to. In other words, she's making a formal request. Maybe it came up in the context of, this is what we're thinking, Robert, if we ask you to pay April rent and May, could you make that payment and I assume I might ask -- I would have assumed that the answer is yes, if we came to an agreement, whatever those discussions were at that time.

Q. I want to ask the question. I don't want your assumption. I'd like your memory.

Do you remember what you said to Ms. O'Callaghan when she raised the question could we pay the April rent and May when it's due?

A. I don't recall the context of the conversation.

Q. What did you understand Ms. O'Callaghan

Page 102

R. Fanning

to mean when she said that it would be enough to get the shareholder over the line?

A. So you got to go back up to the top of the text; right. The request of AMCK to push the aircraft from three to six months and that was after Jimmy having conversations with Airbus. If we were able to -- because we were not able to push Airbus. Airbus would not agree to six months deferment on deliveries.

The other option was, was that we pay the April and May rent -- if I recall, Jane believes that if we paid the rent that it would be enough to get the shareholder comfortable to the context of whether it was for the five remaining aircraft, I don't remember.

Q. When you say the shareholder comfortable, get the shareholder comfortable, did that mean comfortable with taking deliveries under the framework agreement?

A. I don't recall. It could have been.

Q. Based on your recollection of this call and your description here, do you recall that Jane O'Callaghan delivered the message on April 29th that if Frontier got current on its rent that AMCK would

Page 103

R. Fanning

take deliveries under the framework agreement?

A. That could have been an option. But if I remember correctly, there were a lot of asks from AMCK over the course of many, many weeks. And this was one option for them to get comfortable on taking the five remaining aircraft.

Q. Did you consider at this time taking up Jane on the suggestion and just going ahead and getting current on your rent?

A. So I believe the context -- I believe the context was -- my recollection was she did not ask me that we needed to pay the rent. It was in the context whether we could pay the rent if we came to an agreement.

Q. Do you think your recollection is better today than it was on April 29th, 2020, when you sent this text to your bosses, Jimmy Dempsey and Spencer Thwaytes?

A. My recollection was probably far better two years ago than it is today.

MR. BUTLER: Let me show you the next exhibit. It's going to be marked Fanning Exhibit 15.

(Fanning Exhibit 15, emails; 5 pages,

Page 104

R. Fanning

marked for identification.)

Q. It's a series of emails bearing Bates Numbers AMCK 16957 to 61. I want to direct --

MS. WANG: I'm sorry. Jeff, can you repeat the Bates numbers.

MR. HOSENPUD: You introduced it as emails and I wrote down Bates numbers and now we're into text messages, so I'm a little confused.

MR. BUTLER: It's just an issue of what's been put on the screen. That's not the right document. It's AMCK 16957.

Q. Sorry about the discrepancy there. This is Fanning Exhibit 15. The email at the top of the exhibit is dated April 30, 2020. It's from Paul Sheridan to Jimmy Dempsey and, Mr. Fanning, you're cc'd along with some other folks.

My question is: Do you recall receiving this email on April 30, 2020?

A. It's an email I received as to -- I mean, I acknowledge I received the email.

Q. Does this email from Mr. Sheridan set forth AMCK's conditions at that time for funding of upcoming deliveries under the framework agreement?

Page 105

R. Fanning

A. Correct.

Q. And did you understand at this time that AMCK might terminate the framework agreement if these conditions were not met?

MR. HOSENPUD: Object to the form. You can answer.

A. Based on the discussions I had with Jane, it was certainly a possibility, yes.

Q. One of the conditions described in Mr. Sheridan's email is that it was an extension of the schedule. He wants deliveries to be in July of 2020 for three aircraft and February 2021 for two aircraft.

Do you see that?

A. Yes.

Q. And another condition of performing under the framework agreement is that all payments to be current on May 15, 2020, and to remain current.

Do you see that condition?

A. Yes.

Q. And a third one has to do with lease extensions of four years on 12 of the A320neos.

Do you see that condition?

A. Yes.

Page 106

R. Fanning

Q. Do I understand correctly that what that refers to is actually extending the term of 12 of the leases by four years; is that right?

A. That was their ask, yes.

Q. I guess in that same bullet there's also a reference to removal of early termination options on the six aircraft governed by the framework agreement.

Do you know what that -- what he's asking there?

A. Yeah. So these -- so basically these were 8-year deals with a 4-year option at our discretion. Paul was asking for that discretion to be removed and basically it would go to what's called a total of a 12-year lease. That was with the option of returning the aircraft at 8 years.

Q. I wanted to turn your attention to some language at the end of this particular email.

MR. BUTLER: Gege, could you scroll down a little bit.

Q. It says, Thanks and regards, Paul. And then below that it says, quote, For the avoidance of doubt, this email is for discussion purposes only. This email and any subsequent discussions or

Page 107

R. Fanning

correspondence we may have with you are not intended to create (and do not create) any binding obligations on the part of AMCK or any of its affiliates, end quote.

Did I read that language correctly?

A. You did.

Q. Did you understand this language to mean that this proposal by Mr. Sheridan was not intended to create any binding obligation?

MR. HOSENPUD: Objection. Legal conclusion. You can answer.

A. So, Mr. Butler, as I recall, there were many conversations where Frontier wanted to resolve and try and resolve the asks from AMCK.

Yes. This email or this letter does state what you have just told me. But, again, Frontier was in good faith negotiations on the basis that AMCK understood what our asks were and what we were trying to accomplish to move forward.

MR. BUTLER: Gege, could you just scroll up to the main body of the email again.

Q. I think you testified earlier that at this point in time you understood that there was month-to-month deferral agreed upon; is that right?

Page 108

R. Fanning

A. Can you scroll up to the dates? Let me look at the date.

Q. Yeah, of course. At any time if you want to see another part of an exhibit, please just ask. Gege can move it around for you as well as for me.

A. Yes. My recollection, Mr. Butler, was that there were many conversations going on, including the conversations that Jimmy was having with Paul and I was having with Jane, to try to resolve the issues that we both faced to try and come to a conclusion that we were both happy with.

I would say, yes, I mean, again, in the context of Paul's ask that part of that was on a month-to-month deferral. I mean, again, not being party to Jimmy's and Paul's conversations, I've agreed to what you are asking me, yes.

Q. Did you view this email as changing anything or modifying anything about the month-to-month deferral?

A. Well, the letter doesn't state anything about a month-to-month deferral. That was part of the conversation with Jimmy and Paul. I don't see that being mention in this letter. So I don't know the context of what that deferral looks like at that

Page 109

R. Fanning

point in time on April 30th.

Q. Well, this letter does refer to the second condition that Mr. Sheridan places on continued performance of the framework agreement is that Frontier get up-to-date on all payments by May 15th, 2020.

You see that condition in this email; correct?

A. Yes.

Q. Do you recall any other communication from AMCK where the date of May 15th was suggested as the deadline for getting current on rent payments?

A. I can't recall. There were many dates brought up as potential dates, but May 15th, I don't recall.

MR. BUTLER: Let me show you the next exhibit which we'll call Fanning Exhibit 16.

(Fanning Exhibit 16, 5/1/20 text message, marked for identification.)

Q. It's a one-page document with Bates Number Frontier 3542. This appears to be a text message -- again, in a little bit different of a format at this time -- from you and it looks like to

R. Fanning

Jimmy Dempsey and Spencer Thwaytes dated May 1st of 2020.

Is that your understanding as well?

A. Yes.

Q. To you think you sent this text message to Mr. Dempsey and Mr. Thwaytes on that date?

A. It appears to be the date.

Q. Your message is, Jane called me and long story short is their shareholder is not moving off point number 3, end quote.

Do you know what that you meant by that?

A. I'm assuming based on the previous letter that point 3 they weren't going to agree, they were going to stand firm on that point.

Q. And point 3 was the lease extensions and the removal of the early termination options.

Is that your recollection?

A. Yes.

Q. Do you remember getting a call from Jane O'Callaghan where she said that condition was a firm part of their position?

A. I received many calls from Jane. Based on this text, I would have -- that would appear to be the case.

R. Fanning

MR. BUTLER: Let me show you the next exhibit which we'll mark as Fanning Exhibit 17. It's a two-page document bearing Bates number Frontier 8105 to 8106.

(Fanning Exhibit 17, email chain with attachment; 8 pages, marked for identification.)

Q. I want to direct your attention to the email that begins at the bottom of the first page which is -- appears to be an email from Mr. Sashikumar to various individuals including yourself, Mr. Fanning, and it seems to be discussing a revised delivery schedule with Airbus.

Is that your understanding?

A. That's correct.

Q. And Mr. Sashikumar's email which is dated May 7, 2020, says in the first line, quote, We concluded a revision of our delivery schedule yesterday, end quote.

Did that mean or did you understand that to mean that Frontier concluded a revision to its delivery discussion with Airbus on the previous day which may have been -- which would have been May 6, 2020?

R. Fanning

A. Based on the email, it's probably correct.

Q. I've seen, I guess, other documentation indicating that the deal was actually reached on May 5th.

Is that -- do you remember the specific date?

A. So to be clear, I wasn't involved in the Airbus discussions related to revisions of redelivery schedules. So I wasn't a party of those discussions.

Q. This May 7th email from Mr. Sashikumar, is this the first time you had learned that Airbus and Frontier had reached agreement on a revised delivery schedule?

A. So, I was aware based on the ask of AMCK that good faith discussions were ongoing with Spencer and Jimmy based on the request of AMCK to try and push deliveries out later than what was originally scheduled in the lease agreements that AMCK assigned.

Q. When did you become aware that those negotiations with Airbus had been concluded successfully and that various aircraft had been

R. Fanning

delayed under Frontier's purchase agreement with Airbus?

A. I don't -- again, I wasn't part of those discussions so I don't have recollection to when they concluded.

Q. It looks like you did hear about it in this May 7th email; does that sound right?

A. That is correct, yes.

Q. When you did hear about it, that a deal had been reached with Airbus, did you let Ms. O'Callaghan know that Airbus had agreed to some delays for the aircraft under the framework agreement?

A. So I would have communicated to Jane that this is what we've been able to come to an agreement with Airbus, yes.

Q. Do you know when you did that?

A. No.

Q. Sorry. I just didn't hear you. Did you say no?

A. No. No.

Q. Do you remember if you communicated that immediately after you learned it or is it possible that it occurred sometime later?

R. Fanning

A. I don't recall.

MR. BUTLER: Let me show you the next exhibit which we're going to mark Fanning Exhibit 18.

(Fanning Exhibit 18, text messages; 8 pages, marked for identification.)

Q. It's a series of text messages bearing Bates Number AMCK 16974 to 16981. Let me just show you the top of the first page.

MR. BUTLER: Maybe you can zoom out a little bit, Gege, so we can see more on the screen.

Q. This appears to me, sir, to be a series of text messages that you exchanged with Jane O'Callaghan. Looking at the first page, did that appear to be correct?

A. Yes.

Q. It looks like it occurred, the first text in this chain is from March 14, 2020.

MR. BUTLER: Gege, if you scroll down to the very bottom.

Q. It looks like the last text in this chain is from about a month and a half later on April 30th, 2020.

R. Fanning

Do you see that?

A. Yes.

Q. Would you assume from looking at this that this document contains all of your texts back and forth with Jane O'Callaghan during that time period?

A. As best as I can recall, yes.

MR. BUTLER: Gege, if you can go back up to the first page of the exchanges.

Q. I can see for this set of text messages, it looks like your texts are on the left side of the page and Jane's texts to you are on the right side of the page.

Is that the way texts appear on your phone?

A. The phone I had at that time, yes.

Q. So you would have the things you wrote on one side and things Jimmy and Paul wrote on the other side, in chronological order, I assume?

A. That appears to be the case.

Q. And was the case on your phone at that time?

A. Yeah. Yeah.

Q. So the first text that I want to ask you

R. Fanning

about is on the second page of this document, AMCK 16975. And it's near the bottom. There's a series of texts on March 31st of 2020. And I see there are three texts for you. There's a response from Jane. And I want to ask you about the next text.

You say in the last two lines of this text, quote, Airbus will not delay delivery without it costing Frontier, end quote.

I was wondering, what did you mean by that when you wrote that to Ms. O'Callaghan?

A. Well, cost is a substantial amount of losses meaning they would put us in default if we didn't take delivery of the aircraft when they asked us to take delivery of the aircraft.

Q. So the cost you're referring to here is not a financial cost, it's a default under the purchase agreement with Airbus?

A. Well, we would lose our PDP payments. So yes. And be put into default with Airbus.

Q. Was Airbus willing to agree to delay deliveries to Frontier if Frontier paid the storage costs for the Airbus?

MR. HOSENPUD: Objection, form. You can answer.

R. Fanning

A. So, Mr. Butler, let me give you a little bit of context. The first aircraft that AMCK took delivery of was in Toulouse, France. They have a huge amount of flexibility and capability at that airport given that the majority of Airbus aircraft are manufactured there. The remaining aircraft that AMCK was going to take delivery of were in Mobile, Alabama.

To give you the context, I believe at this time Airbus were producing 30 plus A320s a month. In Mobile, Alabama, my recollection is that they were only producing three aircraft a month. They do not have the ability to store or house aircrafts the way that Toulouse. My recollection is that, Jane, part our discussions, invoiced this to Jane and this is part of the reason why Airbus were pressuring Frontier to take delivery of these aircraft because they did not have the ability to store the aircraft. So in the context of your question, whether Airbus were willing to store the aircraft for a cost, I -- my recollection was that Airbus didn't have the ability to do so.

Q. I think you also testified earlier that you were not directly involved in the discussion

Page 118

R. Fanning

with Airbus; is that right?

A. No. But I am aware of when -- I am involved in the delivery process and the delivery schedule of when these airplanes get delivered. So I am familiar -- I have been to Toulouse. I have been to Mobile, Alabama. I am aware of their surroundings of what they're capable of.

Q. I understand. But in terms of the positions that Airbus was taking in the discussions with Frontier over delaying the Airbus, who would have told you about Airbus' position?

A. It would have been Jim, Jim or Spencer.

Q. And those two individuals were directly involved in discussions with Airbus; is that your recollection?

A. That's correct.

Q. Do you recall hearing from those individuals that Airbus was willing to delay the deliveries, but there would be a substantial financial cost to Frontier?

A. I do not -- I do not recall that specific question or that context to the question you asked.

Q. And so I gather that's not what you meant when you texted to Jane O'Callaghan that Airbus will

Page 119

R. Fanning

not delay the delivery without it costing Frontier?

A. No. When I meant costing, I was aware that they would put us into default. That was communicated to me by Spencer and obviously Jimmy had mentioned it at some point in time based on conversations he had. So I knew at that point in time Airbus was putting significant pressure for us to keep the delivery dates that we had in agreements with them. That's what I meant by costing Frontier.

Q. What would be the consequence, in your mind, of Airbus putting you in default for not taking a delivery on time?

A. I mean, it would cripple the airline to where it may potentially put us out of business. Domino effect of the cross of provisions that we have in our aircraft leases.

Q. So were you concerned at that time if you couldn't take a delivery from Airbus, that Airbus was going to put the airline out of business?

A. Well, they were putting a lot of pressure on Jimmy to take delivery of these airplanes. I mean, there's a relationship there but at some point in time -- and Airbus has done this with other airlines, there does come a point in time where

Page 120

R. Fanning

they're not willing to accommodate the request any more than a decision is made to put an airline in default or cancel potential future deliveries. There could be many way.

Again, I wasn't part of those discussions. Although I was aware based on communication from Spencer with his representative of Airbus that Airbus were willing to potentially put us under a default situation if we didn't take delivery. So obviously I reiterated this to Jane to let her know that, you know these issues were coming up and Airbus were forcing -- substantially pushing us to commit to the original delivery schedule that we had agreed.

Q. And certainly at this point in time it looks like you're saying to Ms. O'Callaghan that you won't be able to get delivery delays for the five remaining deliveries under the framework agreement; is that right?

A. When was this -- this text was what, April 1st?

Q. I think this one was March 31st.

A. So we would have been in -- so, again, at that point in time, we would have been in the

Page 121

R. Fanning

earlier part of the discussions with Airbus. And this was their reaction at that point in time that they were holding -- they were holding Frontier to the delivery dates that we had agreed in our purchase agreement.

Q. Do you know when Frontier started having these discussions with Airbus about potentially delaying upcoming deliveries?

A. So it would have been -- the short answer is no. But it would have been based on Jane's request. I would have communicated that to Jimmy. It could have been around that time.

Q. Well, we saw one request from Jane that -- which was dated March 26 of 2020.

Do you think it was shortly after that request to defer deliveries that Frontier began negotiating with Airbus?

A. I would have let Jimmy know that this is what AMCK's position was. Subsequently he probably would have started speaking to Airbus, I would say, shortly after that, yes.

Q. You said probably and shortly. But you don't know for sure when Mr. Dempsey started that process; is that correct?

Page 122

R. Fanning

A. That is correct, yes.

Q. I want to ask you about another text on page marked 16976. At the top of the page there's a text -- well, if you look at the bottom of the preceding page, so if you go up, we're now into April 1st. So you can see at the bottom of the previous page April 1st, and then if you scroll down to the next page, I want to ask you about the -- your first message back to Jane on that date.

You say in the second sentence of that text, quote, well, we've had initial discussions with Airbus. They have not been favorable and they are asking us to take delivery of these A320s, end quote.

Do you recall sending that message to Jane O'Callaghan?

A. Based on the next, yes.

Q. Where did you get that information about the status of the initial discussions?

A. That would have been with either Spencer or Jimmy.

Q. Do you know which at this time?

A. No. They were both having discussions with Airbus. So -- it would be either one of them.

Page 123

R. Fanning

Q. This obviously suggests that those initial discussions took place sometime before April 1st; is that right?

A. Yes.

Q. But as you said before, you're not exactly sure when exactly they began; is that fair to say?

A. I don't recall when, but obviously Jane had, in my discussions with Jane, Jane had brought up that they were having issues on taking delivery of the remaining five aircraft. I, again, would have reiterated this to Spencer and Jimmy and that would have obviously resulted in them having conversations with Airbus. To the timeline of when that happened, I don't recall.

Q. I want to ask you about a text in this exchange that's a little further down the same page. This one is on April 6, 2020. If you look on the screen, it's just below the top.

And you write, quote, Hi Jane, let me know when you are available for a call. We just got notice from Airbus that I'd like to discuss with you and also the rent that is due today.

First, did I read that correctly?

Page 124

R. Fanning

A. Yes.

Q. What is the notice from Airbus that is referenced here?

A. So it would have been based on the -- I'm not going to sit here -- basically it would have been, we received a notice, whether it be verbal or in written form, I would assume it was verbal based, again, on the conversations Jimmy and Spencer were having with Airbus, of what they were going to propose.

Q. Just so I understand, so what Airbus was going to propose in terms of delayed deliveries?

A. Yeah. What we were able to do at that point in time.

Q. So when you say notice, you think it's a proposal -- your recollection is that refers to a proposal from Airbus on delivery dates?

A. So, we would have asked to push the aircraft out to the right and they came back and provided us a notice on what they were able to do; correct.

Q. And in this text you also refer to the rent that that is due today.

Is that a reference to the two rent

Page 125

R. Fanning

payments that we saw before that were due on April 6, 2020?

A. That would make sense, yes.

Q. And here it looks like you're proactively reaching out to Jane about those rent payments; is that correct?

A. Yes.

Q. Do you remember having a discussion with Ms. O'Callaghan about those rent payments?

A. We were, again, making sure we make our rent payments on time separate to whatever discussions we had on the agreement on not paying. Yeah, so it was mindful of the rent was due and we wanted to discuss about the deferment letter that was sent back in March and see what kind of -- see what kind of agreement we could come up to. That's all I would recall.

Q. Did you tell Ms. O'Callaghan that Frontier didn't want to have to make those payments on April 6th?

A. I would have referred back to the deferment letter at that point in time. I don't believe I've ever told -- so, Mr. Butler, I wouldn't put it in that context we didn't want to make the

R. Fanning

payment. We wanted to come to an arrangement to make that payment.

Q. Well, you knew no arrangement was going to be reached during the course of the day on April '6th. Wasn't it Frontier's position that they didn't want to make those payments?

MR. HOSENPUD: Object to the form.

A. We did want to make those payments. But given what was going on at that time, we had wanted to come to an agreement to defer those rent payments. Obviously I wanted to discuss this with Jane so she was aware of what was going on at that time and that I communicated to her that we were mindful that the payments were due that day. But separate to the payments being due that day, that we needed to come to an agreement that we could defer those payments.

Q. Right. Because Frontier didn't want to make those payments; correct?

MR. HOSENPUD: Object to the form.

A. Mr. Butler, it's not that we didn't want to make those payments. We wanted to come to an agreement to make those payments that was acceptable to AMCK.

R. Fanning

Q. Did you ask Ms. O'Callaghan for a short-term agreement that the payments due on April 6th did not have to be paid?

A. I don't recall. But it would have been in the context of the deferment letter that went out and that we were having ongoing discussions at that point. Because, again, where we start back in mid-March to where we were at this point, it was becoming -- it was becoming obvious that AMCK's asks were increasing and obviously adding to the complexity of trying to come to an agreement, part of that would have been that the rent was due on that date.

And, again, I would have asked Jane for relief of that rent. To the context of what was agreed, I don't recall. But I certainly would have made that ask, that we defer rent on those two payments and what was acceptable to AMCK at that time.

Q. So you did ask Ms. O'Callaghan if Frontier could avoid making those two payments due on April 6th?

A. I did come to the conclusion, yes.

Q. In fact that's what led to the Paul

R. Fanning

Sheridan email which granted a 10-day grace period; isn't that right?

A. You could make that connection, yes.

Q. Well, that email came later the same day.

Do you agree they're connected?

A. That was a conversation between Paul and Jimmy. Like I said, yes.

Q. Let me ask you about another -- before I go on to that, I guess that -- the exchange we're talking about is on April 6th.

MR. BUTLER: Gege, if you scroll down just a little bit on the next page.

Q. You'll see there's some more April 6th texts. Maybe go up just a little bit. And then the next text exchange you have with Jane is dated April 21st.

Do you see that?

A. Yeah.

Q. Do you have any recollection of any text exchange with Jane O'Callaghan between April 6th and April 21st?

A. I would -- I mean -- I mean, I would have to look. I would assume yes given the nature of what was going on at the time. I'm assuming I would

R. Fanning

either talked to her or texted her. And keep her updated. I wanted to make sure all our lessors including AMCK were aware of what was going on so I kept them updated. Jane would have been no different.

Q. I understand that. But this series of texts doesn't show any texts between April 6th and April 21.

A. Well, those are messages --

Q. Let me finish the question.

Do you have any specific recollection of exchanging texts with her during that time?

A. Not that I can recall. But -- no.

Q. So focusing on the April 21st texts, it look looks like Ms. O'Callaghan sends you a text on the 21st of April and she says, quote, Hi Robert, can we talk today? Need to understand how you are getting on with delivery deferrals with Airbus? We haven't had your feedback on draft rent deferral for April? Thanks, Jane, end quote.

Does that looks look like a text you received from Jane O'Callaghan on April 21st?

A. Yes.

Q. And April 21st was the last day of the

R. Fanning

grace period that Mr. Sheridan had agreed to on April 6th; correct?

A. That appears to be the case.

Q. And it looks like Jane O'Callaghan reached out to you on that date to ask you about the rent deferral agreement; is that right?

A. That's correct.

Q. And it looks like from subsequent texts as though a call was organized for later that day.

Do you recall having a call with Ms. O'Callaghan on the 21st of April?

A. Based on the text that I see, yes, we would have arranged a call.

Q. Do you have any memory of what was discussed on that call?

A. No.

Q. Do you know whether there was any discussion on that call of the payments due from Frontier after the expiration of the grace period?

A. I am assuming it was a discussion at that point in time, yes.

Q. Did you make any request of Ms. O'Callaghan on that call to extend the grace period that Mr. Sheridan had agreed to?

R. Fanning

A. Based on the last day of the 10 days, we most like -- well, I'm not going to speculate. I would assume we made that request to extend the deferment at that point for the rent.

Q. My question is: Do you recall making that request to Ms. O'Callaghan?

A. I don't remember.

Q. Do you remember what response Ms. O'Callaghan had, if such a request had been made?

A. No.

Q. I'd like to show you another text. This is on page -- let's see here. A little further down that same page, there's a text from Jane O'Callaghan just -- yeah, from April 23rd. That begins, "Hi Robert."

Do you see that?

A. Yes.

Q. In the third line, I guess, Ms. O'Callaghan writes, quote, What remains clear is shareholder unwillingness to fund a new purchase if there are any payments at all outstanding, end quote.

Did I read that language correctly?

R. Fanning

A. Yep.

Q. What did you understand Ms. O'Callaghan to be saying here?

A. That if AMCK were to take any of the five remaining aircraft, that all payments would have to be paid in full before that delivery -- the first delivery would happen or the second aircraft would get delivered and subsequent to the remaining aircraft that we would have to be current on payments.

Q. Did you understand Ms. O'Callaghan to be encouraging Frontier to pay the overdue rent amounts?

MR. HOSENPUD: Object to the form. You can answer.

A. My understanding that she was not asking. She was not directing us to pay. It was certainly whether we had the option -- whether we were in agreement if we came to an agreement, would we agree to pay all the outstanding rent payments. That's my recollection and understanding of her text.

Q. Frontier wanted AMCK to fund the new purchases; correct?

A. Yes.

R. Fanning

Q. And Ms. O'Callaghan is delivering the message here that AMCK was unwilling to do that unless Frontier got current on its rent; correct?

A. Yes.

Q. So isn't that sending a message to you pretty loud and clear that AMCK wanted Frontier to pay the outstanding rent?

MR. HOSENPUD: Object to the form.

A. Well, Mr. Butler, but you're forgetting, you haven't brought this up, that AMCK were asking us to push these aircraft out by six months. So in the context of the text, you're not providing the full disclosure of what this text entails, in my interpretation. AMCK made the request to push the aircraft out from three months to six months.

So how long the payments were going to remain unpaid, I don't have an answer for that. But at that point in time certainly Jimmy and Spencer were trying to go push Airbus based on AMCK's request to push these deliveries out as far as they possibly could, which I would interpret based on the request of AMCK to six months.

Q. Let me ask you about another text in this exchange. This one is on the very bottom of the

R. Fanning

A. Not in this text, no.

Q. But by this time Airbus was willing to move some of the deliveries to the right, as you said; is that your understanding?

A. That's my understanding, yes.

Q. The next text I wanted to ask about is on the same page at the very bottom. This is on April 29th, 2020. And you're writing to Ms. O'Callaghan beginning the second line and you say, quote, Before our first delivery, we would repay the full rent amounts for the current 14 aircraft, end quote.

First, did I read that correctly?

A. Yes.

Q. At this point, when was the first delivery expected, if you remember?

A. It would have -- I don't -- I'm unsure.

Q. Aren't you saying to Jane here that your -- you expect to wait until that first delivery before paying the overdue rent?

MR. HOSENPUD: Object to the form of the question.

A. So this would have been in the context of -- maybe this was a typo on my end. This would

R. Fanning

have been for the second delivery because the first delivery happened in March. The second delivery I'm assuming that I'm referring to that we would have paid -- the ask would have been to pay the full rent for the 14 aircraft before we took delivery of the second aircraft.

Q. Were you communicating to Jane here that you did not intend to make that catchup payment until that next delivery date?

A. Based on the next text, that would be correct.

Q. And that's on April 29th, 2020; right?

A. Yeah.

Q. The next one is on the next page, AMCK 16980. In the middle of the page, maybe two-thirds of the way down the page there's a text from you on April 30th, 2020. It begins, "Okay. Understood."

Do you see that?

A. Yes.

Q. I'm just going to read it for you.

Okay. Understood. Airbus are pressuring us to make a decision day. Chris Jones has called Jimmy twice this morning. He can't hold the slots any longer, end quote.

R. Fanning

Did I read that correctly?

A. Yes.

Q. What decision was Airbus pressuring Frontier to make that day?

A. I'm not going to speculate. I wasn't part of that conversation.

Q. Were they pressuring Frontier to accept the proposal for deliveries that Airbus had previously made?

A. That sounds -- that sounds correct.

Q. Who is Chris Jones?

A. He's one of the more senior -- he's responsible for the -- head of sales for Americas for Airbus Americas.

Q. And it says in your text that he can't hold the slots any longer.

What do you mean by that?

A. Well, obviously he's talking to Mobile, Alabama, he's talking to his executive team and they're probably telling him that we need Frontier to take delivery of these aircraft.

Q. Take delivery according to their revised proposal; is that right?

A. It could be. But, again, I don't know

R. Fanning

into the context of when that delivery was going to take place, whether it would be -- are talking about the aircraft, was it in May, June, July?

Obviously the aircraft got delivered in July. But Chris may have preferred them to take that aircraft sooner which is why I wrote what I wrote to the point of when the second aircraft was -- so Chris Jones was asking us to take delivery of the second aircraft. I don't know when exactly that second aircraft was going to get delivered. I don't recall it was going to be in July. Based on the discussions at that point there's a good chance it would have been sooner. But, again, I wasn't part of that conversation.

Q. Did you understand at the time that Chris Jones was communicating that Airbus needed Frontier to accept the revised schedule being proposed or they may have to take it off the table?

A. You have to ask Jimmy Dempsey that. I wasn't part of that conversation, Mr. Butler.

Q. We saw the email from Paul Sheridan on April 6th where he granted a grace period through April 21st, and I think you testified that you don't recall there being a -- you don't recall one way or

R. Fanning

the other what discussion you had with Jane O'Callaghan about extending that grace period. And I just want to ask you a broader question.

Do you have any memory of any discussion of extending that grace period that Mr. Sheridan included in his April 6th email?

A. Regarding rent?

Q. Yes. Right. A grace period with respect to the payment of rent due under the leases.

A. We would have had discussions related to additional rent deferrals, yes.

Q. I'm talking about extension of the actual grace period that Mr. Sheridan agreed to.

Do you recall any communication of any kind where AMCK committed to extend that grace period to some later point in time?

A. I'm not aware.

MR. BUTLER: Let me show you the next exhibit which we're going to mark as Fanning Exhibit 19. It's a document bearing Bates numbers Frontier 4240 through 4243.

(Fanning Exhibit 19, 6/2/20 emails with attachment; 4 pages, marked for identification.)

R. Fanning

MR. BUTLER: I'm sorry. Let me describe that more accurately because this is actually a combination of two documents. The first one is Frontier 4240 to 41 -- I guess they are continuous. And then 4242 to 43. We just have them marked as separate documents in our system.

Q. I want to direct your attention to the second email on the first page. It's the bottom half of the first page. It appears to be an email from Jorge Garcia at CDB Aviation to you, copy to some others, on June 2nd, 2020.

Do you see that?

A. Yep.

Q. Do you believe you received this email on that date?

A. Yes.

Q. Who is Jorge Garcia?

A. He works for CDB Aviation and he's their -- he's our representative for that company when it comes to sales.

Q. And after AMCK terminated the framework agreement on May 8th, did you go to CDB Aviation about getting alternative financing for the first

R. Fanning

three aircraft deliveries?

A. Yes.

Q. And does this email reflect a proposal from CDB Aviation for providing financing for those deliveries?

A. Yes.

Q. And it looks like there are a number of different options that are proposed in this email.

Do you see that?

A. Yes.

Q. I see options A, B, C, D, E and F.

Am I reading it correctly?

A. Yes.

Q. And it looks like options A, B and C have different combinations of purchase price and monthly rent amounts.

Do I read that correctly?

A. Yes.

Q. It looks like, for example, they're willing to purchase the aircraft for either 48 and a half million, 47 million or 46 million; is that correct?

A. Yes.

Q. And depending on the purchase price,

R. Fanning

there would be a different monthly rent amount that Frontier would pay to CDB Aviation.

Am I interpreting that correctly?

A. Yes.

Q. And it looks like -- well, the higher the purchase price, the higher the rent? They're directly correlated.

Is that your understanding?

A. Yes.

Q. And then options D, E and F look like they're very similar but it says in a note below that these options include a three-month rental holiday for the first three months of the lease term.

What did you understand rental holiday to mean?

A. We wouldn't pay rent for three months.

Q. So basically you get rent -- well, not rent deferral, you don't pay any rent at all for the first three months, but it looks like for these options the monthly rent is a little higher than for options A, B and C; is that right?

A. Yes.

Q. Do you know which of these options

Page 158

R. Fanning

But ten obviously a transfer of sale happens to where the aircraft is sold to AMCK.

Q. I understand the title may reside for a short period of time with Frontier. But the aircraft itself, the plane, is that -- isn't that transferred directly from Airbus to Frontier's possession?

A. For a very short period of time; correct.

Q. Hasn't the airplane always been in Frontier's possession? I mean, these aircraft are all in Frontier's possession?

A. We don't own the aircraft. Airbus owned the aircraft. We don't own the aircraft until it's paid in full.

Q. I understand. AMCK owns the aircraft. No dispute with you on that point.

But hasn't Frontier always had possession of these aircraft?

A. We don't own the aircraft. The aircraft are always owned -- as they are being assembled and manufactured, Airbus owned that aircraft. We have an agreement to take -- a commitment to take delivery of that aircraft.

Q. Mr. Fanning, when the first aircraft was

Page 159

R. Fanning

delivered in Toulouse on March 16th, who went to pick it up, Frontier or AMCK?

A. AMCK.

Q. And at what point -- so AMCK sent a pilot to Toulouse to pick up the aircraft and then what happened to it? How did it get into Frontier's possession?

A. Mr. Butler, I'll repeat it once again. For a very short period of time Frontier Airlines owns that airplane during closing. Again, with a transfer of sale, that ownership transfers to AMCK.

We obviously are now leasing the aircraft through the sale leaseback agreement. AMCK don't have a -- the ability to ferry that aircraft. They don't have a certificate. We ferry that aircraft to Tampa, Florida which is where the aircraft would have gone for its initial service.

But, I mean, I'm not understanding your -- I'm not understanding your question. I'm really not. I'm confused to what you're asking.

Q. I don't think you need to understand why I'm asking. You just need to answer my question.

A. I have truthfully answered your question.

Q. I don't think you have. I don't think

Page 160

R. Fanning

you have.

MR. HOSENPUD: I think -- I'm not trying to interfere. But I think there is a terminology discrepancy between the witness and you, counsel, as to what delivery is.

MR. BUTLER: Thank you, David. Let me see if I can clarify it.

Q. You said that somebody ferried the aircraft from Toulouse to Florida?

A. We ferry the aircraft. Once the lease is in place, the aircraft is under our possession. Since we're leasing it. And then obviously we ferry that aircraft to our own ferry pilots.

Q. So Frontier sent someone to Toulouse to pick up the airplane and take it to Florida; correct?

A. Yes.

Q. Doesn't that mean that the aircraft was -- the physical aircraft, the thing that flies, was delivered to Frontier on March 16th, 2020?

A. Yes.

Q. Let me direct your attention to paragraph 44 of the complaint. It's a little bit further down on the same page. Paragraph 44 reads, quote, Even

Page 161

R. Fanning

though AMCK had no right to make such demand, AMCK also demanded that Frontier agree that the new aircraft to be financed under the March 2020 framework agreement be put into revenue service and not parked while any reduced flight activity might be in force, end quote.

My question, sir, is: Do you know what communication from AMCK this paragraph refers to?

A. It would have been during the conversations that I had with Jane that there was a concern that they didn't want to be paying for an aircraft -- leasing an aircraft to Frontier and then subsequently parking the aircraft once we took delivery of the aircraft.

Q. Right. I think we looked at one of those communications from Jane O'Callaghan and we marked it as Exhibit 5. Do you recall that email where she expressed that idea?

A. Yes.

Q. And do you recall other communications apart from that email which we've talked about, do you recall other communications from the AMCK side or any communications where they demanded that you put the aircraft under the framework agreement into