CONFIDENTIAL

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ---------------------------------------X

5  FRONTIER AIRLINES, INC.,

6                         Plaintiff,

7       - against -

8  AMCK AVIATION HOLDINGS IRELAND
   LIMITED, ACCIPITER INVESTMENT 4

9  LIMITED, VERMILLION AVIATION (TWO)
   LIMITED, WELLS FARGO TRUST COMPANY,

10 N.A., solely in its capacity as OWNER
   TRUSTEE, and UMB BANK, N.A., solely in

11 its capacity as OWNER TRUSTEE,

12                         Defendants.

13 CASE NO.: 1:20-cv-09713-LLS
   ---------------------------------------X

14

15     * * *  C O N F I D E N T I A L * * *

16

17            ZOOM VIDEOCONFERENCE

18

                  April 6, 2022

19                9:02 a.m.  MDT

20

21            DEPOSITION of JAMES DEMPSEY, before

22 Melissa Gilmore, a Stenographic Reporter and

23 Notary Public of the State of New York.

24

25 Job No. NY5155657

CONFIDENTIAL

Page 2

1
2 A P P E A R A N C E S:
3 LANE POWELL PC
4 Attorneys for Plaintiff
5     601 SW Second Avenue, Suite 2100
6     Portland, Oregon 97204-3158
7 BY: DAVID G. HOSENPUD, ESQ.
8     E-MAIL hosenpudd@lanepowell.com
9
10
11 CLIFFORD CHANCE US LLP
12 Attorneys for Defendants
13     31 West 52nd Street
14     New York, New York 10019-6131
15 BY: JEFF BUTLER, ESQ.
16     GEGE WANG, ESQ.
17     E-MAIL jeff.butler@cliffordchance.com
18          gege.wang@cliffordchance.com
19
20
21
22
23
24
25

Page 3

1
2          FEDERAL STIPULATIONS
3
4          IT IS STIPULATED AND AGREED by
5 and between the attorneys for the respective
6 parties herein, that the filing, sealing,
7 and certification of the within deposition
8 be waived.
9          IT IS FURTHER STIPULATED AND
10 AGREED that all objections, except as to the
11 form of the question, shall be reserved to
12 the time of the trial.
13          IT IS FURTHER STIPULATED AND
14 AGREED that the within deposition may be
15 sworn to and signed before any officer
16 authorized to administer an oath, with the
17 same force and effect as if signed to before
18 the Court.
19
20
21          - oOo -
22
23
24
25

Page 4

1          DEMPSEY - CONFIDENTIAL
2 J A M E S   D E M P S E Y,   called as a
3     witness, having been duly placed under
4     oath by a Notary Public, was examined and
5     testified as follows:
6          MR. BUTLER: David, why don't we
7     introduce ourselves for the record?
8          My name is Jeff Butler. I'm from
9     the law firm of Clifford Chance
10     representing AMCK and the other defendants
11     in this action. With me today is my
12     colleague, Gege Wang.
13          MR. HOSENPUD: David Hosenpud on
14     behalf of Frontier Airlines with Lane
15     Powell.
16 EXAMINATION BY
17 MR. BUTLER:
18     Q.   All right. Good morning,
19 Mr. Dempsey.
20     A.   Good morning.
21     Q.   Could you please state your full
22 name for the record?
23     A.   James Dempsey.
24     Q.   And where do you currently reside?
25     A.   In Colorado.

Page 5

1          DEMPSEY - CONFIDENTIAL
2     Q.   Any particular city or town in
3 Colorado?
4     A.   Englewood, Colorado.
5     Q.   Okay. Is that near Denver?
6     A.   Yeah, it's like in the metro area.
7 It's effectively Denver.
8     Q.   Are you currently employed by
9 Frontier Airlines?
10     A.   Yes.
11     Q.   And what is your position?
12     A.   I am the executive vice president
13 and chief financial officer.
14     Q.   Was that also your position in the
15 2020 time frame?
16     A.   Yes.
17     Q.   When did you join Frontier?
18     A.   May 2014.
19     Q.   And can you just give me a brief
20 description of your career before joining
21 Frontier?
22     A.   Sure. I worked prior to Frontier in
23 an airline in Europe called Ryanair for just
24 over ten years. And prior to that, I worked in
25 PricewaterhouseCoopers.

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

DEMPSEY - CONFIDENTIAL

1
2    Q.   Do you have an accounting
3 background?
4    A.   Yes, I'm a chartered accountant.
5    Q.   In 2020, who did you report to?
6    A.   The chief executive.
7    Q.   And who was that?
8    A.   Barry Biffle.
9    Q.   And who reported to you at that
10 time?
11   A.   I'm in charge of the finance
12 function, which incorporates accounting, FP&A,
13 treasury and all the things in those sections.
14   Q.   Are there particular individuals
15 within AMCK who reported directly to you in
16 2020?
17   A.   Nobody in AMCK reported directly to
18 me.
19   Q.   I'm sorry.  Let me restate the
20 question.  Thank you for the clarification.
21       Was there -- were there particular
22 individuals within Frontier who reported
23 directly to you in the 2020 time frame?
24   A.   Yes, our VP of treasury, Spencer
25 Thwaytes has a direct reporting line to me.

Page 7

DEMPSEY - CONFIDENTIAL

1
2    Q.   Were there any other individuals who
3 reported directly to you at that time?
4    A.   Yeah, our chief accounting officer,
5 Mark Mitchell, our head of FP&A, or VP of FP&A,
6 Ashok Shaw, reported directly to me at that
7 time.
8    Q.   Anyone else at that time?
9    A.   They were my direct reports.
10   Q.   In the 2020 time frame, obviously
11 you had some dealings with AMCK and the
12 relationship between Frontier and AMCK is
13 what's at issue in this lawsuit.
14       Who were your contacts at AMCK?
15   A.   Paul Sheridan was my main point of
16 contact in AMCK.
17   Q.   Do you recall dealing with anybody
18 else directly either by telephone or in
19 meetings in the 2020 time frame?
20   A.   I mean, Jane O'Callaghan was on some
21 conference calls.  There may have been other
22 members of their teams.  I don't recall their
23 names.
24   Q.   Was Mr. Biffle involved in
25 discussions of AMCK in the 2020 time frame?

Page 8

DEMPSEY - CONFIDENTIAL

1
2    A.   Not directly with AMCK, but
3 certainly, as we were managing through COVID,
4 he was involved in all aspects of managing
5 through COVID, including our arrangements with
6 AMCK.
7    Q.   Did you communicate on a regular
8 basis with Mr. Biffle about the AMCK situation?
9    A.   I kept him informed, yes.
10   Q.   And how did you keep him informed?
11 Did you do that by e-mail?
12   A.   No, we had a -- at the time, when
13 you're managing through such a crisis, we had
14 regular update calls on various aspects of the
15 business.  And if I had an update that I felt
16 was necessarily in relation to AMCK, I would
17 have delivered that in our daily update calls.
18   Q.   Apart from the daily update calls
19 involving Mr. Biffle, did you also send him
20 e-mails from time to time about AMCK?
21   A.   I don't recall.
22   Q.   Did you send him text messages
23 concerning AMCK?
24   A.   I don't recall.
25   Q.   Was it your practice in 2020 to send

Page 9

DEMPSEY - CONFIDENTIAL

1
2 text messages from time to time to Mr. Biffle?
3    A.   Yeah, I'm sure -- I'm sure.  Yes, I
4 would send text messages, yes.
5    Q.   Was it also your practice in 2020 to
6 send e-mails from time to time to Mr. Biffle?
7    A.   Yes.  I mean, it's one of the
8 communication devices that we use.
9    Q.   Do you have -- and I assume
10 Mr. Biffle responded to you using both text and
11 e-mails where appropriate; is that right?
12   A.   I mean, I don't know what
13 particular -- if there was a particular issue
14 that required a response, he would respond
15 appropriately.  He may call me.  He may text
16 me.  It really depends on what the form was or
17 what the individual issue is.
18   Q.   I guess part of what I'm asking is,
19 Mr. Biffle was not averse to using technology
20 like text messaging and e-mails to communicate
21 with his -- his personnel; is that right?
22   A.   He is capable of using text message
23 and e-mail.
24   Q.   As you sit here today, can you think
25 of any e-mail or text message that you

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

DEMPSEY - CONFIDENTIAL

1        DEMPSEY - CONFIDENTIAL
2 exchanged with Mr. Biffle concerning AMCK in
3 the 2020 time frame?
4     A.   I don't recall.
5     Q.   I just want to ask you briefly about
6 some of the agreements that are at issue in
7 this lawsuit, really just setting the stage for
8 what we're going to be discussing later today.
9       My understanding is that in the --
10 at the beginning of March 2020 Frontier
11 Airlines had a total of 14 leases with AMCK and
12 its affiliates for A320 -- Airbus A320
13 aircraft.
14       Is that also your understanding?
15     A.   We had quite a significant
16 relationship with AMCK, yes.
17     Q.   I'm asking, sir, do you recall that
18 there was a total of 14 leases in place with
19 AMCK as of the beginning of March 2020?
20     A.   I believe that's correct, yeah.
21     Q.   And under each of those leases, were
22 there monthly payments of rent that were due?
23     A.   Yes.
24     Q.   And I heard from Mr. Fanning the
25 other day that Frontier was very scrupulous

Page 11

1        DEMPSEY - CONFIDENTIAL
2 about always paying those rent payments on time
3 prior to March 2020.
4       Is that your understanding as well?
5     MR. HOSENPUD:   Objection, form.
6       You can answer.
7     A.   Yes, we paid our rent on time.
8     Q.   Can you think of any instance, prior
9 to March of 2020, where Frontier failed to pay
10 its rent on time for any of those 14 leases
11 involving AMCK?
12     MR. HOSENPUD:   Objection, form.
13       You can answer.
14     A.   I have no recollection of us missing
15 rent payments.
16     Q.   At the beginning of March of 2020,
17 did Frontier also have a Purchase Agreement
18 with Airbus?
19     A.   Yes.
20     Q.   And do you recall when was that
21 Purchase Agreement first entered?
22     A.   The original agreement, I think, was
23 entered into by our predecessor, Republic
24 Airlines, in -- I could be wrong on this, but I
25 think 2011. And then the agreement would have

Page 12

1        DEMPSEY - CONFIDENTIAL
2 been amended thereafter multiple times, but I
3 think the most recent one material amendment
4 would have been in towards the end of 2017.
5     Q.   And how many aircraft total were
6 ordered by either Republic or Frontier under
7 that Purchase Agreement?
8     A.   I don't have the exact numbers. I
9 know that Republic ordered 80 aircraft. We
10 ordered an additional 134 aircraft in the
11 fourth quarter of 2020 -- or 2017.
12       There were some other aircraft
13 through the years that may have been bolted
14 onto that agreement. I don't recall the exact
15 numbers.
16     Q.   Do you recall roughly how many
17 aircraft remained to be delivered by Airbus
18 under that agreement in March of 2020?
19     A.   I don't have that number to hand.
20 Probably somewhere around 150 or 160, but I
21 don't have that number to hand.
22     Q.   And did AMCK have anything to do
23 with Frontier's Purchase Agreement with Airbus?
24     A.   No, the Purchase Agreement with
25 Airbus was between Frontier and Airbus.

Page 13

1        DEMPSEY - CONFIDENTIAL
2     Q.   So AMCK was not a party to that
3 agreement in any way; is that correct?
4     A.   Not to the Purchase Agreement, no.
5     Q.   As you know, this case also relates
6 to a Framework Agreement between Frontier
7 Airlines and AMCK that was for the
8 sale-leaseback of six of the aircraft to be
9 delivered by Airbus under the Purchase
10 Agreement.
11       Is that your understanding as well?
12     A.   Yes.
13     Q.   And just to make sure we have the
14 same understanding of the Framework Agreement,
15 is it your understanding that under that
16 agreement for each of those six aircraft
17 Frontier -- strike that -- AMCK would purchase
18 the aircraft from Frontier and then lease it
19 back to Frontier?
20     A.   Under the binding Framework
21 Agreement, yes, AMCK at the point of delivery
22 of the aircraft, would simultaneously purchase
23 the aircraft, yes, and then we would lease it
24 back for a term.
25     Q.   Right. And it would purchase the

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

DEMPSEY - CONFIDENTIAL

1       DEMPSEY - CONFIDENTIAL
2    agreement -- it would pay Frontier for the
3    aircraft, and then it would receive a stream of
4    monthly payments under a Lease Agreement as an
5    exchange with Frontier; is that right?
6       A.   Yeah, among other items in the
7    lease.  Yes, the principal commercial term is
8    to pay rent.
9       Q.   And as I understand it, the first
10   delivery under the Framework Agreement, that
11   first exchange occurred on March 16, 2020.
12         Is that consistent with your memory
13   as well?
14      A.   I mean, on or -- yes, on or about
15   that time.
16      Q.   Do you remember that it was March 16
17   or you're not sure about that date?
18      A.   I believe it was March 16, yeah.  I
19   don't recall the actual delivery itself.  I
20   don't participate in the actual delivery of an
21   aircraft from a physical perspective in
22   delivering the aircraft.  They can float day by
23   day.
24      Q.   I'm going to show you what we will
25   mark as Exhibit 1.

Page 15

1       DEMPSEY - CONFIDENTIAL
2       MR. BUTLER:  So we will call this
3    Dempsey Exhibit 1.  And Gege is going to
4    put it up on the screen so that you can
5    see it.
6         (Dempsey Exhibit 1, Text Messages,
7    Bates Stamped FRONTIER0003467, marked for
8    identification.)
9       Q.   Mr. Dempsey because we have to do
10   this remotely, it's a little less than ideal.
11   If we were together in a room, I'd hand you the
12   document and you can see the whole thing, but
13   we can only show you a portion of it on the
14   screen.
15         But if you need to see any other
16   portion, please ask and Gege will move it
17   around to any particular location that you
18   direct.
19      MR. BUTLER:  Dempsey Exhibit 1 is
20   bearing Bates number FRONTIER3467 -- and,
21   I'm sorry.  It's a one-page document.  So
22   that's the total Bates number associated
23   with this.
24      Q.   Mr. Dempsey, this appears to be a
25   set of text messages from Spencer Thwaytes on

Page 16

1       DEMPSEY - CONFIDENTIAL
2    March 14, 2020.
3         Would you agree that these appear to
4    be texts that you and perhaps others received
5    from Spencer Thwaytes on that day?
6       A.   Yes, that's my number at the top of
7    the page.
8       Q.   Okay.  That 720 number, is that your
9    cell phone number?
10      A.   Yes.
11      Q.   And the first text sent by
12   Mr. Thwaytes, again on March 14 says, "We're
13   dealing with an issue on the Monday aircraft
14   delivery that I need to update you on.  Let me
15   know when you have a few minutes to talk."
16         He refers to a Monday aircraft
17   delivery.  Is that a reference to the first
18   delivery under the Framework Agreement which we
19   just discussed took place on the 16th of March?
20      A.   I assume so.  Yeah, I think that was
21   the pending delivery at the time.
22      Q.   Do you remember what was the issue
23   here that Mr. Thwaytes wanted to talk to you
24   about?
25      A.   My recollection is that this was the

Page 17

1       DEMPSEY - CONFIDENTIAL
2    first aircraft that was delivering under -- the
3    tariff scheme was coming in around that time,
4    and my recollection is that this aircraft --
5    there was an appetite by AMCK and Airbus to
6    deliver this aircraft prior to the institution
7    of the tariff scheme between the United States
8    and Europe, and I think that's the issue.
9       Q.   I just wanted to ask about the
10   tariff scheme.
11         Can you explain what that is?
12      A.   Yeah, there was, under the Trump
13   Administration, there was the institution of
14   tariffs on new aircraft deliveries that was
15   being brought in around that time.
16      Q.   And was that a last-minute issue
17   that needed to be addressed with AMCK?
18      A.   I wasn't dealing with it.  The team
19   was dealing with it, but they were -- I think
20   this text is notifying me that -- of some issue
21   relating to it or how they're handling it.
22      Q.   Okay.  The next text message on this
23   page from Mr. Thwaytes says, "I'm on with Jane
24   from Accipiter."
25         Do you see that?

5 (Pages 14 - 17)

CONFIDENTIAL

Page 22

DEMPSEY - CONFIDENTIAL
1
2 making, yes.
3      Q.   Who else was involved in the
4 decision making?
5      A.   I don't have a list of people, but
6 there was our officer team effectively.
7      Q.   By officer team you mean the C-suite
8 essentially; is that right?
9      A.   Yes, the senior management team of
10 the company.
11      Q.   And I think you answered this
12 already, but apart from knowing that it was
13 around this time frame, do you have any
14 recollection of a particular time or a
15 particular meeting at which that decision was
16 made, particularly the decision to seek rent
17 deferrals from all of the lessors?
18      A.   I don't.  I don't have an exact -- I
19 cannot pinpoint an exact time and date.  It was
20 around this time.
21      Q.   Understood.  Thank you.  I'm sorry.
22 I don't mean to interrupt you.  I thought you
23 were finished with your answer.
24           MR. BUTLER:  I would like to mark
25      the next exhibit, which we are going to

Page 23

DEMPSEY - CONFIDENTIAL
1
2 mark as Dempsey Exhibit 2.
3           (Dempsey Exhibit 2, E-Mail With
4      Attachment, Bates Stamped FRONTIER0000240
5      through 242, marked for identification.)
6           MR. BUTLER:  It's a three-page
7      document bearing Bates numbers FRONTIER240
8      to 242.
9      Q.   And, Mr. Dempsey, this is a cover
10 e-mail from Spencer Thwaytes, dated Monday,
11 March 16, and it's followed by a letter from
12 Mr. Thwaytes also dated March 16.
13           MR. BUTLER:  And, Gege, if you
14      scroll down.
15      Q.   It looks like you are cc'd at the
16 bottom of this letter.
17      My first question is, do you
18 recognize this letter?
19      A.   Can you scroll back to the top,
20 please?  (Document review.)
21      I mean, I wasn't the author of the
22 document, but I do recognize it, yes.
23      Q.   Is this the request for rent
24 deferral that Frontier sent to AMCK on
25 March 16, 2020?

Page 24

DEMPSEY - CONFIDENTIAL
1
2      A.   I need to read it to answer that
3 question.  (Document review.)
4      Yes, you can see the request in
5 point 1.
6      Q.   And were similar letters sent to
7 Frontier's other lessors on or about March 16,
8 2020?
9      A.   I didn't send them out, but my
10 recollection is that every lessor or largely
11 every lessor received one of these.  I think
12 every lessor received one.
13      Q.   Were you involved in drafting this
14 letter or the template for this letter?
15      A.   No.
16      Q.   Do you think that you reviewed it
17 before it was sent?
18      A.   I did see it before it was sent,
19 yes.
20      Q.   I would like to direct your
21 attention to the second page of this exhibit.
22 It says FRONTIER241 at the bottom.
23      And the language just below the
24 number 1 and number 2, it says, "The above
25 concessions would be documented in a mutually

Page 25

DEMPSEY - CONFIDENTIAL
1
2 agreed deferral and concession agreement."
3      Was it your expectation, at this
4 time, Mr. Dempsey, that any deferral that might
5 be agreed with AMCK would be documented in a
6 formal agreement?
7      A.   That's what we were endeavoring to
8 do.
9      Q.   If you look a little bit further up
10 at the two numbered points, number 1 says --
11 well, just above that it says, "Accordingly, we
12 request the prompt implementation of the
13 following measures."  And then number 1 says,
14 "All lease rent payments due between the date
15 of this letter and June 30, 2020, will be
16 deferred."
17      Do you see that?
18      A.   Yes.
19      Q.   So was the initial request from
20 Frontier then to request a deferral of all rent
21 from the date of this letter, March 16, through
22 June 30, 2020?
23      A.   The intent of the letter was to
24 effectively receive a three-month deferral in
25 rent expiring on June 30 and that it would be

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

DEMPSEY - CONFIDENTIAL

1  repaid over nine months thereafter.
2
3      Q.    So in your mind, you thought of this
4  as basically a three-month rent deferral even
5  though the letter might ask for slightly more
6  than that; is that correct?
7      A.    Point 1 lays out that, you know, we
8  were looking for -- we were effectively looking
9  to receive a three-month rent deferral at that
10  time.
11          So it depends on the leasing
12  company.  Some rent may have been paid in
13  advance of the issuance of this letter, but the
14  intent was to effectively get three months rent
15  deferred and then pay it back over nine months.
16      Q.    And was that rent deferral to be
17  applicable to all of the leases with AMCK?
18      A.    I assume so, yes.  I don't think the
19  letter specifies excluding any leases.
20      Q.    And we talked about the 14 leases
21  that existed at the beginning of March.
22          Do you know whether, by the time of
23  this letter, that that fifteenth Lease
24  Agreement had been entered by Frontier?
25      A.    Sorry.  Can you repeat that?  I

Page 27

DEMPSEY - CONFIDENTIAL

1  didn't hear the date.
2
3      Q.    My question is, as of the time of
4  this letter, we talked earlier about the 14
5  leases and then there was another delivery on
6  March 16.
7          Was the intent of this letter to
8  cover all 15 leases that existed at that time?
9      A.    Yeah, I think this was a letter that
10  went out to every leasing company covering all
11  our leases at that time.
12      Q.    Okay.  And you talked about your
13  understanding that this was a -- you were
14  requesting a three-month deferral and a
15  nine-month payback period.
16          Did I hear that correctly?
17      A.    That was what our proposal was.
18      Q.    Was your proposal also to pay
19  interest on the deferred rent?
20      A.    Yes, you can see it in the
21  paragraph.
22      Q.    Okay.  So in your mind, generally,
23  the deferrals that you were requesting from
24  lessors, did they involve a three-month period
25  of deferral, some kind of period of repayment,

Page 28

DEMPSEY - CONFIDENTIAL

1  plus an interest rate that would be applicable
2  to the deferred amounts?
3
4      A.    That's correct.
5      Q.    Are those kind of the key components
6  of a rent deferral agreement?
7      A.    The key components are the laid out
8  in this letter.
9      Q.    And I'm asking you, sir, are those
10  the three key components in your mind?
11      A.    If you can see, point 1, the request
12  was to defer rent to the June 30.  There was
13  another request to return the security deposit
14  that existed on the lease, and we would repay
15  it over nine months in the next paragraph, and
16  that we would agree to an interest rate.
17      Q.    In your mind, are there any other
18  material terms to a rent deferral agreement?
19      A.    I mean, this is our proposal to the
20  leasing company.  There are many terms in a
21  lease that are not dealt with here.  This was
22  our proposal to receive rent relief from our
23  lessors.
24      Q.    I understand that.  And we talked
25  about three of the important components of the

Page 29

DEMPSEY - CONFIDENTIAL

1  deferral that you're requesting.
2
3          My question, sir, is, are there any
4  other important agreements that you were
5  seeking from leasing companies at this time?
6      A.    I don't recall.  I mean, this was
7  the principal item that we were -- we had
8  started to discuss with leasing companies in
9  order to gain a relief.
10      Q.    Do you know who drafted this letter?
11      A.    I don't recall exactly who drafted
12  it, but it would have been done by our treasury
13  team in conjunction with our legal advisors.
14      Q.    And Frontier, at this time, sent a
15  letter requesting a similar concession to all
16  of its lessors, correct?
17      A.    Sorry.  Can you repeat that?
18      Q.    My question was, is it true that
19  Frontier sent a letter seeking this kind of
20  rent deferral concession to all of its lessors
21  at this time?
22      A.    Yes, that's my understanding.
23      Q.    In your mind, was there anything
24  wrong with Frontier making this kind of request
25  to all of its lessors?

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

DEMPSEY - CONFIDENTIAL

1
2     A.   I don't understand the context of
3  your question.  Could you clarify it?
4     Q.   My question, sir, is, do you
5  personally think there was anything wrong with
6  Frontier making a request for concessions under
7  its Lease Agreements?
8          MR. HOSENPUD:  Objection, form.
9          You can answer.
10     A.   No, I don't see any reason why we
11  couldn't ask for a concession.
12     Q.   You didn't view this as a breach of
13  the Lease Agreements to ask for this from the
14  lessors, correct?
15     A.   No.
16     Q.   And I gather that the reason for
17  asking for this kind of concession was the
18  unusual circumstance of a global pandemic; is
19  that right?
20     A.   Yes.
21     Q.   You must have viewed this as a
22  reasonable request to be making considering the
23  highly unusual circumstances of the pandemic;
24  is that correct?
25     A.   Yes, there were many leasing

Page 31

DEMPSEY - CONFIDENTIAL

1
2  companies that were approaching us about this
3  very issue.  There were airlines doing this
4  around the world.  This was a common theme that
5  occurred during the start of the pandemic.
6     Q.   And is it correct to say that the
7  global pandemic, at this time, was affecting
8  virtually everyone in your industry?
9     A.   I mean, I can't comment for other
10  airlines, but it certainly had an impact in
11  airlines around the world.
12     Q.   Did it also have an impact on
13  leasing companies around the world?
14     A.   I'm not in the position to answer
15  that.
16     Q.   You don't know one way or the other
17  whether the COVID-19 pandemic impacted the
18  business of leasing companies?
19     A.   I'm not in the business of running a
20  leasing company, so I'm not -- I don't have the
21  expertise to answer that.
22     Q.   Was it your understanding, at this
23  time, that leasing companies were not affected
24  by the COVID-19 pandemic?
25     A.   At this time, I am unsure as to

Page 32

DEMPSEY - CONFIDENTIAL

1
2  whether they were affected at this point in the
3  crisis.  I think if they provided rent
4  deferrals in a large scale to all of their
5  customers, obviously, that would be dependent
6  on the liquidity levels that they had at the
7  time.  But that was a decision for each of the
8  leasing companies to make.
9     Q.   Did you come to understand, at some
10  point after this time, that leasing companies
11  were also affected by the COVID-19 pandemic?
12     A.   A lot of the leasing companies that
13  we spoke to at that time promoted the fact that
14  they had ample liquidity to manage through the
15  COVID event.
16          I mean, at this time, everybody
17  believed it to be a relatively short event,
18  maybe three, four months.  And, hence, we
19  designed our request to each of the leasing
20  companies and to other suppliers with that in
21  mind, and I think the leasing companies had a
22  similar view of the world at that point.
23          I mean, clearly that changed over
24  time given the fact that the pandemic continued
25  for much longer than three months.

Page 33

DEMPSEY - CONFIDENTIAL

1
2     Q.   And because of that pandemic,
3  Frontier requested a concession from Frontier
4  on its existing Lease Agreements in the form of
5  a rent deferral, correct?
6          MR. HOSENPUD:  Object to the form,
7  misstates the record, but you can answer.
8  You used Frontier twice, Jeff.
9          MR. BUTLER:  That's quite possible,
10  so let me restate the question.  I'm sorry
11  if I'm confusing my parties.
12  BY MR. BUTLER:
13     Q.   The question, sir, is, at this time,
14  is it correct that because of the pandemic
15  Frontier was seeking a concession from AMCK in
16  the form of a rent deferral?
17     A.   Yes.
18     Q.   And in response, am I correct to
19  understand that AMCK made a request to Frontier
20  for a concession under the Framework Agreement?
21     A.   Yes, they asked -- they asked -- not
22  at this time.  I think around this time, maybe
23  some day subsequent, there was -- a negotiation
24  began around the Framework Agreement and our
25  rent deferral.

9 (Pages 30 - 33)

CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL
2      Q.   So you made a request for
3  concessions under the Lease Agreements, and at
4  some point later, AMCK made requests --
5  requests for concessions under the Framework
6  Agreement; is that correct?
7      A.   Yes.
8      Q.   And was there anything wrong with
9  AMCK in the circumstances of the pandemic
10 making a request for concessions to Frontier?
11     A.   We were asking AMCK to honor their
12 agreement with us because we had a binding
13 agreement with AMCK, and we had impending
14 aircraft deliveries that we had to satisfy with
15 Airbus.  And so we did ask AMCK to honor that
16 binding agreement.
17     Q.   So you did think there was something
18 wrong with AMCK asking Frontier for concessions
19 under the Framework Agreement; is that correct?
20     A.   Subsequent to them asking us for
21 concessions under the Framework Agreement, it
22 became clear to us that AMCK wanted to adjust
23 our binding agreement, and we asked them to
24 honor that.
25     Q.   Well, you referred to binding

1          DEMPSEY - CONFIDENTIAL
2  agreement.
3          Weren't the Lease Agreements between
4  Frontier and AMCK binding agreements?
5      A.   Yes.
6      Q.   But you asked for concessions with
7  respect to those agreements, right?
8      A.   Yes.
9      Q.   And the Framework Agreement was also
10 a binding agreement, correct?
11     A.   Correct.
12     Q.   And AMCK asked you in return for
13 concessions under that agreement, correct?
14     A.   They did.
15     Q.   My question, sir, is, was there
16 anything wrong with AMCK making that request?
17         MR. HOSENPUD:  Object to the form of
18 the question.
19         You can answer.
20     A.   No, I don't see any reason that they
21 cannot ask for a concession.
22     Q.   Let me show you the next exhibit.
23         MR. BUTLER:  I have marked, as
24 Dempsey Exhibit 3, a document bearing
25 Bates number AMCK16595.

1          DEMPSEY - CONFIDENTIAL
2          (Dempsey Exhibit 3, E-Mail, Bates
3      Stamped AMCK16595, marked for
4      identification.)
5      Q.   And this document appears to be a --
6  an e-mail dated April 3, 2020, from Paul
7  Sheridan of AMCK to you, Mr. Dempsey.
8          Do you recall receiving this e-mail?
9      A.   I don't recall receiving it, but I'm
10 sure I did.
11     Q.   Yeah, you don't have any reason to
12 doubt that you received this e-mail on April 3,
13 2020?
14     A.   No, it's addressed to me.
15     Q.   Okay.  I just want to direct your
16 attention to the first paragraph, or I guess
17 it's the second paragraph that begins
18 "unfortunately".
19         In this e-mail, was Mr. Sheridan
20 telling you that he was -- that AMCK was
21 willing to grant the three-month rent deferral
22 that you proposed, but strictly on the basis
23 that the next deliveries under the Framework
24 Agreement are suspended for six months?
25     A.   (Document review.)

1          DEMPSEY - CONFIDENTIAL
2          That is what he asked.
3      Q.   So is this the first e-mail -- or
4  was this an e-mail from AMCK where, in response
5  to your request for a concession, AMCK asked
6  you for a concession of their own?
7      A.   I don't recall if this was the first
8  request, but this is consistent with my
9  recollection that they started asking for a
10 suspension in deliveries, something that we
11 could not achieve, given we did not have
12 control of the delivery of aircraft timing with
13 Airbus.
14     Q.   Well, whether you could achieve it
15 or not, it was a request from Mr. Sheridan for
16 Frontier to give AMCK something in exchange for
17 what Frontier was requesting from AMCK,
18 correct?
19     A.   That's correct.
20     Q.   And at the bottom of this e-mail,
21 below the place where it says, "Kind Regards,
22 Paul," there is some text.  And I don't need to
23 read the text, but can you tell me your
24 understanding of what this text meant?
25     A.   Which part of the e-mail are you

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

DEMPSEY - CONFIDENTIAL

1  talking about?
2      Q.   I'm talking about the part that
3  begins, "For the avoidance of doubt" -- why
4  don't we strike that.  I'll just read it so
5  it's very clear.
6          So at the bottom of the e-mail it
7  says, "For the avoidance of doubt, this e-mail
8  is for discussion purposes only.  This e-mail
9  and any subsequent discussions or
10 correspondence we may have with you are not
11 intended to create (and do not create) any
12 binding obligations on the part of AMCK or any
13 of its affiliates."
14         First, did I read that correctly?
15     A.   Yes.
16     Q.   And what did you understand that to
17 mean?
18     A.   Exactly what it says.
19     Q.   And in your words, what does it say?
20     A.   It basically says that this
21 correspondence does not intend to create a
22 binding obligation on AMCK.  I mean, I can
23 reread it for if you want, but that's
24 effectively what it says.
25

Page 39

DEMPSEY - CONFIDENTIAL

1      Q.   And did you understand it to mean
2  that at the time you received this e-mail?
3      A.   We were -- we were negotiating at
4  that time, and so -- in relation to the rent
5  deferral.  We were trying, at that point, to
6  achieve concessions from Airbus to satisfy
7  AMCK's request.
8          And so at that point in time, we
9  were attempting to achieve something that
10 worked for both parties.  So this certainly was
11 not a final agreement.
12     Q.   And did you understand that any
13 final agreement would be in writing?
14     A.   Yes.  Not necessarily in writing,
15 but certainly agreed in some form.  And, you
16 know, given our previous letter, we would have
17 been keen to paper the rent deferral request
18 that we put out to each of our leasing
19 companies.  But some leasing companies did it
20 through e-mail, some leasing companies did it
21 through a formal agreement.  There wasn't
22 one-size-fits-all for each of the requests at
23 that time.
24     Q.   Is it fair to say, though, that you

Page 40

DEMPSEY - CONFIDENTIAL

1  expected some kind of writing, some kind of
2  final writing to reflect the deferral
3  agreement?
4      A.   Well, we had worked with Paul
5  Sheridan for some time, and given that he is
6  the chief executive of the leasing company, we
7  also would have managed this on a relationship
8  perspective.  We had a very good relationship
9  with AMCK, and we would have taken his word to
10 be something that we could rely upon, given
11 that he is the chief executive of AMCK.
12     Q.   Well, I'm sure your confidence is
13 well placed in Mr. Sheridan, but my question,
14 sir, is, did you expect a rent deferral
15 agreement with AMCK to be embodied in some kind
16 of final writing?
17     A.   Yes, we tended to be flexible with
18 the format that the leasing companies wanted to
19 agree with us.
20     MR. BUTLER:  Let me show you the
21 next exhibit.  I'm showing document
22 FRONTIER310 to 311.
23     (Dempsey Exhibit 4, E-Mail Chain,
24 Bates Stamped FRONTIER310 through 311,
25

Page 41

DEMPSEY - CONFIDENTIAL

1  marked for identification.)
2      Q.   Mr. Dempsey, this appears to be your
3  response to Mr. Sheridan, dated April 6, 2020.
4          Is that your understanding as well?
5      A.   I mean, you would have to scroll
6  down just to show me that.  (Document review.)
7          Yes, as I said earlier, part of his
8  request to us was something that we did not
9  have control over.  And you can see in my
10 response where we reached out to Airbus to see
11 if they could satisfy that request, and they
12 said no, pretty bluntly.
13     Q.   So this April 6 e-mail, which we
14 have marked as Exhibit 6, this is your response
15 to Mr. Sheridan's April 3 e-mail; is that
16 correct?
17     A.   That's right.
18     Q.   And you write at the beginning, "Hi
19 Paul, this is very disappointing news."
20         Why was his response disappointing?
21     A.   Because he was asking us to defer
22 aircraft deliveries for six months.
23     Q.   And did you hope that he would just
24 agree to your deferral request without asking

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1         DEMPSEY - CONFIDENTIAL
2 for anything in return?
3     A.   Did I hope?  Yes.
4     Q.   Is there any other reason
5 Mr. Sheridan's response was disappointing to
6 you?
7     A.   Well, we couldn't satisfy his
8 request.  We had no control over that.  So yes,
9 that is disappointing because we had no
10 mechanism to institute what he was asking us to
11 do.
12    Q.   Did you believe, at this time, that
13 you had no way to get -- to delay the
14 deliveries under the aircraft Purchase
15 Agreement?
16    A.   At this point, we really didn't know
17 what was feasible with Airbus.  All we knew,
18 after Paul asking for a six-month deferral, was
19 that Airbus said no.
20        And we were working very hard to try
21 and get relief from everybody, as I mentioned
22 earlier, all of our suppliers, including
23 Airbus, in relation to managing the pandemic,
24 and one of those tools was to ask them to move
25 aircraft deliveries.  And Airbus was not

Page 43

1         DEMPSEY - CONFIDENTIAL
2 interested.
3     Q.   Well, you received this e-mail from
4 Mr. Sheridan on April 3, and then you responded
5 on April 6.
6        Between those dates, did you reach
7 out to Airbus and ask them whether a six-month
8 delay in the deliveries relating to AMCK would
9 be feasible?
10    A.   We were speaking to Airbus
11 regularly, yes.
12    Q.   Well, did you personally communicate
13 with Airbus regarding --
14    A.   I did.
15    Q.   -- delivery delays?
16    A.   Yes, I did.
17    Q.   And did you personally reach out to
18 Airbus during this -- after receiving this
19 e-mail from Mr. Sheridan to determine whether
20 Airbus would be agreeable to a six-month delay
21 in the upcoming deliveries?
22    A.   We sought their input into what they
23 could do with us in relation to moving aircraft
24 deliveries inclusive of Paul's request.  And
25 within my e-mail, you can see that they have

Page 44

1         DEMPSEY - CONFIDENTIAL
2 bluntly said no.
3     Q.   Well, I'm asking something more
4 specific.  I'm asking what you personally did.
5        Did you personally ask Airbus for a
6 six-month delivery delay in the aircraft
7 covered by the Framework Agreement?
8     A.   Yes, we asked Airbus to satisfy this
9 request.
10    Q.   My question, sir, was directed at
11 you personally.
12    A.   I personally did it, yes.
13    Q.   You personally asked for a six-month
14 delay; is that correct?
15    A.   We were in discussions with Airbus
16 in managing a fleet program that encompasses
17 six or seven years, and part of that discussion
18 was trying to get relief for AMCK.
19    Q.   And my question, sir, is, did you
20 ask for a six-month delay or did you ask for
21 something else?
22    A.   I asked them to move the aircraft
23 out of 2020, so that would have been greater
24 than a six-month delay.
25    Q.   And when did you make that request

Page 45

1         DEMPSEY - CONFIDENTIAL
2 to Airbus?
3     A.   In this period.  Prior to this
4 e-mail.
5     Q.   Who did you make that request to?
6     A.   I had a telephone conversation with
7 our relationship manager -- well, my
8 counterpart, Christopher Jones.
9     Q.   And what did Mr. Jones say in
10 response?
11    A.   No.
12    Q.   Did he say anything else?
13    A.   He said it wasn't feasible and that
14 the aircraft are built and you need to turn up
15 and deliver them.
16    Q.   Going back to Exhibit 4, you go on
17 to say, in your e-mail to Mr. Sheridan, this is
18 beginning in the middle of the second line, "As
19 a result, I can only deduce that you will
20 finance the aircraft deliveries and honor your
21 commitment to Frontier if we do not put a rent
22 deferral in place."
23        Did I read your e-mail correctly?
24    A.   (Document review.)
25        I said, "I can only deduce that you

12 (Pages 42 - 45)

CONFIDENTIAL

Page 62

DEMPSEY - CONFIDENTIAL
1
2    A.   I don't recall him directly
3 answering that question, but maybe you have
4 evidence to the contrary.
5    Q.   So your recollection, as you sit
6 here today, is that you asked Mr. Sheridan a
7 direct question of whether -- whether AMCK
8 would finance the upcoming deliveries under the
9 Framework Agreement, and you did not get an
10 affirmative answer from Mr. Sheridan; is that
11 your memory?
12    A.   That is correct.  My memory is we
13 got a conditional answer based on certain
14 conditions that they wanted.  So I never
15 received comfort that they would turn up even
16 if I paid the rent that was due on those
17 aircraft.
18    Q.   And did that make you feel that you
19 should not pay the rent?
20    A.   No, we continued to negotiate
21 because, as I said earlier, we were working
22 with our partner in trying to find a solution
23 with them, and we continued to do so.
24    Q.   After April 6 when you got a
25 short-term grace period from Mr. Sheridan and

Page 63

DEMPSEY - CONFIDENTIAL
1
2 you stopped paying the rent, did you ever --
3 did you consider just going ahead and paying
4 the rent as a way of forcing AMCK to comply
5 with the Framework Agreement?
6    A.   I don't recall -- I don't recall.  I
7 mean, I think the situation developed into
8 something different when Mobile got shutdown
9 for April, which is where the aircraft was
10 delivering.
11        MR. HOSENPUD:  Pardon me for
12    interrupting.  Is this a good time for
13    your break?
14        MR. BUTLER:  Let me just follow up
15    on that last question because he has
16    raised a new issue.
17    Q.   So you referred to Mobile, Alabama.
18 What were you talking about?
19    A.   So the aircraft was delivering in
20 Mobile, Alabama.
21    Q.   The next delivery?
22    A.   The next delivery in the sequence
23 with AMCK.
24    Q.   And how did that affect your
25 thinking about whether to go ahead and pay the

Page 64

DEMPSEY - CONFIDENTIAL
1
2 rent that was due under the Lease Agreements?
3    A.   It didn't.
4        MR. BUTLER:  David, this would be a
5    perfectly fine time for a break.
6        MR. HOSENPUD:  All right.  Sounds
7    good.  Let's go off the record.
8        (Recess taken.)
9 BY MR. BUTLER:
10    Q.   Mr. Dempsey, before the break, I was
11 asking you about Exhibits 5 and 6, your text
12 messages on April 6 involving you and
13 Mr. Fanning.
14        MR. BUTLER:  I want to put up on the
15    screen, Gege, the next side by side.
16        So this should be a side by side of
17    FRONTIER3481 and 3489, which are two pages
18    from Exhibits 5 and 6.
19    Q.   And I want to direct your attention
20 to your texts on the left side of the screen
21 right in the middle of the page.
22        MR. BUTLER:  Gege, if you can zoom
23    in.
24    Q.   There is a text from you at
25 11:28 a.m.  Yeah, at the top there, and it

Page 65

DEMPSEY - CONFIDENTIAL
1
2 seems to say -- it looks like it says, "Get
3 immediate relief from Accipiter from today's
4 payment.  Why don't you call them?"
5        Did I read that portion of your text
6 correctly?
7    A.   Sorry.  Let me read it.  It says,
8 "Get immediate relief from Accipiter from
9 today's payment.  Why don't you call them?  The
10 press release says April 27."
11    Q.   And my question, sir, is, do you
12 recall giving that instruction to Mr. Fanning
13 on April 6?
14    A.   I don't recall, but it's a text from
15 me, so...
16    Q.   So from this text, it does appear
17 that you gave that instruction to Mr. Fanning,
18 correct?
19    A.   Yes.
20    Q.   Okay.  And Mr. Fanning responds at
21 11:31, if we move over to the right side of
22 this.  He says, "OK.  I sent Jane a text.  I
23 will speak with her hopefully soon."
24        Did I read Mr. Fanning's response
25 correctly?

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

DEMPSEY - CONFIDENTIAL

1
2   A.   Yes.
3   Q.   Okay.  Now, I want to show you some
4   subsequent texts.  We are going to show you
5   side by side FRONTIER3482 and FRONTIER3489.
6   It's the second page of Exhibit 6 and the third
7   page of Exhibit 5.
8        And at the top of the text from
9   Mr. Fanning, it looks like at 1:11 p.m. on
10  April 6, he writes, "Paul and Jane are
11  available in 20 minutes for a call."
12       Do you see that?
13  A.   Yeah.
14  Q.   And then going to the other side of
15  the screen, it looks like you respond at
16  1:13 p.m.
17       MR. BUTLER:  You have to go down a
18  little bit to find Mr. Dempsey's response.
19  Right there.
20  Q.   It looks like you respond, "I can't
21  make it.  You have the call."
22       Did I read that correctly?
23  A.   Yes.
24  Q.   And then going back to Mr. Fanning's
25  text on the other side of the page, it looks

Page 67

DEMPSEY - CONFIDENTIAL

1
2   like at 1:38 p.m., so about a little more than
3   half an hour later, he writes to you and says,
4   "Paul Sheridan will sending your an e-mail
5   deferring all rent payments for ten business
6   days to give us room to work out a solution."
7        Did I read that text from
8   Mr. Fanning correctly?
9   A.   Yes.
10  Q.   And do you recall getting that
11  message from Mr. Fanning that Paul Sheridan had
12  agreed to a ten-business day grace period?
13  A.   I recall the ten-business day grace
14  period, yeah.  I mean, the text itself -- I
15  mean...
16  Q.   Okay.  And just going back to your
17  texts on the other side of the page to close
18  out the discussion, it looks like you respond
19  at 1:39 p.m. and you say, "Great."
20       Is that your understanding as well?
21  A.   Yes, but I'm not sure if this was in
22  response to his text or not.
23  Q.   Okay.  Well, his text was at
24  1:38 p.m. and your text is at 1:39 p.m.  From
25  those time stamps, would you say you're

Page 68

DEMPSEY - CONFIDENTIAL

1
2   responding to his texts?
3   A.   I think so, yeah.
4   Q.   Okay.  Let me show you the next
5   exhibit.
6        MR. BUTLER:  I'm marking, as Dempsey
7   Exhibit 7, a document bearing Bates
8   numbers FRONTIER251 to 253.
9        (Dempsey Exhibit 7, E-Mail Chain,
10  Bates Stamped FRONTIER0000251 through 253,
11  marked for identification.)
12  Q.   And this appears to be -- well, if
13  you look at the second e-mail in this document,
14  it appears to be an e-mail from Paul Sheridan
15  to you, dated April 6, 2020.
16       And my first question is, sir, did
17  you receive this e-mail from Mr. Sheridan on
18  April 6?
19       MR. HOSENPUD:  Counsel, are you
20  referring to the second e-mail in the
21  middle?
22       MR. BUTLER:  Correct.
23       MR. HOSENPUD:  That looks like it is
24  Mr. Dempsey to Mr. Sheridan.  I am not
25  referring to the very first one.

Page 69

DEMPSEY - CONFIDENTIAL

1
2        MR. BUTLER:  Well, let me see if the
3   witness can clarify this.
4   Q.   Looking at the second e-mail --
5        MR. HOSENPUD:  Oh, if you're
6   focusing on the full e-mail below the
7   Fanning to Sharath, you are correct.  I
8   thought you were referring to the one in
9   the center below this e-mail that's
10  appearing.
11       MR. BUTLER:  Why don't we blow up
12  the e-mail that I'm talking about, Gege,
13  so it's clear for the witness.
14  BY MR. BUTLER:
15  Q.   You see there is a top e-mail where
16  you are forwarding this e-mail to
17  Mr. Sashikumar?  So I'm referring to the one
18  below that from Mr. Sheridan to you, dated
19  April 6, 2020.
20       MR. HOSENPUD:  To clarify the
21  record, you just misspoke.  Mr. Fanning is
22  forwarding the e-mail to Mr. Sashikumar
23  not Mr. Sheridan.
24       MR. BUTLER:  I see.  Okay.  Let me
25  strike that and start over, then.

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

DEMPSEY - CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL
2          MR. HOSENPUD:  Thank you.
3      Q.   Mr. Dempsey, it looks like you can
4  ignore the top e-mail where your colleague,
5  Mr. Fanning, is forwarding this e-mail.  I want
6  to focus your attention on the second e-mail on
7  this page, which is an e-mail from Paul
8  Sheridan to you dated, Monday, April 6.
9          Do you see that?
10     A.   I see it.
11     Q.   Did you receive this e-mail from
12  Mr. Sheridan on that date?
13     A.   I would assume that I did.
14     Q.   You have no reason to doubt that you
15  received it, correct?
16     A.   No.
17     Q.   In this e-mail, this is confirming
18  the ten-day grace period that Mr. Fanning told
19  you about and Mr. Sheridan clarifies here that
20  the grace period will end on the 21st of April,
21  correct?
22     A.   Yes.
23     Q.   Let me show you the next exhibit.
24          MR. BUTLER:  I have marked, as
25  Exhibit 8, a document bearing Bates

Page 71

1          DEMPSEY - CONFIDENTIAL
2  numbers FRONTIER314 to 316.
3          (Dempsey Exhibit 8, E-Mail Chain,
4      Bates Stamped FRONTIER0000314 through 316,
5      marked for identification.)
6      Q.   And you'll see that this document,
7  which maybe I should have used in the first
8  place, has the same e-mail from Mr. Sheridan in
9  the middle of page, correct?
10     A.   Yes.
11     Q.   And then up above, there is an
12  e-mail where you respond to Mr. Sheridan.
13          Did you send this e-mail to
14  Mr. Sheridan on April 6, 2020?
15     A.   Yes.  We had a subsequent call
16  the -- I don't know -- I think it was the
17  following day, but yes.
18     Q.   And in your e-mail you write, "Hi
19  Paul, I appreciate this.  As you know, this
20  will continue to be a challenge with Airbus and
21  I would hope that you reconsider your position
22  on financing.  Let's catch up tomorrow."
23          Did I read your e-mail correctly?
24     A.   Yes.
25     Q.   What was Mr. Sheridan's position on

Page 72

1          DEMPSEY - CONFIDENTIAL
2  financing that you wanted him to reconsider?
3      A.   That they wanted a concession on the
4  binding deal that they had done with us.
5      Q.   So they asked for a concession.  You
6  wanted him to withdraw that request for a
7  concession; is that right?
8      A.   Yes, because I didn't feel it was a
9  balanced deal.  They were asking us to entirely
10  change a deal we had with them, recently
11  agreed, in return for us deferring rent.  I
12  didn't believe that the deferral request with
13  them was matched by a similar level of
14  concession from us in relation to that
15  deal.  And so that was my issue.
16     Q.   You end your e-mail by saying,
17  "Let's catch up tomorrow."
18          Did you, in fact, have a telephone
19  call with Mr. Sheridan on April 7, 2020?
20     A.   My recollection is we had a call
21  shortly -- yes, on April 7.
22     Q.   Was that call something that was
23  scheduled in advance or did one of you just
24  call the other?
25     A.   I don't recall.  I don't remember.

Page 73

1          DEMPSEY - CONFIDENTIAL
2      Q.   So you don't recall whether you
3  called him or he called you?
4      A.   I don't remember.
5      Q.   What was the reason for the call, in
6  your mind?
7      A.   I wanted to discuss with him the
8  fact that Mobile had been closed for April,
9  that that would give them relief on delivering
10  the aircraft in April.  I felt that he should
11  give us a longer rent deferral than ten days
12  because it would take us longer than that to
13  solve our challenges with Airbus that Accipiter
14  was -- or AMCK was presenting to us.
15          And so we needed to have a
16  conversation to outline our positions and to
17  try and progress this matter.
18     Q.   So do I understand correctly that,
19  by this time, you knew that the Mobile Airbus
20  facility was closing temporarily and that
21  all -- all deliveries would be delayed by at
22  least a little while from Airbus?
23     A.   If you scroll down in your
24  e-mails -- if you scroll down on this page,
25  please.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

DEMPSEY - CONFIDENTIAL
1
2    MR. BUTLER:  Gege, could you scroll
3    down?
4    A.    I think it's spelled out very
5    clearly.  I sent Paul an e-mail saying, "Are
6    you available for a call?  Airbus has closed
7    Mobile until April 29."
8    Q.    Okay.  So this is the call that
9    you're referring to?
10    A.    Yes.
11    Q.    But you don't remember whether Paul
12    called you or you called Paul?
13    A.    I don't recall.  I don't know why it
14    matters.
15    Q.    Was anyone else on the call?
16    A.    I don't recall.  I think it was a
17    call between Paul and I, but I cannot confirm
18    that.
19    Q.    Do you remember what time of day the
20    call took place?
21    A.    I think it was likely morning my
22    time, afternoon his time, given the time zone
23    difference.
24    Q.    Is that typically the time that you
25    would have a telephone conversation with

Page 75

DEMPSEY - CONFIDENTIAL
1
2    Mr. Sheridan?
3    A.    Yes.
4    Q.    How often were you speaking to
5    Mr. Sheridan around this time?  Was this call
6    an unusual event or something that happened
7    very frequently?
8    A.    I mean, I don't recall how
9    frequently we spoke, but around this time, we
10    spoke on multiple occasions.
11    Q.    Okay.  On this particular call where
12    you discussed the Mobile facility situation,
13    what else do you remember about that call?
14    A.    Paul and I agreed that we would deal
15    with the rent deferrals on a month-to-month
16    basis.  And so, therefore, we didn't have any
17    rent due for the rest of April.
18    And so we were working on the basis
19    of that, and that we would continue trying to
20    find a solution that helped them with the
21    timing of delivery of the aircraft.  And we
22    worked towards a rent deferral of longer than
23    the month-to-month basis.
24    Q.    You said that you agreed to a
25    month-to-month deferral.

Page 76

DEMPSEY - CONFIDENTIAL
1
2    Did you ask Mr. Sheridan for a
3    month-to-month deferral?
4    A.    We discussed it.  It was raised on
5    the call that, given the change in Mobile, that
6    we should look at this on a month-to-month
7    basis because clearly the delivery of the
8    aircraft was being moved into May at the
9    earliest.
10    Q.    Do you remember what Mr. Sheridan
11    said about the month-to-month deferral idea?
12    A.    Yes, he said that he would agree to
13    a month-to-month rent deferral.
14    Q.    Were those his exact words?
15    A.    I don't recall his exact words, but
16    that was the essence of what he said.
17    Q.    You said he would agree to it.
18    Was it your expectation that this
19    month-to-month deferral would be documented in
20    writing?
21    A.    I had been given an undertaking by
22    Paul that we would move to a month to month as
23    opposed to ten days, and as a result, I took
24    his word for it.  What we really wanted to do
25    was document a longer term solution to the

Page 77

DEMPSEY - CONFIDENTIAL
1
2    issues that existed.
3    Q.    In your discussion with
4    Mr. Sheridan, how did you expect the
5    month-to-month deferral to work?
6    A.    We wouldn't pay any rent and
7    continue the negotiations.
8    Q.    What would be --
9    A.    And, you know, our task was to, you
10    know, provide relief from aircraft deliveries
11    in Airbus, so that they could move the
12    financing requirement out, and we would not
13    have to pay rent while we tried to negotiate
14    that.
15    Q.    So was it your understanding that
16    this was an indefinite deferral of rent under
17    your agreements with AMCK?
18    A.    No, it was a fluid situation, but
19    clearly, at this point, it was for the month of
20    April.
21    Q.    So by month to month, you understood
22    the deferral to be for the month of April; is
23    that right?
24    A.    My understanding was, at this point
25    in time, my understanding was that their

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

DEMPSEY - CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL
2 position was that they would facilitate a rent
3 deferral for April, and we would continue to
4 work on a longer term solution.  And so we were
5 working on that basis.
6          It was subsequently -- subsequently,
7 the negotiations developed where they were
8 looking for us to be current on May 15, and so
9 we were dealing with a continuous moving date
10 as we were negotiating with Airbus.
11          And my point of view at the time was
12 that it would take some time to get agreement
13 with Airbus longer than towards the end of
14 April, but we were endeavoring to try and do
15 that, and that's what we were working hard on
16 in the background with Airbus on achieving for
17 our partners and principally -- and to solve
18 for the short-term financing needs in our
19 business.
20     Q.   Going back to the April 7 call with
21 Mr. Sheridan, I think you said it was a
22 deferral for the month of April.
23          So Mr. Sheridan obviously extended
24 to you a grace period through April 21 in his
25 April 6 e-mail.

Page 79

1          DEMPSEY - CONFIDENTIAL
2          Is it your recollection that the
3 next day Mr. Sheridan agreed to a grace period
4 that would extend at least to April 30?
5     A.   The way it was deemed was we will
6 deal with this on a month-to-month basis, and
7 so yes, it was at least till the end of April
8 with, you know, an overall solution to be
9 worked out in the intervening period.
10     Q.   When you use the term "month to
11 month," does that mean that basically you're
12 agree one month at a time?  So, first, let's
13 agree to the end of April, then later we'll
14 agree to the end of May, if it's necessary?
15     A.   Correct.
16     Q.   And what is the -- so if that's the
17 deferral that you talked about with
18 Mr. Sheridan, what did you discuss about
19 repayment?
20     A.   We said that we would solve that in
21 the overall deal we were putting together.
22     Q.   Did you discuss, during your call on
23 April 7, the repayment period for the rent
24 deferred for the month of April?
25     A.   I don't recall it being as granular

Page 80

1          DEMPSEY - CONFIDENTIAL
2 as discussing exactly when we would repay it
3 and what AMCK at the time were proposing to us
4 or developed into around that time was a -- and
5 we had to be current on all our rent in order
6 to deliver the aircraft.
7     Q.   Was there any discussion on your
8 April 7 call with Mr. Sheridan about the
9 interest rate that Frontier would pay on the
10 deferred amounts?
11     A.   No, I don't recall any discussion on
12 interest rates.  It wasn't the primary issue.
13     Q.   And I think I asked you this
14 question before, but just to be clear, did you
15 expect that month-to-month agreement with
16 Mr. Sheridan to be documented in a written
17 agreement between the parties?
18          THE WITNESS:  Go ahead, David.
19          MR. HOSENPUD:  Just objection, asked
20     and answered.
21          You can answer.
22     A.   We were working towards a more
23 formalized agreement overall.  And so, I mean,
24 I took his word given that he was the chief
25 executive of the company that he had provided

Page 81

1          DEMPSEY - CONFIDENTIAL
2 us with that.
3     Q.   Did you ask Mr. Sheridan to confirm
4 the month-to-month arrangement in writing?
5     A.   I don't recall.  I do recall
6 instructing Robert Fanning -- or, sorry --
7 confirming to Robert Fanning that he had agreed
8 to that.
9     Q.   Did you ask Mr. Fanning to confirm
10 that in writing with AMCK?
11     A.   I don't recall if I did.  I don't
12 see -- I don't recall it being an issue given
13 that I received this from Paul, who is the
14 chief executive.
15     Q.   Did you consider shooting an e-mail
16 to Paul saying, hey, just to confirm our
17 understanding, and maybe writing out what you
18 had agreed to?
19     A.   I don't recall.
20          MR. BUTLER:  Let me show you the
21     next exhibit, which we are going to mark
22     as Dempsey Exhibit 9.
23          This is a single exhibit with two
24     different documents with different Bates
25     numbers.  It's FRONTIER3493 and

21 (Pages 78 - 81)

CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL
2    FRONTIER12172.
3          (Dempsey Exhibit 9, Text Messages,
4    Bates Stamped FRONTIER0003493 and
5    FRONTIER0012172, marked for
6    identification.)
7    Q.   I put these two documents together
8    because I think they are an exchange of text
9    messages.  I have your text messages on the
10   first page and Mr. Fanning's text messages on
11   the second page.  They're all from the same
12   day, April 7, 2020.
13   A.   Yeah.
14   Q.   And I want to focus your attention,
15   first, on the top of the first page, which I
16   think is your text message to Mr. Fanning.  You
17   write, "Just spoke to Paul Sheridan.  He has
18   agreed to do the deferral on a month to month."
19        Did I read that correctly?
20   A.   Yes.
21   Q.   And is that your text message to
22   Mr. Fanning describing your interpretation of
23   the call with Mr. Sheridan?
24   A.   Yes.
25   Q.   Okay.  And if you go over to the

1          DEMPSEY - CONFIDENTIAL
2    other side of the page, it's on the second page
3    of this exhibit, it looks like Mr. Fanning
4    responds, this is at 10:59 a.m., "OK.  Good.
5    Anything mentioned on the repayment period?
6    And are they going to send our revised
7    agreement over?"
8         Do you see that?
9    A.   Yes.
10   Q.   Is that the response you received
11   from Mr. Fanning on that day?
12   A.   I assume so, yes.
13   Q.   Going back to your side of the
14   conversation, it looks like you write back at
15   11:03 a.m., "No, but we should stick to nine
16   months from July 1.  Let's get a draft to him."
17        Did I read your response correctly?
18   A.   Yes.
19   Q.   Does that refresh your
20   recollection --
21   A.   I mean, I think that answers your
22   earlier question.  So we must not have spoken
23   about the repayment period and my suggestion
24   was nine months from July.
25   Q.   My question, sir, is, does that

1          DEMPSEY - CONFIDENTIAL
2    refresh your recollection that you expected a
3    written agreement to be entered --
4    A.   Oh.
5    Q.   -- reflecting the month-to-month
6    arrangement?
7    A.   I suggested that we get a draft of
8    that arrangement, yes, to them.
9    Q.   And in your response to Mr. Fanning,
10   you also clarify that you did not discuss the
11   repayment period with Mr. Sheridan, correct?
12   A.   That's correct.
13   Q.   And your direction to Mr. Fanning is
14   that you should insist -- that Frontier should
15   insist on a nine-month repayment period; is
16   that right?
17   A.   That was my suggestion.
18   Q.   And from July 1 -- the repayment
19   would not begin until July 1 in your view
20   pursuant to your request, right?
21   A.   That is exactly what I said.
22   Q.   Okay.  Going back to Mr. Fanning's
23   side of the conversation, it looks like he
24   responds at 11:04 a.m., "They have our draft.
25   I'll follow up with Jane."

1          DEMPSEY - CONFIDENTIAL
2         Did I read that correctly?
3    A.   Yes.
4    Q.   Was it your understanding that
5    Frontier had already provided a draft deferral
6    agreement to AMCK at this point in time?
7    A.   I wasn't in the weeds on the
8    paperwork going back and forth.  So, I mean, I
9    don't recall being knowledgeable about it, but
10   I wouldn't have been in the weeds on drafts
11   going back and forth.
12   Q.   Well, do you know whether Frontier
13   had previously sent a draft to AMCK that
14   reflected the month-to-month deferral
15   arrangement that you discussed with
16   Mr. Sheridan?
17   A.   I don't know the answer to that.  I
18   don't think so because I think that that came
19   up on the call with Paul Sheridan.
20   Q.   The month-to-month concept came up
21   for the first time on that call?
22   A.   I mean, I'm not sure if it was the
23   first time, but I recall it being the
24   conclusion of that call and that's how we
25   worked towards.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

DEMPSEY - CONFIDENTIAL
1
2     I'm not sure what the paperwork
3 situation between the two parties were.  That
4 was being handled by Robert and his team.
5     Q.   Do you recall having -- well, we saw
6 from your text exchange that you had a
7 discussion with Mr. Fanning about the repayment
8 period under this month-to-month arrangement.
9         Did you also discuss with him the
10 interest rate that would be applied?
11     A.   Not in this text chain.
12     Q.   My question, sir, is, do you recall
13 having any discussion with him about the
14 interest rate for the month-to-month
15 arrangement?
16     A.   I do not.
17     Q.   Did AMCK and Frontier ever enter a
18 written agreement of any kind that reflected
19 the month-to-month arrangement that you
20 discussed with Mr. Sheridan?
21     A.   I don't believe so.  I believe we
22 were working towards trying to find -- both
23 parties were working towards trying to find an
24 overall solution to the issue that existed.
25     Q.   Let me show you the next exhibit.

Page 87

DEMPSEY - CONFIDENTIAL
1
2     MR. BUTLER:  I'm marking, as Dempsey
3 Exhibit 10, a document bearing Bates
4 numbers FRONTIER4144 to 45.
5     (Dempsey Exhibit 10, E-Mail Chain,
6 Bates Stamped FRONTIER0004144 through 45,
7 marked for identification.)
8     A.   Yeah.
9     Q.   And this appears at the top to be an
10 e-mail from you on Saturday, April 11, 2020, to
11 Sharath Sashikumar and copied to some others,
12 and it looks like you're forwarding an offer
13 from Airbus; is that correct?
14     A.   (Document review.)  Yes.
15     Q.   And did you send this e-mail?
16     A.   Yes.
17     Q.   The offer from Airbus that you're
18 forwarding is from a person named Chris Jones.
19         And I think you said before that
20 he's Frontier's relationship person at Airbus;
21 is that right?
22     A.   That's correct.  Well, he was.  He's
23 not -- yes, at that time.
24     Q.   Okay.  And is this -- this offer
25 from Airbus, is this a proposal to delay

Page 88

DEMPSEY - CONFIDENTIAL
1
2 deliveries for various aircraft ordered by
3 Frontier?
4     A.   Yeah, this was their proposal to
5 move aircraft and try and deal with the AMCK
6 issue.
7     Q.   And did this proposal include all of
8 the aircraft covered by the Framework Agreement
9 with AMCK?
10     A.   Can you scroll down, please?
11 (Document review.)
12         That table does not cover all of the
13 aircraft.  It covers near-term aircraft --
14     Q.   So how many --
15     A.   -- the table that you've displayed
16 on screen.
17     Q.   Yeah.  So for this particular offer,
18 did this only cover a portion of the remaining
19 aircraft under the Framework Agreement?
20     A.   (Document review.)
21         Sorry.  Can I just read this, do you
22 mind?
23     Q.   Of course.  Take all the time you
24 need.
25     A.   (Document review.)

Page 89

DEMPSEY - CONFIDENTIAL
1
2         That table just deals with the 2020
3 aircraft deliveries.  Can you scroll down
4 further?
5         Yeah, that was just a portion of
6 what was going on at that time.
7     Q.   I see.  So this was not -- this does
8 not completely describe the potential deferrals
9 on aircraft deliveries from Airbus; is that
10 correct?
11     A.   No, but if you read the context of
12 his note, he is trying to help following my
13 request to move aircraft deliveries to satisfy
14 AMCK as is mentioned in this first paragraph.
15         So you'll see they offered to move
16 the planned April delivery date to June, the
17 next plan, which is MSN 9549.  And then the
18 following aircraft, that would move from April
19 to July, May to July, and so they were trying
20 to move aircraft to satisfy our request, but it
21 was falling short for AMCK because they
22 initially wanted three to six months.  Then
23 they moved to six months, and their position
24 was changing multiple times.
25         So these were aircraft that were

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

DEMPSEY - CONFIDENTIAL

1    particularly the ones in the first few months
2    with MSNs. They were pre-advanced in terms of
3    production, and he was able to give relief out
4    of 2020 into 2021, but very short relief into
5    2021 on four aircraft. And so that's what they
6    proposed at that time.
7        Q.    So Airbus was willing to delay some
8    of the aircraft deliveries, just not quite as
9    long as AMCK had requested; is that right?
10       A.    That's correct.
11       Q.    And in this proposal, going back to
12   my question now that you studied it a little
13   bit more, did this cover all of the aircraft
14   remaining under the Framework Agreement or just
15   a portion of the aircraft?
16       A.    No, this covered a portion of the
17   aircraft.
18       Q.    Okay. Is it the first three
19   aircraft that are listed in this chart that are
20   part of the Framework Agreement?
21       A.    Let me -- sorry. Excuse me. Let me
22   recast that.
23           When you say Framework Agreement,
24   are you talking about the AMCK Framework

Page 91

DEMPSEY - CONFIDENTIAL

1    Agreement or you're talking about the Airbus
2    Purchase Agreement?
3        Q.    Whenever I say "Framework
4    Agreement," I'm talking about the agreement
5    with AMCK.
6        A.    Okay. My bad.
7            My understanding is that this does
8    cover all of the Framework Agreement aircraft.
9            My understanding is that the next
10   five deliveries -- I mean, I may be wrong on
11   the fourth or fifth aircraft, but they were
12   effectively scheduled to be the next sequential
13   aircraft over the production line from Airbus.
14           Sorry. My bad. I misinterpreted
15   what you said.
16       Q.    Thank you for clarifying that.
17           So is it correct that, as of this
18   point in time, you knew that Airbus was willing
19   to delay those deliveries under the Framework
20   Agreement by at least some period of time; is
21   that right?
22       A.    Yes.
23       Q.    In other words, Airbus was not, by
24   this point in time, holding Frontier to the

Page 92

DEMPSEY - CONFIDENTIAL

1    delivery schedule that is set forth in the
2    Framework Agreement, correct?
3        A.    Correct. This was a fluid
4    conversation with Airbus. This is
5    approximately a week after they made the
6    decision to close down Mobile, and so this is
7    the concession that they offered to help us
8    with what -- with AMCK's request. It just fell
9    short.
10       Q.    Let me show you the next exhibit.
11           MR. BUTLER: We are marking, as
12   Dempsey Exhibit 11, a document bearing
13   Bates number FRONTIER12173. It's a
14   one-page document.
15           (Dempsey Exhibit 11, Text Message,
16   Bates Stamped FRONTIER0012173, marked for
17   identification.)
18       Q.    And this appears to be a text
19   message from you to Paul Sheridan on the same
20   day as the previous exhibit, Saturday,
21   April 11, 2020.
22           Is that your understanding as well?
23       A.    (Document review.)
24           April 11, yes. Is it? Yes.

Page 93

DEMPSEY - CONFIDENTIAL

1        Q.    And in your text message you say,
2    "Sorry to bug you on a Saturday. We have been
3    working with Airbus to push deliveries. I
4    don't have this agreed yet, however, I want to
5    see if a two-month delay works for you into
6    June for the aircraft that should have been
7    delivered last week? There are other moves
8    afoot later in the year, however, near-term
9    moves are extremely challenging. Let me know."
10           Did I read your text correctly?
11       A.    Yes.
12       Q.    And were you referring here to a
13   two-month delay of the next delivery under the
14   Framework Agreement with AMCK?
15       A.    I was referring to the aircraft that
16   were -- yes, that were in the Framework
17   Agreement. So what I was referring to was a
18   two-month delay in the near-term deliveries.
19       Q.    And Mr. Sheridan had previously
20   asked -- or AMCK had previously asked for a
21   three to six-month delay or a six-month delay.
22           Is it correct you're asking here if
23   a two-month delay would be enough for AMCK; is
24   that right?

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

DEMPSEY - CONFIDENTIAL

1
2    A.    Yes, I am basically bringing him up
3 to speed on what Airbus has offered.
4    Q.    And did you receive a response from
5 Mr. Sheridan to this text, to your memory?
6    A.    I don't recall.
7    Q.    Let me show you the next exhibit,
8 which is Dempsey Exhibit 12.
9         MR. BUTLER:  It's a document bearing
10    Bates numbers AMCK17769 through 17771.
11    (Dempsey Exhibit 12, E-Mail Chain,
12    Bates Stamped AMCK17769 through 17771,
13    marked for identification.)
14    Q.    And this is a series of e-mails, an
15 e-mail chain.  The most recent e-mail in the
16 chain is Monday, April 13, from Paul Sheridan
17 to you.
18         But I want to start with the e-mail
19 a little -- in the middle of the page which
20 appears to be an April 13 e-mail from you to
21 Paul Sheridan.
22         Do you see that?
23    A.    Yep.
24    Q.    And does this appear to be an e-mail
25 that you sent to Paul Sheridan on April 13,

Page 95

DEMPSEY - CONFIDENTIAL

1
2 2020?
3    A.    Yep.
4    Q.    And, again, in this e-mail, are you
5 asking him, once again, whether a two-month
6 delay would be okay?
7    A.    (Document review.)
8         I'm asking -- I'm spelling out what
9 Airbus has offered us.
10    Q.    And then in the second paragraph of
11 your e-mail you write, "I understand that you
12 were looking for a six-month delay, however,
13 that is impractical given the advanced nature
14 of the aircraft production.  Please confirm
15 that you can support" -- "please confirm you
16 can support the revised schedule."
17         Did I read your e-mail correctly?
18    A.    Yes.
19    Q.    So I think this is consistent with
20 what you said before, but did you understand,
21 at this time, that AMCK was -- had been looking
22 for a six-month delay, but you were only able
23 to get to this point a two-month delay from
24 Airbus?
25    A.    That's correct.

Page 96

DEMPSEY - CONFIDENTIAL

1
2    Q.    Going back to Paul's e-mail at the
3 top of the page, it looks like he responds to
4 you on the same day, and he says, "Hi Jimmy,
5 apologies for the slow response, but I was
6 waiting for some feedback from the
7 shareholders.  Essentially we want to tie the
8 deliveries to having no outstanding deferrals
9 so it would only work if we recast the deferral
10 agreement."
11         So my question, sir, is, what did
12 you understand Mr. Sheridan to be saying when
13 he referred to "no outstanding deferrals"?
14    A.    He means -- I can't put words in his
15 mouth, but my understanding is that he means
16 that your rent is paid up to date.
17    Q.    And in this e-mail, does
18 Mr. Sheridan say one way or the other whether a
19 two-month deferral would be acceptable to AMCK?
20    A.    Sorry.  Could you repeat that,
21 please?
22    Q.    I said, in this response from
23 Mr. Sheridan, does he say one way or the other
24 whether a two-month delivery delay from Airbus
25 would be satisfactory to AMCK?

Page 97

DEMPSEY - CONFIDENTIAL

1
2    A.    He says, essentially, we want to tie
3 the deliveries to having no outstanding
4 deferrals, so it would only work if we recast
5 the deferral agreement.
6    Q.    Right.  And my question, sir, is,
7 does he say anything about whether the
8 two-month delay that you wrote him about would
9 be acceptable to AMCK?
10    A.    On condition that we had no
11 outstanding deferrals.  So he makes the comment
12 that he may be able to work this, but he wants
13 no outstanding deferrals.
14    Q.    So did you understand Mr. Sheridan
15 to be saying, if Frontier gets current on its
16 rent, this might work?
17    A.    He didn't say that.  He said,
18 essentially, we want to tie the deliveries to
19 having no outstanding deferrals, so it would
20 only work if we recast the deferral agreement.
21    Q.    And did you understand this to mean
22 that Mr. Sheridan wanted Frontier to get up to
23 date on its rent payments?
24    A.    You would have to ask Paul Sheridan.
25    Q.    I'm asking, sir, about your

25 (Pages 94 - 97)

Page 102

DEMPSEY - CONFIDENTIAL
1
2 answered, argumentative.
3      You can answer.
4   A.   My understanding of what he is
5 saying is you need to have all of your rent
6 paid at the point of delivery of the next
7 aircraft.
8      MR. HOSENPUD:  Let's take a break.
9 It's 10:10.
10      MR. BUTLER:  That would be fine.
11 When should we come back, David?
12      MR. HOSENPUD:  Actually, it's 10:12,
13 I misspoke.  How about ten minutes?
14      MR. BUTLER:  Sure.  Why don't we
15 throw in the extra three and resume at 25
16 after the hour?
17      MR. HOSENPUD:  Reasonable.  Thank
18 you.
19      (Recess taken.)
20      MR. BUTLER:  I would like to mark
21 the next exhibit, which we will call
22 Dempsey Exhibit 13.  It's a document
23 bearing Bates numbers FRONTIER4329 to
24 4334.
25      (Dempsey Exhibit 13, E-Mail Chain,

Page 103

1      DEMPSEY - CONFIDENTIAL
2 Bates Stamped FRONTIER0004329 through
3 4334, marked for identification.)
4   Q.   And it's a series of e-mails.  It
5 looks like the top e-mail in the chain is from
6 Ray Bishop of Airbus, dated Friday, April 17,
7 to you, Mr. Dempsey, and some others.
8      My first question is, did you
9 receive this e-mail on that date?
10   A.   It seems to be, yeah.
11   Q.   First, who is Ray Bishop?
12   A.   Ray Bishop is -- I don't know his
13 exact title, but he is the individual that
14 manages our contract on behalf of Airbus.  He
15 works for Airbus.
16   Q.   And in this e-mail, is Mr. Bishop
17 forwarding to you a new updated proposed
18 delivery schedule?
19   A.   That's certainly the title of the
20 attachment.
21   Q.   And in the e-mail he says, "Please
22 find attached file updated to reflect the
23 proposed delivery months."
24      Do you see that?
25   A.   Yes.

Page 104

1      DEMPSEY - CONFIDENTIAL
2   Q.   And I guess we could scroll down,
3 Gege, to the attachment, a lot of which is
4 redacted, but there is a portion that's
5 unredacted.  It seems to reflect some new
6 delivery months for various aircraft.
7      Do you see that?
8   A.   Yes.
9   Q.   And does that remind you that this
10 is a new proposed delivery schedule from Airbus
11 on April 17, 2020?
12   A.   Yes, this was their latest proposal
13 to us on the timing of the delivery schedules.
14      If you scroll down, I think it
15 covers -- okay.  So it's redacted, but I
16 believe it covered multiple years.  I mean, you
17 have to go back to the e-mail, but it seems
18 like that's likely what it does.
19   Q.   Okay.  Does this revised delivery
20 schedule cover the aircraft or include the
21 aircraft that are covered by the Framework
22 Agreement with AMCK?
23   A.   Yes, so I think if you look, the
24 initial contracted month of delivery for rank
25 52 is March, and if you tie that to the earlier

Page 105

1      DEMPSEY - CONFIDENTIAL
2 correspondence, Airbus was offering to move
3 that to June.
4      Similarly, March -- the second March
5 delivery was now being proposed in July, and
6 likewise for May to July, May to January, June
7 to September.  You know, this is the sequence
8 of a series of aircraft in 2020 and 2021 and
9 movements for those.
10   Q.   Let me show you the next exhibit.
11      MR. BUTLER:  I'm marking, as
12 Exhibit 14, a two-page document bearing
13 nonconsecutive Bates numbers FRONTIER3500
14 and FRONTIER 3502.
15      (Dempsey Exhibit 14, Text Messages,
16 Bates Stamped FRONTIER0003500 and 3502,
17 marked for identification.)
18   Q.   These are each a series of text
19 messages, dated April 22, 2020, and it looks
20 like they are text messages from you,
21 Mr. Dempsey, on the first page and from Robert
22 Fanning on the second page.  So we are going to
23 go ahead and put them side by side.
24      I guess my first question is,
25 looking at the right {sic} side of this page,

27 (Pages 102 - 105)

CONFIDENTIAL

Page 114

DEMPSEY - CONFIDENTIAL

1 the purchase until we are up to date on
2 payments.
3
4     Q.   I understand there are two parts to
5 it, but didn't you understand that to mean that
6 AMCK wanted Frontier to be current on its
7 payments as is required under the Lease
8 Agreements?
9     A.   I understood that AMCK had provided
10 us with relief from paying rent, and in order
11 to fund a new purchase of an aircraft, that we
12 had to be up to date on all rent payments.
13     Q.   Mr. Dempsey, isn't Ms. O'Callaghan
14 sending a clear message to Frontier Airlines
15 that AMCK wanted Frontier to pay its rent?
16         MR. HOSENPUD:  Objection,
17     argumentative.
18         You can answer.
19     A.   They wanted us to pay our rent in
20 order to fund the purchase of an aircraft.
21     Q.   Let me show you the next exhibit.
22         MR. BUTLER:  I'm going to mark, as
23     Dempsey Exhibit 16, a document bearing
24     Bates numbers FRONTIER3510 to 3513.
25         (Dempsey Exhibit 16, Text Messages,

Page 115

DEMPSEY - CONFIDENTIAL

1
2     Bates Stamped FRONTIER0003510 through
3     3513, marked for identification.)
4     Q.   It appears to be a collection of
5 text messages involving yourself, Mr. Thwaytes
6 and Mr. Fanning.  These are all texts from
7 Mr. Fanning or Mr. Thwaytes, and the date of
8 this is April 25, 2020.
9         So my first question, Mr. Dempsey,
10 is do you recognize these as texts that you
11 received as part of this group chat on
12 April 25, 2020?
13     A.   Yes.
14     Q.   And there is a text from Robert
15 Fanning on that date that he begins, "Jimmy,
16 finally a reply from Jane this morning."
17         Do you see that?
18     A.   Yes.
19     Q.   And then it appears that he quotes
20 language from a text from Jane.
21         Is that your interpretation of this
22 as well?
23     A.   (Document review.)
24         I assume that that's where the text
25 came from.

Page 116

DEMPSEY - CONFIDENTIAL

1
2     Q.   It looks like Mr. Fanning just cut
3 and paste a text from Jane into a text to you,
4 correct?
5     A.   That's my assumption.
6     Q.   And in that chat from Jane, it looks
7 like she says something very similar to what
8 she said two days before.  It says, "1. We
9 will be unable to fund any new delivery unless
10 all payments are up to date, so there can be no
11 deferred payments outstanding at closing."
12         My question once again is, did you
13 interpret this to be another message from AMCK
14 that they wanted Frontier to get current on its
15 rent?
16         MR. HOSENPUD:  Objection, form.
17         You can answer.
18     A.   They wanted us to be current on all
19 payments to fund a new delivery that they were
20 bound to fund.
21     Q.   Let me ask you this, Mr. Dempsey.
22         If you weren't able to reach
23 agreement on a new delivery, did you understand
24 that AMCK wanted all the rent to be paid?
25     A.   I mean, that's a hypothetical,

Page 117

DEMPSEY - CONFIDENTIAL

1
2 right?
3     Q.   And I'm asking you the hypothetical.
4         Was it your understanding that, if
5 you could not reach agreement on the Framework
6 Agreement, that AMCK still wanted all the rent
7 to be paid on time?
8     A.   So we understood that, and we were
9 proposing a deferral in rent, not that we would
10 not pay the rent.  So there is a distinction
11 there.
12         And we understood in the situation
13 that we were in at this stage in April, that we
14 have been given rent relief but that that rent
15 relief would expire in order for them to
16 deliver a new aircraft to us, and the next
17 aircraft delivery was moved to June, from
18 initially March, into April and then into June.
19     Q.   Let me show you the next exhibit.
20         MR. BUTLER:  I'm marking, as Dempsey
21     Exhibit 17, a document bearing Bates
22     numbers FRONTIER338 through 342.
23         (Dempsey Exhibit 17, E-Mail Chain,
24     Bates Stamped FRONTIER0000338 through 342,
25     marked for identification.)

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

DEMPSEY - CONFIDENTIAL

1
2    Q.    This appears to be a series of
3 e-mails.  The last e-mail in the series is
4 dated April 27, 2020, from Paul Sheridan to
5 you, Mr. Dempsey.
6         I want to start by asking you about
7 the e-mail in the middle of the page, the
8 preceding e-mail, which appears to be an e-mail
9 from you to Mr. Sheridan on April 27, 2020.
10        Do you see that e-mail?
11    A.    That's an e-mail from me to Paul,
12 yes.
13    Q.    Yeah.  Does that appear to be an
14 e-mail from you to Paul on April 27?
15    A.    Yes.
16    Q.    And in the second line of your
17 e-mail to Paul, towards the end, there is a
18 sentence that reads as follows, "I put a scheme
19 in place with Airbus that would facilitate
20 short-term deferrals of the aircraft on the
21 basis that you would honor your agreement."
22        Did I read that sentence correctly?
23    A.    Yes.
24    Q.    Does that refer to the two-month
25 delivery delay that you had been successful at

Page 119

DEMPSEY - CONFIDENTIAL

1
2 negotiating from Airbus?
3    A.    I agreed to a three-month deferral,
4 but yes.
5    Q.    Well, at this time, was it a
6 two-month deferral or a three-month deferral,
7 if you remember?
8    A.    Well, in the Framework Agreement it
9 was due to be delivered in March.  That got
10 moved into April, and then we moved it.  And
11 then as a result of conversations with Airbus,
12 that moved into June at this point -- I think
13 at this point in the conversations.  It
14 subsequently got moved to July.
15    Q.    I see.  So you're three months
16 includes the one-month delivery delay that was
17 caused by Airbus closing the Mobile facility;
18 is that right?
19    A.    I mean, technically the aircraft was
20 in the Framework Agreement and in the agreement
21 with Airbus to deliver in March.  It then got
22 moved to early April.  As a result, then, of
23 the closure of Mobile, it became uncertain as
24 to its next delivery date, but it was assumed
25 to be in early May dependent on Mobile

Page 120

DEMPSEY - CONFIDENTIAL

1
2 reopening.  And then that got moved to June
3 because we asked for relief, and they
4 effectively said we can do an aircraft delivery
5 in June.
6         That negotiation continued with
7 Airbus, and we managed to move that aircraft to
8 July, and it delivered in July.
9    Q.    And that was still less than the
10 six-month delay in delivery that Mr. Sheridan
11 had previously requested, correct?
12    A.    Yeah, if you go down in this e-mail
13 chain, you'll see where he stipulates the
14 six-month period was set to allow repayments of
15 the deferred rent, as well as to be over the
16 deferral period.
17        So our assumption, at that time, was
18 that, if we were current on rent at the point
19 of delivery, that the aircraft could deliver in
20 June.
21    Q.    My question, sir, was, simply, that
22 the time period that you had negotiated with
23 Airbus, at this time, was less than the time
24 period requested by Paul Sheridan; isn't that
25 true?

Page 121

DEMPSEY - CONFIDENTIAL

1
2    A.    I mean, I would have to check
3 exactly what time period they were looking for
4 at this point, but he seemed to come down on
5 April 13 off six months and move to a tying
6 paying the outstanding deferred rent with the
7 delivery of the aircraft in June.
8         That's where it sat, I think, around
9 this time.  And that's what's in his April 13
10 e-mail.
11    Q.    The request evolved over time; is
12 that correct?
13    A.    The request from AMCK evolved over
14 time.  Our request is pretty consistent.
15    Q.    But in terms of the six-month
16 deferral, it wasn't the case that Paul asked
17 for a six-month delay and you went and got it
18 from Airbus, correct?
19    A.    Can you repeat that question?  I
20 think there is multiple questions in that.
21    Q.    My question is, that you described
22 how things evolved, which I think sounds pretty
23 accurate, but it did not unfold in the way that
24 Paul asked you for a six-month delay and you
25 delivered what Paul requested, correct?

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

DEMPSEY - CONFIDENTIAL

1
2    A.   I mean, we are going back now to
3  early April when they asked for a six-month
4  delay, and we asked Airbus and Airbus said no.
5        What we -- what transpired, and it
6  developed in the conversations, you can see it
7  in the e-mails, my deduction from Paul is that
8  they were willing to give us a six-month
9  deferral and repayment of rent on the basis
10 that it was -- there was no aircraft delivery.
11       If the aircraft delivery occurred in
12 June, they wanted us to pay all outstanding
13 rent deferrals.  That's where it was at that
14 point.
15    Q.   In that situation, both sides would
16 have to compromise a little bit on the
17 concessions they initially requested from each
18 other, correct?
19    A.   That is correct.  We were willing to
20 compromise on our request for rent deferrals --
21 sorry.  Let me rephrase that.
22       AMCK is offering us an alternative
23 solution, which resulted in us being up to date
24 on aircraft rent deferrals in return for them
25 turning up and financing the next aircraft

Page 123

DEMPSEY - CONFIDENTIAL

1
2  delivery in June.
3        That's where it sat at that point.
4  And we were considering it.
5    Q.   Focusing your attention back on your
6  e-mail to Paul on April 22, in the next
7  sentence after the one that I just read, it
8  says, "Please confirm this is the case as we
9  have a lease signed for these aircraft and are
10 willing to ensure the deferred rent is paid as
11 a CP of delivery."
12       Did I read that correctly?
13    A.   Yes.
14    Q.   Were you asking Mr. Sheridan for
15 confirmation that AMCK would fund deliveries if
16 they were delayed by two months?
17    A.   I am following up on his e-mail
18 where he made a proposal to us, and he wants to
19 tie the deliveries -- the delivery of aircraft
20 to having no outstanding deferrals.
21       I am making a proposal to him and
22 asking for his confirmation that he agrees that
23 we will pay -- ensure that the deferred rent is
24 paid as a condition precedent of the delivery
25 on the basis that he confirms that he would

Page 124

DEMPSEY - CONFIDENTIAL

1
2  fund that delivery.
3        And so I am effectively agreeing to
4  his proposal in the April 13 e-mail.
5    Q.   Did Mr. Sheridan provide the
6  confirmation that you were requesting in this
7  e-mail?
8    A.   I mean, I don't recall, but maybe if
9  you scroll up you might find it.  (Document
10 review.)
11    Q.   Well, of course you can look at
12 this, and I was going to go to that e-mail.
13       Apart from looking at this e-mail,
14 though, you don't recall Mr. Sheridan
15 confirming what you asked him to confirm; is
16 that correct?
17    A.   Sorry.  Bear with me a second.  My
18 screen has just gone wonky.
19       Okay.  Can you repeat that, please?
20    Q.   My question, sir, is, setting aside
21 this e-mail, which we're going to talk about in
22 a second, do you have any recollection of
23 Mr. Sheridan confirming, either orally or in
24 writing, what you asked him to confirm in this
25 e-mail?

Page 125

DEMPSEY - CONFIDENTIAL

1
2    A.   I don't recall.
3    Q.   Focusing on the e-mail, Mr. Sheridan
4  writes back to you, "Hi Jimmy, following our
5  board meeting last week, we have been in
6  discussions with our shareholders and will need
7  to follow up with them again tomorrow morning,
8  so I won't have an update until then.
9  Apologies."
10       Did I read that correctly?
11    A.   Yes.
12    Q.   Certainly, in this e-mail,
13 Mr. Sheridan is not confirming any agreement
14 with you, correct?
15    A.   No, he is sending a holding
16 statement.
17    Q.   Let me show you the next exhibit.
18       MR. BUTLER:  I'm marking, as Dempsey
19 Exhibit 18, a two-page document bearing
20 Bates numbers FRONTIER12176 to 77.
21       (Dempsey Exhibit 18, Text Messages,
22 Bates Stamped FRONTIER0012176 through 77,
23 marked for identification.)
24    Q.   This appears to be a series of text
25 messages from Robert Fanning, dated April 29,

32 (Pages 122 - 125)

CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL
2  2020, and it looks like he's sending these to
3  the same group of you, Mr. Dempsey, and Spencer
4  Thwaytes and Robert Fanning.
5          Do you agree that these are text
6  messages from Robert Fanning to you and
7  Mr. Thwaytes?
8      A.  Yes.
9      Q.  I guess I want to ask you about the
10 second text on this page.  Again, it's
11 April 29, 2020, and I just want to ask you
12 about some particular language in here that
13 begins on the second to the last line.
14         Mr. Fanning writes, "As mentioned,
15 the deferred request right after the March
16 delivery didn't go down well at all, which is
17 why they are asking for Indigo to step in."
18         My question, Mr. Dempsey, is, do you
19 know what Mr. Fanning is saying here?
20     A.  I never had any direct conversations
21 that I recall about that issue.  I mean, I
22 understand the text exists, but I mean, that's
23 just, as far as I was concerned, noise in terms
24 of the deal.
25         I hadn't seen a proposal back to us.

1          DEMPSEY - CONFIDENTIAL
2  I'm not sure if I saw a proposal at this point
3  that Indigo -- they wanted Indigo to guarantee
4  rent.  I don't know.  I don't recall that.
5      Q.  Well, Mr. Fanning is referring -- is
6  referring to AMCK's shareholder in this text,
7  correct?
8      A.  Yeah.
9      Q.  And who did you understand that to
10 be?
11     A.  Sorry.  Who did I understand?
12     Q.  Who was the shareholder of AMCK at
13 this time?
14     A.  I can't recall the exact entity
15 name, but it's their Hong Kong shareholder.
16     Q.  Okay.  But did you understand, at
17 this time, that AMCK had a Hong Kong
18 shareholder and that was one of the primary
19 sources of funding for AMCK?
20     A.  I don't know that it was a primary
21 source of funding.  It was certainly -- you
22 know, they generally did leverage finance
23 deals.  So bank financing was a big portion of
24 their funding, but clearly, their equity came
25 from a Hong Kong-based shareholder.

1          DEMPSEY - CONFIDENTIAL
2      Q.  And do you know what Mr. Fanning was
3  referring to when he talked about the deferral
4  request not going down well with AMCK's
5  shareholder?
6      A.  I don't.
7      Q.  Do you recall hearing that either
8  AMCK or its shareholder was unhappy with
9  receiving a deferral request from Frontier on
10 the very same day that they funded an aircraft
11 delivery for Frontier paying $51 million to do
12 so?
13         MR. HOSENPUD:  Object to form,
14     compound.
15         You can answer.
16         THE WITNESS:  I can answer?  Okay.
17     Sorry.
18     A.  Look, it seemed to be a theme
19 between Jane and Robert.  It never came up --
20 or I don't recall it coming up in conversations
21 that I had.
22     Q.  So you don't recall that being --
23 you don't recall being told that that sequence
24 of events, requesting a deferral on the same
25 day as an aircraft delivery, created an issue

1          DEMPSEY - CONFIDENTIAL
2  of trust for AMCK or its shareholders?
3      A.  My recollection is that Jane had
4  said that to Robert.  It never came up in any
5  conversations -- or I don't recall it coming up
6  in any conversations I had with Paul Sheridan.
7  I don't recall it being a fundamental issue in
8  trying to solve this.
9      Q.  Let me ask you about another text on
10 this page.  I want to direct your attention to
11 the bottom of this page.  There is another text
12 from Robert Fanning a little later in the day
13 on April 29, 2020.
14         Mr. Fanning begins by saying, "I
15 told her we're at the end of the line as far as
16 options go," and then there's some more text.
17 And then it says, "Jane's reply was could we
18 pay the April rent and May when it's due.  If
19 we can agree to that, she could be willing to
20 go to the shareholder and now she believes it
21 would be enough to get them over the line."
22         Do you see that language?
23     A.  Sorry.  I need to read the entire
24 text.
25     Q.  Sure.

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

DEMPSEY - CONFIDENTIAL

1
2    A.    (Document review.)
3         I'm sorry.  Could you repeat the
4    question that you're asking me now?
5    Q.    My question is, what is your
6    understanding of what Jane's reply meant?
7    A.    I mean, Robert is paraphrasing
8    whatever she said.  Jane's reply was could we
9    pay the April rent and May when it's due.
10    Q.    Did you understand Ms. O'Callaghan
11    to be encouraging Frontier to pay the April
12    rent?
13    A.    It was another movement of their
14    position that didn't get communicated directly
15    to me at the time.  Because I was in
16    conversation with Paul Sheridan, and my
17    understanding was that they wanted to be up to
18    date on payment.  I think Jane is saying a
19    version of that because the next -- their
20    desire was, at the time, to have us pay rent
21    and not deliver an aircraft with outstanding
22    rent.
23         I don't know that that changes the
24    position much in this e-mail, but...
25    Q.    Well, my question, sir, is, did you

Page 131

DEMPSEY - CONFIDENTIAL

1
2    interpret this description of Jane's message to
3    be encouraging AMCK to pay the April rent?
4    A.    You meant Frontier to pay the April
5    rent?
6    Q.    I'm sorry.  I seem to have a brain
7    freeze over the name of our respective clients.
8    So let me ask the question again.
9         Did you understand this message from
10    Jane O'Callaghan to be that AMCK wanted
11    Frontier to pay the April rent?
12    A.    I interpreted that she said could we
13    pay the April rent and May when it's due, and
14    then they would go back to their shareholder
15    again.
16    Q.    And did you interpret this message
17    from Ms. O'Callaghan to be that, if Frontier
18    paid the April rent and remained current on the
19    May rent, that she believed the shareholder
20    would fund the upcoming deliveries under the
21    Framework Agreement?
22    A.    I think she's implying that
23    would get them to deliver the aircraft, but,
24    you know, we had a contract in place with them
25    to deliver that aircraft, and we were

Page 132

DEMPSEY - CONFIDENTIAL

1
2    separately negotiating a rent deferral.  And we
3    understood that, and all the communications
4    that we had received up until now was that they
5    wanted that up to date in order to deliver the
6    next aircraft.
7    Q.    You said you had a contract in place
8    to fund delivery of the aircraft.
9         Didn't you also have contracts in
10    place to pay rent to AMCK?
11    A.    Yes, but we received relief from
12    that from their chief executive during this
13    process.
14    Q.    You hadn't received any relief at
15    the time you requested the rent deferral,
16    correct?
17         MR. HOSENPUD:  Object to the form.
18         You can answer.
19    A.    We hadn't deferred the rent at the
20    time we requested the deferral of rent.
21    Q.    Let me show you the next exhibit.
22         MR. BUTLER:  I'm marking, as Dempsey
23    Exhibit 19, a chain of e-mails bearing
24    Bates numbers AMCK16957 to 61.
25         (Dempsey Exhibit 19, E-Mail Chain,

Page 133

DEMPSEY - CONFIDENTIAL

1
2    Bates Stamped AMCK016957 to 61, marked for
3    identification.)
4    Q.    And the top e-mail in this chain is
5    an e-mail from Paul Sheridan to you,
6    Mr. Dempsey, dated April 30, 2020.
7         Please take a look at this, and can
8    you tell me whether you received this e-mail on
9    that date?
10    A.    (Document review.)  Yes.
11    Q.    And take all the time you need to
12    review this, but I just want to ask you some --
13    you know, about the content of this e-mail.
14         Do you understand Mr. Sheridan to be
15    communicating to you the conditions under which
16    AMCK was willing, at this time, to fund the
17    upcoming deliveries under the Framework
18    Agreement?
19    A.    Yeah, this was their latest proposal
20    to us.
21    Q.    And did you understand that AMCK
22    might not fund deliveries under the Framework
23    Agreement if these conditions could not be
24    satisfied?
25    A.    We understood that the first two

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

DEMPSEY - CONFIDENTIAL

1    points in his e-mail -- the first point in the
2    points in his e-mail -- the first point in the
3    e-mail, where we moved deliveries to July 2020
4    and February 2021, we did not have that in
5    place -- my recollection is we did not have
6    that in place on that date, but we were working
7    towards that where we would achieve, and we
8    actually did actually achieve, moving the three
9    aircraft into July.  It was effectively moving
10   one incremental aircraft from June to July.
11          And we swapped -- although in the
12   Framework Agreement, AMCK was due to deliver
13   two aircraft in the fall, we -- it is around
14   this time, but I don't believe it was right at
15   this time -- we actually swapped another
16   leasing company and got them to finance the two
17   aircraft and move AMCK to 2021.  So we achieved
18   the first point.
19          The second point we understood, and
20   we were clear on that.
21          The third point was an introduction
22   of an item that was beyond anything that we
23   could do and, in my opinion, was mixing issues,
24   and it was something that was very challenging
25   for Frontier Airlines to do, and so we could

Page 135

DEMPSEY - CONFIDENTIAL

1    not do that at this point.
2    not do that at this point.
3          And so that's where we were, and we
4    responded in due course about that.
5       Q.   My question, sir, was, did you
6    understand Mr. Sheridan to be telling you that
7    AMCK would not fund future deliveries under the
8    Framework Agreement if these conditions could
9    not be satisfied?
10      A.   Well, he didn't have a right under
11   the Framework Agreement not to fund on point
12   three.
13      Q.   I'm sorry.  Please finish your
14   answer.
15      A.   No, sorry.  I'm finished.  Go ahead.
16      Q.   Did you understand Mr. Sheridan to
17   be communicating that AMCK might terminate the
18   Framework Agreement if the conditions set forth
19   in this e-mail could not be satisfied?
20      A.   I need to read the e-mail.
21   (Document review.)
22          Yes, they are adding conditions to
23   the Framework Agreement by saying we need to
24   add some additional security to ensure that we
25   can obtain our shareholder funding for the

Page 136

DEMPSEY - CONFIDENTIAL

1    deliveries.
2    deliveries.
3          So they're adding incremental items
4    to the Framework Agreement.
5       Q.   In your mind, was there a risk that
6    AMCK might terminate the Framework Agreement if
7    these additional conditions were not agreed to?
8       A.   Could you repeat that?
9       Q.   Yes.  My question is, in your mind,
10   at this time, did you understand that AMCK
11   might terminate the Framework Agreement if
12   these additional conditions could not be
13   satisfied?
14      A.   I mean, it was unclear to me -- I
15   would have to get legal advice on whether they
16   could terminate the lease -- the Framework
17   Agreement on the basis of us not agreeing to
18   conditions that were over and above what was in
19   the Framework Agreement.
20      Q.   Whether they could do it legally or
21   not is a separate question, but wasn't
22   Mr. Sheridan telling you that AMCK might not
23   perform under the Framework Agreement unless
24   Frontier agreed to these additional conditions?
25      A.   I think he's threatening us that, if

Page 137

DEMPSEY - CONFIDENTIAL

1    we didn't agree to this, he would not perform,
2    we didn't agree to this, he would not perform,
3    correct.
4       Q.   So you interpreted this e-mail as a
5    threat.  Is that what you're testifying to?
6       A.   He's saying, "Given the extent of
7    the damage that has done to the airline
8    industry and to airline and lessor funding
9    sources, we need to have some additional
10   security to ensure that we can obtain our
11   shareholder funding for the deliveries."
12          He is telling us that he will not --
13   or there is a doubt as to whether he can turn
14   up and fund the aircraft unless we agree to the
15   three items that are listed below.
16      Q.   And did Frontier agree to these
17   three items?
18      A.   No, because the process of this was
19   a continued negotiation over about a month, and
20   we had conversations about point three, and if
21   you look at my subsequent e-mail to this one,
22   you'll see that I responded to this item and
23   was incapable of agreeing to point three.
24      Q.   So I guess it came as no surprise to
25   you when AMCK did terminate the Framework

35 (Pages 134 - 137)

CONFIDENTIAL

Page 142

DEMPSEY - CONFIDENTIAL
1
2 Exhibit 20, a continuation of the same
3 e-mail exchange. It's bearing Bates
4 numbers AMCK17883 to 887.
5        (Dempsey Exhibit 20, E-Mail Chain,
6        Bates Stamped AMCK017883 to 887, marked
7        for identification.)
8    Q.   And the top e-mail on this page
9 appears to be your response to Paul Sheridan on
10 the same day, April 30, 2020.
11        Did you send this e-mail?
12    A.   Yes.
13    Q.   And you say, "Hi Paul, you need to
14 call me ASAP. This is an overreach." And then
15 you give your telephone number; is that
16 correct?
17    A.   Yes.
18    Q.   Were you intending to reject
19 Mr. Sheridan's proposal?
20    A.   My intention was to debate the third
21 point with him.
22    Q.   And you certainly weren't agreeing
23 to the third point, correct?
24    A.   No.
25    Q.   So what happened? Did Mr. Sheridan

Page 143

DEMPSEY - CONFIDENTIAL
1
2 call you that day?
3    A.   I think we had a phone call, yes.
4    Q.   Do you remember what was discussed
5 on that phone call?
6    A.   I mean, I think I explained to him
7 that I couldn't do point three. It just was
8 not something that we could do.
9        I explained -- I think I explained
10 to him where we were with Airbus, at that point
11 in time, and that we were trying to move the
12 aircraft into July. I think we had possibly
13 achieved that around this time, around
14 April 30, and I think I communicated probably
15 that to him.
16        And I think he communicated to me
17 that he wanted us to be current by May 15, and
18 I mean, we debated point three, which I
19 explained to him I couldn't do.
20    Q.   So you were clear to him on that
21 call that point three was unacceptable from the
22 Frontier side?
23    A.   I mean, it was something we couldn't
24 do.
25    Q.   What do you remember Mr. Sheridan

Page 144

DEMPSEY - CONFIDENTIAL
1
2 saying on this call?
3    A.   I think he reiterated his position
4 and said he will go and see what he can do. I
5 don't recall exactly his words, but it was
6 something to that effect. And he would come
7 back to me, I think.
8    Q.   Did he make any alternative proposal
9 to you on that call?
10    A.   No, he said he would come back to
11 me.
12        MR. BUTLER: Let me mark the next
13        exhibit, which we will call Dempsey
14        Exhibit 21. It's a one-page document
15        bearing Bates number FRONTIER3542.
16        (Dempsey Exhibit 21, E-Mail, Bates
17        Stamped FRONTIER0003542, marked for
18        identification.)
19    Q.   Mr. Dempsey, this appears to be a
20 text message in a little bit of a different
21 format. I'm not sure why text messages were
22 produced in more than one format, but there we
23 have it.
24        This appears to be a message from
25 Robert Fanning to you and Spencer Thwaytes,

Page 145

DEMPSEY - CONFIDENTIAL
1
2 dated May 1, 2020.
3        And the text of the message says,
4 "Jane called me and long story short is there
5 {sic} shareholder is not moving off point
6 number three."
7        My first question is, did you
8 receive this text from Mr. Fanning on May 1,
9 2020?
10    A.   I don't know, but I assume I did.
11    Q.   And did you interpret this text --
12 or do you interpret this text to mean that that
13 point number three from Paul's e-mail, that you
14 would not agree to, is something that AMCK's
15 shareholder is still insisting upon?
16    A.   Yes.
17    Q.   And did that employ to you, since
18 you couldn't agree to that, did that imply to
19 you that AMCK was not going to fund additional
20 deliveries under the Framework Agreement?
21    A.   I did not know that that would
22 result in that event because this was a fluid
23 negotiation, but I think I sent an e-mail to
24 Paul Sheridan outlining what we -- what I
25 offered to him and what he was due to respond

37 (Pages 142 - 145)

CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL
2   to me on subsequent to this timeline.
3          But I don't recall -- I don't recall
4   this text. I think I was aware that point
5   number three was something that they were
6   interested in getting as part of the
7   negotiation.
8          MR. BUTLER: Let me mark the next
9       exhibit. I'm going to show you what we're
10      marking as Dempsey Exhibit 22. It's a
11      document bearing Bates numbers
12      FRONTIER5663 through 5677.
13          (Dempsey Exhibit 22, E-Mail Chain,
14      Bates Stamped FRONTIER0005663 through
15      5677, marked for identification.)
16      Q.   And it's an e-mail from Ray Bishop
17   of Airbus to various people, which do not
18   include you, but it attaches what appears to be
19   the -- an Amendment No. 9 with Airbus.
20          Do you see that attachment?
21      A.   Yes.
22      Q.   And is it your -- do you understand
23   that there was an Amendment No. 9 entered with
24   Airbus that implemented the delivery delays
25   that included the aircraft covered by the

1          DEMPSEY - CONFIDENTIAL
2   Framework Agreement?
3      A.   Sorry. Could you repeat that
4   question?
5      Q.   Is it your recollection that there
6   was an Amendment No. 9 entered with Airbus that
7   implemented the delivery delays that included
8   the AMCK aircraft?
9      A.   Yes.
10      Q.   And was that agreement with Airbus
11   signed on May 5, 2020?
12      A.   I think so. I think that date makes
13   sense.
14      Q.   That sounds right now?
15      A.   I mean, I'm sure it's at the bottom
16   of this agreement, if you want to show it to
17   me.
18      Q.   It's not as clear as you might
19   think, but I'll show you the cover e-mail is
20   from Ray Bishop to Paul Lambert.
21          Who is Paul Lambert?
22      A.   Paul Lambert is our outside counsel
23   from Lane Powell who manages our aircraft
24   transactions.
25      Q.   So he is a corporate lawyer

1          DEMPSEY - CONFIDENTIAL
2   representing Frontier in this transaction; is
3   that right?
4      A.   Yes.
5      Q.   And it looks like he's -- Ray Bishop
6   is sending a compiled version of Amendment No.
7   9 with the signatures appended.
8          Do you see that?
9      A.   Yeah, they're releasing signatures,
10   yeah.
11      Q.   Releasing signatures. And that's on
12   May 5, 2020, correct?
13      A.   Yes.
14      Q.   Does that refresh your memory that
15   the agreement with Airbus changing the delivery
16   schedule was finalized on the 5th of May 2020?
17      A.   I think so. I think that's correct.
18      Q.   Did you obtain approval of the new
19   delivery schedule from AMCK before you
20   finalized this agreement?
21      A.   No.
22      Q.   In fact, AMCK never approved the new
23   delivery schedule that you negotiated with
24   Airbus, correct?
25      A.   AMCK doesn't have an approval right

1          DEMPSEY - CONFIDENTIAL
2   for our agreement with Airbus.
3      Q.   But you asked Paul, at least at one
4   point, Paul Sheridan, whether he would be
5   agreeable to a two-month extension.
6          So whether they had a right or not,
7   did they ever approve the new schedule that you
8   agreed to?
9      A.   I mean, we never sought their
10   approval of the schedule per se. We were
11   trying to involve the timing of deliveries as
12   part of an overall package with AMCK, and at
13   this point in the conversations, my
14   understanding was that moving three aircraft
15   into met their requirements.
16      Q.   In this Amendment No. 9 with Airbus,
17   how many orders from Frontier were delayed or
18   rescheduled?
19      A.   I don't recall. I don't recall.
20      Q.   Was it dozens of aircraft that were
21   rescheduled?
22      A.   In effect, what you do is you --
23   we -- particularly the near-term aircraft
24   deliveries beyond 2020, so the aircraft that
25   were, say, beyond 12 months from production --

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1           DEMPSEY - CONFIDENTIAL
2 from completion, we effectively slid them by
3 about six months, that was around what we did.
4 And so that was -- it cascades.  It's not
5 perfect, but it cascades throughout the
6 delivery program.
7           And, in reality, they tend to move
8 aircraft around, but it effectively has the
9 impact of cascading the delay.  But the
10 near-term aircraft, as opposed to getting a
11 six-month delay, received the delays that you
12 pointed out earlier in the deposition.
13      Q.   So there was a six-month delay for
14 some aircraft under this agreement with Airbus,
15 just not for the aircraft covered by the
16 Framework Agreement; is that right?
17           MR. HOSENPUD:  Object to the form,
18 misstates.
19           You can answer.
20      A.   The aircraft that were outside of a
21 near-term delivery, so the aircraft that were
22 outside of the production line, they received a
23 longer deferral for different reasons than the
24 close-in AMCK aircraft that we're dealing with
25 here.

Page 151

1           DEMPSEY - CONFIDENTIAL
2      Q.   It does sound like there were a lot
3 of aircraft deliveries that were rescheduled
4 that had nothing to do with AMCK or the
5 Framework Agreement; is that correct?
6           MR. HOSENPUD:  Object to the form.
7           You can answer.
8      A.   The background to that is Airbus had
9 made a decision to reduce its production by
10 40 percent.  And so in light of that, there
11 were movements longer term in the aircraft
12 delivery schedule to meet the -- or to react to
13 the cut in production that Airbus made.
14           That was separate to the aircraft
15 that were built, already built and pending
16 delivery or nearly built and pending delivery
17 with Airbus, and those aircraft are the AMCK
18 near-term deliveries that got delayed three,
19 four months.
20      Q.   Okay.  But for whatever reason, this
21 amendment was broader than just the aircraft
22 covered by the Framework Agreement, correct?
23      A.   That's correct.
24      Q.   When you got this new delivery
25 schedule finalized with Airbus, did you

Page 152

1           DEMPSEY - CONFIDENTIAL
2 communicate the new delivery dates for the
3 Framework Agreement aircraft to AMCK?
4      A.   I think we did, yeah.  I think we
5 communicated it multiple times to them, either
6 in my conversations with them or we
7 communicated with them that we were working
8 towards this.
9           You know, I think we kept them
10 informed as to how we were getting on.
11      Q.   Do you remember after -- do you
12 remember informing AMCK that this agreement had
13 been finalized with Airbus?
14      A.   I mean, I don't know that we had an
15 obligation to -- a notice obligation to AMCK on
16 the back of finalizing this agreement.  They
17 were aware that this was happening.
18      Q.   And my question, sir, is, whether
19 you had an obligation or not, do you remember
20 telling anyone at AMCK that this agreement with
21 Airbus had been finalized?
22      A.   I don't recall specific
23 conversations subsequent to May 5 after the
24 agreement had been signed.  I do recall an
25 e-mail where I was reminding Paul Sheridan he

Page 153

1           DEMPSEY - CONFIDENTIAL
2 owed me a response to our conversation the
3 previous week around the proposal that he made
4 in the e-mail you showed me.
5           And I think I confirmed what we had
6 done, but I don't recall a specific
7 communication driven by signing an agreement
8 with Airbus.  AMCK is not a party to the
9 agreement with Airbus.
10      Q.   Well, let me mark the next exhibit,
11 which comes right on time because it's the
12 e-mail you just referenced.
13           MR. BUTLER:  I'm marking, as Dempsey
14 Exhibit 23, a document bearing Bates
15 numbers AMCK17004 to 1708.
16           (Dempsey Exhibit 23, E-Mail Chain,
17 Bates Stamped AMCK017004 through 1708,
18 marked for identification.)
19      Q.   This appears to be a chain of
20 e-mails, two of which are from you to Paul
21 Sheridan on May 8, 2020.  You can see them both
22 on your screen.  They are the first two e-mails
23 in this chain.
24           Did you send these e-mails to
25 Mr. Sheridan on May 8?

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

DEMPSEY - CONFIDENTIAL

1
2    A.    Yes.
3    Q.    And in the second e-mail, which is
4    the first e-mail that you sent on May 8, 2020,
5    you write, "Hi Paul, I have been waiting
6    patiently for your response to our call whereby
7    I offered the following solution."  And we will
8    get to the description in a moment.
9         But do you know what call you're
10   referring to in this sentence?
11   A.    Yes, it's the call that we had as a
12   follow up to his e-mail where I stated, if you
13   scroll down, I don't know if it's in this
14   chain, but where I responded to this saying
15   please call me.
16   Q.    So did that call occur on April 30,
17   to the best of your recollection?
18   A.    I don't know.  On or around that
19   date, yes.
20   Q.    And on that call, did you make the
21   proposal that is described in these two e-mails
22   that you sent on May 8?
23   A.    Yes.
24   Q.    And one element of the solution that
25   you had proposed was that the next aircraft

Page 155

DEMPSEY - CONFIDENTIAL

1
2    delivery would be moved to July 20.
3         Do you see that?
4    A.    Yes.
5    Q.    And that, in fact, had already been
6    agreed with Airbus, correct?
7    A.    So I'm recounting my call, which
8    occurred prior to signing the agreement with
9    Airbus, but I'm sending this e-mail after the
10   agreement has been signed.
11   Q.    Okay.  But by the time you sent this
12   e-mail, that July 2020 delivery date was
13   already set in stone, correct?
14   A.    That's right.
15   Q.    And in this e-mail, you don't tell
16   Paul about your finalized agreement with
17   Airbus, correct?
18   A.    I don't specify that this is agreed
19   with Airbus.  I think -- I think he was well
20   aware, at the time, of where we were with
21   Airbus.
22   Q.    How would he be well aware that you
23   had signed a new agreement with Airbus?
24   A.    I mean, I spoke to him the previous
25   week, and I was quite transparent with where we

Page 156

DEMPSEY - CONFIDENTIAL

1
2    were.
3    Q.    But on April 30, when you spoke to
4    him, you hadn't entered an agreement yet,
5    right?
6    A.    No, but the agreement was being
7    papered.  It was days away from being signed.
8    Q.    So was Mr. Sheridan aware, at this
9    time, that delivery date for the new aircraft
10   had already been moved to July 2020?
11   A.    Yes, and there is no controversy
12   because they asked for the three aircraft to be
13   moved to July 2020, and that's the agreement we
14   put in place with Airbus.
15        In addition to that, I reminded him
16   that we have also moved two aircraft to 2021,
17   which met -- which also met his condition.
18   Q.    Okay.  The other elements of your
19   proposal are prepayment of rent for six months
20   on near-term delivery?
21   A.    Yeah.
22   Q.    And repayment of deferred rent by
23   the end of July 2020, July through December,
24   you say; is that correct?
25   A.    That's right.

Page 157

DEMPSEY - CONFIDENTIAL

1
2    Q.    And then you send a second e-mail
3    with a fourth -- what you describe as a fourth
4    concession that you're making, and that's
5    replacing AMCK as financier on the last two
6    deliveries for the agreement; is that right?
7    A.    Yes, we were taking the obligation
8    to fund the two aircraft that were delivering
9    in September -- I think they were in the fall,
10   between September and November, and we were
11   taking the obligation away from AMCK in this
12   concession and moving their aircraft deliveries
13   into 2021.
14   Q.    And was all of that communicated by
15   you during that April 30 telephone call?
16   A.    Yes, I say, "I have been waiting
17   patiently for your response to the call where I
18   offered the following solution."
19        Sorry, the fourth item I think I
20   offered in addition to the call because we were
21   trying to put that in place at the time.  We
22   were trying to see if we could actually manage
23   that.
24   Q.    I see.  Was that a new element to
25   your proposal that you were communicating for

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

DEMPSEY - CONFIDENTIAL
1
2 the first time on May 8?
3     A.   I don't recall exactly, but I think
4 that's correct.  I think that was an element
5 that we were trying to get.  We were trying to
6 satisfy the -- what we saw at the time was --
7 the timing of deliveries was crucial to AMCK,
8 and we were endeavoring to meet their request
9 on that item.
10     Q.   Just going back to your proposal on
11 the deferred rent.  I just want to clarify one
12 thing.  So your proposal says, "deferred rent
13 for April and May 2020."
14          Were you seeking rent deferral for
15 April and the full month of May?
16     A.   Yes.
17     Q.   So that's different from the
18 proposal from Paul that -- where one of the
19 conditions was that everything had to be
20 current by May 15, correct?
21     A.   Yes.
22     Q.   And, in fact, your proposal that
23 you're articulating on May 8 is very different
24 from the proposal that Paul made on April 30,
25 which you promptly rejected, correct?

Page 159

DEMPSEY - CONFIDENTIAL
1
2     A.   We rejected his point three.  We
3 were trying to negotiate his point two, and we
4 were meeting his point one.
5          As I said, up until this point, it
6 was a very fluid negotiation.  And our view was
7 that we were progressing matters, albeit there
8 was one item that was a sticking point that
9 they had raised on April 30 that we couldn't
10 deliver.
11     Q.   And is it correct that it was still
12 a very fluid situation when you received the
13 termination notice from AMCK later in the day
14 on the 8th of May?
15     A.   I would deem that that was a
16 surprise.
17     Q.   All right.  Let me show you the next
18 exhibit.
19          MR. BUTLER:  I have marked as --
20     A.   Before you do that, I just would
21 like to go for a quick --
22     Q.   Absolutely.  For your information, I
23 don't have too much left.
24     A.   I only need about two or three
25 minutes.

Page 160

DEMPSEY - CONFIDENTIAL
1
2     Q.   Absolutely.  I just want to alert
3 you to that, but by all means let's take a
4 ten-minute break or should we make it five
5 minutes and just come back at 2:45?
6     A.   Let's do five minutes.
7     Q.   Okay.  And then we will have you
8 finished for the day before very long.
9     A.   Thank you.
10     Q.   Okay.
11          (Recess taken.)
12          MR. BUTLER:  I'm going to mark the
13 next exhibit, which I'm going to call
14 Dempsey Exhibit 24.  It's a document
15 bearing Bates numbers AMCK17018 to 17020.
16          (Dempsey Exhibit 24, Letter, Dated
17 May 9, 2020, Bates Stamped AMCK017018
18 through 17020, marked for identification.)
19     Q.   And this is a letter dated May 9,
20 2020 from Howard Diamond to AMCK Aviation
21 Holdings.  That's Howard Diamond of Frontier
22 Airlines.
23          And we can scroll through this as
24 much as you want, but my question, Mr. Dempsey,
25 is, do you recognize this letter?

Page 161

DEMPSEY - CONFIDENTIAL
1
2     A.   Yes.
3     Q.   Is this the response that Frontier
4 sent to the termination notice sent by AMCK?
5     A.   Yes.
6     Q.   Did you participate in the drafting
7 of this letter?
8     A.   At a very high level, yes.
9          MR. HOSENPUD:  Wait, wait, wait,
10     wait, wait.  Do not comment on what was
11     communicated.  That's attorney/client
12     privilege.
13          THE WITNESS:  Oh, sorry.
14          MR. HOSENPUD:  That's all right.
15     Q.   So just to make sure there's no
16 attorney/client issue, can you tell me, yes or
17 no, did you participate in the drafting of this
18 letter?
19     A.   Yes.
20     Q.   Did you review this letter before it
21 was sent?
22     A.   Yes.
23          MR. BUTLER:  Let me mark the next
24     exhibit, which is Dempsey Exhibit 25.
25     It's a one-page document bearing Bates

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

DEMPSEY - CONFIDENTIAL
1
2  number FRONTIER12209.
3      (Dempsey Exhibit 25, Text Messages,
4   Bates Stamped FRONTIER0012209 through
5   12210, marked for identification.)
6     Q.    And this appears to be a series of
7  text messages from you, Mr. Dempsey, dated the
8  10th of May 2020.
9        Do these appear to be your text
10 messages?
11    A.    Yes.
12    Q.    I just want to ask you about the
13 third text on this page.  It's, again, from
14 May 10, 2020, and it appears you write, "We
15 have to find an alternative financier.  We are
16 gonna end up in court with AMCK."
17        Did I read that correctly?
18    A.    Yes.
19    Q.    Was it your understanding as of
20 May 10, 2020, that this dispute between
21 Frontier and AMCK was going to end up in
22 litigation in court?
23    A.    I was unsure.  It was an opinion at
24 the time.  It was unclear where we were at that
25 point.

Page 163

DEMPSEY - CONFIDENTIAL
1
2        I was very surprised that they had
3  defaulted on the agreement with us, on the
4  Framework Agreement.  We could have paid the
5  rent that was owing to them at any time.  We
6  were managing a liquidity situation, and the
7  notice that they sent to us that precipitated
8  our general counsel's letter was a significant
9  event and a big surprise to us.
10    Q.    Mr. Dempsey, did you write the words
11 "We are gonna end up in court with AMCK," on
12 May 10, 2020?
13    A.    Yes.
14    MR. BUTLER:  Let me mark the next
15 exhibit.  Dempsey Exhibit 26 is a document
16 bearing Bates numbers AMCK17029 to 103 --
17 17031, apologies.
18        (Dempsey Exhibit 26, Letter, Dated
19   May 13, 2020, Bates Stamped AMCK017029
20   through 17031, marked for identification.)
21    Q.    This appears to be a May 13 letter
22 from Frontier signed by Howard Diamond to Ernie
23 Yu of AMCK.
24        And my question is, we are happy to
25 scroll through this, have you seen this letter

Page 164

DEMPSEY - CONFIDENTIAL
1
2  before?
3     A.    I don't recall.  Can you scroll
4  down?
5     Q.    Sure.
6     A.    (Document review.)
7        I don't recall, but no.
8     Q.    Okay.  So you recall the May 9
9  letter and reviewing that.
10        Do you recall reviewing this May 13
11 letter before it was sent out?
12    A.    I mean, I don't recall, but I'm not
13 saying I didn't.  I just don't recall.
14    Q.    Okay.
15    MR. BUTLER:  Okay.  Let me mark the
16 next exhibit.  I'm marking, as Dempsey
17 Exhibit 27, a one-page document bearing
18 Bates number FRONTIER8058.
19        (Dempsey Exhibit 27, E-Mail Chain,
20   Bates Stamped FRONTIER0008058 through
21   8059, marked for identification.)
22    Q.    It's a series of e-mails dated
23 April 13, 2020, and it looks like -- Gege, if
24 you scroll down -- it looks like you're giving
25 your approval on a payment to AMCK; is that

Page 165

DEMPSEY - CONFIDENTIAL
1
2  correct?
3     A.    Yes, we were trying to cure their
4  letter from the previous week, and so we paid
5  the rent promptly, given that we were capable
6  of doing it because we wanted to rectify the
7  situation.
8     Q.    So did Frontier pay all of the
9  outstanding rent owed to AMCK on May 13, 2020?
10    A.    That's my understanding, yes.
11    MR. BUTLER:  And, Gege, if you can
12 scroll to the next page where there is a
13 total of the rent payments listed.
14    Q.    Was the total amount due at that
15 time $5,828,440?
16    A.    I don't recall, but I mean, that's
17 the payment I assume we made.
18    Q.    Do you recall that it was an amount
19 around $5.8 million?
20    A.    I don't, but I mean, I don't put
21 together the payments.  There's other people
22 who do that within the organization.
23    Q.    And what prompted Frontier to make a
24 payment to AMCK at this particular time?
25 DI    MR. HOSENPUD:  Objection to the

42 (Pages 162 - 165)

CONFIDENTIAL

1       DEMPSEY - CONFIDENTIAL
2   extent it calls for attorney/client
3   communications.  I'm going to instruct you
4   not to answer.
5       If you have independent information
6   separate from consulting counsel, you may
7   answer.
8       THE WITNESS: No.
9   Q.   Based on your attorney's
10  instruction, are you able to answer my
11  question?
12  A.   No.
13  Q.   Did AMCK send you a reminder to make
14  this payment?
15  A.   I don't recall receiving a reminder
16  to make this payment.
17      MR. BUTLER:  Thank you, Mr. Dempsey.
18  I have no further questions.
19      MR. HOSENPUD:  Nothing from
20  plaintiff's counsel.
21      MR. BUTLER:  Very good.  Then
22  Mr. Dempsey, you're free for the rest of
23  the day.  Enjoy your day and thank you
24  very much for your time.
25      (Time noted:  2:52 p.m.)

1
2   ----------------- I N D E X ------------------
3   WITNESS       EXAMINATION BY      PAGE
4   JAMES DEMPSEY     MR. BUTLER        4
5
6   DIRECTIONS:  PAGE 59, 166
7
8   ----------------- EXHIBITS -------------------
9   DEMPSEY                  PAGE
10  Exhibit 1   Text Messages, Bates      15
11      Stamped FRONTIER0003467
12  Exhibit 2   E-Mail With Attachment,   23
13      Bates Stamped
14      FRONTIER0000240 through
15      242
16  Exhibit 3   E-Mail, Bates Stamped    36
17      AMCK16595
18  Exhibit 4   E-Mail Chain, Bates      41
19      Stamped FRONTIER310
20      through 311
21  Exhibit 5   Text Messages, Bates     47
22      Stamped FRONTIER0003480
23      through 82
24
25

1
2   ------------- EXHIBITS (Cont'd) ---------------
3   DEMPSEY                  PAGE
4   Exhibit 6   Text Messages, Bates      48
5       Stamped FRONTIER0003488
6       through 3489
7   Exhibit 7   E-Mail Chain, Bates       68
8       Stamped FRONTIER0000251
9       through 253
10  Exhibit 8   E-Mail Chain, Bates       71
11      Stamped FRONTIER0000314
12      through 316
13  Exhibit 9   Text Messages, Bates      82
14      Stamped FRONTIER0003493
15      and FRONTIER0012172
16  Exhibit 10  E-Mail Chain, Bates       87
17      Stamped FRONTIER0004144
18      through 45
19  Exhibit 11  Text Message, Bates       92
20      Stamped FRONTIER0012173
21  Exhibit 12  E-Mail Chain, Bates       94
22      Stamped AMCK17769 through
23      17771
24
25

1
2   ------------- EXHIBITS (Cont'd) ---------------
3   DEMPSEY                  PAGE
4   Exhibit 13  E-Mail Chain, Bates      103
5       Stamped FRONTIER0004329
6       through 4334
7   Exhibit 14  Text Messages, Bates     105
8       Stamped FRONTIER0003500
9       and 3502
10  Exhibit 15  Text Messages, Bates     110
11      Stamped FRONTIER0003504
12  Exhibit 16  Text Messages, Bates     115
13      Stamped FRONTIER0003510
14      through 3513
15  Exhibit 17  E-Mail Chain, Bates      118
16      Stamped FRONTIER0000338
17      through 342
18  Exhibit 18  Text Messages, Bates     125
19      Stamped FRONTIER0012176
20      through 77
21  Exhibit 19  E-Mail Chain, Bates      133
22      Stamped AMCK016957 to 61
23  Exhibit 20  E-Mail Chain, Bates      142
24      Stamped AMCK017883 to 887
25

43 (Pages 166 - 169)