**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

FRONTIER AIRLINES, INC.                Case No.:  1:20-cv-09713-LLS

              Plaintiff,

     v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION
(TWO) LIMITED, WELLS FARGO TRUST
COMPANY, N.A., solely in its capacity as
OWNER TRUSTEE, and UMB BANK,
N.A., solely in its capacity as OWNER
TRUSTEE,

              Defendants.

—————————————————————

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. BACKGROUND..................................................................................................2

    A.    Sale and leaseback arrangements...........................................................2

    B.    The parties' relationship until March 16, 2020.......................................3

    C.    The Framework Agreement. ...................................................................4

    D.    Defendants' rights and obligations relating to the contracts, and other key provisions...........................................................................................5

    E.    The parties agree to defer rent payments under the Original Leases. ......7

    F.    The parties continued negotiations through the beginning of May; AMCK never mentioned rent was due............................................................11

    G.    AMCK further repudiates the Framework Agreement on May 8. .........15

    H.    AMCK granted rent deferral agreements to its other airline partners. ...18

    I.    Frontier obtains alternative financing for the remaining Framework Agreement aircraft, under substantially worse terms. ...........................18

III. ARGUMENT ...................................................................................................19

    A.    Legal standard. .....................................................................................19

    B.    AMCK anticipatorily repudiated the Framework Agreement. .............20

    C.    AMCK breached the Framework Agreement. .......................................24

        1.    The parties agreed to defer rent on the Original Leases. ..........25

        2.    The parties' course of dealing required that AMCK provide Frontier with notice and an opportunity to cure. ....................................28

        3.    AMCK could not require literal performance............................29

    D.    AMCK breached the implied covenant of good faith and fair dealing.................31

    E.    Frontier has valid claims against all Defendants. .................................33

    F.    Frontier's promissory estoppel claim is valid.......................................35

    G.    AMCK fraudulently induced Frontier into not paying rent to manufacture a breach. ...............................................................................................37

    H.    AMCK breached the 15 lease agreements. ...........................................40

    I.    AMCK interfered with Frontier's right of quiet use and enjoyment. ...................41

IV. CONCLUSION..................................................................................................42

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*,
282 F.3d 92 (2d Cir. 2002)..................................................................................29

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005)................................................................................21

*AG Props. of Kingston, LLC v. Besicorp-Empire Dev. Co.*,
14 A.D.3d 971 (App. Div. 2005) .................................................................20, 22, 23

*ARI & Co. v. Regent Int'l Corp.*,
273 F. Supp. 2d 518 (S.D.N.Y. 2003)...................................................................32

*Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*,
697 N.Y.S.2d 128, 265 A.D.2d 513 (N.Y. App. Div. 1999) ...................................32

*Bank of China v. Chan*,
937 F.2d 780 (2d Cir. 1991)................................................................................31

*BankUnited, N.A. v. Blue Wolf Invs., LLC*,
2019 WL 3416084 (S.D.N.Y. July 1, 2019) .........................................................34

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*,
491 F. Supp. 2d 403 (S.D.N.Y. 2007)..................................................................25

*In re Best Payphones, Inc.*,
432 B.R. 46 (S.D.N.Y. 2010).............................................................................20

*Brenner v. Brenner*,
2012 WL 3597247 (E.D.N.Y. Aug. 20, 2012).......................................................36

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996)................................................................................37, 38

*Camatron Sewing Mach., Inc. v. F.M. Ring Assocs., Inc.*,
582 N.Y.S.2d 396 (N.Y. App. Div. 1992) ............................................................41

*Carney v. Illarramendi*,
2018 WL 1472510 (D. Conn. Mar 26, 2018) .......................................................24

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*,
444 F.3d 158 (2d Cir. 2006).............................................................................19

022510.0155/9198506.5

*D'Amico v. N.Y.C.*,
 132 F.3d 145 (2d Cir. 1998)..............................................................................19

*DiFolco v. MSNBC Cable L.L.C.*,
 622 F.3d 104 (2d Cir. 2010)..............................................................................20

*Envirotech Corp. v. Bethlehem Steel Corp.*,
 729 F.2d 70 (2d Cir. 1984)................................................................................34

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*,
 804 F.2d 787 (2d Cir. 1986)..............................................................................36

*Exceed Holdings LLC v. Chicago Board Options Exchange Inc.*,
 2018 WL 4757961 (S.D.N.Y. Sept. 30, 2018).......................................................37

*In re Food Mgmt.*,
 372 B.R. 171 (Bankr. S.D.N.Y. 2007)..................................................................22

*Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Limited, et al.*,
 No. 1:22-cv-2943 (PAE) (S.D.N.Y.) ...................................................................35

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
 7 N.Y.3d 96, 850 N.E.2d 653 (N.Y. 2006) ...........................................................26

*Gander Mountain Co. v. Islip U-Slip LLC*,
 923 F. Supp. 2d 351 (N.D.N.Y. 2013)..................................................................39

*Gas Natural, Inc. v. Iberdrola, S.A.*,
 33 F. Supp. 3d 373 (S.D.N.Y. 2014)....................................................................36

*GMAC Com. Credit LLC v. Springs Indus., Inc.*,
 171 F. Supp. 2d 209 (S.D.N.Y. 2001)..................................................................29

*Grammer v. Turits*,
 706 N.Y.S.2d 453 (N.Y. App. Div. 2000) .............................................................41

*Gutierrez v. Gov't Emps. Ins. Co.*,
 25 N.Y.S.3d 625, 136 A.D.3d 975 (N.Y. App. Div. 2016) ......................................32

*Harris v. Provident Life & Accident Ins. Co.*,
 310 F.3d 73 (2d Cir. 2002).................................................................................31

*Herbert Paul, CPA, PC v. 370 Lex, L.L.C.*,
 794 N.Y.S.2d 869 (N.Y. Cty. 2005) .....................................................................42

*Hornell Brewing Co. v. Spry*,
 174 Misc. 2d 451, 664 N.Y.S.2d 698 (Sup. Ct. 1997)............................................21

022510.0155/9198506.5

*Joshi v. Trustees of Columbia Univ. in City of N.Y.*,
  2018 WL 2417846 (S.D.N.Y. May 29, 2018) .......................................................32

*Kaye v. Grossman*,
  202 F.3d 611 (2d Cir. 2000)...............................................................................35

*Leberman v. John Blair & Co.*,
  880 F.2d 1555 (2d Cir. 1989)..............................................................................33

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  13 F.4th 247 (2d Cir. 2021) ...............................................................................39

*Lucente v. Int'l Bus. Mach. Corp.*,
  310 F.3d 243 (2d Cir. 2002)...........................................................................20, 23

*Lumhoo v. Home Depot USA, Inc.*,
  229 F. Supp. 2d 121 (E.D.N.Y. 2002) .................................................................25

*M/A–COM Security Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990)...............................................................................31

*MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*,
  157 F.3d 956 (2d Cir. 1998) (per curiam)............................................................37

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
  842 F. Supp. 2d 682 (S.D.N.Y. 2012).......................................................23, 24, 36

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
  564 F. Supp. 2d 298 (S.D.N.Y. 2008)..................................................................21

*Mickle v. Christie's, Inc.*,
  207 F. Supp. 2d 237 (S.D.N.Y. 2002)..................................................................33

*Mohegan Lake Motors, Inc. v. Maoli*,
  559 F. Supp. 3d 323 (S.D.N.Y. 2021)..................................................................41

*New Moon Shipping Co. v. MAN B&W Diesel AG*,
  121 F.3d 24 (2d Cir. 1997)..................................................................................28

*Of A Feather, LLC v. Allegro Credit Servs., LLC*,
  2020 WL 3972752 (S.D.N.Y. July 14, 2020) ........................................................34

*Oleg Cassini, Inc. v. Couture Coordinates, Inc.*,
  297 F. Supp. 821 (S.D.N.Y. 1969) ......................................................................30

*Plenitude Capital LLC v. Utica Ventures, LLC*,
  2020 WL 6255250 (E.D.N.Y. Oct. 23, 2020).........................................................34

022510.0155/9198506.5

*Randolph Equities, LLC v. Carbon Cap., Inc.*,
  648 F. Supp. 2d 507 (S.D.N.Y. 2009)........................................................26, 28, 29

*Red Fort Capital, Inc. v. Guardhouse Products LLC*,
  397 F. Supp. 3d 456 (S.D.N.Y. 2019).....................................................................40

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)....................................................................................25

*Rosoff v. Mountain Laurel Ctr. For Performing Arts*,
  317 F. Supp. 2d 493 (S.D.N.Y. 2004).....................................................................35

*Rouse v. Elliot Stevens, Ltd.*,
  2016 WL 8674688 (S.D.N.Y. June 24, 2016) .........................................................38

*Rus, Inc. v. Bay Indus., Inc.*,
  322 F. Supp. 2d 302 (S.D.N.Y. 2003).....................................................................33

*Saggio v. Select Portfolio Servicing, Inc.*,
  2015 WL 6760132 (E.D.N.Y. Nov. 5, 2015) ..........................................................31

*Sherwood v. Gordon Bros.*,
  116 N.Y.S.2d 306 (City Ct. 1952) ..........................................................................30

*St. Regis Paper Co. v. Santa Clara Lumber Co.*,
  186 N.Y. 89, 78 N.E. 701 (N.Y. 1906)...................................................................29

*Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*,
  791 F. Supp. 401 (S.D.N.Y. 1991) .........................................................................32

*This Is Me, Inc. v. Taylor*,
  157 F.3d 139 (2d Cir. 1998)....................................................................................34

*Toto, Inc. v. Sony Music Entm't*,
  2012 WL 6136365 (S.D.N.Y. Dec. 11, 2012) ........................................................32

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
  894 F.2d 516 (2d Cir. 1990)....................................................................................26

*Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*,
  26 F. Supp. 2d 698 (S.D.N.Y. 1998).......................................................................41

*Triangle Underwriters, Inc. v. Honeywell, Inc.*,
  604 F.2d 737 (2d Cir. 1979)....................................................................................38

*Turntables, Inc. v. Gestetner*,
  52 A.D.2d 776, 382 N.Y.S.2d 798 (N.Y. App. Div. 1976) ....................................21

*TVT Records v. Island Def Jam Music Grp.*,
    412 F.3d 82 (2d Cir. 2005)................................................................................34

*U.S. Fid. & Guar. Co. v. Delmar Dev. Partners, LLC*,
    788 N.Y.S.2d 252 (N.Y. App. Div. 2005) .........................................................25

*United States v. Schwimmer*,
    968 F.2d 1570 (2d Cir. 1992)............................................................................28

*Ward v. Nat'l Geo. Soc'y*,
    284 F. App'x 822 (2d Cir. 2008) ......................................................................28

*Zurich Ins. Grp. v. Grandurismo, Inc.*,
    2000 WL 1677941 (S.D.N.Y. Nov. 8, 2000)....................................................25

**Statutes**

N.Y. U.C.C. § 1–205(3)................................................................................................29

N.Y. U.C.C. § 2-609(4)................................................................................................21

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................19

Restatement (Second) of Contracts, § 223 (1981) cmt. .............................................28

Restatement (Second) of Contracts § 257 (1981) ......................................................23

Plaintiff Frontier Airlines, Inc. (Frontier) respectfully submits this Memorandum of Law in opposition to the motion for summary judgment (Motion) submitted by Defendants AMCK Aviation Holdings Ireland Limited (AMCK), Accipiter Investments Aircraft 4 Limited (Accipiter), Vermillion Aviation (Two) Limited (Vermillion), UMB Bank, N.A., solely as owner trustee (UMB), and Wells Fargo Trust Company, N.A., solely as owner trustee (Wells Fargo) (collectively, Defendants or AMCK). (Mot. (Dkt. 93); Mem. (Dkt. 97, 102).) Defendants seek summary judgment on all seven of Frontier's claims. Because there are numerous material disputes of fact, and the law favors Frontier, Defendants' Motion should be denied in its entirety.

## I.  **INTRODUCTION**

AMCK repudiated the Framework Agreement to avoid paying $255 million for five aircraft it no longer wanted but was required to purchase and lease to Frontier. AMCK let on, however, that it might withdraw its repudiation if Frontier provided extracontractual concessions, including delaying the delivery (and therefore purchase) dates of these aircraft. This required Frontier to modify terms in a separate, ███ aircraft, decade-long contract between it and Airbus, which is central to Frontier's operations and survival. Knowing these Airbus negotiations would take time, AMCK and Frontier agreed that Frontier could defer its monthly rent payments on certain already-leased aircraft while all parties worked on a global resolution. AMCK then used Frontier's deferred rent payments as pretext to terminate the Framework Agreement, as was its goal all along. Although Frontier was able to find alternative leasing companies to perform AMCK's abandoned obligations, Frontier did so at a significant loss.

The parties disagree about virtually all the material facts in this case. For example, the parties dispute whether: (1) AMCK repudiated and/or breached the Framework Agreement and Lease Agreements; (2) the parties agreed to defer rent on certain aircraft; (3) the length of that rent-deferral agreement; (4) AMCK waived, varied, or modified its right to declare Frontier in

default of the Framework Agreement without first providing notice or an opportunity to cure; and (5) AMCK intended to induce or defraud Frontier to defer paying rent to create a pretext to abandon its contractual obligations. Frontier's positions on these genuine disputes of material fact are verified by the substantial factual record, and thus defeat the Motion.

AMCK is likewise wrong as a matter of law. AMCK seeks to use summary judgment to eliminate Frontier's viable claims on the mistaken theory that a party cannot bring to trial alternative causes of action. That is wrong. There is substantial precedent that specifically permits parties to maintain, through summary judgment, claims for anticipatory repudiation, breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and fraud, where, as here, the non-contractual claims are based on facts separate than those underlying the contract claims. Additionally, while Frontier readily admits it cannot *recover* double-damages under these theories, that is an issue for the bench trial. At this time, the genuine disputes of material fact that remain for each claim preclude summary judgment.

## II.  BACKGROUND

### A.    Sale and leaseback arrangements.

Frontier is a Colorado-headquartered passenger airline that operates commercial passenger aircraft leased from various aircraft lessors. (SMF ¶ 1.)[1] Frontier relies on sale and leaseback (SLB) arrangements—a common method used by airlines to finance new aircraft acquisitions—for 100% of its fleet. (Dempsey Decl. ¶ 3.) An SLB arrangement is comprised of multiple parts: First, an airline (such as Frontier) has an existing purchase agreement with an airline manufacturer (such as Airbus), which obligates the airline to take delivery of aircraft pursuant to a delivery schedule. The

---

[1] SMF refers to Frontier's Statement of Material Fact dated December 9, 2022. Where Frontier cites to a paragraph originally introduced by Defendants in their November 11, 2020 Statement of Material Fact (Dkt. 98, 103), Frontier refers to both Defendants' original statement as well as Frontier's response.

airline makes pre-delivery payments (PDP) to the manufacturer as each construction of each aircraft progresses. Second, around six months prior to an aircraft delivery, the airline enters an SLB arrangement with an aircraft lessor (such as AMCK) in which the lessor agrees (i) to buy the aircraft from the manufacturer when the aircraft delivers and (ii) to simultaneously lease the aircraft to the airline in return for monthly rent payments. The purchase price and rent payments of the aircraft are negotiated solely between the airline and the lessor. Third, at the time of delivery, the lessor pays the purchase price to the manufacturer and takes title to the aircraft, the airline accepts delivery of the aircraft from the lessor under the lease, and the airline begins making monthly rent payments to the lessor. Depending on the purchase price, the airline may receive a refund from the manufacturer for PDP overpayments. (SMF ¶ 4.)

Until the lessor pays the manufacturer, the airline is responsible for purchasing the aircraft. If the lessor fails to pay, the airline must use its own funds, enter an SLB arrangement with another lessor, or risk defaulting on its purchase agreement with the manufacturer. (Dempsey Decl. ¶ 5.)

## B.    The parties' relationship until March 16, 2020.

Frontier is party to the Airbus Purchase Agreement (with amendments, Airbus Agreement), whereby Frontier is obligated to purchase more than ██ aircraft, and make PDPs, according to a decade-long schedule. (Hosenpud, Ex. 1, 4-5.) By the end of September 2019, AMCK—through subsidiaries and owner trustees, which are the other Defendants—owned and leased 14 aircraft to Frontier that were delivered under the Airbus Agreement (Original Leases). (SMF ¶ 5.)

Frontier timely made monthly rent payments on each of these aircraft through the end of March 2020. (McInerney Dep. at 94:18-22.[2]) In every instance where AMCK believed a Frontier

---

[2] Deposition excerpts are attached to the Declaration of David Hosenpud as follows: Bachrach Dep. (Ex. 68); Bindu Dep. (Ex. 69); Dempsey Dep. (Ex. 70); Fanning Dep. (Ex. 71); Lee Dep. (Ex. 72); Ma Dep. (Ex. 73); McInerney Dep. (Ex. 74); Murphy Dep. (Ex. 75); Neels Dep. (Ex. 76); O'Callaghan Dep. (Ex. 77); Sheridan Dep. (Ex. 78); Thwaytes Dep. (Ex. 79).

rent payment might be late, AMCK "chased" Frontier (as it did all its airline partners) for the payment as opposed to terminating the lease. (SMF ¶ 38.) To that end, AMCK has an automatic computer system that lets airlines know when a payment is past due. As part of this system, AMCK also manually communicates the past due payment to the airlines. Frontier always promptly paid after receiving these alerts. (Bachrach Dep. at 97:10-98:12; Dempsey Decl. ¶ 6.)

## C.    The Framework Agreement.

On September 10, 2019, Frontier and AMCK's corporate relative (Accipiter Holdings, DAC) signed a letter of intent to finance six more aircraft under the Airbus Agreement. (Dempsey, Ex. 1; *see also* Hosenpud, Ex. 82.) On March 16, 2020, Frontier and AMCK executed the Framework Agreement, which incorporated the key terms from the September 2019 letter of intent. (Dempsey ¶ 7; Hosenpud, Ex. 7.) The Framework Agreement obligated AMCK to purchase the six aircraft and lease them back to Frontier through Owner Trustee/Lessor UMB according to the following schedule: (i) three aircraft in March 2020; (ii) one in May 2020; (iii) one in June 2020; and (iv) one in August 2020.[3] (Hosenpud, Ex. 7 at FRONTIER0002867.) Also on March 16, AMCK purchased the first of these six aircraft, MSN 10038, and executed corresponding lease documents with Frontier.[4] (Hosenpud, Ex. 10-12; SMF ¶ 11.)

Under the Framework Agreement and resulting lease documents, AMCK paid Airbus $51 million for MSN 10038, and Frontier paid AMCK $▮▮▮▮▮ in monthly rent. (Hosenpud, Ex. 7 at FRONTIER0002873; *id.*, Ex. 13.) AMCK was immediately upset with the rent amount. (SMF ¶ 39; Hosenpud, Ex. 14 ("Ouch!," "Very cheap Neo").) It was much less than Frontier paid for the

---

[3] Some of these delivery dates were later slightly altered due to manufacturing problems at Airbus involving a wing bracket on one aircraft, as well as a brief shutdown of Airbus's manufacturing operations due to COVID-19. (Hosenpud, Ex. 8 at AMCK030056, 65; Hosenpud, Ex. 9.)

[4] For every SLB arrangement, the airline and lessor execute multiple agreements, including the Lease Agreement, Trust Agreement, and Guaranty. The Defendants are all named and defined parties in the relevant agreements. (Hosenpud, Ex. 7, 10-12.)

4

Original Leases, which were between $██████████████. (SMF ¶ 17.) The five remaining

aircraft would be purchased at the same price and leased at a similar monthly rent.[5]

**D.    Defendants' rights and obligations relating to the contracts, and other key provisions.**

The contracts at issue—including the Framework Agreement, as well as the Lease

Agreements, Trust Agreements, Guarantees, and all other "Operative Documents" (as defined in

the Framework Agreement) relating to the 15 aircraft under lease between Frontier and AMCK—

are deeply intertwined and make numerous cross-references to each other. All Defendants have

rights and obligations arising from these contracts. (SMF ¶ 40.) Here is a concise explanation:

Under the Framework Agreement and the lease documents that were scheduled to be

executed thereunder: UMB is the "Lessor" and "Trust Company." (Hosenpud, Ex. 7 § 1.1; *id.*, Ex.

10 at 1, 15.) UMB is also the "Owner Trustee" under the MSN 10038 Trust Agreement. (*Id.*, Ex.

11 at 1.) Vermillion is the "Trustor" of the MSN 10038 Trust Agreement, in which it conveyed all

right, title, and interest and transfer of control of the aircraft to UMB. (*Id.* at 1, §§ 1, 2.) Although

UMB has the power to sell, transfer, or otherwise convey its rights and interest in MSN 10038 as well as

Vermillion's beneficial interest, it cannot do so "without prior written consent of the Trustor," *i.e.*,

Vermillion. (*Id.* §§ 8.01, 8.02, 9.01(b).) The MSN 10038 Guaranty also identifies Vermillion as a Lessor

Guarantor, in which role Vermillion *guarantees* to Frontier all of UMB's performance obligations as

Lessor under the MSN 10038 Lease. (*Id.*, Ex. 12 at 1, § 1.) Further, under the Framework Agreement,

AMCK is a "Lessor Guarantor" and the "Owner Participant," as are Vermillion and Accipiter due to

their status as AMCK's "Affiliate." (*Id.*, Ex. 7 § 1.1.) AMCK is obligated to cause the Lessor (UMB) to

purchase the aircraft from Airbus on the delivery date and execute a Lease Agreement with Frontier—

again, UMB's performance is guaranteed by Vermillion. (*Id.* §§ 2.1.1, 3.3.1.) AMCK is also considered

---

[5] The monthly rent was calculated by adjusting an agreed base price by the 9Y swap rate two business days prior to the delivery and a previously-agreed adjustment factor. (Hosenpud, Ex. 7 at FRONTIER0002847.)

a "Servicer" under the Framework Agreement and resulting leases. (*Id.* § 1.1) As such, it has fully

authority to deal with Frontier directly under the leases arising from Framework Agreement. Accipiter

has similar rights and obligations as Vermillion arising from the Original Leases, including guaranteeing

to Frontier as beneficiary the performance of the "Owner Trustee," *i.e.*, either UMB or Wells Fargo.

(SMF ¶ 40.)

> The Framework Agreement contains the following key provisions related to defaults:

> 6.1.1: *Non-Payment*. Frontier fails to pay any amount due under any of the Transaction Documents in the currency and in the manner stipulated within five (5) Business Days of *written notice* of such failure from AMCK Aviation;

> 6.1.7: *Events of Default under Lease Agreements*. An "Event of Default" under, and as defined, in any Lease Agreement (or any equivalent event, howsoever defined) has occurred *and is continuing*[.]

(Hosenpud, Ex. 7 (emphasis added).) If a default occurs, "*so long as the same shall be continuing*,

AMCK Aviation may at its option *by notice in writing* to Frontier treat such event as a repudiation by

Frontier of this Agreement or declare this Agreement to be in default." (*Id.* § 6.2.1 (emphasis added).)

"Transaction Documents" means the Framework Agreement and each "Operative Document" as defined

in each Lease Agreement. (*Id.*, Ex. 7, § 1.1)

> In turn, the Lease Agreement for MSN 10038 considers the following to be an Event of Default:

> 16.1(a) *Non-Payment.* Lessee fails to pay (i) any Basic Rent or Security when due in the currency and in the manner stipulated in this Agreement within three (3) Business Days of the respective due date, or (ii) any other sum due it under this Agreement or any other Operative Document . . . in the currency and in the manner stipulated within five (5) Business Days of *written notice of such failure* from Lessor;

(*Id.*, Ex. 10 (emphasis added).) "Operative Document" is defined to mean "Lessee's Documents." (*Id.* §

1.1.)  The 14 Original Leases are included as a "Lessee's Document" and, consequently, an "Operative

Document," by virtue of being defined as an "Other Agreement." (*Id.*)

> It is through this interrelation that Defendants declared Frontier in breach of the Framework

Agreement based on an alleged failure to pay deferred rent on the Original Leases. (Hosenpud, Ex. 51.)

**E.    The parties agree to defer rent payments under the Original Leases.**

In light of the sudden and significant impact of COVID-19 on domestic U.S. air travel, on March 16, 2020, Frontier sent similar concession request letters to all its lessors, requesting temporary rent deferrals. (Dempsey Decl. ¶ 8; Fanning Dep. at 22:23-23:15.) For AMCK, Frontier requested a voluntary (i) one-time, three-month aircraft rent deferral on the 15 aircraft under lease; and (ii) return of one-month's security deposit for each aircraft. Frontier explained it would fully repay, with interest, over a nine-month period starting July 1, 2020. (Hosenpud, Ex. 15.) Frontier also represented it had a "strong balance sheet with $685 million of free cash" to assure AMCK that Frontier could make its payments, with interest, when the proposed deferral expired. (*Id.*)

AMCK had anticipated Frontier making such a request. (Hosenpud, Exs. 16-18.) In fact, 32 of AMCK's 34 airline partners made similar rent deferral requests, prompting AMCK to create an inter-company deferral team. (*Id.*, Ex. 37 ¶ 7.3; *id.*, Ex. 20 at AMCK019783.) Further, while rent deferral negotiations were ongoing with an airline, AMCK turned off its automatic alert system, and instructed its employees to not "chase" the airline for past due payments. (*Id.*, Ex. 21.). If AMCK ever denied an airline's rent deferral request, it was AMCK's "standard practice" to inform the airline, at which point AMCK restarted its "chase" procedure and "told [those airlines] to make payments." (SMF ¶ 41.)

AMCK responded to Frontier's request on March 18, providing a four-point counteroffer that focused on rent deferral terms, albeit worse for Frontier. (Hosenpud, Ex. 18.) On March 22, Frontier asked AMCK to reevaluate Frontier's initially proposed terms. Without a rent deferral in place, however, Frontier made timely rent payments on all aircraft in March 2020, including two aircraft on March 24. (*Id.*, Ex. 23; McInerney Tr. 85:8-12; 94:18-22.)

Around this time, however, AMCK asserted it was in "survival mode," and the focus of

negotiations shifted. (Hosenpud, Ex. 24.) The shift was caused in part by AMCK realizing on March 23 that its shareholder[6] needed to fund the upcoming aircraft purchases because the bank financing that AMCK had been counting on deteriorated. (*Id.*, Ex. 8 at AMCK030087; *id.*, Ex. 20 at AMCK019794; *id.*, Ex. 25-26.) Accordingly, AMCK began exploring ways to get out of the Framework Agreement or renegotiate its material terms. On March 24, AMCK explored using the "MAC clause"—the material adverse change clause, used when there is an unanticipated change between the signing and closing of a contract—as a way to get out of the Framework Agreement. (*Id.*, Ex. 46.) Instead of invoking the MAC clause, however, AMCK decided to demand Frontier reduce the purchase price and achieve delivery delays with Airbus for the upcoming aircraft. This, in turn, would lessen and delay AMCK's payment obligations (to Frontier's detriment). (Thwaytes Dep. at 88:14-89:13.) AMCK believed this would "buy ourselves some time . . . to see how everything develops before having to take the nuclear option" of terminating the Framework Agreement. (SMF ¶ 42.) As a result, negotiations shifted from Frontier's rent deferral request to AMCK repudiating the Framework Agreement, only retracting its repudiation if Frontier agreed to extracontractual demands. (*Id.*)

Accordingly, on March 26, AMCK demanded Frontier provide a $3 million discount on the purchase price (in the form of 12 months' advanced payment of rent) on the upcoming aircraft delivery, and that Frontier achieve a three to six month delivery deferral with Airbus for the other four aircraft. In exchange, AMCK would allow Frontier to defer rent on the 14 Original Leases (excluding MSN 10038), with repayment made within four months at an 8% interest rate. AMCK's position was that, if Frontier did not agree to these "conditions," AMCK would not honor the Framework Agreement. (SMF ¶ 43). On March 31, AMCK added a new extracontractual

---

[6] During the relevant time, AMCK had multiple shareholders. However, the key shareholder for purposes of this case was CK Assets. (*See e.g.*, Ma Dep. at 11:12-14:17; Hosenpud, Ex. 19, 24, 37, 46-47, 50, 82.)

condition: it would not proceed "with closing on the 5 remaining sale & leaseback aircraft if they are going to go straight into storage for an uncertain period of time." (*Id.* ¶ 44.) AMCK relayed its repudiation to Airbus, too, explaining that AMCK was not authorized to take delivery of the aircraft if they would go into storage. (*Id.* ¶ 45.).

Troubled by AMCK's repudiation, on April 1, Frontier sought AMCK's assurance that it would honor the Framework Agreement even if the parties could not agree on the rent deferrals or AMCK's extracontractual demands. AMCK did not respond. (*Id.* ¶ 46.) Nevertheless, Frontier immediately tried to meet AMCK's demands to convince it to withdraw its repudiation: by April 2, Frontier had reached out to Airbus, relaying AMCK's repudiation ("our financier is uncomfortable funding aircraft deliveries in 2Q 2020"), and asking Airbus to "work with [Frontier] to manage the timing of upcoming aircraft deliveries." (*Id.* ¶ 47.)

On April 3, AMCK sent Frontier another counteroffer, conditioning AMCK's financing of the upcoming five aircraft on Frontier achieving a six-month delivery deferral with Airbus. If Frontier could achieve this, AMCK would allow Frontier to defer rent on the Original Leases, with repayment made within four months at a 6% interest rate. (*Id.* ¶ 48.) Frontier responded that AMCK's counteroffer was "very disappointing." (Hosenpud, Ex. 32)

A key problem was that Airbus—which had no obligation or incentive to grant these deferrals—would not agree to AMCK's delivery deferral demands. The aircraft were also nearly complete and Airbus had no space at its Mobile, Alabama assembly facility to store them. (Fanning Dep. at 116:21-117:23.) Thus, when Frontier initially asked for a delivery deferral, Airbus's "immediate reaction has been to threaten Frontier with default" of the greater Airbus Agreement. (Hosenpud, Ex. 32.) If Airbus declared a default, Frontier would lose all of its PDP payments for upcoming aircraft and it "could cripple the airline to where it may potentially put [it] out of

business." (*Id.,* Fanning Dep. at 115:25-120:15.) Frontier explained all of this to AMCK. (*Id.*) With the prospect that delivery deferrals with Airbus were not achievable, Frontier again asked for AMCK's assurances "that you will finance the aircraft deliveries and honour your commitment to Frontier if we do not put a rent deferral in place." (SMF ¶ 49.) AMCK did not respond. (*Id*.)

In light of AMCK's repudiation and refusal to provide assurances, as well as the inability to achieve delivery deferrals with Airbus, Frontier began to look for alternative leasing companies to finance the five remaining Framework Agreement aircraft. (SMF ¶ 50.) Due to the changed market conditions, however, the terms offered by these companies were substantially worse for Frontier than those in the Framework Agreement. (*Id*.)

Accordingly, Frontier planned to make its next rent payments under the Original Leases on April 6. (SMF ¶ 51.) On April 6, however, Airbus suddenly closed its Mobile facility until April 29 due to COVID-19. (Hosenpud, Ex. 32.) This effectively paused the delivery schedule and created space for Frontier to negotiate longer delivery deferrals. As such, James Dempsey (Frontier's Executive Vice President and CFO) and Paul Sheridan (AMCK's CEO) spoke on the phone on April 6 and, as memorialized in a follow-up email, agreed to a 10-business-day rent deferral on the Original Leases to provide Frontier with time "to reach agreement with Airbus." (SMF ¶¶ 1, 51, 86.) Frontier confirmed this agreement in writing, reiterating that negotiations "will continue to be a challenge with Airbus," and expressing its "hope that [AMCK] reconsider [its] position on financing" the five aircraft. (*Id*. ¶ 51.)

Mr. Dempsey and Mr. Sheridan then spoke on April 7, during which they extended the rent deferral to "month to month" until all negotiations were complete. (SMF ¶ 52.) Both Mr. Dempsey and Mr. Sheridan have written correspondence with their companies memorializing this agreement. (*Id*.) On the call, Mr. Dempsey again asked Mr. Sheridan to confirm AMCK would

honor its Framework Agreement obligations even if Frontier could not achieve delivery deferrals with Airbus. (*Id.*) Mr. Sheridan "wouldn't tell [Frontier] at this stage what we would do if this didn't happen because I think that it would require a board approval for us to walk away." (*Id.*)

The one aircraft that was not included in the rent deferral agreement was MSN 10038—the only aircraft delivered under the Framework Agreement. It is undisputed that Frontier always made timely rent payments on MSN 10038. (*See generally* Mem.; Hosenpud, Ex. 50.)

Frontier continued to work in earnest with Airbus to negotiate delivery deferrals. On April 11 via text, and on April 13 via email, Frontier informed AMCK that the most Airbus will move the deliveries was "approximately 2 months." (Hosenpud, Ex. 35.) Frontier explained that Airbus would not agree to AMCK's six-month request "given the advanced nature of the aircraft production." (*Id.*) Frontier asked AMCK if it would "confirm you can support the revised schedule." (*Id.*) In response on April 13, 2020, AMCK neither confirmed nor denied, but re-expressed its desire for a six-month deferral that Frontier had already said was impossible. (*Id.*) AMCK also made clear its central position that Frontier needed to have no outstanding rent at the time the next aircraft delivered. (*Id.*; Dempsey Dep. at 94:9-102:7, 120:9-121:10; SMF ¶ 53.)

## F.    The parties continued negotiations through the beginning of May; AMCK never mentioned rent was due.

Negotiations on all fronts continued through the beginning of May, with neither side mentioning that Frontier's rent payments were allegedly due. Indeed, between March 16, 2020 and May 8, 2020, AMCK did not send any "chase" emails, have any employees reach out, or otherwise alert Frontier that rent was past due or needed to be paid immediately. (SMF ¶ 54). Likewise, between March 19, 2020 and May 8, 2020, AMCK did not send any rent invoices to Frontier, except for invoices associated with MSN 10038—which Frontier promptly paid. (*Id.* ¶ 55.) Throughout this time, AMCK knew that, if it ever expressed to Frontier that it believed rent was

11

owed immediately, "Frontier would cure any default." (*Id.* ¶ 56.) Frontier repeatedly represented as much to AMCK throughout the negotiations. (*Id.*) This all confirmed Frontier's understanding that the parties' month to month rent deferral remained in effect into May 2020. (*Id.*)

Consistent with the deferral extending into May, AMCK's internal documents between April 21 and May 8, 2020 represented that Frontier's rent payments "have been deferred," that the "[r]ent deferral request[]" was "under negotiation" and "under review," and that AMCK was still "mandated" under the Framework Agreement to take delivery of the five aircraft. (*Id.* ¶ 57.)

Nevertheless, AMCK remained committed to abandoning the Framework Agreement unless Frontier met its extracontractual demands, which were becoming more extreme. (*Id.* ¶ 58.) For example, on April 25, AMCK demanded Frontier extend 12 aircraft leases (not covered by the Framework Agreement) by four years, threatening, "we are seeing many parties walk from 2019 priced commitments due to the unprecedented crisis we are in." (*Id.*) In response, Frontier confirmed it would pay all unpaid rent before the next aircraft delivery (as AMCK asked) and that Frontier "expect[s] AMCK to hold up to your end of the deal," *i.e.*, the Framework Agreement. (*Id.*) AMCK did not respond. (*Id.*)

On April 27, AMCK's shareholder confirmed it "wants to explore ways to walk from the remaining Frontier SLB commitments," again suggesting the MAC clause. Notably, AMCK did not suggest it was entitled to terminate the Framework Agreement due to purportedly past due rents. AMCK's shareholder further committed to abandoning the Framework Agreement "unless we can negotiate very material QPQ's [quid pro quos] for AMCK, either lease extensions on all 12 originally delivered neo's or a very significant PP [purchase price] holdback on the remaining 5 x S██M neo's + NO outstanding payments whatsoever at the time of closing." (*Id.* ¶ 59.)

Around this time, the AMCK officers who had been working closest with Frontier—Mr.

Sheridan and Ms. O'Callaghan—considered telling Frontier "that we can't get [AMCK's shareholder] comfortable funding at 2019/contracted pricing EVEN IF [Frontier is] completely current on all payments." (SMF ¶ 60) These officers, however, decided to withhold this information as they attempted to extract more extracontractual concessions. (*Id.*)

On April 27, Frontier reached out to AMCK to ensure that, if Frontier was current on its rent by the time the next aircraft delivered—in June 2020 under Airbus's modified delivery schedule—that AMCK would honor its Framework Agreement commitments. (*Id.* ¶ 61.) AMCK, again, refused to provide these assurances. (*Id.*)

Frontier and AMCK spoke multiple times on April 30 via phone and email. In the first April 30 communication, Frontier offered AMCK even more favorable terms to keep AMCK from abandoning the Framework Agreement. Those terms summarized by AMCK included: (i) that Frontier would "immediately pay outstanding April rents on which we agreed an informal deferral pending agreement with Airbus on delivery delays," and to "pay May, June and July rents and, all beyond, on time"—in essence, no rent deferral after the end of April 2020; (ii) convince Airbus to move the next aircraft delivery from June to July 2020, such that the next three aircraft would deliver in July 2020; and (iii) move the delivery dates of the final two aircraft from September 2020 and October 2020 to February 2021. (SMF ¶ 62.)

AMCK responded the same day, agreeing: (i) to the delivery schedule—*i.e.*, three aircraft in July 2020 and two aircraft in February 2021; and (ii) for "[a]ll payments to be current on May 15, 2020 and to remain current." (*Id.* ¶ 63.) In addition, however, AMCK continued to insist that Frontier extend 12 aircraft leases by four years. (*Id.*) Moreover, AMCK introduced a new extracontractual demand: Frontier needed to remove the early lease termination options for all aircraft delivered under the Framework Agreement. (*Id.*) AMCK recognized this new condition

13

was "unusual" and "onerous," and admits it had never before proposed such a term. (*Id.*) This new term would have provided AMCK with another substantial financial windfall because lease payments are often renegotiated to much lower monthly rates after an early termination. (Dempsey Decl. ¶ 20.) Again, AMCK made clear that these extracontractual demands were conditions precedent to AMCK performing the Framework Agreement. (SMF ¶ 63.) Internally, AMCK said if Frontier would not agree to these demands, "we have to consider the nuclear option: this is to terminate the SLB because of nonpayment of lease rents in April." (*Id.* ¶ 64.) AMCK did not communicate this position to Frontier. (*Id.*)

Frontier responded the same day, telling AMCK its new extracontractual demand was an "overreach," and that Frontier would not extend prior leases or remove the early termination option. (*Id.* ¶ 65.) Frontier further communicated that the Framework Agreement is "binding" and while Frontier was "trying to work with [AMCK] on concessions," Frontier will insist that the parties perform the Framework Agreement if concessions could not be agreed to. (*Id.*)

Frontier and AMCK again discussed terms on April 30. (*Id.* ¶ 66.) Frontier reiterated that it was willing to become, and remain, fully current on all rent that day. (*Id.*) Alternatively, Frontier proposed: (i) the same delivery deferral of three aircraft in July 2020 and two in February 2021, the most it could achieve; (ii) it would prepay rent for six months on the three aircraft delivering in July 2020 (an approximately $█ million value to AMCK); and (iii) deferred rent for April and May 2020 would be repaid in full between July and December 2020. (*Id.*) AMCK never responded to this offer. (*Id.*)

On May 1, Mr. Dempsey texted Mr. Sheridan that Frontier "had expected a call today," inquiring "[w]hat's the status" on the negotiations. (*Id.* ¶ 67.) Mr. Dempsey explained Frontier was still working with Airbus to finalize the deal, and had "an additional 24 hrs to get this done." (*Id.*)

Mr. Sheridan stated that AMCK was "about to get on a call with the shareholders." (*Id.*) Mr. Sheridan did not respond after that shareholder call. (*Id.*) Jane O'Callaghan (AMCK's COO) and Robert Fanning (Frontier's Vice President of Fleet Transactions) also exchanged messages on May 5, in which Mr. Fanning expressed that Mr. Dempsey was "expecting a call" from Mr. Sheridan "but never got one." (*Id.* ¶¶ 1, 68, 86.) Ms. O'Callaghan said she was "not sure what we can achieve on the call as our shareholder is adamant there has to be something deemed of value" for AMCK to perform the Framework Agreement. (*Id.* ¶ 68.)

In none of these communications did AMCK request Frontier make any rent payments, or suggest that the month-to-month rent deferral agreement was no longer in effect. (*Id.* ¶¶ 54-68.)

## G.     AMCK further repudiates the Framework Agreement on May 8.

Instead, AMCK devised ways to abandon the Framework Agreement. (*Id.* ¶ 69.) These efforts culminated in an AMCK board meeting on Friday, May 8. (*Id.*) At the meeting, AMCK acknowledged that "Frontier had remained current with rental payments up until March 2020," when deferral negotiations began. And, moreover, that Frontier had offered to "to become current on all leases prior to the [next] deliveries," and had sufficient funds to stay current on rent. (Hosenpud, Ex. 50 § 4.4.) But desiring to avoid its remaining obligations under the Framework Agreement, AMCK decided to invoke the cross-default provisions in the 14 Original Leases—the leases covered by the parties' month to month rent deferral—to terminate the Framework Agreement. (SMF ¶ 69; Hosenpud Ex. 50 §§ 4.6-4.15; *see also supra* § II.D.) AMCK knew this decision would cause "severe reputational consequences," but determined it was in its business interest. (SMF ¶ 69; Hosenpud, Ex. 50 §§ 4.6-4.15.) Mainly, AMCK thought abandoning the Framework Agreement "would provide the best possible leverage with Frontier to continue negotiations" and the extracontractual demands—a lower purchase price; lease term extensions; removing early termination options—it was thus far unable to achieve. (SMF ¶ 69; Hosenpud, Ex.

50 § 4.8.) AMCK knew it would have leverage since the next aircraft deliveries were imminent and, more so, because the aircraft contained certain engines that required an additional tripartite agreement, which limited the "pool of potential lessors that Frontier could negotiate new terms with" thereby "increas[ing] the likelihood of Frontier's willingness to enter into negotiations" with AMCK. (SMF ¶ 69; Hosenpud Ex. 50 § 4.12; *id.*, Ex. 46 at AMCK018498-504.)

Before AMCK could relay its termination, however, Frontier emailed AMCK, explaining it had been "waiting patiently for your response" to the latest terms discussed on the parties' April 30 call. (SMF ¶ 70.) Frontier reiterated its last offer and said it was "available to discuss." (*Id.*) AMCK never responded. (*Id.*)

Instead, on Friday, May 8 at 4:41 p.m. where Frontier is located—11:41 p.m. in Ireland where AMCK is located—and without asking Frontier to pay any alleged late rent, AMCK sent Frontier a Notice of Termination letter, purporting to "terminate[] its obligations under the Framework Agreement" based on the unpaid rent on the Original Leases and the cross-default provisions in the operative documents. (SMF ¶ 71.) AMCK specifically chose the end of Friday "in case [F]rontier decided to pay us money." (*Id.*) The only relief AMCK invoked was to terminate its obligation "to consummate the purchase and lease any [sic] of the remaining Aircraft in accordance with Clause 2 of the Framework Agreement." (*Id.* ¶ 72.) That said, AMCK expressly reserved its rights to rescind all 15 aircraft lease agreements, force the immediate return of the aircraft, repossess the aircraft, and force Frontier to keep the aircraft grounded and stored. (*Id.*)

Frontier responded on Saturday, May 9, explaining it was "shocked by AMCK's sudden decision to attempt to rescind the Framework Agreement," and to "tak[e] advantage of the on-going global crises for its own financial gain." (*Id.* ¶ 73.) Frontier clarified that "AMCK is not entitled at this time to terminate the Framework Agreement based on non-payment of rent" because

"AMCK clearly and unequivocally temporarily waived Frontier's payment obligations under our existing aircraft leases pending the outcome of our active and on-going good faith negotiations over rent deferral and deferral of new upcoming aircraft deliveries." (*Id.*) Frontier further stated that AMCK's May 8 termination letter "is itself a default." (*Id.*) Based on those and other reasons, Frontier asked AMCK to "immediately withdraw the Notice so that [the parties] can work to promptly reach a mutually beneficial resolution." (*Id.*)

AMCK responded on May 12, taking the position that AMCK had never agreed to any rent deferral, but only to "not take action on any defaults" until April 21. (*Id.* ¶ 74.) AMCK maintained it was terminating the Framework Agreement and—for the first time since the parties' negotiations began on March 16—asked Frontier to pay outstanding rent. (*Id.*).

Frontier responded on May 13, explaining that the parties had agreed that rent under the Original Leases was deferred at least until May 15 pending the outcome of the negotiations. (*Id.* ¶ 75.) Frontier told AMCK that it had complied with AMCK's instructions throughout—including paying rent on MSN 10038—and that, had AMCK ever instructed Frontier to pay rent for the Original Leases, Frontier would have done so. (*Id.*) Instead, AMCK negotiated with Frontier well after April 21 and into May—never asking Frontier to make deferred rent payments, and never responding to Frontier's requests for clarity. (*Id.*) Frontier further explained that it understood AMCK's May 12 letter to be its "final notice to terminate the existing temporary deferrals." (*Id.*)

On May 13, 2020—five total days, and three business days, after AMCK's May 8 termination letter—Frontier wired AMCK funds and became current on all monthly aircraft lease payments, fully curing any alleged default. (*Id.* ¶ 76.) To date, Frontier has stayed current on all lease payments. (*Id.* ¶ 77.)

AMCK immediately restarted its standard practice of sending "chase" alerts to Frontier in

June 2020 when it believed Frontier's rent was late, providing Frontier notice and an opportunity to cure instead of terminating the leases. (*Id.* ¶ 78.) As before, Frontier always promptly paid after receiving any such alert. (*Id.* ¶ 79.)

**H.    AMCK granted rent deferral agreements to its other airline partners.**

AMCK granted numerous rent deferral requests to its other airline lessee partners during the relevant timeframe, including those that had not been paying rent during rent deferral discussions. (*Id.* ¶ 80.) Some airlines received two or three deferral extensions. (*Id.*)

What made Frontier unique among AMCK's airline partners that had requested rent deferrals—especially those with similar credit ratings—was that Frontier and AMCK had a binding agreement for more aircraft deliveries in 2020. (*Id.* ¶ 81.) In other words, AMCK could utilize Frontier's alleged outstanding rent payments as pretext to terminate upcoming commitments with Frontier that AMCK no longer wanted to follow through on, whereas AMCK did not have similar upcoming commitments with its other airline partners. In fact, only one other of AMCK's airline partners had a binding agreement with AMCK for deliveries in 2020. (*Id.*) As with Frontier, AMCK terminated its 2020 commitments with this other airline. (*Id.*)

**I.    Frontier obtains alternative financing for the remaining Framework Agreement aircraft, under substantially worse terms.**

Due to AMCK's sudden and unexpected termination, Frontier faced the catastrophic potential of five imminent aircraft deliveries without lessor financing. If Frontier could not find a replacement, Frontier would have to fully fund the aircraft purchases (a $██ million expense) or risk defaulting on the Airbus Agreement.

Consistent with AMCK's plan to use the termination and resulting crisis as leverage, AMCK contacted Frontier on June 18, 2020 and offered to enter SLBs for the three aircraft delivering in July 2020 that had been part of the Framework Agreement. (SMF ¶ 82.) The terms

were substantially worse for Frontier than those in the Framework Agreement, including: (i) AMCK would pay $███ million less for each aircraft; and (ii) Frontier would pay $█████ more in monthly rent. (*Id.*) AMCK's proposal was also "conditioned on the release and waiver of any potential legal claims by Frontier arising from the termination of the Framework Agreement." (*Id.*) With the impending delivery deadlines, Frontier saw no choice but to engage with AMCK. (*Id.*)

Through extraordinary effort, however, Frontier found other lessors to fund the five aircraft. (SMF ¶ 83.) The lessor CDB Aviation Lease Finance DAC (CDB) entered SLBs for three of the remaining aircraft. (*Id.*) The lessor Jackson Square Aviation (JSA) entered SLBs for the other two. (*Id.*) Although the terms CDB and JSA offered were worse than those in the Framework Agreement, the terms were still better than those AMCK offered on June 18. (*Id.*) The difference between the deals Frontier executed with CDB and JSA and the terms in the Framework Agreement caused Frontier approximately $53 million in damages. (*Id.* ¶ 84.) When discounted to present value, Frontier's damages are approximately $46.3 million. (*Id.*)

### III. <u>ARGUMENT</u>

#### A.  Legal standard.

"[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir. 1998); Fed. R. Civ. P. 56(a). Courts do not "weigh the evidence," but rather "view the facts in the light most favorable to the nonmoving party and resolve all factual ambiguities in its favor . . . to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). "A genuine issue of fact for trial exists when there is sufficient evidence on which a jury could reasonably find for the plaintiff." *Id.* (citation omitted).

**B.     AMCK anticipatorily repudiated the Framework Agreement.**

"Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). A repudiation "can consist of an attempt to advance an unwarranted interpretation of the contract or an indication that the renouncing party will perform only if certain 'extracontractual' conditions are satisfied." *In re Best Payphones, Inc.*, 432 B.R. 46, 54 (S.D.N.Y. 2010). The expression of intent not to perform must be "positive and unequivocal." *Id*. "Generally, '[t]he issue of repudiation or abandonment is an issue of fact.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (citation and internal quotation marks omitted).

If a repudiation occurs, the nonbreaching party may elect to: (1) treat the contract as terminated and exercise remedies; or (2) continue to treat the contract as valid. *Lucente*, 310 F.3d at 258. That said, before making an election, the non-repudiating party may work with the repudiator to "withdraw the repudiation." *AG Props. of Kingston, LLC v. Besicorp-Empire Dev. Co.*, 14 A.D.3d 971, 974 (App. Div. 2005) ("[t]he law . . . has refused to regard a continued willingness to receive performance [from the repudiator] as more than an indication that if the repudiator will withdraw the repudiation, but not otherwise, the contract may proceed" (quoting 23 Williston, Contracts § 63:53, at 662-663 [4th ed]) (citations omitted)). There are, at minimum, genuine disputes of material fact regarding AMCK's repudiation of the Framework Agreement.

Frontier was current on all rent through the end of March 2020, even making payments on March 24 after negotiations began. (Hosenpud, Ex. 23; *id.*, Ex. 50 § 4.3.) Frontier's next rent was due on April 6. (SMF ¶ 20.) As early as March 26, AMCK made clear the repudiation it committed to behind the scenes with its shareholder—AMCK would only proceed with the Framework Agreement if Frontier provided a $3 million discount on the upcoming aircraft, and achieved a three-to-six-month delivery deferral on the other four aircraft. (*Id.*, Ex. 24; SMF ¶¶ 42-43.)

AMCK's extracontractual demands snowballed from there: (i) on March 31, AMCK said it would not finance the aircraft if they "go straight into storage for an uncertain period of time," even though AMCK has no right to dictate Frontier's use of the aircraft under the leases (SMF ¶ 44); (ii) on April 3, AMCK changed the delivery deferral request to strictly six months (*Id.* ¶ 48); (iii) on April 25, AMCK added that Frontier must extend 12 leases by four years, threatening that "we are seeing many parties walk from 2019 priced commitments due to the unprecedented crisis we are in" (*Id.* ¶ 58); and (iv) on April 30, AMCK demanded Frontier remove the early termination option under the Framework Agreement aircraft (*Id.* ¶¶ 62-66). These are all unequivocal "words or [] deeds" of repudiation, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 587 (2d Cir. 2005), and Frontier understood them as such. (Dempsey Decl. ¶ 10.)

At each stage, Frontier acted consistent with its understanding that AMCK had repudiated the Framework Agreement, only to return if Frontier achieved extracontractual concessions. <u>First</u>, on April 1, Frontier requested that AMCK provide assurances that it would honor the Framework Agreement. (SMF ¶ 46.) Frontier made similar requests on April 6, April 7, April 13, and April 27. (*Id.* ¶¶ 49, 52, 53, 61.) AMCK never provided those assurances. Under New York law, AMCK's month-long "failure to respond" itself "constituted a repudiation." *Hornell Brewing Co. v. Spry*, 174 Misc. 2d 451, 459, 664 N.Y.S.2d 698, 702 (Sup. Ct. 1997); *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 304 (S.D.N.Y. 2008); *Turntables, Inc. v. Gestetner*, 52 A.D.2d 776, 777, 382 N.Y.S.2d 798 (N.Y. App. Div. 1976); N.Y. U.C.C. § 2-609(4).

<u>Second</u>, believing that AMCK had repudiated the Framework Agreement, on April 6, Frontier began to look for alternative leasing companies to finance the five remaining Framework Agreement aircraft. (SMF ¶ 50.) Due to the changed market conditions, however, the terms offered by these companies were substantially worse for Frontier than those in the Framework Agreement.

Third, Frontier worked to achieve AMCK's extracontractual demands to convince it to withdraw its repudiation. Although Frontier would not capitulate to the demands that AMCK itself described as "unusual" and "onerous," Frontier agreed to be current on rent before the next aircraft delivery (SMF ¶¶ 61-62), and achieved the three-to-six-month delivery deferrals AMCK had originally requested. Frontier did so in the face of Airbus threatening to default the Airbus Agreement, which could have "cripple[d] the airline to where it may potentially put [it] out of business." (Hosenpud, Ex. 32; Fanning Dep. at 115:25-120:15.) To be clear, Frontier's attempt "to proceed with the agreement in the event that [AMCK] agreed to retract its repudiation," does not excuse AMCK's repudiations or invalidate this cause of action. *AG Props.*, 14 A.D.3d at 974.

Nevertheless, AMCK ended the negotiations with a final clear and unequivocal repudiation in its May 8 letter that purported to terminate the Framework Agreement. Of course, because AMCK had already repudiated the contract, it was not entitled to terminate it on May 8. *See In re Food Mgmt.*, 372 B.R. 171, 191-92 (Bankr. S.D.N.Y. 2007) ("the breaching party is estopped to claim that its own breach does not matter").

AMCK does not allege Frontier could not pay the deferred rent on the Original Leases. *Id.* at 191 ("while an anticipatory breach relieves the nonbreaching party of the need to tender performance, such party nonetheless is required to show that it was ready, willing and able to perform its obligations under the contract" (citation omitted)). Nor could it. Frontier expressed on multiple occasions it was able and willing—including in the initial March 16 concession request letter (explaining it had a "strong balance sheet with $685 million of free cash") and again on April 28 (explaining it has "access to up to $700M of govt funds"). (SMF ¶ 85.) Moreover, AMCK knew "Frontier would cure any default" if asked. (*Id.* ¶ 56.) In fact, on April 30, Frontier twice said it would "immediately pay outstanding April rents on which we agreed an informal deferral pending

agreement with Airbus on delivery delays," and pay all future rents "on time." (*Id.* ¶ 62.) AMCK rejected this offer, as it would destroy its pretext for using "the nuclear option: this is to terminate the [Framework Agreement] because of nonpayment of lease rents in April." (*Id.* ¶¶ 63-64.)

Rather, AMCK's main argument—besides that its repudiation was not unequivocal, which, as discussed above, is wrong—is that Frontier cannot recover for both anticipatory repudiation and breach of contract, and therefore the repudiation claim must be dismissed. (Mem. at 14.) AMCK requests this relief because it would effectively excuse all of its repudiations, allowing it to argue that Frontier's deferred rent payments, starting on April 6, were the first breaches.

AMCK mainly cites the election of remedies doctrine, which holds that a party "cannot at the same time treat the contract as broken and subsisting" and "[o]nce a party has elected a remedy for a particular breach, his choice is binding." *Lucente*, 310 F.3d at 258. There are three problems with AMCK's argument: <u>First</u>, it does not apply to our case. As discussed, *prior* to selecting a remedy, the non-repudiating party is permitted to work with the repudiator to "withdraw the repudiation." *AG Props. of Kingston*, 14 A.D.3d at 974; *see also* Restatement (Second) of Contracts § 257 (1981) ("The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation."). *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 711 (S.D.N.Y. 2012) ("Good faith attempts to realize contractual benefits by negotiating with a counterparty, rather than immediately filing suit, do not constitute an election of remedies."). That is precisely what Frontier did here.

<u>Second</u>, Frontier admits that it cannot recover twice under its repudiation *and* breach of contract claims. But the question of the appropriate *remedy* for AMCK's malfeasance is separate from the pertinent question of whether Frontier can *maintain* its repudiation and breach of contract claims at this stage, where there remain genuine disputes of material fact as to each. It is simply

not appropriate to dismiss the repudiation claim because Frontier cannot, ultimately, double-recover. Rather, both the repudiation and breach of contract claim should reach trial. *MBIA Ins.*, 842 F. Supp. 2d at 706-07, 710-11 (denying summary judgment on claims for breach of contract and anticipatory repudiation, rejecting the defendant's argument that the election of remedies doctrine barred the claims). If Frontier prevails on one theory at trial, that will necessarily resolve the other. *See Carney v. Illarramendi*, 2018 WL 1472510, at *12 (D. Conn. Mar 26, 2018) ("*prevailing* upon one inconsistent cause of action 'deprives [the plaintiff] of any right to resort to the other.'") (emphasis added). But, Frontier has not yet prevailed on any claim.

Third, to the extent Frontier selected a remedy, it chose to treat the Framework Agreement as broken. Therefore, the repudiation claim survives. In sum, prior to April 6 (the first time it could even be alleged that Frontier had past due rent), Frontier understood that AMCK had already repudiated the Framework Agreement and began searching for other leasing companies to take its place. When that was not viable, Frontier attempted to meet AMCK's extracontractual demands to convince it to withdraw its repudiation. But, on May 8, 2020, AMCK made clear in its notice of termination letter it would not withdraw its repudiation. At that point, Frontier secured alternative leasing companies, and thereafter brought suit against Defendants. This is not a case where Frontier "pursued two opposing courses of action in the wake of [AMCK]'s breach." *MBIA*, 842 F. Supp. 2d at 711. And to the extent there *is* a genuine dispute over what remedy Frontier chose and, therefore, which claim Frontier can prevail under, that too defeats AMCK's argument on summary judgment.

## C.    AMCK breached the Framework Agreement.

The parties do not dispute that the Framework Agreement was a valid contract. Rather, the issue is whether AMCK was entitled to terminate it. AMCK argues it was justified to do so because Frontier was past due on rent under the Original Leases, which allowed AMCK to cross-default

Frontier and terminate the Framework Agreement. AMCK is wrong for three reasons.

### 1. The parties agreed to defer rent on the Original Leases.

To form a contract, "there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). Courts look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 161 (E.D.N.Y. 2002). "[D]isproportionate emphasis is not to be put on any single act, phrase or expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 491 F. Supp. 2d 403, 408 (S.D.N.Y. 2007). Where there is no written agreement between the parties, the plaintiff must establish, "through the words and/or conduct of the parties, that a contract was made and that its terms are definite." *Zurich Ins. Grp. v. Grandurismo, Inc.*, 2000 WL 1677941, at *3 (S.D.N.Y. Nov. 8, 2000). Further, parties can form or modify a contract even where they contemplate—but fail—to execute a more formal writing. *U.S. Fid. & Guar. Co. v. Delmar Dev. Partners, LLC*, 788 N.Y.S.2d 252, 253-54 (N.Y. App. Div. 2005). If the contract's terms are ambiguous, "the subsequent conduct of the parties [may] be used to indicate their intent." *Id.*

Here, the parties agreed to defer rent on the Original Leases while negotiations were ongoing. AMCK argues that did not occur because "the parties never entered a *written agreement*" as required by the Framework Agreement, thus allowing AMCK to invoke the cross-default provisions. (Mem. at 12 (emphasis added).) This argument is wrong, for multiple reasons.

As an initial matter, AMCK misrepresents the Framework Agreement and the Lease Agreements' terms. Section 8.4.1 of the Framework Agreement (and 20.4(a) of the Lease Agreements) says, "the rights of both parties . . . shall not be capable of being waived or varied

otherwise than by an express waiver or variation in writing." (Hosenpud, Ex. 7 § 8.4.1; *Id.*, Ex. 10 § 20.4(a).) An "express waiver" does not need to be in writing. Rather, it "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 850 N.E.2d 653 (N.Y. 2006). "Whether a party has the intent to waive a contractual right is generally a matter of fact, not a matter of law," which "suggests that the Court should not grant summary judgment on this issue." *Randolph Equities, LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 517 (S.D.N.Y. 2009). In addition, AMCK conflates the contract language "variation in writing" with AMCK's term "written agreement," seemingly to align its argument with *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 519 (2d Cir. 1990), where the relevant contract excluded oral modifications and said "modifications could occur 'only by an agreement in writing, signed by all of the parties.'" But the *Towers* contract is not our contract.

The record here supports a rent deferral agreement, both through "express waiver" and "in writing." On April 6, Frontier and AMCK—through phone and email—agreed to a 10-business-day rent deferral for the express purpose of providing Frontier with time "to reach agreement with Airbus." (SMF ¶ 51.) The parties spoke again the next day, and extended the rent deferral to "month to month" until all negotiations were complete, including Frontier's side-deal with Airbus. (*Id.* ¶ 52.) Both Frontier and AMCK have written correspondence within their companies memorializing this agreement. (*Id.*)

Frontier performed its end, working in earnest to negotiate as long a delivery deferral as possible with Airbus. (Hosenpud, Ex. 5, 63-66.) Frontier's negotiations with both Airbus and AMCK continued through the beginning of May. (*Id.*; SMF ¶¶ 54-68, 70.) Eventually, Frontier achieved the delivery deferrals AMCK originally asked for, providing AMCK with a substantial

benefit, and informed AMCK as such. (Hosenpud, Ex. 5, 63-66; Dempsey Dep. at 151:24-153:9.)

The parties also acted consistent with there being a rent deferral agreement starting on April 6 and 7. For example, after Frontier requested a rent deferral on March 16, but prior to the parties reaching agreements on April 6 and 7, Frontier paid rent on two Original Leases on March 24. (Hosenpud, Ex. 23; Ex. 23; McInerney Dep. 85:8-12; 94:18-22.) It was not until after the parties' April 6 and 7 agreements that Frontier deferred its rent.

Moreover, the parties spoke multiple times—verbally and in writing—between March 16 and May 8. In this timeframe: AMCK turned off its rent "chase" alerts to Frontier; no one from AMCK mentioned to Frontier that rent on the Original Leases was past due or owing; and no one from AMCK mentioned that the rent deferral agreement—or "grace period" as AMCK's Memo portrays it (Mem. at 5-6, 10, 12)—had expired. (SMF ¶¶ 38, 41, 54-56, 60, 62-63, 65-68, 70.) This conduct is in stark contrast to AMCK's actions before *and* after this timeframe, in which it always provided Frontier notice and an opportunity to cure when it believed payments might be past due or owing. (*Id.* ¶¶ 38, 78-79.) Likewise, it stands in stark contrast to AMCK's "standard practice" of informing its other airline partners if a rent deferral request was denied, at which point AMCK would restart its "chase" procedures rather than terminate the lease agreements. (*Id.* ¶ 41.)

To be clear, Frontier argues that, pursuant to Sections 8.4.1 and 20.4(a) of the Framework Agreement and Lease Agreements, respectively, "[t]he *rights*" of the parties were "waived or varied . . . by an express waiver or variation in writing." (Hosenpud, Ex. 7, 10; Bindu, Ex. 1, 5 (emphasis added).) Frontier's argument does not depend, as AMCK portrays it, on separate contract sections relating to varying "[t]he *provisions* of this Agreement" in an executed writing. (Hosenpud, Ex. 7 § 8.4.2; *id.*, Ex. 10 § 20.4(b); Bindu, Ex. 1 § 20.4(b), 5 § 20.4(b) (emphasis added).) Here, the rent deferral agreement—agreed verbally, in writing, and evidenced by the

parties' conduct—*waived* AMCK's *right* to declare a default arising from deferred rent. It is not necessary that the rent deferral agreement also varied or amended the *provisions* of the operative agreements. That said, in New York, "an oral modification to a contract may be valid, even if the contract was in writing and it expressly forbade oral modifications," if there is a course of conduct supporting the modification, or there has been "performance in reliance on the oral modification." *United States v. Schwimmer*, 968 F.2d 1570, 1575 (2d Cir. 1992); *accord Randolph Equities*, 648 F. Supp. at 518 (explaining that "[a] party can overcome a no-oral-modification clause by showing partial performance or equitable estoppel"). Here, Frontier performed in reliance on AMCK's oral (and written) representations, and the parties had a well-established course of performance of providing notice and an opportunity to cure whenever there was an alleged late rent payment.

In sum, the parties agreed to a month-to-month rent deferral extending through at least the May 15 date contained in AMCK's last offer on April 30, as the negotiations were not yet complete and AMCK never communicated otherwise. (*Id.* ¶¶ 14-15, 25, 75.)

## 2. The parties' course of dealing required that AMCK provide Frontier with notice and an opportunity to cure.

"'Course of dealing may become part of an agreement either by explicit provision or by tacit recognition, or it may guide the court in supplying an omitted term. Like usage of trade, it may determine the meaning of language or it may annex an agreed but unstated term." *Ward v. Nat'l Geo. Soc'y*, 284 F. App'x 822, 823-24 (2d Cir. 2008) (quoting Restatement (Second) of Contracts, § 223 (1981) cmt. b). Moreover, "[t]here is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent.'" *Id.* "Evidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms." *New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997). Likewise, "[a] course of dealing between parties and

any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." *GMAC Com. Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209, 219 (S.D.N.Y. 2001) (quoting N.Y. U.C.C. § 1–205(3)). These principles are "relevant not only to the interpretation of express contract terms, but may [themselves] constitute contract terms." *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 102 (2d Cir. 2002). Further, "[a] party may waive its contractual rights through its subsequent course of conduct." *Randolph Equities*, 648 F. Supp. 2d at 517.

As discussed, before March 16 and after May 8, *every time* AMCK believed a Frontier rent payment was late, AMCK always alerted Frontier rather than terminate the contract. (SMF ¶¶ 38, 78-79.) Frontier always promptly paid after receiving these alerts. (*Id.*) This course of dealing and usage of trade modified the Original Leases such that AMCK could not declare a default without providing Frontier with notice and an opportunity to cure.

On top of that, multiple contract provisions relating to default—and which AMCK expressly relied on in its May 8 termination letter (Hosenpud, Ex. 51)—expressly require AMCK to provide "written notice" or "notice in writing" prior to declaring a default. (Hosenpud, Ex. 7 §§ 6.1.1, 6.2.1; *id.*, Ex. 10 § 16.1(a); *see supra* § II.D.) AMCK's course of dealing and trade usage, at a minimum, clarified this contract language to mean AMCK needed to provide Frontier with notice and an opportunity to cure prior to declaring a default.

### 3. AMCK could not require literal performance.

There is a well settled rule "that though a party to a contract is in default, if the other party continues to negotiate with him after such default the contract cannot be rescinded without *reasonable notice* to the party in default to comply with the contract within a specified time. *St. Regis Paper Co. v. Santa Clara Lumber Co.*, 186 N.Y. 89, 98, 78 N.E. 701, 703-04 (N.Y. 1906)

29

(emphasis added); *accord Sherwood v. Gordon Bros.*, 116 N.Y.S.2d 306, 308 (City Ct. 1952). More specifically, "where an executory contract fixes the time within which it is to be performed and performance within that time is waived by the parties to the agreement, neither party can thereafter rescind the contract on account of such delay without notice to the other requiring performance within a reasonable time, to be specified in the notice, or the contract will be abrogated." *Sherwood*, 116 N.Y.S.2d at 308. By continuing to negotiate with a party after an alleged default, "time as an essential element of the contract has been removed therefrom, but it can be restored by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with." *Id.*

For example, in *Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F. Supp. 821, 830 (S.D.N.Y. 1969), plaintiff Cassini alleged that defendant Couture breached the contract through delayed royalty payments between March 11 and July 18, entitling Cassini to terminate the contract. Notably, the contract contained a clause stating that "no waiver by either party, whether express or implied, of any * * * default * * * shall constitute a continuing waiver." *Id.* Still, the Court found that Cassini could not terminate the contract in this timeframe because he "never objected to the delay in payment." The Court explained, "Mr. Cassini and his representatives were, during this period, negotiating with [Couture]. . . . It surpasses belief that plaintiff was unaware of the defaults in royalty payments." *Id. Cassini's* conduct thus "constituted a waiver of the provision in the contract calling for prompt payment of royalties." *Id.* Cassini "could not thereafter put defendant in default without first demanding performance by defendant, thereby restoring time as an element of the contract. Only then, if defendant failed to perform within a reasonable time, could plaintiff elect to terminate the agreement. Any other rule would be unjust." *Id.* at 831.

The same is true here: AMCK negotiated with Frontier through April and into May, during

the time AMCK now claims Frontier was in default. By negotiating throughout this time period, without asking Frontier to pay alleged outstanding rent, or even mentioning rent was due, AMCK waived its right to declare a default without providing Frontier notice and an opportunity to cure.

In fact, once AMCK provided Frontier notice via the May 8 notice of termination letter, Frontier paid all past-due rent within three business days (and within one business day of AMCK's May 12 letter that Frontier understood to be AMCK's "final notice to terminate the existing temporary deferrals"). That timeframe is consistent with the notice and cure periods in the Original Leases, as well as the periods the parties always acted in accord with, both before and after AMCK's purported termination. (Hosenpud, Ex. 10 § 16.1(a); SMF ¶¶ 38, 78-79.)

## D.   AMCK breached the implied covenant of good faith and fair dealing.

AMCK's entire argument against Frontier's breach of good faith and fair dealing claim is that it is based on the same allegations as the contract claims. (Mem. at 14-15.) AMCK is incorrect as a matter of fact and law.

"A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991). "[N]either party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the party's presumed or reasonable expectations. *M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

Although New York law generally does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the facts underlying such a claim also form the basis of a breach of contract claim, *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002); *see also Saggio v. Select Portfolio Servicing, Inc.*, 2015 WL 6760132, at *5-6 (E.D.N.Y. Nov. 5, 2015), there is an exception "in cases involving efforts by one party to

a contract to subvert the contract itself," *Toto, Inc. v. Sony Music Entm't*, 2012 WL 6136365, at *13 (S.D.N.Y. Dec. 11, 2012) (internal quotations omitted). In such cases, "the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130, 265 A.D.2d 513 (N.Y. App. Div. 1999). A claim for breach of the implied covenant of good faith and fair dealing is thus "not necessarily duplicative of a cause of action alleging breach of contract." *Gutierrez v. Gov't Emps. Ins. Co.*, 25 N.Y.S.3d 625, 627, 136 A.D.3d 975, 976 (N.Y. App. Div. 2016).

Moreover, a bad faith claim can survive alongside a breach of contract claim "if it is based on allegations different than those underlying the accompanying breach of contract claim." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003); *see also Joshi v. Trustees of Columbia Univ. in City of N.Y.*, 2018 WL 2417846, at *8 (S.D.N.Y. May 29, 2018) (citations omitted). Frontier's bad faith claim fits squarely within these exceptions.

AMCK acted in bad faith when it took actions to "subvert" the purpose of the Framework Agreement. Most obviously, AMCK threatened to not perform the Framework Agreement unless Frontier agreed to extracontractual quid pro quos, which AMCK itself recognized were "unusual" and "onerous." AMCK knew Frontier could not achieve terms similar to those the Framework Agreement (which were based on a September 2019 letter of intent) because the market had shifted in light of COVID-19. AMCK also knew that Frontier's faced imminent aircraft deliveries and a limited "pool of potential lessors that Frontier could negotiate new terms with" due to a necessary tripartite agreement. AMCK expressly used this leverage to extract concessions out of Frontier, in violation of the covenant. (SMF ¶ 69); *Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, 791 F. Supp. 401, 406 (S.D.N.Y. 1991) (finding bad faith where a party refused to

perform on the original contract terms and demanded a lower interest rate).

Moreover, all along AMCK was aware it was unlikely to perform the Framework Agreement *even if* Frontier achieved the ever-evolving demands. Yet, AMCK promised Frontier it did not need to pay rent on the Original Leases while negotiations were ongoing—going so far as to twice turn down Frontier's April 30 offer to immediately pay all outstanding rent—and never asked Frontier to become current. All of this was done with the goal of using Frontier's outstanding payments as pretext to subvert the Framework Agreement and prevent Frontier from immediately seeking damages for AMCK's repudiation. *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 315 (S.D.N.Y. 2003) (a party breaches the covenant of good faith it is uses "pretext," rather than "good-faith belief[s]" to get out of a contract.).

Finally, AMCK's double-recovery argument fails here for the same reasons as above. *See supra* § III.B. Most notably, there remain genuine disputes of material fact on Frontier's bad faith claim, as well as its breach of contract and repudiation claims. "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989), as it "generally entail[s] fact-intensive inquiries more appropriately resolved at a trial on merits," *Mickle v. Christie's, Inc.*, 207 F. Supp. 2d 237, 250 (S.D.N.Y. 2002). The appropriate course is to resolve these disputed facts, and claims, at trial. *See supra* § III.B.

### E. Frontier has valid claims against all Defendants.

AMCK seeks to dismiss Accipiter and Vermillion (and in a footnote, UMB and Wells Fargo) on the sole basis that they are not signatories to the Framework Agreement. (Mem. at 15-16, 21.) AMCK raised, and lost, this argument at the motion to dismiss stage. It should lose again.

Contrary to AMCK's argument and cases, Frontier has not sued Accipiter and Vermillion solely because they are "related corporate entities" or to "pierc[e] the corporate veil." (*Id.* at 15.)

Instead, Frontier sued Accipiter and Vermillion because they have rights and obligations arising from the contracts at issue. That is proper. *See Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75-76 (2d Cir. 1984) (sole obligee on contracts possessed rights such that it could be an indispensable party); *BankUnited, N.A. v. Blue Wolf Invs., LLC*, 2019 WL 3416084, at *7 (S.D.N.Y. July 1, 2019) (guarantor defendants contractually responsible for loan amounts and attorneys' fees and costs). Indeed, guarantors are often named as defendants. *E.g.*, *Plenitude Capital LLC v. Utica Ventures, LLC*, 2020 WL 6255250, at *2 (E.D.N.Y. Oct. 23, 2020); *Of A Feather, LLC v. Allegro Credit Servs., LLC*, 2020 WL 3972752, at *1 n.1 (S.D.N.Y. July 14, 2020).

Frontier has described above the numerous, interrelated rights and obligations that each Defendant has arising from the operative documents. (*See supra* § II.D.) In short, Vermillion and Accipiter irrevocably guaranteed the due and punctual performance of all of the Lessors' (*i.e.*, UMB and Wells Fargo) obligations under each Lease Agreement. (*Id.*) AMCK did, too. (*Id.*) The question is not, as AMCK presents it, whether these parties "assumed AMCK's obligations under the Framework Agreement." (Mem. at 15.) Rather, these parties have their own, separate, express rights and obligations arising under the operative contracts—including the Original Leases which Defendants invoked to terminate the Framework Agreement. Indeed, under New York law, the Framework Agreement and the other operative contracts should be considered to "form part of a single transaction" and must "be read together, even though they were executed on different dates and were not all between the same parties." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *see also TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). Certainly that is how Defendants treated them.

Specifically, the May 8 notice of termination letter says that "AMCK Aviation and the relevant 'Lessors' are entitled to exercise all of their respective rights and remedies under the Framework

Agreement, the MSN 10038 Lease Agreement and the Other Agreements and/or applicable law." (Hosenpud, Ex. 51 ¶ 5.) On that basis, Defendants terminated the Framework Agreement. Again, the "Lessors" cited in the May 8 termination letter are UMB and Wells Fargo, who could not exercise termination rights "without prior written consent of" Vermillion and Accipiter.

AMCK knows all this. Nevertheless, it seeks to remove Accipiter and Vermillion because they may be the only relevant AMCK-related entities in existence by virtue of the Carlyle Transaction, depriving Frontier of its ability to collect damages. Thus, not only is AMCK wrong as a matter of law that Accipiter and Vermillion should be dismissed, its attempt to remove them further evidences the alleged fraudulent intent behind the Carlyle Transaction, which is presently subject to separate litigation. *See Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Limited, et al.*, No. 1:22-cv-2943 (PAE) (S.D.N.Y.); 7.13.22 Order (Dkt. 92).

## F.    Frontier's promissory estoppel claim is valid.

For promissory estoppel, a plaintiff must prove: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000). Courts "focus closely on both the alleged promise and the claimed reliance." *Rosoff v. Mountain Laurel Ctr. For Performing Arts*, 317 F. Supp. 2d 493, 502 (S.D.N.Y. 2004). Frontier has satisfied all of these elements: (1) AMCK made clear and unambiguous promises that the parties had a rent deferral agreement in place while negotiations were ongoing; (2) Frontier relied on AMCK's promises; and (3) AMCK terminated the Framework Agreement based on Frontier deferring its rent. AMCK makes a number of arguments to dismiss the promissory estoppel claim, all of which fail.

First, AMCK argues that a promissory estoppel claim should be dismissed as "duplicative of the breach of contract claims." (Mem. at 16.) This is, again, wrong. District Courts in this Circuit frequently allow parties to maintain claims for promissory estoppel, breach of contract, and

anticipatory repudiation through summary judgment, especially "where it is not clear that a valid contract exists" that governs the conduct. *Brenner v. Brenner*, 2012 WL 3597247, at *7 (E.D.N.Y. Aug. 20, 2012) (allowing promissory estoppel claim to proceed with breach of contract claim because the defendant denied that the parties had entered into a valid enforceable contract); *MBIA Ins.*, 842 F. Supp. 2d at 711 (noting "triable issues of fact exist with respect to [defendant's] contractual obligations"). This principle applies to our case: AMCK expressly denies that it entered a rent deferral agreement that would prevent it from declaring a cross-default under the Framework Agreement. If AMCK is correct—a decision for trial—then Frontier could proceed on its promissory estoppel claim. AMCK's cited case, *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 386 (S.D.N.Y. 2014), is not to the contrary. There, the Court dismissed the promissory estoppel claim because it "concluded that the parties did enter into a binding agreement" covering the terms alleged in the estoppel claim. *Id.*; *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986) (promissory estoppel claim survived as it alleged promises separate from the "forty-one written and fully executed purchase contracts" between the parties).

Second, recognizing this problem, AMCK asserts that, "of course, the Framework Agreement . . . governs the matter in dispute" and precludes the estoppel claim. (Mem. at 16-17.) But Frontier's estoppel claim is based on the separate rent deferral agreement (which AMCK says does not exist), *not* the Framework Agreement.

Third, AMCK says there was never an unambiguous promise to defer rent payments beyond April 21, 2020. This argument is foreclosed by the month-to-month agreement the parties agreed to on April 7, which is evidenced by AMCK's own writings. (SMF ¶ 52.) Moreover, all of AMCK's conduct between April 21 and May 8 unambiguously evidenced that the month-to-month agreement survived, at least until May 15. Perhaps most importantly, on April 30, when Frontier

36

*twice* offered to "immediately pay outstanding April rents on which we agreed an informal deferral pending agreement with Airbus on delivery delays," and to "pay May, June and July rents and, all beyond, on time," AMCK rejected those offers, instead suggesting that Frontier pay back rent on May 15. (SMF ¶¶ 62-63, 66.) And, of course, unlike every time prior and since—and contrary to its standard pattern and practice—AMCK did not alert Frontier it had past due payments. These unambiguous promises are far different than *Exceed Holdings LLC v. Chicago Board Options Exchange Inc.*, 2018 WL 4757961, at *3 (S.D.N.Y. Sept. 30, 2018), in which the defendant said the plaintiff's products were "complementary" and were "'next' in the investment pipeline."

Fourth, AMCK says that Frontier's reliance on its promises was not "reasonabl[e]" because "the Framework Agreement requires that any waiver or modification of terms be in a writing executed by both parties." (Mem. at 17.) As discussed, the Framework Agreement requires no such thing: the parties may "waive[] or var[y]" their "rights . . . by an express waiver *or* variation in writing." (Framework Agreement § 8.4.1 (emphasis added).) Here, Frontier reasonably relied on AMCK's express promises—made verbally, in writing, and confirmed by conduct—that Frontier did not need to pay the deferred rent while the negotiations were ongoing.

## G.    AMCK fraudulently induced Frontier into not paying rent to manufacture a breach.

A fraud claim has five elements: (1) the defendant made a material, false representation; (2) with knowledge of its falsity; (3) an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused the plaintiff damages. *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 960-61 (2d Cir. 1998) (per curiam); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (combining these same elements into four categories for a fraudulent inducement claim). All of these elements are satisfied here.

Again, AMCK seeks to dismiss the fraud claim because Frontier has also alleged a breach of contract claim. (Mem. 18.)  AMCK remains wrong. A fraud claim can co-exist with a breach of

contract claim where the "fraudulent misrepresentation [is] collateral or extraneous to the contract." *Rouse v. Elliot Stevens, Ltd.*, 2016 WL 8674688, at *5 (S.D.N.Y. June 24, 2016) (quoting *Bridgestone/Firestone*, 98 F.3d at 20). In *Rouse*, for example, the Court noted that "a misrepresentation of a material fact which is collateral to the contract and serves as an inducement for the contract is sufficient to allege an independent claim of fraud." The Court found such a collateral misrepresentation and allowed plaintiff's fraud claim to proceed with its breach of contract claim, noting that "*[a]t trial*, however, the defendants may seek to introduce evidence to dispute the plaintiff's claim that the fraud claim is collateral to and separate from the breach of contract claim." *Id.* (emphasis added).

Here, Frontier's fraud claim does not rely solely on AMCK repudiating and breaching the Framework Agreement or the Original Leases. Rather, AMCK's fraudulent conduct consists of AMCK's material, false representations collateral to those contracts, namely that AMCK would retract its repudiation of the Framework Agreement if Frontier could achieve extracontractual delivery deferrals with Airbus and other concessions, and in the meantime Frontier did not need to pay rent under the Original Leases. In short, these promises were "extraneous to the contract, rather than a fraudulent non-performance of the contract itself." *See Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 747 (2d Cir. 1979).

Moreover, it is now clear that, since at least March 24, AMCK wanted to use the "nuclear option" of getting out of the Framework Agreement, and had no real intention of withdrawing its repudiation. (SMF ¶ 42.) Rather, AMCK's goal was to use its time-consuming, ever-increasing extracontractual demands and its promise of a rent deferral while Frontier attempted to meet those demands to manufacture a technical default, terminate the Framework Agreement, and then re-engage Frontier to lease the aircraft on terms that AMCK was otherwise unable to achieve. This is

exactly what AMCK did.

All told, Frontier has provided more than "enough evidence to allow a reasonable [fact-finder] to find by clear and convincing evidence" that fraud occurred. (*Contra* Mem. at 18 (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021)). The record shows that AMCK made multiple, material misrepresentations that satisfy the first fraud element, including: (i) through numerous communications, AMCK prevented Frontier from acting on AMCK's repudiations by promising Frontier it did not have to pay rent while it worked to achieve extracontractual concessions, even though AMCK knew as far back as March 24 that it only wanted to buy time before invoking the "nuclear option," and by April 7 that it "really cannot" take Frontier's upcoming deliveries (Hosenpud, Ex. 25; *id.*, Ex. 19 at AMCK033774); (ii) AMCK told Frontier it needed the concessions to stay in the Framework Agreement because it was facing financial difficulties, yet it had $███ million cash in its bank account (*Id.*, Ex. 3; McInerney Dep. at 83:22-84:3); (iii) likewise, AMCK told Frontier "we have to manage both our cash position and our bank facilities and associated covenants and these tie our hands in what we can do in total," but admitted in deposition that there were no specific secured or unsecured facilities that tied its hands with Frontier (Hosenpud, Ex. 32; Sheridan Dep. at 85:17-90:5); (iv) AMCK told Frontier on April 30 *not to pay* all outstanding rent and remain current (SMF ¶¶ 62-63); and (v) AMCK failed to disclose to Frontier its belief that the parties did not have a valid rent deferral agreement or that AMCK would declare a cross-default on this basis, even though it knew Frontier was acting on that understanding. *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 366 (N.D.N.Y. 2013) (explaining that, an omission can constitute a fraudulent misrepresentation, where the party "has superior knowledge that is not readily available/accessible to the other party and that party knows the other party is acting on the basis of mistaken knowledge.").

Frontier has also provided sufficient evidence to establish the other elements: AMCK knew the above promises were false; AMCK made these promises in order to manufacture a default to get out of the Framework Agreement; Frontier reasonably relied on AMCK's false promise of a rent deferral agreement; and Frontier has suffered significant damage, in the form of the difference in terms between the Framework Agreement and the alternative leases Frontier was compelled to hurriedly enter with CDB and JSA.

## H.    AMCK breached the 15 lease agreements.

AMCK seeks to dismiss Frontier's third claim that AMCK breached the 15 lease agreements, comprised of the 14 Original Leases and MSN 10038. AMCK reiterates its failed arguments from its motion to dismiss that: (1) there is no evidence the Defendants breached these lease agreements, and (2) that Frontier's alleged harm arises from AMCK terminating the Framework Agreement, not the leases. It likewise relies again on *Red Fort Capital, Inc. v. Guardhouse Products LLC*, 397 F. Supp. 3d 456, 470 (S.D.N.Y. 2019), which remains inapposite.

Unlike *Red Fort*, where the party accused of anticipatory repudiation *had already performed*, Defendants here have wholly failed to honor their contractual obligations. *Id.* ("Red Fort promised to lend money to the Guardhouse entities, which was duly and timely transferred to them."). Defendants wrongfully declared that Frontier materially breached the 15 existing aircraft lease agreements by not making rent payments the parties had agreed to suspend, and then used Frontier's alleged breaches as a predicate for terminating the already-repudiated Framework Agreement. Contrary to AMCK's argument, it has done more than "[m]erely stating that another party is in default." (Mem. at 19.) AMCK used its declaration of default—that depended on its claim that Frontier had violated the 15 leases—to abandon $██ million of remaining obligations.

It is likewise immaterial that most of the harm caused by AMCK's breach of the lease agreements manifested through Defendants' failure to perform the Framework Agreement. The

measure of damages in a breach of contract case relates, in part, to the damages that "are the natural and probable consequence of the breach." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 346 (S.D.N.Y. 2021). It cannot seriously be argued—though AMCK tries (Mem. at 21)—that AMCK's termination of the Framework Agreement was not the natural and probable consequence of AMCK's breach of the 15 lease agreements. Indeed, that was AMCK's express intention. (Hosenpud, Ex. 51 ¶¶ 2-6 ("By reason of" the "fail[ure] to make payments of basic rent when due under [the lease agreements] . . . AMCK Aviation hereby terminates its obligations under the framework agreement" and "has no further obligation to consummate the purchase and lease any [sic] of the remaining Aircraft").

## I.    AMCK interfered with Frontier's right of quiet use and enjoyment.

The 15 lease agreements expressly provide Frontier with the right to quiet enjoyment. (Hosenpud, Ex. 10 § 4.3 ("Lessor will not disturb the continuous use, possession and enjoyment of the Aircraft by Lessee during the Term"); Bindu, Ex. 1 § 4.3; *id.*, Ex. 5 § 4.3.) This right is likewise provided at common law. *Camatron Sewing Mach., Inc. v. F.M. Ring Assocs., Inc.*, 582 N.Y.S.2d 396, 398 (N.Y. App. Div. 1992). The covenant of quiet enjoyment is the "promise by the lessor that it will not interfere with the rights granted" under a lease. *Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*, 26 F. Supp. 2d 698, 706 (S.D.N.Y. 1998). "To establish a breach of the covenant of quiet enjoyment, a tenant must show either an actual or constructive eviction." *Grammer v. Turits*, 706 N.Y.S.2d 453, 455-56 (N.Y. App. Div. 2000). "A constructive eviction occurs where the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the leased premises." *Id.* "A constructive eviction does not require physical removal from the premises; it is sufficient to demonstrate that the lessee could not use the premises for the purpose(s) intended and had to abandon the premises under the circumstances." *Herbert Paul, CPA, PC v. 370 Lex, L.L.C.*, 794 N.Y.S.2d 869, 872 (N.Y. Cty. 2005).

022510.0155/9198506.5

AMCK constructively evicted Frontier from the five remaining Framework Agreement aircraft: One of AMCK's extracontractual conditions for withdrawing its repudiation of the Framework Agreement was that Frontier needed to actively fly its AMCK-leased aircraft, even though AMCK has no right to dictate Frontier's use. (SMF ¶¶ 44-45; Hosenpud, Ex. 29 (AMCK stating on March 31 it would not proceed "with closing on the 5 remaining sale & leaseback aircraft if they are going to go straight into storage for an uncertain period of time").) AMCK also induced Frontier to defer the five aircraft deliveries with Airbus for a number of months, interfering with Frontier's ability to use these newer, more efficient aircraft as Frontier had originally planned. (Hosenpud, Ex. 5.) Frontier is entitled to damages under this claim, at minimum for the months' long loss-of-use of the five aircraft as a result of deferring deliveries on AMCK's demands.

Finally, in terminating the Framework Agreement, Defendants expressly reserved, and threatened to exercise, all of their termination rights, including the immediate return of all aircraft, repossessing the aircraft, and forcing Frontier to keep the aircraft grounded and stored. (Hosenpud, Ex. 51 ¶ 7.) If Defendants make good on their threat—even between now and trial—Frontier's damages arising from this claim will grow exponentially. Also worth noting: a finding for Frontier that Defendants were not entitled to declare a default under the lease agreements necessarily prevents Defendants from further interfering with Frontier's quiet use and enjoyment of the leased aircraft, removing the fiction under which Defendants can exercise their termination rights.

## IV. **CONCLUSION**

Genuine disputes of material fact permeate each claim. Further, contrary to Defendants' request, as a matter of law the Court should not decide Frontier's separate, materially disputed causes of action through piecemeal dismissal. Finally, all Defendants have express contractual rights and obligations and should remain in this case. Defendants' Motion should be denied in its entirety.

DATED:  December 9, 2022

**LANE POWELL PC**


By: */s/ David G. Hosenpud*
    David G. Hosenpud (*pro hac vice*)
    601 SW Second Avenue, Suite 2100
    Portland, Oregon  97204-3158
    Telephone No.:  503.778.2100
    Facsimile No.:  503.778.2200
    E-mail:  hosenpudd@lanepowell.com

    Aaron Schaer, (*pro hac vice*)
    1420 Fifth Avenue, Suite 4200
    P.O. Box 91302
    Seattle, WA  98111-9402
    Telephone:  206.223.7103
    Facsimile:  206.223.7107
    E-mail:  schaera@lanepowell.com

    -and-

**BINDER & SCHWARTZ LLP**
Neil S. Binder
366 Madison Avenue, 6th Floor
New York, New York  10017
Telephone No.:  212.510.7008
Facsimile No.:  212.510.7299
E-mail:  nbinder@binderschwartz.com

*Attorneys for Plaintiff, Frontier Airlines, Inc.*

022510.0155/9198506.5