**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FRONTIER AIRLINES, INC.                    Case No.:  1:20-cv-09713-LLS

                    Plaintiff,

        v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION
(TWO) LIMITED, WELLS FARGO TRUST
COMPANY, N.A., solely in its capacity as
OWNER TRUSTEE, and UMB BANK,
N.A., solely in its capacity as OWNER
TRUSTEE,

                    Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

        Pursuant to Local Civil Rule 56.1(b), Plaintiff Frontier Airlines, Inc. (Frontier) responds

as follows to each statement of material fact submitted by Defendants AMCK Aviation Holdings

Ireland Limited (AMCK), Accipiter Investments Aircraft 4 Limited (Accipiter), Vermillion

Aviation (Two) Limited (Vermillion), UMB Bank, N.A., solely as owner trustee (UMB), and

Wells Fargo Trust Company, N.A., solely as owner trustee (Wells Fargo) (collectively,

Defendants) in support of Defendants' motion for summary judgment.

        1.      Plaintiff Frontier Airlines, Inc. ("Frontier") is a passenger airline based in Denver,

Colorado. (Compl. ¶¶ 1, 11.)

        **Response**: Undisputed. (Dempsey Decl. ¶ 2.)

        2.      Jimmy Dempsey is the Executive Vice President and Chief Financial Officer of

Frontier. Spencer Thwaytes is Frontier's Vice President and Treasurer, reporting to Mr. Dempsey.

Robert Fanning is Vice President of Fleet Transactions, responsible for overseeing the making of

rent payments, and reporting to Mr. Dempsey. Sharath Sashikumar Bindu reports to Mr. Fanning, and is Frontier's manager of fleet and strategic sourcing with responsibility for approving payments. (Bindu Tr. 6:19-8:9, 8:24-9:8; Dempsey Tr. 5:11-13, 6:9-25; Fanning Tr. 5:20-22, 8:4-22; Thwaytes Tr. 4:17-5:8.)

**Response**: Undisputed.

3.      Defendant AMCK is an aircraft leasing company organized under the laws of Ireland and with its principal place of business in Ireland. During the relevant time, Paul Sheridan was AMCK's Chief Executive Officer. Jane O'Callaghan was AMCK's Chief Commercial Officer. (Compl. ¶¶ 2, 11; Sheridan Decl. ¶¶ 1-2; O'Callaghan Decl. ¶¶ 1-2.)

**Response**: Frontier disputes this statement. Defendants, along with AMCK's other affiliates, subsidiaries, and owner-trustee entities, sold various assets, including their portfolio of aircraft," to Carlyle Group Inc (Carlyle Transaction). This transaction is currently subject to separate litigation in *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Limited, et al.*, 1:22-cv-2943 (PAE). (*See also* 7.13.22 Order (Dkt. 92).) The testimony from AMCK's witnesses in this litigation is unclear whether, at this point in time, AMCK is still an operating entity. (O'Callaghan Dep. at 11:7-12:2; Sheridan Dep. at 10:12-12:22; Ma Dep. at 20:5-21:11; Lee Dep. at 21:25-23:17.)[1]

4.      Frontier relies on leased aircraft for 100% of its aircraft fleet. Frontier leases these aircraft from aircraft leasing companies pursuant to "sale and leaseback" transactions. In such a transaction, an airline with an existing agreement to purchase an aircraft from a manufacturer,

---

[1] Deposition excerpts are attached to the Declaration of David Hosenpud as follows: Bachrach Dep. (Ex. 68); Bindu Dep. (Ex. 69); Dempsey Dep. (Ex. 70); Fanning Dep. (Ex. 71); Lee Dep. (Ex. 72); Ma Dep. (Ex. 73); McInerney Dep. (Ex. 74); Murphy Dep. (Ex. 75); Neels Dep. (Ex. 76); O'Callaghan Dep. (Ex. 77); Sheridan Dep. (Ex. 78); Thwaytes Dep. (Ex. 79).

instead of taking delivery of the aircraft itself, enters into an arrangement for an aircraft leasing company to purchase the aircraft and then lease it back to the airline. (Compl. ¶ 27; O'Callaghan Decl. ¶ 3; Thwaytes Tr. 7:24-8:6.)

**Response**: Frontier disputes this statement as materially incomplete. In a sale-leaseback arrangement (SLB), the airline is obligated to take delivery of each aircraft pursuant to an established schedule in the underlying purchase agreement with the manufacturer. The airline makes pre-delivery payments (PDP) to the manufacturer as construction of the aircraft progresses. Then, prior to the delivery of the aircraft (often one year or six months before delivery), the airline will enter into an SLB with an airline leasing company. The purchase price and monthly lease payments of the aircraft under the SLB arrangement are negotiated solely between the airline and the leasing company with no involvement of the manufacturer. That said, the leasing company pays the purchase price directly to the manufacturer at the time of delivery. Depending on the purchase price, the airline may receive a refund from the manufacturer for any PDP overpayments. Until the leasing company pays the purchase price to the manufacturer, the airline remains fully responsible to purchase the aircraft under its purchase agreement with the manufacturer. If a leasing company fails to perform under the SLB as agreed, the airline will be required to use its own funds to purchase the aircraft, negotiate an SLB arrangement with another leasing company, or risk defaulting on its purchase agreement with the manufacturer. (Hosenpud, Ex. 1-2; Bindu, Ex. 1-5; Dempsey Decl. ¶¶ 4-5.).

5.    At the beginning of 2020, Frontier operated 14 Airbus A320 aircraft leased from AMCK, through its affiliate and certain owner trusts. Each of these aircraft was identified by a manufacturer's serial number ("MSN") associated with it. These 14 leases were governed by separate, but in all relevant respects similar, lease agreements. Frontier is the lessee under each

agreement, and the lessor is either UMB or Wells Fargo. However, UMB and Wells Fargo are not lessors in their individual capacities. Rather, UMB and Wells Fargo are "owner trustees" acting for the benefit of the "owner participant," a former affiliate of AMCK called Accipiter. (O'Callaghan Decl. ¶¶ 4-7 & Exs. 1-2; Compl. ¶¶ 7, 30, 64; Dempsey Tr. 10:5-20; Bindu Tr. 10:8-24.)

     **Response**: Frontier disputes this statement. It is unclear what this statement intends in calling Accipiter a "former affiliate of AMCK." Based on testimony from Defendants' witnesses, Accipiter is still in existence, will remain the Guarantor and Owner Participant for a number of aircraft at issue in this litigation, and there are no plans to wind Accipiter down in connection with the Carlyle Transaction. Defendants' statement relates to the surviving corporate structure of certain Defendants after the Carlyle Transaction, to which AMCK's witnesses were instructed to not testify fully in their depositions. That said, certain AMCK witnesses testified that Accipiter "would have been transferred to Carlyle" in the Carlyle Transaction. (Ma Dep. at 23:9-16, 195:3-14; Sheridan Dep. at 16:10-20:15; Lee Dep. at 18:13-23:17.)

     6.    As reflected in the lease agreements, the date, MSN and lessor under each lease is as follows:

| Lease Date | MSN | Lessor |
|---|---|---|
| June 9, 2014 | 6184 | Wells Fargo |
| February 19, 2016 | 7524 | Wells Fargo |
| March 6, 2018 | 8102 | Wells Fargo |
| June 5, 2018 | 8239 | Wells Fargo |
| August 29, 2018 | 8307 | Wells Fargo |
| July 31, 2018 | 8357 | Wells Fargo |
| August 30, 2018 | 8402 | Wells Fargo |
| March 22, 2019 | 8766 | UMB |

| April 23, 2019 | 8857 | UMB |
| May 9, 2019 | 8913 | UMB |
| June 27, 2019 | 8977 | UMB |
| June 28, 2019 | 9026 | UMB |
| August 19, 2019 | 9068 | UMB |
| September 30, 2019 | 9177 | UMB |

(O'Callaghan Decl. ¶ 57 & Exs. 1-2; Compl. ¶ 30.)

**Response**: Undisputed, though Frontier notes that the above citation should be O'Callaghan Decl. ¶¶ 5-7.

7.    Each of the 14 original leases gives Frontier the right to possess and operate an individual aircraft. In exchange, Frontier is required to make monthly payments of rent to the lessor. The payment due date is determined with reference to the date of delivery of the aircraft. For example, if an aircraft was delivered on the fifth day of a month, the payment due date for that aircraft will be the fifth day of each month. If that day falls on a weekend or legal holiday, the payment due date is the next business day. (O'Callaghan Decl. ¶ 8; Thwaytes Tr. 10:15-12:6, 18:10-37:11; Bindu Tr. 10:25-12:7.)

**Response**: Frontier disputes this statement as materially incomplete. Each lease agreement provides a grace period of three business days for rent payments made after the due date. In addition, each lease agreement provides Frontier the right to "the continuous quiet use, possession and enjoyment of the Aircraft." (Thwaytes Dep. 10:15-12:6; Bindu, Ex. 1 §§ 4.3(a), 16.1(a); *id.*, Ex. 3 §§ 4.3(a), 16.1(a); Hosenpud, Ex. 10 §§ 4.3(a), 16.1(a).)

8.    Accipiter also serves as "lessor guarantor" under some of these leases, guaranteeing the performance by the lessor under each such original lease. (O'Callaghan Decl. ¶ 9 & Ex. 3.)

**Response**: Frontier disputes this statement as materially incomplete. Accipiter has a

number of additional legal relationships and obligations arising out of the operative contract documents. For example, Accipiter is considered the Lessor Guarantor, Owner Participant, and Trustor under some of the 14 Original Leases. In its role as Trustor, Accipiter guaranteed the Lessor/Owner Trustee's performance, with Frontier as the beneficiary of that performance. And although the Lessor/Owner Trustee (which is either UMB or Wells Fargo on each relevant lease) has the power to sell, transfer, or otherwise convey its rights and interest in the aircraft, the Lessor/Owner Trustee cannot do so "without prior written consent of the Trustor," *i.e.*, Accipiter. In this case, AMCK and the Lessors (again—whose performance is guaranteed by Accipiter) declared an Event of Default against Frontier based on alleged delayed payments under the 14 Original Leases, which was the purported grounds to declare that Defendants could terminate the Framework Agreement. (Hosenpud, Ex. 51, 80; Bindu, Ex. 1-5; Bindu Decl. ¶ 7.)

9.  On March 16, 2020, Frontier and AMCK entered a Framework Agreement for the sale and leaseback of six additional Airbus A320 aircraft. Under a separate purchase agreement between Airbus and Frontier, these aircraft were scheduled for delivery from Airbus to Frontier in 2020. The Framework Agreement provides for the purchase of the aircraft by an affiliate of AMCK and for the lease of these aircraft back to Frontier. (O'Callaghan Decl. ¶ 10 & Ex. 4; Dempsey Tr. 13:5-14:8; Fanning Tr. 16:5-17:25; Thwaytes Tr.: 47:22-50:18; Bindu Tr. 46:4-47:9.)

**Response**: Frontier disputes this statement as materially incomplete. The key economic terms of the Framework Agreement were finalized and agreed upon by the parties in September 2019. Further, Frontier's purchase agreement with Airbus (Airbus Agreement) obligates Frontier to purchase over ███ aircraft from Airbus, and make certain PDPs on each aircraft, according to an agreed-upon schedule. The six aircraft that AMCK committed to purchasing from and lease back to Frontier were originally set to be delivered according to the following schedule: (i) three

aircraft in March 2020; (ii) one aircraft in May 2020; (iii) one aircraft in June 2020; and (iv) one aircraft in August 2020. (Hosenpud, Ex. 1 at FRONTIER0012417-42, 90-95; *Id*, Ex. 7 at FRONTIER0002831-32, 47-48, 68, 73, 82; Dempsey, Ex. 1.)

10.    Under the purchase agreement between Airbus and Frontier, as of March 2020, Frontier was required to take delivery of approximately 150 additional future aircraft, with 16 aircraft due in 2020. (Dempsey Tr. 11:16-12:21, 102:20-104:18 & Butler Decl. Ex. 11; Thwaytes Tr. 51:16-52:9, 52:20-53:7; Bindu Tr. 49:5-13; Butler Decl. Ex. 8.)

**Response**: Undisputed.

11.    On March 16, 2020, Frontier received delivery of MSN 10038, the first of the six aircraft deliveries covered by the Framework Agreement. (O'Callaghan Decl. ¶ 11 & Ex. 5; Thwaytes Tr. 45:10-46:17; Fanning Tr. 18:8-19:24, 160:19-22.)

**Response**: Undisputed.

12.    On the same date, Frontier executed a sale and leaseback transaction, selling MSN 10038 to Vermillion for a purchase price of $█ million and leasing the aircraft back pursuant to a lease agreement between Frontier and UMB, as owner trustee, dated as of March 16, 2020 (the "MSN 10038 Lease"). In this lease, Vermillion, is the owner participant and guarantor. (O'Callaghan Decl. ¶¶ 11-13 & Exs. 6-7.)

**Response**: Frontier disputes this statement's material mischaracterization that Frontier itself received the $51 million purchase price. Rather, Vermillion—an AMCK Affiliate under the MSN 10038 lease documents—paid $█ million directly to Airbus. To the extent this amount exceeded the amounts Frontier agreed to paid Airbus for the aircraft (including the amounts Frontier had already paid Airbus in PDPs), Frontier received a refund from Airbus for that difference.

7

In addition, Frontier disputes this statement as materially incomplete. Vermillion, and other Defendants, have a number of additional legal relationships and obligations arising out of the MSN 10038 Lease. For example, UMB is the "Lessor" and "Trust Company." UMB is also the "Owner Trustee" under the MSN 10038 Trust Agreement. Vermillion is the "Trustor" of the MSN 10038 Trust Agreement, in which it conveyed all right, title, and interest and transfer of control of the aircraft to UMB. Although UMB has the power to sell, transfer, or otherwise convey its rights and interest in MSN 10038 as well as Vermillion's beneficial interest, it cannot do so "without prior written consent of the Trustor," *i.e.*, Vermillion. The MSN 10038 Guaranty also identifies Vermillion as the Lessor Guarantor, in which Vermillion *guarantees* to Frontier as beneficiary all of UMB's performance obligations as Lessor under the MSN 10038 Lease. Further, under the Framework Agreement, AMCK is the "Lessor Guarantor" and "Owner Participant," as are Vermillion and Accipiter due to their status as AMCK's "Affiliate." AMCK is obligated to cause the Lessor (UMB) to purchase the aircraft from Airbus on the delivery date and execute a Lease Agreement with Frontier—again, UMB's performance is guaranteed by Vermillion. (Hosenpud, Ex. 7 §§ 1.1, 2.1.1, 3.3.1; *id.* Ex. 10 at 1, 15; *id.*, Ex. 11 at 1, §§ 1, 2, 8.01-.02, 9.01(b); *id.*, Ex. 12 at 1, § 1.)

13.    Later that same day, on March 16, 2020, Frontier sent a "concession request letter" to AMCK regarding a requested deferral of rent. (O'Callaghan Decl. ¶ 15 & Ex. 8; Dempsey Tr. 22:24-24:5, 25:9-29:9; Thwaytes Tr. 66:4-67:19; Fanning Tr. 19:25-22:9; Bindu Tr. 86:25-88:3.)

**Response**: Frontier disputes this statement as materially incomplete. Frontier sent substantially similar concession request letters to all of its airline leasing partners on March 16, 2020 in light of the sudden and significant impact of COVID-19 on domestic U.S. air travel. In the letter to AMCK, Frontier requested a voluntary (i) one-time, three-month aircraft rent deferral; and (ii) return of one-month's security deposit. Frontier further explained it would make repayments

with interest in full over a nine-month period commencing on July 1, 2020. In addition, Frontier represented that it had a "strong balance sheet with $685 million of free cash" to assure AMCK that Frontier could make its rent payments, with interest, when the proposed deferral period expired. (Hosenpud, Ex. 15; Fanning Dep. at 19:25-23:15, 38:7-18.)

14.    Frontier expected that any deferral of rent pursuant to this request would be documented in a written agreement. (Bindu Tr. 91:11-92:10; Dempsey Tr. 24:20-25:8, 39:13-40:20, 76:18-77:2, 80:13-81:19, 83:25-84:8 & Butler Decl. Ex. 7; Fanning Tr. 21:23-22:9, 75:23-76:9; Fanning Tr. 76:13-78:10 & O'Callaghan Decl. Ex. 16; Thwaytes 140:9-23, 158:7-20 & O'Callaghan Decl. Ex. 8; Thwaytes Tr. 158:25-160:8, 163:11-16 & O'Callaghan Decl. Ex. 10.)

**Response**: Frontier disputes this statement. The citations provided by AMCK do not support its representation that this is an undisputed fact. The cite to Mr. Bindu's testimony concerns Frontier signing the concession request letter before sending it to AMCK. The cites to Mr. Dempsey's testimony show that Fronter understood a rent deferral agreement would "[n]ot necessarily [be] in writing, but certainly agreed in some form," that Frontier "had a very good relationship with AMCK, and we would have taken [Mr. Sheridan's] word to be something we could rely upon, given that he is the chief executive of AMCK," that Frontier "tended to be flexible with the format that the leasing companies wanted to agree with us," that Frontier and AMCK verbally "agree[d] to a month-to-month rent deferral." In short, Frontier understood that the parties reached a month to month rent deferral agreement through numerous phone calls, emails, and text messages—during a period of time in which the parties were in constant contact—and that such deferral would last until the parties could complete negotiations on all the outstanding terms they were discussing, including AMCK's extracontractual demands that Frontier achieve delivery deferrals for the five upcoming aircraft and to materially adjust the terms of all lease agreements

between the parties. At that point, Frontier expected the parties would memorialize the agreement in a more formalized document, but remained "flexible with the format." (Dempsey Dep. 24:20-25:8, 39:13-40:20, 76:18-78:19, 80:13-81:19, 83:25-84:8; Hosenpud, Ex. 33-34; Fanning Dep. at 84:10-85:21, 89:17-94:16.)

15.     The parties never entered a written agreement providing for the deferral of rent. (Sheridan Decl. ¶ 4; O'Callaghan Decl. ¶¶ 20, 22, 25; Dempsey Tr. 86:17-24; Fanning Tr. 70:19-71:12, 75:11-76:12; Thwaytes Tr. 168:7-22.)

**Response**: Frontier disputes this statement. There are numerous writings evidencing the parties' agreements to defer rent. The nature of these agreements evolved as the parties' discussions evolved, especially Defendants' changing extracontractual demands. For example, in an April 6, 2020 email, Frontier and AMCK agreed to a 10-business-day suspension of rent payments, allowing Frontier to defer its obligation to pay monthly rent on 14 of the 15 aircraft until April 21, 2020, pending the outcome of Frontier's delivery deferral negotiations with Airbus. Frontier and AMCK then held a phone call on April 7, 2020, clarifying that they had "agreed to do the [temporary] deferral on a month to month basis" until the rent deferral negotiations were complete. Both Frontier and Defendants related the terms of this month-to-month rent deferral agreement in writings. On April 13, 2020, after Frontier told AMCK it could achieve delivery deferrals with Airbus of approximately two months (*i.e.*, the next one delivering in June), AMCK wrote back that Frontier only needed to pay its rent before the next aircraft delivered (a date that later changed to July 2020). On April 30, 2020, AMCK told Frontier in writing that all payments need to be current on May 15, 2020. Frontier initially agreed to this term, while explaining to AMCK that its other extracontractual demands were an "overreach." These written agreements are on top of the significant verbal agreements the parties had in which the parties expressed their

agreement that Frontier did not need to pay rent while negotiations were ongoing. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20).

16.    Frontier sent AMCK draft rent deferral agreements on or about March 24 and April 1, 2020. The parties never finalized or executed these drafts. (O'Callaghan Decl. ¶ 20 & Exs. 9-10; Dempsey Tr. 86:17-24; Fanning Tr. 70:19-71:12, 75:11-76:12; Thwaytes Tr. 168:7-22.)

**Response**: Frontier disputes this statement as materially incomplete. The draft agreements Frontier sent on March 24 and April 1, 2020, largely tracked the rent deferral terms in the most recent counteroffers AMCK had made to Frontier. However, these draft agreements were quickly displaced by AMCK's evolving requests, including AMCK's demands for extracontractual terms—such as further aircraft delivery deferrals and lease extensions—as well as the parties' written and verbal agreements that Frontier did not need to pay rent on the 14 Original Leases while negotiations were ongoing. (Dempsey Decl. ¶¶ 8-9; Hosenpud, Ex. 32-34.)

17.    During the month of April 2020, per the terms of the original leases, Frontier owed 14 rent payments in connection with the original leases. The payment amounts and date for each MSN are as follows:

| MSN | Payment Date | Payment Amount |
|-----|--------------|----------------|
| 8239 | April 3, 2020 | $███████ |
| 8102 | April 6, 2020 | $███████ |
| 8913 | April 9, 2020 | $███████ |
| 6184 | April 17, 2020 | $███████ |
| 9068 | April 17, 2020 | $███████ |
| 8766 | April 22, 2020 | $███████ |
| 8857 | April 23, 2020 | $███████ |

022510.0155/9200110.2

| 7524 | April 24, 2020 | $ ████████ | |
| 8977 | April 27, 2020 | $ ████████ | |
| 9026 | April 28, 2020 | $ ████████ | |
| 8307 | April 29, 2020 | $ ████████ | |
| 9177 | April 30, 2020 | $ ████████ | |
| 8357 | April 30, 2020 | $ ████████ | |
| 8402 | April 30, 2020 | $ ████████ | |

(O'Callaghan Decl. ¶ 23; O'Callaghan Decl. Ex. 10; Bindu Tr. 16:14-34:8, 38:6-39:8; Butler Decl. Exs. 1, 2, 17 & 18.)

**Response**: Frontier disputes this statement. The parties expressly agreed that Frontier could defer any rent payments due under the 14 original leases, at least while negotiations were ongoing regarding a larger agreement that included rent deferrals, delivery deferrals, and potential modifications to the underlying lease agreements. These negotiations were ongoing from March 16, 2020 until May 8, 2020, when Defendants unexpectedly sent Frontier a notice of termination letter. Accordingly, the rent amounts in the chart above were not due in April 2020. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20, 25-28.)

18.    Frontier maintained internal records of rent payment amount and due dates under the original leases. Based on this tracker, Frontier knew the correct amount and due date for each rent payment owed under the original leases. (Bindu Tr., 12:8-15, 16:17-17:13, 98:17-99:13; Butler Decl. Exs. 4-5; Fanning Tr. 59:20-60:18; 124:23-125:18; Thwaytes Tr. 13:20-14:15.)

**Response**: Frontier disputes this statement as materially incomplete. In addition to the internal records that Frontier used to determine the rent payments and due dates owed under all of

its lease agreements with lessors, Frontier also had an internal document it used to track the deferred rent agreements Frontier had with its lessors. AMCK was included in the document used to track rent deferral agreements. Likewise, AMCK had internal documents that, through May 8, 2020, represented that the Frontier "[r]ent deferral request[]" was "under negotiation" and "under review," that Frontier's rent payments "have been deferred." (Bindu Dep. at 102:7-103:16; Hosenpud, Ex. 38; *id.*, Ex. 39 (May 1, 2020 "deferral agreement spreadsheet" showing "all rentals that have been deferred and the respective deferred amounts," including Frontier); *id.*, Ex. 40 at AMCK021216; *id.*, Ex. 27 at AMCK031674 (May 8, 2020 edits from Ms. O'Callaghan referencing ongoing negotiations with Frontier); McInerney Dep. at 70:10-21; 98:13-105:13; O'Callaghan Dep. at 139:11-142:15.)

19.    The payment amounts and due dates for rent due in April 2020 and early May 2020, per the terms of the original eases, were reflected in invoices that AMCK sent by email to Frontier in January and March 2020. (Bindu Tr. 16:14-43:8 & Butler Decl. Exs. 17-18.)

**Response**: Frontier disputes this statement as materially incomplete. Between March 19, 2020 (shortly after the parties began discussing rent deferral terms) and May 8, 2020, AMCK did not send any lease invoices to Frontier, except for lease invoices associated with MSN 10038, which Frontier promptly paid. (Hosenpud, Ex. 13, 36.)

20.    On April 6, 2020, Frontier was due to pay rent on two of the original leases. (O'Callaghan Decl. ¶ 23; Butler Decl. Exs. 4-5; Fanning Tr. 59:20-60:18, 62:16-63:8.)

**Response**: Frontier disputes this statement as materially incomplete. The parties had been discussing rent deferrals on all leased aircraft since Frontier's March 16, 2020 concession request letter. Frontier was fully current on all rent payments through April 6, 2020. Rent payments were due on April 6, 2020 on two of the original leases, and the parties had not yet agreed to a rent

deferral. On April 6, 2020, the parties agreed to defer those rent payments, and all others upcoming, over the next 10 business days so that Frontier had time to reach a delivery deferral agreement with Airbus. This rent deferral agreement was extended the next day to a "month to month" deferral agreement until negotiations were complete. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20).

21.     On April 6, 2020, Frontier asked AMCK for a temporary rent deferral regarding the payments due that day. (Butler Decl. Exs. 4-5 & Dempsey Tr. 65:7-19; Fanning Tr. 114:3-115:8, 123:17-128:11 & O'Callaghan Decl. Ex. 15; Sheridan Decl. ¶ 7 & Ex. 3.)

**Response**: Frontier disputes this statement as materially incomplete. The parties had been discussing rent deferrals on all leased aircraft since Frontier's March 16, 2020 concession request letter. Frontier was fully current on all rent payments through April 6, 2020. Rent payments were due on April 6, 2020 on two of the original leases, and the parties had not yet agreed to a rent deferral. On April 6, 2020, the parties agreed to defer those rent payments, and all others upcoming, over the next 10 business days so that Frontier had time to reach a delivery deferral agreement with Airbus. This rent deferral agreement was extended the next day to a "month to month" deferral agreement until negotiations were complete. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20).

22.     During a telephone call on April 6, 2020, AMCK agreed to grant Frontier a grace period on rent payments for 10 business days. (Sheridan Decl. ¶ 8; Fanning Tr. 63:9-65:8, 125:9-

127:24 & Butler Decl. Exs. 4-5; Dempsey Tr. 66:3-67:15.)

**Response**: Frontier disputes this statement's material mischaracterization that AMCK granted Frontier "a *grace period* on rent payments for 10 business days." The term "grace period"—which was not used by the parties in written or verbal communications in reaching their agreement on April 6, 2020—implies that Frontier was late paying rent. However, on April 6, 2020, the parties reached an agreement to defer all lease payments for 10 business days so that Frontier, at AMCK's request, had time to reach a delivery deferral agreement with Airbus. This rent deferral agreement was extended the next day to a "month to month" deferral agreement until negotiations were complete. Thus, rather than being in a "grace period," Frontier was acting in accordance with the parties' separate rent deferral agreement. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20).

23.     Later that day, on April 6, 2020, Mr. Sheridan of AMCK sent a confirming email to Frontier, stating that the grace period would last until April 21, 2020. Frontier understood the duration of the grace period set out in Mr. Sheridan's email. (Sheridan Decl. ¶¶ 8-9 & Exs. 4-5; Fanning Tr. 65:9-66:13, 145:22-146:18; Dempsey Tr. 70:17-22; Butler Decl. Exs. 4-5, Bindu Tr. 99:22-100:9, 101:11-102:6 & Butler Decl. Ex. 6; Thwaytes Tr. 163:17-22, 165:16-168:22.)

**Response**: Frontier disputes this statement's material mischaracterization that AMCK granted Frontier "a *grace period* on rent payments for 10 business days." The term "grace period"—which was not used by the parties in written or verbal communications in reaching their agreement on April 6, 2020—implies that Frontier was late paying rent. However, on April 6, 2020, the parties agreed to defer all lease payments for 10 business days so that Frontier, at

022510.0155/9200110.2

AMCK's request, had time to reach a delivery deferral agreement with Airbus. This rent deferral agreement was extended the next day to a "month to month" deferral agreement until negotiations were complete. Thus, rather than being in a "grace period," Frontier was acting in accordance with the parties' separate rent deferral agreement. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20).

24.    Beginning on April 6, 2020, and continuing through May 8, 2020, Frontier did not pay any amounts that, per the terms of the original leases, were due to be paid in April 2020. (O'Callaghan Decl. ¶¶ 23-24, 27; Bindu Tr. 17:5-8, 17:20-37:3; Thwaytes Tr. 24:2-19, 35:8-37:11.)

**Response**: Frontier disputes this statement. The parties expressly agreed that Frontier could defer any rent payments due under the 14 original leases, at least while negotiations were ongoing regarding a larger agreement that included rent deferrals, delivery deferrals, and potential modifications to the underlying lease agreements. These negotiations were ongoing from March 16, 2020 until May 8, 2020, when Defendants unexpectedly sent Frontier a Notice of Termination letter. Accordingly, the rent amounts for the 14 original leases were not due between April 2020 and May 8, 2020. Notably, the one aircraft that was expressly not included in the monthly rent deferral agreement was MSN 10038—the only aircraft delivered under the Framework Agreement. Frontier has always made timely lease payments on MSN 10038, including during the March 16 to May 8, 2020 timeframe. Moreover, after Frontier received the Notice of Termination letter on May 8, 2020—and confirmed the meaning of that letter in written correspondence on May 9, 2020 and May 13, 2020—Frontier promptly wired Defendants funds on May 13, 2020, becoming

current on all monthly aircraft lease payments, fully curing any alleged default. To date, Frontier has stayed current on all monthly aircraft lease payments. (Hosenpud, Ex. 13, 32-37, 45, 47, 51-55; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11, 164:15-165:10; Fanning Dep. at 83:18-85:21, 87:15-92:11; O'Callaghan Dep. at 229:4-7; Dempsey Decl. ¶¶ 9, 14-17, 19-20, 25-28.)

25.    On April 7, 2020, Mr. Sheridan and Mr. Dempsey had a conversation by telephone. On this call, they discussed a "month-to-month" rent deferral arrangement. Mr. Dempsey testified that Mr. Sheridan agreed to a rent deferral for the rest of April 2020, and that deferrals for future months would be agreed separately. He also testified that there was no discussion of the repayment date for deferred rent. (Dempsey Tr. 72:18-80:12; Dempsey Tr. 81:20-84:12 & Butler Decl. Ex. 7; see also Sheridan Decl. ¶ 11.)

**Response**: Frontier disputes this statement. Frontier understood the parties had reached a month-to-month rent deferral agreement and that such deferral would last until the parties could complete negotiations on all the outstanding terms they were discussing, including AMCK's extracontractual demands that Frontier achieve delivery deferrals for the five upcoming aircraft and to materially adjust the terms of all lease agreements between the parties. Because the month-to-month agreement was originally reached in April 2020, Mr. Dempsey's testimony was that the parties agreed to defer rent until the end of April and would agree to defer rent to the end of May "if it's necessary." AMCK further clarified that its main concern regarding when Frontier needed to pay its deferred rent was that Frontier needed to be current on all rent prior the next aircraft delivery. Because, on April 7, 2020 when the parties agreed to a month-to-month arrangement, both parties knew it would take a long time to work out a delivery deferral with Airbus and it was already apparent that the next aircraft under the Framework Agreement would not be delivered

until May 2020 at the earliest, both parties expected that the month-to-month arrangement would extend into May 2020. Moreover, on April 30, Frontier offered to immediately get current on all outstanding rent and stay current thereafter. AMCK did not accept this term, instead suggesting that Frontier pay its rent back by May 15, 2020. Simultaneously, the parties' negotiations continued past the end of April and into May, and Frontier had not finalized by its complex side-deal with Airbus to defer delivery dates for aircraft by the end of April. Further, Prior to AMCK sending its notice of termination letter on May 8, 2020, AMCK never informed Frontier that deferred rent was past due or needed to be paid immediately, or suggest that the rent deferral agreement was no longer in effect. All of this led to Frontier's belief that it was necessary for the month-to-month rent deferral to extend into May 2020, at least May 15, 2020. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-94:16; Dempsey Decl. ¶¶ 9, 14-17, 19-20, 25-27.)

26.    Mr. Dempsey later asked Mr. Fanning to "get a draft" for a month-to-month deferral arrangement to AMCK. However, there was never a written agreement executed reflecting a month-to-month arrangement. (Dempsey Tr. 80:13-81:19, 82:7-84:12 & Butler Ex. 7; Fanning Tr. 70:19-72:8, 73:14-76:9, 83:3-11; Thwaytes Tr. 166:23-167:21, 168:7-22.)

**Response**: Frontier disputes this statement as materially incomplete. Although the parties did not execute a formal written agreement codifying their month-to-month deferral arrangement, there was significant correspondence—verbal and written—between the parties, as well as internally within both parties, recognizing that the parties had reached a month-to-month deferral agreement. . (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning

Dep. at 83:18-85:21, 87:15-94:16; Dempsey Decl. ¶¶ 9, 14-17, 19-20, 25-27.)

27.     On April 9, 2020, AMCK sent Frontier a draft rent forbearance letter describing a proposed deferral of the rent due in April 2020 for one of the aircraft leased to Frontier. Frontier never responded to AMCK with respect to this draft. (O'Callaghan Decl. ¶ 25 & Ex. 16; Fanning Tr. 77:5-78:10; Sheridan Decl. ¶ 12.)

**Response**: Frontier disputes this statement as materially incomplete. AMCK's April 9, 2020 draft rent forbearance letter was sent as a response to the March 24, 2020 and April 1, 2020 draft rent deferral agreements that Frontier had provided to AMCK. AMCK's April 9 draft letter did not accurately capture the state of the parties' negotiations because (1) it only related to rent deferral payments (using terms that were substantially different than the parties had been discussing to that point); and (2) was silent on AMCK's extracontractual requests that Frontier defer the delivery dates with Airbus. Given the disparity between the terms in this draft letter and the parties' discussions, Ms. Callaghan admits that AMCK provided this draft letter as a template of "a standard form forbearance letter that [AMCK] like[s] to use for all of [its] lessees," "in the event that [the parties] reached agreement on all of the other conditions that [AMCK] would require in order to proceed with" AMCK fulfilling its remaining obligations under the Framework Agreement. (O'Callaghan Dep. at 107:18-110:22.)

28.     During the parties' discussions about potential rent deferral, AMCK repeatedly emphasized that it would not take future aircraft deliveries under the Framework Agreement if any rent from Frontier was outstanding. (See, e.g., Sheridan Decl. ¶ 14 & Ex. 9; O'Callaghan Decl. ¶ 26 & Ex. 15; Dempsey Tr. 96:2-16; Fanning Tr. 85:22-86:21, 90:5-13, & Butler Decl. Ex. 12; Dempsey Tr. 114:13-20; Fanning Tr. 131:13-133:5; Dempsey Tr. 114:22-116:20 & Butler Decl. Ex. 13; Fanning Tr. 98:11-103:21 & Butler Decl. Ex. 14; Dempsey Tr. 125:18-127:4, 129:9-130:9,

131:9-132:6.)

**Response**: Frontier disputes this statement's material mischaracterization of AMCK's representations. At times during the parties' negotiations, AMCK represented that Frontier needed to pay outstanding rent payments prior to the time the next aircraft delivered. Frontier agreed to do just that, repeatedly, including offering on April 30 to immediately pay all rent and stay current. AMCK rejected that offer. Nevertheless, on May 8, 2020—months prior to the next aircraft delivering in July 2020—AMCK sent Frontier the notice of termination letter. Further, AMCK's representation that Frontier needed to be current on its rent before the next aircraft delivery was not made in a vacuum. Rather, it was coupled with AMCK's extracontractual demands that Frontier needed to achieve delivery deferrals with Airbus and extend leases on favorable terms to AMCK, making clear that these were conditions precedent to AMCK performing its obligations under the Framework Agreement. Indeed, from early in the negotiations, AMCK's main position was that it would follow through on its repudiation of the Framework Agreement unless Frontier capitulated to its extracontractual demands *in addition to* Frontier being current on rent prior to the next aircraft delivery. AMCK's internal communications confirm this, acknowledging that AMCK "can't get [its shareholder] comfortable funding at 2019/contracted pricing EVEN IF [Frontier is] completely current on all payments." To be sure, Frontier repeatedly asked AMCK to clarify its position in this regard, asking if AMCK would perform its obligations under the Framework Agreement if Frontier was current on its payments but could not achieve AMCK's extracontractual demands. AMCK repeatedly refused to provide such assurances. (Hosenpud, Ex. 31-34, 37, 42-45, 48; O'Callaghan Dep. at 78:12-79:9, 88:5-90:2; 133:24-134:17; Sheridan Dep at 100:18-101:18, 113:18-114:6; Dempsey Decl. ¶¶ 10, 12, 14-28.)

29.    On April 30, 2020, Mr. Sheridan sent an email to Mr. Dempsey and others at

Frontier regarding a proposal concerning rent deferral through May 15, 2020 and other matters relating to the Framework Agreement. (Sheridan Decl. ¶ 15 & Ex. 10; Dempsey Tr. 132:22-133:20.)

**Response**: Frontier disputes this statement as materially incomplete. In addition to the April 30, 2020 email Mr. Sheridan sent to Mr. Dempsey in which AMCK proposed May 15, 2020 as the end date of the rent deferral agreement, and which was in response to Frontier's offer to immediately pay all rent on April 30, Mr. Sheridan and Mr. Dempsey held at least three phone calls on April 30, 2020 in which they discussed rent deferrals, delivery deferrals, and AMCK's other extracontractual demands. (Hosenpud, Ex. 44-45, 47-48; Dempsey Dep. at 133:21-137:15, 143:4-144:11; Sheridan Dep. at 158:4-160:9, 172:18-173:19.)

30.    Frontier understood that if it did not agree to the arrangement proposed in the April 30 email, AMCK might terminate the Framework Agreement. (Dempsey Tr. 136:9-137:3; Fanning Tr. 104:14-105:9.)

**Response**: Frontier disputes this statement. Frontier understood that, by April 30, 2020, AMCK had already repudiated the Framework Agreement. Frontier understood AMCK's April 30, 2020 offers to further confirm that AMCK would not perform the Framework Agreement unless Frontier agreed to AMCK's evolving extracontractual demands, which AMCK itself recognized in were "unusual" and "onerous." To be clear, Frontier had repeatedly asked for assurances from AMCK that it would perform under the original terms of the Framework Agreement if Frontier could not achieve all of AMCK's extracontractual demands. AMCK repeatedly refused to provide such assurances. Frontier had also offered to immediately pay all outstanding rent on April 30 and remain current thereafter. AMCK refused this offer. Frontier also disputes this statement's material mischaracterization that AMCK could "terminate" the

Framework Agreement without consequence. Because AMCK had already repudiated the Framework Agreement, AMCK was not entitled to "terminate" without being liable for breach of contract. (Hosenpud, Ex. 9; *id.*, Ex. 31 at AMCK016976; *id.*, 32-34, 44-45, 47-48; Thwaytes Dep. at 92:8-94:14; Dempsey Dep. at 42:12-45:15; Dempsey Decl. ¶¶ 8, 10, 12, 18-28.)

31.    Frontier did not agree to the proposal in the April 30 email. (*See* Sheridan Decl. ¶¶ 16-17 & Exs. 11-12; Dempsey Tr. 137:16-23, 142:13-144:11; Fanning Tr. 109:18-110:25; Dempsey Tr. 144:12-145:16 & Butler Decl. Ex. 15; Dempsey Tr. 153:13-154:2, 158:10-159:10.)

**Response**: Frontier disputes this statement as materially incomplete. AMCK's April 30 email proposed that Frontier agree to three "conditions" in order for AMCK to perform its obligations under the Framework Agreement: (i) moving the upcoming aircraft deliveries to three aircraft in July 2020 and two aircraft in February 2020; (ii) for "[a]ll payments to be current on May 15, 2020 and to remain current"; and (iii) to extend 12 aircraft leases (delivered before the Framework Agreement) by four years—*i.e.*, turning eight-year lease agreements into 12-year lease agreements—and to remove the early termination options under the lease agreements for all six aircraft scheduled to be delivered under the Framework Agreement. After initial discussions, Frontier agreed to the first condition, tried to negotiate the second condition, and explained that it could not accept the third condition. (Hosenpud, Ex. 44-45, 47-48; Dempsey Dep. at 158:10-159:10; Dempsey Decl. ¶¶ 19-22.)

32.    Per the terms of the original leases, Frontier owed rent payments on three of the original leases in early May 2020. The payment amounts and date for each MSN are as follows:

| MSN | Payment Date | Payment Amount |
|-----|--------------|----------------|
| 8239 | May 5, 2020 | $█████ |
| 8102 | May 6, 2020 | $█████ |
| 8913 | May 8, 2020 | $█████ |

Frontier did not pay these amounts on those dates. (Bindu Tr. 34:11-36:21 & Butler Decl. Ex. 17; O'Callaghan Decl. ¶¶ 27, 29 & Ex. 17.)

   **Response**: Frontier disputes this statement. The parties expressly agreed that Frontier could defer any rent payments due under the 14 original leases, at least while negotiations were ongoing regarding a larger agreement that included rent deferrals, delivery deferrals, and potential modifications to the underlying lease agreements. These negotiations were ongoing from March 16, 2020 until May 8, 2020, when Defendants unexpectedly sent Frontier a Notice of Termination letter. Accordingly, the rent amounts in the chart above were not due on the listed dates. (Hosenpud, Ex. 32-35, 45, 47; Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-73:17, 75:4-78:19, 111:23-123:4, 124:20-125:16, 133:21-137:15, 143:4-144:11; Fanning Dep. at 83:18-85:21, 87:15-92:11; Dempsey Decl. ¶¶ 9, 14-17, 19-20, 25-28.)

   33.    On May 8, 2020, AMCK provided Frontier with a Notice of Termination based on non-payment of rent in April 2020. (Sheridan Decl. ¶ 18 & Ex. 13, Schedule 1; Bindu Tr. 37:10-39:8.)

   **Response**: Frontier disputes this statement as materially incomplete. AMCK's Notice of Termination purported to "terminate[] its obligations under the Framework Agreement" based on the unpaid rent on the 14 original leases and the cross-default provisions contained in those 14 original leases. Regarding the one aircraft that was delivered under the Framework Agreement, MSN 10038, at all times Frontier made lease payments accordingly to the original payment schedule. Accordingly, AMCK's Notice of Termination letter did not cite alleged non-payments associated with MSN 10038 as a basis for declaring a default. (Hosenpud, Ex. 13, 51-54.)

   34.    On or about May 13, 2020, Frontier paid a total of $███████ in rent to AMCK. This amount reflected the 14 rent payments that, per the terms of the original eases, were due in

022510.0155/9200110.2

April 2020 and the three rent payments that, per the terms of the original leases, were due in early May 2020. (Bindu Tr. 39:11-42:16; Dempsey Tr. 164:15-165:22; Butler Decl. Ex. 19; O'Callaghan Decl. ¶ 29 & Exs. 17-18.)

**Response**: Undisputed. Frontier confirms that these payments were made on May 13, 2020. (Hosenpud, Ex. 55.)

35.    The original 14 lease agreements and the MSN 10038 Lease remain in force, and Frontier has continued to make monthly rent payments and to operate the leased aircraft. Neither AMCK nor any other party terminated any of these lease agreements. Neither AMCK nor any other party ever repossessed the aircraft or otherwise prevented Frontier from using them. (O'Callaghan Decl. ¶ 30; Thwaytes Tr. 173:22-174:9; Butler Decl. Ex. 27.)

**Response**: Frontier disputes this statement as materially incomplete. In its May 8, 2020 Notice of Termination letter, AMCK purported to "terminate[] its obligations under the Framework Agreement" based on the unpaid rent on the 14 original leases and the cross-default provisions contained in those 14 original leases. Moreover, AMCK expressly reserved its rights to exercise all of its other options under all contract documents relating to all 15 aircraft under lease between Frontier and AMCK, including rescinding the lease agreements, forcing the immediate return of any aircraft from Frontier to AMCK, repossessing the aircraft, and forcing Frontier to keep the aircraft grounded and stored. (Hosenpud, Ex. 10 § 4.3; *id.*, Ex. 51.)

36.    Following the termination of the Framework Agreement, Frontier obtained alternative financing for the five additional aircraft that had been covered by the Framework Agreement. Frontier has entered replacement leases for these aircraft. (Compl. ¶¶ 75-77; Butler Decl. Ex. 22.)

**Response**: Undisputed.

37.    The damages Frontier seeks to recover in this action consist of the difference in financial terms between the hypothetical leases under the Framework Agreement and the replacement leases Frontier obtained after AMCK's termination of the Framework Agreement. (Butler Decl. Ex. 22; Bindu Tr. 104:4-105:18, 108:4-125:16; Thwaytes Tr. 169:2-174:9.)

**Response**: Frontier disputes this statement's material mischaracterizations that AMCK's obligations under the Framework Agreement were "hypothetical." AMCK's contractual obligations under the Framework, including its obligation to enter six SLB arrangements for certain aircraft, were in no way "hypothetical." Frontier also disputes this statement's material mischaracterization that AMCK could "terminate" the Framework Agreement without consequence. Because AMCK had already repudiated the Framework Agreement, AMCK was not entitled to "terminate" without being liable for breach of contract, among other causes of action. In addition, Frontier disputes this statement as materially incomplete to the extent that AMCK intends the phrase "financial terms" to exclude damages related to the material differences in redelivery terms, early termination options, and the on-watch burdens between the leases AMCK was obligated to perform under the Framework Agreement, and the replacement leases Frontier was able to procure. The impact of each of these terms, as well as the differences in purchase price and monthly lease payments, contribute to the damages Frontier seeks to recover. (Hosenpud, Ex. 61-62, 81 at 11-22; Bindu Dep. at 108:4-125:3; Neels Dep. at 23:24-25:22, 117:13-118:11)

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACT

38.    In every instance where AMCK believed a Frontier rent payment was late, AMCK "chased" Frontier (as it did all its airline partners) for the payment as opposed to terminating the lease. (McInerney Dep. at 20:7-21; 23:5-24:8; 105:25-106:5; 110:20-111:11; 126:10-13; Bachrach

Dep. at 30:6-32:12, 97:10-98:12; Hosenpud, Ex. 6.).

39.     AMCK was immediately upset with the $███████ in monthly rental payments due for MSN 10038 as it was much less than Frontier paid for the Original Leases, which were between $██████ $███████ (Hosenpud, Ex. 14 ("Ouch!," "Very cheap Neo"); SMF ¶ 17.)

40.     All Defendants have rights and obligations arising from the contracts at issue, including the Framework Agreement, as well as the Lease Agreements, Trust Agreements, and Guarantees relating to the 15 aircraft between Frontier and AMCK. Under the Framework Agreement and the lease documents that were scheduled to be executed thereunder: UMB is the "Lessor" and "Trust Company." UMB is also the "Owner Trustee" under the MSN 10038 Trust Agreement. Vermillion is the "Trustor" of the MSN 10038 Trust Agreement, in which it conveyed all right, title, and interest and transfer of control of the aircraft to UMB. Although UMB has the power to sell, transfer, or otherwise convey its rights and interest in MSN 10038 as well as Vermillion's beneficial interest, it cannot do so "without prior written consent of the Trustor," *i.e.*, Vermillion. The MSN 10038 Guaranty also identifies Vermillion as the Lessor Guarantor, in which Vermillion *guarantees* to Frontier as beneficiary all of UMB's performance obligations as Lessor under the MSN 10038 Lease. Further, under the Framework Agreement, AMCK is the "Lessor Guarantor" and "Owner Participant," as are Vermillion and Accipiter due to their status as AMCK's "Affiliate." AMCK is obligated to cause the Lessor (UMB) to purchase the aircraft from Airbus on the delivery date and execute a Lease Agreement with Frontier—again, UMB's performance is guaranteed by Vermillion. AMCK is also considered a "Servicer" under the Framework Agreement and resulting leases. (*Id.*) As such, it has fully authority to deal with Frontier directly under the leases arising from Framework Agreement. Accipiter has similar rights and obligations as Vermillion arising from the Original Leases, including guaranteeing to Frontier as beneficiary the performance of the "Owner Trustee," *i.e.*, either UMB or

022510.0155/9200110.2

Wells Fargo. (Hosenpud, Ex. 7 §§ 1.1, 2.1.1, 3.3.1; *id.* Ex. 10 at 1, 15; *id.*, Ex. 11 at 1, §§ 1, 2, 8.01-.02, 9.01(b); *id.*, Ex. 12 at 1, § 1; *id.*, Ex. 80 ¶¶ 1-30; Bindu, Ex. 1-5; Bindu Decl. ¶ 7.)

41.     While rent deferral negotiations were ongoing with an airline, AMCK turned off its automatic alert system, and instructed its employees to not "chase" the airline for past due payments. If AMCK ever denied an airline's rent deferral request, it was AMCK's "standard practice" to inform the airline, at which point AMCK restarted its "chase" procedure and "told [those airlines] to make payments." (Hosenpud, Ex. 21; McInerney Dep. at 110:20-111:11, 131:24-134:19; Bachrach Dep. at 30:9-32:12; Hosenpud, Ex. 22.)

42.     On March 24, 2020, AMCK considered taking "the nuclear option" of terminating the Framework Agreement. As a result, negotiations shifted from Frontier's rent deferral request to AMCK repudiating the Framework Agreement, only retracting its repudiation if Frontier agreed to extracontractual demands. (Hosenpud, Ex. 25; Sheridan Dep. at 56:23-59:10; Hosenpud, Ex. 28-29; O'Callaghan Dep. at 48:19-51:5; 69:3-11.)

43.     On March 26, 2020, in demanding certain extracontractual conditions from Frontier—namely, that Frontier provide a $█ million discount on the purchase price (in the form of 12 months' advanced payment of rent) on the upcoming aircraft delivery, and that Frontier achieve a three to six month delivery deferral with Airbus for the other four aircraft—AMCK's position was that it would not perform the Framework Agreement. (Hosenpud, Ex. 29; O'Callaghan Dep. at 48:19-51:5; 69:3-11; Dempsey Dep. at 34:8-24.)

44.     On March 31, 2020, AMCK added a new extracontractual condition required for its performance under the Framework Agreement: it would not proceed "with closing on the 5 remaining sale & leaseback aircraft if they are going to go straight into storage for an uncertain period of time." (Hosenpud, Ex. 29.)

45.    On April 1, 2020, AMCK relayed its repudiation to Airbus, too, explaining that AMCK was not authorized to take delivery of the aircraft if they would go into storage. (Hosenpud, Ex. 30).

46.    Troubled by AMCK's repudiation, on April 1, Frontier sought AMCK's assurance that it would honor the Framework Agreement even if the parties could not agree on the rent deferrals or AMCK's extracontractual demands. AMCK did not respond. (*Id.*, Ex. 31 at AMCK016976; Fanning Decl. ¶¶ 3-4.)

47.    Nevertheless, Frontier immediately tried to achieve AMCK's demands to convince it to withdraw its repudiation: by April 2, Frontier had reached out to Airbus, relaying AMCK's repudiation ("our financier is uncomfortable funding aircraft deliveries in 2Q 2020"), and asking Airbus to "work with [Frontier] to manage the timing of upcoming aircraft deliveries." (Hosenpud, Ex. 9; Thwaytes Dep. at 92:8-94:14; *see also* Dempsey Dep. at 42:12-45:15; Dempsey Decl. ¶ 10.)

48.    On April 3, AMCK sent Frontier another counteroffer, conditioning AMCK's financing of the upcoming five aircraft on Frontier achieving a six-month delivery deferral with Airbus. If Frontier could achieve this, AMCK would allow Frontier to defer rent on the Original Leases, with repayment made within four months at a 6% interest rate. At this time, it was clear to Frontier that AMCK wanted to adjust the terms of the binding Framework Agreement. (Hosenpud, Ex. 32; Dempsey Decl. ¶ 10; Dempsey Dep. at 34:8-24.)

49.    With the prospect that delivery deferrals with Airbus were not achievable, on April 6, 2020, Frontier again asked for AMCK's assurances "that you will finance the aircraft deliveries and honour your commitment to Frontier if we do not put a rent deferral in place." AMCK did not respond. (Hosenpud, Ex. 32; Sheridan Dep. at 100:15-101:18; Dempsey Dep. at 45:16-47:9, 49:21-52:2, 60:22-62:23; Dempsey Decl. ¶ 12.)

022510.0155/9200110.2

50.    In light of AMCK's repudiation and refusal to provide assurances, as well as the inability to achieve delivery deferrals with Airbus, Frontier began to look for alternative leasing companies to finance the five remaining Framework Agreement aircraft. However, due to the changed market conditions as a result of COVID-19, the terms offered by these companies were substantially worse for Frontier than those in the Framework Agreement. As a result, Frontier decided to try to work with AMCK to achieve concessions that would convince AMCK to perform its obligations under the Framework Agreement. (Dempsey Dep. at 53:20-60:21; Dempsey Decl. ¶ 13.)

51.    Frontier planned to make its next rent payments under the Original Leases on April 6, 2020, until Frontier and AMCK—over the phone and memorialized in follow-up emails—agreed to a 10-business-day rent deferral on the Original Leases to provide Frontier with time "to reach agreement with Airbus." Frontier confirmed this agreement in writing, reiterating that negotiations "will continue to be a challenge with Airbus," and expressing its "hope that [AMCK] reconsider [its] position on financing" the five aircraft. (Dempsey Dep. at 45:16-47:9, 49:21-53:14; 66:3-67:9, 70:23-72:15; Hosenpud, Ex. 32; Dempsey Decl. 14.)

52.    Mr. Dempsey and Mr. Sheridan then spoke on April 7, during which they extended the rent deferral to "month to month" until all negotiations were complete, knowing that it would take Frontier longer than 10 days to work out a delivery deferral with Airbus. The expectation on the call was that the month-to-month agreement would extend into May 2020 given the time-consuming negotiations with Airbus and that the next aircraft delivery "was being moved into May at the earliest." Both Mr. Dempsey and Mr. Sheridan have written correspondence with their companies memorializing this agreement. In making that agreement, Mr. Dempsey again asked Mr. Sheridan to confirm AMCK would honor its Framework Agreement obligations even if

Frontier could not achieve delivery deferrals with Airbus. Mr. Sheridan "wouldn't tell [Frontier] at this stage what we would do if that didn't happen because I think that it would require a board approval for us to walk away." (Hosenpud, Ex. 33-34; Dempsey Dep. at 72:16-73:17, 75:4-78:19; Fanning Dep. at 84:10-85:21; Sheridan Dep. at 112:11-114:6; Dempsey Decl. 15.)

53.     On April 11 via text, and on April 13 via email, Frontier told AMCK that the most Airbus will move the deliveries was "approximately 2 months." Frontier explained that Airbus would not agree to AMCK's six-month request "given the advanced nature of the aircraft production." Frontier asked AMCK if it would "confirm you can support the revised schedule." In response on April 13, 2020, AMCK neither confirmed nor denied, but re-expressed its desire for a six-month deferral that Frontier had already said was impossible. AMCK also made clear its central position that Frontier needed to have no outstanding rent at the time the next aircraft delivered. (Hosenpud, Ex. 35; Dempsey Dep. at 79:22-80:6; 94:9-102:7, 120:9-121:10; Dempsey Decl. ¶¶ 16-17.)

54.     Negotiations on all fronts continued through the beginning of May, with no side mentioning that Frontier's rent payments were due. Indeed, between March 16, 2020 and May 8, 2020, AMCK did not send any "chase" emails, have any employees reach out, or otherwise alert Frontier that rent was past due or needed to be paid immediately. (McInerney Dep. at 126:10-13; O'Callaghan Dep. at 256:4-24; Dempsey Decl. ¶¶ 17, 25-27.)

55.     Likewise, between March 19, 2020 and May 8, 2020, AMCK did not send any rent invoices to Frontier, except for invoices associated with MSN 10038—which Frontier promptly paid. (Hosenpud Ex. 13, 36; Dempsey Decl. ¶¶ 17, 25-27.).

56.     Between March 16, 2020 and May 8, 2020, AMCK knew that, if it ever expressed to Frontier that it believed rent was owed immediately, "Frontier would cure any default." Frontier

repeatedly represented as much to AMCK throughout the negotiations. This all confirmed Frontier's understanding that the parties' month to month rent deferral remained in effect into May 2020. (Hosenpud, Ex. 37 ¶ 7.10; O'Callaghan Dep. at 139:11-142:15; Fanning Dep. at 90:19-94:16.)

57.    Consistent with the deferral extending into May, AMCK's internal documents between April 21 and May 8, 2020 represented that Frontier's rent payments "have been deferred," that the "[r]ent deferral request[]" was "under negotiation" and "under review," and that AMCK was still "mandated" under the Framework Agreement for delivery of the remaining five aircraft. (Hosenpud, Ex. 38; *id.*, Ex. 39 (May 1, 2020 "deferral agreement spreadsheet" showing "all rentals that have been deferred and the respective deferred amounts," including Frontier); *id.*, Ex. 40 at AMCK021216; McInerney Dep. at 70:10-21; 98:13-105:13; O'Callaghan Dep. at 139:11-142:15.)

58.    Nevertheless, AMCK remained committed to leaving the Framework Agreement unless Frontier would meet its extracontractual demands. For example, on April 25, AMCK demanded Frontier extend 12 aircraft leases (not covered by the Framework Agreement) by four years, threatening, "we are seeing many parties walk from 2019 priced commitments due to the unprecedented crisis we are in." In response, Frontier confirmed it will pay all unpaid rent before the next aircraft delivery (as AMCK asked) and that Frontier "expect[s] AMCK to hold up to your end of the deal," *i.e.*, the Framework Agreement. AMCK did not respond. At this time, Frontier understood AMCK's position on deferred rent was "categorical": Frontier's rent remained deferred and only needed to be paid back prior to the next aircraft delivery. No later than April 27, 2020, Frontier agreed to this term. (Hosenpud, Ex. 31 at AMCK016978.; *id.*, Ex. 43; Dempsey Dep. at 111:23-123:4; Fanning Dep. at 90:19-94:16.; Dempsey Decl. ¶¶ 16-17; Fanning Decl. ¶¶ 7-8.)

59.    On April 27, 2020, AMCK's shareholder confirmed it "wants to explore ways to

walk from the remaining Frontier SLB commitments," and again suggested invoking the MAC clause. Notably, AMCK did not suggest it was entitled to terminate the Framework Agreement due to purportedly past due on rent. AMCK's shareholder further committed to abandoning the Framework Agreement "unless we can negotiate very material QPQ's [quid pro quos] for AMCK, either lease extensions on all 12 originally delivered neo's or a very significant PP [purchase price] holdback on the remaining 5 x $██M neo's + NO outstanding payments whatsoever at the time of closing." (Hosenpud, Ex. 41.)

60.     On April 22, 2020, the AMCK officers who had been working closest with Frontier—Mr. Sheridan and Ms. O'Callaghan—considered telling Frontier "that we can't get [AMCK's shareholder] comfortable funding at 2019/contracted pricing EVEN IF [Frontier is] completely current on all payments." These officers, however, decided to withhold this information as they attempted to extract more extracontractual concessions. (Hosenpud, Ex. 42; O'Callaghan Dep. at 133:24-134:17; Hosenpud, Ex. 37 §§ 7.8-7.10.)

61.     On April 27, Frontier reached out to AMCK to ensure that, if Frontier was current on its rent by the time the next aircraft delivered in June 2020 under Airbus's modified delivery schedule, that AMCK would honor its Framework Agreement commitments. AMCK, again, refused to provide these assurances. (Hosenpud, Ex. 43; O'Callaghan Dep. 161:4-162:19; Sheridan Dep. 142:17-145:8; Dempsey Dep. at 124:20-125:16; Dempsey Decl. ¶ 18; *see also* Fanning Decl. ¶¶ 6-7.)

62.     Frontier and AMCK then spoke multiple times on April 30 via phone and email. In the first April 30 communication, Frontier offered AMCK even more favorable terms to keep AMCK from abandoning the Framework Agreement. Those terms summarized by AMCK included: (i) that Frontier would "immediately pay outstanding April rents on which we agreed an

informal deferral pending agreement with Airbus on delivery delays," and to "pay May, June and July rents and, all beyond, on time"—in essence, no rent deferral after the end of April 2020; (ii) convince Airbus to move the next aircraft delivery from June to July 2020, such that the next three Framework Agreement aircraft would deliver in July 2020; and (iii) move the delivery dates of the final two Framework Agreement aircraft from September 2020 and October 2020 to February 2021. (Hosenpud, Ex. 44 at AMCK031595; Dempsey Decl. ¶ 19.)

63.    AMCK responded the same day, agreeing: (i) to the delivery schedule—*i.e.*, three aircraft in July 2020 and two aircraft in February 2021; and (ii) for "[a]ll payments to be current on May 15, 2020 and to remain current." Especially in light of AMCK turning down Frontier's offer to immediately pay all rent, AMCK's latest offer led Frontier to believe that the rent deferral agreement had extended at least until May 15, 2020. In addition, however, AMCK continued to insist that Frontier extend 12 aircraft leases by four years. Moreover, AMCK introduced a new extracontractual demand: Frontier needed to remove the early lease termination options for all aircraft delivered under the Framework Agreement. AMCK recognized this new condition was "unusual" and "onerous," and admits it has never before proposed such a term. Again, AMCK made clear that these extracontractual demands were conditions precedent to AMCK performing the Framework Agreement. (Hosenpud, Ex. 45; Sheridan Dep. at 158:4-160:9; Dempsey Dep. at 133:21-137:15; 143:4-144:11; Dempsey Decl. ¶ 20.)

64.    Internally, AMCK said if Frontier would not agree to these demands, "we have to consider the nuclear option: this is to terminate the SLB because of non payment of lease rents in April." AMCK did not communicate this position to Frontier. (Hosenpud, Ex. 46 at AMCK018496; Dempsey Decl. ¶¶ 22-26.)

65.    Frontier responded the same day, telling AMCK its new extracontractual demand

was an "overreach," and that Frontier would not agree to extending prior leases or removing the early termination option.  Frontier further communicated that the Framework Agreement is "binding" and while Frontier was "trying to work with [AMCK] on concessions," Frontier will insist that the parties perform the Framework Agreement if concessions could not be agreed to. (Hosenpud, Ex. 45, 47; Dempsey Decl. ¶ 20.)

66.    Frontier and AMCK again discussed terms on April 30. In that call, Frontier reiterated that it was willing to become, and remain, fully current on all rent that day. Alternatively, Frontier proposed: (i) the same delivery deferral of three aircraft in July 2020 and two in February 2021, which was the most it could achieve; (ii) Frontier would prepay rent for six months on the three aircraft delivering in July 2020 (an approximately $█ million value to AMCK); and (iii) deferred rent for April and May 2020 would be repaid in full between July and December 2020. AMCK never responded to this offer. (Hosenpud, Ex. 47, 48; Sheridan Dep. at 172:18-173:19; Dempsey Decl. ¶¶ 22; *see also* Fanning Decl. ¶¶ 8-10.)

67.    On May 1, 2020, Mr. Dempsey texted Mr. Sheridan that Frontier "had expected a call today," and inquiring "[w]hat's the status" on the negotiations. Mr. Dempsey told Mr. Sheridan that Frontier was still working with Airbus to finalize the deal, and had "an additional 24 hrs to get this done." Mr. Sheridan represented that AMCK was "about to get on a call with the shareholders." Mr. Sheridan did not respond to Mr. Dempsey after the shareholder call. (Hosenpud, Ex. 49; Sheridan Dep. at 172:18-173:19; Dempsey Decl. ¶ 23.)

68.    On May 5, 2020, Ms. Ms. O'Callaghan and Mr. Fanning also exchanged messages, in which Mr. Fanning expressed that Mr. Dempsey was "expecting a call" from Mr. Sheridan "but never got one." Ms. O'Callaghan said she was "not sure what we can achieve on the call as our shareholder is adamant there has to be something deemed of value" for AMCK to perform the

Framework Agreement. (Hosenpud, Ex. 31 at AMCK016981; Fanning Decl. ¶ 11.)

69.    At the beginning of May 2020, AMCK further devised ways to abandon the Framework Agreement. These efforts culminated in an AMCK board meeting on Friday, May 8. Desiring to avoid its remaining obligations under the Framework Agreement, AMCK decided to invoke cross-default provisions in the 14 Original Leases—the leases covered by the parties' month to month rent deferral—to terminate the Framework Agreement. AMCK knew this decision would cause "severe reputational consequences," but determined it was in its business interest. Mainly, AMCK believed abandoning the Framework Agreement "would provide the best possible leverage with Frontier to continue negotiations" and obtain the extracontractual demands—a lower purchase price; lease term extensions; removing early termination options—AMCK was thus far unable to achieve. AMCK knew it would have leverage given that next aircraft deliveries were imminent and, even more so, because the aircrafts contain certain engines that required an additional tripartite agreement, which limited the "pool of potential lessors that Frontier could negotiate new terms with" thereby "increas[ing] the likelihood of Frontier's willingness to enter into negotiations" with AMCK. (Hosenpud, Ex. 26 at AMCK018497-506; *id.*, Ex. 46 at AMCK018498-504; *id.*, Ex. 50; O'Callaghan Dep. at 222:2-227:10.)

70.    On May 8, 2020, before AMCK could relay its termination, Frontier emailed AMCK, explaining it had been "waiting patiently for your response" to the latest terms discussed on the parties' April 30 call. Frontier reiterated its last offer and said it was "available to discuss." AMCK never responded. (Hosenpud, Ex. 48; Sheridan Dep. at 172:18-173:19; Dempsey Decl. ¶ 24).

71.    On May 8, 2020 at 4:41 p.m. where Frontier is located—11:41 p.m. in Ireland where AMCK is located—and without asking Frontier to pay any alleged late rent, AMCK sent

Frontier a Notice of Termination letter, purporting to "terminate[] its obligations under the Framework Agreement" based on the unpaid rent on the Original Leases and the cross-default provisions in the operative documents. AMCK specifically chose the end of the day on Friday "in case [F]rontier decided to pay us money." (Hosenpud, Ex. 51; *id.*, Ex. 46 at AMCK018502; Dempsey Decl. ¶¶ 25-26.)

72.    The only relief AMCK invoked was to terminate its obligation "to consummate the purchase and lease any [sic] of the remaining Aircraft in accordance with Clause 2 of the Framework Agreement." That said, AMCK expressly reserved its rights to rescind all 15 aircraft lease agreements, force the immediate return of the aircraft, repossess the aircraft, and force Frontier to keep the aircraft grounded and stored. (Hosenpud, Ex. 51 ¶¶ 6-7.)

73.    Frontier responded on Saturday, May 9, 2020, explaining it was "shocked by AMCK's sudden decision to attempt to rescind the Framework Agreement," and AMCK's "taking advantage of the on-going global crises for its own financial gain." Frontier clarified that "AMCK is not entitled at this time to terminate the Framework Agreement based on non-payment of rent" because "AMCK clearly and unequivocally temporarily waived Frontier's payment obligations under our existing aircraft leases pending the outcome of our active and on-going good faith negotiations over rent deferral and deferral of new upcoming aircraft deliveries." Frontier further stated that AMCK's May 8 termination letter "is itself a default." Based on those and other reasons, Frontier asked AMCK to "immediately withdraw the Notice so that [the parties] can work to promptly reach a mutually beneficial resolution." (Hosenpud, Ex. 52.)

74.    AMCK responded on May 12, 2020, taking the position that AMCK had never agreed to any rent deferral, but only to "not take action on any defaults" until April 21, 2020. AMCK maintained it was terminating the Framework Agreement and—for the first time since the

parties' negotiations began on March 16, 2020—asked Frontier to pay outstanding rent. (Hosenpud, Ex. 53.)

75.    Frontier responded on May 13, explaining that the parties had agreed that rent under the Original Leases was deferred at least until May 15 pending the outcome of the negotiations. Frontier told AMCK that it had complied with AMCK's instructions throughout—including paying rent on MSN 10038—and that, had AMCK ever instructed Frontier to pay rent for the Original Leases, Frontier would have done so. Instead, AMCK negotiated with Frontier well after April 21 and into May, never asking Frontier to make deferred rent payments. Frontier further explained that it understood AMCK's May 12 letter to be its "final notice to terminate the existing temporary deferrals." (Hosenpud, Ex. 13; *id.*, Ex. 54 at AMCK017029-31; Dempsey Decl. ¶ 27.)

76.    On May 13, 2020—five total days, and three business days, after AMCK's May 8 termination letter—Frontier wired AMCK funds and became current on all monthly aircraft lease payments, fully curing any alleged default. (Hosenpud, Ex. 55; Dempsey Dep at 164:15-165:10.)

77.    Since Frontier made the deferred rent payments on May 13, 2020, Frontier has stayed current on all lease payments. (O'Callaghan Dep. at 229:4-7.)

78.    AMCK immediately restarted its standard practice of sending "chase" alerts to Frontier in June 2020 when it believed Frontier's rent was late, providing Frontier notice and an opportunity to cure instead of terminating the leases. (Hosenpud, Ex. 56; McInerney Dep. at 126:15-131:23).

79.    After May 8, 2020, upon receiving AMCK's "chase" alerts for allegedly late rent payments, Frontier always promptly paid after receiving any such alert. (O'Callaghan Dep. at 229:4-7.)

80.    AMCK granted numerous rent deferral requests to its other airline lessee partners

during the relevant timeframe, including those that had not been paying rent during rent deferral discussions. In certain cases, AMCK entered two or three deferral extensions with airlines. (Murphy Dep. at 80:15-18, 82:7-83:5; Hosenpud, Ex. 37 ¶ 7.3.)

81.    What made Frontier unique among AMCK's airline partners that had requested rent deferrals—especially those with similar credit ratings—was that Frontier and AMCK had a binding agreement for more aircraft deliveries in 2020. In other words, AMCK could utilize Frontier's alleged outstanding rent payments as pretext to terminate upcoming commitments with Frontier that AMCK no longer wanted to follow through on, whereas AMCK did not have similar upcoming commitments with its other airline partners. In fact, only one other of AMCK's airline partners had a binding agreement with AMCK for deliveries in 2020. As with Frontier, AMCK terminated its 2020 commitments with this other airline. (Murphy Dep. at 28:8-30:12; O'Callaghan Dep. at 82:3-83:11; Hosenpud, Ex. 57.)

82.    Consistent with AMCK's plan to use the termination and resulting crisis as leverage to negotiate better terms, AMCK reached out to Frontier on June 18, 2020 and offered to enter SLBs for the three aircraft delivering in July 2020 that had been part of the Framework Agreement. The terms AMCK offered were substantially worse for Frontier than those in the Framework Agreement, including: (i) AMCK would pay $█ million less for each aircraft; and (ii) Frontier would pay $█████ more for monthly rent. AMCK's proposal was also "conditioned on the release and waiver of any potential legal claims by Frontier arising from the termination of the Framework Agreement." With the impending delivery deadlines, Frontier saw no choice but to engage with AMCK. (Hosenpud, Ex. 58.)

83.    Through extraordinary effort, Frontier was able to find other lessors to fund the aircraft. The lessor CDB Aviation Lease Finance DAC (CDB) entered into SLBs for three of the

remaining aircraft. (Hosenpud, Ex. 59.) The lessor Jackson Square Aviation (JSA) entered into SLBs for two of the remaining aircraft. (*Id.*) Although the terms CDB and JSA offered were much worse than those in the Framework Agreement, the terms were still better than those AMCK offered on June 18. (Dempsey Decl. ¶ 29; *Compare* Hosenpud, Ex. 58, *with id.*, Ex. 59-60.)

84.    Altogether, the difference between the deals Frontier executed with CDB and JSA and the terms in the Framework Agreement caused Frontier approximately $53 million in damages. When discounted to present value, Frontier's damages are approximately $46.3 million. (Hosenpud, Ex. 61-62; Bindu Dep. at 108:4-125:3; Neels Dep. at 117:13-118:11.)

85.    On multiple occasions throughout March 16, 2020 and May 8, 2020, Frontier expressed to AMCK its ability and willingness to pay any and all outstanding rent. (Hosenpud, Ex. 15, 67.)

86.    Paul Sheridan is the CEO of AMCK. Jane O'Callaghan is the Chief Commercial Officer at AMCK. Michael McInerney is a Contract Manager with AMCK. Fabian Bachrach is a consultant with AirFinance Corporate, and has been a commercial advisor for AMCK since January 2019. Ronan Murphy is the Vice President of Strategy and Planning with AMCK. Gerald Ma is an Executive Committee Member at CK Assets, which is one of AMCK's shareholders. (Sheridan Dep. at 8:11-10:11; O'Callaghan Dep. at 9:5-12; McInerney Dep. at 12:18-13:4; Bachrach Dep. at 10:24-13:2; Murphy Dep. at 8:24-9:23; Ma Dep. at 11:12-14:17.)

022510.0155/9200110.2

DATED:  December 9, 2022

**LANE POWELL PC**


By:  s/David G. Hosenpud
     David G. Hosenpud (*pro hac vice*)
     601 SW Second Avenue, Suite 2100
     Portland, Oregon  97204-3158
     Telephone No.:  503.778.2100
     Facsimile No.:  503.778.2200
     E-mail:  hosenpudd@lanepowell.com

     Aaron Schaer, (*pro hac vice*)
     1420 Fifth Avenue, Suite 4200
     P.O. Box 91302
     Seattle, WA  98111-9402
     Telephone:  206.223.7103
     Facsimile:  206.223.7107
     E-mail:  schaera@lanepowell.com

     -and-

     **BINDER & SCHWARTZ LLP**
     Neil S. Binder
     366 Madison Avenue, 6th Floor
     New York, New York  10017
     Telephone No.:  212.510.7008
     Facsimile No.:  212.510.7299
     E-mail:  nbinder@binderschwartz.com

     *Attorneys for Plaintiff, Frontier Airlines, Inc.*