```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4    FRONTIER AIRLINES, INC.,
 5            Plaintiff,
 6       v.                         No.
 7    AMCK AVIATION HOLDINGS         12:20-cv-09713-LLS
 8    IRELAND LIMITED, ACCIPITER
 9    INVESTMENT 4 LIMITED,
10    VERMILLION AVIATION (TWO)
11    LIMITED, WELLS FARGO TRUST
12    COMPANY, N.A., solely in
13    its capacity as OWNER
14    TRUSTEE, and UMB BANK,
15    N.A., solely in its
16    capacity as OWNER TRUSTEE,
17            Defendants.
18
19
20
21        REMOTE VIDEOTAPED DEPOSITION OF FABIAN BACHRACH
22              Taken in behalf of Plaintiff
23                    March 15, 2022
24
25
```

Page 1

```
 1          BE IT REMEMBERED THAT, the remote videotaped
 2      deposition of FABIAN BACHRACH was reported by
 3      Aleshia K. Macom, Oregon CSR No. 94-0296,
 4      Washington CCR No. 2095, California CSR No.
 5      7955, RMR, CRR, RPR, on Tuesday, March 15, 2022,
 6      commencing at the hour of 2:03 p.m. GMT, the
 7      witness appearing at London, United Kingdom.
 8
 9              APPEARANCES (Via videoconference)
10
11      LANE POWELL PC
12         By David G. Hosenpud
13         601 SW Second Avenue, Suite 2100
14         Portland, Oregon 97204
15         503-778-2100
16         hosenpudd@lanepowell.com
17              and
18         By Aaron Schaer
19         1420 Fifth Avenue, Suite 4200
20         Seattle, Washington 98101
21         206-223-7103
22         schaera@lanepowell.com
23         Appearing for Plaintiff
24
25
```

Page 2

```
 1      CLIFFORD CHANCE US LLP
 2         By John Alexander
 3         31 West 52nd Street
 4         New York, New York 10019
 5         212-878-8000
 6         john.alexander@cliffordchance.com
 7         Appearing for Defendants
 8
 9      Also Present:  Emily Walter - Videographer
10                     Darcy Deibele
11                          *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        fair?
 2   A.   Okay.
 3   Q.   And I'd like you to continue to do what you were
 4        doing, which is answering audibly.  Sometimes we
 5        tend to get into a pattern of nodding our heads
 6        or shaking our heads or giving an uh-huh, huh-uh
 7        response.  Were you to do that, I would say do
 8        you mean yes, do you mean no?  And it's for the
 9        purpose of a clear record.  All right?
10   A.   Yes.
11   Q.   And the last piece of information that might
12        help us both is please wait until I finish my
13        question before answering.  I'll do my best to
14        let you finish your answer before propounding
15        another question.  All right?
16   A.   Sounds fair.
17   Q.   Where are you currently located, sir?
18   A.   London, U.K.
19   Q.   And you appear to be in an office.  Whose office
20        are you in?
21   A.   It's my personal office space.
22   Q.   Okay.  And are you in your residence then?
23   A.   No.  I'm in an office building.
24   Q.   Okay.  Are you a consultant?
25   A.   In general or with, for AMCK?  I'm not sure I
```

Page 10

```
 1              understand your question.
 2    Q.        Well, in general.
 3    A.        I do consulting work.  Yes.
 4    Q.        Okay.  And were you employed by AMCK?
 5    A.        No.
 6    Q.        You were consulting with them?
 7    A.        Correct.
 8    Q.        When did you obtain your engagement to consult
 9              with AMCK?
10    A.        On or about January 2019.
11    Q.        2019?
12    A.        Correct.
13    Q.        And what was the scope of that engagement?
14    A.        The scope was to be a commercial advisor with a
15              focus on the Americas, on AMCK's business in the
16              Americas, meaning Canada, USA and Central, South
17              America.
18    Q.        And what is your area of expertise, generally?
19    A.        Aircraft leasing.
20    Q.        How long have you been in that business?
21    A.        Since 1987.
22    Q.        And has it always been as a consultant or were
23              you employed specifically with any lessors?
24    A.        I started out by being an employee of a lessor.
25              From 19 --
```

Page 11

1  Q.  How long did you -- Sorry.
2  A.  From 1987 to 1993.
3  Q.  And then after that point did you go on to a
4      consulting capacity or were you employed
5      elsewhere?
6  A.  I started my own company, and my company has
7      provided consulting services as well as acted as
8      principal investor in aircraft and aviation
9      assets.
10 Q.  Is that the same company you run these -- today?
11 A.  Correct.
12 Q.  What's the name of the company?
13 A.  AirFinance Corporation.
14 Q.  Was AirFinance Corporation involved in the
15     financing of any aircraft for AMCK during the
16     time you were consulting?
17 A.  It was not.
18 Q.  So when you were brought on to consult with the
19     scope of commercial advisor for the Americas,
20     what were your day-to-day roles?
21 A.  My day-to-day roles were to maintain existing
22     relationships with, with airlines with whom AMCK
23     had aircraft on lease and to develop and search
24     new business opportunities for AMCK.
25 Q.  Okay.  Anything else?

Page 12

| | | |
|---|---|---|
| 1 | A. | I think the answer I just gave you sort of is |
| 2 | | pretty widely encompassing my responsibilities. |
| 3 | Q. | Did you have a portfolio of lessees assigned to |
| 4 | | you with whom you were maintaining business, |
| 5 | | existing business relations? |
| 6 | A. | Just our -- I was looking after the Americas, |
| 7 | | like I said before. |
| 8 | Q. | So would that include Frontier Airlines? |
| 9 | A. | In this specific case it did not include |
| 10 | | Frontier Airlines. |
| 11 | Q. | Who did it include in the Americas, in the |
| 12 | | continental United States? |
| 13 | A. | In the U.S.?  I mean, all airlines, you know, I |
| 14 | | was calling on all airlines in the U.S. in |
| 15 | | theory, but we had, you know, we had a number of |
| 16 | | relationships with other airlines.  I'm not sure |
| 17 | | I need to tell you who those were, but, you |
| 18 | | know, we had clients in the U.S. other than |
| 19 | | Frontier Airlines. |
| 20 | Q. | Well, I think you can tell me.  I'm not going to |
| 21 | | ask you specifics of the economics of those |
| 22 | | relationships.  So which other airlines in the |
| 23 | | U.S.? |
| 24 | A. | Which airlines in the U -- What's your question? |
| 25 | Q. | Yes.  Which airlines in the U.S. did you assist |

Page 13

```
 1          the Americas; is that correct?
 2  A.      I don't recall any leases, you know, that I was
 3          responsible for that were modified with the
 4          letter of credit being added to the
 5          requirements.  No.
 6  Q.      Are you aware of rent deferral requests being
 7          denied?
 8  A.      Yes.
 9  Q.      Were any of the airlines in your, under your
10          responsibility in the Americas denied lease rent
11          deferrals?
12  A.      Yes.
13  Q.      And were the airlines informed of that and
14          requested to pay any lease amounts current?
15  A.      Yes.
16  Q.      Did you actually inform those airlines yourself?
17  A.      Yes.
18  Q.      And during -- Were those airlines not paying
19          their rent during the course of discussions
20          about a rent deferral prior to your
21          notification?
22  A.      No.  I recall that they were paying us.
23  Q.      They were paying you in full?
24  A.      Uh-huh.
25  Q.      Were there any airlines that were not paying you
```

```
 1              during the discussions about rent deferrals?
 2      A.      Yes.
 3      Q.      And were those airlines denied rent deferrals?
 4      A.      I'm trying to jog my memory with specific cases,
 5              which is difficult.  It's a long time ago and
 6              there were so many clients and so many rent
 7              deferrals and so much chaos in the world.  So
 8              it's hard to remember exactly, you know, who was
 9              getting what and denied when and who paid when.
10              I mean, I just don't really remember.  I'm
11              trying to answer truthfully, but it's hard after
12              all this time with this many clients.
13      Q.      Are you aware of, are you aware of any airlines
14              who had basically suspended their rent payments
15              during discussions?
16      A.      Yes.
17      Q.      And to your knowledge, were any of those
18              airlines denied a rent deferral?
19      A.      No.  But I think, you know, you're -- There are
20              also airlines operating under Chapter 11 in that
21              time.
22      Q.      Yes.  Let's exclude those.
23      A.      Yeah.  Well, so, I mean, it's -- Yeah.
24      Q.      So is it your testimony based on your memory as
25              it stands now that there were no airlines that
```

```
 1              had temporary suspended payments during
 2              discussions about rent deferrals?
 3     A.       No.  There were airlines that suspended
 4              payments.
 5     Q.       And is it your testimony that every one of those
 6              airlines that did was granted a lease rent
 7              deferral?
 8     A.       No, it's not my testimony.  I don't remember.
 9     Q.       Okay.  But you know that if an airline was not
10              granted a lease deferral and they had suspended
11              payments, they were told to make payments?
12     A.       Yes.
13     Q.       Were you and -- You are aware that Frontier
14              Airlines made a rent deferral request; correct?
15     A.       I -- Yeah.  They made -- Yes.  I think Frontier
16              was one of the airlines that requested rent
17              deferrals.  Yes.  I'm aware of that.
18     Q.       Did you anticipate that?  Were you anticipating
19              that as a potential?
20     A.       There are very, very few airlines that did not
21              ask for rent deferrals.  So yes, I was
22              anticipating that.
23     Q.       All right.  We're going to start to look at some
24              exhibits.  And I know you're on an iPad.  We'll
25              do our best.  So I'd like to see Tab 53 pulled
```

Page 32

```
 1    Q.    Are you aware of any communication to Frontier
 2          prior to May 14 other than on May 8 -- Strike
 3          that.
 4                Are you aware of any communication to
 5          Frontier before the May 8 board meeting in which
 6          Ms. O'Callaghan states that it looks like we're
 7          going to go down this path and declare a
 8          default, of Frontier being requested to pay any
 9          outstanding rents?
10    A.    AMCK has a system in place whereby if rent is
11          not paid on time, the accounts department is the
12          first point to make contact with the airline
13          almost on an automatic basis.  So I'm assuming
14          because of that system that's in place for every
15          airline, that Frontier was contacted by the
16          accounts department to pay their outstanding
17          rent.
18    Q.    And that's an assumption?  You have no facts to
19          base that on other than the system that you've
20          described?
21    A.    Well, the system is a fact.  That's how the
22          company works.  If rent is overdue even by two
23          days, every airline automatically gets a request
24          for payment from the accounts department.
25    Q.    Okay.  And that request comes from the person,
```

```
 1            the accounts department individual who is
 2            responsible for that specific airline?
 3      A.    That's right.  Or maybe the head of the accounts
 4            department.  I don't know who sends the e-mail.
 5            But I know because then, you know, if it, if
 6            then it, if we don't get paid, I think it's
 7            after seven or 10 days, then it gets kicked up
 8            to the commercial department and then we have to
 9            get involved and collect money.  So I know that
10            every airline that doesn't pay always gets, you
11            know, a message from the company saying, please
12            pay.  You haven't paid.  Where's the money?
13      Q.    Thank you.  Let's look at 73.
14                  (Exhibit 50 [Tab 73] marked for
15                  identification.)
16      Q.    BY MR. HOSENPUD:  All right.  Exhibit or Tab 73
17            is an e-mail dated May 27, 2020, from Jane
18            O'Callaghan to Paul Sheridan, Christine Davin,
19            the PRM e-mail, you, Mr. Yu Suzuki with a cc to
20            the executive e-mail address.  And it is
21            AMCK017045.  And Justine Henderson is saying
22            good morning.  "Please see Frontier's unaudited
23            financial statements for the three months ended
24            March 31, 2020," and then it goes up further to
25            Jane analyzing what she perceives the data
```

Page 98

C E R T I F I C A T E

    I, Aleshia K. Macom, Oregon CSR No. 94-0296, Washington CCR No. 2095, California CSR No. 7955, RMR, CRR, RPR, do hereby certify that FABIAN BACHRACH remotely appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 104, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition, and of the whole thereof, to the best of my ability.  I further certify review of the transcript was not requested.

    Witness my hand at Vancouver, Washington, this 29th day of March, 2022.

*[signature]*

Aleshia K. Macom

OR CSR No. 94-0296, Expires 9-30-2023

WA CCR No. 2095, Expires 7-7-2022

CA CSR No. 7955, Expires 7-7-2022