CONFIDENTIAL

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ---------------------------------------X

5  FRONTIER AIRLINES, INC.,

6                          Plaintiff,

7      - against -

8  AMCK AVIATION HOLDINGS IRELAND

   LIMITED, ACCIPITER INVESTMENT 4

9  LIMITED, VERMILLION AVIATION (TWO)

   LIMITED, WELLS FARGO TRUST COMPANY,

10  N.A., solely in its capacity as OWNER

   TRUSTEE, and UMB BANK, N.A., solely in

11  its capacity as OWNER TRUSTEE,

12                          Defendants.

13  CASE NO.: 1:20-cv-09713-LLS

   ---------------------------------------X

14

15      * * *  C O N F I D E N T I A L * * *

16

17              ZOOM VIDEOCONFERENCE

18

19                  April 6, 2022

19                  9:02 a.m.  MDT

20

21          DEPOSITION of JAMES DEMPSEY, before

22  Melissa Gilmore, a Stenographic Reporter and

23  Notary Public of the State of New York.

24

25  Job No. NY5155657

Veritext Legal Solutions

CONFIDENTIAL

Page 2

1

2  A P P E A R A N C E S:

3  LANE POWELL PC

4  Attorneys for Plaintiff

5        601 SW Second Avenue, Suite 2100

6        Portland, Oregon 97204-3158

7  BY:  DAVID G. HOSENPUD, ESQ.

8        E-MAIL hosenpudd@lanepowell.com

9

10

11  CLIFFORD CHANCE US LLP

12  Attorneys for Defendants

13        31 West 52nd Street

14        New York, New York 10019-6131

15  BY:  JEFF BUTLER, ESQ.

16        GEGE WANG, ESQ.

17        E-MAIL jeff.butler@cliffordchance.com

18                gege.wang@cliffordchance.com

19

20

21

22

23

24

25

CONFIDENTIAL

Page 4

```
 1              DEMPSEY - CONFIDENTIAL
 2   J A M E S    D E M P S E Y,    called as a
 3        witness, having been duly placed under
 4        oath by a Notary Public, was examined and
 5        testified as follows:
 6              MR. BUTLER:  David, why don't we
 7        introduce ourselves for the record?
 8              My name is Jeff Butler.  I'm from
 9        the law firm of Clifford Chance
10        representing AMCK and the other defendants
11        in this action.  With me today is my
12        colleague, Gege Wang.
13              MR. HOSENPUD:  David Hosenpud on
14        behalf of Frontier Airlines with Lane
15        Powell.
16   EXAMINATION BY
17   MR. BUTLER:
18        Q.    All right.  Good morning,
19   Mr. Dempsey.
20        A.    Good morning.
21        Q.    Could you please state your full
22   name for the record?
23        A.    James Dempsey.
24        Q.    And where do you currently reside?
25        A.    In Colorado.
```

CONFIDENTIAL

Page 24

                    DEMPSEY - CONFIDENTIAL

1
2      A.    I need to read it to answer that
3   question.   (Document review.)
4            Yes, you can see the request in
5   point 1.
6      Q.    And were similar letters sent to
7   Frontier's other lessors on or about March 16,
8   2020?
9      A.    I didn't send them out, but my
10  recollection is that every lessor or largely
11  every lessor received one of these.  I think
12  every lessor received one.
13     Q.    Were you involved in drafting this
14  letter or the template for this letter?
15     A.    No.
16     Q.    Do you think that you reviewed it
17  before it was sent?
18     A.    I did see it before it was sent,
19  yes.
20     Q.    I would like to direct your
21  attention to the second page of this exhibit.
22  It says FRONTIER241 at the bottom.
23            And the language just below the
24  number 1 and number 2, it says, "The above
25  concessions would be documented in a mutually

Page 25

```
 1              DEMPSEY - CONFIDENTIAL
 2    agreed deferral and concession agreement."
 3              Was it your expectation, at this
 4    time, Mr. Dempsey, that any deferral that might
 5    be agreed with AMCK would be documented in a
 6    formal agreement?
 7         A.    That's what we were endeavoring to
 8    do.
 9         Q.    If you look a little bit further up
10    at the two numbered points, number 1 says --
11    well, just above that it says, "Accordingly, we
12    request the prompt implementation of the
13    following measures."  And then number 1 says,
14    "All lease rent payments due between the date
15    of this letter and June 30, 2020, will be
16    deferred."
17              Do you see that?
18         A.    Yes.
19         Q.    So was the initial request from
20    Frontier then to request a deferral of all rent
21    from the date of this letter, March 16, through
22    June 30, 2020?
23         A.    The intent of the letter was to
24    effectively receive a three-month deferral in
25    rent expiring on June 30 and that it would be
```

```
 1              DEMPSEY - CONFIDENTIAL
 2      Q.    So you made a request for
 3  concessions under the Lease Agreements, and at
 4  some point later, AMCK made requests --
 5  requests for concessions under the Framework
 6  Agreement; is that correct?
 7      A.    Yes.
 8      Q.    And was there anything wrong with
 9  AMCK in the circumstances of the pandemic
10  making a request for concessions to Frontier?
11      A.    We were asking AMCK to honor their
12  agreement with us because we had a binding
13  agreement with AMCK, and we had impending
14  aircraft deliveries that we had to satisfy with
15  Airbus.  And so we did ask AMCK to honor that
16  binding agreement.
17      Q.    So you did think there was something
18  wrong with AMCK asking Frontier for concessions
19  under the Framework Agreement; is that correct?
20      A.    Subsequent to them asking us for
21  concessions under the Framework Agreement, it
22  became clear to us that AMCK wanted to adjust
23  our binding agreement, and we asked them to
24  honor that.
25      Q.    Well, you referred to binding
```

CONFIDENTIAL

Page 39

1         DEMPSEY - CONFIDENTIAL
2         Q.    And did you understand it to mean
3    that at the time you received this e-mail?
4         A.    We were -- we were negotiating at
5    that time, and so -- in relation to the rent
6    deferral.  We were trying, at that point, to
7    achieve concessions from Airbus to satisfy
8    AMCK's request.
9              And so at that point in time, we
10   were attempting to achieve something that
11   worked for both parties.  So this certainly was
12   not a final agreement.
13        Q.    And did you understand that any
14   final agreement would be in writing?
15        A.    Yes.  Not necessarily in writing,
16   but certainly agreed in some form.  And, you
17   know, given our previous letter, we would have
18   been keen to paper the rent deferral request
19   that we put out to each of our leasing
20   companies.  But some leasing companies did it
21   through e-mail, some leasing companies did it
22   through a formal agreement.  There wasn't
23   one-size-fits-all for each of the requests at
24   that time.
25        Q.    Is it fair to say, though, that you

CONFIDENTIAL

Page 40

```
         1              DEMPSEY - CONFIDENTIAL
         2   expected some kind of writing, some kind of
         3   final writing to reflect the deferral
         4   agreement?
         5        A.    Well, we had worked with Paul
         6   Sheridan for some time, and given that he is
         7   the chief executive of the leasing company, we
         8   also would have managed this on a relationship
         9   perspective.  We had a very good relationship
        10   with AMCK, and we would have taken his word to
        11   be something that we could rely upon, given
        12   that he is the chief executive of AMCK.
        13        Q.    Well, I'm sure your confidence is
        14   well placed in Mr. Sheridan, but my question,
        15   sir, is, did you expect a rent deferral
        16   agreement with AMCK to be embodied in some kind
        17   of final writing?
        18        A.    Yes, we tended to be flexible with
        19   the format that the leasing companies wanted to
        20   agree with us.
        21             MR. BUTLER:  Let me show you the
        22        next exhibit.  I'm showing document
        23        FRONTIER310 to 311.
        24             (Dempsey Exhibit 4, E-Mail Chain,
        25        Bates Stamped FRONTIER310 through 311,
```

Page 42

```
 1              DEMPSEY - CONFIDENTIAL
 2    for anything in return?
 3         A.    Did I hope?  Yes.
 4         Q.    Is there any other reason
 5    Mr. Sheridan's response was disappointing to
 6    you?
 7         A.    Well, we couldn't satisfy his
 8    request.  We had no control over that.  So yes,
 9    that is disappointing because we had no
10    mechanism to institute what he was asking us to
11    do.
12         Q.    Did you believe, at this time, that
13    you had no way to get -- to delay the
14    deliveries under the aircraft Purchase
15    Agreement?
16         A.    At this point, we really didn't know
17    what was feasible with Airbus.  All we knew,
18    after Paul asking for a six-month deferral, was
19    that Airbus said no.
20              And we were working very hard to try
21    and get relief from everybody, as I mentioned
22    earlier, all of our suppliers, including
23    Airbus, in relation to managing the pandemic,
24    and one of those tools was to ask them to move
25    aircraft deliveries.  And Airbus was not
```

CONFIDENTIAL

Page 43

1              DEMPSEY - CONFIDENTIAL

2    interested.

3         Q.    Well, you received this e-mail from

4    Mr. Sheridan on April 3, and then you responded

5    on April 6.

6              Between those dates, did you reach

7    out to Airbus and ask them whether a six-month

8    delay in the deliveries relating to AMCK would

9    be feasible?

10        A.    We were speaking to Airbus

11   regularly, yes.

12        Q.    Well, did you personally communicate

13   with Airbus regarding --

14        A.    I did.

15        Q.    -- delivery delays?

16        A.    Yes, I did.

17        Q.    And did you personally reach out to

18   Airbus during this -- after receiving this

19   e-mail from Mr. Sheridan to determine whether

20   Airbus would be agreeable to a six-month delay

21   in the upcoming deliveries?

22        A.    We sought their input into what they

23   could do with us in relation to moving aircraft

24   deliveries inclusive of Paul's request.  And

25   within my e-mail, you can see that they have

1              DEMPSEY - CONFIDENTIAL
2    bluntly said no.
3         Q.    Well, I'm asking something more
4    specific.  I'm asking what you personally did.
5              Did you personally ask Airbus for a
6    six-month delivery delay in the aircraft
7    covered by the Framework Agreement?
8         A.    Yes, we asked Airbus to satisfy this
9    request.
10         Q.    My question, sir, was directed at
11    you personally.
12         A.    I personally did it, yes.
13         Q.    You personally asked for a six-month
14    delay; is that correct?
15         A.    We were in discussions with Airbus
16    in managing a fleet program that encompasses
17    six or seven years, and part of that discussion
18    was trying to get relief for AMCK.
19         Q.    And my question, sir, is, did you
20    ask for a six-month delay or did you ask for
21    something else?
22         A.    I asked them to move the aircraft
23    out of 2020, so that would have been greater
24    than a six-month delay.
25         Q.    And when did you make that request

CONFIDENTIAL

1                DEMPSEY - CONFIDENTIAL

2    to Airbus?

3         A.    In this period.  Prior to this

4    e-mail.

5         Q.    Who did you make that request to?

6         A.    I had a telephone conversation with

7    our relationship manager -- well, my

8    counterpart, Christopher Jones.

9         Q.    And what did Mr. Jones say in

10   response?

11        A.    No.

12        Q.    Did he say anything else?

13        A.    He said it wasn't feasible and that

14   the aircraft are built and you need to turn up

15   and deliver them.

16        Q.    Going back to Exhibit 4, you go on

17   to say, in your e-mail to Mr. Sheridan, this is

18   beginning in the middle of the second line, "As

19   a result, I can only deduce that you will

20   finance the aircraft deliveries and honor your

21   commitment to Frontier if we do not put a rent

22   deferral in place."

23             Did I read your e-mail correctly?

24        A.    (Document review.)

25             I said, "I can only deduce that you

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL
2      will finance the aircraft deliveries and honor
3      your commitment to Frontier if we do not put a
4      rent deferral in place."
5           Q.    And what did you mean by "do not put
6      a rent deferral in place"?
7           A.    That we do not institute a rent
8      deferral with AMCK.
9           Q.    Does that mean that you would pay
10     all the rent on time?
11          A.    That's exactly what it means.
12          Q.    Okay.  Did you understand at that
13     time that, if Frontier paid all of its rent on
14     time, that AMCK would be required to take
15     deliveries under the Framework Agreement?
16          A.    Yes, we were well aware that we had
17     a binding agreement.  We were trying to work on
18     a relationship basis with AMCK.
19                Specifically, I was speaking to
20     their chief executive about this, and we were
21     under pressure from Airbus to deliver the
22     aircraft to Frontier, and part of that
23     requirement is to have a financier.
24                And so we were looking for AMCK to
25     confirm that they would actually deliver the

Page 47

1           DEMPSEY - CONFIDENTIAL
2    aircraft.
3        Q.    And your understanding is that, if
4    Frontier paid all of its rent on time, that
5    AMCK would have no choice under the Framework
6    Agreement but to finance the upcoming
7    deliveries, correct?
8        A.    Correct, otherwise they would have
9    been in default.
10       Q.    Let me show you the next exhibit.
11           MR. BUTLER:  I have marked, as
12       Dempsey Exhibit 5, a document bearing
13       Bates numbers FRONTIER3480 to 82.
14           (Dempsey Exhibit 5, Text Messages,
15       Bates Stamped FRONTIER0003480 through 82,
16       marked for identification.)
17           MR. BUTLER:  I'm sorry.  I actually
18       want to mark two exhibits at this time.
19       That was Exhibit 5.
20           I would also like to mark, as
21       Dempsey Exhibit 6, a document bearing
22       Bates numbers FRONTIER3488 to 3489.
23           (Dempsey Exhibit 6, Text Messages,
24       Bates Stamped FRONTIER0003488 through
25       3489, marked for identification.)

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL

2        is clear.

3        Q.    But is that your understanding of

4   these texts?

5        A.    Without reading them, I cannot

6   confirm, but it looks like they were texts sent

7   on the 6th of April, so I assume they were --

8        Q.    And do those look like your texts?

9        A.    (Document review.)  Yes.

10       Q.    Okay.

11             MR. BUTLER:  I'm not sure whether

12        this is going to be legible enough, but,

13        Gege, can you try putting these two sets

14        of text messages side by side so that we

15        can try to see the exchange?

16       Q.    And I'm just not sure whether this

17   is going to be easy enough to read, but we can

18   always put up the full document for you.

19             MR. BUTLER:  Can you zoom in a

20        little bit more?

21       Q.    These text messages were produced to

22   us in this form with all the texts from

23   Mr. Thwaytes in one document and all of your

24   texts in another.  So in order to see the

25   exchange of texts, we're going to have to move

CONFIDENTIAL

Page 50

1        DEMPSEY - CONFIDENTIAL

2   back and forth between the two documents.

3           If we were in a room together, I

4   would just put the two of them in front of you,

5   and this is the best we can do on a screen.

6           So let me ask you about -- what we

7   have basically done is put on the screen, for

8   the record, a side-by-side comparison of

9   FRONTIER3480 and FRONTIER3488, the first page

10  of Exhibit 5 and Exhibit 6.

11          And if you look at the -- to the

12  right of the screen at the top, it looks

13  like -- well, these are all text messages on

14  April 6, 2020.  And it looks like the first one

15  is a text from Robert Fanning at 7:43 a.m., and

16  he says, "Hi Jimmy, when you have time this

17  morning, need to talk about AMCK, we have a

18  rent payment due today."

19          Do you see that text?

20      A.    Yes.

21      Q.    And it looks like, going to the left

22  side of the page, you respond at 7:44 a.m.

23          MR. BUTLER:  And, Gege, maybe you

24      can zoom in on that left side.

25      Q.    It looks like you respond saying,

CONFIDENTIAL

DEMPSEY - CONFIDENTIAL

1
2    "Yes.  Been thinking about how we respond.  If
3    we pass on the rent deferral, will they deliver
4    the aircraft?"
5            Did I read that correctly?
6        A.    Yes.
7        Q.    And was that a text you sent to
8    Mr. Fanning on April 6, 2020?
9        A.    Yes.
10        Q.    And what did you mean by that?
11        A.    Which part?
12        Q.    The part that I just read, your
13    text.
14        A.    You read the entire text.  Yeah, I
15    mean, we were considering how to respond to
16    Paul.  We had an impending aircraft delivery.
17    At this point, it was pretty soon, and we were
18    trying to figure out if they were going to
19    default on their agreement or not.
20        Q.    Well, the text that I just read from
21    Mr. Fanning was about a rent payment due that
22    day.
23        A.    Well, no, actually, the question
24    was, will they deliver the aircraft, which was
25    a direct question about are they going to turn

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL

2    up and finance the aircraft.

3         Q.     Right.    Okay.    I'm sorry if I

4    misunderstood that.

5         A.     That was the risk that we faced

6    right there and then.

7         Q.     So were you asking Mr. Fanning, if

8    you pay the rent on April 6, will they come

9    through with the future deliveries?

10        A.     In this context, I'm talking about

11   one aircraft, but yes, I'm effectively asking

12   the question, are they going to finance our

13   aircraft.

14        Q.     And --

15        A.     And what I'm doing is asking his

16   opinion because over the previous week or two,

17   the conversation that we were having with them

18   had developed where they were asking us -- we

19   had asked them for a concession, then they

20   started asking us for a concession.

21             And so I was trying to understand

22   his thinking on the situation because we had an

23   impending aircraft delivery.

24        Q.     And were you, at this point in time,

25   thinking of making the rent payments that were

CONFIDENTIAL

Page 53

1              DEMPSEY - CONFIDENTIAL
2    due on April 6?
3         A.    Yes, we were capable of making the
4    rent payments.  What we were trying to do at
5    the time was maximum Frontier's liquidity and
6    obtain rent deferrals with leasing companies,
7    but we also had to honor our commitment to
8    Airbus.
9              And so we were trying to balance the
10   two items.  And so we were considering whether
11   it made sense on this day to make the rent
12   payment or not, and we were trying to ascertain
13   what -- whether they were going to deliver on
14   their agreement with us.
15        Q.    Okay.  Let me ask you this --
16             MR. BUTLER:  Gege, I think the
17        magnification here is great.  Can you just
18        scroll over to the Fanning side of the
19        conversation?
20        Q.    And I want to ask you about his
21   response at 7:45 a.m.  He writes, "Well, I've
22   been working on {redacted} as an option taking
23   delivery of that aircraft and the next five."
24             What did you understand Mr. Fanning
25   to be saying here?

CONFIDENTIAL

Page 54

1              DEMPSEY - CONFIDENTIAL
2        A.      He was saying that he is trying to
3   find an alternative financier for the aircraft.
4        Q.      And is it correct that, at this
5   point in time, April 6, Frontier was exploring
6   alternative options for financing the
7   deliveries that otherwise would be financed by
8   the Framework Agreement?
9              MR. HOSENPUD:  Object to the form.
10             You can answer.
11       A.      Okay.  We were -- our primary focus
12  was on AMCK because we had a binding agreement
13  with them at that time, and they had just
14  signed it to deliver the aircraft.  We were
15  also concerned about our posture around asking
16  for concessions.
17             And so we were trying to see if
18  there were alternatives in the marketplace
19  because we were nervous about the developing
20  situation with AMCK and the fact that Airbus
21  was insisting on us taking delivery of the
22  aircraft on schedule.
23       Q.      So as early as April 6, 2020, you,
24  at Frontier, had concern that AMCK may not
25  finance deliveries under the Framework

CONFIDENTIAL

Page 55

DEMPSEY - CONFIDENTIAL

1    Agreement; is that correct?

2        A.    We did not know.

3        Q.    And you were uncertain enough to be

4    exploring other financing options with other

5    lessors, correct?

6        A.    We were trying to figure out where

7    the market was and whether there was

8    alternative financing options.  We were

9    concerned that AMCK, even though they had just

10   signed the agreement, that their posture was

11   changing.

12       And you will see, in my earlier

13   e-mail where I asked Paul directly, are you

14   going to honor the agreement.  I'm not sure if

15   that's before or after these texts, but

16   clearly, we were asking them to confirm to us

17   that they were going to deliver these aircraft.

18       Q.    And it looks from this text as

19   though there was enough concern, at this time,

20   to be reaching out specifically to another

21   lessor about taking those deliveries; is that

22   correct?

23       MR. HOSENPUD:  Object to the form,

24   misstates.

Page 56

1              DEMPSEY - CONFIDENTIAL

2              You can answer.

3         A.    Can you repeat the question, please?

4         Q.    My question, sir, is, was there

5    sufficient concern, as of April 6, that

6    Frontier was reaching out to a -- specifically

7    to another leasing company about taking

8    delivery of the aircraft covered by the

9    Framework Agreement?

10        A.    Yes, for two reasons.  One was we

11   were concerned about AMCK, and secondly, you

12   know, AMCK had asked us for relief of six

13   months.  And if we were capable of moving

14   aircraft deliveries around in their favor by

15   finding another alternative financing partner,

16   we may have been able to satisfy their request

17   in a different format.

18              And so there were multiple things

19   happening in this at that time.  The primary

20   concern was whether AMCK would show up for and

21   finance the next aircraft delivery, which they

22   were due to finance and had agreed to finance.

23        Q.    I just want to make sure I

24   understand your previous answer.

25              So AMCK had asked for a six-month

CONFIDENTIAL

Page 57

1                DEMPSEY - CONFIDENTIAL
2     delay in the deliveries.
3                Do I understand correctly that one
4     of the options that you considered was just
5     getting another leasing company to step in for
6     the near-term deliveries and then you could use
7     AMCK to finance subsequent deliveries under the
8     Framework Agreement?
9         A.    That was one option that failed, but
10    yes, we were -- we were assessing that.
11        Q.    Okay.    I want to go back to the --
12    to your set of text messages on the other side.
13    This will be on Exhibit 6.
14                At 7:45, it looks like you -- or
15    7:46, it looks, perhaps, that you write back to
16    Mr. Fanning, "Do we know whether AMCK will turn
17    up?"
18                And consistent with what you said
19    before, it looks like you're asking him, hey,
20    are they going to turn up and finance these
21    upcoming deliveries; is that right?
22        A.    That's exactly right.
23        Q.    Okay.    Going back to the Fanning
24    side of the conversation, it looks like at 7:46
25    and 33 seconds, Mr. Fanning writes "David Wang

1                DEMPSEY - CONFIDENTIAL

2    has made a request to Beijing, so I'm waiting

3    to hear back."

4                Who was David Wang?

5        A.    Well, his name should have been

6    redacted.

7                MR. HOSENPUD:    Yeah, this should

8        have been redacted based on other lessors,

9        and so you can speak in terms of another

10       lessor.

11       A.    So, yes, he does work for another

12   lessor, so his name should have been redacted.

13       Q.    I don't agree that his name should

14   have been redacted or the name of his company

15   should be redacted.    So let me ask you, what

16   company did Mr. Wang work for?

17               MR. HOSENPUD:    Counsel, for the

18       record, AMCK redacted or attempted to

19       redact all of its other lease clients

20       whose -- with whom it was doing business

21       dealings concerning rent deferrals.

22               We have -- and I have revealed this

23       to Mr. Alexander, we have discovered that

24       there were errors in those redactions, and

25       we made a representation that they needed

CONFIDENTIAL

Page 59

1          DEMPSEY - CONFIDENTIAL
2     to address that if they wanted to and that
3     we would not ask questions about those
4     other arrangements.  This falls into the
5     same category.
6          MR. BUTLER:  I understand your
7     statement, but I still have the question.
8     Q.    Which company did Mr. Wang work for?
9  DI      MR. HOSENPUD:  I'm going to object,
10     Counsel, and ask the witness not to
11     answer.
12     Q.    Did Mr. Wang work for ICBC Financial
13 Leasing?
14          MR. HOSENPUD:  Same objection.
15          MR. BUTLER:  Are you instructing the
16     witness not to answer?
17  DI      MR. HOSENPUD:  I am.
18          MR. BUTLER:  I am asking him about
19     public information that I took off the
20     internet.  There is nothing confidential
21     about Mr. Wang or his employer.
22          Are you going to stand by your
23     objection?
24          MR. HOSENPUD:  If that's what -- if
25     that's the source of your information,

Page 60

1              DEMPSEY - CONFIDENTIAL

2        that you have found public information

3        about Mr. Wang and who he works for, then

4        he can answer.

5                THE WITNESS:   So do I answer?

6                MR. HOSENPUD:   Yes.

7        A.     Yes, David Wang works for ICBC.

8        Q.     And just to close out the record,

9    was ICBC Financial Leasing the other company

10   you reached out to about potentially financing

11   upcoming deliveries?

12       A.     I think this text makes it very

13   clear that Robert reached out to David on

14   financing the aircraft.

15       Q.     At this time, did Frontier reach out

16   to any other leasing companies about

17   potentially financing the deliveries otherwise

18   covered by the Framework Agreement?

19       A.     I think we did, but I don't have a

20   recollection of exactly who we reached out to,

21   and Robert Fanning would have done that.

22       Q.     Just going down to Robert Fanning's

23   next text, which I think he sent before you

24   sent any response, it's April 6, 2020, at

25   7:47 a.m.   He says, "As for your question, I'd

CONFIDENTIAL

Page 61

1              DEMPSEY - CONFIDENTIAL
2    have to ask Jane, I don't know the answer.
3    Well, based on their last e-mail, they can't
4    turn up since their financier has conditions."
5              Did I read that correctly?
6         A.    You read the text correctly.
7         Q.    Was Mr. Fanning responding to your
8    question about whether AMCK would show up?
9         A.    I assume so, but you would have to
10   ask Robert.
11        Q.    And did you understand Mr. Fanning
12   to be saying --
13        A.    He doesn't know.
14        Q.    That he doesn't know.  Okay.  Or did
15   you understand him to be saying no, they're not
16   going to show up?
17        A.    We didn't know.  We were trying to
18   ascertain whether they would show up or not
19   and, hence, I asked Paul Sheridan the direct
20   question.
21        Q.    I understand that.  I think we are
22   going to get to the e-mail subsequently where
23   you asked him that question, but since you
24   raised it a couple times, what did Mr. Sheridan
25   say in response to your question?

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL

2        A.    I don't recall him directly

3   answering that question, but maybe you have

4   evidence to the contrary.

5        Q.    So your recollection, as you sit

6   here today, is that you asked Mr. Sheridan a

7   direct question of whether -- whether AMCK

8   would finance the upcoming deliveries under the

9   Framework Agreement, and you did not get an

10  affirmative answer from Mr. Sheridan; is that

11  your memory?

12       A.    That is correct.  My memory is we

13  got a conditional answer based on certain

14  conditions that they wanted.  So I never

15  received comfort that they would turn up even

16  if I paid the rent that was due on those

17  aircraft.

18       Q.    And did that make you feel that you

19  should not pay the rent?

20       A.    No, we continued to negotiate

21  because, as I said earlier, we were working

22  with our partner in trying to find a solution

23  with them, and we continued to do so.

24       Q.    After April 6 when you got a

25  short-term grace period from Mr. Sheridan and

CONFIDENTIAL

Page 66

1                   DEMPSEY - CONFIDENTIAL

2           A.      Yes.

3           Q.      Okay.   Now, I want to show you some

4    subsequent texts.   We are going to show you

5    side by side FRONTIER3482 and FRONTIER3489.

6    It's the second page of Exhibit 6 and the third

7    page of Exhibit 5.

8                   And at the top of the text from

9    Mr. Fanning, it looks like at 1:11 p.m. on

10   April 6, he writes, "Paul and Jane are

11   available in 20 minutes for a call."

12                  Do you see that?

13          A.      Yeah.

14          Q.      And then going to the other side of

15   the screen, it looks like you respond at

16   1:13 p.m.

17                  MR. BUTLER:   You have to go down a

18          little bit to find Mr. Dempsey's response.

19          Right there.

20          Q.      It looks like you respond, "I can't

21   make it.   You have the call."

22                  Did I read that correctly?

23          A.      Yes.

24          Q.      And then going back to Mr. Fanning's

25   text on the other side of the page, it looks

Page 67

1                  DEMPSEY - CONFIDENTIAL
2      like at 1:38 p.m., so about a little more than
3      half an hour later, he writes to you and says,
4      "Paul Sheridan will sending your an e-mail
5      deferring all rent payments for ten business
6      days to give us room to work out a solution."
7                  Did I read that text from
8      Mr. Fanning correctly?
9           A.    Yes.
10          Q.    And do you recall getting that
11     message from Mr. Fanning that Paul Sheridan had
12     agreed to a ten-business day grace period?
13          A.    I recall the ten-business day grace
14     period, yeah.  I mean, the text itself -- I
15     mean...
16          Q.    Okay.  And just going back to your
17     texts on the other side of the page to close
18     out the discussion, it looks like you respond
19     at 1:39 p.m. and you say, "Great."
20                  Is that your understanding as well?
21          A.    Yes, but I'm not sure if this was in
22     response to his text or not.
23          Q.    Okay.  Well, his text was at
24     1:38 p.m. and your text is at 1:39 p.m.  From
25     those time stamps, would you say you're

CONFIDENTIAL

Page 70

DEMPSEY - CONFIDENTIAL

1

2          MR. HOSENPUD:  Thank you.

3      Q.    Mr. Dempsey, it looks like you can

4  ignore the top e-mail where your colleague,

5  Mr. Fanning, is forwarding this e-mail.  I want

6  to focus your attention on the second e-mail on

7  this page, which is an e-mail from Paul

8  Sheridan to you dated, Monday, April 6.

9          Do you see that?

10     A.    I see it.

11     Q.    Did you receive this e-mail from

12  Mr. Sheridan on that date?

13     A.    I would assume that I did.

14     Q.    You have no reason to doubt that you

15  received it, correct?

16     A.    No.

17     Q.    In this e-mail, this is confirming

18  the ten-day grace period that Mr. Fanning told

19  you about and Mr. Sheridan clarifies here that

20  the grace period will end on the 21st of April,

21  correct?

22     A.    Yes.

23     Q.    Let me show you the next exhibit.

24          MR. BUTLER:  I have marked, as

25  Exhibit 8, a document bearing Bates

CONFIDENTIAL

Page 71

```
 1            DEMPSEY - CONFIDENTIAL
 2       numbers FRONTIER314 to 316.
 3            (Dempsey Exhibit 8, E-Mail Chain,
 4       Bates Stamped FRONTIER0000314 through 316,
 5       marked for identification.)
 6       Q.    And you'll see that this document,
 7   which maybe I should have used in the first
 8   place, has the same e-mail from Mr. Sheridan in
 9   the middle of page, correct?
10       A.    Yes.
11       Q.    And then up above, there is an
12   e-mail where you respond to Mr. Sheridan.
13            Did you send this e-mail to
14   Mr. Sheridan on April 6, 2020?
15       A.    Yes.  We had a subsequent call
16   the -- I don't know -- I think it was the
17   following day, but yes.
18       Q.    And in your e-mail you write, "Hi
19   Paul, I appreciate this.  As you know, this
20   will continue to be a challenge with Airbus and
21   I would hope that you reconsider your position
22   on financing.  Let's catch up tomorrow."
23            Did I read your e-mail correctly?
24       A.    Yes.
25       Q.    What was Mr. Sheridan's position on
```

1              DEMPSEY - CONFIDENTIAL

2    financing that you wanted him to reconsider?

3         A.     That they wanted a concession on the

4    binding deal that they had done with us.

5         Q.     So they asked for a concession.  You

6    wanted him to withdraw that request for a

7    concession; is that right?

8         A.     Yes, because I didn't feel it was a

9    balanced deal.  They were asking us to entirely

10   change a deal we had with them, recently

11   agreed, in return for us deferring rent.  I

12   didn't believe that the deferral request with

13   them was matched by a similar level of

14   concession from us to them in relation to that

15   deal.  And so that was my issue.

16        Q.     You end your e-mail by saying,

17   "Let's catch up tomorrow."

18              Did you, in fact, have a telephone

19   call with Mr. Sheridan on April 7, 2020?

20        A.     My recollection is we had a call

21   shortly -- yes, on April 7.

22        Q.     Was that call something that was

23   scheduled in advance or did one of you just

24   call the other?

25        A.     I don't recall.  I don't remember.

CONFIDENTIAL

Page 73

1            DEMPSEY - CONFIDENTIAL
2        Q.    So you don't recall whether you
3    called him or he called you?
4        A.    I don't remember.
5        Q.    What was the reason for the call, in
6    your mind?
7        A.    I wanted to discuss with him the
8    fact that Mobile had been closed for April,
9    that that would give them relief on delivering
10   the aircraft in April.  I felt that he should
11   give us a longer rent deferral than ten days
12   because it would take us longer than that to
13   solve our challenges with Airbus that Accipiter
14   was -- or AMCK was presenting to us.
15            And so we needed to have a
16   conversation to outline our positions and to
17   try and progress this matter.
18       Q.    So do I understand correctly that,
19   by this time, you knew that the Mobile Airbus
20   facility was closing temporarily and that
21   all -- all deliveries would be delayed by at
22   least a little while from Airbus?
23       A.    If you scroll down in your
24   e-mails -- if you scroll down on this page,
25   please.

```
 1              DEMPSEY - CONFIDENTIAL
 2              MR. BUTLER:  Gege, could you scroll
 3      down?
 4      A.    I think it's spelled out very
 5  clearly.  I sent Paul an e-mail saying, "Are
 6  you available for a call?  Airbus has closed
 7  Mobile until April 29."
 8      Q.    Okay.  So this is the call that
 9  you're referring to?
10      A.    Yes.
11      Q.    But you don't remember whether Paul
12  called you or you called Paul?
13      A.    I don't recall.  I don't know why it
14  matters.
15      Q.    Was anyone else on the call?
16      A.    I don't recall.  I think it was a
17  call between Paul and I, but I cannot confirm
18  that.
19      Q.    Do you remember what time of day the
20  call took place?
21      A.    I think it was likely morning my
22  time, afternoon his time, given the time zone
23  difference.
24      Q.    Is that typically the time that you
25  would have a telephone conversation with
```

1               DEMPSEY - CONFIDENTIAL

2    Mr. Sheridan?

3         A.    Yes.

4         Q.    How often were you speaking to

5    Mr. Sheridan around this time?  Was this call

6    an unusual event or something that happened

7    very frequently?

8         A.    I mean, I don't recall how

9    frequently we spoke, but around this time, we

10   spoke on multiple occasions.

11        Q.    Okay.  On this particular call where

12   you discussed the Mobile facility situation,

13   what else do you remember about that call?

14        A.    Paul and I agreed that we would deal

15   with the rent deferrals on a month-to-month

16   basis.  And so, therefore, we didn't have any

17   rent due for the rest of April.

18               And so we were working on the basis

19   of that, and that we would continue trying to

20   find a solution that helped them with the

21   timing of delivery of the aircraft.  And we

22   worked towards a rent deferral of longer than

23   the month-to-month basis.

24        Q.    You said that you agreed to a

25   month-to-month deferral.

1          DEMPSEY - CONFIDENTIAL
2               Did you ask Mr. Sheridan for a
3     month-to-month deferral?
4          A.    We discussed it.  It was raised on
5     the call that, given the change in Mobile, that
6     we should look at this on a month-to-month
7     basis because clearly the delivery of the
8     aircraft was being moved into May at the
9     earliest.
10         Q.    Do you remember what Mr. Sheridan
11    said about the month-to-month deferral idea?
12         A.    Yes, he said that he would agree to
13    a month-to-month rent deferral.
14         Q.    Were those his exact words?
15         A.    I don't recall his exact words, but
16    that was the essence of what he said.
17         Q.    You said he would agree to it.
18               Was it your expectation that this
19    month-to-month deferral would be documented in
20    writing?
21         A.    I had been given an undertaking by
22    Paul that we would move to a month to month as
23    opposed to ten days, and as a result, I took
24    his word for it.  What we really wanted to do
25    was document a longer term solution to the

CONFIDENTIAL

Page 77

1              DEMPSEY - CONFIDENTIAL

2    issues that existed.

3         Q.     In your discussion with

4    Mr. Sheridan, how did you expect the

5    month-to-month deferral to work?

6         A.     We wouldn't pay any rent and

7    continue the negotiations.

8         Q.     What would be --

9         A.     And, you know, our task was to, you

10   know, provide relief from aircraft deliveries

11   in Airbus, so that they could move the

12   financing requirement out, and we would not

13   have to pay rent while we tried to negotiate

14   that.

15        Q.     So was it your understanding that

16   this was an indefinite deferral of rent under

17   your agreements with AMCK?

18        A.     No, it was a fluid situation, but

19   clearly, at this point, it was for the month of

20   April.

21        Q.     So by month to month, you understood

22   the deferral to be for the month of April; is

23   that right?

24        A.     My understanding was, at this point

25   in time, my understanding was that their

CONFIDENTIAL

Page 78

1              DEMPSEY - CONFIDENTIAL

2    position was that they would facilitate a rent

3    deferral for April, and we would continue to

4    work on a longer term solution.  And so we were

5    working on that basis.

6              It was subsequently -- subsequently,

7    the negotiations developed where they were

8    looking for us to be current on May 15, and so

9    we were dealing with a continuous moving date

10   as we were negotiating with Airbus.

11             And my point of view at the time was

12   that it would take some time to get agreement

13   with Airbus longer than towards the end of

14   April, but we were endeavoring to try and do

15   that, and that's what we were working hard on

16   in the background with Airbus on achieving for

17   our partners and principally -- and to solve

18   for the short-term financing needs in our

19   business.

20        Q.    Going back to the April 7 call with

21   Mr. Sheridan, I think you said it was a

22   deferral for the month of April.

23             So Mr. Sheridan obviously extended

24   to you a grace period through April 21 in his

25   April 6 e-mail.

CONFIDENTIAL

1          DEMPSEY - CONFIDENTIAL

2              Is it your recollection that the

3   next day Mr. Sheridan agreed to a grace period

4   that would extend at least to April 30?

5       A.    The way it was deemed was we will

6   deal with this on a month-to-month basis, and

7   so yes, it was at least till the end of April

8   with, you know, an overall solution to be

9   worked out in the intervening period.

10      Q.    When you use the term "month to

11  month," does that mean that basically you're

12  agree one month at a time?  So, first, let's

13  agree to the end of April, then later we'll

14  agree to the end of May, if it's necessary?

15      A.    Correct.

16      Q.    And what is the -- so if that's the

17  deferral that you talked about with

18  Mr. Sheridan, what did you discuss about

19  repayment?

20      A.    We said that we would solve that in

21  the overall deal we were putting together.

22      Q.    Did you discuss, during your call on

23  April 7, the repayment period for the rent

24  deferred for the month of April?

25      A.    I don't recall it being as granular

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL

2    as discussing exactly when we would repay it

3    and what AMCK at the time were proposing to us

4    or developed into around that time was a -- and

5    we had to be current on all our rent in order

6    to deliver the aircraft.

7         Q.    Was there any discussion on your

8    April 7 call with Mr. Sheridan about the

9    interest rate that Frontier would pay on the

10   deferred amounts?

11        A.    No, I don't recall any discussion on

12   interest rates.  It wasn't the primary issue.

13        Q.    And I think I asked you this

14   question before, but just to be clear, did you

15   expect that month-to-month agreement with

16   Mr. Sheridan to be documented in a written

17   agreement between the parties?

18             THE WITNESS:  Go ahead, David.

19             MR. HOSENPUD:  Just objection, asked

20        and answered.

21             You can answer.

22        A.    We were working towards a more

23   formalized agreement overall.  And so, I mean,

24   I took his word given that he was the chief

25   executive of the company that he had provided

CONFIDENTIAL

Page 81

1                 DEMPSEY - CONFIDENTIAL

2    us with that.

3         Q.    Did you ask Mr. Sheridan to confirm

4    the month-to-month arrangement in writing?

5         A.    I don't recall.  I do recall

6    instructing Robert Fanning -- or, sorry --

7    confirming to Robert Fanning that he had agreed

8    to that.

9         Q.    Did you ask Mr. Fanning to confirm

10   that in writing with AMCK?

11        A.    I don't recall if I did.  I don't

12   see -- I don't recall it being an issue given

13   that I received this from Paul, who is the

14   chief executive.

15        Q.    Did you consider shooting an e-mail

16   to Paul saying, hey, just to confirm our

17   understanding, and maybe writing out what you

18   had agreed to?

19        A.    I don't recall.

20             MR. BUTLER:  Let me show you the

21        next exhibit, which we are going to mark

22        as Dempsey Exhibit 9.

23             This is a single exhibit with two

24        different documents with different Bates

25        numbers.  It's FRONTIER3493 and

CONFIDENTIAL

Page 82

1              DEMPSEY - CONFIDENTIAL

2         FRONTIER12172.

3              (Dempsey Exhibit 9, Text Messages,

4         Bates Stamped FRONTIER0003493 and

5         FRONTIER0012172, marked for

6         identification.)

7         Q.    I put these two documents together

8    because I think they are an exchange of text

9    messages.  I have your text messages on the

10   first page and Mr. Fanning's text messages on

11   the second page.  They're all from the same

12   day, April 7, 2020.

13        A.    Yeah.

14        Q.    And I want to focus your attention,

15   first, on the top of the first page, which I

16   think is your text message to Mr. Fanning.  You

17   write, "Just spoke to Paul Sheridan.  He has

18   agreed to do the deferral on a month to month."

19              Did I read that correctly?

20        A.    Yes.

21        Q.    And is that your text message to

22   Mr. Fanning describing your interpretation of

23   the call with Mr. Sheridan?

24        A.    Yes.

25        Q.    Okay.  And if you go over to the

CONFIDENTIAL

1                    DEMPSEY - CONFIDENTIAL

2    other side of the page, it's on the second page

3    of this exhibit, it looks like Mr. Fanning

4    responds, this is at 10:59 a.m., "OK.  Good.

5    Anything mentioned on the repayment period?

6    And are they going to send our revised

7    agreement over?"

8              Do you see that?

9         A.    Yes.

10        Q.    Is that the response you received

11   from Mr. Fanning on that day?

12        A.    I assume so, yes.

13        Q.    Going back to your side of the

14   conversation, it looks like you write back at

15   11:03 a.m., "No, but we should stick to nine

16   months from July 1.  Let's get a draft to him."

17             Did I read your response correctly?

18        A.    Yes.

19        Q.    Does that refresh your

20   recollection --

21        A.    I mean, I think that answers your

22   earlier question.  So we must not have spoken

23   about the repayment period and my suggestion

24   was nine months from July.

25        Q.    My question, sir, is, does that

CONFIDENTIAL

Page 84

1              DEMPSEY - CONFIDENTIAL
2    refresh your recollection that you expected a
3    written agreement to be entered --
4         A.    Oh.
5         Q.    -- reflecting the month-to-month
6    arrangement?
7         A.    I suggested that we get a draft of
8    that arrangement, yes, to them.
9         Q.    And in your response to Mr. Fanning,
10   you also clarify that you did not discuss the
11   repayment period with Mr. Sheridan, correct?
12        A.    That's correct.
13        Q.    And your direction to Mr. Fanning is
14   that you should insist -- that Frontier should
15   insist on a nine-month repayment period; is
16   that right?
17        A.    That was my suggestion.
18        Q.    And from July 1 -- the repayment
19   would not begin until July 1 in your view
20   pursuant to your request, right?
21        A.    That is exactly what I said.
22        Q.    Okay.  Going back to Mr. Fanning's
23   side of the conversation, it looks like he
24   responds at 11:04 a.m., "They have our draft.
25   I'll follow up with Jane."

CONFIDENTIAL

 1              DEMPSEY - CONFIDENTIAL
 2        A.    Yes, I am basically bringing him up
 3    to speed on what Airbus has offered.
 4        Q.    And did you receive a response from
 5    Mr. Sheridan to this text, to your memory?
 6        A.    I don't recall.
 7        Q.    Let me show you the next exhibit,
 8    which is Dempsey Exhibit 12.
 9              MR. BUTLER:   It's a document bearing
10         Bates numbers AMCK17769 through 17771.
11              (Dempsey Exhibit 12, E-Mail Chain,
12         Bates Stamped AMCK17769 through 17771,
13         marked for identification.)
14         Q.    And this is a series of e-mails, an
15    e-mail chain.   The most recent e-mail in the
16    chain is Monday, April 13, from Paul Sheridan
17    to you.
18              But I want to start with the e-mail
19    a little -- in the middle of the page which
20    appears to be an April 13 e-mail from you to
21    Paul Sheridan.
22              Do you see that?
23         A.    Yep.
24         Q.    And does this appear to be an e-mail
25    that you sent to Paul Sheridan on April 13,

CONFIDENTIAL

Page 95

1                    DEMPSEY - CONFIDENTIAL

2        2020?

3            A.      Yep.

4            Q.      And, again, in this e-mail, are you

5        asking him, once again, whether a two-month

6        delay would be okay?

7            A.      (Document review.)

8                    I'm asking -- I'm spelling out what

9        Airbus has offered us.

10           Q.      And then in the second paragraph of

11       your e-mail you write, "I understand that you

12       were looking for a six-month delay, however,

13       that is impractical given the advanced nature

14       of the aircraft production.  Please confirm

15       that you can support" -- "please confirm you

16       can support the revised schedule."

17                   Did I read your e-mail correctly?

18           A.      Yes.

19           Q.      So I think this is consistent with

20       what you said before, but did you understand,

21       at this time, that AMCK was -- had been looking

22       for a six-month delay, but you were only able

23       to get to this point a two-month delay from

24       Airbus?

25           A.      That's correct.

CONFIDENTIAL

Page 96

1            DEMPSEY - CONFIDENTIAL
2        Q.      Going back to Paul's e-mail at the
3    top of the page, it looks like he responds to
4    you on the same day, and he says, "Hi Jimmy,
5    apologies for the slow response, but I was
6    waiting for some feedback from the
7    shareholders.  Essentially we want to tie the
8    deliveries to having no outstanding deferrals
9    so it would only work if we recast the deferral
10   agreement."
11           So my question, sir, is, what did
12   you understand Mr. Sheridan to be saying when
13   he referred to "no outstanding deferrals"?
14       A.      He means -- I can't put words in his
15   mouth, but my understanding is that he means
16   that your rent is paid up to date.
17       Q.      And in this e-mail, does
18   Mr. Sheridan say one way or the other whether a
19   two-month deferral would be acceptable to AMCK?
20       A.      Sorry.  Could you repeat that,
21   please?
22       Q.      I said, in this response from
23   Mr. Sheridan, does he say one way or the other
24   whether a two-month delivery delay from Airbus
25   would be satisfactory to AMCK?

CONFIDENTIAL

Page 97

1                   DEMPSEY - CONFIDENTIAL

2          A.     He says, essentially, we want to tie

3      the deliveries to having no outstanding

4      deferrals, so it would only work if we recast

5      the deferral agreement.

6          Q.     Right.  And my question, sir, is,

7      does he say anything about whether the

8      two-month delay that you wrote him about would

9      be acceptable to AMCK?

10         A.     On condition that we had no

11     outstanding deferrals.  So he makes the comment

12     that he may be able to work this, but he wants

13     no outstanding deferrals.

14         Q.     So did you understand Mr. Sheridan

15     to be saying, if Frontier gets current on its

16     rent, this might work?

17         A.     He didn't say that.  He said,

18     essentially, we want to tie the deliveries to

19     having no outstanding deferrals, so it would

20     only work if we recast the deferral agreement.

21         Q.     And did you understand this to mean

22     that Mr. Sheridan wanted Frontier to get up to

23     date on its rent payments?

24         A.     You would have to ask Paul Sheridan.

25         Q.     I'm asking, sir, about your

CONFIDENTIAL

1                DEMPSEY - CONFIDENTIAL
2     understanding.
3          A.    My interpretation of this e-mail
4     was, before the next aircraft delivery, you
5     have to have all outstanding rent paid, and so
6     the next aircraft delivery in this case was
7     June.
8          Q.    Are you saying that your
9     interpretation of this e-mail from Mr. Sheridan
10    was that you didn't have to pay rent until
11    June?
12         A.    If you go back to the previous
13    schedule -- our previous e-mail, I said to him
14    the first aircraft was delivered sometime in
15    June, the next two in July.  It's in this third
16    sentence of the first paragraph of the e-mail
17    dated April 13 at 14:31.
18              So I say the first aircraft were
19    delivered sometime in June, the next two in
20    July.
21              He then responds to me saying,
22    essentially, we want to tie the deliveries to
23    having no outstanding deferrals, so it would
24    only work if we recast the deferral agreement.
25              My deduction on that comment is you

```
 1              DEMPSEY - CONFIDENTIAL
 2    would have to be up to date on rent at the
 3    point of delivery of those aircraft.
 4         Q.    And when you say up to date on rent,
 5    do you mean repaying any deferred rent?
 6         A.    That's effectively what he says, no
 7    outstanding deferrals.
 8         Q.    Going back to the question I asked
 9    previously, did Mr. Sheridan say anything in
10    his e-mail one way or the other about whether
11    he would agree to the two-month delay?
12         A.    Sorry.  Could you repeat that?
13         Q.    Yes, I asked did Mr. Sheridan say in
14    his e-mail to you on April 13, 2020, one way or
15    the other whether AMCK would agree to the
16    two-month delay proposed by Airbus?
17         A.    (Document review.)
18              He says -- there is multiple
19    different things in this e-mail.  He says, the
20    six-month period that they asked for was set to
21    allow for repayments of the deferred rent as
22    well as to be over the deferral period.  Right?
23    We couldn't achieve his six-month period, so he
24    is walking that back.
25              He is saying in the prior sentence,
```

```
 1              DEMPSEY - CONFIDENTIAL
 2    essentially, we want to tie the deliveries,
 3    which I spelled out now were occurring in June
 4    and July to the deliveries to having no
 5    outstanding deferrals.
 6              And so he's saying it would only
 7    work if we recast the deferral agreement.  So
 8    he's effectively saying that the deferral
 9    agreement needs to be recast to say, you will
10    have no outstanding deferrals at the point of
11    delivery of the aircraft, which in my e-mail
12    says the next aircraft is in June.  And this is
13    in April 13.
14        Q.    Did you understand Mr. Sheridan to
15    be saying that the two-month delay might work
16    for AMCK if Frontier gets current on its rent
17    and repays all deferred rent by that time?
18        A.    Sorry.  Could you repeat?  I just
19    want to make sure I understand exactly what
20    you're asking.  Could you repeat the question?
21              MR. BUTLER:  Why don't we reread
22        that one?
23              (Record read.)
24        A.    Are you asking me do I understand?
25              MR. BUTLER:  Please reread the
```

CONFIDENTIAL

Page 101

1                  DEMPSEY - CONFIDENTIAL
2          question.
3                  (Record read.)
4          A.    I mean, I don't know that he's
5     saying it might work.  I think what he's saying
6     is this is what we will offer you, which is no
7     outstanding deferrals at the point of delivery
8     of the next aircraft.  I don't think he's
9     saying it might work.  He's saying this is what
10    we essentially want to do.  Essentially, we
11    want to tie the deliveries to having no
12    outstanding deferrals.
13         Q.    Well, by communicating essentially
14    what he wanted to do, wasn't he communicating
15    to you that it might work?
16         A.    I mean, I can't tell you what he was
17    trying to communicate.  All I can do is read
18    the language that's there.
19         Q.    Well, you can tell us your
20    understanding of his words.  Just let me finish
21    the question.
22                Was it your understanding at the
23    time that, because he was saying or expressing
24    a willingness to do this, that it might work?
25                MR. HOSENPUD:  Objection, asked and

CONFIDENTIAL

Page 102

```
 1              DEMPSEY - CONFIDENTIAL
 2       answered, argumentative.
 3              You can answer.
 4       A.     My understanding of what he is
 5   saying is you need to have all of your rent
 6   paid at the point of delivery of the next
 7   aircraft.
 8              MR. HOSENPUD:  Let's take a break.
 9       It's 10:10.
10              MR. BUTLER:  That would be fine.
11       When should we come back, David?
12              MR. HOSENPUD:  Actually, it's 10:12,
13       I misspoke.  How about ten minutes?
14              MR. BUTLER:  Sure.  Why don't we
15       throw in the extra three and resume at 25
16       after the hour?
17              MR. HOSENPUD:  Reasonable.  Thank
18       you.
19              (Recess taken.)
20              MR. BUTLER:  I would like to mark
21       the next exhibit, which we will call
22       Dempsey Exhibit 13.  It's a document
23       bearing Bates numbers FRONTIER4329 to
24       4334.
25              (Dempsey Exhibit 13, E-Mail Chain,
```

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL
2    Mr. Fanning and Mr. Thwaytes on April 23, 2020?
3         A.     It looks like a group text chain.
4    So I don't know if they are specifically
5    addressed to me, but they were addressed to
6    everybody in the group.
7         Q.     And the group consisted of you,
8    Robert Fanning and Spencer Thwaytes, correct?
9         A.     That's correct.
10        Q.     And was that kind of a typical way
11   of you to correspond with Mr. Fanning and
12   Mr. Thwaytes, all three of you together?
13        A.     Depending on -- yes, sometimes we
14   would correspond like this.  Sometimes we would
15   meet in person.  There may be telephone calls.
16   There's multiple different communication
17   skills.  It depends on what's going on at the
18   time.
19        Q.     I should clarify.  Is this a common
20   way for you to text Mr. Fanning and
21   Mr. Thwaytes?
22        A.     Yes.
23        Q.     In the first text, at the top of the
24   page, Mr. Fanning writes, "Finally a reply from
25   Jane."  And it goes on.  It appears to quote a

CONFIDENTIAL

Page 112

1                      DEMPSEY - CONFIDENTIAL
2      message from Jane where she says, "Hi Robert,
3      we are still formulating a response based on
4      the directors' position.  What remains clear is
5      shareholder unwillingness to fund a new
6      purchase if there are any payments at all
7      outstanding."
8                 Did I read that correctly?
9           A.    I think you missed the final
10     sentence, did you?
11          Q.    At least the portion that I read,
12     did I read it correctly?
13          A.    You read to the portion of the text
14     that says "outstanding".
15          Q.    Okay.  Well, let me complete the
16     text for you just for the sake of completeness.
17                It goes on to say, "I hope to get
18     back to you tomorrow with our thoughts on
19     possible ways forward."
20                Did I read that correctly?
21          A.    That is the text that's in quotes,
22     yeah.
23          Q.    And focusing on the second sentence
24     that I read there, the one that begins "what
25     remains clear," did you understand Jane's

CONFIDENTIAL

Page 113

1                   DEMPSEY - CONFIDENTIAL
2    message to be that AMCK's shareholder wanted
3    Frontier to be current on all of its rent
4    payments?
5        A.    It's very similar to Paul Sheridan's
6    e-mail that you shared with me before the
7    break, that they are unwilling to fund a new
8    purchase unless we have all payments up to
9    date, all rent payments up to date.
10       Q.    And doesn't that imply to you that
11   they wanted all rent payments to be up to date?
12       A.    It implies that they want all rent
13   payments up to date prior to funding any
14   purchase of an aircraft.  Actually -- let me
15   just finish my sentence.  It actually states it
16   categorically.
17       Q.    It's a pretty categoric statement,
18   then, that AMCK's position was that all rent
19   payments should be up to date, correct?
20            MR. HOSENPUD:  Object to the form.
21            You can answer.
22       A.    Okay.  It says that the shareholder
23   is unwilling to fund a new purchase, right, if
24   there are any payments at all outstanding.  So
25   there's two steps to this.  They will not fund

CONFIDENTIAL

Page 114

1                DEMPSEY - CONFIDENTIAL
2    the purchase until we are up to date on
3    payments.
4        Q.    I understand there are two parts to
5    it, but didn't you understand that to mean that
6    AMCK wanted Frontier to be current on its
7    payments as is required under the Lease
8    Agreements?
9        A.    I understood that AMCK had provided
10   us with relief from paying rent, and in order
11   to fund a new purchase of an aircraft, that we
12   had to be up to date on all rent payments.
13       Q.    Mr. Dempsey, isn't Ms. O'Callaghan
14   sending a clear message to Frontier Airlines
15   that AMCK wanted Frontier to pay its rent?
16            MR. HOSENPUD:    Objection,
17       argumentative.
18            You can answer.
19       A.    They wanted us to pay our rent in
20   order to fund the purchase of an aircraft.
21       Q.    Let me show you the next exhibit.
22            MR. BUTLER:    I'm going to mark, as
23       Dempsey Exhibit 16, a document bearing
24       Bates numbers FRONTIER3510 to 3513.
25            (Dempsey Exhibit 16, Text Messages,

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL

2         Bates Stamped FRONTIER0003510 through

3         3513, marked for identification.)

4         Q.    It appears to be a collection of

5    text messages involving yourself, Mr. Thwaytes

6    and Mr. Fanning.   These are all texts from

7    Mr. Fanning or Mr. Thwaytes, and the date of

8    this is April 25, 2020.

9              So my first question, Mr. Dempsey,

10   is do you recognize these as texts that you

11   received as part of this group chat on

12   April 25, 2020?

13        A.    Yes.

14        Q.    And there is a text from Robert

15   Fanning on that date that he begins, "Jimmy,

16   finally a reply from Jane this morning."

17              Do you see that?

18        A.    Yes.

19        Q.    And then it appears that he quotes

20   language from a text from Jane.

21              Is that your interpretation of this

22   as well?

23        A.    (Document review.)

24              I assume that that's where the text

25   came from.

CONFIDENTIAL

1                    DEMPSEY - CONFIDENTIAL

2          Q.      It looks like Mr. Fanning just cut

3    and paste a text from Jane into a text to you,

4    correct?

5          A.      That's my assumption.

6          Q.      And in that chat from Jane, it looks

7    like she says something very similar to what

8    she said two days before.  It says, "1.  We

9    will be unable to fund any new delivery unless

10   all payments are up to date, so there can be no

11   deferred payments outstanding at closing."

12              My question once again is, did you

13   interpret this to be another message from AMCK

14   that they wanted Frontier to get current on its

15   rent?

16              MR. HOSENPUD:   Objection, form.

17              You can answer.

18         A.     They wanted us to be current on all

19   payments to fund a new delivery that they were

20   bound to fund.

21         Q.     Let me ask you this, Mr. Dempsey.

22              If you weren't able to reach

23   agreement on a new delivery, did you understand

24   that AMCK wanted all the rent to be paid?

25         A.     I mean, that's a hypothetical,

CONFIDENTIAL

Page 117

1              DEMPSEY - CONFIDENTIAL
2  right?
3       Q.    And I'm asking you the hypothetical.
4              Was it your understanding that, if
5  you could not reach agreement on the Framework
6  Agreement, that AMCK still wanted all the rent
7  to be paid on time?
8       A.    So we understood that, and we were
9  proposing a deferral in rent, not that we would
10 not pay the rent.  So there is a distinction
11 there.
12             And we understood in the situation
13 that we were in at this stage in April, that we
14 have been given rent relief but that that rent
15 relief would expire in order for them to
16 deliver a new aircraft to us, and the next
17 aircraft delivery was moved to June, from
18 initially March, into April and then into June.
19      Q.    Let me show you the next exhibit.
20             MR. BUTLER:  I'm marking, as Dempsey
21        Exhibit 17, a document bearing Bates
22        numbers FRONTIER338 through 342.
23             (Dempsey Exhibit 17, E-Mail Chain,
24        Bates Stamped FRONTIER0000338 through 342,
25        marked for identification.)

CONFIDENTIAL

Page 118

1                    DEMPSEY - CONFIDENTIAL
2          Q.       This appears to be a series of
3    e-mails.   The last e-mail in the series is
4    dated April 27, 2020, from Paul Sheridan to
5    you, Mr. Dempsey.
6                    I want to start by asking you about
7    the e-mail in the middle of the page, the
8    preceding e-mail, which appears to be an e-mail
9    from you to Mr. Sheridan on April 27, 2020.
10                   Do you see that e-mail?
11         A.       That's an e-mail from me to Paul,
12   yes.
13         Q.       Yeah.   Does that appear to be an
14   e-mail from you to Paul on April 27?
15         A.       Yes.
16         Q.       And in the second line of your
17   e-mail to Paul, towards the end, there is a
18   sentence that reads as follows, "I put a scheme
19   in place with Airbus that would facilitate
20   short-term deferrals of the aircraft on the
21   basis that you would honor your agreement."
22                   Did I read that sentence correctly?
23         A.       Yes.
24         Q.       Does that refer to the two-month
25   delivery delay that you had been successful at

CONFIDENTIAL

Page 119

1           DEMPSEY - CONFIDENTIAL
2    negotiating from Airbus?
3         A.    I agreed to a three-month deferral,
4    but yes.
5         Q.    Well, at this time, was it a
6    two-month deferral or a three-month deferral,
7    if you remember?
8         A.    Well, in the Framework Agreement it
9    was due to be delivered in March.  That got
10   moved into April, and then we moved it.  And
11   then as a result of conversations with Airbus,
12   that moved into June at this point -- I think
13   at this point in the conversations.  It
14   subsequently got moved to July.
15        Q.    I see.  So you're three months
16   includes the one-month delivery delay that was
17   caused by Airbus closing the Mobile facility;
18   is that right?
19        A.    I mean, technically the aircraft was
20   in the Framework Agreement and in the agreement
21   with Airbus to deliver in March.  It then got
22   moved to early April.  As a result, then, of
23   the closure of Mobile, it became uncertain as
24   to its next delivery date, but it was assumed
25   to be in early May dependent on Mobile

CONFIDENTIAL

                    DEMPSEY - CONFIDENTIAL

1
2   reopening.   And then that got moved to June
3   because we asked for relief, and they
4   effectively said we can do an aircraft delivery
5   in June.
6                That negotiation continued with
7   Airbus, and we managed to move that aircraft to
8   July, and it delivered in July.
9        Q.    And that was still less than the
10  six-month delay in delivery that Mr. Sheridan
11  had previously requested, correct?
12       A.    Yeah, if you go down in this e-mail
13  chain, you'll see where he stipulates the
14  six-month period was set to allow repayments of
15  the deferred rent, as well as to be over the
16  deferral period.
17                So our assumption, at that time, was
18  that, if we were current on rent at the point
19  of delivery, that the aircraft could deliver in
20  June.
21       Q.    My question, sir, was, simply, that
22  the time period that you had negotiated with
23  Airbus, at this time, was less than the time
24  period requested by Paul Sheridan; isn't that
25  true?

CONFIDENTIAL

```
 1              DEMPSEY - CONFIDENTIAL
 2        A.     I mean, I would have to check
 3   exactly what time period they were looking for
 4   at this point, but he seemed to come down on
 5   April 13 off six months and move to a tying
 6   paying the outstanding deferred rent with the
 7   delivery of the aircraft in June.
 8              That's where it sat, I think, around
 9   this time.  And that's what's in his April 13
10   e-mail.
11        Q.     The request evolved over time; is
12   that correct?
13        A.     The request from AMCK evolved over
14   time.  Our request is pretty consistent.
15        Q.     But in terms of the six-month
16   deferral, it wasn't the case that Paul asked
17   for a six-month delay and you went and got it
18   from Airbus, correct?
19        A.     Can you repeat that question?  I
20   think there is multiple questions in that.
21        Q.     My question is, that you described
22   how things evolved, which I think sounds pretty
23   accurate, but it did not unfold in the way that
24   Paul asked you for a six-month delay and you
25   delivered what Paul requested, correct?
```

CONFIDENTIAL

Page 122

1                   DEMPSEY - CONFIDENTIAL
2          A.     I mean, we are going back now to
3    early April when they asked for a six-month
4    delay, and we asked Airbus and Airbus said no.
5                 What we -- what transpired, and it
6    developed in the conversations, you can see it
7    in the e-mails, my deduction from Paul is that
8    they were willing to give us a six-month
9    deferral and repayment of rent on the basis
10   that it was -- there was no aircraft delivery.
11                If the aircraft delivery occurred in
12   June, they wanted us to pay all outstanding
13   rent deferrals.  That's where it was at that
14   point.
15        Q.     In that situation, both sides would
16   have to compromise a little bit on the
17   concessions they initially requested from each
18   other, correct?
19        A.     That is correct.  We were willing to
20   compromise on our request for rent deferrals --
21   sorry.  Let me rephrase that.
22                AMCK is offering us an alternative
23   solution, which resulted in us being up to date
24   on aircraft rent deferrals in return for them
25   turning up and financing the next aircraft

CONFIDENTIAL

Page 123

1          DEMPSEY - CONFIDENTIAL
2    delivery in June.
3              That's where it sat at that point.
4    And we were considering it.
5          Q.    Focusing your attention back on your
6    e-mail to Paul on April 22, in the next
7    sentence after the one that I just read, it
8    says, "Please confirm this is the case as we
9    have a lease signed for these aircraft and are
10   willing to ensure the deferred rent is paid as
11   a CP of delivery."
12             Did I read that correctly?
13         A.    Yes.
14         Q.    Were you asking Mr. Sheridan for
15   confirmation that AMCK would fund deliveries if
16   they were delayed by two months?
17         A.    I am following up on his e-mail
18   where he made a proposal to us, and he wants to
19   tie the deliveries -- the delivery of aircraft
20   to having no outstanding deferrals.
21             I am making a proposal to him and
22   asking for his confirmation that he agrees that
23   we will pay -- ensure that the deferred rent is
24   paid as a condition precedent of the delivery
25   on the basis that he confirms that he would

CONFIDENTIAL

Page 124

1                DEMPSEY - CONFIDENTIAL
2    fund that delivery.
3                And so I am effectively agreeing to
4    his proposal in the April 13 e-mail.
5        Q.    Did Mr. Sheridan provide the
6    confirmation that you were requesting in this
7    e-mail?
8        A.    I mean, I don't recall, but maybe if
9    you scroll up you might find it.  (Document
10   review.)
11       Q.    Well, of course you can look at
12   this, and I was going to go to that e-mail.
13                Apart from looking at this e-mail,
14   though, you don't recall Mr. Sheridan
15   confirming what you asked him to confirm; is
16   that correct?
17       A.    Sorry.  Bear with me a second.  My
18   screen has just gone wonky.
19                Okay.  Can you repeat that, please?
20       Q.    My question, sir, is, setting aside
21   this e-mail, which we're going to talk about in
22   a second, do you have any recollection of
23   Mr. Sheridan confirming, either orally or in
24   writing, what you asked him to confirm in this
25   e-mail?

CONFIDENTIAL

Page 125

1              DEMPSEY - CONFIDENTIAL

2          A.    I don't recall.

3          Q.    Focusing on the e-mail, Mr. Sheridan

4    writes back to you, "Hi Jimmy, following our

5    board meeting last week, we have been in

6    discussions with our shareholders and will need

7    to follow up with them again tomorrow morning,

8    so I won't have an update until then.

9    Apologies."

10              Did I read that correctly?

11         A.    Yes.

12         Q.    Certainly, in this e-mail,

13   Mr. Sheridan is not confirming any agreement

14   with you, correct?

15         A.    No, he is sending a holding

16   statement.

17         Q.    Let me show you the next exhibit.

18              MR. BUTLER:  I'm marking, as Dempsey

19         Exhibit 18, a two-page document bearing

20         Bates numbers FRONTIER12176 to 77.

21              (Dempsey Exhibit 18, Text Messages,

22         Bates Stamped FRONTIER0012176 through 77,

23         marked for identification.)

24         Q.    This appears to be a series of text

25   messages from Robert Fanning, dated April 29,

CONFIDENTIAL

Page 133

1                DEMPSEY - CONFIDENTIAL
2          Bates Stamped AMCK016957 to 61, marked for
3          identification.)
4          Q.    And the top e-mail in this chain is
5    an e-mail from Paul Sheridan to you,
6    Mr. Dempsey, dated April 30, 2020.
7                Please take a look at this, and can
8    you tell me whether you received this e-mail on
9    that date?
10         A.    (Document review.)  Yes.
11         Q.    And take all the time you need to
12   review this, but I just want to ask you some --
13   you know, about the content of this e-mail.
14               Do you understand Mr. Sheridan to be
15   communicating to you the conditions under which
16   AMCK was willing, at this time, to fund the
17   upcoming deliveries under the Framework
18   Agreement?
19         A.    Yeah, this was their latest proposal
20   to us.
21         Q.    And did you understand that AMCK
22   might not fund deliveries under the Framework
23   Agreement if these conditions could not be
24   satisfied?
25         A.    We understood that the first two

CONFIDENTIAL

Page 134

1              DEMPSEY - CONFIDENTIAL
2    points in his e-mail -- the first point in the
3    e-mail, where we moved deliveries to July 2020
4    and February 2021, we did not have that in
5    place -- my recollection is we did not have
6    that in place on that date, but we were working
7    towards that where we would achieve, and we
8    actually did actually achieve, moving the three
9    aircraft into July.  It was effectively moving
10   one incremental aircraft from June to July.
11           And we swapped -- although in the
12   Framework Agreement, AMCK was due to deliver
13   two aircraft in the fall, we -- it is around
14   this time, but I don't believe it was right at
15   this time -- we actually swapped another
16   leasing company and got them to finance the two
17   aircraft and move AMCK to 2021.  So we achieved
18   the first point.
19           The second point we understood, and
20   we were clear on that.
21           The third point was an introduction
22   of an item that was beyond anything that we
23   could do and, in my opinion, was mixing issues,
24   and it was something that was very challenging
25   for Frontier Airlines to do, and so we could

CONFIDENTIAL

Page 135

1                DEMPSEY - CONFIDENTIAL
2    not do that at this point.
3                And so that's where we were, and we
4    responded in due course about that.
5         Q.    My question, sir, was, did you
6    understand Mr. Sheridan to be telling you that
7    AMCK would not fund future deliveries under the
8    Framework Agreement if these conditions could
9    not be satisfied?
10        A.    Well, he didn't have a right under
11   the Framework Agreement not to fund on point
12   three.
13        Q.    I'm sorry.  Please finish your
14   answer.
15        A.    No, sorry.  I'm finished.  Go ahead.
16        Q.    Did you understand Mr. Sheridan to
17   be communicating that AMCK might terminate the
18   Framework Agreement if the conditions set forth
19   in this e-mail could not be satisfied?
20        A.    I need to read the e-mail.
21   (Document review.)
22                Yes, they are adding conditions to
23   the Framework Agreement by saying we need to
24   add some additional security to ensure that we
25   can obtain our shareholder funding for the

Page 136

DEMPSEY - CONFIDENTIAL

1
2   deliveries.
3           So they're adding incremental items
4   to the Framework Agreement.
5       Q.    In your mind, was there a risk that
6   AMCK might terminate the Framework Agreement if
7   these additional conditions were not agreed to?
8       A.    Could you repeat that?
9       Q.    Yes.  My question is, in your mind,
10  at this time, did you understand that AMCK
11  might terminate the Framework Agreement if
12  these additional conditions could not be
13  satisfied?
14      A.    I mean, it was unclear to me -- I
15  would have to get legal advice on whether they
16  could terminate the lease -- the Framework
17  Agreement on the basis of us not agreeing to
18  conditions that were over and above what was in
19  the Framework Agreement.
20      Q.    Whether they could do it legally or
21  not is a separate question, but wasn't
22  Mr. Sheridan telling you that AMCK might not
23  perform under the Framework Agreement unless
24  Frontier agreed to these additional conditions?
25      A.    I think he's threatening us that, if

CONFIDENTIAL

Page 137

1          DEMPSEY - CONFIDENTIAL

2    we didn't agree to this, he would not perform,

3    correct.

4         Q.    So you interpreted this e-mail as a

5    threat.   Is that what you're testifying to?

6         A.    He's saying, "Given the extent of

7    the damage that has done to the airline

8    industry and to airline and lessor funding

9    sources, we need to have some additional

10   security to ensure that we can obtain our

11   shareholder funding for the deliveries."

12             He is telling us that he will not --

13   or there is a doubt as to whether he can turn

14   up and fund the aircraft unless we agree to the

15   three items that are listed below.

16        Q.    And did Frontier agree to these

17   three items?

18        A.    No, because the process of this was

19   a continued negotiation over about a month, and

20   we had conversations about point three, and if

21   you look at my subsequent e-mail to this one,

22   you'll see that I responded to this item and

23   was incapable of agreeing to point three.

24        Q.    So I guess it came as no surprise to

25   you when AMCK did terminate the Framework

CONFIDENTIAL

Page 143

1                DEMPSEY - CONFIDENTIAL
2    call you that day?
3         A.    I think we had a phone call, yes.
4         Q.    Do you remember what was discussed
5    on that phone call?
6         A.    I mean, I think I explained to him
7    that I couldn't do point three.  It just was
8    not something that we could do.
9              I explained -- I think I explained
10   to him where we were with Airbus, at that point
11   in time, and that we were trying to move the
12   aircraft into July.  I think we had possibly
13   achieved that around this time, around
14   April 30, and I think I communicated probably
15   that to him.
16             And I think he communicated to me
17   that he wanted us to be current by May 15, and
18   I mean, we debated point three, which I
19   explained to him I couldn't do.
20        Q.    So you were clear to him on that
21   call that point three was unacceptable from the
22   Frontier side?
23        A.    I mean, it was something we couldn't
24   do.
25        Q.    What do you remember Mr. Sheridan

CONFIDENTIAL

Page 144

1          DEMPSEY - CONFIDENTIAL
2  saying on this call?
3      A.    I think he reiterated his position
4  and said he will go and see what he can do.  I
5  don't recall exactly his words, but it was
6  something to that effect.  And he would come
7  back to me, I think.
8      Q.    Did he make any alternative proposal
9  to you on that call?
10     A.    No, he said he would come back to
11  me.
12         MR. BUTLER:  Let me mark the next
13     exhibit, which we will call Dempsey
14     Exhibit 21.  It's a one-page document
15     bearing Bates number FRONTIER3542.
16         (Dempsey Exhibit 21, E-Mail, Bates
17     Stamped FRONTIER0003542, marked for
18     identification.)
19     Q.    Mr. Dempsey, this appears to be a
20  text message in a little bit of a different
21  format.  I'm not sure why text messages were
22  produced in more than one format, but there we
23  have it.
24         This appears to be a message from
25  Robert Fanning to you and Spencer Thwaytes,

Page 151

1                DEMPSEY - CONFIDENTIAL
2        Q.    It does sound like there were a lot
3   of aircraft deliveries that were rescheduled
4   that had nothing to do with AMCK or the
5   Framework Agreement; is that correct?
6                MR. HOSENPUD:  Object to the form.
7                You can answer.
8        A.    The background to that is Airbus had
9   made a decision to reduce its production by
10  40 percent.  And so in light of that, there
11  were movements longer term in the aircraft
12  delivery schedule to meet the -- or to react to
13  the cut in production that Airbus made.
14                That was separate to the aircraft
15  that were built, already built and pending
16  delivery or nearly built and pending delivery
17  with Airbus, and those aircraft are the AMCK
18  near-term deliveries that got delayed three,
19  four months.
20        Q.    Okay.  But for whatever reason, this
21  amendment was broader than just the aircraft
22  covered by the Framework Agreement, correct?
23        A.    That's correct.
24        Q.    When you got this new delivery
25  schedule finalized with Airbus, did you

CONFIDENTIAL

1                    DEMPSEY - CONFIDENTIAL
2    communicate the new delivery dates for the
3    Framework Agreement aircraft to AMCK?
4         A.     I think we did, yeah.   I think we
5    communicated it multiple times to them, either
6    in my conversations with them or we
7    communicated with them that we were working
8    towards this.
9              You know, I think we kept them
10   informed as to how we were getting on.
11        Q.     Do you remember after -- do you
12   remember informing AMCK that this agreement had
13   been finalized with Airbus?
14        A.     I mean, I don't know that we had an
15   obligation to -- a notice obligation to AMCK on
16   the back of finalizing this agreement.   They
17   were aware that this was happening.
18        Q.     And my question, sir, is, whether
19   you had an obligation or not, do you remember
20   telling anyone at AMCK that this agreement with
21   Airbus had been finalized?
22        A.     I don't recall specific
23   conversations subsequent to May 5 after the
24   agreement had been signed.   I do recall an
25   e-mail where I was reminding Paul Sheridan he

Page 153

DEMPSEY - CONFIDENTIAL

1

2    owed me a response to our conversation the

3    previous week around the proposal that he made

4    in the e-mail you showed me.

5                And I think I confirmed what we had

6    done, but I don't recall a specific

7    communication driven by signing an agreement

8    with Airbus.   AMCK is not a party to the

9    agreement with Airbus.

10        Q.    Well, let me mark the next exhibit,

11   which comes right on time because it's the

12   e-mail you just referenced.

13               MR. BUTLER:  I'm marking, as Dempsey

14        Exhibit 23, a document bearing Bates

15        numbers AMCK17004 to 1708.

16               (Dempsey Exhibit 23, E-Mail Chain,

17        Bates Stamped AMCK017004 through 1708,

18        marked for identification.)

19        Q.    This appears to be a chain of

20   e-mails, two of which are from you to Paul

21   Sheridan on May 8, 2020.  You can see them both

22   on your screen.  They are the first two e-mails

23   in this chain.

24               Did you send these e-mails to

25   Mr. Sheridan on May 8?

Page 158

1              DEMPSEY - CONFIDENTIAL

2    the first time on May 8?

3          A.    I don't recall exactly, but I think

4    that's correct.  I think that was an element

5    that we were trying to get.  We were trying to

6    satisfy the -- what we saw at the time was --

7    the timing of deliveries was crucial to AMCK,

8    and we were endeavoring to meet their request

9    on that item.

10         Q.    Just going back to your proposal on

11   the deferred rent.  I just want to clarify one

12   thing.  So your proposal says, "deferred rent

13   for April and May 2020."

14               Were you seeking rent deferral for

15   April and the full month of May?

16         A.    Yes.

17         Q.    So that's different from the

18   proposal from Paul that -- where one of the

19   conditions was that everything had to be

20   current by May 15, correct?

21         A.    Yes.

22         Q.    And, in fact, your proposal that

23   you're articulating on May 8 is very different

24   from the proposal that Paul made on April 30,

25   which you promptly rejected, correct?

CONFIDENTIAL

Page 159

```
 1              DEMPSEY - CONFIDENTIAL
 2       A.      We rejected his point three.  We
 3  were trying to negotiate his point two, and we
 4  were meeting his point one.
 5              As I said, up until this point, it
 6  was a very fluid negotiation.  And our view was
 7  that we were progressing matters, albeit there
 8  was one item that was a sticking point that
 9  they had raised on April 30 that we couldn't
10  deliver.
11       Q.   And is it correct that it was still
12  a very fluid situation when you received the
13  termination notice from AMCK later in the day
14  on the 8th of May?
15       A.   I would deem that that was a
16  surprise.
17       Q.   All right.  Let me show you the next
18  exhibit.
19              MR. BUTLER:  I have marked as --
20       A.   Before you do that, I just would
21  like to go for a quick --
22       Q.   Absolutely.  For your information, I
23  don't have too much left.
24       A.   I only need about two or three
25  minutes.
```

CONFIDENTIAL

1              DEMPSEY - CONFIDENTIAL

2    before?

3        A.    I don't recall.  Can you scroll

4    down?

5        Q.    Sure.

6        A.    (Document review.)

7              I don't recall, but no.

8        Q.    Okay.  So you recall the May 9

9    letter and reviewing that.

10             Do you recall reviewing this May 13

11   letter before it was sent out?

12       A.    I mean, I don't recall, but I'm not

13   saying I didn't.  I just don't recall.

14       Q.    Okay.

15             MR. BUTLER:  Okay.  Let me mark the

16       next exhibit.  I'm marking, as Dempsey

17       Exhibit 27, a one-page document bearing

18       Bates number FRONTIER8058.

19             (Dempsey Exhibit 27, E-Mail Chain,

20       Bates Stamped FRONTIER0008058 through

21       8059, marked for identification.)

22       Q.    It's a series of e-mails dated

23   April 13, 2020, and it looks like -- Gege, if

24   you scroll down -- it looks like you're giving

25   your approval on a payment to AMCK; is that

CONFIDENTIAL

Page 165

1              DEMPSEY - CONFIDENTIAL

2     correct?

3          A.    Yes, we were trying to cure their

4     letter from the previous week, and so we paid

5     the rent promptly, given that we were capable

6     of doing it because we wanted to rectify the

7     situation.

8          Q.    So did Frontier pay all of the

9     outstanding rent owed to AMCK on May 13, 2020?

10         A.    That's my understanding, yes.

11              MR. BUTLER:  And, Gege, if you can

12         scroll to the next page where there is a

13         total of the rent payments listed.

14         Q.    Was the total amount due at that

15    time $5,828,440?

16         A.    I don't recall, but I mean, that's

17    the payment I assume we made.

18         Q.    Do you recall that it was an amount

19    around $5.8 million?

20         A.    I don't, but I mean, I don't put

21    together the payments.  There's other people

22    who do that within the organization.

23         Q.    And what prompted Frontier to make a

24    payment to AMCK at this particular time?

25    DI              MR. HOSENPUD:  Objection to the

CONFIDENTIAL

Page 172

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK )
                                :ss
5    COUNTY OF RICHMOND)

6

7             I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10            That JAMES DEMPSEY, the witness

11   whose deposition is hereinbefore set forth, was

12   duly placed under oath by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15            I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19            IN WITNESS WHEREOF, I have hereunto

20   set my hand this 15th day of April, 2022.

21

22                    *Melissa Gilmore*

                   MELISSA GILMORE

23

24

25