1
2                  UNITED STATES DISTRICT COURT
3                  SOUTHERN DISTRICT OF NEW YORK
4
5      ------------------------------
       FRONTIER AIRLINES, INC,
6
                          Plaintiff,
7
8             vs.                    Case No.:
                                     1:20-CV-09713-
9                                    LLS
       AMCK AVIATION HOLDINGS IRELAND
10     LIMITED, ACCIPITER INVESTMENT 4
       LIMITED, VERMILLION AVIATION
11     (TWO) LIMITED, WELLS FARGO TRUST
       COMPANY, N.A., solely in its
12     capacity as OWNER TRUSTEE, and
       UMB BANK, N.A., solely in its
13     capacity as OWNER TRUSTEE,
14                        Defendants.
       ------------------------------
15
16                                  April 4, 2022
                                    9:59 a.m. MDT
17
        ***TRANSCRIPT CONTAINS CONFIDENTIAL AEO SECTION***
18
19         Remote video-teleconference deposition of
20     ROBERT FANNING, taken by Defendants, held at Denver,
21     Colorado, pursuant to notice, before Elizabeth F.
22     Tobin, a Registered Professional Reporter and Notary
23     Public of the State of New York.
24
25

Page 2

1

2    A P P E A R A N C E S:

3

4    On behalf of the Plaintiff:

5        LANE POWELL, P.C.

6        601 S.W. Second Avenue, Suite 2100

7        Portland, Oregon 97204

8        503.778.2100

9        BY:   DAVID G. HOSENPUD, ESQ.

10               hosenpudd@lanepowell.com

11               (via video-teleconference)

12

13

14    On behalf of the Defendants:

15        CLIFFORD CHANCE, LLP

16        31 West 52nd Street

17        New York, New York 10019-6131

18        212.878.8000

19        BY:   JEFF E. BUTLER, ESQ.

20               jeff.butler@cliffordchance.com

21               GEGE WANG, ESQ.

22               (via video-teleconference)

23

24

25

Page 19

1                        R. Fanning
2          A.    That is correct.
3          Q.    Is it consistent with your memory that
4     that aircraft was delivered on Monday, March 16th?
5          A.    I do not recall.  If that's the date
6     you're telling me, then I'll take that as the
7     delivery date.
8          Q.    Based on this email which you have here
9     in front of you, does that refresh your memory that
10     that delivery took place on March 16?
11          A.    The email looks familiar but I don't
12     recall the dates of this specific delivery.
13          Q.    Do you have any reason to doubt that it
14     was on Monday, March 16?
15          A.    No.
16          Q.    This MSN 10038, do you understand that to
17     be the first delivery of aircraft under the
18     framework agreement with AMCK?
19          A.    That is correct.
20          Q.    So AMCK provided the funds to purchase
21     this aircraft or purchase the aircraft from
22     Frontier, rather, and then there was a lease
23     applicable to this aircraft; is that right?
24          A.    Correct.
25                    MR. BUTLER:  Let me show you what we've

```
                                        Page 20
 1                      R.  Fanning
 2         marked as Exhibit 2 which is a document bearing
 3         Bates Number Frontier 240 to 242.
 4               (Fanning Exhibit 2, 3/16/20 email with
 5         attached letter; 3 pages, marked for
 6         identification.)
 7               MR.  BUTLER:  If you could just show the
 8         top of the email, Gege.
 9         Q.    This appears to be an email from Spencer
10    Thwaytes to Jane O'Callaghan dated Monday, March 16,
11    2020.  It refers at the top to please see the
12    attached concession requested letter.
13               MR.  BUTLER:  Gege, if you go to the
14         second page.
15         Q.    You'll see there's a letter from Frontier
16    to Ms. O'Callaghan dated March 16, 2020.
17               Have you seen this letter before?
18         A.    Yes.
19         Q.    What is it?
20         A.    It's basically a request to deferments
21    for a specific given time.
22         Q.    It was a request to AMCK for a deferral
23    of rent for a three-month time period; is that
24    right?
25         A.    That is correct.
```

R. Fanning

1

2      Q.    And it looks like there's also a request

3  in this letter, if you look down the page to number

4  2, for return of one month's rent security deposit.

5           Do you see that?

6      A.    Yes.

7      Q.    What is that asking for?

8      A.    So typically when we sign a lease,

9  depending on the lessor, they may request a one

10  month's rent that is paid on a monthly basis.  That

11  amount is held by the lessor for the term of the

12  lease.

13      Q.    And in this letter you are asking or

14  Frontier was asking in addition to the rent deferral

15  to have a refund of that security deposit; is that

16  right?

17      A.    That is my understanding, yes.

18      Q.    And it refers to one month's rent

19  security deposit, but that would be, if I understood

20  you correctly, the whole amount of the security

21  deposit; is that right?

22      A.    Correct.

23      Q.    Just below that text, it says, quote, the

24  above concessions would be documented in a mutually

25  agreed deferral and concession agreement, end quote.

```
                                          Page 22

 1                       R. Fanning

 2              Do you see that text?

 3        A.    Yes.

 4        Q.    Was it your understanding that if there

 5    was agreement on this deferral and refund that would

 6    be documented in a normal agreement signed by both

 7    parties?

 8        A.    Yes.  As it was with other lessors;

 9    correct.

10        Q.    Were you involved in drafting this

11    letter?

12        A.    I was involved in what the ask would be

13    with myself, Spencer and Jimmy Dempsey.  So, yes.

14        Q.    Do you know who drafted it, who drafted

15    the texts?

16        A.    I don't recall, no.

17        Q.    Do you know when this letter was drafted?

18        A.    I have -- a specific date, no.

19        Q.    Do you remember roughly how long this

20    letter was sent on March 16th that the letter was

21    drafted?

22        A.    I do not.

23        Q.    Was this letter -- does it follow the

24    same format of letters that Frontier sent to other

25    lessors around this time?
```

```
                                              Page 23
 1                        R. Fanning
 2         A.      That is correct.
 3         Q.      Did Frontier send a letter similar to
 4    this to all of its lessors?
 5         A.      Correct.
 6         Q.      How many lessors were there at that time?
 7         A.      I can't give you an exact number, but 16
 8    would come to mind.
 9         Q.      Did all of these letters go out on the
10    same day or did they go out on different days?
11         A.      They all went out on the same day, from
12    what I can recall.
13         Q.      So your recollection is they all went out
14    on Monday, March 16?
15         A.      That is my understanding, yes.
16              MR. BUTLER:  Let me show you what we're
17         going to mark as Fanning Exhibit 3.
18              (Fanning Exhibit 3, text messages; 3
19         pages, marked for identification.)
20         Q.    This is a three-page document and the
21    first two pages bear Bates numbers Frontier 12162 to
22    63.  The third page is not consecutive.  It's
23    Frontier 12260.
24              Let me direct your attention to the very
25    top of this exhibit.  That would be on Frontier
```

```
                                                    Page 38
```

 1                     R. Fanning
 2          A.    Specifics, I do not recall.  But I do
 3     recall they did come to an agreement.
 4          Q.    But you don't recall as you sit here
 5     today what the terms of that agreement were?
 6          A.    Correct.
 7          Q.    Do you know whether it was simply just
 8     accepting the request of Frontier?
 9          A.    No.  I mean, Mr. Butler, there's back and
10     forth.  Remember, ALC were just one -- like AMCK
11     were just one of many lessors that I was in
12     conversation about coming to some type of an
13     agreement regarding a rent deferment.
14                The specifics, I don't remember.  I do
15     remember that other than two lessors out of the
16     lessors that we had sent around deferral agreements,
17     everybody had agreed to some type of rent deferral
18     agreement.
19          Q.    You've testified a couple of times today
20     that you believe all of the represent deferral
21     request letters went out on the same day; correct?
22          A.    That is my understanding.
23          Q.    Do you recall when the decision was made
24     within Frontier to send this type of rent deferral
25     letter out to all of the lessors?

```
                                        Page 83
 1                       R. Fanning
 2    me whether it be on a month-to-month basis.
 3         Q.    Did you ever see any email or text from
 4    Mr. Sheridan confirming the supposed agreement that
 5    he reached with Mr. Dempsey?
 6         A.    I don't recall.
 7         Q.    Do you recall ever seeing any email or
 8    text from Mr. Dempsey, apart from the text to you,
 9    any email or text to Mr. Sheridan purporting to
10    confirm that agreement?
11         A.    I don't recall.
12         Q.    I think you testified that your
13    understanding was that the month-to-month deferral
14    applied to all 15 aircraft.
15              Did I hear you correctly?
16         A.    That was my understanding before Jimmy
17    had sent that text, yes.
18         Q.    But here you seem to be saying it was
19    part of a deal that the March 16 delivery would be
20    excluded from the month-to-month deferral; is that
21    right?
22         A.    Well, we had paid, obviously --
23    Mr. Sashikumar had asked us to pay the rent for that
24    aircraft on the due date, which we did.  My
25    assumption -- well, my recollection is that it was
```

Page 84

R. Fanning

1

2  part of the -- that aircraft was part of the 15

3  aircraft.

4              But subsequent to Jimmy speaking to Paul,

5  obviously they came to an agreement that that

6  aircraft was excluded.  So prior to that

7  discussion -- my recollection that prior to that

8  discussion that that aircraft was part of the

9  agreement.

10      Q.    I just want to ask about the chronology

11  here.  We've seen from the documents I've shown you

12  that on April 6 Mr. Sheridan sent an email

13  confirming a 10-day grace period through April 21,

14  2020.

15              Do you recall that?

16      A.    Based on what you showed me, yes.

17      Q.    And then on the next day, April 7th,

18  there's a text from Jimmy Dempsey saying that

19  Mr. Sheridan had agreed to a month-to-month

20  deferral, right, we just saw that exhibit?  Do you

21  recall that?

22      A.    Yes.

23      Q.    Was there any discussion -- how do you

24  reconcile those two things?  One day there's a

25  10-day grace period, and the next day there's

Page 85

                        R. Fanning

1
2   agreement to everything Frontier was asking for, a
3   three-month deferral with no strings attached?
4            MR. HOSENPUD:  Objection, form.  You can
5        answer.
6        A.    Mr. Butler, like anything, it's
7   negotiations.  Right.  One day you may have one
8   agreement.  The next day you come to another
9   agreement.  That's between, obviously, Jimmy and
10  Paul.  I wasn't part of that conversation.
11       Q.    And that was going to be my next
12  question:  Do you remember any discussion internally
13  at Frontier about that apparent change of heart on
14  the AMCK side?
15       A.    I don't.
16       Q.    Did anyone express surprise that they
17  seemed to have changed their mind so quickly, to
18  your recollection?
19       A.    I don't recall.  But in the context of a
20  discussion, I mean, things can change overnight and
21  that's obviously what appeared to be the case.
22            MR. BUTLER:  Let me show you the next
23        exhibit which we're going to mark as Fanning
24        Exhibit 13.  It's a one-day document bearing
25        Bates Number Frontier 3504.

```
                                              Page 87
 1                        R.  Fanning
 2              What  did  you  understand  Mr.  Thwaytes  to
 3    be saying here?
 4         A.    Pay what we owe.
 5         Q.    Well, does the deferred payments here
 6    refer to the payments that were due in April for the
 7    14 aircraft?
 8         A.    I'm sorry.  Say that again, Mr. Butler.
 9         Q.    When he refers to deferred payments, is
10    he referring to the payments that were due earlier
11    in April for the 14 aircraft leased from AMCK?
12              MR. HOSENPUD:  Object to the form.  You
13         can answer.
14         A.    That appears to be correct.
15         Q.    And by true-up, he just means Frontier is
16    willing to pay them?  Is that what it means?
17         A.    Well, I had offered to -- in text and
18    conversation to pay Jane or to pay AMCK what they're
19    owed.  So that is correct.
20         Q.    And Mr. Thwaytes here is expressing his
21    willingness to just go ahead and pay those deferred
22    amounts; correct?
23         A.    Correct.
24         Q.    And is it your recollection that at this
25    time it wasn't only Mr. Thwaytes but others at
```

R.  Fanning

1

2    Frontier were willing to pay those amounts that had

3    been due in April?

4         A.    As part of the ongoing negotiations; that

5    is correct.

6         Q.    Was there any discussion within Frontier

7    about just going ahead and making those payments?

8         A.    In the context of internal discussions,

9    it would have been related to the conversations that

10   I had with Jane and obviously Jimmy had with Paul.

11   It didn't appear that we need to make -- from my

12   recollection, it didn't appear that we needed to

13   make a payment based on the negotiations that were

14   going on at that time and their willingness to try

15   and resolve the asks that Accipiter were asking at

16   that time.

17        Q.    My question was:  Was there any internal

18   discussion you can recall at Frontier about just

19   going ahead and paying the amounts due in April?

20        A.    If AMCK had asked for us to make the

21   payment, we would have made the payment.

22        Q.    Well, you said that before March of 2020

23   Frontier had always made its rent payments on time;

24   is that correct?

25        A.    That is correct.

Page 89

R. Fanning

1

2     Q.     And they made those rent payments on
3     time, I assume, even though there wasn't a specific
4     request for those payments; is that right?
5          A.     No.  In this regard we had requested a
6     payment deferment schedule with all lessors.  What
7     you're inferring is that -- what you're inferring is
8     that we had -- so, yes, we had paid our rent
9     payments on time.  But during March it became
10    apparent that we need to set up a schedule or send
11    out an ask to our vendors, including lessors, for a
12    rent payment schedule or deferment on that
13    obligation.
14         Q.     Well --
15         A.     There's a difference, in my opinion, on
16    making rent prior to March of 2020.
17         Q.     I understand there's a difference.  I'm
18    not trying to suggest it's exactly the same.  But
19    with that track record of always paying rent on
20    time, I just wonder if there was any discussion
21    about maybe we should just stop this deferral
22    request and just go ahead and pay the amounts.
23              Do you recall any discussion like that?
24         A.     The only parts that I recall was the
25    understanding that we had an agreement whether it

R.  Fanning

1

2    was me with Jane or Jimmy with Paul that we did not

3    have to make payments at that time because of the

4    ongoing discussion.

5         Q.     In this email that you quote from Jane,

6    she's expressing the view that AMCK or -- or

7    expressing the position that AMCK is not comfortable

8    with the remaining deliveries under the framework

9    agreement unless Frontier gets current on all of its

10   rent payments.

11             Is that your understanding of AMCK's

12   position at that time?

13        A.     Yes.

14        Q.     And, in fact, were there a number of

15   communications where Jane O'Callaghan said to you or

16   texted you or emailed you that AMCK did not want to

17   take new deliveries if there was any overdue rent on

18   the other aircraft?

19        A.     No.  My recollection is that I had

20   sent -- and it was probably after the 23rd, I think

21   it was on the 25th, that I had expressed to Jane

22   that we would pay what we had owed.  But she never

23   responded back to me in a text.

24        Q.     Well, my question is:  Sir, do you recall

25   that being a position that AMCK was taking at this

Page 91

1                          R. Fanning
2      time, that Frontier needed to get current on all of
3      its rent payments in order for a new delivery to be
4      accepted?
5                  MR. HOSENPUD:   Object to the form.
6          A.     Repeat yourself, Mr. Butler.
7          Q.     My question is:  Do you remember that
8      being AMCK's position?  You were negotiating with
9      them at this time.  Was one of their positions that
10     they expected Frontier to be current on all of its
11     payments before the next delivery to be funded under
12     the framework agreement?
13         A.     That is my understanding, yes.
14         Q.     And in the context of that understanding,
15     did you consider just paying the rent, because then
16     that would obviate the concern this is being raised
17     by AMCK?
18         A.     Well, I did.  I sent a text to Jane on
19     the basis of, do you want us to pay the rent.  I
20     never got a response, Mr. Butler.
21         Q.     Didn't AMCK always want you to pay the
22     rent?
23                MR. HOSENPUD:   Object to the form.  You
24         can answer.
25         A.     Not after the negotiations.  Our belief

Page 92

R. Fanning

1

2  was we weren't required based on the discussions

3  going on at that time that there was an

4  understanding -- hold on, Mr. Butler.  That there

5  was an understanding that if AMCK wanted us to make

6  the payments, there is a process that they have

7  internally that they would have sent us, which they

8  didn't, and we -- the payments weren't made based

9  on, again, the discussions that we were having with

10  Paul and Jane at that time that we were not

11  required.

12      Q.    Mr. Fanning, it wasn't AMCK's idea for

13  Frontier to stop paying the rent under those 14

14  lease agreements; isn't that right?

15      A.    Well, we had made a request back in March

16  for a deferment.

17      Q.    Right.  It wasn't their idea, you made

18  the request; right?

19      A.    Yes.

20      Q.    Didn't you believe at all times that AMCK

21  wanted Frontier to pay the rent on the date that

22  it's due?

23      A.    Under the discussions at that time, no.

24  They were willing to work with us and understood why

25  we weren't making those payments.

Page 93

1                              R. Fanning
2            Q.     So your understanding at that time was
3       that AMCK didn't really care that much about the
4       rent, they were willing to go along as long as the
5       negotiations continued without being paid rent?
6            A.     In good faith, yes, absolutely.
7            Q.     So that's --
8            A.     Let me put it another way.  Let me put it
9       another way, Mr. Butler.  If AMCK had asked us to
10      pay the rent, we would pay the rent.  And I had
11      asked Jane, do you want me to pay the rent.  We
12      never got an answer.
13           Q.     When did you ask her that question?
14           A.     Two days after this text, the 23rd -- the
15      25th.  So the 25th of April.  I never received an
16      answer.
17           Q.     And you interpret that to mean that AMCK
18      did not want you to pay the rent?
19           A.     My understanding was at that time that
20      they knew we were in discussions of resolving what
21      AMCK's ask was.  And that in the grand scheme of the
22      negotiation, it was understood that if we were
23      required to make the payment, we would have made the
24      payment.  We had the ability to make the payment and
25      our attention would have been to make -- if

1                    R. Fanning

2    requested, we would have made the payment.   Or their

3    accounting would have sent us a letter and reminded

4    us that a payment was due as they had -- as they had

5    prior -- I'm sorry previous to March.   And then, I

6    believe, during the summer they had requested if a

7    payment had been made.   We never got that

8    communication from their accounting department.

9            My understanding was the reason why we

10   didn't was because they were aware that we were in

11   discussions with Paul and Jane to resolve the

12   ongoing discussions at that time.

13       Q.    That was your assumption; is that right?

14       A.    That was my belief based on the

15   conversations that I had with Jane and that Jimmy

16   had with Paul.

17       Q.    I thought you just testified that you

18   asked Jane whether you needed to pay rent and she at

19   this particular time give you a response?

20       A.    That is correct.

21       Q.    She didn't write back and say, no, don't

22   worry about the rent, it's no problem; correct?

23       A.    She never replied, Mr. Butler.

24       Q.    But when you ask a question, do you want

25   me to pay the rent and she never replied, did that

Page 115

1                        R. Fanning

2              Do you see that?

3        A.    Yes.

4        Q.    Would you assume from looking at this

5    that this document contains all of your texts back

6    and forth with Jane O'Callaghan during that time

7    period?

8        A.    As best as I can recall, yes.

9              MR. BUTLER:  Gege, if you can go back up

10        to the first page of the exchanges.

11        Q.    I can see for this set of text messages,

12    it looks like your texts are on the left side of the

13    page and Jane's texts to you are on the right side

14    of the page.

15              Is that the way texts appear on your

16    phone?

17        A.    The phone I had at that time, yes.

18        Q.    So you would have the things you wrote on

19    one side and things Jimmy and Paul wrote on the

20    other side, in chronological order, I assume?

21        A.    That appears to be the case.

22        Q.    And was the case on your phone at that

23    time?

24        A.    Yeah.  Yeah.

25        Q.    So the first text that I want to ask you

Page 116

R.  Fanning

1

2    about is on the second page of this document, AMCK

3    16975.  And it's near the bottom.  There's a series

4    of texts on March 31st of 2020.  And I see there are

5    three texts for you.  There's a response from Jane.

6    And I want to ask you about the next text.

7             You say in the last two lines of this

8    text, quote, Airbus will not delay delivery without

9    it costing Frontier, end quote.

10            I was wondering, what did you mean by

11   that when you wrote that to Ms. O'Callaghan?

12       A.    Well, cost is a substantial amount of

13   losses meaning they would put us in default if we

14   didn't take delivery of the aircraft when they asked

15   us to take delivery of the aircraft.

16       Q.    So the cost you're referring to here is

17   not a financial cost, it's a default under the

18   purchase agreement with Airbus?

19       A.    Well, we would lose our PDP payments.  So

20   yes.  And be put into default with Airbus.

21       Q.    Was Airbus willing to agree to delay

22   deliveries to Frontier if Frontier paid the storage

23   costs for the Airbus?

24            MR. HOSENPUD:  Objection, form.  You can

25       answer.

R.  Fanning

A.    So, Mr. Butler, let me give you a little
bit of context.  The first aircraft that AMCK took
delivery of was in Toulouse, France.  They have a
huge amount of flexibility and capability at that
airport given that the majority of Airbus aircraft
are manufactured there.  The remaining aircraft that
AMCK was going to take delivery of were in Mobile,
Alabama.

To give you the context, I believe at
this time Airbus were producing 30 plus A320s a
month.  In Mobile, Alabama, my recollection is that
they were only producing three aircraft a month.
They do not have the ability to store or house
aircrafts the way that Toulouse.  My recollection is
that, Jane, part our discussions, invoiced this to
Jane and this is part of the reason why Airbus were
pressuring Frontier to take delivery of these
aircraft because they did not have the ability to
store the aircraft.  So in the context of your
question, whether Airbus were willing to store the
aircraft for a cost, I -- my recollection was that
Airbus didn't have the ability to do so.

Q.    I think you also testified earlier that
you were not directly involved in the discussion

Page 118

R. Fanning

1

2    with Airbus; is that right?

3        A.    No.   But I am aware of when -- I am

4    involved in the delivery process and the delivery

5    schedule of when these airplanes get delivered.   So

6    I am familiar -- I have been to Toulouse.   I have

7    been to Mobile, Alabama.   I am aware of their

8    surroundings of what they're capable of.

9        Q.    I understand.   But in terms of the

10   positions that Airbus was taking in the discussions

11   with Frontier over delaying the Airbus, who would

12   have told you about Airbus' position?

13       A.    It would have been Jim, Jim or Spencer.

14       Q.    And those two individuals were directly

15   involved in discussions with Airbus; is that your

16   recollection?

17       A.    That's correct.

18       Q.    Do you recall hearing from those

19   individuals that Airbus was willing to delay the

20   deliveries, but there would be a substantial

21   financial cost to Frontier?

22       A.    I do not -- I do not recall that specific

23   question or that context to the question you asked.

24       Q.    And so I gather that's not what you meant

25   when you texted to Jane O'Callaghan that Airbus will

1                          R. Fanning

2    not delay the delivery without it costing Frontier?

3          A.     No.   When I meant costing, I was aware

4    that they would put us into default.   That was

5    communicated to me by Spencer and obviously Jimmy

6    had mentioned it at some point in time based on

7    conversations he had.   So I knew at that point in

8    time Airbus was putting significant pressure for us

9    to keep the delivery dates that we had in agreements

10   with them.   That's what I meant by costing Frontier.

11         Q.     What would be the consequence, in your

12   mind, of Airbus putting you in default for not

13   taking a delivery on time?

14         A.     I mean, it would cripple the airline to

15   where it may potentially put us out of business.

16   Domino effect of the cross of provisions that we

17   have in our aircraft leases.

18         Q.     So were you concerned at that time if you

19   couldn't take a delivery from Airbus, that Airbus

20   was going to put the airline out of business?

21         A.     Well, they were putting a lot of pressure

22   on Jimmy to take delivery of these airplanes.   I

23   mean, there's a relationship there but at some point

24   in time -- and Airbus has done this with other

25   airlines, there does come a point in time where

1              R. Fanning

2    they're not willing to accommodate the request any

3    more than a decision is made to put an airline in

4    default or cancel potential future deliveries.

5    There could be many way.

6              Again, I wasn't part of those

7    discussions.  Although I was aware based on

8    communication from Spencer with his representative

9    of Airbus that Airbus were willing to potentially

10   put us under a default situation if we didn't take

11   delivery.  So obviously I reiterated this to Jane to

12   let her know that, you know these issues were coming

13   up and Airbus were forcing -- substantially pushing

14   us to commit to the original delivery schedule that

15   we had agreed.

16        Q.    And certainly at this point in time it

17   looks like you're saying to Ms. O'Callaghan that you

18   won't be able to get delivery delays for the five

19   remaining deliveries under the framework agreement;

20   is that right?

21        A.    When was this -- this text was what,

22   April 1st?

23        Q.    I think this one was March 31st.

24        A.    So we would have been in -- so, again, at

25   that point in time, we would have been in the

Page 169

CERTIFICATE

STATE OF NEW YORK )

) ss.

COUNTY OF SUFFOLK)

I, Elizabeth F. Tobin, a Registered
Professional Reporter and Notary Public within and
for the State of New York, do hereby certify:

That Robert Fanning, the witness whose
deposition is hereinbefore set forth, was duly sworn
by me remotely and that such deposition is a true
record of the testimony given by such witness.

I further certify that I am not related
to any of the parties to this action by blood or
marriage and that I am in no way interested in the
outcome of this matter.

ELIZABETH F. TOBIN, RPR