1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4     FRONTIER AIRLINES, INC.

5                    Plaintiff,

6          v.              Case No. 1:20-CV-09713-LLS

7     AMCK AVIATION HOLDINGS IRELAND

8     LIMITED, ACCIPITER INVESTMENT 4

9     LIMITED, VERMILLION AVIATION

10    (TWO) LIMITED, WELLS FARGO TRUST

11    COMPANY, N.A., solely in its capacity as

12    OWNER TRUSTEE, and UMB BANK,

13    N.A., solely in its capacity as OWNER

14    TRUSTEE,

15                   Defendants.

16

17

18      VIDEOTAPED DEPOSITION OF MICHAEL MCINERNEY

19          Taken on behalf of the Plaintiff

20                 March 11, 2022

21

22

23

24

25

                                        Page 1

1            BE IT REMEMBERED THAT pursuant to the Oregon

2       Rules of Civil Procedure, the deposition of

3       MICHAEL MCINERNEY was taken before Julie A. Walter,

4       Registered Professional Reporter, Certified

5       Realtime Reporter, Oregon CSR No. 90-0173, on March

6       11, 2022, commencing at the hour of 2:59 p.m.(GMT)

7       the proceedings being reported via Zoom

8       videoconference with all participants appearing

9       remotely.

10                          *   *   *

11                       APPEARANCES

12      LANE POWELL

13         David G. Hosenpud

14         601 SW Second Avenue, Suite 2100

15         Portland, Oregon 97204

16             and

17      Aaron Schaer

18         1420 Fifth Avenue, Suite 4200

19         P.O. Box 91302

20         Seattle, Washington 98111

21         Counsel for the Plaintiff

22

23

24

25

                                        Page  2

```
 1          APPEARANCES CONTINUED:

 2

 3      CLIFFORD CHANCE US LLP

 4         Mr. John Alexander

 5         31 West 52nd Street

 6         New York, New York 10019

 7         Counsel for Defendants

 8

 9      Also Present:

10      Darcy Deibele - Lane Powell

11      Emily Walter - Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext
www.veritext.com

| | | |
|---|---|---|
| 1 | | That way we get a clean record and we're not |
| 2 | | talking over each other in the transcript.  Will |
| 3 | | you do that? |
| 4 | A. | Yes. |
| 5 | Q. | Have you reviewed documents that don't have numbers |
| 6 | | on them in this case in preparation for your |
| 7 | | deposition? |
| 8 | A. | No. |
| 9 | Q. | And in the course of reviewing documents, have you |
| 10 | | seen what are known as redactions, black spaces in |
| 11 | | the documents? |
| 12 | A. | Yes, I have. |
| 13 | Q. | Okay.  Is it your understanding that that is due |
| 14 | | the fact that there is information in those |
| 15 | | documents that are not -- that is not related to |
| 16 | | Frontier Airlines? |
| 17 | A. | I would think so, yes. |
| 18 | Q. | Okay.  What's your position with AMCK? |
| 19 | A. | My position is a contract manager. |
| 20 | Q. | And how long have you held that role? |
| 21 | A. | Since 2018, October. |
| 22 | Q. | And is that your current position today? |
| 23 | A. | Yes, it is. |
| 24 | Q. | Okay.  And what are your responsibilities as |
| 25 | | contract manager? |

Page 12

1   A.   My responsibilities would be to invoice the

2        airlines, collect payments and insurance renewals

3        and working with letters of credit and general

4        lease management.

5   Q.   Do you prepare any reports in connection with your

6        duties?

7   A.   Yes.

8   Q.   What are the reports that you prepare?

9   A.   We repair -- or prepare a receivable report on a

10       daily basis that we send to the company, which

11       covers receivables, outstanding payments.

12  Q.   Any other types of reports?

13  A.   And also we do a weekly report that we feed

14       in -- each department feeds into, including the

15       contract department.

16  Q.   Okay.  And is the weekly report also known as the

17       weekly agenda?

18  A.   Yes.

19  Q.   All right.  And is there a particular category of

20       that report that you populate through your group?

21  A.   Will you repeat --

22  Q.   Yes.  Is there a particular area of the report that

23       your group provides the information for?

24  A.   Yes.

25  Q.   And which would that be?

Page 13

```
 1    Q.   And with respect to those airlines that you had,

 2         was Frontier one of them?

 3    A.   Yes.

 4    Q.   And what is your -- what is your typical

 5         interaction with Frontier as part of your duties as

 6         contract manager?

 7    A.   With Frontier I would issue the airline invoices,

 8         and I would chase for updated insurance renewals,

 9         and if they have a letter of credit and -- I would

10         chase that if the renewal is coming up.

11    Q.   And would you also chase for payments?

12    A.   Yes.  Apologies.  And outstanding payments.  I

13         would also chase for outstanding payment.

14    Q.   Okay.  And I understand what you're meaning by the

15         word "chase," but really it's a follow-up, is it

16         not?

17    A.   Yes.

18    Q.   And you do that by email?

19    A.   Yes.

20    Q.   Do you ever do it by phone?

21    A.   No.

22    Q.   During the onset of the pandemic in approximately

23         March of 2020, how did you obtain information

24         concerning rent deferral requests?

25    A.   Sorry, David, could you repeat the question,
```

Page 20

```
 1     Q.    When a deferral request was rejected and it was one

 2           of your airlines, what did you do in connection

 3           with that airline that owed money?

 4     A.    Could you repeat the question again, David, please.

 5     Q.    Yes.  During a deferral request, did you continue

 6           to chase the airlines that you had under your

 7           management for payment?

 8     A.    Yes.

 9     Q.    With some of your airlines, did you stop chasing

10           them while the deferral request was pending?

11     A.    I can't recall at that time.

12     Q.    What did your other managers do?

13     A.    Could you be more specific?

14     Q.    Yes.  In connection with a pending deferral

15           request, what did your other contract managers do

16           with respect to any airline seeking such a deferral

17           as it relates to payments?

18     A.    I don't --

19     Q.    Did they chase them, or did they --

20     A.    I don't recall.  I don't recall what the other

21           contract managers did.

22     Q.    And you have absolutely no recollection, as you sit

23           here today under oath, what you did?

24     A.    I would have -- I would have continued chasing

25           payments at that time.
```

Page 23

Michael McInerney - March 11, 2022

1    Q.   For all of them?

2    A.   Yeah.

3    Q.   Did you chase payments for Frontier during the time

4         that it sought a deferral request?

5    A.   I don't recall.

6    Q.   Would we see in emails from you to Frontier if you

7         had?

8    A.   Yes.

9    Q.   Did you sit in on any specific conversations

10        relating to Frontier Airlines in connection with

11        its deferral request?

12   A.   Could you repeat that, please, David.

13   Q.   Yes.  Did you sit in on any conversations specific

14        to Frontier Airlines with respect to its deferral

15        request?

16   A.   I don't recall.

17   Q.   Do you recall sitting in on any conversations with

18        any of the airlines in your contract management

19        portfolio related to their deferral request?

20   A.   I don't recall.

21   Q.   Were you ever in a meeting with Mr. Sheridan or

22        Ms. O'Callaghan in connection with the subject of

23        airline deferral requests?

24   A.   I don't recall.  No, I don't recall.

25   Q.   Let me ask it this way:  Other than the weekly

Page 24

```
1    A.   Yeah.  That's what the report says, yeah.

2    Q.   And were you aware of any feedback that updated

3         that as of May 5, 2020?

4    A.   Could you repeat that, please.

5    Q.   Yes.  The information says "No feedback last week."

6         My question is, were you aware of anything that

7         would contradict that, that there had been

8         feedback?

9    A.   No, I don't -- don't have -- I don't recall.

10   Q.   Okay.  We are in the "Contract Management" section,

11        and I'm on page 30 for that reference, and then I'm

12        moving to page 31 -- pardon me, 32, and for

13        Frontier, it shows $4,787,199.91, 14 times rent.

14        Correct?

15   A.   Correct.

16   Q.   And the comments are that the "Rent deferral

17        requested, under review."  Is that right?

18   A.   Yes.

19   Q.   And that's the information that you were provided.

20        Correct?

21   A.   Yeah.

22   Q.   In the section relating to finance

23        activity -- financing activity for Aircraft 1

24        through 3, it still indicates "All on hold —

25        Awaiting update on revised delivery timetable, if
```

Page 70

```
 1              aircraft that is on the ground, based on your
 2              understanding?
 3         A.   Could you rephrase that, please.
 4         Q.   Yes.  I'm trying to figure out -- your question is
 5              why is it low on cash?  And my question is what did
 6              you mean by AOGs?  You said aircraft on the ground
 7              to which there is no lease attached.  Do I have it
 8              summarized so far?
 9         A.   Yeah.
10         Q.   And if it is an aircraft on the ground with no
11              lease attached, has AMCK already purchased that and
12              is searching for a lessor -- a lessee?  Pardon me.
13         A.   Yes.
14         Q.   Okay.  So it's put out the capital for the
15              aircraft, and there is no rent stream coming back
16              during that period that it doesn't have a lessee.
17              Is that right?
18                  MR. ALEXANDER:  Objection to the form.
19         Q.   BY MR. HOSENPUD:  You can answer.
20         A.   Yeah, that would -- it would be an aircraft that is
21              owned by AMCK that is without a lease.
22         Q.   Understood.  And bankruptcies is self-evident.  And
23              the next entry from Mr. Hunt, its not low on cash,
24              there's plenty of cash in the bank, its just badly
25              negative monthly net cashflow go.  He then goes on
```

Page 83

1          to say, there's 340 million in AMCK's bank ATM.

2              Do you understand what that was reference to?

3     A.   Yeah, that AMCK is 340 million in the bank.

4     Q.   Got it.  And then he goes on to say, "like the

5          company isn't" -- F'ed explicative, F-U-C-K-E-D --

6          it has the cash -- "it has cash to" take it

7          -- "take this issue on the chin."  Let me repeat

8          that.

9              He says, "like the company isn't F-U-C-K-E-D,

10         it has cash to take this issue on the chin."

11             Did I read that accurately?

12    A.   Yes.

13    Q.   And what was James Hunt's primary responsibility at

14         AMCK?

15    A.   I don't know.  He's an accountant.

16    Q.   Okay.  So he would know where the cash is.

17         Correct?

18    A.   I can't answer for James.

19             MR. HOSENPUD:  Let's move on to Tab 12, please.

20                 (Exhibit 12 marked)

21             MR. ALEXANDER:  David, thanks for keeping the

22         transcript clean.

23             MR. HOSENPUD:  I normally don't.

24    Q.   BY MR. HOSENPUD:  Okay.  Tab 12 is Raymond

25         Yu -- strike that.

                                             Page 84

```
 1                 Tab 12 is a March 12, 2020, email from Raymond
 2        Yu to you with a cc to James Hunt, Curley Chan and
 3        Ivy Wu.  Where was Raymond Yu situated?  With
 4        CK Assets?
 5   A.   Correct.
 6   Q.   And what was his position?
 7   A.   I don't know.
 8   Q.   This is a report that you are giving to Raymond for
 9        aircraft billing for March 2020, and he has asked
10        for a list of all invoices that have been issued
11        with a date March 2020.  Do you see that?
12   A.   I do.
13   Q.   Okay.
14            MR. ALEXANDER:  Can I just see the Bates number
15        of this, please.
16            MR. HOSENPUD:  Yeah.  Let me go back.  024608.
17            MR. ALEXANDER:  Thanks.
18   Q.   BY MR. HOSENPUD:  So this worked its way up the
19        chain, and you provided the information, it
20        appears.  I'm into the native document.  The native
21        document was stamped AMCK024614, and there are no
22        additional stamps because it's in native form.
23            And you are listing -- let me see if I can
24        widen this slightly.
25            You are listing Frontier Airline, and I presume
```

Page 85

```
 1              been payments outstanding for March 30 or March 27
 2              if March 31 is zero?
 3    A.   Well, that was just one invoice you showed me.
 4    Q.   Right.  I'm just showing you how it was produced to
 5              me, the document in this litigation, and that's the
 6              only invoice at issue that was shown on this
 7              document.
 8    A.   Okay.  So that invoice that you showed me was paid.
 9    Q.   All right.  But do you think that this type of
10              report would have all invoices that are due?
11    A.   Yes.  If there was a number of invoices
12              outstanding, it would be shown where the dark
13              patches are.
14    Q.   Okay.  But I'm telling you these dark patches --
15    A.   Yeah.
16    Q.   -- are all entities not related to Frontier.
17    A.   Correct.
18    Q.   Okay.  So if Frontier only had one invoice on this
19              report showing and it was shown as paid in full or
20              zero owed, we can conclude that Frontier had paid
21              all of March 2020.  Correct?
22    A.   Correct.
23    Q.   Okay.  Thank you.
24              MR. HOSENPUD:  17, please.
25                      (Exhibit 16 marked)
```

Page 94

1           the invoices and the number of days past due, and

2           those range from 11 days past due down to 3 days

3           past due.  Is that correct?

4     A.    Yeah.

5     Q.    And was this a standard report that you would issue

6           to the global team and CK Assets, or was this just

7           one that was necessitated by the COVID pandemic?

8     A.    No.  This was sent every day from my first day in

9           AMCK.

10    Q.    Okay.

11              MR. HOSENPUD:  Let's move on to Tab 20, please.

12                 (Exhibit 19 marked)

13    Q.    BY MR. HOSENPUD:  This is a report dated April 27,

14          2020, from you to the global team and members of

15          CK Assets, and it's for the April 27 payments due

16          report, Bates Number AMCK029 -- pardon me,

17          AMCK020693, and it shows that Frontier

18          is 3,035,174.75 outstanding, nine times rent with a

19          designation "Rent deferral requested, under

20          negotiation."  Is that correct?

21    A.    Yeah.

22    Q.    And that was the information you had obtained

23          concerning the status of the deferral request.  Is

24          that right?

25    A.    I don't remember on this exact date but -- yeah.

                                              Page 98

Michael McInerney - March 11, 2022

1    Q.    And again the format is similar to what we've

2          examined in the other exhibits, and the rent

3          outstanding in this report dated April 27, 2020, is

4          ranging from 14 days outstanding down to 1 day

5          outstanding.  Correct?

6    A.    Correct.

7               MR. HOSENPUD:  Tab 21, please.

8                    (Exhibit 20 marked)

9    Q.    BY MR. HOSENPUD:  Tab 21 is an April 28, 2020,

10         email from you to the global team with a

11         carbon -- with a cc to representatives of CK Asset,

12         Bates-numbered 020768, and it shows that Frontier

13         has amounts outstanding of 3,097,343.31, nine times

14         rent, "Rent deferral requested, under negotiation."

15             So that figure is higher than the prior report

16         of April 27, but your notation indicates that a

17         deferral was requested and it's under negotiation

18         at this time.  Correct?

19              MR. ALEXANDER:  Objection to the form.

20              THE WITNESS:  That's what it says.

21   Q.    BY MR. HOSENPUD:  And you got this information from

22         somebody who would know that that's the case,

23         right?

24   A.    I don't remember getting that information.  It's

25         three years ago.

Page 99

Michael McInerney - March 11, 2022

1    Q.   Right.  But typically when you write something to

2         the global group and to the shareholder, you're

3         accurate, aren't you?

4    A.   You would be, yeah.

5    Q.   You are.  That's your practice.  You want to be

6         accurate in conveying information, don't you?

7    A.   Yeah.

8    Q.   Okay.  Let's look down to the report which is

9         similar again in form.  Actually, this one doesn't

10        have an attached report.  Let's move on.

11             MR. HOSENPUD:  22, please.

12                  (Exhibit 21 marked)

13   Q.   BY MR. HOSENPUD:  April 29, 2020, is the email from

14        you to the global team and representatives of

15        CK Assets.  It is the April 29, 2020, payments due

16        report, Bates-number 020824.  Here you are showing

17        Frontier outstanding amounts of 3,429,587.06, ten

18        times rent.  Correct?

19   A.   Correct.

20   Q.   And the rent deferral requested is under

21        negotiation.  Correct?

22   A.   That's what it says, yeah.

23   Q.   And that does not contain a attachment.

24             MR. HOSENPUD:  Let's go on to 23, please.  No,

25        we're going to go on to 24.

Page 100

Michael McInerney - March 11, 2022

```
 1                    (Exhibit 22 marked)
 2    Q.    BY MR. HOSENPUD:  Tab 24 is a May 1, 2020, email
 3          from you to Raymond Yu, to AMCK contracts' email
 4          address and to representatives of CK Assets, and it
 5          is the April 2020 monthly payments due report.
 6          Correct?
 7    A.    Yeah.  I see a whole part of attachments there.
 8    Q.    Okay.  We'll get to it.  I'm going to identify the
 9          Bates number first.  021106.
10             So Raymond Yu is asking you for an update 2020
11          report -- April 2020.  Correct?
12    A.    He's asking me for the 2020 report, yeah.
13    Q.    Okay.
14    A.    2020, yeah.
15    Q.    And then you say, please see the -- please see
16          attached the MR and LC monthly report.
17             MR is monthly rent?  LC is letter of credit?
18    A.    No.  Maintenance reserve and letter of credit.
19    Q.    Thank you for that clarification.
20             We're at the native document AMCK021120, and it
21          shows -- pardon me -- the MSN numbers and the
22          amounts due for those numbers as well as the
23          security deposit on hand.  Correct?
24    A.    No.
25    Q.    This is not the security deposit?
```

Michael McInerney - March 11, 2022

1    A.    That's the security department -- deposit, but

2          that's not -- that's the monthly rental.  That's

3          not what --

4    Q.    Yes.  The rent invoice total due is the monthly.

5          The cash security deposit is the amount associated

6          with that aircraft.  Correct?

7    A.    Correct.

8    Q.    All right.  So, for example, MSN 6184 has a rent

9          invoice of 343,186, and it's got a security deposit

10         of 686,372.  Correct?

11   A.    Yeah.  That's correct.

12   Q.    So that one happens to be double the rent.  Is that

13         right?

14   A.    That is what the report says, yeah.

15   Q.    Okay.  And the same would be true of the MSN 7524

16         where the amount due is 36 -- 362,630.80 and the

17         security deposit is 725,261.  Correct?

18   A.    Yeah.  That's what the report says.

19   Q.    Okay.  And did you prepare this report?

20   A.    I don't recall preparing this report on that day.

21   Q.    And then there is an entry for MSN 10038, the

22         aircraft that's renting for 269,525.94 per month.

23         Correct?

24   A.    Yes.

25   Q.    All right.  You understood that the deferral was

Michael McInerney - March 11, 2022

1      still under negotiation at this time.  Correct?

2            MR. ALEXANDER:  Objection to form.

3            THE WITNESS:  That's what the report says.

4            MR. HOSENPUD:  Tab -- Tab 25, please.

5            (Exhibit 23 marked)

6    Q.   BY MR. HOSENPUD:  This is a May 1 payments due

7         report where you are sending it again to the global

8         team and to representatives of CK Assets, and

9         you're also attaching a receivables report for

10        April.  You note at Bates page 021143 that Frontier

11        is outstanding in rent, 4,787,199.91, 14 rents and

12        that the rent deferral requested is under

13        negotiation.  Correct?

14   A.   Correct on the report.

15   Q.   And that's the information you had to put into the

16        report.  Is that right?

17   A.   I don't recall this exact report, but --

18   Q.   But you obtained this information to summarize for

19        the global team and for CK Assets.  Is that right?

20   A.   I don't recall putting that -- this exact report

21        together at this date.

22   Q.   Right.  But if your name is on it, you likely did

23        it, didn't you?

24   A.   My name is on the email, yeah.

25   Q.   And would you be preparing payments due reports

Page 103

1      typically as part of your job duties for the
2      aircraft -- for the lessees that you managed?
3  A.  Yes.  We would prepare the daily receivables
4      report.
5  Q.  Okay.  And this section of the native
6      document, 021146, again where it lists the MSN,
7      Accipiter Investments Aircraft 4 Limited is the
8      lessor or the bank account into which the money is
9      to be deposited, and then we have a listing of all
10     the dates of the invoices due in April.  Is that
11     correct?
12 A.  Yes.
13 Q.  And then in addition you have one invoice listed in
14     May, May 5, 2020.  Correct?
15 A.  That's what the report says, yeah.
16 Q.  Okay.  Okay.
17          MR. HOSENPUD:  We can move on.  Tab 26, please.
18              (Exhibit 24 marked)
19 Q.  BY MR. HOSENPUD:  This is a May 8 payments due
20     report sent by you to the global team and to
21     CK Asset representatives, Bates Number 021370.  You
22     are showing at this point the total amount
23     outstanding is 5,483,871.60, 16 rent, rent deferral
24     requested and under negotiation.  Is that correct?
25 A.  That's what the report says.

1    Q.    And you populated this report with information you

2          endeavored to make accurate.   Correct?

3    A.    My name is at the top of the email.   I sent it.

4    Q.    Yeah.   And that's basically what your duties were

5          is to provide accurate information.   Is that right?

6    A.    It's provide this report daily.

7    Q.    Okay.   And to provide accurate information.

8          Correct?

9    A.    It would be to send out this report daily.

10   Q.    My question, though, is were you to provide

11         accurate information in this report?

12   A.    Yeah.   But it would have been -- I wouldn't have

13         provided inaccurate information.

14   Q.    Fair enough.   And on the native document -- let me

15         ask you this:   Based on your experience with

16         Frontier when you would chase the receivables and

17         inquire about the status of payments, did Frontier

18         promptly respond?

19   A.    I don't recall.

20   Q.    Do you have a memory for having to do multiple

21         efforts at obtaining payment of overdue amounts

22         with Frontier?

23   A.    I don't have a memory of that.   I don't recall

24         that.

25   Q.    Were there some of your lessees who you had to do

Page 105

1          it numerous times for the same amounts outstanding?

2     A.   Yes.

3     Q.   And do you recall Frontier being one of those

4          lessees?

5     A.   I would have to chase Frontier every so often.

6     Q.   Okay.  We're on the days late, days overdue,

7          section of this report, and they range from 22 days

8          overdue down to 2 days overdue.  Correct?

9     A.   Correct.  Yeah.

10    Q.   All right.  How did your department and Ciara Flynn

11         interact?  She was the VP of operations.  Correct?

12    A.   Correct.

13    Q.   Is she still there at AMCK?

14    A.   Yes.

15    Q.   And what would she be interfacing with your

16         department about?

17    A.   Could you rephrase the question.

18    Q.   Yeah.  Yeah.  What would cause her to be

19         interacting with you?

20    A.   General day-to-day matters.

21    Q.   And were there any specific day-to-day matters that

22         she -- would cause her interaction with you --

23         subject areas?

24    A.   In 2020?

25    Q.   Yes.

Michael McInerney - March 11, 2022

```
 1                going for April, May and June, it appears, and then
 2                there is a series of payments starting in July.  Do
 3                you understand what that is about?
 4                     MR. ALEXANDER:  Objection to the form.
 5                     THE WITNESS:  I don't know this report.  I
 6                don't remember compiling this -- or I don't think I
 7                compiled the report, so I can't answer that.
 8           Q.   BY MR. HOSENPUD:  In your practice, does a red
 9                bracketed number indicate negative?
10           A.   It could do.
11           Q.   All right.  So with respect to the instruction from
12                Ciara Flynn, did you adhere to that?
13           A.   I don't know.  I don't recall.
14           Q.   But she was applying this to all airlines who had
15                requested deferrals.  Correct?
16           A.   That is what the email says.
17           Q.   Okay.  And do you know if there were any of the
18                airlines who sought deferrals that were denied?
19           A.   I don't recall.
20           Q.   If an airline was denied, did you resume chasing
21                payment?
22           A.   I don't recall.
23           Q.   We would need to see the communications to other
24                airlines to determine that.  Is that correct?
25                     MR. ALEXANDER:  Objection to the form.
```

Page 110

```
 1                 THE WITNESS:  Should I still answer?
 2    Q.   BY MR. HOSENPUD:  Yeah.  You can still answer, and
 3         let me -- I'll strike that.  I'm going to rephrase.
 4                 Once a deferral was denied, if you did chase
 5         the airline whose deferral was denied, the only way
 6         we would know that is to see your emails to that
 7         airline.  Is that correct?
 8                 MR. ALEXANDER:  Objection to the form.
 9    Q.   BY MR. HOSENPUD:  You can answer.
10    A.   That would be standard practice I would think,
11         yeah.
12    Q.   Okay.  Were you ever a participant in weekly
13         opportunities calls?
14    A.   I don't recall.
15    Q.   Does that seem -- does that strike any bells with
16         you, or is it simply you don't know one way or
17         another?
18    A.   Not at this moment.  It doesn't strike any bells in
19         me.
20    Q.   Okay.  And you're still in contracts, right?
21    A.   Correct.
22    Q.   And do you participate in weekly opportunity calls
23         to this date?
24    A.   No.  I don't -- I don't recall any weekly
25         opportunities calls.
```

Page 111

Michael McInerney - March 11, 2022

```
 1              is attached to your email of the 24th.  Is that
 2              right?
 3     A.   Yes.
 4     Q.   Okay.
 5     A.   21st.  The attached invoice was due for payment on
 6              the 21st.
 7     Q.   Yes.  It was due on the 21st, and your email was
 8              the 24th.  Correct?
 9     A.   Looks like it, yeah.
10     Q.   Okay.  Are you aware of sending any such emails
11              during the time frame of March through June 2020 to
12              Frontier?
13     A.   I don't recall sending emails to Frontier.
14     Q.   All right.
15              MR. HOSENPUD:  Let's look at Tab 43, please.
16                   (Exhibit 29 marked)
17     Q.   BY MR. HOSENPUD:  This is another series of emails
18              to Frontier, inquiring about payment.  The first is
19              June 29, 2020, and it is Bates-marked 0000167,
20              Frontier Bates, and it attaches an invoice that is
21              referenced in the email.  Is that correct?
22     A.   I didn't see the reference in the email.
23     Q.   All right.  Fair enough.  I moved too quickly.
24              It's an email from you to fleet administration
25              at Frontier, Sharath, Robert Fanning, attaching
```

Page 126

Michael McInerney - March 11, 2022

```
 1              invoices and inquiring whether -- strike that.
 2              That's where it's confusing.
 3      A.      So 19RD003118, yeah.
 4      Q.      Yes.  So it's a June 29, 2020, email that is
 5              referencing an invoice issued November 26, 2019.
 6              Is that right?
 7      A.      Yeah.
 8      Q.      And this fits the pattern that you've described --
 9      A.      No.  No.  Sorry.  No.  No, that's -- sorry.  I
10              misspoke there.
11                  I can't tell from this when the invoice was
12              overdue, so that original email would have been the
13              batch of invoices that were sent to Frontier.
14      Q.      I understand.
15      A.      On the 26th.  Yeah.
16      Q.      So this may fit the pattern of sending six months'
17              worth of invoices on a certain day, right?
18                  MR. ALEXANDER:  Objection to the form.
19                  THE WITNESS:  Yeah, I don't know.  I can't
20              answer that.
21      Q.      BY MR. HOSENPUD:  Okay.  Well, let's look at the
22              invoice itself and you can hopefully answer that
23              question.  This is the invoice that was attached to
24              your inquiry.
25      A.      Correct.
```

Page 127

1    Q.    It's the same MSN number.  Correct?

2    A.    Yeah.

3    Q.    And it's got an invoice date of November 25, 2019,

4          and a due date of June 26, 2020?

5    A.    Yeah.

6    Q.    So would that make sense that this accompanied an

7          original email back in November 2019?

8    A.    It looks like it.

9    Q.    Okay.  This is another email from you, dated

10         July 6, 2020, to Avril and Sharath inquiring about

11         an invoice that was due for payment on Thursday,

12         July 2, 2020.  Is that right?

13   A.    Yeah, it looks like it.

14             MR. ALEXANDER:  David, is this another

15         compilation of documents?

16             MR. HOSENPUD:  It is.

17             Why don't you send Jack Exhibit -- Tab 43.

18             MR. ALEXANDER:  Thank you.

19   Q.    BY MR. HOSENPUD:  And then the email from Avril to

20         Sharath -- pardon me, from you to Avril and Sharath

21         accompanies Avril's earlier email sending the

22         invoices for July as well as August invoices.  Is

23         that right?

24   A.    Looks like it.

25   Q.    And a communication came back from Sharath saying,

1        "Please send over the invoice for MSN 9068 for

2        June.  Going forward, kindly send over the invoices

3        compiled for the entire month for all aircraft."

4        Did I read that accurately?

5    A.  I think that -- I think that email might have come

6        in before Avril's email.  I think Avril's email was

7        in response to that.

8    Q.  Okay.  This email chain seems to incorporate

9        several different emails inquiring about the due

10       date of invoices.  Your email starting on July 6,

11       2020, has Bates Number FRONTIER0001003 followed by

12       Bates Number -- last four digits -- 1004 and 1005.

13       It appears to be an ongoing communication at

14       various points involving the subject of past due

15       invoices.  Is that right?

16           MR. ALEXANDER:  Objection to the form.

17           THE WITNESS:  Could be.  I can't answer that

18       for sure.  I didn't read each line.

19   Q.  BY MR. HOSENPUD:  Okay.  Let's go back so you can

20       answer it.

21           So the starting point of that document that has

22       the same Bates numbers in sequence is January 20,

23       2020, where Avril is sending to you and Frontier a

24       notice saying we haven't received Friday,

25       January 17, payment.

Michael McInerney - March 11, 2022

1    A.   Looks like it.

2    Q.   And then it goes up a chain to a request for having

3         the invoice for MSN 9068 and then up a chain to

4         reflecting invoices due on July 31 and a comment

5         from Avril about that as well as August invoices.

6    A.   Yeah.

7    Q.   And then it starts with your invoice to Sharath and

8         Avril, saying hope you had a nice 4th.  The

9         attached invoice was due for payment on July 2.

10        Did I capture that accurately?

11   A.   Yeah, you did.

12   Q.   Okay.  And if we go to the invoice to see if it is

13        attached, it looks to be an invoice for

14        Asset 08239, MSN 08239, payment due date July 2,

15        2020.  Correct?

16   A.   Looks about right.

17   Q.   Okay.  So that ties to that exchange.  Is that

18        right?

19   A.   Yeah.

20   Q.   Okay.  And the next invoice is one dated July 20,

21        2020, where you're indicating that an invoice has

22        been outstanding since Friday -- since Friday,

23        July 17.  Correct?

24   A.   Looks like it.

25   Q.   And we'll skip over the original transmission

Page 130

1          because it looks like it's a continuation of a

2          discussion that we've already been through with

3          different invoices, but it attaches the invoice

4          for 09068, payment due date July 17, 2020, which

5          ties to your invoice.  Correct -- pardon me, which

6          ties to your email.  Correct?

7    A.    Looks like it.

8    Q.    Okay.  This is a repeat of that email, and the

9          repeat is Bates Number 0002121.  I'll pass by that.

10         That is the same invoice that we've already

11         referred to, the July 17, 2020, invoice for

12         MSN 9068.  Correct?

13   A.    Yes.

14   Q.    Now we are looking at a September 8, 2020, email

15         from you to the Frontier team, Dovi and Sharath,

16         indicating that the attached invoice was due for

17         payment on Friday, September 4, asking for an

18         update, and you attach the invoice in question

19         showing payment due date September 4, 2020.

20         Correct?

21   A.    That's on the email.

22   Q.    It's also in the invoice.  Correct?

23   A.    Correct.

24   Q.    Okay.  Were you instructed to not communicate with

25         Frontier about outstanding invoices during the

Page 131

```
 1              period of March 2020 through June 2020?
 2    A.    I don't recall.  I don't remember.
 3    Q.    Could you have been instructed to not do so?
 4              MR. ALEXANDER:  Objection to the form.
 5              THE WITNESS:  Yeah, I don't know.
 6    Q.    BY MR. HOSENPUD:  You were communicating with other
 7        airlines to inquire about payments, weren't you?
 8    A.    I don't recall at that time.
 9              MR. HOSENPUD:  Let's look at Tab 52, please.
10                (Exhibit 30 marked)
11              MR. HOSENPUD:  Let's get this a little larger
12        so you can see it.
13    Q.    BY MR. HOSENPUD:  So let's just start with this
14        receivable report email exchange, and I'll start at
15        the bottom and work my way up.
16            So it starts with a receivables report from
17        Avril going to the global team and contracts.  Are
18        you contained -- is your email summarized within a
19        contracts@amck.aero email address?
20    A.    Yes.
21    Q.    Okay.  So you received this, and then as we scroll
22        up, Graham Cooley is writing, "Avril," and then
23        we've got blacked-out information because it
24        relates to another airline or airlines, and we'll
25        just leave it at that.
```

Michael McInerney - March 11, 2022

1          But Graham Cooley is the vice president of

2      commercial?

3  A.  That's what it says there, yeah.

4  Q.  And is commercial have contract management within

5      it?

6  A.  No.

7  Q.  Who does Graham Cooley report to, if you know?

8  A.  It would be Jane O'Callaghan.

9  Q.  Okay.

10 A.  I don't think I'm on any of these emails.

11 Q.  You were in the group email from Avril.  Is that

12     right?

13 A.  Yeah, the daily receivable report, but anything

14     above that appears to be -- was emails between

15     Avril and Graham.

16 Q.  Let's keep going because I think I'll refresh your

17     recollection on that.

18          MR. ALEXANDER:  Can I get the Bates number of

19     this document?

20          MR. HOSENPUD:  Yes.  Let me scroll to the

21     right.  I'll go back up because I may have missed

22     one.

23          MR. ALEXANDER:  021321.

24          MR. HOSENPUD:  0211321.  Correct.

25          MR. ALEXANDER::  Thanks.

                                        Page 133

1    Q.   BY MR. HOSENPUD:   All right.   I'm going to go back

2         so we can read the text.

3              So this is Graham to Avril on May 6, 2020, and

4         then above that is Avril back to Graham on May 6,

5         2020, contracts is cc'd, so at that point, you

6         would be in the chain.   Correct?

7    A.   Looks like it, yeah.

8    Q.   And then the next email is Graham to contracts and

9         Avril, saying, thanks.   This should be everything

10        for now.

11             The information is blacked out.   And then you

12        respond on May 6, 2020, at 11:45, "Thanks Graham —

13        I chased both airlines again this morning but I

14        didn't hear anything back, I will keep at them."

15        Did I read that accurately?

16   A.   Yeah, that's what the document says.

17   Q.   And so you were communicating reminder notices to

18        other airlines in May 2020, weren't you?

19   A.   I must have been.   That's what the document says.

20   Q.   All right.

21   A.   But for the record, I do not recall that.

22   Q.   Understood.   But you don't deny that that's your

23        email, do you?

24   A.   My name.   It's from my email address.

25   Q.   Okay.   You just don't have a present recollection,

Page 134

Michael McInerney - March 11, 2022

1              C E R T I F I C A T E

2

3          I, Julie A. Walter, CSR No. 90-0173, do hereby

4      certify that MICHAEL MCINERNEY appeared before me

5      at the time and place mentioned in the caption

6      herein; that the witness was by me first duly sworn

7      on oath and examined upon oral interrogatories

8      propounded by counsel; that said examination

9      together with the testimony of said witness was

10     taken down by me in stenotype and thereafter

11     reduced to typewriting; and that the foregoing

12     transcript, Pages 1 to 136, both inclusive,

13     constitutes a full, true and accurate record of

14     said examination of and testimony given by said

15     witness and of all other proceedings had during the

16     taking of said deposition, and of the whole

17     thereof, to the best of my ability.

18          Witness my hand at Portland, Oregon, this 24th

19     day of March, 2022.

20

21                    *Julie A. Walter*

22                    Julie A. Walter

23                    CSR No. 90-0173

24

25

                                        Page 137