Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
FRONTIER AIRLINES, INC.,
                            Plaintiff,
     - against -
AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION (TWO)
LIMITED, WELLS FARGO TRUST COMPANY,
N.A., solely in its capacity as OWNER
TRUSTEE, and UMB BANK, N.A., solely in
its capacity as OWNER TRUSTEE,
                            Defendants.
CASE NO.: 1:20-cv-09713-LLS
------------------------------------------X

        * * *  C O N F I D E N T I A L * * *

              ZOOM VIDEOCONFERENCE

                   October 25, 2022
                   10:03 a.m.   EST

              DEPOSITION of Expert Witness,
     DR. KEVIN NEELS, before Melissa Gilmore, a
     Stenographic Reporter and Notary Public of the
     State of New York.
```

1
2      A P P E A R A N C E S:
3      LANE POWELL PC
4      Attorneys for Plaintiff
5           601 SW Second Avenue, Suite 2100
6           Portland, Oregon 97204-3158
7      BY:  DAVID G. HOSENPUD, ESQ.
8           E-MAIL hosenpudd@lanepowell.com
9
10
11     CLIFFORD CHANCE US LLP
12     Attorneys for Defendants
13          31 West 52nd Street
14          New York, New York 10019-6131
15     BY:  JEFF BUTLER, ESQ.
16          GEGE WANG, ESQ.
17          E-MAIL jeff.butler@cliffordchance.com
18               gege.wang@cliffordchance.com
19
20
21
22
23
24
25

Page 23

1   NEELS - CONFIDENTIAL
2   associated with the spin-off.
3              So I worked on part of that, looking
4   at, you know, different intangible assets that
5   were associated with the regional airline.
6        Q.    Do I understand correctly that, at
7   that time, you were providing some inputs or
8   some valuations that would be relevant to the
9   income tax for Continental Airlines?
10       A.    That's correct.
11       Q.    How long ago was that engagement?
12       A.    That was probably about ten years
13  ago.
14       Q.    Does any other work come to mind
15  that is related to the preparation of income
16  taxes?
17       A.    Not that comes to mind.  You know, I
18  know in various points in various engagements
19  I've had to, you know, look at tax returns or
20  pull information from them, but that's the
21  only -- that one case that I mentioned was the
22  only one that comes to mind.  It really is
23  related to preparation of taxes.
24       Q.    I want to ask you some questions
25  about the overall approach to damages that

NEELS - CONFIDENTIAL

you've used in this case.  And, as I understand your approach for both hypothetical leases with AMCK and the actual leases that were entered by Frontier with other leasing companies, you have determined all of the cash flows associated with those leases and discounted them back to an early date using a discount rate.

        Have I described your approach correctly?

   A.   Mostly.  I would -- I did calculate the cash flows associated with the actual leases and the -- you know, what the leases would have been.  I did -- as I mention in my report, there were some aspects of the leases that could have -- that had the potential to affect cash flows, but I didn't have sufficient information to put a number on it.

        Things like the early termination provision in the AMCK lease or, you know, some of the provisions relating to sharing of airworthiness directive cost.

   Q.   So some elements may have been omitted because you didn't have perfect information.

NEELS - CONFIDENTIAL

                    But was your approach to try to
capture all of the cash flows and then to
discount them back using a discount rate to a
certain date?
        A.      That's correct.
        Q.      And under that approach, you treat
all cash flows the same way regardless of
whether they occurred in the past or are
expected to occur in the future; is that right?
        A.      That's right.
        Q.      Have you used the same approach for
your other cases that involve past and future
cash flows?
        A.      I have.  I mean, to the extent that
I'm taking past and future cash flows into
account in the calculations, I do.
        Q.      So you've consistently used that
approach for the three pharmaceutical cases
that we've talked about; is that right?
        A.      Yes.
        Q.      Would you agree with me, though,
that there is a difference between past cash
flows that have already occurred and future
cash flows in terms of the precision with which

Page 117

1  NEELS - CONFIDENTIAL
2  those up, and it comes to 33.9 million,
3  correct?
4      A.   That's right.
5      Q.   Okay.  And then for this chart,
6  table 17, this is the one that's based on your
7  debt-based discount rates, correct?
8      A.   That's correct.
9      Q.   On the next page, table 18 there's a
10 similar chart that's based on your weighted
11 average cost of capital discount rate, correct?
12     A.   Yes.
13     Q.   Okay.  So going back to table 17,
14 you add up all those figures, which are the
15 figures, I guess, that, if the Court was
16 awarding damages, you would say that's the
17 amount of damages as of the date of your
18 report; is that right?
19     A.   Which number, again, are you
20 referring to here?
21     Q.   Well, 33 -- the 33.9 million figure.
22 Is that the --
23     A.   That's the after-tax damages --
24     Q.   That's what I'm trying --
25     A.   -- as of the date of my report.

1    NEELS - CONFIDENTIAL
2         Q.    That's what I'm trying to
3    understand.
4              Is that after tax, and then you
5    apply a tax rate of 22.8 percent to come to a
6    larger number?  Let me try to unpack this.
7              So I take it from this chart you
8    believe the -- based on your debt-based
9    discount rate you believe that, as of
10   September 9, the date of your report, the Court
11   should award total damages of 43.9 million; is
12   that correct?
13        A.    That's correct.
14        Q.    But based on your effective tax rate
15   of 22.8, Frontier is going to owe taxes on that
16   amount of $10,000; is that right?
17        A.    10 million.
18              MR. HOSENPUD:  Object to form.
19        Q.    $10 million.  I'm sorry.
20   $10 million.  And that means that --
21        A.    Well, let me put it -- actually, let
22   my change that a little bit.  I think -- you
23   know, let me explain it.  I think what's shown
24   in line 6 is the after-tax damages to Frontier.
25   And then, to make Frontier whole, you know,

```
 1
 2                C E R T I F I C A T E
 3
 4    STATE OF NEW YORK )
                                  :ss
 5    COUNTY OF RICHMOND)
 6
 7              I, MELISSA GILMORE, a Notary Public
 8    within and for the State of New York, do hereby
 9    certify:
10              That KEVIN NEELS, the witness whose
11    deposition is hereinbefore set forth, was duly
12    placed under oath by me and that such
13    deposition is a true record of the testimony
14    given by such witness.
15              I further certify that I am not
16    related to any of the parties to this action by
17    blood or marriage; and that I am in no way
18    interested in the outcome of this matter.
19              IN WITNESS WHEREOF, I have hereunto
20    set my hand this 4th day of November, 2022.
21
22       [Signature: Melissa Gilmore]
23
         MELISSA GILMORE
24
25
```