1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK

3     -----------------------------------------X
      FRONTIER AIRLINES, INC.,

4
                              PLAINTIFF,

5
6          -against-      Case No.:
                          1:20-cv-09713-LLS

7
8     AMCK AVIATION HOLDINGS IRELAND LIMITED,
      ACCIPITER INVESTMENT 4 LIMITED, VERMILLION

9     AVIATION (TWO) LIMITED, WELLS FARGO TRUST
      COMPANY, N.A., solely in its capacity as

10    OWNER TRUSTEE, and UMB BANK, N.A., solely
      in its capacity as OWNER TRUSTEE,

11
                              DEFENDANTS.

12    -----------------------------------------X
                     DATE: March 23, 2022

13                   TIME: 9:08 A.M.

14

15         VIDEOTAPED HYBRID DEPOSITION of the

16    Defendant, AMCK AVIATION HOLDINGS IRELAND

17    LIMITED, by a Witness, JANE O'CALLAGHAN,

18    taken by the Plaintiff, pursuant to a

19    Subpoena and to the Federal Rules of Civil

20    Procedure, held remotely, at all parties'

21    locations, before Karyn Chiusano, a Notary

22    Public of the State of New York.

23

24

25

                              Page 1

```
 1
 2      A P P E A R A N C E S:
 3
 4      LANE POWELL, P.C.
           Attorneys for the Plaintiff
 5         FRONTIER AIRLINES, INC.
           601 SW Second Avenue ~ Suite 2100
 6         Portland, Oregon 97204-3158
           BY: DAVID G. HOSENPUD, ESQ.
 7         hosenpudd@lanepowell.com
 8
        CLIFFORD CHANCE, US, LLP
 9         Attorneys for the Defendants
           AMCK AVIATION HOLDINGS IRELAND LIMITED,
10         ACCIPITER INVESTMENT 4 LIMITED,
           VERMILLION AVIATION (TWO) LIMITED, WELLS
11         FARGO TRUST COMPANY, N.A., solely in its
           capacity as OWNER TRUSTEE, and UMB BANK,
12         N.A., solely in its capacity as
           OWNER TRUSTEE
13         31 West 52nd Street
           New York, New York 10019
14         BY: JEFF BUTLER, ESQ.
15
16
        ALSO PRESENT:
17         JONATHAN DiFILLIPO, Videographer
           AARON SCHAER, ESQ., LANE POWELL, P.C.
18         DARCY DEIBELE, LANE POWELL, P.C.
19
20                 *         *         *
21
22
23
24
25


                                Page 2
```

```
 1                    OPENING STATEMENTS
 2               MR. BUTLER:  Jeff Butler
 3          representing the Defendant, AMCK.
 4               THE VIDEOGRAPHER:  Okay.  Will
 5          the Court Reporter please swear in
 6          the witness.
 7    J A N E    O ' C A L L A G H A N, called
 8    as a witness, having been first duly sworn
 9    by a Notary Public of the State of New
10    York, was examined and testified as
11    follows:
12               THE COURT REPORTER:  Can I
13          kindly have your name, spelling
14          please?
15               THE WITNESS:  Jane O'Callaghan.
16               THE COURT REPORTER:  Can I have
17          your address, please?
18               THE WITNESS:  Home address?
19               THE COURT REPORTER:  Please.
20               THE WITNESS:  4 Belgrave Place,
21          Rahmanes, Dublin D06X6V6.
22               THE COURT REPORTER:  Any time
23          you're ready, I am ready for you.
24               MR. HOSENPUD:  Thank you.
25      / / /
```

Page 6

```
 1              JANE O'CALLAGHAN
 2     report?
 3          A.    I report to the CEO.
 4          Q.    Do you report to anybody at CK
 5     Access?
 6          A.    No, I do not.
 7          Q.    Is your employment ending with
 8     AMCK?
 9          A.    Yes, it's expected to end at
10     some point in April of next month.
11          Q.    And will you transition to any
12     other entity or will you be out on the
13     market?
14          A.    I am out on the market.
15          Q.    And when in April?
16          A.    I don't know yet.  The closing
17     date is predicted to be sometime in the
18     middle of April.
19          Q.    And will AMCK Aviation continue
20     its operations after the closing date?
21          A.    It's not -- it's not expected
22     to.  I believe there will be a couple of
23     junior finance people kept on for a period
24     of time to just transition accounts, minor
25     kind of admin type of tasks for perhaps a
```

AMCK Aviation Holdings Ireland Limited Jane O'Callaghan - March 23, 2022

1                  JANE O'CALLAGHAN

2      couple of months.

3           Q.    And in speaking with Mr. Fabian

4      Bachrach, he indicated that he is a

5      consultant and has known you for 40 years.

6      Also in -- and he also indicated that his

7      contract has been altered to end December

8      31, 2022.

9                  Do you know why he would

10     continue?

11          A.    No, the -- the plan was we

12     would have in the past since I hired

13     Fabian, we've done a contract on the basis

14     of a 12-month rolling basis.  So, rather

15     than amend that form of contract, we just

16     decided to just let it role for another 12

17     months.  He understood perfectly well, as

18     did I, that it would be terminated at such

19     point as we closed the sale of the AMCK

20     business.

21          Q.    As part of the transaction and

22     closing of the sale, will the owner

23     trustees change in the leases that are

24     connected to Frontier Airlines?

25          A.    I cannot say that because I

                                    Page 12

1                    JANE O'CALLAGHAN

2          A.    Yes.

3          Q.    And that would have been on

4     each date that you had those calls?

5          A.    Yes.

6          Q.    All right.

7               MR. HOSENPUD:  Note for the

8            record, request follow-up on all

9            dates identified as reflecting phone

10           calls with Frontier and Ms.

11           O'Callaghan for those notes.

12               MR. HOSENPUD:  All right.

13           Let's look at 16.

14               (Whereupon, Draft e-mail with

15           metadata was marked as O'Callaghan

16           Exhibit 16 for identification as of

17           this date by the Reporter.)

18               (Witness reviews document.)

19          Q.    Exhibit 16, Ms. O'Callaghan,

20     appears to be an e-mail in draft form to

21     yourself.  It is AMCK031 --

22               MR. HOSENPUD:  Strike that.

23          Q.    AMCK03164.  And if you turn to

24     the second page, I will represent to you

25     that this is the Metadata that accompanied

                                        Page 48

JANE O'CALLAGHAN

1

2     that e-mail.  This is created on March 25,

3     2020.

4                Do you see that?

5                (Witness reviews document.)

6       A.     Yes.

7       Q.     Okay.  So, going back to the

8     first page, it says Draft:

9                "Just to summarize the

10    company's position on Frontier and, then

11    it's blacked out, following this morning's

12    discussion."

13               And then it reads:

14               Frontier.

15               "We will accede to the Frontier

16    request of all its lessors for three months

17    rent deferrals, commencing April, in

18    respect of 14 of our 15 aircraft (excluding

19    the A320neo delivered on March 16) with

20    repayment over subsequent four months

21    versus their nine-month amortization

22    requests, on the following conditions."

23               Then a bullet point.

24               "We will honor our SLB

25    financing commitment in respect of the

Page 49

1                    JANE O'CALLAGHAN

2    second A320neo delivery from our package of

3    6 in 2020 due on 13th April."

4              What were you -- what meeting

5    or discussion were you summarizing from on

6    March 25, 2020?

7         A.    I don't recall because I often

8    have a tendency to do this, to start

9    putting together a draft of an e-mail or a

10   recommendation.  I suspect that this was

11   the start of a draft that we might consider

12   internally following an executive meeting,

13   the 10:30 daily executive meeting, where

14   clearly the Frontier request had come up.

15   And obviously this is not complete because

16   of all of the other conditions that we

17   would have been planning obviously found

18   their way into some other note, but this is

19   just a start of a draft.

20        Q.    And as of this point, however,

21   AMCK Aviation was intending to fund the

22   April 13th A320neo delivery, correct?

23        A.    Well, this was -- this was the

24   beginning of a draft which would have

25   included, and I hadn't yet articulated

                                        Page 50

1                    JANE O'CALLAGHAN

2     them, a number of conditions.   But

3     depending on whether those conditions were

4     met that was going to be the

5     recommendation.

6          Q.    And when would you have made

7     the recommendation that contained more

8     conditions?

9          A.    The e-mail probably followed

10    within 24 or 48 hours.  But I -- I don't

11    have it to hand, so obviously this is just

12    a beginning of a draft.

13         Q.    We will see if we can locate

14    that.

15               And if -- if you had prepared

16    an e-mail with additional conditions, is it

17    likely that it would have been within the

18    next 24 or 48 hours?

19         A.    It was likely --

20         Q.    All right.

21         A.    -- because we normally try to

22    turn around the requests from big important

23    customers fairly quickly.

24         Q.    All right.  So, if that exists,

25    it should be in the record that's been

Page 51

1              JANE O'CALLAGHAN

2        A.      Yes.

3        Q.      And so, the exchange of a rent

4    deferral was to essentially increase the

5    purchase -- decrease the purchase price

6    from 51 Million to 48 by virtue of advance

7    payment of 12 months; is that right?

8        A.      Correct.

9        Q.      That was not a term of the

10   frame work agreement, was it?

11       A.      No.

12       Q.      And the second condition, the

13   delay of delivery of the four sale and

14   leaseback aircraft that were scheduled to

15   be delivered in May through July of 2020

16   was also a condition that was not within

17   the 2020 framework agreement, correct?

18       A.      Um-hum, yes.  Correct.

19       Q.      Okay.  And the failure of

20   Frontier to pay the deferred rent on time

21   -- first of all, let me ask what that

22   means.  What does "on time" mean?

23       A.      It means on time in accordance

24   with any documents that are in place

25   governing the leases and/or a document

Page 69

1                    JANE O'CALLAGHAN

2      lessors A) pay more for airplanes than the

3      airlines and B) and pay a higher PDP

4      schedule.

5                    So, typically the lessors pay

6      somewhere between 20 to 30 percent of the

7      purchase price via PDPs, airlines pay

8      somewhere between at lowest 7 to 10 percent

9      and at highest 15, 16 percent.  So, the

10     amount of money at risk for lessors is

11     considerably higher.

12        Q.    And so, Mr. Fanning at 016976

13     responds:

14                    "So, you're asking us in

15     delaying delivery of all the A320Ns for

16     2020?  Well, we've had initial discussions

17     with Airbus and they have been -- not been

18     favorable and they are asking us to take

19     delivery of these A320s."

20                    Did you have any information

21     contrary to that position?

22        A.    No, we weren't party between to

23     any discussions between Airbus and

24     Frontier.

25        Q.    And then he says:

Page 78

AMCK Aviation Holdings Ireland Limited Jane O'Callaghan - March 23, 2022

```
 1                    JANE O'CALLAGHAN
 2                    "If we're unable to delay the
 3      deliveries and you're pulling out of the
 4      five remaining A320s, we need to know
 5      ASAP."
 6                    Did you respond to that?
 7                    (Witness reviews document.)
 8           A.    He made a comment.  I didn't
 9      specifically respond to that.
10           Q.    And he goes on:
11                    "I know Jimmy's had discussions
12      with Chris Jones at Airbus and as
13      mentioned, the discussion has been, they
14      expect us to take deliveries when the
15      aircrafts are all ready."
16                    And then it stops.
17                    Did you have any discussion
18      with anybody to corroborate that statement?
19                    (Witness reviews document.)
20           A.    No, but it wasn't surprising
21      because that is initially Airbus's initial
22      position.
23                    But on the other hand, we knew
24      from other airlines and lessees that we had
25      that those airlines had been successful in
```

Page 79

JANE O'CALLAGHAN

1

2        jotted down one or two notes.

3                    MR. HOSENPUD:    This is Exhibit

4        21.

5                    (Whereupon, E-mail dated April

6        3, 2020 was marked as O'Callaghan

7        Exhibit 21 for identification as of

8        this date by the Reporter.)

9                    (Witness reviews document.)

10       A.        Thank you.

11       Q.        This is an April 3 e-mail from

12       you to Paul Sheridan, dated -- pardon me,

13       AMCK031157 and it is asking when should we

14       speak to Gerald about Frontier and blank,

15       A320neos SLB financing opportunity 2020?

16                    Do you know if you spoke to him

17       shortly thereafter?

18       A.        I don't know for certain.  And

19       if this was on Friday, it's most likely

20       that we didn't talk to him until the

21       following Tuesday morning when we had a

22       weekly update call with the shareholder at

23       9:00 A.M.

24       Q.        And you were discussing eight

25       A320 SLB financing opportunities, five of

Page 82

JANE O'CALLAGHAN

1

2      those were with Frontier and three with

3      another airlines?

4           A.    That's correct.

5           Q.    And did AMCK Aviation follow

6      through with any of those A320 sale

7      leasebacks in 2020?

8           A.    No, it did not.

9           Q.    The other company at issue here

10     is Volaris, isn't it?

11          A.    That's correct.

12               MR. HOSENPUD:  Exhibit 22.

13               (Whereupon, E-mail dated April

14          3, 2020 was marked as O'Callaghan

15          Exhibit 22 for identification as of

16          this date by the Reporter.)

17               (Witness reviews document.)

18          Q.    It is a Paul Sheridan e-mail to

19     Jimmy Dempsey, dated April 3, 2020, carbon

20     copying Robert Fanning, Spencer Thwaytes

21     and you.  And it says:

22               "Dear Jimmy.

23               We have discussed the upcoming

24     five A320neo deliveries further with our

25     shareholder overnight."

Page 83

```
1                    JANE O'CALLAGHAN
2      Airlines?
3           A.    I don't know.  I'm not familiar
4      with those agreements.
5                    MR. HOSENPUD:  Exhibit 24.
6                    (Whereupon, E-mail chain dated
7           April 6, 2020 was marked as
8           O'Callaghan Exhibit 24 for
9           identification as of this date by the
10          Reporter.)
11                   (Witness reviews document.)
12          Q.    This is an e-mail chain with
13     Jimmy Dempsey dated April 6, 2020.  It's
14     FRONTIER000314 through 316.  And I'm at
15     Page 315.
16                   So, this, again, captures your
17     -- Paul Sheridan's April 3, 2020 e-mail to
18     Jimmy Dempsey, carbon copying Fanning,
19     Spencer Thwaytes and you, that you did the
20     draft of as we saw in the prior Exhibit 23.
21                   (Witness reviews document.)
22          A.    Yes.
23          Q.    Okay.  And Mr. Dempsey
24     responds:
25                   "Hi Paul.
```

JANE O'CALLAGHAN

1

2          This is very disappointing

3    news.  My reading of your e-mail assumes

4    that you will only agree to the rent

5    deferral if we defer aircraft deliveries

6    with Airbus?  As a result, I can only

7    deduce that what -- that you will finance

8    the aircraft deliveries and honor your

9    commitment to Frontier if we do not put a

10   rent deferral in place."

11         Did I read that accurately?

12    A.     Yes.

13    Q.     Did AMCK Aviation ever confirm

14   in writing that it would honor its

15   commitments to Frontier if no rent deferral

16   was in place?

17    A.     We didn't need to do that.  The

18   documents already provide for how we

19   perform under the framework agreement if

20   they are current under all of the other

21   leases.

22    Q.     But in response to this e-mail,

23   did AMCK Aviation confirm that it would do

24   so if no rent deferral was in place?

25    A.     We didn't need to do that.  So,

Page 89

```
1                JANE O'CALLAGHAN
2     as far as I know, we did not do that.
3          Q.    And -- first page of Exhibit
4     24, goes on to indicate --
5                MR. HOSENPUD:   Strike that.
6          Q.    Jimmy Dempsey writes on April
7     6, 2020 at 19:05:
8                "Hi, Paul.  Available for a
9     call ASAP.  Airbus has closed Mobile until
10    April 29th.  I am keen to get a deferral in
11    place and am conscious that we have two
12    times rent payments today that we really
13    need to defer."
14               And then Mr. Sheridan responds
15    that day with summary of a call with Robert
16    and basically indicates that -- that there
17    will be no action taken or call any
18    defaults for non-payments of rents due --
19    from today, April 6 to April 21."
20               Did I summarize that
21    accurately?
22         A.    Yes.
23         Q.    And then Mr. Dempsey repeats:
24               "I appreciate this.  As you
25    know, this will continue to be a challenge
```

Page 90

```
 1                    JANE O'CALLAGHAN
 2          Q.     You were remote at this point,
 3     correct?
 4          A.     We were remote, yeah.
 5          Q.     Okay.
 6          A.     So, if I had to taken part in
 7     this call it would have been in living room
 8     or my kitchen area.
 9          Q.     Understood.
10                 Did you have a home office is
11     that what you're referring to?
12          A.     Yes.
13          Q.     Okay.  Do you remember anything
14     about it?
15          A.     By this call?
16          Q.     Yes.
17          A.     No.  Honestly, no.
18                 (Whereupon, E-mail dated April
19          9, 2020 with Frontier Forbearance
20          Letter attached was marked as
21          O'Callaghan Exhibit 31 for
22          identification as of this date by the
23          Reporter.)
24                 (Witness reviews document.)
25          Q.     Exhibit 31 is an e-mail from
```

Page 107

JANE O'CALLAGHAN

1

2  you dated April 9, 2020 to Robert Fanning,

3  Sharath Sashikumar and Spencer Thwaytes.

4  It reads -- and it's AMCK016655 through

5  659.  It reads:

6              "Hi, Robert.

7              Herewith a draft of the

8  deferral letter from 1 of 14 aircraft (the

9  recently neo is excluded).  We are in the

10 process of cloning out the letter for the

11 other 13 aircraft, but rather than wait

12 thought it wise to send the draft for your

13 review."

14             (Witness reviews document.)

15      Q.    And then it contains a draft

16 letter, correct?

17      A.    Correct.

18      Q.    And now, what -- what prompted

19 you sending this out?

20             (Witness reviews document.)

21      A.    I don't recall, but I guess --

22 this is based on the standard form

23 forbearance letter that AMCK produced for

24 all lessees that we had a similar agreement

25 with.  And I guess that we would have been

Page 108

JANE O'CALLAGHAN

1

2  sending this out in response to a draft

3  that their lawyers provided us to review

4  and get working on in the event that we

5  reached agreement on all of the other

6  conditions that we would require in order

7  to proceed with agreeing with these in

8  relation to the 14 airplanes.

9       Q.    So, this did not -- this

10  pertains only to rent on the 14 leases,

11  correct?

12            (Witness reviews document.)

13       A.    Yep.  It pertains to the

14  forbearance event in relation to the 14

15  airplanes and this was just in relation to

16  the one airplane and the plan would have

17  been to agree to this form and then dup it

18  out for the other 13.

19       Q.    And it did not address delivery

20  deferral -- the delivery deferral topic,

21  correct?

22       A.    The forbearance letter would

23  not.  That would be a separate side letter.

24       Q.    So, as of this point, AMCK

25  Aviation had not abandoned its position

Page 109

```
                    JANE O'CALLAGHAN
 1
 2     that rent deferral condition was
 3     conditioned on delivery deferral, correct?
 4         A.    We had set out our position, I
 5     guess we hadn't -- we never abandoned
 6     discussions with big important customers
 7     like Frontier.  It was always a hope that
 8     we would agree all of the conditions,
 9     notably the deferral of delivery, in order
10     to be able to do something on the rent
11     deferral.
12         Q.    My point is that this letter
13     addressing the rent deferrals, did not have
14     any bearing on AMCK Aviation abandoning a
15     condition of delivery deferral for the rent
16     deferrals to be in place?
17         A.    That would not be dealt with in
18     the forbearance letter to say this was a
19     standard form forbearance letter that we
20     like to use for all of our lessees.  And it
21     was a piece of the overall offer that we
22     had made in writing to Jimmy and others.
23              (Whereupon, E-mail chain dated
24         April 6, 2020 was marked as
25         O'Callaghan Exhibit 32 for

                                        Page 110
```

```
1              JANE O'CALLAGHAN
2              Did I read that accurately?
3      A.    Yes.
4      Q.    So, you were advocating doing
5  the -- taking a step to assure the
6  integrity of AMCK Aviation and giving
7  notice to Frontier that even if they were
8  current on rents, there would be no funding
9  of the sale and leaseback subject to the
10 2020 agreement at their current prices?
11            MR. BUTLER:  Object to the
12       form.
13     A.    I mean, I think these were just
14 musings.  I wasn't surprised that Board
15 directors raised these kind of issues and
16 items, all Boards or all lessors were
17 having similar conversations and talks at
18 Board meetings throughout 2020.
19            Nevertheless, I think everybody
20 realized that if they did get current, we
21 would have no option.  We had to perform,
22 otherwise it would have been breach of
23 contract.
24     Q.    Right.  But your statement was,
25 we'd be better off telling them that we
```

Page 133

AMCK Aviation Holdings Ireland Limited Jane O'Callaghan - March 23, 2022

```
 1                    JANE O'CALLAGHAN
 2     can't get shareholder comfortable with 2019
 3     contracted pricing, even if they are
 4     completely current on all payments,
 5     correct?
 6                    (Witness reviews document.)
 7          A.     We didn't do that.
 8          Q.     You -- you were not given any
 9     authority to do that?
10          A.     We did not do that.
11          Q.     All right.  Because nobody gave
12     you authority to do that?
13          A.     I wasn't even suggesting it.  I
14     was saying -- musing that perhaps that was
15     one, you know, way that we could approach
16     this, but we -- it never went beyond this
17     and we did not do that.
18          Q.     Then Mr. Sheridan writes:
19                 "It's probably worth discussing
20     on the team call tomorrow morning.  All
21     have a think between now and then."
22                 And you respond:
23                 "Great, thanks."
24                 The team call, is this the
25     Executive Team?
```

                                        Page 134

```
 1                  JANE O'CALLAGHAN
 2    please turn to page AMCK041720.
 3                  (Witness complies.)
 4        Q.    And just for the record, I am
 5    going to identify the Bates range of
 6    document Exhibit 35A, 041716 through
 7    041737.
 8                  And please turn to page 041720,
 9    it is under the heading Portfolio Update.
10                  (Witness reviews document.)
11        Q.    There are various attributes to
12    you in this document.  And I would like you
13    to just look through them generally and
14    then I'm gonna ask you specific questions,
15    but let me know when you finish looking
16    through them generally where they appear in
17    the various sub-parts of Section 7.
18        A.    Okay.  I should do that.
19                  (Witness reviews document.)
20        A.    You just want me to read to the
21    end of 041720.
22        Q.    The next page is 21 and may
23    have some references to you.
24        A.    Okay.
25                  (Witness reviews document.)
```

Page 139

```
                    JANE O'CALLAGHAN
 1
 2          A.      Okay.
 3          Q.      Do the paragraphs that
 4   reference you accurately reflect the
 5   information you conveyed to the Board?
 6          A.      I believe so, yes.
 7          Q.      Okay.  And what I would like to
 8   focus on is Paragraph 7.3 in part.  You
 9   were advising that 32 of 34 lessees had
10   asked for some form of assistance most were
11   in the form of rental deferrals for the
12   months of April, May and June; is that
13   accurate?
14          A.      Yes.
15          Q.      And of those 32 requests, you
16   note that 21 had since been agreed
17   commercially or documentation had been
18   executed.
19                  What does it mean agreed
20   commercially?
21          A.      Means that we had agreed to
22   terms for some form of rent deferral, but
23   that does mean necessarily that we agreed
24   to three months rent deferral for all of
25   those 21.
```

Page 140

AMCK Aviation Holdings Ireland Limited Jane O'Callaghan - March 23, 2022

```
1                    JANE O'CALLAGHAN
2         Q.    Did that mean you agreed to
3    three months rent deferral for several of
4    those 21?
5         A.    Only among the smaller lessees
6    where the amount of money at risk exposure
7    was limited and I would say it was only in
8    the case of airlines that had maybe less
9    than four or five airplanes on lease from
10   us.
11        Q.    And what were the deferral
12   arrangements for those that had more than
13   that?
14        A.    It was a shorter period.  It
15   was not more than 50 percent of rent
16   deferral.  In the case of a similar sized
17   airline that we had with a similar number
18   of airplanes and a similar value of assets,
19   so in or around 700 million, we agreed to
20   50 percent rent deferral for two months and
21   it had to be repaid within the subsequent
22   two months and that it was repaid in full.
23             And that would be the most
24   comparable lessee that we have in or
25   portfolio to Frontier.
```

Page 141

1                    JANE O'CALLAGHAN

2          Q.      You indicate that 11 requests

3    were still pending, Frontier was among

4    those 11; is that correct?

5          A.      Yes, that's correct.

6          Q.      All right.   7 -- Paragraph 7.5

7    you state that in the middle section:

8                  "Be advised that airlines were

9    now reluctant to take delivery of new

10   aircraft, but Airbus were approving very

11   difficult on requests for deferrals unless

12   a right of deferral had been built into the

13   original sale and Purchase Agreement."

14                 Did I state that accurately?

15         A.      Yes.

16         Q.      And you learned that from your

17   lessees; is that right?

18         A.      We learned that from the

19   markets.   So, in some cases we learned this

20   from lessees directly, but more often than

21   not you would heard this from other lessors

22   who had heard it from either lessees or the

23   manufacturer themselves.

24         Q.      Did you learn anything from the

25   manufacturer that would contravene that

                                        Page 142

```
                    JANE O'CALLAGHAN
1
2        A.      I don't recall seeing it.
3        Q.      All right.   Thank you.
4                MR. HOSENPUD:    Exhibit 40.
5                (Whereupon, E-mail dated April
6        27, 2020 was marked as O'Callaghan
7        Exhibit 40 for identification as of
8        this date by the Reporter.)
9                (Witness reviews document.)
10       Q.      This is a Paul Sheridan e-mail
11   exchange with Jimmy Dempsey, April 27, 2020
12   Frontier 0000338 through 342.   It starts
13   with an e-mail exchange on the 27th where
14   Jimmy Dempsey is communicating to Paul
15   Sheridan.
16               Were you part of this exchange?
17               (Witness reviews document.)
18       Q.    I see you copied on Paul
19   Sheridan's response.
20       A.    Yeah, I was just copied.
21       Q.    All right.   He says to Mr.
22   Sheridan:
23               "I have just been briefed by
24   Robert and I was working on the assumption
25   that we had to be current on all rent for
```

Page 161

```
1                    JANE O'CALLAGHAN
2       you to finance upcoming deliveries.  This
3       is set out in your e-mail below."
4                 He then states:
5                 "I put a scheme in place with
6       Airbus that would facilitate short term
7       deferrals of aircraft on the basis that you
8       would honor your agreement.  Please confirm
9       this is the case as we have a signed -- as
10      we have a lease signed for these aircraft
11      and are willing to ensure the deferred rent
12      is paid as a CP of delivery."
13                CP, condition precedent, is
14      that your understanding?
15           A.     Yes.
16           Q.     So, do you know if Mr. Sheridan
17      ever confirmed this with Frontier?
18           A.     I don't know whether he
19      confirmed this, but I don't believe he did.
20                MR. HOSENPUD:  Okay.  Exhibit
21           41.
22                (Whereupon, E-mail dated April
23           27, 2020 was marked as O'Callaghan
24           Exhibit 41 for identification as of
25           this date by the Reporter.)

                                        Page 162
```

JANE O'CALLAGHAN

1

2      Q.      Okay.

3              (Whereupon, Minutes from Board

4      of Directors meeting dated May 8,

5      2020 was marked as O'Callaghan

6      Exhibit 55 for identification as of

7      this date by the Reporter.)

8              (Witness reviews document.)

9      Q.      Exhibit 55 is the May 8, 2020

10     minutes.  And you were in attendance along

11     with Mr. Sheridan, Gerald Ma, Pat O'Brien

12     and others, correct?

13     A.      Correct.

14     Q.      Section 4.4 is Update on

15     Discussions with Frontier and one other

16     airline; is that right?

17             (Witness reviews document.)

18     A.      I missed the last of -- an

19     update on...

20     Q.      Yes.  With Frontier and another

21     airline --

22     THE COURT REPORTER:  I can't

23     hear you, sir.

24     Q.      Yes.  Is Paragraph -- Paragraph

25     4 of the minutes an update on discussions

                                    Page 222

JANE O'CALLAGHAN

1

2    with Frontier and another airline?

3         A.    Yes, correct.

4         Q.    All right.  So, 4.1 through

5    4.15 are the discussions related to

6    Frontier?

7              (Witness reviews document.)

8         A.    That's correct.

9         Q.    There are several attributes to

10   you in these discussions and I'd like you

11   to just generally look at those to tell me

12   if you agree that they accurately reflect

13   the information you've imparted.

14              (Witness reviews document.)

15        A.    Okay.

16        Q.    Do you agree that this

17   accurately characterizes your

18   representations to the court?

19        A.    Yes, I would agree with that.

20        Q.    All right.  The first statement

21   I'd like to ask you about is in 4.3 where

22   the minutes state that:

23              Ms. O'Callaghan advised that

24   Frontier had remained current with rental

25   payments up until March 2020, where a

Page 223

JANE O'CALLAGHAN

1
2    three-months deferral of lease payments
3    alongside the return of a deposit had been
4    requested, subsequent to the payment of the
5    first aircraft.
6                Is March 2020 an error?
7         A.    I don't understand the
8    question.
9         Q.    You are not aware of Frontier
10   failing to pay March 2020 rent, are you?
11        A.    It's perhaps a bit of a clumsy
12   wording and because what we're really
13   trying to say is that they had remained
14   current with rental payments up until the
15   end of March.  But, of course, it was the
16   middle of March when they requested the
17   three-month rent deferral, alongside the
18   return of the security deposit.  So, it
19   could have been as slightly more correctly
20   written.
21        Q.    Understood.
22                And Paragraph 4.8 it discusses
23   that the Board is noting that there could
24   be potentially severe reputational
25   consequences for the company in the leasing

Page 224

AMCK Aviation Holdings Ireland Limited Jane O'Callaghan - March 23, 2022

1                JANE  O'CALLAGHAN

2    and aviation markets if termination rights

3    were exercised.

4              And you are noted as having

5    responded or informing the Board that from

6    a strategic standpoint to exercise the

7    company's termination rights would provided

8    the best possible leverage with Frontier to

9    continue negotiations.

10             Did I note that accurately?

11        A.     Yes.

12        Q.     And that's what you

13   represented?

14        A.     Yes.

15        Q.     You also, at 4.12, you noted

16   that there were -- there was only a small

17   pool of potential lessors that Frontier

18   could negotiate new terms with as there was

19   a Fleet Hour Agreement attached to the

20   engines which could only be entered into by

21   parties who signed up to the CFM

22   International Tripartite Agreement.   And

23   noted that this may increase the likelihood

24   of Frontier's willingness to enter into

25   renegotiations.

                                Page  225

1          JANE O'CALLAGHAN

2          Did I note that accurately?

3     A.    That is accurate.

4     Q.    And what are the number of

5  lessors who would be potentially eligible

6  for renegotiation?

7     A.    I don't have an answer to that,

8  you would need to check that with CFM.  How

9  many lessors?  It was a handful of lessors

10  at the time, it was certainly less than 10.

11     Q.    Fair enough.

12          And you also advise that should

13  Frontier not be interested in

14  renegotiations and the leases were

15  terminated, the Management Team would look

16  to reinvest the funding of 255 Million into

17  airlines with good credits, such as, and

18  it's blacked out.

19          Did you redeploy the capital?

20     A.    No, we did not.

21     Q.    At any time?

22     A.    No, we did not.

23     Q.    What was the reason for that?

24     A.    Um, I think that there were no

25  deals with credits that the shareholder

Page 226

1                    JANE O'CALLAGHAN
2     felt entirely comfortable with that would
3     meet their obligations.  The state of the
4     market was so, um, unpredictable that the
5     shareholder wasn't able to convince
6     themselves that this income stream was
7     completely dependable.  I think the idea
8     was we will just -- we'll deploy that in
9     '21.  We'll wait out the worst of COVID and
10    we'll deploy it later.
11          Q.    And did you do so?
12          A.    And we bought two A321neos in
13    2021.  That's all.
14                THE VIDEOGRAPHER:  Is this a
15          bad time for me to take us off the
16          record very quickly?  I just need to
17          switch SD cards?
18                MR. HOSENPUD:  Please do so.
19                THE VIDEOGRAPHER:  I don't need
20          an extended break at all.
21                MR. HOSENPUD:  Sure.  Let's go
22          off the record.
23                THE VIDEOGRAPHER:  The time is
24          2:50 P.M. and we are off the record.
25                (Whereupon, a short recess was

                                    Page 227

```
1                    JANE O'CALLAGHAN
2          A.    Yes, we do consider Frontier as
3     a good credit.
4          Q.    And from the moment of default
5     after which Frontier paid, Frontier has
6     been current to date, correct?
7          A.    Yes, they have been.
8          Q.    And in addition, during the
9     course of this -- of 2021, you reached out
10    to Frontier to discuss potentially entering
11    into sale and leaseback agreements,
12    correct?
13         A.    In their most recent RFP, yes.
14    I felt that perhaps there was a way in
15    which we might try to rebuild bridges by
16    offering new leasebacks on current market
17    terms.
18         Q.    All right.
19         A.    Because they are, after all,
20    still one of our biggest lessees.  And all
21    things being equal, it would be good to
22    rebuild the relationship.
23              (Whereupon, E-mail dated May 9,
24         2020 was marked as O'Callaghan
25         Exhibit 56 for identification as of
```

Page 229

1              JANE O'CALLAGHAN

2    from AMCK Aviation --

3              MR. HOSENPUD:  Strike that.

4         Q.    Was there any communication

5    from AMCK Aviation to Frontier Airlines

6    demanding rent payments from the time

7    period of April 21, 2020 to May 8, 2020?

8         A.    I don't know whether the

9    contract management people sent out a

10   reminder, they sometimes do, but it is not

11   needed under our lease.  So, I can't answer

12   whether we actually sent them out a not,

13   but it's certainly not needed, necessary

14   under our lease.

15             MR. HOSENPUD:  Move to strike.

16        Q.    My question is:  Was there any

17   communication from AMCK --

18             MR. HOSENPUD:  Strike that.

19        Q.    Was there any communication

20   from AMCK Aviation to Frontier demanding

21   rent payments from April 21, 2020 to May 8,

22   2020?

23        A.    I did not send out a written

24   note.

25        Q.    Thank you.

Page 256

AMCK Aviation Holdings Ireland Limited Jane O'Callaghan - March 23, 2022

```
 1              JANE O'CALLAGHAN
 2            C E R T I F I C A T E
 3
 4    STATE OF NEW YORK        )
                               :  SS.:
 5    COUNTY OF NEW YORK       )
 6
 7         I, KARYN CHIUSANO, a Notary Public
 8    for and within the State of New York, do
 9    hereby certify:
10         That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14         I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 5th day of April, 2022.
21
22
23
              KARYN CHIUSANO
24
25
```

                                    Page 267