1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ----------------------------------------X

   FRONTIER AIRLINES, INC.,

4

                          PLAINTIFF,

5

6          -against-    Case No.:

                        1:20-cv-09713-LLS

7

8  AMCK AVIATION HOLDINGS IRELAND LIMITED,

   ACCIPITER INVESTMENT 4 LIMITED, VERMILLION

9  AVIATION (TWO) LIMITED, WELLS FARGO TRUST

   COMPANY, N.A., solely in its capacity as

10 OWNER TRUSTEE, and UMB BANK, N.A., solely

   in its capacity as OWNER TRUSTEE,

11

                          DEFENDANTS.

12 ----------------------------------------X

13

14              DATE: March 25, 2022

15              TIME: 9:05 A.M.

16

17         VIDEOTAPED HYBRID DEPOSITION of

18 the Defendant, AMCK AVIATION HOLDINGS

19 IRELAND LIMITED, by a Witness, PAUL

20 SHERIDAN, taken by the Plaintiff, pursuant

21 to a Subpoena and to the Federal Rules of

22 Civil Procedure, held remotely, at all

23 parties' locations, before Karyn Chiusano,

24 a Notary Public of the State of New York.

25

                                    Page 1

Paul Sheridan - March 25, 2022

```
 1
 2    A P P E A R A N C E S:
 3
 4    LANE POWELL, P.C.
         Attorneys for the Plaintiff
 5       FRONTIER AIRLINES, INC.
         601 SW Second Avenue ~ Suite 2100
 6       Portland, Oregon 97204-3158
         BY: DAVID G. HOSENPUD, ESQ.
 7       hosenpudd@lanepowell.com
 8
      CLIFFORD CHANCE, US, LLP
 9       Attorneys for the Defendants
         AMCK AVIATION HOLDINGS IRELAND LIMITED,
10       ACCIPITER INVESTMENT 4 LIMITED,
         VERMILLION AVIATION (TWO) LIMITED, WELLS
11       FARGO TRUST COMPANY, N.A., solely in its
         capacity as OWNER TRUSTEE, and UMB BANK,
12       N.A., solely in its capacity as
         OWNER TRUSTEE
13       31 West 52nd Street
         New York, New York 10019
14       BY: JEFF BUTLER, ESQ.
15
16
      ALSO PRESENT:
17       JONATHAN DiFILLIPO, Videographer
         AARON SCHAER, ESQ., Lane Powell, P.C.
18       DARCY DEIBELE, Lane Powell, P.C.
19              *          *          *
20
21
22
23
24
25
```

Page  2

```
1              OPENING STATEMENTS
2         Frontier Airlines.
3              MR. BUTLER:  Jeff Butler, from
4         Clifford Chance, for the Defendant,
5         AMCK Aviation, joined by my
6         colleague, Gege Wang today.
7              THE VIDEOGRAPHER:  Will the
8         Court Reporter please swear in the
9         witness?
10             THE COURT REPORTER:  Can you
11        raise your right hand, please?
12             (Witness complies.)
13             THE COURT REPORTER:  Do you
14        swear that the testimony you are
15        about to give will be the truth, the
16        whole truth and nothing but the truth
17        so help you God?
18             THE WITNESS:  I do.
19             THE COURT REPORTER:  Wonderful.
20             Can I have your name, spelling,
21        please?
22             THE WITNESS:  Paul Sheridan,
23        P-A-U-L  S-H-E-R-I-D-A-N.
24             THE COURT REPORTER:  Can I have
25        your address, sir?
```

Page 6

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2   there are any questions that I ask you that
 3   confuse you in any way or you simply do not
 4   understand them, will you please ask me to
 5   rephrase or restate the question to you?
 6        A.    I will.
 7        Q.    If you do not do so, I will
 8   presume that you've understood the
 9   question.
10        A.    Okay.
11        Q.    And what's your position and
12   name at AMCK Aviation?
13        A.    I am the CEO.
14        Q.    And how many years have you
15   held that position?
16        A.    Well, AMCK have been in
17   operation since August of 2019, after the
18   merger of two companies, and I am CEO of
19   one of the previous companies, Accipiter
20   Aviation Holdings.
21        Q.    And how long were you CEO for
22   Accipiter?
23        A.    Officially appointed CEO, I
24   think, in 2017.  I don't quite remember.
25             At 2016, I was appointed as an
```

Page 8

Paul Sheridan - March 25, 2022

```
 1                    PAUL SHERIDAN
 2    Acting MD of the company.
 3          Q.      Managing Director?
 4          A.      Yeah.
 5          Q.      And did you have affiliations
 6    with Accipiter prior to 2016?
 7          A.      I joined as an employee in
 8    January of 2015.
 9          Q.      And how many years have you
10    been in aviation leasing?
11          A.      Since 2003.
12          Q.      Okay.   And what are your
13    general responsibilities as CEO?
14          A.      The direction of the company,
15    dealing with shareholders, I am also
16    Director of AMCK Aviation and the
17    subsidiary companies.
18          Q.      And who are they, the
19    subsidiary companies?
20          A.      There's a range of aircraft
21    owning companies, financing companies and
22    to arrange and own the -- and finance the
23    aircrafts that -- that we manage.
24          Q.      Would these be considered
25    beneficial owners, the financing companies?
```

Page  9

Paul Sheridan - March 25, 2022

PAUL SHERIDAN

1

2    A.    Some of them are, but not all

3    of them.

4    Q.    And is Vermillion Aviation

5    (Two) Limited one of them?

6    A.    I -- I -- I don't quite

7    remember the full organization structure.

8    I think it does own aircraft, yeah, so --

9    Q.    And to whom do you report?

10   A.    I worked with the Board and the

11   shareholders.

12   Q.    And is your employment with AMC

13   Aviation -- AMCK Aviation ending at any

14   time?

15   A.    Um, potentially, yes.    Assuming

16   the proposed sale of the company is

17   underneath AMCK Holding -- Aviation

18   Holdings proceeds, but I haven't yet

19   received any notice of that termination,

20   just a potential notice.

21   Q.    And when would that likely be

22   if the transaction proceeds?

23   A.    Within the next month or two.

24   Q.    Will you be transitioned to any

25   of the acquiring entities?

Page 10

PAUL SHERIDAN

1

2    A.    Not necessarily, no.    It's

3  still -- not automatically, I should say

4  really.

5    Q.    Is that something under

6  discussion?

7    A.    Um, not to -- to a small

8  extent, yes.

9    Q.    Do you have any sort of

10  proposed Severance Agreements --

11    A.    Yes.    Yes.

12    Q.    -- with AMCK Aviation?

13    A.    Yes.

14    Q.    And as one of the terms of the

15  Severance Agreement, does it require you to

16  cooperate in connection with this

17  litigation?

18    A.    I haven't reviewed it fully

19  yet.  I think it does, but, yeah, I don't

20  know.

21    Q.    And were you responsible for

22  preparing any other Severance Agreements

23  for those subordinates of yours?

24    A.    I was part of the team that

25  prepared the Severance Agreements, but they

Page 11

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2    haven't been issued to anyone yet, other
 3    than template form.  So, nothing has been
 4    finalized or agreed to yet.
 5         Q.    And would Ms. O'Callaghan also
 6    have some sort of cooperation provision in
 7    connection with her severance?
 8         A.    I think so.  I can't remember.
 9         Q.    And how long will AMCK Aviation
10    continue its operations if the sale
11    proceeds?
12         A.    Um, I don't know the full
13    details.  Wind-up procedures will be
14    started, but, you know, you can't just
15    close a company down, so I haven't had that
16    discussion with the shareholders.
17              My plan was to leave the
18    company and that would be their concern.
19         Q.    So, no wind-up procedures have
20    begun?
21         A.    Not that I know.  I don't know.
22    I just haven't been part of that process.
23         Q.    All right.  You have not been
24    informed if they have?
25         A.    No.
```

Veritext
www.veritext.com

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2         I'll see if I can clarify.
 3         Does this litigation transfer
 4  to the acquiring entity in terms of
 5  responsibility to satisfy any judgment,
 6  were there to be a judgment?
 7      A.    Not entirely, I don't think so.
 8  I think there's a provision for sharing,
 9  but I don't have the details.
10      Q.    All right.  To your knowledge,
11  as part of the transaction to the Carlyle
12  Group, are -- have any of the
13  owner/trustees changed for the aircraft, at
14  least to Frontier?
15      A.    Um, not as -- I don't think
16  there are as part of the transaction.
17         And I did -- one of the
18  owner/trustees companies, Wells Fargo, is
19  retiring from the business and they may
20  have changed because of that, but I don't
21  know if Frontier is affected or is included
22  in that.
23      Q.    And to your knowledge, has
24  there any -- been any documentation
25  prepared for the owner/trustees to transfer
```

Page 16

Paul Sheridan - March 25, 2022

PAUL SHERIDAN

1

2     at the close of the transaction?

3          A.     Um, no.   I -- unless they are

4     linked to the Wells Fargo retirement, from

5     the business stand, but to my knowledge,

6     no.

7          Q.     Okay.   And same question:   In

8     connection with the owner participants,

9     have those changed as of this time in

10    connection with the aircraft leased to

11    Frontier?

12         A.     I don't think so.

13         Q.     Have the beneficial owners of

14    the aircraft, at least to Frontier, changed

15    as of this time?

16         A.     No.

17         Q.     Have -- will the benefit -- is

18    there paperwork drawn up that will cause

19    the beneficial owners to change, once the

20    deal closes?

21         A.     No.

22                The paper -- it's companies

23    above the beneficial owners that will --

24    that will have the ownership changed.

25         Q.     All right.   And the guarantors,

Page 17

Paul Sheridan - March 25, 2022

```
1                    PAUL SHERIDAN
2    has there been any change in the guarantors
3    on the aircraft, at least to Frontier
4    Airlines?
5         A.    Um, I don't think so, but I
6    can't remember which specific companies
7    are guarantors that are specific to the
8    leases.
9         Q.    Okay.  Some of the guarantors
10   are Accipiter Holding/DAC for several of
11   the aircraft.
12              Have -- has Accip -- have the
13   guarantors, who are Accipiter Holdings/DAC,
14   changed?
15        A.    I don't think so.
16        Q.    Is there any paperwork drawn up
17   to have them change at the close of the
18   transaction?
19        A.    Not to my knowledge.
20        Q.    The other guarantor for some of
21   the aircraft is Accipiter Investment
22   Aircraft 4 Limited.
23              Has that guarantor changed as
24   of this time?
25        A.    No.
```

Veritext
www.veritext.com

Paul Sheridan - March 25, 2022

```
 1                   PAUL SHERIDAN
 2              I don't think so.
 3          Q.     Is there any paperwork drafted
 4     up that would effect a change once the
 5     transaction closes?
 6          A.     I don't think so.
 7          Q.     The final guarantor is
 8     Vermillion Aviation (Two) Limited, has that
 9     guarantor changed as of this time?
10          A.     No.
11          Q.     Is there any paperwork drafted
12     up to cause that change to occur as of the
13     close of the transaction?
14          A.     No, not to my knowledge.
15          Q.     Will there be a change in the
16     lease payments by Frontier to the
17     owner/trustees --
18              MR. HOSENPUD:    Strike that.
19          Q.     Will there be a change to whom
20     Frontier makes lease payments on the
21     aircraft as you see it --
22          A.     No.
23          Q.     -- as a result of this
24     transaction?
25          A.     No.
```

Page 19

```
 1                  PAUL SHERIDAN
 2        Q.     The lease payments are
 3   currently being made for the benefit of
 4   Accipiter Investments 4 Limited and
 5   Vermillion Aviation (Two) Limited.
 6               Is there any anticipated change
 7   of lease payments being paid for the
 8   benefit of other entities?
 9        A.     Not to my knowledge, no.
10        Q.     And to your knowledge, at this
11   time, the deal documents do not reflect any
12   changes to where the lease payments are to
13   be made?
14        A.     That's correct.
15        Q.     All right.
16               MR. HOSENPUD:  I am handing you
17        Exhibit 1, sir.  (Handing.)
18               (Whereupon, Corporate structure
19        chart was marked as Sheridan Exhibit
20        1 for identification as of this date
21        by the Reporter.)
22               (Witness reviews document.)
23        Q.     Have you had a chance to review
24   Exhibit 1?
25        A.     Yes.
```

                                        Page 20

Paul Sheridan - March 25, 2022

```
 1                    PAUL SHERIDAN
 2   above that e-mail dated, March 24, 2020:
 3              "I asked Francis why they were
 4   holding back the MR cash, but he didn't
 5   really answer.  He just said "I guess a lot
 6   of focus on rent".
 7              Did I read that accurately?
 8       A.    Yes.
 9       Q.    What were you seeking to
10   understand?
11       A.    What the maintenance reserve
12   cash is the property of the lessor.  And
13   so, a lot of companies will use it in their
14   cash flows and we typically didn't.  So, in
15   this crisis time, we were considering it.
16       Q.    Because they were being held
17   back?
18       A.    Well, because it was ours to
19   use and we might have been holding it and
20   expecting to pay it to the airline in three
21   years time or four years time so you can
22   use it for your corporate purposes to date.
23       Q.    I understand.
24              And then, Mr. Kelleher, at the
25   top of this e-mail chain says:
```

Page 56

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2              "This cash flow may soothe some
 3   nerves:
 4              And then he goes on to state."
 5              "If we can buy ourselves some
 6   time or something from Frontier in terms of
 7   rents-in-advance-deduction from the
 8   purchase price, we may be able to get
 9   through this delivery.
10              Did I read that accurately?
11      A.      Yes.
12      Q.      So, do you know where Mr.
13   Kelleher came up with the idea of
14   rent-in-advance?
15              (Witness reviews document.)
16      A.      Um, I don't know where he came
17   up with the idea, but it had been discussed
18   as a potential and that -- I think from
19   what the reading that it would have been a
20   portion of the rent paid on delivery or
21   effectively deductions from the purchase
22   price and cash flow and --
23      Q.      I'm sorry.
24      A.      So, that you would then
25   effectively hand over a lower amount of
```

Page 57

Paul Sheridan - March 25, 2022

PAUL SHERIDAN

1

2   cash and purchase the aircraft.

3       Q.    So, that concept was being

4   discussed internally at AMCK Aviation as of

5   March 24, 2020, correct?

6       A.    I think so, yeah.

7       Q.    That was not one of the

8   provisions in the frame work agreement for

9   how to finance the agreement, was it?

10      A.    Um, I don't think so.  I don't

11  know.

12      Q.    He goes on to say after that:

13            "We would have a little time to

14  see how everything develops before having

15  to take the nuclear option."

16            What is the nuclear option?

17            (Witness reviews document.)

18      A.    I don't remember.  I don't

19  know.

20      Q.    Typically when that's used,

21  does it mean the most extreme option?

22      A.    I guess so, yeah.

23      Q.    And what did you understand him

24  to be saying?

25      A.    I don't remember.

Page 58

PAUL SHERIDAN

1

2      Q.      Would that be to terminate the

3 framework agreement?

4      A.      Um, it could be, but I don't

5 recall the context of -- of we're talking

6 about corporate forecasts as well and

7 whether we would have to draw down from

8 shareholders, if the deferrals went on for

9 long, but it could have been either one of

10 those draw backs.

11      Q.      Is it typical that drawing down

12 from shareholders is deemed a nuclear

13 option at AMCK Aviation?

14      A.      I mean, it was an unusual

15 situation.  I don't remember what -- I

16 mean, I can -- you would have to ask him

17 what he meant by this.

18      Q.      Drawing down from shareholders

19 was something that was done in the course

20 of business, wasn't it?

21      A.      Yes.

22           When I said drawing down from

23 shareholders, I meant other than for -- we

24 -- we would typically only have drawn down

25 from shareholders to purchase aircrafts for

Page 59

```
 1                    PAUL SHERIDAN
 2   I knew the unredacted, maybe I could.
 3        Q.    Okay.  So, you don't think the
 4   8 A320neo SLB financing opportunity
 5   pertains in any way to Frontier?
 6        A.    I don't think so, but I don't
 7   recall.
 8        Q.    So, do you know if there was a
 9   communication with Gerald about Frontier in
10   and around this time?
11        A.    I don't know specifically.
12              MR. HOSENPUD:  20.
13              (Whereupon, E-mail chain dated
14         April 3, 2020 was marked as Sheridan
15         Exhibit 20 for identification as of
16         this date by the Reporter.)
17        Q.    Exhibit 20 is an e-mail
18   exchange between you and Jane O'Callaghan,
19   dated April 3, 2020, AMCK016596-597.  And
20   she has in the bottom e-mail prepared a
21   draft for comment of a communication that
22   was to be sent to Jimmy Dempsey.
23              Do you see that?
24        A.    I do.
25        Q.    You indicate in the middle
```

Page 85

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2   section of the first page:
 3              "Do you think it's worth
 4   adding:  While we are one step removed from
 5   the front lines of the crisis, we have to
 6   manage both our cash position and our bank
 7   facilities and associated covenants and
 8   these tie our hands in what we can do in
 9   total."
10        A.    Yes.
11        Q.    What -- what in the bank
12   facilities tied your hands in any way?
13        A.    Um, I don't remember the
14   specific complaints.  There may not have
15   been very many specific ones in -- in --
16   there were some in the secured bank
17   facilities and to maintain minimum cash
18   balances to maintain particular net
19   tangible net worth at the AMCK level or
20   level Accipiter level, I can't remember
21   exactly.
22        Q.    Were there any in the unsecured
23   facilities that tied your hands?
24        A.    I don't think there were.  I
25   don't recall any that reflected AMCK or
```

Page 86

Paul Sheridan - March 25, 2022

PAUL SHERIDAN

1

2  Accipiter.

3      Q.    Okay.   In the secured

4  facilities, did those documents relate to

5  CK Assets' net worth?

6            MR. BUTLER:   Objection to form.

7      A.    I don't recall any that did.

8      Q.    Okay.   You mentioned net worth

9  being a factor to be mindful of in

10  connection with covenants and secured

11  facilities.

12            Whose net worth?

13      A.    It would have either been the

14  borrower or AMCK Aviation Holdings or

15  Accipiter Holdings, the top companies

16  within a two leasing groups.

17      Q.    And would rent deferrals impact

18  those?

19      A.    Um, to the extent that they

20  lead to any reduction in the equity

21  position of the company, yes.

22      Q.    Did any of the rent deferral

23  request lead to that reduction in the net

24  worth of these companies?

25      A.    You mean from other airlines

PAUL SHERIDAN

1

2    or...

3         Q.    Yes, just in general.

4         A.    Yes.

5         Q.    Did you violate any of the

6    facility covenants as a result?

7         A.    Um, there was a debt service

8    coverage facility --

9              THE WITNESS:  I'm sorry.

10        A.    Yes, debt service coverage

11   ratio covenant, I don't think we violated

12   the -- violated is a strong word, there

13   were provisions for what would happen if

14   they went below certain levels for holding

15   back cash.  And that was one of the secured

16   facilities and that level was breached.

17        Q.    It wasn't breached as a result

18   of Frontier receiving any deferrals, was

19   it?

20        A.    No.

21        Q.    And at what point in time was

22   it breached?

23        A.    At some point in 2020, I don't

24   recall the exact date.

25        Q.    And was the -- were those debt

Page 88

Paul Sheridan - March 25, 2022

PAUL SHERIDAN

1

2    service coverage ratios in the secured

3    facilities breached as of the time that you

4    were speaking with Frontier?

5          A.     No.

6          Q.     And --

7          A.     There was no provision for

8    measuring them at that time.

9          Q.     What do you mean by that?

10         A.     The documents required an

11   annual measurement or a measurement when

12   the aircraft got sold or prepaid.

13         Q.     Understood.

14                So, you hadn't triggered the

15   measurement portion --

16         A.     Right.

17         Q.     -- of the covenant?

18         A.     Yeah.

19         Q.     And annual year end?

20         A.     No, it was anniversary of the

21   facility I think.

22         Q.     Was that sometime after July of

23   2020?

24         A.     I think so.

25         Q.     So, any deferral for grant --

Page 89

```
 1                      PAUL SHERIDAN
 2    rent deferral granted to Frontier would not
 3    have implicated those -- that covenant that
 4    we just spoke of, correct?
 5         A.    That's correct.
 6         Q.    It then goes on, your
 7    statement:
 8               "I think we should say six
 9    months to begin with in the e-mail."
10               And she says she agrees.
11               The subject there is,
12    suspending the sale leasebacks for six
13    months; would that be accurate?
14         A.    Yeah, I -- I am not certain.
15    It looks like it, but I am not -- with
16    that.
17               (Witness reviews document.)
18               Um, it looks like that, yes.
19         Q.    Okay.
20         A.    I don't remember.
21         Q.    And that's a change from the --
22    from the prior document we looked at where
23    it had the deferral at the 3 to 6 months
24    time, correct?
25         A.    I think, I don't know.
```

Page 90

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2         an extended break.
 3              Can I take us off the record?
 4              MR. HOSENPUD:  Yes.
 5              THE VIDEOGRAPHER:  Okay.  The
 6         time is 11:07 A.M.  We're going off
 7         the record.
 8              (Whereupon, a short recess was
 9         taken.)
10              THE VIDEOGRAPHER:  The time is
11         11:09 A.M.  we are back on the
12         record.
13              You may proceed.
14              MR. HOSENPUD:  Thank you.
15     Q.    Mr. Sheridan, I am turning to
16   the second page of Exhibit 21 at 0000315.
17              (Witness complies.)
18     Q.    And the focus of this question
19   is the response of Jimmy Dempsey to the
20   proposal that was sent to him on April 3rd
21   of 2020, which we already discussed.  He
22   says to you:
23              "This is very disappointing
24   news."
25              And then states:
```

Page 100

Paul Sheridan - March 25, 2022

```
 1                  PAUL SHERIDAN
 2            "My reading of your e-mail
 3    assumes that you will only agree the rent
 4    deferral if we defer aircraft deliveries
 5    with Airbus?  As a result, I can only
 6    deduce that you will finance the aircraft
 7    deliveries and honor your commitment to
 8    Frontier if we do not put a rent deferral
 9    in place."
10            Did I read that correctly?
11       A.    Yes.
12       Q.    Did you ever confirm to
13    Frontier that without a rent deferral in
14    place, AMCK Aviation would honor its
15    commitment regarding financing the
16    remaining aircraft deliveries?
17       A.    I don't recall any confirmation
18    of that, but...
19            Q.    So, let's turn to Exhibit 22.
20            (Whereupon, E-mail chain dated
21         April 6, 2020 was marked as Sheridan
22         Exhibit 22 for identification as of
23         this date by the Reporter.)
24            (Witness complies.)
25            (Handing.)
```

Page 101

Paul Sheridan - March 25, 2022

```
 1                    PAUL SHERIDAN
 2              "I'll check with Jane to see if
 3      they responded to this," correct?
 4           A.     Yeah.
 5           Q.     All right.
 6                  (Whereupon, E-mail chain dated
 7            April 9, 2020, April 8, 2020 and
 8            April 7, 2020 was marked as Sheridan
 9            Exhibit 28 for identification as of
10            this date by the Reporter.)
11           Q.     I have handed you Exhibit 28.
12      And this is an e-mail chain dated April 9th
13      and April 8th as -- as well as April 7th,
14      it picks up on the chain that we'd seen
15      before.   It is AMCK033918 through 033923.
16      My focus is going to be on the second page,
17      033919, and it is the e-mail you wrote as
18      of April 8, 2020.
19                  Take a look at that first.
20                  (Witness reviews document.)
21           A.     Okay.
22           Q.     So, you say:
23                  "Hi, all.
24                  A quick update on the situation
25      with Frontier.   They will formally ask
```

Page 112

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2    Airbus for a deferral this week.  I spoke
 3    with the CFO again yesterday to reiterate
 4    that our aim at this stage is to find a way
 5    to work with them to get the deliveries
 6    deferred and that since between us,
 7    Frontier and Airbus, one of the three has
 8    to take the hit, but our aim was to -- was
 9    to make sure that would be Airbus."
10              Did I read that accurate?
11        A.     Yes.
12        Q.     It goes on to say:
13             "I said that I wouldn't tell
14    him at this stage that what we would do if
15    that didn't happen because I think that it
16    would require a board approval for us to
17    walk away."
18              So, my question is this:  Did
19    you just simply say to Mr. Dempsey -- he's
20    the CFO, correct?
21        A.     Correct.
22        Q.     Did you simply say to Mr.
23    Dempsey, "I won't say what we would do if
24    the deferral does not happen"?
25        A.     I don't recall the specifics of
```

Page 113

```
 1                   PAUL SHERIDAN
 2   that conversation, but what I reported here
 3   is -- he -- looks like he would have asked
 4   me what would happened in that
 5   circumstance, and I said, I don't know, I
 6   can't tell you what we'd be doing.
 7        Q.    And then you go on to note:
 8              "They are not arguing against
 9   us, but are -- are understandably worried
10   about being in a default position with
11   Airbus.  Indigo partners hasn't entered the
12   conversation yet, but he expects this to
13   happen soon.  In the meantime, he asks for
14   us to do the deferral on a month-by-month
15   basis (so --
16              MR. HOSENPUD:  Strike that.
17        Q.    (They are also conscious that
18   they do not want to be in default with us.)
19   Since the next delivery isn't going to be
20   in April now that Mobile -- the Mobile
21   plant is shut.  I think we can agree to
22   this and give them a bit more time to work
23   with Airbus."
24              Did I read that accurate?
25        A.    You did.
```

Page 114

```
 1              PAUL SHERIDAN
 2    by saying:
 3              "Robert is chasing me for
 4    feedback from the Board Meeting.  He says
 5    Airbus now waiting for an answer from
 6    them."
 7              And then, I think you respond
 8    with the following:
 9              "Would it be pushing too much
10    to ask for the extension on more than
11    five?"
12              And she says:
13              "Yes, I think so, but we can
14    start out asking for that."
15              Correct?
16       A.    Correct.
17              MR. HOSENPUD:   Exhibit 38.
18              (Whereupon, E-mail chain dated
19    April 27, 2020 was marked as Sheridan
20    Exhibit 38 for identification as of
21    this date by the Reporter.)
22              (Handing.)
23              (Witness reviews document.)
24              MR. HOSENPUD:   Just for the
25    record, the Exhibit 38 is an April
```

Page 142

PAUL SHERIDAN

2        27, 2020 e-mail chain starting with

3        you to Jimmy Dempsey.  It is Frontier

4        0000338 through 342.

5    Q.    And I am going to just focus on

6    the first page because the rest we have

7    spoken about in one form or another.

8    A.    Okay.

9    Q.    And I would like to call your

10    attention to the middle e-mail from Jimmy

11    Dempsey on April 27, 2020 where he says:

12        "Hi, Paul.

13        I have just been briefed by

14    Robert and I was working on the assumption

15    that we had to be current on all rent for

16    you to finance the upcoming deliveries.

17    This is set out in your e-mail below.  I

18    put a scheme in place with Airbus that

19    would facilitate short-term deferrals of

20    the aircraft on the basis that you would

21    honor your agreement.  Please confirm this

22    is the case as we have a lease sign for

23    these aircrafts and are willing to ensure

24    the deferred rent is paid as a CP of

25    delivery."

Page 143

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2          Did I read that accurately?
 3     A.    Yes.
 4     Q.    Do you understand the capital
 5  CP to mean condition precedent or
 6  precedent?
 7     A.    I do yes.
 8     Q.    Did you ever confirm for Mr.
 9  Dempsey what he was asking you to do?
10          (Witness reviews document.)
11     A.    No, I would have just sent this
12  e-mail response back, I think.  I am not
13  certain when I read it exactly what he was
14  asking me to do.
15     Q.    If you read the sentence that
16  says, "I put a scheme in place with Airbus
17  that would facilitate short-term deferrals
18  of the aircraft on the basis that you would
19  honor your agreement," did you ever confirm
20  that you would honor your agreement?
21     A.    Well, where -- that's the
22  sentence that I was a bit confused about
23  because we had discussed the deferrals of
24  Airbus aircraft as a means of also
25  facilitating the deferral of the rent and
```

Page 144

Paul Sheridan - March 25, 2022

```
 1                PAUL SHERIDAN
 2    rather than anything else.
 3        Q.    The sentence that says, "Please
 4    confirm this is the case as we have a lease
 5    sign for these aircraft and are willing to
 6    ensure the deferred rent is paid as a CP of
 7    delivery," isn't he referring to the 2020
 8    framework agreement in that sentence?
 9        A.    I think -- when he says a lease
10    signed, he probably means framework
11    agreement, rather than the lease itself,
12    which wouldn't have been signed at the
13    time.
14        Q.    Okay.  And then your response
15    is, basically you've been in discussion
16    with the shareholders and will need to
17    follow up with them again tomorrow morning?
18        A.    Yeah.
19        Q.    All right.
20              (Whereupon, E-mail dated April
21          27, 2020 was marked as Sheridan
22          Exhibit 39 for identification as of
23          this date by the Reporter.)
24        Q.    Exhibit 39 is an e-mail from
25    you to Gerald Ma, Francis Lee and a copy to
```

Page 145

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN
 2        A.    As the second of the three
 3    conditions, yes.
 4        Q.    Okay.  And then the third
 5    condition regarding four year extensions on
 6    12 A320s and elimination of a removal of
 7    the early termination options on the six
 8    aircraft from the latest deal, that would
 9    mean 2020 framework agreement, correct?
10        A.    Yes.
11        Q.    And that the extensions would
12    only apply if there are any payment related
13    defaults out to 15 May, 2021.  These were
14    not part of the original framework
15    agreement, were they?
16        A.    That's correct.
17        Q.    And Mr. Dempsey's response was,
18    you need call me as soon as possible.  This
19    is an overreach and then gives you his
20    number, correct?
21        A.    Yes.
22        Q.    And you had that call, didn't
23    you?
24        A.    Yes.
25        Q.    And do you remember what was
```

Page 158

Paul Sheridan - March 25, 2022

```
 1              PAUL SHERIDAN

 2   said on the call?

 3        A.    I don't remember specifically

 4   other than it was Jimmy rejecting our

 5   proposal in strong terms.

 6        Q.    And when you say "in strong

 7   terms," do you mean -- what do you mean?

 8        A.    I think he was -- from my

 9   memory, he was angry about it.

10        Q.    Did you anticipate that he

11   would be?

12        A.    I think so, yeah.

13        Q.    And why?

14        A.    I dealt with him on a number of

15   occasions, it was quite a fraught

16   situation.

17        Q.    But did you anticipate because

18   the terms had changed from what had

19   previously been discussed that he would

20   have a reaction that would be one of anger?

21        A.    Um, yeah.  I mean, we were

22   proposing something as a discussion point

23   that was outside of what was in the

24   framework agreement, we were aware of -- of

25   that and -- and aware of the fraud
```

Page 159

PAUL SHERIDAN

1

2      discussions that are no longer before that

3      so I assume that was the idea.

4          Q.      Had you ever proposed a similar

5      type of lease extensions to any other

6      airlines for whom you have an obligation to

7      purchase aircraft as a condition to going

8      through the purchase?

9          A.      I don't think so, no.

10              MR. HOSENPUD:  Exhibit 47.

11              (Whereupon, E-mail chain dated

12          April 30, 2020 was marked as Sheridan

13          Exhibit 47 for identification as of

14          this date by the Reporter.)

15          Q.    Exhibit 47 is an April 30, 2020

16     e-mail exchange AMCK031600 through 031605.

17     My focus will be only on the first page.

18              (Witness complies.)

19          A.    Okay.

20          Q.    So, this is your e-mail to

21     Francis -- to Gerald Ma, carbon copy

22     Francis Li and Lillian Kiang as well as

23     Jane O'Callaghan, call on Frontier and

24     Volaris is the subject line.  Here you

25     indicate, Frank!  Discussion with Jimmy

Page 160

```
 1                  PAUL SHERIDAN
 2   AMCK, we would have produced a written
 3   paper, rather than a presentation of
 4   slides.
 5          Q.    Oh, I see.  Okay.  So, the
 6   slides that you just referenced are for the
 7   Investment Committee meetings?
 8          A.    I think that that's what these
 9   are referring to, yeah.
10          Q.    And do you attend those
11   meetings?
12          A.    No.
13          Q.    All right.
14              (Whereupon, E-mail dated May 8,
15            2020 was marked as Sheridan Exhibit
16            49 for identification as of this date
17            by the Reporter.)
18          Q.    Exhibit 49 is an e-mail chain
19   to you from Jimmy Dempsey, dated May 8,
20   2020.  It is AMCK017004 through 009.  And
21   my focus is going to be on the first page.
22              (Witness reviews document.)
23          A.    Okay.  Okay.
24          Q.    Mr. Dempsey opens his e-mail to
25   you in the middle of the page:
```

Page 172

PAUL SHERIDAN

1

2          "Hi, Paul.  I have been waiting

3   patiently for your response to our call

4   whereby offered the following solution."

5          Did you communicate with him

6   after receiving this e-mail?

7          (Witness reviews document.)

8      A.    I don't think I did, no.

9      Q.    Okay.

10     A.    Not on these topics, no.

11     Q.    Did anybody communicate with

12  him from AMCK after your receipt of the May

13  8, 2020 e-mail on May 8th?

14     A.    Um, well, I sent them the, um,

15  the termination notice via the framework

16  agreement.

17     Q.    Excluding that?

18     A.    Excluding that, I don't think

19  so.

20          (Whereupon, Skype meeting dated

21       May 8, 2020 was marked as Sheridan

22       Exhibit 50 for identification as of

23       this date by the Reporter.)

24     Q.    All right.  Let's look at

25  Exhibit 50.  Exhibit 50 is a Skype meeting

Page 173

```
 1                    PAUL SHERIDAN
 2            C E R T I F I C A T E
 3
 4    STATE OF NEW YORK        )
                               :   SS.:
 5    COUNTY OF NEW YORK       )
 6
 7         I, KARYN CHIUSANO, a Notary Public
 8    for and within the State of New York, do
 9    hereby certify:
10         That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14         I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 28th day of March, 2020.
21
22
23
                    KARYN CHIUSANO
24
25

                              Page 208
```