# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FRONTIER AIRLINES, INC.,

                    Plaintiff,

    v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION (TWO)
LIMITED, WELLS FARGO TRUST COMPANY,
N.A., solely in its capacity as OWNER TRUSTEE,
and UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE,

                    Defendants.

20 Civ. 9713 (LLS)

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated: December 30, 2022

Jeff E. Butler
John P. Alexander
Gege Weinberg
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

Introduction.................................................................................................................1

Argument ..................................................................................................................2

I.  FRONTIER'S CLAIMS FOR BREACH OF THE FRAMEWORK
    AGREEMENT SHOULD BE REJECTED AS A MATTER OF
    LAW. ..........................................................................................................2

    A.  Termination of the Framework Agreement Was Justified by
        Frontier's Non-Payment of Rent (Second Claim). .......................2

        1.  There Was No Rent Deferral Agreement or Waiver That
            Would Preclude Termination.............................................2

        2.  AMCK Was Not Required to Give Frontier Notice and an
            Opportunity to Cure Its Payment Defaults.......................11

    B.  Frontier's Claim of an Earlier Repudiation (First Claim)
        Should Be Rejected as a Matter of Law......................................14

    C.  Frontier's Claim for Breach of the Implied Covenant of Good
        Faith and Fair Dealing (Fourth Claim) Should Be Rejected as a
        Matter of Law. ..........................................................................15

    D.  There Is No Valid Claim Under the Framework Agreement
        Against Any Other Defendant. ..................................................16

II. FRONTIER'S NON-CONTRACT CLAIMS REGARDING THE
    FRAMEWORK AGREEMENT SHOULD BE REJECTED AS A
    MATTER OF LAW......................................................................................17

    A.  Frontier's Promissory Estoppel Claim (Sixth Claim) Should Be
        Rejected as a Matter of Law. ....................................................17

    B.  Frontier's Fraud Claim (Seventh Claim) Should Be Rejected as
        a Matter of Law..........................................................................18

III. FRONTIER'S CLAIMS FOR BREACH OF THE LEASE
     AGREEMENTS SHOULD BE REJECTED AS A MATTER OF
     LAW. ..........................................................................................................19

Conclusion ..................................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*644 E. 14th Realty LLC v. Mount Sinai Health Sys., Inc.*,
  205 A.D.3d 405 (1st Dep't 2022) ............................................. 18

*ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*,
  No. 19 Civ. 7800, 2021 WL 1177532 (S.D.N.Y. Mar. 29, 2021) ........................................... 19

*AG Props. of Kingston, LLC v. Besicorp-Empire Dev. Co.*,
  14 A.D.3d 971 (3d Dep't 2005) ............................................. 14

*ARP Films, Inc. v. Marvel Entertainment Group*,
  952 F.2d 643 (2d Cir. 1991) ............................................. 14

*Bigda v. Fischbach Corp.*,
  898 F. Supp. 1004 (S.D.N.Y. 1995) ............................................. 13-14

*Ciaramella v. Reader's Digest Assn., Inc.*,
  131 F.3d 320, 322 (2d Cir.1997) ............................................. 4

*City of N.Y. v. N.Y. Pizzeria Delicatessen, Inc.*,
  No. 05 Civ. 2754, 2006 WL 2850237 (S.D.N.Y. Sept. 29, 2006) ........................................... 15

*CS First Bos. Ltd. v. Behar*,
  No. 94 Civ. 7167, 1996 WL 384893 (S.D.N.Y. July 9, 1996) ............................................. 13

*EchoStar Satellite, LLC v. ESPN, Inc.*,
  79 A.D.3d 614 (1st Dep't 2010) ............................................. 4

*Envirotech Corp. v. Bethlehem Steel Corp.*,
  729 F.2d 70 (2d Cir. 1984) ............................................. 16

*Faulkner v. Nat'l Geographic Soc.*,
  452 F. Supp. 2d 369 (S.D.N.Y. 2006) ............................................. 3

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
  7 N.Y.3d 96 (2006) ............................................. 4

*Glencore Ltd. v. Degussa Engineered Carbons L.P.*,
  848 F. Supp. 2d 410 (S.D.N.Y. 2012) ............................................. 3-4

*Hayes v. New York City Dep't of Corr.*,
  84 F.3d 614 (2d Cir. 1996) ............................................. 7

*HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*,
    994 F. Supp. 2d 520 (S.D.N.Y. 2014).................................................................. 15

*In re Houbigant Inc.*,
    914 F. Supp. 964 (S.D.N.Y. 1995)..................................................................... 16

*Jordan Panel Sys., Corp. v. Turner Const. Co.*,
    45 A.D.3d 165 (1st Dep't 2007) ................................................................. 10-11

*Krumme v. WestPoint Stevens Inc.*,
    143 F.3d 71 (2d Cir. 1998)................................................................................ 10

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012)............................................................... 14

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*,
    930 F. Supp. 2d 532 (S.D.N.Y. 2013)............................................................... 12

*Norwest Fin., Inc. v. Fernandez*,
    86 F. Supp. 2d 212 (S.D.N.Y. 2000)................................................................. 13

*Oleg Cassini, Inc. v. Couture Coordinates, Inc.*,
    297 F. Supp. 821 (S.D.N.Y. 1969)............................................................. 13, 14

*Omega Engineering, Inc. v. Omega, S.A.*,
    432 F.3d 437, 444 (2d Cir. 2005) ...................................................................... 4

*Otiniano v. Magier*,
    181 A.D.2d 438 (1st Dep't 1992) ..................................................................... 21

*Paxi, LLC v. Shiseido Americas Corp.*,
    636 F. Supp. 2d 275 (S.D.N.Y. 2009)............................................................... 17

*Red Fort Capital, Inc. v. Guardhouse Prods. LLC*,
    397 F. Supp. 3d 456 (S.D.N.Y. 2019)......................................................... 19-20

*Ronis v. Carmine's Broadway Feast, Inc.*,
    No. 10 Civ. 3355, 2011 WL 4444307 (S.D.N.Y. Sept. 26, 2011) ...................... 12-13

*Rosendale v. Mr. Cooper Grp. Inc.*,
    No. 19 Civ. 9263, 2021 WL 4066821 (S.D.N.Y. Sept. 7, 2021) ............................ 12

*Rouse v. Elliot Stevens, Ltd.*,
    No. 13 Civ. 1443, 2016 WL 8674688 (S.D.N.Y. June 24, 2016).............................. 19

*S. Fed. Sav. & Loan Ass'n of Georgia v. 21-26 E. 105th St. Assocs.*,
    145 B.R. 375 (S.D.N.Y. 1991) ........................................................... 18

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
    No. 97 Civ. 5499, 2004 WL 691680 (S.D.N.Y. Mar. 31, 2004) ............................ 10

*Stonehill Cap. Mgmt., LLC v. Bank of the W.*,
    28 N.Y.3d 439 (2016) ...................................................................... 3

*Sugerman v. MCY Music World, Inc.*,
    158 F. Supp. 2d 316 (S.D.N.Y. 2001) .................................................... 7

*Summit Health v. APS Healthcare Bethesda, Inc.*,
    993 F. Supp. 2d 379 (S.D.N.Y. 2014) .................................................... 9

*TN Metro Holdings I, LLC v. Commonwealth Ins. Co.*,
    51 F. Supp. 3d 405 (S.D.N.Y. 2014) .................................................... 19

*Toto, Inc. v. Sony Music Entertainment*,
    No. 12 Civ. 1434, 2012 WL 6136365 (S.D.N.Y. Dec. 11, 2012) ........................ 15

*Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*,
    26 F. Supp. 2d 698 (S.D.N.Y. 1998) .................................................... 20

*Triangle Underwriters, Inc. v. Honeywell, Inc.*,
    604 F.2d 737 (2d Cir. 1979) ............................................................ 19

*Union Cosm. Castle, Inc. v. Amorepacific Cosms. USA, Inc.*,
    454 F. Supp. 2d 62 (E.D.N.Y. 2006) ................................................. 17-18

*Whitecap (U.S.) Fund I, LP v. Siemens First Cap. Com. Fin. LLC*,
    121 A.D.3d 584 (1st Dep't 2014) ....................................................... 13

*Winston v. Mediafare Enertainment Corp.*,
    777 F.2d 78 (2d Cir. 1986) .............................................................. 4

Defendants AMCK Aviation Holdings Ireland Limited ("AMCK"), Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), UMB Bank, N.A., not in its individual capacity but solely as owner trustee ("UMB"), and Wells Fargo Trust Company, N.A., not in its individual capacity but solely as owner trustee ("Wells Fargo"), submit this Reply Memorandum of Law in further support of their Motion for Summary Judgment.[1]

## Introduction

The central claim made by Frontier in this case is that AMCK breached the Framework Agreement when it terminated that agreement on May 8, 2020. Frontier does not dispute AMCK's stated basis for termination, namely, that Frontier failed to pay rent on 14 aircraft lease agreements in April and early May totaling nearly $5 million. Instead, Frontier argues that AMCK orally agreed that Frontier did not have to pay rent "while all parties worked on a global resolution." (*See* Opp. 1.)

The time has now come to assess whether there is evidence sufficient to create a triable issue of fact on whether a binding agreement to defer rent was reached. Basic principles of contract formation necessarily come into play, including whether there is objective evidence of assent by both parties and whether the parties intended to be bound by oral discussions without a written agreement. Applying these principles, the evidence submitted by Frontier fails to show that a contract was formed. It indicates, at most, that Frontier's CFO, James Dempsey, *believed*

---

[1] Capitalized terms used herein and not otherwise defined have the meaning given them in Defendants' memorandum of law filed on November 11, 2022 ("Defs.' Mem."). Reference is also made to Frontier's opposition memorandum of law ("Opp.") and its response to Defendants' Statement of Material Facts ("Frontier SMF").

an agreement had been reached.  One party's subjective belief, however, is not enough to establish a legally-binding agreement.

Frontier's other claims have even less support in the factual record.  They are either duplicative of Frontier's main claim for breach of contract, or they are wholly lacking in any factual basis.  For these reasons, the Court should grant summary judgment in favor of Defendants on all of the claims in this action.

<u>Argument</u>

## I.    FRONTIER'S CLAIMS FOR BREACH OF THE FRAMEWORK AGREEMENT SHOULD BE REJECTED AS A MATTER OF LAW.

### A.    Termination of the Framework Agreement Was Justified by Frontier's Non-Payment of Rent (Second Claim).

There is no dispute that Frontier failed to pay rent on the 14 original leases during the month of April 2020, and during the first week of May 2020.  (*See* SMF & Frontier Response ¶ 24.)  Non-payment of rent under these contracts constituted a cross-default under the MSN 10038 Lease and, therefore, a Framework Event of Default under the Framework Agreement.  (*See* Defs.' Mem. 11.)  AMCK terminated the Framework Agreement on May 8, 2020 based on this Framework Event of Default, as specifically provided under the Framework Agreement.  To avoid summary judgment based on this simple set of undisputed facts, Frontier must present evidence that AMCK was subject to an agreement to defer rent—*i.e.*, an agreement *not* to terminate based on non-payment of rent—as of May 8, 2020.  None of the evidence submitted by Frontier creates a triable issue of fact on this issue.

#### 1.    There Was No Rent Deferral Agreement or Waiver That Would Preclude Termination.

Frontier argues that the parties "agreed to defer rent" on the 14 original leases "while negotiations were ongoing."  (Opp. 25.)  There is no writing evidencing such an agreement.

(*See, e.g.*, SMF & Frontier Response ¶ 26.)   For this reason, Frontier contends that AMCK agreed to a rent deferral through oral discussions and by implication.  However, this line of argument is foreclosed by the plain contract language.  Section 8.4.1 of the Framework Agreement (and similar language in the lease agreements) provides that the parties' rights may not be "waived or varied otherwise than by an *express waiver or variation in writing*." (O'Callaghan Decl. Ex. 4, § 8.4.1 (emphasis added).)

Frontier argues that Section 8.4.1 should be interpreted to provide different standards for waiver and variation—*i.e.*, that a waiver need only be "express" and need not be "in writing." (Opp. 25-26.)  This is not a reasonable interpretation of the contract language.  Section 8.4.1 treats waivers and variations in the same way, and requires that they be both express and in writing.

Assuming, for purposes of argument, that Section 8.4.1 does not bar Frontier's claim as a matter of law, summary judgment is still appropriate because Frontier has not presented evidence that a binding agreement to defer rent was formed.   At most, the evidence shows that the parties *discussed* deferral of rent on a month-to-month basis, subject to working out further details in a written agreement.

Under New York law, a binding agreement requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448–49 (2016). Moreover, "only objective manifestations of intent are relevant under New York law."  *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 377 (S.D.N.Y. 2006).  Thus, "any subjective views of the parties as to the existence of a binding contract are irrelevant, as it is long-settled that a contract has . . . nothing to do with personal, or individual, intent of the parties."  *Glencore*

*Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 424 (S.D.N.Y. 2012) (internal quotation marks omitted).[2]

There are circumstances in which an oral agreement may be entered even though the parties contemplate subsequent documentation in a written agreement.  As the Second Circuit observed in *Winston v. Mediafare Enertainment Corp.*, 777 F.2d 78 (2d Cir. 1986):

> [The] freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement.  In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution.  On the other hand, if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.

*Id.* at 80–81; *see also Ciaramella v. Reader's Digest Assn., Inc.*, 131 F.3d 320, 322 (2d Cir.1997) ("However, if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then.")  *Winston* sets forth the several factors a court should consider to determine whether the parties intended to be bound without a written document, including "whether all of the terms of the alleged agreement have been agreed upon" and "whether the agreement at issue is the type of contract that is usually committed to writing."  *See* 777 F.2d at 80; *see also Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005).

Here, there is evidence of three events relevant to rent payment: (1) on April 6, 2020, AMCK agreed to a 10-day forbearance period; (2) on April 7, 2020, the parties discussed rent on a "month-to-month" basis; and (3) on April 30, 2020, Frontier rejected an offer to defer rent to

---

[2] Similarly, contract rights may be waived only when they are "knowingly, voluntarily and intentionally abandoned" through a "clear manifestation of intent."  *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006) (internal quotation marks omitted); *EchoStar Satellite, LLC v. ESPN, Inc.*, 79 A.D.3d 614, 617 (1st Dep't 2010) (waiver cannot be inferred from a "doubtful or equivocal act").

May 15, 2020.  There is objective evidence of an agreement or waiver for only one of these events—the 10-day grace period confirmed in writing on April 6, 2020.  With respect to the others, the evidence clearly indicates that the parties did not intend to be bound unless a written agreement addressing all material terms was signed.  Based on this evidence, no reasonable jury could conclude that a binding agreement to defer rent was in place when AMCK terminated the Framework Agreement.

### *April 6, 2020 10-Day Grace Period*

There is no dispute that AMCK agreed to a 10-day forbearance period on April 6, 2020.  In a confirming email, AMCK CEO Paul Sheridan stated that AMCK would not "take any actions or call any defaults linked to non payment of rents on any aircraft where the rent is due from today to 21 April (ie, for the next 10 working days)."  (*See* Sheridan Decl. Ex. 4.)  In this case, the email communication supplies the necessary objective manifestation of assent.

The April 6 email provides important context for subsequent events.  *First*, the email is not a fully-fledged rent deferral agreement, *i.e.*, it does not change the dates on which any rent payment is due.  Instead, it confirms that rent payment defaults by Fronter will occur, and waives the right to act on those defaults for a strictly-defined period of 10 business days.  *Second*, to state the obvious, the email itself is writing confirming an earlier telephone conversation.  The April 6 email is therefore consistent with other evidence that these sophisticated commercial parties normally documented any modification to their agreements in writing.  (*See* Sheridan Decl. ¶ 4.)

### *April 7, 2020 Discussion of "Month to Month" Deferral*

The next day, Mr. Sheridan and Mr. Dempsey had a telephone call during which a "month to month" deferral was discussed.  Frontier contends that an oral agreement was reached

on this call to defer rent "until all negotiations were complete." (Opp. 26.) Frontier has not

submitted evidence, however, establishing such an agreement. To the contrary, the evidence

shows that (1) not all material terms were agreed and (2) both sides expected an agreement to be

documented in writing.

Frontier relies mainly on Mr. Dempsey. In his declaration, Mr. Dempsey does not claim

to remember any of the words spoken during the April 7 conversation. Instead, he states that

"we agreed" to a month to month deferral, and characterizes his "understanding" that the deferral

period would extend into May 2020. (Dempsey Decl. ¶ 15.) These conclusory and subjective

observations in Mr. Dempsey's declaration do not establish that all material terms were agreed,

or that the parties agreed that no writing was necessary.

Mr. Dempsey provided a more detailed account of the telephone call at his deposition.

When asked about Mr. Sheridan's exact words, Mr. Dempsey testified as follows:

> Q.   Do you remember what Mr. Sheridan said about the month-to-month deferral idea?
>
> A.   Yes, he said that he would agree to a month-to-month deferral.
>
> Q.   Were those his exact words?
>
> A.   I don't recall his exact words, but that was the essence of what he said.
>
> Q.   You said he would agree to it. Was it your expectation that this month-to-month deferral would be documented in writing?
>
> A.   I had been given an undertaking by Paul that we would move to a month to month as opposed to ten days, and as a result, I took his word for it. What we really wanted to do was document a longer term solution to the issues that existed.

(Dempsey Tr. 76:10-77:20.) Mr. Dempsey also clarified that the deferral discussed would not be

indefinite in nature:

> Q.   So was it your understanding that this was an indefinite deferral of

rent under your agreements with AMCK?

A.     No, it was a fluid situation, but clearly, at this point, it was for the
month of April.

(*Id.* 77:15-20.)  Thus, the testimony of Mr. Dempsey establishes only that Mr. Sheridan said he

"would agree" or "would move" to a month-to-month deferral.  It does *not* establish that

Mr. Sheridan agreed to all material terms of a rent deferral agreement, or that he intended the

telephone conversation to be binding in the absence of a written agreement.[3]

Other facts about the April 7 call indicate that the parties did not intend to create a

binding agreement at that time.  First, there was no discussion on the call about terms that would

have been material to a rent deferral including, for example, the repayment period for deferred

rent.  (*See* Dempsey Tr. 79:22-80:12; Sheridan Decl. ¶ 11.)[4]  Also, there was no indication on the

call that the parties intended to depart from the normal practice of documenting their agreements

in writing.  (*See* O'Callaghan Decl. Ex. 8; Sheridan Decl. ¶ 4; Dempsey Tr. 24:20-25:8, 39:13-

40:20, 83:25-84:8.)

In addition to these facts, subsequent events confirm that neither side intended to be

bound by the April 7 call.  In an internal exchange of texts at Frontier on April 7, 2020, Robert

Fanning asked Mr. Dempsey whether there had been discussion "on the repayment period" and

---

[3] To the extent Mr. Dempsey's declaration is construed as contradicting his deposition
testimony, the declaration should be disregarded.  It is well-settled that "a party may not create
an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by
omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New
York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (internal citations and quotation marks
omitted).

[4] It is well-settled that, "[i]f an agreement is not reasonably certain in its material terms, there
can be no legally enforceable contract."   *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d
316, 325 (S.D.N.Y. 2001) (granting summary judgment because there was "no manifestation of
mutual assent to the material terms of any stock option arrangement").

whether AMCK was "going to send our revised agreement over." (Hosenpud Decl. Ex. 34.)[5]
Mr. Dempsey replied: "No but we should stick to 9 months from July 1. Let's get a draft to
him." (*Id.*) This exchange of texts within Frontier shows unequivocally that agreement was not
reached on all material terms, and that Mr. Dempsey expected an agreement to be documented in
writing.

On the AMCK side, Mr. Sheridan sent an email to representatives of AMCK's
shareholder describing the April 7 telephone call. He said that Mr. Dempsey had "asked for us
to do the deferral on a month by month basis." (Hosenpud Decl. Ex. 33; *see also* Sheridan Decl.
¶ 11.) Mr. Sheridan went on to say: "I think we can agree to this," and the shareholder
representatives responded by saying that they were agreeable to a month-to-month deferral at six
percent interest. (*Id.*) Mr. Sheridan later asked Jane O'Callaghan of AMCK to send draft
documentation of such an arrangement to Frontier for their review. (Sheridan Decl. ¶ 12.)

Two days after the April 7 call, on April 9, 2020, AMCK sent Frontier a draft
forbearance letter setting forth the terms on which AMCK would defer April rent. (*See*
O'Callaghan Decl. ¶ 25 & Ex. 16; SMF & Response ¶ 27.) The letter addressed only the rent
due in April and made no mention of deferring rent due in subsequent months. As to the
repayment period, the letter specified that, subject to the terms therein, the April rent would be
due "on or before 24 July 2020." (O'Callaghan Decl. Ex. 16, § 2.1.) In other words, AMCK
was proposing a repayment period for these amounts of three months from the payment due date,
rather than "9 months from July 1" as proposed by Mr. Dempsey in his internal text exchange.

---

[5] In Exhibit 34 of the Hosenpud Declaration, the exchange between Mr. Dempsey and
Mr. Fanning is split into two pages—with messages sent by Mr. Dempsey on the first page, and
messages sent by Mr. Fanning on the second page. The time stamp following each message
indicates the chronology in which messages were sent. (*See* Dempsey Tr. 82:3-84:21.)

(Hosenpud Decl. Ex. 34.)  The letter also stated that the agreement would be effective only upon signing by Frontier.  (O'Callaghan Decl. Ex. 16, § 2.2.)  It is undisputed that Frontier never responded to this draft, and the parties never entered into any written agreement arising from the April 7 call.  (SMF & Frontier Response ¶¶ 26-27.)  This draft agreement clearly establishes that (1) the parties had not reached agreement on the repayment period and (2) AMCK did not intend to be bound by the oral discussion on April 7.  *See McElroy v. Gemark Alloy Ref. Corp.*, 592 F. Supp. 2d 508, 519 (S.D.N.Y. 2008) (granting summary judgment because a draft agreement showed that one side did not consider itself bound by oral discussions).

In sum, the evidence concerning the April 7, 2020 telephone call is not sufficient to establish an agreement of any kind on the deferral of rent.  There was no objective manifestation of assent by AMCK and the material terms of rent deferral—including the repayment period— were not discussed.  Moreover, subsequent internal communications on each side confirm that the two sides had different views about what was discussed, and that both sides expected a written agreement to be entered.  Based on all the evidence, no reasonable jury could conclude that a binding agreement was reached on the April 7 call.[6]

*Communications on April 30, 2020*

Frontier asserts that the parties' communications on April 30, 2020 "led Frontier to believe that the rent deferral agreement had extended at least until May 15, 2020."  (Frontier SMF ¶ 63; *see also* Opp. 13-14, 28.)  The chronology of events on that day is undisputed:

- As reflected in an internal AMCK email, Frontier offered various terms to AMCK, including that it would "immediately pay outstanding April rents . . . ."

---

[6] To the extent Frontier contends that the April 7 call involved a unilateral *waiver* by AMCK—as opposed to an agreement—then AMCK's April 9 draft agreement represented a withdrawal of any such waiver.  A waiver may be withdrawn "as long as the counterparty receives notice of the withdrawal and is given a reasonable time to perform."  *Summit Health v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 400 (S.D.N.Y. 2014).

(Hosenpud Decl. Ex. 44.)

- AMCK responded in an email later that day.  In the email, Mr. Sheridan proposed an arrangement that included payment of all rent by May 15, 2020.  The proposal also included "conditions" that the lease terms be extended and early termination options be removed from the Framework Agreement.  (*See* Sheridan Decl. ¶ 15 & Ex. 10.)

- Frontier immediately rejected AMCK's proposal by email, saying it was an "overreach."  (Sheridan Decl. Ex. 11; Dempsey Tr. 142:8-24.)

- On a telephone call later that day, Frontier made an alternative proposal, but "AMCK never responded" to this offer.  (Dempsey Decl. ¶ 22; Hosenpud Decl. Ex. 48.)

As a matter of law, these exchanges do not amount to an agreement or waiver of any kind.

*First*, there is no dispute that Frontier rejected the offer contained in AMCK's April 30, 2020 email.  (*See* Opp. 14, 28.)  Frontier asserts that it nevertheless "agreed" to the term regarding payment by May 15, 2020.  (Frontier SMF Response ¶ 15.)  However, Frontier was not free to pick-and-choose the parts of AMCK's offer that it liked.  Indeed, "[u]nder New York law, an acceptance must comply with the terms of the offer," and so, "[a] proposal to accept the offer if modified or an acceptance subject to other terms and conditions is equivalent to an absolute rejection of the offer."  *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (internal quotation marks and alterations omitted).  Thus, even if the parties' proposals overlapped in some respects, this does not mean there was "a partial agreement with regards to the overlapping terms; there is simply no agreement."  *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499, 2004 WL 691680, at *17 (S.D.N.Y. Mar. 31, 2004).

*Second*, Mr. Sheridan's April 30 email stated expressly that it was "for discussion purposes only" and does not create "any binding obligations" by AMCK.  (Sheridan Decl. Ex. 10.)  Thus, the April 30 email cannot be construed as a waiver of Frontier's rent payment obligations.  *See Jordan Panel Sys., Corp. v. Turner Const. Co.*, 45 A.D.3d 165, 179 (1st Dep't

2007) ("In the context of arm's-length bargaining between sophisticated commercial entities, we see no justification for such nullification of the express limitations one party placed on the conditions under which it would become contractually bound.").

In short, there is no way that the exchange of communications on April 30 can be characterized as a meeting of the minds on rent deferral. The evidence conclusively shows that the parties did not agree on anything that day.

### 2.    AMCK Was Not Required to Give Frontier Notice and an Opportunity to Cure Its Payment Defaults.

Frontier argues that AMCK could not terminate the Framework Agreement unless it first gave Frontier notice and an opportunity to cure its payment defaults. (Opp. 28-31.) This argument is foreclosed by the plain language of the relevant contracts.

AMCK terminated the Framework Agreement based on Frontier's non-payment of rent under the original leases. Such non-payment was a cross-default under the MSN 10038 Lease (O'Callaghan Decl. Ex. Ex. 6, § 16.1(l)), and, therefore, a Framework Event of Default under the Framework Agreement (*id.* Ex. 4, § 6.1.7). Neither of these cross-default provisions requires any kind of prior notice. Thus, in the event of such a rent payment default, AMCK was free to terminate "by notice in writing to Frontier" (*id.* § 6.2.1), which AMCK provided in its letter dated May 8, 2020. (*See* Sheridan Decl. Ex. 13.)

Ignoring AMCK's stated basis for termination, Frontier focuses on different contract provisions that require prior written notice in other circumstances. (*See* Opp. 6, 29.) Specifically, five days prior notice is required where the default relates to matters *other* than the non-payment of rent. (*See* O'Callaghan Decl. Ex. 4, § 6.1.1; *id.* Ex. 6, § 16.1(a)(ii).) These other forms of default are not relevant because they were not the basis for AMCK's termination. Moreover, the fact that the parties specified that notice was required for some defaults and not

others underscores that no notice was required following a rent payment default. *See Rosendale v. Mr. Cooper Grp. Inc.*, No. 19 Civ. 9263, 2021 WL 4066821, at *18 (S.D.N.Y. Sept. 7, 2021) ("Given that the parties did include express notification and cure provisions with respect to other scenarios, the Court is especially reluctant to rewrite the [contract] and add substantive provisions that could have been easily included in the first instance."); *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 540 (S.D.N.Y. 2013) (same).

Frontier notes that, in the past, AMCK had "alerted" Frontier to late payments and Frontier had then promptly paid. (Opp. 29.) Frontier contends that this "course of dealing" modified the original leases so that—even though the contracts do not say so—AMCK was required to provide notice and an opportunity to cure. (*Id.*) This argument fares no better.

As an initial matter, it is undisputed that Frontier knew it had missed rent payments and that—after granting Frontier a 10-day grace period—AMCK stated that it expected payment. (*See* Fanning Decl. ¶ 9; Fanning Tr. 98:11-100:19 & Butler Decl. Ex. 14; Dempsey Tr. 131:9-132:6; *see also* SMF ¶ 28; Sheridan Decl. ¶ 14 & Ex. 9; O'Callaghan Decl. ¶ 26 & Ex. 15.) Additional notice that payments were due would have been redundant.

In any event, the Framework Agreement and lease agreements expressly provide that any amendment must be in writing and, moreover, that "*no act or course of conduct or negotiation* on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right." (O'Callaghan Decl. Ex. 4, § 8.4.1 (emphasis added).) This precludes Frontier's modification-by-course-of-dealing argument. *See Ronis v. Carmine's Broadway Feast, Inc.*, No. 10 Civ. 3355, 2011 WL 4444307, at *3 (S.D.N.Y. Sept. 26, 2011) ("[B]y including a 'no-waiver' provision in their contract, parties may limit the effect of a waiver of contractual rights through a course of conduct inconsistent

with the contract's terms."); *Norwest Fin., Inc. v. Fernandez*, 86 F. Supp. 2d 212, 230 (S.D.N.Y. 2000) ("'No-waiver' provisions which cover course-of-conduct waivers are enforceable."); *CS First Bos. Ltd. v. Behar*, No. 94 Civ. 7167, 1996 WL 384893, at *4 (S.D.N.Y. July 9, 1996) (noting that "the alleged oral modification and modification or waiver by course of dealing are impermissible" under the relevant agreement).

Finally, Frontier argues that AMCK waived its right to declare a default without notice because AMCK knew Frontier was not paying rent but continued to negotiate a potential deferral anyway.  (*See* Opp. 29-30.)  This, again, ignores the clear language of Section 8.4.1, providing that negotiation would not waive AMCK's rights.  *See Whitecap (U.S.) Fund I, LP v. Siemens First Cap. Com. Fin. LLC*, 121 A.D.3d 584, 593 (1st Dep't 2014) ("Unfruitful negotiations to restructure or extend the terms of the third amendment to the credit agreement did not limit [defendant's] rights under the third amendment, as the no-waiver clause protected those rights.").

The main case cited by Frontier concerning waiver and notice is inapposite.  In *Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F. Supp. 821, 830-31 (S.D.N.Y. 1969), the court found that the plaintiff waived a requirement for prompt payment by not objecting to payment defaults and continuing to negotiate over other matters.  The court held that the plaintiff could not terminate the contract until it first provided notice to the other side that it was reinstating the requirement for prompt payment.[7]  Here, by contrast, the non-waiver language in Section 8.4.1 of the Framework Agreement means that there was never a waiver by AMCK in the first place, and therefore there was no need to revoke any such waiver.  *See Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995) (distinguishing *Oleg Cassini* because, based on the

---

[7] The contract at issue provided that a "waiver shall not constitute a continuing waiver."  *Id.* at 831.  The court held that this meant that if a party waived a provision, it could, after notice, "reinstate his contractual right to strict performance."  *Id.*

contract language, "[n]o waiver can have occurred here"). Applying *Oleg Cassini* to this case

would, in effect, re-write Section 8.4.1 to require immediate termination in every case of default.

### B. Frontier's Claim of an Earlier Repudiation (First Claim) Should Be Rejected as a Matter of Law.

Frontier asserts that AMCK repudiated the Framework Agreement when it proposed

extracontractual terms. (*See* Opp. 20-21.) It is beyond dispute, though, that AMCK proposed

these terms as potential concessions in response to Frontier's own request for an extracontractual

rent deferral. (*See* O'Callaghan Decl. ¶ 18; Sheridan Decl. ¶ 5; Dempsey Tr. 33:13-34:7, 35:15-

21.) In this context, AMCK's request cannot be viewed as an unequivocal statement of intent

not to perform.

Moreover, even if AMCK's negotiating position could be viewed as a repudiation, there

is no dispute that Frontier did not treat the contract as finished. Frontier argues that it was not

required to elect its remedy immediately, and that it was free to negotiate with AMCK without

waiving any repudiation. (*See* Opp. 20, 22.) This argument misses the mark. The point is that

having elected to wait for performance that did not come, Frontier's only claim is for the actual

non-performance, not the preceding threat of non-performance.[8]

Frontier also states that because AMCK "had already repudiated," it was "not entitled to

terminate" the Framework Agreement. (Opp. 22.) This is incorrect as a matter of law. The

Second Circuit addressed this very issue in *ARP Films, Inc. v. Marvel Entertainment Group*, 952

F.2d 643 (2d Cir. 1991). In that case, the defendant repudiated and the plaintiff retaliated by

---

[8] The cases cited by Frontier are not to the contrary. They stand for the uncontroversial proposition that the non-repudiating party does not waive a repudiation merely by negotiating. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 711 (S.D.N.Y. 2012); *AG Props. of Kingston, LLC v. Besicorp-Empire Dev. Co.*, 14 A.D.3d 971, 974-75 (3d Dep't 2005). These cases do not address circumstances where the alleged repudiator went on to *actually* breach and then faced claims both for the repudiation and the breach.

withholding part of its own performance.  The defendant then terminated the contract.  *Id.*
at 646-48.  The Second Circuit upheld the termination because, if plaintiff wanted defendant to
perform, it had to perform its own obligations.  *Id.* at 649-50; *see also City of N.Y. v. N.Y.
Pizzeria Delicatessen, Inc.*, No. 05 Civ. 2754, 2006 WL 2850237, at *7 (S.D.N.Y. Sept. 29,
2006) ("When the non-breaching party elects to continue the contract, it is not freed from its
obligations under the contract, despite the [other] party's breach.").  Thus, even if AMCK had
repudiated, AMCK was also entitled to terminate based on Frontier's non-payment of rent.[9]

### C. Frontier's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Fourth Claim) Should Be Rejected as a Matter of Law.

Frontier admits that a separate claim for breach of the implied covenant generally cannot
stand alongside a breach of contract claim based on the same facts.  (Opp. 31; *see also* Defs.'
Mem. 14-15.)  Frontier argues that there is an "exception" to this rule in cases "involving efforts
by one party to a contract to subvert the contract itself."  (Opp. 31-32.)  As support, Frontier
principally relies on *Toto, Inc. v. Sony Music Entertainment*, No. 12 Civ. 1434, 2012 WL
6136365, at *13 (S.D.N.Y. Dec. 11, 2012).  In that case, however, the court clearly applied the
general rule and dismissed as duplicative a good faith and fair dealing claim that "rest[ed] on the
same facts" as an accompanying breach of contract claim.  *Id.* at *14.  Thus, *Toto* supports
AMCK's argument that the Fourth Claim should be dismissed.  Frontier cites no authority for the
proposition that a purely duplicative claim may survive.

---

[9] Similarly, AMCK's subjective motive does not affect the validity of the termination.  *See
HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 537
(S.D.N.Y. 2014) ("As long as a party has the legal right to terminate its obligation under the
contract, it is legally irrelevant whether the party was also motivated by reasons which would not
themselves constitute valid grounds for termination of the contract." (internal quotation marks
omitted)).

**D.    There Is No Valid Claim Under the Framework Agreement Against Any Other Defendant.**

Accipiter and Vermillion are not signatories to the Framework Agreement. Frontier does not dispute this, and Frontier also does not contest the well-established principle that non-parties generally cannot be sued for breach of contract.

Instead, Frontier states that Accipiter and Vermillion "have rights and obligations arising from the contracts at issue." (Opp. 33-34.) However, the only rights and obligations that Frontier identifies arise under the lease agreements, *not* the Framework Agreement. For example, Frontier states that Accipiter and Vermillion provided guarantees "under each Lease Agreement." (*Id.*) These guarantees relate to performance of the leases, not the Framework Agreement. (*See* O'Callaghan Decl. Exs. 3, 7.)[10]

Frontier also argues that the lease agreements and the Framework Agreement should be "read together" as part of a "single transaction." (Opp. 34.) However, even if that were so, it would not make Accipiter or Vermillion liable for the breach of contracts to which they are not party. *See In re Houbigant Inc.*, 914 F. Supp. 964, 994–95 (S.D.N.Y. 1995) (dismissing contract claim against defendant "who is not a party to the particular contract, even where there are several contracts that are part of the same transaction").

---

[10] Frontier cites cases for the uncontroversial proposition that a guarantor may be sued for the breach of a contract it agreed to guarantee. (Opp. 34.) These cases are inapposite because Accipiter and Vermillion did not provide guarantees under the Framework Agreement. Frontier also cites *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70 (2d Cir. 1984) for the proposition that the "sole obligee on contracts possessed rights such that it could be an indispensable party." (Opp. 34.) *Envirotech* involved a corporate parent that had been assigned certain contract rights and was therefore a real party in interest for diversity jurisdiction purposes. 729 F.2d at 74-75. There is no allegation that Accipiter and Vermillion were the sole obligees of, or real parties in interest to, the Framework Agreement.

In short, because Frontier offers no basis for holding Accipiter and Vermillion liable for alleged breaches of the Framework Agreement, the First, Second Claims and Fourth Claims should be rejected as to Accipiter and Vermillion.[11]

## II.    FRONTIER'S NON-CONTRACT CLAIMS REGARDING THE FRAMEWORK AGREEMENT SHOULD BE REJECTED AS A MATTER OF LAW.

### A.    Frontier's Promissory Estoppel Claim (Sixth Claim) Should Be Rejected as a Matter of Law.

Promissory estoppel is a "narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason." *Paxi, LLC v. Shiseido Americas Corp.*, 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009) (internal quotation marks omitted).  The parties agree that the Framework Agreement is a valid written contract. Frontier contends that it may assert promissory estoppel as an alternative claim because there is a dispute about whether the parties "entered a rent deferral agreement."  (Opp. 36.)  This argument ignores all the other written agreements in this case.  Whether or not there was a rent deferral agreement, the relationship between AMCK and Frontier was governed by written agreements, including the Framework Agreement.  (*See* Defs.' Mem. 16-17.)

Even if Frontier's promissory estoppel claim were compatible with the existence of written agreements, Frontier fails to produce evidence of the requisite "clear and unambiguous promise" regarding a rent deferral, as discussed in Section I.  Frontier asserts that AMCK's "conduct" between April 21 and May 8, 2020 "evidenced" a rent deferral.  (Opp. 36.)  However, conduct is not a sufficient basis for a promissory estoppel claim.  *See Union Cosm. Castle, Inc. v. Amorepacific Cosms. USA, Inc.*, 454 F. Supp. 2d 62, 73 (E.D.N.Y. 2006) (rejecting argument

---

[11] The same would be true for UMB and Wells Fargo, but the Complaint does not name them as defendants on these claims.

that promise element of promissory estoppel claim can be based on "ongoing conduct"); *S. Fed. Sav. & Loan Ass'n of Georgia v. 21-26 E. 105th St. Assocs.*, 145 B.R. 375, 383 (S.D.N.Y. 1991) (same, because parties "produce no evidence of such a promise, but instead rely upon the Bank's conduct"). Frontier also asserts that, "most importantly," AMCK's April 30, 2020 email constitutes a promise of rent deferral. (Opp. 36-37.) As discussed above, however, the April 30 email speaks for itself and cannot reasonably be interpreted as a promise of any kind. (*See* Sheridan Decl. Ex. 10.)

Moreover, even if there were evidence of some sort of implicit promise, any reliance by Frontier would have been unreasonable as a matter of law. This is because the contract requires that any waivers or amendments be "*express*," and that "*no act or course of conduct or negotiation* on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right." (O'Callaghan Decl. Ex. 4, § 8.4.1 (emphasis added).) In addition, AMCK's April 30, 2020 email expressly stated that it did not create "any binding obligations" for AMCK, so Frontier could not reasonably have relied on it. *See 644 E. 14th Realty LLC v. Mount Sinai Health Sys., Inc.*, 205 A.D.3d 405, 405–06 (1st Dep't 2022) (rejecting promissory estoppel claim where letter of intent "expressly stated that it 'shall not bind' either party").

### B. Frontier's Fraud Claim (Seventh Claim) Should Be Rejected as a Matter of Law.

Frontier's fraud claim should be rejected as duplicative of the breach of contract claim. (*See* Defs.' Mem. 18.) Frontier argues that a fraud claim can be maintained alongside a breach of contract claim when the alleged misrepresentation is "collateral or extraneous" to the contract. (Opp. 37-38.) While this may be true as a general matter, this principle does not help Frontier.

The case law cited by Frontier concerns claims of fraudulent inducement—*i.e.*, where

"before there ever was a contract between the parties," the defendant made false statements about "present facts" as opposed to statements about "future intent to perform." *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 747 (2d Cir. 1979); *Rouse v. Elliot Stevens, Ltd.*, No. 13 Civ. 1443, 2016 WL 8674688, at *5 (S.D.N.Y. June 24, 2016). By contrast, here, the Framework Agreement already governed the relationship between Frontier and AMCK, and the alleged "fraud" was allegedly inducing Frontier to breach the lease agreements so that AMCK could terminate the Framework Agreement. (*See* Opp. 38.) These circumstances do not support a claim for fraudulent inducement. *See TN Metro Holdings I, LLC v. Commonwealth Ins. Co.*, 51 F. Supp. 3d 405, 412 (S.D.N.Y. 2014) (dismissing fraud claim based on "promise to perform under the terms of the already-existing [] contract"). Moreover, because Frontier's fraud claim is based on the same facts as the contract claim and seeks the same damages, it is "abundantly clear" that the claim is duplicative. *ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, No. 19 Civ. 7800, 2021 WL 1177532, at *22 (S.D.N.Y. Mar. 29, 2021) (dismissing duplicative fraud claim).

## III. FRONTIER'S CLAIMS FOR BREACH OF THE LEASE AGREEMENTS SHOULD BE REJECTED AS A MATTER OF LAW.

The Third and Fifth Claims impermissibly conflate the lease agreements with the Framework Agreement. Indeed, Frontier acknowledges that "most of the harm caused" on these claims "manifested through Defendants' failure to perform the Framework Agreement." (Opp. 40.) Because Frontier still points to no evidence of a failure by Defendants to perform the *lease agreements*, these claims should be rejected as a matter of law.

On the Third Claim, Frontier insists that declaring a default alone may be sufficient to establish a breach of contract. (Opp. 40.) Frontier cites no authority for this proposition. Instead, Frontier attempts to distinguish a case cited by Defendants, *Red Fort Capital, Inc. v.*

*Guardhouse Prods. LLC*, 397 F. Supp. 3d 456 (S.D.N.Y. 2019).  In *Red Fort*, the court

dismissed a claim that a creditor breached by prematurely declaring a default:  "[b]aseless

accusations that a counter party has breached an agreement is not the equivalent of the accusing

party's failure to perform its obligations under the entire contract."  *Id.* at 470.  Frontier argues

that, unlike in *Red Fort*, Defendants here have "wholly failed to honor their contractual

obligations" by using the defaults as a "predicate" to abandon the "remaining obligations" under

the Framework Agreement.  (Opp. 40.)  But there is no evidence that Defendants have failed to

perform any obligation under the 15 lease agreements.  Without such evidence, Frontier's claim

for breach of the lease agreements should be rejected.

      As to the Fifth Claim, Frontier asserts that Defendants breached the covenant of quiet

enjoyment contained in the lease agreements.  Frontier concedes that "actual or constructive

eviction" is required for this claim.  (Opp. 42.)  Frontier also does not dispute that it has had

continuous possession and use of the 15 aircraft leased from Defendants.  (SMF & Frontier

Response ¶ 35.)  Instead, Frontier argues that AMCK "constructively evicted Frontier *from the

five remaining Framework Agreement aircraft*."  (Opp. 42 (emphasis added).)  In other words,

Frontier now claims that it was "evicted" from aircraft that had not been delivered (and pursuant

to leases that never came into existence).  This novel theory has no support in the case law, and

should be rejected as a matter of law.

      The covenant of quiet enjoyment is a "promise by the lessor" that it will not interfere

with "the rights granted to the lessee by the lease."  *Trans Pac. Leasing Corp. v. Aero

Micronesia, Inc.*, 26 F. Supp. 2d 698, 706 (S.D.N.Y. 1998).  While the covenant prevents

interference with the leased property during the term of the lease, it does not affect other matters

between the parties.  *See Otiniano v. Magier*, 181 A.D.2d 438, 439 (1st Dep't 1992) (finding no

quiet enjoyment violation where landlord allegedly failed to honor agreement to extend the lease term).  Thus, the covenants of quiet enjoyment in the 15 existing lease agreements do not apply to the additional aircraft (and additional potential leases) covered by the Framework Agreement.

Finally, Frontier notes that AMCK's May 8, 2020 notice terminating the Framework Agreement included a reservation of the lessors' rights under the lease agreements.  Frontier interprets this as a threat that the lessors may in the future exercise their "termination rights" under the leases, including repossessing the aircraft.  (Opp. 42.)  This is not a serious argument. The lessors were not under any obligation to exercise (and did not in fact exercise) those rights. Moreover, the right to terminate the leases exists only as to a "continuing" event of default.  (*See, e.g.*, O'Callaghan Decl. Ex. 6, § 16.2.)  In this case, the payment default is not presently continuing because Frontier belatedly paid the rent it owed on May 13, 2020.  (*See* SMF ¶ 34 & Frontier Response.)  Therefore, although Defendants had the right to terminate the lease agreements prior to May 13, 2020, they no longer have that right.  Consistent with this, Defendants have made no effort to do so in the intervening two and a half years.

## Conclusion

For the reasons set forth above, summary judgment should be granted dismissing all claims against Defendants.

Dated: December 30, 2022                   Respectfully submitted,
      New York, New York

   s/ Jeff E. Butler

Jeff E. Butler
John P. Alexander
Gege Weinberg
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
*Attorneys for Defendants*