<u>AIRBUS</u>

<u>A320 FAMILY AIRCRAFT</u>

<u>P U R C H A S E   A G R E E M E N T</u>

<u>B E T W E E N</u>

<u>A I R B U S S.A.S.</u>

<u>as Seller</u>

<u>A N D</u>

<u>REPUBLIC AIRWAYS HOLDINGS INC.</u>

as Buyer

110930_CT0905340_EXECUTION_PA_RJET_A320

ATTORNEYS'S EYES ONLY

## CONTENTS

0 -    DEFINITIONS ................................................................................................ 2
1 -    SALE AND PURCHASE ................................................................................ 9
2 -    SPECIFICATION ........................................................................................... 9
3 -    PRICE ........................................................................................................... 12
4 -    PRICE REVISION ......................................................................................... 15
5 -    PAYMENT TERMS ........................................................................................ 16
6 -    MANUFACTURE PROCEDURE - INSPECTION ........................................ 21
7 -    CERTIFICATION .......................................................................................... 22
8 -    TECHNICAL ACCEPTANCE ...................................................................... 24
9 -    DELIVERY .................................................................................................... 26
10 -   EXCUSABLE DELAY AND TOTAL LOSS .................................................. 30
11 -   INEXCUSABLE DELAY ............................................................................... 33
12 -   WARRANTIES AND SERVICE LIFE POLICY ............................................ 35
13 -   PATENT AND COPYRIGHT INDEMNITY ................................................... 51
14 -   TECHNICAL DATA AND SOFTWARE SERVICES ..................................... 54
15 -   SELLER REPRESENTATIVE SERVICES .................................................... 61
16 -   TRAINING SUPPORT AND SERVICES ....................................................... 64
17 -   EQUIPMENT SUPPLIER PRODUCT SUPPORT .......................................... 74
18 -   BUYER FURNISHED EQUIPMENT ............................................................. 75
19 -   INDEMNITIES AND INSURANCE ............................................................... 80
20 -   TERMINATION ............................................................................................. 82
21 -   ASSIGNMENTS AND TRANSFERS ............................................................. 88
22 -   MISCELLANEOUS PROVISIONS ................................................................ 90

110930_CT0905340_EXECUTION_PA_RJET_A320



Exhibit A-1    A320 STANDARD SPECIFICATION
              Appendix 1 to Exhibit A-1 A320 AIRCRAFT SPECIFICATION CHANGE
              NOTICES

Exhibit A-2    A319 STANDARD SPECIFICATION
              Appendix 1 to Exhibit A-2 A319 AIRCRAFT SPECIFICATION CHANGE
              NOTICES

110930_CT0905340_EXECUTION_PA_RJET_A320

ATTORNEYS'S EYES ONLY

## A320 FAMILY AIRCRAFT PURCHASE AGREEMENT

This A320 Family Aircraft Purchase Agreement ("**Agreement**") is dated as of September 30, 2011

BETWEEN:

**AIRBUS S.A.S.**, a *société par actions simplifiée*, created and existing under French law having its registered office at 1 Rond-Point Maurice Bellonte, 31707 Blagnac-Cedex, France and registered with the Toulouse Registre du Commerce under number RCS Toulouse 383 474 814 (the "**Seller**"),

and

**REPUBLIC AIRWAYS HOLDINGS INC.**, a corporation organized and existing under the laws of the State of Delaware, United States of America, having its principal corporate offices located at 8909 Purdue Road, Suite 300, Indianapolis, Indiana 46268, United States of America (the "**Buyer**").

**WHEREAS** subject to the terms and conditions of this Agreement, the Seller desires to sell the Aircraft to the Buyer and the Buyer desires to purchase the Aircraft from the Seller.

**NOW THEREFORE IT IS AGREED AS FOLLOWS:**

ATTORNEYS'S EYES ONLY                                                              FRONTIER0012409

**0 -    DEFINITIONS**

For all purposes of this Agreement (defined below), except as otherwise expressly provided, the following terms will have the following meanings:

A319 Aircraft – any or all of the A319-100 aircraft for which the delivery schedule as of the date hereof is set forth in Clause 9.1 to be sold by the Seller and purchased by the Buyer pursuant to this Agreement, including the A319 Airframe and all components, equipment, parts and accessories installed in or on such A319 Airframe and the A319 Propulsion System, as applicable, installed thereon upon delivery.

A319 Airframe –

A319 Propulsion System –

A319 Specification



A319 Standard Specification –

A320 Aircraft – any or all of the A320-200 aircraft for which the delivery schedule as of the date hereof is set forth in Clause 9.1 to be sold by the Seller and purchased by the Buyer pursuant to this Agreement, including the A320 Airframe and all components, equipment, parts and accessories installed in or on such A320 Airframe and the A320 Propulsion System, as applicable, installed thereon upon delivery.

A320 Airframe – any A320 Aircraft, excluding the A320 Propulsion System therefor.

A320 Propulsion System – as defined in Clause 2.3.

A320 Specification – the A320 Standard Specification as amended by all applicable SCNs.

A320 Standard Specification –



AACS – Airbus Americas Customer Services, Inc., a corporation organized and existing under the laws of Delaware, having its principal offices at 198 Van Buren Street, Suite 300, Herndon, VA 20170, or any successor thereto.

Affiliate – with respect to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control with such person or entity.

ATTORNEYS'S EYES ONLY                                    FRONTIER0012410

Agreement – this Airbus A320 family aircraft purchase agreement, including all exhibits and appendixes attached hereto, as the same may be amended or modified and in effect from time to time.

AirbusWorld – as defined in Clause 14.10.1.

Aircraft – as applicable, any or all of the A319 Aircraft and any or all of the A320 Aircraft.

Aircraft Training Services –



Airframe – as applicable, the A319 Airframe or the A320 Airframe.

AirN@v Family – as defined in Clause 14.9.1.

Approved BFE Supplier – as defined in Clause 18.1.2.

AOG – as defined in Clause 15.1.4.

ATA Specification – recommended specifications developed by the Air Transport Association of America reflecting consensus in the commercial aviation industry on accepted means of communicating information, conducting business, performing operations and adhering to accepted practices.

Attestation – as defined in Clause 16.3.3.

Aviation Authority – when used with respect to any jurisdiction, the government entity that, under the laws of such jurisdiction, has control over civil aviation or the registration, airworthiness or operation of civil aircraft in such jurisdiction.

Balance of the Final Price – as defined in Clause 5.4.

Base Flight Training – as defined in Clause 16.6.2.1.

Base Period – as defined in Clause 3.1.1.3.

Base Price – for any Aircraft, Airframe, SCNs or Propulsion System, as defined in Clause 3.1.

BFE Data – as defined in Clause 14.3.2.1.

BFE Engineering Definition – as defined in Clause 18.1.3.

BFE Supplier – as defined in Clause 18.1.1.

Bill of Sale – as defined in Clause 9.2.2.

ATTORNEYS'S EYES ONLY                                              FRONTIER0012411

Business Day – with respect to any action to be taken hereunder, a day other than a Saturday, Sunday or other day designated as a holiday in the jurisdiction in which such action is required to be taken.

Buyer Furnished Equipment or BFE – as defined in Clause 18.1.1.

Buyer's Inspector(s) – as defined in Clause 6.2.1.

CDF Date – as defined in Clause 2.4.2.

CDR – as defined in Clause 18.1.5(iii)(b).

Certificate – as defined in Clause 16.3.3.

Certificate of Acceptance – as defined in Clause 8.3.

Change in Law – as defined in Clause 7.3.1.

COC Data – as defined in Clause 14.8.

Confidential Information – as defined in Clause 22.11.

Contractual Definition Freeze or CDF – as defined in Clause 2.4.2.

Customization Milestones Chart – as defined in Clause 2.4.1.

DDU or Delivery Duty Unpaid –

Declaration of Design and Performance or DDP – the documentation provided by an equipment manufacturer guaranteeing that the corresponding equipment meets the requirements of the Specification, the interface documentation and all the relevant certification requirements.

Delivery – with respect to any Aircraft, the transfer of title to such Aircraft from the Seller to the Buyer in accordance with Clause 9.

Delivery Date – the date on which Delivery occurs.

Delivery Location – the facilities of the Seller at the location of final assembly of the Aircraft.

Delivery Period – as defined in Clause 11.1.

Development Changes – as defined in Clause 2.2.2.

EASA – the European Aviation Safety Agency or any successor thereto.

End-User License Agreement for Airbus Software – as defined in Clause 14.9.4.

Excusable Delay – as defined in Clause 10.1.

110930_CT0905340_EXECUTION_PA_RJET_A320                                      PA-4

ATTORNEYS'S EYES ONLY                                      FRONTIER0012412

Export Certificate of Airworthiness – an export certificate of airworthiness issued by the Aviation Authority of the Delivery Location for export of an Aircraft to the United States.

FAA – the U.S. Federal Aviation Administration, or any successor thereto.

FAI – as defined in Clause 18.1.5(iv).

Failure – as defined in Clause 12.2.1(ii).

Final Price – as defined in Clause 3.2.

First Quarter or 1Q – means the 3-month period of January, February and March.

Fleet Serial Numbers – as defined in Clause 14.2.1.

Fourth Quarter or 4Q – means the 3-month period of October, November and December.

Goods and Services – any goods, excluding Aircraft, and services that may be purchased by the Buyer from the Seller or its designee.

GTC – as defined in Clause 14.10.3.

Indemnitee – as defined in Clause 19.3.

Indemnitor – as defined in Clause 19.3.

Inexcusable Delay – as defined in Clause 11.1.

Inhouse Warranty – as defined in Clause 12.1.7.1.

Inhouse Warranty Labor Rate – as defined in Clause 12.1.7.5(ii).

Inspection – as defined in Clause 6.2.1.

Instructor(s) – as defined in Clause 16.3.3.

Interface Problem – as defined in Clause 12.4.1.

Irrevocable SCN – an SCN which is irrevocably part of the A319 Specification or the A320 Specification, as expressly set forth in Appendix 1 to Exhibit A-1 and Appendix 1 to Exhibit A-2, as applicable.

Item – as defined in Clause 12.2.1(i).

LIBOR – means, for any period, the rate per annum equal to the quotation that appears on the LIBOR01 page of the Reuters screen (or such other page as may replace the LIBOR01 page) or if such service is not available, the British Bankers' Association LIBOR rates on Bloomberg (or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 a.m., London time, two (2) Business Days prior to the beginning of such

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012413

period as the rate for twelve-month U.S. dollar deposits to be delivered on the first day of each period.

Losses – as defined in Clause 19.1.

Major BFE – as defined in Clause 18.1.5(iii).

Manufacture Facilities – means the various manufacture facilities of the Seller, its Affiliates or any subcontractor, where the Airframe or its parts are manufactured or assembled.

Manufacturer Specification Change Notice or MSCN – as defined in Clause 2.2.2.1.

NEO Aircraft – means an Aircraft incorporating the New Engine Option.

New Engine Option or NEO – as defined in Clause 2.1.

Option Catalogs – as defined in Clause 2.4.1.

Other Agreement – as defined in Clause 5.12.1.

Other Indebtedness – as defined in Clause 20.5(iv).

Paris Convention – as defined in Clause 13.1.1(ii)(b).

PDR – as defined in Clause 18.1.5(iii)(a).

PEP – as defined in Clause 14.13.1.

Practical Training – as defined in Clause 16.8.2.

Predelivery Payment – any of the payments determined in accordance with Clause 5.3.

Predelivery Payment Reference Price – as defined in Clause 5.3.2.

Propulsion System – either or both, as the context requires, of the A319 Propulsion System and the A320 Propulsion System.

Propulsion System Manufacturer – means the manufacturer of the Propulsion System as set out in Clause 2.3.

Propulsion System Price Revision Formula – the applicable Propulsion System price revision formula set forth in Part 2 of Exhibit C.

Propulsion System Reference Price – the applicable Propulsion System reference price set forth in Part 2 of Exhibit C.

Quarter – means any or, depending on the context, all of the First Quarter, Second Quarter, Third Quarter and Fourth Quarter.

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012414

Ready for Delivery – means the time when the Technical Acceptance Process has been completed in accordance with Clause 8 and all technical conditions required for the issuance of the Export Certificate of Airworthiness have been satisfied.

Relevant Amounts – as defined in Clause 5.12.1(ii).

Revision Service Period – as defined in Clause 14.5.

Scheduled Delivery Month – as defined in Clause 9.1.

Scheduled Delivery Quarter – as defined in Clause 9.1.

SEC – as defined in Clause 20.5(i).

Second Quarter or 2Q – means the 3-month period of April, May and June.

Seller Price Revision Formula – the Seller price revision formula set forth in Part 1 of Exhibit C.

Seller Representative – as defined in Clause 15.1.1.

Seller's Customer Services Catalog – as defined in Clause 16.3.1.

Seller's Training Center(s) – as defined in Clause 16.2.1.

Service Life Policy – as described in Clause 12.2.

Sharklets –

SI – as defined in Clause 18.1.5(v).

Software Services – as defined in Clause 14.1.

Specification – as applicable, the A319 Specification or the A320 Specification.

Specification Change Notice or SCN – as defined in Clause 2.2.1.

Standard Specification – the A319 Standard Specification or the A320 Standard Specification, as applicable.

Successor – as defined in Clause 21.4.

Supplier – as defined in Clause 12.3.1.1.

Supplier Part – as defined in Clause 12.3.1.2.

Supplier Product Support Agreements – as defined in Clause 12.3.1.3.

Taxes – as defined in Clause 5.5.

ATTORNEYS'S EYES ONLY                                                      FRONTIER0012415

Technical Acceptance Flight – as defined in Clause 8.1.2(iv).

Technical Acceptance Process – as defined in Clause 8.1.1.

Technical Data – as defined in Clause 14.1.

Termination – as defined in Clause 20.2.1(i)(d).

Termination Event – as defined in Clause 20.1.

Third Party – as defined in Clause 14.15.2.

Third Party Entity – as defined in Clause 12.8.

Third Quarter or 3Q – means the 3-month period of July, August and September.

Total Loss – as defined in Clause 10.4.

Training Conference – as defined in Clause 16.1.3.

Type Certificate – as defined in Clause 7.1.

VAT – as defined in Clause 5.5.1.

Warranted Part – as defined in Clause 12.1.1.1.

Warranty Claim – as defined in Clause 12.1.5.

Warranty Period – as defined in Clause 12.1.3.

The definition of a singular in this Clause 0 will apply to the plural of the same word.

Except where otherwise indicated, references in this Agreement to an exhibit, schedule, article, section, subsection or clause refer to the appropriate exhibit or schedule to, or article, section, subsection or clause in this Agreement.

Each agreement defined in this Clause 0 will include all appendices, exhibits and schedules thereto. If the prior written consent of any person is required hereunder for an amendment, restatement, supplement or other modification to any such agreement and the consent of each such person is obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, supplemented or modified.

References in this Agreement to any statute will be to such statute as amended or modified and in effect at the time any such reference is operative.

The term "including" when used in this Agreement means "including without limitation" except when used in the computation of time periods.

Technical and trade terms not otherwise defined herein will have the meanings assigned to them as generally accepted in the aircraft manufacturing industry.

ATTORNEYS'S EYES ONLY                                               FRONTIER0012416

1 -       **SALE AND PURCHASE**

The Seller will sell and deliver to the Buyer, and the Buyer will purchase and take delivery of ▇▇▇ NEO Aircraft, consisting of ▇▇▇ A319 Aircraft and ▇▇▇ A320 Aircraft from the Seller, subject to the terms and conditions contained in this Agreement.

2 -       **SPECIFICATION**

2.1     Aircraft Specification

2.1.1   The A320 Aircraft will be manufactured in accordance with the A320 Standard Specification, as modified or varied prior to the date of this Agreement by the Specification Change Notices listed in Appendix 1 to Exhibit A-1 which includes the Irrevocable SCNs.

The A319 Aircraft will be manufactured in accordance with the A319 Standard Specification, as modified or varied prior to the date of this Agreement by the Specification Change Notices listed in Appendix 1 to Exhibit A-2 which includes the Irrevocable SCNs.

2.1.2   New Engine Option

2.1.2.1 The Seller is currently developing a new engine option (the "**New Engine Option**" or "**NEO**"), applicable to the Aircraft. The specification of the NEO Aircraft shall be derived from the current Standard Specification and based on the new Propulsion Systems, as set forth in Clause 2.3 below, and Sharklets, combined with the required airframe structural adaptations, as well as Aircraft systems and software adaptations required to operate such NEO Aircraft. The foregoing is currently reflected in the Irrevocable SCNs listed in Appendix 1 to Exhibits A-1 and Appendix 1 to Exhibit A-2, the implementation of which is hereby irrevocably accepted by the Buyer.

2.1.2.2 The New Engine Option shall modify the design weights of the Standard Specification as follows:



2.2     Specification Amendment

The parties understand and agree that the Specification may be further amended following signature of this Agreement in accordance with the terms of this Clause 2.

2.2.1   Specification Change Notice

ATTORNEYS'S EYES ONLY                                                          FRONTIER0012417

The Specification may be amended by written agreement between the parties in a notice, substantially in the form set out in Exhibit B-1 (each, a "**Specification Change Notice**" or "**SCN**") and will set out the SCN's Aircraft embodiment rank and will also set forth, in detail, the particular change to be made to the Specification and the effect, if any, of such change on design, performance, weight, Delivery Date of the Aircraft affected thereby and on the text of the Specification. An SCN may result in an adjustment to the Base Price of the Aircraft, which adjustment, if any, will be specified in the SCN.

2.2.2     Development Changes

The Specification may also be amended to incorporate changes deemed necessary by the Seller to improve the Aircraft, prevent delay or ensure compliance with this Agreement ("**Development Changes**"), as set forth in this Clause 2.

2.2.2.1   Manufacturer Specification Changes Notices

(i)     The Specification may be amended by the Seller through a Manufacturer Specification Change Notice ("**MSCN**"), which will be substantially in the form set out in Exhibit B-2 hereto, or by other appropriate means, and will set out the MSCN's Aircraft embodiment rank as well as, in detail, the particular change to be made to the Specification and the effect, if any, of such change on performance, weight, Base Price of the Aircraft, Delivery Date of the Aircraft affected thereby and interchangeability or replaceability requirements under the Specification.

(ii)    Except when the MSCN is necessitated by an Aviation Authority directive or by equipment obsolescence, in which case the MSCN will be accomplished without requiring the Buyer's consent, if the MSCN adversely affects the performance, weight, Base Price, Delivery Date of the Aircraft affected thereby or the interchangeability or replaceability requirements under the Specification, the Seller will notify the Buyer of a reasonable period of time during which the Buyer must accept or reject such MSCN. If the Buyer does not notify the Seller of the rejection of the MSCN within such period, the MSCN will be deemed accepted by the Buyer and the corresponding modification will be accomplished.

2.2.2.2   If the Seller revises the Specification to incorporate Development Changes which have no adverse effect on any of the elements identified in Clause 2.2.2.1, such Development Change will be performed by the Seller without the Buyer's consent.

In such cases, the Seller will provide to the Buyer the details of all changes in an adapted format and on a regular basis.

2.2.2.3   The Seller may at its discretion notify Seller from time to time that certain items, which are currently BFE in the Specification, shall be deemed to be seller-furnished equipment ("**SFE**") and the parties agree that, upon such notice, such BFE items shall thereafter be excluded from the provisions of Clauses 2.2.2.1 (ii) and 2.2.2.2 above and shall be considered instead SFE and thereafter chargeable to the Buyer.

ATTORNEYS'S EYES ONLY                                          FRONTIER0012418

2.3    Propulsion System

2.3.1    Each A320 Airframe will be equipped with a set of two (2) CFM International LEAP-X1A26 engines (such set, an "**A320 Propulsion System**").

Each A319 Airframe will be equipped with a set of two (2) CFM International LEAP-X1A24 engines (such set, an "**A319 Propulsion System**").

2.4    Milestones

2.4.1    Customization Milestones Chart



2.4.2    Contractual Definition Freeze



ATTORNEYS'S EYES ONLY                                                FRONTIER0012419

3 –    **PRICE**

3.1    Base Price of the Aircraft



3.1.3    Base Price of the A319 Airframe

ATTORNEYS'S EYES ONLY    FRONTIER0012420



3.2     Final Price of the Aircraft

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012421



110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -14

ATTORNEYS'S EYES ONLY                                    FRONTIER0012422

**4 –**    **PRICE REVISION**

4.1    Seller Price Revision Formula

4.2    Propulsion System Price Revision



ATTORNEYS'S EYES ONLY

**5 -     PAYMENT TERMS**

5.1     Seller's Account

The Buyer will pay, from bank accounts within the United States, the Predelivery Payments, the Balance of the Final Price and any other amount due hereunder at the relevant times required by the Agreement and in immediately available funds in United States dollars to:



5.2     INTENTIONALLY LEFT BLANK

5.3     Predelivery Payments

5.3.1     Predelivery Payments are nonrefundable (although amounts equal to Predelivery Payments may be paid to the Buyer pursuant to Clause 10 or 11) and will be paid by the Buyer to the Seller for the Aircraft.



ATTORNEYS'S EYES ONLY                                    FRONTIER0012424

5.3.3    Predelivery Payments will be paid according to the following schedule:

| Payment Date | | Percentage of Predelivery Payment Reference Price |
|---|---|---|
| 1st Payment | On signature of this Agreement | ▮ |
| | No later than the first Business Day of each of the following months: | |
| 2nd Payment | -The thirty-sixth (36th) month before the Scheduled Delivery Month of each Aircraft | ▮ |
| 3rd Payment | -The twenty-fourth (24th) month before the Scheduled Delivery Month of each Aircraft | ▮ |
| 4th Payment | -The eighteenth (18th) month before the Scheduled Delivery Month of each Aircraft | ▮ |
| 5th Payment | -The twelfth (12th) month before the Scheduled Delivery Month of each Aircraft | ▮ |

TOTAL PAYMENT PRIOR TO DELIVERY ▮

In the event of the above schedule resulting in any Predelivery Payment falling due prior to the date of signature of the Agreement, such Predelivery Payments shall be made upon signature of this Agreement.

5.3.4    The Seller will be entitled to hold and use any Predelivery Payment as absolute owner thereof, subject only to the obligation (such obligation itself subject to the provisions of Clause 5.6) to deduct an amount equal to Predelivery Payments from the Final Price of the Aircraft, when calculating the Balance of the Final Price of such Aircraft. The Seller will be under no obligation to segregate any Predelivery Payment, or any amount equal thereto, from the Seller's funds generally.

5.3.5    Specification Change Notice Predelivery Payments

The Seller shall be entitled to require, and the Buyer shall pay, Predelivery Payments for each SCN (excluding those listed in Appendix 1 to Exhibit A-1) executed after signature of this Agreement:

(i)    for each SCN executed prior to the first day of the ▮ month prior to the Scheduled Delivery Month, the Buyer will make a Predelivery Payment equal to ▮ of the SCN price which shall be paid on the first day of the ▮ prior to the Scheduled Delivery Month;

(ii)    for each SCN executed between ▮ and ▮ months prior to the Scheduled Delivery Month, the Buyer will make a Predelivery Payment equal to ▮ of the SCN price which shall be paid on the first day of the ▮ prior to the Scheduled Delivery Month; and

ATTORNEYS'S EYES ONLY      FRONTIER0012425

(iii)    for each SCN executed between ▮▮▮▮▮ and ▮▮▮▮▮ months prior to the Scheduled Delivery Month the Buyer will make a Predelivery Payment equal to ▮▮▮▮▮ of the SCN price which shall be paid on the first day of the ▮▮▮▮▮ month prior to the Scheduled Delivery Month.

**5.4    Payment of Balance of the Final Price of the Aircraft**

Before the Delivery Date or concurrent with the Delivery of each Aircraft, the Buyer will pay to the Seller the Final Price of such Aircraft less an amount equal to the Predelivery Payments received for such Aircraft by the Seller (the "**Balance of the Final Price**").

The Seller's receipt of the full amount of all Predelivery Payments and of the Balance of the Final Price of such Aircraft, and any amounts due under Clause 5.8, are a condition precedent to the Seller's obligation to deliver such Aircraft to the Buyer.

5.5    Taxes

5.5.1    

5.5.2

5.5.3

"**Taxes**" means any present or future stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority or any political subdivision or taxing authority thereof or therein.

5.6    Application of Payments

Notwithstanding any other rights the Seller may have at contract or at law, the Buyer and the Seller hereby agree that should any amount (whether under this Agreement or under any other agreement between the Buyer and its Affiliates on the one hand and the Seller and its Affiliates on the other hand and whether at the stated maturity of such amount, by acceleration or otherwise) become due and payable by the Buyer or its Affiliates, and not be paid in full in immediately available funds on the date due, then the Seller will have the right to debit and apply, in whole or in part, the Predelivery Payments paid to the Seller by the Buyer against such unpaid amount. The Seller will promptly notify the Buyer in writing after

ATTORNEYS'S EYES ONLY                                                      FRONTIER0012426

such debiting and application, and the Buyer will immediately pay to the Seller the amount required to comply with Clause 5.2.3.

5.7    Setoff Payments

Notwithstanding anything to the contrary contained herein, the Seller may set-off any matured obligation owed by the Buyer or any of its Affiliates to the Seller or any of its Affiliates against any obligation (whether or not matured) owed by the Seller or any of its Affiliates to the Buyer or any of its Affiliates, regardless of the place of payment or currency.

5.8    Overdue Payments

5.8.1    If any payment due to the Seller from the Buyer is not received by the Seller on the date or dates due, the Seller will have the right to claim from the Buyer, and the Buyer will promptly pay to the Seller, on demand, interest at the rate of ███████████ on the amount of such overdue payment, to be calculated from and including the due date of such payment to (but excluding) the date such payment is received by the Seller. The Seller's right to receive such interest will be in addition to any other rights of the Seller hereunder or at law.

5.8.2    If any Predelivery Payment is not received by the date on which it is due, the Seller, in addition to any other rights and remedies available to it, will be under no obligation to deliver any Aircraft remaining to be delivered under this Agreement within such Aircraft's Scheduled Delivery Month(s). Upon receipt of the full amount of all such overdue Predelivery Payments, together with interest on such Predelivery Payments in accordance with Clause 5.8.1, the Seller will provide the Buyer with new Scheduled Delivery Months for the affected Aircraft, subject to the Seller's commercial and industrial constraints.

5.9    Proprietary Interest

Notwithstanding any provision of law to the contrary, the Buyer will not, by virtue of anything contained in this Agreement (including, without limitation, any Predelivery Payments hereunder, or any designation or identification by the Seller of a particular aircraft as an Aircraft to which any of the provisions of this Agreement refers) acquire any proprietary, insurable or other interest whatsoever in any Aircraft before Delivery of and payment for such Aircraft, as provided in this Agreement.

5.10    Payment in Full

The Buyer's obligation to make payments to the Seller hereunder will not be affected by and will be determined without regard to any setoff, counterclaim, recoupment, defense or other right that the Buyer may have against the Seller or any other person and all such payments will be made without deduction or withholding of any kind. The Buyer will ensure that the sums received by the Seller under this Agreement will be equal to the full amounts expressed to be due to the Seller hereunder, without deduction or withholding on account of and free from any and all taxes, levies, imposts, duties or charges of whatever nature, except that if the Buyer is compelled by law to make any such deduction or withholding the Buyer will pay such additional amounts to the Seller as may be necessary so that the net amount received by the Seller after such deduction or withholding will equal the amounts that would have been received in the absence of such deduction or withholding.

ATTORNEYS'S EYES ONLY                                                                    FRONTIER0012427

5.11     Other Charges

Unless expressly stipulated otherwise, any charges due under this Agreement other than those set out in Clauses 5.3 and 5.8 will be paid by the Buyer at the same time as payment of the Balance of the Final Price or, if invoiced, within ten (10) days after the invoice date.

5.12     Cross-Collateralisation

5.12.1   The Buyer hereby agrees that, notwithstanding any provision to the contrary in this Agreement, in the event that the Buyer should fail to make any material payment owing under this Agreement or under any other agreement between the Buyer and the Seller and/or any of their respective Affiliates (the "**Other Agreement**"), the Seller may:

(i)

(ii)



The rights granted to the Seller in the preceding paragraphs (i) and (ii) are without prejudice and are in addition to and shall not be deemed a waiver of any other rights and remedies the Seller or its Affiliates may have at law or under this Agreement or any Other Agreement, including the right of set-off.

5.12.2



Failure of the Buyer to pay such amount in full, shall entitle the Seller to (i) collect interest on such unpaid amount in accordance with Clause 5.8.1 hereof from the fourth (4th) working day following the Seller's written request to the Buyer for such payment and (ii) treat such failure as an additional termination event for which the Seller shall be entitled to the remedies available under Clause 20.2 of the Agreement.

110930_CT0905340_EXECUTION_PA_RJET_A320                                          PA -20

ATTORNEYS'S EYES ONLY                                                          FRONTIER0012428

## 6 -     MANUFACTURE PROCEDURE - INSPECTION

6.1     Manufacture Procedures

The Airframe will be manufactured in accordance with the requirements of the laws of the jurisdiction of incorporation of the Seller or of its relevant Affiliate as enforced by the Aviation Authority of such jurisdiction.

6.2     Inspection

6.2.1     The Buyer or its duly authorized representatives (the "**Buyer's Inspector(s)**") will be entitled to inspect the manufacture of the Airframe and all materials and parts obtained by the Seller for the manufacture of the Airframe (the "**Inspection**") on the following terms and conditions:

(i)     any Inspection will be conducted pursuant to the Seller's system of inspection and the relevant Airbus Procedures, as developed under the supervision of the relevant Aviation Authority and generally applicable to commercial airline customers of Seller for A320 family aircraft;

(ii)     the Buyer's Inspector(s) will have access to such relevant technical documentation solely to the extent reasonably necessary for the purpose of the Inspection;

(iii)     any Inspection and any related discussions with the Seller and other relevant personnel by the Buyer's Inspector(s) will be at reasonable times during business hours and will take place in the presence of the relevant inspection department personnel of the Seller;

(iv)     the Inspections will be performed in a manner not to unduly delay or hinder the manufacture or assembly of the Aircraft or the performance of this Agreement by the Seller or any other work in progress at the Manufacture Facilities.

6.2.2     Location of Inspections

The Buyer's Inspector(s) will be entitled to conduct any such Inspection at the relevant Manufacture Facility of the Seller or the Affiliates and where possible at the Manufacture Facilities of the sub-contractors provided that if access to any part of the Manufacture Facilities where the Airframe manufacture is in progress or materials or parts are stored are restricted for security or confidentiality reasons, the Seller will be allowed reasonable time to make the relevant items available elsewhere.

6.3     Seller's Service for Buyer's Inspector(s)

For the purpose of the Inspections with respect to an Aircraft, and starting from a mutually agreed date until the Delivery Date of such Aircraft, the Seller will furnish without additional charge suitable space and office equipment in or conveniently located with respect to the Delivery Location for the use of a reasonable number of Buyer's Inspector(s).

ATTORNEYS'S EYES ONLY                                        FRONTIER0012429

7 –       **CERTIFICATION**

Except as set forth in this Clause 7, the Seller will not be required to obtain any certificate or approval with respect to the Aircraft.

7.1       Type Certification

The Seller will obtain or cause to be obtained (i) a type certificate under EASA procedures for joint certification in the transport category and (ii) an FAA type certificate (the "**Type Certificate**") to allow the issuance of the Export Certificate of Airworthiness.

7.2       Export Certificate of Airworthiness

Subject to the provisions of Clause 7.3, each Aircraft will be delivered to the Buyer with an Export Certificate of Airworthiness issued by EASA in a condition enabling the Buyer to obtain at the time of Delivery a Standard Airworthiness Certificate issued pursuant to Part 21 of the US Federal Aviation Regulations and a Certificate of Sanitary Construction issued by the U.S. Public Health Service of the Food and Drug Administration.



7.3       Specification Changes before Aircraft Ready for Delivery

7.3.1     If, any time before the date on which an Aircraft is Ready for Delivery, any law, rule or regulation is enacted, promulgated, becomes effective and/or an interpretation of any law, rule or regulation is issued by the EASA that requires any change to the Specification for the purposes of obtaining the Export Certificate of Airworthiness (a "**Change in Law**"), the Seller will make the required modification and the parties hereto will sign an SCN pursuant to Clause 2.2.1.

7.3.2     The Seller will as far as practicable, but at its sole discretion and without prejudice to Clause 7.3.3(ii), take into account the information available to it concerning any proposed law, rule or regulation or interpretation that could become a Change in Law, in order to minimize the costs of changes to the Specification as a result of such proposed law, regulation or interpretation becoming effective before the applicable Aircraft is Ready for Delivery.

7.3.3     The cost of implementing the required modifications referred to in Clause 7.3.1 will be:

(i)       

ATTORNEYS'S EYES ONLY                                                              FRONTIER0012430



(ii)

7.3.4

7.4     Specification Changes after Aircraft Ready For Delivery

Nothing in Clause 7.3 will require the Seller to make any changes or modifications to, or to make any payments or take any other action with respect to, any Aircraft that is Ready for Delivery before the compliance date of any law or regulation referred to in Clause 7.3.

ATTORNEYS'S EYES ONLY                                              FRONTIER0012431

8 -    TECHNICAL ACCEPTANCE

8.1    Technical Acceptance Process

8.1.1    Prior to Delivery, the Aircraft will undergo a technical acceptance process developed by the Seller (the "**Technical Acceptance Process**"). Completion of the Technical Acceptance Process will demonstrate the satisfactory functioning of the Aircraft and will be deemed to demonstrate compliance with the Specification. Should it be established that the Aircraft does not comply with the Technical Acceptance Process requirements, the Seller will without hindrance from the Buyer be entitled to carry out any necessary changes and, as soon as practicable thereafter, resubmit the Aircraft to such further Technical Acceptance Process as is necessary to demonstrate the elimination of the non-compliance.

8.1.2    The Technical Acceptance Process will:

(i)    commence on a date notified by the Seller to the Buyer not later than ten (10) days notice prior thereto,

(ii)    take place at the Delivery Location,

(iii)    be carried out by the personnel of the Seller, and

(iv)    include a technical acceptance flight that will not exceed three (3) hours (the "**Technical Acceptance Flight**"), and

8.2    Buyer's Attendance

8.2.1    The Buyer is entitled to elect to attend the Technical Acceptance Process.

8.2.2    If the Buyer elects to attend the Technical Acceptance Process, the Buyer:

(i)    will comply with the reasonable requirements of the Seller, with the intention of completing the Technical Acceptance Process within five (5) Business Days after its commencement, and

(ii)    may have a maximum of four (4) of its representatives (no more than three (3) of whom will have access to the cockpit at any one time) accompany the Seller's representatives on the Technical Acceptance Flight, during which the Buyer's representatives will comply with the instructions of the Seller's representatives.

8.2.3    If the Buyer does not attend or fails to cooperate in the Technical Acceptance Process, the Seller will be entitled to complete the Technical Acceptance Process and the Buyer will be deemed to have accepted that the Technical Acceptance Process has been satisfactorily completed, in all respects.

8.3    Certificate of Acceptance

ATTORNEYS'S EYES ONLY                                                        FRONTIER0012432

Upon successful completion of the Technical Acceptance Process, the Buyer will, on or before the Delivery Date, sign and deliver to the Seller a certificate of acceptance in respect of the Aircraft in the form of Exhibit D (the "**Certificate of Acceptance**").

8.4    Finality of Acceptance

The Buyer's signature of the Certificate of Acceptance for the Aircraft will constitute waiver by the Buyer of any right it may have, under the Uniform Commercial Code as adopted by the State of New York or otherwise, to revoke acceptance of the Aircraft for any reason, whether known or unknown to the Buyer at the time of acceptance.

8.5    Aircraft Utilization

The Seller will, without payment or other liability, be entitled to use the Aircraft prior to Delivery as may be necessary to obtain the certificates required under Clause 7. Such use will not limit the Buyer's obligation to accept Delivery of the Aircraft hereunder.

The Seller will be authorized to use the Aircraft for up to twenty (20) hours for any other purpose without the specific agreement of the Buyer.

ATTORNEYS'S EYES ONLY                                                FRONTIER0012433

9 -    **DELIVERY**

9.1    Delivery Schedule

Subject to Clauses 2, 7, 8 10 and 18:

the Seller will have the Aircraft listed in the table below Ready for Delivery at the Delivery Location within the following months (each a "**Scheduled Delivery Month**") or quarters (each a "**Scheduled Delivery Quarter**"):



| Aircraft Rank | | Scheduled Delivery | |
|---|---|---|---|
| | | Quarter | Year |

110930_CT0905340_EXECUTION_PA_RJET_A320                                                    PA -26

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012434



| Aircraft Rank | | Scheduled Delivery | |
|---|---|---|---|
| | | | |
| 50 | A320 Aircraft | 1st | 2020 |
| 51 | A320 Aircraft | 1st | 2020 |
| 52 | A320 Aircraft | 1st | 2020 |
| 53 | A320 Aircraft | 1st | 2020 |
| 54 | A320 Aircraft | 1st | 2020 |
| 55 | A320 Aircraft | 2nd | 2020 |
| 56 | A320 Aircraft | 2nd | 2020 |
| 57 | A320 Aircraft | 2nd | 2020 |
| 58 | A320 Aircraft | 2nd | 2020 |
| 59 | A320 Aircraft | 3rd | 2020 |
| 60 | A320 Aircraft | 3rd | 2020 |
| 61 | A320 Aircraft | 3rd | 2020 |
| 62 | A320 Aircraft | 3rd | 2020 |
| 63 | A319 Aircraft | 4th | 2020 |
| 64 | A319 Aircraft | 4th | 2020 |
| 65 | A319 Aircraft | 4th | 2020 |
| 66 | A319 Aircraft | 4th | 2020 |
| 67 | A319 Aircraft | 4th | 2020 |
| 68 | A319 Aircraft | 1st | 2021 |
| 69 | A319 Aircraft | 1st | 2021 |
| 70 | A319 Aircraft | 1st | 2021 |
| 71 | A319 Aircraft | 1st | 2021 |
| 72 | A319 Aircraft | 2nd | 2021 |
| 73 | A319 Aircraft | 2nd | 2021 |
| 80 | A319 Aircraft | 4th | 2021 |

110930_CT0905340_EXECUTION_PA_RJET_A320

ATTORNEYS'S EYES ONLY

FRONTIER0012435

The Seller will give the Buyer the Scheduled Delivery Month of each Aircraft ▮▮▮▮▮▮ ▮▮▮▮ before the first day of the Scheduled Delivery Quarter of the respective Aircraft. The Seller will give the Buyer at least ▮▮▮▮▮▮ written notice of the anticipated date on which the Aircraft will be Ready for Delivery. Thereafter, the Seller will notify the Buyer of any change to such dates.

**9.2       Delivery Process**

9.2.1       The Buyer will, when the Aircraft is Ready for Delivery, pay the Balance of the Final Price, take Delivery of the Aircraft and remove the Aircraft from the Delivery Location.

9.2.2       The Seller will deliver and transfer title to the Aircraft to the Buyer free and clear of all encumbrances (except for any liens or encumbrances created by or on behalf of the Buyer) provided that the Balance of the Final Price of such Aircraft has been paid by the Buyer pursuant to Clause 5.4 and that the Certificate of Acceptance has been signed and delivered to the Seller pursuant to Clause 8.3. The Seller will provide the Buyer with a bill of sale in the form of Exhibit E (the "**Bill of Sale**") and such other documentation confirming transfer of title and receipt of the Final Price of the Aircraft as may reasonably be requested by the Buyer. Title to, property in and risk of loss of or damage to the Aircraft will transfer to the Buyer contemporaneously with the delivery by the Seller to the Buyer of such Bill of Sale.

9.2.3       If the Buyer fails to (i) deliver the signed Certificate of Acceptance with respect to an Aircraft to the Seller when required pursuant to Clause 8.3, or (ii) pay the Balance of the Final Price of such Aircraft to the Seller and take Delivery of the Aircraft, then the Buyer will be deemed to have rejected Delivery wrongfully when such Aircraft was duly tendered to the Buyer hereunder. If such deemed rejection arises, then in addition to the remedies of Clause 5.8.1, (a) the Seller will retain title to such Aircraft and (b) the Buyer will indemnify and hold the Seller harmless against any and all costs (including but not limited to any parking, storage, and insurance costs) and consequences resulting from the Buyer's rejection (including but not limited to risk of loss of or damage to such Aircraft), it being understood that the Seller will be under no duty to the Buyer to store, park, insure or otherwise protect such Aircraft. These rights of the Seller will be in addition to the Seller's other rights and remedies in this Agreement.

9.2.4       If the Buyer fails to remove the Aircraft from the Delivery Location, then, without prejudice to the Seller's other rights and remedies under this Agreement or at law, the provisions of Clause 9.2.3 (b) shall apply.

9.3       Flyaway

9.3.1       The Buyer and the Seller will cooperate to obtain any licenses that may be required by the Aviation Authority of the Delivery Location for the purpose of exporting the Aircraft.

9.3.2       All expenses of, or connected with, flying the Aircraft from the Delivery Location after Delivery will be borne by ▮▮▮▮▮. ▮▮▮▮▮▮ will make direct arrangements with the supplying companies for the fuel and oil required for all post-Delivery flights.

110930_CT0905340_EXECUTION_PA_RJET_A320                                      PA -28

110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -29

ATTORNEYS'S EYES ONLY                                    FRONTIER0012437

**10 -    EXCUSABLE DELAY AND TOTAL LOSS**

10.1    Scope of Excusable Delay

Neither the Seller nor any Affiliate of the Seller, will be responsible for or be deemed to be in default on account of delays in delivery of the Aircraft or failure to deliver or otherwise in the performance of this Agreement or any part hereof due to causes beyond the Seller's, or any Affiliate's control or not occasioned by the Seller's, fault or negligence ("**Excusable Delay**"), including, but not limited to:



10.2    Consequences of Excusable Delay

If an Excusable Delay occurs:

(i)    the Seller will notify the Buyer of such Excusable Delay as soon as practicable after becoming aware of the same;

(ii)    

(iii)    the Seller will not be deemed to be in default in the performance of its obligations hereunder as a result of such Excusable Delay;

(iv)    the Seller will as soon as practicable after the removal of the cause of such delay resume performance of its obligations under this Agreement and in particular will notify the Buyer of the revised Scheduled Delivery Month.

ATTORNEYS'S EYES ONLY                                                        FRONTIER0012438

10.3    Termination on Excusable Delay

10.3.1  If any Delivery is delayed as a result of an Excusable Delay for a period of more than ▓▓▓▓▓ months after the last day of the Scheduled Delivery Month, then either party may terminate this Agreement with respect to the affected Aircraft, by giving written notice to the other party within ▓▓▓▓▓ days after the expiration of such ▓▓▓▓▓ month period. However, the Buyer will not be entitled to terminate this Agreement pursuant to this Clause 10.3.1 if the Excusable Delay is caused directly or indirectly by the action or inaction of the Buyer.

10.3.2  If the Seller advises the Buyer in its notice of a revised Scheduled Delivery Month pursuant to Clause 10.2.1(iv) that there will be a delay in Delivery of an Aircraft of more than ▓▓▓▓▓ months after the last day of the Scheduled Delivery Month, then either party may terminate this Agreement with respect to the affected Aircraft. Termination will be made by giving written notice to the other party within ▓▓▓▓▓ days after the Buyer's receipt of the notice of a revised Scheduled Delivery Month.

10.3.3  If this Agreement is not terminated under the terms of Clause 10.3.1 or 10.3.2, then the Seller will be entitled to reschedule Delivery. The Seller will notify the Buyer of the new Scheduled Delivery Month after the ▓▓▓▓▓ day period referred to in Clause 10.3.1 or 10.3.2, and this new Scheduled Delivery Month will be deemed to be an amendment to the applicable Scheduled Delivery Month in Clause 9.1.

10.4    Total Loss, Destruction or Damage

If, prior to Delivery, any Aircraft is lost or destroyed or in the reasonable opinion of the Seller is damaged beyond economic repair ("**Total Loss**"), the Seller will notify the Buyer to this effect within ▓▓▓▓▓ of such occurrence. The Seller will include in said notification (or as soon after the issue of the notice as such information becomes available to the Seller) the earliest date consistent with the Seller's other commitments and production capabilities that an aircraft to replace the Aircraft may be delivered to the Buyer, and the Scheduled Delivery Month will be extended as specified in the Seller's notice to accommodate the delivery of the replacement aircraft; provided, however, that if the Scheduled Delivery Month is extended to a month that is later than ▓▓▓▓▓) months after the last day of the original Scheduled Delivery Month then this Agreement will terminate with respect to said Aircraft unless:

(i)     the Buyer notifies the Seller within ▓▓▓▓▓ of the date of receipt of the Seller's notice that it desires the Seller to provide a replacement aircraft during the month quoted in the Seller's notice; and

(ii)    the parties execute an amendment to this Agreement recording the change in the Scheduled Delivery Month.

Nothing herein will require the Seller to manufacture and deliver a replacement aircraft if such manufacture would require the reactivation of its production line for the model or series of aircraft that includes the Aircraft.

10.5    Termination Rights Exclusive

110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA-31

ATTORNEYS'S EYES ONLY                                    FRONTIER0012439

If this Agreement is terminated as provided for under the terms of Clauses 10.3 or 10.4, such termination will discharge all obligations and liabilities of the parties hereunder with respect to such affected Aircraft and undelivered material, services, data or other items applicable thereto and to be furnished under the Agreement.

10.6    Remedies



ATTORNEYS'S EYES ONLY                                        FRONTIER0012440

11 -   **INEXCUSABLE DELAY**

11.1   Liquidated Damages

Should an Aircraft not be Ready for Delivery within ▉▉▉▉▉▉ after the last day of the
Scheduled Delivery Month (as such month may be changed pursuant to Clauses 2, 7 and/or 10)
(the "**Delivery Period**") and such delay is not as a result of an Excusable Delay or Total Loss,
then such delay will be termed an "**Inexcusable Delay**." In the event of an Inexcusable Delay,
the Buyer will have the right to claim, and the Seller will pay the Buyer liquidated damages of US
▉▉▉▉▉▉▉▉▉▉ for each day of delay in the Delivery starting on the date
falling ▉▉▉▉▉▉ after the last day of the Scheduled Delivery Month for such
Aircraft.

In no event will the amount of liquidated damages exceed the total of ▉▉▉▉ (US
dollars—▉▉▉▉▉▉▉ in respect of any one Aircraft.

The Buyer's right to liquidated damages in respect of an Aircraft is conditioned on the Buyer's
submitting a written claim for liquidated damages to the Seller not later than ▉▉▉ days after
the last day of the Scheduled Delivery Month.

11.2   Renegotiation

If, as a result of an Inexcusable Delay, the Delivery does not occur within ▉▉▉▉▉▉ after the
last day of the Delivery Period the Buyer will have the right, exercisable by written notice to the
Seller given between ▉▉▉▉▉▉▉▉▉▉ after lapse of such ▉▉▉▉▉
period, to require from the Seller a renegotiation of the Scheduled Delivery Month for the
affected Aircraft. Unless otherwise agreed between the Seller and the Buyer during such
renegotiation, the said renegotiation will not prejudice the Buyer's right to receive liquidated
damages in accordance with Clause 11.1.

11.3   Termination

If, as a result of an Inexcusable Delay, the Delivery does not occur within ▉▉▉▉▉▉
after the last day of the Delivery Period and the parties have not renegotiated the Delivery Date
pursuant to Clause 11.2, then both parties will have the right exercisable by written notice to the
other party, given between t▉▉▉▉▉▉▉▉ after the lapse of such
▉▉▉ period, to terminate this Agreement in respect of the affected Aircraft. In the event of
termination, neither party will have any claim against the other, ▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

11.4   Remedies



ATTORNEYS'S EYES ONLY                                              FRONTIER0012441



110930_CT0905340_EXECUTION_PA_RJET_A320                    PA -34

ATTORNEYS'S EYES ONLY                    FRONTIER0012442

12 -    **WARRANTIES AND SERVICE LIFE POLICY**

This Clause covers the terms and conditions of the warranty and service life policy.



110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -35

ATTORNEYS'S EYES ONLY                                    FRONTIER0012443



12.3    Supplier Warranties and Service Life Policies



12.3.1    Definitions

12.3.1.1    "**Supplier**" means any supplier of Supplier Parts.

12.3.1.2    "**Supplier Part**" means any component, equipment, accessory or part installed in an Aircraft at the time of Delivery thereof and for which there exists a Supplier Product

110930_CT0905340_EXECUTION_PA_RJET_A320                                PA -45

THIS CLAUSE 12 SETS FORTH THE EXCLUSIVE WARRANTIES, EXCLUSIVE LIABILITIES AND EXCLUSIVE OBLIGATIONS OF THE SELLER, AND THE EXCLUSIVE REMEDIES AVAILABLE TO THE BUYER, WHETHER UNDER THIS AGREEMENT OR OTHERWISE, ARISING FROM ANY DEFECT OR NONCONFORMITY OR PROBLEM OF ANY KIND IN ANY AIRCRAFT, COMPONENT, EQUIPMENT, ACCESSORY, PART, SOFTWARE, DATA OR SERVICE DELIVERED BY THE SELLER UNDER THIS AGREEMENT.



110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -48

ATTORNEYS'S EYES ONLY                                    FRONTIER0012456



110930_CT0905340_EXECUTION_PA_RJET_A320                    PA -49

ATTORNEYS'S EYES ONLY                                    FRONTIER0012457

12.8    Disclosure to Third Party Entity

In the event of the Buyer intending to designate a third party entity (a "**Third Party Entity**") to administer this Clause 12, the Buyer will notify the Seller of such intention prior to any disclosure of this Clause to the selected Third Party Entity and will cause such Third Party Entity to enter into a confidentiality agreement and or any other relevant documentation with the Seller solely for the purpose of administrating this Clause 12.

12.9    Transferability

Without prejudice to Clause 21.1, the Buyer's rights under this Clause 12 may not be assigned, sold, transferred, novated or otherwise alienated by operation of law or otherwise, without the Seller's prior written consent, which will not be unreasonably withheld.

Any transfer in violation of this Clause 12.9 will, as to the particular Aircraft involved, void the rights and warranties of the Buyer under this Clause 12 and any and all other warranties that might arise under or be implied in law.

ATTORNEYS'S EYES ONLY                                                FRONTIER0012458

13 -    **PATENT AND COPYRIGHT INDEMNITY**



ATTORNEYS'S EYES ONLY                                    FRONTIER0012459



14.11     Waiver, Release and Renunciation

ATTORNEYS'S EYES ONLY                    FRONTIER0012466



14.12    Proprietary Rights

14.13    Performance Engineer's Program

14.14    Future Developments

110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -59

ATTORNEYS'S EYES ONLY                                              FRONTIER0012467



14.15    Confidentiality

14.15.1    This Clause, the Technical Data, the Software Services and their content are designated as confidential. All such Technical Data and Software Services are provided to the Buyer for the sole use of the Buyer who undertakes not to disclose the contents thereof to any third party without the prior written consent of the Seller, except as permitted therein or pursuant to any government or legal requirement imposed upon the Buyer.

14.15.2    If the Seller authorizes the disclosure of this Clause or of any Technical Data or Software Services to third parties either under this Agreement or by an express prior written authorization or, specifically, where the Buyer intends to designate a maintenance and repair organization or a third party to perform the maintenance of the Aircraft or to perform data processing on its behalf (each a "**Third Party**"), the Buyer will notify the Seller of such intention prior to any disclosure of this Clause and/or the Technical Data and/or the Software Services to such Third Party.

The Buyer hereby undertakes to cause such Third Party to agree to be bound by the conditions and restrictions set forth in this Clause 14 with respect to the disclosed Clause, Technical Data or Software Services and will in particular cause such Third Party to enter into a confidentiality agreement with the Seller and appropriate licensing conditions, and to commit to use the Technical Data solely for the purpose of maintaining the Buyer's Aircraft and the Software Services exclusively for processing the Buyer's data.

14.16    Transferability

Without prejudice to Clause 21.1, the Buyer's rights under this Clause 14 may not be assigned, sold, transferred, novated or otherwise alienated by operation of law or otherwise, without the Seller's prior written consent.

Any transfer in violation of this Clause 14.16 will, as to the particular Aircraft involved, void the rights and warranties of the Buyer under this Clause 14 and any and all other warranties that might arise under or be implied in law.

ATTORNEYS'S EYES ONLY                                                        FRONTIER0012468

15 -      **SELLER REPRESENTATIVE SERVICES**

The Seller will provide at no charge to the Buyer the services described in this Clause 15, at the Buyer's main base or at other locations to be mutually agreed.

15.1      Customer Support Representative(s)



15.2      Buyer's Support

ATTORNEYS'S EYES ONLY                                                        FRONTIER0012469



15.3    Withdrawal of the Seller Representative

15.4    Indemnities

INDEMNIFICATION PROVISIONS APPLICABLE TO THIS CLAUSE 15 ARE SET FORTH IN CLAUSE 19.

ATTORNEYS'S EYES ONLY

APPENDIX A TO CLAUSE 15

## SELLER REPRESENTATIVE ALLOCATION

The Seller Representative allocation provided to the Buyer pursuant to Clause 15.1 is defined hereunder.



ATTORNEYS'S EYES ONLY                                        FRONTIER0012471

16.7     Performance / Operations Courses



16.8     Maintenance Training



16.8.2     Practical Training on Aircraft



16.9     Supplier and Propulsion System Manufacturer Training



16.10    Proprietary Rights

All proprietary rights, including but not limited to patent, design and copyrights, relating to the Seller's training data and documentation will remain with the Seller and/or its Affiliates and/or its Suppliers, as the case may be.

These proprietary rights will also apply to any translation into a language or languages or media that may have been performed or caused to be performed by the Buyer.

ATTORNEYS'S EYES ONLY                                              FRONTIER0012478

16.11    Confidentiality

The Seller's training data and documentation are designated as confidential and as such are provided to the Buyer for the sole use of the Buyer, for training of its own personnel, who undertakes not to disclose the content thereof in whole or in part, to any third party without the prior written consent of the Seller, save as permitted herein or otherwise pursuant to any government or legal requirement imposed upon the Buyer.

In the event of the Seller having authorized the disclosure of any training data and documentation to third parties either under this Agreement or by an express prior written authorization, the Buyer will cause such third party to agree to be bound by the same conditions and restrictions as the Buyer with respect to the disclosed training data and documentation and to use such training data and documentation solely for the purpose for which they are provided.

16.12    Transferability

Without prejudice to Clause 21.1, the Buyer's rights under this Clause 16 may not be assigned, sold, transferred, novated or otherwise alienated by operation of law or otherwise, without the Seller's prior written consent.

16.13    Indemnities and Insurance

INDEMNIFICATION    PROVISIONS    AND    INSURANCE    REQUIREMENTS APPLICABLE TO THIS CLAUSE 16 ARE AS SET FORTH IN CLAUSE 19.

THE BUYER WILL PROVIDE THE SELLER WITH AN ADEQUATE INSURANCE CERTIFICATE PRIOR TO ANY TRAINING ON AIRCRAFT.

ATTORNEYS'S EYES ONLY                                                                   FRONTIER0012479

19 –    INDEMNITIES AND INSURANCE

The Seller and the Buyer will each be liable for Losses (as defined below) arising from the acts or omissions of their respective directors, officers, agents or employees occurring during or incidental to such party's exercise of its rights and performance of its obligations under this Agreement, except as provided in Clauses 19.1 and 19.2.

19.1    Seller's Indemnities

The Seller will, except in the case of gross negligence or wilful misconduct of the Buyer, its directors, officers, agents and/or employees, be solely liable for and will indemnify and hold the Buyer, its Affiliates and each of their respective directors, officers, agents, employees and insurers harmless against all losses, liabilities, claims, damages, costs and expenses, including court costs and reasonable attorneys' fees ("**Losses**"), arising from:

(i)    claims for injuries to, or death of, the Seller's directors, officers, agents or employees, or loss of, or damage to, property of the Seller or its employees when such Losses occur during or are incidental to either party's exercise of any right or performance of any obligation under this Agreement, and

(ii)    claims for injuries to, or death of, third parties, or loss of, or damage to, property of third parties, occurring during or incidental to the Technical Acceptance Flights.

19.2    Buyer's Indemnities

The Buyer will, except in the case of gross negligence or wilful misconduct of the Seller, its directors, officers, agents and/or employees, be solely liable for and will indemnify and hold the Seller, its Affiliates, its subcontractors, and each of their respective directors, officers, agents, employees and insurers, harmless against all Losses arising from:

(i)    claims for injuries to, or death of, the Buyer's directors, officers, agents or employees, or loss of, or damage to, property of the Buyer or its employees, when such Losses occur during or are incidental to either party's exercise of any right or performance of any obligation under this Agreement, and

(ii)    claims for injuries to, or death of, third parties, or loss of, or damage to, property of third parties, occurring during or incidental to (a) the provision of Seller Representatives services under Clause 15 including services performed on board the aircraft or (b) the provision of Aircraft Training Services to the Buyer.

19.3    Notice and Defense of Claims



ATTORNEYS'S EYES ONLY                                                       FRONTIER0012488



19.4     Insurance

ATTORNEYS'S EYES ONLY                                                       FRONTIER0012489

**20 -** **TERMINATION**

20.1    Termination Events

Each of the following will constitute a "**Termination Event**"

(1)    The Buyer or any of its Affiliates commences in any jurisdiction any case, proceeding or other action with respect to the Buyer or any of its Affiliates or their properties relating to bankruptcy, insolvency, reorganization, winding-up, liquidation, dissolution or other relief from, or with respect to, or readjustment of, its debts or obligations.

(2)    An action is commenced in any jurisdiction seeking the appointment of a receiver, trustee, custodian or other similar official for the Buyer or any of its respective Affiliates or for all or any substantial part of their respective assets, and such action remains unstayed, undismissed or undischarged for sixty (60) days, or the Buyer or any of its Affiliates makes a general assignment for the benefit of its creditors.



(7)    The Buyer or any of its Affiliates fails to make payment of (i) any payment required to be made under this Agreement or any other material agreement between the Buyer or any of its Affiliates and the Seller or any of its Affiliates when such payment is due, (ii) any Predelivery Payment required to be made under this Agreement when such payment is due, or (iii) payment of all or part of the Final Price of any Aircraft required to be made under this Agreement.



(9)    The Buyer defaults in its obligation to take delivery of an Aircraft as provided in Clause 9.2.

110930_CT0905340_EXECUTION_PA_RJET_A320                                           PA -82



(11)     Any other event that the parties agree in writing constitutes a Termination Event.

20.2      Remedies in Event of Termination

20.2.1     If a Termination Event occurs, the Buyer will be in material breach of this Agreement, and the Seller can elect any of the following remedies under the applicable law:

A.     suspend its performance under this Agreement with respect to any or all Aircraft;
B.     reschedule the Scheduled Delivery Month of any or all Aircraft remaining to be delivered under this Agreement without prejudice to Seller's rights under Clause 5.8.2;
C.     suspend or reschedule the date for performance under this Agreement with respect to any or all equipment, services, data and other items; *and/or*
D.     cancel or terminate this Agreement (a "**Termination**") with respect to any or all Aircraft, and/or equipment, services, data and/or other items related thereto.

20.2.2     In the event Seller elects a remedy under any of Clauses 20.2.1(A)(B) or (C), above:

A.     Seller shall be entitled to any incidental damages incurred as a result of electing such remedy, including without limitation any commercially reasonable charges, expenses, commissions or costs of care or custody incurred in suspending or rescheduling performance after the Buyer's breach or any costs identified in Clause 9.2.3.1;
B.     Buyer shall compensate Seller for such incidental damages within ten (10) *calendar* days of Seller issuing an invoice for such damages to Buyer; and
C.     for the avoidance of doubt, nothing herein shall preclude Seller from subsequently electing a Termination under 20.2.1(D), above.

20.2.3     If the Seller elects a Termination under Clause 20.2.1(D) above:

A.     Seller may claim and receive payment from the Buyer, as liquidated damages and not as a penalty, an amount equal to, for each Affected Aircraft (as defined below), the amount set forth as follows (in each case, (i) less cash Predelivery Payments that have already been received by the Seller pursuant to Clause 5.3 at the time of such termination and solely to the extent such Predelivery Payments are attributable to the Affected Aircraft and (ii) plus the total amount of any credits, concessions or allowances extended by the Seller to the Buyer prior to the Applicable Date divided by the number of Aircraft on firm order and multiplied by the number of Affected Aircraft):

ATTORNEYS'S EYES ONLY                                                      FRONTIER0012491

    i.  if the Applicable Date (as defined below) occurs before the first day of the 48th month prior to the Scheduled Delivery Month of the Affected Aircraft: ███ █████████ of the Escalated Price (as defined below) of such Affected Aircraft;

   ii.  if the Applicable Date occurs on or after the first day of the 48th month but before the first day of the 36th month prior to the Scheduled Delivery Month of the Affected Aircraft: ████████ of the Escalated Price of such Affected Aircraft;

  iii.  if the Applicable Date occurs on or after the first day of the 36th month but before the first day of the 24th month prior to the Scheduled Delivery Month of the Affected Aircraft: ████████ of the Escalated Price of such Affected Aircraft;

  iv.  if the Applicable Date occurs on or after the first day of the 24th month but before the first day of the 18th month prior to the Scheduled Delivery Month of the Affected Aircraft: ████████ of the Escalated Price of such Affected Aircraft;

   v.  if the Applicable Date occurs on or after the first day of the 18th month but before the first day of the 12th month prior to the Scheduled Delivery Month of the Affected Aircraft: ████████ of the Escalated Price of such Affected Aircraft;

  vi.  if the Applicable Date occurs on or after the first day of the 12th month but before the first day of the 6th month prior to the Scheduled Delivery Month of the Affected Aircraft: ████████ of the Escalated Price of such Affected Aircraft; and

  vii.  if the Applicable Date occurs on or after the first day of the 6th month prior to the Scheduled Delivery Month of the Affected Aircraft: ████████ of the Escalated Price of such Affected Aircraft.

B.  Liquidated damages will be payable by the Buyer promptly, and in any event within ten (10) calendar days of the date of written notice and demand therefor from the Seller that the Buyer is in breach. The parties agree that the remedy of liquidated damages is not to be denied to the Seller due to the inability of the Seller to deliver a notice and demand for payment thereof due to the operation of law following a bankruptcy or other Termination Event under Clause 20.1(1) – (4).

20.2.4.  The parties to this Agreement are commercially sophisticated parties acting within the same industry, and represented by competent counsel and the parties expressly agree and declare as follows:

A.  damages for material breach of this Agreement by the Buyer resulting in a Termination of this Agreement as to any or all Aircraft have been liquidated at amounts that are reasonable in light of the anticipated or actual harm caused by the Buyer's breach, the difficulties of proof of loss and the nonfeasibility of otherwise obtaining an adequate remedy;

B.  it is understood and agreed by the parties that the amount of liquidated damages set forth herein is the total amount of monetary damages, no more and no less, to which the Seller will be entitled for and with respect to any Aircraft as recovery for material breach of this Agreement by Buyer resulting in a Termination by the Seller of this Agreement as to such Aircraft; provided, however, that for the avoidance of doubt the foregoing shall not be deemed to preclude Seller's

ATTORNEYS'S EYES ONLY                                        FRONTIER0012492

entitlement to (i) incidental damages where it is electing remedies under Clause 20.2.1(A),(B) or (C), (ii) exercise any set-off or similar rights under Clauses 5.6 and 5.12 with respect to payments due under this Clause 20 or (iii) interest specified in Clause 5.8.1 with respect to any payments overdue under this Clause 20; and

C.  the liquidated damages provision of this Clause 20 has been fully negotiated by sophisticated parties represented by counsel, is a material component of the consideration granted and, in the absence of such liquidated damages provision, the consideration would have been materially different.

20.3    Definitions

For purposes of this Clause 20, the terms "Affected Aircraft", "Applicable Date" and "Escalated Price" are defined as follows:

i.  **"Affected Aircraft"** – any or all Aircraft with respect to which the Seller has cancelled or terminated this Agreement pursuant to Clause 20.2.1 D,

ii.  **"Applicable Date"** – for any Affected Aircraft, the date the Seller issues the notice and demand for payment of liquidated damages pursuant to Clause 20.2.3 B.

iii.  **"Escalated Price"** - 

20.4    Notice of Termination Event

Within ten (10) days of becoming aware of the occurrence of a Termination Event by the Buyer, the Buyer will notify the Seller of such occurrence in writing, provided, that any failure by the Buyer to notify the Seller will not prejudice the Seller's rights or remedies hereunder.

20.5    Information Covenants

The Buyer hereby covenants and agrees that, from the date of this Agreement until no further Aircraft are to be delivered hereunder, the Buyer will furnish or cause to be furnished to the Seller the following:

a.  Annual Financial Statements.  As soon as available and in any event no later than the date that the Buyer furnishes such annual statements to the Securities and Exchange Commission or successor thereto (the "SEC") (i) a copy of the SEC Form 10-K filed by the Buyer with the SEC for such fiscal year, or, if no such Form 10-K was filed by the Buyer for such fiscal year, the consolidated balance sheet of the Buyer and its Subsidiaries, as at the end of such fiscal year and the related consolidated statements of operations, of common stockholders' equity

110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -85

(deficit) (in the case of the Buyer and its Subsidiaries) and of cash flows for such fiscal year, setting forth comparative consolidated figures as of the end of and for the preceding fiscal year, and examined by any firm of independent public accountants of recognized standing selected by the Buyer and reasonably acceptable to the Seller, whose opinion will not be qualified as to the scope of audit or as to the status of the Buyer as a going concern, and (ii) a certificate of such accounting firm stating that its audit of the business of the Buyer was conducted in accordance with generally accepted auditing standards.

b.  <u>Quarterly Financial Statements</u>.  As soon as available and in any event no later than the date that the Buyer furnishes such quarterly statements to the Securities and Exchange Commission or successor thereto, a copy of the SEC Form 10-Q filed by the Buyer with the SEC for such quarterly period, or, if no such Form 10-Q was filed by the Buyer with respect to any such quarterly period, the consolidated balance sheet of the Buyer and its Subsidiaries, as at the end of such quarterly period and the related consolidated statements of operations for such quarterly period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period and in each case setting forth comparative consolidated figures as of the end of and for the related periods in the prior fiscal year, all of which will be certified by an Authorized Officer of the Buyer, subject to changes resulting from audit and normal year-end audit adjustments.

c.  <u>Debt Rescheduling</u>.  (i) Promptly upon the Buyer commencing negotiations with one or more of its significant creditors with a view to general readjustment or rescheduling of all or any material part of its indebtedness under circumstances in which a reasonable business person, in the exercise of prudent business judgment, would conclude that the Buyer would otherwise not be able to pay such indebtedness as it falls due, notice of commencement of such negotiations, and (ii) thereafter timely advice of the progress of such negotiations until such negotiations are terminated or completed.

d.  

e.  <u>Other Information</u>.  Promptly upon transmission thereof, copies of any filings and registrations with, and reports to, the SEC by the Buyer or any of its Subsidiaries, and, with reasonable promptness, such other information or documents (financial or otherwise) as the Seller may reasonably request from time to time.

For the purposes of this Clause 20, (x) an **"Authorized Officer"** of the Buyer will mean the Chief Executive Officer, the Chief Financial Officer or any Vice President and above

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012494

who reports directly or indirectly to the Chief Financial Officer and (y) **"Subsidiaries"** will mean, as of any date of determination, those companies owned by the Buyer whose financial results the Buyer is required to include in its statements of consolidated operations and consolidated balance sheets.

20.6     Nothing contained in this Clause 20 will be deemed to waive or limit the Seller's rights or ability to request adequate assurance under Article 2, Section 609 of the Uniform Commercial Code (the "UCC"). It is further understood that any commitment of the Seller or the Propulsion Systems manufacturer to provide financing to the Buyer shall not constitute adequate assurance under Article 2, Section 609 of the UCC.

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012495

21 -    ASSIGNMENTS AND TRANSFERS

21.1    Assignments

Except as hereinafter provided, neither party may sell, assign, novate or transfer its rights or obligations under this Agreement to any person without the prior written consent of the other, except that the Seller may sell, assign, novate or transfer its rights or obligations under this Agreement to any Affiliate without the Buyer's consent.

21.2    Assignments on Sale, Merger or Consolidation

The Buyer will be entitled to assign its rights under this Agreement at any time due to a merger, consolidation or a sale of all or substantially all of its assets, provided the Buyer first obtains the written consent of the Seller. The Buyer will provide the Seller with no less than 90 days notice if the Buyer wishes the Seller to provide such consent.



21.3    Designations by Seller

The Seller may at any time by notice to the Buyer designate facilities or personnel of the Seller or any other Affiliate of the Seller at which or by whom the services to be performed under this Agreement will be performed. Notwithstanding such designation, the Seller will remain ultimately responsible for fulfilment of all obligations undertaken by the Seller in this Agreement.

21.4    Transfer of Rights and Obligations upon Reorganization

In the event that the Seller is subject to a corporate restructuring having as its object the transfer of, or succession by operation of law in, all or a substantial part of its assets and liabilities, rights and obligations, including those existing under this Agreement, to a person (the "**Successor**") that is an Affiliate of the Seller at the time of that restructuring, for the purpose of the Successor

110930_CT0905340_EXECUTION_PA_RJET_A320                                    PA -88

ATTORNEYS'S EYES ONLY                                    FRONTIER0012496

carrying on the business carried on by the Seller at the time of the restructuring, such restructuring will be completed without consent of the Buyer following notification by the Seller to the Buyer in writing. The Buyer recognizes that succession of the Successor to the Agreement by operation of law that is valid under the law pursuant to which that succession occurs will be binding upon the Buyer.

ATTORNEYS'S EYES ONLY                                                    FRONTIER0012497

## 22 -    MISCELLANEOUS PROVISIONS

### 22.1    Data Retrieval

On the Seller's reasonable request no more frequently than once in any twelve month period, the Buyer will provide the Seller with all the necessary data, as customarily compiled by the Buyer and pertaining to the operation of the Aircraft, to assist the Seller in making an efficient and coordinated survey of all reliability, maintenance, operational and cost data with a view to monitoring the efficient and cost effective operations of the Airbus fleet worldwide

### 22.2    Notices

All notices, requests and other communications required or authorized hereunder will be given in writing either by personal delivery to a authorized officer of the party to whom the same is given or by commercial courier, certified air mail (return receipt requested) or facsimile at the addresses and numbers set forth below. The date on which any such notice or request is received (or delivery is refused), will be deemed to be the effective date of such notice or request.

The Seller will be addressed at:

Airbus S.A.S.



The Buyer will be addressed at:

Republic Airways Holdings Inc.



From time to time, the party receiving the notice or request may designate another address or another person.

### 22.3    Waiver

The failure of either party to enforce at any time any of the provisions of this Agreement, to exercise any right herein provided or to require at any time performance by the other party of any of the provisions hereof will in no way be construed to be a present or future waiver of such provisions nor in any way to affect the validity of this Agreement or any part hereof or

110930_CT0905340_EXECUTION_PA_RJET_A320                                      PA -90

ATTORNEYS'S EYES ONLY                                      FRONTIER0012498

the right of the other party thereafter to enforce each and every such provision. The express waiver by either party of any provision, condition or requirement of this Agreement will not constitute a waiver of any future obligation to comply with such provision, condition or requirement.

22.4    International Supply Contract

The Buyer and the Seller recognize that this Agreement is an international supply contract which has been the subject of discussion and negotiation, that all its terms and conditions are fully understood by the parties, and that the Specification and price of the Aircraft and the other mutual agreements of the parties set forth herein were arrived at in consideration of, inter alia, all provisions hereof specifically including all waivers, releases and remunerations by the Buyer set out herein.

22.5    Certain Representations of the Parties

22.5.1    Buyer's Representations

The Buyer represents and warrants to the Seller:

(i)    the Buyer is a corporation organized and existing in good standing under the laws of the State of Delaware and has the corporate power and authority to enter into and perform its obligations under this Agreement;

(ii)    neither the execution and delivery by the Buyer of this Agreement, nor the consummation of any of the transactions by the Buyer contemplated thereby, nor the performance by the Buyer of the obligations thereunder, constitutes a breach of any agreement to which the Buyer is a party or by which its assets are bound;

(iii)    this Agreement has been duly authorized, executed and delivered by the Buyer and constitutes the legal, valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.

22.5.2    Seller's Representations

The Seller represents and warrants to the Buyer:

(i)    the Seller is organized and existing in good standing under the laws of the Republic of France and has the corporate power and authority to enter into and perform its obligations under the Agreement;

(ii)    neither the execution and delivery by the Seller of this Agreement, nor the consummation of any of the transactions by the Seller contemplated thereby, nor the performance by the Seller of the obligations thereunder, constitutes a breach of any agreement to which the Seller is a party or by which its assets are bound;

(iii)    this Agreement has been duly authorized, executed and delivered by the Seller and constitutes the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms.

ATTORNEYS'S EYES ONLY                                              FRONTIER0012499

22.6      Interpretation and Law

22.6.1      THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED AND THE PERFORMANCE THEREOF WILL BE DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

Each of the Seller and the Buyer (i) hereby irrevocably submits itself to the nonexclusive jurisdiction of the courts of the state of New York, New York County, and of the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement, the subject matter hereof or any of the transactions contemplated hereby brought by any party or parties hereto, and (ii) hereby waives, and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, to the extent permitted by applicable law, any defense based on sovereign or other immunity or that the suit, action or proceeding which is referred to in clause (i) above is brought in an inconvenient forum, that the venue of such suit, action or proceeding is improper, or that this Agreement or the subject matter hereof or any of the transactions contemplated hereby may not be enforced in or by these courts.

THE PARTIES HEREBY ALSO AGREE THAT THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS WILL NOT APPLY TO THIS TRANSACTION.

22.6.2      Service of process in any suit, action or proceeding in respect of any matter as to which the Seller or the Buyer has submitted to jurisdiction under Clause 22.6 may be made (i) on the Seller by delivery of the same personally or by dispatching the same via Federal Express, UPS, or similar international air courier service prepaid to, CT Corporation, New York City offices as agent for the Seller, it being agreed that service upon CT Corporation will constitute valid service upon the Seller or by any other method authorized by the laws of the State of New York, and (ii) on the Buyer by delivery of the same personally or by dispatching the same by Federal Express, UPS, or similar international air courier service prepaid, return receipt requested to its address for notices designated pursuant to Clause 22.2, or by any other method authorized by the laws of the State of New York; provided in each case that failure to deliver or mail such copy will not affect the validity or effectiveness of the service of process made as aforesaid.

22.7      Headings

All headings in this Agreement are for convenience of reference only and do not constitute a part of this Agreement.

22.8      Waiver of Jury Trial

EACH OF THE PARTIES HERETO WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM OR CROSS-CLAIM THEREIN.



ATTORNEYS'S EYES ONLY                                                              FRONTIER0012500

22.10    No Representations Outside of this Agreement

The parties declare that, prior to the execution of this Agreement, they, with the advice of their respective counsel, apprised themselves of sufficient relevant data in order that they might intelligently exercise their own judgments in deciding whether to execute this Agreement and in deciding on the contents of this Agreement. Each party further declares that its decision to execute this Agreement is not predicated on or influenced by any declarations or representations by any other person, party, or any predecessors in interest, successors, assigns, officers, directors, employees, agents or attorneys of any said person or party, except as set forth in this Agreement. This Agreement resulted from negotiation involving counsel for all of the parties hereto and no term herein will be construed or interpreted against any party under the contra proferentum or any related doctrine.

22.11    Confidentiality

Subject to any legal or governmental requirements of disclosure (whether imposed by applicable law, court order ortherwise), the parties (which for this purpose will include their employees and legal counsel) will maintain the terms and conditions of this Agreement and any reports or other data furnished hereunder strictly confidential, including but not limited to, the Aircraft pricing and all confidential, proprietary or trade secret information contained in any reports or other data furnished to it by the other party hereunder (the "**Confidential Information**"), provided that disclosure may be made to each party's respective accountants and lawyers so long as such accountants and lawyers have agreed to maintain the Confidential Information as strictly confidential. To the extent the Buyer furnishes any Confidential Information to its accountants or lawyers in accordance with this Clause 22.11, the Buyer agrees that it shall be liable to the Seller for damages resulting from unauthorized disclosures of Confidential Information by such parties. Without limiting the generality of the foregoing, the Buyer and the Seller will use their best efforts to limit the disclosure of the contents of this Agreement to the extent legally permissible in (i) any filing required to be made by the Buyer or the Seller with any governmental agency and will make such applications as will be necessary to implement the foregoing, and (ii) any press release concerning the whole or any part of the contents and/or subject matter hereof or of any future addendum hereto. With respect to any public disclosure or filing, each party agrees to submit to the other a copy of the proposed document to be filed or disclosed and will give the other party a reasonable period of time in which to review said document. The Buyer and the Seller will consult with each other prior to the making of any public disclosure or filing, permitted hereunder, of this Agreement or the terms and conditions thereof.

The provisions of this Clause 22.11 will survive any termination of this Agreement.

22.12    Severability

If any provision of this Agreement should for any reason be held ineffective, the remainder of this Agreement will remain in full force and effect. To the extent permitted by applicable law, each party hereto hereby waives any provision of law that renders any provision of this Agreement prohibited or unenforceable in any respect.

110930_CT0905340_EXECUTION_PA_RJET_A320                                          PA -93

22.13    Entire Agreement

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any previous understanding, commitments or representations whatsoever, whether oral or written. This Agreement will not be amended or modified except by an instrument in writing of even date herewith or subsequent hereto executed by both parties or by their fully authorized representatives.

22.14    Inconsistencies

In the event of any inconsistency between the terms of this Agreement and the terms contained in either (i) the Specification, or (ii) any other Exhibit, in each such case the terms of this Agreement will prevail over the terms of the Specification or any other Exhibit. For the purpose of this Clause 22.14, the term Agreement will not include the Specification or any other Exhibit hereto.

22.15    Language

All correspondence, documents and any other written matters in connection with this Agreement will be in English.

22.16    Counterparts

This Agreement has been executed in two (2) original copies.

Notwithstanding the foregoing, this Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute but one and the same instrument.

ATTORNEYS'S EYES ONLY                                    FRONTIER0012502

IN WITNESS WHEREOF, this A320 Family Aircraft Purchase Agreement was entered into as of the day and year first above written.

AIRBUS S.A.S.

By: _____

Title: _____
      Patrick de Castelbajac
      Vice President Contracts

REPUBLIC AIRWAYS HOLDINGS INC.

By: _____

Title: _____

Purchase Agreement SigPage

ATTORNEYS'S EYES ONLY

IN WITNESS WHEREOF, this A320 Family Aircraft Purchase Agreement was entered into as of the day and year first above written.

AIRBUS S.A.S.

By: _____

Title: _____


REPUBLIC AIRWAYS HOLDINGS INC.

By: _____

Title: __President_____

Purchase Agreement SigPage

ATTORNEYS'S EYES ONLY

FRONTIER0012504