EXECUTION VERSION

UMB BANK, N.A.,
NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS OWNER TRUSTEE,
AS LESSOR

AND

FRONTIER AIRLINES, INC.,
AS LESSEE

---

### AIRCRAFT LEASE AGREEMENT

LEASE OF ONE AIRBUS MODEL A320-251N
AIRCRAFT, MANUFACTURER'S SERIAL NO: 10038
UNITED STATES REGISTRATION MARK: N370FR
MAKE AND MODEL OF ENGINES: CFM
INTERNATIONAL, INC. MODEL LEAP-1A26
SERIAL NUMBERS OF ENGINES: 599709 AND 599720

---

COUNTERPART NO. ___ OF SIX (6) CONSECUTIVELY NUMBERED, MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT THAT THIS AIRCRAFT LEASE AGREEMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE IN THE UNITED STATES OF AMERICA OR ANY CORRESPONDING LAW IN ANY FOREIGN JURISDICTION, NO SECURITY INTEREST IN THIS AIRCRAFT LEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HERETO OTHER THAN COUNTERPART NO. 1.

CONFIDENTIAL

## CONTENTS

Clause                                                                                      Page

1.   Definitions and Interpretation ....................................................................1
2.   Representations and Warranties ................................................................18
3.   Conditions Precedent ...............................................................................22
4.   Commencement .........................................................................................28
5.   Disclaimers ...............................................................................................30
6.   Rent and Other Payments .........................................................................32
7.   Fees and Expenses ....................................................................................37
8.   General Undertakings................................................................................37
9.   Operational Undertakings.........................................................................39
10.  Maintenance and Repair ...........................................................................48
11.  Engines .....................................................................................................56
12.  Title ..........................................................................................................60
13.  Manufacturer's Warranties .......................................................................60
14.  Insurances .................................................................................................61
15.  Loss, Damage and Requisition..................................................................69
16.  Default ......................................................................................................71
17.  Payments on Event of Default...................................................................78
18.  Redelivery .................................................................................................81
19.  Indemnities ...............................................................................................85
20.  Further Provisions .....................................................................................94

**SCHEDULES**

Schedule 1 Aircraft Description................................................................. Sch. 1-1
Schedule 2 Lease Agreement Supplement No. 1......................................... Sch. 2-1
Schedule 3 Officer's Certificate................................................................. Sch. 3-1
Schedule 4 Redelivery Condition............................................................... Sch. 4-1
Schedule 5 Maintenance Status Report....................................................... Sch. 5-1
Schedule 6 Basic Rent and Other Terms.................................................... Sch. 6-1
Schedule 7 Form of Irrevocable Letter of Credit....................................... Sch. 7-1
Schedule 8 Maintenance Payments............................................................. Sch. 8-1
Schedule 9 Form of Quiet Enjoyment Letter.............................................. Sch. 9-1
Schedule 10 Form of Return Acceptance Certificate .................................. Sch. 10-1
Schedule 11 Form of Acceptance Certificate .............................................. Sch. 11-1

UMB0004087                                                                     CONFIDENTIAL

**THIS AIRCRAFT LEASE AGREEMENT** (this "**Agreement**") is made this __ day of March, 2020.

**BETWEEN**:

(1)    **UMB BANK, N.A.,** a national banking association organized under the laws of the United States of America having its principal office at 6550 S. Millrock Drive, Suite 150, Salt Lake City, UT 84121, not in its individual capacity but solely as owner trustee under the Trust Agreement (the "**Lessor**"); and

(2)    **FRONTIER AIRLINES, INC.,** a corporation under the laws of the State of Colorado having its principal place of business at 4545 Airport Way, Denver, Colorado 80239, United States of America (the "**Lessee**").

**IT IS AGREED** as follows:

1.    **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

In this Agreement the following words and expressions have, except where the context otherwise requires, the following meanings:

"**6Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (i) the 6-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks, (ii) the relevant C-Check and lower checks, (iii) any CPCP tasks falling due at that interval and (iv) all Supplementary Structural Inspection (SSI) items.

"**12Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (a) the 12-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks; (b) the relevant C-Check and lower checks; (c) any CPCP tasks falling due at that interval; and (d) all Supplementary Structural Inspection (SSI) items.

"**Acceptance Certificate**" means the acceptance certificate substantially in the form set out in Schedule 11.

"**Additional Insured**" has the meaning specified in Section 14.5(b)(i).

"**Affiliate**" means, in respect of any person, any person directly or indirectly controlling, controlled by, or under common control with such first person or within the same corporate group as such first person; and a person shall be deemed to control another person if such first person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, contract or otherwise.

"**After-Tax Basis**" means, in respect of an amount (the "**base amount**") with respect to a person, the base amount supplemented by a future payment (the "**additional amount**"), if necessary, to such person such that, after the sum of the base amount and

UMB0004088
CONFIDENTIAL

the additional amount is reduced for all Taxes, if any, imposed on such person in respect of the sum of the base amount and the additional amount, the resulting amount shall be equal to the original base amount.

"**Agreed Value**" means the amount specified in Schedule 6.

"**Agreement**" means this Aircraft Lease Agreement and the Schedules hereto.

"**Aircraft**" means (a) the aircraft described in Part A of Schedule 1, including the Airframe, the Engines, the APU and all Parts installed in or on the Airframe at Delivery and all BFE; (b) all substituted and/or replacement Parts at any particular time installed in or on such aircraft; (c) any Parts installed in or on the Airframe following Delivery which have become the property of Lessor pursuant to this Agreement or a Lessee's Document; and (d) the Aircraft Documents; including, in the case of (a), (b) and (c), any Part which is for the time being detached from such aircraft but remains the property of Lessor pursuant to this Agreement.

"**Aircraft Documents**" means all of the documentation set forth or referred to in Part B of Schedule 1 and as may be supplemented from time to time, including on the Delivery Date (as set out in Annex 2 to Lease Supplement No. 1) and at redelivery of the Aircraft (as set out in Annex 2 to the Return Acceptance Certificate), and all technical data, manuals supplied by the Manufacturer or any other manufacturer or supplier (including, but not limited to, any updated or revised manuals), logs, records (including all historical records), computer data media and other materials and documents kept by Lessee or for the benefit of Lessee by any third party after Delivery or required to be kept with respect to the Aircraft or any part thereof whether in compliance with any applicable law or this Agreement or any requirement for the time being of the Aviation Authority or otherwise.

"**Aircraft 6Y Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**Aircraft 12Y Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**Airframe**" means the Aircraft, excluding the Engines, the APU and the Aircraft Documents.

"**Airframe Warranties Agreement**" means the Airframe Warranties Agreement, dated as of the Delivery Date, entered into by the Manufacturer, together with the initial notice thereunder specifying the Lessee as the "Initial Entitled Party" and specifying the Lessor as the "Initial Controlling Party", together with each and every further notice issued thereunder in accordance with the terms of such agreement, or such other agreement relating to the Manufacturer's airframe warranties in respect of the Aircraft entered into (or consented to, as the case may be) by the Lessor, the Lessee and the Manufacturer.

"**Airworthiness Directive**" means an airworthiness directive issued by the FAA.

"**Airworthiness Directive Threshold**" means the amount set forth in Schedule 6.

"**AMCK Aviation**" means AMCK Aviation Holdings Ireland Limited.

UMB0004089                                                                                   CONFIDENTIAL

"**AMM**" means the latest revision of the Manufacturer's Aircraft Maintenance Manual.

"**Annual Adjustment Date**" means the first day of the calendar month in which the Delivery Date occurred.

"**Approved Maintenance Performer**" means any person qualifying as a FAR-145 Approved Maintenance Organization and, for the purposes of any Engine Performance Restoration or Fan and/or LPT Module Performance Restoration, a person approved by the Engine OEM.

"**APU**" means (a) the auxiliary power unit specified in Part A of Schedule 1 and (b) any replacement APU unit installed on the Aircraft in accordance with Clause 10.4(d), including any such auxiliary power unit which, having been removed from the Aircraft, remains the property of Lessor pursuant to this Agreement.

"**APU Cycle**" means each cycle or part thereof elapsing from the moment at which the APU commences operating until the APU is shut down, whether for aircraft operations or testing.

"**APU Hour**" means each hour or part thereof elapsing from the moment at which the APU commences operating until the time the APU is shut down, whether for aircraft operations or testing.

"**APU Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**APU Overhaul**" means a complete power section disassembly, inspection and repair in accordance with the APU manufacturer's then current workscope planning guide entailing a complete disassembly of the power section at a minimum.

"**Assignment of Insurances**" means the Assignment of Insurances, dated as of the Delivery Date, between Lessor and Lessee together with the Notice and Acknowledgment relating thereto and entered into among each of the foregoing persons and acknowledged by Lessee's insurer or insurance broker, as the case may be.

"**Aviation Authority**" means the FAA and any successor thereto or other Government Entity which shall have control or supervision of civil aviation in the State of Registration or have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft.

"**Back to Birth Traceability**" means original documentary evidence specifying the part number and the unique serial number, and providing a detailed full operational history record acceptable to an EASA or FAA regulatory standard but in any event having the following:  (a) the Original Delivery Document where Original Delivery Document means (i) for a part delivered new as a spare part, the manufacturer's airworthiness document (FAA Form 8130-3 or EASA Form 1) showing the part number and serial number; and (ii) for a part delivered new installed on an assembly, the manufacturer's assembly bill of material listing showing part number, serial number, assembly serial number and where relevant the as-delivered model and thrust rating; (b) a certified removal/installation ('on/off') transaction history detailing an unbroken record of the hours and cycles elapsed at each relevant thrust rating (for engine LLPs) from new up to current; and (c) a statement from the previous operator disclosing whether or not it

UMB0004090

CONFIDENTIAL

was involved in any major incident or accident, exposed to over-temperature extreme stress condition or immersed in salt water and whether or not it was obtained from any government or military source.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Basic Rent**" means all and any amounts payable under Clause 6.1(a).

"**Basic Rent Payment Date**" has the meaning specified in Schedule 6.

"**BFE**" means the buyer furnished equipment supplied or purchased by or on behalf of the Lessee in respect of the Aircraft for installation by the Manufacturer pursuant to the Purchase Agreement on or before the Delivery Date or by Lessee following the Delivery Date, in each case as agreed by Lessor and/or the Servicer on behalf of the Lessor on the one hand and Lessee on the other hand, it being agreed that such buyer furnished equipment will include the buyer furnished equipment specified in Schedule 1.

"**BFE Bill of Sale**" means the bill of sale relating to the BFE to be executed by Lessee in favor of Lessor on the Delivery Date.

"**Break Costs**" means any costs, expenses, losses, liabilities, premium or penalties which the Lessor or the Owner Participant or any Affiliate of the Owner Participant is required to pay in order to repay funds raised to finance or refinance the Lessor's acquisition or ownership of the Aircraft or secured directly or indirectly by the Aircraft, or in unwinding (or maintaining or continuing to make payments under) any swap, hedge, cap, forward interest agreement or other financial instrument entered into in whole or in part in connection with the leasing or financing or refinancing of the Aircraft or secured by the Aircraft.

"**Business Day**" means (a) with respect to any requirement under the Lessee's Documents for the Lessee to make payments in U.S. Dollars, a day other than Saturday or Sunday, on which banks are open in the State of Colorado and the State of New York, USA and (b) for all other matters, a day, other than a Saturday or Sunday, on which banks are open in Dublin, Ireland, and the State of Colorado and the State of New York, USA for the transaction of business of the nature required by this Agreement.

"**Cape Town Convention**" means, collectively, the official English language texts of the Convention on International Interests in Mobile Equipment (the "**Convention**"), the Protocol to the Convention on Matters Specific to Aircraft Equipment (the "**Protocol**") both signed in Cape Town, South Africa on 16 November 2001 and the regulations and procedures enacted by the Supervisory Authority of the International Registry thereunder.

"**C-Check**" means a maintenance check on the Airframe under the Maintenance Program consisting of full and complete zonal, systems and structural inspection checks, all in accordance with the Maintenance Program, or if the Maintenance Program permits such structural checks to be performed in phases, the performance of such phases shall constitute a complete zonal, systems and structural block "C" check, but in any event not including repairs arising as the result of operational or maintenance mishandling or accidental damage, which will be sufficient to clear the

UMB0004091                                                                                                    CONFIDENTIAL

Aircraft for the C-Check Interval, which on the date hereof is 7,500 Flight Hours, 4,250 Cycles and 24 months, as such figures may be increased in accordance with the Maintenance Program.

"**C-Check Interval**" means the then current inspection intervals (or its equivalent in the future) in the Maintenance Program without reference to the specific tasks associated with such "Inspection Interval".

"**Certificated Air Carrier**" means any person (except the United States government) that:  (a) is a "citizen of the United States", as defined in Section 40102(a)(15)(c) of the Title 49 of the United States Code and (b) holds both (i) a Certificate of Public Convenience and Necessity issued under Section 41102 of Title 49 of the United States Code by the Department of Transportation or predecessor or successor agency thereto, or in the event such certificates are no longer issued, a person meeting the requirements set forth immediately above holding all necessary certificates, authorizations and licenses and legally engaged in the business of transporting passengers or cargo for hire by air predominantly to, from or between points within the United States of America, and (ii) an air carrier operating certificate issued pursuant to Chapter 447 of Title 49 of the United States Code for aircraft capable of carrying ten or more individual or 6,000 pounds or more of cargo thus entitling Lessor to the benefits of Section 1110.

"**CFM Tripartite Agreement**" means the CFM Rate Per Flight Hour Services Tri-partite Agreement dated as of March 6, 2018 (as amended, supplemented and otherwise modified from time to time), among the Lessee, Accipiter Holdings DAC and the Engine Manufacturer relating to the CFM RPFH Agreement.

"**CFM RPFH Agreement**" means the CFM Rate Per Flight Hour Agreement #1-2494673211 dated October 17, 2011, as assumed and amended, between the Lessee and the Engine Manufacturer.

"**CFM Lessor Maintenance Agreement**" means the Lessor Maintenance Agreement dated as of March 6, 2018 (as amended, supplemented and otherwise modified from time to time), between Accipiter Holdings DAC and the Engine Manufacturer, together with the LSA Addendum thereto relating to the Engines between the Lessor and the Engine Manufacturer.

"**Change**" has the meaning specified in Clause 10.6(a).

"**Compliance Date**" shall have the meaning provided in Clause 19.1(b)(i).

"**Consolidated Text**" shall have the meaning provided in Clause 3.4.

"**Code**" means the Internal Revenue Code of 1986.

"**Core Module**" means the following major modules of the Engines:

(a)    high pressure compressor;

(b)    high pressure turbine;

(c)    combustion chamber; and

UMB0004092    CONFIDENTIAL

(d)     stage one low pressure turbine.

"**CPCP**" means the Manufacturer's Corrosion Prevention Control Program.

"**CRAF**" means the Civil Reserve Aircraft Fleet as more fully described in Clause 9.3(c).

"**CRAF Activation Period**" has the meaning specified in Clause 9.3(c).

"**Cycle**" means one (1) take-off and landing of the Aircraft or, in respect of any Engine or Part temporarily installed on another aircraft, of that other aircraft.

"**Damage Notification Threshold**" means the amount specified in Schedule 6.

"**Default Rate**" means a rate of interest per annum equal to (a) if there is a Lender, the interest rate specified as the default or overdue rate with respect to the indebtedness secured by the Security Documents or (b) otherwise, LIBOR for such period as Lessor shall specify plus three point five (3.5) percent.

"**Delivery**" means delivery of the Aircraft by Lessor to Lessee on the Delivery Date.

"**Delivery Date**" means the date on which Delivery occurs.

"**Delivery Location**" means the location specified in Schedule 6 or such other location as may be mutually agreed in writing between Lessor and Lessee.

"**Early Termination Date**" means the day numerically corresponding to the day before the Delivery Date in the 96th calendar month after the calendar month in which the Delivery Date occurs or, if the Delivery Date occurs on the first day of the month, the last day of the 95th calendar month after the calendar month in which the Delivery Date occurs.

"**Early Termination Fee**" means the amount as specified in Schedule 6.

"**Early Termination Notice**" has the meaning specified in Section 4.4(a)

"**Early Termination Option**" has the meaning specified in Section 4.4(a)

"**EASA**" means the European Aviation Safety Agency established by the European Parliament and the Council of the European Union under Regulation (EC) Number 1592/2002 and any successor that under the laws of the European Union shall have from time to time control or supervision of civil aviation in the European Union or have jurisdiction over the registration, airworthiness or operation of all other matters relating to the Aircraft.

"**Engine**" means (a) each of the engines of the manufacture and model and having the respective manufacturer's serial numbers specified in Schedule 1 and all Parts installed in or on such engines at Delivery; (b) any Replacement Engine acquired by Lessor and which becomes leased to Lessee hereunder pursuant to Clause 15.2 and all Parts installed in or on such engine at the time of such acquisition and lease; and (c) all substituted and replacement Parts at any particular time installed in or on any of the said engines in accordance with this Agreement; including, in the case of (a) and (b)

UMB0004093                                                                                                        CONFIDENTIAL

above, any such engine which, having been removed from the Aircraft, remains the property of Lessor pursuant to this Agreement and, in the case of (a), (b) and (c) above, any Parts which, having been removed from any such engine, remain the property of Lessor pursuant to this Agreement.

"**Engine Manufacturer**" means CFM International, Inc.

"**Engine Rate Adjustment Factor**" has the meaning set forth in Schedule 6.

"**Engine Performance Restoration**" means an Engine shop visit in which at a minimum any of the following modules are exposed, disassembled and subsequently refurbished in accordance with the then-current OEM LEAP-1A Maintenance Guide: (i) high-pressure compressor, (ii) high-pressure turbine or (iii) combustion chamber.

"**Engine Performance Restoration (Non-RPFH Covered)**" means an Engine shop visit in which at a minimum the following modules are exposed, disassembled and subsequently refurbished in accordance with the then current OEM LEAP-1A Maintenance Guide definition for a performance restoration; (i) high-pressure compressor, (ii) high-pressure turbine, (iii) combustion chamber and (iv) low-pressure compressor.

"**Engine Restoration Maintenance Payment Rate (Full Term)**" means the amount specified as such in, and determined in accordance with, Schedule 6.

"**Engine Restoration Maintenance Payment Rate (Early Termination)**" means the amount specified as such in, and determined in accordance with, Schedule 6.

"**Engine Shortfall**" means the amount as specified in Schedule 6.

"**Engine Thrust Rating**" means the "Maximum Engine Thrust" of the Engines specified in Schedule 1.

"**Engine Warranties Assignment**" means the Engine Warranties Assignment Agreement dated as of the Delivery Date, by the Engine Manufacturer, together with the initial notice thereunder specifying the Lessee as the "Initial Entitled Party" and specifying the Lessor as the "Initial Controlling Party", together with each and every further notice issued thereunder in accordance with the terms of such agreement, or such other agreement relating to the Engine Manufacturer's engine warranties in respect of the Aircraft entered into (or consented to, as the case may be) by the Lessor, the Lessee and the Engine Manufacturer.

"**Event of Default**" means any of the events referred to in Clause 16.1.

"**Excluded Tax**" has the meaning set forth in Clause 19.2.

"**Expiry Date**" means the day numerically corresponding to the day before the Delivery Date in the 144th calendar month after the calendar month in which the Delivery Date occurs or, if the Delivery Date occurs on the first day of the month, the last day of the 143rd calendar month after the calendar month in which the Delivery Date occurs; **provided that**, if the Lessee duly exercises the Early Termination Option in accordance with Clause 4.4, "Expiry Date" means the Early Termination Date.

UMB0004094                                                                    CONFIDENTIAL

"**FAA**" means the Federal Aviation Administration of the Department of Transportation of the United States of America and any successor that under the laws of the United States of America shall from time to time have control or supervision of civil aviation in the United States of America or have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft.

"**FAA Bill of Sale**" has the meaning given to such term in Clause 2.1(f).

"**FAA Filed Documents**" has the meaning given to such term in Clause 2.1(f).

"**Fan Module**" means the (i) fan and booster; and (ii) low pressure compressor.

"**Fan and/or LPT Module Performance Restoration**" means a shop visit in which a Level 2 performance restoration is performed on the Fan Module and/or LPT Module, as applicable, in accordance with the then-current OEM LEAP-1A Maintenance Guide.

"**Fan and LPT Module Performance Restoration (Non-RPFH Covered)**" means a shop visit in which at a minimum the following modules are exposed, disassembled and subsequently refurbished in accordance with the then current OEM LEAP-1A Maintenance Guide definition for a performance restoration: (i) Fan Module and (ii) LPT Module.

"**FATCA**" means Section 1471 through 1474 of the Code (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1).

"**Federal Aviation Regulations**" or "**FAR**" means the regulations promulgated by the FAA pursuant to Title 49, Subtitle VII of the United States Code, including, for the avoidance of doubt, Part 25, Part 91 (as applicable), Part 121 and Part 129 (as applicable).

"**Financing Documents**" means all Loan Agreements and all Security Documents, swaps and forward interest rate agreements entered into in connection with any Loan Agreement and all other documents from time to time executed by Lessor, Owner Participant or any of its Affiliates or any third party by way of security for, or as a guarantee of the performance by, Lessor, Owner Participant or any of its Affiliates of its obligations under any Loan Agreement (whether or not such document secures any other obligations as well) and notified in writing to Lessee.

"**Flight Hour**" means each hour or part thereof elapsing from the moment at which the wheels of the Aircraft (or other aircraft in the case of Parts, the APU or Engines temporarily installed on such other aircraft) leave the ground on the take-off of the Aircraft (or such other aircraft) until the wheels of the Aircraft (or such other aircraft) touch the ground on the landing of the Aircraft (or such other aircraft) following such take-off.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Government Entity**" means (a) any national government, political subdivision thereof or local jurisdiction therein; (b) any instrumentality, board commission, court or agency of any of the foregoing, however constituted; and (c) any association,

UMB0004095    CONFIDENTIAL

organization or institution of which any of the foregoing is a member or to whose jurisdiction any thereof is subject or in whose activities any of the above is a participant.

"**Habitual Base**" means the jurisdiction set forth in Schedule 6.

"**Holdings**" means Frontier Airlines Holdings, Inc., a Delaware corporation.

"**I.A.T.A.**" means the International Air Transport Association.

"**ICAO**" means the International Civil Aviation Organization.

"**Incident and Accident Statement**" means a statement signed by Lessee's Quality Control Manager certifying that, other than as set out in detail in such certificate neither the Aircraft nor any Engine or Part thereon has ever been damaged in any 'accident' or 'incident' (as such terms are defined by the FAA) and has never been exposed to excessive heat, shock or salt water and that no Part has ever been procured form a military source.

"**Indemnitee**" means Lessor, Owner Participant, Servicer, Trust Company, each Lender and their respective successors, permitted assigns and their respective officers, directors, agents, shareholders, partners, members, managers, contractors, Affiliates and employees.

"**Inflight Equipment**" has the meaning specified in Clause 10.6(f).

"**International Registry**" shall mean the electronic registry maintained pursuant to the Cape Town Convention.

"**IRS**" means the Internal Revenue Service.

"**Landing Gear**" the complete strut assembly, consisting of the inner and outer cylinders of each main Landing Gear and nose Landing Gear and all associated parts that comprise each landing gear assembly (as listed in the Aircraft Documents) (including side struts, braces, and uplock and downlock mechanisms but excluding rotable parts such as wheels, tires, brakes, transducers and switch assemblies) as specified in Schedule 1 and any replacement landing gear installed on the Aircraft in accordance with the terms of this Agreement, title to which is vested in Lessor in accordance with this Agreement.

"**Landing Gear Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**Landing Gear Overhaul**" means an overhaul of a Landing Gear assembly in accordance with the Manufacturer's repair manual that restores such Landing Gear to a "zero time since overhaul" condition in accordance with the Manufacturer's repair manual and is performed in accordance with the Manufacturer's overhaul specifications and operating criteria (excluding any rotable components such as wheels, tires, brakes and consumable items).

"**LEAP-1A Maintenance Guide**" means the Engine Manufacturer's workscope planning guide for the applicable engine type.

UMB0004096                                                                                    CONFIDENTIAL

"**Lease Supplement No. 1**" means the lease supplement substantially in the form set out in Schedule 2.

"**Lender**" means one or more banks or financial institutions or other persons notified in writing to Lessee that may from time to time provide financing directly or indirectly to Lessor, Owner Participant or any of its Affiliates in relation to acquisition or continuing ownership of the Aircraft, or which is secured directly or indirectly by the Aircraft or the rights of the Lessor under this Agreement, and shall include any person acting as agent or security agent or trustee for one or more Lenders; **provided that**, any requirement in this Agreement to give notices to or receive consents from the Lender shall be disregarded until such time as the Lessor has identified one or more Lenders and has specified the Lender who is to be treated as the "Lender" for purposes of such requirements.

"**Lessee Caused Tax**" means any Tax imposed if and to the extent that such Tax results from (a) the negotiation, presence, execution, enforcement, registration, or delivery of any of the Operative Documents, (b) the presence, use, operation, maintenance, alteration, registration, repair, or replacement of the Aircraft or any part thereof, (c) the presence or organization of the Lessee, any sublessee or other person in possession of control of the Aircraft in, or payment of any amount under the Operative Document from such jurisdiction, (d) the gross negligence, recklessness or willful misconduct of the Lessee or other use of the Aircraft, or (e) the breach by Lessee of any of its representations or covenants under any Lessee's Document.

"**Lessee's Documents**" means (a) this Agreement, the Lease Supplement No. 1 and Acceptance Certificate, the CFM RPFH Agreement, the CFM Tripartite Agreement, the Warranty Bill of Sale, the BFE Bill of Sale, the Purchase Agreement Assignment, the Purchase Agreement insofar as it relates to the Aircraft, the Return Acceptance Certificate (when executed), the Assignment of Insurances, the Airframe Warranties Agreement, the Engine Warranties Assignment, any consent or confirmation of any such assignment of warranties in respect of the Aircraft, or any Engines, any acknowledgment and agreement with respect to the Security Documents executed by Lessee and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into by Lessee pursuant to or in connection with any of the foregoing; or (b) any other document or agreement with respect to the Aircraft which Lessee on the one hand and the Servicer or Lessor on the other hand agree in writing shall be a Lessee's Document.

"**Lessor Guarantee**" means a Guarantee from Lessor Guarantor in respect of Lessor's obligations under this Agreement.

"**Lessor Guarantor**" means Owner Participant.

"**Lessor's Lien**" means any Lien over the Aircraft arising as a result of (a) any act or omission of Lessor that constitutes a breach of any of the terms of this Agreement, (b) any indebtedness, liability or other obligation arising by, through or under Lessor that is unrelated to the Operative Documents or the transactions contemplated thereby or (c) the Financing Documents from time to time entered into by Lessor or (d) Taxes not indemnified by Lessee pursuant to the terms of Clause 19.2.

UMB0004097                                                                CONFIDENTIAL

"**Letter of Credit**" has the meaning set forth in Clause 6.2(c) and forming a portion of the Security for the Aircraft.

"**LIBOR**" has the meaning set forth in Schedule 6.

"**Lien**" means any mortgage, charge, pledge, lien, right of detention, right of set-off, right of de-registration or export, any "international interest" or "national interest" as defined in the Cape Town Convention or any encumbrance or security interest whatsoever, howsoever created or arising.

"**LLP**" means any Part for which a mandatory or established replacement time limit or inspection interval is specified in the type design, instructions for continued airworthiness or, in some cases, the maintenance manual.

"**LLP Replacement Event**" means, in respect of an Engine, the performance of scheduled replacement of LLP(s) for an Engine in accordance with the Engine Manufacturer's time limits manual certified cyclic life limits.

"**Loan Agreement**" means any agreement from time to time entered into between Lessor, Owner Participant or any Affiliate of the Owner Participant and one or more Lenders providing financing to Lessor, Owner Participant or any Affiliate of the Owner Participant in relation to the acquisition or continuing ownership of the Aircraft or which is secured, directly or indirectly, by the Aircraft or the beneficial interests of the Owner Participant under the Trust Agreement or the rights of the Lessor under this Agreement.

"**LPT Module**" means the low pressure turbine module.

"**Maintenance Adjustment Payments**" means the amounts to be paid by Lessee pursuant to Clause 18.7.

"**Maintenance Planning Document**" means the latest revision of the Manufacturer's recommended maintenance program for the Aircraft.

"**Maintenance Program**" means at any time a continuous airworthiness maintenance and inspection program of Lessee that is authorized and approved by the Aviation Authority and based on the Manufacturer's Maintenance Planning Document and in compliance with FAA guidelines, encompassing scheduled maintenance (including block maintenance), condition monitored maintenance, and/or on condition maintenance of the Airframe and Engines.

"**Maintenance Requirements**" has the meaning provided in Clause 10.1.

"**Major Modification**" means any Change that requires an FAA supplemental type certificate.

"**Manufacturer**" means Airbus S.A.S., a *société par actions simplifiée* organized and existing under the law of France, or Airbus Americas, Inc., a corporation incorporated and existing under the law of Delaware, United States, as applicable.

"**Maximum Change Amount**" means the amount specified in Schedule 6.

UMB0004098                                                                                CONFIDENTIAL

"**Minimum Liability Coverage Amount**" means the amount specified in Schedule 6.

"**Module**" means any of the Core Module, the Fan Module or the LPT Module, as the context may require.

"**Module Apportionment Percentage**" has the meaning specified in Schedule 6.

"**MRO**" means a maintenance and repair organization that is certified pursuant to FAR Part 145.

"**OEM**" means an original equipment manufacturer.

"**OEM Parts**" means any part that has been produced, approved or licensed for production by or on behalf of an OEM and is included in the illustrated parts catalogue.

"**Operative Documents**" means Lessee's Documents and the Financing Documents and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into pursuant to or in connection with any thereof.

"**Other Agreement**" means (a) any lease agreement relating to an Other Aircraft or (b) any other agreement that Lessee, on the one hand, and Lessor or the Servicer on behalf of the Lessor, on the other hand, agree is an "Other Agreement" for purposes of this Agreement.

"**Other Aircraft**" means any aircraft (other than the Aircraft) leased by Lessor or Owner Participant or an Affiliate of Owner Participant, on the one hand, to Lessee or Holdings or any of their respective subsidiaries, on the other hand.

"**Other Lessee's Documents**" has the meaning given to the term "Lessee's Documents" (or any functionally similar term) in any Other Agreement, and includes each Other Agreement.

"**Other Second Group Aircraft**" means any of the six (6) aircraft (other than the Aircraft) leased by Lessor or Owner Participant or an Affiliate of Owner Participant, on the one hand, to Lessee or Holdings or any of their respective subsidiaries, on the other hand, with scheduled delivery months, in the case of two aircraft April 2020, in the case of one aircraft May 2020, in case of one aircraft October 2020.

"**Owner Participant**" means Vermillion Aviation (Two) Limited.

"**Part**" means each part, component, appliance, accessory, instrument or other item of equipment (other than complete Engines or other engines) for the time being installed or incorporated in or attached to the Airframe or an Engine or which, having been removed therefrom, remains the property of Lessor pursuant to this Agreement, including, for the avoidance of doubt, all LLPs.

"**Permitted Lien**" means (a) any Lien in respect of Taxes which are either not yet assessed or, if assessed, not yet due and payable or if due and payable are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves are maintained by or an adequate bond has been provided by Lessee); (b) any Lien of an airport hangar-keeper, mechanic, material-man, carrier, employee or other similar Lien arising in the ordinary course of business by statute or by operation

UMB0004099                                                    CONFIDENTIAL

of law, in respect of obligations that are not overdue or that are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves have been maintained by or an adequate bond has been provided by Lessee); (c) any Lien created by, or which is expressly permitted under, the terms of any of the Operative Documents; and (d) any Lessor's Liens; **provided that** (in relation to (a) and (b) above), any such proceedings, or the continued existence of such Lien, do not involve any likelihood of the sale, forfeiture or loss of the Aircraft or an Engine or any interest therein or the imposition of any criminal or unindemnified civil liability upon the Lessor or any Indemnitee.

"**Permitted Transferee**" has the meaning set forth in Schedule 6.

"**PMA Part**" means a Part manufactured in accordance with a parts manufacturer approval under FAR Part 21, but excludes Parts that are manufactured with the license or approval of the OEM and are included in the illustrated parts catalogue.

"**Purchase Agreement**" means the A320 Family Aircraft Purchase Agreement dated as of September 30, 2011 between the Lessee and the Manufacturer, together with its various exhibits and appendices, as assigned, amended and supplemented from time to time.

"**Purchase Agreement Assignment**" means the Purchase Agreement Assignment in respect of the Aircraft to be entered into and dated as of the Delivery Date between Lessor and Lessee, and the related consent thereto by Manufacturer.

"**Quotation Date**" means, in relation to any period for which an interest rate is to be determined hereunder, the day on which quotations would ordinarily be given by prime banks in the London Interbank Market for deposits in the currency in relation to which such rate is to be determined for delivery on the first day of that period (the time on such day on which such quotations are given being 11:00 a.m. London time); **provided that**, if, for any period, quotation would ordinarily be given on more than one date, the Quotation Date for that period shall be the last of those dates.

"**RDAS**" has the meaning specified in Section 10.3(e).

"**Redelivery**" means the redelivery of the Aircraft to Lessor in compliance with the terms of this Agreement.

"**Redelivery C-Check**" has the meaning specified in Schedule 4.

"**Redelivery Date**" means the date on which Lessor accepts the Aircraft for Redelivery.

"**Rent**" means Basic Rent and Supplemental Rent.

"**Removed Engine**" has the meaning set forth in Clause 11.1(a).

"**Replacement Engine**" has the meaning set forth in Clause 15.2(c).

"**Replacement Part**" has the meaning set forth in Clause 10.4(g).

"**Return Acceptance Certificate**" means the certificate substantially in the form set out in Schedule 10.

UMB0004100                                                                                      CONFIDENTIAL

"**Return Location**" has the meaning provided in Clause 18.1.

"**Section 1110**" means Section 1110 of the Bankruptcy Code as in effect at any relevant time.

"**Security**" has the meaning provided in Clause 6.2.

"**Security Documents**" means any and all assignments by way of security, security agreements, mortgages or similar documents, instruments or agreements entered into by Lessor from time to time, and notified in writing to Lessee by Lessor, pursuant to which the Lessor grants a Lien in respect of any or all of Lessor's right, title and interest in and to the Aircraft, this Agreement and/or the other Lessee's Documents in favor of a Lender.

"**Servicer**" means AMCK Aviation or such other person that Lessor may notify Lessee in writing as being the servicer of this Agreement and the Aircraft from time to time.

"**Special FAA Counsel**" means Daugherty, Fowler, Peregrin, Haught and Jenson, or such other specialist FAA counsel as may be mutually agreed by Lessor and Lessee.

"**SRM**" means the latest revision of the Manufacturer's Structural Repair Manual.

"**State of Incorporation**" means the State of Colorado, U.S.A.

"**State of Registration**" means the either the United States of America or such other jurisdiction in which the Aircraft is then registered in accordance with the terms of this Agreement.

"**STC**" shall have the meaning as set forth in Clause 10.6(a).

"**Supplemental Rent**" means all amounts, liabilities and obligations (other than Basic Rent) which Lessee assumes or agrees to pay under this Agreement or any other Lessee's Document to Lessor or others, including Maintenance Adjustment Payments, and Security and Agreed Value payments.

"**Tax Indemnitee**" means each of Lessor, Owner Participant, Servicer, Trust Company, AMCK Aviation, each Lender and any Affiliate of any of the foregoing and if any such entity is treated as a partnership, a disregarded entity or other pass-through entity for tax purposes (each, a "**Pass-Through Entity**"), any person who owns, directly or indirectly through one or more Pass-Through Entities, an interest in the Pass-Through Entity and each of the respective successors and assigns of the foregoing.

"**Taxes**" means all present and future taxes, levies, imposts, duties, withholdings, fees or charges of any nature whatsoever, and wheresoever imposed, including value added tax, consumption tax or any other tax in respect of added value or any income (including gross income, minimum, alternative minimum, capital gains income, gross receipts and net receipts), franchise, transfer, sales, use, business, occupation, excise, personal property, real property, stamp, import, export or other tax imposed by a taxing authority of any country, or governmental subdivision thereof or therein or by any international authority, together with any penalties, additions to tax, fines or interest with respect to any of the foregoing; and "tax" and "taxation" shall be construed accordingly.

UMB0004101                                                                    CONFIDENTIAL

"**Term**" means the period commencing on the Delivery Date and ending on the Termination Date.

"**Termination Date**" means the Expiry Date, or, if earlier, (a) the date when Lessor terminates the leasing of the Aircraft to Lessee pursuant to the terms hereof, or (b) the date when Lessor receives the Agreed Value together with any other amounts then due and unpaid under Lessee's Documents, following a Total Loss of the Aircraft; **provided that**, if the Term is extended pursuant to Clause 18.4, the Termination Date shall be extended to the date when the Aircraft has been redelivered to Lessor in full compliance with this Agreement.

"**Total Loss**" means, in relation to the Aircraft, the Airframe, the APU or any Engine, any of the following:  (a) actual, constructive, compromised, arranged or agreed total loss (including any damage thereto or requisition for use or hire which results in an insurance settlement on the basis of a total loss); (b) destruction, damage beyond repair or being rendered permanently unfit for normal use for any reason whatsoever (which in the case of an Engine shall be determined jointly with the Engine Manufacturer); (c) requisition of title, confiscation, forfeiture, compulsory acquisition, sequestration, detention, seizure or other similar event; (d) its hijacking, theft or disappearance resulting in loss of possession by Lessee for a period of thirty (30) consecutive days or longer or on the last day of the Term; (e) any sale of the Aircraft in connection with a Lessee bankruptcy, whether by an administrator, trustee or court; or (f) any other occurrence not permitted under this Agreement which deprives Lessee, or any other person permitted to have possession or use of the Aircraft, of use or possession for a period of sixty (60) consecutive days or longer.

"**Transportation Code**" means subtitle VII of title 49, United States Code.

"**Trigger Event**" means, at Redelivery, that each of the following conditions is satisfied: (A) each of the CFM RPFH Agreement and the CFM Tripartite Agreement remains in full force and effect in respect of the Engines and (B) no event of default by Lessee has occurred and is continuing with respect to the Engines under the CFM RPFH Agreement or the CFM Tripartite Agreement (regardless of whether the same has been terminated).

"**Trust Agreement**" means the Trust Agreement (including each supplement thereto) relating to the Aircraft entered into on or prior to the Delivery Date between the Trust Company and the Owner Participant.

"**Trust Company**" means: (a) UMB Bank, N.A. a national banking association, in its individual capacity, or (b) if UMB Bank, N.A. is not then serving as Owner Trustee under the Trust Agreement, the entity serving as successor Owner Trustee, in its individual capacity.

"**UCC**" means the Uniform Commercial Code, as the same may be in effect in any applicable jurisdiction within the United States.

"**United States**" or "**U.S.**" means the United States of America; provided, that for geographic purposes, "United States" means, in aggregate, the 50 states and the District of Columbia of the United States of America.

UMB0004102                                                                                                    CONFIDENTIAL

"**US$,**" "**US Dollars**" **or** "**$**" means the lawful currency of the United States of America.

"**Warranty Bill of Sale**" means the bill of sale in respect of the Aircraft, in form and substance satisfactory to the Lessor, executed and delivered by the Manufacturer in favor of Lessor.

1.2     **Interpretation**

(a)     References in this Agreement to:

(i)     an Event of Default includes (except in relation to Clause 16.2) references to any event that, with the giving of notice and/or lapse of time and/or the making of a relevant decision contemplated by Clause 16.1 would constitute an Event of Default;

(ii)     Clauses or Schedules are, unless otherwise specified, references to Clauses of, and Schedules to, this Agreement;

(iii)     any statutory or other legislative provision shall be construed as including any statutory or legislative modification or re-enactment thereof, or any provision enacted in substitution therefor;

(iv)     the Aircraft include any part of the Aircraft, and, where the context so admits, any of the Aircraft Documents, and references to any part of the Aircraft include any part of any Engine;

(v)     the word "**person**" or "**persons**" or to words importing persons include individuals, partnerships, limited liability companies, corporations, Government Entities and other bodies, corporate or unincorporated, whether having distinct legal personality or not;

(vi)     references to "**Lessor**", "**Lessee**", "**Owner Participant**", "**Trust Company**", "**Servicer**" or any "**Lender**" includes each of their respective successors, assigns and transferees, subject, in each case, to any provisions hereof (if any) relating to permissible successions, transfers and assignments;

(vii)     any agreement shall include such agreement as it may from time to time be amended, restated, modified, supplemented, novated or substituted;

(viii)     an "**agreement**" also includes a concession, contract, deed, instrument, franchise, license, treaty or undertaking (in each case, whether oral or written);

(ix)     the "**assets**" of any person shall be construed as a reference to the whole or any part of its business, undertaking, property, assets and revenues (including any right to receive revenues);

(x)     "**indebtedness**" with respect to any person includes any obligation of that person (whether present or future, actual or contingent, secured or unsecured, as principal or surety or otherwise) for the payment or repayment of money, including (A) under acceptances, bills, bonds,

UMB0004103                                                                                     CONFIDENTIAL

debentures, notes or similar instruments; (B) under guarantees, indemnities or other assurances against financial loss; (C) under any finance or operating lease relating to any asset; or (D) in respect of any liability for the payment of any purchase price for any asset or services, payment of which is deferred for more than 180 days;

(xi)     "**law**" shall include common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, rule, statute, treaty, convention or other legislative measure in any jurisdiction or any present or future directive, regulation, procedure, request or requirement, or official or judicial interpretation of any of the foregoing, in each case having the force of law;

(xii)    "**month**" are references to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month (and references to "**months**" shall be construed accordingly) except that, where any such period would otherwise end on a non-Business Day, it shall end on the preceding Business Day; **provided that**, if there is no numerically corresponding day in the month in which that period ends, that period shall end on the last Business Day in such month;

(xiii)   a "**guarantee**" also includes any other obligation (whatever called) of any person to pay, purchase, provide funds (whether by way of the advance of money, the purchase of or subscription for shares or other securities, the purchase of assets or services, or otherwise) for the payment of, to indemnify against the consequences of default in the payment of, or otherwise to be responsible for, any indebtedness of any other person;

(xiv)    the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "without limitation";

(xv)     the word "**will**" shall be construed to have the same meaning and effect as the word "**shall**";

(xvi)    the words "**herein**", "**hereof**" and "**hereunder**", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; and

(xvii)   "**gross negligence**" means, in relation to any person, intentional, conscious or voluntary acts or decisions of that person taken with wanton, reckless or flagrant disregard for the consequences of such act or decision; and

(xviii)  "**material**" means the subject matter of the statement or concealment related to a fact or circumstance which would be important to the decision to be made as distinguished from an insignificant, trivial or unimportant detail.

(b)      Headings are for ease of reference only.

UMB0004104                                                                              CONFIDENTIAL

(c)     Where the context so admits, words importing the singular number shall include the plural and *vice versa*, and words importing neuter gender shall include the masculine or feminine gender.

2.     **REPRESENTATIONS AND WARRANTIES**

2.1    **Lessee's Representations and Warranties**

Lessee acknowledges that Lessor and Owner Participant have entered into this Agreement and the other Operative Documents in full reliance on the representations and warranties by Lessee in Clauses 2.1 and 2.3; and Lessee now represents and warrants to Lessor and the Owner Participant that the following statements are on the date hereof, and on the Delivery Date will be, true and accurate:

(a)     Lessee is duly incorporated under the laws of the State of Incorporation and is validly existing and in good standing, and has full corporate power and authority to conduct its business as presently conducted, to own or hold under lease its assets, to enter into and perform its obligations under the Operative Documents to which it is a party, to satisfy the conditions precedent set forth in Clause 3.1 and to consummate the transactions contemplated by the Operative Documents to which it is a party;

(b)     Lessee's organizational documents incorporate provisions that permit, and all necessary authorizations, approvals, consents, licenses, permits and orders of and registrations with any Government Entity, including, but not limited to, those relating to foreign exchange controls, have been duly and unconditionally obtained and are now in full force and effect that are required to authorize, Lessee to sign and deliver, and perform its obligations under and the transactions contemplated by, the Operative Documents to which Lessee is a party and satisfy the conditions precedent set forth in Clause 3.1;

(c)     Lessee holds all licenses, certificates and permits from all relevant Government Entities for the conduct of its business (as presently conducted) as a Certificated Air Carrier and the performance of its obligations hereunder;

(d)     the Operative Documents to which Lessee is a party constitute, or when entered into will constitute, legal, valid and binding obligations of Lessee, enforceable in accordance with their respective terms, except to the extent that enforceability may be limited by any applicable bankruptcy or insolvency laws affecting creditors' rights generally and/or general principles of equity;

(e)     neither the execution and delivery of the Operative Documents to which Lessee is a party, the performance of any of the transactions contemplated herein and therein nor the satisfaction of the conditions precedent set forth in Clause 3.1 will:  (i) contravene or constitute a violation or breach of or a default under any existing law or agreement by which Lessee or any of its assets is bound, any agreement to which it is a party or Lessee's organizational documents; (ii) cause any limitation on Lessee or its assets or the powers of its directors or officers, whether imposed by or contained in Lessee's organizational documents or any existing law, agreement or otherwise, to be exceeded; or (iii) result in the

UMB0004105                                                                                        CONFIDENTIAL

creation or imposition of, or oblige Lessee to create, any Lien (other than a Permitted Lien) over its undertaking or any of its assets, rights or revenues;

(f)    except for (i) (A) the filing for acceptance or recordation with the aircraft registry of the FAA of this Agreement, Lease Supplement No. 1, the Trust Agreement, the Trust Supplement thereto, as applicable, the FAA Bill of Sale duly executed by the Manufacturer (the "**FAA Bill of Sale**"), the Application for Registration on AC Form 8050-1 duly completed and executed by Lessor with respect to the Aircraft and any documents required to establish Lessor's status as a "citizen of the United States" within the meaning of Section 40102(a)(15)(c) of Title 49 of the United States Code (collectively, the "**FAA Filed Documents**"); and (B) the registration with the International Registry (as defined in the Cape Town Convention) of the International Interests (as defined in the Cape Town Convention) constituted by this Agreement with respect to the Airframe and each Engine via AC Form 8050-135 filed by Special FAA Counsel; and (ii) UCC-1 financing statements with regard to this Agreement and the Security in the State of Colorado, all of which shall have been accomplished on or before the Delivery Date, it is not necessary under the laws of the State of Registration, the State of Incorporation or the Habitual Base in order to ensure the validity, effectiveness or enforceability as against Lessee of any Lessee's Document or to protect the rights of Lessor in the Aircraft or any part thereof or to ensure that the rights of Lessor in the Aircraft are properly registered and recorded that any Lessee's Document or any other instrument be filed, registered or recorded or that any registration or any other action be taken under such laws;

(g)    upon completion of the filings referenced in Clause 2.1(f) and the recordation, registration or indexing of the instruments so filed by the appropriate Government Entities, under the laws of the State of Incorporation, the State of Registration and the Habitual Base, the property rights of Lessor in the Aircraft and this Agreement will be fully established and perfected;

(h)    the obligations of Lessee under the Operative Documents to which Lessee is a party are, or upon execution thereof by Lessee will be, direct, general and unconditional obligations of Lessee and rank, or will rank, at least *pari passu* with all other present and future unsecured and unsubordinated obligations (including contingent obligations) of Lessee except for obligations mandatorily preferred by law and not by reason of any Lien;

(i)    no event has occurred that constitutes a contravention of, or default under, any agreement by which Lessee or any of its assets is bound or affected, and that could reasonably be expected to have a material adverse effect on the financial condition, business, assets, operations or prospects of Lessee or an adverse effect on its ability to observe or perform its obligations under the Operative Documents to which Lessee is a party;

(j)    no litigation, arbitration or administrative proceeding that could (by itself or together with any other such proceedings or claims) reasonably be expected to have an adverse effect on Lessee's ability to observe or perform its obligations under the Operative Documents to which Lessee is a party or a material adverse

UMB0004106         CONFIDENTIAL

effect upon its financial condition, business, assets, operations or prospects is presently in progress or pending or threatened against Lessee or any of its assets;

(k)     the audited consolidated accounts of Lessee and Holdings for the fiscal year ended 2019 have been prepared in accordance with GAAP and give a true and fair view of the results of its operations for that period and its financial condition at such date and, in particular, to the extent required by GAAP, accurately disclose or reserve against all the liabilities (actual or contingent) of Lessee, and there has been no material adverse change in the financial condition, business, assets or operations of Lessee since such date;

(l)     Lessee is not delinquent to the applicable taxation authorities on any tax returns, Lessee is not in default in the payment of any Taxes, no claim is being asserted with respect to Taxes that is not disclosed in the audited accounts referred to in paragraph (k) above that, if paid, could reasonably be expected to have a material adverse effect on the financial condition, business, assets, operations or prospects of Lessee or an adverse effect on Lessee's ability to observe or perform any of its obligations under the Operative Documents to which it is a party, taking into account all other obligations that Lessee must observe or perform at that time, and any supply for value added tax purposes from Lessor to Lessee under or pursuant to this Agreement shall be exempt from value added taxes;

(m)     the financial and other information furnished by or on behalf of Lessee to Lessor and its Affiliates in writing does not contain any untrue statement or omit to state any fact the omission of which makes the statements therein, in the light of the circumstances under which they were made, misleading, nor omits to disclose any material matter and all expressions of expectation, intention, belief and opinion contained therein were honestly made on reasonable grounds after due and careful inquiry by Lessee;

(n)     Lessee, under applicable law, is subject to private commercial law and suit, and neither Lessee nor its properties or assets have any right of immunity from suit or execution on the grounds of sovereignty in the State of Incorporation or any other jurisdiction or on any other grounds;

(o)     upon Delivery, good and marketable title to the Aircraft (subject to the recordation of the FAA Bill of Sale with the FAA and the registration on the International Registry of the sale of the Airframe and the Engines from the Manufacturer to Lessor), including the BFE, free and clear of all Liens (other than Lessor's Liens) shall be vested in the Lessor;

(p)     no Event of Default has occurred and is continuing;

(q)     Lessee has not granted to any person other than Lessor an "international interest," "national interest," "prospective international interest" (as such terms are defined in the Cape Town Convention) or a de-registration and export request authorization with respect to the Airframe or any Engine;

(r)     Lessee has duly appointed and registered with the International Registry an administrator to act on behalf of Lessee as a transacting user entity;

UMB0004107                                                                 CONFIDENTIAL

(s)     the "location" of Lessee, for purposes of Section 9-307 of the Uniform Commercial Code of the State of New York, is in the State of Colorado and Lessee is not situated for the purposes of Article 3(1) of the Cape Town Convention, in any jurisdiction other than the State of Incorporation, the State of Registration or the Habitual Base;

(t)     the full and correct legal name and mailing address of Lessee as of the Delivery Date are correctly set forth in Clause 20.8;

(u)     Lessee is a Certificated Air Carrier and Lessor as lessor of the Aircraft to Lessee is entitled to the benefits of Section 1110 of the Bankruptcy Code with respect to any case brought under Chapter 11 in which Lessee is the debtor; and

(v)     Lessee has not filed any tax return that is inconsistent with the provisions of Clause 20.11(b).

## 2.2     Lessor's Representations and Warranties

Lessor now represents and warrants to Lessee that the following statements are, at the date hereof, and on the Delivery Date will be, true and accurate:

(a)     Lessor is a national banking association duly organized and validly existing under the law of the United States of America and has full corporate power and authority to conduct its business as presently conducted, to enter into and perform its obligations under the Operative Documents to which it is a party and to consummate the transactions contemplated hereby and thereby;

(b)     Lessor's organizational documents permit, and all necessary action has been taken to authorize, and all necessary authorizations of any Government Entity have been duly and unconditionally obtained and are now in full force and effect that are required to authorize, Lessor to sign and deliver, and to perform the transactions contemplated by, the Operative Documents to which Lessor is a party;

(c)     the Operative Documents to which Lessor is a party constitute, or when entered into will constitute, legal, valid and binding obligations of Lessor, enforceable in accordance with their respective terms, except to the extent that enforceability may be limited by any applicable bankruptcy or insolvency laws affecting creditors' rights generally and/or general principles of equity;

(d)     neither the execution and delivery of the Operative Documents to which Lessor is a party nor the performance of any of the transactions contemplated herein and therein will: (i) contravene or constitute a violation or breach of or a default under any existing law or agreement by which Lessor or any of its assets is bound, any agreement to which Lessor is a party or Lessor's organizational documents; (ii) cause any limitation on Lessor, or the power of its directors and officers, whether imposed by or contained in Lessor's organizational documents or any existing law, agreement or otherwise, to be exceeded; or (iii) result in the creation or imposition of, or oblige Lessor to create, any Lessor's Lien (other than pursuant to the Financing Documents);

UMB0004108                                                                              CONFIDENTIAL

(e)     no litigation, arbitration or administrative proceeding that could reasonably be expected (by itself or together with any other such proceedings or claims) to have an adverse effect on Lessor's ability to observe or perform its obligations under the Operative Documents to which it is a party is presently in progress or pending or threatened against Lessor or any of its assets;

(f)     Lessor is a "citizen of the United States" as defined in Section 40102(a)(15)(c) of Title 49 of the United States Code;

(g)     Owner Participant is a resident of Ireland within the meaning of Article 4 (Residence) of the Convention between the Government of Ireland and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains (the "Treaty") and is entitled to the benefits of the Treaty under Article 23 (Limitation on Benefits) thereof; and

(h)     Lessor has not filed any tax return that is inconsistent with the provisions of Clause 20.11(b).

## 2.3     Representations and Warranties Repeated

The representations and warranties in Clause 2.1 (d), (e) (other than sub-clause (i) thereof), (h) and (n) shall be deemed to be repeated on each Basic Rent Payment Date by Lessee with reference to the facts and circumstances existing at such time.

## 2.4     No Prejudice

The rights of either party hereto in relation to any misrepresentation or breach of warranty by the other party shall not be prejudiced by any investigation by or on behalf of the first party into the affairs of the other party, by the performance of this Agreement and the other Operative Documents to which it is a party or by any other act or thing done or omitted by the first party that would, but for this Clause 2.4, prejudice such rights.

## 3.     CONDITIONS PRECEDENT

## 3.1     Lessor's Conditions Precedent

Lessor's obligation to deliver and commence the leasing of the Aircraft under this Agreement is subject to fulfillment of each of the following conditions:

(a)     Lessor shall have received from Lessee the following documents, each in form and substance reasonably acceptable to Lessor, on or prior to Delivery:

(i)     (A) an opinion or opinions of one or more independent counsel to Lessee (which may include Lessee's in-house counsel with respect to matters of due authorization, execution and non-contravention) with respect to the laws of the United States, the State of New York and the State of Colorado with respect to the due authorization and enforceability of this Agreement and the other Lessee's Documents, and such other matters as Lessor may request, and which must include an opinion to the effect that, based upon reasonable and customary assumptions of fact, the Lessor

UMB0004109                                                                                    CONFIDENTIAL

will be entitled to the benefits of Section 1110 in any case under Chapter 11 of the Bankruptcy Code in which Lessee is a debtor; (B) if reasonably requested by the Lessor, a legal opinion from counsel in the jurisdiction in which Delivery takes place as to lex situs and matters of stamp and/or transfer tax; (C) legal opinions from in-house counsel of each of the Manufacturer and the Engine Manufacturer, as to the due execution and delivery of the documentation to which they are a party; and (D) an opinion or filing memorandum of Special FAA Counsel issued in respect of FAA filings and/or International Registry registrations contemplated hereunder on the Delivery Date and a post-recordation opinion of Special FAA Counsel in due course following Delivery. Each of the foregoing opinions shall be (w) dated the Delivery Date, (x) from counsel acceptable to the Lessor, (y) addressed to the Lessor, the Owner Participant, the Trust Company and the Lenders (if any) in form and substance acceptable to the Lessor and the Lenders (if any);

(ii)     the Lease Supplement No. 1 and Acceptance Certificate duly executed on behalf of Lessee;

(iii)    the FAA Bill of Sale duly executed on behalf of the Manufacturer;

(iv)    the Warranty Bill of Sale duly executed on behalf of the Manufacturer;

(v)     the BFE Bill of Sale duly executed on behalf of the Lessee;

(vi)    the original counterpart no. 1 of this Agreement shall have been delivered to Lessor;

(vii)   the CFM Lessor Maintenance Agreement (including the LSA Addendum) duly executed on behalf of the Manufacturer;

(viii)  an officer's certificate substantially in the form of Schedule 3 signed by a duly authorized officer or director of Lessee together with the documents referred to in such certificate;

(ix)    an insurance brokers' certificate addressed to Lessor and Lenders (if any) evidencing to the satisfaction of Lessor and Lenders (if any) that the insurance required by Clause 14 on and with respect to the Aircraft is in full force and effect, specifying the insurers with whom such insurance is carried, together with a broker's letter of undertaking addressed to Lessor and Lenders (if any), in form and substance satisfactory to Lessor and Lenders (if any);

(x)     copies of Lessee's Certificate of Public Convenience and Necessity under Section 40102 of Title 49 of the United States Code, Lessee's air carrier operating certificate issued pursuant to Chapter 447 of Title 49 of the United States Code for aircraft capable of carrying 10 or more individuals or 6,000 pounds or more of cargo, and Lessee's continuing airworthiness management organization certificate (or its equivalent) and all other licenses, certificates and permits required to be maintained by Lessee for the public transport of passengers and cargo by aircraft;

UMB0004110                                                    CONFIDENTIAL

(xi)     a copy of the time and control index of the Maintenance Program;

(xii)    a letter from the process agent appointed by Lessee accepting that appointment as contemplated by Clause 20.15(b);

(xiii)   a letter from Lessee addressed to whom it may concern, pursuant to which Lessee grants a general authorization to all relevant airport authorities (including but not limited to all the airports' managing companies) and air traffic control agencies to issue Lessor or Servicer, upon Lessor's or Servicer's request from time to time, a statement of account of all sums due by Lessee to such authority in respect of the Aircraft and Lessee's fleet;

(xiv)    a letter from Lessee addressed to its insurance broker, pursuant to which Lessee authorizes its insurance broker to issue Lessor, upon Lessor's request from time to time, a statement of account of all sums due by Lessee to such broker and the status of any renewal of insurance coverages in respect of the Aircraft; and

(xv)     any other documents reasonably requested by Lessor in writing at least two (2) Business Days prior to delivery of the Aircraft relating to the transactions contemplated by the Operative Documents or with respect to Lessee or the Aircraft;

(b)     Lessor shall have received executed counterparts of this Agreement and the other Operative Documents, duly executed by the parties thereto other than Lessor;

(c)     precautionary UCC financing statements with respect to the Aircraft under this Agreement in a form acceptable to Lessor shall have been prepared for filing with the appropriate Government Entity in the State of Colorado and any other jurisdiction reasonably selected by Lessor and Lessor shall be satisfied with the arrangements for filing the same promptly following Delivery;

(d)     Lessor shall have received copies of the most recent consolidated annual financial reports of Lessee and Holdings, audited by independent, certified public accountants in accordance with GAAP consistently applied, and the most recent unaudited quarterly consolidated financial reports of Lessee and Holdings;

(e)     the FAA Filed Documents shall have been duly filed for recordation (or shall be in the process of being so duly filed for recordation promptly following Delivery) with the FAA pursuant to the Transportation Code;

(f)     each of Lessee and Lessor shall have appointed Special FAA Counsel as its "professional user entity" (as defined in the Cape Town Convention) to make the registrations described in Clause 3.4 and shall have authorized the making of such registrations immediately following Delivery;

(g)     good and marketable title to the Aircraft (subject to the recordation of the FAA Bill of Sale with the FAA and the registration on the International Registry of

UMB0004111                                                                                    CONFIDENTIAL

the sale of the Airframe and the Engines from the Manufacturer to Lessor), including the BFE, shall have been conveyed to Lessor free and clear of Liens other than Lessor's Liens;

(h)  the Aircraft shall have been tendered for delivery by Manufacturer on the Delivery Date under and in accordance with the Purchase Agreement new "ex-factory" and in compliance with the description of the Aircraft set forth in Schedule 1;

(i)  the Purchase Agreement is in full force and effect and Lessee has performed in full all of its obligations thereunder (other than payment of the balance of the purchase price of the Aircraft due on Delivery) in respect of such Aircraft;

(j)  counsel to the FAA shall have confirmed in writing that the Aircraft is eligible to be registered in the name of Lessor;

(k)  Lessor shall have received the Rent due on the Delivery Date and the Security due before the Delivery Date;

(l)  no Event of Default hereunder or breach by Lessee under any other Operative Document to which it is a party shall have occurred and be continuing on the Delivery Date or would arise by reason of the occurrence of the transactions contemplated in the Operative Documents to which it is a party;

(m)  each of the representations and warranties contained in Clause 2.1 of this Agreement and in each of the other Operative Documents to which Lessee is a party shall be true and accurate on the Delivery Date as if made on the date thereof;

(n)  no change shall have occurred since the date of this Agreement in any applicable law or in the interpretation thereof that would make it illegal for Lessor and/or Lessee to perform any of their respective obligations under this Agreement or any of the other Operative Documents to which it is a party or would make any Lessee's Document unenforceable in whole or in part, **provided that**, if any such change shall have occurred, Lessor and Lessee shall discuss in good faith whether any mitigating action could be taking to avoid the relevant illegality or unenforceability so as to permit the leasing of the Aircraft to proceed;

(o)  the CFM RPFH Agreement and the CFM Tripartite Agreement shall be in full force and effect and the Lessor shall have received evidence in form and substance satisfactory to it that the Engines are subject to each such agreement;

(p)  no material adverse change in the financial condition or business affairs of Lessee shall have occurred since September 10, 2019; and

(q)  Lessee shall have taken any further actions requested by Lessor to perfect Lessor's interest in the Aircraft and this Agreement in the State of Registration;

(r)  any commitment letter proposed by any of the Manufacturer, Engine Manufacturer, supplier and/or vendor with respect to any discrepancies in respect of the delivery condition of the Aircraft provided for under the Purchase Agreement shall be acceptable to Lessor and, if required by Lessor, any of the

UMB0004112                                                    CONFIDENTIAL

Manufacturer, Engine Manufacturer, supplier and/or vendor shall have agreed to extend the benefit of any such commitments that remain effective at the expiration of the Term to the Lessor;

(s)    Lessor shall have received a copy of the full export certificate of airworthiness in relation to the Aircraft and evidence satisfactory to the Lessor that upon Delivery the FAA will issue an unrestricted certificate of airworthiness;

(t)    no event shall have occurred and be continuing that constitutes a Total Loss with respect to the Aircraft or which, with the passage of time or making of any relevant determination, would constitute a Total Loss with respect to the Aircraft; and

(u)    the Delivery Location shall be acceptable to Lessor, and Lessee shall have provided such exemption certificates for sales, value added, goods and services, transfer, stamp or similar Tax purposes with respect to the delivery, sale and lease of the Aircraft in such location as Lessor may reasonably request.

3.2    **Waiver**

The conditions precedent set forth in Clause 3.1 are for the sole benefit of Lessor and may be waived or deferred by Lessor in whole or in part and with or without conditions. If any of such conditions precedent are not satisfied on the Delivery Date and Lessor (in its absolute discretion) nonetheless agrees to deliver the Aircraft to Lessee, Lessee shall ensure that such conditions precedent are satisfied within such period as may be agreed in writing between Lessee and Lessor and failure of Lessee to do so shall constitute an Event of Default.

3.3    **Lessee's Conditions Precedent**

Lessee's obligation to accept delivery of the Aircraft under this Agreement is subject to the satisfaction of the following conditions:

(a)    each of the representations and warranties contained in Clause 2.2 shall be true and accurate on the Delivery Date as if made on the date thereof;

(b)    Lessee shall have received (i) a IRS form W-8BEN-E (or other appropriate tax form) claiming a full exemption from U.S. withholding tax on the payments to be received from Lessee under this Agreement, duly completed (including a United States taxpayer identification number of Owner Participant) and executed by Owner Participant and (ii) an IRS form W-9 (or other appropriate tax form) duly completed by the Lessor evidencing that the Lessor/Trust Company is a U.S. Person as defined in Section 7701(a)(30) of the Code;

(c)    Lessee shall have received a certificate of Irish tax residence evidencing that Owner Participant is a resident of Ireland;

(d)    Lessee shall have received from each of Owner Participant and the security trustee acting on behalf of the Lenders under the Financing Documents (if any) a grant of quiet enjoyment substantially in the agreed form;

UMB0004113                                                                                CONFIDENTIAL

(e)    a Utah legal opinion in respect of Lessor addressed to Lessee in form and substance reasonably acceptable to Lessee; and

(f)    Lessee shall have received duly executed counterparts of this Agreement, the Lease Supplement No.1, the Lessor Guaranty, the Airframe Warranties Agreement, the Engine Warranties Assignment and the CFM Tripartite Agreement.

3.4    **FAA Filings and Cape Town Convention**

(a)    In this Agreement, the Convention and the Protocol shall be read and interpreted together as a single instrument as required by Article 6(1) of the Convention (the "**Consolidated Text**").  In this Clause 3.4 the following expressions have the respective meanings given to them in Article 1 of the Consolidated Text:

aircraft engines; aircraft object; airframe; assignment; associated rights; buyer; contract of sale; creditor; international interest; leasing agreement; prospective international interest; prospective sale; registry authority; sale; security agreement; seller; title reservation agreement; state of registry.

(b)    Lessor and Lessee agree that:

    (i)    on the Delivery Date, Lessee and Lessor will cause the FAA Filed Documents to be promptly filed and recorded with the FAA;

    (ii)    the Aircraft shall be registered with the aircraft registry of the FAA and a Certificate of Registration will be issued by the FAA with United States registration mark specified in the Lease Supplement No. 1;

    (iii)    the Airframe is an airframe and, accordingly, an aircraft object to which this Agreement relates for the purposes of the Cape Town Convention and for purposes of making registrations on the International Registry, has the generic model designation of "A320" (as required by the regulations) with manufacturer's serial number and U.S. registration mark as specified in the Lease Supplement No. 1 and the Engines are aircraft engines and, accordingly, aircraft objects for the purposes of the Cape Town Convention and, for purposes of making registrations on the International Registry, have the generic model designations "LEAP-1A" (as required by the regulations) with manufacturer's serial numbers as specified in the Lease Supplement No. 1;

    (iv)    the international interest of Lessor, as a creditor, in the Airframe and each of the Engines, being the lessor under a leasing agreement of an aircraft object; the international interest of Lessor in respect of the sale of the Airframe and each of the Engines to Lessor as buyer under a contract of sale shall, on the Delivery Date, be registered with the consent of Lessor and Lessee, as international interests under the Cape Town Convention in each of the Airframe and the Engines, and as a sale of each of the Airframe and the Engines, with the consent in writing of the Manufacturer, such consent of the Manufacturer to be provided by the Manufacturer immediately upon the Delivery;

UMB0004114    CONFIDENTIAL

(v)    Lessee and Lessor each shall also, as and to the extent applicable, consent to the foregoing registrations upon the issuance of a request for such consent by the International Registry;

(vi)    the events which are referred to in Clause 16.1 as Events of Default are events that constitute a default or otherwise give rise to the rights and remedies specified in Articles 12 to 15 and 20 of the Consolidated Text; and

(vii)    Lessor shall have the remedies referred to in Articles 15(1) and 20(1) of the Consolidated Text.

## 4.    COMMENCEMENT

### 4.1    Term of Leasing

(a)    *General.*  Lessor hereby agrees (subject to satisfaction or waiver of the conditions set forth in Clause 3.1) to lease the Aircraft to Lessee hereunder for the duration of the Term, and Lessee hereby agrees (subject to satisfaction or waiver of the conditions set forth in Clause 3.3) to lease the Aircraft from Lessor hereunder for the duration of the Term.  Lessee will effect acceptance of the Aircraft on lease hereunder by execution and delivery to Lessor of the Lease Supplement No. 1 and Acceptance Certificate.  Lessee's acceptance of the Aircraft shall be regarded for all purposes as absolute, unconditional and irrevocable. The date set forth on the Lease Supplement No. 1 and Acceptance Certificate confirming the "Delivery Date" shall be the Delivery Date for all purposes under this Agreement.

(b)    *Risk of Loss.*  After Delivery, the Aircraft, the Engines and every Part will be in every respect at the sole risk of Lessee, who will bear all risk of loss, theft, damage or destruction to the Aircraft, any Engine or any Part from any cause whatsoever.

(c)    *Condition of the Aircraft at Delivery.*  THE LESSEE SHALL ACCEPT DELIVERY OF THE AIRCRAFT IN "AS IS, WHERE IS" CONDITION (SUBJECT TO ALL FAULTS AND DEFECTS AND SUBJECT TO EACH AND EVERY DISCLAIMER AND WAIVER SET FORTH IN CLAUSE 5 OF THIS AGREEMENT).

### 4.2    Licenses; Importation into the State of Registration

Lessee will at its expense obtain all licenses, permits and approvals, and undertake all relevant filings and procedures, which may be necessary to export and/or transport the Aircraft from the Delivery Location to the State of Registration and/or the Habitual Base and to import the Aircraft from the Delivery Location into the State of Registration and/or the Habitual Base. As between the Lessee and the Tax Indemnitees, and without prejudice to Section 19.2 (*General Tax Indemnity*), Lessee agrees no Tax Indemnitee will have any responsibility for the payment of any import or export duties or similar imposed by any jurisdiction in connection with the foregoing.

UMB0004115       CONFIDENTIAL

4.3    **Quiet Enjoyment; Lessor's Obligations**

(a)    *Quiet Enjoyment.*  Subject to the provisions of this Agreement, including the provisions for early termination, or unless compelled to do so by any applicable law, so long as no Event of Default has occurred and is continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term. Lessor will procure that the Lender (or, in the case of multiple Lenders, the agent or security trustee on behalf of the Lenders) and any other assignee or transferee of Lessor pursuant to Clause 20.2 will give a direct covenant to Lessee substantially similar to the terms set out in this paragraph (a).  Notwithstanding anything to the contrary in this Agreement or any other Lessee's Document, any exercise by Lessor of its rights following an Event of Default shall not constitute a breach of this paragraph.

(b)    *Lessor Obligations Following Termination Date.*  Within fifteen (15) Business Days after (i) redelivery of the Aircraft to Lessor in accordance with and in the condition required by this Agreement; (ii) payment to Lessor of the Agreed Value following a Total Loss after the Delivery Date; or (iii) such later time as Lessee has irrevocably paid to Lessor all amounts which may then be outstanding under this Agreement and the other Lessee's Documents and has paid all other amounts that are then due and owing under any Other Lessee's Document, Lessor will, provided no Event of Default has occurred which is then continuing, Lessor shall pay to Lessee an amount equal to the Security less amounts applied pursuant to Clause 6.2 and will return any Letter of Credit provided pursuant to Clause 6.2(c); **provided that**, Lessor may set off against the Security any amounts that are or may be due to Lessor pursuant to the terms of any of the Lessee's Documents or any Other Lessee's Documents. If any additional amounts become payable by Lessee after the Termination Date, Lessee will pay such amounts to Lessor within fifteen (15) Business Days of receipt of a notice and reasonable supporting documentation from Lessor of such amounts owed.

(c)    *Airworthiness Directive.*  If Lessee complies on a terminating action basis with an Airworthiness Directive applicable to the Aircraft on the terms set forth in Clause 10.7, Lessor will pay to Lessee an amount calculated in accordance with Clause 10.7 of this Agreement.

4.4    **Early Termination Option**

(a)    *Early Termination.*  Subject to the provisions of this Agreement, so long as no Event of Default has occurred and is continuing, and **provided that** Lessee delivers to Lessor a notice (the "**Early Termination Notice**") no later than 24 months prior to the Early Termination Date, Lessee shall have the option (the "**Early Termination Option**") to terminate the leasing of the Aircraft hereunder on the Early Termination Date.

(b)    If Lessee exercises the Early Termination Option, Lessee shall pay to Lessor the Early Termination Fee and the Engine Shortfall on the Expiry Date (which shall be the Early Termination Date). For the avoidance of doubt, any payments due from Lessee to Lessor under this Clause 4.4(b) shall be in addition to any Maintenance Adjustment Payments due under Clause 18.7 herein.

UMB0004116                                                                    CONFIDENTIAL

(c)    The Early Termination Notice shall be irrevocable once issued by Lessee and shall constitute Lessee's exercise of the Early Termination Option for all purposes of this Agreement.

5.    **DISCLAIMERS**

5.1    **General Disclaimers**

(a)    LESSEE ACKNOWLEDGES AND AGREES THAT LESSEE ALONE HAS SELECTED THE AIRCRAFT FOR LEASING BY LESSOR TO LESSEE. LESSEE ACKNOWLEDGES THAT LESSOR IS NOT A MANUFACTURER OF THE AIRCRAFT, REPAIRER OR DEALER IN THE AIRCRAFT.

(b)    LESSEE UNCONDITIONALLY AGREES FOR THE BENEFIT OF EACH INDEMNITEE THAT THE AIRCRAFT AND EACH PART THEREOF IS TO BE LEASED HEREUNDER IN AN "AS IS, WHERE IS" CONDITION AS AT THE DELIVERY DATE AND THROUGHOUT THE TERM WITH ALL FAULTS ACCEPTED, AND NO TERM, CONDITION, WARRANTY, REPRESENTATION OR COVENANT OF ANY KIND HAS BEEN MADE OR IS GIVEN BY LESSOR OR ANY INDEMNITEE OR ANY OF THEIR RESPECTIVE AGENTS, SERVANTS, OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS OR REPRESENTATIVES IN RESPECT OF THE AIRWORTHINESS, VALUE, QUALITY, DURABILITY, CONDITION, DESIGN, OPERATION, DESCRIPTION, MERCHANTABILITY, SATISFACTORY QUALITY OR FITNESS FOR USE OR PURPOSE OF THE AIRCRAFT OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT, INHERENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), OR AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, COPYRIGHT, DESIGN, OR OTHER PROPRIETARY RIGHT; AND ALL CONDITIONS, WARRANTIES AND REPRESENTATIONS (OR OBLIGATION OR LIABILITY, IN CONTRACT OR IN TORT) IN RELATION TO ANY OF THOSE MATTERS, EXPRESSED OR IMPLIED, STATUTORY OR OTHERWISE, ARE EXPRESSLY EXCLUDED.

(c)    TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW BUT WITHOUT PREJUDICE TO ANY RIGHTS OF LESSEE UNDER THIS AGREEMENT, LESSEE HEREBY WAIVES ANY RIGHTS IT MAY HAVE IN TORT IN RESPECT OF ANY OF THE MATTERS REFERRED TO ABOVE AND IRREVOCABLY AND UNCONDITIONALLY AGREES THAT NONE OF LESSOR, ANY OTHER INDEMNITEE OR ANY OF THEIR RESPECTIVE AGENTS, SERVANTS, OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS OR REPRESENTATIVES SHALL HAVE ANY GREATER LIABILITY IN TORT IN RESPECT OF ANY SUCH MATTER THAN SUCH PERSON WOULD HAVE IN CONTRACT AFTER TAKING ACCOUNT ALL OF THE EXCLUSIONS EXPRESSLY SET FORTH IN THE LESSEE'S DOCUMENTS.

(d)    LESSEE ACKNOWLEDGES THAT NO THIRD PARTY MAKING ANY REPRESENTATION OR WARRANTY RELATING TO THE AIRCRAFT OR ANY PART THEREOF IS THE AGENT OF LESSOR OR ANY

UMB0004117      CONFIDENTIAL

INDEMNITEE NOR HAS SUCH THIRD PARTY AUTHORITY TO BIND OR REPRESENT LESSOR OR ANY INDEMNITEE.

(e)     MOREOVER, IN CONSIDERATION OF:  (I) LESSEE'S RIGHTS WITH RESPECT TO THE INSPECTION OF THE AIRCRAFT PURSUANT TO THE PURCHASE AGREEMENT; (II) LESSEE HAVING NEGOTIATED AND ENTERED INTO THE PURCHASE AGREEMENT IN RESPECT OF THE AIRCRAFT; AND (III) LESSOR PROVIDING TO LESSEE THE BENEFIT OF MANUFACTURERS' WARRANTIES UNDER THE AIRFRAME WARRANTIES AGREEMENT AND THE ENGINE WARRANTIES ASSIGNMENT, LESSEE HEREBY AGREES THAT, AS BETWEEN LESSEE AND LESSOR, ITS ACCEPTANCE OF THE AIRCRAFT AT DELIVERY AND ITS EXECUTION AND DELIVERY OF THE LEASE SUPPLEMENT NO. 1 AND ACCEPTANCE CERTIFICATE CONSTITUTE LESSEE'S WAIVER OF ANY WARRANTY OF DESCRIPTION AND ANY CLAIMS LESSEE MAY HAVE AGAINST LESSOR BASED UPON THE FAILURE OF THE AIRCRAFT TO CONFORM WITH SUCH DESCRIPTION.

(f)     DELIVERY OF LEASE SUPPLEMENT NO. 1 AND ACCEPTANCE CERTIFICATE BY LESSEE TO LESSOR SHALL BE CONCLUSIVE PROOF AS BETWEEN LESSOR AND EACH OTHER INDEMNITEE ON THE ONE HAND AND LESSEE ON THE OTHER HAND THAT, AND LESSEE REPRESENTS AND WARRANTS THAT, LESSEE'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED THE AIRCRAFT AND EACH PART THEREOF AND THAT THE AIRCRAFT AND EACH PART THEREOF IS AIRWORTHY AND IN GOOD WORKING ORDER AND REPAIR, WITHOUT DEFECT (WHETHER OR NOT DISCOVERABLE AT THE DELIVERY DATE), AND (EXCEPT AS OTHERWISE STATED THEREIN) IN EVERY WAY SATISFACTORY TO LESSEE.

(g)     LESSEE UNCONDITIONALLY AGREES TO WAIVE ANY RIGHTS (WHETHER BY WAY OF DAMAGES, SPECIFIC PERFORMANCE OR OTHER AVAILABLE REMEDIES) THAT IT MAY HAVE UNDER ANY APPLICABLE LAW AGAINST ANY INDEMNITEE FOR ANY LOSS LESSEE MAY SUFFER DUE TO ANY DEFECTS IN THE AIRCRAFT OR ANY PART THEREOF WHETHER LATENT, INHERENT OR OTHERWISE AND WHETHER OR NOT DISCOVERABLE AT DELIVERY.

(h)     LESSEE UNCONDITIONALLY AGREES TO WAIVE ANY RIGHTS (WHETHER BY WAY OF DAMAGES, SPECIFIC PERFORMANCE OR OTHER AVAILABLE REMEDIES) THAT IT MAY HAVE UNDER ANY APPLICABLE LAW AGAINST ANY INDEMNITEE FOR MAINTENANCE CONTRIBUTIONS OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT TOWARDS ANY REPAIR WHETHER MAJOR OR MINOR IN KIND WITH THE RESPONSIBILITY FOR CARRYING OUT SUCH REPAIRS FALLING SOLELY ON LESSEE.

(i)     LESSEE UNCONDITIONALLY AGREES TO WAIVE, AND DOES HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW,

UMB0004118                                                            CONFIDENTIAL

ANY RIGHTS THAT IT MAY HAVE UNDER ANY APPLICABLE LAW TO TERMINATE, CANCEL, QUIT OR SURRENDER THIS AGREEMENT.

5.2   **No Lessor Liability for Losses**

NONE OF LESSOR, OWNER PARTICIPANT OR ANY AFFILIATE OF THE OWNER PARTICIPANT SHALL HAVE ANY OBLIGATIONS OR LIABILITY WHATSOEVER TO LESSEE OR ANY OTHER PERSON WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE AND WHETHER ARISING BY REFERENCE TO NEGLIGENCE OR STRICT LIABILITY OF LESSOR OR OTHERWISE FOR ANY LIABILITY, CLAIM, PROCEEDING, LOSS, DAMAGE, (CONSEQUENTIAL OR OTHERWISE), FEE, COST OR EXPENSE OF ANY KIND CAUSE DIRECTLY OR INDIRECTLY BY, OR ASSOCIATED WITH, THE AIRCRAFT OR ANY PART THEREOF, ANY INADEQUACY OF THE AIRCRAFT FOR ANY PURPOSE OR ANY DEFICIENCY OR DEFECT THEREIN, THE USE OR PERFORMANCE OF THE AIRCRAFT, ANY MAINTNENACE, REPAIRS, REPLACEMENT OR MODIFICATION TO THE AIRCRAFT, ANY INTERRUPTION OR LOSS OF SERVICE OR USE OF THE AIRCRAFT OR ANY LOSS OF BUSINESS OR CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGE OR DAMAGES RELATED TO LOSS OF REVENUE OR ANY DAMAGE OR DELAY WHATSOEVER, HOWSOEVER CAUSED.

5.3   **Repairs and Replacement**

If the Aircraft or any part thereof is lost, confiscated, damaged, destroyed or otherwise rendered unfit or unavailable for use prior to or after Delivery, Lessor shall not be liable to repair the same or to supply any equipment in substitution therefor.

5.4   **No Waiver**

Nothing in this Clause 5 or elsewhere in this Agreement will be deemed a waiver by Lessee of any rights it may have against Manufacturer, Engine Manufacturer or any other person; **provided that**, Lessee will not commence an action against Manufacturer, Engine Manufacturer or any vendor or supplier of any Part involving claims in excess of the Damage Notification Threshold without prior written notice to Lessor. If Lessee commences any action against Manufacturer, Engine Manufacturer or any vendor or supplier of any Part, Lessee shall copy Lessor on all correspondence with such party.

5.5   **Consideration for Rent and other Amounts.**

The amount of the Rent and other payments contained herein are based upon and in consideration of the disclaimers and Lessee's waiver of warranties and indemnities set forth in this Clause 5 and the other provisions of this Agreement.

6.   **RENT AND OTHER PAYMENTS**

6.1   **Rent**

(a)   *Basic Rent.*  On each Basic Rent Payment Date, Lessee will pay to Lessor as Basic Rent the amounts calculated in accordance with Schedule 6.

UMB0004119                                    CONFIDENTIAL

(b)   *Supplemental Rent.*



6.2   **Security**

(a)   *Initial Payment.*



(b)   *Application.*



(c)   *Letter of Credit.* So long as no Event of Default is then continuing, Lessee may, at its election, provide to Lessor or (at Lessor's option) the Servicer an

UMB0004120        CONFIDENTIAL

irrevocable letter of credit satisfying the provisions of this Clause 6.2(c) (the "**Letter of Credit**") in place of making any cash payment of Security under this Clause 6.2 or in substitution for any cash Security already paid to Lessor. Any Letter of Credit provided as Security shall be in a stated amount equal to the cash Security replaced thereby, permit multiple drawings thereunder in an aggregate amount not to exceed the stated amount for application as provided in this Clause 6.2(c)) (including drawings by fax, SWIFT or by presentation in person at the offices of the bank providing such letter of credit if reasonably requested by Lessor), have a term of not less than twelve (12) months (unless such Letter of Credit is issued within the last twelve (12) months of the Term, in which case it shall have an expiration date of not less than sixty (60) days following the Expiry Date) and otherwise be substantially in the form of Schedule 7. Any such Letter of Credit shall be issued by, or if confirmed, confirmed by, an internationally recognized financial institution in the United States or Western Europe reasonably acceptable to Lessor and must be presentable for drawing at a branch or office of the financial institution in London, Dublin or New York. Within ten (10) Business Days after receipt by Lessor of such Letter of Credit, Lessor shall return to Lessee any cash Security previously paid by Lessee in an amount equal to the lesser of (i) the relevant cash Security held by Lessor; and (ii) the value of that Letter of Credit. Not later than thirty (30) days before the expiration date of any Letter of Credit, Lessee shall either (i) pay to Lessor cash Security equal to the stated amount of that Letter of Credit, less any amounts previously drawn under such Letter of Credit that have not been applied in accordance with this Agreement that Lessor has retained as cash Security or (ii) provide to Lessor a replacement letter of credit satisfying the requirements of this Clause 6.2(c) or an amendment to such Letter of Credit in form and substance acceptable to Lessor extending the term thereof for not less than twelve (12) months. Upon receipt by Lessor of cash Security or a replacement letter of credit, Lessor shall promptly return to Lessee any Letter of Credit that has been so replaced pursuant to this Clause 6.2(c). If Lessee fails to comply with any of its obligations under any of Lessee's Documents or an Event of Default has occurred and is continuing, Lessor may draw (or may cause the Servicer to draw, as applicable) on any Letter of Credit and apply or hold all or any portion of the proceeds of such drawing in accordance with Clause 6.2(b).

6.3    **Other Supplemental Rent**

(a)    

UMB0004121                                                                          CONFIDENTIAL

(b)     *Maintenance Status Report.*  Lessee shall provide Lessor with a written report in respect of the related calendar month substantially in the form of Schedule 5 in accordance with the terms of Clause 9.4(c).

6.4     **Payment Obligations Unconditional**

Lessee's obligation to pay Rent in accordance with this Agreement shall be absolute and unconditional irrespective of any contingency whatsoever, including (a) any right of set-off, counterclaim, recoupment, defense, withholding or other right Lessee may have against Lessor or any other person; (b) any unavailability of the Aircraft for any reason, (including a requisition thereof not constituting a Total Loss of the Aircraft including all Engines) or any prohibition or interruption of or other restriction against Lessee's use, operation or possession of the Aircraft, any interference with such use, operation or possession or any lack or invalidity of title or any other defect in the title, airworthiness, merchantability, fitness for any purpose, condition, design or operation of any kind or nature of the Aircraft, or the ineligibility of the Aircraft for any particular use or trade, or for registration or documentation under the laws of any relevant jurisdiction, or the Total Loss of, or any damage (not constituting a Total Loss) to, the Aircraft; (c) any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against Lessor or Lessee or any other person; (d) any invalidity or unenforceability or lack of due authorization of, or other defect in, this Agreement or any of the other Operative Documents or any Other Lessee's Documents; (e) any failure or delay on the part of any party hereto or of Lessor or any Lender or any other person to duly to perform or comply with its obligations under this Agreement or any Operative Document or any Other Lessee's Document; and (f) any other cause that, but for this provision, would or might have the effect of terminating, discharging or in any way affecting any obligation of Lessee hereunder. Nothing in this Clause 6.4 will be construed to extinguish or otherwise limit Lessee's right to institute legal proceedings against Lessor in the event of Lessor's breach of this Agreement.

6.5     **Currency of Payments**

All funds due from Lessee shall be paid by interbank ACH transfers in immediately available US Dollars to a bank account advised by Lessor, free and clear of any and all taxes and deductions. At any time when an Event of Default has occurred and is continuing, Lessor will have complete discretion to allocate all payments by Lessee as Lessor determines.

6.6     **Currency Indemnity**

If, under any applicable law, whether as a result of judgment against Lessee or the liquidation of Lessee or for any other reason, any payment under or in connection with this Agreement is made or is recovered in a currency (the "**other currency**") other than the currency (the "**currency of obligation**") in which it is payable pursuant to this Agreement then:

(a)     to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount unpaid under this Agreement, Lessee shall, as a

UMB0004122                                                                    CONFIDENTIAL

separate and independent obligation, fully indemnify Lessor and any other person entitled to such payment against the amount of the shortfall;

(b)     Lessee shall indemnify Lessor and any other party entitled to such payment as an independent obligation against any loss or liability arising out of or as a result of the conversion; and

(c)     Lessee shall pay on an After-Tax Basis to Lessor any exchange costs and Taxes payable in connection with such conversion.

For the purposes of this Clause "rate of exchange" means the rate at which Lessor is able on the relevant date to purchase the currency of obligation from an internationally recognized bank or financial institution in London (or at its option, New York) with the other currency.

6.7     **Authorizations for Payments**

Lessee shall obtain or procure that there are obtained any certificates, licenses, permits and other authorizations that are from time to time required for the making of the payments required by this Agreement on the date and in the amounts and currency that are stipulated herein and therein, and shall maintain the same or procure that the same are maintained in full force and effect for so long as the same shall be required.

6.8     **Set-off; Withholding of Payments**

At any time after the occurrence of an Event of Default and as long as the same is continuing, Lessor may set off any matured obligation which is then past due by Lessee under this Agreement, the other Lessee's Documents or any Other Lessee's Documents against any obligation (whether or not matured) owed by Lessor or Owner Participant or any of its Affiliates to Lessee, regardless of the place of payment or currency. If the obligations are in different currencies, Lessor may convert either obligation at the market rate of exchange available in London (or at its option, New York) for the purpose of the set-off. If an obligation is unascertained or unliquidated, Lessor may in good faith estimate that obligation and set off in respect of the estimated amount, in which case when the obligation is ascertained or liquidated Lessor or Lessee may make a payment to the other (as appropriate) in respect of any amount by which the ascertained or liquidated amount differs from the estimated amount. Lessor will not be obliged to pay any amounts to Lessee under this Agreement so long as any sums which are then due from Lessee to Lessor, Owner Participant or any of its Affiliates under this Agreement, the other Lessee's Documents or any Other Lessee's Documents remain unpaid or any Event of Default is continuing, and any such amounts which would otherwise be due will fall due only if and when Lessee has paid all such sums and cured to Lessor's satisfaction all such Events of Default, except to the extent that Lessor otherwise agrees or sets off such amounts against such payment pursuant to the foregoing provisions.

6.9     **Lessor's Account; Receipt of Payment**

All payments by Lessee under this Agreement shall be made to such bank and/or account as Lessor may from time to time notify to Lessee no less than five (5) Business Days prior to the due date of any such payment. All payments must be received at such

UMB0004123                                                                                                    CONFIDENTIAL

account on the due date therefor. If any due date is not a Business Day, payment is due on the following Business Day.

7.    **FEES AND EXPENSES**

Each party to this Agreement shall pay its own expenses (including legal and other out-of-pocket expenses) incurred in connection with the negotiation, preparation and completion of this Agreement and the other Lessee's Documents,



8.    **GENERAL UNDERTAKINGS**

8.1    **Duration**

Lessee and Lessor shall perform and comply with all of their respective undertakings, covenants and agreements in this Agreement and shall undertake best efforts to procure that no person will act in any manner inconsistent with their respective obligations hereunder from the date of this Agreement until expiration or earlier termination of the Term and redelivery of the Aircraft by Lessee to Lessor.  All such undertakings, covenants and agreements shall be performed at each party's expense except where this Agreement expressly provides otherwise.

8.2    **Notice of Default; Certificate**

(a)    Lessee shall promptly notify Lessor if Lessee becomes aware of the occurrence of (i) an Event of Default; or (ii) the imposition of any Lien on the Aircraft other than Permitted Liens, and shall (if requested by Lessor) provide Lessor, in reasonable detail, the steps that Lessee is taking, or proposes to take, to remedy or mitigate the effect of such Event of Default, other event or circumstance or Lien.

(b)    Lessee shall, upon written request by Lessor, provide to Lessor a confirmation as to whether an Event of Default or such other event or circumstance as is referred to in paragraph (a) above has then occurred or is then subsisting.

UMB0004124                                                                                  CONFIDENTIAL

(c)    Lessee shall, upon written request by Lessor, provide to a proposed transferee or assignee of Lessor's rights in the Aircraft or any Operative Document or to a proposed Lender a certificate containing representations as to (i) the matters set forth in Clause 8.2(b) and (ii) whether to the actual knowledge of the person signing the certificate on behalf of the Lessee (who shall be the treasurer or other senior officer of the Lessee), Lessor is in breach of any term or condition contained in this Agreement or any other Lessee's Document, and confirming the documents which constitute all supplements to, and amendments of, this Agreement.

### 8.3 Financial and Other Information

(a)    Lessee shall deliver or cause to be delivered to Lessor promptly after the same are available to shareholders (and in any event within ninety (90) days) after the end of each of Lessee's financial years ending after the date hereof, a copy of Lessee's and Holdings' consolidated financial statements for such financial year, which (i) shall be audited by independent, certified public accountants in accordance with GAAP consistently applied; (ii) shall fairly and accurately present the financial position of Lessee and Holdings as at the date as of which they were prepared and the results of the operations of Lessee for the period to which they relate; and (iii) shall, in accordance with such accounting principles and practices, disclose all significant liabilities, actual or contingent, of Lessee and Holdings.

(b)    Lessee shall deliver or cause to be delivered to Lessor promptly after the same are available to shareholders (and in any event within forty-five (45) days) after the end of each of Lessee's fiscal quarters after the date hereof, a copy of Lessee's and Holdings' consolidated financial statements for such fiscal quarter, which (i) shall fairly and accurately present the financial position of Lessee as at the date as of which they were prepared and the results of the operations of Lessee and Holdings for the period to which they relate and (ii) shall, in accordance with such accounting principles and practices, disclose all significant liabilities, actual or contingent, of Lessee and Holdings.

(c)    Lessee shall promptly provide Lessor with such financial and other information concerning Lessee and its affairs as Lessor may from time to time reasonably request in the context of the Operative Documents to which it is a party and the transactions contemplated thereby.

### 8.4 Existence and Authorizations

Lessee will preserve its corporate existence, good standing, and all corporate power and authority necessary to conduct its business as presently conducted, to own or hold under lease its assets, to enter into and perform its obligations under the Operative Documents to which it is a party and to consummate the transactions contemplated by the Operative Documents to which it is a party. Lessee shall ensure that its organizational documents incorporate provisions that permit, and shall ensure that all necessary authorizations, approvals, consents, licenses, permits and orders of and registrations with any Government Entity, including, but not limited to, those relating to foreign exchange controls, are duly and unconditionally obtained and remain in full force and effect that are required to authorize, Lessee to sign and deliver, and perform its obligations under

UMB0004125       CONFIDENTIAL

and the transactions contemplated by, the Operative Documents to which Lessee is a party.

8.5    **Chief Executive Office**

Lessee will not change the state in which its "place of business" or "centre of administration" (as those terms are used in the Cape Town Convention) is located (without Lessor's prior written consent) or the location of its chief executive office from that described in the first paragraph of this Agreement or otherwise be located (as determined pursuant to Section 9-307 of the UCC) at any place other than the State of Colorado, except in each case upon ten (10) days prior written notice thereof to Lessor, which notice shall be accompanied by appropriate UCC financing statements to be filed in the relevant jurisdiction.

9.    **OPERATIONAL UNDERTAKINGS**

The undertakings in this Clause 9 will (i) except as otherwise stated, be performed at the expense of Lessee and (ii) remain in force from Delivery until the Termination Date and the return of the Aircraft and Aircraft Documents as required by this Agreement.

9.1    **Registration, Title and Nameplates**

(a)    At its own cost and expense, Lessee shall ensure that upon Delivery and at all times thereafter, the Aircraft is registered with the Aviation Authority in the name of Lessor as owner and lessor under this Agreement in accordance with applicable laws of the State of Registration or, in the event that such registration is not possible, in the name of Lessee with Lessor's interest in the Aircraft noted in the register. Lessor agrees to cooperate with Lessee, at the expense of Lessee, to the extent necessary to maintain such registration. Lessee shall obtain (and at all times thereafter maintain in effect) with respect to the Aircraft a full certificate of airworthiness in accordance with all applicable laws, rules and regulations of the State of Registration and provide Lessor with a copy of the same duly certified by an officer of Lessee, and Lessee shall comply with any special conditions attaching thereto within any time limits imposed for compliance by the Aviation Authority. Lessee shall promptly produce to Lessor true copies of each certificate of airworthiness for the Aircraft, and each certificate of registration issued to the Aircraft. Lessee shall not be entitled to change the State of Registration without the prior written consent of the Lessor.

(b)    Lessee shall not do or knowingly permit to be done anything that would jeopardize the rights of Lessor as owner of, or any Lender in the Aircraft and shall cause to be taken all actions necessary or reasonably requested by Lessor to prevent the rights of Lessor as owner of, and Lender in the Aircraft from being jeopardized, and shall not do or permit to be done anything which, or omit to do anything the omission of which, would or would be likely to prejudice any material right that Lessor may have against the Manufacturer, the Engine Manufacturer, any maintenance provider or any supplier or manufacturer of the Aircraft or any part thereof. At the reasonable request of Lessor, Lessee will do all acts and things (including making any filing, registration or recording with the Aviation Authority or any other Government Entity or as required to comply with any applicable law) and execute, notarize, file, register and record all

UMB0004126                                                                    CONFIDENTIAL

documents as may be required by Lessor to establish, maintain, perfect, protect and preserve the rights and interests of Lessor hereunder and in the Aircraft and the rights and interests of any Lender under the Security Documents; **provided that**, Lessor shall reimburse Lessee for any out-of-pocket costs incurred by Lessee in connection with such actions relating to the perfection or preservation of any interest of any Lender under the Security Documents, unless such actions are required as a result of a change in the State of Registration requested by Lessee and agreed by Lessor. At the reasonable request of Lessor, Lessee shall furnish to Lessor and any Lender an opinion of counsel or other evidence satisfactory to Lessor of each such filing, recordation and act.

(c)     Lessee shall affix on or prior to Delivery a fireproof plate in accordance with the Manufacturer's guidelines or, if no such guidelines have been provided, then having dimensions of not less than 10 cm x 7 cm. Such plate shall be located in a prominent position in the cockpit or entry door of the Aircraft, on each Engine and on the APU stating:

"THIS AIRCRAFT/ENGINE IS OWNED BY UMB BANK, N.A., NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS OWNER TRUSTEE, AND IS LEASED TO FRONTIER AIRLINES, INC.",

and within five Business Days after receipt of notice of any Lender and any Security Documents, Lessee shall cause the plate to contain the additional inscription:

"AND IS SUBJECT TO A MORTGAGE IN FAVOR OF [NAME OF LENDER(S)]."

Lessee shall maintain and shall not cover up (or permit to be covered up) such name plates and shall replace such name plates, if requested, reflecting the name of any successor Lessor or Lender as permitted under the Operative Documents.

Except as above provided or as required by applicable law, Lessee will not allow the name of any person to be placed on the Airframe or on any Engine as a designation that might be interpreted as a claim of ownership or any security interest; **provided that**, nothing herein contained shall prohibit Lessee from placing its customary colors and insignia on the Airframe or any Engine.

(d)     Lessee shall not hold itself out to any third party as owner of the Aircraft or any part of it, and when any third party inquires as to the ownership of the Aircraft or any part thereof, Lessee will make clear to such third party that title to the same is held by Lessor and that the Aircraft is mortgaged to the Lender(s), if any. Lessee shall not at any time represent or hold out Lessor, Owner Participant, Lessor Guarantor or any Lender as carrying goods or passengers on the Aircraft or as being in any way connected or associated with any operation of carriage (whether for hire or reward, or gratuitously) that may be undertaken by Lessee.

(e)     Lessee has no authority to pledge, and shall not pledge, the credit of Lessor, Owner Participant, Lessor Guarantor or any Lender for any fees, costs or expenses connected with any maintenance, overhaul, repairs, replacements, or

UMB0004127                                                                    CONFIDENTIAL

modifications to the Aircraft or any part thereof or otherwise connected with the use or operation of the Aircraft or any part thereof.

(f)    Lessee shall not grant to any person other than Lessor a de-registration and export request authorization with respect to the Airframe or any Engine.

(g)    If at any time subsequent to the initial registration of the Aircraft and the initial filing of UCC financing statements, any other filing or any recording or other act is necessary to perfect, protect and preserve the rights and interests of Lessor hereunder and in the Aircraft and the Security, including the filing of continuation statements with respect to filed UCC financing statements, Lessee shall, at its cost and expense, procure that such filings, recordings and acts are done pursuant to applicable law.  Without prejudice to Lessee's obligations hereunder, Lessee agrees that Lessor is hereby authorized to make any filings or recordings referred to in this paragraph.

9.2    **Liens**

Lessee shall not create or permit to arise or subsist any Lien (other than Permitted Liens) over the Aircraft or any part thereof or over any rights, revenues or proceeds derived from the Aircraft or any part thereof, shall not register or permit any person claiming through Lessee to register on the International Registry any interest in the Airframe, any Engine or this Agreement, and shall not attempt or hold itself out as having any power to sell, charge, lease or otherwise dispose of or encumber the Aircraft or any Engine or any Part other than as permitted under this Agreement.

9.3    **Possession; CRAF**

Lessee shall not, without the prior written consent of Lessor, such consent not to be unreasonably withheld, sublease, wet lease or charter or otherwise part with possession of the Aircraft except:

(a)    for maintenance, testing, service, overhaul work, maintenance or repair or alterations, modifications or additions in accordance with this Agreement; or

(b)    for wet leases or charters on terms whereby:

(i)    the Aircraft shall at all times be in the possession and operational control of Lessee and operated by Lessee's flight crew;

(ii)    the Aircraft shall continue to be registered in the State of Registration and maintained in accordance with the Maintenance Program;

(iii)    the insurance requirements under this Agreement continue to be satisfied;

(iv)    the term of such wet lease or charter shall not extend beyond the lesser of six (6) months and the end of the Term;

(v)    such wet lease or charter is expressly subordinated to this Agreement and the rights of Lessor hereunder in respect of the Aircraft; and

UMB0004128                                                                                  CONFIDENTIAL

(vi)    such wet lease or charter shall contain an express notice to, and acknowledgment, from such charterer or wet lessee of the foregoing arrangements.

(c)    Lessee may allocate the Aircraft to the Civil Reserve Air Fleet (CRAF) pursuant to the terms established by the laws and regulations of the government of the United States and its agencies, **provided**, **however**, **that** the Aircraft at all times: (i) shall be operated solely by regular employees of Lessee possessing all current certificates and licenses and that are required by applicable Law, including by the State of Registration, shall remain in the operational control and possession of Lessee; (ii) shall be used and operated in accordance with this Agreement and shall be maintained or caused to be maintained by Lessee in accordance with the Maintenance Program and Lessee's normal maintenance practices; and (iii) shall not be subject to any change in its State of Registration. Lessor understands that the United States government has the right to activate the CRAF fleet in times of air lift emergency and in such event Lessee may not be able to return the Aircraft at the termination, cancellation or expiration of this Agreement.  Accordingly, in the event that CRAF is activated with respect to the Aircraft and, pursuant to the then applicable law, Lessee is not permitted to redeliver the Aircraft while CRAF is so activated (the "**CRAF Activation Period**"), the Lease Term shall be deemed extended and all terms and conditions of this Agreement shall continue to apply during this extended period. Lessee shall give Lessor notice in advance if the Aircraft is to be allocated to CRAF, which notice shall specify the appropriate United States government official or agency responsible for the Aircraft under CRAF and to whom Lessor should direct any notice of any Event of Default hereunder.  In the event that CRAF activation occurs with respect to the Aircraft, then (i) Lessor will accept indemnification by the United States government in lieu of the insurances required under this Agreement, **provided that** such indemnification is at least substantially equivalent to such required insurances; and (ii) Lessor shall inform such United States government official or agency identified by Lessee in the notice of CRAF activation if an Event of Default shall occur.

Notwithstanding any such parting with possession permitted by this Clause 9.3, Lessee shall remain responsible for procuring observance of and compliance with all of its obligations under this Agreement.

If Lessee, with the consent of Lessor and on such terms and conditions as the Lessor may reasonably require, enters into a sublease for the Aircraft, at the request of Lessor Lessee shall cause the sublessee to provide Lessor with a deregistration power of attorney and/or an IDERA (if the Cape Town Convention is in effect in the jurisdiction of registration) in a form acceptable to Lessor which shall be effective during the Term to enable Lessor to effect such de-registration and exportation of the Aircraft. Lessee shall not be obligated to provide Lessor with a deregistration power of attorney or an IDERA signed by Lessee for this Agreement so long as the Aircraft is registered with the FAA.

UMB0004129

CONFIDENTIAL

9.4    **Information**

Lessee shall:

(a)    promptly furnish to Lessor all information Lessor from time to time reasonably requests regarding the Aircraft, any Engine or any part thereof, its use, registration, location and condition including a copy of the Maintenance Program and any and all updates thereto, the hours available on the Aircraft and any Engine until the next scheduled check, inspection, overhaul or shop visit, as the case may be;

(b)    on request, promptly furnish to Lessor evidence satisfactory to Lessor that all payments due to the relevant air traffic control authorities or relevant "competent authority" in respect of the European Emissions Trading Scheme (or a comparable administrator of any other emissions trading scheme), in either case in respect of the Aircraft, have been paid and discharged in full other than in respect of such charges which are being contested by Lessee in good faith by appropriate proceedings;

(c)    on the fifth (5th) day of each calendar month after the Delivery Date and on the Termination Date, furnish to Lessor a maintenance status report substantially in the form of Schedule 5;

(d)    promptly on becoming aware of the same notify Lessor of:

    (i)    any Total Loss with respect to the Aircraft, the Airframe or any Engine;

    (ii)    any loss, theft, damage or destruction to the Aircraft, any Engine or any part thereof, or any modification to the Aircraft if (A) the potential cost of repairs may exceed the Damage Notification Threshold or its equivalent in any other currency, or (B) Lessee is required to report the same to the Aviation Authority;

    (iii)    any loss, arrest, hijacking, confiscation, seizure, requisition, impound, taking in execution, detention or forfeiture of the Aircraft or any part thereof; and

    (iv)    any event, accident or incident in respect of the Aircraft that might reasonably be expected to involve Lessor or Lessee in loss or liability in excess of the Damage Notification Threshold or its equivalent in any other currency, or which is required to be reported to the Aviation Authority).

(e)    provide Lessor not less than sixty days' prior written notice of each C-Check, 6Y-Check, 12Y-Check, Engine Performance Restoration, Fan and/or LPT Module Performance Restoration, LLP Replacement Event, APU Overhaul and Landing Gear Overhaul; **provided that**, if any such maintenance event is to occur less than sixty days after the scheduling thereof, Lessee shall provide written notice of such maintenance event promptly upon the scheduling thereof;

(f)    promptly notify Lessor of any agreement or arrangement reached by Lessee with any airport authority or air traffic control authority for the purposes of

UMB0004130                                                                    CONFIDENTIAL

restructuring, deferring or in any way reorganizing payment of any debt owed by Lessee to such authority; and

(g)    during the Term, Lessee shall provide Lessor with a certificate executed by a duly authorized officer of Lessee promptly after written request therefor has been made by Lessor, stating, in each case, that, to Lessee's knowledge after performing any and all necessary research, no Liens which are not Permitted Liens exist or have been created over the Aircraft in any other jurisdiction to which the Aircraft may from time to time become subject.

9.5    **Aircraft Documents**

(a)    Lessee shall keep, or procure that there are kept:

(i)    the Aircraft Documents and shall keep or cause to be kept as part thereof accurate, complete and current records of all flights made by the Aircraft, of all Flight Hours and Cycles of the Airframe, each Engine, each Engine Module, the APU, each Landing Gear and the Parts (whether or not time or cycle limited), and of all maintenance and repairs carried out on the Aircraft and each Engine, each Engine Module, APU, the Landing Gear and every Part;

(ii)    historical records for condition monitored, hard time Parts and LLPs (including tags from the manufacturer of such Part or a repair facility which evidence that such Part is new or overhauled and establish authenticity, total time in service and time since overhaul for such Part); and

(iii)    any updates or additions to any of the foregoing and renewals, revisions and replacements of any of the foregoing from time to time created or obtained in accordance with this Agreement, applicable law or otherwise.

Except as required by applicable law, the Aircraft Documents referred to in paragraph (a) shall be the property of Lessor;

(b)    Such Aircraft Documents referred to in paragraph (a):

(i)    shall be kept and maintained in English;

(ii)    may be in either paper or electronic format (as determined by Lessee), **provided that**, at the end of the Lease Term, Lessee will certify for Lessor any hard copies of the aircraft records printed and requested by Lessor;

(iii)    shall be the latest revision and in an up-to-date status (through subscription to the relevant manufacturer's update service or otherwise) in accordance and in such manner, form and location as the Aviation Authority, FAR Part 121 and any applicable law may from time to time require;

(iv)    shall accurately disclose the location (that is, if not installed on any Lessee aircraft, the physical location, and if installed on another aircraft,

UMB0004131           CONFIDENTIAL

the aircraft on which it is installed) of each Engine, APU, Landing Gear not installed on the Aircraft; and

(v)     shall contain accurate, full Back to Birth Traceability in respect of each LLP;

(c)     Following any repair which is carried out other than in accordance with instructions contained in the Manufacturer's repair manual, Lessee shall ensure that there is obtained and kept with the Aircraft Documents appropriate manufacturer repair scheme data and a Manufacturer's approval issued in accordance with the requirements of the FAA;

(d)     Lessee shall keep all the Aircraft Documents on the Aircraft or in its possession, and shall not permit any other person (other than a person entitled to have possession or control of the Aircraft under the terms of this Agreement) to have possession of or control over the Aircraft Documents except with the prior written consent of Lessor;

(e)     If Lessee fails to comply with the provisions of Clause 18.2(c) as of the Termination Date, then in lieu of such compliance, at Lessor's sole and absolute discretion, Lessor may accept Lessee compensating Lessor (i) for overhaul costs and/or LLP replacement cost incurred in respect of the Aircraft resultant upon the maintenance of inadequate Aircraft Documents by Lessee during the Term; and (ii) for all rectification costs incurred in respect of any Part resultant upon the failure by Lessee to maintain an EASA Form 1 or FAA Form 8130-3 tag in respect of each Part, APU and Engine which is installed on the Aircraft at the time the Aircraft is redelivered to Lessor;

(f)     Lessee shall, and shall procure that its Approved Maintenance Performer, permit Lessor to copy and scan such Aircraft Documents as Lessor deems necessary during each scheduled C-Check for the Aircraft and at reasonable intervals;

(g)     Lessee shall permit or procure free and full access by Lessor to all relevant Aircraft Documents by printing and providing copies to Lessor of any of the Aircraft Documents requested by Lessor; **provided that**, unless an Event of Default has occurred and is continuing, such access shall be not more frequent than once per year and shall not interfere with Lessee's normal commercial operations of the Aircraft;

(h)     Upon request from Lessor, Lessee will provide or procure that there is provided Aircraft and Engine health monitoring data produced by Lessee and/or Lessee's third-party provider; and

(i)     Lessee, at its own cost and expense, shall be responsible for subscribing to Manufacturer's documents revision services and on-line data services.

UMB0004132                                                                              CONFIDENTIAL

9.6     **Lawful and Safe Operation**

Lessee shall:

(a)     comply and procure compliance with all laws for the time being in force in any country or jurisdiction which may for the time being be applicable to the Aircraft (including laws mandating insurance coverage) or, so far as it concerns the use, maintenance and operation of the Aircraft or an operator thereof, and will procure that the Aircraft is not used for any illegal purpose or in any illegal manner;

(b)     not use or permit the use of the Aircraft in any manner contrary to any recommendation of the Manufacturer, the Engine Manufacturer or any recommendation or regulation of the Aviation Authority or for any purpose for which the Aircraft is not designed or reasonably suitable;

(c)     ensure that the crew and engineers employed in connection with the operation and maintenance of the Aircraft have the qualifications and hold the licenses required by the Aviation Authority and applicable law;

(d)     use the Aircraft and procure that the Aircraft is used solely in commercial or other operations for which Lessee is duly authorized by the Aviation Authority and under applicable law;

(e)     not use or permit the use of the Aircraft for the carriage of:

    (i)     whole animals living or dead except in the cargo compartments according to I.A.T.A. regulations, and except (y) domestic pet animals carried in a suitable container to prevent the escape of any liquid and to ensure the welfare of the animals and (z) service animals permitted according to the Department of Transportation, 14 CFR Part 382 (Nondiscrimination on the basis of disability in Air Travel) or its equivalent under EASA;

    (ii)     acids, toxic chemicals, other corrosive materials, explosives, nuclear fuels, nuclear wastes, or any nuclear assemblies or components, except as permitted for passenger aircraft under the "Restriction of Goods" schedule issued by I.A.T.A. from time to time; **provided that**, all the requirements for packaging or otherwise contained therein are fulfilled;

    (iii)     any other goods, materials or items of cargo which could reasonably be expected to cause damage to the Aircraft and which would not be adequately covered by the Insurances; or

    (iv)     any illegal item or substance;

(f)     not utilize or permit the use of the Aircraft for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel and then only if the use of the Aircraft for such purposes is not disproportionate in any manner to the use for such purpose of other aircraft of the same type operated by the Lessee;

UMB0004133                                                                                                        CONFIDENTIAL

(g)     except in the case necessary to avert an operational emergency, not cause or permit the Aircraft to proceed to, or remain at, any location which is for the time being the subject of a prohibition order (or any similar order or directive) by or sanction or restriction pursuant to any regulation or law of:

    (i)     any Government Entity of the State of Registration or the Habitual Base; or

    (ii)     any Government Entity of the country in which such location is situated; or

    (iii)     any Government Entity having jurisdiction over the Aircraft, or Lessor, Owner Participant or Lessor Guarantor.

(h)     obtain and maintain in full force, and comply with in all respects with the conditions and restrictions (if any) imposed in or in connection with, all certificates, licenses, permits and authorizations from time to time required for Lessee to continue to be a Certificated Air Carrier, for the use and operation of the Aircraft for the time being, and for the making of payments required by, and the compliance by Lessee with its other obligations under the Lessee's Documents, and will insure that the Habitual Base remains the habitual base of the Aircraft; and

(i)     not use, operate, or locate the Aircraft or suffer or permit the Aircraft to be used, operated or located during the Term in any manner not covered by the insurances required hereby.

## 9.7     Right of Inspection

(a)     Lessor and each Lender (or the authorized representative of any of the foregoing) as a group shall have the right (at Lessor's expense, unless an Event of Default has occurred and is continuing, in which case at Lessee's expense) to inspect, once annually during each year of the Term and as frequently as Lessor reasonably determines during the last six months of the Term prior to the redelivery of the Aircraft, during any Event of Default or any period in which Lessor reasonably believes that an Event of Default exists or Lessee's business, operations or financial position are such that Lessee may not or may not be able to perform any of its material obligations hereunder or connection with a transfer of the Aircraft or assignment of rights hereunder as permitted by Clause 20.2, the Aircraft and all logs, flight manuals and maintenance records and any other books and records related to the Aircraft and identified by Lessor with respect thereto at reasonable times and on reasonable notice to Lessee.  Neither Lessor nor any Lender shall have any duty to inspect and shall not incur any liability or obligation by reason of not making any such inspection.  So long as no Event of Default has occurred and is continuing, any such inspection shall be limited to a visual, walk-around inspection which may include going on board the Aircraft, but may not include any opening of any panels, bays or disassembly of any components, etc. (unless such inspection is during an overhaul of the Aircraft and such panels or bays are then opened or components then disassembled in the ordinary course of such maintenance), and, provided no Event of Default has occurred and is then continuing, any such inspection

UMB0004134                                                                    CONFIDENTIAL

shall be conducted so as not to interfere in any manner with Lessee's business or the operation and maintenance of the Aircraft and, either (A) shall be conducted while the Aircraft is in Denver, Colorado; or (B) if the Aircraft is not then regularly routed through Denver, Colorado, shall only occur at a scheduled A-Check or scheduled C-Check.  Upon the specific request of Lessor, Lessee will give Lessor, Lender or their authorized representative notice of the next scheduled C-Check or other heavy maintenance visit with respect to the Aircraft or any Engine and afford Lessor, Lender or their authorized representative an opportunity to be present at the same, which presence shall not interfere with the maintenance, operations or business of Lessee.  Lessee shall furnish to Lessor such additional information within the possession or control of Lessee concerning the location, condition, maintenance, use and operation of the Aircraft as Lessor may reasonably request promptly following such request.  Lessee will obtain to the extent reasonably practicable to do so, at Lessor's cost (unless during the continuance of an Event of Default in which case at Lessee's cost) all necessary security clearance to permit Lessor, Lender or their authorized representative access to the Aircraft to permit such inspections.

(b)     Any inspection of the Aircraft (including the Aircraft Documents) shall be solely for Lessor's, Lenders' or prospective operator's information and failure to notify Lessee of any discrepancies thereafter shall not imply that Lessee is in compliance with this Agreement, its maintenance provisions or applicable law.

9.8     **Compliance with U.S. Export Controls and Sanctions Laws**

Both Lessor and Lessee shall comply with applicable export controls and sanctions laws of the United States of America, including, but not limited to, the Export Administration Regulations administered by the Department of Commerce, Bureau of Industry and Security, and the various economic sanctions programs administered by the Department of the Treasury, Office of Foreign Assets Control.  Lessee may not undertake any activity, or cause or require Lessor, Owner Participant, Lessor Guarantor or any of their respective Affiliates (including CK Asset Holdings Limited (formally known as Cheung Kong Property Holdings Limited)) to undertake any activity, that would be reasonably likely to or cause or require any such person to undertake any activity, that would be reasonably likely to result in any such person, its agent as a United States person, violating U.S. export controls and/or sanction laws.

10.     **MAINTENANCE AND REPAIR**

10.1    **General**

At all times during the Term, Lessee shall, at its own cost and expense:

(a)     keep the Aircraft or procure that the Aircraft is kept airworthy and in good repair and operating condition with all of its equipment, components and systems functioning in accordance with their intended use, and keep the Aircraft in good operating condition, subject to fair ordinary wear and tear of a kind consistent with similar aircraft operated by Lessee within Manufacturer's aircraft maintenance manual limits;

UMB0004135                                                                    CONFIDENTIAL

(b)     maintain the Aircraft or procure that the Aircraft is maintained in accordance with (i) the Maintenance Program through an Approved Maintenance Performer; (ii) Aviation Authority and FAR requirements as implemented in the State of Registration and the Habitual Base; (iii) all Airworthiness Directives having a compliance date during the Term and the period from the end of the Term until the date falling due within 180 days of the Termination Date pursuant to Clause 18 and Schedule 4; (iv) the regulations of the FARs, which are imposed and which relate to the maintenance, condition, use or operation of the Aircraft or require any modification or alteration to the Aircraft, any Engine, the APU or Part; and (v) all applicable laws of other countries and regulations of other aviation authorities with jurisdiction over Lessee, the Aircraft, any Engine, the APU or Part and which relate to the use or operation of the Aircraft (collectively, the "**Maintenance Requirements**");

(c)     perform or procure performance of all 6Y-Checks and 12Y-Checks;

(d)     maintain or procure maintenance of a current certificate of airworthiness (in the appropriate category for the nature of the operations of the Aircraft) for the Aircraft issued by the Aviation Authority except where the Aircraft is undergoing maintenance, modification or repair required or permitted by this Agreement, and will from time to time provide to Lessor a copy on request;

(e)     if required by the Aviation Authority, maintain or procure maintenance of a current certification as to maintenance issued by or on behalf of the Aviation Authority in respect of the Aircraft and will from time to time provide to Lessor a copy on request;

(f)     procure promptly the replacement of any Part which has become time, cycle or calendar expired, lost, stolen, seized, confiscated, destroyed, damaged beyond repair, unserviceable or permanently rendered unfit for use, with a part complying with the conditions set out in Clause 10.3;

(g)     not adversely discriminate against the Aircraft, Engines or APU in any use, maintenance, operation or modification level, including the incorporation of service bulletins, of the Aircraft as compared to other aircraft of the same model and type owned or operated by Lessee and Lessee shall service, repair, maintain and overhaul the Aircraft so as to keep the Aircraft maintained in the same manner and with the same care as used by Lessee with the same model and type aircraft owned or operated by Lessee (and for the avoidance of doubt, all maintenance, inspections modifications and overhauls shall be carried out as if the Aircraft was to remain in Lessee's fleet notwithstanding any impending termination of the leasing of the Aircraft under this Agreement); and

(h)     keep the Aircraft equipped with the Engines and Parts installed at the Delivery Date or with substitutes or replacements thereof made in accordance with this Agreement.

10.2    **Maintenance Program**

Lessee shall procure that the Maintenance Program shall, at all times, be based on the Maintenance Planning Document or Engine Manufacturer recommendations and, in

UMB0004136                                                                                                                    CONFIDENTIAL

respect of the Engines, the applicable Engine Manufacturer's work scope, planning guide, engine program and maintenance planning guide.

10.3    **Specific Requirements**

Without limiting the maintenance and repair obligations specified in Clause 10.1, Lessee:

(a)    shall ensure that normal progressive maintenance will continue to be performed on the Aircraft throughout the Term;

(b)    shall conduct a microbiological fuel sampling in accordance with the requirements set forth in the Maintenance Program;

(c)    shall (i) notify the Manufacturer or OEM (as the case may be) upon accomplishment of each service bulletin in order for the Manufacturer or OEM (as the case may be) to update the applicable operations and maintenance manuals and (ii) include such updates in the Aircraft Documents;

(d)    shall not install or permit to be installed on the Landing Gear, Airframe or Engines, any Parts that are not OEM parts, or if repaired Parts, only OEM or Aviation Authority approved repaired Parts having not more than two OEM authorized repairs. Lessee may replace a Part with a PMA Part if such Part is installed in the cabin interior and **provided that** such PMA Parts are accompanied with proper records and FAA or EASA documentation; and

(e)    shall ensure that all structural repairs are in accordance with the Manufacturer's structural repair manual or the Manufacturer's approval in the form of Repair Design Approval Sheet ("**RDAS**").

10.4    **Substitution of Parts**

(a)    Lessee, at its own cost and expense, will promptly replace all Parts that may from time to time be incorporated or installed in or attached to the Airframe or any Engine and that may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, except as otherwise provided in Clause 10.5. In addition, Lessee may, at its own cost and expense, remove or permit the removal in the ordinary course of maintenance, service, repair, overhaul or testing, any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use; **provided that**, except as otherwise provided in Clause 10.6, at no cost or expense to Lessor, all such Parts are replaced as soon as operationally and commercially practicable (but no later than the next C-Check), unless otherwise approved by Lessor. Except as permitted by Clause 10.4(e), each part installed on the Aircraft in replacement of any Part or part shall be a Replacement Part.

(b)    Lessee shall procure that any substituted or replacement Part shall be, or upon installation become, the property of Lessor subject to this Agreement and the Security Documents and be free and clear of any Lien other than Permitted Liens.

UMB0004137                                                                                              CONFIDENTIAL

(c)    Any part installed on the Aircraft by way of replacement that is a Replacement Part will on installation, without further act, vest in Lessor subject to the terms of any relevant Financing Document free and clear of all Liens (other than Permitted Liens) as if it were attached to the Aircraft on the Delivery Date. At any time when requested by Lessor, Lessee will provide evidence to Lessor's reasonable satisfaction that title has so passed to Lessor. All BFE installed on the Aircraft by Lessee after the Delivery Date shall vest in Lessor subject to the terms of any relevant Financing Document free and clear of all Liens (other than Permitted Liens) as if it were attached to the Aircraft on the Delivery Date. Lessee will at its own expense and at the request of Lessor take all such steps and execute, and procure the execution of, all such instruments as are necessary to ensure that title to the BFE so passes to Lessor according to all applicable laws. At any time when requested by Lessor, Lessee will provide evidence to Lessor's reasonable satisfaction that title to the BFE has so passed to Lessor.

(d)    Any Part at any time removed from the Airframe or any Engine shall remain the property of Lessor, no matter where located, until such time as such Part shall be replaced by a Replacement Part that has been incorporated or installed in or attached to such Airframe or Engine and until title to such Replacement Part shall have passed to Lessor, according to applicable law (whereupon title to the replaced Part shall vest in Lessee free and clear of all Lessor's Liens).

(e)    Lessee shall, if no Event of Default has occurred which is continuing, be entitled to replace or permit the replacement of any Part with a part that is not a Replacement Part notwithstanding Clause 10.4(a) if:

(i)    there is not available to the Lessee at the time and in the place that such replacement part is required to be installed on the Aircraft a Replacement Part;

(ii)   it would result in an unreasonable disruption of the operation of the Aircraft and/or the business of the Lessee to ground the Aircraft until a Replacement Part becomes available for installation on the Aircraft;

(iii)  the installation of such replacement part on the Aircraft will not contravene applicable law;

(iv)   as soon as soon as operationally and commercially practicable (but no later than the next C-Check or, if earlier, the Termination Date) after installation of such replacement part on the Aircraft (but in any event on or before the expiration or termination of the Term), the Lessee removes such part and replaces it with a Replacement Part; and

(v)    title to the Part which has been replaced, substituted or renewed shall remain with Lessor free from all Liens (other than Permitted Liens) until the Replacement Part which replaces it becomes the property of Lessor;

**provided that**, for the avoidance of doubt and notwithstanding anything contained in this Clause 10.4(e), Lessee shall not replace or permit the replacement of any Part on the Engines with a PMA Part.

UMB0004138                                                        CONFIDENTIAL

(f)     Without Lessor's prior written consent, Lessee shall only replace Engine LLPs with Engine LLPs that are either new or have a cyclic life remaining that is greater than the LLP to be replaced.

(g)     A "**Replacement Part**" means a part, component, furnishing, appliance, module, APU, accessory, instrument or other item of equipment:

    (i)     that is in the same operating condition as, and has a utility (in calendar time, Flight Hours, Cycles or APU operating hours as applicable) and value at least equal to, the replaced Part (assuming that that replaced Part was in the condition and repair in which it is required to be maintained under this Agreement);

    (ii)    that is of the same make and model and an equivalent or an improved or advanced version with an equivalent or advanced modification status of the replaced part, component, furnishing, appliance, module, accessory, instrument or other item of equipment, as the case may be; **provided that**, any such part must be approved by the FAA and/or the Aviation Authority as a replacement for the replaced Part;

    (iii)   that has a valid FAA certification (with 8130-3 tag) or EASA certification (Form 1 tag) and, if an LLP or hard time component, origin traceability (full Back to Birth Traceability);

    (iv)    has not been involved in an accident or incident;

    (v)     which does not impair the airworthiness or diminish the overall value of the Aircraft;

    (vi)    for which the installation of such part as a Replacement Part is recorded in the Aircraft Documentation in relation to the relevant Part; and

    (vii)   that is, except as permitted by 10.3(d), not a PMA Part.

10.5   **Pooling of Parts**

Lessee shall not permit any Part to become subject to pooling or interchange arrangements, or allow any Part to go out of its possession pursuant to any such arrangement, except pursuant to an arrangement whereby:

(a)     a record of the location of any Part will be kept and made available to Lessor at any time on request; and

(b)     title to the Part which has been replaced shall (if previously vested in Lessor) remain with Lessor until the Part which replaced it becomes the property of Lessor or is replaced by a Part which thereupon becomes the property of Lessor.

Lessee agrees that, unless otherwise agreed to in writing by Lessor, Lessee shall limit the time during which any Part which is not the property of Lessor remains on the Aircraft and will as soon as practicable replace the same with a Part which either is the property of Lessor, or will, upon fitting, become the property of Lessor.

UMB0004139     CONFIDENTIAL

10.6    **Alterations and Modifications**

(a)    **Provided that** no Event of Default has occurred and is continuing, Lessee shall be entitled to make or permit any modifications or additions, alterations, removals or other changes to the Aircraft (each a "**Change**"); **provided that**, such Change shall not:

    (i)    alter the fundamental nature of the Aircraft as a passenger and cargo carrying aircraft;

    (ii)    invalidate or impair any warranty with respect to the Aircraft, the Airframe, any Engine or any Part;

    (iii)    adversely affect the eligibility of the Aircraft to obtain an Airworthiness Certificate from the Aviation Authority;

    (iv)    diminish the value, utility or airworthiness of the Aircraft;

    (v)    result in any change in the category or status of the Aircraft for purposes of any rules or regulations of the State of Registration, or of the Aviation Authority; or

    (vi)    be in an amount in excess of Maximum Change Amount without Lessor's prior written approval, unless expressly authorized or required by this Agreement.

Prior to the installation of any Change (whether or not the Change is one that requires Lessor's prior written approval) that is a Major Modification, Lessee will provide to Lessor advance copies of the engineering data pack effective for the Aircraft including but not limited to all engineering orders, designs, plans, diagrams, drawings and data associated with the accomplishment of such Major Modification. The data pack shall furthermore include all manual supplements, component manuals, part certification, instructions for continued airworthiness documentation and right-to-use letters and Lessee shall obtain an FAA approved and validated supplemental type certificate ("**STC**") for such Major Modification within ninety (90) days of the completion of such Major Modification (or if earlier the last day of the Term).

(b)    For the avoidance of doubt, (i) compliance with Airworthiness Directives shall not be construed as Changes and shall be complied with in accordance with Clause 10.1 and (ii) Maximum Change Amount shall be based on the actual cost of the incorporation of such Change to the Aircraft, assuming the cost of such Change was obtained, contracted or performed on an arm's length basis with no favorable treatment or discount applied and (iii) the installation by the Lessee of BFE post-Delivery in accordance with and as contemplated by Schedule 1 shall not be construed as Changes.

(c)    So long as no Event of Default has occurred and is continuing, Lessee may remove or permit the removal of any Change if it can be removed from the Aircraft without diminishing or impairing the value, utility or airworthiness of the Aircraft and the Parts comprising the Change are not required to be installed

UMB0004140    CONFIDENTIAL

on or attached to the Aircraft in order to comply with any other provision of this Agreement.

(d)    Upon written request of Lessor, to be given at least sixty (60) days prior to the scheduled expiration of the Term, Lessee shall on or before the last day of the Term at its own expense, reverse any Change (including Major Modifications but excluding any modification that is necessitated by Lessee's compliance with Clause 10.1) and restore the Aircraft to its prior condition.

(e)    Title to such Change shall be vested in and remain with Lessor unless and until such Change is removed from the Aircraft or reversed in accordance with paragraph (c) or (d) above, as applicable. Lessee will take such actions and execute such documents as may be necessary to ensure such title has properly vested with Lessor.

(f)    Inflight Equipment

(i)    Lessor acknowledges that Lessee may at any time during the Term install a Wi-Fi, communication and/or electronic entertainment system or other severable equipment for passenger use (collectively, the "**Inflight Equipment**") on the Aircraft in accordance with the Manufacturer's service bulletin, which Inflight Equipment may be owned either by Lessee or by a third party, **provided that** the following conditions are at all times complied with:

(A)    Lessee shall give Lessor not less than thirty (30) days' advance written notice of the installation of the Inflight Equipment on the Aircraft and the name and mailing address of the owner(s) of such Inflight Equipment (which may be Lessee), and a copy of the Manufacturer's service bulletin or STC (as applicable) relating to the installation thereof;

(B)    the documents pursuant to which the owner of the Inflight Equipment installs the Inflight Equipment on the Aircraft or otherwise makes the same available to the Lessee for such installation shall provide, for the enforceable benefit of Lessor, (and in cases where the owner of such Inflight Equipment is the Lessee, the Lessee hereby agrees) that neither such owner nor any other person (including any financier) claiming by through or under such owner shall have or assert any lien, security interest, claim or other encumbrance on or against the Aircraft, and that such owner's only right with respect to the Aircraft shall be to remove the Inflight Equipment from the Aircraft in compliance with sub-clause (D) below not later than the earlier of: (x) thirty (30) days after notice from Lessor that it has repossessed the Aircraft from Lessee (which notice the Lessor shall deliver per the notice details provided under Clause 10.6(f)(i) above), and (y) the Termination Date, and that in the event such Inflight Equipment is not so removed, title thereto shall immediately and without further act vest in the Lessor free and clear of any interests of the owner or any other person, all of

UMB0004141          CONFIDENTIAL

which shall be thereupon extinguished, and if requested by Lessor the owner shall execute a bill of sale or other evidence of title transfer reasonably requested by Lessor;

(C)    the Lessee shall provide Lessor with a true and correct copy of the documents described in Clause 10.6(f)(ii); and

(D)    if so requested by Lessor, Lessee shall, at redelivery or repossession of the Aircraft, remove the Inflight Equipment from the Aircraft and in doing so Lessee shall restore all alterations made to the Aircraft in connection with the installation of the Inflight Equipment to the condition prior to the installation thereof in accordance with a service bulletin or STC (depending on whether the installation was made according to a service bulletin or an STC), including repairing or permanently covering any holes or other damage in the seats or any other fitments, Parts, accessories or equipment resulting from such removal to the satisfaction of the Lessor.

(ii)    **Provided that** Lessee removes, or causes to be removed, the Inflight System from the Aircraft prior to redelivery in accordance with sub-clause (i)(D) above and otherwise complies with each of its obligations set forth above in sub-clause (i), Lessor acknowledges and agrees that at all times (but in each case subject to sub-clause (i)(B) and (iii) hereof):

(A)    the owner of the Inflight Equipment has and will retain sole and exclusive right and title to and in the Inflight Equipment;

(B)    the Inflight Equipment shall not constitute a Part or a part of the Aircraft;

(C)    title to the Inflight Equipment shall not transfer to the Owner pursuant to Clause 10.3; and

(D)    the Inflight Equipment shall not become subject to the Lien of any Lender under any of the Financing Documents.

(iii)    If the Inflight Equipment remains on the Aircraft at redelivery or repossession, title to the Inflight Equipment shall immediately and without further act vest in the Lessor pursuant and Lessee will (if it owns the Inflight Equipment) or will procure that the owner of such Inflight Equipment will, provide a bill of sale evidencing transfer of title to such Inflight Equipment to Lessor.

10.7    **Airworthiness Directives**

So long as no Event of Default has occurred and is continuing, if Lessee complies on a terminating action basis with an Airworthiness Directive applicable to the Aircraft imposed by the FAA and the cost of performing such Airworthiness Directive (including the cost of labor and materials associated with performance of such Airworthiness Directive but excluding transportation costs) on the Aircraft exceeds the

UMB0004142    CONFIDENTIAL

Airworthiness Directive Threshold, following receipt of an invoice and supporting documentation in form and substance acceptable to Lessor according to industry standards supporting the cost of performing such Airworthiness Directive or no more than sixty (60) days after the completion of the performance of such Airworthiness Directive on the Aircraft,





11.     **ENGINES**

11.1    **General Principles**

(a)     In this Clause 11, "**Removed Engine**" means an Engine that is for the time being detached from the Airframe.

(b)     Lessee shall not at any time during the Term remove or permit the removal of an Engine from the Airframe or install or permit to be installed an engine other than an Engine on the Airframe except (i) for the purpose of testing, service, overhaul work, maintenance or repair or alterations, modifications or additions permitted or required by this Agreement or (ii) as expressly permitted by this Clause 11.

UMB0004143                                                                CONFIDENTIAL

(c)     If an Engine is at any time removed from the Airframe for the purpose of maintenance or repairs, Lessee shall procure that the same are completed promptly, and that, (A) subject to the provisions of Clause 11.1(h), the Removed Engine is re-installed on the Airframe or another airframe owned or operated by Lessee as soon as commercially and operationally practicable after removal and in no event more than 240 days after removal; and (B) the Removed Engine is safely stored or sheltered according to international commercial airline industry operating standards.

(d)     If an Engine is at any time removed from the Airframe for the purpose of maintenance or repairs, Lessee shall procure only OEM Parts and OEM approved repairs are used in connection with such installation, maintenance or repairs and are only performed by an Aviation Authority authorized maintenance performer, unless otherwise approved in writing by Lessor prior to such installation or repair.

(e)     If an Engine is at any time removed from the Airframe for any reason whatsoever, title to the Removed Engine shall remain vested in Lessor at all times and the Removed Engine shall remain subject to this Agreement and the Security Documents, and Lessee shall not take any steps or permit any steps to be taken that could be reasonably expected to jeopardize the interests of Lessor and any Lender therein or that could be reasonably expected to lead any third party to believe that the Removed Engine is the property of any person other than Lessor.

(f)     If an Engine is at any time removed from the Airframe for the replacement of LLPs, Lessee shall procure that only LLPs which are new or have a cyclic life remaining that is greater than the cyclic life on the LLP being replaced are installed in the Engine.

(g)     If an Engine is at any time removed from the Airframe as a result of its becoming unserviceable, then as soon as commercially and operationally practicable, Lessee shall place such Engine with an Approved Maintenance Performer for repair, maintenance and/or refurbishment pursuant to the Maintenance Program.

(h)     Lessee shall not operate the Engine in excess of the Engine Thrust Rating without Lessor prior written notice to Lessor and obtaining all necessary approvals from the Engine Manufacturer. In the event that the Engines are operating in excess of the Engine Thrust Rating, Lessee will discuss in good faith with the Lessor with a view to agreeing in advance an appropriate modification to the Engine Restoration Maintenance Payment Rate (Early Termination) to be paid in accordance with Schedule 8 using such increased rate.

(i)     Lessee shall provide Lessor with a TruEngine Certificate issued by the Engine Manufacturer within six (6) months of completion of each Engine Performance Restoration and each Fan and/or LPT module Performance Restoration if the Engine Manufacturer makes such TruEngine Certificates available to Lessee generally.

UMB0004144                                                                                                    CONFIDENTIAL

11.2    **Removal of Engines**

(a)    Lessee shall be entitled, so long as no Event of Default has occurred and is continuing, to remove or permit the removal of an Engine from the Airframe and to install on the Airframe an engine other than an Engine; **provided that**:

    (i)    such engine is leased to or is owned by Lessee;

    (ii)    the Removed Engine is, during the period of substitution, either being safely stored and sheltered or repaired or maintained in accordance with this Agreement, or is installed on another aircraft operated by Lessee which, unless otherwise approved by Lessor in writing (and the provisions of Clause 11.1(e) concerning preservation of title shall apply to the Removed Engine), is (A) (subject to any changes in accordance with 11.1(h)) being operated at the same Engine Thrust Rating; and (B) free and clear of all Liens (excepted Permitted Liens);

    (iii)    each lease or other agreement pursuant to which Lessee from time to time operates or finances any aircraft on which any Removed Engine is installed contains provisions that are consistent with the maintenance at all times of the interests of Lessor and any Lender in the Removed Engine while such Removed Engine is installed on such aircraft, and that in particular do not state or require that any Removed Engine that is installed on such aircraft shall become the property of the lessor or owner of, or person having a lien on, such aircraft; and

    (iv)    as soon as commercially and operationally practicable and in any event within 240 days following the removal of the Removed Engine from the Aircraft, the Removed Engine is reinstalled on the Airframe or another airframe owned or operated by Lessee and, in any event, on or before the expiration of the Term, such engine is removed from the Aircraft and the Removed Engine is re-installed on the Airframe,

**provided that**, in each case, Lessee maintains or causes to be maintained separate insurance in accordance with Clause 14 in respect of the Removed Engine at all times while it is removed from the Airframe (and, if required by Lessor, Lessee shall furnish or cause to be furnished to Lessor waivers or acknowledgments by the insurers of the aircraft on which the Removed Engine is installed) and the installation of an engine or auxiliary power unit on the Airframe does not have an adverse effect on the insurance for the Aircraft.

11.3    **Claims against Removed Engine**

(a)    Lessee shall notify Lessor in the monthly status reports whenever any Removed Engine is removed from the Airframe or installed on another aircraft operated by Lessee, and from time to time, on request, shall procure that any person to whom possession of the Removed Engine is given and any lessor of, or person having a Lien on, an aircraft on which the Removed Engine is installed acknowledges in writing for the benefit of Lessor and any Lenders, that it will respect the interests of Lessor and any Lender(s) in the Removed Engine, as the case may be, and that neither it nor its successors or assigns will acquire, as

UMB0004145        CONFIDENTIAL

against Lessor or any Lender, any right, title or interest in a Removed Engine as a result of such Removed Engine being installed on their airframe for so long as it remains owned by Lessor; **provided that**, such acknowledgment may take the form of an acknowledgment contained within the lease or financing document in respect of the airframe on which the Removed Engine is installed, so long as such acknowledgment is expressly stated to be for the benefit of third party lessors and lenders in the same position as Lessor and such Lender.

(b)     If such acknowledgment is unenforceable by Lessor or Lender or despite the apparent enforceability of such acknowledgment, another lessor or lender fails to remove a Removed Engine from their airframe either upon the request for removal by Lessee or prior to such lessor's or lender's departure with that airframe from the Habitual Base (such refusal or departure constituting a "**confiscation**") and Lessor or Lender thereby loses its right, title or interest in or to any Removed Engine, then Lessee shall use its best efforts to recover the Removed Engine, as follows:

(i)     If a Removed Engine has been installed on an airframe operated by Lessee that has been or is in the process of being returned to or repossessed by that airframe's owner or lender, as the case may be, but has not yet been removed from the Habitual Base, Lessee will take all such efforts to take possession of such Removed Engine prior to the removal of that airframe, have such Engine or APU uninstalled from such airframe and reinstalled on the Aircraft or on another airframe owned or leased by Lessee as soon as reasonably practicable but in any case not to exceed 180 days from such Removed Engine's removal from the departing airframe; or

(ii)     If a Removed Engine has been installed on an airframe operated by Lessee that has already been returned to or repossessed by that airframe's owner or lender, as the case may be, and such airframe has been removed from the Habitual Base, Lessee will take all such efforts to take possession of such Removed Engine from its location in what other jurisdiction it may then be located and return such Removed Engine (within 45 days of such Removed Engine's confiscation) so that it may be reinstalled on the Aircraft or, if no Event of Default is then continuing, on another airframe owned or leased by Lessee as soon as reasonably practicable but in any case not to exceed 180 days from the date of recovery of such Engine or APU;

(c)     If Lessee is unable to retake possession of the Removed Engine within the time permitted by paragraph (b)(ii) above, then the same shall be treated as a Total Loss per Clause 15 of this Agreement except that (i) Lessee shall post a bond or provide a letter of credit, in each case acceptable to Lessor, or other security acceptable to Lessor, in an amount equal to 110 per cent. of the desktop appraised value of such Removed Engine, and (ii) upon Lessee providing a Replacement Engine as required under Clause 15.2 or recovering possession of such Removed Engine (and restoring it to the condition required by this Agreement if it is not then in such condition), Lessor will return such bond, letter of credit or other security to Lessee.

UMB0004146                                                                                    CONFIDENTIAL

(d)     For the benefit of each lessor of an airframe or engine leased to Lessee and each holder of a security interest in an airframe or engine owned by Lessee under a security agreement, Lessor shall not acquire or claim, as against such lessor or security interest holder, any right, title or interest in any engine (other than an Engine) covered by any such lease or security agreement as a consequence of such engine being attached to the Airframe.

## 12.     TITLE

Title to the Aircraft shall remain vested in Lessor subject to the Security Documents and any assignments, charges or other disposals as Lessor may make in accordance with this Agreement.  Lessor does not give any warranty or representation in respect of title to or its interest in the Aircraft, and all such warranties or representations, expressed or implied, statutory or otherwise, are hereby expressly excluded.

## 13.     MANUFACTURER'S WARRANTIES

### 13.1     Assignment of Warranties

So long as no Event of Default has occurred and is continuing, Lessor agrees to assign or otherwise make available to Lessee at the expense of Lessee such rights as Lessor may have under any warranty, express or implied, with respect to the Aircraft made by the Manufacturer, any subcontractor or supplier thereof, or any other seller thereof or the Engine Manufacturer, any manufacturer of any Part, or any person undertaking maintenance, repairs or modifications in respect of the Aircraft, to the extent that the same may be assigned or otherwise made available to Lessee and without warranty by Lessor as to the enforceability of any of the rights so assigned.  To the extent that the same may not be assigned or otherwise made available to Lessee, Lessor agrees, **provided that** no Event of Default has occurred and is continuing, and at Lessee's request and expense, to diligently enforce such rights as Lessor may have with respect thereto for the benefit of Lessee.  At any time when an Event of Default has occurred and is continuing, all such rights shall immediately revert to Lessor including all claims thereunder whether or not perfected.

### 13.2     Proceeds of Warranty Claims

Lessee shall give Lessor prompt written notice of any warranty claim in excess of the Damage Notification Threshold which is settled with Lessee on the basis of a total or partial cash payment.  Any cash payments to Lessee in respect of warranty claims, which are not or will not be applied to the repair or remedy of defects in the Aircraft and which are not in respect of compensation for loss of use of the Aircraft, an Engine or Part during the Term due to a defect covered by such warranty, shall be for Lessor's account and shall to the extent received by Lessee be promptly paid by Lessee to Lessor.  Any proceeds of any other claims (other than as set forth in the preceding sentence) under any warranty relating to the Aircraft, any Engine or any Part received by Lessee shall be promptly applied to remedy the defect, if any, in the Aircraft, any Engine or any Part giving rise to such claim or retained by Lessee in respect of compensation for loss of use of the Aircraft, an Engine or Part.

UMB0004147                                                                              CONFIDENTIAL

13.3     **[Intentionally Omitted]**

13.4     **Reassignment of Warranty and Existing Claims**

The assignment or other transfer of rights pursuant to this Clause 13 shall terminate and automatically revert to Lessor at the time the Aircraft is redelivered to Lessor (whether at the end of the Term or otherwise and whether voluntary or involuntary in connection with the exercise of remedies by Lessor under Clause 16.2) without any further act on the part of Lessor or Lessee; **provided that**, if any claims relating to the repair or remedy of defects in the Aircraft, any Engine or a Part remain outstanding at the time of such termination, then Lessee shall, at its own expense, assign the rights to such claims to Lessor and notify the Manufacturer, Engine Manufacturer, relevant supplier, relevant subcontractor or relevant seller of any Part, or any Person undertaking maintenance, repairs or modifications in respect of the Aircraft, each to the extent that the rights to such claims may be assigned or otherwise made available to Lessor.  Any claims being pursued by Lessee by way of reimbursement for work previously performed by Lessee under the assigned warranties for the remedy of a defect prior to the termination of the assignment or in respect of compensation for loss of use of the Aircraft, an Engine or Part during the Term due to a defect covered by such warranty shall remain the property of Lessee notwithstanding such termination and Lessee shall continue to have the right after the Aircraft is redelivered to Lessor.  If Lessor receives any proceeds described in the foregoing sentence following the redelivery of the Aircraft, Lessor shall promptly pay over to Lessee such proceeds it receives in respect of such warranty claim; **provided that**, any proceeds received by Lessor during the continuance of an Event of Default shall be subject to the provisions of Clause 6.8.

14.     **INSURANCES**

14.1     **Obligation to Insure**

From the Delivery Date until expiration or earlier termination of the Term and redelivery of the Aircraft to Lessor, Lessee shall, at its own expense, effect and maintain or cause to be effected and maintained in full force and effect insurances on and with respect to the Aircraft that comply with the provisions of this Clause 14.  Lessee agrees that such insurances shall be (a) carried with such insurers of recognized standing who regularly participate in aviation insurance and (b) through such brokers as Lessor shall approve in writing in its reasonable discretion, in both cases in the London or New York or such other leading international insurance markets as mutually agreed upon by Lessee and Lessor (it being acknowledged that JLT Aerospace (North America) Inc., has been approved by Lessor as Lessee's broker as of the date of this Agreement).  Lessee further agrees that such insurances shall reflect prudent practices in the international aviation insurance market for major U.S. air carriers operating the same type of aircraft as the Aircraft on similar routes.

14.2     **Changes**

If Lessor wishes to revoke its approval of any insurer, reinsurer, broker, insurance coverage or reinsurance coverage, Lessor and its insurance advisers will consult with Lessee and its insurance broker as to whether that approval should be revoked to protect the interests of the parties insured.  If, following that consultation, Lessor considers that

UMB0004148                                                                                    CONFIDENTIAL

any change should be made, Lessee shall promptly arrange or procure the arrangement of alternative coverage satisfactory to Lessor.

14.3    **Insurance with Respect to the Aircraft**

Lessee shall obtain and maintain, or cause to be obtained and maintained with respect to the Aircraft the following insurances:

(a)    "**Hull All-Risks**" of loss or damage while flying and on the ground with respect to the Aircraft on an "agreed value" basis for the Agreed Value;

(b)    "**All-Risks**" (including **War and Allied Risk** except when on the ground or in transit other than by air) property insurance on all Engines and Parts when not installed on the Aircraft on an "agreed value" basis for their full replacement value and including engine test and running risks; and

(c)    "**Hull War and Allied Perils**" based on the coverage afforded by LSW 555D or market equivalent available from the leading international insurance markets, including confiscation and requisition by the State of Registration on an "agreed value" basis for the Agreed Value.

14.4    **Terms Specific to Hull Insurance**

The insurances required under Clause 14.3 shall be provided on an agreed value basis and the policies shall comply with the conditions of AVN 67B and:

(a)    include Lessor, Owner Participant and each Lender as additional insureds for its rights and interests and Lessor as the designated contract party;

(b)    include a loss payable clause that provides that all insurance proceeds in respect of a Total Loss shall be payable to Lessor or at the direction of Lessor, any Lender or its assignee and that all other insurance proceeds shall be paid in accordance with the terms of this Agreement and the Security Documents to such parties as may be necessary to repair the Aircraft;

(c)    include a notice and/or acknowledgment of any assignment relating to Lessee's or any insurer's rights and benefits to all proceeds of insurances and reinsurances, as the case may be, (relating to the assignment of Lessee's or Lessor's interest in such insurances and reinsurances to such person as Lessor may direct) in a form acceptable to Lessor;

(d)    be subject to such exclusions and deductibles as Lessor may reasonably approve; **provided that**, in no event shall the deductible under the Hull All-Risks and the Hull War-Risks insurance exceed the Damage Notification Threshold; and

(e)    provide that all insurance proceeds shall be payable in US Dollars.

In the event separate insurances are arranged to cover the "Hull All-Risks" insurance and the "Hull War-Risks" and related insurances, the underwriters subscribing to such insurance agree that in the event of any dispute as to whether a claim is covered by the "Hull All-Risks" or "Hull War-Risks" policies, such claim be settled on a 50/50 claim funding basis in accordance with AVS103 (or similar).

UMB0004149                                                                                    CONFIDENTIAL

14.5 **Liability Insurance with Respect to the Aircraft**

    (a)    Lessee shall obtain and maintain a policy or policies of comprehensive insurance covering third party legal liability, bodily injury and property damage, passenger legal liability, baggage, cargo and mail for a combined single limit of not less than the Minimum Liability Coverage Amount or the equivalent thereof in any other currency approved by Lessor, for any one accident, such policy or policies to cover war risks and allied perils. Notwithstanding anything herein to the contrary, war risks and allied perils coverage otherwise complying with the terms of this Agreement may be provided by the U.S. Federal Government.

    (b)    The policies evidencing the insurance required under Clause 14.5(a) shall comply with the conditions of AVN 67B, and:

        (i)    include each Indemnitee as additional insureds (each, an "**Additional Insured**") for their respective rights and interests;

        (ii)    provide that all the provisions thereof, except the limits of liability, shall operate to give each Additional Insured the same protection as if there were a separate policy covering each named insured; and

        (iii)    be primary and without right of contribution from other insurance that may be available to any other Additional Insured.

14.6 **Provisions Relating to all Insurance**

The policies evidencing the insurances with respect to the Aircraft required under this Clause 14 shall comply with the conditions of AVN 67B and:

    (a)    provide that the insurance shall not be invalidated, so far as concerns any Additional Insured, by any action or inaction or omission (including misrepresentation and nondisclosure) of any person or party that results in a breach of any term, condition or warranty of such policy; **provided that**, the Additional Insured so protected has not caused, contributed to or knowingly condoned the action, inaction or omission, as the case may be;

    (b)    specifically reference this Agreement;

    (c)    provide for worldwide coverage (subject only to such exceptions as are customary in insurance coverages carried by major U.S. air carriers operating aircraft of the same type as the Aircraft);

    (d)    provide that upon payment of any loss or claim to or on behalf of any Additional Insured, the respective insurer shall to the extent and in respect of such payment be thereupon subrogated to all legal and equitable rights of the Additional Insured indemnified hereby;

    (e)    provide that neither Lessor nor any Additional Insured shall be liable for any premiums in respect thereof and that the insurers shall waive any right of set-off or counterclaim against Lessor or any Additional Insured except in respect of unpaid premiums in respect of the Aircraft;

UMB0004150        CONFIDENTIAL

(f)      provide that the insurers shall promptly notify Lessor and any Lender in the event of cancellation of, or any material change in, the insurances or any act or omission or any event that might invalidate or render unenforceable the insurances or in the event that any premium or installment of premium shall not have been paid when due and that the insurances shall continue unaltered for the benefit of each Indemnitee for at least thirty (30) days after written notice of such cancellation, change, act, omission, event or non-payment of premium or installment thereof shall have been received by Lessor and any Lender or the relevant broker except in the case of War Risks for which seven (7) days notice (or such period as may be customarily available in respect of War Risks or Allied Perils) will be given; and

(g)      provide coverage with respect to losses and claims in connection with the change of year from 1999 to 2000, the change of date from 21 August 1999 to 22 August 1999 and/or any other change of year, date or time to the fullest extent as customary in the worldwide aviation insurance market, including date recognition limited coverage clauses AVN 2001A and AVN 2002A.

### 14.7    Insurance Covenants

Lessee shall:

(a)      ensure or procure that all legal requirements relating to the insurance of the Aircraft which may from time to time be imposed by the laws of the State of Registration or any country to, from or over which the Aircraft may be flown are complied with and in particular those requirements compliance with which is necessary to ensure that:

         (i)      the Aircraft is not in danger of detention or forfeiture;

         (ii)      the insurances remain valid and in full force and effect; and

         (iii)      the interests of the Indemnitees in the insurances and the Aircraft are not prejudiced;

(b)      not permit the Aircraft to be used for any purpose or in any manner inconsistent with or not fully covered by the insurances or outside any geographical limit imposed by the insurances;

(c)      comply with the terms and conditions of each policy of the insurances and not do, consent, agree or permit to occur any act or omission which:

         (i)      invalidates or may invalidate the insurances; or

         (ii)      renders or may render void or voidable the whole or any part of any of the insurances; or

         (iii)      brings any particular liability within the scope of an exclusion or exception to the insurances;

UMB0004151        CONFIDENTIAL

(d)    commence renewal procedures at least thirty (30) days prior to expiry of any of the insurances and provide to Lessor:

    (i)    if requested by Lessor, a written status report of renewal negotiations fourteen (14) days prior to each such expiry date;

    (ii)    faxed or telexed confirmation of completion of renewal prior to each such expiry date; and

    (iii)    a certificate of insurance (and where applicable a certificate of reinsurance), and, where reasonably requested by Lessor, a broker's (and where applicable a reinsurance broker's) letter of undertaking detailing the coverage and confirming the insurers' (and, where applicable, any reinsurers') agreement to the specified insurance requirements of this Agreement no less than five (5) Business Days prior to the expiration of the current insurance period;

(e)    on request, provide to Lessor copies of documents evidencing the insurances;

(f)    on request, provide to Lessor or Lessor's insurance broker evidence that the insurance premiums have been paid;

(g)    not make any material modification or alteration to the insurances which is adverse to the interests of any of the Indemnitees;

(h)    be responsible for any deductible under the insurances; and

(i)    provide any other insurance and reinsurance related information or assistance in respect of the insurances that Lessor may reasonably require.

**14.8**    **Information**

(a)    On or before the Delivery Date and promptly prior to each renewal of the insurances, but in no event later than two (2) Business Days thereto, Lessee shall provide Lessor with certificates of insurance and a broker's letter of undertaking that (i) evidence to the satisfaction of Lessor that the insurances are and will continue in full force after the Delivery Date or the renewal date (as the case may be) for such period as shall then be stipulated; (ii) specify the insurers with whom the insurances are carried; and (iii) contain such other certifications and undertakings as are customarily provided to lessors by insurance brokers acting for major North American air carriers.

(b)    Lessee shall furnish such information regarding the status of renewal negotiations as may from time to time be reasonably requested by Lessor. In addition, Lessee shall arrange for its brokers to confirm to Lessor not later than five (5) days prior to the date for renewal of the insurance, that negotiations for such renewal are at an advanced state and that there is no reason to suppose that the insurances will not be renewed at the relevant date in terms that will comply with the provisions of this Agreement.

(c)    Lessee shall furnish, or cause to be furnished, to Lessor on the Delivery Date and thereafter as and when required by Lessor and upon each transfer of the

UMB0004152        CONFIDENTIAL

Aircraft or assignment of rights hereunder as permitted by Clause 20.2 of this Agreement, certificates and undertakings of its brokers (and, if further requested, of its insurers) that confirm that the requirements of this Clause 14 are being complied with.

(d)     Lessee shall, at the request of Lessor, make copies of the policies and endorsements and any amendments thereto with respect to the insurance available to Lessor (or its respective authorized representatives, including Lessor's insurance broker) for inspection by any representative of Lessor, at the office of Lessee or its insurance brokers during normal business hours.

14.9    **Additional Insurance; No Lien**

(a)     Lessee shall not, without the prior written consent of Lessor and the Lender(s), maintain insurances with respect to the Aircraft or any Engine, other than as required under this Agreement.

(b)     Lessor may, having regard to insurances coverage from time to time carried by major North American commercial air carriers operating aircraft of the same type as the Aircraft and to practices current from time to time in the aviation insurance market and to the requirements of lessors of aircraft, from time to time require Lessee at no cost to Lessor or any Lender, to effect such other insurances, or such variations to the terms of the existing insurances, as Lessor may by notice to Lessee reasonably require in order fully to protect the interests of the Indemnitees.

(c)     If at any time Lessor reasonably consider(s) that the insurances effected or procured by Lessee hereunder do not provide Lessor or the Lender(s) a satisfactory breach of warranty endorsement (in the case of Hull All-Risks and Hull War-Risks policies) and a satisfactory breach of warranty endorsement and cross liability and/or severability of interests clause (in the case of liability policies), then Lessee shall, at the request of Lessor and at its own expense, effect and maintain, a policy in respect of the interests of Lessor and the Lender(s), in such form as Lessor reasonably consider(s) appropriate.

(d)     Lessee shall not create or permit to exist any Lien over the insurances required by this Agreement, or its interest therein, except as constituted by this Agreement and the Operative Documents.

14.10   **Failure to Insure**

If at any time Lessee fails to maintain in full force and effect procure insurances in compliance with this Agreement, Lessor and any Lender shall be entitled but not bound (without prejudice to any other rights that it may have or acquire under this Agreement by reason of such failure):

(a)     to pay the premiums due or effect and maintain insurances satisfactory to it or otherwise remedy Lessee's failure in such manner (including to effect and maintain an "owner's interest" policy) as it considers appropriate and any sums so expended by it will become immediately due and payable by Lessee to Lessor

UMB0004153                                                                                    CONFIDENTIAL

or Lender, as the case may be, together with interest thereon from the date of expenditure by it up to the date of reimbursement by Lessee; and

(b)    at any time while such failure is continuing, require the Aircraft to remain at any airport or to proceed to and remain at any airport designated by it until the failure is remedied to its satisfaction.

### 14.11  Settlement of Claims

(a)    Lessee shall not settle or permit settlement of any claim arising under any of the hull and spare insurances in respect of any loss or damage in excess of the Damage Notification Threshold or make any payment in connection therewith without the prior written consent of Lessor, and will not settle or permit settlement of any claims under such insurances without such consent if an Event of Default has occurred and is continuing.  The proceeds of hull insurances in respect of a Total Loss of the Aircraft or any Engine shall be paid to Lessor or its assignee in an amount equal to the Agreed Value.  The proceeds of hull and spare insurances in respect of any loss other than a Total Loss shall be paid (i) to Lessee if such loss is less than the Damage Notification Threshold or (ii) to such parties as may be necessary to repair the Aircraft if such loss is equal to or greater than the Damage Notification Threshold; **provided that**, if an Event of Default has occurred and is continuing, all such proceeds which would otherwise be paid to Lessee shall be paid to Lessor or its assignee.

(b)    Upon completion of the repairs or replacement associated with any loss on which the insurers have paid insurance proceeds to Lessee, Lessee shall deliver to Lessor an officer's certificate certifying that such repairs to or replacement of the Aircraft, as applicable, have been completed in accordance with the Manufacturer's recommended procedures.

### 14.12  Assignment

If Lessor transfers the Aircraft or assigns its rights hereunder as permitted by Clause 20.2 of this Agreement, Lessee will, upon request, promptly procure that the transferee or assignee (including any Lender) shall be added as a further named insured to any of the insurances referred to in this Clause 14 so as to enjoy the same rights and protection as Lessor may have from time to time under such insurances.

### 14.13  Post Termination

(a)    Lessee shall effect and maintain (at no cost to Lessor) insurance in an amount not less than the Minimum Liability Coverage in the annual aggregate after the Termination Date with respect to its liability under the indemnities in Clause 19 for such period as Lessor may reasonably require, but in any event for not more than the earlier of two (2) years or the completion of the next 6Y-Check which provides for each Indemnitee to be named as an additional insured.  Lessee's obligation in this Clause 14.13 shall not be affected by Lessee ceasing to be the "Lessee" of the Aircraft and/or any of the Indemnitees ceasing to have any interest in respect of the Aircraft.

UMB0004154                        CONFIDENTIAL

(b)     In addition, if Lessor transfers the Aircraft or such rights and thereafter ceases to be Lessor of the Aircraft (a "**Transferor**"), Lessee shall, at the request of such Transferor and at Lessee's expense, effect and maintain for the benefit of such Transferor the liability insurances otherwise required under this Agreement for such period (not exceeding the lesser of the time until the next 6Y-Check or two (2) years and not, in any event, to exceed the end of the coverage period provided for in Clause 14.13(a)) as the Transferor may request and shall ensure that the Transferor shall be named as an additional insured thereunder.

(c)     Lessee's obligations under Clauses 14.13(a) and (b) shall not be affected by Lessee ceasing to be Lessee of the Aircraft or any Indemnitee ceasing to have an interest in respect of the Aircraft.

14.14   **Reinsurance**

Where applicable, any reinsurance will be maintained with reinsurers of recognized standing who normally participate in aviation insurances and brokers in the London or New York or such other leading international insurance markets approved by Lessor. Where applicable, any reinsurance in respect of the Insurances under Clause 14 of this Agreement must:

(a)     be on the same terms as the original insurance;

(b)     be for not less than 98 per cent. (or such other amount as the Lender, if any, may agree) and shall be effected in the insurance markets in Lloyd's of London, or other internationally recognized aviation insurance markets with reinsurers of international standing and repute who normally participate in aircraft insurance programs acceptable to Lessor;

(c)     provide that notwithstanding the bankruptcy, insolvency, liquidation, or similar proceedings affecting the reinsured party, the reinsurers will be liable to make payment under the relevant policy of reinsurance as if the reinsured party had (immediately before such proceedings) discharged its obligations in full under the original insurance policy;

(d)     be with insurers of recognized responsibility with limits in line with those of standard airline practice; and

(e)     contain a "cut through" clause in the following terms or otherwise satisfactory to Lessor:

"The reinsurers hereby agree that in the event of any claim arising under the reinsurances in respect of a Total Loss or other claim where, as provided by the Lease, such claim is to be paid to the person named as sole loss payee under the primary insurances, the reinsurers shall in lieu of payment to the reinsured, its successors in interest and assigns, pay to the person named as sole loss payee under the primary insurances effected by the Insured that portion of any loss due for which the reinsurers would otherwise be liable to pay the reassured (subject to proof of loss), it being understood and agreed that any such payment by the reinsurers shall (to the extent of such payment) fully discharge and

UMB0004155                                                                        CONFIDENTIAL

release the reinsurers from any and all further liability in connection therewith. Any payment due under this clause shall not contravene any law, statute or decree of [insert country of primary insurer]."

15.    **LOSS, DAMAGE AND REQUISITION**

15.1   **Total Loss of Aircraft or Airframe**

(a)



15.2   **Total Loss of Engine(s)**

(a)



UMB0004156                                                                    CONFIDENTIAL



(b)      The parties hereto agree to take such action as either of them may reasonably request in order that any such Replacement Engine shall be or immediately become the property of Lessor and by amendment to this Agreement and any applicable Security Documents become subject to this Agreement and any applicable Security Documents executed by Lessor, and leased hereunder on the same terms as the destroyed Engine.  Lessee's obligation to pay Rent shall continue in full force and effect and shall not be affected by such replacement. Upon compliance with the foregoing, the leasing of the destroyed Engine shall cease and Lessor will, subject to the rights of any insurers and reinsurers or other third party, procure at Lessee's request and expense that there is transferred to Lessee without recourse or warranty (except as to good title and freedom from Lessor's Liens) all of Lessor's rights, title and interest in and to the destroyed Engine, on an "as-is where-is" basis, and will procure such bills of sale and other documents and instruments as Lessee may reasonably request to evidence (on the public record or otherwise) such transfer, free and clear of all rights of Lessor and Lessor's Liens. If the destroyed Engine or any part thereof is salvaged and returned to service, Lessee shall continue to include Lessor as an additional insured on its insurance policy with respect to the destroyed Engine for so long as the destroyed Engine is operated by Lessee.

(c)      A "**Replacement Engine**" means a CFM International, Inc. model LEAP-1A26 engine (or an engine of an improved model suitable for installation and use on the Airframe) (i) in the same operating condition as, and having a value, utility (including (a) having no more than 105% of the months or time since new or cycles since new than the replaced Engine on average taken as a whole; and (b) having no more Engine Performance Restorations or Fan and/or LPT Module Performance Restorations than the replaced Engine), and remaining useful life at least equal to, the replaced Engine (assuming that the replaced Engine was in the condition and repair in which it is required to be maintained under this Agreement) and (ii) that has no fewer Flight Hours or Cycles than the replaced Engine remaining to the next expected life restoring shop visit and to the next removal for replacement of life-limited parts, and any and all LLPs in the Replacement Engine shall have Cycles of life remaining to cyclic life expiry not fewer than those in the replaced Engine.

15.3      **Other Loss or Damage**

If the Aircraft or any part thereof suffers loss or damage not constituting a Total Loss of the Aircraft or the Airframe, all the obligations of Lessee under this Agreement shall continue in full force, and Lessee shall, at Lessee's expense, promptly procure the repair or replacement of all damaged or lost Parts in accordance with this Agreement.

UMB0004157                                                                                                                                    CONFIDENTIAL

15.4    **Requisition**

    (a)    If there is a requisition for use or hire of the Aircraft or any part thereof, then, unless and until the Aircraft becomes a Total Loss and Lessee shall have paid all sums due pursuant to Clause 15.1, the leasing of the Aircraft to Lessee under this Agreement shall continue in full force and effect, and Lessee shall remain fully responsible for performance and observance of all its obligations under this Agreement, other than obligations (which shall not include reporting requirements and payment of Rent) with which Lessee is unable to comply solely by virtue of such requisition.

    (b)    Lessee shall, as soon as practicable after the end of any requisition for use or hire, cause the Aircraft to be put into the condition required by this Agreement.

15.5    **Replacement**

If the Airframe or the Aircraft suffers a Total Loss during the Term, Lessee, with the approval of Lessor (which approval may be given or withheld in Lessor's sole discretion), may elect either to promptly substitute the Airframe or the Aircraft with an appropriate substitute airframe or aircraft approved by Lessor (which approval may be given or withheld in Lessor's sole discretion), in which case, this Agreement shall continue on such terms and with such modifications as the Lessor may require in its sole discretion.  Nothing in this Clause 15.6 shall prejudice or limit the obligation of Lessee to make the payments required under Clause 15.1 when required to do so under such provision or otherwise affect the operation of such provision unless and solely to the extent that the Lessor (in its sole discretion) agrees otherwise in connection with its acceptance of a replacement Airframe or Aircraft under and in accordance with this Clause 15.6.  If Lessee substitutes an Airframe or Aircraft which is subject to a Total Loss with a replacement Airframe or Aircraft, Lessor and Lessee shall amend this Agreement to subject such replacement Airframe or Aircraft to the terms of this Agreement and Lessor will, subject to there being no Event of Default which has occurred and is continuing, procure at Lessee's expense that there is transferred to Lessee or its designee without recourse or warranty (except as to good title and freedom from Lessor's Liens) all of Lessor's right, title and interest in and to the replaced Airframe or Aircraft, on an "as-is where-is" basis, and will procure such bills of sale and other documents and instruments as Lessee may reasonably request to evidence (on the public record or otherwise) such transfer, free and clear of all rights of Lessor and Lessor's Liens. Lessee shall indemnify each Tax Indemnitee for all fees, expenses and Taxes incurred by it in connection with any such transfer.

16.    **DEFAULT**

16.1    **Classes of Events**

Each of the following shall constitute an Event of Default:

    (a)    *Non-Payment.*  Lessee fails to pay (i) any Basic Rent or Security when due in the currency and in the manner stipulated in this Agreement within three (3) Business Days of the respective due date, or (ii) any other sum due from it under this Agreement or any other Operative Document, including Maintenance Adjustment Payments or Agreed Value, in the currency and in the manner

UMB0004158          CONFIDENTIAL

stipulated within five (5) Business Days of written notice of such failure from Lessor;



UMB0004159                                                                        CONFIDENTIAL



UMB0004160                                        CONFIDENTIAL



UMB0004161                                                        CONFIDENTIAL



(l)    *Events of Default under Other Agreements*.  An "Event of Default" under, and as defined in, any Other Agreement (or any equivalent event, howsoever defined) has occurred and is continuing;



(s)    *Other Cross Defaults*.  The Lessee (i) defaults in any payment of any indebtedness (other than intra-group indebtedness) having an aggregate outstanding value of more than ▮▮▮▮▮▮▮ (or the equivalent thereof) beyond the period of grace if any, provided in the instrument or agreement under

UMB0004162                                                                                CONFIDENTIAL

which such indebtedness was created or (ii) any such indebtedness having an aggregate outstanding value of more than ███████████ (or the equivalent thereof) of Lessee shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required repayment, prior to the stated maturity thereof;



### 16.2 Lessor's Rights

Upon the occurrence of any Event of Default and any time thereafter so long as the same shall be continuing, Lessor may at its option by notice in writing to Lessee treat such event as a repudiation by Lessee of its obligations under this Agreement or declare this Agreement to be in default; **provided that**, upon the occurrence of any Event of Default specified in Clause 16.1(e) of this Agreement shall automatically be deemed to have been repudiated by Lessee and declared in default. Once this Agreement has been repudiated by Lessee or declared in default, or is deemed to have been repudiated by Lessee or declared in default, in accordance with the foregoing sentence then, and at any time thereafter, Lessor shall be entitled automatically to exercise any of the following remedies as Lessor in its sole discretion shall elect, to the extent permitted by applicable law then in effect without making demand or giving notice or the taking of any other action:

(a) proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of Lessee hereunder and to recover damages for the breach thereof and/or to rescind this Agreement; and/or

UMB0004163                                                                                    CONFIDENTIAL

(b)     require the Lessee to move the Aircraft to an airport designated by Lessor and keep it grounded and stored at such Aircraft until further notice by the Lessor; and/or

(c)     require that Lessee shall provide Lessor immediately with the originals of the Aircraft Documents and Lessee hereby accepts the obligation to comply with such request; and/or

(d)     cancel the leasing of the Aircraft hereunder by written notice and repossess the Aircraft; and/or

(e)     require that Lessee, at Lessor's option, and Lessee shall upon the written request of Lessor, either (x) immediately return the Aircraft to Lessor in the manner specified in such request, in which event such return shall not be delayed for purposes of complying with the return conditions specified in Clause 18 hereof (none of which conditions shall be deemed to affect Lessor's possession of the Aircraft) or be delayed for any other reason or (y) take such actions as would be required by the provisions of this Agreement if the Aircraft were being returned at the end of the Term. If Lessor requires that Lessee immediately return the Aircraft pursuant to paragraph (x), Lessor shall not, nor shall it be deemed to have released or relinquished any of its rights to cause the Aircraft subsequently to be put in the condition specified in Clause 18 at Lessee's expense; and/or

(f)     sell at private or public sale, as Lessor may determine, or hold, use, operate or lease to others the Aircraft as Lessor in its sole discretion may determine, all free and clear of any rights of Lessee, in each case to the extent permitted by applicable law; and/or

(g)     exercise any rights or remedies afforded to Lessor under applicable law, including the Cape Town Convention.

In effecting repossession, Lessor and its representatives and agents, to the extent permitted by law shall: (i) have the right to enter upon any premises where it reasonably believes the Aircraft, the Airframe, an Engine or Part to be located and take immediate possession of and, at Lessor's sole option, remove the same (and any engine or part which is not an Engine or Part but which is installed on the Airframe, subject to the rights of the owner, lessor or secured party thereof) by summary proceedings or otherwise; (ii) not be liable, in conversion or otherwise, for the taking of any personal property of Lessee or any other person which is in or attached to the Aircraft, the Airframe, an Engine or Part which is repossessed; **provided that**, Lessor shall return to Lessee or such other person at Lessee's expense all personal property of Lessee or such other person which was on or attached to the Aircraft at the time Lessor re-takes possession of the Aircraft unless such item of personal property is a part installed in substitution for a Part; (iii) not be liable or responsible, in any manner, for any damage or injury to any of Lessee's property in repossessing and holding the Aircraft, the Airframe, an Engine or Part if any of Lessee or any relevant landlord fails to cooperate with Lessor; except for such damage caused by or in connection with Lessor's willful misconduct or recklessness; (iv) have the right to maintain possession of and dispose of the Aircraft, the Airframe, an Engine or Part on any premises owned by Lessee or under Lessee's control; and (v) have the right to obtain a key to any premises at which

UMB0004164                                                                      CONFIDENTIAL

the Aircraft, the Airframe, an Engine or Part, may be located from the landlord or owner thereof.

If required by Lessor, Lessee shall assemble and make the Aircraft, the Airframe, an Engine or Part available at a place designated by Lessor in accordance with Clause 18. Lessee hereby agrees that, in the event of the return to or repossession by Lessor of the Aircraft, the Airframe, Engine or Part, any rights in any warranty (express or implied) heretofore assigned to Lessee or otherwise held by Lessee shall without further act, notice or writing be assigned or reassigned to Lessor, if assignable.

No remedy referred to in this Clause 16.2 is intended to be exclusive, but, to the extent permissible hereunder or under applicable law, each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity; and the exercising or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all of such other remedies.  No express or implied waiver by Lessor of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.  To the extent permitted by applicable law, Lessee hereby waives any rights now or hereafter conferred by statute or otherwise that may require Lessor to sell, lease or otherwise use the Aircraft or any Engine which may otherwise limit or modify any of Lessor's rights or remedies hereunder.

Lessee agrees that following an Event of Default to promptly do and perform such other and further acts and promptly execute and deliver any and all such other instruments as may be requested by Lessor to deregister the Aircraft from the Aviation Authority and export the Aircraft from the Habitual Base or any other jurisdiction where the Aircraft is then located.

Lessee hereby appoints Lessor as Lessee's irrevocable agent and attorney-in-fact to execute all documents deemed necessary to release, terminate and void Lessee's interest in the Aircraft leased hereunder, to de-register and export the Aircraft, and to file said documents for recordation with the Aviation Authority and any other appropriate agency; **provided that**, Lessor will not use this agency unless an Event of Default has occurred.

17.    **PAYMENTS ON EVENT OF DEFAULT**

17.1   **Payments**

(a)     Upon the occurrence of any Event of Default, and at any time thereafter, whether or not Lessor shall have exercised, or shall thereafter exercise, any of its rights under Clause 16.2, Lessee shall upon receipt of notice from Lessor:

(i)     pay to Lessor all arrears of Rent and any other sums (whether in respect of interest, costs, fees, expenses or otherwise) then accrued and due under Lessee's Documents;

(ii)    pay and indemnify Lessor, Owner Participant and Affiliates of Owner Participant against all losses, fees, costs and expenses (including legal, professional, inspection and other out-of-pocket expenses, but without duplication of any amounts referred to in paragraphs (i) or (iii) of this

UMB0004165                                                                                                          CONFIDENTIAL

paragraph (a)) payable or incurred by Lessor, Owner Participant or Affiliates of Owner Participant in connection with such Event of Default, the drawing under any Letter of Credit provided as Security, or the enforcement of, or preservation of any of Lessor's or Owner Participant's rights under, this Agreement or the other Lessee's Documents or in respect of recovering possession of the Aircraft or carrying out any works or modifications required to place the Aircraft in the condition specified in Clause 18; and

(iii)    pay and indemnify Lessor, Owner Participant and Affiliates of Owner Participant against any loss (including loss of profit), damage, expense, cost or liability that Lessor, Owner Participant or Affiliates of Owner Participant may sustain or incur as a consequence of the occurrence of any Event of Default and/or termination of the leasing of the Aircraft pursuant to Clause 16.2, including (A) any loss of profit suffered by Lessor, Owner Participant or Affiliates of Owner Participant because of the inability to place the Aircraft on lease with another lessee on terms as favorable to Lessor, Owner Participant or Affiliates of Owner Participant as the terms hereof or because whatever use, if any, to which Lessor, Owner Participant or Affiliates of Owner Participant are able to put the Aircraft upon its return to Lessor (or the funds arising upon a sale or other disposal thereof) is not as profitable as leasing the Aircraft in accordance with the terms hereof would have been; (B) any amount of interest, fees or other sums whatsoever paid or payable on account of funds borrowed in order to carry any unpaid amount; (C) amounts payable by Lessor, Owner Participant or Affiliates of Owner Participant in respect of any loss, premium, penalty or expense that may be incurred in repaying (having regard to any general duty at law which Lessor, Owner Participant or Affiliates of Owner Participant may have to mitigate its losses consequent on a breach of Lessee's obligations hereunder) funds raised to finance the Aircraft or in unwinding any swap, forward interest rate agreement or other financial instrument relating in whole or in part to, directly or indirectly, Lessor's, Owner Participant's or Owner Participant Affiliates' financing of the Aircraft; and (D) any loss, cost, expense or liability sustained or incurred by Lessor, Owner Participant, Affiliates of Owner Participant or any Lender owing to Lessee's failure to redeliver the Aircraft in the condition required by this Agreement.

(b)    Upon termination of the leasing of the Aircraft or if Lessor is prohibited by any law from terminating the leasing of the Aircraft, upon the occurrence of any Event of Default after Delivery of the Aircraft and at any time thereafter so long as the same shall be continuing, in lieu of (y) the Rent for the Aircraft due for the period commencing (1) in the case of paragraph (i) below, after the Payment Date (as defined in paragraph (i) below) or (2) in the case of paragraph (ii) below, after the date of any re-letting or sale of the Aircraft and (z) amounts provided for in Clause 17.1(a)(iii), Lessor may, in its sole discretion, demand payment, and Lessee shall make payments as provided below:

UMB0004166        CONFIDENTIAL

(i)    Lessor, by written notice to Lessee specifying a payment date (the "**Payment Date**"), may demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the Payment Date, as liquidated damages for loss of a bargain and not as a penalty, any accrued but unpaid Rent for the Aircraft due to and including the Payment Date specified in such notice, plus whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice: (A) an amount equal to the excess, if any, of the discounted value of the unpaid Rent for the Aircraft that would otherwise have accrued over the remainder of the Term but for the Event of Default, over the discounted value of the fair market monthly rental for the Aircraft (computed as hereafter in this Clause provided) for a period commencing six months after the Payment Date and extending to the Expiry Date, in each case discounted monthly to present value as of the Payment Date specified in such notice at the then current market yield of United States Treasury securities having a remaining maturity closest to but not later than the Expiry Date; or (B) an amount equal to the excess, if any, of the Agreed Value for the Aircraft, computed as of the date specified for payment in such notice over the fair market sale value (as hereinafter defined) of the Aircraft as of the Payment Date specified in such notice.  The amounts specified in such notice shall continue to earn interest at the Default Rate from the Payment Date until payment is made; or

(ii)    In the event Lessor shall have re-let the Aircraft or the Aircraft shall have been sold, Lessor, in lieu of exercising its rights under such paragraph (i), may demand that Lessee pay Lessor and Lessee shall pay Lessor, as liquidated damages for loss of a bargain and not as a penalty, any accrued but unpaid Rent for the Aircraft due up to and including the date of re-letting or sale plus: (A) in the case of a re-letting, an amount equal to the excess, if any, of the discounted value of the unpaid Rent for the Aircraft that would otherwise have become due over the Term but for the re-letting, over the discounted value of the rental payments to become due with respect to such re-letting from the date of such re-letting to the Expiry Date, in each case discounted monthly to present value as of the date of re-letting at the then current market yield of United States Treasury securities having a remaining maturity closest to but not later than the Expiry Date, or (B) in the case of a sale, the excess of Agreed Value for the Aircraft, immediately preceding the date of sale, over the net cash proceeds of such sale.  The amounts specified in this paragraph shall continue to bear interest at the Default Rate from the date notice of re-letting or sale, as the case may be is delivered to Lessee, until payment is made.

For the purpose of paragraph (i) above, the "fair market monthly rent" or the "fair market sale value" of the Aircraft shall be specified in an appraisal by a recognized independent aircraft appraiser chosen by Lessor.

UMB0004167        CONFIDENTIAL

17.2   **Further Notices**

Lessor shall be entitled, following the issuance of a notice under Clause 17.1, to issue further notices thereafter in respect of any amounts referred to in Clause 17.1 that shall not have been incurred and/or quantified at the date of any previous notice.

18.    **REDELIVERY**

18.1   **Redelivery**



18.2   **Condition of Aircraft and the Aircraft Documents**



18.3   **Inspection; Corrections**



UMB0004168                                                                                    CONFIDENTIAL



18.4    **Compliance after Term**

UMB0004169

CONFIDENTIAL



18.5     **Deregistration and Export**

At such time as Lessee is obligated to redeliver the Aircraft to Lessor pursuant to this Agreement, Lessee shall upon the request of Lessor:

(a)



(b)

(c)

UMB0004170                                                                                      CONFIDENTIAL

(d) 

### 18.6    Ferry Flight

Immediately following redelivery of the Aircraft, Lessee will, upon the written request of Lessor and subject to flight crew availability, use good faith and reasonable efforts to fly the Aircraft from the Return Location to such location as may be agreed between Lessor and Lessee (the "**Ferry Flight**").



### 18.7    Maintenance Adjustment Payments



### 18.8    Engine Exchange Option



UMB0004171                                                                    CONFIDENTIAL



19.     **INDEMNITIES**

19.1    **General Indemnities**

(a)     Lessee hereby agrees at all times to indemnify, protect, defend and hold harmless each Indemnitee from and against all and any liabilities, losses, claims, proceedings, damages, penalties, fines, fees, costs and expenses whatsoever (any of the foregoing being referred to as a "**Claim**") that any of them at any time suffers or incurs:

(i)     arising directly or indirectly out of, or in any way connected with, the, manufacture, ownership, possession, registration (or non-registration), performance, transportation, management, control, use or operation, design, condition, testing, delivery, leasing, subleasing, maintenance, repair, service, modification, overhaul, replacement, removal or redelivery of the Aircraft (either in the air or on the ground) or any part of the Aircraft or Aircraft Documents, whether or not such Claims may be attributable to any defect in the Aircraft or any part thereof or the Aircraft Documents or to the design, testing or use thereof or to any maintenance, service, repair, overhaul, or to any other reason whatsoever (whether similar to any of the foregoing or not), and regardless of when the same shall arise (whether during, or after termination of, the leasing of the Aircraft under this Agreement);

(ii)    arising as a result of any design, article or material in the Aircraft or any part thereof or the operation or use thereof constituting or being alleged to constitute an infringement of any patent, copyright, design or other proprietary right;

(iii)   in relation to preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Aircraft, or in securing the release of the Aircraft other than from any Lessor's Lien; or

(iv)    arising, directly or indirectly out of or in any way connected with (x) a breach by Lessee of any of its obligations under the Lessee's Documents; (y) Lessor's payment for or performance of any of Lessee's obligations hereunder on behalf of Lessee in accordance with Lessee's Documents; or (z) Lessor's procurement in accordance with Lessee's Documents of a third party to perform such obligations on behalf of Lessee, including, for the avoidance of doubt, compliance with Maintenance Requirements.

UMB0004172                                                                                  CONFIDENTIAL

(b)     The following are excluded from Lessee's agreement to indemnify any particular Indemnitee under Clause 19.1(a):

(i)      any Claim judicially determined to be attributable to an act, matter, circumstance or thing done, arising or occurring after the date on which Lessee shall have redelivered the Aircraft and the Aircraft Documents to Lessor in accordance with this Agreement and shall have complied with all of its obligations under this Agreement and Lessee's Documents (such date, the "**Compliance Date**"), but only to the extent not attributable or related, in whole or in part, to acts or omissions of Lessee or to circumstances, acts, omissions, incidents or events occurring on or before the Compliance Date;

(ii)     any Claim judicially determined to have been caused by the gross negligence, willful misconduct or recklessness of such Indemnitee, its successors, servants or agents;

(iii)    any Claim which is a Tax imposed by a taxing authority or a loss of a Tax benefit, which shall be governed by Clauses 19.2, 19.3, 19.4 and 19.5;

(iv)    any Claim for currency indemnification, which shall be governed by Clause 6.6.

(c)     An Indemnitee shall promptly after obtaining actual knowledge thereof notify Lessee of any Claim as to which indemnification is sought. Without prejudice to the obligation of Lessee to indemnify pursuant to this Clause 19.1 and **provided that** no Event of Default has occurred and is continuing, Lessee shall have the right to investigate and, in its discretion, to defend or compromise (other than with respect to a compromise of a non-monetary Claim, the compromise of which may adversely affect the Indemnitee), any Claim for which indemnification is sought under this Clause 19.1 and each Indemnitee shall cooperate at Lessee's cost with all reasonable requests of Lessee in connection therewith; **provided that** (i) such proceedings do not involve any material risk of loss or forfeiture of title to the Aircraft (unless Lessee shall have posted a bond or other security satisfactory to Lessor in respect of such risk) or any material risk of any civil or criminal penalty being assessed against any Indemnitee and (ii) Lessee shall have agreed to indemnify, and shall indemnify on demand, such Indemnitee in a manner satisfactory to it for all costs and expenses which it may incur in connection with such Claim and shall deliver to such Indemnitee a written undertaking to indemnify it whether or not any contest of such Claim is successful. Where Lessee or its insurers undertake the defense of an Indemnitee with respect to a Claim, no additional legal fees or expenses of such Indemnitee in connection with such defense of such Claim shall be indemnified hereunder unless such fees or expenses were incurred at the request of Lessee or such insurers; **provided that**, if in the written opinion of counsel to such Indemnitee an actual or potential material conflict of interest exists where it is advisable for such Indemnitee to be represented by separate counsel, the reasonable fees and expenses of such separate counsel shall be borne by Lessee. Subject to the requirements of any policy of insurance, any Indemnitee may participate at its own expense in any judicial proceeding

UMB0004173                                                                                    CONFIDENTIAL

controlled by Lessee pursuant to the preceding provisions, and such participation shall not constitute a waiver of the indemnification provided in this Clause 19.1. Nothing in this Clause 19.1 shall be deemed to require an Indemnitee to contest any Claim or to assume responsibility for or control of any judicial proceeding with respect thereto.

19.2    **General Tax Indemnity**



(a)

(b)

(c)

UMB0004174   CONFIDENTIAL

(d)

(e)

(f)

(g)

(h)

(i)



UMB0004175 CONFIDENTIAL



UMB0004176

CONFIDENTIAL



19.3    **Value Added Tax**

(a)    For purposes of this clause:

(i)    "**VAT**" means value added tax and any sales or turnover tax, imposition or levy of a like nature; and

(ii)    "**supply**" includes anything on which VAT is chargeable;



UMB0004177                                                    CONFIDENTIAL

19.4    **Payments on After-Tax Basis**



19.5    **No Deductions or Withholdings**

(a)



19.6    **Tax Benefit**

(a)



UMB0004178      CONFIDENTIAL



19.7  **Reports**



19.8  **Continuation of Indemnities**



UMB0004179                                                    CONFIDENTIAL

19.9    **Computations**



19.10   **Cooperation**

Lessee and Lessor shall co-operate with one another in providing information that may be reasonably required to fulfill each party's Tax filing requirements, any audit information request arising from such filing, and to evidence eligibility for any relevant Tax treaty benefits, including, without limitation, IRS Form W-8-BEN-E ("Certification of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Entities)") and a certificate of residence issued by an appropriate Government Entity or taxing authority. Nothing herein shall be deemed, however, to require that Lessor or any other Tax Indemnitee furnish or disclose to Lessee or any other Person any Tax return or other information relating to its Tax affairs that Lessor or such Tax Indemnitee deems, in its sole discretion, to be confidential or proprietary other than the required provision of IRS tax forms specified herein.

19.11   **Restructuring**

If Owner Participant, as applicable, does not change its status as a resident of Ireland (or substitute agreed jurisdiction) but the treaty benefits that were available for application to payments under and assets that are the subject of this Agreement on the Delivery Date nevertheless cease to be so available, then Lessor and/or Owner Participant, as applicable, at Lessee's request and expense, shall consult in good faith seek to determine what commercially reasonable actions or arrangements could be taken in respect of this Agreement so that the transactions contemplated hereby are exempt from withholding and eligible for benefits similar to those of the current treaty, but Lessor and/or Owner Participant shall not be obliged to take any or agree to any arrangements that it determines in its sole discretion to be adverse to its rights, interests or internal policies or that subject it to any cost, expense or liability that is not paid or indemnified against by the Lessee to the satisfaction of the Lessor and/or Owner Participant, **provided further that** no provision of this Clause 19.12 will:

(a)     interfere with the rights of any party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)     oblige any party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim;

(c)     oblige any party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of tax; or

(d)     affect, reduce or diminish Lessee's tax payment or indemnification obligations under this Agreement (including, without limitation, under this Clause 19.10).

UMB0004180                                                      CONFIDENTIAL

19.12    **Forms**

(a)    Each Indemnitee agrees to furnish from time to time to Lessee or to such other person as Lessee may designate, at Lessee's request and expense, such duly executed and properly completed forms as such Indemnitee may be permitted and legally able to deliver and as may be necessary or appropriate in order to claim any reduction of, or exemption from any Tax which Lessee may be required to indemnify against hereunder, unless such Indemnitee determines that furnishing such forms may have an adverse effect on the business or operations of such Indemnitee.

(b)    Lessor will provide Lessee, upon Lessee's request not more frequently than once annually: (i) an IRS form W-8BEN-E or other appropriate tax form claiming a full exemption from U.S. withholding tax on the payments to be received from Lessee under this Agreement, duly completed (including a United States taxpayer identification number of Owner Participant) and executed by Owner Participant, (ii) an IRS form W-9 (or other appropriate tax form) duly completed by the Lessor evidencing that the Lessor/Trust Company is a U.S. Person as defined in Section 7701(a)(30) of the Code; and (iii) if and for so long as the Owner Participant is a person which is a resident of Ireland for tax purposes and it remains the practice of the Irish Revenue Commissioners to provide such certificates, a certificate of Irish tax residence evidencing that Owner Participant is a resident of Ireland; **provided, however, that** Lessor shall not be considered in breach of its obligation under this Clause 19.12(b) if the Owner Participant or the Lessor is unable to provide any such document or form as a result of a change in law after the date hereof.

19.13    **Survival**

The indemnities and other obligations of Lessee under this Clause 19 shall survive the expiration or other termination of this Agreement.

20.    **FURTHER PROVISIONS**

20.1    **Nature of Lessee's Obligations**

All obligations of Lessee under this Agreement shall constitute conditions, and the time for the performance of such conditions shall be of the essence.

20.2    **Benefit of Agreement**

(a)    *Lessor Transfer*.  Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; **provided that:**

UMB0004181                                                                        CONFIDENTIAL

(i)    Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place and Lessee acknowledges that an increase in the number of or replacement of beneficiaries (including the number of beneficiaries under any applicable insurance or reinsurance), Indemnitees or Tax Indemnitees shall not, of itself, constitute an increase in Lessee's financial obligations hereunder;

(ii)    such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

(iii)    in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer.

(iv)    in the case of an assignment as security by Lessor, any such assignee or transferee shall have delivered to Lessee an executed copy of a quiet enjoyment letter substantially in the form of Schedule 11, but in any event on terms not less favorable to Lessee;

(v)    Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2(a), including reasonable legal fees; and

(vi)    in the event of a transfer in accordance with this Clause 20.2, Lessor shall cause the new Lessor and/or new Owner Participant, as the case may be, to deliver to Lessee at the time of transfer a duly authorized and properly executed IRS Form W-8BEN-E, IRS Form W-8-IMY (with attachments), IRS Form W-8ECI (including a United States taxpayer identification number) or other applicable IRS form, claiming an exemption from, or reduced rate of, U.S. withholding taxes on payments to be received from Lessee under this Agreement, W-9 or appropriate successor or substitute form, as appropriate.

(b)    Lessee shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting any such transfer, novation, assignment, mortgage, grant or other disposition referred to in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments (including any supplement or amendment to

UMB0004182          CONFIDENTIAL

or novation of this Agreement and any confirmation of the Lessee's representations and warranties as of the date of such transfer, novation, assignment, mortgage, grant or other disposition) in form and substance reasonably satisfactory to Lessee and promptly provide an electronic consent to any registration or release of any Lien on the International Registry that may be required in order to give effect to or perfect any such transfer, novation, assignment, mortgage, grant or other disposition and promptly request the reissuance of any insurance and reinsurance certificates and broker's letters required in connection therewith with such changes as necessary to reflect such transfer, novation, assignment, mortgage, grant, or other disposition and if the transfer involves the assumption by the transferee of any of Lessor's or Owner Participant's obligations under Lessee's Documents, to release Lessor and Owner Participant from the obligations so assumed and will execute such certificates and cooperate in the provision of such legal opinions as shall be reasonably requested by Lessor in connection therewith. Without limiting the foregoing, in the event of any assignment to Lenders, Lessee undertakes to acknowledge the Security Documents by executing and delivering a consent to such documents in such form as Lessor shall reasonably require, to give the insurers notice of any assignment of insurance in such form as Lessor shall reasonably require and to procure that the insurers acknowledge the same and otherwise to provide all reasonable assistance and cooperation to Lessor, Owner Participant, each Lender and their respective representatives and advisers in connection with the perfection and maintenance of such security interests, including the effecting of all necessary filings and registrations of the Security Documents in the State of Registration and Habitual Base. Lessor shall provide Lessee with such financial and other information relating to a transferee as Lessee may reasonably request.

(c)     Subject to any subleases consented to by the Lessor under Clause 9.3 or any wet lease permitted under Clause 9.3, no assignment, transfer or charge may be made by Lessee of all or any of its rights in respect of the Aircraft or this Agreement, and any such purported assignment, transfer or charge shall be void *ab initio*.

(d)     Subject to the provisions of Clause 9.3, no assignment or transfer may be made by Lessee of all or any of its rights or obligations in respect of this Agreement or any other Lessee's Document. Notwithstanding the foregoing and for so long as no Event of Default shall have occurred and be continuing, without the prior consent of Lessor, Lessee may consolidate (on a solvent basis) with or merge into or with any other corporation or other person, or convey, transfer, lease or otherwise disposes of all or substantially all of its property and other assets, whether by one or a series of transactions, to, or merge or consolidates (on a solvent basis) with another corporation or person, **provided that**:

(i)     the person formed by or surviving or receiving such acquisition, consolidation or merger, as applicable (the "**Successor Entity**"): (A) is a U.S. Person, (B) immediately after giving effect to such transaction, has a tangible net worth of not less than Lessee's tangible net worth (determined in each case in accordance with GAAP) immediately prior to such transaction; and (C) if and to the extend required under Section

UMB0004183                                                                                    CONFIDENTIAL

1110 in order that Lessor continues to be entitled to the benefits of Section 1110 with respect to the Aircraft, is a Certificated Air Carrier;

(ii)     the Successor Entity shall make such recordations and filings with any Government Entity of the State of Registration and the state of incorporation of the Successor Entity as are necessary to evidence or give effect to such consolidation, merger, sale, lease, transfer or other disposition;

(iii)    the Successor Entity executes and delivers, or causes to be executed and delivered, to Lessor and Owner Participant an agreement, in form and substance satisfactory to Lessor (acting reasonably) which is a legal, valid, binding and enforceable assumption by such Successor Entity of all of the rights and obligations of the Lessee under this Agreement and the other Lessee's Documents; and

(iv)    Lessee shall have delivered to Lessor and Owner Participant an officer's certificate and an opinion of counsel (which may be Lessee's General Counsel), each stating that such acquisition, consolidation or merger, as applicable, and the agreement referred to in sub-clause (iii) above, comply with this Section 20.2(d) and that all conditions precedent provided in this Section 20.2(d) relating to such acquisition, consolidation or merger, as applicable, have been complied with and, in the case of such opinion, that the agreement described in sub-clause (iii) above has been duly authorized, executed and delivered by the Successor Entity, constitutes its legal, valid and binding obligation and is enforceable against such Successor Entity in accordance with its terms, except to the extent that enforceability may be limited by any applicable bankruptcy or insolvency  laws affecting creditors' rights generally and/or general principles of equity.



(e)     Subject to mutual agreement between the parties as to schedule, location, duration, confidentiality arrangements and procedures, Lessee will make the Aircraft and the Aircraft Documents available for inspection by any potential transferee or assignee of Lessor or Owner Participant; **provided further that**, the arrangements for such inspection are made through Lessor, such inspection does not interfere with the operations of Lessee and that such potential transferee or assignee shall be accompanied by Lessor during such inspection.

(f)     Lessor holds the benefit of any disclaimer, indemnity or other provision of this Agreement expressed to be for the benefit of any or all of its, or the Owner Participant's, Affiliates and its and their respective officers, directors, agents, shareholders, partners and employees (the "**Lessor Parties**") in trust for each

UMB0004184                                                                                    CONFIDENTIAL

such person so that such disclaimers, indemnities or other provisions can be enforced by Lessor on behalf of Lessor Parties.

20.3    **Further Assurances**

Lessee agrees from time to time to promptly do and perform such other and further acts and promptly execute and deliver and, if applicable, consent electronically to, any and all such other instruments and registration as may be required by law or reasonably requested by Lessor to establish, maintain and protect the rights and remedies of Lessor, Owner Participant and the Lender(s) under the Operative Documents and to carry out and effect the intent and purpose of the Operative Documents, including, if requested by Lessor and at Lessee's expense, the execution and delivery of supplements or amendments hereto subjecting to this Agreement any Replacement Engine in accordance with the laws of any appropriate jurisdiction.

20.4    **Rights Cumulative; Waivers; Variation; Counterparts; Language; Delivery by E-mail**

(a)    The rights of both parties under this Agreement are cumulative, may be exercised as often as the relevant party considers appropriate and are in addition to its rights under the general law.  The rights of both parties against the other or in relation to the Aircraft (whether arising under this Agreement or the general law) shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing; and in particular any failure to exercise or any delay in exercising any such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

(b)    The provisions of this Agreement shall not be varied otherwise than by an instrument in writing executed by or on behalf of Lessor and Lessee.

(c)    This Agreement may be executed in counterparts each of which will constitute one and the same document.

(d)    All documents delivered to Lessor or required to be delivered pursuant to this Agreement shall be in English, or if not in English, will be accompanied by a certified English translation.  If there is any inconsistency between the English version of this Agreement or any document delivered hereunder and any other version in any other language, the English version will prevail.

(e)    This Agreement and the other Operative Documents (and the counterparts thereof) may be delivered by a party thereto by way of e-mail transmission to the other party and delivery shall be deemed completed for all purposes upon the completion of such e-mail transmission.  A party that so delivers this Agreement or any of the other Operative Documents (and the counterparts thereof) by way of e-mail transmission agrees to promptly thereafter deliver to the other parties thereto an original signed counterpart. The e-mail signature of any party shall be considered for these purposes as an original document, and

UMB0004185                                                                      CONFIDENTIAL

any e-mail document shall be considered to have the same binding legal effect as an originally executed document. In consideration of the mutual covenants herein contained, the parties agree that neither of them shall raise the use of e-mail as a defense to this Agreement or any of the other Operative Documents and forever waive any such defense.

20.5    **Delegation**

Lessor hereby delegates to the Servicer, all of the rights, powers or discretions vested in it by this Agreement and Lessor hereby further designates the Servicer as its fully authorized representative to deal directly with Lessee with respect to all legal, financial, insurance and technical matters with respect to this Agreement and the transactions contemplated hereby with the same effect as if Lessee was dealing directly with Lessor, and Lessee shall been entitled to rely on such delegation for all purposes until it has received a written notice of revocation from Lessor.

20.6    **Evidence of Indebtedness**

Except where expressly otherwise provided in this Agreement, any certificate or determination by Lessor as to any rate of interest or as to any amount payable under this Agreement shall contain reasonable details of the calculation of such rate or, as the case may be, amount and, if appropriate, the circumstances giving rise thereto and shall, in the absence of manifest error, be conclusive and binding on Lessee.

20.7    **Applications of Moneys**

If any sum paid or recovered in respect of the liabilities of Lessee under this Agreement is less than the amount then due, Lessor may apply such sum to Rent, interest, fees or any other amount due under this Agreement in such proportions and order and generally in such manner as Lessor shall determine.

20.8    **Notices**

Any notice or communication under or in connection with this Agreement shall be in English and in writing and shall be delivered personally or by e-mail transmission (confirmed, orally or in writing, as received by the recipient) or sent by express courier or certified, registered or express mail, postage prepaid to the respective addresses given below or such other address or e-mail as the recipient may have notified to the sender in writing.  Notices or communications shall be deemed received:

(a)    in the case of an e-mail on the Business Day immediately following the date of dispatch;

UMB0004186                                                                                    CONFIDENTIAL

(b)    in the case of express courier or certified, registered or express mail, on the date received:

to Lessor at:

UMB BANK, N.A.



with a copy to:

AMCK AVIATION HOLDINGS IRELAND LIMITED



to Lessee at:

FRONTIER AIRLINES, INC.



with a copy to:

FRONTIER AIRLINES, INC.

20.9    **Invalidity of any Provision**

If any of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

20.10    **Lessor's Right to Remedy**

If Lessee fails to perform or comply with any of its obligations hereunder, Lessor shall have the right, but shall not be obligated, to effect such performance on Lessee's behalf, and the amount of any reasonable out-of-pocket expenses and other reasonable expenses of Lessor incurred in connection with such performance, together with interest thereon at the Default Rate, shall be payable by Lessee upon demand.

UMB0004187                                                                    CONFIDENTIAL

20.11  **Entire Agreement**

(a)      Lessee's Documents constitute the entire agreement between the parties hereto in relation to the leasing of the Aircraft by Lessor to Lessee, and supersede all previous proposals, agreements and other written and oral communications in relation thereto.

(b)      The parties intend and agree that this Agreement:

(i)       constitutes a "true lease" and not a "security interest" as defined in Section 1-201(37) of the UCC; and

(ii)      confers only a leasehold interest on Lessee in and to the Aircraft on and subject to the terms of this Agreement, and no ownership or other interest with respect to the Aircraft is provided to Lessee under this Agreement.

Lessee shall not file any tax return that is inconsistent with the provisions of this Clause 20.11(b).

20.12  **Section 1110**

Lessee acknowledges that Lessor would not have entered into this Agreement unless it had available to it the benefits of a lessor under Section 1110. Lessee covenants and agrees with Lessor that to better ensure the availability of such benefits, Lessee shall support any motion, petition or application filed by Lessor with any bankruptcy court having jurisdiction over Lessee, whereby Lessor seeks recovery of possession of the Aircraft under Section 1110 and shall not in any way oppose such action by Lessor unless Lessee shall have complied with the requirements of Section 1110 to be fulfilled in order to entitle Lessee to continue use and possession of the Aircraft under this Agreement.  In the event Section 1110 is amended, or it is repealed and another statute is enacted in place thereof, Lessor and Lessee agree to amend this Agreement and take such other action (to the extent not inconsistent with this Agreement) as Lessor reasonably deems necessary so as to afford to Lessor the rights and benefits as such amended or substituted statute confers upon owners and Lessors of aircraft similarly situated to Lessor.

20.13  **Third Party Beneficiary**

The Owner Participant shall be an express third party beneficiary with respect to each provision herein that expressly grants the Owner Participant rights and is entitled to enforce directly and in its own name such rights.

20.14  **Governing Law**

This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York. This Agreement has been delivered in the State of New York.

UMB0004188                                                                                                        CONFIDENTIAL

20.15    **Submission to Jurisdiction**

(a)     With respect to any suit, action or proceedings relating to this Agreement or any other Lessee's Document or any matter between the parties arising under or in connection with this Agreement or any other Lessee's Document ("**Proceedings**"), each party irrevocably:  (i) submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York, and any appellate court from any thereof; and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. Each party hereby agrees that, subject to any rights of appeal, a final judgment in any such Proceedings shall be conclusive and may be enforced in other jurisdictions otherwise having jurisdiction over such party by suit on such final judgment or in any other manner provided by law.  Nothing in this Agreement precludes any party from bringing Proceedings in any other jurisdiction, nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(b)     Lessee shall designate, appoint and empower Corporation Service Company (CSC) of 80 State Street, Albany, NY 12207, as its authorised agent solely to receive and acknowledge, for and on its behalf, service of any writ, summons, order, judgment or other notice of legal process in any Proceedings.  As long as this Agreement remains in force, Lessee shall maintain a duly appointed and authorised agent to receive and acknowledge, for and on its behalf, service of any writ, summons, order, judgment or other notice of legal process in any Proceedings.  Lessee shall keep Lessor advised of the identity and location of such agent.  Lessee irrevocably undertakes not to revoke the authority of such agent and, in the event of the termination of such appointment, or if for any reason Lessee's process agent is unable to act as such, Lessee will appoint a substitute process agent acceptable to Lessor.

(c)     Lessee further agrees that service of process in any Proceedings also may be effected by mailing a copy thereof by registered or certified mail or by overnight courier service, postage prepaid, to it at its address specified in Clause 20.8. Notwithstanding anything herein to the contrary, Lessee hereby waives, to the fullest extent permitted by applicable law, the right to object to the service of process by Lessor, with respect to any Proceedings. Nothing in this Agreement will affect the right of Lessor to serve process in any other manner permitted by applicable law or to bring any legal action or proceeding or to obtain execution of judgment in any jurisdiction.

(d)     Lessee irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, with respect to itself and its property (irrespective of its use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might

UMB0004189                                                                        CONFIDENTIAL

otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

20.16    **Waiver of Jury Trial**

**EACH OF LESSOR AND LESSEE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS.** Each of the parties hereby (a) certifies that no representative, agent or attorney of any other parties has represented, expressly or otherwise, that such other parties would not, in the event of a Proceeding, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this paragraph.

20.17    **Confidentiality**

Each of Lessor and Lessee shall keep confidential the provisions of this Agreement that were redacted for filing with the FAA and any confidential information furnished or made available to them hereunder by the other party hereto, except:

(a)    each of Lessor and Lessee may make disclosure to the extent necessary to comply with the law, the valid order of a court of competent jurisdiction or the request of a regulatory authority;

(b)    each of Lessor and Lessee may make disclosure as part of its normal reporting or review procedure to its parent companies (and, in the case of Lessor, to the Owner Participant and its Affiliates), its auditors, its attorneys, its regulators and its advisors; **provided that**, such parent companies, the Owner Participant, Owner Participant's Affiliates, auditors, attorneys and advisors will be bound by the provisions of this Clause;

(c)    each of Lessor and Lessee may make disclosure to the extent necessary to enforce its rights and remedies under this Agreement;

(d)    Lessor may make disclosures to any Lender or any potential Lender and to potential assignees and transferees and their respective auditors, attorneys and advisers, so long as Lessor obtains an undertaking of confidentiality from such persons on the terms substantially no less strict *mutatis mutandis* than this Clause; or

(e)    each of Lessor and Lessee may disclose such information as is in the public domain.

Notwithstanding the foregoing provisions of this Clause 20.17, each of Lessor and Lessee (and any employee, representative, or agent of Lessor or Lessee) is expressly authorized to disclose to any and all persons, without limitation of any kind, the U.S. federal and state tax treatment and U.S. federal and state tax structure of the transactions contemplated by this Agreement and the other Operative Documents, and all materials of any kind (including opinions or other tax analyses, if any) that are provided to it related to such tax treatment and tax structure.

UMB0004190                                                                                      CONFIDENTIAL

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement to be executed as of the date first above written.

UMB BANK, N.A.,
not in its individual capacity, but solely as owner trustee

By:..................................................................
Name:   Scott Rosevear
Title:    Senior Vice President

*[Signature Page – Aircraft Lease Agreement (MSN 10038)]*

CONFIDENTIAL

FRONTIER AIRLINES, INC.

By:..................................................
Name:
Title:

James G. Dempsey
Chief Financial Officer

*[Signature Page – Aircraft Lease Agreement (MSN 10038)]*

UMB0004192

CONFIDENTIAL