CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.<br><br>**Plaintiff**<br><br>v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>**Defendant(s)** | **Case No. 1:20-cv-09713** |

DECLARATION OF

# DR. KEVIN NEELS

RE: TRIAL TESTIMONY

ON BEHALF OF

# FRONTIER, INC.

**SEPTEMBER 21, 2023**

DECLARATION OF DR. KEVIN NEELS

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

CONTENTS

**I.   Executive Summary** .................................................................................................**2**

   A.   Qualifications ..............................................................................................2

   B.   Assignment .................................................................................................2

   C.   Methodology and Original Results .............................................................3

   D.   Updated Analysis ........................................................................................5

   E.   Further Updates to the Damages Calculation .............................................5

   F.   Damages Will Be Further Updated as of Time of Trial ..............................6

   G.   Flaws In Mr. De Jounge's Report ..............................................................6

**II.  Background** .........................................................................................................**7**

   A.   The Parties ..................................................................................................7

      1.   Frontier ...........................................................................................7

      2.   AMCK and Other Defendants .........................................................8

      3.   Frontier's Past Relationships with AMCK .......................................8

   B.   The Framework Agreement .........................................................................8

   C.   Effects of the Pandemic ..............................................................................9

   D.   AMCK's Termination of the Framework Agreement ................................10

   E.   Frontier's Efforts to Mitigate Damages ...................................................12

**III. Approach to Calculation of Damages** ............................................................**12**

   A.   Overview ...................................................................................................12

      1.   The But-For Approach ...................................................................12

      2.   Nature of the But-For World in this Case ......................................13

      3.   The Measure of Damages ..............................................................13

**IV. Calculation of Damages** .................................................................................**16**

   A.   Aircraft Purchase Price .............................................................................16

   B.   Base Monthly Rent ...................................................................................17

   C.   Security Deposit ........................................................................................19

   D.   Airworthiness Directive Cost Sharing Provisions ....................................19

   E.   Redelivery Terms ......................................................................................19

   F.   Early Termination Option .........................................................................20

   G.   Effects by Individual Aircraft and Lease...................................................20

   H.   Discounting and Treatment of Taxes ........................................................28

      1.   Original Derivation of Debt-Based and WACC-Based Discount Rates ................28

      2.   Updated Approach to Discount Rate Calculations..........................29

      3.   Calculation of Frontier's Tax Rate ................................................31

      4.   Derivation of a Risk-Free Rate for Calculation of Pre-Judgment Damages ...........31

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**V.  Damages Results** ................................................................................................**33**

**VI.  Responses to Criticisms Raised By Defendants' Expert** ................................**39**

    A.  Monthly Basic Rent Calculation ................................................................40

    B.  The Choice Between a Debt-Based Discount Rate and WACC ...................41

    C.  The Value of Frontier's WACC ..................................................................41

    D.  The Valuation Date......................................................................................43

**VII. Conclusions**...............................................................................................................**44**

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

I, Dr. Kevin Neels, hereby declare and will testify in court as follows:

## I.    EXECUTIVE SUMMARY

### A.    QUALIFICATIONS

1. I have more than forty years of experience as a consultant and expert witness in the aviation, rail, trucking, courier, postal, and automotive industries.  I have led many significant engagements relating to competition, market structure, pricing, revenue management, distribution strategy, regulation, and public policy.  My work has addressed issues related to system planning, competition policy, privatization, and congestion management.  I have testified on numerous occasions in international arbitrations, before regulatory bodies, and in state and federal courts.

2. I am currently self-employed.  I served formerly as Principal and Transportation Practice Leader at The Brattle Group, and as Vice President and leader of the transportation practice at Charles River Associates.  I have also served as a researcher in the Urban Policy Program at the Rand Corporation and in the Transportation Studies Program at the Urban Institute, as a Director in the Transportation Practice at the consulting firm of Putnam, Hayes & Bartlett, as a Management Consultant in the Transportation Practice of the firm now known as KPMG.  I was for many years the Chairman of the standing Committee on Freight Transportation Economics and Regulation of the Transportation Research Board, an arm of the National Academy of Sciences.  I am currently a member of the Transportation Research Board's standing Committee on Airfield and Airspace Performance.

3. I earned my Ph.D. from Cornell University.  My CV is included in the Appendices to this Declaration.

### B.    ASSIGNMENT

4. On September 9, 2022, I submitted an expert report that quantified the economic injury suffered by Frontier, Inc. ("Frontier") as a result of the unilateral decision by AMCK Aviation

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

Holdings and its co-defendants ("AMCK") on May 8, 2020 to terminate the Framework Agreement they had entered into with Frontier only a few months before.[1]  I was asked, in particular, to compute the magnitude of the damage award that would be required to compensate Frontier for the economic injury it has suffered as a result of the actions of AMCK, and to make it whole.  A true and accurate copy of my September 9th report, with Appendices 1 through 3, is attached hereto.  I also submitted a Supplemental Statement on October 28th, 2022, a true and accurate copy of which is attached hereto.[2]

5.  In Appendix 4, I provide an updated set of Exhibits, where those Exhibits provide details of the calculations underlying the opinions presented in this Declaration.  Finally, in Appendix 5, I provide a List of Additional Materials Considered.  This list supplements the List of Materials Considered that I provided in Appendix 3 with my September 2022 report.

## C.    METHODOLOGY AND ORIGINAL RESULTS

6.  At trial, I will testify on my methodology and original results, as provided in my September 2022 report.  I briefly summarize the key points here, and provide a more detailed discussion in Sections III and IV of this Declaration.

7.  To calculate damages, I follow an approach that is widely accepted within economics, and by state and federal courts. This approach is often referred to as the "but-for" approach. As described in the Reference Manual for Scientific Evidence,[3] this approach measures the damages caused by a harmful act as "the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position."[4] The hypothetical scenario in which the harmful act had not occurred is often referred to as the "but for" world—that is, the world that the injured party would have faced, but-for the harmful act. The injured party's actual economic position can be observed and measured directly. Its but-for

---

[1]    Expert Report of Dr. Kevin Neels, September 9, 2022 ("Neels Expert Report").

[2]    Supplemental Statement of Dr. Kevin Neels, October 28, 2022, ("Supplemental Neels Statement").

[3]    National Research Council 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press. https://doi.org/10.17226/13163 ("Reference Manual on Scientific Evidence").

[4]    "Reference Guide on Estimation of Economic Damages," in Reference Manual on Scientific Evidence: Third Edition, at p. 432.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

economic status, however, must be inferred from the facts of the case, using appropriate economic tools and reasoning.

8.  In this matter, I am not aware, despite my investigations into the details and circumstances of these events, of any reason why the operating revenues or operating costs of Frontier might have been affected by the actions of AMCK.  Rather, the economic differences between the actual and but-for worlds correspond entirely to differences between the terms of the leases that would have been in place but for AMCK's termination of the framework agreement and the replacement leases that Frontier entered into after that termination.

9.  Frontier will experience damages over the course of the 12-year term of the replacement leases. In order to determine the appropriate compensation owed Frontier for the injury that it has experienced and will continue to experience over the remaining term of the twelve-year leases, one must calculate the current value of the stream of economic losses Frontier will experience. Such a calculation requires both a discount rate to express the value as of the time of the harm of the difference in the cash flow streams, and then a risk-free rate to bring that value forward in time to the present after accounting for pre-judgment interest.

10. The appropriate discount rate to use in calculating the present value of a stream of costs or payments should account both for the fundamental time value of money, and the specific risks of the costs or payment under consideration. In this matter, both the actual lease payments and the but-for lease payments are debt-like in nature, in that they are pre-specified by the terms of the relevant agreements, known in advance, and completely independent of the market shifts that might be expected to alter Frontier's revenues, expenses, or earnings.  I therefore conclude that a measure of the after-tax cost of debt is the most appropriate discount rate to apply in this case.

11. Using information available to me at the time I prepared my September 9, 2022 report, I concluded that the total amount that would have needed to be paid to Frontier on that date in order to compensate it for its injury and make it whole was $43.941 million.  As I explained in my report, using a different discount rate would give a different damages amount.[5]

---

[5]  Neels Expert Report at ¶ 72.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

### D.    UPDATED ANALYSIS

12.  On October 28, 2022, I updated my analysis and submitted a six-page supplemental statement updating my analysis in light of new information that had recently come to my attention.[6]  At trial, I will be prepared to testify as to why that new information superseded portions of my original analysis.  I provide a brief summary in the next two paragraphs, and expand on this description in Section IV.H.2 of this Declaration.

13.  Bloomberg is a well-regarded and commonly-used source for information about firms' costs of capital.  I did not initially find such information for Frontier, and hence for my September 2022 Report I developed alternative approaches to calculating the relevant measure of Frontier's cost of capital.  After double-checking Bloomberg using an updated search criterion, I found that Bloomberg did in fact contain information on Frontier's cost of debt and WACC during the relevant time period. In my supplemental report, I provided a number of comments about how these values from Bloomberg relate to the respective values that I used in my expert report.[7]  Specifically, I explained how the discount rates used in my original analysis yielded reliable and conservative results that actually overstated the cost of debt and the after-tax WACC of Frontier during the relevant time period.

14.  I updated my original analysis to account for the more reliable discount rate measures I found on Bloomberg.  I believe that the most appropriate discount rate is a debt-based discount rate using data from 2020.  This update increased the damages amount (still valued as of September 9, 2022) to $46.364 million.[8]

### E.    FURTHER UPDATES TO THE DAMAGES CALCULATION

15.  More than a year has passed since I submitted my initial report.  Accordingly, additional pre-judgement interest has accrued, relative to the damages calculations I presented in my September 2022 Expert Report and my October 2022 Supplemental Statement.  In both of those documents, the final damages values were as of September 9, 2022.

---

[6]    Supplemental Statement of Dr. Kevin Neels, October 28, 2022, ("Supplemental Neels Statement").

[7]    Supplemental Neels Statement, at ¶ 5-8.

[8]    Supplemental Neels Statement, Table S-1.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

16. To account for the time that has passed, I have updated my analyses to present the value of damages as of September 21, 2023.  The monthly risk-free rate I rely on has, in general, been higher over the last 12 months than it had been in the time between May 2020 (the termination date) and September 2022 (when I filed my initial report).  Accordingly, pre-judgment interest has accrued at a somewhat faster rate than it had previously.

17. **As of the date this Declaration is filed (September 21, 2023), the dollar amount that would make Frontier whole for the damages it suffered is $47.780 million.**  I discuss my updated calculation of the risk-free rate in Section IV.H.4 of this Declaration.  In Section V, I walk through the damages calculation in details, before summarizing my conclusions in Section VII. In the event that the Court determines that a WACC-based discount rate is appropriate, the dollar amount that would make Frontier whole, as of the date this Declaration is filed, is $46.058 million.

### F.     DAMAGES WILL BE FURTHER UPDATED AS OF TIME OF TRIAL

18. Pre-judgment interest will continue to accrue, so the damages calculations presented in this Declaration will need to be updated when a trial date is set.  I will update the pre-judgment interest calculation in advance of the trial, so that the Court will have the most current information.

### G.     FLAWS IN MR. DE JOUNGE'S REPORT

19. If this case proceeds to trial and I am asked to appear as an expert witness, I will present direct testimony as summarized in the preceding paragraphs.  I will also testify about flaws in the analysis and report prepared by Mr. de Jounge.[9]  I briefly summarize those opinions here.

20. Mr. de Jounge posits an alternative calculation of the fixed monthly Basic Rents under two of the replacement leases, based on what he believes is a "strict interpretation" of those leases. His alternative calculation is flawed in that it implies that the parties expected the swap rate to be an implausibly and unprecedentedly high rate approaching 60%.  It also is contradicted in

---

[9]     Expert Report of Rikard de Jounge, October 7, 2022 ("De Jounge Expert Report").

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

the real-world evidence in this case regarding Basic Rents actually paid.  Due to these flaws in his analysis, his opinions are unreliable.

21.  Next, Mr. de Jounge insists that Frontier's WACC is more appropriate to use than the debt-based discount rate I proposed.  He does not dispute that the cash flows and therefore the damages are "debt-like," but offers no explanation as to why the Court should disregard the specific risks of the cash flows at issue in order to use a WACC as the applicable discount rate.  His opinion basically amounts to an unsupported assertion.

22.  Furthermore, Mr. de Jounge assumes a value for Frontier's WACC that is improper in two respects.  First, it relies on an approximate rule-of-thumb number rather than a measure of WACC that is based on actual financial market data.  Second, it uses hindsight—information that could not have been known at the time the agreement was terminated—to inflate the WACC and therefore depress the damages amount.

23.  Finally, Mr. de Jounge proposes an incorrect alternative valuation date that would fail to reflect the risk Frontier faced between the date of the termination and the first payment of security deposits under each substitute lease.  While my use of the earlier May 8, 2020 valuation date slightly lowers damages, all things being equal, I believe it is the more appropriate approach.

## II.    BACKGROUND

### A.    THE PARTIES

#### 1.    Frontier

24.  Frontier Airlines is a U.S. based low cost air carrier headquartered in Denver, Colorado.  As of the end of 2022 Frontier operated a fleet of 120 Airbus single-aisle aircraft.[10]  All of these aircraft were financed under operating leases.[11]

---

[10]    Frontier Airlines Annual 10-K Report for Fiscal Year Ending December 31, 2022, at p. 4.
[11]    Frontier Airlines Annual 10-K Report for Fiscal Year Ending December 31, 2021, at p. 44.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

## 2.    AMCK and Other Defendants

25.   AMCK Aviation was a leasing company established on October 30, 2019.  The company was a full service, global leasing platform with a portfolio of over 170 owned, managed, and committed fleet, consisting of both narrowbody and widebody aircraft.  The shareholders of AMCK were CK Asset Holdings Limited (50%), Mitsubishi Corporation (40%), and Li Ka Shing Foundation (10%).[12]

## 3.    Frontier's Past Relationships with AMCK

26.   As of the beginning of 2020 Frontier and AMCK had entered into a number of lease agreements covering a total of 14 aircraft.  At that time AMCK was Frontier's largest lessor.[13]

### B.    THE FRAMEWORK AGREEMENT

27.   In March of 2020 the two parties had entered into a new Framework Agreement, through which AMCK had committed to purchasing from and leasing back to Frontier six new Airbus aircraft that Frontier was scheduled to purchase and take possession of from Airbus in 2020.[14]  Frontier negotiated the original purchase prices with Airbus, paid deposits and progress payments, and when the aircraft were delivered, was responsible for payment of the negotiated purchase prices.  The Framework Agreement anticipated that following the purchases of these aircraft from Airbus, in separate transactions, AMCK would purchase the new aircraft from Frontier, and then lease them back in exchange for monthly lease payments by Frontier.  Among other terms, the Framework Agreement specified the purchase price that AMCK would pay,[15] and the base rental amount that Frontier would pay on a monthly basis.[16]  Frontier was scheduled to take possession of the first three aircraft to be delivered under this Framework Agreement in

---

[12]   "AMCK Aviation: Lessor," CAPA Centre for Aviation, last accessed September 8, 2022, available at https://centreforaviation.com/data/profiles/lessors/amck-aviation.

[13]   Complaint, November 18, 2020, at ¶ 30.

[14]   Framework Agreement, FRONTIER0002829 at 832.

[15]   Framework Agreement, FRONTIER0002829 at 873.

[16]   Framework Agreement, FRONTIER0002829 at 832.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

March of 2020.  The remaining aircraft were scheduled to be delivered in May, June, and August of that same year. [17]

### C.    EFFECTS OF THE PANDEMIC

28.  As everyone knows, the coronavirus pandemic emerged as a serious global health threat in the spring of 2020.  The rapid spread of this disease had significant effects on the worldwide economy, and in particular, on the airline industry, and its suppliers and investors.

29.  As Frontier noted in one of its SEC filings:

> The rapid spread of COVID-19, along with government-mandated restrictions on travel, required stay-in-place orders, and other social distancing measures, resulted in a drastic decline in near-term air travel demand in the United States, and caused reductions in revenues and income levels as compared to corresponding pre-pandemic periods.[18]

30.  In a relatively short period of time Frontier found itself carrying many fewer passengers, generating less revenue, and flying fewer aircraft.  Other airlines had similar experiences.  Data published by the Bureau of Transportation Statistics, part of the U.S. Department of Transportation, tell an eloquent story about events during this time period, as shown in Figure D-1.

---

[17]    Framework Agreement, FRONTIER0002829 at 832, 868.
[18]    Frontier Airlines Annual 10-K Report for Fiscal Year Ending December 31, 2021, at p. 3.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**FIGURE D-1: MONTHLY PASSENGERS ON U.S. SCHEDULED AIRLINES (DOMESTIC + INTERNATIONAL, SEASONALLY ADJUSTED, MAY 2019-MAY 2022)**



Source: "May 2022 U.S. Airline Traffic Data," Bureau of Transportation Statistics, https://www.bts.gov/newsroom/may-2022-us-airline-traffic-data, last accessed August 15, 2022.

Although the immediate impacts of the pandemic on the airline industry were severe, these impacts were mitigated to a significant extent by emergency government aid.[19]  Despite this aid, however, many airlines requested rent deferrals form the lessors.[20]

### D.    AMCK'S TERMINATION OF THE FRAMEWORK AGREEMENT

31.    On May 8, 2020, AMCK issued to Frontier a Notice of Termination of the March 2020 Framework Agreement (the "Termination Notice").  In this notice AMCK asserted that Frontier's failure to pay rent on aircraft that Frontier leased from AMCK under other agreements gave AMCK the right to unilaterally terminate the Framework Agreement.[21]  This

---

[19]   *See,* "Airline and National Security Relief Programs," U.S. Department of the Treasury, last accessed September 9, 2022, available at https://home.treasury.gov/policy-issues/coronavirus/assistance-for-american-industry/airline-and-national-security-relief-programs.

[20]   In one survey from this period, 66% of lessor respondents said that their companies had granted relief requests. *See,* "Survey: COVID-19 Impact on Airlines and Aircraft Lessors," last accessed September 8, 2022, available at https://glginsights.com/articles/survey-covid-19-impact-on-airlines-and-aircraft-lessors/.

[21]   Complaint, at ¶ 20.

DECLARATION OF DR. KEVIN NEELS                                                                10

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

act by AMCK followed a complex series of events involving AMCK and Frontier that had taken place over the preceding weeks.

32. According to the Amended Complaint, Frontier took delivery on March 16, 2020 of the first of the aircraft[22] covered by the Framework Agreement. Frontier promptly paid the rent that it owed on this aircraft.[23] Shortly after the delivery of this aircraft, Frontier asked all of its aircraft lessors to consider granting it a one-time three month rent deferral. In making these requests Frontier noted the negative effects that the coronavirus pandemic was having on the demand for air travel.[24]

33. Shortly after the delivery of the first aircraft—MSN 10038—to Frontier, AMCK informed the airline of its desire to terminate the Framework Agreement.[25] Following receipt of Frontier's request for a short-term rent deferral, AMCK demanded that the economic terms of the Framework Agreement be renegotiated to make them more favorable to AMCK. AMCK also demanded that Frontier work with Airbus to postpone the deliveries of the five remaining aircraft covered by the Framework Agreement. AMCK then granted Frontier a temporary suspension of rent payments on 14 of the 15 aircraft leased by Frontier from AMCK.[26] Frontier entered into negotiations with Airbus, and on May 5, 2020 secured that company's agreement to defer deliveries of the five aircraft that Frontier still had on order.[27]

34. Despite the fact that Frontier had succeeded in meeting AMCK's demand for postponement of deliveries of the five remaining aircraft, and that it had been granted a temporary deferral of rent payments owed to AMCK, the latter company nonetheless informed Frontier on May 8, 2020 of the termination of the Framework Agreement.

---

[22] This aircraft bore manufacturer's serial number 10038 ("MSN 10038"). *See*, Complaint, at ¶ 35.

[23] Complaint, at ¶ 16.

[24] Complaint, at ¶ 18.

[25] Complaint, at ¶ 17.

[26] Complaint, at ¶ 19.

[27] Amendment No. 9 to A320 Family Aircraft Purchase Agreement, May 4, 2020, FRONTIER0005667.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

### E.  FRONTIER'S EFFORTS TO MITIGATE DAMAGES

35. Frontier acted promptly to make alternative financing arrangements for the five remaining aircraft that it had on order.  It eventually succeeded in these efforts.  On June 29, 2020 CDB Aviation Lease Finance of Dublin ("CDB" or "CDB Aviation") agreed to purchase and lease back three new aircraft that were scheduled to be delivered to Frontier in the following month.[28]  On October 7, 2020 Jackson Square Aviation ("JSA" or "JSA International") of San Francisco, CA agreed to purchase and lease back to Frontier the remaining aircraft it had on order.[29]  However, the terms of these replacement agreements were much less favorable to Frontier than those provided for in the Framework Agreement with AMCK.

## III.  APPROACH TO CALCULATION OF DAMAGES

### A.  OVERVIEW

#### 1.  The But-For Approach

36. To calculate damages I follow an approach that is widely accepted within economics, and within state and federal courts.  This approach is often referred to as the "but-for" approach.  As described in the Reference Manual for Scientific Evidence,[30] this approach measures the damages caused by a harmful act as "the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position."[31]  The hypothetical scenario in which the harmful act had not occurred is often referred to as the "but-for" world—that is, the world that the injured party would have faced, but-for the harmful act.  The injured party's actual economic position can be observed and measured directly.  Its but-for economic status, however, must be inferred from the facts of the case, using appropriate economic tools and reasoning.

---

[28]  CDB Aviation Lease Finance DAC Letter of Intent, FRONTIER0011290.

[29]  Jackson Square Aviation Letter of Intent, FRONTIER0012136.

[30]  National Research Council 2011.  *Reference Manual on Scientific Evidence: Third Edition*.  Washington, DC: The National Academies Press.  https://doi.org/10.17226/13163 ("Reference Manual on Scientific Evidence").

[31]  "Reference Guide on Estimation of Economic Damages," in Reference Manual on Scientific Evidence: Third Edition, at p. 432.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

### 2.    Nature of the But-For World in this Case

37.    It is clear in this case that the key difference between the actual and the but-for world is that in the but-for world AMCK would not have terminated its Framework Agreement with Frontier, and would have entered into purchase and lease back agreements with Frontier for the five remaining aircraft on the terms that are set forth in that Agreement, which the two parties had agreed upon just a few months earlier.  AMCK's failure to do just this is precisely the harmful act alleged in this dispute.

### 3.    The Measure of Damages

#### a.    Difference between the Actual and But-For Worlds

38.    To quantify the economic injury suffered by Frontier as a result of AMCK's termination of the Framework Agreement one must identify the specific ways in which the revenues earned and expenses incurred by Frontier changed as a result of AMCK's actions.

39.    In this instance I am not aware of any reason why the operating revenues or operating costs of Frontier might have been affected by the actions of AMCK.  Prior to AMCK's termination of the Framework Agreement, Frontier and Airbus had agreed to defer the delivery of the five remaining aircraft.  Delivery dates would thus have been the revised dates agreed to by Frontier, and would have been the same in the actual and but-for worlds.  It is therefore reasonable to assume that Frontier would have operated the same flights, carried the same passengers, and collected the same fares in the actual and but-for worlds.[32]

40.    However, the terms of the replacement leases differ substantially from the terms provided for in the Framework Agreement in ways that have caused and will cause injury to Frontier.  First, the purchase prices specified in the replacement sale and leaseback agreements were lower than those called for in the Framework Agreement.  In addition, the basic monthly rent amounts

---

[32]    It is worth noting that, while it is true that the monthly lease payments owed by Frontier would have been different in the actual and but-for worlds, those financial obligations were not influenced in any way by the number of flights operated, or even whether the leased aircraft were operated at all.  For this reason, the lower lease payments Frontier would have enjoyed in the but-for world would not have influenced the expected marginal profitability of a flight.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

realized under the replacement leases were significantly higher than those that would have been realized under the terms of the Framework Agreement. The replacement leases required Frontier to make larger security payments. Some of the replacement leases contained terms relating to the costs of complying with airworthiness directives, and certain other provisions that were less favorable to Frontier.[33]

### b. Discount Rate

41. The damages in this case will be experienced by Frontier over the course of the twelve-year replacement leases. In order to determine the appropriate compensation owed Frontier for the injury that it has experienced and will continue to experience over the remaining term of the twelve-year leases, one must calculate the current value of the stream of economic losses Frontier will experience. Such a calculation requires a discount rate. There are a number of conceptual issues that must be addressed in selecting an appropriate discount to use in this proceeding.

42. It is well accepted that the appropriate discount rate to use in calculating the present value of a stream of costs or payments should account both for the fundamental time value of money, and the specific risks of the costs or payment under consideration.[34] When the injured party is a business entity, it is common to use that entity's weighted average cost of capital ("WACC")[35]

---

[33] The Federal Aviation Administration ("FAA"), the agency responsible for overseeing the safety of commercial aircraft, will sometimes issue an Airworthiness Directive requiring commercial aircraft owners and operators to make specific modifications to a defined group of commercial aircraft in order to address safety problems that the FAA becomes aware of after the aircraft in question have been in operation for a period of time following their initial certification. Both the Framework Agreement and the replacement leases contain provisions specifying how the costs of complying with an airworthiness directive covering the leased aircraft should be divided between the lessor, and Frontier, the lessee. *See, e.g.,* the lease for MSN 10038, the only aircraft leased under the Framework Agreement, AMCK014555 at 612-613. Any such costs below a threshold amount specified in each lease are borne entirely by Frontier. Any costs above that threshold are borne by the lessor. Thus, a lower threshold is more favorable to Frontier, while a higher threshold is more favorable to the lessor. Other terms of the lease can affect the manner in which airworthiness compliance costs are divided between the lessee and the lessor. For example, certain leases contain provisions that cause the threshold amount to change over the course of the lease. *See, e.g.,* the CDB Aviation Letter of Intent, FRONTIER0011290 at 292. I understand, however, that Frontier regards the threshold level as the primary parameter that the parties focus on in negotiations.

[34] *See, e.g.,* Richard A. Brealey, Stewart C. Myers, and Franklin Allen, "Principles of Corporate Finance," 12th Edition, at p. 236.

[35] The weighted average cost of capital measures the rate that a business must pay in order to fund the capital assets required for the operation of the business. It is computed as a weighted average of the interest rate the business must pay on its debt, and the rate of return it must offer to is equity investors.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

as a discount rate in computing damages.  The general rationale for this selection is that if the injured party is a business, it will be the cash flows of that business that are altered by the injury.  A company's WACC will reflect the riskiness of those cash flows.

43. However, in the specific circumstances of this dispute Frontier's WACC does not accurately reflect the riskiness of the cash flows at issue.  An airline's general cash flow can be strongly influenced by a wide range of market factors—entry of new competitors, pricing decisions by existing competitors, changes in fuel prices, strength of the overall economy, and even the time of the year, to name only a few.  None of these factors, however, will alter either the payments Frontier will make under the replacement leases, or the payments it would have made had AMCK not terminated the Framework Agreement.  Both the actual lease payments and the but-for lease payments are pre-specified by the terms of the relevant agreements, known in advance, and completely independent of the market shifts that might be expected to alter Frontier's revenues, expenses, or earnings.[36]  In financial terms, the impacts of AMCK's actions are analogous to the impacts Frontier would experience if it were forced to substitute one debt agreement for an alternative agreement embodying less favorable terms.  Because the cash flows at issue are fundamentally debt-like, it is appropriate to discount them using an interest rate based on what Frontier pays on its debt.

44. Although I believe that a debt-based discount rate is most appropriate given the facts of this case, because it is common to discount a business entity's damages using its WACC, I will present an alternative calculation of damages using this approach.

45. To compute the total amount of Frontier's economic injury as of the date of this Declaration I follow standard discounting procedures.  Specifically, I discount the losses that Frontier has experienced and will experience to establish their net present value as of the date of the termination—May 8, 2020.  In computing this net present value I use a discount rate that reflects the riskiness of these payment streams.  I then carry this discounted amount forward to the present (specifically, the date of the filing of this Declaration) using a risk free discount

---

[36] One small qualification to this statement is worth noting.  Both the terms of the Framework Agreement and the terms of the replacement leases include provisions for adjusting the amount of the monthly rent payment if the actual delivery date of an aircraft differs from the expected delivery date.  However, these provisions are tied to shifts in interest rates, rather than to shifts in the airline market.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

rate. The use of a risk free rate reflects the fact that once Frontier has been made whole as of the time of injury, the only valuation issue that needs to be addressed is the time value of money, and the fact that Frontier will be compensated not at the time of injury, but at a later point in time.

### c.    Treatment of Taxes

46. I calculate Frontier's damages on an after tax basis. For each affected time period I calculate the net loss of revenue experienced by Frontier as a result of AMCK's termination of the Framework Agreement, and then multiply this number by one minus Frontier's tax rate to compute the net after tax effect. I then discount these after tax impacts using an after tax discount rate, arriving thereby at a measure of the net after tax economic injury experienced by Frontier. Finally, to compute the damages owed to Frontier I divide the amount of the after tax injury to Frontier by one minus Frontier's tax rate. A damage award of this amount would leave Frontier in the same position after taxes that it would have been in had the termination not occurred.

## IV.    CALCULATION OF DAMAGES

47. To quantify the damages suffered by Frontier as a result of AMCK's termination of the Framework Agreement, I compare the terms of the leases that would have emerged from that Agreement with the terms of the replacement leases that Frontier was forced to enter into. The latter terms differed between CDB and JSA. As I noted above, the relevant terms included the purchase price of the aircraft, the basic monthly rent paid under the lease, the details of the required security deposit, and other provisions, including those relating to the sharing of the costs of complying with airworthiness directives. Below I discuss each of these terms and how they differ across lessors.

### A.    AIRCRAFT PURCHASE PRICE

48. The transactions at issue in this proceeding were structured as follows.

49. The aircraft covered by the leases in question were manufactured by Airbus. Frontier agreed to purchase these aircraft at a price negotiated between these two parties. Prior to delivery

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

Frontier made a series of payments to Airbus, including an initial deposit, and, as the aircraft were built, a series of progress payments. Once the aircraft were completed and delivered, Frontier paid to Airbus the remainder of the negotiated purchase price. At that point, the aircraft became the property of Frontier.

50. Frontier then, in two closely linked transactions, sold the aircraft to the lessor, and then entered into a long-term lease permitting Frontier to use the aircraft, in exchange for a series of regular monthly lease payments.[37] The purchase price for the resale of the aircraft obviously reflected current market conditions, as well as the alternatives and bargaining power of the two parties. It was not tied in any direct way to the price negotiated between Frontier and Airbus.

51. The purchase prices provided for in the original and replacement leases differed substantially. The Framework Agreement specified a purchase price of ████████ [38] In contrast, the agreement with CDB Aviation specified a purchase price of only ████████ for each of the three aircraft covered.[39] The agreement with JSA International specified a purchase price of ████████ for each of the two remaining aircraft.[40]

## B.    BASE MONTHLY RENT

52. The Framework Agreement and replacement leases differed also in terms of the monthly rent to be paid by Frontier. The Framework Agreement specified a monthly payment of ████████ [41] The CDB Aviation agreement specified a monthly payment of ██████.[42] The agreement with JSA International specified a monthly payment of ██████ [43]

53. It must be noted that the monthly rental amounts Frontier actually wound up paying, and would have paid under the Framework Agreement are not in all cases precisely equal to the amounts

---

[37] For each of the aircraft in question there is a sale and leaseback agreement, and a more detailed lease agreement setting forth in more detailed the rights and obligations of the two parties under the lease.

[38] Framework Agreement, FRONTIER0002829 at 873.

[39] CDB Aviation Letter of Intent, FRONTIER0011290 at 291.

[40] JSA International Letter of Intent, FRONTIER0012136 at 137.

[41] Framework Agreement, FRONTIER0002829 at 832.

[42] CDB Aviation Letter of Intent, FRONTIER0011290 at 291.

[43] JSA International Letter of Intent, FRONTIER0012136 at 137.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

set forth above.  All three agreements contained provisions for adjusting the monthly rental amounts in response to interest rate changes between the time when the primary agreements were signed, and the times when the aircraft were finally delivered.  These provisions differed across the three agreements.  They are summarized in Table D-1 below.

**TABLE D-1: PROVISIONS FOR ADJUSTING MONTHLY RENTS**



| | Lessor | Adjustment Terms |
|---|---|---|
| [1] | AMCK | |
| [2] | CDB Aviation | |
| [3] | JSA International | |

Sources and Notes:
[1]: FRONTIER0002829 at 847.
[2]: FRONTIER0011290 at 291.
[3]: FRONTIER0012136 at 137–138.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

### C.    SECURITY DEPOSIT

54.    The security deposits that Frontier was required to post on its leased aircraft would have been less burdensome under the Framework Agreement than they are under the replacement leases. The Framework Agreement required Frontier to post a security deposit equal to ▮▮▮▮▮▮ basic rent.[44] In contrast, the CDB Aviation Letter of Intent called for a security deposit equal to ▮▮▮▮▮▮ basic rent. This amount could be reduced to ▮▮▮▮▮ rent following the 18th month of the lease term, and then to ▮▮▮▮▮ rent following the 24th month of the lease term if certain conditions were met.[45] The JSA International Letter of Intent also called for a security deposit equal to ▮▮▮▮▮ basic rent. This amount could be reduced to ▮▮ ▮▮▮ rent following the 24th month of the lease term if certain conditions were met.[46] Thus, the replacement leases forced Frontier to tie up ▮▮▮▮▮▮ in security deposits than would have been the case under the Framework Agreement.

### D.    AIRWORTHINESS DIRECTIVE COST SHARING PROVISIONS

55.    As noted above, some of the replacement leases incorporated airworthiness cost sharing provisions less favorable than those provided for in Frontier's agreements with AMCK.[47] However, because it is impossible at this point to foresee which future airworthiness directives, if any, might apply to the remaining five leased aircraft, or what the costs of complying with those directives might turn out to be, it is impossible to place a specific dollar value on these contract term differences. In the face of these uncertainties, the most conservative course of action is to ignore them. For this reason, I have not accounted for these differences in my computation of damages.

### E.    REDELIVERY TERMS

56.    I understand that the redelivery terms of the CDB leases are less favorable to Frontier than the corresponding AMCK terms, especially as regards to the potential incremental maintenance

---

[44]    Framework Agreement, FRONTIER0002829 at 847.
[45]    CDB Letter of Intent, FRONTIER0011290 at 291.
[46]    JSA Letter of Intent, FRONTIER0012136 at 138.
[47]    *See,* Footnote 33.

DECLARATION OF DR. KEVIN NEELS                                                    19

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

exposure at the end of the leases.  However, I do not have access to information that would permit me to place a dollar value on these term differences.  I reserve the right to modify my opinions should such information become available.

## F.    EARLY TERMINATION OPTION

57.    Under the first and only lease agreed with AMCK under the Framework Agreement, Frontier had the option to terminate the lease before the completion of its ███████.[48]  Clearly this option had value.  If conditions were favorable, Frontier could have terminated the AMCK lease, and entered into an alternative lease with greater value to Frontier, or negotiated more favorable terms for its existing lease.  If conditions were not favorable, Frontier could simply let the AMCK lease run to the end of its ███████.  Thus, the availability of this termination option could only have left Frontier better off than it would be without it.  The lease agreements with CDB and JSA █████████████████████  Therefore, to the extent that the five AMCK leases that were not completed due to the termination of the Framework Agreement would have contained similar provisions, the loss of this ███████████ also harmed Frontier.  I have not accounted for this source of harm in my computation of damages.  However, I reserve the right to further amend my opinion with respect to this issue, and provide the Court with a supplemental declaration if required, if more information becomes available.

## G.    EFFECTS BY INDIVIDUAL AIRCRAFT AND LEASE

58.    In this section I describe the overall effects of the contractual differences described above for each of the five affected aircraft.  These descriptions provide the key inputs necessary for computation of damages.

59.    Table D-2 summarizes the key contractual terms that changed as a result of the termination for aircraft MSN 9549.  This aircraft was delivered in July of 2020, and its replacement lessor was CDB Aviation.  The purchase price (row [2]) provided for by the replacement lease was ███ ███████ lower than that provided for in the Framework Agreement, while the monthly

---

[48]    *See,* MSN 10038 lease, AMCK014555 at 585–586.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

rent payment (row [9]) was roughly ██████████. The security deposit called for by the replacement lease was three times that provided for in the Framework Agreement.

**TABLE D-2: SUMMARY FOR MSN 9549 OF CONTRACTUAL TERMS AFFECTED BY THE TERMINATION**



Sources and Notes:

[1][B]: "MSN 9549 Lease," FRONTIER0011322.

[2][A]: "2020 Framework Agreement," FRONTIER0002829 at 873.

[2][B]: "CDB Letter of Intent," FRONTIER0011290 at 291.

[3]: "Aircraft Inquiry - Serial Number 9549," FAA, last accessed August 25, 2022, available at https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=368FR.

[4][A]: "2020 Framework Agreement," FRONTIER0002829 at 847. As per this Framework Agreement, the Effective Date for the Swap Rate is defined as 2 business days before the delivery date. Therefore, [4][A] = [3][A] − 2 Business Days.

[4][B]: "MSN 9549 Lease," FRONTIER0011322 at 434. As per this lease, the Effective Date for the Swap Rate is defined as 3 business days before the delivery date. Therefore, [4][B] = [3][B] − 3 Business Days.

[5][A]: "2020 Framework Agreement," FRONTIER0002829 at 832.

[6][A]: "2020 Framework Agreement," FRONTIER0002829 at 847.

[5][B],[6][B]: "MSN 9549 Lease," FRONTIER0011322 at 435.

[7]: USSW9 Ticker from Bloomberg for Effective Swap Date determined by Contract.

[8][A]: "2020 Framework Agreement," FRONTIER0002829 at 847.

[8][B]: "MSN 9549 Lease," FRONTIER0011322 at 435.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER



[9][A]:

[9][B]:

[10][A]: "10038 Lease," AMCK014555 at 695.

[10][B]:

[11][A],[12][A]: "10038 Lease," AMCK014555 at 589-590.
[11][B],[12][B]: "MSN 9549 Lease," FRONTIER0011322 at 435.

60. Table D-3 through Table D-6 provide similar summaries for the other four aircraft affected by the termination.

**TABLE D-3: SUMMARY FOR MSN 10031 OF CONTRACTUAL TERMS AFFECTED BY THE TERMINATION**



Sources and Notes:
[1][B]: "MSN 10031 Lease," FRONTIER0011678.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

[2][A]:  "2020 Framework Agreement," FRONTIER0002829 at 873.

[2][B]:  "CDB Letter of Intent," FRONTIER0011290 at 291.

[3]:  "Aircraft Inquiry—Serial Number 10031," FAA, last accessed August 25, 2022, available at https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=369FR.

[4][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847. As per this Framework Agreement, the Effective Date for the Swap Rate is defined as 2 business days before the delivery date. Therefore, $[4][A] = [3][A] - 2$ Business Days.

[4][B]:  "MSN 10031 Lease," FRONTIER0011678 at 791. As per this lease, the Effective Date for the Swap Rate is defined as 3 business days before the delivery date. Therefore, $[4][B] = [3][B] - 3$ Business Days.

[5][A]:  "2020 Framework Agreement," FRONTIER0002829 at 832.

[6][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[5][B],[6][B]:  "MSN 10031 Lease," FRONTIER0011678 at 791.

[7]:  USSW9 Ticker from Bloomberg for Effective Swap Date determined by Contract.

[8][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[8][B]:  "MSN 9549 Lease," FRONTIER0011322 at 435.

[9][A]:

[9][B]:



[10][A]:  "10038 Lease," AMCK014555 at 695.

[10][B]:

[11][A],[12][A]:  "10038 Lease," AMCK014555 at 589–590.

[11][B],[12][B]:  "MSN 10031 Lease," FRONTIER0011678 at 791.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-4: SUMMARY FOR MSN 10089 OF CONTRACTUAL TERMS AFFECTED BY THE TERMINATION**



Sources and Notes:

[1][B]:  "MSN 10089 Lease," FRONTIER0011678.

[2][A]:  "2020 Framework Agreement," FRONTIER0002829 at 873.

[2][B]:  "CDB Letter of Intent," FRONTIER0011290 at 291.

[3]:  "Aircraft Inquiry—Serial Number 10089," FAA, last accessed August 25, 2022, available at https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=371FR.

[4][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.  As per this Framework Agreement, the Effective Date for the Swap Rate is defined as 2 business days before the delivery date. Therefore, [4][A] = [3][A] − 2 Business Days.

[4][B]:  "MSN 10089 Lease," FRONTIER0011678 at 790. As per this lease, the Effective Date for the Swap Rate is defined as 3 business days before the delivery date. Therefore, [4][B] = [3][B] − 3 Business Days.

[5][A]:  "2020 Framework Agreement," FRONTIER0002829 at 832.

[6][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[5][B],[6][B]:  "MSN 10089 Lease," FRONTIER0011678 at 790.

[7]: USSW9 Ticker from Bloomberg for Effective Swap Date determined by Contract.

[8][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[8][B]:  "MSN 9549 Lease," FRONTIER0011322 at 435.

[9][A]:

DECLARATION OF DR. KEVIN NEELS

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

[9][B]: 

[10][A]:  "10038 Lease," AMCK014555 at 695.

[10][B]:

[11][A],[12][A]:  "10038 Lease," AMCK014555 at 589–590.

[11][B],[12][B]:  "MSN 10089 Lease," FRONTIER0011678 at 790.

**TABLE D-5: SUMMARY FOR MSN 10384 OF CONTRACTUAL TERMS AFFECTED BY THE TERMINATION**



Sources and Notes:

[1][B]:  "MSN 10384 Lease," FRONTIER0011912 at 021.

[2][A]:  "2020 Framework Agreement," FRONTIER0002829 at 873.

[2][B]:  "JSA Letter of Intent," FRONTIER0012136 at 137.

[3]:  "Aircraft Inquiry - Serial Number 10384," FAA, last accessed August 25, 2022, available at https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=377FR.

[4][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847. As per this Framework Agreement, the Effective Date for the Swap Rate is defined as 2 business days before the delivery date. Therefore, [4][A] = [3][A] − 2 Business Days.

[4][B]:  "MSN 10384 Lease," FRONTIER0011912 at 021. As per this lease, the Effective Date for the Swap Rate is defined as 3 business days before the delivery date. Therefore, [4][B] = [3][B] − 3 Business Days.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

[5][A]:  "2020 Framework Agreement," FRONTIER0002829 at 832.

[6][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[5][B],[6][B]:  "MSN 10384 Lease," FRONTIER0011912 at 021.  As outlined in this source, if the actual swap rate noted in [7][B] is greater than .596%, then the assumed swap rate shall be .80%.  If the actual swap rate noted in [7][B] is less than or equal to .596%, then the assumed swap rate shall be .596%.  Because [7][B] is greater than .596%, [6][B] = 0.80%.

[7][A]:  USSW9 Ticker from Bloomberg for Effective Swap Date determined by Contract.

[7][B]:  The actual swap rate used to calculate the monthly rent payment was provided by Frontier.  It is the "Close" USSW9 Rate reported by Bloomberg on 3/26/2021 at 9 AM.

[8][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[8][B]:  "MSN 9549 Lease," FRONTIER0011322 at 435.

[9][A]:



[9][B]:

[10][A]:  "10038 Lease," AMCK014555 at 695.

[10][B]:

[11][A],[12][A]:  "10038 Lease," AMCK014555 at 589–590.

[11][B],[12][B]:  "MSN 10384 Lease," FRONTIER0011912 at 941.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-6: SUMMARY FOR MSN 10452 OF CONTRACTUAL TERMS AFFECTED BY THE TERMINATION**



Sources and Notes:

[1][B]:  "MSN 10452 Lease," FRONTIER0012024.

[2][A]:  "2020 Framework Agreement," FRONTIER0002829 at 873.

[2][B]:  "JSA Letter of Intent," FRONTIER0012136 at 137.

[3]:  "Aircraft Inquiry - Serial Number 10452," FAA, last accessed August 25, 2022, available at https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=377FR.

[4][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.  As per this Framework Agreement, the Effective Date for the Swap Rate is defined as 2 business days before the delivery date.  Therefore, [4][A] = [3][A] − 2 Business Days.

[4][B]:  "MSN 10452 Lease," FRONTIER0012024 at 133.  As per this lease, the Effective Date for the Swap Rate is defined as 3 business days before the delivery date.  Therefore, [4][B] = [3][B] − 3 Business Days.

[5][A]:  "2020 Framework Agreement," FRONTIER0002829 at 832.

[6][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[5][B],[6][B]:  "MSN 10452 Lease," FRONTIER0012024 at 133.  As outlined in this source, if the actual swap rate noted in [7][B] is greater than .596%, then the assumed swap rate shall be .80%.  If the actual swap rate noted in [7][B] is less than or equal to .596%, then the assumed swap rate shall be .596%.  Because [7][B] is greater than .596%, [6][B] = 0.80%.

[7][A]: USSW9 Ticker from Bloomberg for Effective Swap Date determined by Contract.

[7][B]: The actual swap rate used to calculate the monthly rent payment was provided by Frontier.  It is the "Close" USSW9 Rate reported by Bloomberg on 4/27/2021 at 9 AM.

[8][A]:  "2020 Framework Agreement," FRONTIER0002829 at 847.

[8][B]:  "MSN 9549 Lease," FRONTIER0011322 at 435.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER



[9][A]:

[9][B]:

[10][A]: "10038 Lease," AMCK014555 at 695.

[10][B]:

[11][A],[12][A]: "10038 Lease," AMCK014555 at 589–590.
[11][B],[12][B]: "MSN 10452 Lease," FRONTIER0012024 at 053.


## H.    DISCOUNTING AND TREATMENT OF TAXES

61.    As noted above, I present the results of two alternative calculations of Frontier's damages.  My preferred approach uses a debt-based discount rate.  For comparison purposes I also present the results of a damages calculation using a discount rate based upon Frontier's WACC.  As I explain below, I carry out both of these calculation on an after tax basis, and then adjust these results for the tax consequences of the damage award itself.  In this section I describe in detail my treatment of these issues.  I begin with a brief discussion of how I originally derived these values, before explaining my current preferred approach.  I then explain my approach to calculating the relevant tax rate, as well as the risk-free interest rate used to calculate pre-judgment interest.


### 1.    Original Derivation of Debt-Based and WACC-Based Discount Rates

62.    I previously used a debt-based discount rate that was based on the interest rate paid by Frontier on its debt around the time of the injury it suffered.[49]  In its 10-K report for the fiscal year ending December 31, 2021, Frontier reports having entered into a loan agreement on September 28, 2020.  Based on the terms of this loan agreement, I calculate an interest rate as of that date of 2.87 percent, which I proceeded to use as a pre-tax discount rate.  In order to

---

[49]    Neels Expert Report, ¶¶ 46-47.

compare this loan-derived value to the value I eventually use, it must first be converted to an after-tax discount rate; doing so using the tax rate I calculated for Frontier in 2019 results in an after-tax discount rate of 2.22%.[50]

63. At the time I filed my initial report, I was unable to obtain information on Frontier's WACC.[51] I instead adopted a statistical approach to developing a WACC value for Frontier.[52] Theoretically one would expect the cost of capital for a company to reflect the cost structure of the company and the riskiness of its business. These features of a business will be heavily influenced by the characteristics of the industry within which that business operates. I therefore constructed a dataset of WACC values for U.S. passenger airlines, and developed a regression model to use to compute the unknown WACC value for Frontier. The regression model used a measure of the airline's size, a low-cost carrier indicator variable, and time indicators. The resulting after-tax WACC value for Frontier as of the time of injury was 7.09%. Additional details of this analysis appear in Paragraphs 48 through 59 of my September 2022 Expert Report.

## 2.    Updated Approach to Discount Rate Calculations

64. During my deposition in this matter, which took place on October 25th, 2022, I was asked whether, when searching for cost of capital information, I had searched for Frontier Airlines or Frontier Holdings.[53] This prompted me to revisit the question of whether I could obtain information on Frontier's WACC from Bloomberg. Therefore, I double-checked whether there was any information on the Bloomberg Terminal about Frontier's WACC, this time using the current ULCC ticker as my search criterion. I found that Bloomberg does in fact contain information on Frontier's WACC, Cost of Debt (After Tax), and Cost of Equity.[54] This source generally reports these values on a quarterly basis since the time of Frontier's initial public

---

[50]    2.87% x (1 − 22.8%) ≈ 2.22%.  I calculate a 22.8% tax rate for Frontier in 2019.  Neels Expert Report, Table 10 on p. 31.

[51]    Neels Expert Report, ¶ 48.  *See also*, Supplemental Neels Statement, ¶ 2.

[52]    Neels Expert Report, ¶ 49.

[53]    Frontier Airlines was previously publicly traded under the ticker "FRNTQ."  The current incarnation of the company is now known as Frontier Group Holdings Inc. and is traded under the ticker symbol "ULCC."

[54]    *See,* Supplemental Neels Statement, at Table S-1.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

offering in 2021, but also providing values for each of the two preceding calendar years (2019 and 2020), while it was still a privately-held company.[55]

65. I generally find these values for both the debt-based discount rate and the WACC to be reliable. Bloomberg is an authoritative source of financial information that relies on a combination of Frontier's own data and real-world interest rates, as of the time period the injury was suffered. The values reported in Bloomberg also generally showed that the approach I took in calculating WACC yielded reliable and conservative results that actually overstated both the cost of debt and the after-tax WACC of Frontier during the relevant time period.[56] I therefore think that the 2020 values reported in Bloomberg are a more appropriate measure of these two alternative discount rates.

**TABLE D-7: SUMMARY OF DISCOUNT RATES USED**

|  |  | Debt-Based After-Tax Discount Rate [A] | After-Tax WACC [B] |
|---|---|---|---|
| Discount Rates Calculated for Initial Report | [1] | 2.2165% | 7.0946% |
| 2020 Discount Rates Reported in Bloomberg | [2] | 1.0445% | 1.8405% |

Sources and Notes:
[1][A]: Neels Expert Report at Paragraph 46 shows how I calculated the pre-tax debt-based discount rate of about 2.87%. The after-tax debt-based discount rate is calculated by applying the Frontier tax rate of about 22.8% to that value. See, Table D-8, Row [3].
[1][B]: Neels Expert Report at Table 9, [8][C].
[2][A]: Supplemental Neels Statement at Table S-1, Column [B].
[2][B]: Supplemental Neels Statement at Table S-1, Column [A].

66. As explained above, I believe that a debt-based discount rate is most appropriate given the facts of this case. Accordingly, my measure of damages, and most of the calculations presented in

---

[55]  While the 2020 values were simply labeled "12/31/2020" in Table S-1 of my Supplemental Statement, I have since confirmed with Bloomberg that those values reflect annual information covering the entire calendar year (i.e. "WACC History for the 12 Months Ending 12/31/2020").

Appendix 4 contains the 16 Exhibits to my Declaration, numbered D-1 to D-16. In Exhibit D-1, I have included a table from Bloomberg that clearly indicates a cost of debt of 1.0445(%) and a WACC value of 1.8405(%) for the 12 months ending 12/31/2020. The remaining Exhibits D-2 to D-16 include, for each relevant aircraft: a) detailed cash flow calculations; b) alternate detailed cash flow calculations using Frontier's WACC as a discount rate; and c) alternate damages summaries using that same alternate discount rate. The Exhibits in Appendix 4 supersede the Exhibits I provided as Appendix 1 to my September 2022 Report.

[56]  *See* Supplemental Neels Statement, ¶¶ 5-7.

the rest of this Declaration, are based on the 1.0445% discount rate that appears in the table above.  However, in the event that the Court rules my debt-based discount rate to be inappropriate, at the end of this Declaration I also present the results of my damages calculations if I instead use the WACC-based discount rate of 1.8405%.

### 3.    Calculation of Frontier's Tax Rate

67.  I base my calculation of Frontier's effective tax rate on that company's reported financial results for 2019, which is the last complete year before the termination, the latest year unaffected by the pandemic, and the only year in the company's public financials for which it reported a positive tax liability.  As shown in Table D-8 below, in that year Frontier paid taxes in the amount of 22.8 percent of its pre-tax income.

**TABLE D-8: CALCULATION OF FRONTIER TAX RATE**

| Income before income taxes | [1] | 325 |
|---|---|---|
| Income Tax Expense | [2] | 74 |
| Effective Tax Rate | [3] | 22.8% |

Sources and Notes:
[1], [2]: Frontier Form 10-K for 2021, p. 96.
[3] = [2] / [1].

### 4.    Derivation of a Risk-Free Rate for Calculation of Pre-Judgment Damages

68.  I use the interest rates in 10-year U.S. Treasury securities as my measure of the risk-free discount rate.  These values are shown in Table D-9 below.  I focus on the period from the date of AMCK's termination of the Framework Agreement to the date of this updated report.  Because I am computing damages on an after-tax basis, I adjust the raw Treasury security interest rates for Frontier's tax rate.  Results of these calculations are shown in Table D-9 below. Risk-free interest rates were relatively low at the time of the injury and have, with a few minor exceptions, grown steadily since May 2020.  I compute that over this roughly 3.5-year period the cumulative annual after-tax risk-free rate was 1.753 percent per year.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-9: CALCULATION OF RISK-FREE RATE FOR PRE-AWARD INTEREST**

| Month and Year | Annual Yield on Risk-Free Security | Corresponding Monthly Yield | Days in Month | Monthly Yield, Adjusted to Account for Partial Months | After-Tax Risk-Free Rate | End of Month Value |
|---|---|---|---|---|---|---|
| | [2] | [3] | [4] | [5] | [6] | [7] |
| | | | | | | 1 |
| May-20 | 0.67% | 0.0558% | 31 | 0.0432% | 0.0334% | 1.0003 |
| June-20 | 0.73% | 0.0608% | 30 | 0.0608% | 0.0470% | 1.0008 |
| July-20 | 0.62% | 0.0517% | 31 | 0.0517% | 0.0399% | 1.0012 |
| August-20 | 0.65% | 0.0542% | 31 | 0.0542% | 0.0418% | 1.0016 |
| September-20 | 0.68% | 0.0567% | 30 | 0.0567% | 0.0438% | 1.0021 |
| October-20 | 0.79% | 0.0658% | 31 | 0.0658% | 0.0508% | 1.0026 |
| November-20 | 0.87% | 0.0725% | 30 | 0.0725% | 0.0560% | 1.0031 |
| December-20 | 0.93% | 0.0775% | 31 | 0.0775% | 0.0599% | 1.0037 |
| January-21 | 1.08% | 0.0900% | 31 | 0.0900% | 0.0695% | 1.0044 |
| February-21 | 1.26% | 0.1050% | 28 | 0.1050% | 0.0811% | 1.0052 |
| March-21 | 1.61% | 0.1342% | 31 | 0.1342% | 0.1036% | 1.0063 |
| April-21 | 1.64% | 0.1367% | 30 | 0.1367% | 0.1055% | 1.0073 |
| May-21 | 1.62% | 0.1350% | 31 | 0.1350% | 0.1043% | 1.0084 |
| June-21 | 1.52% | 0.1267% | 30 | 0.1267% | 0.0978% | 1.0094 |
| July-21 | 1.32% | 0.1100% | 31 | 0.1100% | 0.0850% | 1.0102 |
| August-21 | 1.28% | 0.1067% | 31 | 0.1067% | 0.0824% | 1.0111 |
| September-21 | 1.37% | 0.1142% | 30 | 0.1142% | 0.0882% | 1.0120 |
| October-21 | 1.58% | 0.1317% | 31 | 0.1317% | 0.1017% | 1.0130 |
| November-21 | 1.56% | 0.1300% | 30 | 0.1300% | 0.1004% | 1.0140 |
| December-21 | 1.47% | 0.1225% | 31 | 0.1225% | 0.0946% | 1.0150 |
| January-22 | 1.76% | 0.1467% | 31 | 0.1467% | 0.1133% | 1.0161 |
| February-22 | 1.93% | 0.1608% | 28 | 0.1608% | 0.1242% | 1.0174 |
| March-22 | 2.13% | 0.1775% | 31 | 0.1775% | 0.1371% | 1.0188 |
| April-22 | 2.75% | 0.2292% | 30 | 0.2292% | 0.1770% | 1.0206 |
| May-22 | 2.90% | 0.2417% | 31 | 0.2417% | 0.1866% | 1.0225 |
| June-22 | 3.14% | 0.2617% | 30 | 0.2617% | 0.2021% | 1.0246 |
| July-22 | 2.90% | 0.2417% | 31 | 0.2417% | 0.1866% | 1.0265 |
| August-22 | 2.90% | 0.2417% | 31 | 0.2417% | 0.1866% | 1.0284 |
| September-22 | 3.52% | 0.2933% | 30 | 0.2933% | 0.2265% | 1.0307 |
| October-22 | 3.98% | 0.3317% | 31 | 0.3317% | 0.2561% | 1.0333 |
| November-22 | 3.89% | 0.3242% | 30 | 0.3242% | 0.2504% | 1.0359 |
| December-22 | 3.62% | 0.3017% | 31 | 0.3017% | 0.2330% | 1.0384 |
| January-23 | 3.53% | 0.2942% | 31 | 0.2942% | 0.2272% | 1.0407 |
| February-23 | 3.75% | 0.3125% | 28 | 0.3125% | 0.2413% | 1.0432 |
| March-23 | 3.66% | 0.3050% | 31 | 0.3050% | 0.2356% | 1.0457 |
| April-23 | 3.46% | 0.2883% | 30 | 0.2883% | 0.2227% | 1.0480 |
| May-23 | 3.57% | 0.2975% | 31 | 0.2975% | 0.2298% | 1.0504 |
| June-23 | 3.75% | 0.3125% | 30 | 0.3125% | 0.2413% | 1.0529 |
| July-23 | 3.90% | 0.3250% | 31 | 0.3250% | 0.2510% | 1.0556 |
| August-23 | 4.17% | 0.3475% | 31 | 0.3475% | 0.2684% | 1.0584 |
| September-23 | 4.17% | 0.3475% | 30 | 0.2317% | 0.1789% | 1.0603 |

| | |
|---|---|
| Growth between May 8, 2020 and September 21, 2023, using the post-tax risk-free growth rate | 6.0319% |
| Years between May 8, 2020 and September 21, 2023. | 3.37 |
| Compound average annual post-tax risk-free rate for relevant period. | 1.7530% |

Sources and Notes:

[2]: Market Yield on U.S. Treasury Securities at 10-Year Constant Maturity. FRED Series GS10, available at https://fred.stlouisfed.org/series/GS10. For September 2023, I apply the August 2023 yield.

DECLARATION OF DR. KEVIN NEELS

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

[3] = [2] / 12.

[5] = [3], after adjusting for partial months in May 2020 and September 2023.

[6] = [5] × (1 − 22.8%).  Tax rate of 22.8% calculated in Table D-8, Row [3].

[7] = Value at end of previous month × (1 + [6]).

## V.    DAMAGES RESULTS

69.  At trial, I will testify to the results of the damages calculations using the inputs described in the preceding sections of this Declaration.  I conclude that the total amount that must be paid to Frontier in order to compensate it for its injury and make it whole–if that payment were to be made today–is $47.780 million.  In the remainder of this section, I provide a guide as to how I arrived at that final number.

70.  The information contained in Table D-2 through Table D-6 provide the inputs necessary for the computation of damages.  While the general concepts underlying the damages calculations are straightforward, the details are somewhat complex.  I will explain those details through a discussion of the damages calculations arising from aircraft MSN 9459.  Those calculations are presented in Exhibit D-2.

71.  The column labeled "Date," shown on the left of Exhibit D-2 shows the dates associated with all of the payment events related to the lease for MSN 9459.  The column to its immediate right contains descriptions of these payment events, while the next column to the right shows the number of months between the date of each payment event, and the valuation date, May 8, 2020.  These month counts drive the discounting process.

72.  The next major section to the right describes the cash flows that would have been associated with a lease for MSN 9549 granted to Frontier under the terms of the Framework Agreement.  This section contains three subsections.  The leftmost subsection shows undiscounted pre-tax cash flows.  The middle subsection shows undiscounted after-tax cash flows.  The rightmost subsection shows discounted after-tax cash flows.  Within each subsection there are three columns, one for each of the three payment related provisions that differed between the but-for lease and the replacement lease.  The leftmost of the three columns shows the purchase prices paid to Frontier.  The middle column shows monthly rent payments, and the rightmost column shows cash flows arising from security deposit requirements.

DECLARATION OF DR. KEVIN NEELS                                                             33

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

73. The rightmost major section in Exhibit D-2 has the same structure as the major section described above, in the preceding paragraph. However, instead of showing payments that would have been made under a lease derived from the Framework Agreement, it shows the payments that will be made under the replacement agreement. That lease was issued by CDB.

74. Exhibit D-2 thus provides a complete description of the actual and but-for cash flows associated with the change in lease terms for aircraft MSN 9549. To compute the damages associated with the changes in lease terms for this aircraft, it is only necessary to summarize the payment streams shown in this Exhibit.

75. Table D-10, shown below, does exactly that. The first two rows show the cash flows and damages associated with this aircraft that arise from differences in sales price. The table includes both undiscounted pre-tax values, and discounted after tax values. The next two rows show comparable calculations for the cash flows and damages associated with this aircraft that arise from differences in monthly rents. This provision accounts for the bulk of the damages. The following two lines show comparable values for the security deposit provisions. Total after-tax damages associated with this aircraft as of the time of the termination of the Framework Agreement come to ██████████. Bringing this value up to the date of this report brings the total after-tax damages associated with this aircraft to ██████████. Note that this amount does not take into account the taxes Frontier will have to pay on a damage award, and so it falls short of what it would take to make Frontier whole. I address that issue below.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-10: SUMMARY OF DAMAGES TO FRONTIER ARISING FROM LEASE FOR MSN 9549 (IN THOUSANDS OF DOLLARS), USING DEBT-BASED DISCOUNT RATE**



Sources and Notes:

[1]:  "CDB Letter of Intent," FRONTIER0011290 at 291; "2020 Framework Agreement," FRONTIER0002829 at 873. [1][C] = [1][A] − [1][B].

[2]:  After-tax NPV of [1].  See Appendix 4 for details. [2][D] = [2][A] − [2][B].

[3]:  Sum of Undiscounted Pre-Tax Rent Payments; See Appendix table for details. [3][C] = [3][A] − [3][B].

[4]:  After-tax NPV of [3].  See Appendix 4 for details. [4][D] = [4][A] − [4][B].

[5]:  Calculated based on provisions in lease documents. [5][C] = [5][A] − [5][B].

[6]:  After-tax NPV of [5].  See Appendix 4 for details. [6][D] = [6][A] − [6][B].

[7]:  Sum of the differences in after-tax NPV figures from rows [1], [3], and [5].

[8]:  After-tax risk-free rate, based on cumulative yield on U.S. ten-year treasury bonds since the valuation date.

[10] = [7] × (1 + [8]) ^ [9]) − [7].

[11] = [7] + [10].

Totals may not sum due to rounding.

76.  Table D-11 through Table D-14, contained below, show comparable calculations for the remaining four aircraft.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-11: SUMMARY OF DAMAGES TO FRONTIER ARISING FROM LEASE FOR MSN 10031 (IN THOUSANDS OF DOLLARS), USING DEBT-BASED DISCOUNT RATE**



Sources and Notes:

[1]: "CDB Letter of Intent," FRONTIER0011290 at 291; "2020 Framework Agreement," FRONTIER0002829 at 873. [1][C] = [1][A] − [1][B].

[2]: After-tax NPV of [1].  See Appendix 4 table for details. [2][D] = [2][A] − [2][B].

[3]: Sum of Undiscounted Pre-Tax Rent Payments; See Appendix 4 for details. [3][C] = [3][A] − [3][B].

[4]: After-tax NPV of [3].  See Appendix 4 for details. [4][D] = [4][A] − [4][B].

[5]: Calculated based on provisions in lease documents. [5][C] = [5][A] − [5][B].

[6]: After-tax NPV of [5].  See Appendix 4 for details. [6][D] = [6][A] − [6][B].

[7]: Sum of the differences in after-tax NPV figures from rows [1], [3], and [5].

[8]: After-tax risk-free rate, based on cumulative yield on U.S. ten-year treasury bonds since the valuation date.

[10] = [7] × (1 + [8]) ^ [9]) − [7].

[11] = [7] + [10].

Totals may not sum due to rounding.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-12: SUMMARY OF DAMAGES TO FRONTIER ARISING FROM LEASE FOR MSN 10089 (IN THOUSANDS OF DOLLARS), USING DEBT-BASED DISCOUNT RATE**



Sources and Notes:

[1]: "CDB Letter of Intent," FRONTIER0011290 at 291; "2020 Framework Agreement," FRONTIER0002829 at 873. [1][C] = [1][A] − [1][B].

[2]: After-tax NPV of [1].  See Appendix 4 for details.  [2][D] = [2][A] − [2][B].

[3]: Sum of Undiscounted Pre-Tax Rent Payments; see Appendix 4 for details. [3][C] = [3][A] − [3][B].

[4]: After-tax NPV of [3].  See Appendix 4 for details. [4][D] = [4][A] − [4][B].

[5]: Calculated based on provisions in lease documents.  [5][C] = [5][A] − [5][B].

[6]: After-tax NPV of [5].  See Appendix 4 for details.  [6][D] = [6][A] − [6][B].

[7]: Sum of the differences in after-tax NPV figures from rows [1], [3], and [5].

[8]: After-tax risk-free rate, based on cumulative yield on U.S. ten-year treasury bonds since the valuation date.

[10] = [7] × (1 + [8]) ^ [9]) − [7].

[11] = [7] + [10].

Totals may not sum due to rounding.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-13: SUMMARY OF DAMAGES TO FRONTIER ARISING FROM LEASE FOR MSN 10384 (IN THOUSANDS OF DOLLARS), USING DEBT-BASED DISCOUNT RATE**



Sources and Notes:

[1]: "JSA Letter of Intent," FRONTIER0012136 at 137; "2020 Framework Agreement," FRONTIER0002829 at 873. [1][C] = [1][A] − [1][B].

[2]: After-tax NPV of [1]. See Appendix 4 for details. [2][D] = [2][A] − [2][B].

[3]: Sum of Undiscounted Pre-Tax Rent Payments; See Appendix 4 for details. [3][C] = [3][A] − [3][B].

[4]: After-tax NPV of [3]. See Appendix 4 for details. [4][D] = [4][A] − [4][B].

[5]: Calculated based on provisions in lease documents. [5][C] = [5][A] − [5][B].

[6]: After-tax NPV of [5]. See Appendix 4 for details. [6][D] = [6][A] − [6][B].

[7]: Sum of the differences in after-tax NPV figures from rows [1], [3], and [5].

[8]: After-tax risk-free rate, based on cumulative yield on U.S. ten-year treasury bonds since the valuation date.

[10] = [7] × (1 + [8]) ^ [9]) − [7].

[11] = [7] + [10].

Totals may not sum due to rounding.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

**TABLE D-14: SUMMARY OF DAMAGES TO FRONTIER ARISING FROM LEASE FOR MSN 10452 (IN THOUSANDS OF DOLLARS), USING DEBT-BASED DISCOUNT RATE**



Sources and Notes:

[1]: "JSA Letter of Intent," FRONTIER0012136 at 137; "2020 Framework Agreement," FRONTIER0002829 at 873.  [1][C] = [1][A] − [1][B].

[2]: After-tax NPV of [1].  See Appendix 4 for details.  [2][D] = [2][A] − [2][B].

[3]: Sum of Undiscounted Pre-Tax Rent Payments; see Appendix 4 for details.  [3][C] = [3][A] − [3][B].

[4]: After-tax NPV of [3].  See Appendix 4 for details.  [4][D] = [4][A] − [4][B].

[5]: Calculated based on provisions in lease documents.  [5][C] = [5][A] − [5][B].

[6]: After-tax NPV of [5].  See Appendix 4 for details.  [6][D] = [6][A] − [6][B].

[7]: Sum of the differences in after-tax NPV figures from rows [1], [3], and [5].

[8]: After-tax risk-free rate, based on cumulative yield on U.S. ten-year treasury bonds since the valuation date.

[10] = [7] × (1 + [8]) ^ [9]) − [7].

[11] = [7] + [10].

Totals may not sum due to rounding.

## VI.    RESPONSES TO CRITICISMS RAISED BY DEFENDANTS' EXPERT

77.   In a report dated October 7, 2022, Rikard de Jounge, who has been engaged by Defendants, commented on my initial damage assessment.[57]  At trial, I plan to testify as to why the comments and criticisms he made are either incorrect or irrelevant.

---

[57]    De Jounge Expert Report.

DECLARATION OF DR. KEVIN NEELS                                                                          39

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

A.    MONTHLY BASIC RENT CALCULATION

78.    First, Mr. de Jounge offered in his report an alternative "strict" interpretation of the swap rate formula used in calculating the basic rent amount.[58]  He opines that the base rent for the JSA leases would be significantly lower, by more than ███████ per aircraft <u>per month</u>.[59]  Based partially on this finding, he estimated Frontier's damages to be significantly lower, at ███████ ███████.[60]  This disagreement regarding the correct interpretation centers on whether or not the assumed and actual swap rate parameters should be interpreted in percentage or decimal form.

79.    There are two reasons why I have a high degree of confidence that Mr. De Jounge's "strict" interpretation is erroneous, and not what the parties intended.  First, his reading and subsequent implementation[61] would imply that the swap rate assumed in the letter of intent and leases was 0.596, or an implausibly high <u>59.6%</u>, rather then the 0.596% implied by my interpretation.  The former would be an unprecedentedly high interest rate, while the latter is much more in line with the range of interest rates that had been observed in recent history in the United States.[62]  The parties would have had no reason to set a benchmark swap rate anywhere near the ballpark of the number implied by Mr. de Jounge's interpretation.

80.    Second, the JSA leases actually took effect, and we can therefore directly observe how the parties *actually* interpreted the formula by which base rates were set.  Invoices from JSA to Frontier indicate that the actual monthly rents are indeed ███████ per month for aircraft MSN 10384, and ███████ per month for aircraft MSN 10452.[63]  These amounts are

---

58    De Jounge Expert Report, ¶ 14, 24-25.

59    Specifically, Mr. de Jounge states that for aircraft MSNs 10384 and 10452: "I calculate the 144-month fixed monthly Basic Rents to be ███████ and ███████. Dr. Neels' cash flows assume ███████ and ███████" De Jounge Expert Report, ¶ 14.

60    De Jounge Expert Report, ¶ 16.

61    De Jounge Expert Report, ¶ 25.

62    To provide some further context, I looked at the historical swap rates from January 2010 through December 2020, as reported in Bloomberg.  Over that time frame, the values ranged from 0.4613 to 3.883, with an average value of 2.206.  I maintain that interest rates during this time ranged from 0.46% to 3.88%.  Mr. De Jounge's interpretation would imply that they ranged from 46% to 388% during that time period.

63    *See*, for example, FRONTIER0012328 ("Fixed Rent Invoice" for the rental period from April 30, 2021 to May 29, 2021, indicating that the monthly rent for Aircraft MSN 10384 is ███████) and FRONTIER0012332 ("Fixed Rent Invoice" for the rental period from May 29, 2021 to June 28, 2021, indicating that the monthly rent for Aircraft MSN 10452 is ███████).

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

consistent with my calculations and interpretation.  I expect that had either party interpreted the swap rate formula in a manner consistent with that of Mr. de Jounge, there would have been a dispute between the parties, given the large implications for the basic rent amount.  I am not aware of any such dispute.

## B.    THE CHOICE BETWEEN A DEBT-BASED DISCOUNT RATE AND WACC

81. Mr. de Jounge also disagrees with my conclusion that a debt-based discount rate is more appropriate in the current context than a WACC.[64]  Mr. de Jounge's explanation for his opinion does not address the substance of my reasoning for preferring a debt-based discount rate.[65]  As I have explained previously, it is well accepted that the choice of a discount rate must account for the specific risks of the stream of costs or payment under consideration.[66]  The damages in this case are driven by the difference between the but-for leases and the actual leases, which were both pre-specified by the terms of the relevant agreements, known in advance, and completely independent of the market shifts that might be expected to alter Frontier's revenues, expenses, or earnings.  This makes the cash flows fundamentally debt-like and less risky than the use of a WACC would imply.  Mr. de Jounge's opinion is largely unsubstantiated and unconvincing.  I maintain, despite whatever discount rates Mr. de Jounge and others might have used in decidedly different contexts, that a debt-based discount rate is most appropriate to use here, given the nature of the cash flows at issue.

## C.    THE VALUE OF FRONTIER'S WACC

82. Although I believe that a debt-based discount rate is most appropriate given the facts of this case, because it is common in circumstances such as this to discount a business entity's damages using its weighted average cost of capital, I presented an alternative calculation of

---

[64]    De Jounge Report, ¶ 17.

[65]    Mr. de Jounge simply states that "leasing is a means of financing assets and supposedly once could refer to it as 'debt-like', but this complaint is about damages and how to quantify time value of past and future monetary damages."

[66]    Neels Expert Report, ¶ 26.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

damages using WACC, both in my Expert Report (where I used a statistically-derived value of 7.09%) and below (where I use a value of 1.8405%, sourced from a third-party authority).[67]

83. Mr. de Jounge proposes a significantly higher WACC of 12%, which is based on two factors: a) the deposition testimony of two Frontier fact witnesses, who both responded that 10% is a standard discount factor used by Frontier; and b) at the time of Mr. De Jounge's report, interest rates had risen and, as of the time of Mr. de Jounge's report in October of 2022, "WACCs are getting higher."[68]  He concludes by assuming a WACC of 12%.

84. There are two key problems with Mr. de Jounge's rationale and his conclusions.  First, an approximate rule-of-thumb discount rate commonly used by Frontier in internal decision-making is not equivalent to an after-tax WACC.  Despite this obvious fact, Mr. de Jounge implicitly equates the two.  Firms and individuals within firms often use approximate discount rates to inform internal decision-making.  But for more precise and accurate values of a Company's cost of capital, it is essential to rely on financial data that reflect the company's financial structure and financial market conditions as of the time of interest.  In relying on information, reported in Bloomberg, that reflected Frontier's after-tax cost of capital around the time of the termination, I have done just that.

85. Second, Mr. de Jounge's basis for inflating Frontier's WACC to 12% violates a widely-accepted principle of damages calculations and, furthermore, is imprecise.  In relying on a discount rate informed by the general increase in interest rates over a period of more than 2 years *after* the harm was incurred, Mr. de Jounge is in effect using hindsight to penalize Frontier and benefit his client.  However, as respected economists have argued in similar settings, where the objective is to make the plaintiff "whole" and "in the financial position that would have been occupied had the violation not taken place," it is correct to rely solely on information that was known at the time the harm was incurred.[69]  Furthermore, Mr. de Jounge

---

[67]  Neels Expert Report, Table 9 and ¶ 72.

[68]  De Jounge Report, ¶ 28, 32-35.  I note that Mr. de Jounge mischaracterizes the deposition testimony he relies on, as both witnesses he cites answer question about discount rates and not WACC.  Whether the two terms are synonymous depends on the context.

[69]  Fisher, F. M., & Romaine, R. C. (1990). Janis Joplin's Yearbook and the Theory of Damages. Journal of Accounting, Auditing & Finance, 5(1), 145–157. https://doi.org/10.1177/0148558X9000500114.  Here, the

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

offers no facts, argument or other explanation as to how or why the increase in risk-free treasury rates from 1.5% to 4% over a 12-month period translates into in an exact 2% increase in the WACC.[70]

86.    Mr. de Jounge also makes certain comments on the regression analysis I used in my initial calculation of Frontier's WACC, and on the dataset I used in that analysis.[71]  Both his comments and the implications of his comments are unclear.  For example, he did not perform an alternative regression analysis to show whether or how the factors he discusses affected the resulting measure of WACC.  Moreover, given the fact that that I have amended my opinion that the most reliable measure of WACC—which I reiterate is less appropriate than the debt-based discount rate—is the value I found in Bloomberg for calendar year 2020, I do not intend to address his comments on my regression analysis.

### D.    THE VALUATION DATE

87.    Finally, Mr. de Jounge opines that the damages do not start at the time that the agreement was terminated but rather, for each aircraft and lease, at the date of the first security payment.[72]  Consequently, according to Mr. de Jounge, the valuation date should not be May 8, 2020, but should vary by aircraft, with cash flows discounted back to that first security payment date, before being brought forward to "an appropriate date."  I disagree that the valuation date should correspond to the realization of the first payments under the substitute leases, for the simple reason that Frontier was exposed to risk as of the termination date.  It is therefore appropriate for the valuation calculation to apply a discount rate for this longer period.[73]  I also note that the average after-tax risk-free rate between the termination date and the security payment dates are uniformly lower than the values I considered using to discount the cash flows back to May

---

authors explain that it is appropriate to choose a "discount rate…(or other rate associated with the riskiness of the stream) *as of the time of violation"* (emphasis as in the original).

[70]    In fact, the Exhibit Mr. de Jounge relies on indicates that the rate in question never achieved 4%, and had in fact fallen to 3.67% as of the time he prepared the exhibit.[70] De Jounge Report, Exhibit 2.

[71]    De Jounge Report, ¶ 29-31.

[72]    De Jounge Report, ¶ 18.

[73]    The elapsed time between the termination date and the first security payment date varies by aircraft, from roughly three months to roughly a year.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

2020.  Therefore, an alternative approach such as he suggests that uses the security payment dates instead of the termination date would, all things equal, *increase* the damages amount.

## VII.   CONCLUSIONS

88.  Table D-15 summarizes the information presented above, and calculates the total injury to Frontier from AMCK's termination of the Framework Agreement, and the amount that should be paid to Frontier to compensate it fully for the economic injury it has suffered.

**TABLE D-15: PRESENT VALUE OF DAMAGES (IN THOUSANDS OF DOLLARS), AS OF SEPTEMBER 21, 2023**



Sources and Notes:

[1] − [5]: See Table D-10, Table D-11, Table D-12, Table D-13, and Table D-14.

[6]:  Sum of [1] through [5].

[7]:  Tax Rate.  See calculation in Table D-8, Row [3].

[8] = [6] × [7] / (1 − [7]).

[9] = [6] + [8].

The values in this chart reflect the use of a 2020 value for the after-tax cost of debt (1.0445%) as the discount rate, as reported by Bloomberg.

89.  As I discussed above, all of my damages calculations have been carried out on an after-tax basis, and are designed to compute the after-tax injury Frontier has suffered.  Any damage award will be taxable, and the taxes paid on the award must thus be taken into account if

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

Frontier is to be fully compensated for its injury.  The correct way to do this is to divide Frontier's after-tax damages by one minus its tax rate. Table D-15 performs this calculation.

90.   Based on these calculations and the economic reasoning discussed above, I conclude that the total amount that must be paid to Frontier in order to compensate it for its injury and make it whole–if that payment were to be made today–is $47.780 million.

91.   Table D-16 presents the results of an alternative calculation that relies upon a WACC based discount.  In the event that the Court determines that a WACC-based discount rate is appropriate, the total amount that must be paid to Frontier today in order to compensate it for its injury and make it whole is $46.058 million.

**TABLE D-16: ALTERNATE DAMAGES SUMMARY BASED ON WACC (IN THOUSANDS OF DOLLARS), AS OF SEPTEMBER 21, 2023**



Sources and Notes:

[1] − [5]: See Appendix 4, Exhibits D-7, D-9, D-11, D-13, and D-15.

[6]:  Sum of [1] through [5].

[7]:  Tax Rate.  See calculation in Table D-8, Row [3].

[8] = [6] × [7] / (1 − [7]).

[9] = [6] + [8].

The values in this chart reflect the use of a 2020 value for the after-tax WACC (1.8405%) as the discount rate, as reported by Bloomberg.

CONFIDENTIAL DECLARATION SUBJECT TO THE PROTECTIVE ORDER

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 21st day of September, 2023.

_____
Dr. Kevin Neels