**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FRONTIER AIRLINES, INC.,

                        Plaintiff,

     v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION (TWO)
LIMITED, WELLS FARGO TRUST COMPANY,
N.A., solely in its capacity as OWNER TRUSTEE,
and UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE,

                        Defendants.

20 Civ. 9713 (LLS)

---

**DEFENDANTS' TRIAL BRIEF**

Dated: September 21, 2023

                                 Jeff E. Butler
                                 John P. Alexander
                                 Gege Weinberg
                                 CLIFFORD CHANCE US LLP
                                 31 West 52nd Street
                                 New York, New York 10019

                                 *Attorneys for Defendants*

# TABLE OF CONTENTS

Page

Introduction...................................................................................................................1

Argument .....................................................................................................................2

I.    THE COURT SHOULD FIND FOR DEFENDANTS ON
      FRONTIER'S REMAINING CLAIM FOR BREACH OF THE
      FRAMEWORK AGREEMENT...............................................................2

      A.    Frontier's Non-Payment of Lease Rent Was a Framework
            Event of Default..........................................................................2

      B.    There Was No Rent Deferral Agreement or Waiver. ..................3

            1.    The Parties Did Not Reach Agreement on a Rent Deferral............3

            2.    Any Oral Agreement to Defer Rent Would Be Unenforceable. ......5

            3.    There Was No Waiver of Rent Payment Obligations....................7

      C.    Issues Raised by Frontier Are Not Relevant.................................8

            1.    AMCK's Alleged "Course of Conduct" Is Not Relevant. ..............8

            2.    AMCK's Alleged Motives Are Not Relevant................................9

      D.    Accipiter and Vermillion Cannot Be Liable for Breach of the
            Framework Agreement. ...........................................................10

II.   FRONTIER'S DAMAGES EXPERT SHOULD BE EXCLUDED....................11

      A.    Dr. Neels' "After Tax" Measurement of Damages....................11

      B.    The Court Should Reject Dr. Neels' Flawed Methodology........12

III.  AMCK'S COUNTERCLAIM FOR INDEMNIFICATION
      SHOULD BE RESOLVED IN POST-TRIAL PROCEEDINGS..........................15

Conclusion .................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)...........................................................................13

*Baraliu v. Vinya Cap., L.P.*,
    765 F. Supp. 2d 289 (S.D.N.Y. 2011)...............................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)...................................................................................2, 13

*EchoStar Satellite, LLC v. ESPN, Inc.*,
    79 A.D.3d 614 (1st Dep't 2010) ........................................................................7

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004).............................................................................2

*Eujoy Realty Corp. v. Van Wagner Commcn's*,
    22 N.Y.3d 413 (2013) ......................................................................................6

*Faulkner v. Nat'l Geographic Soc.*,
    452 F. Supp. 2d 369 (S.D.N.Y. 2006)...............................................................4

*Ferring B.V. v. Allergan, Inc.*,
    4 F. Supp. 3d 612 (S.D.N.Y. 2014)..................................................................10

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
    7 N.Y.3d 96 (2006) ..........................................................................................7

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997).......................................................................................12

*Gertler v. Sol Masch & Co.*,
    40 A.D.3d 282 (1st Dep't 2007) .....................................................................13

*Glencore Ltd. v. Degussa Engineered Carbons L.P.*,
    848 F. Supp. 2d 410 (S.D.N.Y. 2012)...............................................................4

*Golfo v. Kycia Assocs., Inc.*,
    45 A.D.3d 531 (2d Dep't 2007) ........................................................................7

*Held v. Kaufman*,
    91 N.Y.2d 425 (1998) .......................................................................................5

*HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*,
   994 F. Supp. 2d 520 (S.D.N.Y. 2014)......................................................... 9

*In re Houbigant Inc.*,
   914 F. Supp. 964 (S.D.N.Y. 1995)........................................................ 10-11

*Ixe Banco, SA. v. MBNA Am. Bank, NA.*,
   No. 07 Civ. 432, 2008 WL 650403 (S.D.N.Y. Mar. 7, 2008) ................................. 10

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
   29 F.4th 118 (2d Cir. 2022) ................................................................. 9

*Krumme v. WestPoint Stevens Inc.*,
   143 F.3d 71 (2d Cir. 1998)................................................................... 3

*Merrill Lynch Interfunding, Inc. v. Argenti*,
   155 F.3d 113 (2d Cir. 1998).................................................................. 6

*Omega Engineering, Inc. v. Omega, S.A.*,
   432 F.3d 437 (2d Cir. 2005).................................................................. 4

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004).................................................................. 3

*Rossrock Fund II, L.P. v. Osborne*,
   82 A.D.3d 737 (2d Dep't 2011)............................................................... 7

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
   No. 97 Civ. 5499, 2004 WL 691680 (S.D.N.Y. Mar. 31, 2004) ............................... 4

*Solin v. Domino*,
   501 F. App'x 19 (2d Cir. 2012) ............................................................ 13

*Stonehill Cap. Mgmt., LLC v. Bank of the W.*,
   28 N.Y.3d 439 (2016) ....................................................................... 3

*Sugerman v. MCY Music World, Inc.*,
   158 F. Supp. 2d 316 (S.D.N.Y. 2001)......................................................... 3

*Summit Health v. APS Healthcare Bethesda, Inc.*,
   993 F. Supp. 2d 379 (S.D.N.Y. 2014)......................................................... 7

*Teledata Tech. Sols., Inc. v. Sandton Fund Assignments*, LLC,
   172 A.D.3d 527 (1st Dep't 2019) ........................................................... 10

*This is Me, Inc. v. Taylor,*
    157 F.3d 139 (2d Cir. 1998)................................................................. 10

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.,*
    894 F.2d 516 (2d Cir. 1990)............................................................... 5, 6

*TVT Records v. The Island Def Jam Music Group,*
    412 F.3d 82 (2d Cir. 2005)................................................................. 11

*V.S. Int'l, S.A. v. Boyden World Corp.,*
    862 F. Supp. 1188 (S.D.N.Y. 1994)...................................................... 2

*Winston v. Mediafare Entertainment Corp.,*
    777 F.2d 78 (2d Cir. 1986).................................................................. 4

<u>Statutes</u>

N.Y. Gen. Oblig. § 15-301........................................................................ 5

N.Y. U.C.C. § 2-A-208............................................................................. 5

<u>Rules</u>

Fed. R. Evid. 702.................................................................................... 12

Defendants AMCK Aviation Holdings Ireland Limited ("AMCK"), Accipiter

Investments Aircraft 4 Limited ("Accipiter") and Vermillion Aviation (Two) Limited

("Vermillion") submit this Trial Brief pursuant to Section 4 of the Court's Individual Practices.

The other named Defendants in this action were dismissed in the Court's July 6, 2023 Opinion &

Order (the "Opinion & Order").  Capitalized terms used herein and not otherwise defined have

the meaning given them in the parties' Joint Pretrial Order.

### Introduction

This Trial Brief sets forth the legal framework applicable to the remaining claim of

Plaintiff Frontier Airlines, Inc. ("Frontier") for breach of the Framework Agreement.  In

particular, we address the legal standards and case law relevant to (1) mutual agreement to

modify a contract, (2) enforceability of an oral modification when the parties have agreed that

any modification must be in writing and (3) unilateral waiver of a contractual right and

withdrawal of a waiver.  These issues are relevant to Frontier's assertions that AMCK and

Frontier agreed to defer rent payments due under lease agreements or, in the alternative, that

AMCK waived the right to timely payment of those amounts.  As will be shown at trial, AMCK

and Frontier did not reach agreement on rent deferral and AMCK did not waive its right to

timely payment.  Accordingly, AMCK had the right to terminate the Framework Agreement on

May 8, 2020 based on Frontier's failure to pay lease rent due in April and early May.

This Brief also addresses certain evidentiary issues that Defendants expect to raise, either

through pretrial motions in limine or during the course of the trial.  For example, Frontier seeks

to introduce evidence in support of arguments that the Court has already rejected in the Opinion

& Order.  Frontier also seeks to introduce evidence concerning AMCK's motivation for

terminating the Framework Agreement, which is not relevant to the issue of whether AMCK had

the right to terminate.  Finally, Frontier's damages expert, Dr. Kevin Neels, uses a flawed and

unreliable "after tax" methodology for calculating damages, which should be rejected as a matter of law under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

<u>Argument</u>

## I.    THE COURT SHOULD FIND FOR DEFENDANTS ON FRONTIER'S REMAINING CLAIM FOR BREACH OF THE FRAMEWORK AGREEMENT.

As set forth in the Opinion & Order, the only claim remaining in the case is Frontier's Second Claim for breach of the Framework Agreement.  Under New York law, a plaintiff claiming breach of contract must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).  As the plaintiff, Frontier bears the burden of proof on these issues.  *See, e.g., V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994) ("In this breach of contract action, plaintiffs have the burden of proving the material allegations in the complaint by a fair preponderance of the evidence.").

Defendants' proposed findings of fact on these matters are included in the parties' Joint Pretrial Order.  Defendants' proposed conclusions of law are set forth below.

### A.    Frontier's Non-Payment of Lease Rent Was a Framework Event of Default.

The Framework Agreement allows AMCK to terminate in the event of a "Framework Event of Default" by Frontier.  Failure to pay rent under the Original Leases qualifies as such a default.  Specifically, a Framework Event of Default includes a default under the MSN 10038 Lease.  The MSN 10038 Lease specifies that Frontier's failure to pay rent under any "Other Agreement" constitutes a default.  The definition of "Other Agreement" encompasses each of the 14 Original Leases.

The evidence will show that Frontier did not pay rent under the Original Leases when due

during the month of April 2020 and the first week of May 2020.  To avoid a Framework Event of Default, Frontier would have to show either an agreement to defer rent or a waiver of timely payment by AMCK.  The evidence at trial will show there was no such agreement or waiver. Thus, the Court should conclude there was a Framework Event of Default and AMCK had the right to terminate the Framework Agreement on May 8, 2020.

**B.    There Was No Rent Deferral Agreement or Waiver.**

Frontier has argued that the parties "agreed to defer rent" on the Original Leases "while negotiations were ongoing" regarding Frontier's request for a rent deferral.  The evidence will show that there was no written agreement to this effect.  The evidence will also show that there was no oral deferral agreement or express waiver.

**1.    The Parties Did Not Reach Agreement on a Rent Deferral.**

Under New York law, a binding agreement requires "an offer, acceptance, consideration, mutual assent and intent to be bound."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (internal quotation marks omitted).  There must be a "meeting of the minds," which entails "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448–49 (2016) (internal quotation marks omitted).  "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 324 (S.D.N.Y. 2001) (internal quotation marks omitted).

Relatedly, "[u]nder New York law, an acceptance must comply with the terms of the offer," and so, "[a] proposal to accept the offer if modified or an acceptance subject to other terms and conditions is equivalent to an absolute rejection of the offer."  *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (internal quotation marks and alterations omitted).

Thus, even if the parties' proposals overlapped in some respects, this does not mean there was "a partial agreement with regards to the overlapping terms; there is simply no agreement." *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499, 2004 WL 691680, at *17 (S.D.N.Y. Mar. 31, 2004).

Moreover, "only objective manifestations of intent are relevant under New York law." *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 377 (S.D.N.Y. 2006). Thus, "any subjective views of the parties as to the existence of a binding contract are irrelevant, as it is long-settled that a contract has . . . nothing to do with personal, or individual, intent of the parties." *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 424 (S.D.N.Y. 2012) (internal quotation marks omitted).

In determining whether the parties intended to be bound without a written document, courts consider several factors, including:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80-81 (2d Cir. 1986); *see also Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005).

Applying these principles, the evidence at trial will show that the parties did not reach any binding agreement to defer rent due in April and early May 2020. The parties *discussed* a "month-to-month" deferral of rent during a telephone call on April 7, 2020. This proposed deferral would have lasted, at least initially, to the end of April, but no meeting of the minds was reached on the material terms of such an agreement. Indeed, both sides expected a month-to-month deferral to be documented in writing, as is the normal practice in the aircraft leasing business. Consistent with this, on April 9, 2020, AMCK sent Frontier a draft forbearance

agreement that would effectively defer rent through the end of April, but Frontier never

responded to AMCK's proposal.  Thus, the Court should conclude that no agreement on rent

deferral was reached.

### 2. Any Oral Agreement to Defer Rent Would Be Unenforceable.

Even if the parties had reached an oral agreement regarding rent deferral, any such

agreement would be unenforceable.  The Framework Agreement provides:

> The rights of both parties against the other or in relation to the Aircraft
> (whether arising under this Agreement or the general law) shall not be
> capable of being waived or varied otherwise than by an express waiver or
> variation in writing; and in particular any failure to exercise or any delay in
> exercising any such rights shall not operate as a waiver or variation of that
> or any other such right; any defective or partial exercise of any of such
> rights shall not preclude any other or further exercise of that or any other
> such right; and no act or course of conduct or negotiation on the part of such
> party or on its behalf shall in any way preclude it from exercising any such
> right or constitute a suspension or any variation of any such right.

The Framework Agreement further states that "[t]he provisions of this Agreement shall not be

varied otherwise than by an instrument in writing executed by or on behalf of AMCK Aviation

and Frontier."  The lease agreements have substantially similar clauses.

Such clauses are enforceable.  *See Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,

894 F.2d 516, 521-22 (2d Cir. 1990); *see also* N.Y. Gen. Oblig. 15-301 ("A written agreement or

other written instrument which contains a provision to the effect that it cannot be changed orally,

cannot be changed by an executory agreement unless such executory agreement is in writing and

signed by the party against whom enforcement of the change is sought or by his agent."); N.Y.

U.C.C. § 2-A-208(2).

A party seeking to avoid such a clause has the "burden to submit evidentiary facts taking

the agreement outside the Statute of Frauds, by exception or otherwise."  *Held v. Kaufman*, 91

N.Y.2d 425, 433 (1998).  As relevant here, there are two exceptions to the Statute of Frauds.

*First*, "an oral modification may be enforced when there has been partial performance of the agreement to modify, so long as the partial performance is unequivocally referable to the oral modification." *Towers*, 894 F.2d at 522 (internal quotation marks omitted). *Second*, a party may be equitably estopped from invoking such a clause when it has "induced another's significant and substantial reliance upon an oral modification, and if the conduct relied upon is not otherwise compatible with the agreement as written." *Baraliu v. Vinya Cap., L.P.*, 765 F. Supp. 2d 289, 298 (S.D.N.Y. 2011). As the Second Circuit has explained:

> Thus, for either exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written.

*Towers*, 894 F.2d at 522.

The "unequivocally referrable" requirement means that the "action taken must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (internal quotation marks omitted). In addition, acts taken "before the time the oral agreement was reached" or that are "explainable as preparatory steps taken with a view toward consummation of an agreement in the future" are insufficient. *Id.* (internal quotation marks omitted).

Finally, a party cannot point to its own non-performance of the contract as evidence of partial performance or reliance. *See Eujoy Realty Corp. v. Van Wagner Commcn's*, 22 N.Y.3d 413, 426-27 (2013) ("[Defendant's] payment of prorated rent in lieu of the annual basic rent was just as demonstrative of breach of contract as of completion of the purported oral modification. General Obligations Law § 15–301 becomes meaningless if a tenant's nonpayment of the rent required by a lease is sufficient to prove an oral modification of payment terms, or estop the landlord from recovering the shortfall.").

Here, the evidence will show that there is no basis to disregard the contractual bar on oral

modification.  Therefore, even if Frontier could prove the parties reached an oral agreement, the Court should conclude that the oral agreement is unenforceable.

### 3.    There Was No Waiver of Rent Payment Obligations.

Contract rights may be waived only when they are "knowingly, voluntarily and intentionally abandoned" through a "clear manifestation of intent." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006) (internal quotation marks omitted).  Waiver cannot be inferred from "a doubtful or equivocal act." *EchoStar Satellite, LLC v. ESPN, Inc.*, 79 A.D.3d 614, 617 (1st Dep't 2010); *see also Golfo v. Kycia Assocs., Inc.*, 45 A.D.3d 531, 533 (2d Dep't 2007) ("A waiver is not created by negligence, oversight, or thoughtlessness, and cannot be inferred from a mere silence." (internal quotation marks omitted)).  In addition, the Framework Agreement provides that a waiver must be "express," and that "no act or course of conduct or negotiation" can constitute a waiver.  (*See* Opinion & Order, at 23 n.1 (noting that the Framework Agreement "expressly forbids a waiver by course of conduct").)

Even if a waiver has occurred, a waiver may be withdrawn "as long as the counterparty receives notice of the withdrawal and is given a reasonable time to perform."  *Summit Health v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 400 (S.D.N.Y. 2014) ("The party asserting waiver . . . bears the burden of demonstrating both that there was a valid waiver and that such waiver was not withdrawn.").  A withdrawal can be accomplished by correspondence making clear the party's intention to enforce the contract.  *See Rossrock Fund II, L.P. v. Osborne*, 82 A.D.3d 737, 738 (2d Dep't 2011).

There is no dispute that AMCK did expressly waive the timely payment of rent for the time period from April 6, 2020 to April 21, 2020.  This is set forth in an email from AMCK's CEO, Paul Sheridan.  The evidence at trial will show that there was no other express waiver of

Frontier's obligation to make timely rent payments.  In addition, to the extent anything said on the April 7, 2020, telephone call could be construed as an express waiver, such waiver was withdrawn on April 9, 2020, when AMCK sent a draft forbearance agreement indicating that, absent agreement, AMCK expected Frontier to be bound by the lease terms.

### C.    Issues Raised by Frontier Are Not Relevant.

Several of Frontier's proposed findings of fact and proposed exhibits indicate that Frontier intends to argue certain issues at trial that are not relevant to the claim remaining in this case.  For the reasons discussed below, the Court should exclude or disregard such evidence.  AMCK expects to raise these issues with the Court as motions in limine or at trial.

### 1.    AMCK's Alleged "Course of Conduct" Is Not Relevant.

In its pretrial submissions, Frontier points to AMCK's alleged conduct during the parties' discussions as evidencing an agreement to defer rent.  For instance, Frontier asserts that AMCK did not "chase" Frontier with reminders about rent payment obligations during the course of negotiations, which supposedly "confirmed to Frontier that the parties had reached a month-to-month rent deferral/waiver."  (*See, e.g.*, Frontier Proposed Findings of Fact, Nos. 37, 38.)

However, as the Court has already ruled, this argument fails as a matter of law.  Specifically, in the Opinion & Order, the Court explained:

> Frontier argues that AMCK's course of dealing during the negotiation period is evidence of AMCK's consent to the rent deferral.  Frontier primarily relies on the fact that AMCK ceased sending chase alerts to Frontier to notify it that rent was past due, as AMCK had allegedly done so habitually for all other rents that became due proceeding and following the period of negotiation.  While a party, in general, may waive its contractual rights through its subsequent course of conduct, the Framework Agreement expressly forbids a waiver by course of conduct.  Frontier's argument thus fails as a matter of law.

(Opinion & Order, at 23 n.1 (internal citations and quotation marks omitted).  Therefore, this course of conduct evidence is not relevant and should be excluded or disregarded.

## 2.    AMCK's Alleged Motives Are Not Relevant.

Frontier also apparently intends to argue that AMCK had an ulterior motive for terminating the Framework Agreement.  Specifically, Frontier contends that AMCK soured on the terms of the Framework Agreement and was looking for an excuse to terminate.  (*See, e.g.*, Frontier's Proposed Findings of Fact, Nos. 18, 19.)  Even if this were true, it is legally irrelevant.

It is well-settled that "[a]s long as a party has the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract."  *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 537 (S.D.N.Y. 2014) (internal quotation mark omitted); *see also JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 126 (2d Cir. 2022) ("As the district court aptly held, because [defendant] properly exercised its contractual right to terminate the [] Agreement, its motives for doing so are irrelevant." (internal quotation marks and alterations omitted)).  Therefore, if Frontier's non-payment of rent constituted a Framework Event of Default, AMCK had every right to terminate regardless of its subjective motivations for doing so.

Along similar lines, evidence of AMCK's alleged repudiation of the Framework Agreement also is irrelevant.  For instance, Frontier repeatedly argues that AMCK was "exploring ways to get out of the Framework Agreement or renegotiate its material terms," and that AMCK "would not honor the Framework Agreement" if Frontier did not agree to various "conditions."   (*See, e.g.*, Frontier's Proposed Findings of Fact, Nos. 16, 17, 20.)  However, as the Court has already ruled, "[n]o reasonable fact finder could find that the Framework Agreement was repudiated."  (Opinion & Order, at 21.)

In short, the trial of the remaining claim should focus on whether there was an agreement or express waiver.  Evidence concerning AMCK's motivation for terminating or the

reasonableness of its negotiating position should be excluded or disregarded.

>    **D.    Accipiter and Vermillion Cannot Be Liable for Breach of the Framework Agreement.**

Accipiter and Vermillion are not parties to the Framework Agreement. At trial, the evidence will show that the parties did not intend the Framework Agreement to be binding on Accipiter or Vermillion.

"It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) (internal quotation marks omitted). This is so even with respect to related corporate entities. Indeed, "New York law respects corporate separateness," and so a plaintiff seeking to hold nonparty affiliates liable must meet the "heavy burden" of piercing the corporate veil. *Ixe Banco, SA. v. MBNA Am. Bank, NA.*, No. 07 Civ. 432, 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008).

It is also true under New York law that "all writings forming part of a single transaction are to be read together." *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). However, reading agreements together does not mean that a party to one related agreement is necessarily liable for all obligations under all the related agreements. As the First Department has explained:

>    While the contemporaneous agreements should be read together, that does not support plaintiffs' claims, which would require the court to rewrite the agreements to add obligations that are not included in the agreements. Plaintiffs err in their attempt to rewrite the agreements by suggesting that reading them together creates mutual rights and duties between all parties even though not all the parties signed each agreement or assumed the same duties under the agreements.

*Teledata Tech. Sols., Inc. v. Sandton Fund Assignments*, LLC, 172 A.D.3d 527, 527 (1st Dep't 2019) (internal citations omitted)); *see also In re Houbigant Inc.*, 914 F. Supp. 964, 994-95 (S.D.N.Y. 1995) ("While ACB has cited several sources which accurately stand for the

proposition that where two or more writings are executed as part of the same general transaction, they are to be read together as part of the same agreement, it has pointed to no authority for imposing a duty of good faith and fair dealing on a party who is not a party to the particular contract, even where there are several contracts that are part of the same transaction.").[1]

For these reasons, the Court should conclude that Accipiter and Vermillion are not liable for any breach of the Framework Agreement.

## II.    FRONTIER'S DAMAGES EXPERT SHOULD BE EXCLUDED.

Frontier intends to offer expert testimony from Dr. Kevin Neels on the issue of damages. Such testimony would be relevant only if the Court concludes that AMCK breached the Framework Agreement.  For the reasons discussed below, the Court should exclude Dr. Neels' testimony as unreliable.

### A.    Dr. Neels' "After Tax" Measurement of Damages.

Frontier claims damages in this case based on the difference between the economic terms of the Framework Agreement and the replacement contracts Frontier entered with two other leasing companies.  This involves determining the cash flows associated with each set of terms over a 12-year time period.  In calculating Frontier's damages, Dr. Neels purports to calculate the net present value of these cash flows as of the date AMCK terminated the Framework Agreement.  (Neels Report ¶¶ 25, 29.)

Dr. Neels attempts to do this calculation on an *after tax* basis.  (*Id.* ¶ 30.)  To do this, he

---

[1] The Second Circuit addressed a different question in *TVT Records v. The Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005).  In that case, plaintiff alleged a tortious interference claim against defendant.  However, the contract at issue was part of a larger transaction to which defendant was a party.  Because defendant was no "stranger" to the contract, it could not be liable for interference.  *Id.* at 88-90.  The Second Circuit did not address which obligations belonged to defendant under which agreement.

applies an "effective tax rate" to the relevant cash flows.  (*Id.* ¶ 60.)  The tax rate used is 22.8%, which was Frontier's effective tax rate for 2019.[2]  He chose that year because it was "the latest year unaffected by the pandemic, and the only year in the company's public financials for which it reported a positive tax liability."  (*Id.* ¶ 60; Neels Tr. 87:24-88:6-89:7, 91:10-15.)  He applies this 2019 tax rate to cash flows in each of the years from 2020 to 2032.  (Neels Tr. 86:14-87:3.)

Finally, after purporting to calculate an after tax damages figure, Dr. Neels adjusted the total amount of damages upward using the same 22.8% tax rate in order to account "for the tax consequences of the damage award itself."  (Neels Report ¶ 45; Neels Tr. 118:7-119:9.)

**B.  The Court Should Reject Dr. Neels' Flawed Methodology.**

Under Rule 702 of the Federal Rules of Evidence, an expert may offer an opinion if:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Courts are not required to admit expert opinion that is "connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Rather, courts must assess an expert's reliability, and generally consider the following factors:

> (1) whether a theory or technique "can be (and has been) tested";
> (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted; quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).  Notably, "it is

---

[2] Specifically, this rate results from a comparison of the "income before income taxes" and "income tax expense" reflected in Frontier's public filings.  (*See* Neels Report ¶ 60; Neels Tr. 76:21-77:21, 79:8-15.)  Dr. Neels does not know what (if any) taxes Frontier actually paid in 2019 or any other year.  (Neels Tr. 75:12-76:2; 77:22-79:20.)

critical that an expert's analysis be reliable at every step," and "*any* step that that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*." *Id.* at 267 (emphasis in original; quotation marks omitted).

Here, Dr. Neels' novel approach of calculating damages on an after tax basis is inherently flawed and should be rejected as unreliable.

*First*, as a legal matter, New York law generally does not allow for the recovery of tax liability as part of a damages award. *See, e.g., Solin v. Domino*, 501 F. App'x 19, 21–22 (2d Cir. 2012) ("[Plaintiff's] claim for malpractice damages fails because it falls within New York's proscription on the recovery of tax liability."); *Gertler v. Sol Masch & Co.,* 40 A.D.3d 282, 283 (1st Dep't 2007) ("[T]axes . . . are not recoverable under New York law."). Dr. Neels' methodology would involve the Court in a complex, multi-year determination of tax liability that should have no relevance to an award of damages in a breach of contract case.

*Second*, Dr. Neels' method of assessing tax effects in calculating damages is not generally accepted or supported by published authorities. As Dr. Neels conceded at his deposition, "most damages calculations are done on a pre-tax basis." (Neels Tr. 124:16-125:4.) He is not aware of any published literature endorsing an after tax approach for measuring damages in a breach of contract case. (*Id.* 72:17-73:7, 127:21-128:9.) Consistent with this, Dr. Neels testified that his own damages calculations in other breach of contract cases "probably" were done on a pre-tax basis. (*Id.* 70:24-71:12, 126:10-16.)

*Third*, even if calculating damages on an after tax basis could be deemed appropriate in some cases, Dr. Neels' methodology of using a single tax rate for 12 years of cash flows in this case is indefensible. This is because Frontier's effective tax rate varies significantly from year to year. The data needed to calculate effective tax rate is available in Frontier's public filings with

the SEC.[3]  The data from these documents and the calculation of effective tax rate are set forth in the following chart.

| Year | Income (Loss) in Millions | Tax Liability (Benefit) in Millions | "Effective Tax Rate" |
|------|---------------------------|--------------------------------------|----------------------|
| 2016 | 316 | 116 | 36.7% liability |
| 2017 | 248 | 86 | 34.6% liability |
| 2018 | 105 | 25 | 23.8% liability |
| 2019 | 325 | 74 | 22.8% liability |
| 2020 | (372) | (147) | 39.5% benefit |
| 2021 | (144) | (42) | 29.2% benefit |
| 2022 | (45) | (8) | 17.8% benefit |

Given that Frontier experienced a tax *benefit* in 2020, 2021 and 2022, applying a 22.8% tax rate to cash flows in those years is absurd.  Moreover, this data emphasizes the high degree of variability in Frontier's effective tax rate from year to year.  In these circumstances, the use of a single tax rate to calculate tax effects over a 12-year period is inherently unreliable.

Dr. Neels had no response to these critiques at his deposition.  He admitted that he is not a tax expert.  (*See* Neels Tr. 21:15-23:23, 78:2-4 ("I don't consider myself an expert in taxation, and I haven't done much work in it.").)  He conceded that he could not know with "any exactitude" what Frontier's tax rates would be in the future.  (*Id.* 90:12-91:9.)  He also stated—in

---

[3] Frontier's 2021 Registration Statement on Form S-1 (at p. 69) shows the figures necessary to calculate effective tax rates for 2016-2018.  Frontier's 2021 Annual Report on Form 10-K (at p. 96) shows the figures for 2019-2021, and the 2022 Annual Report on Form 10-K (at p. 89) shows the figures for 2022.  These filings are available at the SEC's website, available at: https://www.sec.gov/edgar/browse/?CIK=1670076&owner=exclude.

direct contrast to his own approach—that he would "feel more comfortable calculating damages on a pre-tax basis" if tax rates vary substantially over time. (*Id.* 129:3-130:4.)

For all these reasons, Dr. Neels' method of calculating the tax effect on cash flows should be rejected as unsupported and unreliable, and his opinion should be excluded under the *Daubert* standard.

## III.    AMCK'S COUNTERCLAIM FOR INDEMNIFICATION SHOULD BE RESOLVED IN POST-TRIAL PROCEEDINGS.

Under the Framework Agreement and each of the Lease Agreements, Frontier is required to indemnify AMCK for any expenses, including legal fees, in incurred in connection with the enforcement or preservation of rights relating to a default by Frontier. On this basis, AMCK has asserted a counterclaim for indemnification for the legal fees in this action arising from Frontier's defaults and the resulting termination of the Framework Agreement.

Because AMCK continues to incur legal expense—and expects to incur substantial additional expense at trial—AMCK proposes to address its counterclaim in post-trial submissions as the Court may direct, rather than during the trial itself.

### Conclusion

For the reasons set forth above, and based on the evidence to be presented at trial, the Court should enter judgment in favor of Defendants.

Dated: September 21, 2023            Respectfully submitted,
      New York, New York

        s/ Jeff E. Butler

Jeff E. Butler
John P. Alexander
Gege Weinberg
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
*Attorneys for Defendants*