## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FRONTIER AIRLINES, INC.                          Case No.:  1:20-cv-09713-LLS

                    Plaintiff,

        v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION
(TWO) LIMITED, WELLS FARGO TRUST
COMPANY, N.A., solely in its capacity as
OWNER TRUSTEE, and UMB BANK,
N.A., solely in its capacity as OWNER
TRUSTEE,

                    Defendants.

_____

## JOINT PRETRIAL ORDER

## <u>TABLE OF CONTENTS</u>

**Page**

A.    Agreed Findings of Fact. ........................................................................................1

B.    Plaintiff's Proposed Findings of Fact. ....................................................................5

C.    Defendants' Proposed Findings of Fact. ...............................................................20

D.    Joint List of Expert Witnesses. ............................................................................24

E.    Premarked Joint Exhibits Which the Parties Agree May Be Received in Evidence. ..............................................................................................................24

F.    Premarked Exhibits Which the Parties Do Not Agree May Be Received in Evidence, Together with the Basis for Objection and Citation to the Applicable Federal Rule of Evidence. ...................................................................24

G.    Type of Trial and Length of Trial. ........................................................................25

The parties, Plaintiff Frontier Airlines, Inc. (Frontier or Plaintiff) and Defendants AMCK Aviation Holdings Ireland Limited, Accipiter Investment 4 Limited, and Vermillion Aviation (Two) Limited (collectively, AMCK or Defendants) having exchanged proposed findings and counter-findings of fact in accordance with Rule 4(A)(4) of the Court's Individual Practices and the Court's Second Amended Scheduling Order (Dkt. 117), hereby submit the following:

## A.    Agreed Findings of Fact.

1.    Frontier is a Colorado-headquartered passenger airline that operates commercial passenger aircraft leased from various aircraft lessors.

2.    Jimmy Dempsey is the Executive Vice President and Chief Financial Officer of Frontier. Spencer Thwaytes is Frontier's former Vice President and Treasurer, reporting to Mr. Dempsey. Robert Fanning is Vice President of Fleet Transactions, responsible for overseeing the making of rent payments, and reporting to Mr. Dempsey. Sharath Sashikumar Bindu reports to Mr. Fanning, and is Frontier's manager of fleet and strategic sourcing with responsibility for approving payments.

3.    During the relevant timeframe, Defendant AMCK was an aircraft leasing company organized under the laws of Ireland and with its principal place of business in Ireland.

4.    During the relevant timeframe, Paul Sheridan was the Chief Executive Officer of AMCK, Jane O'Callaghan was the Chief Commercial Officer of AMCK, Ronan Kelleher was the Chief Financial Officer of AMCK, Michael McInerney was a Contract Manager with AMCK, Fabian Bachrach was a consultant with AirFinance Corporate and had been a commercial advisor for AMCK since January 2019, Ronan Murphy was the Vice President of Strategy and Planning with AMCK, Gerald Ma was an Executive Committee Member at CK Assets Holdings, which was one of AMCK's shareholders, and a member of the AMCK Board of Directors, and Francis Lee

was a Chief Manager of Corporate Business Development at CK Assets Holdings, reporting to Mr. Ma, and served as an alternative member of the AMCK Board of Directors.

5.      Frontier relies on sale and leaseback (SLB) arrangements—a common method used by airlines to finance new aircraft acquisitions—for 100% of its fleet.

6.      An SLB arrangement is comprised of multiple parts: First, an airline (such as Frontier) has an existing purchase agreement with an airline manufacturer (such as Airbus), which obligates the airline to take delivery of aircraft pursuant to a delivery schedule. The airline makes pre-delivery payments (PDP) to the manufacturer as the construction of each aircraft progresses. Second, around six months prior to an aircraft delivery, the airline enters a SLB arrangement with an aircraft lessor (such as AMCK, or an affiliate) in which the lessor agrees to (i) buy the aircraft from the manufacturer when the aircraft delivers and (ii) simultaneously lease the aircraft to the airline in return for monthly rent payments. The purchase price and rent payments of the aircraft are negotiated solely between the airline and the lessor. Third, shortly before or on the date of delivery, the lessor pays the purchase price to the manufacturer and takes title to the aircraft; the airline accepts delivery of the aircraft from the lessor under the lease; and the airline begins making monthly rent payments to the lessor. Depending on the purchase price, the airline may receive a refund from the manufacturer for PDP overpayments.

7.      Until the lessor pays the manufacturer, the airline remains responsible for purchasing the aircraft and will not receive any PDP overpayment refunds. If the lessor fails to pay, the airline must use its own funds, enter an SLB arrangement with another lessor, or risk defaulting on its purchase agreement with the manufacturer.

022510.0155/9214660.3

8.      Frontier is party to the Airbus Purchase Agreement (with amendments, Airbus Agreement), whereby Frontier is obligated to purchase more than 150 aircraft, and make PDPs, according to a decade-long schedule.

9.      By the end of September 2019, AMCK—through subsidiaries and owner trustees, which are the other Defendants—owned and leased 14 aircraft to Frontier that were delivered under the Airbus Agreement pursuant to 14 individual lease agreements (Original Leases). Copies of two of the Original Leases [MSN 8402 and MSN 9177], as representative examples, will be marked as Joint Trial Exhibits 2 and 7 .

10.     Frontier knew the correct amount and due date for each rent payment owed under the Original Leases.

11.     Frontier timely made all monthly rent payments required by the Original Leases through the end of March 2020.

12.     On September 10, 2019, Frontier and AMCK's affiliate, Accipiter Holdings, DAC, signed a letter of intent to enter into a sale and leaseback arrangement for six additional aircraft under the Airbus Agreement. A copy of the Letter of Intent will be marked as Joint Trial Exhibit 5.

13.     On March 16, 2020, Frontier and AMCK executed the Framework Agreement, which incorporated the key terms from the September 2019 letter of intent. A copy of the Framework Agreement will be marked as Joint Trial Exhibit 24.

14.     Also on March 16, AMCK purchased the first of these six aircraft, MSN 10038. AMCK, by and through its affiliates, executed corresponding lease documents with Frontier. In particular: Vermillion executed a trust agreement with UMB Bank, N.A., relating to the ownership of MSN 10038 (MSN 10038 Trust Agreement), a copy of which will be marked as Joint Trial Exhibit 25.  UMB, not in its individual capacity but solely as owner trustee, executed a

corresponding lease with Frontier (MSN 10038 Lease), a copy of which will be marked as Joint Trial Exhibit 29. And Vermillion provided a guaranty in favor of Frontier (MSN 10038 Guaranty), a copy of which will be marked as Joint Trial Exhibit 26.

15.    Under the Framework Agreement and resulting lease documents, AMCK paid Airbus $51 million for MSN 10038, and Frontier agreed to pay, and paid, AMCK $269,525.94 in monthly rent.

16.    On March 16, 2020, Frontier received delivery of MSN 10038 from Airbus.

17.    Under the Framework Agreement, the five remaining Framework Agreement aircraft would be purchased at the same price and leased at a similar monthly rent.

18.    The contracts executed on March 16, 2020—including the Framework Agreement, the MSN 10038 Lease, the MSN 10038 Trust Agreement, and the MSN 10038 Guaranty—were entered into contemporaneously and are related to the same transaction.

19.    On March 25, 2020, Frontier sent AMCK a draft rent deferral agreement for one aircraft for review. This draft contemplated deferral of rent due through June 30, 2020, payment of 3% interest on the deferred amounts and repayment over a nine-month period beginning in July 2020.  A copy of this draft will be marked as Joint Trial Exhibit 47.

20.    On April 1, 2020, Frontier sent AMCK two omnibus draft rent deferral agreements for review, one for the aircraft owned by Wells Fargo and one for the aircraft owned by UMB. This draft contemplated deferral of rent due through June 30, 2020, payment of 6% interest on the deferred amounts and repayment over a nine-month period beginning in July 2020. A copy of this draft will be marked as Joint Trial Exhibit 53.

022510.0155/9214660.3

21.     AMCK and Frontier exchanged correspondence relating to a potential rent deferral between March 18 and March 22. Without a rent deferral in place, however, Frontier continued to make timely rent payments on all aircraft, including two aircraft on March 24.

22.     Following the April 7 phone call, in a text message exchange, Mr. Dempsey asked Mr. Fanning to "get a draft" of a month-to-month deferral arrangement to AMCK.  A copy of that exchange will be marked as Joint Trial Exhibit 75.

23.     On April 8, 2020, Mr. Sheridan sent an email to representatives of AMCK's shareholder concerning the April 7 phone call. A copy of that email will be marked as Joint Trial Exhibit 76.

**B.     Plaintiff's Proposed Findings of Fact.**

1.     Defendants, along with AMCK's other affiliates, subsidiaries, and owner-trustee entities, sold various assets, including their portfolio of aircraft, to Carlyle Group Inc. (Carlyle Transaction). This transaction is currently subject to separate litigation in *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Limited, et al.*, 1:22-cv-2943 (PAE). (Sheridan Decl. (Dkt. 95, 100) ¶¶ 1-2; O'Callaghan Decl. (Dkt. 94) ¶¶ 1-2; O'Callaghan Dep. at 11:7-12:2; Sheridan Dep. at 10:12-12:22; Ma Dep. at 20:5-21:11; Lee Dep. at 21:25-23:17.)

2.     As of the time of this filing, AMCK is no longer an operating entity. (O'Callaghan Dep. at 11:7-12:2; Sheridan Dep. at 10:12-12:22; Ma Dep. at 20:5-21:11; Lee Dep. at 21:25-23:17.)

3.     Under each of the Original Leases, Frontier was required to pay rent on a monthly basis until AMCK granted Frontier a waiver of payments under the Original Leases for the parties to work out concessions sought by AMCK including for Frontier to negotiate with Airbus AMCK's delivery deferral demands. (Thwaytes Dep. at 24:2-15; Joint Trial Exs. 24, 65, 77 and 75, ; 66:3-67:9, 70:23-73:17, 75:4-78:19; O'Callaghan Dep. at 104:24-106:5, 186:8-188:3;

Fanning Dep. at 84:10-85:21; Sheridan Dep. at 112:11-114:6; Dempsey Decl. ¶ 15; Joint Trial Exhibit 135 at AMCK021190-91.)

4.     Each of the Original Leases, as well as the MSN 10038 Lease, contains indemnity provisions in the event that an Event of Default occurs, which exclude indemnification for "any Claim judicially determined to have been caused by the gross negligence, willful misconduct or recklessness of such Indemnitee, its successors, servants or agents." (MSN 8402 Lease § 19.1(b)(ii); MSN 9177 Lease, § 19.1(b)(ii); MSN 10038 Lease § 19.1(b)(ii).)

5.     Under each of the Guarantees associated with the Original Leases, AMCK (through its affiliates Vermillion and Accipiter) is required to pay all of Frontier's reasonable fees and expenses, including attorney's fees, incurred in connection with enforcement of the Guarantees. (MSN 6184 Guaranty, §§ 1, 2.2; MSN 9177 Guaranty §§ 1, 2.2.)

6.     On or about November 12, 2019, November 25, 2019, January 7, 2020, and March 19, 2020, AMCK sent Frontier invoices for each of the monthly rent payments required under the original terms of the Original Leases in April and early May 2020. (Joint Trial Exhibit 192; Thwaytes Dep. at 18:10-37:11.)

7.     The Framework Agreement obligated AMCK to purchase six aircraft and lease them back to Frontier through Owner Trustee/Lessor UMB according to the following schedule: (i) three aircraft in March 2020; (ii) one in May 2020; (iii) one in June 2020; and (iv) one in August 2020. (Framework Agreement, Schedule 1.)

8.     AMCK was immediately dissatisfied with the rent amount due for MSN 10038 per the terms of the Framework Agreement. It was much less than Frontier paid for the Original Leases, which were between $323,126.20–$362,630.80. (Joint Trial Exhibit 27; O'Callaghan Decl. ¶ 23; Murphy Dep. at 92:13-93:13.)

9.    The contracts at issue—including the Framework Agreement, as well as the Lease Agreements, Trust Agreements, Guarantees, and all other "Operative Documents" (as defined in the Framework Agreement) relating to the 15 aircraft under lease between Frontier and AMCK— are deeply intertwined and make numerous cross-references to each other. (Joint Trial Exhibit 24 §§ 1.1, 2.1.1, 3.3.1; *id.*, Ex. 29 at 1, 15; *id.*, Ex. 25 at 1, §§ 1, 2, 8.01-.02, 9.01(b); *id.*, Ex. 26 at 1, § 1; *id.*, Ex. 80 ¶¶ 1-30; Bindu Decl. ¶ 7, Joint Trial Exs. 1-4, 7.)

10.    The contracts executed on March 16, 2020—including the Framework Agreement and the Lease Agreement, Trust Agreement, and Guaranty for MSN 10038 that intended to impose binding obligations on Vermillion as well as AMCK—were entered into contemporaneously and are related to the same transaction. (Joint Trial Exs. 24, 29, 25 and 26 .)

11.    The September 2019 letter of intent signed by Accipiter Holdings DAC, the parent company of Accipiter, is also part of this same transaction—and intended to impose binding obligations on Accipiter as well as AMCK—because the key terms of the letter of intent formed the basis for, and were incorporated into, the Framework Agreement. (Dempsey Decl., Ex. 1; Joint Trial Exhibit 24.)

12.    AMCK also considers Accipiter Holdings DAC to be the "Owner" of the 14 Original Leases and, without Accipiter Holdings DAC's involvement, Defendants could not have declared an Event of Default under the Original Leases in pursuit of terminating the Framework Agreement. (Joint Trial Exhibit 38 at 4.)

13.    In light of the sudden and significant impact of COVID-19 on domestic U.S. air travel, on March 16, 2020, Frontier sent similar concession request letters to all of its lessors, requesting temporary rent deferrals. For AMCK, Frontier requested a voluntary (i) one-time, three-month aircraft rent deferral on the 15 aircraft under lease; and (ii) return of one-month's security

deposit for each aircraft. Frontier explained it would fully repay, with interest, over a nine-month period starting July 1, 2020. Frontier also represented it had a "strong balance sheet with $685 million of free cash" to assure AMCK that Frontier could make its payments, with interest, when the proposed deferral expired. (Dempsey Decl. ¶ 8; Fanning Dep. at 22:23-23:15; Joint Trial Exhibit 28 .)

14.     AMCK had anticipated Frontier making such a request. In fact, 32 of AMCK's 34 airline partners made similar rent deferral requests, prompting AMCK to create an inter-company deferral team. (Joint Trial Exs. 12,15, 36 ; *id.*, Ex. 100 ¶ 7.3; *id.*, Ex. 37 at AMCK019783.)

15.     While rent deferral negotiations were ongoing with an airline, AMCK turned off its automatic alert system, and instructed its employees to not "chase" the airline for past due payments. If AMCK ever denied an airline's rent deferral request, it was AMCK's "standard practice" to inform the airline, at which point AMCK restarted its "chase" procedure and "told [those airlines] to make payments." (Joint Trial Exhibit 38; McInerney Dep. at 110:20-111:11, 131:24-134:19; Bachrach Dep. at 30:9-32:12; Joint Trial Exhibit  143.)

16.     Around March 24, AMCK asserted it was in "survival mode," and the focus of negotiations between the parties shifted. The shift was caused in part by AMCK realizing on or about March 23 that its shareholder[1] needed to help fund the upcoming aircraft purchases because the terms of AMCK's bank financing changed to AMCK's dissatisfaction. In addition, AMCK floated the idea that it was at risk of failing its debt-service coverage ratio, even though AMCK admitted this concern was unfounded. Accordingly, AMCK began exploring ways to get out of the Framework Agreement or renegotiate its material terms. (Joint Trial Exhibit 39; *id.*, Ex. 11 at

---

[1] During the relevant time, AMCK had multiple shareholders. However, the key shareholder for purposes of this case was CK Assets Holdings

AMCK030087; *id.*, Ex. 37 at AMCK019794; *id.*, Exs. 44 ,191, 32; Ma Dep. at 60:23-64:22; Sheridan Dep. at 46:3-47:16, 86:3-90:5, 185:18-189:4.)

17.    On March 24, AMCK explored using the "MAC clause"—the material adverse change clause, used when there is an unanticipated change between the signing and closing of a contract—as a way to get out of the Framework Agreement. (Joint Trial Exhibit 42 at AMCK018494.)

18.    Instead of invoking the MAC clause, however, AMCK decided to demand Frontier reduce the purchase price and achieve delivery delays with Airbus for the upcoming aircraft. This, in turn, would lessen and delay AMCK's payment obligations (to Frontier's detriment). AMCK believed this would "buy ourselves some time . . . to see how everything develops before having to take the nuclear option" of terminating the Framework Agreement. (Thwaytes Dep. at 88:14-89:13; Joint Trial Exhibit 44; Sheridan Dep. at 56:23-59:10; Joint Trial Exs. 40, 55; O'Callaghan Dep. at 48:19-51:5; 69:3-11.)

19.    Thus, even while Frontier was indisputably up to date on all rent payments, AMCK intended to terminate the Framework Agreement. (McInerney Dep. at 85:8-12, 94:18-22; O'Callaghan Dep. at 223:20-224:20; Joint Trial Exhibit 145 ¶ 4.3; *id.*, Ex. 36; *id.*, Ex. 43; *id.*, Ex. 42 at AMCK018494; *id.*, Ex. 44; Sheridan Dep. at 56:23-59:10.)

20.    On March 26, AMCK demanded Frontier provide a $3 million discount on the purchase price (in the form of 12 months' advanced payment of rent) on the upcoming aircraft delivery, and that Frontier achieve a three to six month delivery deferral with Airbus for the other four aircraft. In exchange, AMCK would allow Frontier to defer rent on the 14 Original Leases (excluding MSN 10038), with repayment made within four months at an 8% interest rate. AMCK's position was that, if Frontier did not agree to these "conditions," AMCK would not honor the

Framework Agreement. (Joint Trial Exhibit 55; O'Callaghan Dep. at 48:19-51:5; 69:3-11; Dempsey Dep. at 34:8-24.)

21.    On March 31, AMCK added a new extracontractual condition: it would not proceed "with closing on the 5 remaining sale & leaseback aircraft if they are going to go straight into storage for an uncertain period of time." (Joint Trial Exhibit 55.)

22.    AMCK relayed its intentions to Airbus, too, explaining that AMCK was not authorized to take delivery of the aircraft if they would go into storage. (Joint Trial Exhibit 54.)

23.    Troubled by AMCK's position, on April 1, Frontier sought AMCK's assurance that it would honor the Framework Agreement even if the parties could not agree on the rent deferrals or AMCK's extracontractual demands. AMCK did not respond. (Joint Trial Exhibit 17 at AMCK016976; Fanning Decl. ¶¶ 3-4.)

24.    Nevertheless, Frontier immediately tried to meet AMCK's demands, even though it would "negatively impact [Frontier's] cash position" as any delivery deferral delayed when Frontier would recoup its PDPs (allowing it to reallocate the PDPs to future aircraft purchases) and receive any "proceeds from the SLB transaction." By April 2, Frontier had reached out to Airbus, relaying AMCK's demands ("our financier is uncomfortable funding aircraft deliveries in 2Q 2020"), and asking Airbus to "work with [Frontier] to manage the timing of upcoming aircraft deliveries." (Joint Trial Exhibit 56; Thwaytes Dep. at 92:8-94:14; *see also* Dempsey Dep. at 42:12-45:15; Dempsey Decl. ¶ 10.)

25.    Prior to April 6, 2020, Frontier began discussing with Airbus a potential delay in aircraft deliveries that were covered by the Framework Agreement. AMCK was not a party to these discussions, but they were repeatedly informed of the progress of these discussions by

Frontier, as well as through AMCK's own outreach to Airbus. (O'Callaghan Dep. at 51:19-60:10, 75:25-80:2; Joint Trial Exhibits 17, 54, 134.)

26.    On April 3, AMCK sent Frontier another counteroffer, conditioning AMCK's financing of the upcoming five aircraft on Frontier achieving a six-month delivery deferral with Airbus. If Frontier could achieve this, AMCK would allow Frontier to defer rent on the Original Leases, with repayment made within four months at a 6% interest rate. At this time, it was clear to Frontier that AMCK wanted to adjust the terms of the binding Framework Agreement. (Joint Trial Exhibit 65; Dempsey Decl. ¶ 10; Dempsey Dep. at 34:8-24.)

27.    A key problem was that Airbus—which had no obligation or incentive to grant these deferrals—would not agree to AMCK's delivery deferral demands. The aircraft were also nearly complete and Airbus had no space at its Mobile, Alabama assembly facility to store them. Thus, when Frontier initially asked for a delivery deferral, Airbus's "immediate reaction has been to threaten Frontier with default" of the greater Airbus Agreement. If Airbus declared a default, Frontier would lose all of its PDP payments for upcoming aircraft and it "could cripple the airline to where it may potentially put [it] out of business." Frontier explained all of this to AMCK. With the prospect that delivery deferrals with Airbus were not achievable, Frontier again asked for AMCK's assurances "that you will finance the aircraft deliveries and honour your commitment to Frontier if we do not put a rent deferral in place." AMCK did not respond. (Fanning Dep. at 115:25-120:15; Joint Trial Exhibit 190 at FRONTIER 0012490-95; *id.*, Ex. 17 at AMCK016975-76; *id.*, Ex. 65; Sheridan Dep. at 100:15-101:18; Dempsey Dep. at 45:16-47:9, 49:21-52:2, 60:22-62:23; Dempsey Decl. ¶ 12.)

28.    In light of AMCK's position and refusal to provide assurances, as well as the inability to achieve delivery deferrals with Airbus, Frontier began to look for alternative leasing

companies to finance the five remaining Framework Agreement aircraft. Due to the changed market conditions, however, the terms offered by these companies were substantially worse for Frontier than those in the Framework Agreement. (Dempsey Dep. at 53:20-60:21; Joint Trial Exhibit 69; Dempsey Decl. ¶ 13.)

29.     Frontier planned to make its next rent payments under the Original Leases, which were due on April 6, 2020. On April 6, however, Airbus suddenly closed its Mobile facility until April 29 due to COVID-19. This had the effect of temporarily pausing the delivery schedule—at least on the next two aircraft set for delivery under the Framework Agreement—and created space for Frontier to negotiate longer delivery deferrals, as well as for Frontier and AMCK to work out a rent deferral agreement. (Dempsey Dep. at 45:16-47:9, 49:21-53:14, 66:3-67:9, 70:23-72:15; Joint Trial Exhibit 69, 65; Dempsey Decl. ¶ 14.)

30.     Later on April 6, 2020, Frontier and AMCK agreed over the phone to defer Frontier's lease payments on the 14 Original Leases for 10-business-days, whereby AMCK waived its right to declare Frontier in default based on these lease payments, to provide Frontier with time "to reach agreement with Airbus" relating to the delivery deferrals AMCK had demanded for the remaining five Framework Agreement aircraft. (Joint Trial Exs. 24, 65; Dempsey Dep. at 66:3-67:9, 70:23-72:15; O'Callaghan Dep. at 104:24-106:5, 186:8-188:3.)

31.     Between April 6, 2020 and May 8, 2020, Frontier did not make payments under the Original Leases because the parties agreed those payments were not due in this timeframe. (Thwaytes Dep. at 24:2-15; Joint Trial Exs. 24, 65, 77 and 75 ; 66:3-67:9, 70:23-73:17, 75:4-78:19; O'Callaghan Dep. at 104:24-106:5, 186:8-188:3; Fanning Dep. at 84:10-85:21; Sheridan Dep. at 112:11-114:6; Dempsey Decl. ¶ 15; Joint Trial Exhibit 135 at AMCK021190-91.)

022510.0155/9214660.3

32.     On April 7, 2020, Frontier and AMCK again reached an agreement over the phone, this time extending the rent deferral duration on the 14 Original Leases to "month to month" until all negotiations were complete, including Frontier's negotiations with Airbus relating to the delivery deferrals. The parties understood that this meant that AMCK waived its right to declare Frontier in default based on these lease payments for the remainder of April 2020, and that this wavier would roll over until the end of May 2020 if negotiations were ongoing at the beginning of that month. (Joint Trial Exs. 77 and 75; Dempsey Dep. at 72:16-73:17, 75:4-78:19; Fanning Dep. at 84:10-85:21; Sheridan Dep. at 112:11-114:6; Dempsey Decl. ¶ 15; Joint Trial Exhibit 135 at AMCK021190-91.)

33.     On April 9, 2020, Ms. O'Callaghan sent an email to Frontier attaching a draft rent forbearance letter for 1 of the 14 aircraft.  The draft letter contemplated deferral of the rent due in April 2020, payment of 6% interest on the deferred amount and repayment in July 2020, but made no mention of the delivery deferrals AMCK had demanded and the parties had been discussing. A copy of that email and draft forbearance letter will be marked as Joint Trial Exhibit 74. (Joint Trial Exhibit 79; O'Callaghan Dep. at 107:25-110:22.)

34.     Frontier never signed this draft for 1 of the 14 aircraft, and which omitted any terms related to the delivery deferrals AMCK had demanded and the parties had been discussing. The parties never memorialized in a formal document their agreement to a month-to-month rent deferral while Frontier worked to achieve the delivery deferrals with Airbus that AMCK had demanded. (O'Callaghan Dep. at 107:25-110:22; Dempsey Dep. at 39:2-40:20, 75:11-81:19, 133:4-135:4, 154:25-156:17; Joint Trial Exs. 24, 56, 121-122, 123, 142; Fanning Dep. at 69:16-76:9, 83:3-11; Thwaytes Tr. 166:23-168:6; Sheridan Dep. at 149:17-151:14.)

022510.0155/9214660.3

35.    As CEO, Mr. Sheridan has the full authority to enter into a rent deferral agreement with Frontier on behalf of AMCK, without needing shareholder approval. (O'Callaghan Dep. at 104:24-106:5; Ma Dep. at 41:17-42:7; Lee Dep. at 13:11-25.)

36.    Negotiations on all fronts (*i.e.*, Frontier-AMCK; Frontier-Airbus) continued past April and into May, with neither Frontier nor AMCK mentioning that Frontier's rent payments on the 14 Original Leases were allegedly due or needed to be paid immediately, and without AMCK providing any notice that the waiver period would terminate by a date certain. (McInerney Dep. at 126:10-13; O'Callaghan Dep. at 209:11-210:8, 256:4-24; Dempsey Decl. ¶¶ 17, 25-27; Joint Trial Exhibit 17 at AMCK016977-81; *id.*, Ex. 100 ¶¶ 7.5-7.13; *id.*, Plaintiff's Exhibit 4 ; *id.*, Joint Trial Exhibit 42 at AMCK018497-98; *id.*, Exs. 142, 127 and 133.)

37.    Between April 21 and May 8, 2020, AMCK acknowledged that Frontier's rent payments on the 14 Original Leases "have been deferred," that the "[r]ent deferral requested" was "under negotiation" and "under review," and that AMCK was still "mandated" under the Framework Agreement to take delivery of the five remaining aircraft. (Joint Trial Exhibit 100¶¶ 7.3-7.13; *id.*, Exs. 110, 135; Plaintiff's Ex. 4, McInerney Dep. at 70:10-21; 98:13-105:13; O'Callaghan Dep. at 139:11-142:15.)

38.    Between March 19, 2020 and May 8, 2020, AMCK did not send any rent invoices to Frontier, except for invoices associated with MSN 10038—which Frontier promptly paid. This confirmed to Frontier that the parties had reached a month-to-month rent deferral/waiver on the 14 Original Leases that extended into May 2020. (Joint Trial Exs. 14, 72; Dempsey Decl. ¶¶ 17, 25-27.)

39.    Between March 16, 2020 and May 8, 2020, AMCK did not send Frontier any of its standard "chase" emails, or otherwise have any employees tell Frontier that lease payments were

allegedly due or past due. This further confirmed to Frontier that the parties had reached a month-to-month rent deferral/waiver on the 14 Original Leases that extended into May 2020. (McInerney Dep. at 126:10-13; O'Callaghan Dep. at 209:11-210:8, 256:4-24; Dempsey Decl. ¶¶ 17, 25-27.)

40.    From the time of Frontier's original rent deferral request on March 16, 2020, AMCK knew at all times that Frontier had the ability—and indeed repeatedly offered—to bring all rent payments current at any time, and that if AMCK ever expressed to Frontier that it believed rent was owed immediately, "Frontier would cure any default." (Joint Trial Exhibit 28; *id.*, 17 at AMCK016979; *id.*, Ex. 65 at AMCK033741; *id.*, Ex. 100 ¶ 7.10; *id.*, Ex. 42 at AMCK018502-06; *id.*, Ex. 123 at AMCK031600-01; *id.*, Ex. 145 ¶¶ 4.4, 4.11; Fanning Dep. at 90:19-94:16.)

41.    Throughout the negotiations, Frontier repeatedly asked for AMCK's commitment and assurance to fund the remaining five aircraft under the original Framework Agreement terms, and emphasized to AMCK that it "d[id]n't want to be in default with [AMCK]." AMCK never provided that commitment or assurance. (Joint Trial Exs. 17, 65, 77, 75, 100, 101, 111, 121, 122; O'Callaghan Dep. at 78:12-79:9, 88:5-90:2, 133:24-134:17, 161:4-162:19; Sheridan Dep. at 100:18-101:18, 113:18-114:6, 142:17-145:8; Dempsey Decl. ¶¶ 10, 12, 14-28; Dempsey Dep. at 124:20-125:16; Fanning Decl. ¶¶ 6-7.)

42.    Throughout the negotiations, AMCK had no intention of funding the remaining five aircraft under the original Framework Agreement terms "EVEN IF [Frontier is] completely current on all payments," and instead intended to invoke the "nuclear option" of abandoning the Framework Agreement if Frontier would not acquiesce to significant extracontractual terms. (Joint Trial Exhibit 100§§ 7.8-7.10.; *id.*, Ex. 101; O'Callaghan Dep. at 133:24-134:17.)

43.    On April 27, 2020, while the month-to-month rent deferral remained in place, AMCK's shareholder again suggested terminating the Framework Agreement on the basis of the

MAC clause, evidencing that AMCK did not believe at this time that it could terminate the Framework Agreement on the basis of alleged late lease payments. (Joint Trial Exhibit 108.)

44.    Frontier and AMCK spoke multiple times on April 30, 2020 via phone and email. (Joint Trial Exs. 17, 121-123.)

45.    The parties first spoke on April 30, 2020, over the phone, during which Frontier offered to "immediately pay outstanding April rents on which we agreed an informal deferral pending agreement with Airbus on delivery delays," and to "pay May, June and July rents and, all beyond, on time"—in essence, no rent deferral after the end of April 2020; (ii) convince Airbus to move the next aircraft delivery from June to July 2020, such that the next three aircraft would deliver in July 2020; and (iii) move the delivery dates of the final two aircraft from September 2020 and October 2020 to February 2021. (Joint Trial Exhibit 121 at AMCK031595; Dempsey Decl. ¶ 19.)

46.    Even though AMCK now agreed to Frontier's delivery deferral schedule, AMCK rejected Frontier's offer to immediately become, and remain, current on all lease payments. (Joint Trial Exhibit 122; Sheridan Dep. at 149:6-153:5, 155:20-160:9; Dempsey Dep. at 133:4-144:11; Dempsey Decl. ¶ 19.)

47.    AMCK instead asked Frontier to become current on all payments on May 15, 2020, alongside other extracontractual demands. (Joint Trial Exhibit 122; Sheridan Dep. at 149:6-153:5, 155:20-160:9; Dempsey Dep. at 133:4-144:11, 153:13-159:16; Dempsey Decl. ¶¶ 19-20.)

48.    Frontier and AMCK had subsequent negotiations over the phone on April 30, with Frontier providing the last offer. (Joint Trial Exs. 122, 142; Sheridan Dep. at 158:17-160:9, 172:18-173:19; Dempsey Dep. at 153:13-159:16; Dempsey Decl. ¶¶ 22-23; Fanning Decl. ¶¶ 8-10.)

49.     AMCK never responded to Frontier's April 30 offer, despite Frontier reminding AMCK numerous times in May 2020 that it was awaiting AMCK's response. (Joint Trial Exs. 17, 142, 127; Sheridan Dep. at 172:18-173:19; Dempsey Decl. ¶ 23; Fanning Decl. ¶ 11.)

50.     AMCK instead chose to prolong the negotiations, "happy to kick that one into next month," and thereby extend the month-to-month rent deferral/waiver into May 2020. (Joint Trial Exhibit 17; *id.*, Ex. 101 at AMCK016911; *id.*, Exs. 142, 127; Sheridan Dep. at 172:18-173:19; Dempsey Decl. ¶ 23.)

51.     AMCK knew by early May 2020 that Frontier was close to finalizing a delivery deferral agreement with Airbus whereby the next three aircraft under the Framework Agreement would deliver in July 2020, and the final two would deliver in February 2021. (Joint Trial Exs. 121-122, 123, 142; Dempsey Dep. at 154:25-156:17; Sheridan Dep. at 149:17-151:8.)

52.     Frontier finalized the delivery deferral agreement with Airbus on May 5, 2020, achieving the delivery deferral dates that AMCK had agreed to on April 30, 2020. (Joint Trial Exs. 56, 133.)

53.     The amendment to the purchase agreement between Airbus and Frontier included delays in the delivery of many other aircraft that were not covered by the Framework Agreement in part because the delays with the Framework Agreement aircraft had a "cascading" effect on the other aircraft under the Airbus Agreement. (Dempsey Dep. at 149:16-151:23; Dempsey Testimony.)

54.     Despite Frontier achieving the delivery deferrals with Airbus that AMCK had demanded—which also had the effect of delaying when Frontier would recoup its PDP payments for these aircraft—and Frontier offering to immediately pay all outstanding rent, AMCK remained

committed to invoking the nuclear option of abandoning the Framework Agreement because it did not like the payment terms. (Joint Trial Exhibit 123 at AMCK018496.)

55.    On May 8, 2020, while the month-to-month rent deferral/waiver period was still in effect, and without AMCK providing Frontier any notice that AMCK demanded immediate payment of the deferred rent on the 14 Original Leases or otherwise believed that the lease payments were immediately due, AMCK invoked its nuclear option and breached the Framework Agreement by purporting to terminate it and its remaining obligations thereunder even though AMCK had no right to do so. (Joint Trial Exhibit 146; *id.*, Ex. 42 at AMCK018497-506; *id.*, Ex. 145; O'Callaghan Dep. at 222:2-227:10.)

56.    AMCK intentionally did not contact Frontier to demand payment before purporting to terminate the Framework Agreement because AMCK knew that Frontier would immediately make such payment. (Sheridan Dep. at 165:21-167:25, 172:18-173:19; Joint Trial Exhibit 42 at AMCK018503-06.)

57.    Despite Frontier's attempts to persuade AMCK to withdraw its unlawful termination, and Frontier's complete payment of all deferred rent on May 13, 2020 (which was five total days, and three business days, after AMCK's May 8 termination letter), AMCK has remained in breach of the Framework Agreement, chiefly by failing to consummate the SLB arrangements for the remaining five aircraft. (Joint Trial Exs. 14, 148, 150-151; Dempsey Decl. ¶ 27.)

58.    After making complete payments on May 13, 2020, Frontier has stayed current on all lease payments. (Joint Trial Exs. 14, 152 ; O'Callaghan Dep. at 229:4-7.)

59.    AMCK immediately restarted its standard practice of sending "chase" alerts to Frontier in June 2020 when it believed Frontier's rent was late, providing Frontier notice and an

opportunity to cure instead of terminating the leases. Plaintiff's Trial Exhibit 7; McInerney Dep. at 126:15-131:23.)

60.    After May 8, 2020, upon receiving AMCK's "chase" alerts for allegedly late rent payments, Frontier always promptly paid its rent in full. (O'Callaghan Dep. at 229:4-7.)

61.    Consistent with AMCK's plan to use the termination and resulting crisis as leverage to negotiate better terms, AMCK reached out to Frontier on June 18, 2020 and offered to enter SLBs for the three aircraft delivering in July 2020 that had been part of the Framework Agreement. The terms AMCK offered were substantially worse for Frontier than those in the Framework Agreement, including: (i) AMCK would pay $3 million less for each aircraft; and (ii) Frontier would pay $70,000 more for monthly rent. AMCK's proposal was also "conditioned on the release and waiver of any potential legal claims by Frontier arising from the termination of the Framework Agreement." With the impending delivery deadlines, Frontier saw no choice but to engage with AMCK. (Plaintiff's Trial Exhibit 6.)

62.    To mitigate its damages, Frontier found other lessors to consummate the SLB arrangements for the five remaining aircraft due under the Framework Agreement, which provided better terms than AMCK's June 18, 2020, reduced offer. The difference between the deals Frontier executed with CDB Aviation Lease Finance DAC and Jackson Square Aviation and the terms in the Framework Agreement caused Frontier approximately $53 million in damages. When discounted to present value, as of October 28, 2022, Frontier's damages were approximately $46.3 million. The present value of these damages will continue to increase until resolution. (Dempsey Decl. ¶ 29; Joint Trial Exs. 158, 162-163, 95; Bindu Dep. at 108:4-125:3; Neels Dep. at 117:13-118:11; Joint Trial Exs. 166-169; Neels Testimony; Neels Decl.)

**C.      Defendants' Proposed Findings of Fact.**

1.      Under each of the Original Leases, Frontier was required to make a monthly payment of rent.  (Testimony of Jane O'Callaghan; Joint Trial Exs. 2, 7.)

2.      Under each of the Original Leases, Frontier is required to indemnify AMCK for all losses, fees, costs and expenses incurred in connection with the enforcement or preservation of rights relating to a default by Frontier.  (Joint Trial Exs. 2 & 7, § 17.1(a).)

3.      On or about January 7, 2020 and March 19, 2020, AMCK sent Frontier invoices for each of the monthly rent payments required under the Original Leases in April and early May 2020.  (Bindu Tr. 16:14-43:8 & Joint Trial Exs. 139, 140.)

4.      The Framework Agreement required Frontier to indemnify AMCK for all losses, fees, costs and expenses incurred in connection with any default by Frontier.  (Joint Trial Ex. 24, § 7.1.)

5.      The Framework Agreement does not impose any obligations on Accipiter or Vermillion.  (*See, e.g.*, Joint Trial Ex. 24, § 8.8; Joint Trial Ex. 5 at p. 4, ¶ 6.)

6.      On March 16, 2020, Frontier sent a letter to AMCK requesting temporary deferral of monthly rent payments under the Original Leases and the MSN 10038 Lease.  A copy of the letter will be marked as Joint Trial Exhibit 28.

7.      Frontier expected that any deferral of rent pursuant to this request would be documented in a written agreement.  (Bindu Tr. 91:11-92:10; Dempsey Tr. 24:20-25 :8, 39: 13-40:20, 76:18-77:2, 80:13-81:19, 83:25-84:8 & Joint Trial Ex. 73; Fanning Tr. 21:23-22:9, 75:23-76:9, 76:13-78:10 & Joint Trial Ex. 79; Thwaytes Tr. 140:9-23, 158:7-20 & Joint Trial Ex. 28; Thwaytes Tr. 158:25-160:8, 163:11-16) & Joint Trial Ex. 53.)

8.      The parties never finalized or executed a written agreement providing for the deferral of rent.  (Testimony of Paul Sheridan; Testimony of Jane O'Callaghan; Dempsey Tr. 86:17-24; Fanning Tr. 70:19- 71:12, 75:11-76:12; Thwaytes Tr. 168:7-22.)

9.      On March 26, 2020, AMCK sent Frontier an email proposing a short-term rent deferral on certain conditions described therein.  A copy of this email will be marked as Joint Trial Exhibit 48.  Frontier did not agree to this proposal.  (Testimony of Paul Sheridan; Testimony of Jane O'Callaghan.)

10.     On March 31, 2020, AMCK sent Frontier an email proposing a delay in aircraft deliveries as part of a rent deferral arrangement.  A copy of this email will be marked as Joint Trial Exhibit 51.  Frontier did not agree to this proposal.  (Testimony of Paul Sheridan; Testimony of Jane O'Callaghan.)

11.     On or about April 2, 2020, Frontier began discussing with Airbus a potential delay in aircraft deliveries that were covered by the Framework Agreement.  AMCK was not a party to these discussions.  (Thwaytes Tr. 64:19-66:38, 85:20-88:23 & Joint Trial Ex. 56; Dempsey Tr. 41:19-45:15, 12:22-13:4, 150:13-153:9; Fanning Tr. 118:9-17, 121:7-122:2; Bindu Tr. 52:3-18; Compl. ¶ 51.)

12.     On April 3, 2020, Mr. Sheridan sent Mr. Dempsey an email with a proposal on rent deferral.  A copy of the email will be marked as Joint Trial Exhibit 58.  Frontier did not agree to this proposal.  (Testimony of Paul Sheridan; Testimony of Jane O'Callaghan.)

13.     During a telephone call on April 6, 2020 between Mr. Sheridan and Mr. Fanning, AMCK agreed to a grace period of 10 business days with respect to payments due under the Original Leases.  Mr. Sheridan confirmed this arrangement in an email of the same date.  A copy of the email will be marked as Joint Trial Exhibit 63.

14.     Beginning on April 6, 2020, and continuing through May 8, 2020, Frontier did not pay amounts that, per the terms of the original leases, were due to be paid in April 2020. (Testimony of Jane O'Callaghan; Bindu Tr. 17:5-8, 17:20-37:3; Thwaytes Tr. 24:2-19, 35:8-37:11.)

15.     During a telephone call on April 7, 2020, Mr. Dempsey and Mr. Sheridan discussed deferring rent on a "month to month" basis.  Mr. Dempsey and Mr. Sheridan understood "month to month" to mean that rent payments would be deferred until the end of April.  Mr. Dempsey and Mr. Sheridan did not discuss the repayment terms or the interest rate.  Both Mr. Dempsey and Mr. Sheridan expected any agreement on deferral to be documented in writing.  (Testimony of Paul Sheridan.)

16.     AMCK did not agree to a month-to-month deferral on the April 7 phone call. (Testimony of Paul Sheridan.)

17.     Following the April 7 phone call, in a text message exchange, Mr. Dempsey asked Mr. Fanning to "get a draft" of a month-to-month deferral arrangement to AMCK.  A copy of that exchange will be marked as Joint Trial Exhibit 75.

18.     In addition, Mr. Sheridan asked Jane O'Callaghan to send draft documentation for a month-to-month rent deferral arrangement to Frontier for its review.  (Testimony of Paul Sheridan.)

19.     On April 9, 2020, Ms. O'Callaghan sent an email to Frontier attaching a draft rent forbearance letter.  The draft letter contemplated deferral of the rent due in April 2020, payment of 6% interest on the deferred amount and repayment in July 2020.  A copy of that email and draft forbearance letter will be marked as Joint Trial Exhibit 79.  (*See also* Fanning Tr. 77:5-78:10.)

20.     Frontier did not respond to this draft, and there was never a written agreement executed reflecting a month-to-month rent deferral arrangement.  (Testimony of Paul Sheridan; Testimony of Jane O'Callaghan; Dempsey Tr. 80:13-81:19, 82:7-84:12 & Joint Trial Ex. 75; Fanning Tr. 70:19-72:8, 73:14-76:9, 83:3-11; Thwaytes Tr. 166:23-167:21, 168:7-22.)

21.     On April 30, 2020, AMCK and Frontier had a phone call during which Frontier made a proposal to AMCK.  The proposal is summarized in an April 30, 2020 email from Paul Sheridan to AMCK's shareholder.  A copy of that email will be marked as Joint Trial Exhibit 121. AMCK did not agree to this proposal.  (Testimony of Paul Sheridan.)

22.     AMCK made another proposal to Frontier on rent deferral in an email from Paul Sheridan on April 30, 2020.  A copy of that email will be marked as Joint Trial Exhibit 120.

23.     Frontier rejected the proposal in AMCK's April 30, 2020 email.  (*See* Testimony of Paul Sheridan; Joint Trial Exs. 122, 142; Dempsey Tr. 137:16-23, 142:13-144:11; Fanning Tr. 109:18-110:25; Dempsey Tr. 144:12-145:16 & Joint Trial Ex. 128; Dempsey Tr. 153:13-154:2, 158:10-159:10.)

24.     On April 30, 2020, after Mr. Sheridan's email to Frontier, Mr. Sheridan and Mr. Dempsey spoke by telephone.  Mr. Dempsey rejected AMCK's proposal and made another proposal with respect to rent deferral.  AMCK did not agree to this proposal.  (Testimony of Paul Sheridan.)

25.     Per the terms of the Original Leases, Frontier owed rent payments on three of the Original Leases on May 5, May 6, and May 8, 2020.  Frontier did not make any of these rent payments on those dates.  (Bindu Tr. 34:11-36:21 & Joint Trial Ex. 140; Testimony of Jane O'Callaghan; Joint Trial Ex. 155.)

26.     On May 5, 2020, Frontier finalized a delivery deferral agreement with Airbus whereby the next three aircraft under the Framework Agreement would deliver in July 2020 and the final two would deliver in February 2021.  (Joint Trial Ex. 134.)

27.     The amendment to the purchase agreement between Airbus and Frontier included delays in the delivery of other aircraft that were not the subject of the Framework Agreement. (Thwaytes Tr. 51-53, 90:7-92:7, 96:16-99:20, 103:20-105:10, 108:16-25, 112:15-114:19, 118:20-119:16, 120:16-23 & Joint Trial Exs. 88, 93; Dempsey Tr. 44:13-18, 151:20-23; Bindu Tr. 64:9-65:9, 72:5-9.)

28.     On May 8, 2020, AMCK provided Frontier with a Notice of Termination based on non-payment of rent in April 2020.  A copy of the Notice will be marked as Joint Trial Exhibit 146.

29.     On or about May 13, 2020, Frontier paid a total of $5,828,440.52 in rent to AMCK. This amount included 14 rent payments that were due in April 2020 and the three rent payments that were due in early May 2020.  (Bindu Tr. 39:11-42:16; Dempsey Tr. 164:15-165:22; Joint Trial Exs. 152, 153, 155; Testimony of Jane O'Callaghan.)

**D.     Joint List of Expert Witnesses.**

Plaintiff intends to call upon the following expert witness to testify: Dr. Kevin Neels

Defendants intend to call upon the following expert witness to testify: Rikard de Jounge

**E.     Premarked Joint Exhibits Which the Parties Agree May Be Received in Evidence.**

The Parties respectfully refer the Court to **Exhibit A** attached hereto for the Parties' premarked Joint Trial Exhibit List.

**F.     Premarked Exhibits Which the Parties Do Not Agree May Be Received in Evidence, Together with the Basis for Objection and Citation to the Applicable Federal Rule of Evidence.**

The Parties respectfully refer the Court to **Exhibit A** attached hereto for the list of other premarked exhibits which the parties do not agree may be received in evidence, together with the

basis for objection and citation to the applicable Federal Rule of Evidence. The Parties will continue to work to resolve objections to the admissibility of exhibits prior to trial.

**G.    Type of Trial and Length of Trial.**

1.    The Parties request a bench trial.

2.    The Parties estimate that the trial will last five days.

    a.    Plaintiff estimates that it will take 3.5 days to present its case.

    b.    Defendants estimate that it will take 1.5 days to present their case.

DATED:  September 21, 2023

LANE POWELL PC

By  s/ David G. Hosenpud

David G. Hosenpud (*pro hac vice*)
601 SW Second Avenue, Suite 2100
Portland, Oregon  97204-3158
Telephone No.:  503.778.2100
Facsimile No.:  503.778.2200
E-mail:  hosenpudd@lanepowell.com

Aaron Schaer, (*pro hac vice*)
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA  98111-9402
Telephone:  206.223.7103
Facsimile:  206.223.7107
E-mail:  schaera@lanepowell.com

-and-

**BINDER & SCHWARTZ LLP**
Neil S. Binder
366 Madison Avenue, 6th Floor
New York, New York  10017
Telephone No.:  212.510.7008
Facsimile No.:  212.510.7299
E-mail:  nbinder@binderschwartz.com

*Attorneys for Plaintiff Frontier Airlines, Inc.*

022510.0155/9214660.3

DATED:  September 21, 2023

**CLIFFORD CHANCE US LLP**

By  s/Jeff E. Butler
    Jeff E. Butler
    John P. Alexander
    Gege Weinberg
    31 West 52nd Street
    New York, NY  10019

*Attorneys for Defendants*