**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRONTIER AIRLINES, INC. | Case No.: 1:20-cv-09713-LLS |
| Plaintiff, | |
| v. | |
| AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE, | |
| Defendants. | |

**PLAINTIFF'S TRIAL BRIEF**

# TABLE OF CONTENTS

**Page**

I. ISSUES TO BE TRIED ............................................................................................................1

II. CONTESTED ISSUES OF LAW ...........................................................................................1

    A. A party who waives a contractual right to strict timely payment must provide the other party with (i) notice and (ii) reasonable time to cure prior to withdrawing its waiver. ..................................................................................1

    B. Because AMCK's waiver of Frontier's strict timely payment obligations was supported by consideration and Frontier's reasonable and justified reliance, AMCK could not retract the waiver without Frontier's consent. ...............5

    C. Meaning of "month-to-month" ...................................................................................6

    D. Although the parties agreed to the waiver verbally and in writing, the Court may consider other communications and acts to determine the intent of the waiver. .......................................................................................................................7

    E. The evidence will establish that AMCK, Accipiter, and Vermillion are all proper defendants because the contracts at issue were intended as part of the same transaction. ....................................................................................................11

    F. Frontier is entitled to $47.78 million in damages. ...................................................13

III. EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL ................................................13

    A. The parties' June 2020 offers and counteroffers are not precluded under ER 408. ........................................................................................................................13

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alsens Am. Portland Cement Works v. Degnon Contracting Co.*,
   222 N.Y. 34, 118 N.E. 210 (1917)......................................................................................7, 8

*In re Caldor, Inc.-NY*,
   217 B.R. 121 (Bankr. S.D.N.Y. 1998).......................................................................................8

*Carlo v. Koch-Matthews*,
   53 Misc. 3d 466, 37 N.Y.S.3d 426 (N.Y. City Ct. 2016) ..........................................................6

*Consarc Corp. v. Marine Midland Bank, N.A.*,
   996 F.2d 568 (2d Cir. 1993).....................................................................................................10

*In re Gordon Car & Truck Rental, Inc.*,
   59 B.R. 956 (Bankr. N.D.N.Y. 1985) ........................................................................................7

*Kamco Supply Corp. v. On the Right Track, LLC*,
   149 A.D.3d 275, 49 N.Y.S.3d 721 (2017) .............................................................................2, 4

*Nau v. Vulcan Rail & Constr. Co.*,
   286 N.Y. 188, 36 N.E.2d 106 (1941).......................................................................................11

*Oleg Cassini, Inc. v. Couture Coordinates, Inc.*,
   297 F. Supp. 821 (S.D.N.Y. 1969).........................................................................................3, 4

*Randolph Equities, LLC v. Carbon Cap., Inc.*,
   648 F. Supp. 2d 507 (S.D.N.Y. 2009).......................................................................................7

*Sherwood v. Gordon Bros.*,
   116 N.Y.S.2d 306 (City Ct. 1952) .........................................................................................2, 4

*This Is Me, Inc. v. Taylor*,
   157 F.3d 139 (2d Cir. 1998).....................................................................................................11

*TVT Recs. v. Island Def Jam Music Grp.*,
   412 F.3d 82 (2d Cir. 2005).......................................................................................................11

**Statutes**

N.Y. U.C.C. Law § 2-A-208 (McKinney 2023) ..........................................................................2, 4

U.C.C. § 2-209(5) (2022)..............................................................................................................2, 4

**Other Authorities**

Federal Rule of Evidence 404..........................................................................................................10

Federal Rule of Evidence 406..........................................................................................................10

Federal Rule of Evidence 408...................................................................................................13, 14

Restatement (Second) of Contracts § 84 .........................................................................................6

13 Williston on Contracts § 39:20 (4th ed.)........................................................................2, 3, 4, 6

022510.0155/9513180.4

Plaintiff Frontier Airlines, Inc. (Frontier) provides this Trial Brief pursuant to Rule 4(A)(5) of the Court's Individual Practices and the Court's Second Amended Scheduling Order (Dkt. 117).

## I. ISSUES TO BE TRIED

1. Did Defendants AMCK Aviation Holdings Ireland Limited, Accipiter Investment 4 Limited, and Vermillion Aviation (Two) Limited (collectively, AMCK or Defendants) waive strict compliance with Frontier's payment-timing obligations provided for in the 14 original leases between Defendants and Frontier (Original Leases)? **Yes.**

2. If Defendants wanted to end the waiver, were they required to provide Frontier with notice and a reasonable time to cure any alleged outstanding payments subject to the waiver? **Yes.**

3. Did Defendants failure to provide Frontier with notice and a reasonable time to cure any alleged outstanding payments subject to the waiver preclude Defendants from terminating the Framework Agreement such that Defendants' abandonment of their remaining contractual obligations constitutes a breach of contract? **Yes.**

4. Are all Defendants liable for this breach of contract? **Yes.**

5. How much is Frontier entitled to in damages based on Defendants' breach of contract? **$47.78 million** (to be updated at the time of trial).

## II. CONTESTED ISSUES OF LAW

**A. A party who waives a contractual right to strict timely payment must provide the other party with (i) notice and (ii) reasonable time to cure prior to withdrawing its waiver.**

Evidence at trial will show and confirm that AMCK waived the right to declare a default without providing notice and an opportunity to cure when it agreed to defer rent payments under the Original Leases on a month-to-month basis, ending no earlier than May 15, 2020. If AMCK desired to end the month-to-month arrangement, AMCK was required to (i) so notify Frontier and (ii) to provide Frontier with "reasonable time" to pay. AMCK's failure to do so has three

1

consequences: First, AMCK's purported May 8, 2020 after-hours, no-notice attempt at termination is ineffective. Second, the Court may impose a reasonable period of time for Frontier to make payment. Third, because Frontier paid within a reasonable time of AMCK's May 8 letter (three business days; five total days), Frontier is in compliance with all relevant contracts. Accordingly, AMCK's abandonment of its remaining Framework Agreement obligations is a breach of contract.

It is black-letter law that "where an executory contract fixes the time within which it is to be performed and performance within that time is waived by the parties to the agreement, neither party can thereafter rescind the contract on account of such delay without notice to the other requiring performance within a reasonable time, to be specified in the notice, or the contract will be abrogated." *Sherwood v. Gordon Bros.*, 116 N.Y.S.2d 306, 308 (City Ct. 1952). Put another way, when a party waives strict compliance with a contract term such as the timing of payments, "time as an essential element of the contract has been removed therefrom, but it can be restored by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with." *Id.*; *see also Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 282, 49 N.Y.S.3d 721, 727 (2017) ("If the waiver applies prospectively, it may be retracted *upon reasonable notice*, unless such retraction would be unjust in view of a material change of position in reliance on the waiver."); N.Y. U.C.C. Law § 2-A-208(4) (McKinney 2023) ("A party who has made a waiver affecting an executory portion of a lease contract may retract the waiver *by reasonable notification* received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."); U.C.C. § 2-209(5) (2022) (same); 13 Williston on Contracts § 39:20 (4th ed.) ("[H]aving once waived strict compliance with the terms of a contract, a party

2

can assert its right to strict compliance in the future *only by notifying the other party of its intent to do so and by allowing a reasonable time for the other party to comply*.").

For example, in *Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F. Supp. 821, 830 (S.D.N.Y. 1969), plaintiff Cassini alleged that defendant Couture breached the contract through delayed royalty payments over the course of four months, entitling Cassini to terminate the contract. The Court held that Cassini could not terminate the contract "without first demanding performance by defendant, thereby restoring time as an element of the contract." *Id.* at 831. The Court went on: "*Only then*, if defendant failed to perform *within a reasonable time*, could plaintiff elect to terminate the agreement. Any other rule would be unjust." *Id.* (emphasis added). Cassini, however, sent Couture a letter purporting to terminate the contract without "allowing defendant a reasonable time within which to make payments to cure past defaults." *Id.* The Court held that this letter was "not effective." *Id.* Moreover, the Court explained, "[i]n such situations, the courts are disposed to impose a reasonable time limit for compliance." *Id.* (citing *Arnot v. Union Salt Co.*, 186 N.Y. 501, 79 N.E. 719 (1906); *Berke v. Sherman*, 213 N.Y.S.2d 210 (Sup. Ct. 1961); *Schneider v. Rola Construction Co., Inc.*, 183 N.Y.S.2d 955 (Sup. Ct. 1959); 3A A. Corbin, Contracts § 723 (Supp. 1965)); *see also* 13 Williston on Contracts § 39:20 (4th ed.) ("The requirement of reasonable notice to the party whose nonperformance has been excused by waiver, as well as a reasonable opportunity to comply, are generally not obviated by an antiwaiver clause in the parties' contract").

Frontier's case parallels *Cassini* in many respects: Frontier's evidence will show that, in early April 2020, AMCK waived Frontier's rent payments under the Original Leases on a month-to-month basis as a result of the extraordinary circumstances created by the pandemic. The parties discussed and agreed to do this through email, text messages, and phone calls in return for

3

Frontier's agreement to attempt to negotiate delivery deferrals with Airbus as well as to work out extracontractual terms between themselves. Among other indicia of the waiver, AMCK and Frontier stayed in close contact throughout April and into May without any mention that the deferred rent payments were overdue or even due. There will be no evidence at trial that AMCK rescinded the waiver during the relevant period by "first demanding performance" and, second, providing Frontier "reasonable time" to pay as New York law requires. *Id.*; *Sherwood* 116 N.Y.S.2d at 308; *Kamco*, 149 A.D.3d at 282; N.Y. U.C.C. Law § 2-A-208(4) (McKinney 2023); U.C.C. § 2-209(5) (2022); 13 Williston on Contracts § 39:20 (4th ed.).

AMCK instead sent Frontier a letter late in the afternoon on Friday, May 8, 2020, purporting to terminate the Framework Agreement on the ground that Frontier had materially breached the Original Leases by failing to pay the deferred rent on time. Under well-settled law, the Court should hold that this May 8 letter was ineffective as a *fait accompli* termination. At best for AMCK, the Court should construe the May 8 letter as a notice of intent to terminate, subject to a reasonable cure period. And the evidence will show that Frontier paid all of the alleged outstanding amounts on May 13, 2020—within three business days of AMCK's May 8 letter. This satisfies the three- and five-business day time periods provided in the Framework Agreement, Original Leases, and MSN 10038 Lease for a party to cure any alleged outstanding payments. Frontier's performance was thus within a reasonable time and AMCK's only excuse for failing to perform its obligations under the Framework Agreement is therefore invalid.

To be clear, Frontier does not cite or rely upon *Cassini* for the proposition that a party's "conduct" (there, ongoing negotiations) can *create* a waiver. Frontier recognizes, as the Court noted in its Motion for Summary Judgment Order, that the Framework Agreement excludes conduct from creating a waiver. MSJ Order (Dkt. 123) at 23 n.1. Rather, Frontier cites *Cassini*—

and the other cases, model codes, and treatises—for the proposition that, once a party has waived a contractual right (as AMCK did through written and verbal means, *not* conduct), it cannot reverse course and terminate the contract without (i) giving notice that demands performance; and (ii) providing reasonable time for such performance.

**B.       Because AMCK's waiver of Frontier's strict timely payment obligations was supported by consideration and Frontier's reasonable and justified reliance, AMCK could not retract the waiver without Frontier's consent.**

Evidence will show that AMCK's waiver of Frontier's strict timely payment obligations under the Original Leases on a month-to-month basis was supported by consideration and Frontier's reasonable and justified reliance. Among other things, in exchange for AMCK's waiver, Frontier negotiated and achieved delivery deferrals with Airbus for the five remaining aircraft under the Framework Agreement. This negatively impacted Frontier's cash position because of delivery deferral delays when Frontier recoups its pre-delivery payments (PDP) from Airbus for the aircraft. This prevents Frontier from reallocating the recouped PDPs to future aircraft purchases. Moreover, Frontier's negotiations with Airbus were fraught with risk. Airbus's immediate reaction to Frontier's delivery deferral request made at the behest of AMCK (and in exchange for the payment-timing waiver) was to threaten Frontier with default of the greater Airbus Purchase Agreement, which contained more than 150 aircraft over a decade-long schedule. Such a result would have devastated Frontier. Frontier also reasonably and justifiably relied on AMCK's month-to-month waiver. This is proven by Frontier's repeated offers during the relevant period to pay all deferred rent immediately and conclude delivery deferral discussions with Airbus, and AMCK's repeated directions to Frontier not to do this.

It is blackletter law that "[o]f course, a waiver supported by consideration or a substitute, such as reasonable and justified reliance, will form a new contract or a binding modification of the original contract and may not be retracted without mutual consent; in other words, a condition

5

eliminated from a contract by an agreement, supported by consideration, cannot be reinstated by the unilateral action of the promisor whose duty would be subject to the condition." 13 Williston on Contracts § 39:20 (4th ed.); *see also* Restatement (Second) of Contracts § 84 cmt. f (1981) ("*Reinstatement after waiver.* If the requirement of a condition has been eliminated from a contract by an agreement supported by consideration it cannot be reinstated by unilateral action of the promisor.").

Because the waiver here was supported by consideration as well as Frontier's reasonable and justified reliance, AMCK could not retract the waiver without mutual consent. The evidence shows that there was no such mutual consent to retract the waiver. AMCK's retraction was therefore ineffective, meaning that AMCK could not terminate the Framework Agreement.

C. **Meaning of "month-to-month."**

"Month-to-month" has a well understood, long-established, meaning in the context of leases and tenancy. "[A] month-to-month tenancy has an indefinite term and continues until terminated by notice." *Carlo v. Koch-Matthews*, 53 Misc. 3d 466, 470, 37 N.Y.S.3d 426, 429 (N.Y. City Ct. 2016) (citing *Adams v. City of Cohoes*, 127 N.Y. 175, 183–184, 28 N.E. 25 (1891)). A month-to-month term suggests that the parties "have failed to mutually assent to an ending date." *Id.* Thus, a "month-to-month tenancy may and can continue indefinitely," and can "only be ended upon reasonable notice to the other party." *Id.* at 471–72. New York "adopted a rule of proportion" whereby a party must provide "a week's or month's notice to end the tenancy." *Id.* at 472. This idea has its roots in the English common law. *Id*. Thus, the plain ordinary meaning of "month-to-month" is that it continues until terminated—not that it terminates automatically at the end of each month as AMCK contends.

Evidence will show that the parties intended their month-to-month waiver of rent due under the Original Leases to be in accord with how the term "month-to-month" has been long used and

6

interpreted: the waiver would continue from month to the next until a party provided reasonable notice to the other that it would end the waiver. As the waiver continued from April 2020 into May 2020, and without any notice that the waiver had ended, the month-to-month waiver carried over into May 2020. AMCK could only terminate this waiver by providing reasonable notice.

**D.     Although the parties agreed to the waiver verbally and in writing, the Court may consider other communications and acts to determine the intent of the waiver.**

A waiver is the "voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved." *Randolph Equities, LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 516 (S.D.N.Y. 2009). "Waiver is a question of intent." *In re Gordon Car & Truck Rental, Inc.*, 59 B.R. 956, 962 (Bankr. N.D.N.Y. 1985). "Whether a party had the intent to waive is usually a matter of fact." *Randolph Equities*, 648 F. Supp. 2d at 516. This intent to waive a contractual right may "be proved by various species of proofs and evidence, by declarations, by acts, and by nonfeasance, permitting differing inferences, and which do not directly, unmistakably, or unequivocally establish it." *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37–38, 118 N.E. 210, 210–11 (1917).

Evidence at trial will show that, through verbal and written communications, AMCK waived Frontier's obligation to pay rent on the schedule set forth in the Original Leases—first for 10-business days, then on a month-to-month basis while negotiations were ongoing, and finally ending no earlier than May 15, 2020. Evidence will show that AMCK reaffirmed this waiver throughout April and into May 2020 through additional emails, text messages, and phone calls whereby, among other things, in response to Frontier's offers to pay all outstanding amounts immediately, AMCK confirmed (verbally and in writing) that Frontier need not pay anything, at least until May 15. It is therefore no consequence that the Framework Agreement does not allow

7

a waiver to be *created* by a course of conduct. *See* MSJ Order at 23 n.1. There is ample evidence of verbal and written communications to prove the existence and terms of the waiver.

With that in mind, the Court may still look to other evidence to determine what the parties "intended" with the waiver:

> The intention to relinquish the right or advantage must be proved. Occasionally it is proved by the express declaration of the party, or by his undisputed acts or language so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary. Then the waiver is established as a matter of law. Commonly it is sought to be proved by various species of proofs and evidence, by declarations, by acts, and by nonfeasance, permitting differing inferences, and which do not directly, unmistakably, or unequivocally establish it. Then it is for the jury to determine from the facts as proved or found by them whether or not the intention existed. . . . The acts and language of the party must be given, as evidence, their natural and logical effect under the circumstances of the case.

*Alsens*, 222 N.Y. at 37–38. Indeed, as the Court explained in its Summary Judgment Order, trial must resolve what the parties' intended with the payment-timing waiver: "to suspend payments through May 15, 2020, or while the parties were negotiating, or on a month-to-month basis." MSJ Order at 24. The "totality of the parties' conversations" surrounding the events of March–May 2020, as well as the "witnesses' credibility" weigh on this determination. *Id.*; *see also In re Caldor, Inc.-NY*, 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998) ("Whether there was a knowing and intentional waiver of rights is a factual question that we determine based on the totality of the circumstances."). The Court may look to the parties' external and internal communications, as well as their respective conduct, to show what the parties intended with their waiver and to judge witness credibility.

As AMCK conceded in its Motion for Summary Judgment briefing, the parties' discussed and may have agreed to a "month-to-month" rent deferral. *See* MSJ (Dkt. 102) at 10–12; Reply (Dkt. 119) at 6-7. AMCK mainly attacks these discussions by claiming that they did not form a

8

contract because other material terms remained unresolved. Reply at 7. That argument is inapposite to the waiver analysis. It is also wrong because the waiver was based on the premise that Frontier need not pay rent on the Original Leases while Frontier either granted or helped obtain concessions sought by AMCK, including that Frontier negotiate with Airbus to obtain its agreement to AMCK's delivery deferral demands—which is exactly what occurred. AMCK's other argument is that the parties' phone call on April 7 in which they discussed a month-to-month waiver does not establish that AMCK "*intended* the telephone conversation to be binding in the absence of a written agreement." *Id.* (emphasis added). The evidence adduced at trial and reasonable inferences therefrom will be clear that the parties intended just that.

Specifically, the evidence will show that AMCK had multiple reasons for waiving Frontier's timely rent payments on a month-to-month basis in exchange for Frontier negotiating and achieving delivery deferrals with Airbus for the five remaining aircraft under the Framework Agreement, including, but not limited to:

1. AMCK expressly intended to "buy ourselves some time . . . to see how everything develops before having to take the nuclear option" of terminating the Framework Agreement;

2. AMCK intended to delay for as long as possible its payment obligations under the Framework Agreement, which otherwise would have required AMCK to fund the five remaining aircraft for $255 million between March–August 2020; and

3. AMCK intended to delay its obligations under the Framework Agreement so that it could negotiate extracontractual quid pro quos because AMCK did not like the Framework Agreement's payment terms.

Consistent with AMCK's intention that the month-to-month waiver continue while negotiations were ongoing (or at least until May 15, 2020), AMCK's internal communications in May 2020 express that: (1) Frontier's rent payments on the 14 Original Leases "have been deferred," that the "[r]ent deferral requested" was "under negotiation" and "under review"; and (2)

9

022510.0155/9513180.4

AMCK was still "mandated" under the Framework Agreement to take delivery of the five remaining aircraft. The same is true of AMCK's communications and conduct of invoicing Frontier for only MSN 10038—the sole aircraft not subject to the waiver—between March 19 and May 8, 2020, never requesting that Frontier make payments on the Original Leases, and halting its chase emails to Frontier that lease payments were allegedly due or past due.

In the similar context of "determining whether parties *intend* to be bound [by a contract] absent a writing," courts look to myriad factors, including: (1) the "relationship of the parties"; (2) "acts of partial performance by one party accepted by the other"; (3) "usage and custom of the industry"; (4) "subsequent conduct and interpretation by the parties themselves"; and (5) "the time when the contract was entered into." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 575–76 (2d Cir. 1993). All of these factors evidence *intent*, even if courts do not look to them to *create* the contract itself. So too here—these factors evidence the parties' intent of their waiver even though they agreed to the waiver orally and in writing.

This type of evidence is admissible under multiple rules of evidence. *See, e.g.*, Fed. R. Evid. 404(b)(2) (evidence not relevant for other purposes is admissible to prove intent, motive, plan, and knowledge); Fed. R. Evid. 406(b)(2) (evidence admissible to show that, during the relevant timeframe, AMCK did not act in accordance with its "routine practice" of demanding payments because the parties were operating under the waiver). It is also admissible because it undercuts the credibility of witnesses who may attempt to portray, as AMCK has, that the parties only ever agreed to a 10-business-day waiver that expired on April 21, given that the parties showed through their communications and acts that they understood the waiver to extend beyond that date.

022510.0155/9513180.4

**E.     The evidence will establish that AMCK, Accipiter, and Vermillion are all proper defendants because the contracts at issue were intended as part of the same transaction.**

Under New York law, writings are to be read together when they form part of a single transaction, relate to the same subject matter, and are intended to effectuate the same purpose. *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941). That is so even where the writings were "executed on different dates and were not all between the same parties." *This Is Me*, 157 F.3d at 143. It is up to the fact-finder to determine whether different writings were intended to impose on separate parties the same binding obligations, even though the obligations were defined in different documents. *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). In making this determination, the fact-finder should look to "the drafting history and chronology, the cross-referencing of the agreements, the integral nature of the undertakings . . . , the relationships among the . . . parties and entities, and the background assumptions furnished" in the drafting. *This Is Me*, 157 F.3d at 143.

As the Court explained in its Summary Judgment Order, and as the evidence will show, prior to March 2020, Frontier and Accipiter Holdings DAC—the parent company of Accipiter Investment Aircraft 4 Limited—were parties to all 14 Original Leases. In September 2019, Frontier and Accipiter Holdings DAC signed the Letter of Intent, agreeing to the material terms that later made up the Framework Agreement, whereby the parties committed to leasing an additional six aircraft. Frontier and AMCK executed the Framework Agreement on March 16, 2020. On the same date, Frontier entered into a Lease Agreement for MSN 10038.

Each of the 15 lease agreements are between Frontier (as Lessee) and either UMB Bank, N.A. or Wells Fargo Trust Company (as Lessors/Owner Trustees). The Lessors/Owner Trustees' respective performances are guaranteed by the Guarantors—which are Accipiter Investments

11

Aircraft 4 Limited for five of the Original Leases and Vermillion for MSN 10038. The evidence will show that both Accipiter Investment Aircraft 4 Limited and Vermillion are Trustors under the contemporaneously executed Trust Agreements for the aircraft under the Original Leases and MSN 10038. Under Section 3.14 of the Trust Agreements, the Lessors/Owner Trustees of the aircraft can only declare a "default or event of default as shall be specified in written instructions from the Trustor[s]"—Accipiter Investments Aircraft 4 Limited and Vermillion respectively.

All of these agreements—the Original Leases, the MSN 10038 Lease, the accompanying Trust Agreements and Guarantees, and the Framework Agreement—form part of a single transaction, relate to the same subject matter, and are intended to effectuate the same purpose: namely, the financing and leasing of aircraft between Frontier and Defendants. Evidence will show that these documents expressly incorporate and reference each other and were intended to be read together. Indeed, it is only through the interrelation of these documents that Defendants—all corporate relatives—purported to use Frontier's alleged outstanding rent payments under the *Original Leases*, to claim that Frontier breached the *MSN 10038 Lease*, thus justifying Defendants to terminate the *Framework Agreement* under cross-default provisions that tie all of these agreements together.

Further, due to Defendants' multiple, overlapping statuses under the operative documents, each Defendant needed to expressly authorize and participate in the purported termination of the Framework Agreement. Defendants stated as much in their May 8 Notice of Termination letter: "By reason of the occurrence and continuation of the above-described Event of Defaults and Framework Event of Default, AMCK Aviation and the relevant 'Lessors' [*i.e.*, UMB or Wells Fargo, who's performance is guaranteed by Accipiter Investments Aircraft 4 Limited and Vermillion and] are entitled to exercise all of their respective rights and remedies under the Framework Agreement, the MSN 10038 Lease Agreement and the Other Agreements and/or applicable law." And again, the Lessors (which are also Owner Trustees

under the Trust Agreements) could not declare a default without Accipiter Investments Aircraft 4 Limited and Vermillion directing them to do so. Accordingly, all Defendants are proper parties to this litigation and are liable for their conduct giving rise to the termination of the Framework Agreement.

**F.     Frontier is entitled to $47.78 million in damages.**

The evidence will prove that, as of the time of this filing, the dollar amount that would make Frontier whole as a result of AMCK's breach of contract is $47.78 million. This amount will be updated at the time of trial.

### III.  EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL

**A.     The parties' June 2020 offers and counteroffers are not precluded under ER 408.**

Frontier anticipates that AMCK will object to the admission of an exhibit containing certain offers and counteroffers between the parties in June 2020 under Evidence Rule 408. Specifically, after AMCK purported to terminate the Framework Agreement on May 8, 2020, on June 18, 2020, AMCK reached out to Frontier to bid on three of the aircraft that had previously been part of the Framework Agreement. This was consistent with AMCK's plan to use the termination and resulting crisis as leverage to extract a better deal for these aircraft. The terms AMCK offered in June 2020 were substantially worse for Frontier than the terms under the Framework Agreement: (i) AMCK would pay $3 million less for each aircraft; and (ii) Frontier would pay $70,000 more in monthly rent. In addition, AMCK's proposal was "conditioned on the release and waiver of any potential legal claims by Frontier arising from the termination of the Framework Agreement."

As an initial matter, Frontier cited this exhibit and included this discussion in its Memorandum of Law in Response to AMCK's Motion for Summary Judgment. Opp. at 19. AMCK did not mention anything about ER 408 in its Reply, or otherwise seek to have this exhibit or discussion excluded. *See generally* Reply. The exhibit itself—which originates as an email from AMCK to Frontier—also bears none of the hallmarks of something the parties intended to be

13

protected under ER 408: it is not marked as privileged, confidential, or for settlement purposes only, and there is no reference to ER 408. Accordingly, AMCK has waived its admissibility objections to this exhibit.

Nevertheless, this exhibit can be used for multiple reasons beyond those discussed by ER 408. Evidence Rule 408 only makes evidence of settlement discussions not admissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." ER 408(a). But Frontier does not intend to introduce the exhibit for those purposes. Rather, Frontier intends to use this exhibit to show, among other things, the continued offers and counteroffers of the parties related to the aircraft set to be due under the Framework Agreement. Evidence will also show that this exhibit demonstrates the completion of AMCK's plan that it had been executing since March 2020. In particular, and as AMCK explained in its May 8 board meeting where it resolved to terminate the Framework Agreement, terminating "would provide the best possible leverage with Frontier to continue negotiations."

Finally, this exhibit is relevant to Frontier's efforts to mitigate its damages. Even after AMCK terminated the Framework Agreement, Frontier chose to reengage in negotiations with

AMCK, though ultimately leased the remaining five aircraft through CDB Aviation Lease Finance DAC (CDB) and Jackson Square Aviation (JSA) because those companies offered better terms.

DATED:  September 21, 2023

           **LANE POWELL PC**

By: s/ David G. Hosenpud
David G. Hosenpud (*pro hac vice*)
601 SW Second Avenue, Suite 2100
Portland, Oregon  97204-3158
Telephone No.:  503.778.2100
Facsimile No.:  503.778.2200
E-mail:  hosenpudd@lanepowell.com

Aaron Schaer, (*pro hac vice*)
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA  98111-9402
Telephone:  206.223.7103
Facsimile:  206.223.7107
E-mail:  schaera@lanepowell.com

-and-

**BINDER & SCHWARTZ LLP**
Neil S. Binder
675 Third Avenue, 26th Floor
New York, New York  10017
Telephone No.:  212.510.7008
Facsimile No.:  212.510.7299
E-mail:  nbinder@binderschwartz.com

*Attorneys for Plaintiff, Frontier Airlines, Inc.*