NA6CfroC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FRONTIER AIRLINES, INC.,

 4                Plaintiff,

 5        v.                              20 Civ. 9713 (LLS)

 6   AMCK AVIATION HOLDINGS IRELAND
     LIMITED, ACCIPITER INVESTMENT
 7   4 LIMITED, VERMILLION AVIATION
     (TWO) LIMITED, WELLS FARGO
 8   TRUST COMPANY, N.A., solely in
     its capacity as OWNER TRUSTEE,
 9   and UMB BANK, N.A., solely in
     its capacity as OWNER TRUSTEE,
10
                Defendants.
11
     ------------------------------x
12                                        New York, N.Y.
                                          October 6, 2023
13                                        3:00 p.m.

14   Before:

15                  HON. LOUIS L. STANTON,

16                                        District Judge

17                       APPEARANCES

18   LANE POWELL PC
          Attorneys for Plaintiff
19   BY:  DAVID G. HOSENPUD
          AARON SCHAER
20
     CLIFFORD CHANCE US LLP
21        Attorneys for Defendants
     BY:  JEFF E. BUTLER
22        JOHN P. ALEXANDER

23

24

25
```

NA6CfroC

| | |
|---|---|
| 1 | THE COURT:  Your submissions are very, very good. |
| 2 | It's good lawyering on both sides.  Of course legally, really |
| 3 | nice case. |
| 4 | Why is it nonjury, is it because of the contract? |
| 5 | MR. BUTLER:  Yes, your Honor.  There's a jury waiver |
| 6 | in the contract. |
| 7 | THE COURT:  My only question is when do you want |
| 8 | trial?  But I could answer some of your questions perhaps. |
| 9 | MR. HOSENPUD:  Your Honor, we think that we want to be |
| 10 | able to clear '23 because of the potential scheduling issues |
| 11 | with our witnesses.  So over into the new year, January, |
| 12 | February timeframe. |
| 13 | MR. SCHAER:  For me, either in middle January or |
| 14 | middle of March.  I have a February conflict. |
| 15 | MR. BUTLER:  For our part, your Honor, we're obviously |
| 16 | eager to hear about the Court's schedule and the Court's |
| 17 | preferences for trial.  We, of course, have issues of our own. |
| 18 | We haven't had a trial date yet to give notice to witnesses to |
| 19 | get them to be able to travel to New York, our witnesses are in |
| 20 | Ireland. |
| 21 | THE COURT:  Where are they located? |
| 22 | MR. BUTLER:  Ireland, your Honor. |
| 23 | THE COURT:  Are they? |
| 24 | MR. BUTLER:  Yeah.  Our client AMCK with the defendant |
| 25 | in this case was Ireland-based, and the former employees who |

NA6CfroC

```
 1   will be the key witnesses are still located in Dublin.

 2              THE COURT:  How many do you think?

 3              MR. BUTLER:  For our side, there are really only two

 4   key witnesses, your Honor.

 5              THE COURT:  Both in Dublin?

 6              MR. BUTLER:  Both in Dublin, correct.

 7              MR. HOSENPUD:  We believe we have four key witnesses,

 8   your Honor.  There will be, obviously, some deposition

 9   transcript excerpts and counsel and I have discussed working

10   that out and exchanging, highlighting.

11              THE COURT:  The main thing on that is not to have to

12   make rulings, do them in advance so it's one smooth transcript.

13              MR. HOSENPUD:  Understood.

14              THE COURT:  That's easily done.

15              Where are your witnesses?

16              MR. HOSENPUD:  Largely, one is in Italy and three are

17   in Colorado.  So that will take a little bit of engineering for

18   that gentleman's schedule in Italy.

19              THE COURT:  What are they going to testify to?

20              MR. BUTLER:  Well, your Honor, I think the key issue

21   in the case is whether there's been a waiver of the right to

22   timely payment.  The contention is that there was waiver either

23   on this April 7 telephone conference between Paul Sheridan, who

24   is the CEO of my client, and James Dempsey, who is the CFO and

25   is the CFO of Frontier Airlines.  Then there's a possibility of
```

NA6CfroC

1    a further waiver that could have occurred on a subsequent call,

2    but we're really talking mainly, I believe, about what happened

3    on a single telephone call on April 7, 2020, from our

4    perspective.

5              THE COURT:  Is there a transcript of the call?

6              MR. BUTLER:  No, your Honor, there's no written record

7    of the call and memories differ.

8              THE COURT:  And who was on the call?  These witnesses

9    or were they just in the room?

10             MR. BUTLER:  It was really a call between two

11   individuals and everyone else was joining in on the call.

12             THE COURT:  And so what are the witnesses going to

13   testify?

14             MR. BUTLER:  Presumably about what they remember about

15   that call, your Honor.  Among other things, I guess surrounding

16   events.  Some surrounding events may cast light on what was --

17   whether any commitment was made on that call.

18             THE COURT:  To which they weren't parties, they were

19   simply in the same room.

20             MR. BUTLER:  I think, for example, on both sides, your

21   Honor, the two participants of that call, when they hung up the

22   phone, they had communications with their colleagues on each

23   side, and there was given indication of what was discussed on

24   the call.

25             THE COURT:  And at least their understanding of it.

NA6CfroC

1              MR. BUTLER:  Correct, your Honor.

2              THE COURT:  And possibly a little motivation.

3              MR. BUTLER:  Correct.  Exactly right.

4              MR. HOSENPUD:  Yes.  And from the plaintiff's

5    perspective, your Honor, we think that this entire pattern of

6    communication continued through April and into May through both

7    internal communications and external communications between the

8    parties.  So we really have a concentrated period of time

9    starting in late March --

10             THE COURT:  When was the communication terminating the

11   relationship?

12             MR. HOSENPUD:  May 8.

13             THE COURT:  May 8th?

14             MR. HOSENPUD:  2020.

15             THE COURT:  And so these go past that.

16             MR. HOSENPUD:  These go up to it.

17             THE COURT:  Up to?

18             MR. HOSENPUD:  Yes.

19             THE COURT:  Okay.

20             MR. HOSENPUD:  And there are a few stragglers that go

21   past it, but the primary communications, which we think

22   demonstrate our position in the case, continued right up to

23   May 8th.

24             THE COURT:  It's a great case to try, no question.

25             In the first place, what is the way, by way of

NA6CfroC

1    documentation, of any of the takings of position?

2         MR. HOSENPUD:  Yes.  We have jointly agreed to

3    approximately, and I'd have to look at the list, about 135

4    documents, your Honor.  There are a few that are in contention,

5    but very few.  So it's that paper trail of email, contracts,

6    text messages that inform the parties' positions.

7         THE COURT:  So long since I've tried a business case,

8    I've forgotten how useful the emails were — lethal.

9         What kind of a concept do you have without having

10   verified it with your clients about when, generally, you want a

11   trial?

12        MR. BUTLER:  From our perspective, I haven't checked

13   on the particular availability of witnesses, but I would have

14   the similar timeframe in mind that we could certainly

15   contemplate something in January or February subject to the

16   Court's schedule or earlier if necessary, but we would want to

17   have the opportunity to go and talk to our clients and just

18   confirm the witnesses will be available and don't have some

19   conflict that we don't anticipate.

20        MR. HOSENPUD:  Your Honor, from our perspective, given

21   my colleague's intimate involvement in this case and the fact

22   that he will be with me at trial, we have mid January or mid

23   March to avoid a conflict on Mr. Schaer's schedule.

24        THE COURT:  That's the time you can try.

25        MR. HOSENPUD:  Yes, mid January or mid March.

NA6CfroC

1          THE COURT:  From mid January, that's where I start

2     being booked of a slow and small series of other cases.  This

3     case, what do have?  Recite what we've got.

4          THE DEPUTY CLERK:  In January, we have the Chanel

5     case, and then February we have the FTC case, January 9th and

6     February 6th.

7          THE COURT:  I think you've got to figure that will

8     take three weeks.  There's no reason to really expect it to go

9     beyond, except for the fact that all expectations are so much

10    guesswork, but for present purposes, I would think three weeks

11    for that.  That's January and I'm biting into February or at

12    least up to February.  Then we're free --

13         THE DEPUTY CLERK:  No, FTC is February 6, and they're

14    expecting five weeks.

15         THE COURT:  The next month is March.  Those are solid

16    bookings.  What seems to me, maybe a blessing in your case, is,

17    number 1, it's non-jury.  Number 2, the individual witnesses

18    can really be taken in any order.  It might be that we're going

19    to end up trying it in little bites, filling it in in the times

20    that I have available and you have available, and the witness

21    has it, and that that really wouldn't matter.  It may turn out

22    that that's a great convenience.

23         MR. BUTLER:  We can pick and choose the dates, yes.

24         THE COURT:  But while I do another trial, it has to be

25    tried as a unit.

NA6CfroC

| | |
|---|---|
| 1 | MR. HOSENPUD:  Your Honor, does the -- |
| 2 | THE COURT:  Because you piece it all together at the |
| 3 | end and it's a question of law on the waiver with the key |
| 4 | evidence, what happens during that period up to May. |
| 5 | MR. HOSENPUD:  Does the Court have available -- |
| 6 | THE COURT:  Just tell me so I can be thinking about |
| 7 | it.  May 8th was the termination, so this is all |
| 8 | pretermination? |
| 9 | MR. HOSENPUD:  Essentially, with a little bit after. |
| 10 | Just wondering, does the Court have an opening during |
| 11 | the week of the 18th of March? |
| 12 | THE COURT:  Do I have a? |
| 13 | MR. HOSENPUD:  Is your trial docket open during the |
| 14 | week of March 18?  And would you be done with the FTC case? |
| 15 | THE COURT:  How long do they think the FTC case -- |
| 16 | THE DEPUTY CLERK:  Five weeks. |
| 17 | THE COURT:  Oh, you said five weeks.  I doubt it's |
| 18 | shorter.  It would be dangerous.  Their guess is at least as |
| 19 | good as mine and much closer to the facts.  Is that how you got |
| 20 | to March 18? |
| 21 | MR. HOSENPUD:  That is.  I counted five weeks and I |
| 22 | threw in another. |
| 23 | THE COURT:  That would give you a little lump at the |
| 24 | end of March.  If you were to try it all in one lump, how long |
| 25 | do you think it would take, couple of weeks? |

NA6CfroC

1          MR. HOSENPUD:  Our estimate is five trial days — three

2     and a half for the plaintiff, one and a half for the defendant.

3     So if the Court held trial in a five-day week, five days for

4     the week, one week.

5          THE COURT:  What's the earliest?

6          MR. BUTLER:  Again, it's subject to witness

7     availability, which I don't know right now.  But the earliest

8     that we could do it is I think December at the earliest, but

9     again, that's subject to checking conflicts and our witnesses

10    are not --

11         THE COURT:  It might be quite needed.

12         We're free in December, aren't we?

13         THE DEPUTY CLERK:  After December 11th, starting from

14    the 12th.

15         THE COURT:  I'm going away on the 22nd, but that's

16    10 days.  We might be able to use that time quite usefully

17    depending --

18         MR. BUTLER:  For our part, we'd be happy to go back to

19    see if that would work for our people.  I don't know if you

20    guys have your own conflict during that timeframe.

21         MR. HOSENPUD:  We would need to check, as well.

22         MR. BUTLER:  But particularly, given the other

23    conflicts that you have in January and February, I mean, that's

24    an obvious solution if we can make it work.

25         THE COURT:  I was just thinking, would it be good or

NA6CfroC

```
 1    bad or neutral if there was really substantially no

 2    differentiation between the plaintiff's case and the

 3    defendants', we simply took the witnesses as they become

 4    available, how much difference would it make?  Still talking

 5    about a finite time.  It's not like a jury where you can

 6    assemble the evidence after the case is closed and that might

 7    be necessary or the best roll.  So it's really a question of

 8    putting it on the record.

 9            MR. BUTLER:  I agree, your Honor.

10            THE COURT:  I'll be listening to it and of course I

11    can straighten it out in my mind.

12            MR. BUTLER:  I haven't thought about this possibility,

13    your Honor, but I don't see why it wouldn't work, and it would

14    enable us to, if we know the dates the Court is available, I

15    could pick and choose.

16            THE COURT:  I'll have those 10 days, day-to-day,

17    that's what I figure.

18            MR. BUTLER:  It might be efficient to have one witness

19    per day, especially so we don't have to worry about witnesses

20    coming in and not being sure of when they'll be able to

21    testify.

22            THE COURT:  What do you think about that?

23            MR. HOSENPUD:  Your Honor, obviously my preference

24    would be to put on our case, and if we selected --

25            THE COURT:  What I'm really asking is to the extent
```

NA6CfroC

1    that it's impossible to do that, how damaging is it?  It might

2    not matter at all.

3         MR. HOSENPUD:  And just going through the back and

4    forth in my mind with all the various testimony that we've

5    gathered and the documentation, the only thing I can think of,

6    potentially, is the damages witnesses as something that might

7    be a different dynamic, the damage experts, and then also

8    preparation in terms of how it is scheduled.

9         THE COURT:  Supposing we took the damage experts out

10   of the calculation on the theory that we basically try

11   liability first and everybody's experts can testify then, I'm

12   not suggesting you do it, just if you took them out of the

13   calculation, it might simplify the calculation.

14        MR. HOSENPUD:  Is your thinking that they would be

15   testifying after the liability witnesses?

16        THE COURT:  Yes.

17        MR. HOSENPUD:  In the same period of time set for

18   trial?

19        THE COURT:  Whatever period of time is available or

20   even take a verdict as a sort of bifurcation.

21        MR. HOSENPUD:  And that would depend on the Court's

22   ruling as the trier of fact, that would come out potentially

23   weeks later and then we would schedule the damage experts

24   depending on that outcome.

25        THE COURT:  Certainly potentially, but not

NA6CfroC

1    necessarily.

2             MR. HOSENPUD:  My preference personally would be to

3    try the case.

4             THE COURT:  Straight.

5             MR. HOSENPUD:  Straight, and have our witnesses,

6    liability and damage testimony to the Court rather than jump

7    over the damage witnesses and then reschedule some weeks later,

8    depending on the Court's calendar.

9             THE COURT:  And you think the plaintiff's damage

10   witness would be all of the plaintiff's case?

11            MR. HOSENPUD:  Yes.

12            THE COURT:  And no more damages until you come to the

13   end of the defendants' case.

14            MR. HOSENPUD:  Yes.

15            THE COURT:  I think there are a couple of principles

16   involved.  One is the basic assumption, probably the safest

17   working assumption of a whole lot of shaky assumptions is that

18   I can give you about 10 days in December following day-by-day,

19   and that the most desirable thing is to get the cases in in the

20   old fashioned way.  Now, that might mean that the plaintiff can

21   get finished in that time in one unit and, by definition, that

22   leaves the defendants' case at least not being interrupted by

23   plaintiff's evidence.  It may be interrupted by events.  It

24   seems to me that's one principle.

25            Another is no matter how much you chop up the evidence

NA6CfroC

1    because it's easier to do than in almost any other case I've

2    seen, in little units, little bites that will fit together

3    later as though you were cutting and pasting emails.  Still,

4    the human mind tends to envision and remember chronologically.

5    It's the easiest way and it's the most familiar and it's

6    basically the way we think, and it's probably better.  To the

7    degree we can do that, it's better.  I think it's much less

8    essential than it would be in a different kind of case because

9    you can patch it together in your posttrial briefs.  Still, it

10    is a function of comprehension.

11            MR. HOSENPUD:  And we've largely attempted to

12    structure --

13            THE COURT:  Mike, if we can give them 10 days in

14    December, when's the next time we could pick it up, March?

15            THE DEPUTY CLERK:  No, probably a few days after you

16    come back.

17            THE COURT:  There are only about two days.  I come

18    back the 2nd of January.  Well, we're really going into Chanel,

19    the case for that time, and they may need three days of

20    concentration before we take them in on the 9th.

21            THE DEPUTY CLERK:  There might be time in between the

22    two trials.

23            THE COURT:  I don't think it's workable.  I think

24    we'll probably be too busy getting ready for Chanel.  And that

25    means, basically, the middle of March.

NA6CfroC

1          THE DEPUTY CLERK:  Yes.

2          THE COURT:  Well, so be it.  Is there any particular

3    harm in a rather long interval?

4          MR. BUTLER:  From my perspective, your Honor, I would

5    not invite such a long interval.  I would rather try to try the

6    case in December in its entirety or, if we can't do that, it

7    would be better --

8          THE COURT:  You think you can, 10 days?

9          MR. BUTLER:  Oh, yes.  The parties think we need only

10   five days, your Honor, five trial days.

11         THE COURT:  Why don't we shoot for that?

12         MR. BUTLER:  I think we'll try, but it's only subject

13   to witness availability.

14         THE COURT:  Of course.

15         MR. BUTLER:  And it being relatively close in

16   December.

17         THE COURT:  There are pluses.  You're able to give the

18   witnesses a good deal of notice, and what they want more than

19   anything else is their commitment that this is really going to

20   happen and don't shift it around.  It's the breaking of their

21   schedules that makes the problem.

22         MR. BUTLER:  Right.  From my perspective also, though,

23   and I don't know if counsel shares it, it's good to concentrate

24   on everything in one period of time, if possible.

25         THE COURT:  That's ideal.

NA6CfroC

1          MR. BUTLER:  And that's why I think we should try to

2     make it work in December.

3          THE COURT:  Yes.

4          MR. BUTLER:  And if that just proves to be impossible,

5     we should not try to start in December and go to March, we

6     should just schedule it for March and have our week then.

7          THE COURT:  And a lot will depend on how much is left

8     over, if any.

9          MR. BUTLER:  If we can find the time in December, I'm

10     very confident we can try the case in a week in December.

11          THE COURT:  I think that's what we better do.  The

12     chances are good and the positives are very desirable.  And if

13     you have one loose witness that's going to have to pick up in

14     March, well, you're still way ahead.

15          I did that when I was a lawyer on a case.  It was a

16     non-jury case in supreme New York, and by the time we had tried

17     the rest of the case, the testimony of the witness in

18     California that I had thought was sort superfluous had become

19     key.  So we waited until he could come over and testify, and it

20     wasn't until midwinter and then we came in, he came right in,

21     he was wonderful and won us the case.

22          MR. BUTLER:  So it can be done.

23          THE COURT:  Right.  If something like that can happen,

24     then there's really no injury to the case at all.  Life goes

25     on, you do other things, and then you go back to thinking about

NA6CfroC

1     them.

2              MR. HOSENPUD:  Your Honor, understanding what has been

3     said here, I echo the preference of trying it together if we

4     can, and depending -- we'll confer with each other about our

5     witness scheduling, but I've yet to decide whether I call as

6     adverse witnesses some of the witnesses that are being put

7     forward in the defense case.

8              THE COURT:  You can always videotape.  I'm just like

9     any juror, they all love videotape.  It's like going to a

10    movie.

11             MR. BUTLER:  I'm glad to hear you say that, your

12    Honor, because there's a possibility that if there's a

13    difficulty for one of our witnesses in traveling to New York,

14    we could just arrange for a trial deposition in Ireland that

15    can then be shown to the Court.

16             THE COURT:  Sure.  That's entirely --

17             MR. BUTLER:  I don't think that will be necessary, but

18    if necessary, we'll raise it with your Honor.

19             THE COURT:  It's entirely acceptable in principle, and

20    it settles a lot of scheduling questions.

21             Well let's, for present purposes, schedule the trial

22    in December.  A normal trial day is about 11:30 or 11:00 to

23    1:00 and then 2:00 or 2:15 to 5:00.  That sounds short, but we

24    get a lot done.

25             MR. BUTLER:  So if I understand your Honor, we'll set

NA6CfroC

```
 1    it for December 12th, but can we also have the --

 2              THE COURT:  I'm the one with the schedule as it turns

 3    out.

 4              MR. BUTLER:  I'm sorry.  December 11th would be the

 5    first day of that week.

 6              THE DEPUTY CLERK:  That would be the 12th.

 7              THE COURT:  I see.  I see.  You're back on the 9th?

 8              THE DEPUTY CLERK:  Back on the 11th.

 9              THE COURT:  Oh, on the 12th because Monday is the --

10    okay.  So that's Tuesday the 12th.  I just want to make sure

11    these are clear.  I've got a doctor's appointment on the

12    Thursday, but it's far away and it's easy to shift that.  It

13    wouldn't make any trouble.  I wouldn't worry about that.  If I

14    have notice so I can give him notice, long notice, then

15    December 17, 18, 19, 20, 21, and that's the end of the

16    available time in December.

17              MR. BUTLER:  So you have days available through the

18    21st?

19              THE COURT:  Through the 21st, but not Friday the 22nd.

20              MR. BUTLER:  What I would propose, your Honor, is that

21    we confer with our witnesses, Mr. Hosenpud and I will confer to

22    see if we can slot our witnesses into those days, even if

23    they're not consecutive days.

24              THE COURT:  I wouldn't worry.  Don't worry about the

25    order of proof.  And, really, it's a tertiary consideration.
```

NA6CfroC

1          MR. BUTLER:  Right.

2          THE COURT:  Particularly where we're talking about a

3     sequence of calls and they'll really separate goals and

4     separate little units of proof, and as I say, you can put them

5     in chronological order, even though they came in at trial at

6     different times.

7          MR. BUTLER:  Right.

8          THE COURT:  It wouldn't make any real difference.  I

9     wouldn't worry about it.  Then we're out of gas until March.

10          MR. BUTLER:  Well, we might be able to get it done,

11     your Honor.

12          THE COURT:  Maybe we'll finish.

13          MR. BUTLER:  I think we should be optimistic about it

14     at this point.

15          THE COURT:  Okay.  Let's do this --

16          MR. BUTLER:  We'll let you know.

17          Can we have -- we don't need a fixed timeframe, but I

18     think we'll try to let the Court know as soon as we can if

19     there's any problem with that plan or if we can't make it work.

20          THE COURT:  Something basic that you know it's not

21     going to work.

22          MR. BUTLER:  And I think we had also, and I would

23     suggest that I confer with Mr. Hosenpud on this, we probably

24     would like to have some -- there's some pretrial events that we

25     need to work out, like deposition designations, if there are

NA6CfroC

1    transcripts we want to use, so each side can designate and

2    counter designate.

3                THE COURT:  You have time for that, sure.

4                MR. BUTLER:  There's also an issue, we may have some

5    motions *in limine*.  Does the Court have a preference as to how

6    we handle those?  Should we just pick a briefing schedule for

7    those or would you have another preference?

8                THE COURT:  What relief would you be asking?

9                MR. BUTLER:  The one I'm thinking of in particular,

10   your Honor, is that we have a *Daubert* challenge to the damages

11   expert, Dr. Neels, the plaintiff is putting forward.  That's

12   why, from our perspective, bifurcating liability and damages

13   would be great because we could put that issue off, but we have

14   a challenge to the methodology that Dr. Neels uses in coming up

15   with his damages calculation.  That could be handled at trial

16   or we could do it as a motion *in limine*.  I was hoping to get

17   your Honor's views on that at this conference.

18               THE COURT:  My view is it's much better handled at

19   trial and subject to cross.

20               MR. HOSENPUD:  We would agree.

21               THE COURT:  And the whole thing is fought out.

22               The trouble with *in limine* is it's inevitably based on

23   a theory and the theory is full of assumptions.  The fact that

24   you think the evidence is very convincing and therefore it's

25   more convenient to win it before trial is not good.  It belongs

NA6CfroC

in the trial, particularly where it goes to the foundation and
the method because there, you want to hear what he's done and
what the attack on it is together.

MR. BUTLER:  Understood.

As long as we can reserve, I think some courts hear
those types of motions in advance, but as long as we can
reserve the right to challenge the testimony based on the
*Daubert* consideration, that would be fine.

THE COURT:  Absolutely.  And all of the other
considerations of trial, believability, plausibility, common
sense.

MR. BUTLER:  Good.  We hope all those issues will be
reserved, your Honor.

THE COURT:  They're all there, but they don't have
much access.  I've said this before in other cases, it's a very
sort of a disappointed and a little bit ashamed feeling when,
in the middle of the trial, you realize that something you
excluded *in limine* because the theoretical basis for it was so
convincing is actually would be very useful.

MR. BUTLER:  Right.

THE COURT:  And you think why the hell did I decide
that when I didn't have to and it was out of context.

MR. BUTLER:  We have great confidence that the Court
will be able to sit through the evidence.  We're not really
contemplating a motion to exclude evidence in advance, that can

NA6CfroC

| 1 | all be addressed, the weight of evidence can all be addressed

| 2 | at trial.

| 3 | THE COURT:  Well, you said *Daubert*.

| 4 | MR. BUTLER:  For *Daubert*, it's just the experts,

| 5 | whether the expert testimony should be heard at all under the

| 6 | *Daubert* standard.

| 7 | THE COURT:  That point hasn't gone away in the middle

| 8 | of trial.

| 9 | MR. BUTLER:  Understood.  Understood.

| 10 | THE COURT:  I suppose you can demand an offer of proof

| 11 | or something like that.  The real thing is plow ahead with the

| 12 | evidence and it can be held to be excluded.

| 13 | MR. BUTLER:  Understood.

| 14 | Your Honor, one question, you mentioned at one point

| 15 | posttrial briefs.

| 16 | THE COURT:  I did.

| 17 | MR. BUTLER:  Would it be the Court's preference to

| 18 | hear all the testimony and then rather than have sort of a

| 19 | traditional closing argument, have the parties submit posttrial

| 20 | briefs that pull it all together?

| 21 | THE COURT:  That's a very fair question.  Of course

| 22 | the honest answer is I don't know because I don't know what I'm

| 23 | talking about.  I'll know at the point of trial when we reach

| 24 | that point.

| 25 | From this distance, and I've read your briefs

NA6CfroC

1   carefully and I think I understand them, and the waiver point

2   with the little table that also counts, based on just that

3   reading, I would say in your case, it was almost unique in the

4   degree of possibility or probability that it carries that, in

5   this case, I will decide it almost as a juror at the end of the

6   trial because that little point is so conclusive and the

7   evidence on it is so finite, that to make a ruling may be quite

8   really easy.

9        And the rule is not terribly ambiguous, it's pretty

10  clear.  In this case, much more than the normal case I think,

11  that possibility is open and I simply will feel so confident on

12  that point, which is decisive, that I would say there's no

13  point in having briefing on it, I know what the law is, I know

14  what the facts are, and there's no point in putting people

15  through that work.  If that's the answer, if they don't like

16  it, they have to go to appeal.  So it's easy, it's a useful

17  question, I can't answer it, but think I think it's much more

18  open in the nature of this case.

19       MR. BUTLER:  And don't take my question as

20  encouragement to have posttrial briefing, I'm happy to not to

21  have to do that, your Honor, if it's unnecessary.

22       THE COURT:  Most posttrial briefs are -- well,

23  somebody described it as kind of some sort of eating cold

24  cabbage.  The more direct one was it was like getting into a

25  wet bathing suit.  I would think that is a much more -- I can't

NA6CfroC

| 1 | say probably, because that's a value, a judgment I simply am |

```
 1    say probably, because that's a value, a judgment I simply am

 2    not able to make, but more in the picture than it would be in

 3    almost any other case of a trial, susceptible of those elements

 4    coming together and with such conviction that I rest in

 5    judgment or not.

 6              MR. BUTLER:  Understood, your Honor.

 7              THE COURT:  It happens all the time in criminal cases.

 8    You don't have to have posttrial briefs.

 9              So, pretty much, unless I thought it was wrong in

10    principle, then I would say I want to hear everything you want

11    to say in posttrial briefs, but at this point now, I'm unsure.

12    No point not to go through it.  And in your discussions between

13    yourselves, I think you can understand that and expect it, any

14    way which seems to me now not having heard one word --

15              MR. HOSENPUD:  From the witnesses.

16              THE COURT:  -- the evidence or oral argument.

17              MR. BUTLER:  Your Honor, I just checked my list I

18    don't have any other questions.  I think we know what we need

19    to do going forward.

20              THE COURT:  Have a nice weekend.

21                              *  *  *

22

23

24

25
```