**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FRONTIER AIRLINES, INC.

      Plaintiff,

v.

AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,

      Defendants.

Case No.: 1:20-cv-09713-LLS

## PLAINTIFF'S SUPPLEMENTAL TRIAL BRIEF

1. **Even if the parties never reached a coherent waiver regarding rent payments on the 14 airplanes, and therefore the right to payment continued unimpaired, does AMCK still face liability under the law for its failure to provide Frontier with notice and an opportunity to cure?**

Yes. "There is no dispute that AMCK did expressly waive the timely payment of rent for the time period from April 6, 2020 to April 21, 2020." AMCK Tr. Brief (Dkt. 134) at 7. AMCK granted this waiver so Frontier had time to "reach agreement with Airbus" and thereafter reach a rent deferral agreement with AMCK. Joint Ex. 63. On April 7, the parties discussed over the phone extending the waiver on a month-to-month basis to provide the time needed to complete these negotiations. Joint Exs. 73, 76. The record supports that AMCK provided a month-to-month waiver on this call, which continued until either (1) the next aircraft delivered or (2) the parties completed negotiations. *See, e.g.*, Trans. at 567:3-570:1; 580:10-582:3. Frontier testified that AMCK granted this month-to-month waiver. *Id*. at 532:14-19. AMCK's principal has no recollection what he said on the April 7 call, but knows he and AMCK's shareholder were agreeable to the month-to-month waiver. *Id.* at 676:25-677:3; 728:8-23. But even without a coherent extension on April 7, the Court can hold that AMCK needed to provide notice and a reasonable opportunity to cure for three reasons: (1) AMCK's acts extended the waiver; (2) the contracts require written notice; and (3) the record supports claims of bad faith and estoppel.

Waiver is "a clear manifestation of intent to relinquish a contractual protection." *Natale v. Ernst*, 63 A.D.3d 1406, 1407 (2009). "[A]ny alleged subjective and unstated intent" is irrelevant. *Id.* at 1409. As the Court recognized, waiver can occur "by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage." *Dice v. Inwood Hills Condo.*, 237 A.D.2d 403, 404 (2d Dep't 1997); Order (Dkt. 123) at 24; Trans. at 181:21-183:13. "Even where a contract specifically contains a nonwaiver clause or a provision that it cannot be modified without a writing, a waiver may be established by the parties' course of conduct and

1

actual performance." *McGuire v. McGuire*, 197 A.D.3d 897, 901-02 (2021); *Williams v. Buffalo Pub. Sch.*, 758 F. App'x 59, 63 (2d Cir. 2018). When a waiver is supported by consideration or reasonable and justified reliance, it "form[s] a new contract or a binding modification of the original contract and may not be retracted without mutual consent." 13 Williston on Contracts § 39:20 (4th ed.). When a waiver is not supported by consideration or justified reliance, it can be withdrawn only after providing notice and an opportunity to cure. Dkt. 136 at 1-5. "The notice must be clear, distinct and unequivocal; fix a reasonable time within which to act; and inform the other party that failure to perform by that date will be considered a default." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 270 (S.D.N.Y. 2002).

The record shows that AMCK's actions clearly manifested an extended waiver. Among other things: (i) AMCK stopped sending "chase" alerts during the period in dispute, Pl. Exs. 7-8; (ii) the parties negotiated past April 21 without any mention that the waiver expired or payments were due; (iii) AMCK never corrected Frontier when it expressed, after April 21, its understanding that the waiver was ongoing, Joint Exs. 17, 111, 121; and (iv) AMCK rejected Frontier's repeated offers to pay immediately, Joint Exs. 121, 120, 123. This extended waiver was supported by consideration and justified reliance: Frontier delayed receiving $15 million per aircraft by deferring deliveries, Trans. at 564:10-565:4, weathered threats of default from Airbus, *id.* at 518:3-519:4; 521:7-524:12, and chose to not make payments while expressing it was conscious of not being in default with AMCK, *id.* at 581:12-19; Joint Exs. 63, 76. AMCK in turn benefitted by deferring paying $51 million per aircraft. Trans. at 566:7-567:19. To withdraw this waiver, AMCK needed Frontier's mutual assent or, at least, to provide notice and a reasonable opportunity to cure.

The parties' contracts also required notice and a reasonable cure period before termination. The airplane lease agreements consider the following to be an Event of Default:

2

> 16.1(a) *Non-Payment.* Lessee fails to pay (i) any Basic Rent or Security when due in the currency and in the manner stipulated in this Agreement within three (3) Business Days of the respective due date, or (ii) any other sum due from it under this Agreement or any other Operative Document . . . in the currency and in the manner stipulated within five (5) Business Days of *written notice* of such failure from Lessor.

Joint Ex. 29 § 16.1(a) (emphasis added); *see also* Joint Ex. 24 § 6.1.1 (The Framework Agreement contains a similar five-business-day written notice requirement for non-payments). AMCK may argue that, under section 16.1(a)(i), it did not need to provide written notice for monthly rent payments. However, the undisputed 10-business-day waiver brings this case within section 16.1(a)(ii): By virtue of that waiver, the monthly rents were no longer due "in the manner stipulated in this Agreement" per section 16.1(a)(i). Instead, the payments became "any other sum due . . . under this Agreement or any other Operative Document" per section 16.1(a)(ii)—which without doubt is subject to the five-business-day written notice requirement. Joint Ex. 29 § 16.1(a).

  Finally, the record supports claims of bad faith and estoppel in light of the lack of notice and cure period. The Court previously dismissed Frontier's claims of bad faith and promissory estoppel as duplicative of the breach of contract claim. Order at 25-27, 30-32. Of course, the Court may revise its interlocutory orders "before the entry of a judgment," Fed. R. Civ. P. 54(b), and pleadings may be amended based on the evidence at trial, *id.* 15(b), (c)(1). The covenant of good faith "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Aventine Inv. Mgmt., Inc. v. Can. Imperial Bank of Com.*, 265 A.D.2d 513, 514 (1999). "Under New York law, '[t]he implied covenant of good faith and fair dealing may give rise to a notice requirement." *Echo Bay Pharms., LLC v. Torrent Pharma, Inc.*, 2022 WL 2132964, at *11 (S.D.N.Y. June 14, 2022); N.Y. U.C.C. Law § 2-309(3), cmt. 8 (McKinney 2024). Similarly, estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought

3

022510.0155/9738052.3

and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Fund. Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 106 (2006). The evidence supports, and the Court could hold that AMCK's termination—without notice or a cure period—violated both doctrines.

Frontier reiterates that the robust record supports that the parties reached a waiver—first on April 6, and then extended on April 7—through their express statements. These waivers are corroborated (even if not separately created) by all the parties' conduct up until AMCK's May 8 termination. Under a waiver—as well as the contracts, the covenant of good faith and fair dealing, and estoppel—AMCK must provide notice and a cure period. And Frontier indisputably cured all alleged outstanding payments on May 13, within the contracts' three- and five-business-day grace periods. Joint Ex. 29 § 16.1(a); Joint Ex. 24 § 6.1.1. Thus, no matter the doctrine, Frontier fully performed, and AMCK's termination—without notice or opportunity to cure—is a breach.

**2.    If Frontier is awarded damages, should Frontier be reimbursed for its tax liability?**

No. Frontier does not request, nor has it sought, reimbursement for its tax liability. Rather, Frontier requests the amount needed to put it in the financial position it would have been in absent AMCK's breach. That amount is $48.66 million, which will be taxed at 22.8%, leaving Frontier with $37.58 million. These amounts—$48.66 million pre-tax; $37.58 million after tax—are the same amounts Frontier would have received if it earned the money in its regular course of business.

If Frontier sought tax reimbursement, the damages would be $63.03 million. This would leave $48.66 million *after* taxes ($63.03 * (1 – .228) = $48.66). This is not Frontier's request.[1]

---

[1] To that end, the cases AMCK cited for the proposition that "New York law generally does not allow for the recovery of tax liability," are inapposite. AMCK Tr. Brief at 13. If anything, those cases distinguish Frontier's request. AMCK's cases involve plaintiffs alleging malpractice against financial advisors, seeking damages for the difference in taxes the advisors represented plaintiffs would pay versus what they actually paid once the correct tax provision was applied. Those plaintiffs were specifically trying to recover their lawful tax liability. Frontier is not seeking that.

4

There may be some confusion due to Frontier's expert, Dr. Kevin Neels, calculating damages on an *after-tax* basis. An after-tax calculation requires three steps:

(1) Apply the 22.8% tax rate to the total pre-tax damages to arrive at an after-tax sum.
(2) Apply the discount rate (1.0445%) to the after-tax sum, equaling $37.58 million.
(3) "Gross-up" that amount with a 22.8% tax rate. This calculation equals $48.66 million (as of April 8, 2024, and after accounting for prejudgment interest).

Frontier will pay approximately $11.079 million in taxes on the $48.66 million (for which it is not seeking reimbursement), leaving it with $37.58 million.

To be clear, the "gross-up" at Step 3 is not a reimbursement. Instead, when doing an after-tax calculation, the gross-up avoids the double-tax issue discussed at trial. Had Frontier not done the gross-up at Step 3, it would be taxed twice because the after-tax formula taxes damages at Step 1, with damages taxed again upon Frontier's receipt. If that occurred, Frontier would be taxed on the $37.58 million, and improperly left with $29.01 million. Trans. at 445:15-447:2.

In cases like this, where the tax rate is constant, Steps 1 and 3 of the after-tax method actually cancel each other out. Indeed, the calculation could have been done wholly on a *pretax* basis where taxes would not be considered. The only step necessary would be Step 2: apply the discount rate to the total damages—no tax reduction on the frontend; no tax gross-up on the backend. And still, the calculation equals $48.66 million, which is taxed upon receipt.

The main reason Dr. Neels ran an after-tax calculation is because that is the proper way to conduct the analysis, even if Steps 1 and 3 typically offset each other. The Reference Manual on Scientific Evidence, the seminal damages treatise, endorses this approach. The treatise likewise explains that Steps 1 and 3 "are a wash" when the tax rate is the same:

> In principle, the calculation of compensation should measure the plaintiff's loss after taxes and then calculate the magnitude of the pretax award needed to compensate the plaintiff fully, once taxation of the award is considered. In practice, the tax rates applied to the original loss and to the compensation are frequently the same. When the rates are the same, the two tax adjustments are a wash. In that case, the appropriate

5

022510.0155/9738052.3

pretax compensation is simply the pretax loss, and the damages calculation may be simplified by the omission of tax considerations.

*Reference Manual on Scien. Evidence*, 454-57 (Fed. Jud. Ctr., 3d ed. 2011). AMCK's expert agrees the same result is reached under the pretax and after-tax analyses. Dkt. 133 ¶ 9. This chart demonstrates the same—in either case, Frontier is entitled to $48.66 million:

| Net Present Value of Damages Calculation Pretax and After-Tax (in Thousands) | | | |
|---|---|---|---|
| Aircraft | Eventual Lessor | Pretax Damages | After-Tax Damages (with 22.8% tax) |
| MSN 9549 | CDB | $9,808 | $7,575 |
| MSN 10031 | CDB | $9,808 | $7,575 |
| MSN 10089 | CDB | $9,919 | $7,661 |
| MSN 10384 | JSA | $9,556 | $7,380 |
| MSN 10452 | JSA | $9,568 | $7,389 |
| Sum of Damages | | $48,660 | $37,580 |
| Rate for Tax Gross-Up | | n/a | 22.8% |
| Amount Added in Tax Gross-Up | | n/a | $11,079 |
| **Award Necessary to Make Frontier Whole** | | **$48,660** | **$48,660** |

The after-tax approach is favored because there are times when the pretax and after-tax analyses reach different results. Most common is when the tax rates at Steps 1 and 3 are different, such as when receiving a lump-sum damages award will put a plaintiff in a different tax bracket. In those scenarios, taxes must be considered because "a tax gross-up is appropriate when necessary to make a claimant whole." *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, 2016 WL 4129111, at *3 (S.D.N.Y. Aug. 3, 2016). Here, however, Steps 1 and 3 are simply "a wash."

In sum, if the after-tax approach is used, a tax "gross-up" (Step 3)—*not* reimbursement—is needed to make Frontier whole because this approach already taxes Frontier once on the frontend (Step 1). If the pretax approach is used (only Step 2), then no gross-up is necessary. In either scenario—after-tax with a gross-up; pretax without a gross-up—the award needed to make Frontier whole is $48.66 million, which will be taxed upon receipt and reduced to $37.58 million, just as it would have been if Frontier earned the funds under the Framework Agreement.

022510.0155/9738052.3

DATED: May 2, 2024

                                         **LANE POWELL PC**

                                         By: <u>s/ David G. Hosenpud</u>
                                             David G. Hosenpud (*pro hac vice*)
                                             601 SW Second Avenue, Suite 2100
                                           Portland, Oregon 97204-3158
                                           Telephone No.: 503.778.2100
                                           Facsimile No.: 503.778.2200
                                           E-mail: hosenpudd@lanepowell.com

                                           Aaron Schaer, (*pro hac vice*)
                                           1420 Fifth Avenue, Suite 4200
                                           P.O. Box 91302
                                           Seattle, WA 98111-9402
                                           Telephone: 206.223.7103
                                           Facsimile: 206.223.7107
                                           E-mail: schaera@lanepowell.com

                                           -and-

                                        **BINDER & SCHWARTZ LLP**
                                        Neil S. Binder
                                        675 Third Avenue, 26th Floor
                                        New York, New York 10017
                                        Telephone No.: 212.510.7008
                                        Facsimile No.: 212.510.7299
                                        E-mail: nbinder@binderschwartz.com

                                     *Attorneys for Plaintiff Frontier Airlines, Inc.*

022510.0155/9738052.3