O483FRO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FRONTIER AIRLINES, INC.,

4                   Plaintiff,

5           v.                              20 Civ. 9713 (LLS)

6   AMCK AVIATION HOLDINGS IRELAND
    LIMITED, ACCIPITER INVESTMENT
7   4 LIMITED, VERMILLION AVIATION
    (TWO) LIMITED,
8
                    Defendants.
9
    ------------------------------x
10                                          Bench Trial

11                                          New York, N.Y.
                                            April 8, 2024
12                                          11:00 a.m.

13  Before:

14                      HON. LOUIS L. STANTON,

15                                          District Judge

16                          APPEARANCES

17  LANE POWELL PC
         Attorneys for Plaintiff
18  BY:  DAVID G. HOSENPUD
         AARON SCHAER
19
    CLIFFORD CHANCE US LLP
20       Attorneys for Defendants
    BY:  JEFF E. BUTLER
21       JOHN P. ALEXANDER
         RISHIKA JIKARIA
22       GINA CROSBY

23

24

25

O483FRO1                          Opening – Mr. Hosenbud

1          (In open court)

2          THE COURT:  Good morning.

3          MR. HOSENPUD:  Good morning, your Honor.

4          MR. BUTLER:  Good morning, your Honor.

5          THE COURT:  Do you want to make opening statements?

6  Or do you want to go straight to the witness?

7          MR. HOSENPUD:  Your Honor, it would be the plaintiff's

8  preference to make an opening statement.

9          THE COURT:  Okay.  It will work better from the

10  lectern.

11          MR. HOSENPUD:  Thank you, your Honor.

12          Your Honor, David Hosenbud and Aaron Schaer on behalf

13  plaintiff.  At counsel's table is Gerald Diamond, corporate

14  counsel, and corporate representative Jimmy Dempsey.

15          Your Honor, this case involves a month-to-month rent

16  deferral.  This case involves a month-to-month rent deferral

17  that was expressly agreed on April 7, 2020, and it was entered

18  into by the parties to fundamentally allow for time.  And that

19  time was needed to do three principal things:  The first was

20  for Frontier to engage in complex delivery deferral

21  negotiations with Airbus in the center of the unrolling

22  pandemic.  The second was to negotiate terms with AMCK

23  regarding rent deferral repayment.  The third was for AMCK to

24  continue its process of negotiating lease concessions, or to

25  engage in what its language is called the nuclear option.  And

O483FRO1                          Opening - Mr. Hosenbud

1    that means to terminate the Framework Agreement.

2            The Framework Agreement, the delivery of the first

3    aircraft under the six aircrafts pursuant to the Framework

4    Agreement and the rent deferral request, all occurred on

5    March 16, 2020.

6            The schedule under the Framework Agreement for the

7    delivery of these six aircraft was three in March, one in May,

8    and one in June.  One of the March aircraft was delivered.

9    That occurred on March 16.

10           During the period of March, Frontier Airlines

11   continued to make its rent payments on all the aircraft already

12   under lease with AMCK.  It made its rent payments on the

13   brand-new aircraft that was just delivered on March 16.  And

14   all of its lease payments were current through March 2020.

15           The evidence will show that while Frontier was timely

16   on all its March lease payments, AMCK was already contemplating

17   a termination of the Framework Agreement and not fulfilling its

18   obligations, but it needed time to consider how to work those

19   options out.

20           The next aircraft under the Framework Agreement, which

21   was originally scheduled for March, was pushed into April by

22   virtue of internal sequencing at Airbus.  AMCK shareholder on

23   March 24 suggests to AMCK that it needed 24 months' prepaid

24   rent for that April delivery to convince their board not to

25   stop taking the delivery.

O483FRO1                      Opening - Mr. Hosenbud

1          The internal AMCK communications will reflect on that

2     same day of March 24, that if they could buy themselves some

3     time, they may be able to get through the next delivery.  And

4     then they would determine at that point, having a little more

5     time to see how everything develops, before having to take the

6     nuclear option.

7          On March 26, there had been delivery deferral requests

8     as I mentioned on March 16, there was a response on March 18,

9     but the first substantive response on March 26, that had

10    changes, was a request by AMCK to prepay rent on the next

11    aircraft, and then to defer the remaining four aircraft three

12    to six months.

13         Shortly after that request was made to Frontier, it

14    began pushing on Airbus with basic inquiries.  We would like

15    you to consider deferring the aircraft.  The responses to those

16    inquiries by Airbus was essentially you need to take delivery

17    or you will face default, but that did not deter Frontier from

18    pursuing this.

19         Similar inquiries were made by -- one inquiry was made

20    by Jimmy Dempsey.  Similar inquiries were made by Spencer

21    Thwaytes, who was the vice president of the treasury.  And he

22    received the same response from Airbus.

23         On April 3, Mr. Sheridan, after a phone call, provided

24    a new proposal.  And that proposal basically said in order to

25    defer deliveries, you must shift the upcoming aircraft

O483FRO1                         Opening - Mr. Hosenbud

1     deliveries by six months.

2              Discussions were had about the difficulty that that

3     would entail, given Airbus's predisposition to not want to

4     defer deliveries on aircraft that had already been

5     manufactured.  They were rolling off the assembly line, and

6     they were from Mobile, Alabama and there was no place to put

7     them.  So, Mr. Dempsey pursued Airbus on April 6 again.  And

8     then learned that Mobile, Alabama was going to close.  It was

9     going to close for the month of April.  He also realized that

10    there were rent payments due to AMCK, and he scheduled a call

11    with AMCK to discuss the fact that Mobile was closing, as well

12    as that there were rent payments, two rent payments due, and he

13    requested that they be deferred.

14             In a phone call between Robert Fanning and

15    Mr. Sheridan and Jane O'Callaghan, there was an arrangement for

16    a waiver, a grace period of 10 days, that was then confirmed in

17    writing.

18             The reason for that is explicitly noted in the chart

19    in front of you to allow Frontier to reach agreement with

20    Airbus, and to allow AMCK to reach a deferral agreement.

21             They echoed that idea to their shareholder in the box

22    below that starts with "to catch you up."  And that was to give

23    us a bit more time to reach an amicable agreement, we extended

24    them a grace period.

25             Now, there was communication by Mr. Dempsey with Paul

O483FRO1                      Opening – Mr. Hosenbud

Sheridan, thanking him for that 10-day grace period and asking
to get on a call the next day, April 7.  And on April 7, that
call occurred, and that is when the express waiver was
discussed and agreed upon.

Mr. Dempsey pointed out that the cycle of getting
Airbus to move aircraft as far as potentially six months would
take a great deal of time.  And so they agreed to a
month-to-month waiver of the rent payment while Mr. Dempsey
worked with Airbus to negotiate as far a deferral of deliveries
as he possibly could, but their desire was six months.

On April 11, Mr. Dempsey texted Mr. Sheridan saying
can you give me a call, I think I've got Airbus to consider
moving two aircraft out to July and one aircraft out to June.

And then Mr. Dempsey, on the 13th of April, confirmed
that in an e-mail to Mr. Sheridan and requested that he would
like to get a deferral in place and he hoped that that would be
satisfactory to Mr. Sheridan.

The response by Mr. Sheridan, CEO of AMCK, was that
the idea of having the aircraft move six months was to have all
rent deferrals paid before the first delivery.  And if it was
going to be only to June, one in June, and two to July, they
would have to recast any rent deferral agreement such that it
accomplished all payments on rents were done before the first
delivery.

That theme continued throughout the course of

O483FRO1                    Opening – Mr. Hosenbud

1    negotiations all the way up until April 30.

2            Frontier, in two instances before, one before April 30

3    and one on April 30, agreed to pay all April rents in full.

4    And in each occasion, that they did so.  AMCK did not respond.

5    Did not demand.  Did not make a request to have that done.

6            The evidence will demonstrate that AMCK's own writings

7    on April 30 confirmed the existence of an informal deferral

8    pending agreement with Airbus on delivery deferrals.

9            The evidence will also establish that AMCK and its

10   shareholder knew that the acceptance of April rents from

11   Frontier would obligate AMCK Aviation to move ahead with the

12   terms of the Framework Agreement.

13           Frontier continued its efforts on April 30 to move the

14   aircraft beyond June.  The near-term delivery would be on June

15   and into July.  It had a basic understanding with Airbus at

16   that time that they would agree to do so, even though the

17   negotiations were still ongoing.

18           Also on April 30, Frontier had received from Airbus

19   indications that they would be willing to move the last two

20   aircraft potentially out to February 2021.  So three aircraft

21   to July, two additional aircraft to 2021.  And it would be

22   accomplished either by Airbus agreeing or potentially having a

23   substitute lessor come in and take earlier deliveries to allow

24   the AMCK deliveries to move into Q1 2021.

25           On that date, Mr. Sheridan, in conferring with the

O483FRO1                    Opening – Mr. Hosenbud

1    shareholder out of Hong Kong, said that they were going to

2    basically propose what are known as quid pro quos, something in

3    exchange, of course.  And those were going to be lease

4    extensions on all of the aircraft already under lease with AMCK

5    from prior years, of 4 years.  And there were also going to be,

6    on the six aircraft that were subject to the Framework

7    Agreement, an elimination of the early termination option that

8    would allow Frontier to terminate the leases at year eight.

9    And if Frontier performed up until May of 2021 on all rents and

10   was current, those options would drop away.  But nonetheless,

11   lease extensions on the prior 14 aircraft would eliminate the

12   early termination options completely, and those leases would go

13   to 12 years.

14          This proposal was one that would effectively cause

15   Frontier millions of dollars in debt reporting.  It would

16   change the entire nature of those leases such that Frontier

17   would be in a very difficult position to obtain capital from

18   other sources, because its debt profile would have gone up

19   considerably.

20          Mr. Dempsey did receive that proposal from AMCK on

21   April 30.  And the only thing that changed between the

22   communication with Mr. Sheridan and its shareholder, which had

23   a July repayment date that was on basically a

24   take-it-or-leave-it, and if Frontier did not take it, AMCK

25   would again explore the nuclear option, and that meant

O483FRO1                        Opening – Mr. Hosenbud

1    termination of the Framework Agreement for the allegation of

2    non-payment of April rents.

3           When Mr. Dempsey received the written offer, the only

4    thing that changed was instead of payment by July, it had to be

5    payment by May 15.

6           Due to the clause that talked about the lease

7    extensions, Mr. Dempsey communicated with Mr. Sheridan that

8    they needed to have a phone call.  And in that phone call,

9    Mr. Dempsey conveyed the concerns about having lease extensions

10   and the serious impact it would have on the ability of the

11   company, Frontier, to generate capital.

12          He then proposed to Mr. Sheridan as an alternative, in

13   addition we can pay you current.  As an alternative, we keep

14   the rent deferral that is current in place through May, and we

15   will offer you prepaid rent on all of the upcoming aircraft.

16   And that was an effort to balance out the deferral of rents for

17   that short period of time, April and May, with advancing the

18   rents on the new leases.

19          Mr. Sheridan told him in that phone call, I will get

20   back with you, I'll let you know, have to discuss with the

21   shareholder.

22          On May 1, while these negotiations were still ongoing,

23   Mr. Dempsey texted Mr. Sheridan any word?  And he responded,

24   have a meeting essentially four hours from now, phone

25   conference with the shareholder, and Mr. Dempsey then advised,

O483FRO1                        Opening – Mr. Hosenbud

1    all right, Airbus has given us another 24 hours to make this

2    deal on the delivery deferrals.

3          After May 1, Mr. Sheridan did not communicate with

4    Mr. Dempsey.  Mr. Dempsey then prepared an e-mail on May 8

5    recapping what had been offered on the phone call.  And said

6    patiently been waiting for you to respond to our discussion.

7          That was both -- that e-mail went earlier in the day

8    and recapped the three in July aircraft move that was close to

9    completion with Airbus, two in February of 2021, the prepaid

10   rents, and clarifying that someone else would take over their

11   slots of the second half of 2020, which is what caused

12   Mr. Dempsey to be able to represent that the next deliveries

13   for AMCK would be February 2021.

14         So on May 8 these negotiations were continuing.

15         Then, late in the day, probably about 4:41

16   approximately Denver time in the afternoon, six hours later in

17   Ireland, the default notice came.  And there will be testimony

18   in this record that that came as a complete surprise, given

19   where the parties were.  It was sent after banking hours.  But,

20   Frontier treated it as a request for payment.  And within the

21   three business day grace period, wire transfers were sent out

22   on May 13 within that three-day business grace period.

23         They timely paid, same as they did before the

24   month-to-month rent deferral, and have continued to do so

25   today.

1          Your Honor, at the close of the evidence we are going

2     to respectfully request that the Court award a judgment for

3     Frontier, and we believe the evidence will demonstrate that it

4     has been damaged in the amount of $48,660,000 as a result of

5     the breach of the waiver agreement.  Thank you.

6          MR. BUTLER:  Good morning, your Honor.  My name is

7     Jeff Butler from Clifford Chance.  And we represent the

8     defendants, the remaining defendants in this case, who are AMCK

9     Aviation, Accipiter Investments, and Vermillion Aviation.

10          Let me just introduce you to the rest of the Clifford

11     Chance trial team for this case.  In the middle of our table

12     you'll see Jack Alexander and Gina Crosby.  You'll hear from

13     them this week examining some of the Frontier witnesses.

14     Closer to me is Rishika Jikaria.  She plays a very important

15     role in this trial.  She's making sure all the right exhibits

16     get on the Elmo machine to show you at the right time.  Also

17     sitting behind us is Beverly Alcober.  She is our paralegal who

18     will keep us organized behind the scenes.  At the end of the

19     table is Mr. Ernie Yu.  He is the former head of legal for

20     AMCK, and he currently serves as deputy general counsel at

21     AMCK's shareholder CK Asset Holdings.  Mr. Yu traveled here

22     from Singapore for this hearing, he arrived over the weekend,

23     but he's normally based in Dublin, Ireland.

24          Your Honor, this case really begins with the COVID-19

25     pandemic.  In March of 2020, there was tremendous uncertainty

O483FRO1                         Opening - Mr. Butler

1    over this new virus.  Cases of the disease seemed to be rising

2    exponentially in the United States.  Events were being

3    canceled, quarantines and travel restrictions were being

4    imposed.  Schools and businesses were closing.

5         In the midst of all this uncertainty, on March 16,

6    2020, AMCK financed the first of six aircraft deliveries under

7    the Framework Agreement.  AMCK paid $51 million to Airbus, and

8    Frontier took delivery of an A320 aircraft as lessee under a

9    12-year lease.  Later that same day, Frontier sent a letter to

10   AMCK, asking for rent deferral for all of its leases, citing

11   the COVID-19 pandemic as the reason.  And the March 16 letter

12   asked for deferral of rent for the next three months, through

13   June 30, 2020, with repayment of the deferred rent over a

14   nine-month period beginning on July 1st.  The letter also

15   mentioned that Frontier would pay interest on the deferred

16   rent, but the amount of interest was not specified in the

17   letter.

18        And you are going to see evidence during this trial

19   that those are the three key terms of a rent deferral

20   arrangement:  A rent deferral period, a repayment period, and a

21   rate of interest to be paid on the deferred rent.

22        You'll see these terms reflected in draft deferral

23   agreements that were prepared on the Frontier side, as well as

24   in a draft deferral agreement prepared by AMCK.

25        One of the things about the March 16 letter, it states

O483FRO1                        Opening – Mr. Butler

1    that the deferral agreement would be documented in a written

2    agreement.  And you are going to hear in this case that that

3    would be the normal practice in this industry.  The rent

4    deferral that was being proposed would be an amendment to an

5    aircraft lease agreement, and those kinds of amendments are

6    almost always documented in writing in this business.

7            Now, this rent deferral request from Frontier did not

8    sit well with some on the AMCK side, especially at AMCK's

9    shareholder CK Assets Holding in Hong Kong.  Some were unhappy

10   that on the same day that AMCK performed its obligations under

11   the Framework Agreement, and paid $51 million, Frontier was

12   asking to suspend performance under its lease agreements

13   involving AMCK.

14           Now you might hear that Frontier made the same request

15   to all of its lessors, but AMCK was the only lessor that had

16   financed a delivery that very same day.  And AMCK was expected

17   to finance at least the next two or three deliveries from

18   Airbus.  So the evidence will show that AMCK was in a unique

19   position among Frontier's lessors.

20           Now, AMCK did not reject this rent deferral request

21   out of hand.  They began a negotiation with Frontier over the

22   request.  And in exchange for the rent deferral requested by

23   Frontier, AMCK asked for some concessions of its own.  They

24   referred to these as quid pro quos, or you might see QPQ.  One

25   concession that AMCK wanted, they wanted Frontier to defer

1    AMCK's financing obligations under the Framework Agreement for

2    six months.  And Frontier could arrange that by negotiating

3    with Airbus to delay the upcoming deliveries.

4          But you are going to hear that there were a number of

5    other concessions requested by AMCK, one was emphasized by

6    Mr. Hosenbud, and had to do with lease extensions.  But there

7    were a number of concessions that bubbled up during the course

8    of this negotiation.

9          And the negotiations over all these possible

10   concessions, they're really all set forth in the documentary

11   record.  The parties exchanged proposals and counterproposals

12   by e-mail throughout the month of April.  But the parties never

13   reached an overall agreement with respect to both rent deferral

14   and concessions under the Framework Agreement.

15         The parties did reach agreement on one thing.

16   Frontier had two lease payments due on April 6, 2020, and

17   Frontier asked for a short-term deferral of those payments in

18   order to negotiate with Airbus over delivery delays.  And this

19   was discussed on a telephone call involving Robert Fanning from

20   Frontier and Paul Sheridan, the CEO of AMCK, on April 6.

21         And Mr. Sheridan agreed to a 10-business-day grace

22   period ending on April 21, 2020.  This is set forth in a

23   confirming e-mail that Mr. Sheridan sent shortly after that

24   call.

25         The next day, April 7, is a critical day in this case.

O483FRO1                        Opening – Mr. Butler

1    On that day there was a telephone call between James Dempsey,

2    the CFO of Frontier, and Mr. Sheridan, as I said, the CEO of

3    AMCK, and one thing is certain about that call.  They discussed

4    a month-to-month rent deferral arrangement.

5              You're going to hear conflicting evidence, however,

6    about whether any agreement was reached on that call.  And

7    you're also going to hear conflicting evidence about what a

8    month-to-month deferral might mean.

9              Obviously the key witnesses on these issues are

10   Mr. Dempsey and Mr. Sheridan.  They were the only two people on

11   that April 7 call.  Now, unfortunately, neither of them

12   remembers exactly what was said on the call, and each left the

13   call with a different impression of what had been discussed.

14             Happily, there are written communications on each side

15   from shortly after the call that shed some light on what

16   happened.

17             On the Frontier side, immediately after the call,

18   Mr. Dempsey exchanged text messages with his colleague Robert

19   Fanning about the supposed month-to-month agreement, and

20   Mr. Hosenbud showed you one of those text messages.  But there

21   are other text messages on the same day that we think are even

22   more revealing.

23             For example, they indicate that Mr. Dempsey was still

24   expecting the arrangement to be documented in a written

25   agreement.  The text exchange also confirmed that at least one

O483FRO1                         Opening – Mr. Butler

1    of the key terms of rent deferral -- the repayment period --

2    had not been discussed at all on the telephone call.

3           On the AMCK side, Mr. Sheridan sent an e-mail to

4    AMCK's shareholder describing the month-to-month discussion,

5    and Mr. Sheridan described it as a deferral of rent for the

6    rest of April, and he also described it at that time as

7    something AMCK can agree to.  Not something that AMCK had

8    already agreed to.  And consistent with this, on April 9, 2020,

9    two days later, AMCK sent Frontier a draft agreement proposing

10   to defer rent for the month of April, so consistent with

11   Mr. Sheridan's understanding of that call.

12          And now here's one of the enduring mysteries of this

13   case, your Honor.  Frontier never responded to that draft

14   agreement.  They never agreed to it.  And they never wrote back

15   to propose any alternative terms for the rent deferral.  The

16   matter of rent deferral for the month of April was simply

17   dropped by Frontier.

18          Although there was no written agreement in place for

19   rent deferral for the rest of April, Frontier did not make any

20   payment when that 10-day grace period expired on April 21.  The

21   evidence will show that Frontier did not pay rent due in April

22   for 14 of the aircraft it leased from AMCK, and it also failed

23   to make a couple of rent payments that were due in early may.

24          AMCK did not take immediate action on these payment

25   defaults.  Instead, AMCK continued to negotiate with Frontier

O483FRO1                      Opening – Mr. Butler

1    in an attempt to reach an overall agreement.  And you will see

2    that the parties continued to exchange proposals on rent

3    deferral and on other concessions through the end of April and

4    into early May.

5         By early May, however, it was clear to AMCK that the

6    parties were not going to reach an overall agreement.  On

7    May 8, 2020, AMCK sent a notice to Frontier that it was

8    terminating the Framework Agreement, based on Frontier's

9    payment defaults in April.

10        Now, AMCK terminated the Framework Agreement, but it

11   did not terminate the 14 leases with Frontier, the 14 leases

12   that were in default as of that time.  So, accordingly,

13   Frontier changed course, and they decided to pay all the past

14   due rent to avoid being in default under those leases.  And on

15   May 13, 2020, Frontier did pay just over 5.8 million in past

16   due rent on those lease agreements.

17        Your Honor, you've now heard a summary of the

18   important facts from each side.  And you might notice that

19   there is really not that much disagreement between the parties

20   on the relevant chronology of events.  Mr. Hosenbud talked

21   about most of the same dates that I told you about.

22        This case really boils down to one disputed fact.

23   What happened on that telephone call on April 7 between

24   Mr. Dempsey and Mr. Sheridan.  And during this trial, you are

25   going to hear what each of those individuals had to say about

O483FRO1                    Opening – Mr. Butler

1    that telephone call.  Mr. Dempsey is here today, I assume

2    you'll hear from him later this week to hear his side of the

3    story.  Mr. Sheridan is traveling from Dublin, Ireland, at the

4    end of this week, and he will be available to tell you his side

5    of the story on Monday, Tuesday next week.

6              The testimony from those two witnesses will be the key

7    to this case.  And after hearing that testimony, it will be up

8    to your Honor to decide whether that telephone call resulted in

9    any agreement or express waiver with respect to rent deferral.

10              Thank you very much, your Honor.

11              THE COURT:  Thank you, gentlemen.

12              MR. SCHAER:  Your Honor, we'd like to call our first

13    witness.  That's Spencer Thwaytes from Frontier.

14              Your Honor, we have a handful of exhibits to go

15    through with Mr. Thwaytes, many of them have been agreed to by

16    the parties.  Is it best to move to admit the batch right now

17    or should we do that as we go through each exhibit?

18              THE COURT:  I think probably right now do them all.

19              MR. SCHAER:  Can you please bring up the page that

20    shows all the different exhibit numbers.

21              So we would move to admit Joint Exhibits 1, 2, 3, 4,

22    5, 19, 22, 24, 25, 26, 28, 29, 36, 48, 51, 56, 60, 73, 81, 91,

23    95, 111, 120, 134, 142, 146, 148, 156, 157, 163 and 190.

24              THE COURT:  Received.

25              (Joint Exhibits 1, 2, 3, 4, 5, 19, 22, 24, 25, 26, 28,

O483FRO1                          Thwaytes – Direct

 1    29, 36, 48, 51, 56, 60, 73, 81, 91, 95, 111, 120, 134, 142,

 2    146, 148, 156, 157, 163, 190 received in evidence)

 3              MR. BUTLER:  Your Honor, I want to address -- pardon

 4    me -- as long as they're joint trial exhibits, and think I

 5    those are the only ones you mentioned, we have no objection of

 6    course to entering them into evidence.

 7              MR. SCHAER:  Yes.  There is a Defense Exhibit 1 we'll

 8    lay the foundation for because it hasn't been jointly

 9    stipulated unless it's okay to --

10              MR. BUTLER:  Thank you.

11              MR. SCHAER:  Okay.

12     SPENCER THWAYTES,

13         called as a witness by the Plaintiff,

14         having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MR. SCHAER:

17    Q.  Good morning, Mr. Thwaytes.  Where do you work currently?

18    A.  Aircraft Finance Germany.

19    Q.  What's your role at Aircraft Finance Germany?

20    A.  Chief revenue officer and head of North America.

21    Q.  How long have you been in that role?

22    A.  About nine months.

23    Q.  Where were you working before then?

24    A.  Frontier Airlines.

25    Q.  How long you did you work at Frontier?

O483FRO1                          Thwaytes - Direct

1  A.  About seven and a half years.

2  Q.  What was your position at Frontier when you left?

3  A.  I was the vice president and treasurer.

4  Q.  What was your position at Frontier in March of 2020?

5  A.  Same position.

6  Q.  Why did you leave Frontier?

7  A.  I wanted to move to Italy.

8  Q.  Is that where you live currently?

9  A.  Yes.

10  Q.  Did you have any jobs in the airline industry before

11  working at Frontier?

12  A.  No, not directly in the airline industry.

13  Q.  Where were you working before Frontier?

14  A.  Bank of America Merrill Lynch.

15  Q.  Can you just tell us briefly about your education.  Did you

16  attend university?

17  A.  Yes, I have an associate's degree in accounting from

18  BYU-Idaho, and a bachelor's degree in accounting from

19  University of Florida, and a master's in business

20  administration from Columbia Business School.

21  Q.  Right here in New York.

22          Going back to when you were at Frontier and the vice

23  president.  What were your responsibilities in that role?

24  A.  When I left or in March of 2020?

25  Q.  Thank you.  In March of 2020.

O483FRO1                        Thwaytes – Direct

1    A.  I was responsible for the treasury department, the fleet

2    department, and the strategic sourcing procurement departments.

3    Q.  Can you tell us about the treasury department.  What is

4    that department did and your role in being responsible for it?

5    A.  The department was responsible for administering all of the

6    cash receipts and expenditures and investing excess liquidity,

7    risk management, including structuring, buying derivatives,

8    managing the corporate insurance policies, financing the

9    business, outside of operating leases with lessors.  Generally

10   those were the things, and I was responsible for overseeing a

11   team of people that administered those responsibilities.

12   Q.  How about can you do the same with the fleet department;

13   what does it do and what was your role in overseeing it?

14   A.  The fleet department primarily was responsible for managing

15   the relationship with the OEMs that we purchased aircraft from,

16   and the engine manufacturing as well.  Also the lessors that we

17   leased did sale leaseback transactions with and leased aircraft

18   with.  And then in addition, inducting aircraft and returning

19   aircraft, there was some involvement in those matters and some

20   other matters that are less general than that.

21   Q.  And you're responsible for overseeing that?

22   A.  Overseeing that.  There was a team of people that reported

23   up to me that would administer it.

24   Q.  Can you just quickly tell us about strategic sourcing, that

25   department as well?

O483FRO1                            Thwaytes - Direct

A.  That department is responsible for negotiating contracts

across the business and all the different departments of the

business.  IT contracts, operating contracts, and the flight

ops department, maintenance contracts, HR contracts.  Just

contracts across the rest of the business outside of fleet

particularly.

Q.  Thank you.  So, let's turn now to how Frontier acquires the

aircraft it uses in its operations.

        Now, I'll say as a headliner this involves a number of

complicated contracts, so we'll try to keep this as narrow and

brief and hopefully as interesting as possible.

        Does Frontier own the airplanes that it uses in its

day-to-day operations?

A.  No.

Q.  So I want you to walk us through the process of how

Frontier acquires the airplanes that it uses in its operations.

What is the first step in the process of acquiring an airplane

for Frontier?

A.  First step is negotiating an agreement with an aircraft

manufacturer such as Airbus, Boeing, for example, to acquire

the aircraft that they manufacture.

Q.  And how long, what is the span of time that a contract like

this generally would cover?

A.  Aircraft in these contracts deliver out over extended

periods of time, could be up to 10 years in some cases, more or

O483FRO1                          Thwaytes - Direct

1   less from the date of agreement.

2   Q.  And when you were at Frontier, did Frontier work with a

3   particular airplane manufacturer?

4   A.  Yes.

5   Q.  Which manufacturer was that?

6   A.  Airbus.

7   Q.  Did Frontier work with any other manufacturers while you

8   were at Frontier?

9   A.  Frontier didn't not buy aircraft from any other aircraft

10  manufacturers.

11  Q.  Thank you for clarifying my question.

12          I want to bring up what's been premarked as Joint

13  Exhibit 190.

14          What is this document?

15  A.  This is the aircraft purchase agreement between Airbus and

16  Republic Airways Holdings.

17  Q.  Who is Republic Airways Holdings?

18  A.  It is a predecessor owner of Frontier Airlines.

19  Q.  Did Frontier step into this contract at some point or take

20  over this contract from Republic Airways Holdings?

21  A.  Yes, in some manner, yes.

22  Q.  I want to take us down to page 29 of this exhibit.  We're

23  in section 9.

24          What is this section showing?

25  A.  It is the schedule of aircraft that Airbus has agreed to

O483FRO1                        Thwaytes - Direct

sell and Frontier's agreed to purchase, including the aircraft

rank, which is a way to identify the aircraft individually, and

then the scheduled delivery period, including the year and

quarter.

Q.  Why is it done in quarters?

A.  Because at the time that this agreement was signed, Airbus,

looking into the future of their manufacturing system, could

only predict the year and the quarter that the aircraft would

be delivered.

Q.  I am going to scroll down in what looks like that same

chart so we can see the unredacted period.

        Can you tell us how many aircraft were part of this

contract that we're looking at right now?

A.  At the time that this contract was signed that we're

looking at here, 80 aircraft.

Q.  Is this contract ever amended?

A.  Yes.

Q.  Are new aircraft added through the amendments?

A.  Yes.

Q.  How many aircraft were part of this contract through the

amendments at the time that you left Frontier?

A.  200ish.

Q.  Okay.  Let's walk through the process for a single

airplane.

        What are the main cash flows involved between Frontier

1    and Airbus in the purchase of a single aircraft?

2    A.  When you agree to purchase the aircraft, you agree to pay

3    predelivery payments to Airbus.  And there is a schedule of

4    when those payments are due, relative to when you sign the

5    agreement, and the expected delivery date or quarter.  And then

6    the percentage of a price that you will pay in each of those

7    PDP payments.  So you are required to make those predelivery

8    payments to them.

9           And then when the aircraft are delivered, you pay the

10   balance of the purchase price to them.

11   Q.  Are these amounts agreed to between Frontier and Airbus?

12   A.  Yes.

13   Q.  I want to look at this section here.  What is section 5.33

14   showing us?

15   A.  The schedule of predelivery payments.

16   Q.  When is the final predelivery payment due, according to

17   this contract?

18   A.  12 months before the scheduled delivery month of each

19   aircraft.

20   Q.  Where does Frontier get the money to make these predelivery

21   payments?

22   A.  It is a combination of cash equity from the company's

23   balance sheet and from a credit facility with a bank.

24   Q.  What's the percentage, what's the percentage that comes

25   from Frontier's cash and what's the percentage that comes from

O483FRO1                              Thwaytes - Direct

1    the bank?

2    A.   90 percent financing, 10 percent bank, somewhere in that

3    range.

4    Q.   So 90 percent financing and you said 10 percent bank?

5    A.   I'm sorry.  10 percent from the cash equity of the business

6    and 90 percent from the bank, in that range.

7    Q.   Is Frontier paying interest on the amount of the PDPs that

8    it's taking from the bank?

9    A.   Yes.

10   Q.   That's the PDPs.  When is the purchase price due on the

11   aircraft?

12   A.   On the delivery date.

13   Q.   I want to look at this section here.  Can you explain what

14   this section 5.4 is telling us?

15   A.   It is saying when the payment for the aircraft needs to

16   occur, including the predelivery payments and the balance of

17   the final price.

18   Q.   So, we got the predelivery payments, the purchase price,

19   that's at the delivery of the aircraft.  Is that the end for

20   Frontier of the airplane acquisition process?

21   A.   It is the end of the process of acquiring the aircraft from

22   Airbus.

23   Q.   Is there another part of the process for Frontier?

24   A.   Simultaneously at delivery, Frontier enters into a sale and

25   leaseback transaction with a lessor.

O483FRO1                          Thwaytes - Direct

1    Q.  What is a sale and -- we'll try to go through it slowly.

2    What is a sale leaseback agreement?

3    A.  It is an agreement where Frontier sells an aircraft to a

4    lessor and simultaneously agrees to lease the aircraft back

5    from the lessor over a period of time.

6    Q.  About how long before Frontier enters into a sale leaseback

7    agreement with the lessor is Frontier I guess contemplating or

8    working on the process for that particular aircraft?

9    A.  Typically Frontier would issue an RFP to finance the

10   aircraft 12 to 18 months in advance of the aircraft delivery.

11   Q.  What is an RFP?

12   A.  A request for a proposal.

13   Q.  Who is Frontier sending this RFP to?

14   A.  To aircraft leasing companies.

15   Q.  About how many aircraft leasing companies?

16   A.  25, 30.  It fluctuates, but in that range.

17   Q.  So Frontier sends RFP to 25, 30 aircraft leasing companies,

18   and then what happens next?

19   A.  Those aircraft leasing companies provide proposals to

20   Frontier that have different terms in them, and Frontier

21   evaluates the proposals, negotiates with them, and determines

22   the optimal leasing company to select, based off of the terms

23   of the proposals and experience with the lessors, credibility

24   in the marketplace.

25   Q.  When Frontier selects the lessor through that RFP process

O483FRO1                          Thwaytes - Direct

1    to use, is there any type of agreement that's reached to kind

2    of solidify that?

3    A.  Yes, a letter of intent is agreed.

4    Q.  About how far before the airplane actually delivers is a

5    letter of intent generally agreed to?

6    A.  At the end of the RFP process, soon after that.  So, 12, 9,

7    12 months before an aircraft delivers.

8    Q.  Does Frontier do its sale leaseback agreements on a one-off

9    or airplane-by-airplane basis?

10   A.  Each aircraft has an individual lease agreement.  But,

11   Frontier would typically agree to do a sale leaseback agreement

12   for multiple aircraft in each go.

13   Q.  And is there a particular term for the agreement to do

14   multiple aircraft in a single go?

15   A.  A Framework Agreement.

16   Q.  What are some of the main -- and under this Framework

17   Agreement, is that the only agreement there is when the

18   aircraft deliver with the leasing companies or are there other

19   agreements that come later?

20   A.  There is other agreements that come later.

21   Q.  What are some of those agreements?

22   A.  There is a lease agreement, there's a guarantor agreement,

23   there is a trust agreement.

24   Q.  What are some of the main pricing terms or commercial terms

25   that are included in the sale leaseback arrangement between

O483FRO1                              Thwaytes – Direct

1   Frontier and the aircraft leasing companies?

2   A.   The sales price, the monthly rental amount that's paid,

3   adjustment factors to the monthly rent, and some end-of-lease

4   adjustment rates for utilization on the aircraft.

5   Q.   When you say sales price, can you explain what is that

6   price and who is paying whom?

7   A.   It is the price that the lessor acquires from the aircraft

8   from Frontier for.

9   Q.   When you say monthly rent payments, can you explain what

10  that is and who is paying who?

11  A.   That's the monthly amount that Frontier pays the lessor

12  every month during the term of the lease to lease the aircraft

13  from them.

14  Q.   So, back to the process itself.  How does this process

15  work, the sale leaseback process work, at the time that Airbus

16  completes the manufacture of the plane and that plane is ready

17  for delivery?

18  A.   A couple days prior to the aircraft delivery, some

19  calculations are done to determine what the final price of the

20  aircraft will be with Airbus.  At the same time, some

21  calculations are done to determine what the final lease rate

22  will be or monthly lease amount will be to the lessor.

23  Frontier pays off the loan with the bank, the PDP loan, in

24  order to have no lien on the aircraft.  And then on the

25  delivery date, the purchase price is paid from the lessor into

O483FRO1                    Thwaytes - Direct

1   kind of an escrow situation that then is used to pay the

2   balance of the amount due to Airbus, with the difference

3   between the amount due to Airbus and the price that the lessor

4   is paying Frontier for the aircraft being retained by Frontier,

5   and transfer -- title transfers to the lessor, a lease

6   agreement is in place between the lessor and Frontier.

7   Q.  So a lot is going on there.

8   A.  A lot goes on.

9   Q.  Does Frontier make a profit when these airplanes deliver?

10          THE COURT:  Do most of those latter prices adhere

11   pretty closely to the figures that were forecast before?  Or

12   are there major changes?

13          THE WITNESS:  Well, they're affected by interest rates

14   in some circumstances.  The monthly rent paid to the lessor is

15   affected by changes in interest rates.  And then the final

16   purchase price to Airbus is impacted by escalation factors.

17   Escalation factors.  So, potentially a CPI index will have to

18   be calculated to determine what the -- the escalation of

19   certain parts of how you determine the final purchase price,

20   including credits and different things.

21          THE COURT:  Thank you.

22          THE WITNESS:  You're welcome.

23   Q.  Does Frontier make a profit when these airplanes deliver

24   from Airbus and go through this transfer of title in the sale

25   leaseback process?

O483FRO1                          Thwaytes – Direct

1    A.  Oh, yeah.

2    Q.  How so?

3    A.  Frontier buys these aircraft in bulk from Airbus.  So,

4    agrees to buy a significant amount of aircraft that will be

5    delivering over an extended period of time, so makes a big

6    commitment to Airbus.  And that results in a -- a lower price

7    than the market price per aircraft.  And then lessor agrees to

8    purchase a number of aircraft from Frontier that's

9    significantly lower than the amount of aircraft that Frontier

10   is buying and in a short period of time, and pays a market

11   price for the aircraft.

12   Q.  I know Frontier's commercial and financial terms with

13   Airbus are highly confidential.  But can you approximately tell

14   us how much profit Frontier makes from this difference in

15   purchase price that it owes to Airbus and that the lessor owes

16   to Frontier?

17   A.  It is confidential, but I can say it's in the millions of

18   dollars.

19   Q.  Are there other financial benefits to Frontier when an

20   airplane delivers?

21   A.  The many financial benefits to Frontier are the cash inflow

22   from the difference between the purchase price from Airbus and

23   the sales price to the lessor, the pay down of the PDP facility

24   to reduce the company's debt, also the receipt of the cash

25   equity that the company has put into the PDPs, and then not

1    paying interest on outstandings under the debt as well.

2    Q.  Is it fair to say that Frontier wants these planes to

3    deliver when they are ready?

4    A.  Definitely.

5    Q.  So, the main events in this case, as we heard, are March of

6    2020, but I'd like to go over Frontier's relationship with AMCK

7    prior to that date and get ourselves a bit acquainted with some

8    of these aircraft sale and leaseback documents.

9            In March of 2020, who was Frontier's largest aircraft

10   leasing company partner?

11   A.  AMCK.

12   Q.  Do you know in March of 2020, at the beginning of it or

13   prior to March of 2020, how many aircraft Frontier was leasing

14   with AMCK?

15   A.  I believe 14.

16   Q.  I am pulling up now what's been previously marked Joint

17   Exhibit No. 1.  What is this document?

18   A.  It is a Framework Agreement between Accipiter Holdings and

19   Frontier Airlines relating to Accipiter purchasing a number of

20   aircraft from Frontier Airlines and doing a leaseback after

21   purchasing them.

22   Q.  Who is Accipiter Holdings?

23   A.  An entity affiliated with AMCK.

24   Q.  Are Airbus model 320-251N, are those referred to by any

25   other name?

O483FRO1                        Thwaytes - Direct

1   A.   320neos.

2   Q.   Can you please read the date of this agreement on page 3.

3   A.   29th day of May, 2018.

4   Q.   I want to take us down to page 40.  This is schedule 1 on

5   this document.  What is this?

6   A.   This is a schedule of aircraft that are contemplated in

7   this agreement.

8   Q.   How many aircraft are here?

9   A.   11.

10  Q.   What does this rank number refer to?

11  A.   That refers to the rank number in the Airbus purchase

12  agreement between Frontier Airlines and Airbus.  It is a way to

13  identify the aircraft individually.

14  Q.   And what's in this column all the way over to the right

15  here?

16  A.   That column shows the period when the aircraft are

17  scheduled to be delivered, whether it's months or quarters,

18  depending on how soon they're going to be delivered.

19  Q.   Let's go down to schedule 3 on page 45.  What is this

20  showing us?

21  A.   This is the purchase price that Accipiter's agreed to

22  purchase the aircraft from Frontier for in the respective years

23  2018 and 2019.

24  Q.   What is that price in 2018?

25  A.   49 million.

O483FRO1                      Thwaytes - Direct

1    Q.  And how about 2019?

2    A.  50 million.

3    Q.  Now we're on page 4.  What is this definition telling us?

4    A.  That's the base fixed rental for the aircraft.  So the

5    amount that Frontier will pay to Accipiter before the

6    adjustment factor contemplates the final rent in years 2018 and

7    2019.

8    Q.  So is this the exact amount that Frontier will pay in

9    monthly rent for 2018 aircraft?

10   A.  It could be, but it could not be, depending on the

11   adjustment of the rent before delivery.

12   Q.  Let's go down to section 4.1 on page 19.  What is this

13   showing us here?

14   A.  This is the formula to adjust the rent prior to the

15   delivery.

16   Q.  Can you please read this line here, I've highlighted two,

17   but I meant to highlight this one here.

18   A.  So (b) is the assumed base swap rate of 1.00 percent.

19   Q.  And what does the assumed base swap rate represent?

20   A.  It represents the cost of capital for the lessor in this

21   period of time.

22   Q.  This is 1 percent, correct?

23   A.  1 percent.

24   Q.  I want to introduce now what's been previously marked as

25   Joint Exhibit 2.  What is this document?

O483FRO1                        Thwaytes - Direct

1   A.  It is an aircraft lease agreement between Wells Fargo Trust
2   Company and Frontier Airlines.
3   Q.  Is this one of -- let me bring you down to here.  What is
4   the date of this agreement?
5   A.  30th day of August, 2018.
6   Q.  Now bring you down to the definitions.  What does this show
7   us here?
8   A.  AHDAC, an acronym meaning Accipiter Holdings DAC.
9   Q.  Is that the same entity that entered the Framework
10  Agreement that we just looked at?
11  A.  I don't recall exactly, but Accipiter was the name that was
12  on the Framework Agreement.  Just not recalling if it was
13  exactly the same after.
14  Q.  What is your understanding about whether this lease -- if
15  this lease agreement relates to that Framework Agreement we
16  just looked at?
17  A.  That it does.
18  Q.  This is one of the leases that --
19  A.  This is one of the leases for one of the aircraft
20  contemplated in the Framework Agreement.
21  Q.  What is the manufacturer's serial number or the MSN?
22  A.  It is a unique identifier for the aircraft, for each
23  aircraft.
24  Q.  What number are we looking at here?
25  A.  8402.

1  Q.  Why is this agreement between Wells Fargo and Frontier?

2  A.  Typically, a lessor has the -- each aircraft in a trust

3  that it then owns for some reasons.  And Wells Fargo Trust

4  Company is one of the common companies that provide these

5  trusts to lessors to facilitate these transactions.

6  Q.  Under this agreement, who is the lessor?

7  A.  Wells Fargo Trust Company.

8  Q.  Who is the lessee?

9  A.  Frontier Airlines.

10  Q.  A few more definitions.

11        Under this agreement, who is the lessor guarantor?

12  A.  AHDAC.

13  Q.  And then how about the owner participant?

14  A.  Accipiter Investments Aircraft 4 Limited.

15  Q.  Let's look at some of the provisions that are within this

16  lease agreement.

17        What is provision 6.1 relating to?

18  A.  Are you asking 6.1 in total or sub bullet (a)?

19  Q.  Thank you.  6.1(a).

20  A.  It is the basic rent.  So the basic rent is the monthly

21  rent that Frontier will pay to the lessor.

22  Q.  Does this direct us anywhere to see the exact amount?

23  A.  Schedule 6.

24  Q.  And let's go down to Schedule 6.

25        What is the basic rent?

O483FRO1                              Thwaytes - Direct

1    A.  $343,181.29 U.S.

2    Q.  And what is that amount representing?

3    A.  It's the monthly rent that Frontier as lessee will pay to

4    Wells Fargo as lessor over the life of the lease.

5    Q.  How is this amount, this $343,181.29 amount arrived at?

6    A.  You take the rent agreed through the RFP process that is

7    translated into the LOI and then into the Framework Agreement.

8    And number of days prior to the delivery, you use the formula

9    that we looked at previously to compare the indicative swap

10   rate that is in the Framework Agreement to the same indicative

11   swap rate a couple of days before the aircraft is delivered,

12   and that couple of days is stipulated how many days in the

13   Framework Agreement.  And you take that difference and you

14   multiply that difference by an adjustment factor, and that will

15   either increase or decrease the basic rent from the initially

16   agreed rent in the RFP LOI -- that's in the LOI and in the

17   Framework Agreement.

18   Q.  Just to hopefully make it clearer.  Because we were just

19   dealing with the 2018 aircraft.  Is this that base fixed rental

20   that was agreed to in the Framework Agreement?

21   A.  Yes.

22   Q.  And what we just saw, that was the adjustment to that based

23   on the calculation you were telling us?

24   A.  Correct.

25   Q.  What is this paragraph saying?

O483FRO1                          Thwaytes - Direct

1    A.  The date that the lease payments are due.

2    Q.  And can you explain to us how that's determined?  Are all

3    payments due on the first of every month?

4    A.  It's relative to the date that the aircraft delivers and

5    the sale leaseback agreements are executed.

6    Q.  So let's say something is delivered on April 8 to use today

7    as an example.  When would those lease payments be due moving

8    forward?

9    A.  April 8, as long as they fall on a business day.

10   Q.  Well, would it always be due on April 8 moving forward?

11   A.  No.  If April 8 is on a weekend, then there is a way to

12   manage that to either pay it the day prior or day after the

13   weekend.

14   Q.  And what does this tell us happens if a payment is due on

15   the weekend?

16   A.  That it's due the immediately preceding business day.

17   Q.  I think I was asking my prior question a couple ago not as

18   clearly as I should have, so my apologies.

19        When would the payment be due in the following months

20   if something were to deliver on April 8, so when would the

21   payment be due in May?

22   A.  May 8.

23   Q.  And then in June?

24   A.  June 8.

25   Q.  Unless it fell on a holiday or weekend?

1    A.   That's right.

2    Q.   What is a grace period as it relates to these aircraft

3    leasing agreements?

4    A.   It is a period of days after the basic rent payment date

5    that the lessee is able to make the payment and not be deemed

6    late in making the payment.

7    Q.   Does this lease agreement, to your understanding, contain a

8    grace period?

9    A.   Yes.

10   Q.   And what is that grace period?

11   A.   Three days.

12   Q.   So can you just explain if a lessee, Frontier, doesn't pay

13   on the payment date, but pays before the grace period expires,

14   can you explain what happens in that circumstance?

15   A.   Nothing.

16   Q.   Why is that?

17   A.   Because it's considered on time.

18   Q.   Up to March 2020, which is the time period we're talking

19   about here, had Frontier made all of its payments on time to

20   AMCK or at least within that three-day grace period of a

21   payment due date?

22   A.   I believe so.

23   Q.   I'm bringing up what's been previously marked as Joint

24   Exhibit 3.  What is this document, Mr. Thwaytes?

25   A.   The trust agreement between Accipiter Investments Aircraft

O483FRO1                         Thwaytes - Direct

1  4 Limited and Wells Fargo Trust Company.

2  Q.  And what date is this agreement executed on?

3  A.  August 30, 2018.

4  Q.  Is that the same date as the lease agreement is executed?

5  A.  It should be.

6  Q.  Let's confirm.  Is it the same dates as the lease agreement

7  was executed?

8  A.  Same day.

9  Q.  Do you know what the purpose of a document like this is?

10 A.  It is an agreement between the trust company that owns the

11 aircraft and the lessor.

12 Q.  Who is the trustor in this agreement?

13 A.  Accipiter Investments Aircraft 4 Limited.

14 Q.  And who is the trustee?

15 A.  Wells Fargo Trust Company.

16 Q.  I should have made clear.  What does this 8402 refer to?

17 A.  I believe that's the MSN for the aircraft.

18 Q.  Is that the same MSN that we saw in the lease agreement we

19 just looked at?

20 A.  Yes.

21 Q.  Could a sale leaseback transaction, at least as it is used

22 with Frontier, could that have gone through without this

23 document being executed?

24 A.  Frontier wouldn't have agreed to it going through without

25 this document executed.

O483FRO1                         Thwaytes – Direct

1   Q.  I'm bringing up now what's been previously marked as Joint

2   Exhibit 4.

3           What is this document?

4   A.  It is a guaranty between Accipiter Holdings DAC and

5   Frontier Airlines.

6   Q.  And what MSN or aircraft does this relate to?

7   A.  Again 8402.

8   Q.  And what date was this executed on?

9   A.  August 30, 2018.

10  Q.  Is that the same date as the other two documents that we

11  just saw?

12  A.  Yes.

13  Q.  Who is the guarantor in this agreement?

14  A.  Accipiter Holdings DAC.

15  Q.  And who is the beneficiary?

16  A.  Frontier Airlines.

17  Q.  I want to go down to section 1 here.  I'm sorry to ask you

18  to do this, but can you please read the two sentences that I

19  have highlighted here.

20  A.  "From and after the date of this guaranty, guarantor hereby

21  irrevocably and unconditionally guarantees the due and punctual

22  payment and performance of all of the obligations of lessor

23  under the lease, in each case after any applicable notice

24  requirements in accordance with the lease, such obligations of

25  lessor being referred to herein as the guaranteed obligations.

O483FRO1                          Thwaytes - Direct

1    If lessor fails to perform or comply with any such guaranteed

2    obligations in accordance with the lease, then guarantor hereby

3    agrees to pay, perform, or cause to be paid and/or performed,

4    on demand, such guaranteed obligations to the same extent as if

5    it were the primary obligor."

6    Q.  Could the sale leaseback transaction we've just been

7    looking at for MSN 8402, could that have gone through without

8    this document?

9    A.  Frontier wouldn't have agreed for it to go through without

10   this document.

11   Q.  Okay.  So, to sum up, is it fair to say a lot of things

12   happen when an aircraft delivers?

13   A.  Yes.

14           MR. ALEXANDER:  Object to the leading question, your

15   Honor.

16           MR. SCHAER:  I'm happy to withdraw that question.

17           THE COURT:  It's purely epithetical.  Overruled.

18           MR. ALEXANDER:  Thank you, your Honor.

19   Q.  Is it fair to say a lot of things happen all at once when

20   an aircraft delivers?

21   A.  Yes.

22   Q.  To your understanding, did these documents that we just

23   looked at, do these contain similar material terms as the other

24   13 aircraft that Frontier had on lease with AMCK prior to March

25   of 2020?

O483FRO1                          Thwaytes – Direct

1    A.  Yes.

2    Q.  So, you don't think we need to look at all of the documents

3    related to all of the aircraft?

4    A.  No.

5    Q.  Thank you.

6         Let's move now into the time period where this case is

7    centered around.

8         I want to first cover, though, what was going on

9    between Frontier and AMCK in that time period between March 16

10   and April 7.

11        Talking about March 16, 2020, 1st.  Did anything of

12   note happen on that date between Frontier and AMCK?

13   A.  Frontier and AMCK completed a sale and leaseback

14   transaction.

15   Q.  Did anything else of note happen on that date between the

16   two parties?

17   A.  Frontier sent to AMCK a request for deferral of rent

18   payments and deposit refund.

19   Q.  Did anything else happen on that date as well?

20   A.  A lot of things were happening on that date.

21   Q.  Let me try it this way.  That sale and leaseback agreement

22   that happened on March 16, did that relate to any other

23   contract or arise from any other contract?

24   A.  It arose from the Framework Agreement.

25   Q.  When did that Framework Agreement get executed?

O483FRO1                              Thwaytes – Direct

1    A.  The Framework Agreement was also executed on that date.

2    Q.  Were the terms of that March 16, 2020, Framework Agreement

3    initially agreed to between Frontier and AMCK on March 16,

4    2020?

5    A.  They were negotiated before March 16, 2020, and

6    contemplated in an LOI that was executed well in advance.

7    Q.  Similar to the process you told us about before with the

8    RFPs?

9    A.  Yes.

10   Q.  We're going to come back to the Framework Agreement but

11   let's look now to that LOI you just referenced.

12          I'm showing now what's been previously marked as Joint

13   Exhibit 5.

14          What is this document?

15   A.  Letter of intent between Accipiter and Frontier for the

16   sale and leaseback of six 320neo aircraft.

17   Q.  What is the date of this document?

18   A.  10th of September 2019.

19   Q.  So about how far before the Framework Agreement was entered

20   was this letter of intent sent?

21   A.  Six months.

22   Q.  What does this document contain?

23   A.  The material terms of the agreement between the parties to

24   do a sale leaseback transaction on six aircraft.

25   Q.  Let's go to page 2.  I want to go through some of those

O483FRO1                              Thwaytes - Direct

1   terms.

2              In this box number 1 here, what is this referring to?

3   A.  It's referring to the six aircraft that are agreed to be

4   sold on leaseback between Accipiter and Frontier, including the

5   months that they would be -- that they were scheduled to

6   deliver, and the aircraft rank to identify each individual

7   aircraft.

8   Q.  What does that rank refer to?

9   A.  It is a way to reference the aircraft in the purchase

10  agreement between Airbus and Frontier, so it's just a unique

11  identifier for each of the aircraft.

12  Q.  So these are the ranks that we saw in that Airbus

13  agreement?

14  A.  Correct.

15  Q.  I want you to do your best, because we should come back to

16  these, to remember these ranks.  Can you just read them out

17  loud?

18  A.  Rank 52, rank 53, rank 54, rank 55, rank 58, and rank 59.

19  Q.  And can you tell us what are the delivery months of these

20  aircraft?

21  A.  March, March, March, May, June, and August.

22  Q.  What were the purchase price what would the purchase price

23  be that was agreed to between the parties?

24  A.  $51 million U.S.

25  Q.  And how about the lease term?

O483FRO1                          Thwaytes - Direct

1    A.  144 months.

2    Q.  What is an early termination option?

3    A.  It is an option for the lessee, in this case Frontier

4    Airlines, to terminate the lease after 8 years.  And that's

5    essentially it.

6    Q.  Is an early termination option valuable to Frontier?

7    A.  Yes.

8    Q.  And why is that?

9    A.  It provides Frontier the opportunity to renegotiate the

10   terms of the agreement after 8 years if it wants to continue to

11   operate the aircraft for longer than 8 years.  An

12   eight-year-old aircraft should demand a lower lease rate than a

13   brand-new aircraft, for example.  It also provides Frontier

14   with flexibility in its fleet to have these aircraft exit its

15   fleet early, if it wants to replace them with other types of

16   aircraft, newer aircraft, different size aircraft.

17            Just provides flexibility in its fleet and in its

18   operation and commercially.

19   Q.  This box right here, number 4.  What is this -- first, what

20   does box number 4 relate to?

21   A.  This relates to the monthly lease payment that's paid

22   between Frontier and Accipiter or from Frontier to Accipiter.

23   Q.  What is the base fixed rental agreed to in this agreement

24   or in this letter of intent?

25   A.  $299,880 U.S.

O483FRO1                              Thwaytes - Direct

1   Q.  Would this amount have been adjusted at the time when an
2   airplane delivers?
3   A.  The adjustment formula would have been utilized to see if
4   an adjustment was -- if it would have been adjusted.
5   Q.  Is this that adjustment formula?
6   A.  Yes.
7   Q.  Why did Frontier select AMCK to take on these six aircraft
8   through the RFP process?
9   A.  They provided the most optimal terms that we discussed
10  previously that are important.  They were our larger lessor.
11  We had a good relationship with them.  They had a good standing
12  in the aviation community as a lessor.
13  Q.  Let's look now at what has been previously marked Joint
14  Exhibit 24.  What is this document?
15  A.  This is the Framework Agreement between AMCK and Frontier
16  relating to six 320neo aircraft.
17  Q.  Is this the Framework Agreement that arose out of the
18  letter of intent that we just looked at?
19  A.  Yes.
20  Q.  Just look at a few items to confirm that.  Schedule 1 on
21  page 40.  What is this showing us?
22  A.  This is contemplating the six aircraft that are
23  contemplated in this agreement to be sold on leaseback between
24  the parties.
25  Q.  Do the dates we're seeing here match up with the dates we

O483FRO1                         Thwaytes - Direct

1    saw in that letter of intent?

2    A.  I believe so.

3    Q.  Going down one page to schedule 3.  What is this showing

4    us?

5    A.  This is the price that Frontier Airlines is selling the

6    aircraft to Accipiter for.

7    Q.  And how much is that price that was agreed to?

8    A.  $51 million U.S.

9    Q.  Does that $51 million U.S. match what we saw in the letter

10   of intent?

11   A.  Yes.

12   Q.  I want to take us up to page 4 here.  What is this showing

13   us?

14   A.  The base fixed rental amount, so this is the base amount of

15   the monthly rent that will be paid between or from Frontier to

16   Accipiter for each of the aircraft.

17   Q.  And then going down to page 19.  What is on your screen

18   here?

19   A.  That's the formula to potentially adjust the basic fixed

20   rent prior to delivery.

21   Q.  And does this -- sorry.  The prior term we just saw,

22   299,000, does that match what we saw in the letter of intent?

23   A.  I believe so.

24   Q.  Does this basic rent calculation on the screen here match

25   what we saw in the letter of intent?

O483FRO1                          Thwaytes - Direct

1    A.  Word by word you'd have to put them next to each other, but

2    generally it looks like it's the same.

3    Q.  So that's the Framework Agreement.  And one of the other

4    things that you said happened on March 16, 2020, was that an

5    aircraft sale leaseback agreement was entered into.  Do I

6    remember that correctly?

7    A.  Yes.

8    Q.  Do you remember which aircraft delivered on that date, what

9    the MSN number of that aircraft was?

10   A.  8402?

11   Q.  We'll go over some documents to get that right.  But before

12   we get into the documents though, for the aircraft that

13   delivered on that date, were there any special or unique

14   challenges with that delivery on March 16 of 2020?

15   A.  Yes.

16   Q.  What were they?

17   A.  This aircraft was being delivered right before tariffs were

18   increasing on aircraft delivered outside of the U.S. and being

19   imported into the U.S.  And there was a motivation to deliver

20   the aircraft quickly or by a certain period of time in order to

21   avoid having to pay a higher tariff amount.

22   Q.  Was this aircraft that was delivered on March 16 being

23   manufactured and delivered from abroad?

24   A.  Yes.

25   Q.  Where was it being manufactured and delivered from?

O483FRO1                          Thwaytes - Direct

1   A.  Toulouse, France.

2   Q.  What is in Toulouse, France?

3   A.  It is the headquarters of Airbus, and a very large

4   manufacturing and assembly site of Airbus build.

5   Q.  Were the remaining aircraft under the Framework Agreement,

6   the remaining five, set to also be delivered from Toulouse?

7   A.  No.

8   Q.  Where were they set to be delivered from?

9   A.  Mobile, Alabama.

10  Q.  Is there any difference between Airbus's facility in

11  Toulouse, France, and their facility in Mobile, Alabama?

12  A.  Yes.

13  Q.  What is that difference?

14  A.  It's significantly different.  In Mobile, Alabama, it is

15  just a final assembly facility.  Where aircraft arrive

16  partially assembled and the assembly process is completed and

17  then delivered.  There is not a lot of back shop capabilities

18  and engineering and all.  Where, in Toulouse, Airbus has every

19  capability they have available, and a very large facility, and

20  many, many aircraft.  It's just completely different.

21  Q.  So, much larger in Toulouse?

22  A.  Larger and more complex in Toulouse, and much simpler and

23  smaller in Alabama.

24  Q.  How did the storage capabilities compare between the two

25  facilities?

O483FRO1                        Thwaytes - Direct

1   A.  Many more aircraft in Toulouse parked, waiting delivery or

2   something than in Mobile.

3   Q.  We saw earlier in the Airbus agreement that planes are

4   provided a quarter in which they'll deliver, and then we saw

5   months of deliveries in the Framework Agreement.

6          Do you know how long before a plane actually delivers

7   is Frontier provided with the expected date of delivery?

8   A.  45 days in advance.

9   Q.  Who determines the exact date of deliveries; is that

10  Frontier determines the date of delivery?

11  A.  Airbus.

12  Q.  When Frontier learns the date of the delivery, does it

13  inform its aircraft leasing partners about that date?

14  A.  Yes.

15  Q.  Does it do that in short order after it learns that date?

16  A.  Typically.

17  Q.  Going to show now what has been previously marked as Joint

18  Exhibit 22.

19          What is the date and time of this e-mail?

20  A.  March 16, 2020, at 6:59:57 a.m.

21  Q.  Who is Jane O'Callaghan?

22  A.  She was the chief commercial officer of AMCK.

23  Q.  If we look down here, what is Jane saying to the Frontier

24  team?

25  A.  "Congratulations on completing the delivery and the sale

O483FRO1                           Thwaytes - Direct

1   leaseback."

2   Q.  Does this sentence provide any information about the exact

3   MSN number of the plane that delivered on that date?

4   A.  Yes.

5   Q.  What is that MSN number?

6   A.  10038.

7   Q.  Do you know what Ms. O'Callaghan is referring to when she

8   says "Great teamwork across the board over the last three

9   days"?

10  A.  All the parties were working feverishly to get the aircraft

11  delivered by this date in order to avoid the increase in the

12  tariffs.  I can remember being on the phone in my backyard

13  talking about it with people on the Sunday before.

14  Q.  Look at the next document that's been previously marked as

15  Joint Exhibit 29.

16        Mr. Thwaytes, what is the document that is on the

17  screen in front of you?

18  A.  A trust -- aircraft lease agreement between UMB Bank as

19  owner trustee and lessor and Frontier Airlines.

20  Q.  And what aircraft does this relate to?

21  A.  MSN 10038.

22  Q.  Is this one of the leases that fell within the March 16,

23  2020, Framework Agreement?

24  A.  I believe so.

25  Q.  And I believe you said it, but just to make sure, who is

O483FRO1                         Thwaytes - Direct

1   the lessor?

2   A.   UMB Bank.

3   Q.   Who is the lessee?

4   A.   Frontier Airlines.

5   Q.   And going down a handful of pages.  Who is the lessor

6   guarantor?  Where does that refer you to?

7   A.   The guaranty agreement between Frontier and the lessor

8   guarantor.

9   Q.   Can you read what lessor guarantor says on this screen.

10  A.   "Owner participant."

11  Q.   Let's go down to the owner participant.  Who is the owner

12  participant in this lease agreement?

13  A.   Vermillion Aviation (Two) Limited.

14  Q.   Do you know who Vermillion Aviation (Two) Limited is?

15  A.   A entity affiliated with AMCK.

16  Q.   Let's look at some of the other terms here, hopefully

17  briefly.

18          We'll go down to schedule 6.  What do you see on your

19  screen?

20  A.   Schedule 6, basic rent and other terms.

21  Q.   What is the basic rent for this aircraft?

22  A.   $269,525.94 U.S.

23  Q.   What does that amount refer to?

24  A.   That's the monthly rent that Frontier will pay to the

25  lessor.

O483FRO1                          Thwaytes – Direct

1   Q.  How does that amount relate to the basic fixed rent amount

2   that the parties agreed to in the LOI and the Framework

3   Agreement?

4   A.  It's different.  It's lower.

5   Q.  And how was that amount determined?

6   A.  As I explained earlier, via the final rent calculation by

7   comparing the indicative rates between what was agreed in the

8   LOI and the Framework Agreement, and that same rate number of

9   days before the delivery, and then multiplying that by the

10  adjustment factor to come to an amount that you then either

11  increase or decrease the basic rent by or the rent that's in

12  the Framework Agreement by.

13  Q.  One more term here.  What does security mean?

14  A.  The security deposit that Frontier pays to the lessor.

15  Q.  Showing you now what's been previously marked as Joint

16  Exhibit 25.  What is the document on your screen?

17  A.  Trust agreement.

18  Q.  And which aircraft does this relate to?

19  A.  10038.

20  Q.  Is this document dated the same as the date of the lease

21  agreement?

22  A.  Yes.

23  Q.  And who is the trustor under this agreement?

24  A.  Vermillion Aviation (Two) Limited.

25  Q.  Who is the trustee in this agreement?

O483FRO1                          Thwaytes - Direct

1    A.   UMB Bank.

2    Q.   With the exception of the different parties in the prior

3    trust agreement we saw, are the terms in this trust agreement

4    the same as the other trust agreement?  Is that your general

5    understanding?

6    A.   General understanding.

7    Q.   Was this document necessary to complete the sale and

8    leaseback process for MSN 10038?

9    A.   Frontier required that this agreement be in place to do so.

10   Q.   I want to introduce what's been marked as Joint Exhibit 26.

11   Mr. Thwaytes, what is the document on your screen?

12   A.   A guaranty agreement between Vermillion Aviation (Two)

13   Limited and Frontier Airlines.

14   Q.   Which airplane does this relate to?

15   A.   MSN 10038.

16   Q.   Is that the same airplane we've seen with the lease

17   agreement and the trust agreement before this?

18   A.   Yes.

19   Q.   And what is the date provided for in this document?

20   A.   March 16, 2020.

21   Q.   Is that the same date that we just saw in the prior two

22   agreements?

23   A.   Yes.

24   Q.   Who is the guarantor in this agreement?

25   A.   Vermillion Aviation (Two) Limited.

O483FRO1                           Thwaytes - Direct

1    Q.  Who is the beneficiary in this agreement?

2    A.  Frontier Airlines.

3    Q.  Besides the different parties, is your general

4    understanding that this guaranty is the same as the guaranty

5    that we previously went over?

6    A.  Yes, my general understanding.

7    Q.  Is this document necessary, was this document necessary to

8    completing the sale and leaseback process for MSN 10038?

9    A.  Yes.

10   Q.  Okay.  I think we are mostly done looking through these

11   complicated contract documents.

12        MR. SCHAER:  Your Honor, I note the time is 12:51.

13   This would -- I believe the Court takes a recess at 1.  This

14   would be a good stopping point or I'm happy to keep going.

15        THE COURT:  Good.  We'll resume at 2:15.  And we're

16   expecting a short interruption at 3:25, I understand.  And

17   probably you can use better this window and the same window in

18   the robing room, which is just through that door, to

19   accommodate more people.

20        Okay.  See you at 2:15.

21        MR. HOSENPUD:  Thank you, your Honor.

22        MR. BUTLER:  Thank you, your Honor.

23        (Recess)

24        (Continued on next page)

25

O48BFRO2

1                           AFTERNOON SESSION

2                              2:15 p.m.

3          MR. SCHAER:  Your Honor, one quick housekeeping issue

4    before we get started.  Some of the documents we're going to be

5    going through this afternoon have been marked attorneys eyes

6    only because they contain highly confidential pricing terms.  I

7    believe we do have somebody observing today who is not a party

8    to the protective order in this case.  How would the Court like

9    to handle those exhibits when they come up?

10         THE COURT:  What are the dates of the prices?

11         MR. SCHAER:  The main ones that we are concerned

12   about, your Honor, are the after -- kind of the dates of the

13   main disputes between the parties and when Frontier's

14   mitigation efforts with other lessors and the competitive

15   bidding price terms to take over the aircraft that would have

16   been part of the Framework Agreement but for the dispute.  So

17   it's pricing terms related to parties that are not in this

18   dispute but that do form the basis of the damages calculation

19   in this case.

20         THE COURT:  Is there much confidentiality left if

21   they've been offering that to the other people in the industry?

22         MR. SCHAER:  I do believe that there is

23   confidentiality left because the pricing terms that Frontier

24   has with its lessors it does keep highly confidential even from

25   each other.  The exception in this case is with AMCK because

O48BFRO2

1    it's a dispute, and it had to be put out there for us to

2    provide the damages we are seeking.  But the actual purchase

3    prices Frontier agreed to with other lessors, monthly rent,

4    swap rates, some of the other terms that effect pricing, the

5    maintenance reserves, things like that, that is all highly

6    confidential and competitive amongst the other 25, 30 leasing

7    companies that Frontier engages in those requests for the RFP

8    processes.

9              THE COURT:  When was all that going on?

10             MR. SCHAER:  This would be June and July of 2020, and

11   then October of 2020.

12             THE COURT:  If you wanted confidentiality for that,

13   you should have arbitrated.

14             MR. SCHAER:  Understood, your Honor.

15             THE COURT:  It's a very strict rule about the public

16   notice.  Particularly in this Circuit I think.  It may vary in

17   different circuits, but it's very one-sided here, so don't

18   worry about separating the wheat from the chaff.

19             MR. SCHAER:  Thank you.  We just wanted to make sure

20   we were honoring the NDA's with these other leasing companies,

21   but we understand the Court's order.

22   Q.  Good afternoon, Mr. Thwaytes.  When we left off, I'll just

23   reorient us.  We were just talking --

24             THE COURT:  That's right, but you tried.  That's

25   important.  It wasn't you who let them down.  I pushed them

O48BFRO2                          Thwaytes - Direct

1    down.

2            MR. SCHAER:  Your words, your Honor.  Thank you.

3    BY MR. SCHAER:

4    Q.  Good afternoon, Mr. Thwaytes.

5            Just to reorient us.  When we left we were still

6    talking about March 16 of 2020, and you had provided us a

7    number of important items that happened on that day.  We talked

8    about the Framework Agreement that Frontier and AMCK entered.

9    We talked about the sale leaseback agreement and all of those

10   contracts for MSN 10038 that the parties entered.

11           Can you tell us about the other noteworthy event that

12   happened between Frontier and AMCK on March 16 of 2020?

13   A.  Frontier sent AMCK a deferral request letter.

14   Q.  I'm showing you on the screen what has been previously

15   marked as joint exhibit 28.

16           Mr. Thwaytes, what is that I'm showing you on the

17   screen here?

18   A.  This is the request letter that we sent to AMCK to defer

19   rents and receive our security deposit back for a period of

20   time.

21   Q.  What is the date of this letter?

22   A.  March 16, 2020.

23   Q.  And scrolling down to page two.  Is this your signature?

24   A.  Yes.

25   Q.  Why did you sign this document?

O48BFRO2                    Thwaytes – Direct

1    A.  I was responsible for making these requests to suppliers

2    across the business at this time.  My teams were responsible

3    for managing these requests at this time, so I was the one that

4    was signing these letters.

5    Q.  I'm going to scroll up.  Can you summarize the main terms

6    that you understand that were the main requests that you were

7    making of AMCK in this letter?

8    A.  There's two as you can see.  All rent payments due between

9    the date of this letter, which was March 16, 2020, and June 30,

10   2020, will be deferred, and return of one month security

11   deposit.

12   Q.  Was Frontier proposing to pay back that rent at some point?

13   A.  Yes.  As you can see in the next paragraph, Frontier states

14   that it will repay the rent and security deposit over a

15   nine-month period commencing July 1, 2020 with interest.

16   Q.  Why did Frontier send this rent deferral request letter to

17   AMCK?

18   A.  This was a period of time right when the COVID-19 pandemic

19   crisis was escalating and Frontier was concerned about its

20   liquidity situation so was requesting from many suppliers

21   across the business to defer payments in order to conserve

22   liquidity.

23   Q.  Did Frontier send similar letters to any of its other

24   aircraft leasing company partners?

25   A.  It sent them to all of them.

O48BFRO2                          Thwaytes - Direct

1    Q.  And when did Frontier send those letters?

2    A.  All on March 16.

3    Q.  All on the same day?

4    A.  Yes.

5    Q.  I'm going to bring up what's been previously marked joint

6    exhibit 19.

7              Mr. Thwaytes, is this your phone number?

8    A.  Yes.

9    Q.  And who is Robert Fanning?

10   A.  At the time he was the director of fleet transactions.  He

11   worked for me running the fleet department.

12   Q.  And do you know whose phone number this is?

13   A.  Jimmy Dempsey.

14   Q.  Who is Jimmy Dempsey?

15   A.  At the time he was the chief financial officer of Frontier.

16   Q.  And what is the message that you are sending on this date?

17   A.  Could you be more clear with your question?

18   Q.  I'll break it into a couple of pieces.

19             Who is Andras?

20   A.  Andras is or was a person that worked at Wizz Air and was

21   responsible for their fleet department.

22   Q.  What is Wizz Air?

23   A.  It's an airline based in Budapest that operates in Europe

24   that we had a relationship with because the owner of Frontier

25   Airlines also had an ownership position in Wizz Air.

O48BFRO2                        Thwaytes - Direct

1    Q.  Who is that shared owner?

2    A.  Indigo Partners.

3    Q.  And what is this that I've highlighted on the screen that's

4    a part of your message?

5    A.  A text message exchange with Andras on WhatsApp.

6            MR. SCHAER:  I'm going to put on the screen what's

7    been previously marked as Defense Exhibit One.  We hadn't

8    included this in the exhibits that we moved to admit, so I will

9    move to admit this exhibit at this point.

10           MR. ALEXANDER:  No objection, your Honor.

11           THE COURT:  Received.

12           (Defendant's Exhibit 1 received in evidence)

13   BY MR. SCHAER:

14   Q.  Mr. Thwaytes, what is the date that this was sent?

15   A.  March 15, 2020.

16   Q.  Is that the same date that we just saw in the last exhibit

17   we looked at?

18   A.  Yes.

19   Q.  Is this FYI from Andras the same message that we just saw?

20   A.  Looks like it.

21   Q.  I'm going to scroll down to what I believe is a more

22   readable version of that picture that you sent.

23           Are you able to read this version better than the last

24   exhibit?

25   A.  Yes.

O48BFRO2                          Thwaytes - Direct

1   Q.  Mr. Thwaytes, which messages on this image, which messages

2   are yours, the one in green on the right or the one in white on

3   the left?

4   A.  The ones in green on the right.

5   Q.  And how do you know that?

6   A.  By looking at WhatsApp, when you have a message exchange

7   where the messages that you type end up.

8   Q.  When it's your phone and you are the sender on WhatsApp,

9   where do your messages show up?

10  A.  On the right side.

11  Q.  And where do the other person you're communicating with,

12  where do their messages show up?

13  A.  On the left side.

14  Q.  What are you asking Andras in these messages?

15  A.  I'm asking him what response he received from lessors to

16  letters requesting rent deferrals.

17  Q.  And what is his response?

18  A.  That he'd only received one answer from ALC, another

19  leasing company with no agreement.

20  Q.  What are you explaining here about where Frontier is in its

21  process of drafting its letter?

22  A.  That we were drafting our letter.

23  Q.  Will you remind us of the date of this message?

24  A.  March 15.

25  Q.  Are these messages consistent with your memory about the

1   time that you eventually sent those rent deferral request

2   letters on March 16?

3   A.  Yes.

4   Q.  Do you remember being asked about these text messages in

5   your deposition?

6   A.  Yes.

7   Q.  And in your deposition, what was your understanding about

8   which messages originated from you and which messages

9   originated from Andras?

10          MR. ALEXANDER:  Your Honor, we object to the use of

11  Mr. Thwaytes' deposition by his own party.

12          THE COURT:  Overruled.  I want to see where this goes.

13  You may have a valid objection later.

14          MR. ALEXANDER:  Thank you, your Honor.

15  Q.  I believe the question was in your deposition what was your

16  understanding about which messages originated from you and

17  which messages originated from Andras?

18  A.  I was understanding that the messages on the left were from

19  me and on the right from Andras.

20  Q.  As you sit here today, do you have a clear understanding

21  about which messages are yours?

22  A.  Yes, clear.

23  Q.  Which messages are those?

24  A.  The ones on the right side.

25  Q.  Besides leasing companies, aircraft leasing companies, did

O48BFRO2                          Thwaytes - Direct

1    Frontier make payment deferral request to anyone else?

2    A.   Many other suppliers of the business.

3    Q.   Going back to the airline or airplane leasing companies.

4    When you sent these requests on March 16, did any of these

5    leasing companies ever just say no rent deferrals?

6    A.   Yes.

7    Q.   And when a leasing company said to Frontier no, we are not

8    going to give you a rent deferral, what would Frontier do with

9    its monthly payments to that leasing company?

10   A.   It would pay them on time.

11   Q.   Can you think of any circumstances where a leasing company

12   said no rent deferral to Frontier and then Frontier did not pay

13   the scheduled monthly lease on time?

14   A.   No.

15   Q.   Did AMCK ever just say no rent deferrals to Frontier?

16   A.   No.

17   Q.   Did AMCK respond to this rent deferral request letter at

18   all?

19   A.   Yes.

20   Q.   And how did they respond to this letter?

21   A.   That they were also in a trying situation given the crisis

22   that we were in and they could not agree with it.

23   Q.   Did they engage in negotiations?

24   A.   Yes.

25   Q.   How long did the negotiations with AMCK last for?

O48BFRO2                          Thwaytes – Direct

1    A.   A month and a half.

2    Q.   Can you give us through what month or what date

3    approximately?

4    A.   Through the beginning of May.

5    Q.   Was Frontier paying monthly rent on its airplanes with AMCK

6    while those negotiations were ongoing through the beginning of

7    May?

8    A.   On one aircraft.

9    Q.   How about on the other 14?

10   A.   No.

11   Q.   And why is that?

12   A.   AMCK requested that we pay rent on one aircraft.

13   Q.   And what did they say about the other 14?

14   A.   They said that we did not have to pay on those aircraft

15   until we finish negotiating an agreement with Airbus to defer

16   aircraft deliveries and reach an agreement with them on a rent

17   deferral and then sign both of those agreements.

18   Q.   Why did negotiations with AMCK stop?

19   A.   Because they sent us a termination notice.

20   Q.   Do you remember the date that AMCK sent that termination

21   notice?

22   A.   May 8th I recall.

23   Q.   Prior to Frontier receiving that May 8 termination notice,

24   to your knowledge did AMCK ever ask anyone at Frontier to repay

25   any of the deferred rent?

O48BFRO2                          Thwaytes - Direct

A.  They had asked us to pay the deferred rent before the next

aircraft delivery multiple times and then asked us to pay it by

May 15th.  Those were the only times that they asked us to pay

back the deferred rent or the timeframes they gave.

Q.  Did they ever ask you to pay the deferred rent prior to May

8th?

A.  No.

Q.  I want to briefly go through some of Frontier's and AMCK

negotiations to help provide some of the background for this

case and testimony moving forward.

        But before I do, could you please let us know were you

the lead negotiator in these negotiations on Frontier's behalf?

A.  I initially sent the letter and communicated with Jane, and

then subsequently Jimmy Dempsey and Robert Fanning took over

communicating directly with AMCK and I was not communicating

directly with them.

Q.  And do you know who the lead negotiators were for AMCK?

A.  Jane O'Callaghan and Paul Sheridan.

Q.  Were you kept up-to-date on the status of these

negotiations?

A.  Generally.

Q.  And how so?

A.  In meetings that we would have as leadership team by being

CC'd on emails and by receiving text messages.

Q.  Were you being kept up-to-date in the normal course of your

O48BFRO2                          Thwaytes - Direct

1    work?

2    A.   Yes.

3    Q.   Is it part of your duties to stay informed on these types

4    of topics such as rent deferral, when to pay rent?

5    A.   Yes, I need to stay inform so I know if there's actions

6    that my team need to take.

7    Q.   I'm showing now what's been previously marked as joint

8    exhibit 36.  Do you recognize this email?

9    A.   Yes.

10   Q.   What is this email?

11   A.   It's Jane O'Callaghan's response to the request letter that

12   we sent to her.

13   Q.   Who is she sending this response to?

14   A.   To me.

15   Q.   What is the date of this email?

16   A.   March 18, 2020.

17   Q.   I'm going to read this first sentence here it says.  "You

18   may appreciate that we are receiving numerous requests for

19   assistance from our clients."

20          What is your understanding of whether other airlines

21   were making similar rent deferral request at this time?

22   A.   My understanding was that many airlines were impacted

23   significantly by the crisis so were requesting similar things

24   to what Frontier was requesting from their suppliers.

25   Q.   I want to go through some of the terms that are in here.

O48BFRO2                          Thwaytes - Direct

1    Let me ask this, did Ms. O'Callaghan provide a proposal for how

2    to resolve the rent deferral request?

3    A.   Yes.

4    Q.   Is that what's characterized beginning here?

5    A.   Yes.

6    Q.   And just so the record is clear, here means.  This is our

7    proposal on the 15 aircraft we have leased to Frontier.  Is

8    that right?

9    A.   That's right.

10   Q.   Do you understand these four bullet points to be that

11   proposal?

12   A.   Yes.

13   Q.   Can you explain to us what bullet point number one means?

14   A.   So AMCK was proposing to novate or sale these three

15   aircraft two other aircraft leasing companies, Merx and Amedeo,

16   and requested that we be current on the payments for those

17   three aircraft and that we cooperate in closing the sale of

18   those novations.

19   Q.   How about term number two?

20   A.   That on the remaining 12 aircraft that they would agree to

21   or they were proposing to defer 50 percent of the rent for

22   three months commencing on the 1st of April.

23   Q.   How about the third term?

24   A.   And that there'd be no deferral on the remaining five

25   A320neos that were scheduled to deliver and for them to

O48BFRO2                        Thwaytes - Direct

1   purchase from Frontier per the Framework Agreement.

2   Q.   And how about the fourth term?

3   A.   That Frontier would pay back the deferred rent over four

4   months and equal payments with eight percent interest per

5   annum.

6   Q.   I'm going to scroll up here.  What are you seeing on your

7   screen right here?

8   A.   My reply to Jane.

9   Q.   Can you just summarize this reply?

10  A.   Just reiterating to Jane the gravity of the situation and

11  asking her to reconsider our original request.

12  Q.   What's the date of your reply?

13  A.   March 22, 2020.

14  Q.   I want to take us forward a few days.

15          What is the document on the screen now?  Excuse me.

16  This has been previously remarked as joint exhibit 48.  What is

17  the document showing on your screen?

18  A.   It's an email from Jane O'Callaghan.

19  Q.   What's the date of this email?

20  A.   March 26, 2020.

21  Q.   And are you the only recipient of this email?

22  A.   No.

23  Q.   Are there others from Frontier that are now part of this?

24  A.   Yes.

25  Q.   Is this about the time where you stopped being the lead

1  negotiator on Frontier's behalf for these negotiations?

2  A.  Yeah.

3  Q.  Were you still involved in the negotiations?

4  A.  I wasn't the one interacting directly with AMCK, but I was

5  being kept up-to-date and informed if there were any actions

6  that I needed to take or the people that worked on my teams.

7  Q.  I want to just quickly touch on a couple of items.  We'll

8  have other witnesses that get more into depth on some of these

9  items and items we'll see in other exhibits.  But I want to

10  orient you, especially as it relates to your specific roles.

11          Can you explain what Ms. O'Callaghan is saying here?

12  A.  That AMCK would agree to Frontier's request for a

13  three-month rent deferral beginning in April 2020 for 14 of the

14  15 delivered aircraft.  They're excluding the one aircraft that

15  was delivered on the 16th of March 2020.

16  Q.  Is this the first time that either party suggested treating

17  the original 14 aircraft differently than the one that had

18  delivered under the Framework Agreement?

19  A.  Yes.

20  Q.  Did Frontier continue to timely pay its lease payments for

21  the one aircraft that delivered under the Framework Agreement?

22  A.  Yes.

23  Q.  Even in April of 2020?

24  A.  Yes.

25  Q.  Looking at the second term here, and I'll read it but ask

O48BFRO2                          Thwaytes - Direct

1    for your clarification.

2            It says, With respect to the remaining four SLB

3    aircraft.  What does SLB stand for?

4    A.  Sale leaseback.

5    Q.  So the four sale leaseback aircraft that are scheduled to

6    be delivered in May through July 2020, the delivery schedule

7    will be delayed between Frontier and Airbus by three to six

8    months.  Did I read that correctly?

9    A.  Yes.

10   Q.  Was this the first time that AMCK express to Frontier that

11   they wanted the delivery dates for the aircraft under the

12   Framework Agreement to be delayed?

13   A.  I believe so.

14   Q.  Was Frontier able to agree to this term on its own?

15   A.  No.

16   Q.  And why is that?

17   A.  Because Airbus per the purchase contract we have with them

18   dictate when aircraft are delivered.

19   Q.  Would it have been easy to achieve this request that AMCK

20   is making that Frontier needs Airbus to agree with?

21   A.  Definitely not.

22   Q.  And why definitely not?

23   A.  Because Airbus wants to deliver aircraft as soon as

24   possible.

25   Q.  Do you know why that is?

1    A.   A few reasons.  Airbus receives a significant amount of

2    cash when they deliver aircraft.  From an accounting

3    perspective, they book profits or revenues from delivering

4    aircraft, and they don't have room to store aircraft

5    particularly in Mobile, Alabama.

6    Q.   I'm going to bring up the next document.  This has been

7    previously marked joint exhibit 51.  Is this message I'm

8    showing you on the screen the message we just looked at in the

9    prior email?

10   A.   Looks like it.

11   Q.   I'm scrolling up now.  What do you understand this message

12   to be?

13   A.   Jane O'Callaghan reaching out to Robert.  Do you want more

14   detail than that?

15   Q.   What's the general subject matter of this email broadly

16   speaking?

17   A.   Just a follow-up on the previous proposal that she had

18   made.

19   Q.   I want to direct your attention to this line where she

20   says, We really believe it's in both parties' best interest to

21   defer delivery of these aircraft by three to six months.

22            Was it in Frontier's interest to delay the delivery of

23   these aircraft?

24   A.   No.

25   Q.   Why not?

O48BFRO2                              Thwaytes – Direct

A.  As I stated earlier when we were discussing the process of

delivering an aircraft and the sale leaseback transaction,

Frontier receives a significant amount of cash from the

difference between the price it pays Airbus and it sales the

aircraft to a lessor at delivery.

        It also pays down its credit facility, it's PDP credit

facility, so it reduces its debt, doesn't pay interest on that

debt.  And it also receives cash back from the PDP payments

that it had made, or the portion of the PDP payment it had made

with its own cash.  So at this time, Frontier was very focused

on liquidity, and every aircraft delivery provided a

significant amount of liquidity.

Q.  Did Frontier want these planes to deliver when they were

ready to be delivered?

A.  Yes.

Q.  I want to take us to what's been previously marked as joint

exhibit 60.  I'm going to scroll down here.

        Who is the sender of the message that is on this

screen here?

A.  Paul Sheridan.

Q.  And who is Paul Sheridan?

A.  The chief executive officer of AMCK.

Q.  What is the date of this message?

A.  April 3, 2020.

Q.  I'm going to skip over the first two paragraphs and read

1  the third one.  As mentioned yesterday, we are hearing on a

2  daily basis that many airlines and lessors have agreed

3  deferrals, and in some cases cancellations.  And indeed Airbus

4  has just today alluded to cutting its production in order to

5  avoid a glut of undelivered aircraft.

6          At this time on April 3rd had Frontier already began

7  discussing delivery deferrals with Airbus?

8  A.  I believe so.

9  Q.  Had you in particular already began discussing delivery

10 deferrals with Airbus?

11 A.  We were having conversations with Airbus about different

12 things throughout this period.  I don't recall exactly if I

13 talked to them about delivery deferrals, but I may have at this

14 point in time.  I just don't recall.  It was a long time ago.

15 Q.  We'll look at some exhibits later that might help with that

16 when we start talking about the conversations between Frontier

17 and Airbus.

18         Before we do, can you think of any reasons that it may

19 have been more difficult for Frontier to achieve delivery

20 deferrals with Airbus than it may have been for other airlines

21 at this time?

22 A.  Couple things.  One, we didn't have rights in our contract

23 to defer aircraft.  Second, our aircraft were either fully

24 built or very close to being fully built because they were

25 scheduled to deliver, if you recall, originally in March, three

1  of them.  So that made it I think difficult for Airbus -- well,
2  for Frontier to get Airbus to agree to defer those aircraft.
3  Q.  And it looks like -- who is this next message from?
4  A.  Jimmy Dempsey.
5  Q.  What is the date of this message?
6  A.  April 6, 2020.
7  Q.  I'm going to focus on the second paragraph of this.
8  Mr. Dempsey says, As a backdrop, I have spoken to Airbus about
9  your request, and their immediate reaction has been to thread
10  in Frontier with default.  This is also not a very palatable
11  event for you or us.  Did anybody from Airbus ever threaten a
12  default to you?
13  A.  Yes.
14  Q.  What would the consequence have been to Frontier if Airbus
15  put it in default?
16  A.  Potentially catastrophic.
17  Q.  Why is that?
18  A.  The Airbus contract to purchase aircraft is, if not the
19  core, one of the core contracts of the business.  The
20  significant gains received on delivery of the aircraft is a
21  significant and very important part of the business to generate
22  income.
23       Also since it was such a material contract, if it were
24  to default, it could have cross-defaulted into other contracts.
25  And I don't know where that would have ended up, but it could

O48BFRO2                        Thwaytes - Direct

1   have been catastrophic for the business.

2   Q.  Looks like we have another email on April 6 from

3   Mr. Dempsey.

4           Do you see that here?

5   A.  Yes.

6   Q.  He says, Hi, Paul.  Are you available for a call ASAP?

7   Airbus has closed Mobile until April 29. I am keen to get the

8   deferral in place and am conscious that we have 2X rent

9   payments today that we really need to defer.

10          My questions for you are pretty narrow here.  What

11  effect does closing Mobile have on deliveries?

12  A.  That deliveries cannot occur while it's closed.

13  Q.  Does that help achieve what AMCK was looking for?

14  A.  No.

15  Q.  Why is that?

16  A.  Cause they were asking for aircraft to be deferred three to

17  six months.

18  Q.  Does this achieve some amount of a deferral?

19  A.  Yes, the aircraft won't deliver before April 29th.

20  Q.  Do you see another April 6 message.  This time from Paul

21  Sheridan addressed to Mr. Dempsey?

22  A.  Yes.

23  Q.  I'm going to read it, so please bear with me.

24          It says, Hi, Jimmy.  We just got off the phone with

25  Robert so I would like to confirm what we discussed.  Mindful

1    of the time it might take you to reach agreement with Airbus or

2    to make some other arrangements; and therefore, of the ability

3    for us to reach a deferral agreement.  We can't confirm that we

4    won't take any actions or call off any defaults linked to

5    nonpayments of rents on any aircraft where the rent is due from

6    today, 21 April, i.e., for the next ten working days.

7            Did I read that correctly?

8    A.  Yes.

9    Q.  Focusing on this first part, do you agree that it would

10   take sometime to reach agreement with Airbus on delivery

11   deferrals?

12   A.  Definitely.

13   Q.  And why is that?

14   A.  Airbus was not motivated to defer aircraft for the reasons

15   I stated.

16   Q.  How did you understand what AMCK was providing to Frontier

17   on April 6, in terms of rent payments?

18   A.  That Frontier didn't need to make any rent payments due

19   during that period.

20   Q.  What was the purpose of that?

21   A.  To provide time for Frontier to negotiate with Airbus to

22   hopefully reach an agreement to delay the delivery dates of

23   aircraft and then sign an agreement with Airbus to confirm

24   that; and then subsequently to negotiate with AMCK the

25   specifics of the rent deferral and then sign an agreement for

O48BFRO2                          Thwaytes - Direct

1    that as well.

2    Q.  So the waiver was to provide time for those things that you

3    just listed?

4    A.  Yes.

5    Q.  To your understanding was April 6, the first point in time

6    where AMCK granted Frontier a rent deferral?

7    A.  Yes.

8    Q.  Prior to April 6, was Frontier fully current on all rent

9    payments with AMCK?

10   A.  Yes.

11           MR. SCHAER:  Your Honor, we can keep going.  I notice

12   that we're right at the Eclipse time that we've been informed

13   of.

14           THE COURT:  What time is it suppose to be?  I'm

15   uninformed.  When is the Eclipse suppose to occur?

16           THE LAW CLERK:  The peak is at 3:25.

17           THE COURT:  It's 3:10 now.

18           MR. SCHAER:  We have another document.

19           THE COURT:  You're at a good place to pause.

20           MR. SCHAER:  We have another document that I think

21   will not take too much time and still give us time to catch the

22   peak without rushing.

23           THE COURT:  Why don't you do that.  In the meantime,

24   we're trying to find out where you can actually see the Eclipse

25   from in this building.  Nobody will know until it gets closer.

O48BFRO2                          Thwaytes - Direct

1              THE LAW CLERK:  Judge, Courtney has suggested going to

2    Foley Square outside the courthouse.  She said a lot of people

3    are gathering.

4              THE COURT:  We'd lose an hour.  We have

5    responsibilities.

6    BY MR. SCHAER:

7    Q.  Mr. Thwaytes, beyond this ten-day-waiver provided on April

8    6, are you aware of any further deferrals or waivers provided

9    by AMCK to Frontier?

10   A.  Yes.

11   Q.  And what is that?

12   A.  AMCK provided Frontier a waiver of time until Frontier was

13   able to come to an agreement with Airbus and on deferring

14   aircraft and an agreement with them on the rent deferral.  And

15   on April 7, there was another agreement to do that.  That was

16   for an extended period of time.

17   Q.  I'm showing now what's been previously marked as joint

18   exhibit 73.  I will represent to the Court that when some of

19   these text messages were produced, they came through in a not

20   easily readable form, so the parties have agreed to use the

21   more readable form than what appears on the screen here.

22             Mr. Thwaytes, what is the date of this message?

23   A.  April 7.

24   Q.  Is this you and your phone number here?

25   A.  Yes.

O48BFRO2                          Thwaytes - Direct

```
 1    Q.   Whose phone number is this?

 2    A.   Jimmy Dempsey.

 3    Q.   Mr. Dempsey says on April 7th, just spoke to Paul Sheridan.

 4    He has agreed to do the deferral on a month-to-month basis.

 5         What did you take this comment from Mr. Dempsey to

 6    mean?

 7    A.   That Paul Sheridan and Jimmy had agreed to extend the rent

 8    deferral from the previous agreement of ten days that was made

 9    on April 6, kind of indefinitely into the future until we reach

10    an agreement with Airbus as we were negotiating and ink that

11    agreement, and until we reach an agreement with AMCK about how

12    we would pay back the deferred rent and ink that agreement.

13    Q.   Were you aware of an exact repayment date for the deferred

14    rent that was being provided here?

15    A.   At this point in time, no.

16    Q.   Were you ever aware of an exact repayment date for this

17    deferred rent?

18    A.   There was a number of times when AMCK propose that we pay

19    back the deferred rent prior to the next aircraft delivery, and

20    I recall that they also propose at one point paying back the

21    rent by a May 15 date.

22    Q.   Did Frontier pay AMCK its monthly rent on the 14 aircraft

23    in April of 2020?

24    A.   No.

25    Q.   And why was that?
```

O48BFRO2                          Thwaytes – Direct

1    A.  Because the rent deferral was in place.

2    Q.  Can you think of any other reasons that Frontier did not

3    pay monthly rent on those 14 aircraft to AMCK in April of 2020?

4    A.  No.

5            THE COURT:  I think this is a good place to pause,

6    gives us a little slack.  And I also think that there's really

7    no question that the best place to look from is my chambers,

8    one flight up, and so I invite everybody who would like to come

9    to that.  It will be really equally good from the robing room

10   here or this window, but there is a large bunch of big windows

11   in my chambers upstairs.  There are two ways of getting there.

12   One is the back elevator which is here which I have a pass for

13   and can take passengers up.  I think that's going to be very

14   crowded because other people are going to be using it,

15   particularly if they have courtrooms in this area.  So I think

16   that may be slow.  The ordinate for the youthful and clean

17   living among you is one flight of stairs up, and my clerks can

18   tell you how to get on and off that.  They're happy to do it.

19   I have only one here.  Mike will help me.

20           THE LAW CLERK:  Courtney reported that you cannot see

21   the sun from this side of the building.  You have to go

22   outside, but perhaps it's the best that we can do.

23           THE COURT:  Did you hear that?  Let's just stop, and

24   anybody who wants to go and make their way to the other side

25   can and is wished good luck.  Be back here at 3:30, and we'll

O48BFRO2                        Thwaytes – Direct

1    get back to work.

2              MR. SCHAER:  One quick question, your Honor.  We have

3    a witness in the witness room.  Is that okay to bring him

4    along?

5              THE COURT:  This lady sitting back there?

6              MR. SCHAER:  Out in the hall in the witness room.

7              THE COURT:  You're holding one.

8              MR. SCHAER:  We're holding one.

9              THE COURT:  Invite them all.  I really think you're

10   wasting your time on the side of the building.  I'd say forget

11   that.

12             MR. SCHAER:  Thank you, your Honor.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O483FRO3                              Thwaytes – Direct

 1              (In open court)

 2              THE COURT:  Mr. Schaer.

 3    BY MR. SCHAER:

 4    Q.  I want to put a pin in the discussions directly between

 5    Frontier and AMCK and briefly turn to the negotiations and

 6    discussions going on between Frontier and Airbus.  So to do

 7    that, we're going to go a short time back from the messages we

 8    were just discussing.

 9              I'm showing now what's been previously marked as Joint

10    Exhibit 56.  Mr. Thwaytes, who are Matthew M. Saks and Ray

11    Bishop?

12    A.  Matthew Saks was the sales direct working for Airbus that

13    covered Frontier.  And Ray Bishop was the contracts director at

14    Airbus that covered Frontier.

15    Q.  What is the date of this e-mail?

16    A.  April 2nd, 2020.

17    Q.  Can you please explain what this first paragraph of the

18    e-mail is relating to?

19    A.  There was an aircraft that had a complication during the

20    delivery process that needed to -- Airbus needed to resolve.

21    And accordingly, they were, as they state, indefinitely

22    delaying the delivery of that aircraft.

23    Q.  I am going to stop you there.  And I am going to show you

24    the attachment to this exhibit.  What is this attachment

25    relating to?

O483FRO3                          Thwaytes - Direct

1    A.  This is relating to that aircraft that there was a damaged

2    bracket that was discovered on the aircraft.  Airbus was trying

3    to resolve it but was unable to.  And accordingly, needed to

4    delay delivery of the aircraft until they could resolve it.

5    Q.  Can you tell by this message which aircraft this relates

6    to?

7    A.  That unique identifier identifies the aircraft, but I can't

8    recall the MSNs for all the aircraft.

9    Q.  How about in this highlighted text here?

10   A.  I know this aircraft is the aircraft that was scheduled to

11   deliver in this period of time.  So it's the aircraft that was

12   I believe the second aircraft under the Framework Agreement

13   with AMCK.

14   Q.  Can you read the subject line that's highlighted here.

15   A.  "Postponement of the delivery schedule A320neo MSN 9549."

16   Q.  Does that tell you which aircraft this relates to?

17   A.  Yes.  The second aircraft in the Framework Agreement.

18   Q.  So, Airbus has indefinitely delayed it.  What is the rest

19   of this relating to?

20   A.  I'm just impressing upon Airbus that a delay in an aircraft

21   negatively impacts Frontier, it impacts our cash position,

22   because we're not able to utilize our PDP financing facility,

23   at least capacity of the facility that has funded the PDPs for

24   this aircraft.  And we're not able to get the proceeds from the

25   sale leaseback transaction that's a difference between the

O483FRO3                          Thwaytes - Direct

price we're selling to the lessor and the price we're buying

from Airbus.

Q.  Are those the financial benefits we discussed earlier

relating to why Frontier wants deliveries of aircrafts to go

through?

A.  Yes.

Q.  In this second paragraph here, "We received verbal notice

this afternoon that our financier is uncomfortable funding

aircraft deliveries in 2Q 2020.  So we anticipate that Airbus

will work with us to manage the timing of upcoming aircraft

deliveries."

        Who is the financier that you are referring to in this

April 2, 2020, e-mail?

A.  AMCK.

Q.  How do you know that?

A.  They were the only financier that was expressing that they

were uncomfortable funding aircraft deliveries at this time,

and they were the aircraft lessor that was delivering a number

of aircraft during this time.

Q.  So, by April 2, had you already begun the discussions with

Airbus on the delivery deferrals that AMCK had requested?

A.  Yes.

Q.  I'm going to jump us ahead to what has been previously

marked as Joint Exhibit 91.  I'm going to quickly scroll

through these messages.

O483FRO3                          Thwaytes – Direct

1              Mr. Thwaytes, what do you understand these messages to
2     relate to?
3     A.   This is an ongoing negotiation with Airbus to try to get
4     them to delay the delivery of AMCK's aircraft.
5     Q.   And what is the range of dates that we see in these
6     messages?
7     A.   The first date that I'm seeing right now is April 11, 2020,
8     and April 17, 2020.
9     Q.   Were you the lead negotiator with Airbus regarding the
10    delivery delays that AMCK had requested?
11    A.   No.
12    Q.   Were you being kept up to date on those negotiations?
13    A.   Yes.
14    Q.   Similar to how we were discussing with the direct
15    negotiations directly between Frontier and AMCK?
16    A.   Yes.
17    Q.   I'm bringing us now to the attachment to this e-mail.  What
18    is this attachment depicting?
19    A.   It depicts the aircraft to be delivered and the schedule
20    delivery month or quarter and year currently contracted per
21    amendment 8 to the purchase agreement with Airbus.
22    Q.   Before you go on, just to keep us oriented.  Is that what
23    this column in blue is referring to?
24    A.   Yes.
25    Q.   Okay.

O483FRO3                          Thwaytes - Direct

1   A.   And then the column in yellow is the new delivery schedule

2   that Airbus was proposing.

3   Q.   Do you remember what the aircraft ranks were for the

4   aircraft that fell within the Framework Agreement?

5   A.   I do.

6   Q.   Which -- what are those ranks?

7   A.   52 to 55 and 58 and 59.

8   Q.   So 52 to 55, did I hear you correctly?

9   A.   Yes.

10  Q.   And 58 and 59?

11  A.   Yes.

12  Q.   Now, it looks -- how many aircraft at this time were

13  remaining to deliver under the Framework Agreement?

14  A.   Five.

15  Q.   Looking at this, it looks as though more than just five

16  aircraft were having their delivery dates pushed out.  Am I

17  understanding this correctly?

18  A.   Yes.

19  Q.   Can you please explain why that is?

20  A.   When you -- when aircraft are moved into another period,

21  the aircraft that are scheduled to deliver in that other period

22  then also have to move.  So there is kind of a cascading effect

23  of the aircraft and the delivery schedule.

24  Q.   Why is it that those other aircraft have to move in a way

25  that creates a cascading effect?

O483FRO3                          Thwaytes – Direct

A.  Airbus only has capacity to deliver so many aircraft in any

period of time.  Frontier only has the capacity to take

delivery of so many aircraft in a given period of time.  Those

are the two main reasons.

Q.  At this time, April 11 through April 17, 2020, had any

other lessor asked Frontier to move delivery dates with Airbus?

A.  No.

Q.  Are you aware of any other reason, other than AMCK's

request, that Frontier asked Airbus to move these delivery

dates?

A.  Not at this time, no.

Q.  I should have done this before.  But can you just please

explain what the current offer is to move the aircraft out from

between Airbus and Frontier?

A.  So they proposed to move the two remaining aircraft that

were originally scheduled to deliver in March to June and July,

2020.  The one aircraft that was scheduled to deliver in

May 2020, they proposed to move it to July 2020.  The aircraft

that was scheduled to deliver in June 2020, they proposed to

deliver it in February 2021.  And the aircraft originally

scheduled to deliver in August 2020, they proposed to move it

to November 2020.

Q.  Okay.  I'm showing now what has been previously marked as

Joint Exhibit 95.  I want to focus you in on this message.

        Who is the sender of this message?

O483FRO3                              Thwaytes - Direct

1   A.  Jimmy Dempsey.

2   Q.  What is the date of this message?

3   A.  April 20, 2020.

4   Q.  What do you understand the nature of this message to be in

5   general?

6   A.  Jimmy going back to Chris with a proposal to revise the

7   delivery schedule that they had proposed to us in order for it

8   to provide a manageable growth rate for Frontier.

9   Q.  Who is Chris?

10  A.  Chris Jones was the senior vice president of customers for

11  Airbus Americas I believe.

12  Q.  What do you understand Mr. Dempsey is referring to here

13  when he discusses appropriate growth levels?

14  A.  It's difficult to have peaks and valleys when aircraft are

15  delivered.  It's more beneficial and manageable if you have a

16  relatively steady growth rate, because of operational

17  constraints, hiring pilots, flight attendants, managing the

18  amount of capacity that you have on sale, also financial

19  implications of cash inflows and profits generated from the

20  sale of aircraft, it's manageable and beneficial for that to be

21  relatively steady rather than with peaks and valleys.  We were

22  always trying to achieve that.

23  Q.  Is this the proposal that Mr. Dempsey was providing to

24  Mr. Jones at Airbus for moving the discussions along?

25  A.  Yes.

O483FRO3                          Thwaytes - Direct

1    Q.  Can you please explain what the second term is referring to

2    here, "All PDPs obligations moved to the new scheduled delivery

3    months and overfunded PDPs under the new delivery schedule get

4    refunded."  What does that mean?

5    A.  If you don't deliver aircraft, then you don't receive your

6    PDP payments back.  So, if you push aircraft out, particularly

7    aircraft that are scheduled to be delivered within 12 months

8    when you've already paid all the PDP payments, then you just

9    have a growth in the amount of PDPs that you have on deposit

10   with Airbus, and that uses your credit capacity, it uses your

11   cash.  So we were asking Airbus to refund us the deposits that

12   we had with them for aircraft that, given the new scheduled

13   delivery month, would not have been on deposit with them unless

14   we had already paid the PDPs, which we had, because the

15   scheduled delivery month was different prior to the new

16   scheduled delivery month.

17   Q.  I just want to draw your attention to this aspect.  What

18   does Mr. Jones say in response to Frontier's request to refund

19   the PDPs for all of the reasons that you just explained?

20   A.  That they cannot refund the PDPs.

21   Q.  Was Frontier keeping AMCK apprised or generally up to date

22   with the conversations it was having with Airbus about

23   deferring these deliveries?

24   A.  I believe Jimmy and Robert were keeping them generally up

25   to date.

O483FRO3                          Thwaytes - Direct

1   Q.  Were you ever able to actually finalize a deal with Airbus

2   to defer the delivery dates of the aircraft that AMCK had

3   requested?

4   A.  Yes.

5   Q.  And when was that?

6   A.  I believe March 5 -- sorry.  May 5 of 2020.

7   Q.  I am showing now what has been previously marked as Joint

8   Exhibit 134.  What is the date of this e-mail, Mr. Thwaytes?

9   A.  May 5, 2020.

10  Q.  What does this e-mail generally relate to?

11  A.  It's an amendment to the purchase agreement reflecting the

12  agreement that we were able to finally accomplish with Airbus.

13  Q.  What number amendment is that?

14  A.  Amendment No. 9.

15  Q.  I'm showing the attachment to these e-mails.  What is the

16  document that's on your screen now?

17  A.  Amendment No. 9.

18  Q.  I'm scrolling down to page 11.  What does page 11 reflect?

19  A.  It is the delivery schedule for the aircraft contemplated

20  in the purchase agreement with Airbus.

21  Q.  Is this the updated delivery schedule?

22  A.  Yes.

23  Q.  We're back to the memory test.  Do you remember the

24  aircraft rank for the aircraft that were scheduled under the

25  Framework Agreement?

1   A.   Even though I have three little kids I can remember things

2   like this.  52 to 55 and 58 and 59.

3   Q.   What was Frontier ultimately able to achieve in terms of

4   moving these aircraft?  Tell us about the first four here.

5   A.   Well, that March 2020 aircraft at rank 54 was the aircraft

6   that was delivered on March 16.  52, 53 and 55 we were able to

7   achieve moving those aircraft to July 2020.

8   Q.   And then how about 58 and 59?

9   A.   We were able to achieve moving those to February 2021 and

10  November 2020.

11  Q.   Now, these dates here, three in July, and one in March we

12  know delivered.  Are those the same dates that we saw in the

13  prior attachment proposal for moving these aircraft delivery

14  dates?

15  A.   Can you bring that up for me to look again?

16  Q.   Yes.

17  A.   No, they're not.

18  Q.   Okay.  What is the difference?

19  A.   We were able to achieve an additional one-month delay in

20  the delivery of one of the aircraft from June to July.

21  Q.   So when would the next aircraft, after this May 5 agreement

22  that Frontier inked with Airbus, when would the next aircraft

23  have delivered?

24  A.   July 2020.

25  Q.   Is this the extent of the deferrals that Frontier was able

O483FRO3                        Thwaytes - Direct

1    to achieve for AMCK being three in July, one in November of

2    2020, and one in February of 2021?

3    A.  No, we were able to achieve even more than that.

4    Q.  How is that?

5    A.  We were able to move that November 2020 aircraft to

6    February 2021.

7    Q.  How was Frontier able to achieve that?

8    A.  We were able to swap that with another lessor.

9    Q.  Can you just explain how that swap process works?

10   A.  We asked the other lessor to move the commitment that we

11   had with each other from delivering an aircraft in

12   February 2021, instead to delivering an aircraft in

13   November 2020.  And when they agreed do that, then we were able

14   to provide AMCK with a further delay in that one aircraft by

15   having them deliver the aircraft in February 2021, instead of

16   the November 2020 aircraft.

17   Q.  So was Frontier also working with its other aircraft

18   leasing company partners to achieve what AMCK had requested?

19   A.  Yes.

20   Q.  Can you identify for us the plane that Frontier was able to

21   swap?

22   A.  59.

23   Q.  So that's the one that Frontier swapped out from AMCK?

24   A.  Yes.

25   Q.  And can you identify the one that it swapped in?

O483FRO3                              Thwaytes - Direct

1     A.  61.

2     Q.  Is that this one here?

3     A.  Yes.

4     Q.  So, what are the final I guess deferred delivery dates that

5     Frontier was able to achieve for AMCK?

6     A.  Three in July 2020 and two in February 2021.

7     Q.  Did Frontier ever communicate that to AMCK what it was able

8     to achieve?

9     A.  I believe Jimmy and Robert did.

10    Q.  Okay.  Let's go back to our discussions between Frontier

11    and AMCK.

12          So last we left them, we had looked at the April 6 and

13    April 7 communications relating to those deferrals.  Now let's

14    pick it up from there, though we'll do it with a light touch

15    because you were not the lead on those negotiations.

16          I'm showing what's been marked as Joint Exhibit 111.

17          Who is the sender of this message that's on your

18    screen?

19    A.  Paul Sheridan, the chief executive officer of AMCK.

20    Q.  And what is the date of this message?

21    A.  April 13, 2020.

22    Q.  Mr. Sheridan says, "Hi, Jimmy.  Apologies for the slow

23    response but I was waiting for some feedback from the

24    shareholders.  Essentially we want to tie the deliveries to

25    having no outstanding deferrals so it would only work if we

O483FRO3                          Thwaytes – Direct

1    recast the deferral agreement."

2              Did I read that correctly?

3    A.  Yes.

4    Q.  Is this consistent with your understanding about when AMCK

5    wanted Frontier to repay the deferred rent?

6    A.  Yes.

7    Q.  What is that understanding, if you could just restate it

8    here?

9    A.  That they wanted us to repay the deferred rent before the

10   next aircraft delivery.

11   Q.  Can you remind us when was Frontier eventually able to push

12   out that next aircraft delivery to?

13   A.  July 2020.

14   Q.  What is the date of this e-mail again?

15   A.  April 13, 2020.

16   Q.  Scrolling up it looks like the conversation has skipped a

17   couple of weeks.  We have April 27, 2020.  Do you know why the

18   conversation, at least in this e-mail thread, might have

19   skipped a couple of weeks?

20   A.  Because we were negotiating with Airbus to achieve the

21   delay in aircraft delivery that AMCK requested from us.

22   Q.  Just to skip to the end of this first paragraph here.  Do

23   you know what CP means in the context of this e-mail?

24   A.  Condition precedent.

25   Q.  I am going to read this e-mail.  Who is the sender of this

1  e-mail?

2  A.  Jimmy Dempsey, the CFO of Frontier.

3  Q.  He says, "Hi, Paul.  I have just been briefed by Robert and

4  was working on the assumption that we had to be current on all

5  rent for you to finance the upcoming deliveries.  This is set

6  out in your e-mail below.  I put a scheme in place with Airbus

7  that would facilitate short-term deferrals of the aircraft on

8  the basis that you would honor your agreement.  Please confirm

9  this is the case as we have a lease signed for these aircraft

10  and are willing to ensure the deferred rent is paid as a CP of

11  delivery," which you have explained means condition precedent

12  of delivery.

13          Did I read that correctly?

14  A.  Yes.

15  Q.  Is this consistent with your understanding of the scope of

16  the rent waiver and when AMCK was interested in Frontier paying

17  back that deferred rent?

18  A.  Yes, at this time.

19  Q.  And what is that understanding again?

20  A.  That we needed to pay back the deferred rent before the

21  next aircraft delivery.

22  Q.  I'm showing now what's been marked as Joint Exhibit 120.

23  Do you see on the screen the message we just looked at?

24  A.  Yes.

25  Q.  And so what do you understand this top message to relate

O483FRO3                         Thwaytes – Direct

1    to?

2    A.   This is in furtherance of the negotiation with AMCK.

3    Q.   Who is the sender of this e-mail?

4    A.   Paul Sheridan, the CEO of AMCK.

5    Q.   What is the date of this e-mail?

6    A.   April 30, 2020.

7    Q.   If we look at the first bullet point here, it says

8    deliveries in July -- let me go back.

9         What do you understand these bullet points to be?

10   A.   Paul Sheridan essentially agreeing with what we had

11   achieved with Airbus, to move the delivery of the five

12   aircraft, three to July 2020, two to February 2021.

13   Q.   Let me stop you there.  Is this consistent with what

14   Frontier, the first bullet point, was able to achieve with

15   Airbus?

16   A.   Yes.

17   Q.   And the second term, all payments to be current on May 15,

18   2020, and to remain current.

19        What do you understand this to mean?

20   A.   This was a change from their previous request that all

21   payments be current before the next scheduled aircraft

22   delivery, which was July 2020.  Now they were asking that we

23   instead be current on May 15, 2020.

24   Q.   Now before we go to the third bullet point, let's read this

25   final sentence.  It says, "Given the extent of the damage that

O483FRO3                          Thwaytes - Direct

1    has been done to the airline industry, and to airline and

2    lessor funding sources, we need to have some additional

3    security to ensure that we can obtain our shareholder funding

4    for the deliveries."

5            What do you understand "additional security" to mean

6    in this sentence?

7    A.  It was an additional significant ask from AMCK.

8    Q.  Is this third bullet point here referring to that

9    additional security?

10   A.  Yes.

11   Q.  I am going to read this first sentence then I'm going to

12   ask you to break it down for us.  It says, "Lease extensions of

13   4 years on the 12 A320neos funded in 2017, 2018, and 2019, at

14   rents to be agreed, plus a removal of the ETOs on the six

15   aircraft from the latest deal."

16           What is an ETO here?

17   A.  An early termination option.

18   Q.  Do you understand this request -- does this request in this

19   bullet point actually relate to two separate items?

20   A.  Yes.

21   Q.  Let's go through the first item.  Lease extensions of

22   4 years on the 12 A320neos funded in 2017, 2018 and 2019 at

23   rents to be agreed.  Can you please explain to us what that

24   means?

25   A.  These 12 A320neos were on eight-year leases with AMCK.  So

O483FRO3                    Thwaytes - Direct

1    they were asking for us to extend the leases by an additional

2    50 percent, which at the agreed lease rates was asking us to

3    commit to another 150, 160 million dollars, increase the

4    obligation to them by that amount.

5    Q.   So this first ask is an approximately 150,

6    160 million dollar request?

7    A.   Generally, yes, based on the lease rates we were paying to

8    them at the time.

9    Q.   And how about this second request here.  Removal of the

10   early termination options on the six aircraft from the latest

11   deal.  Can you please explain that to us?

12   A.   These aircraft had 12-year leases, but this early

13   termination option enabled Frontier to exit the lease at

14   8 years if it chose to do so.  So, they were asking us to

15   essentially do the same thing as the first 12, commit to four

16   additional years.  Which then the lease rates for those

17   aircraft were different than the others, but another

18   $70 million obligation or so we would be committing to them

19   with them.

20           Then you could look at it another way, where we would

21   not be able to renegotiate the lease rate at the end of the

22   8-year period, and we saw that as an opportunity to reduce the

23   cost of leasing these aircraft by $7 million or so.  So it was

24   a significant ask.

25   Q.   What's the date that this ask came in on again?

O483FRO3                          Thwaytes – Direct

1   A.  April 30, 2020.

2   Q.  Let's go forward another week.

3         I am now showing what has been previously marked as

4   Joint Exhibit 142.  Who is the sender of this e-mail?

5   A.  Jimmy Dempsey.

6   Q.  What is the date of this e-mail?

7   A.  May 8, 2020.

8   Q.  Do you understand these two e-mails, this one down here,

9   and this one up here, to be linked to each other?

10  A.  Yes.

11  Q.  On May 8, Mr. Dempsey says, "I have been waiting patiently

12  for your response to our call whereby I offered the following

13  solutions" and then it lists a number of terms.

14        Do you know what call this refers to?

15  A.  I wasn't on the call.  But I -- but I believe Jimmy and

16  Paul had a call in between when Paul sent that previous e-mail

17  on April 30 and this date discussing further negotiating the

18  particulars of the agreement we were trying to reach.

19  Q.  Are you aware if AMCK countered this negotiation by

20  Mr. Dempsey?

21  A.  They did not counter this May 8 correspondence.

22  Q.  Did AMCK respond in any way to this correspondence?

23  A.  I don't know if you would consider it a response to this

24  correspondence, but they sent us a notice of termination.

25  Q.  Is that the next correspondence that Frontier received from

O483FRO3                          Thwaytes - Direct

1   AMCK after Frontier sent this negotiation proposal?

2   A.  Yes.

3   Q.  Can you say that answer again?

4   A.  Yes.

5   Q.  I'm showing you now what's been previously marked as Joint

6   Exhibit 146.  What is the date of this e-mail?

7   A.  May 8, 2020.

8   Q.  Who is the sender?

9   A.  Paul Sheridan.

10  Q.  And this is being sent to you?

11  A.  Yes.

12  Q.  We see there is an attachment here.  Let me take you down

13  to the attachment.  Do you know what this document is?

14  A.  A notice of termination of the Framework Agreement.

15  Q.  Can you please just summarize your general understanding of

16  this document?

17  A.  That AMCK was terminating the Framework Agreement for the

18  six aircraft with Frontier.

19  Q.  Can you please explain how an alleged -- what was the basis

20  for the termination, as you understand it?

21  A.  That Frontier had not made lease payments on time.

22  Q.  Which lease payments would those have related to?

23  A.  For the 14 aircraft.

24  Q.  Did those 14 aircraft fall under the Framework Agreement

25  that's being terminated here?

O483FRO3                            Thwaytes - Direct

1    A.  No.

2    Q.  So, can you just generally explain to us how an alleged

3    non-payment of rent for those 14 aircraft could lead to AMCK

4    sending a letter terminating a different Framework Agreement?

5    A.  Yeah.  The agreements have cross default provisions between

6    them.  So if you are in default under a lease, one of the 14

7    leases, then it would cross into being into default under the

8    Framework Agreement.

9    Q.  Do you remember your reaction when you received this notice

10   of termination on May 8, 2020?

11   A.  Very surprised.

12   Q.  What was your understanding of the status of the rent

13   deferral with AMCK when you received this notice of

14   termination?

15   A.  That it was ongoing.

16   Q.  Before receiving this termination notice, did AMCK tell you

17   that negotiations were over?

18   A.  No.

19   Q.  Between April 7 and May 8 or April 6 and May 8, excuse me,

20   before receiving the termination notice, did anyone at AMCK

21   ever provide you with notice that Frontier needed to pay

22   outstanding rent payments?

23   A.  No.

24   Q.  To your knowledge, between April 6 and May 8, before

25   receiving the termination notice, did anyone at AMCK ever

O483FRO3                        Thwaytes - Direct

1   provide anyone at Frontier with notice that Frontier needed to

2   pay outstanding rent payments?

3   A.   No.

4   Q.   I want to briefly go over this document that has been

5   marked as Joint Exhibit 148.  Mr. Thwaytes, what is just your

6   general understanding of what this document is?

7   A.   A response from Frontier to AMCK to the notice of

8   termination that they had sent to us.

9   Q.   Did Frontier ever ask AMCK to withdraw its termination?

10  A.   I believe in this letter or in a correspondence like this,

11  yes.

12  Q.   Did AMCK ever actually withdraw its termination of the

13  Framework Agreement?

14  A.   No.

15  Q.   Did Frontier end up paying the outstanding rent alleged by

16  AMCK?

17  A.   Yes.

18  Q.   Do you know the date that Frontier paid that outstanding

19  rent?

20  A.   I think it was May 13.

21  Q.   How many business days would that have been after Friday,

22  May 8?

23  A.   I believe it's three business days.

24  Q.   Can you please remind us of the grace period provided for

25  in the lease agreements?

O483FRO3                          Thwaytes - Direct

1    A.  Three business days.

2    Q.  Has Frontier remained current on all of its rental payments

3    with AMCK since then, at least while you were at Frontier?

4    A.  At least while I was at Frontier, yes.

5    Q.  Okay.  We're in the homestretch with you.

6          So, AMCK has terminated the Framework Agreement and

7    taken delivery of the next five aircraft, and now, according to

8    you, Frontier has fully paid that rent on May 13.

9          What happens next?

10   A.  Frontier moves very quickly to try to find lessors to

11   finance these aircraft that are now delivering in July of 2020.

12   Q.  Did Frontier engage in the RFP process that you talked to

13   us about earlier?

14   A.  Yes.

15   Q.  Can you remind us, how much in advance of an aircraft

16   delivering does Frontier like to engage in a RFP process?

17   A.  12 to 18 months.

18   Q.  How many months here did Frontier have to engage in an RFP

19   process before an airplane was delivering?

20   A.  Two.

21   Q.  Could Frontier have just taken these aircraft without a

22   leasing company?

23   A.  It could.

24   Q.  What would the consequences have been?

25   A.  An outflow of 150ish million dollars of cash.

O483FRO3                              Thwaytes - Direct

1   Q.  Is Frontier structured or is that in Frontier's financial

2   plan to purchase these aircraft without leasing companies?

3   A.  Frontier's business model is to do sale leasebacks on all

4   of the new delivery of aircraft, so it wasn't its plan.

5   Q.  I want to introduce what's been previously marked as Joint

6   Exhibit 156.

7            Who is this e-mail from?

8   A.  Robert Fanning.

9   Q.  What is the date of this e-mail?

10  A.  June 2, 2020.

11  Q.  I am going to read the contents here.  It says, "See below

12  offer from CDB, slightly better than JSQ."

13            Can you just tell us who is CDB; who is JSQ?

14  A.  CDB is China Development Bank, a lessor bank.  And Jackson

15  Square Aviation, another aircraft lessor.

16  Q.  "The holiday rent they offered to probably be kicked out

17  for six months.  This offer is consistent with other offers I'm

18  seeing, and unfortunately for now very close to the new market

19  pricing for A320neos."

20            What is this e-mail capturing?

21  A.  It's giving an update on the proposals that we had received

22  from aircraft lessors to finance the three aircraft delivering

23  in July, specifically the CDB proposal.

24  Q.  So, does this just relate to the three aircraft that were

25  delivering in July?

O483FRO3                          Thwaytes - Direct

1   A.  Yes.

2   Q.  Did Frontier put out separate RFPs for the three delivering

3   in July from the two delivering in February?

4   A.  Yes.

5   Q.  Why is that?

6   A.  There was a very short period of time to complete the

7   process to finance the aircraft that were delivering in July,

8   and we wanted to just focus on that, and wait to focus on

9   financing deliveries after that subsequently.

10  Q.  How did these terms that we are seeing here compare with

11  those that AMCK had agreed to in the Framework Agreement?

12  A.  Worse.

13  Q.  How so?

14  A.  Purchase price is less by two and a half million, basic

15  rent is higher, I believe no early termination option.

16  Q.  I want to introduce now what's been previously marked as

17  Joint Exhibit 157.

18          Who is the sender in this e-mail?

19  A.  Jane O'Callaghan.

20          MR. ALEXANDER:  Your Honor, I'd like to object at this

21  time.  This document contains what is a settlement proposal

22  under Rule 408.  And we've objected to the use of this type of

23  evidence in the pretrial order.  We've also objected to

24  documents that contain the e-mail described here.

25          Now, I think this particular document slipped into the

O483FRO3                           Thwaytes - Direct

1    agreed exhibits, but it contains the same issue so we wanted to

2    raise it with your Honor.

3             THE COURT:  I'd like to take a look at it.

4             MR. SCHAER:  Would you like me to question through it

5    or do you want to see?

6             THE COURT:  I'd like to see it first.

7             MR. SCHAER:  I believe it's on your screen, your

8    Honor, but I can show it in hard copy.

9             THE COURT:  Oh this?

10            MR. SCHAER:  Let me pull it back up, your Honor.

11            THE COURT:  This is not used in a way that would

12   offend the rule against evidence of a settlement offer.

13   Overruled.

14            MR. SCHAER:  Thank you, your Honor.

15            THE COURT:  408.

16   BY MR. SCHAER:

17   Q.  Who is this offer from?

18   A.  Jane O'Callaghan.

19   Q.  What is the date of this?

20   A.  June 18, 2020.

21   Q.  What is the general contents of this e-mail?

22   A.  It is a proposal from Jane to finance the three aircraft

23   delivering in July 2020.

24   Q.  Did you expect AMCK to make a proposal for three of the

25   aircraft that had previously been part of the Framework

1    Agreement before it terminated the Framework Agreement?

2    A.   No.

3    Q.   Why not?

4    A.   They had just terminated the Framework Agreement, and

5    showed a significant discomfort with delivering aircraft under

6    sale leaseback agreements at this time.

7    Q.   How did these terms that Ms. O'Callaghan is providing to

8    you compare to the terms that were in the Framework Agreement

9    that AMCK had terminated?

10   A.   Worse.

11   Q.   In which ways?

12   A.   Lower purchase price.

13   Q.   How much lower?

14   A.   3 million per aircraft.

15   Q.   How else is this --

16   A.   Higher monthly lease rent.

17   Q.   About how much higher would this have been?

18   A.   I don't recall.  I'd have to look at the amount in the

19   Framework Agreement.

20   Q.   How much is the lease rent being provided here?

21   A.   339,600 U.S. per month.

22   Q.   Let me take us back to what I believe is the Framework

23   Agreement.  What was the base fixed rental in the Framework

24   Agreement?

25   A.   $299,880 U.S.

O483FRO3                        Thwaytes - Direct

1   Q.  And then let me show you joint Exhibit 29.  This is the

2   lease agreement for MSN 10038.  How much is the actual rent

3   that Frontier paid on the aircraft that delivered under the

4   Framework Agreement?

5   A.  $269,525.94 U.S.

6   Q.  So between that amount, 269,000 and change, and the amount

7   that Ms. O'Callaghan was putting in this proposal, what's the

8   difference?

9   A.  $70,000 per month.

10  Q.  Can you please read this final paragraph for us.

11  A.  "I should also point out that this proposal is conditioned

12  on the release and waiver of any potential legal claims by

13  Frontier arising from the termination of the Framework

14  Agreement."

15  Q.  Did Frontier attempt to negotiate this proposal with AMCK?

16  A.  Yes, we provided them a counterproposal.

17  Q.  Were the parties ever able to reach an agreement on these

18  three aircraft in July of 2020?

19  A.  No.

20  Q.  I'm showing now what's been previously marked as Joint

21  Exhibit 159.  What is this document?

22  A.  It is a board approval request from Frontier Airlines to

23  its board of directors.

24  Q.  What's the date of this document?

25  A.  July 1st, 2020.

O483FRO3                        Thwaytes - Direct

1   Q.  Scrolling down to the second page, and I'll read this for

2   you.  It says, "In order to obtain financing for the three July

3   deliveries which would have otherwise been financed by AMCK,

4   under the Framework Agreement, management reached out to

5   lessors who are competitive in prior RFPs, including ICBC,

6   BOCOM, ALM, GOAL, CALC, Arena Aviation Capital, GECAS, BOC

7   Aviation, CDB Aviation, and Jackson Square Aviation."

8           Are all of those airline -- or airplane leasing

9   companies?

10  A.  They're all aircraft leasing companies.

11  Q.  "Both ICBC and BOCOM declined to provide bids due to

12  current political tensions between U.S.A. and China.  The most

13  competitive offers were from Jackson Square Aviation and CDB

14  Aviation.  The economics of the respective offers are described

15  in the following page."

16          Did I read that correctly?

17  A.  Yes.

18  Q.  Is that your memory of this time and the RFP process for

19  these three July aircraft?

20  A.  Yes.

21  Q.  We are on the next page.  What is this page trying to

22  capture for us?

23  A.  This is a comparison of the CDB and Jackson Square

24  proposals to finance these three aircraft to the terms that

25  were agreed between AMCK and Frontier per the Framework

O483FRO3                          Thwaytes - Direct

1    Agreement.

2    Q.  I want you to help us walk through some of the pricing

3    terms.  What would the sale price, the 2020 sale price have

4    been for the AMCK aircraft under the Framework Agreement?

5    A.  51 million.

6    Q.  What were the offers from CDB and Jackson Square?

7    A.  48.5 million.

8    Q.  How much was -- what the difference between those?

9    A.  Two and a half million.

10   Q.  Better or worse?

11   A.  Worse.

12   Q.  What would the base lease rent have been for the AMCK

13   airplane?

14   A.  299,880.

15   Q.  What were the terms provided by CDB and Jackson Square?

16   A.  CDB proposed 315,250.  Jackson Square proposed $326,500.

17   Q.  Can you explain, what does the final rent row try to

18   capture for us?

19   A.  The total of all of the rent payments that you'd make under

20   the term of the lease.

21   Q.  Is there a difference between the airplanes that would have

22   been under the AMCK Framework Agreement versus the offers by

23   CDB and Jackson Square?

24   A.  Seven to eight and a half million difference.

25   Q.  It looks like the next two columns, the next two rows are

1  the same across the three different leasing companies.  Is that

2  fair to say?

3  A.  Yes.

4  Q.  What is this row capturing for us, total per aircraft?

5  A.  That's the total cost per aircraft that Frontier forecasted

6  for these three aircraft.  Or, I'm sorry, per aircraft while

7  the aircraft would be leased by Frontier.

8  Q.  How much would it have cost per aircraft for Frontier under

9  the AMCK Framework Agreement?

10 A.  82.5 million.

11 Q.  And how about under the CDB proposal?

12 A.  89.4 million.

13 Q.  How about under the Jackson Square proposal?

14 A.  90.8 million.

15 Q.  Were the CDB proposals and Jackson Square proposals better

16 for Frontier or worse for Frontier?

17 A.  They were worse for Frontier.

18 Q.  About approximately how much worse?

19 A.  The CDB proposal was about $7 million worse per aircraft.

20 The Jackson Square proposal about $8 million worse.

21 Q.  Do you know which leasing company Frontier went with for

22 these three aircraft that were now delivering in July of 2020?

23 A.  Frontier selected the best economic terms, which was CDB.

24 Q.  Do you know which leasing company Frontier went with for

25 the remaining two aircraft that were scheduled to deliver in

O483FRO3                           Thwaytes - Direct

1    February of 2021?

2    A.  Jackson Square.

3    Q.  How did Frontier select Jackson Square?

4    A.  Through an RFP process.

5    Q.  Similar to the one we've just looked at with CDB?

6    A.  Yes.

7    Q.  Is it your understanding that Jackson Square offered the

8    most competitive terms in that RFP process?

9    A.  Yes.

10   Q.  I want to introduce what's been previously marked as Joint

11   Exhibit 163.  What is the date of this document?

12   A.  October 7, 2020.

13   Q.  Do you see there is an attachment?

14   A.  Yes.

15   Q.  I am going to take us down to the attachment.  What is this

16   attachment showing us?

17          THE COURT:  What's the objection?  I thought I

18   heard --

19          MR. ALEXANDER:  No objection, your Honor.

20          THE COURT:  Okay.

21          MR. SCHAER:  I said "attachment" one too many times I

22   think?

23          THE COURT:  Proceed.

24          MR. SCHAER:  Thank you.

25   Q.  What is this document showing us?

O483FRO3                              Thwaytes - Direct

A.   This document is showing a comparison of the terms in the

Framework Agreement for the five -- in the AMCK Framework

Agreement for the five aircraft that were delivering in July of

2020 and then February of 2021, and compared to CDB and Jackson

Square's proposals and final terms for those aircraft.  And

then the total negative financial impact to Frontier per

aircraft and the total for all five aircraft.

Q.   What does B/W mean in this line?

A.   Better or worse.

Q.   If something is in parentheses, what is that relating to

us?  Or if a number is in parentheses, what is that relating to

us?

A.   It means it's worse.

Q.   We are going to go through this reasonably methodically.

What is the purchase price comparison here?

A.   AMCK in the Framework Agreement had agreed to purchase the

aircraft for $51 million each.  CDB purchased the three

aircraft delivering in July '20 for 48 and a half million each,

and Jackson Square proposed or had agreed to purchase the

aircraft delivering in February 2021 for 49 million each.

Q.   How much worse were the terms under the CDB agreement and

the JSA agreements as it relates to the purchase price that

would have been paid otherwise under the Framework Agreement

with AMCK?

A.   The CDB agreement was two and a half million dollars worse

1    per aircraft.  And the Jackson Square agreement was 2 million

2    dollars worse per aircraft.

3    Q.  This line says final eight year rent.  What is that

4    referring to?

5    A.  That's the rent that Frontier would have paid to AMCK over

6    the eight-year lease period per month.

7    Q.  For the remaining five aircraft?

8    A.  For the remaining five aircraft.

9    Q.  What does four-year extension rent refer to here?

10   A.  The assumption of how much the rent would have been reduced

11   after year eight, if Frontier elected to utilize early

12   termination option and renegotiate the rent.

13   Q.  Is this trying to capture the value that Frontier places on

14   the early termination option?

15   A.  Some of the value.

16   Q.  The line below it says final 12-year rent.  What is that

17   for CDB and for JSA?

18   A.  That's the monthly rent that Frontier would pay to CDB and

19   to JSA per aircraft over the 12-year lease that was being

20   contemplated or agreed.

21   Q.  So, just a quick point of reference.  This e-mail is coming

22   to us in October of 2020.  Is that right?

23   A.  That's right.

24   Q.  And when would the aircraft have delivered under the JSA

25   agreements?

O483FRO3                          Thwaytes - Direct

1    A.  In February 2021.

2    Q.  Had the final rent calculations been performed for the JSA

3    aircraft in October of 2020?

4    A.  No.

5    Q.  What is this number reflecting then?

6    A.  It's the base rent, before the adjustment.

7    Q.  So, would there have been an adjustment to this base rent?

8    A.  Yes.

9    Q.  What is this nominal rent line showing us here?

10   A.  That's the total of the final 12-year rent amounts for all

11   of the aircraft contemplated.  So, for the three aircraft with

12   CDB multiplied by 315.3 times 144 payments.  Same math with the

13   Jackson Square aircraft.

14   Q.  How much worse was the rent, the nominal rent under the CDB

15   and JSA aircraft as it relates to the AMCK aircraft, that would

16   have been under the AMCK Framework Agreement?

17   A.  CDB 7,462,000.6.  And Jackson Square, 8,933,000.1 worse.

18   Q.  I am going to skip NPV for a moment.  What is on-watch

19   burden?

20   A.  That's a condition in the lease where Frontier would be

21   obligated to cure a maintenance issue with an engine on an

22   aircraft if it was deemed on watch.  And the -- that's

23   representing the probability of that happening, and then the

24   cost to rectify that.  And you don't see that in the AMCK

25   column or the Jackson Square column, because only CDB required

O483FRO3                          Thwaytes - Direct

1    that we take on that obligation.

2    Q.  I want to go back up now to NPV rent.  What does NPV stand

3    for?

4    A.  Net present value.

5    Q.  Can you say that one more time?

6    A.  Net present value.

7    Q.  What is net present value trying to capture?

8    A.  The present value of future cash flows.

9    Q.  How does Frontier arrive at a net present value?

10   A.  It discounts the future cash flows by a discount rate back

11   to day zero.

12   Q.  What is the discount rate that is being used in this

13   document?

14   A.  10 percent.

15   Q.  What is that 10 percent trying to reflect?

16   A.  Frontier's cost of capital.

17   Q.  Can you explain what a cost of capital is?

18   A.  A company's capitalized with debt and equity.  And the cost

19   of capital is the weighted average cost of debt and equity.  So

20   the cost to fund the business.

21   Q.  Is this 10 percent figure an exact cost of capital figure

22   for Frontier?

23   A.  No.

24   Q.  Why did Frontier choose a 10 percent discount rate in this

25   document?

1   A.   Frontier used a 10 percent discount rate generally across

2   the business when doing NPV calculations.  So it used it in

3   this document just like it used it for all of the NPV

4   calculations that it did.

5   Q.   Is it possible to arrive at an exact cost of capital

6   figure?

7   A.   Yes.

8   Q.   How would you do that?

9   A.   You look at the percentage of the capital structure, debt

10  and equity, that's debt, and that's equity.  You would

11  determine how much the debt costs and multiply it by its

12  percentage of the total capital structure, and then you'd

13  calculate the cost of equity for a particular company, and

14  multiply it by the percentage of the capital structure, that's

15  equity, and then you'd add those two numbers together.

16  Q.   If you wanted to perform that calculation, or I should say,

17  is that the discount rate that would be the product of that

18  calculation, in reality, is that changing frequently?

19  A.   It changes all the time, because the underlying interest

20  rates, swap rates, treasury rates that underpin the cost of

21  debt are traded publicly and change all the time.  And then the

22  cost of equity changes all the time, at least when the

23  financial markets are open and you can see volatility and

24  pricing.

25  Q.   So is that amount changing daily?

O483FRO3                         Thwaytes – Cross

1    A.  Potentially every second or every minute.

2    Q.  To be clear, did Frontier perform that calculation prior to

3    applying its general 10 percent discount rate in this document?

4    A.  No.

5    Q.  When you were at Frontier, was this 10 percent rate fairly

6    constant?

7    A.  Yes.

8    Q.  Was this the same rate that Frontier was using when you

9    left Frontier nine months ago?

10   A.  Yes.

11   Q.  Now, even using this generic 10 percent discount rate,

12   that's not the product of the calculation that you said you

13   would need to do to get the accurate rate.  What is the amount

14   of damages that is being calculated in this document by virtue

15   of having to select CDB and JSA to take over those five

16   aircraft?

17   A.  The nominal amount was 53,179,000.5 U.S.  And the

18   discounted total was 34,303,000.7 U.S.

19   Q.  Thank you, Mr. Thwaytes.

20   A.  Thank you.

21   CROSS-EXAMINATION

22   BY MR. ALEXANDER:

23   Q.  Good afternoon Mr. Thwaytes.

24   A.  Good afternoon.

25   Q.  We're just getting situated here with our documents.  But,

O483FRO3                          Thwaytes - Cross

1   thank you for your time today.
2            You testified earlier that Frontier asked Airbus to
3   move aircraft deliveries in order to accommodate AMCK.  Do you
4   recall that?
5   A.  Yes.
6   Q.  You also testified that you were involved in those
7   discussions yourself; is that right?
8   A.  Early on I was involved in the discussions.
9   Q.  And as of March 2020, how many aircraft did Frontier have
10  to purchase from Airbus under their purchase agreement?
11  A.  Remaining to be purchased or that were contemplated in
12  total throughout the -- that purchase agreement and its
13  amendments?  Can you clarify?
14  Q.  As of March 20, how many aircraft remained to be delivered
15  under the purchase agreement?
16  A.  Around 160, 170.
17  Q.  Do you recall that on March 16, 2020, Frontier and Airbus
18  agreed on an amendment to their purchase agreement?
19  A.  Yes.
20  Q.  And was that Amendment No. 8?
21  A.  I believe so.
22  Q.  I'd like to show you a copy of that agreement, it's Joint
23  Trial Exhibit 21.  And do you understand what this document is,
24  Mr. Thwaytes?
25  A.  It looks like Amendment No. 8 to the purchase agreement

O483FRO3                         Thwaytes - Cross

1    between Airbus and Frontier.

2                MR. ALEXANDER:  Your Honor, I'd like to move to admit

3    Joint Trial Exhibit 21.

4                MR. SCHAER:  No objection.

5                THE COURT:  Received.

6                (Joint Exhibit 21 received in evidence)

7    Q.  Mr. Thwaytes, I'd like to direct your attention to the

8    appendix to this agreement which starts on page 6.  Do you see

9    that this first page of the appendix contains a schedule of

10   aircraft deliveries?

11   A.  Yes.

12   Q.  And this schedule here on this page shows 44 aircraft

13   deliveries going up to September 2019.  Is that right?

14   A.  Yes.

15   Q.  I'd like to direct you to the next page of this exhibit,

16   which you can see on the screen, shows continued deliveries in

17   2019 through 2020, and up to May 2021, at what's listed there

18   as number 80.  Do you see that?

19   A.  I do.

20   Q.  And I believe you testified earlier, so you probably have

21   these numbers still in your head, but do you recall what are

22   the aircraft rank numbers of the Framework Agreement aircraft?

23   A.  52 to 55, and 58 and 59.

24   Q.  So looking at 52, 53, and 54, I think you mentioned are

25   among the Framework Agreement aircraft?

O483FRO3                          Thwaytes – Cross

1    A.  Yes.

2    Q.  And those were the only aircraft scheduled to be delivered

3    in March 2020, right?

4    A.  Yes.

5    Q.  So, was AMCK the only lessor responsible for financing

6    aircraft deliveries for Frontier in March of 2020?

7    A.  Yes.

8    Q.  Mr. Thwaytes, I believe you testified earlier that the

9    first delivery under the Framework Agreement took place this

10   same day on March 16, 2020.  Is that right?

11   A.  Same day as what?

12   Q.  Sorry.  The same day as this March 16 Amendment No. 8 to

13   the Airbus purchase agreement?

14   A.  Took place on March 16, 2020.

15   Q.  So to finance that purchase, AMCK paid $51 million; is that

16   right?

17   A.  Yes.

18   Q.  And that was the very first delivery under the Framework

19   Agreement.  Do you recall hearing any delay issue related to

20   the second delivery under the Framework Agreement?

21   A.  At what point in time?

22   Q.  Do you recall there being an indefinite delay regarding

23   that aircraft because of a technical issue that Airbus notified

24   you of?

25   A.  Yes.

O483FRO3                              Thwaytes - Cross

1   Q.   That technical issue that Airbus flagged, that didn't have

2   anything to do with an AMCK request for delay, is that right?

3   A.   That's right.

4   Q.   Mr. Thwaytes, I'd like to show you what's been marked as

5   Joint Trial Exhibit 48.  And I believe you testified about this

6   document earlier.  But just to confirm, did you understand that

7   Jane O'Callaghan from AMCK was e-mailing you on March 26, 2020,

8   with AMCK's proposal on rent deferral issues?

9   A.   Yes.

10  Q.   And in the first bullet point in her e-mail,

11  Ms. O'Callaghan refers to the SLB aircraft that is scheduled to

12  be delivered in April 2020, MSN 9549.  Do you see that?

13  A.   I do.

14  Q.   And was that the aircraft that Airbus had notified you had

15  a technical problem?

16  A.   I believe it is, but I'm not certain of the MSN.  It was a

17  long time ago.

18  Q.   I'd also like to point you to the second bullet of this

19  e-mail which refers to AMCK's request that the remaining four

20  SLB aircraft that are scheduled to be delivered in May through

21  July 20 be delayed by three to six months.  Do you see that?

22  A.   Yes.

23  Q.   Did you understand that as part of its response to

24  Frontier's request for a rent deferral, AMCK was proposing in

25  return concessions from Frontier under the Framework Agreement?

O483FRO3                        Thwaytes - Cross

1    A.  If moving aircraft, delaying aircraft is considered a

2    concession, then yes.

3    Q.  Do you recall that AMCK proposed any other concessions

4    under the Framework Agreement, besides moving aircraft?

5    A.  At what point in time?

6    Q.  Well, at any point in time.  Are you aware of AMCK

7    proposing that Frontier provide concessions under the Framework

8    Agreement?

9    A.  Yes.

10   Q.  Besides aircraft deliveries?

11   A.  Yes.

12   Q.  One of those proposals is in this e-mail, isn't it?  In the

13   first bullet, AMCK was proposing a holdback of rent on the

14   agreed purchase price of $51 million relating to MSN 9549,

15   right?

16   A.  Yes.

17   Q.  You testified about MSN 9549, and you weren't sure about

18   the number, but that may have been the technical issue aircraft

19   that Airbus had notified you of?

20   A.  May have been.

21   Q.  I'd like to show you what's marked as Joint Trial

22   Exhibit 56.  And I believe you testified about this exhibit

23   earlier, Mr. Thwaytes, but does this is April 2 e-mail from you

24   to Airbus personnel refresh your recollection that MSN 9549 was

25   the technical issue aircraft that we were discussing?

1    A.  Yes.

2    Q.  And in the second paragraph of this e-mail, you mentioned

3    that you had received verbal notice in afternoon from your

4    financier, and you testified earlier that that referred to

5    AMCK.  Is that right?

6    A.  Yes.

7    Q.  So, you asked Airbus to consider moving aircraft deliveries

8    at least by April 2, 2020, is that correct?

9    A.  If you read this e-mail, we advised them that our financier

10   was uncomfortable funding deliveries, so we told them we

11   anticipated that they would work with us to manage upcoming

12   deliveries.

13   Q.  In the discussions between Frontier and Airbus, did the

14   parties discuss changing only the schedule for aircraft covered

15   by the Framework Agreement?

16   A.  No.

17   Q.  So you discussed changing the schedule for non-Framework

18   Agreement aircraft as well, correct?

19   A.  When you move aircraft into other periods, you have to move

20   those aircraft into other periods, so there is a cascading

21   effect by moving any aircraft.

22   Q.  And as of March 2020, do you recall how many aircraft were

23   scheduled for delivery in 2020?

24   A.  I don't recall the number.

25   Q.  Do you know if Frontier and Airbus discussed delaying all

1   of the aircraft scheduled for delivery in 2020?

2   A.  I don't recall if Frontier and Airbus discussed that.

3   Q.  You mentioned a cascading effect.  But isn't it true that

4   Frontier and Airbus discussed delaying aircraft deliveries in

5   2020 at Frontier's request?

6   A.  Frontier requested to delay aircraft that AMCK was going to

7   finance into other periods, which then caused a need to delay

8   the aircraft in those other periods into other periods.  So, by

9   requesting to move aircraft that AMCK was going to finance, it

10  caused other aircraft need to be moved as well.

11  Q.  So is it your testimony that all of the aircraft that were

12  moved as a result or that were moved in connection with these

13  2020 discussions with Airbus, were solely due to AMCK's

14  request?

15  A.  Unless Airbus had other reasons to propose moving aircraft

16  to accommodate their manufacturing process.

17  Q.  Mr. Thwaytes, I'd like to show you what's marked as Joint

18  Trial Exhibit 176 which is a copy of your deposition in this

19  case.  Do you recall having your deposition taken?

20  A.  Yes.

21  Q.  And I'd like to put up on screen page 108 of your

22  deposition.  And I direct you to line 16 which is toward the

23  bottom but if we could pull that up a little bit.  Do you see

24  that at line 16, you were asked:

25  "Q.  Other than the aircraft subject to the Framework

Agreement, how did Frontier choose what other aircraft to seek

delivery changes for?

"A.  Based off of the impact on PDP payments and impact on cash

flows from the delivery of the aircraft.  So the total cash

flow impact, and then also looking at capacity.  Really a cash

flow exercise and then a capacity exercise."

            Do you see that?

A.  Yes.

Q.  Were you asked that question and did you give that answer?

A.  If it's written here, then I assume yes.

Q.  You testified about the cascading effect of aircraft

deliveries.  Mr. Thwaytes, isn't it true that the cascading

effect of deliveries would take place in later years?

A.  No, it would take place in near -- in the current year, if

aircraft would be moved within the current year, and then in

later years, as the aircraft in the current year have to be

moved out into the next year and so on.

Q.  Wasn't Frontier seeking to delay aircraft in the second

half of 2020 and into 2021 to provide cash flow relief and to

manage capacity?

A.  As a result of having to move the AMCK aircraft.

Q.  You testified earlier that there were there may have been

some deliveries that were pushed at Airbus's request?

A.  Potentially.

Q.  I'd like to show you your deposition again, Mr. Thwaytes,

O483FRO3                          Thwaytes - Cross

1    at page 91, and at line 9 of page 91, you were asked:

2    "Q.  How many other aircraft not covered by the Framework

3    Agreement was Frontier seeking a delivery change for?

4    "A.  I don't -- I don't recall how many.

5    "Q.  Was it more than 50?

6    "A.  It's hard to -- it's hard to determine how many because

7    change in delivery schedule for some aircraft can have a

8    cascading effect that causes a change in the delivery schedule

9    for other aircraft.

10            "So I think that the discussions for aircraft

11   delivering in 2020 and into 2021, I believe it's that period of

12   time, but the impact of that it appeared to be more, because it

13   kind of cascades the delivery stream."

14            Were you asked those questions and did you give those

15   answers?

16   A.  Yes.

17   Q.  You testified about the request by AMCK that Frontier delay

18   delivery schedules with Airbus, and I believe you testified,

19   but I want to confirm, no other lessors asked Frontier to delay

20   delivery of aircraft in 2020; is that right?

21   A.  No, not that I recall.

22   Q.  Is it correct then that all of the delivery changes -- or

23   strike that.

24            Was it correct that the only delivery delays requested

25   in the 2020 amendment process with Airbus were AMCK related

1  deliveries; is that right?

2  A.  Are you talking about specifically Amendment No. 9?

3  Q.  In Amendment No. 9, when Frontier and Airbus amended the

4  delivery schedule, no other lessors had requested that Frontier

5  change the delivery schedule; is that right?

6  A.  That's right.

7  Q.  So those delivery changes were not the result of requests

8  by other lessors?

9  A.  No.

10  Q.  I'd like to show you what's marked as Joint Trial

11  Exhibit 88.  Is it Mr. Thwaytes this appears to be an April 15,

12  2020 e-mail from you to Ashok Shah, Thomas Frey, and Sharath

13  Sashikumar Bindu.  Do you see that?

14  A.  I do.

15  Q.  Did you send this e-mail?

16  A.  Yes.

17          MR. ALEXANDER:  I'd like to move to admit Joint Trial

18  Exhibit 88.

19          MR. SCHAER:  No objection.

20  Q.  Mr. Thwaytes, the recipients of this e-mail --

21          THE COURT:  Received.

22          (Joint Exhibit 88 received in evidence)

23  Q.  -- are those Frontier employees?

24  A.  Yes.

25  Q.  And in the header of your e-mail it refers to an FFT Airbus

1    delivery schedule scenario 15 April 2020.  Do you see that?

2    A.  That's the attachment.

3    Q.  And do you understand that that's a delivery schedule

4    scenario that Airbus had sent to Frontier in connection with

5    the parties' discussions about delivery delays?

6    A.  I assume it is, looking at the trail of e-mails.

7    Q.  And the e-mail below that you're referring to, is that the

8    April 15 e-mail from Ray Bishop at Airbus?

9    A.  Yes.

10   Q.  And what do you understand Mr. Bishop to have been sending

11   to Frontier?

12   A.  Proposed revision to the aircraft delivery schedule.

13   Q.  Let's look at page 4 of this exhibit.  If we can zoom out

14   so you can see the document here.  But, do you understand that

15   this is the attachment with the Airbus proposed delivery

16   schedule scenario?

17   A.  I assume it is.

18   Q.  Do you understand, I believe you testified about at least a

19   version of this chart earlier today.  Do you recall that?

20   A.  I recall seeing this and I was talking about it.

21   Q.  So, the chart shows a number of aircraft deliveries, and

22   then in blue, the schedule for that delivery as of amendment 8,

23   so the original delivery date, right?

24   A.  Yup.

25   Q.  And then in yellow it shows the proposed delayed delivery

O483FRO3                         Thwaytes - Cross

1   date for that aircraft, correct?

2   A.  That's right.

3   Q.  If you have a look at this chart, do you see that there's

4   about 20 aircraft deliveries in '20 or 2021 as of the original

5   amendment 8 at this time?

6   A.  Did you say in 2020 and 2021?

7   Q.  So as of this point in time, this chart is showing a number

8   of deliveries for 2020 and 2021.  And would you agree that

9   there is about 20 of them?

10  A.  Yes.

11  Q.  And if you scroll down a little bit, do you see there is a

12  redacted portion of the document.  Do you understand what has

13  been redacted at a general level?

14  A.  Additional aircraft.

15  Q.  Do you know if those deliveries are from later years or

16  later periods of time?

17  A.  It's in chronological order, so I'd assume that they would

18  be a continuation of what we're looking at here.

19  Q.  And let's look very briefly at the next page of this

20  exhibit, just for reference.  The redactions continue.  Do you

21  understand that there were a number of aircraft deliveries

22  after this point in time?

23  A.  You asked me earlier how many were still to be delivered at

24  this point in time, and I answered 150 to 160.  So you can

25  infer from that.

1   Q.  Let's go back to the prior page which shows the chart.  For

2   the deliveries we can see, which are starting in March 2020 and

3   going up to June 2021, do you agree that all of those scheduled

4   deliveries were being delayed in this proposal?

5   A.  Yes.

6   Q.  And how many of those aircraft were aircraft covered by the

7   Framework Agreement?

8   A.  Six.

9   Q.  And I believe you testified earlier that rank 54, which

10  indicates it was delivered, was that a Framework Agreement

11  aircraft?

12  A.  Yes.

13  Q.  So as of this point in time, how many aircraft deliveries

14  remained to be made under the Framework Agreement?

15  A.  Five.

16  Q.  So, of the remaining deliveries in this chart, only five of

17  them are Framework Agreement aircraft?

18  A.  Yes.

19  Q.  And I know you've done this exercise before, Mr. Thwaytes,

20  but if we could just point them out, which are the aircraft

21  deliveries listed here that are covered by the Framework

22  Agreement?

23  A.  Ranks 52 to 55 and then ranks 58 and 59.

24  Q.  All right.  So, the first three deliveries were Framework

25  Agreement aircraft deliveries, correct?

O483FRO3                        Thwaytes – Cross

1   A.  The first four.

2   Q.  Yes.  Certainly.  But starting with the first three that

3   were scheduled in March, 52, 53 and 54 were all Framework

4   Agreement aircraft, correct?

5   A.  Yes.

6   Q.  And you testified that 55 was also a Framework Agreement

7   aircraft, right?

8   A.  Yes.

9   Q.  And that was scheduled to be delivered in May?

10  A.  Yes.

11  Q.  56 was not a Framework Agreement aircraft, correct?

12  A.  Correct.

13  Q.  And that was scheduled to be delivered in May 2020, but in

14  this discussion was being proposed extended to second quarter

15  of 2021, correct?

16  A.  Correct.

17  Q.  What was the next Framework Agreement aircraft shown in

18  this chart?

19  A.  58.

20  Q.  And that's an aircraft that was scheduled to be delivered

21  in June?

22  A.  Yes.

23  Q.  Looking at the prior row, rank 57, that's also an aircraft

24  scheduled to be delivered in June 2020, correct?

25  A.  Yes.

O483FRO3                          Thwaytes – Cross

1    Q.  And that was being delayed in this proposal to

2    September 2020, correct?

3    A.  Correct.

4              THE COURT:  Mr. Alexander, when you get to a stopping

5    point, we'll stop.

6              MR. ALEXANDER:  Certainly, your Honor.  Now's fine if

7    that's a good time for the Court.

8              THE COURT:  Okay.  We'll resume at 11 tomorrow

9    morning.  Have a good evening.  We don't have an eclipse to

10   offer you tomorrow.  It will be a dull day, but we're doing

11   well.

12             MR. ALEXANDER:  Thank you, your Honor.

13             (Adjourned until April 9, 2024, at 11 a.m.)

14                         JOINT EXHIBITS

15   Exhibit No.                              Received

16    1, 2, 3, 4, 5, 19, 22, 24, 25, 26, 28,  . . . .18

17             29, 36, 48, 51, 56, 60, 73,

18             81, 91, 95, 111, 120, 134,

19             142, 146, 148, 156, 157, 163,

20             190

21    21   . . . . . . . . . . . . . . . . . . 122

22    88   . . . . . . . . . . . . . . . . . . 130

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3      SPENCER THWAYTES

4     Direct By Mr. Schaer . . . . . . . . . . . . .19

5     Cross By Mr. Alexander . . . . . . . . . . . 120

6                          DEFENDANT EXHIBITS

7     Exhibit No.                              Received

8      1   . . . . . . . . . . . . . . . . . . . . .62

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25