O49BFRO1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  FRONTIER AIRLINES, INC.,

4              Plaintiff,

5       v.                          20 Civ. 9713 (LLS)

6  AMCK AVIATION HOLDINGS IRELAND
   LIMITED, ACCIPITER INVESTMENT
7  4 LIMITED, VERMILLION AVIATION
   (TWO) LIMITED,
8
                Defendants.
9
   ------------------------------x
10                                 Bench Trial

11                                 New York, N.Y.
                                   April 9, 2024
12                                 11:00 a.m.

13 Before:

14              HON. LOUIS L. STANTON,

15                                 District Judge

16                    APPEARANCES

17 LANE POWELL PC
        Attorneys for Plaintiff
18 BY:  DAVID G. HOSENPUD
        AARON SCHAER
19
   CLIFFORD CHANCE US LLP
20      Attorneys for Defendants
   BY:  JEFF E. BUTLER
21      JOHN P. ALEXANDER
        RISHIKA JIKARIA
22      GINA CROSBY

23

24

25

O49BFRO1                          Thwaytes – Cross

1           (Trial resumed)

2           THE COURT:  Good morning.  Please be seated.

3   Mr. Thwaytes, you're reminded you're still under oath.

4           THE WITNESS:  Thank you.

5    SPENCER THWAYTES,

6   CROSS-EXAMINATION CONTINUED

7   BY MR. ALEXANDER:

8   Q.  Good morning, Mr. Thwaytes.

9   A.  Good morning.

10  Q.  Do you recall testifying yesterday about a ten-day grace

11  period that AMCK granted to Frontier on April 6, 2020?

12  A.  Yes.

13  Q.  And that was in an email from Paul Sheridan of AMCK; is

14  that right?

15  A.  Yes.

16  Q.  Let's just put that up on the screen so we have it.

17          MR. ALEXANDER:  This is, for the record, Joint Trial

18  Exhibit 63 which I don't believe is in evidence yet, but I'll

19  move to admit it.

20          MR. SCHAER:  No objection.

21          THE COURT:  Received.

22          (Joint Exhibit 63 received in evidence)

23  BY MR. ALEXANDER:

24  Q.  Mr. Thwaytes, is this the email you were testifying about

25  yesterday?

1    A.  Yes.

2    Q.  Do you recall being asked yesterday about whether beyond

3    the ten-day waiver period on April 6, you were aware of any

4    further deferrals or waivers that AMCK granted to Frontier?

5    A.  Yes.

6    Q.  And I believe you testified yesterday that you were aware

7    of an agreement on rent deferral on April 7, between

8    Mr. Sheridan and Mr. Dempsey; is that correct?

9    A.  Yes.

10   Q.  And you testified that that agreement extended this April

11   6th rent deferral in Mr. Sheridan's email indefinitely; is that

12   right?

13   A.  Until the -- indefinitely because it was undetermined when

14   the next aircraft would deliver.

15   Q.  Do you remember testifying differently when asked that

16   question at your deposition?

17   A.  No, not necessarily.

18   Q.  Do you recall mentioning anything at your deposition about

19   a April 7th, agreement on rent deferral?

20   A.  I recall testifying that there was a rent deferral in place

21   for an extended period of time, and it was kind of ambiguous

22   how long the period of time would be.

23   Q.  Well, I'd like to show you your deposition, Mr. Thwaytes,

24   which is Joint Trial Exhibit 176.  And I'll direct you to page

25   168 which we're putting up on the screen here.

O49BFRO1                        Thwaytes – Cross

1            Do you see starting at line seven I asked you, "Apart

2     from the ten-day grace period referred to in Mr. Sheridan's

3     email, are you aware of any other grace period that anyone at

4     AMCK granted to Frontier at this time?"

5            Do you see that?

6     A.  I do.

7     Q.  And what was your response?

8     A.  Do you want me to read it?

9     Q.  Please.

10    A.  "Besides the grace period that we had in our agreements

11    with them, which were already in place at this time, I'm not

12    aware of any additional grace periods explicitly provided to

13    us."

14            MR. SCHAER:  Your Honor, I would object and ask for

15    the sake of completeness under ER106 to read an additional

16    portion of Mr. Thwaytes' deposition testimony into the record

17    at the bottom of page 163 to the top of the page 164.

18            THE COURT:  Well, I have to see it to know whether it

19    is a continuation.

20            MR. ALEXANDER:  Well, your Honor, we can hand up the

21    deposition transcript or put it on the screen, however you

22    would like us to proceed.

23            THE COURT:  I'll read it in any form which is

24    presented to me, but I can't do it from here.

25            MR. ALEXANDER:  Why don't we put the page on the

 1   screen that Mr. Schaer is talking about.

 2            MR. SCHAER:  The question, your Honor, starts at line

 3   23 of page 163 and it's, Do you know the end date of that grace

 4   period?

 5            And Mr. Thwaytes' answer is, The end day of the grace

 6   period was -- and it goes on at the top of 164.  It says,

 7   undetermined because we continued to have dealings with AMCK

 8   the first part of May, so it was kind of an ambiguous end date

 9   that continued to be pushed out as we continued to pursue what

10   AMCK had requested us --

11            THE COURT:  Yes, it can be read in at this point.

12            MR. SCHAER:  Thank you, your Honor.  Just to finish

13   it -- to pursue with Airbus.  Thank you, your Honor.

14   BY MR. ALEXANDER:

15   Q.  Mr. Thwaytes, I'd like to direct you again to page 168 of

16   your deposition.  The portion of the deposition testimony that

17   we just looked at involved your testimony that you understood

18   there was an ambiguous end date and that it continued because

19   of discussions.  Is that right?

20   A.  Yes.

21   Q.  But on page 168 of your transcript here, you stated you

22   were not aware of any extension of the grace period, correct?

23   A.  No.  You're asking in this, are you aware of any other

24   grace period.  You're not asking if there was an extension of

25   the grace period.

1    Q.  So it's your testimony that you were not aware of any

2    extension of the grace period, but that Mr. Sheridan's email

3    itself extended indefinitely?

4    A.  I was aware that we had a grace period that was

5    undetermined of how long it would last because it was tied to

6    the next aircraft delivery and Mr. Sheridan wanted us to be

7    current on rents for the grace period to end before the next

8    aircraft delivery.

9    Q.  Did you say anything at your deposition about an April 7th

10   rent deferral agreement?

11   A.  I don't believe I did.

12   Q.  Were you not aware of that April 7th agreement at the time

13   of your deposition?

14   A.  The deposition was almost two years after the

15   circumstances, and I did not recall all of the text messages

16   and emails I had received during that time in the crisis.  So

17   at the time of my deposition, I did not recall that.

18   Q.  Your deposition was about two years ago, right,

19   Mr. Thwaytes?

20   A.  I think it was in October of 2022.  I'm not sure of the

21   exact date of the deposition, so you could tell me.

22   Q.  If I told you it was March 30, 2022, would that sound

23   right?

24   A.  That's about two years.

25   Q.  And you didn't remember this April 7th rent deferral waiver

1  at your deposition in 2022; is that right?

2  A.  Yeah, if I didn't say that I did, then I didn't.

3  Q.  But you do remember it now?

4  A.  Yes.

5  Q.  When did you remember it?

6  A.  After thinking about it for an extended period of time in

7  my head playing out the circumstances that took place I

8  remembered it.

9  Q.  What were the circumstances of you remembering?

10  A.  Just trying to piece the timeline together in my head that

11  wasn't presented to me during the deposition.

12  Q.  Did you see any documents that made you remember?

13  A.  No.  It was more just remembering the circumstances of what

14  was happening at the time.

15  Q.  You testified yesterday about this April 7th agreement

16  between Mr. Sheridan and Mr. Dempsey.  What do you know about

17  that agreement?

18  A.  That Mr. Dempsey and Mr. Sheridan had a phone call, and the

19  phone call extended the grace period for an indefinite period

20  of time in order for us to reach an agreement with Airbus and

21  ink that agreement; and then reach an agreement on the deferral

22  of rents with AMCK and ink that agreement.  So from my role in

23  the organization, we didn't have to make any rent payments

24  until the next aircraft delivery.

25  Q.  You said it was a phone call between Mr. Sheridan and

1  Mr. Dempsey, were you on that phone call?

2  A.  I don't believe I was.

3  Q.  Is it fair to say that everything you know about that

4  agreement comes from Mr. Dempsey?

5  A.  Yes.

6  Q.  When you remembered this April 7th phone call did, you talk

7  to anyone about it?

8  A.  I'm trying to think if -- I'm not sure if it was a

9  recollection from me just thinking in my own head and

10  remembering, going through the circumstances in my own head or

11  if it was prompted by something I read.  I'm not sure.

12  Q.  Whatever the circumstances of your remembering today, you

13  do remember hearing about an April 7th phone call between

14  Mr. Sheridan and Mr. Dempsey?

15  A.  Yes.

16  Q.  But you didn't remember that in 2022, did you?

17  A.  That's right.

18  Q.  When did you first learn about this April 7th phone call?

19  A.  In the middle of April, around April 7th.

20  Q.  Of 2020?

21  A.  Right.

22  Q.  Who told you about it?

23  A.  My recollection is Jimmy told us about it.

24  Q.  And what did Mr. Dempsey say?

25  A.  That the rent deferral was extended in order to give us

1    time to negotiate an agreement with Airbus and ink that

2    agreement; and in order to give us time to negotiate with AMCK,

3    to ink an agreement on the deferral of rent payments.

4    Q.  I believe you testified yesterday, Mr. Thwaytes, that by

5    late March 2020, you were no longer the lead negotiator in rent

6    deferral discussion; is that right?

7    A.  Yes.

8    Q.  And you weren't speaking directly with AMCK anymore on

9    these issues; is that right?

10   A.  Yes.

11   Q.  On the April 7th phone call in the discussion that

12   Mr. Dempsey told you about, what did he tell you about the

13   length of the rent deferral period?

14   A.  That it was until we reach an agreement with Airbus to

15   defer aircraft and to reach an agreement with AMCK on a

16   deferral of rent which at that time was contemplated to happen

17   or to be paid prior to next aircraft delivery.

18   Q.  Was it an indefinite deferral period then?

19   A.  Indefinite in terms of we didn't know exactly when the next

20   aircraft was going to deliver.

21   Q.  And you testified yesterday about a March 16 letter that

22   you sent to AMCK asking for a rent deferral.  Do you recall

23   that?

24   A.  Yes.

25   Q.  And Frontier was seeking a three-month rent deferral; is

1   that right?

2   A.  Yes.

3   Q.  And so the rent deferral that was agreed according to

4   Mr. Dempsey on an April 7th phone call was for an indefinite

5   deferral; is that right?

6   A.  It was deferral until we reached agreement with Airbus, and

7   ink that, and reach an agreement with AMCK and ink that. So it

8   was uncertain how long that would take.

9   Q.  But potentially longer depending on how long negotiations

10  took?

11  A.  Yeah, potentially.

12  Q.  Did Mr. Dempsey tell you anything about the time period

13  Frontier would have to pay rent back that had been deferred?

14  A.  Up until the next aircraft delivery.

15  Q.  So just so I understand it, your testimony is that the rent

16  would be deferred for as long as it took to complete

17  negotiations, and then it would all be repaid back at delivery?

18  A.  The rent would be deferred until the next aircraft

19  delivery.  We would have to be current on rent before the next

20  aircraft delivery.

21  Q.  And that's what Mr. Dempsey told you was discussed on the

22  April 7th phone call?

23  A.  I believe so.

24  Q.  I believe you testified yesterday that you weren't aware of

25  the repayment period for the rent deferral discussed on April

O49BFRO1                          Thwaytes – Cross

1   7th; is that not right?

2   A.  I'd have to look at my testimony from yesterday, but I

3   believe that my recollection is that the rent deferral period

4   was going to be until the next aircraft was delivered at that

5   time.

6   Q.  Did Mr. Dempsey tell you anything about the interest that

7   would be paid in connection with deferred rents?

8   A.  I don't recall if he did.

9   Q.  Did you expect that Frontier would have to pay interest on

10  any deferred rents?

11  A.  Yes.

12  Q.  I'd like to show you, Mr. Thwaytes, Joint Trial Exhibit 79.

13  This is an April 9th, 2020 email from Jane O'Callaghan to

14  Robert Fanning, Sashi Sharath, Sashikumar and Spencer Thwaytes,

15  you, on that day.

16          Do you see that?

17  A.  I do.

18  Q.  Did you receive this email?

19  A.  Apparently.

20  Q.  Do you have any reason to believe that you did not receive

21  it?

22  A.  No.

23          MR. ALEXANDER:  Your Honor, I move to admit Joint

24  Trial Exhibit 79.

25          MR. SCHAER:  Objection, your Honor.  This was not gone

1    into on direct exam, and I believe it's outside the scope.

2            THE COURT:  Overruled.  Received.

3            (Joint Exhibit 79 received in evidence)

4    BY MR. ALEXANDER:

5    Q.  Mr. Thwaytes in this email from Jane O'Callaghan, she

6    states that she's providing a draft of the deferral letter.

7            Do you see that?

8    A.  Yes.

9    Q.  Did you understand that AMCK was providing a draft rent

10   deferral agreement at this time?

11   A.  It appears that they were per this email, yes.

12   Q.  Did you understand that this was a proposed implementation

13   of an agreement discussed on an April 7th phone call between

14   Mr. Sheridan and Mr. Dempsey?

15   A.  No.  I would have assumed that this was a draft of an

16   agreement that we would eventually negotiate and execute once

17   we negotiated the terms of deferral agreement with them.

18   Q.  Do you recall reviewing this agreement?

19   A.  I don't recall reviewing it.

20   Q.  Did you discuss this agreement with anyone at Frontier?

21   A.  I don't recall discussing this agreement with anyone at

22   Frontier.

23   Q.  Do you know if Frontier ever signed the agreement attached

24   to this email?

25   A.  I don't believe so.

1    Q.  I'd like to ask you some questions about your March 16

2    concession letter that you testified about yesterday,

3    Mr. Thwaytes.  And this is Joint Trial exhibit 28.

4            Do you see the March 16 letter?

5    A.  Yes.

6    Q.  I won't go over all these points in detail, but you

7    testified about the request for a three-month rent deferral in

8    this letter, correct?

9    A.  Yes.

10   Q.  So if AMCK agreed to it, Frontier would not have to pay any

11   rent during April, May or June of 2020, right?

12   A.  Yes.

13   Q.  And in this letter Frontier also specified that it wanted a

14   repayment period for that deferred rent of nine months from

15   July 1, 2020, right?

16   A.  Yes.

17   Q.  And did Frontier pay to plan those deferred rents back with

18   interest?

19   A.  Yes, we plan to.

20   Q.  Did Frontier have an interest rate in mind?

21   A.  We had an idea of what we thought was a reasonable interest

22   rate.

23   Q.  And what did you think was a reasonable interest rate?

24   A.  Four, five percent.

25   Q.  I'd like to point you to some language you didn't testify

1    about yesterday under the numbered points one and two.

2              You state, The above concessions would be documented

3    in a mutually agreed deferral and concession agreement.  Do you

4    see that?

5    A.  Yes.

6    Q.  What did you mean by that?

7    A.  Once we finish negotiating with really all of our suppliers

8    that we ask for concessions and we determine what the final

9    terms would be, we would reflect those terms in an agreement.

10   Q.  So you expected that if Frontier's request for a rent

11   deferral was granted, that would be documented in an agreement,

12   right?

13   A.  Yes.

14   Q.  And I believe you testified about other suppliers.  You

15   testified yesterday that some lessors of Frontiers said no to a

16   rent deferral.  Is that right?

17   A.  Yes.

18   Q.  And some lessors said yes to a rent deferral?

19   A.  Yes.

20   Q.  Do recall how many said yes?

21   A.  I don't recall an exact number, no.

22   Q.  And the lessors that did agree to a rent deferral, were

23   those deferrals documented in writing?

24   A.  Almost all of them were.

25   Q.  Which ones weren't?

O49BFRO1                          Thwaytes - Cross

1    A.  Is it okay to disclose the name of another lessor?

2             MR. SCHAER:  That's a question for the Court, your

3    Honor.  I believe the witness is concerned about disclosing the

4    name of another lessor for purposes of the NDA with that

5    lessor.  Would it be permissible for the witness just to say it

6    was another airplane lessor?

7             THE COURT:  It's okay with me.

8             MR. SCHAER:  Thank you.

9    A.  So it was another aircraft lessor.

10   Q.  Which one?

11            MR. SCHAER:  Objection, your Honor.  That would

12   violate the NDA the witness is trying to not violate that you

13   just ordered on.

14            THE COURT:  What parties are the parties to the NDA?

15            MR. SCHAER:  That would be Frontier and one of its

16   other airplane lessor partners that is not a party to the case.

17            THE COURT:  And the NDA is with the other party?

18            MR. SCHAER:  That's correct, your Honor.

19            THE COURT:  Have you got a copy of the NDA?

20            MR. SCHAER:  Not with me, your Honor.

21            THE COURT:  I'd like to see it.

22            MR. SCHAER:  Understood, your Honor.  I also believe,

23   your Honor --

24            THE COURT:  Is it at your office?

25            MR. SCHAER:  No, it is not.  I think it would be

1   difficult to receive.  And as I understand it, part of the

2   issues are with the lessor's own contracts that are implicated

3   by granting these types of waivers and deferrals.  And they may

4   not want it public, not just because of their relationship with

5   Frontier and other leasing companies, but its relationships

6   with all of its other partners.  So I don't believe we would

7   have access to all those other NDAs that leasing company has

8   and is concerned about.

9             THE COURT:  Do you really need the name?

10             MR. ALEXANDER:  I can proceed without the name, your

11   Honor.

12             THE COURT:  Yes, I should think so.

13   BY MR. ALEXANDER:

14   Q.  Mr. Thwaytes, do you recall testifying at your deposition

15   that when Frontier agreed to rent deferrals with their other

16   lessors, those were documented in writing?

17   A.  I don't recall exactly what I testified there.

18   Q.  All right.  Why don't we show you a page of your deposition

19   transcript.  This is page 158.

20             You were asked at line seven:  Mr. Thwaytes, we looked

21   earlier at the concession letter that you wrote to Jane

22   O'Callaghan, and you referred in that letter to your

23   expectation that any agreement would be in writing.  Is that

24   right?

25             Answer:  Yeah.  The final agreement would be in

1    writing documented.  I forget the language exactly.

2              Question: And that was your expectation as well?

3              And what was your answer?

4    A.  Yes, that was the result of the negotiations with other

5    lessors.  We put the agreements in writing once we came to a

6    final agreement.

7    Q.  Mr. Thwaytes, you testified yesterday that following

8    Frontier's request for a rent deferral there was some

9    negotiations between AMCK and Frontier about the terms of that

10   deferral, right?

11   A.  Yes.

12   Q.  AMCK did not accept the terms as proposed in Frontier's

13   March 16 letter, did they?

14   A.  No.

15   Q.  And you testified about one of the items in discussion was

16   AMCK's request that Frontier delay some of the aircraft covered

17   by the sale leaseback agreement, right?

18   A.  Could you repeat that, please.

19   Q.  You testified yesterday that part of the discussions

20   involved AMCK's request for a delay of aircraft under the

21   Framework Agreement?

22   A.  Yes.

23   Q.  I'd like to show you Joint Trial Exhibit 58.  And this is

24   an April 3rd, 2020, email from Paul Sheridan to Jimmy Dempsey

25   and others, including you.  Do you see that?

1    A.  Yes.

2    Q.  I believe you testified about this email yesterday.  Is

3    that correct?

4    A.  I believe so.

5    Q.  Do you recall that Mr. Sheridan proposed that part of rent

6    deferral with Frontier would be strictly on the basis that we

7    suspend the SLB for six months?

8    A.  Yes.

9    Q.  Did Frontier agree on an extension of aircraft deliveries

10   under the Framework Agreement to six months?

11   A.  I don't believe so.

12   Q.  So AMCK asked for a six-month delay, but Frontier was not

13   able to provide it.  Is that right?

14   A.  Frontier was working with Airbus to try to meet AMCK's

15   request and was only able to provide what was achievable with

16   Airbus.

17   Q.  And what was achievable with Airbus was less than the six

18   month ask, correct?

19   A.  Yes.

20   Q.  I'd like to point you to the bottom line on the page

21   following the signature from Paul Sheridan, Mr. Sheridan

22   states, "For the avoidance of doubt, this email is for

23   discussion purposes only.  This email and any subsequent

24   discussions or correspondence we may have with you are not

25   intended to create and do not create any binding obligations on

1    the part of AMCK or any of its affiliates."

2                Do you see that language?

3    A.  Yes.

4    Q.  What did you understand that to mean?

5    A.  That AMCK was notifying recipients of their emails that

6    they should not consider emails as binding obligations.

7    Q.  Did you understand Mr. Sheridan to be saying that AMCK

8    didn't consider itself bound by its proposal?

9    A.  Please repeat that.

10   Q.  Did you understand Mr. Sheridan to be saying that AMCK did

11   not consider itself bound by this email?

12   A.  As the chief executive officer of AMCK, we took

13   Mr. Sheridan's emails and dialogue with him as a representation

14   of AMCK with authority.

15   Q.  Part of what he was saying was this last line in the email,

16   correct?

17   A.  That was in every one of his emails.

18   Q.  Mr. Thwaytes, I'd like to call your attention to Joint

19   Trial Exhibit 120, which is an April 30 email from Paul

20   Sheridan that I believe you testified about yesterday.

21               Do you see this, an April 30th email from Paul

22   Sheridan to Jimmy Dempsey and others including you?

23   A.  Yes.

24   Q.  Did you receive this email?

25   A.  Apparently.

O49BFRO1                          Thwaytes – Cross

1    Q.  Mr. Thwaytes, I believe you testified yesterday about the

2    first bullet in this email which refers to deliveries in July

3    2020, three aircraft and February 2021 two aircraft.

4                Do you see that?

5    A.  I do.

6    Q.  And you testified that you understood that Mr. Sheridan was

7    agreeing to the delivery schedule that Frontier was able to

8    achieve with Airbus.

9                Do you recall that?

10   A.  Yes.

11   Q.  There are other conditions in this email as well, aren't

12   there?

13   A.  Yes.

14   Q.  And I'd like to direct you to the last line of the email

15   below Mr. Sheridan's signature and he says, "For the avoidance

16   of doubt, this email is for discussion purposes only.  This

17   email and any subsequent discussions or correspondence we may

18   have with you are not intended to create and do not create any

19   binding obligations on the part of AMCK or any of its

20   affiliates."

21               Do you see that?

22   A.  I do.

23   Q.  And that was the language we looked at in the earlier email

24   from Mr. Sheridan too, correct?

25   A.  Correct.

O49BFRO1                          Thwaytes - Cross

1    Q.  I'd like to move into a different area now, Mr. Thwaytes.

2    You testified yesterday that after AMCK terminated the

3    Framework Agreement, Frontier got replacement financing for the

4    five remaining aircraft deliveries under the Framework

5    Agreement, right?

6    A.  Yes.

7    Q.  And the replacement lessors were CDB Aviation and Jackson

8    Square Aviation?

9    A.  Correct.

10   Q.  And you testified also yesterday that in October 2020,

11   Frontier performed an internal analysis to determine the amount

12   of damages claimed from the termination of the Framework

13   Agreement, correct?

14   A.  Correct.

15   Q.  I'd like to show you Joint Trial Exhibit 163.

16          Do you see this is the email discussing AMCK damages

17   that you testified about yesterday?

18   A.  Yes.

19   Q.  And I'll direct your attention to the third page of this

20   document.  I believe you testified yesterday that this document

21   was Frontier's analysis of the damages from the termination of

22   the Framework Agreement; is that right?

23   A.  Yes.

24   Q.  And that involved performing an analysis of the discounted

25   cash flows under the respective agreements?

1   A.  Yes.

2   Q.  And at the bottom right of the chart it shows the total for

3   the five aircraft with a 53 million and change number for the

4   nominal total of harm.  Is that correct?

5   A.  Yes.

6   Q.  And then below that it shows a discounted to present value

7   amount of 34 million and change.  Is that right?

8   A.  Yes.

9   Q.  And to calculate that discounted present value Frontier

10  used a 10 percent discount rate; is that right?

11  A.  Yes.

12  Q.  Do you know if interest rates have gone up or down since

13  2020?

14  A.  They've gone up.

15  Q.  Did this analysis that Frontier performed take any account

16  of the taxes Frontier paid in determining the discounted cash

17  flows?

18  A.  I don't believe these were tax affected.

19  Q.  So this analysis didn't take any account of the tax impact

20  of these cash flows, correct?

21  A.  I don't believe so.

22          MR. ALEXANDER:  Thank you, Mr. Thwaytes.  I have no

23  further questions.

24          THE WITNESS:  Thank you.

25          MR. SCHAER:  Your Honor, a short redirect.

1          THE COURT:  Sure.

2     REDIRECT EXAMINATION

3     BY MR. SCHAER:

4     Q.  Good morning, Mr. Thwaytes.

5     A.  Good morning.

6     Q.  Just a few questions.  What was the date again that you

7     sent the rent deferral request letter?

8     A.  March 16.

9     Q.  I think we just read a portion where you were anticipating

10    the parties eventually inking a deal in writing?

11    A.  Yes.

12    Q.  Did that letter come before or after your memory of AMCK

13    granting a deferral for the parties to work out their

14    negotiations?

15    A.  Before.

16    Q.  About how many weeks before?

17    A.  Threeish.

18    Q.  I'm showing now what's been previously marked as Joint

19    Exhibit 60.  I believe counsel went over a portion of this

20    email with you.

21          Do you see this email from Paul Sheridan on April 3rd?

22    A.  Yes.

23    Q.  And then with this qualifying language you just read with

24    counsel for AMCK about the avoidance of doubt, this is for

25    discussion purposes only?

1    A.  Yes.

2    Q.  So that was on Mr. Sheridan's April 3rd email with his

3    proposal?

4    A.  Yes.

5    Q.  I'm going to scroll up to this email.

6            What is the date of this email?

7    A.  Monday, April 6th.

8    Q.  Who is the sender of this email?

9    A.  Paul Sheridan.

10   Q.  What is the content of this email?

11           What do you understand this email to be relaying to

12   Frontier?

13   A.  This is providing Frontier a rent deferral for a period of

14   time to negotiate -- try to negotiate an agreement with Airbus

15   and ink that agreement, and then subsequent to that try to

16   negotiate a deferral agreement with AMCK and ink that

17   agreement.

18   Q.  And eventually get that agreement in writing?

19   A.  Yes.

20   Q.  Do you see any qualifying language on this email that says

21   for the avoidance of doubt this is for discussion purposes

22   only?

23   A.  No.

24   Q.  I'm showing now what's been marked Joint Exhibit 73.  This

25   is the email produced in unreadable form that the parties have

1   provided in a readable form.

2            What is the date of this text message again?

3   A.  April 7th, 2020.

4   Q.  And will you remind us who the sender of this message is?

5   A.  Jimmy Dempsey.

6   Q.  What is Mr. Dempsey relaying to you on April 7th?

7   A.  That Paul Sheridan had agreed to a further deferral of rent

8   payments.

9   Q.  Were you shown this text message at your deposition?

10  A.  I don't believe I was.

11  Q.  How long after this text message was sent was your

12  deposition?

13  A.  Two years.

14  Q.  Mr. Thwaytes, do you remember all of the text messages that

15  you've received as you sit here today from two years ago?

16  A.  No.

17  Q.  In the time period of this text message April of 2020, was

18  there anything else going on in your life besides the AMCK

19  negotiations?

20  A.  Two small children, pregnant wife, COVID-19 crisis

21  pandemic, working for an airline, etc.

22  Q.  Were you engaged in negotiations with any other of

23  Frontier's partners at this same time?

24  A.  Many.

25  Q.  How many about?

1    A.  50 plus.

2    Q.  Do you remember all of your messages with all of those

3    partners who you were negotiating with in that time?

4    A.  No.

5    Q.  What was your understanding of the scope of the deferral

6    that AMCK had granted Frontier while you were at your

7    deposition?

8    A.  That it was for an extended period of time that was to give

9    us enough time to reach an agreement with Airbus on deferring

10   aircraft, inking that deal, then subsequently reaching an

11   agreement with AMCK to ink that deal.  So an ambiguous period

12   of time because we didn't know how long that would take or when

13   the next aircraft would deliver.

14   Q.  And as you sit here today, what is your understanding of

15   the scope of the deferral agreement that AMCK granted to

16   Frontier?

17   A.  The same.

18        MR. SCHAER:  Thank you.  No further questions, your

19   Honor.

20        THE COURT:  But you understood that in any event it

21   had to be paid before delivery of the next plane?

22        THE WITNESS:  That's right.

23        THE COURT:  No one misunderstood that?

24        THE WITNESS:  My understanding was that we were given

25   time to complete these two negotiations, and that AMCK wanted

1   us to be current on all of our rents before they would show up

2   to deliver the next aircraft.

3           THE COURT:  So in any event it had to be a current at

4   that point?

5           THE WITNESS:  At that point until they subsequently

6   introduced a May 15th date that we needed to be current.

7           THE COURT:  Well, that's later.

8           MR. SCHAER:  Thank you, your Honor.

9           THE COURT:  Anything further for Mr. Thwaytes?

10          MR. ALEXANDER:  Nothing from the defendants, your

11  Honor.  Thank you.

12          THE COURT:  Thank you, Mr. Thwaytes.  You're excused.

13          MR. SCHAER:  Your Honor, may the witness be excused

14  and observe?

15          THE COURT:  I'm simply missed that.

16          MR. SCHAER:  May the witness be excused such that he

17  can observe or the remainder or the next few days.  I believe

18  he doesn't have a flight back to Italy for a number of days.

19          THE COURT:  Oh, why not.  Is there any objection to

20  that?

21          MR. BUTLER:  No, your Honor.  Mr. Thwaytes has

22  testified so we have no objection.

23          MR. SCHAER:  Thank you, your Honor.  Frontier is now

24  going to call get its next witness Mr. Sharath Sashikumar.

25  SHARATH SASHIKUMAR,

O49BFRO1                          Sashikumar- Direct

 1          called as a witness by the Plaintiff,

 2          having been duly sworn, testified as follows:

 3              THE DEPUTY CLERK:  Please state your full name for the

 4      record.

 5              THE WITNESS:  Sharath Chandrabalan Sashikumar Bindu,

 6      S-H-A-R-A-T-H, C-H-A-N-D-R-A-B-A-L-A-N, S-A-S-H-I-K-U-M-A-R,

 7      B-I-N-D-U.

 8      DIRECT EXAMINATION

 9      BY MR. SCHAER:

10      Q.  Good morning, Mr. Sashikumar.

11      A.  Good morning.

12      Q.  Where do you work currently?

13      A.  Frontier Airlines.

14      Q.  How long have you worked at Frontier?

15      A.  About seven and a half years.

16      Q.  What is your current role at Frontier?

17      A.  Senior manager of fleet transactions.

18      Q.  How long have you been in that role?

19      A.  Since late 2022.

20      Q.  What was your position at Frontier in March of 2020?

21      A.  It was manager fleet and strategic sourcing.

22      Q.  Can you tell us about your education?

23          Did you ever attend university?

24      A.  Yes. I did my undergraduate in aeronautical engineering

25      from India.  I came to the U.S. to do a master's, ended up

1    doing a MBA in aviation finance out of Embry-Riddle

2    aeronautical university in Daytona Beach, Florida.

3    Q.  When you were in March of 2020 manager of fleet and

4    strategic sourcing, can you explain what your responsibilities

5    were in that role?

6    A.  Primarily with fleet it was the day-to-day management of

7    leasing companies that involved any requirements that they

8    would have towards us, including lease payments, maintenance

9    reserve payments, and also had the responsibility to negotiate

10   or assist in negotiating aircraft financing contracts and

11   related agreements.

12   Q.  In March of 2020, did you report to anyone at Frontier?

13   A.  Yes.

14   Q.  And how did that reporting relate in any way to your role

15   as making the lease payments as you just explained?

16   A.  My role was to prepare and seek approval for the lease

17   payments that we would have to make.  So I was reporting to

18   Robert Fanning at the time, and I would seek approval to him

19   and Spencer in order to make those lease payments.

20   Q.  By Spencer are you referring to Spencer Thwaytes?

21   A.  Yes.

22   Q.  We don't need to go too deeply into how Frontier acquires

23   its airplanes or leases them, but just want to touch on those

24   briefly and then your role how Frontier makes the payment on

25   these leases.

O49BFRO1                          Sashikumar- Direct

1            Does Frontier own the airplanes that it uses?

2    A.  Currently, no.  We are a hundred percent leased for all of

3    our aircraft.

4    Q.  And who does Frontier lease those airplanes from?

5    A.  A wide spectrum of global aircraft leasing companies.

6    Q.  Do you know if in March of 2020, approximately how many

7    leasing companies Frontier was leasing its airplanes from?

8    A.  I would say between 15 and 20 leasing companies.

9    Q.  Do you know approximately how many airplanes in March of

10   2020 were on lease?

11   A.  I would have to say around 100 aircraft.

12   Q.  What are the lease arrangements with these aircraft leasing

13   companies called?

14   A.  They're called sale leasebacks typically.

15   Q.  What are the key or main financial terms under these sale

16   leasebacks agreements?

17   A.  I would say there are five main points that we would

18   commercially negotiate with them.  It would be the purchase

19   price that they pay us for the aircraft.  It would be the

20   monthly lease rent that we would pay them relating to third

21   item which would be the term of the lease.

22            Typically we do between eight and 12-year-lease

23   agreements.  We would have the discussion about what a security

24   deposit would be under the lease.  And I think the last

25   commercial point would be with some cost that relate to

1   maintenance events that we would have during the term of lease.

2   Q.  I want to focus on those monthly lease payment portions.

3   How is that monthly lease or the monthly rent amount determined

4   for each of the aircraft?

5   A.  Typically we have a base rent that we would agree to at an

6   RFP or letter of intent stage of the discussion with a leasing

7   partner.  And then we would have a competent that would adjust

8   that base rent up or down between that point in time to when

9   the aircraft delivers.

10  Q.  And when is rent due for each of these aircraft -- excuse

11  me.  When is the monthly rent due, on what day of each month is

12  the rent due on each aircraft?

13  A.  It is typically related to the date that the aircraft

14  delivers, so at that same date each month for the term of the

15  contract rent would be do.

16  Q.  Did Frontier keep track of when payments on each of its

17  approximately hundred aircraft were due?

18  A.  Yes.

19  Q.  How did it do that?

20  A.  We had a lease payment tracker file that we used to keep

21  track of the payments.

22  Q.  Did that file contain all of Frontier's lessor partners?

23  A.  Yes.

24  Q.  Was that file updated on a regular basis?

25  A.  It was updated as needed which primarily related to when a

O49BFRO1                        Sashikumar– Direct

1    new aircraft delivers.

2    Q.   And what information would be put into that file?

3    A.   Once rent on a new aircraft is fixed before delivery, you

4    have the lease term, the monthly rent amount, and just what

5    aircraft that relates to being inputted into that file.

6    Q.   Around March of 2020, who at Frontier managed that tracker

7    file?

8    A.   That would be me.

9    Q.   How would that tracker file deal with it if a payment date

10   fell on a weekend or on a holiday?

11   A.   So the way the tracker handled it would be that it would

12   default to the following business day if it fell on a weekend

13   or a holiday.

14   Q.   And who was in charge of making these monthly aircraft

15   lease payments at Frontier?

16   A.   It was my responsibility to prepare an approval document or

17   an email seeking approval for payments that would be due.

18              (Continued on next page)

19

20

21

22

23

24

25

O493FRO2                      Sashikumar - Direct

1    Q.   Who were you seeking approval from, again?

2    A.   That would be Robert Fanning and Spencer Thwaytes.

3    Q.   I want to turn now to Frontier's relationship with AMCK.

4    Who or what is AMCK to your understanding?

5    A.   They're one of our leasing companies that we do business

6    with.

7    Q.   And you are aware this case involves a March 2020 Framework

8    Agreement between Frontier and AMCK?

9    A.   Yes.

10   Q.   We'll get back to that Framework Agreement, but prior to

11   that agreement, who was Frontier's largest aircraft leasing

12   partner as in which of the leasing partners did Frontier have

13   the most aircraft on lease with?

14   A.   I would have to say AMCK.

15   Q.   Do you know how many aircraft AMCK leased to Frontier prior

16   to that March 2020 Framework Agreement?

17   A.   I believe it was 14 aircraft.

18   Q.   Up through the end of March 2020, did Frontier always pay

19   its leases on time to AMCK?

20   A.   Yes.

21   Q.   How did Frontier ensure it paid its leases on time?

22   A.   Using the lease payments tracker file we just spoke about.

23   Q.   What is a grace period as it relates to lease payments?

24   A.   Typically, in a lease agreement you have a certain number

25   of days that the lessor and us agree to as being a period of

1  time after the due date where we are still within the ability

2  to make that lease rent payment.

3  Q.  Was there a grace period for the AMCK lease payments?

4  A.  Yes.

5  Q.  What was it?

6  A.  It was three business days.

7  Q.  So if a payment is made after the due date but within the

8  grace period, is that payment still considered on time?

9  A.  Yes.

10 Q.  Do you know how the AMCK lease agreements handled it when

11 the payment due date fell on a holiday or a weekend?  What

12 would be the due date?

13 A.  My recollection is it defaults to the preceding business

14 day.

15 Q.  The preceding business day?

16 A.  Yes.

17 Q.  Would Frontier always pay the lease on the preceding

18 business day in those scenarios?

19 A.  No.  Because as I described in our tracker file, it

20 defaults to the following business day.  So there have been

21 instances where we would pay on the following business day.

22 Q.  If Frontier were to pay on the following business day,

23 would the payment still have been timely?

24 A.  Yes.

25 Q.  Why is that?

O493FRO2                          Sashikumar - Direct

1   A.   Because it would still be within the three-business-day

2   grace period we have.

3   Q.   Can you think of any time when Frontier paid AMCK -- strike

4   that.   I believe you just answered this question.

5        When Frontier would pay after the business day, or

6   within that three-day grace period, would AMCK ever communicate

7   with Frontier about that issue?

8   A.   Yes.

9   Q.   And what form would those communications generally take?

10  A.   Typically, we would get a follow-up e-mail, say the

11  following day, asking us for a status update on the payment.

12  Q.   How would Frontier respond to those e-mails?

13  A.   We would normally confirm that payment has been made,

14  either -- if it has, which would have been the day of, or we

15  would inform them that it is in process and will be paid

16  shortly.

17       MR. SCHAER:   Darcy, can you please turn the screens

18  on.

19       I forgot to do this at the beginning, but if it works

20  now, to jointly move to admit all of the joint trial exhibits

21  that the parties have already agreed on and that would be

22  numbers 60 --

23       THE COURT:   Any objection?

24       MR. BUTLER:   No objection to the joint exhibits, your

25  Honor.

O493FRO2                    Sashikumar – Direct

1          THE COURT:  By definition they're joint exhibits.

2    Received.

3          MR. SCHAER:  So just for the record that would be

4    Joint Exhibits 60, 66, 67, 89, 138, 146, 152, 158, 160, 162,

5    164, 166, 167, 168, and 169.

6          THE COURT:  Received.

7          MR. SCHAER:  Thank you.

8          (Joint Exhibits 60, 66, 67, 89, 138, 146, 152, 158,

9    160, 162, 164, 166, 167, 168, 169 received in evidence)

10   Q.  I do want to show now what has been premarked though as

11   Plaintiff's Exhibit 8.

12         Mr. Sashikumar, what is this e-mail or who is sending

13   this e-mail?

14   A.  It is from Dovile Kukulskiene at AMCK.

15   Q.  What is the date of this e-mail?

16   A.  July 1st, 2019.

17   Q.  Is this your name on the "to" line?

18   A.  Yes.

19   Q.  What is this e-mail relating to?

20   A.  This is one of the follow-up e-mails that I just described,

21   and it seems to be relating to a payment that per AMCK was due

22   on the 28th of June which was a Friday, and as a follow-up

23   e-mail that we're getting on Monday about those funds not being

24   received.

25   Q.  I want to scroll down to this attachment.  Can you actually

1   see who is this invoice is actually directed towards?

2   A.  This seems to be directed to American Airlines actually.

3   Q.  Would this be a mistake on AMCK's behalf?

4   A.  Seems to have been an incorrect attachment to the e-mail.

5   Q.  Let's go down to the next e-mail.  Who is this e-mail from?

6   A.  Michael McInerney.

7   Q.  What is the date of this e-mail?

8   A.  23rd September, 2019.

9   Q.  Are you receiving this e-mail?

10  A.  Yes.

11  Q.  What is the general content of this e-mail?

12  A.  Similar to the first e-mail that we looked at, it is a

13  follow up on a Monday for a payment that, according to them,

14  was due on the 20th of September, Friday.

15  Q.  Let's look at this invoice.  Is this an invoice that's

16  directed towards Frontier?

17  A.  Yes.

18  Q.  And can you tell which aircraft this invoice relates to?

19  A.  It is for MSN 8766, or M349FR.

20  Q.  What is the payment due date on this invoice?

21  A.  20th of September, 2019.

22  Q.  Can you tell, is this one of those invoices where the

23  payment date otherwise would have fallen on a holiday or

24  weekend?

25  A.  Yes, so if you look at the description for the fixed lease

1    rental period, it describes the period between 22nd September

2    and 21st of October.  So the due date would have been 22nd of

3    September, which appears to be a Sunday.

4    Q.  And how many business days after the payment due date of

5    September 20 did this e-mail come in?

6    A.  One business day.

7    Q.  Did Frontier pay this invoice?

8    A.  Yes, our system would have had this invoice being paid on

9    the 23rd, which is the following business day or the Monday.

10   Q.  Let's try to go through the remainder of this e-mails with

11   a bit more pace now we've done that with one.

12        Who is the sender of this?

13   A.  Dovile.

14   Q.  What is the sent date?

15   A.  September 30, 2019.

16   Q.  What is the general content of this e-mail?

17   A.  It is another follow up for an invoice which they view as

18   overdue.

19   Q.  This is the attached invoice.  What is the payment due

20   date?

21   A.  27th of September, 2019.

22   Q.  Is this another one of those invoices where payment due

23   date otherwise would have fallen on a holiday or weekend?

24   A.  Yes.  Per the description, the due date would have been the

25   29th of September, which would have been a Sunday.

O493FRO2                          Sashikumar – Direct

1    Q.  Did Frontier pay this invoice?

2    A.  Yes.

3    Q.  Going to skip a few pages that are largely duplicative of

4    each other.

5         What's this invoice, what's this e-mail down here?

6    A.  An e-mail from Dovile on 31st of October, 2019, requesting

7    an update about a payment for an invoice related to MSN 9177.

8    Q.  And then it looks like is this a follow up on the next day?

9    A.  Correct.

10   Q.  And what's the content of this invoice?

11   A.  Requesting a further update on that same invoice since they

12   haven't received the payment yet.

13   Q.  They followed up the next day when he hadn't received

14   payment?

15   A.  Correct.

16   Q.  And are you the sender of this e-mail?

17   A.  Yes.

18   Q.  What's the date on this e-mail?

19   A.  November 1st, 2019.

20   Q.  What are you explaining to Dovi here?

21   A.  My explanation relates to the fact that MSN 9177 was a new

22   aircraft that we had delivered, and this was the first invoice

23   since delivery that we had received for the aircraft.  And as

24   we discussed about the payment tracker file, it appears that

25   this aircraft was not input into the file timely, and so did

O493FRO2                          Sashikumar – Direct

1    not get caught in our usual approval process for lease

2    payments.

3    Q.   But AMCK alerted you to that issue?

4    A.   Correct.

5    Q.   Did you pay this invoice?

6    A.   And yes, as I stated in that e-mail, it was paid shortly

7    and we did send them a payment confirmation for it.

8    Q.   The next one, who is the sender of this e-mail?

9    A.   Michael McInerney.

10   Q.   And what is the date on this e-mail?

11   A.   November 18, 2019.

12   Q.   What does this e-mail concern?

13   A.   Very similar where he's following up about an invoice that

14   they viewed as overdue.

15   Q.   And this is the attached invoice.  What is the payment due

16   date on this invoice?

17   A.   15th of November, 2019.

18   Q.   Is this another situation where the payment date otherwise

19   would have fallen on a weekend or a holiday?

20   A.   Yes, again from the rental period which starts on the 17th

21   of November, that's when the payment would have been due, which

22   is a Sunday.

23   Q.   Did Frontier pay this invoice?

24   A.   Yes.

25   Q.   Going to skip a few more pages.  What is the date of this

O493FRO2                          Sashikumar – Direct

1    e-mail?

2    A.   November 18, 2019.

3    Q.   And here was that the same date as the e-mails we just saw?

4    A.   Yes.

5    Q.   Is this your response to that e-mail right here?

6    A.   Yes.  Confirming that the payment is due to go out on

7    November 18.

8    Q.   What was Michael McInerney's response to Frontier paying on

9    the business day after the payment should have been due?

10   A.   He just says thanks for your response.  And they look

11   forward to receiving the payment.

12   Q.   Was there any issue with Frontier paying within the

13   three-business-day grace period?

14   A.   No.

15   Q.   I'm now down on page 21.  What is the date of this e-mail?

16   A.   December 30, 2019.

17   Q.   Who is the sender?

18   A.   From Dovile.

19   Q.   What does this e-mail concern?

20   A.   Seems to be another follow up on a payment that was due on

21   the 27th December.

22   Q.   And here is the attached invoice.  What's the due date?

23   A.   27 December, 2019.

24   Q.   Is this another situation where a payment would have been

25   due on a weekend or holiday?

O493FRO2                          Sashikumar - Direct

1    A.  Yes.  It appears the payment would have been due on the

2    29th of December, which could have been a Sunday.

3    Q.  Did Frontier pay this invoice?

4    A.  Yes.

5    Q.  Let me make sure we're not duplicating.  I believe this

6    would be -- this your response to Dovi's last e-mail?

7    A.  Yes.

8    Q.  What are you saying?

9    A.  Confirms that we will make the payment on December 30th.

10   Q.  Next one, page 24, what is the date of this e-mail?

11   A.  January 20, 2020.

12   Q.  Who is the sender of this?

13   A.  Avril Alcala.

14   Q.  Where does she work?

15   A.  AMCK.

16   Q.  What is the content of this e-mail it?

17   A.  It's a similar follow-up e-mail about a payment that they

18   viewed was due on Friday, 17th of January.

19   Q.  Here is the attached invoice.  What is the payment due

20   date?

21   A.  17th of January, 2020.

22   Q.  Is this another one of those situations where payment

23   otherwise would have been due on a holiday or a weekend?

24   A.  Yes.  And in this case, it would have been due on 19th of

25   January, which could have been a Sunday.

O493FRO2                          Sashikumar – Direct

1   Q.  Did Frontier pay this invoice?

2   A.  Yes.

3   Q.  Here's the next e-mail, just a couple more here.  Who is

4   the sender of this?

5   A.  Michael McInerney.

6   Q.  What is the date?

7   A.  10th of February, 2020.

8   Q.  What does this e-mail concern?

9   A.  Very similar follow up for an invoice that was due on the

10  7th of February.

11  Q.  This is the attached invoice.  What is the payment due

12  date?

13  A.  7th of February, 2020.

14  Q.  Is this another scenario where payment otherwise would have

15  fallen on a holiday or a weekend?

16  A.  Yes.  Again, based on the description, this payment would

17  have been due on Sunday, 9th of February, 2020.

18  Q.  Did Frontier pay this invoice?

19  A.  Yes.

20  Q.  Last one.  Who is the sender of this e-mail?

21  A.  Michael McInerney.

22  Q.  What is the date of this e-mail?

23  A.  February 24, 2020.

24  Q.  What is the content of this e-mail?

25  A.  It is a follow up for a payment that was due on Friday,

O493FRO2                          Sashikumar - Direct

1    21st of February.

2    Q.  And this attachment, what is the payment due date?

3    A.  21st of February, 2020.

4    Q.  Is this another scenario where payment would have fallen on

5    a holiday or weekend?

6    A.  Yes, the payment would have fallen on the 23rd of February,

7    which could have been a Sunday.

8    Q.  Did Frontier pay this invoice?

9    A.  Yes.

10   Q.  Can you remind us how far after this final reminder e-mail

11   and invoice was the Framework Agreement entered into?

12   A.  The Framework Agreement I believe was signed on the 16th of

13   March, 2020.

14   Q.  Is that less than one month?

15   A.  Yes.

16   Q.  Did AMCK have any objections with Frontier paying these

17   invoices after the due dates, but within the grace period?

18   A.  No.

19   Q.  That was up to one month before the Framework Agreement?

20   A.  Yes.

21          MR. SCHAER:  Your Honor, we would move to admit

22   Plaintiff's Exhibit 8.

23          MR. BUTLER:  Your Honor, we've objected to Plaintiff's

24   Exhibit 8.  And frankly, I have the same objection to this

25   whole line of questioning because it's inconsistent with the

O493FRO2                          Sashikumar - Direct

Court's ruling on summary judgment that course of conduct

evidence, and, in particular, the stopping the sending of chase

e-mails to Frontier for payments that they knew were due can

result in a waiver.  Your Honor has already ruled that the

Framework Agreement expressly forbids a waiver by course of

conduct.  That's in your opinion and order at page 23, footnote

1.

          And this document is, to my mind, being submitted only

for purposes of showing a previous course of conduct that

Frontier argues changed some time after March 16, 2020.  So

that's our objection, your Honor.

          MR. SCHAER:  Your Honor, if we can be heard on that.

          The parties agree with what the Court's order was, and

frankly that it's consistent with the Framework Agreement that

says course of conduct cannot create a waiver.

          We are submitting this document not to show that

course of conduct created the waiver.  As Mr. Thwaytes

testified and other evidence will show, what created the waiver

were the April 6 phone call between the parties, and the

April 7 phone call between the parties.

          But waiver is ultimately a creature of contract law.

And under contract law, when there is a disputed material term,

courts are instructed to look at extrinsic evidence as to how

the parties understood and intended those disputed material

terms.

O493FRO2                       Sashikumar – Direct

1          The fact that up until weeks before the Framework

2     Agreement, AMCK always sent Frontier reminder notices when it

3     believed payment was even due one business day late, but still

4     within a grace period, and then stopped sending any of those

5     notices during the time we allege there was a waiver to not pay

6     rent, and then restarted, as evidence will show later,

7     restarted those notices directly after that waiver period was

8     terminated, is directly relevant and corroborates the

9     understanding of the express waiver that was created through

10    that April 6 and April 7 phone call.

11         THE COURT:  I frankly don't recall what the purpose of

12    that language in the opinion was at the time.  But I don't

13    think it was meant to exclude circumstances like these.

14         MR. SCHAER:  Thank you, your Honor.  So is Plaintiff's

15    Exhibit 8 admitted into evidence?

16         THE COURT:  Yes.

17         (Plaintiff's Exhibit 8 received in evidence)

18    BY MR. SCHAER:

19    Q.  I want to go over some of the AMCK invoices that are at the

20    heart of this matter and I don't believe it's in this file.

21    Let me see if I can get to it quickly.

22         MR. SCHAER:  Your Honor, I did not do this before but

23    I'll do it now.  I move to admit Joint Trial Exhibit 192 into

24    the record.

25         MR. BUTLER:  No objection, your Honor.

O493FRO2                          Sashikumar – Direct

1              THE COURT:  Received.

2              (Joint Exhibit 192 received in evidence)

3    Q.  Mr. Sashikumar, I'm going to scroll through these fairly

4    quickly, and then come back and ask you questions.  But as I

5    scroll through them, please pay attention to the payment due

6    dates that I've highlighted here.

7    A.  Okay.

8    Q.  Mr. Sashikumar, what is this compilation of documents I've

9    just shown you?

10   A.  It appears to be the invoices for 14 AMCK aircraft, where

11   14 invoices were due in April of 2020, and I noticed three

12   invoices due in May of 2020.

13   Q.  I'll bring us down to the first of the invoices that were

14   due in May of 2020.  That's at page 15.

15              What is the payment due date on that invoice?

16   A.  5th of May, 2020.

17   Q.  And would that be with or without the grace period?

18   A.  Without.

19   Q.  So including the grace period, then when could payment have

20   been made on this and still have been timely?

21   A.  The 8th of May, 2020.

22   Q.  Do these invoices relate to the 14 aircraft I believe you

23   said that Frontier was leasing with AMCK?

24   A.  Yes.

25   Q.  Prior to March of 2020?

O493FRO2                           Sashikumar - Direct

1    A.  Yes.

2    Q.  Regarding the April invoices here, what is your

3    understanding about whether Frontier paid these on the due

4    dates listed on the invoices?

5    A.  My understanding is we did not pay them on the due dates

6    listed on the invoices.

7    Q.  Why is that?

8    A.  From what was communicated to me, there was deferral

9    discussions in place with AMCK at the time.  And while those

10   negotiations were ongoing, these invoices were not due and

11   payable.

12   Q.  Moving on from that riveting look at invoices, I believe

13   you said this, but do you know when Frontier and AMCK entered

14   the Framework Agreement that we're really here to talk about?

15   A.  16th of March, 2020.

16   Q.  How many aircraft did AMCK commit to under that Framework

17   Agreement?

18   A.  I believe six aircraft.

19   Q.  Do you know when the first of those aircraft delivered?

20   A.  Yes, that would be 16th of March, 2020.

21   Q.  Same date?  Do you know which MSN or manufacturer's serial

22   number was associated with that aircraft?

23   A.  Yes.  I believe it was 10038.

24   Q.  Did Frontier around this time make any request to AMCK

25   regarding its rent payments?

O493FRO2                          Sashikumar - Direct

1   A.   I believe there was a deferral request relating to rent

2   payments sent out to them as well, yes.

3   Q.   Were you involved in the discussions with AMCK that related

4   to the request to defer rent payments?

5   A.   Not directly involved with them, no.

6   Q.   How were you directly involved with them?  Or how were you

7   indirectly involved with them?

8   A.   I was just in communication with Robert Fanning and Spencer

9   Thwaytes at the time, about just the discussions that were

10  ongoing but relevant to my job, which would be related to the

11  lease payments that we would have to make.

12  Q.   Are you aware of whether AMCK made any demands to Frontier

13  in those discussions?

14  A.   I believe there was an ask as it related to deferring the

15  short-term deliveries with Airbus.

16  Q.   Are you aware of whether Frontier engaged in discussions

17  with Airbus about that ask?

18  A.   Yes, I believe Frontier did engage with them.  But me

19  personally, I was not directly involved in those negotiations.

20  Q.   What was your involvement in those negotiations with

21  Airbus?

22  A.   I would say it was pretty peripheral as far as just

23  supporting any analyses that were needed.

24  Q.   So back to AMCK, what is your general understanding of

25  whether Frontier and AMCK reached an arrangement regarding rent

O493FRO2                          Sashikumar – Direct

1    deferrals?

2    A.   My understanding was that as long as the negotiations were

3    ongoing, be it with Airbus and obviously then with AMCK, the

4    deferral was in place.

5    Q.   Do you know when exactly this deferral started?

6    A.   I believe it was with the first payment that would have

7    been due in April of 2020.

8    Q.   Do you know the date of that?

9    A.   6th of April, 2020.

10   Q.   Between the time that Frontier asked for the rent deferrals

11   in mid-March and being given the deferral at the 6th of April,

12   did Frontier continue to timely make rent payments to AMCK?

13   A.   Yes.

14   Q.   And why is that?

15   A.   Because we did not have an agreement in place for deferrals

16   for that period of time.

17   Q.   Did Frontier continue to make timely -- to make all of its

18   payments on time with AMCK up until the time it was given the

19   deferral?

20   A.   Yes.

21   Q.   I'm showing now what's been previously marked as Joint

22   Exhibit 66.

23           Mr. Sashikumar, whose phone number is this?

24   A.   That would be mine.

25   Q.   And who are you corresponding with here?

O493FRO2                         Sashikumar – Direct

1    A.  Robert Fanning.

2    Q.  And what are you asking Robert Fanning?

3    A.  I'm asking him if we were paying AMCK on the 6th of April.

4    Q.  Why are you asking him that on the 6th of April?

5    A.  My recollection is there was a payment due on that date,

6    and per my job, I had to make sure that whether or not we had a

7    deferral in place with AMCK.

8    Q.  Did you get a response from Robert Fanning?

9    A.  I believe I did, yes.

10   Q.  I'm showing now what's been previously marked Joint

11   Exhibit 67.  Is this that response from Mr. Fanning?

12   A.  That's correct.

13   Q.  And what is he saying to you?

14   A.  He says all Accipiter rent payments are deferred for the

15   next 10 business days.

16   Q.  What is Accipiter?

17   A.  The name of the company before AMCK, when Accipiter and CK

18   Aviation merged I believe.

19   Q.  Do you understand Accipiter in this context to refer to

20   AMCK?

21   A.  Yes.

22   Q.  I'm showing now what's been previously marked Joint

23   Exhibit 60.  And focusing at the top here, who is the sender of

24   this e-mail?

25   A.  Robert Fanning.

O493FRO2                          Sashikumar – Direct

1   Q.  And are you on the "to" line?

2   A.  Yes.

3   Q.  What's the date of this e-mail?

4   A.  April 6, 2020.

5   Q.  What is Robert Fanning forwarding to you here?

6   A.  He is forwarding an e-mail from Paul Sheridan to Jimmy

7   Dempsey that confirmed that rent payments between 6th of April

8   and 21st of April were not due.

9   Q.  Were you left off of this original e-mail from

10  Mr. Sheridan?

11  A.  Yes.

12  Q.  Is that consistent with your role in the negotiations with

13  AMCK?

14  A.  That's correct.  Just peripheral and informed as needed.

15  Q.  I'm showing now what's been previously marked as Joint

16  Exhibit 89.  And I'll scroll to the bottom first.  Are you the

17  sender of this e-mail?

18  A.  Yes.

19  Q.  And who are you sending this e-mail to?

20  A.  To Robert Fanning and Spencer Thwaytes.

21  Q.  I am going to read this e-mail.  "Hi, Robert and Spencer.

22  Please approve the following lease payments that are due today.

23  The AMCK aircraft is the one we took in March and we do not

24  have a proposal from (redacted) for deferrals."

25              I don't know if I asked this, but what is the date of

O493FRO2                        Sashikumar – Direct

1    this e-mail?

2    A.  April 16, 2020.

3    Q.  What is the general or why are you sending this e-mail to

4    Mr. Fanning and Mr. Thwaytes on this date?

5    A.  Consistent with my role, I was seeking approval for lease

6    payments that would have been due in a certain time frame.  And

7    as of that time, my understanding of the discussions with AMCK

8    involved the fact that we had to make payment for rent on the

9    aircraft that we delivered in March of 2020 under the Framework

10   Agreement.

11   Q.  So I want to focus on the second part of this second

12   sentence for a moment.  What do you understand the redacted

13   area to be referring here?

14   A.  Possibly just another lessor's name.

15   Q.  And so what is this saying about Frontier paying that other

16   lessor on this date?

17   A.  We were -- I was seeking approval to make a payment to that

18   lessor, since we did not have a proposal for rent deferral from

19   them yet.

20   Q.  Had Frontier asked that leasing company for a rent

21   deferral?

22   A.  Yes.

23   Q.  How do you know?

24   A.  Because we sent requests to all of our leasing companies.

25   Q.  Did this company grant you a lease deferral?

 1   A.  Based on this e-mail, it appears that they did not, which

 2   is why we were making that payment.

 3   Q.  So focusing now on the AMCK aircraft.  Is this the MSN

 4   number of the aircraft delivered under the March 2020 Framework

 5   Agreement?

 6   A.  Yes.

 7   Q.  Is April 16 during the time that you understood the

 8   deferral to be in effect between Frontier and AMCK?

 9   A.  Yes.

10   Q.  So why are you making this payment to AMCK on this date

11   again?

12   A.  Because based on communications I had, presumably with

13   Robert, my understanding was that this particular aircraft was

14   not to be part of the deferral discussions that were ongoing

15   with AMCK at the time.

16   Q.  And what is the feedback you get from Robert Fanning?

17   A.  He approved the payments.

18   Q.  And this message here from Spencer Thwaytes, how does he

19   respond to this?

20   A.  He is asking if the agreement with AMCK didn't include that

21   particular aircraft.

22   Q.  And how does Mr. Fanning respond to him?

23   A.  He says, "Correct, Jimmy is aware this was part of the

24   deal."

25   Q.  Who is Jimmy in this context?

O493FRO2                         Sashikumar - Direct

1    A.  Jimmy Dempsey, our CFO at the time.

2    Q.  And what does the deal mean in this e-mail from

3    Mr. Fanning?

4    A.  My understanding is that it was to do with the ongoing

5    discussions that we were having with AMCK relevant to their ask

6    for the Airbus deferrals as well as the discussions we were

7    having with them at the time.

8    Q.  Was Frontier trying to pay its leases consistent with how

9    it understood that deal?

10   A.  Yes.

11   Q.  And what is your understanding of whether Frontier actually

12   made payment on MSN 10038 on April 16, 2020?

13   A.  Based on this, we did make payment on April 16, 2020.

14   Q.  I want to just briefly talk about the Airbus piece.  I

15   believe you said you were aware that Frontier did engage with

16   Airbus in delivery deferrals?

17   A.  That's correct.

18   Q.  And that your role was peripheral?

19   A.  Yes.

20   Q.  Can you just explain again what exactly that peripheral

21   role was.

22   A.  It was mainly assisting with analyzing or modeling what the

23   impacts would be from moving or changing our delivery stream

24   with Airbus at the time.

25   Q.  Was Frontier able to achieve delivery deferrals with

O493FRO2                          Sashikumar – Direct

1   Airbus?

2   A.  I believe we did, yes.

3   Q.  Do you know when those negotiations with Airbus completed?

4   A.  It was around May 5 of 2020.

5   Q.  Do you know what ultimately happened regarding the

6   Framework Agreement between Frontier and AMCK?

7   A.  Yes.

8   Q.  What is that?

9   A.  We received a notice of termination from them I believe on

10  the 8th of May, 2020.

11  Q.  I am showing you on the screen now what's been marked as

12  Joint Exhibit 146.

13          Mr. Sashikumar, what is the date of this e-mail?

14  A.  It is May 8, 2020, Friday.

15  Q.  And I'm going to ask you to try to remember, but can you

16  read out the time of this e-mail?

17  A.  It is 4:41 p.m.

18  Q.  Try to keep that in your mind.

19          What is your understanding of what was attached to

20  that May 8th, 2020, Friday at 4:41 e-mail?

21  A.  It was a notice of termination of the Framework Agreement

22  that we had with them relating to six aircraft.

23  Q.  I'm scrolling down now to page 5 of that letter.

24          What do you understand this page to be referencing?

25  A.  It lists out the invoices that were due during April of

1  2020 for the 14 aircraft we had prior to March 2020 with them.

2  Q.  And just looking at all of the different invoices listed

3  here, can you tell us which month are all of these invoice due

4  dates listed in?

5  A.  April 2020.

6  Q.  Do you see any in May of 2020?

7  A.  No.

8  Q.  I am showing you what has been previously marked as Joint

9  Exhibit 152.  And let's focus on this bottom one for a moment.

10 Let me see if I can make that a bit bigger.

11           Mr. Sashikumar, are you the sender of this e-mail?

12 A.  Yes.

13 Q.  And what is the date of this e-mail?

14 A.  It's Wednesday, May 13, 2020.

15 Q.  And what is the content of this e-mail?

16 A.  It's me seeking approval from Jimmy Dempsey for the payment

17 of -- it appears to be 14 payments in April, and three payments

18 in May, related to AMCK aircraft.

19 Q.  And I'm scrolling down just to capture the full extent

20 because we only see one through eight here.  And this is on the

21 next page.

22           Does this reflect the 14 in April and three in May?

23 A.  That's correct.

24 Q.  Does this list cover all of the payments that we just saw

25 that were cited in the termination notice?

O493FRO2                          Sashikumar – Direct

1    A.  Yes.

2    Q.  It appears there are some additional payments included on

3    this list though.

4    A.  Yes.

5    Q.  Why is that?

6    A.  As of the date of this e-mail, which was May 13, I believe

7    there were three more invoices in May that would have come due.

8    Q.  I want to read the message right above yours, but first,

9    who is Erik Hauglid?

10   A.  He is our director of treasury.

11   Q.  And he says, "We have the wires ready, just need approval

12   before 330 to release."

13            What does this refer to?

14   A.   It refers to the requirement we have to be able to release

15   wires, and the time that we have in order to be able to do it

16   with our bank.  And so, we would need to release wires before

17   3:30 Mountain Time, in order for them to be confirmed and

18   released by the bank.

19   Q.  Where is your bank located?

20   A.  New York.

21   Q.  So what time in New York would it be if it were 3:30

22   Mountain Time?

23   A.  That would be 5:30 New York time.

24   Q.  In the e-mail above, this is from Mr. Dempsey?

25   A.  Yes.

O493FRO2                          Sashikumar – Direct

1    Q.   And what's the date of this e-mail?

2    A.   May 13, 2020 as well.

3    Q.   How is he responding to Mr. Hauglid?

4    A.   He approved the list of payments that I had in my e-mail.

5    Q.   And scrolling up one more.  How does Mr. Hauglid respond?

6    A.   He confirms that the wires have been released.

7    Q.   What is the date and time that that occurred?

8    A.   It was May 13, 2020, and 3:17 p.m.

9    Q.   I am going to take you through some more riveting invoice

10   type documents, so thank you for your patience in doing this.

11           What is this document I'm showing you on the screen

12   now that was attached to the e-mail above?

13   A.   It is a confirmation that we pulled from our banking system

14   showing the release of a wire.

15   Q.   Does this relate to any of those payments we just saw?

16   A.   Yes.

17   Q.   And can you tell from looking at this when the wire was

18   actually released?

19   A.   Yes, so, the bottom right time which is just below input

20   time, that's the approved time, which is 3:16:57 p.m. Mountain

21   Time.

22   Q.   What does this tell you about whether the wire was in fact

23   released on this date?

24   A.   It was released on the same day because it is prior to 3:30

25   which is our cutoff time.

O493FRO2                          Sashikumar – Direct

1   Q.  Had it been released after 3:30, what impact does that have

2   on the wire transmission?

3   A.  It is more than likely that the wire would only be released

4   the following day, if the approval was done after 3:30 Mountain

5   Time.

6   Q.  This one was released before 3:30?

7   A.  Yes.

8   Q.  So what does that mean about whether this wire released on

9   the same day?

10  A.  It was released on the same day from our bank.

11  Q.  Let's go through these attachments quickly.  What is this

12  attachment, the next page refer to?

13  A.  Seems to be a very similar confirmation for payment.  Just

14  for a different aircraft.

15  Q.  What is the release date and time?

16  A.  13th of May 2020, 3:16:57 p.m. Mountain Time.

17  Q.  Is that the same time we just saw in the prior?

18  A.  Yes.

19  Q.  What's this next document we are looking at here?

20  A.  Very similar confirmation for a different aircraft.

21  Q.  Is this the same date and time?

22  A.  Yes.

23  Q.  And the next document we're looking at?

24  A.  Again, very similar confirmation.

25  Q.  Is this the same date and time?

O493FRO2                          Sashikumar – Direct

1   A.  Yes.

2   Q.  The next document we're looking at, what is this?

3   A.  Confirmation for a different aircraft.

4   Q.  Is this the same date and time?

5   A.  Yes.

6   Q.  What is the next document we're looking at?

7   A.  Another confirmation for another aircraft.

8   Q.  Is this the same date and time?

9   A.  Yes.

10  Q.  To speed this up a little bit, I am going to scroll through

11  these and I will ask you a hopefully summarizing

12  all-encompassing question at the end.

13          What were all the documents we just looked at?

14  A.  Various confirmations for all the payments we made related

15  to the e-mail approval I sent.

16  Q.  What was the date of all of those wires?

17  A.  The approval time was 3:16:57 p.m. Mountain Time.

18  Q.  Did these wires capture the full 17 payments that were

19  made?

20  A.  Yes.

21  Q.  On May 13?

22  A.  Yes, I believe so.

23  Q.  Going back to when Frontier received the termination notice

24  from AMCK, do you remember the day of the week and the time?

25  A.  Yes.  It was Friday, May 8, at 4:41 p.m.

O493FRO2                          Sashikumar - Direct

1   Q.  Would it have been possible for Frontier to have released

2   wires on the same day that it received the May 8th termination

3   notice?

4   A.  It would not have been confirmed or released by the bank

5   since it was after our 3:30 Mountain cutoff time.

6   Q.  Can you release wires over the weekend?

7   A.  No.

8   Q.  Do you know where AMCK is located?

9   A.  I believe in Dublin, Ireland.

10  Q.  Do you know what time of day it would be in Dublin,

11  Ireland, as it is relates to 4:41 p.m. Mountain Time?

12  A.  11:41 p.m. I think.

13  Q.  Did these payments that we just looked at bring Frontier

14  fully to up to date with all of its payments with AMCK?

15  A.  Yes.

16  Q.  Has Frontier ever fallen behind on payments with AMCK since

17  these events we've just looked through?

18  A.  No.

19  Q.  Since May 13, has Frontier ever not paid rent on the exact

20  due date listed on invoices with AMCK?

21  A.  There have been instances where it's not the exact due date

22  on the invoice.

23  Q.  In those circumstances, would Frontier pay within the

24  three-business-day grace period?

25  A.  Yes.

O493FRO2                          Sashikumar – Direct

1    Q.  And what would AMCK do in those circumstances when it

2    didn't receive a payment on the exact date it believed payments

3    were due?

4    A.  Similar to what we saw before, we would get a reminder or a

5    request for an update on the payment.

6    Q.  I'm showing on your screen what's been previously marked as

7    Plaintiff's Exhibit 7.

8          MR. SCHAER:  I'll submit to the Court this is a

9    similar compilation of emails that was at Plaintiff's Exhibit

10   8.  Before going through it, I would move to admit this into

11   the record on the same basis as Plaintiff's Exhibit 8.

12         MR. BUTLER:  Given the Court's ruling on Plaintiff's

13   Exhibit 8, we have no objection, your Honor.

14         THE COURT:  Received.

15         (Plaintiff's Exhibit 7 received in evidence)

16   Q.  We'll try to do this with efficiency.  Who is this e-mail

17   from?

18   A.  Michael McInerney.

19   Q.  Have we seen this person on the prior e-mails?

20   A.  Yes.

21   Q.  And what is the date of this e-mail?

22   A.  It is June 29, 2020.

23   Q.  Can you remind us, how long after AMCK sent the termination

24   notice is AMCK now sending this notice?

25   A.  Around a month and a half.

O493FRO2                          Sashikumar - Direct

1    Q.  What is the content of this e-mail?

2    A.  It is a follow-up from him telling us that there is an

3    invoice that is outstanding, and is requesting an update on the

4    status of payment.

5    Q.  We'll go down to the attachment to that invoice.  What is

6    the payment due date?

7    A.  26th of June, 2020.

8    Q.  Is this a scenario where the payment would have fallen on a

9    weekend or holiday?

10   A.  Yes.  Based on the description, the payment would have been

11   due on 28th of June, 2020, which would have been a Sunday.

12   Q.  Did Frontier pay this invoice?

13   A.  Yes.

14   Q.  And the next e-mail, who is this from?

15   A.  Michael McInerney as well.

16   Q.  What is the date of this e-mail?

17   A.  July 6, 2020.

18   Q.  So about how long after the AMCK sent the notice of

19   termination?

20   A.  About two months.

21   Q.  What is the content of this e-mail?

22   A.  Seems to be another follow up on an invoice that they

23   viewed as overdue and requesting an update for.

24   Q.  Looking at the attached invoice, what is the payment due

25   date?

O493FRO2                              Sashikumar – Direct

1    A.  That would be 2nd of July, 2020.

2    Q.  Is this a scenario where the payment otherwise would have

3    fallen on a holiday or a weekend?

4    A.  Yes, it appears the payment would have been due on 5th of

5    July, 2020, which could have been a holiday in the U.S. because

6    of 4th of July being on a Sunday.

7    Q.  Did Frontier pay this invoice?

8    A.  Yes.

9    Q.  And who is the sender of this invoice or who is the sender

10   of this e-mail?

11   A.  Michael McInerney as well.

12   Q.  What is the date of this?

13   A.  July 20, 2020.

14   Q.  About how long after AMCK sent the notice of termination is

15   this e-mail?

16   A.  A little over two months.

17   Q.  What is the content of this e-mail?

18   A.  Another follow up requesting an update on a payment that

19   was due on the 17th of July.

20   Q.  I'll take us to the attached invoice.  What is the due date

21   on this invoice?

22   A.  17th of July, 2020.

23   Q.  Is this a scenario where the payment date otherwise would

24   have fallen on a holiday or a weekend?

25   A.  Yes, it appears the payment would have been due on 19th of

O493FRO2                          Sashikumar – Direct

1   July, 2020, based on the description.

2   Q.  Did Frontier pay this invoice?

3   A.  Yes.

4   Q.  I am going to skip 11, 12, 13, and 14.  I believe they are

5   duplicates.  And finally, page 15, who is this e-mail from?

6   A.  Michael McInerney.

7   Q.  What is the date of this invoice?

8   A.  September 8, 2020.

9   Q.  What is the content of this e-mail?

10  A.  Another follow up for a payment that they believed was due

11  on Friday, September 4.

12  Q.  Looking at the attachment, what is the payment due date

13  here?

14  A.  September 4, 2020.

15  Q.  And is this another scenario where the payment otherwise

16  would have fallen on a holiday or a weekend?

17  A.  Yes.  It appears the payment would have been due on

18  September 6, 2020, which would have been a Sunday.

19  Q.  Did Frontier pay this invoice?

20  A.  Yes.

21  Q.  Did AMCK object in any way to Frontier paying these

22  invoices after it gave the notice that it believed payments

23  were past due?

24  A.  No.

25  Q.  To be clear, between April 6 and May 8th, did AMCK ever

O493FRO2                          Sashikumar – Direct

1   send you any of these reminder e-mails representing that a
2   payment was past due or requesting an update on the status of
3   the payment?
4   A.  No, they did not.
5   Q.  To the best of your knowledge, between April 6 and May 8th,
6   did AMCK ever send anyone at Frontier one of these reminder
7   e-mails representing that a payment was past due, or requesting
8   an update on the status of payments?
9   A.  To the best of my knowledge, no, they did not.
10           MR. SCHAER:  Your Honor, I'm noting the time is 12:50.
11  This is a good stopping point.  I'm about to shift topics and
12  get a little dense.
13           THE COURT:  We'll resume at 2:15.
14           MR. SCHAER:  Thank you.
15           MR. BUTLER:  Thank you, your Honor.
16           (Recess)
17           (Continued on next page)
18
19
20
21
22
23
24
25

O49BFRO3

                          AFTERNOON SESSION

1                             2:15 p.m.

2          THE COURT:  Good afternoon.

3          MR. SCHAER:  Good afternoon, your Honor.  Good

4   afternoon, Mr. Sashikumar.

5          THE COURT:  Good afternoon.

6   BY MR. SCHAER:

7   Q.  This picked up I think at the timeframe from we're in

8   discussion March through May.  Now I want to discuss what

9   happened after that May 8th termination notice.

10          What did Frontier do with the remaining five planes

11  that were due under the Framework Agreement when AMCK sent the

12  termination notice?

13  A.  We had to find alternate financing for it, so we had to go

14  seek financing from other leasing companies.

15  Q.  And was Frontier able to find other leasing companies to

16  take over those airplanes?

17  A.  Yes, we were.

18  Q.  How did the terms provided by those leasing companies

19  relate to the terms that were in the Framework Agreement with

20  AMCK?

21  A.  They were comparatively worse primarily in two aspects.

22  One was with the purchase price being lower with the new

23  lessors than they were compared to AMCK, and the monthly rent

24  being the second aspect that was higher than it was with AMCK.

O49BFRO3

1    Q.  Are you familiar with what a swap rate is?

2    A.  Yes.

3    Q.  And what is it as it relates to aircraft leasing?

4    A.  It is an interest rate adjustment that is used as a form of

5    adjusting your base rent from when we agree to an LOI or letter

6    of intent to when the aircraft delivers.

7    Q.  What is a typical swap rate?

8    A.  It would be typically low single digit percentages.

9    Q.  Have you ever seen a swap rate as high as 80 percent?

10   A.  No.

11   Q.  Have you ever seen a swap rate as high as 60 percent?

12   A.  No, I have not.

13   Q.  I'm showing now what's been previously marked as Joint

14   Exhibit 158.

15           What is this document?

16   A.  It is a letter of intent between Frontier airlines and CDB

17   Aviation.

18   Q.  And what is this letter of intent relating to?

19   A.  It is for the sale leaseback of three Airbus A320neo

20   aircraft.

21   Q.  Do these aircraft have any relation to AMCK?

22   A.  Yes.  It was three of the five aircraft that was allocated

23   to the AMCK previously.

24   Q.  And what is the schedule delivery month for these three

25   aircraft?

O49BFRO3

1    A.  July of 2020.

2    Q.  I want to take a quick look at some of the terms here.

3         What is this term explaining to us?

4    A.  It explains what the amount of security deposit is that we

5    would pay per aircraft under this transaction.  And as it

6    states here, it's equal to three months basic rent with two

7    periods of step downs resulting in one-month's base rent after

8    24 months.

9    Q.  I'm going down here to the term purchase price.

10        What is this telling us?  What is the purchase price

11   for these aircraft?

12   A.  $48.5 million.

13   Q.  And what is the lease term for these aircraft?

14   A.  144 months.

15   Q.  And, finally, what is this basic rent term telling us?

16   A.  It is the formula that describes how the base rent of

17   $315,250 will adjust between when the LOI is agreed and when

18   the airplane is delivered.

19   Q.  What is the swap rate that is being provided in this

20   adjustment calculation?

21   A.  The base swap rate that's being provided is .6 percent.

22   Q.  Is that .6 percent or 60 percent?

23   A.  0.6 percent.

24   Q.  I want to introduce or show you what's been previously

25   marked as Plaintiff's Exhibit 10.

O49BFRO3

1         Mr. Sashikumar, what is this document?

2    A.  It appears to be a lease agreement relating to one of the

3    three aircraft we looked at since I see a delivery month of

4    July 2020.

5         MR. SCHAER:  Your Honor, this is not been previously

6    admitted into evidence.  I would move to admit it at this

7    point.

8         MR. BUTLER:  Your Honor, we have no objection.

9         THE COURT:  Received.

10        (Plaintiff's Exhibit 10 received in evidence)

11   BY MR. SCHAER:

12   Q.  Does this lease agreement reflect the terms from that

13   letter of intent that we just looked at?

14   A.  That's correct.

15   Q.  Is it your understanding that the two other planes, July

16   2020 planes that delivered with CDB match the terms in this

17   lease agreement and the letter of intent we just looked at?

18   A.  That is correct.

19   Q.  Has Frontier -- did these July 2020 three planes actually

20   deliver between CDB and Frontier?

21   A.  Yes.

22   Q.  Has Frontier been paying monthly rent on these three

23   aircraft?

24   A.  Yes, we have.

25   Q.  Is Frontier fully current on its rent with CDB for these

O49BFRO3

1    three aircraft?

2    A.   Yes, we are.

3    Q.   CDB took the first three leases, what did Frontier do with

4    the next two?

5    A.   My recollection is it was allocated to Jackson Square

6    Aviation.

7    Q.   Do you know how Frontier selected Jackson Square Aviation

8    for those next two?

9    A.   It was through a request for proposal process that we do

10   for any of our financing activities for aircraft by reaching

11   out to multiple lessors and selecting the most favorable

12   economic terms.

13   Q.   What is the document that's showing on your screen right

14   now?

15   A.   It is the LOI between Jackson Square Aviation and Frontier

16   for the sale leaseback of up to five A320neo aircraft.

17   Q.   Do you know why this concerns five aircraft when there were

18   only two remaining aircraft that needed accounting for under

19   the Framework Agreement after CDB took those first three?

20   A.   We have to finance airplanes that deliver for the business

21   throughout the year.  My recollection is we had more airplanes

22   deliver in 2021, and so as part of that we were financing

23   remaining aircraft that had yet to be financed.

24   Q.   Were the two remaining though under the Framework Agreement

25   included in this letter of intent with Jackson Square?

O49BFRO3

1    A.  Yes.

2    Q.  What was the purchase price in this letter of intent

3    between Jackson Square and Frontier?

4    A.  49 million.

5    Q.  And let me zoom out see if I can capture the full term.

6    Looks like not, so I have to do it a bit together.

7            What is this highlighted section referring to here

8    basic rent?

9    A.  It is capturing the formula that would allow for the

10   adjustment of the base rent of 322,500 between when this LOI is

11   agreed and when the actual aircraft delivers.

12   Q.  And what is the assumed swap rate in this letter of intent?

13   A.  It is the nine-year swap rate of .596 percent.

14   Q.  Is that .596 or 59.6?

15   A.  .596 percent.

16   Q.  Is that similar to the swap rate we just saw in the CDB

17   letter of intent and lease?

18   A.  Yes.

19   Q.  I'm showing now what's been previously marked as Joint

20   Exhibit 164.

21           Mr. Sashikumar, what is this document that's on your

22   screen?

23   A.  Appears to be the lease agreement between Frontier and

24   Jackson Square for one, A320neo aircraft.

25   Q.  Does this document reflect the material commercial terms

O49BFRO3

1  that we just looked at in the letter of intent between Frontier

2  and Jackson Square?

3  A.  Yes, it does.

4  Q.  Are there any differences in some of the commercial terms

5  between the letter of intent we looked at and this lease

6  agreement?

7  A.  Yes, as it relates to the calculation of the basic rent.

8  As we progressed through negotiations, I believe there was a

9  slight adjustment to how the calculation would be made for

10  that.

11  Q.  Do you know between the letter of intent and the lease

12  agreement which one is signed later?

13  A.  The lease agreement is.

14  Q.  And do you know between those two documents which terms

15  control, the letter of intent's terms or the lease agreement's

16  terms?

17  A.  The lease agreement's terms.

18  Q.  We're on page 109.  Can you explain what I've highlighted

19  on the screen here?

20  A.  It relates to the amount of secured deposit that would be

21  owed in this transaction.  And as it states, it's for three

22  months of basic rent.

23  Q.  What have I highlighted here on your screen relating to

24  basic rent amount?

25  A.  It is the formula that allows the base rent of 322,500

O49BFRO3

adjust depending on the nine-year swap rate at the time of

delivery.

Q.  And I believe you said this is changed slightly since the

letter of intent?

A.  Yes, it has.

Q.  And in what way has it changed?

A.  It is primarily related to the definition of "S" which

bleeds into "L" which is in the LOI we had .596 as being the

base rate.

        We progress to adjusting that slightly to say that "S"

could be either .596 or .8 which will be determined based on

where the actual nine-year swap rate fell, which is "L" in this

formula.

Q.  Do you know why you made this adjustment with Jackson

Square?

A.  Sure.  I recall it being just a progression of the

negotiations we had.  The end result of this would have been

what I'll call a dead band of interest rates where the base

rent would stay 322,500.  But if interest rates moved above or

below the two numbers we're talking about, then there would be

an adjustment of that basic rent.

Q.  Was the other airplane that Frontier leased from Jackson

Square that was originally under the Framework Agreement with

AMCK, was that subject to the same terms that we're seeing in

this lease agreement now?

O49BFRO3

1    A.  Yes, it was.

2    Q.  I'm showing now what's been previously marked as Joint

3    Exhibit 166.  What is this document that I'm showing you now?

4    A.  It is an email from John Yanney at Jackson Square Aviation

5    to myself and a few other recipients relating to the rent

6    setting for MSN 10384.

7    Q.  What is the date of this email?

8    A.  It's the 26 of March 2021.

9    Q.  Do you know why this plane delivered in March of 2021 and

10   not February of 2021?

11   A.  I don't recall exactly why, but it could have been related

12   to just Airbus delaying the aircraft by an additional month.

13   Q.  Why is John Yanney sending you this email with the subject

14   line Frontier MSN 10384 rent setting?

15   A.  Just typical process is the lessor sending us their

16   calculation of what the rent is two business days prior to

17   delivery as is laid out in the lease agreement, and for us to

18   review those calculations and confirm that we agree.

19   Q.  We're about to go through some numbers, and please remember

20   your audience is lawyers and not mathematicians.  I'm taking us

21   to page three.

22           What is it that you see on your screen as the

23   attachment to this email?

24   A.  It is a snippet from the lease agreement that we just

25   looked at describing what the basic rent amount calculation

O49BFRO3

1    needs to be.

2    Q.  Is this the same calculation that we saw in the lease

3    agreement?

4    A.  Yes.

5    Q.  I want you to help us walk through this.  What is "L" in

6    this equation?

7    A.  Yes.  So "L" refers to the actual nine-year interest rate

8    swap as obtained from Bloomberg two business days prior to the

9    delivery at a set time of 12 noon Eastern.  And the rest of

10   that description just applies to how it links back to "S."

11   Q.  Is that a rate that's actually set in the market?

12   A.  It is a rate that's pulled from the market on Bloomberg,

13   yes.

14   Q.  And what is "S?"

15   A.  "S" is the base to which you would compare the actual rate

16   which we just spoke about as being "L."

17   Q.  I'm going to page four of this document now.  What is this

18   page showing us?

19   A.  It is the snapshot from Bloomberg for the nine-year swap

20   rate.

21   Q.  And is this providing I guess the number to fill in for

22   either "L" or "S?"

23   A.  Yes.  So this is where we would pull "L" from because it is

24   the actual swap rate two business days before delivery.

25   Q.  Is that the amount that is circled in red right here?

O49BFRO3

```
 1   A.  Yes, that would be 1.5745.

 2   Q.  Can you explain to us why the calculation said this amount

 3   should be done at noon Eastern, but the time we see here is

 4   9:00?

 5   A.  Yeah.  So Jackson Square Aviation is based out of San

 6   Francisco which is on Pacific time.  So for them 9 a.m. Pacific

 7   time would be 12 Eastern.

 8   Q.  Is this 1.5745, is that the actual swap rate?

 9   A.  Yes, it is.

10   Q.  Is any adjustment need to be made to this number to reflect

11   the swap rate?

12   A.  No.

13   Q.  Does this number need to be adjusted in any way before

14   plugging it into the equation that we just saw to arrive at

15   monthly rent payments?

16   A.  No.

17   Q.  So going back to page three, what number should be used to

18   reflect what "L" equals?

19   A.  Should be 1.5745.

20   Q.  And what number then -- are we able to then determine what

21   number "S" should be filled in with?

22   A.  Yes.  So if we look at the formula for "S," it states that

23   it would be .8 if "L" is greater than .596, which 1.5745 is

24   greater than .596, so "S" would be .8.

25   Q.  Does "S" need to be adjusted at all before you plug it into
```

1    this equation?

2    A.   No.

3    Q.   I'm scrolling up now to page two of this document.

4             What does page two reflect?

5    A.   It is an attachment that we got from John that explains the

6    formula that we just walked through and the calculation of the

7    adjusted fixed rent as a result of that.

8    Q.   I guess what letter is this portion that I've highlighted

9    here reflecting?

10   A.   That would be "L."

11   Q.   And what letter is this portion that I've highlighted

12   reflecting?

13   A.   That would be "S."

14   Q.   Has there been any adjustment to those numbers before

15   putting them into this equation?

16   A.   No.

17   Q.   What does express as a number rather than a percent mean?

18   A.   As we said before I believe, swap rates are interest rates

19   percentages.  But in this case the way the formula is drafted

20   and the way the multiplier is used which is 27,500, it requires

21   us to use "L" and "S" in the format we're seeing here as

22   numbers which would be 1.5745 and .8.

23   Q.   And what would the consequence be of adjusting 1.5745 to

24   depict that as a percentage?

25   A.   You would have to make it 0.015745.

O49BFRO3

```
 1    Q.  How would you have to depict that?

 2    A.  0.015745.

 3    Q.  There would be one zero?

 4    A.  0.01, so you basically divide that by a hundred.

 5    Q.  And how would that then relate to .8 that's being used

 6    here?

 7    A.  That then becomes what I would reflect as an apples and

 8    oranges comparison because one of them then is being depicted

 9    as percentage, while the other is used as a number.

10    Q.  Have you ever seen it done that way where only one of the

11    numbers is adjusted down, but the other number remains as it's

12    already captured?

13    A.  No.

14    Q.  And if you just adjusted one of the numbers down, but not

15    the other one, what is the consequence of that?

16    A.  It becomes a pretty significant adjustment to that basic

17    rent and goes against the intent of why this adjustment is even

18    done in the first place.

19    Q.  Have you ever seen it done that way?

20    A.  No.

21    Q.  Did you agree with this calculation that Jackson Square

22    provided to you?

23    A.  Yes, I did.

24    Q.  Let's take us down to page five.  What is this email

25    reflecting?
```

O49BFRO3

1   A.  It is an email from me to John Yanney in response to his

2   original email confirming that I agree that his calculation

3   looks good.

4   Q.  And just so we keep it in our minds.

5        What is the total amount of fix rent that you and John

6   Yanney are agreeing is the correct amount?

7   A.  That would be $343,798.75.

8   Q.  Has Frontier been paying this amount in monthly rent to

9   Jackson Square Aviation?

10   A.  Yes.

11   Q.  Is Frontier fully current on its rent payments with Jackson

12   Square Aviation?

13   A.  Yes.

14   Q.  I'm showing now what's been previously marked as Joint

15   Exhibit 167.  What is this document that's on your screen?

16   A.  It is an email from me to John confirming that we had made

17   the rent and security deposit payments with payment

18   confirmations to prove it.

19   Q.  I'm taking us down to the last page.

20        What is this document that's on the screen that was

21   attached to this email?

22   A.  It is the rent invoice that we got for this particular

23   aircraft.

24   Q.  And what is the amount of this invoice?

25   A.  $343,798.75.

O49BFRO3

1    Q.   Does this match the calculation we just saw in the prior

2    document?

3    A.   Yes.

4    Q.   And I'm taking us up to page three here.

5         What is this document showing us that was attached to

6    this email?

7    A.   It's a wire confirmation pulled from our banking system

8    confirming that we paid them both the security deposit and the

9    rent that was due.

10   Q.   What is the amount that's being paid here or as is

11   reflected in this document?

12   A.   $1,375,195.

13   Q.   Can you explain to us why that amount is being paid when

14   the invoice is for $343,798.75?

15   A.   That would be because per the lease we also owe them three

16   months of security deposit, which is three times the basic rent

17   amount.  So this amount reflects total of four times that basic

18   rent amount.

19   Q.   I'm showing now what's been previously mark as Joint

20   Exhibit 168.  What is this email that I'm showing you on your

21   screen?

22   A.   It is an email from John Yanney to myself with the rent

23   setting for MSN 10452 in April of 2021.

24   Q.   And what is MSN 10452?

25   A.   If I recall correctly that is the second aircraft that was

O49BFRO3

1    allocated to Jackson Square that was supposed to be under the

2    Framework Agreement.

3    Q.  And do you know why this aircraft is being delivered in

4    April 2021 instead of February 2021?

5    A.  Again, not exactly, but it could be something to do with

6    Airbus just delaying the aircraft.

7    Q.  Does this email largely -- let me scroll through it

8    quickly.

9            Does this email largely match the prior rent email

10   that we saw?

11   A.  Yes.

12   Q.  Are the terms the same here for adjusting the rent

13   calculation?

14   A.  The way it's calculated, yes.

15   Q.  Thank you.  And according to this chart, what should the

16   swap rate be?

17   A.  That would be 1.5040, which is as of 9 a.m. Pacific on the

18   27th of April.

19   Q.  So using 1.5040 as the actual swap rate or "L," what does

20   that tell us "S" should be?

21   A.  Similar to the previous aircraft, "S" would then end up

22   being .8.

23   Q.  Is that what's being depicted in this calculation here?

24   A.  That's correct.

25   Q.  Do you agree with this calculation?

O49BFRO3

1    A.  Yes, I do.

2    Q.  And so we don't lose it, what is the total amount of rent

3    reflected in this calculation?

4    A.  $341,860.

5    Q.  And let's just take us down to page six.

6           What is this email I've highlighted reflect from us?

7    A.  It is an email from me to John Yanney confirming again I

8    agree his calculation looks good.

9    Q.  I'm now showing what's been previously marked as Joint

10   Exhibit 169.

11          Mr. Sashikumar, what is this email depicting?

12   A.  It is an email from Deanna at Jackson Square to me with

13   security deposit and first month invoices for MSN 10452.

14   Q.  Is that the plane we just looked at in the prior rent set

15   emails?

16   A.  Yes.

17   Q.  What is this first page of the attachment that we're seeing

18   here?

19   A.  This is the invoice for the first month's rent.

20   Q.  And what is the amount being depicted?

21   A.  $341,860.

22   Q.  Does this match the rent that was calculated in the prior

23   emails we just saw?

24   A.  Yes, it does.

25   Q.  And what is this next document that's on the screen here?

O49BFRO3

1  A.  It is an invoice for the security deposit under the same

2  aircraft.

3  Q.  And can you remind us how is this amount determined?

4  A.  That would be three times the basic rent amount that we

5  just looked at.

6  Q.  And how much is this amount?

7  A.  $1,025,580.

8  Q.  And what are we seeing here on page six of this exhibit?

9  A.  It is a wire confirmation for the payment of that first

10 month's rent which is $341,860.

11 Q.  And what is on the screen, showing on your screen here of

12 page seven of this exhibit?

13 A.  It is a payment confirmation for $1,025,580, which would be

14 the security deposit.

15 Q.  Has Frontier been paying monthly rent to JSA of $341,860 on

16 this aircraft?

17 A.  Yes.

18 Q.  Is Frontier fully current on its rent for this aircraft

19 with JSA?

20 A.  Yes.

21      MR. SCHAER:  Thank you, Mr. Sashikumar.  No further

22 questions at this time.

23      MR. BUTLER:  Your Honor, Ms. Crosby will be

24 cross-examining Mr. Sashikumar.

25 CROSS-EXAMINATION

O49BFRO3                        Sashikumar – Cross

1   BY MS. CROSBY:

2   Q.  Good afternoon, Mr. Sashikumar.

3           My name is Jane Crosby as Jeff mentioned.  It's very

4   nice to meet you.  You testified a little bit about your

5   position in Frontier in March 2020.

6           I'd just like to confirm, is it correct that as of

7   March 2020, you were Frontier's manager of fleet.  And that as

8   Frontier's manager of fleet, you were the main point of contact

9   with lessors of AMCK

10  A.  As it related to day-to-day activities, yes.

11  Q.  Do I have it right that you would generally receive and

12  maintain invoices for aircraft leased by Frontier?

13  A.  Yes.

14  Q.  And that included invoices in connection with the original

15  14 leases with AMCK?

16  A.  Yes.

17  Q.  So I'd like to just bring up an example in Joint Exhibit 9.

18          Do you see that this is an email from Michael

19  McInerney at AMCK on November 26, 2019, to yourself and others

20  at Frontier?

21  A.  Yes.

22          MS. CROSBY:  Your Honor, at this time I'd like to move

23  Joint Exhibit 9 into evidence.

24          MR. SCHAER:  No objection.

25          THE COURT:  Received.

O49BFRO3                         Sashikumar – Cross

1              (Joint Exhibit 9 received in evidence)

2    BY MS. CROSBY:

3    Q.  Do you see where Mr. McInerney writes, please find attach

4    your invoices?

5    A.  Yes.

6    Q.  Do you recall receiving this email?

7    A.  Yes.

8    Q.  So we'll just look through a couple of the attachments so

9    you can see them.  Do you understand that this email was

10   attaching a number of invoices which were due by Frontier?

11   A.  That's correct.

12   Q.  So we'll turn to page 18.

13           Do you see that this is an invoice for payment on MSN

14   8402?

15   A.  Yes.

16   Q.  The amount due was $343,181.29?

17   A.  Yep.

18   Q.  And the due date was April 30, 2020?

19   A.  Yes.

20   Q.  Is MSN 8402 one of the aircraft leased by Frontier under

21   the original lease agreements?

22   A.  Yes.

23   Q.  Is this a typical invoice that you would have received from

24   AMCK?

25   A.  Yes.

1  Q.  This invoice was sent, as you can see, in November of 2019.

2  You typically would have received these invoices in advance of

3  when payment was due on the invoices; is that right?

4  A.  That's correct.

5  Q.  This payment wasn't made to AMCK when it was due on April

6  30, 2020; isn't that right?

7  A.  That's correct.

8  Q.  And you testified earlier that Frontier didn't make any

9  payments on the original leases in April 2020?

10 A.  On the aircraft that we took prior to March of 2020, yes.

11 Q.  The original 14 leases?

12 A.  Yes.

13 Q.  Instead you testified that you were responsible for sending

14 out the approval email to make a wire payment to Accipiter on

15 May 13, 2020?

16 A.  Yes.

17 Q.  So we'll bring back up Joint Exhibit 152 which you saw

18 earlier.

19        Halfway down the page do you see the email you sent to

20 Jimmy Dempsey and others on May 13?

21 A.  Yes.

22 Q.  You testified earlier that this email was you seeking

23 approval for these 14 payments on invoices due in April and

24 three on invoices due in May?

25 A.  Correct.

1    Q.  So I think we saw earlier that the chart goes under two

2    pages.  So we'll pull up the second page to see the full chart

3    together.

4              Do you remember that you sent this email a few days

5    after AMCK sent their termination notice?

6    A.  Yes, it appears I sent it on May 13th.

7    Q.  Did any of these payment amounts in this chart that you've

8    included here seeking approval include any interest?

9    A.  No, it did not.

10   Q.  I believe you also testified earlier that you were

11   peripheral to all of the rent deferral discussions; is that

12   correct?

13   A.  Correct.

14   Q.  Did you have any communications with anyone at AMCK at your

15   level during the April and May 2020 time period?

16   A.  I don't recall I did.

17   Q.  And you didn't have any direct discussions with AMCK about

18   any rent grace periods; isn't that right?

19   A.  I didn't.

20   Q.  So you didn't hear the exact terms of the ten-day grace

21   period when it was being discussed with AMCK; isn't that right?

22   A.  Correct.

23   Q.  So I'd like to show you Joint Exhibit 66 again which you

24   saw earlier.

25              So you testified earlier that this was a text message

O49BFRO3                       Sashikumar - Cross

1    from yourself to Robert Fanning on April 6, 2020, right?

2    A.  Yes.

3    Q.  And you were asking, are we paying AMCK?

4    A.  Yes.

5    Q.  I'll just bring up Joint Exhibit 67 then.

6            Do you recognize this as a text message from Robert to

7    yourself on that same day?

8    A.  Yes.

9    Q.  And he writes, all Accipiter rent payments are deferred for

10   the next ten business days?

11   A.  Correct.

12   Q.  And you testified that you understood this text message to

13   mean that none of the payments that were due during that period

14   of time needed to be paid, correct?

15   A.  Correct.

16   Q.  So it was Mr. Fanning who informed you about the ten-day

17   grace period; isn't that right?

18   A.  Yes.

19   Q.  So I'll show you as well Joint Exhibit 60.  So I believe we

20   saw this earlier, but was this an email from Robert Fanning to

21   yourself on April 6, 2020?

22   A.  Yes, he was forwarding me the email from Paul.

23   Q.  Did you understand that the email from Paul was about the

24   ten-day grace period?

25   A.  As it's stated in his email, yes.

O49BFRO3                    Sashikumar – Cross

1    Q.  So was this another way that Mr. Fanning informed you about

2    the ten-day grace period?

3    A.  Yes.

4    Q.  And did you understand from this email that the grace

5    period would end on April 21st?

6    A.  I don't recall coming to that conclusion just based off

7    this email.

8    Q.  So I'd like to read for you.  I'd like to read Paul's email

9    to you.  He wrote, We just got off the phone with Robert, and

10   so I'd like to confirm what we discussed.  Mindful of the time

11   that it would take you to reach agreement with Airbus or to

12   make some other arrangements, and therefore the ability of us

13   to reach a deferral agreement, we can confirm that we won't

14   take any actions or call any defaults for nonpayment of rents

15   on any aircraft where the rent is due from today to 21 April.

16   Do you see that?

17   A.  Sure.

18   Q.  So do you understand from this communication that the rent

19   period discussed here was to end on April 21st?

20   A.  Based on my discussion with Robert, it was related to that

21   period of time from this email, yes.

22   Q.  By your discussion with Robert, do you mean the email and

23   the text message?

24   A.  Sure.

25   Q.  Do you have any recollection of anyone at Frontier

1    instructing you not to make payments to AMCK after April 21,

2    2020?

3    A.  I believe we had or I had discussions at least with Robert,

4    and the discussions were surrounding the fact that there were

5    ongoing negotiations and the deferral of payments was to

6    continue till those negotiations concluded.

7    Q.  Do you remember anyone instructing you not to make payments

8    to AMCK after April 21, 2020, from Frontier?  Is that your

9    testimony that Mr. Fanning did do that?

10   A.  As a direct -- again, I don't recall if those were the

11   exact words he used.  But in discussion, the takeaway that I

12   took relevant to my role was that while negotiations were

13   ongoing, we were to defer the rent payments that were due.

14   Q.  So I'd like to -- do you recall testifying at your

15   deposition differently?

16   A.  I don't recall exactly what I testified to during the

17   deposition.

18   Q.  So I'll bring up your deposition which is Joint Exhibit

19   number 177, page 102, line four.

20          And you were asked at your deposition, Did anyone at

21   Frontier instruct you not to make payments to AMCK after April

22   21, 2020.  How did you respond?

23   A.  I can't recall.

24   Q.  So you couldn't recall at your deposition two years ago,

25   but you're recalling now?

1  A.  My inference to the question you asked was I still can't

2  clearly recall what the communication was, but my assumption

3  was, yes, we had discussions around it at the time.

4  Q.  So if your understanding at the time was that there were

5  discussions that were ongoing, why didn't you answer the

6  question at your deposition that way?

7      Why didn't you remember that to answer it?

8  A.  Again, I don't recall what the status was at the time what

9  the sequence of questions were here, but I'm still recalling

10 that I don't know the exact nature like I said of the

11 communications that we had at the time.

12     But to answer your question that you asked me again

13 now, was I instructed to not make payments, I still said I

14 don't recall that that was the way he put it.  Maybe we had

15 discussions around the fact that there were negotiations still

16 ongoing.

17 Q.  Do you remember any of the specifics about your discussions

18 with Mr. Fanning?

19 A.  No, I don't recall specifics.

20 Q.  Do you recall any of your understanding about the

21 agreement?

22 A.  Nothing other than the fact that while negotiations were

23 ongoing, the deferral was to be continued.

24     MR. SCHAER:  Your Honor, if I can ask that under ER106

25 an additional portion of Mr. Sashikumar's deposition be read

O49BFRO3                        Sashikumar - Cross

into the record, and that would be at the bottom of page 101 to
the top of page 102.

          MS. CROSBY:  Your Honor, Mr. Schaer will have the
opportunity on direct to go over any deposition testimony that
he would like.

          THE COURT:  Yes, but he'd like to have it done now so
it forms part of the same question and answer.

          MS. CROSBY:  We've already moved beyond his deposition
testimony though, your Honor.

          THE COURT:  Well, catch it as it flees. Read it in.

          MS. CROSBY:  Thank you, your Honor.

          MR. SCHAER:  The question at line 19 of page 101.

          Did anyone at Frontier tell you that there will be an
extension of that 10-day grace period?

          The answer for Mr. Sashikumar.  Maybe in discussions
it came up.  Again for me to not know what was being spoken
about at that level.  All I was told is that we have an ongoing
negotiation with them.  And, obviously, we were also
negotiating with Airbus after this point in time.
BY MS. CROSBY:
Q.  Mr. Sashikumar, from the testimony that was just read from
your deposition, you suggest that you were only told about
ongoing negotiations, that there wasn't any other information
you were provided at the time; is that true?
A.  Sure.

O49BFRO3                          Sashikumar - Cross

1    Q.  But you testified earlier today that you were informed if

2    needed about updates in rent negotiations?

3            Was that your language?

4    A.  Again relating to, it links back to the ongoing discussions

5    that were being had at the time of negotiations that were being

6    had at the time.

7    Q.  You don't recall any specific instruction from anyone at

8    Frontier not to make payments to AMCK after April 21st?

9    A.  I don't recall a specific instruction, no.

10   Q.  You also testified about an internal lease payment file

11   that you would use to track the rent payments that were due?

12   A.  Yes.

13   Q.  And that would cover all lease payments for aircraft and

14   show the monthly rent on those aircraft?

15   A.  Yes.

16   Q.  You also testified that AMCK did not send you any type of

17   the chase alert that we saw earlier between April 6 and May

18   8th?

19   A.  Correct.

20   Q.  And that to the best of your knowledge no one at Frontier

21   receive those chase alerts?

22   A.  That's correct.

23   Q.  Did you need the chase alerts that we saw earlier in order

24   to know when to make rent payments on time or within the grace

25   period?

O49BFRO3                        Sashikumar - Cross

1   A.  No, the lease payment tracker had the dates in there for

2   when the payments were due.  The chase emails would come like

3   we discussed if it slip to the following business day, as

4   opposed to the following business day convention.

5   Q.  You also testified about the replacement leases that

6   Frontier entered into with other lessors after the termination

7   notice?

8   A.  Yes.

9   Q.  Do you recall preparing an internal analysis in October

10  2020, on damaging experiences with those replacement leases?

11  A.  Yes.

12  Q.  So I'll point you to Joint Exhibit 163.

13          Is this an email from yourself to Spencer Thwaytes on

14  October 7, 2020?

15  A.  Yes.

16  Q.  Do you see you're attaching a document entitled AMCK

17  comparison 10-07-20?

18  A.  Yes.

19  Q.  I'll point you to the attachment.  What does this chart

20  showing to your understanding?

21  A.  It is a comparison of the commercial terms that we achieved

22  with CDB and Jackson Square to the terms we had with AMCK.

23  Q.  And it's analyzing the cash flow under those different

24  leases?

25  A.  It is focused on the purchase price and rent and one

1  specific item related to on-watch for CDB, yes.

2  Q.  What was the result of your analysis here?

3  A.  That the total nominal difference between those elements

4  was $53,179,500 roughly across the five aircraft, and on a NPV

5  basis that was 34.3 million.

6  Q.  What is a NPV basis?

7  A.  That is the net present value of those cash flows.

8  Q.  So that's the discounted amount?

9  A.  Correct.

10 Q.  What discount rate did you use to prepare this analysis?

11 A.  We assume the discount rate of 10 percent at the time.

12 Q.  And this is typically the discount rate you would use;

13 isn't that right?

14 A.  That is the discount rate that we would assume in our

15 analysis in the company at the time, yes.

16 Q.  As part of your calculations, did you consider the tax

17 effect of these cash flows?

18 A.  I did not, no.

19      MS. CROSBY:  Thank you, Mr. Sashikumar.  Those are my

20 questions.

21      MR. SCHAER:  Nothing further from the plaintiff, your

22 Honor.  We ask that the witness be excused.

23      THE COURT:  Thank you, Mr. Sashikumar.  You're

24 excused.

25      MR. SCHAER:  Your Honor, may Mr. Sashikumar, now that

1    he's excused, observe?

2              MR. BUTLER:  No objection.

3              THE COURT:  Yes, as far as I'm concerned.

4              MR. SCHAER:  Thank you.

5              MR. HOSENPUD:  Thank you, your Honor.  Our next

6    witness will be Mr. Robert Fanning.

7              MR. SCHAER:  Your Honor, it appears the witness may

8    have left the room for a short moment.  We're going to find him

9    right now.

10   ROBERT FANNING,

11        called as a witness by the Plaintiff,

12        having been duly sworn, testified as follows:

13             THE DEPUTY CLERK:  Please state and spell your name

14   for the record.

15             THE WITNESS:  Robert Fanning, R-O-B-E-R-T,

16   F-A-N-N-I-N-G.

17   DIRECT EXAMINATION

18   BY MR. HOSENPUD:

19   Q.  Good afternoon, Mr. Fanning.

20   A.  Good afternoon.

21   Q.  Would you please state your current position at Frontier

22   Airlines?

23   A.  I'm vice president for fleet.

24   Q.  Going back to 2020, what was your position then?

25   A.  I was the director of fleet.

O49BFRO3                          Fanning- Direct

1    Q.  What were some of your duties as a director of fleet?

2    A.  My primary responsibilities were to finance our current

3    order book through sale leasebacks.

4    Q.  By order book you're talking about the aircraft that are on

5    order with at that time Airbus?

6    A.  That is correct.

7    Q.  And typically how far are you looking ahead for financier

8    for the upcoming orders in a particular year?

9    A.  At a minimum of 12 months, but typically somewhere between

10   12 to 16 months.

11   Q.  To whom did you report?

12   A.  In 2020, I reported to Spencer Thwaytes.

13   Q.  And did you have interactions also with Mr. Jimmy Dempsey?

14   A.  That is correct.

15           MR. HOSENPUD:  Your Honor, at this time I would move

16   to admit Joint Exhibits, and my list is shorter than what

17   you're seeing on the screen, but Joint Exhibits 24, 17, 48, 60,

18   69, 72, 73, 79, 89, 120, 146 and 149, recognizing that I may

19   have been redundant in some of those exhibits that may be

20   admitted.

21           MR. BUTLER:  No objection, your Honor.

22           THE COURT:  They're received. They're joint exhibits

23   and they are received.

24           (Joint Exhibits 24, 17, 48, 60, 69, 72, 73, 79, 89,

25   120, 146 and 149 received in evidence)

O49BFRO3                          Fanning- Direct

1    BY MR. HOSENPUD:

2    Q.  Mr. Fanning, did you have interactions with AMCK in 2020?

3    A.  I did.

4    Q.  And who was your primary contact?

5    A.  Jane O'Callaghan.

6    Q.  What would be the nature of the manner in which you would

7    communicate with Ms. O'Callaghan?

8    A.  It either would be through phone call or text.

9    Q.  I'm going to take you -- strike that.

10            The Framework Agreement of 2020 to your recollection

11   had how many aircraft that were subject to it?

12   A.  Fourteen.

13   Q.  The Framework Agreement of 2020?

14   A.  I'm sorry.  Correction, six.

15   Q.  Thank you.  And from your recollection how many of those

16   six were to come from Toulouse, France?

17   A.  It was one aircraft of those six.

18   Q.  And then the remainder were coming from where?

19   A.  Mobile, Alabama.

20   Q.  Have you been to the facility in Toulouse, France?

21   A.  I have.

22   Q.  And could you explain for the Court your observations of

23   the manufacturing operation there?

24   A.  So for airports in Toulouse, France, it's their major

25   non-factory facility for Airbus.  They approximately make

widebodies, single aisle bus, specifically for single aisle

aircraft.  They delivered around 60 to 70 aircraft per month.

It's a huge facility.  They have a lot of capabilities

there; whereas in Mobile, at the time they were only building

three aircraft a month which they had no ability to store

aircraft.  It's a very small facility compared to Toulouse.

Q.  And of the 60 or so aircraft in Toulouse, how many of those

were A320neos?

A.  I can't recall how many, but on a specific month you would

have probably in the A320 family, you have the A319 and the

A321.  Specifically for the A320, they were probably delivering

at that time between 60 to 70 aircraft a month.

Q.  And you talked about storage facilities in Toulouse, is

that because of the size of the operation there?

A.  While they have some capability of storage, it's not

infinite.  Obviously they're building extremely big aircraft,

the A380 was being built at that time, the 330.  They have some

room to store aircraft, but it's not an infinite amount of

space.

Q.  Compared to Mobile, Alabama, is there any storage capacity

at all?

A.  Very little.

Q.  I'm going to show you what has now been admitted as Joint

Exhibit 17.  I'm going to ask if these are text messages

between you and Ms. O'Callaghan starting just looking at the

1    date March 14, 2020, and then I'll scroll forward so you can

2    bracket the date to April 30, 2020, at least as far as page

3    seven.  You see the date at the top of page seven?

4    A.  I do.

5    Q.  So would that be the series of communications via text

6    message that you had with Ms. O'Callaghan during those dates?

7    A.  That is correct.

8    Q.  I'm going to open exhibit 24 now, Joint Exhibit 24.

9         And this, as we scroll to page 40, shows the aircraft

10   to which you just referred.  And of the aircraft in Toulouse,

11   which one would that have been?

12   A.  The first aircraft, number one.

13   Q.  I'm going to bring you forward in time, sir, to March 26,

14   2020, and you appear to be one of the recipients of this email

15   from Jane O'Callaghan to you, Spencer Thwaytes and Mr. Sharath

16   Sashikumar, correct?

17   A.  That is correct.

18   Q.  Do you understand this to be a proposal from

19   Ms. O'Callaghan about what conditions would be necessary to

20   enter into a rent deferral agreement?

21   A.  That is correct.

22   Q.  With respect to the first condition, what did you

23   understand Ms. O'Callaghan to be conveying to you?

24   A.  For her first condition it was that we would be required to

25   prepay 12 months rent in advance of closing from the closing of

1    the first aircraft.

2    Q.  And she spells out what that would amount to, approximately

3    $3 million paid in advance.  Is that how you understood it?

4    A.  That is correct.

5    Q.  And was that condition any part of the Framework Agreement

6    that was signed as the evidence has already been established on

7    March 16, 2020?

8    A.  No.

9    Q.  There's a second bullet point that is relating to the

10   remaining four SLB aircraft.

11           Do you understand that to mean aircraft number three,

12   four, five and six?

13   A.  That is correct.

14   Q.  And is this the first time there was a reference to a

15   delivery deferral of the aircraft?

16   A.  To my recollection, yes.

17   Q.  And that request is a three to six month deferral.  Do I

18   have that correct?

19   A.  That is correct.

20   Q.  All right.  Before or around the time of receiving this

21   text message, had you conversations with Ms. O'Callaghan where

22   she had discussed the need for a delivery deferral?

23   A.  To my recollection, I believe it would have been a brief

24   discussion of this email forthcoming, but not into the context

25   of what the letter stated or the email stated.

1  Q.  But you have a recollection of having at least the topic

2  being raised?

3  A.  That is correct.

4  Q.  And did that cause to your understanding Frontier Airlines

5  to take some action with Frontier -- with Airbus to determine

6  whether Frontier could start to achieve what this request was?

7  A.  So in order to start the conversation with Airbus, that was

8  left to Mr. Thwaytes and Jimmy Dempsey in order to have a

9  conversation with Airbus to see if it was possible in order to,

10  base on the request that AMCK had made, to see if we were able

11  to assist with their request.

12  Q.  Let me take you back to Exhibit 17 which are your text

13  messages between you and Ms. O'Callaghan, and I'm going to

14  direct your attention to the discussion that begins on March

15  31.

16          You are asking Ms. O'Callaghan if you could receive

17  comments on a deferment letter that went out to AMCK, and I

18  think the record has established that was done on March 16.

19  And she's saying that in response Hi, Robert.  We have a draft

20  ready for one of the 14 aircraft, but we're waiting to hear

21  from you what the position was on the deferral of deliveries

22  A320neos, 2-6.  Do you see that reference?

23  A.  I do.

24  Q.  Is that different than what we just reviewed in the March

25  26 email where the notion was deferring the aircraft 4-6?

A.   It was the start of the discussion if we were able to defer

the aircraft from the current delivery dates for the second

aircraft which would have been in April to push it out to a

later date.

Q.   So that then became included with her comments that you saw

in March 31, five aircraft?

A.   That is correct.

Q.   And you comment, You spoke to Jimmy yesterday, and it says

and her position.  That should have probably read his?

A.   That's correct.

Q.   His position as will take delivery of these airplanes.

There may be some delay with Airbus.  This could change, but

that was Jimmy's position yesterday.  He's aware that we would

have to pay rent on these deliveries.

     What did you mean by that?

A.   So as a condition of AMCK financing the aircraft and taking

delivery of that specific aircraft, we would have to be current

on that aircraft and subsequent aircraft, the 14 aircraft that

we had with AMCK.

Q.   I'm turning your attention to March 31, 2020, and there's

an email that -- pardon me, a text message that Ms. O'Callaghan

conveys to you indicating that they didn't receive a formal

response to the email to you dated March 26.

     And then she indicates, which was sent in response to

the deferral letter of the 24th.  And I think it's because you

O49BFRO3                          Fanning- Direct

1    indicate that.  Were you both wrong on those dates?

2    A.  I believe so, yes.

3    Q.  Because we're talking about the concession letter on the

4    16th, correct?

5    A.  That is correct.

6    Q.  And your response back is, I sent an email today.  So you

7    are talking about an email in response to the questions that

8    she posed?

9    A.  That is correct.

10   Q.  We'll get there in a second.  I'd like to look at the

11   additional comments that you made.

12        How are we supposed to move forward with the five

13   aircraft.  And you are saying, If there's no demand, what's the

14   point of flying them.

15        Is that also responding to the query that she made in

16   her March 26 email to you?

17   A.  That is correct.

18   Q.  Let me get that up just so we can orient to that email

19   exchange.  So here we have an email from you dated March 31,

20   2020, and she is asked a series of questions in connection with

21   her earlier email of March 26.

22        Did she ask what support are Indigo Partners going to

23   give the airline capital injections?

24   A.  Yes.

25   Q.  And what was your answer?

O49BFRO3                          Fanning- Direct

1   A.  As far as I was aware Indigo were not going to provide any

2   support.

3   Q.  At that time?

4   A.  Correct.

5   Q.  And was part of her questions to find out what the

6   financial posture of Frontier was at that time given that we're

7   now in the Covid pandemic?

8   A.  It was more of the extent that she was querying that if

9   Frontier needed capital injections into the airline, that

10  Indigo would step up and provide the liquidity that it would

11  need.

12  Q.  That was her query?

13  A.  That is correct.

14  Q.  And then you gave an answer to the question of, What's your

15  current cash position.  You see that right there?

16  A.  I do.

17  Q.  What did you report to her in terms of demonstrating the

18  current cash position of Frontier?

19  A.  As I answered, I told her where our cash position was at

20  that time which was 610 million, and our senior leadership,

21  Mr. Dempsey and Mr. Thwaytes were looking into alternative

22  financing in conjunction with the government had started

23  initial conversations about loan programs for airlines.

24  Q.  And was the purpose of that in part to convey to AMCK that

25  Frontier could manage if the aircraft under the Framework

O49BFRO3                         Fanning- Direct

1    Agreement were delivered?

2    A.   That is correct.

3    Q.   And then there's a question about how much of the fleet is

4    now grounded and you give a report on that; is that correct?

5    A.   That is correct.

6    Q.   And what did you tell her?

7    A.   So in the context of our fleets, the A321s, A319s and the

8    A320ceo's had been grounds. But in specific to the A320neo's

9    they were being circulated within the network and they were

10   being used and flown.

11   Q.   And the aircraft under the Framework Agreement were

12   A320neo's; is that correct?

13   A.   That is correct.

14   Q.   And so was there an intention if these Neos were delivered

15   by AMCK that they would be used in flight?

16   A.    In conversation Ms. O'Callaghan's conversation was, and

17   based on the letter was, where we going to fly them.  At that

18   point in time, there was a conversation about how much

19   utilization we were going to put on them on a monthly basis.

20            But given that Covid, there was a lot going on in the

21   aviation sector at that time, commercial aviation sector at

22   that time, I couldn't give her how many hours and cycles were

23   going to be put on the aircraft.

24            I did inform her that the aircraft would be used given

25   that the A320neo's are more fuel efficient.  And in order to

O49BFRO3                              Fanning- Direct

1    save money and preserve money, we would fly the A320neo's as

2    opposed to the A320ceo's, A319s and A320ceo's.

3    Q.  And the term CO is really CEO, correct?

4    A.  Correct.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O493FRO4                          Fanning - Direct

1    Q.  Thank you.  Let's take that down.  We're going to go back

2    up to the text messages and we're still on March 31 and pick up

3    where we left off.

4           Was your comment about if there's no demand, what's

5    the point of flying them, was that in response to anything that

6    Ms. O'Callaghan was demanding at the time?

7    A.  It was a condition that if they took delivery of the

8    aircrafts, that we would not put them into storage and we would

9    fly them.

10   Q.  And did you have any intention at all to put these aircraft

11   in storage?

12   A.  Like most airlines, we were looking at all our options.

13   But, my belief at that time, based on the conversations I had

14   with our leadership, we were going to fly them.

15   Q.  Now let's look at the last question you pose to

16   Ms. O'Callaghan in this text exchange.  "If this is an issue

17   for me, I don't believe we can commit to this, Airbus will not

18   delay delivery without it costing Frontier."

19           What did you mean by that?

20   A.  So, it would cost the airline financially, so within our

21   PDP rolling facility, and obviously, well, we get a gain from

22   selling these aircrafts to the lessor, we would not -- in order

23   to sell the aircraft, we were not able to sell the aircraft to

24   AMCK, it was going to have a financial impact on our airline.

25   And furthermore, Airbus was a consideration at this time to

1    where -- with the conversations I was aware of what was going

2    on at that time, Airbus were putting significant pressure on

3    Frontier in taking delivery.

4    Q.  So, your use of the term "costing," did it have anything to

5    do with storing the aircraft?

6    A.  That is correct.

7    Q.  It did not or did?

8    A.  It did not.

9    Q.  And we've heard some testimony about PDPs, but to spell

10   that out, those are predelivery payments?

11   A.  Yes.

12   Q.  And are those made at various stages in the manufacture of

13   a particular aircraft?

14   A.  That is correct.

15   Q.  So, on April 1, the communication on the right in this

16   series of text messages is Ms. O'Callaghan.  She says to you,

17   "Hi Robert.  I've had further internal discussions with the

18   shareholder.  We need to maintain our position that the rent

19   deferrals on the 14 aircraft must be linked to delivery

20   deferrals of the remaining five neos in 2020."

21          What did you understand from that communication as

22   early as April 1, 2020?

23   A.  My understanding of this text was basically that in order

24   for her to accept the rent deferral requests, she wanted to

25   make sure that the five aircraft would be, in my language,

1   pushed to the right, meaning that it would be a delay on taking

2   delivery of these aircraft.  And through the text and e-mails

3   and the requests they wanted to push them out as far as -- at

4   that time, as far as they could.

5   Q.  All right.  This is your response as of April 1.  And let

6   me go back just one second here.  This is your response on

7   April 1 that we're looking at, at page 3 of Exhibit 17.  What

8   do you say?

9   A.  So I'm asking slash questioning Ms. O'Callaghan that based

10  on her requests, that I wanted to make sure her requests was

11  she was asking us to delay delivery of the five remaining A320s

12  for 2020.  Based on the conversations with Mr. Dempsey and

13  Mr. Thwaytes, the conversations that they had with Airbus were

14  by not favorable, meaning that Airbus were having -- you know,

15  the conversations that we take delivery of these airplanes when

16  they are ready to be taken delivery of.

17  Q.  And then what question do you ask her in the next bubble

18  down?

19  A.  So, I wanted to query to see whether they were committed on

20  financing the remaining five aircraft.

21  Q.  Did you say, "If we're unable to delay the deliveries and

22  your is pulling out of the five remaining 320s, we need to know

23  ASAP"?

24  A.  That is correct.

25  Q.  And the "your" might have been intended to be "you"?

O493FRO4                          Fanning - Direct

1    A.  Yes.

2    Q.  All right.  So, did Ms. O'Callaghan answer that question?

3    A.  No.

4    Q.  And then you further emphasize a discussion with Airbus and

5    you give a name of a gentleman.  Who did you identify there?

6    A.  So, Jimmy Dempsey with their leadership at Airbus, who is

7    Chris Jones works for Airbus, and is one of their -- I believe

8    he was the chief commercial officer for Airbus, I don't recall,

9    but he was the decision maker within Airbus Americas.  And

10   that's who we -- that's who Jimmy had, Jimmy Dempsey had a

11   relationship with, and who was reaching out communicating the

12   request that was made by AMCK.

13   Q.  And the response back and now you've identified the

14   individual who responded to Mr. Dempsey was what?

15   A.  Well, Airbus expected us to take the delivery of the

16   aircraft when the aircraft was ready to be delivered.

17   Q.  The next sequence of communications between you and

18   Ms. O'Callaghan are dated April 2, 2020.  And it appears that

19   she's inquiring about setting up a call.  Would you agree with

20   that?

21   A.  Yes.

22   Q.  And did you have that call on April 2?

23   A.  We didn't have Skype, so I asked Jane if we could have it

24   just a typical phone call, which she agreed.

25   Q.  Do you recall generally the nature of what was discussed in

O493FRO4                          Fanning - Direct

1    that call?

2    A.  It would have been the initial conversations that

3    Mr. Dempsey had with Airbus and bringing them up to date from

4    where we were with those discussions.

5    Q.  All right.  I am going to move forward in the Exhibit 17 to

6    another series of communiques.  And before I do that, I am

7    going to show you Exhibit 58.  And this is an e-mail to Jimmy

8    Dempsey, yourself, and Spencer Thwaytes, and also copying Jane

9    O'Callaghan.  And in the body of this e-mail, Mr. Sheridan is

10   saying the shareholder position has not, unfortunately not

11   changed.

12          Is there a different condition than one you had seen

13   prior to this that's shown in this paragraph?

14   A.  I'm sorry.  Could you repeat that?

15   Q.  Yes.

16          Previously they had been speaking of three to six

17   month delays.  Do you recall that back in March 26?

18   A.  Yes.

19   Q.  And do you see that condition present in this e-mail

20   exchange or has it changed?

21   A.  It had changed.

22   Q.  What did it change to?

23   A.  Six months.

24   Q.  So, the goalpost was shifted further in terms of what you

25   were being asked to do with Airbus, is that correct?

O493FRO4                      Fanning - Direct

1    A.   That is correct.

2    Q.   Let's go back to Exhibit 17.  I'm moving us forward to the

3    date of April 6, 2020.  And you communicate with

4    Ms. O'Callaghan asking her availability for a call, is that

5    correct?

6    A.   That is correct.

7    Q.   What occurred on that day that prompted this text message?

8    A.   My, from my understanding, it was a -- I believe it was a

9    delivery notice or further communication from Airbus on them

10   asking us to take delivery of the aircraft.

11   Q.   Was there anything happening in terms of Airbus'

12   manufacturing that was revealed to Frontier Airlines that day?

13   A.   From my understanding, Airbus had notified Mr. Dempsey and

14   Mr. Thwaytes that the facility in Mobile, Alabama, was going to

15   close, shut down for the remainder of the month.

16   Q.   That would be April?

17   A.   That is correct.

18   Q.   And did you arrange for a call with Ms. O'Callaghan and

19   Mr. Sheridan?

20   A.   Yes.

21   Q.   Was Mr. Dempsey originally supposed to participate in that

22   call?

23   A.   That is correct.

24   Q.   And I'm looking at page 4 of Exhibit 17.  And you have a

25   comment there near my cursor.  Do you see that?

O493FRO4                          Fanning - Direct

1   A.  Yes.

2   Q.  And was Mr. Dempsey able to make that call?

3   A.  No.

4   Q.  Why not?

5   A.  He was talking to Airbus at that time.

6   Q.  Now let's look at Exhibit 60.  And you see on April 6,

7   Mr. Dempsey also reached out to Mr. Sheridan about a call on

8   April 6 as soon as possible, ASAP, is that correct?

9   A.  That is correct.

10  Q.  And did Mr. Dempsey report that Mobile had closed, Mobile

11  had closed until April 29?

12  A.  Yes.

13  Q.  And what else was he conveying to you -- conveying to

14  Mr. Sheridan?

15  A.  It was regarding two rent payments that were due that day,

16  and we were conscious that we needed to have a discussion about

17  deferring those two payments.

18  Q.  And so we now have the stage set where Mr. Dempsey was not

19  able to participate in the call with the AMCK representatives,

20  Ms. O'Callaghan and Mr. Sheridan.  You did.  And what was

21  discussed on that call?

22  A.  It was based on the letter that we had received and to

23  notify Jane O'Callaghan and Paul Sheridan that Mobile had

24  closed and obviously we needed time, Airbus had not provided us

25  revised delivery dates.  My recollection is they did not know

1    when the plant was going to open based on the state closing

2    down.  And the request was made by me to extend the deferral

3    and ask for a stay on the two rent payments that were due and

4    also for the remaining five aircraft.

5    Q.  And did you get a copy of Mr. Sheridan's communication to

6    Jimmy Dempsey regarding this call?

7    A.  Yes.

8    Q.  And are we looking at that now in Exhibit 60 with the

9    e-mail dated April 6, 2020?

10   A.  Yes.

11   Q.  And Mr. Sheridan says, "We just got off the phone with

12   Robert, and so I would like to confirm what was discussed.

13   Mindful of the time it might take you to reach agreement with

14   Airbus or to make some other arrangements and therefore of the

15   ability for us to reach a deferral agreement, we can confirm

16   that we won't take any actions or call any defaults linked to

17   non-payments of rents on any aircraft where the rent is due

18   from today to 21 April i.e. next 10 working days."

19            Did I read that accurately?

20   A.  Yes.

21   Q.  And so there were two notions in this.  Did you understand

22   that to be the case?

23   A.  Yes.

24   Q.  What were those from your understanding?

25   A.  That for 10 days from that day we weren't required to make

1   any rent payments, and the second point was that they would not

2   take any action when it came to default on those aircraft.

3   Q.  And what was the purpose of this allowing more time from

4   your understanding?

5   A.  So my conversation with Paul Sheridan and Jane was that it

6   was a very fluid situation that was ongoing at that time, we

7   needed to understand when Airbus was going to open, and give

8   Airbus time to communicate that to Mr. Dempsey and Mr. Thwaytes

9   on when exactly that was.  At that time, they believed that

10  they would have an idea within 10 days.  And that's what I

11  recall.

12  Q.  And was there also the concept of the ability to reach

13  agreement with Airbus?

14  A.  That is correct.

15  Q.  And what did you understand that to be?

16  A.  That based on the requests made by AMCK, that we would be

17  able to reach an agreement based on that request.

18  Q.  Their delivery deferral request?

19  A.  Yes.

20  Q.  There was also in that exhibit a notion of make some other

21  arrangements.  Do you know what that refers to?

22  A.  So in my conversation at some point within a couple of

23  days, Ms. O'Callaghan had asked if I was -- I was willing to

24  reach out to other lessors to see if we had the ability to find

25  another lessor that would take delivery of that aircraft.

O493FRO4                    Fanning - Direct

1    Q.  So, you were contemplating kind of a two approach, a

2    two-pronged approach?

3    A.  Yes, as a plan B, yes.

4    Q.  And did you take steps to reach out to other lessors?

5    A.  I did.

6    Q.  Were you successful at that time in connecting with other

7    lessors who might be willing to change places with AMCK?

8    A.  At that time, I had initial conversations, and lessors,

9    while they would not agree at that specific point in time, were

10   going to look into it and see if this was something that they

11   could accommodate.  But they did not provide me with a yes at

12   that time.

13   Q.  Let's move forward.  Your text messages basically stop

14   between you and Ms. O'Callaghan during the period of April 6

15   and then pick up again on April 21.  Do you see that?

16   A.  Yes.

17   Q.  And what was Frontier doing in connection with its

18   discussions with Airbus during that time, to your knowledge?

19   A.  So to my knowledge, Mr. Dempsey and Mr. Thwaytes were

20   continuing to have a conversation with Airbus.  To my

21   recollection, there was extreme pressure put on by Airbus for

22   us to take delivery.  We weren't the only airline that they

23   were talking to.  Many airlines around the world that were

24   having similar conversations about deferring aircraft, and

25   obviously Airbus needed time to see what they could accommodate

O493FRO4                          Fanning - Direct

1    given the circumstances that the aircrafts were either in

2    delivery condition or very close to it.  And was again, to my

3    recollection, there was a lot of time spent with the big

4    relationship we had with Airbus to try and accommodate with

5    what AMCK were requesting.

6    Q.  You are using the phrase "A-MAK" because I know it's fairly

7    common in and among Frontier to say that.  You're referring to

8    AMCK, is that correct?

9    A.  That is correct.

10   Q.  There is -- I'm moving forward to April 23, 2020.  And

11   there is a question from you, "Hi Jane, do you have an update

12   from your meeting yesterday?"

13            Do you see that question?

14   A.  Yes.

15   Q.  You are posing to her?

16   A.  Yes.

17   Q.  And what meeting were you referencing?

18   A.  It was a meeting based on Ms. O'Callaghan and Mr. Sheridan

19   speaking to their shareholder in Hong Kong.

20   Q.  Let me go back and have you look at Exhibit 73, which is a

21   communication from Mr. Dempsey to you, and I am going to get to

22   a more legible version of this joint exhibit.

23            On April 7, 2020, Mr. Dempsey is reporting to you that

24   he and Mr. Thwaytes, that he just spoke to Paul Sheridan.  He

25   has agreed to do the deferral on a month-to-month basis.

O493FRO4                         Fanning - Direct

1          Do you see that reference?

2   A.   Yes.

3   Q.   And what did you understand that to be relating to?

4   A.   So, just as a background, because Mr. Dempsey had been

5   informed by Airbus that the facility on which the second

6   aircraft was going to be delivered was going to shut down for

7   the remaining of the month, the 10 days that Mr. Sheridan had

8   agreed with myself wasn't going to be enough.

9          So, in the -- at some point between the two

10  conversations, Jimmy had reached out to Paul and asked if he

11  could extend the deferral agreement of which Mr. Dempsey

12  replied back to me as I guess it was 10:30 in the morning that

13  he had come to an agreement with Mr. Sheridan on a

14  month-to-month basis.

15  Q.   And what was your understanding of how the month-to-month

16  agreement to defer rents was to work?

17  A.   So my understanding of a month-to-month was it was a

18  three-month deferral on a rolling basis.  So, for, you know, in

19  the normal conversation of just a dialogue that we would

20  reassess where we are for the second month and the third

21  months.  But the overall agreement was that it would be a

22  three-month deferral.

23  Q.   Now, were you basing that on just what you had originally

24  asked in the concession letter?

25  A.   That is correct.

O493FRO4                          Fanning - Direct

1    Q.  You weren't part of the conversation between Mr. Dempsey

2    and Mr. Sheridan, is that right?

3    A.  No, I was not.

4    Q.  And did you come to learn at any point in time that the

5    month-to-month was to in some way be tied to the delivery of

6    aircraft?  In other words, that rent payments would resume

7    before the delivery of aircraft?

8    A.  Yes, that is correct.

9    Q.  And did you know precisely when the next aircraft would

10   deliver as of April 7, 2020?

11   A.  So, again, Airbus had just obviously closed down the

12   facility.  If I recall within conversations with Mr. Dempsey,

13   there was an outlook of maybe the aircraft delivering in May,

14   but it wasn't 100 percent.

15   Q.  So, if it had delivered in May, what was your understanding

16   of when rents would need to be paid?

17   A.  That would have been, if we had an agreement at that time

18   knowing if the aircraft was going to deliver in May, then we

19   would have been -- we would have made AMCK whole during that

20   time in May.

21   Q.  Similarly, if it had delivered in June, was it your

22   understanding that you would pay any outstanding rent before

23   that delivery?

24   A.  Yes, that is correct.

25   Q.  All right.  Did you get any specific terms on the timing of

O493FRO4                      Fanning - Direct

1    repayment in this conversation with Mr. Dempsey?

2    A.  No, I did not.

3    Q.  Which aircraft did you understand the month-to-month was

4    related to?

5    A.  It would have been on the 14 aircraft that had been

6    subsequently delivered that we were leasing from AMCK.

7    Q.  When your deposition was taken, did you comment about it

8    being applied to 15 aircraft?

9    A.  I did, yes.

10   Q.  Was that a mistake?

11   A.  It was.

12   Q.  And did you -- had you before that point in time approved

13   the payment on the first aircraft?

14   A.  I did.

15   Q.  So, you in part were responsible for approving those

16   payments?

17   A.  Yes, I was responsible for approving all payments, dealing

18   with 20-plus lessors, there was a lot going on in that time.

19   But to answer your specific question, that is correct.

20   Q.  And so you had approved payment for the first aircraft.

21   What was the significance of that?  What did you then

22   understand?

23   A.  Well, we would, as mentioned by Jane that they wanted to

24   see a willingness we had the ability to pay, it was part of the

25   agreement that we had made at that time, so we went on and made

1    that payment.

2    Q.  So, when you say the agreement you'd made at that time, in

3    other words, any rent deferral, was that excluding the very

4    first aircraft?

5    A.  Correct.

6    Q.  Under the Framework Agreement?

7    A.  Yes.

8    Q.  Did you receive any sort of draft deferral agreement from

9    anybody at AMCK in and around the time period of April 7 to

10   April 11?

11   A.  Yes, from Jane O'Callaghan.

12   Q.  And what did you understand that document to be for?

13   A.  So this was in the context of for the first aircraft to be

14   mirrored for the total of 14 aircraft, but the deferment

15   agreement that Ms. O'Callaghan had sent was for the first

16   aircraft.  And that was for a deferment that I believe was

17   July 24.

18   Q.  Did that have, to your knowledge, and I'm showing you this

19   now, it's an e-mail from Ms. O'Callaghan dated April 9, 2020.

20   And with it has connected to it a letter agreement in draft.

21   And it appears that she's telling you that just give us some

22   feedback on this because we're in the process of cloning the

23   letter for the other 13 aircraft.

24   A.  That is correct.

25   Q.  And at the time were these terms anything that could be

O493FRO4                          Fanning - Direct

1   agreed on, based on not knowing the delivery of the next

2   aircraft?

3   A.   So, as implied, this is a draft, because we did not know

4   when exactly the aircrafts were going to deliver.  And the

5   continued attempts to try to push Airbus to provide AMCK on

6   their request of pushing the aircraft as far as possible, i.e.

7   within three to six months since that was still ongoing and not

8   finalized, this document was -- there was, in my opinion, it

9   didn't make sense for us to -- it didn't make sense for us to

10  do anything to the document until we had a final agreement with

11  Airbus.

12  Q.   Let's turn back to the text message Exhibit 17 and pick up

13  at April 23 where we left off.

14          You say, and I'll refresh again, "Hi Jane, do you have

15  an update from your meeting yesterday?"

16          Do you see that statement?

17  A.   Yes.

18  Q.   And did you understand what meeting had happened the day

19  before?

20  A.   To my recollection, again, Mr. Sheridan and Jane

21  O'Callaghan were speaking to their shareholder based on the

22  request that we had made, and they were having ongoing

23  discussions on whether they could accommodate our request or

24  not.

25  Q.   All right.  And on April 23, Ms. O'Callaghan says, "Hi

1    Robert.  We are still formulating a response based on the

2    directors' position.  What remains clear is shareholder

3    unwillingness to fund a new purchase if there are any payments

4    at all outstanding.  Hope to get back to you tomorrow with our

5    thoughts on possible ways forward."

6           So, was this consistent with your understanding about

7    deferred payments needing to be made before deliveries?

8    A.  That is correct.

9    Q.  You then communicate with Ms. O'Callaghan on the 24th, what

10   you wrote there, and what are you asking her about?

11   A.  So, from my understanding within the continuing discussions

12   that Mr. Dempsey and Mr. Thwaytes were having with Airbus, they

13   were still pressuring us taking the second aircraft, and we

14   needed to know what decision that Jane and Paul had got from

15   their shareholder, as it was still essentially up in the air as

16   to what they were able to agree to.

17   Q.  All right.  Moving on to April 25, this is the response to

18   your query about getting an answer of what their shareholder's

19   position was, is that correct?

20   A.  Yes.

21   Q.  There Ms. O'Callaghan states, "We struggled at our board

22   meeting last week.  Here are the basic elements of our board

23   and shareholder's direction on how to approach the remaining

24   A320neo sale leasebacks this year."

25           She says:  "Number 1.  We will be unable to fund any

1  new delivery unless all payments are up to date, so there can

2  be no deferred payments outstanding at closing."

3          Did I read that accurately?

4  A.  Yes.

5  Q.  And "closing" in your terminology for sale leasebacks means

6  what?

7  A.  So, when the aircraft is at the delivery center as what

8  would be Toulouse, but for this aircraft it would have been

9  Mobile, Alabama, that the aircraft is ready for Frontier to

10 take delivery and subsequent sell to AMCK, that would be the

11 closing.

12 Q.  This message of be current before the next closing?

13 A.  Next delivery, yes.

14 Q.  Next delivery.  Is that any different than what had been

15 made before?

16 A.  It was no difference from the deliveries that we had done

17 with AMCK previous to this aircraft.

18 Q.  But is that any different from the message that AMCK was

19 conveying about being current -- when Frontier had to be

20 current?

21 A.  I see.

22          No, this had been a consistent message from AMCK, that

23 we needed to be up to date with our payments before the next

24 delivery.

25 Q.  It goes on to say, "We need some quid pro quo to fund

O493FRO4                              Fanning - Direct

1    250 million of capex on terms that now appear to be wildly off

2    market, and we are seeing many parties walk from 2019 priced

3    commitments due to the unprecedented crisis we are in."

4              Did I read that accurately?

5    A.  Yes.

6    Q.  Then she says, "Our thinking here is a QPQ which would be

7    of value to us is a four-year lease extension of the earlier

8    block of neo deliveries from Accipiter to take those leases to

9    12 years."

10             Did I read that accurately?

11   A.  Yes.

12   Q.  What did you understand Ms. O'Callaghan to be conveying in

13   connection with their current thinking?

14   A.  So, my recollection that this was a new ask from Jane, from

15   AMCK, it was one that had never been discussed before.  And

16   they wanted, obviously, with the current aircraft that we had

17   from AMCK, they wanted a four-year extension.  So extending

18   from, we had done eight-year deals on those aircraft.  They had

19   a four-year extension at Frontier's option.  But Jane,

20   Ms. O'Callaghan wanted us to extend those aircraft from eight

21   years to 12 years.

22   Q.  And is there a financial consequence to Frontier for that

23   are type of extension?

24   A.  Absolutely.  It is another obligation on a monthly payment

25   that would need to be made on those aircraft for an additional

O493FRO4                          Fanning - Direct

1    4 years that was not forecasted.

2    Q.  On April 25, you are commenting on that back to

3    Ms. O'Callaghan.  You say, "Well, that's a huge ask.  Over 12

4    additional aircraft each extended at 4 years, over what rent

5    rate?  I think the best we could agree to is five.  And that's

6    only that you're asking Frontier to pay 100 percent of the

7    deferred rent which is a huge amount of money for an airline

8    that's not making much."

9            Did I read that accurately?

10   A.  Yes, you did.

11   Q.  All right.  Ms. O'Callaghan says, "I'll need to get back to

12   you Monday with extension rent for 4 years.  May be able to

13   live with just six extensions on a one-for-one basis for each

14   of the 2020 SLB commitment."

15           So, what did you understand her "may be" comment to be

16   referring to?

17   A.  So for the additional six aircrafts that they were going to

18   take delivery of in 2020, basically it would be a one-for-one

19   so we would extend six aircraft for 4 years based on AMCK

20   taking six aircraft in 2020.

21   Q.  You then go on, on April 25, you say, "But Jane, as you are

22   aware, we have signed leases on these five aircraft.  Thought

23   process is we pay you in full for the deferred rent, since in

24   the eight year deals we have extension options, our position is

25   we will pay you back the unpaid rent."  You go on to say,

O493FRO4                              Fanning - Direct

1    "Remember Airbus are holding us to our deliveries and I'm sorry

2    to say we expect AMCK to hold up your end of the deal."

3             Did I read that accurately?

4    A.  Yes.

5    Q.  What did you mean when you said "our thought process is to

6    pay you in full for the deferred rent"?

7    A.  So, at this point in time, the last thing we wanted was to

8    be in default with AMCK.  And we were very conscious of that.

9    We were willing to pay what we were obligated to pay, and we

10   were willing to pay it in full for the aircraft that we were

11   asking to get a deferment on.  And that was it.

12   Q.  So, you're saying we'll pay -- did Ms. O'Callaghan say yes,

13   do so?

14   A.  No, she never responded.

15   Q.  The next conversation occurs on the 27th, and it's a topic

16   that where you are saying, do you see in the left side here,

17   where -- the right side, she says, "I still don't have a clean

18   way forward from the shareholder, Robert, due to speak to him

19   again in the morning and will call you in the afternoon."

20            Do you see that reference?

21   A.  Yes.

22   Q.  And what did, how did you respond?

23   A.  So, I was -- in the course of April, there seemed to be

24   this additional ask every time I heard from Jane.  And I was

25   kind of -- since it had never been discussed before and just in

1    the bigger context of our other lessors, nobody at that time

2    was asking for the same kind of asks that AMCK were asking.

3    And I wanted to understand, you know, what was the reasoning

4    really behind this.

5              They were committed to the remaining five aircraft,

6    and my understanding was they wanted more, in my wording, more

7    of the bite of the apple in order to justify for them to take

8    delivery of the five remaining aircraft.

9    Q.   There was a reference to I think it's -- let's see.  On

10   April 28 there is a reference to having a call with you and

11   Jimmy and circulating a dial-in.  Did that call occur?

12   A.   Yes.

13   Q.   And was that in the nature of any sort of update on

14   finances of Frontier?

15   A.   Well, Mr. Dempsey would have provided Paul and

16   Ms. O'Callaghan with an update on where he was with Airbus.

17   The news wasn't as positive as AMCK would like, but we were --

18   Frontier was trying as best to accommodate again the request

19   that AMCK were making, but, you know, Airbus were getting

20   impatient on us not making a decision, and they were forcing us

21   to take delivery and putting pressure on us to take delivery of

22   the second aircraft, given it was ready and they wanted to

23   close on that aircraft.

24   Q.   The next communique is on the 29th, and I'm not really

25   sure -- obviously there's a time zone difference.  So you're

O493FRO4                          Fanning – Direct

1    asking about a call tomorrow today.  Is that because there is a

2    different time zone and it's tomorrow in one place and today in

3    another?

4    A.  As far as I remember, yes.

5    Q.  You said, "Are we still having a call tomorrow based on our

6    chat today."  Did I read that accurately?

7    A.  Yes.

8    Q.  And did a call take place either on the 29th or the 30th

9    with AMCK?

10   A.  I believe it did, but I'm not 100 percent.

11   Q.  Okay.  And on the 29th, you are saying, "Just following up

12   from our previously conversation.  Before your first delivery

13   we would repay the full rent amounts for the current 14

14   aircraft."

15            And that again is reiterating what AMCK had been

16   saying?

17   A.  Yes.

18   Q.  You go on to tell her on April 29, 2020 -- why don't you

19   read that for the Court.

20   A.  "I discussed the other options, I got no traction or

21   support for the lease extensions.  Option 2, the current rent

22   deferral would stay in place for each of the three aircraft

23   delivering.  We would pay six months of rent in advance for

24   each delivery.  There is no other options that we can consider

25   and we believe that this is a fair and reasonable approach to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O493FRO4                              Fanning - Direct

1    resolve this issue.  If you need to have a call with me before

2    you speak to your shareholder, please let me know and I will

3    make myself available in early morning."

4    Q.  When you referenced the current rent deferral would stay in

5    place for each of the three aircraft, were you referring to the

6    communication you received with Jimmy Dempsey regarding the

7    month-to-month waiver?

8    A.  That is correct.

9    Q.  On April 30, 2020, you inquire of Ms. O'Callaghan what's

10   the status or what's the latest.  Is that correct?

11   A.  Yes.

12   Q.  How does she respond?

13   A.  The short answer she didn't have -- they were still

14   considering what I had provided above, and she didn't have an

15   answer yet.

16   Q.  And did she indicate a call was going to occur that day

17   with the shareholder or waiting for them to confirm?

18   A.  Well, as I had outlined in the text that I stated, I was,

19   you know, I was anxious to hear back from her, and her reply

20   was, as you see, that we are waiting for them to confirm

21   whether they can have a call today.  So Ms. O'Callaghan and

22   Mr. Sheridan were waiting to have a call with their

23   shareholder.

24   Q.  And what did you convey to Ms. O'Callaghan regarding

25   Airbus?

O493FRO4                          Fanning - Direct

1   A.  Again, Airbus were just putting extreme pressure on

2   Frontier.  Even though we have a good relationship with them,

3   they wanted us to take delivery of the second aircraft.  That's

4   it.

5   Q.  She then says, "Why wouldn't you take the July 2020 and

6   February 2021 slots anyway as that's better for everyone.  I'm

7   just not sure we're going to get CK to give us a decision

8   today."

9        First, who is CK?  Do you know?

10  A.  It's their shareholder in Hong Kong.

11  Q.  And how did you respond to Ms. O'Callaghan?

12  A.  As stated, because they're contingent upon AMCK getting

13  their approval, if they do not get their approval it creates a

14  big issue.  Again, the big issue is that AMCK would not take

15  delivery of the second aircraft.  As I stated, Airbus have

16  asked us what's the delay.  So Mr. Dempsey would have had the

17  conversation with Mr. Jones at Airbus, and they were keen to

18  understand why it was taking AMCK so long to get a decision on

19  taking delivery of that aircraft.

20  Q.  Mr. Fanning, I'm showing you what has been marked as

21  Exhibit 120.  And it is addressed to Jimmy Dempsey but you're

22  cc'd on it.  Does this appear to be a follow up to discussions

23  that were had between Frontier and AMCK?

24  A.  That is correct.

25  Q.  And Mr. Sheridan notes that he appreciates the efforts that

O493FRO4                          Fanning - Direct

1    have been made in restructuring deliveries with Airbus.  Is

2    that correct?

3    A.  Yes.

4    Q.  And he's referring to deliveries now moving to July, three

5    aircraft, and February 2021, two aircraft.  Is that right?

6    A.  That is correct.

7    Q.  And there is references to all payments to be current on

8    May 15, 2020, and to remain current.

9    A.  That is correct.

10   Q.  Is that the first time you saw in any of these exchanges

11   over the several weeks that there had been negotiations that

12   there was a date fixed by AMCK for Frontier to get current?

13   A.  So, my recollection was that at this point in time, for the

14   second aircraft it was going to get delivered either in June or

15   Mr. Dempsey had got us into July.  The thought process, based

16   on the agreement that we had with AMCK, was that we would

17   make -- we would be current on all payments by that delivery

18   date.  This reference of all payments must be current on

19   May 15, 2020, to remain current, was the first time we had had

20   that conversation or even seen this demand made by or a

21   condition made by AMCK.

22   Q.  And then you see the lease extension concept now featured

23   in this communication.  Is that right?

24   A.  That is correct.

25   Q.  Did you address this communication or is that something

1    Mr. Dempsey did, Exhibit 120?

2    A.  It primarily would have been Mr. Dempsey, but I'm sure in

3    the context of phone calls, I would have spoken to Jane about

4    our position based on the conversations I had with Mr. Dempsey.

5    But, to be clear, Mr. Dempsey would have been talking to

6    Mr. Sheridan about this.

7    Q.  Did you receive a communication from Ms. O'Callaghan

8    indicating that their shareholder wanted to stay with that

9    third proposition of lease extensions on or about May 1?

10   A.  That sounds around the correct timeline.

11   Q.  Do you know if there were further negotiations, even after

12   that with AMCK?

13   A.  My recollection, there was always continued negotiations,

14   even at around that time.  Again, with Jimmy talking to Airbus,

15   again trying to push the deliveries based on the AMCK request,

16   and then either with myself or with Ms. O'Callaghan or

17   Mr. Dempsey with Mr. Sheridan, we were having to try and find a

18   resolution that worked for all parties.

19   Q.  I'm showing you what has been marked as Exhibit 146.  And

20   this is a cover e-mail directed by Paul Sheridan to Spencer

21   Thwaytes and Howard Diamond, and you, Jimmy Dempsey, and

22   Ms. O'Callaghan are copied.  Do you see that?

23   A.  Yes.

24   Q.  This is the notice of termination that came forward on

25   May 8 from AMCK to Frontier.  You see that?

1    A.   Yes.

2    Q.   Were you expecting this notice of termination of the

3    Framework Agreement?

4    A.   Given the relationship that we had with AMCK and the long

5    history we had with Ms. O'Callaghan and Mr. Sheridan, I was

6    shocked that we received this.  I was not expecting it.

7    Q.   Did you start, following receipt of this May 8, 2020,

8    termination notice, working on trying to find substitute

9    lessors to take delivery of these aircraft?

10   A.   That is correct.

11   Q.   How many did you approximately have to reach out to, to see

12   who might be able to assist?

13   A.   Approximately three to five lessors if I recall correctly.

14   Q.   Did you touch other lessors who weren't even willing to

15   respond?  In other words, did you reach out to other lessors

16   who were not even prepared to talk to you, essentially?

17   A.   Yes, we did.  I mean, I wanted to reach out to lessors

18   that, again, just as we had with AMCK, we had good

19   relationships, we depended on them to finance our aircraft.

20   And given the situation, we needed to find a lessor that was

21   going to step up and potentially, if we were not going to

22   take -- if AMCK were not going to take delivery of this

23   aircraft, we were going to look at a plan B and seek another

24   lessor.

25   Q.   As of this time AMCK had terminated the Framework

O493FRO4                              Fanning - Direct

1   Agreement?

2   A.   That is correct.

3   Q.   So, given that you normally in this process have up to --

4   have 12 to 16 months' time to find your financier, was this,

5   for lack of a better term, essentially a fire drill?

6   A.   Under the normal course of our sale leasebacks, this was

7   the first I had ever encountered that we had to do something

8   like this.   And in my way, you know, put a substantial discount

9   on in order to encourage lessors to take deliveries of the

10  aircraft so we would not be put into default by Airbus.   Airbus

11  were putting extreme pressure and potentially putting us into

12  default if we did not take delivery of that aircraft.

13  Q.   Do you recall as of May 5, the agreement with Airbus had

14  finally been reached?

15  A.   That is my understanding, based on what I saw and was told

16  that day.

17  Q.   But you still now had an obligation to take these aircraft

18  in July and again in the first quarter of 2021.   Is that right?

19  A.   That's what Mr. Dempsey had agreed with Mr. Jones, correct.

20  Q.   And did you secure the participation of what we've heard in

21  testimony, the two lessors known as CDB and JSA?

22  A.   That is correct.   With CDB I had 30 days to get -- so they

23  were, to be clear, a new lessor to Frontier.   We did not have

24  existing documentation in place.   Typically just for the

25  context of negotiations, on a new lease agreement it can take

O493FRO4                    Fanning - Cross

1    anywhere from three to six months, but I had 30 days to get an

2    agreement with CDB for the second aircraft that was delivering

3    in July.

4            MR. HOSENPUD:  Thank you, sir.  That's all I have at

5    this time.

6            THE WITNESS:  Okay.

7    CROSS-EXAMINATION

8    BY MR. ALEXANDER:

9    Q.  Good afternoon, Mr. Fanning.

10   A.  Good afternoon.

11   Q.  I'd like to first ask you some questions about a March 16,

12   2020, letter that Frontier sent to AMCK asking for a rent

13   deferral.  I believe you testified about that earlier.

14   A.  Yes.

15   Q.  Can we put up Joint Trial Exhibit 28.

16          Mr. Fanning, do you recognize this letter?

17   A.  I do.

18   Q.  You've received this letter in any event?

19   A.  Yes.

20   Q.  And in this letter you understood that Frontier was asking

21   AMCK for a three-month rent deferral?

22   A.  That is correct.

23   Q.  So if AMCK accepted this proposal, Frontier would not have

24   to pay rent for April, May, or June of 2020, is that right?

25   A.  Yes.

O493FRO4                          Fanning - Cross

1   Q.  And what repayment period were you proposing?

2   A.  So the repayment period would have been after the third

3   month, and typically, it would have been somewhere between six

4   months to a year, depending on the -- so my recollection that

5   it was fluid, but we were -- I believe for AMCK it was nine

6   months on the repayment period.

7   Q.  Were you expecting to pay interest on those deferred

8   amounts?

9   A.  Yes.

10  Q.  At what interest rate did you expect to pay?

11  A.  Typically, it's somewhere between 6 to 9 percent, but I

12  recall with AMCK it was 6 percent.

13  Q.  I'm sorry.  I didn't hear you.

14  A.  That's what they were asking.  They were asking for

15  6 percent for interest.

16  Q.  AMCK was asking for 6 percent interest?

17  A.  Yes.

18  Q.  Did Frontier have an interest rate it proposed?

19  A.  Obviously it was something that would have been negotiated,

20  depending on the lessor.  Every lessor that we negotiated a

21  deferment on was different, and that was AMCK's request.  At

22  that time, from what I remember, we didn't have an issue with

23  it.

24  Q.  I'd like to call your attention to the language at the

25  bottom of what you see on the screen under those points one and

O493FRO4                         Fanning - Cross

1    two.  The letter from Frontier states "The above concessions

2    would be documented in a mutually agreed deferral and

3    concession agreement."  Do you see that?

4    A.  Yes.

5    Q.  And what did you understand that to mean?

6    A.  That we would document -- once we came to an agreement from

7    the negotiations that were ongoing, based on the request made

8    by AMCK, that it would be documented once we came to an

9    agreement.

10   Q.  So it was your understanding that if there was an agreement

11   on the deferral requests by Frontier, that would be documented

12   in an agreement signed by both parties, is that correct?

13   A.  That is correct.

14   Q.  Did Frontier send similar rent concession letters to its

15   other lessors?

16   A.  Yes.  All lessors.

17   Q.  And how many lessors agreed to rent deferrals with

18   Frontier?

19   A.  So, I can't recall how many lessors we had at that specific

20   time, but it would have been more than 20.  Out of the 20-plus

21   lessors we had at that time, only two lessors had rejected the

22   deferral request.

23   Q.  And when you agreed on rent deferrals with other lessors,

24   that was documented in writing, correct?

25   A.  Yes, some took -- some of those deferral requests took

O493FRO4                          Fanning - Cross

1  longer.  Some were longer than others, but yes.

2  Q.  Mr. Fanning, do you recall that Frontier sent draft

3  deferral agreements to AMCK during the course of the parties'

4  discussions?

5  A.  That is correct, yes.

6  Q.  I'd like to show you Joint Trial Exhibit 47, which is a

7  March 25, 2020 e-mail from Qingqing Miao at Lane Powell, do you

8  see that?

9  A.  Yes.  That's "Qingqing."

10  Q.  Sorry.  Thank you.

11  A.  That's all right.

12  Q.  And you're among the recipients of this e-mail that's

13  directed to Jane O'Callaghan, is that right?

14  A.  Yes.

15         MR. ALEXANDER:  Your Honor, I'd like to move to admit

16  Joint Trial Exhibit 47.

17         MR. HOSENPUD:  No objection.

18         THE COURT:  No objection, received.

19         MR. ALEXANDER:  Thank you, your Honor.

20         (Joint Exhibit 47 received in evidence)

21  Q.  And Qingqing Miao was at Lane Powell which is Frontier's

22  counsel, is that correct?

23  A.  That is correct.

24  Q.  And Lane Powell was in closing the draft rent deferral and

25  waiver agreement for AMCK's review, right?

O493FRO4                          Fanning - Cross

1    A.  Yes.

2    Q.  Why don't we take a look at the attached document on the

3    next page.  And do you understand that this was Frontier's

4    proposal for documenting a rent deferral agreement?

5    A.  Yes.

6    Q.  And I'd like to direct you to paragraph 2 if we scroll down

7    the page here.  Do you see the paragraph that refers to

8    deferred lease payments?

9    A.  Yes.

10   Q.  And that goes on to the next page.  But do you understand

11   that Frontier was proposing in this draft agreement a

12   three-month rent deferral consistent with the March 16 letter,

13   is that right?

14   A.  Yes.

15   Q.  And what interest was Frontier proposing to pay?

16   A.  At this particular time we proposed 3 percent.

17   Q.  And what was the repayment period that Frontier was

18   proposing?

19   A.  Nine months.

20   Q.  And that would be nine months starting July of 2020?

21   A.  Correct.

22   Q.  And that was the same nine months proposed in Frontier's

23   March 16 letter, correct?

24   A.  Correct.

25   Q.  So, under this proposal, Frontier would pay no rent in

O493FRO4                          Fanning - Cross

1   April, May or June, and then would start paying back those

2   amounts in July of 2020, at 3 percent interest, is that right?

3   A.   That's what it states, yes.

4   Q.   And the payments would continue to be made until

5   March 2021, is that right?

6   A.   Yes.

7   Q.   Do you know if AMCK ever signed this agreement?

8   A.   No, they didn't sign.

9   Q.   I'd like to show you what's been marked as Joint Trial

10  Exhibit 53 which I believe you testified about earlier this

11  afternoon.  Do you recall seeing this document?

12  A.   Yes.

13  Q.   And this is an April 1st e-mail from Lane Powell to Jane

14  O'Callaghan and copying various persons at Frontier, including

15  you, is that right?

16  A.   Yes.

17  Q.   And so, Frontier's counsel in this e-mail was

18  circulating -- was referring to the fact that it had circulated

19  a draft lease payment waiver and deferral agreement form on

20  March 24, do you see that?

21  A.   Yes.

22  Q.   Do you understand that that was referring to the March 25

23  e-mail that we looked at a moment ago?

24  A.   That would be correct, yes.

25  Q.   Do you think that part of the explanation for that

O493FRO4                          Fanning – Cross

1    difference in dates might be the time difference between

2    Colorado and Ireland?

3    A.  Yes, I mean, there is a time difference between Colorado

4    and Ireland.

5    Q.  Well, sure.  I guess why don't we put up Joint Trial

6    Exhibit 47 just to get the timing right.  So you see this

7    e-mail was dated March 25 at 5:31 a.m.  Right?

8    A.  So this would have been West Coast time, so Lane Powell are

9    based on the West Coast.  Not Denver time.

10   Q.  Okay.  What time would this be in Ireland, then?

11   A.  It would have been six hours -- six hours ahead.

12   Q.  Let's go back to Joint Trial Exhibit 53.  And in this

13   e-mail Lane Powell is describing the fact that this agreement

14   is an omnibus form, but the substance of the omnibus agreement

15   is the same as the aircraft agreement circulated prior.  Is

16   that right?

17   A.  Yes.

18   Q.  Why don't we look at the next page of this document, of

19   Joint Trial Exhibit 53.  And then move on to the attachment so

20   we can see the draft agreement.

21       And did you understand that this was another draft

22   deferral and waiver agreement that Frontier was providing to

23   AMCK?

24   A.  That is correct, yes.

25   Q.  And did AMCK ever sign this agreement?

O493FRO4                          Fanning - Cross

1   A.  No.

2   Q.  Let's look at Joint Trial Exhibit 48.  And I believe you

3   testified about this document earlier, but this is a March 26

4   e-mail from Jane O'Callaghan to you and others at Frontier.  Do

5   you see that?

6   A.  Yes.

7   Q.  And so, this e-mail came about a day after Frontier's

8   counsel had proposed a first draft of the rent deferral

9   agreement, is that right?

10  A.  Looks about right, yeah.

11  Q.  And did you understand that this e-mail included AMCK's

12  proposal in response to Frontier's proposal on rent deferral?

13  A.  For that time, yes.

14  Q.  And did you understand that AMCK was prepared to offer

15  short term assistance to Frontier, but with certain conditions

16  attached, right?

17  A.  That is correct.

18  Q.  So AMCK wasn't just agreeing to Frontier's proposal then,

19  was it?

20  A.  No, they had their list of requirements, and that's what

21  they laid out in their letter.

22  Q.  And some of the conditions proposed in this letter relate

23  to concessions from Frontier under the Framework Agreement, is

24  that right?

25  A.  That would appear to be the case, yes.

O493FRO4                           Fanning - Cross

1   Q.  I believe you testified on direct that these conditions

2   that AMCK was requesting were not required by the Framework

3   Agreement, is that right?

4   A.  That's my understanding.

5   Q.  And just to confirm also, Frontier was not entitled to a

6   rent deferral under the lease agreements, was it?

7   A.  No, no.

8   Q.  Do you recall that one of AMCK's conditions related to a

9   holdback of rent on aircraft under the Framework Agreement?

10  A.  That is correct.

11  Q.  And do you recall that AMCK was proposing a delivery delay

12  in aircraft of three to six months at this time under the

13  Framework Agreement?

14  A.  That's what they requested, yes.

15  Q.  And AMCK on those sorts of conditions described in this

16  e-mail was willing to grant a three-month rent deferral with

17  repayment over four months, and at 8 percent interest.  Is that

18  right?

19  A.  Yes.

20          MR. ALEXANDER:  Your Honor, I'm at a place before I

21  move on to another exhibit.  If the Court would like for me to

22  continue, I'm happy to do so.  But it might be a natural

23  stopping point.

24          THE COURT:  We can stop now.  We'll start tomorrow

25  morning -- we'll do our regular day tomorrow, Wednesday.  But I

O493FRO4                              Fanning – Cross

1    am advised to advise you that I have a doctor's appointment

2    Thursday afternoon, so I think the effect of that is we would

3    stop for the week Thursday midday, assuming we take Friday off

4    in the usual way.  But that's two days ahead and a long time in

5    a trial.

6              Anyway, see you tomorrow morning at 11.

7              MR. ALEXANDER:  Thank you, your Honor.

8              (Adjourned until April 10, 2024, at 11 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                        Page

 3     SPENCER THWAYTES

 4    Cross By Mr. Alexander . . . . . . . . . . . 139

 5    Redirect By Mr. Schaer . . . . . . . . . . . 160

 6    SHARATH SASHIKUMAR

 7    Direct By Mr. Schaer . . . . . . . . . . . . 165

 8    Cross By Ms. Crosby . . . . . . . . . . . . 223

 9    ROBERT FANNING

10    Direct By Mr. Hosenpud . . . . . . . . . . . 235

11    Cross By Mr. Alexander . . . . . . . . . . . 276

12                     JOINT EXHIBITS

13    Exhibit No.                          Received

14     63                                  139

15     79                                  149

16     60, 66, 67, 89, 138, 146, . . . . . . . . . 173

17              152, 158, 160, 162, 164, 166,

18              167, 168, 169

19     192  . . . . . . . . . . . . . . . . . . . 184

20     9                                   224

21     24, 17, 48, 60, 69, 72, 73, 79, 89, 120, 146 and 149    236

22     47  . . . . . . . . . . . . . . . . . . . . 279

23                   PLAINTIFF EXHIBITS

24    Exhibit No.                          Received

25     8  . . . . . . . . . . . . . . . . . . . . 183
```

7      . . . . . . . . . . . . . . . . . . 200

10       . . . . . . . . . . . . . . . . . 208