04A3FRO1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    FRONTIER AIRLINES, INC.,

4                    Plaintiff,

5           v.                              20 Civ. 9713 (LLS)

6    AMCK AVIATION HOLDINGS IRELAND
     LIMITED, ACCIPITER INVESTMENT
7    4 LIMITED, VERMILLION AVIATION
     (TWO) LIMITED,
8
                    Defendants.
9
     ------------------------------x
10                                          Bench Trial

11                                          New York, N.Y.
                                            April 10, 2024
12                                          11:00 a.m.

13   Before:

14                    HON. LOUIS L. STANTON,

15                                          District Judge

16                        APPEARANCES

17   LANE POWELL PC
          Attorneys for Plaintiff
18   BY:  DAVID G. HOSENPUD
          AARON SCHAER
19
     CLIFFORD CHANCE US LLP
20        Attorneys for Defendants
     BY:  JEFF E. BUTLER
21        JOHN P. ALEXANDER
          RISHIKA JIKARIA
22        GINA CROSBY

23

24

25

04A3FRO1                         Fanning – Cross

1          (Trial resumed; in open court)

2          THE COURT:  Good morning.  Please sit down.

3          We'll work Friday morning and finish at midday.  Then

4     I'll do some conferences in the afternoon.  And I think that's

5     a good compromise.  You get some extra time out of it.

6          MR. ALEXANDER:  Thank you, your Honor.

7      ROBERT FANNING,

8          having been previously sworn, testified as follows:

9     CROSS-EXAMINATION

10    BY MR. ALEXANDER:

11    Q.  Good morning, Mr. Fanning.

12    A.  Good morning.

13    Q.  You testified yesterday about a 10-day grace period that

14    AMCK agreed to on April 6, 2020.  Do you recall that?

15    A.  I do.

16    Q.  And that was from an e-mail from Paul Sheridan; is that

17    right?

18    A.  That is correct.

19    Q.  I'd like to show you Joint Trial Exhibit 69.  And this

20    is -- do you understand that this is a text message

21    conversation on April 6, 2020, involving you, Mr. Thwaytes, and

22    Mr. Dempsey?

23    A.  Yes.

24          MR. ALEXANDER:  Your Honor, I'd move to admit Joint

25    Trial Exhibit 69.

04A3FRO1                          Fanning - Cross

1              MR. HOSENPUD:  No objection.

2              THE COURT:  Received.

3              (Joint Exhibit 69 received in evidence)

4    Q.  So calling your attention to page 3 of the document which

5    is up on the screen.  And if you look at the last message, you

6    can see there it's from you on April 6, 2020, at 1:38 p.m.  Do

7    you see that?

8    A.  I do.

9    Q.  And you state, "Paul Sheridan will sending your an e-mail

10   deferring all rent payments for 10 business days to give us

11   room to work out a solution."

12             Do you see that?

13   A.  I do.

14   Q.  Were you reporting on a phone call that you had had with

15   Mr. Sheridan that day?

16   A.  That is correct, yes.

17   Q.  And what did Mr. Sheridan say on that phone call?

18   A.  To the best of my knowledge, it was regarding -- my

19   recollection was that Jimmy was still talking to Airbus.  The

20   discussions were still going based on the request from AMCK.

21   And we were updating Paul as to where that status was and what

22   progress Mr. Dempsey had made with Airbus, and the request was

23   made that we need more time in order to work out the

24   negotiations with Airbus to push the aircrafts further beyond

25   the current delivery dates.  And going -- not remembering the

04A3FRO1                         Fanning – Cross

1    exact conversation that Mr. Sheridan -- the way that it was

2    stated, but ultimately, it was agreed at that point in time,

3    based on the situation, that we knew that Mr. Sheridan had

4    agreed to a deferral of 10 days.

5    Q.   Did Mr. Sheridan say on that call that he would be sending

6    an e-mail to confirm?

7    A.   I know he did, but to the best of my knowledge, I do not

8    recall.

9    Q.   In your text message to your colleagues at Frontier, you

10   told them that Mr. Sheridan would be sending an e-mail.  Is it

11   fair to assume that you understood that because that's what

12   Mr. Sheridan said?

13   A.   That is correct.

14   Q.   I'd like to show you Joint Trial Exhibit 60, which is a

15   copy of Mr. Sheridan's April 6, 2020, e-mail.

16            And I believe you testified about this document

17   yesterday.  Do you recall that?

18   A.   Yes.

19   Q.   And at the top of the e-mail is an e-mail from you to

20   Mr. Sashikumar Bindu on April 6 at 6:11 p.m.  Do you see that?

21   A.   Yes.

22   Q.   It looks like you're forwarding a copy of Mr. Sheridan's

23   April 6 e-mail from earlier that day.  Right?

24   A.   Yeah.

25   Q.   And this was the e-mail where Mr. Sheridan confirmed that

04A3FRO1                          Fanning - Cross

1   AMCK would provide a 10-business-day deferral, correct?

2   A.   Correct.

3   Q.   In the above e-mail, you're forwarding this message to

4   Mr. Sashikumar, correct?

5   A.   That is correct.

6   Q.   Why were you sending that to Mr. Sashikumar?

7   A.   We weren't in the office at this time.  And I wanted to

8   keep Sharath, I wanted to keep Sharath apprised of what was

9   going on at the time, and he had the e-mail that we had the

10  10-day stay at that time with AMCK.

11  Q.   Why did you want to keep Mr. Sashikumar apprised of these

12  things?

13  A.   He works for me, and we were -- it was just part of the

14  process that we shared e-mails that we weren't copied on.

15  Q.   Was Mr. Sashikumar responsible for making payment to

16  lessors?

17  A.   So, Sharath would have been responsible for sending the

18  approval e-mails to me, for me and Mr. Thwaytes to approve.

19  Q.   And you thought it was worth informing him about this

20  10-day deferral, correct?

21  A.   Well, yeah, we worked together.  He needs to know what's

22  going on.  We have many deferral requests at that time, so he's

23  kept informed of what's going on.

24  Q.   And he's kept informed because his role is getting approval

25  for making payments to lessors, right?

04A3FRO1                          Fanning - Cross

1    A.  Yeah, but that's not the reason it was sent to him.

2    Q.  So then why did you send it to him?

3    A.  As I stated, so we had many deferral requests ongoing

4    during this time.  He needed to be kept in the loop as to what

5    the agreement was with AMCK.

6    Q.  Let's look at Joint Trial Exhibit 67.  This is an April 6,

7    2020, message from you to it looks like Mr. Sashikumar, and I

8    believe you testified about this document yesterday.  Do you

9    recall that?

10   A.  Yes.

11   Q.  And you tell Mr. Sashikumar, "All Accipiter rent payments

12   are deferred for the next 10 business days."  Is that right?

13   A.  That's right.

14   Q.  Why were you sending this message to Mr. Sashikumar?

15   A.  To the context of why this e-mail was sent, I do not

16   recall.  But it was, again, for the same reasons I sent the

17   previous e-mail and forwarding to him.  He may have been just

18   notifying our accounting and treasury department to stop the

19   payments for the next 10 business days with AMCK, if any were

20   due during that time.

21   Q.  You thought he should know the status of the deferral

22   discussions with AMCK?

23   A.  That would be correct.

24   Q.  Mr. Fanning, I'd like to step back and ask some more

25   general questions about Frontier's rent deferral request.

04A3FRO1                          Fanning - Cross

1                You testified yesterday that on March 16, 2020,

2      Frontier sent a concession letter to AMCK that spelled out the

3      terms of the rent deferral that Frontier was requesting.

4      Right?

5      A.   Correct.

6      Q.   And that letter included a proposed deferral of three

7      months' rent.  Do you recall that?

8      A.   Yes.

9      Q.   And so, that would have meant Frontier did not have to pay

10     rent for April, May, or June 2020, right?

11     A.   That is correct.

12     Q.   You testified that Frontier also reached deferral

13     agreements with other of its lessors, right?

14     A.   Yes.

15     Q.   Generally speaking, what was the length of the deferral

16     periods for those deferrals?

17     A.   So typically, so, in the mainstream of the deferrals they

18     were done fairly quickly, within two to three weeks.  There

19     were some that went out and extended beyond about two months,

20     and then there were one or two that extended beyond I

21     believe -- it was six months before they were signed.

22     Q.   Understood.

23               You testified yesterday about a month-to-month

24     deferral agreement between AMCK and Frontier.  Do you recall

25     that?

04A3FRO1                          Fanning - Cross

```
 1   A.  I do.
 2   Q.  You testified that that was something that was agreed to
 3   between Mr. Dempsey and Mr. Sheridan on an April 7 phone call,
 4   right?
 5   A.  Yes.
 6   Q.  And you were not on that phone call, were you?
 7   A.  I was not.
 8   Q.  So is it fair to say that everything you know about that
 9   agreement came from Mr. Dempsey?
10   A.  Yes.
11   Q.  I'd like to put up Joint Trial Exhibit 73.  And
12   Mr. Fanning, this is a document that you looked at yesterday.
13   It is an April 7 text message.  And what we have up on the
14   screen here is the message from Mr. Dempsey on April 7.  Do you
15   see that?
16   A.  Yes.
17   Q.  And Mr. Dempsey said, "Just spoke to Paul Sheridan.  He has
18   agreed to do the deferral on a month-to-month basis." Right?
19   A.  Yes.
20   Q.  Okay.  Now do you understand that this was a text message
21   exchange between you and Mr. Dempsey, right?
22   A.  That is correct.
23   Q.  I don't believe you were asked about it yesterday, but I'd
24   like to show you your side of this conversation which is on the
25   next page of this document.
```

04A3FRO1                    Fanning – Cross

1          Now, do you see here, Mr. Fanning, that at the top of

2    the page you have a message to Mr. Dempsey and Mr. Thwaytes on

3    April 7, 2020?  Do you see that?

4    A.  I do.

5    Q.  Now, what we're going to do is put up on the screen the

6    first page of that exhibit and the second so you can see what

7    Mr. Dempsey was saying and what you were saying.

8          Just zooming that out so it's visible.

9          On the top-left-hand side of the exhibit, you can see

10   Mr. Sheridan's text at 10:33 a.m., right?

11   A.  That is correct.

12   Q.  And you testified about your understanding of what

13   Mr. Dempsey meant yesterday.  Correct?

14   A.  That's correct.

15   Q.  We'll come back to that.  But right now I'd like to ask you

16   about your response which is on the right side of the screen.

17   Do you see you responded at 10:59 a.m.?

18   A.  I do.

19   Q.  And you said, "Okay, good.  Anything mentioned on the

20   repayment period?  And are they going to send our revised

21   agreement over?"

22          Do you see that?

23   A.  That is correct.

24   Q.  So, let's just break that down a bit.  In the first

25   sentence of your message, you said, "Okay good, anything

04A3FRO1                          Fanning – Cross

1   mentioned on the repayment period?"

2             What did you mean by that?

3   A.  Well, as we had initially stated in our deferment

4   agreement, we were looking for three months.  I wanted to

5   confirm that that was in line with the deferment agreement that

6   we had sent over, that Mr. Thwaytes had sent over to AMCK.

7   Since the conversations between Jane and Paul had shifted, I

8   wanted to be on whether it was discussed with Mr. Sheridan, if

9   Jimmy and Mr. Sheridan had discussed it.

10  Q.  And the subject you were asking about was when the rent

11  would have to be repaid, right?

12  A.  Well, I look at it differently.  We requested three months.

13  That was part of the negotiations at that time.  That's not the

14  way that I would have interpreted the way that I asked that

15  question.

16  Q.  So how do you interpret the way you asked that question?

17  A.  I would have interpreted it, like I said, I just needed to

18  understand if this was something that Mr. Dempsey and

19  Mr. Sheridan had discussed.  There was a lot of discussions

20  going on at that time.  I just wanted to be clear that I knew

21  exactly what they discussed.  That's why I asked the question.

22  Q.  You used the word "repayment period."  Didn't that refer to

23  the time period when the rent would be repaid?

24  A.  That is correct.

25  Q.  In the next sentence of your message, you say, "And are

04A3FRO1                              Fanning – Cross

1    they going to send our revised agreement over?"

2              What did you mean by that?

3    A.  Well, you know, so, so they had our agreement, I wanted to

4    understand, based on the conversation Mr. Dempsey and

5    Mr. Sheridan had, if the agreement that they had made was going

6    to be sent over to us to review.

7    Q.  When you said "they had our agreement," who are you

8    referring to?

9    A.  Sorry.  AMCK.

10   Q.  And AMCK had your agreement.  What was your agreement?

11   A.  Well, it was the original request that was made on

12   March 16.

13   Q.  Do you recall testifying yesterday that Frontier's lawyers

14   had sent a couple draft agreements to AMCK?

15   A.  Yeah, that is correct.

16   Q.  So when you said AMCK had our draft agreement, is that what

17   you were referring to?

18   A.  Yes.

19   Q.  Now, let's go back to the left side of the screen, and see

20   how Mr. Dempsey responded to you.

21             At 11:03 a.m., Mr. Dempsey said, "No, but we should

22   stick to nine months from July 1st.  Let's get a draft to him."

23             Do you see that?

24   A.  Yes.

25   Q.  So, in the first sentence of Mr. Dempsey's response, did

1  you understand him to be saying that no, nothing had been

2  mentioned about the repayment period?

3  A.  Based on Mr. Dempsey's text, this was just part of, again,

4  of what he requested that we go back to them with.  Given that

5  it wasn't unusual for us -- it wasn't unusual for us to ask for

6  a longer period.  Mr. Dempsey was aware of these deferment

7  requests that had gone out.  But he wasn't in the detail as to

8  how many months, and that was his opinion that we should go out

9  and request nine months.

10  Q.  Well, I asked you a different question, which is in

11  response to your question to Mr. Dempsey, "Anything mentioned

12  on the repayment period?"  He answered, "No, but we should

13  stick to nine months from July 1st."

14       Did you understand Mr. Dempsey to be saying no,

15  nothing had been mentioned on the repayment period?

16  A.  That is correct.

17  Q.  Mr. Dempsey refers to nine months from July 1 period there.

18  Was that the repayment period Frontier had requested in its

19  rent deferral request to AMCK?

20  A.  No.

21  Q.  What was the repayment period that Frontier requested from

22  AMCK in its rent deferral request?

23  A.  Frontier originally requested three months.

24  Q.  Well, Mr. Fanning, maybe we're having a difference in

25  terminology.

04A3FRO1                          Fanning - Cross

1          In the original March 16 letter, was Frontier

2    requesting to defer the rent owed for the three months of

3    April, May, and June?

4    A.  That is correct.

5    Q.  And Frontier was proposing to repay those deferred amounts

6    over nine months, starting in July 2020, right?

7    A.  Right.

8    Q.  So, the nine months from July 1 was the repayment period

9    referenced in Frontier's request for a rent deferral, correct?

10   A.  Correct.

11   Q.  Mr. Dempsey said we should stick to nine months from

12   July 1st, right?

13   A.  That's what he says.  That's what Mr. Dempsey said.

14   Q.  Did you understand him to mean that was the repayment

15   period he wanted?

16   A.  Well, the -- well, the reason why Mr. Dempsey asked for

17   nine months was because he was discussing with Airbus, and he

18   needed time in order to, based on the requests made by AMCK, he

19   needed time in order to negotiate the request that was made by

20   AMCK to defer the aircraft.

21          So, Jimmy thought that -- due to the -- due to the

22   ongoing discussions with Airbus, he may need more time in order

23   to -- he -- we may need more time in order to extend the

24   deferment payments out from three to nine months.

25   Q.  So, if I understand you correctly, the reason that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

04A3FRO1                          Fanning – Cross

1   Mr. Dempsey wanted to stick to that position was because of the

2   time it would take to negotiate with Airbus?

3   A.   It was ongoing.  We didn't know -- right.  So at this point

4   Mobile, Alabama, the Airbus facility had closed down.

5   Mr. Dempsey had gotten notification.  There was an indefinite

6   period of -- nobody knew exactly when it would open up.  And I,

7   just knowing Mr. Dempsey, I assumed he wanted, needed more time

8   in order to make those payments, which is why he mentioned in

9   his text to stick to nine months.  He was having conversations

10  with Airbus that I wasn't aware of.

11  Q.   But whatever the reason for Mr. Dempsey's view, Mr. Dempsey

12  was saying that was the repayment period he wanted you to stick

13  to, right?

14  A.   Yes.

15  Q.   In the second sentence of Mr. Dempsey's message, he says

16  "let's get a draft to him."  Do you see that?

17  A.   I do.

18  Q.   What did you understand that to mean?

19  A.   Based on the request that Mr. Dempsey had made to stick to

20  nine months, he wanted Frontier -- us -- to get a draft to

21  AMCK.

22  Q.   To get a draft agreement to AMCK?

23  A.   Yes, yes.

24  Q.   And let's look over at the right-hand side of the screen

25  again to see how you responded to Mr. Dempsey.

1          At 11:04 a.m. you said, "They have our draft.  I'll

2     follow up with Jane."  Do you see that?

3     A.  I do.

4     Q.  What did you mean by that?

5     A.  Well, at that time, I was aware they had our draft, and I

6     was going to follow up with Jane.  The mention was I discussed

7     with Jimmy and see if it was something we could -- if we could

8     agree and let her know what our intentions were, based on the

9     conversation I had with Mr. Dempsey.

10    Q.  When you said "they have our draft," were you referring to

11    one of the draft agreements that Frontier had sent to AMCK?

12    A.  That is correct.

13    Q.  Do you remember speaking to Ms. O'Callaghan about this

14    month-to-month agreement?

15    A.  Well, I had many conversations with Jane.  I don't

16    specifically remember having that conversation.

17    Q.  So, Mr. Dempsey responded to you, on the left-hand side of

18    the screen at 11:04 a.m., "He was going to call Jane after we

19    spoke."  Do you see that?

20    A.  Yes.

21    Q.  Did you understand that to mean that Mr. Sheridan was going

22    to call Ms. O'Callaghan?

23    A.  That is correct.

24    Q.  Let's take a step back for a second.

25          In this exchange between Mr. Dempsey and you, you were

1    asking questions about Mr. Dempsey's discussion with Paul

2    Sheridan, right?

3    A.  Yes.

4    Q.  And so, as you testified earlier, your information about

5    that month-to-month agreement came from Mr. Dempsey, right?

6    A.  That is correct.

7    Q.  Apart from this text message exchange, do you remember

8    hearing from Mr. Dempsey anything about this supposed

9    month-to-month agreement?

10   A.  So, I would have recalled in conversation, but

11   specifically, I don't remember.

12   Q.  I'm not sure I understood the first part of your answer.

13   A.  I would have had many conversations and phone calls, not

14   just with AMCK, but other lessors on what was going on.  To my

15   recollection, as best as I can remember, we may have discussed

16   it.  But beyond the context of the text and the conversations,

17   we would have discussed it just simply because this was

18   important for us to get AMCK committed to a month-to-month.

19   Q.  Well, we have the text exchange here.  You mentioned

20   conversations with other lessors.  But, those weren't informing

21   you about the month-to-month agreement that Mr. Dempsey was

22   talking about, right?

23   A.  Right.  But other lessors weren't asking us for -- weren't

24   asking for the type of request that AMCK were making.  Most

25   lessors -- under the relationship that we had with them, gave

1    us the relief that we requested.  They didn't ask for any

2    additional asks.  AMCK made additional asks, which is why Jimmy

3    had to speak to Airbus in order to accommodate their request.

4    We needed time, which is why Mr. Dempsey had asked for a

5    month-to-month.

6    Q.  I'm asking you about what Mr. Dempsey told you, if

7    anything, about this month-to-month agreement on the April 7

8    phone call with Paul Sheridan.

9    A.  As I stated, I had many conversations with Mr. Dempsey.  Do

10   I recall a conversation about a month-to-month on the phone?  I

11   do not.

12   Q.  So, just to understand, it's your testimony that you had

13   many conversations with Mr. Dempsey, but you can't remember any

14   conversation about this agreement.  Is that right?

15   A.  No, the conversations -- so, on record knowing the

16   conversations I had with Mr. Dempsey, I would have been aware

17   we would have had a conversation.  But today, 4 years later, I

18   do not recall a conversation.

19   Q.  And just to clarify the term, you said you would have

20   spoken to Mr. Dempsey about it.  But you don't actually recall

21   any discussion with Mr. Dempsey about it?

22   A.  That is correct.

23   Q.  How do you understand that this month-to-month agreement

24   would work in practice?

25   A.  So, the reason why Mr. Dempsey asked for a month-to-month

1    was because Airbus had notified Mr. Dempsey that the factory

2    was going to shut down.  They had -- they didn't have a date,

3    so it was indefinite of when they were going to open.  They

4    weren't aware of when they were going to reopen in order to be

5    able to deliver the aircraft.

6           So Mr. Dempsey, you know, asked Mr. Sheridan for a

7    month-to-month, given we know Airbus, it was reasonable to

8    assume within a relatively, you know, short period of time,

9    anywhere from one to four months, they were going to reopen.

10    And my assumption is that's the reason why he asked, was we

11    needed time in order to talk to Airbus.

12           Airbus were talking to many airlines.  We were just

13    one airline making the request to push the aircraft out as far

14    as we could, given the requests from AMCK.  So in order to do

15    that, we needed time.

16    Q.  I understand why Frontier wanted time.  But, my question

17    is, how did this month-to-month agreement work in practice?

18    What were the terms of that agreement?

19    A.  The terms of the agreement, the way I understood it, that

20    for every month, so, starting in April, May, June, we would

21    have a deferral on a month-to-month basis.

22    Q.  And you said starting in April, May, and June there would

23    be a deferral on a month-to-month basis.

24           What does that mean?

25    A.  We would not pay rent during that time.  There would be a

04A3FRO1                          Fanning - Cross

1   deferment on our obligation for the rent that was owed to AMCK.

2   It would be deferred for starting in April, May, and June.

3   Q.  And was it a three-month deferral period then?

4   A.  That is correct.

5   Q.  And what was the month-to-month part of it?

6   A.  I don't understand your question.  Can you elaborate?

7   Q.  Well, in this text message exchange, there is a discussion

8   about a month-to-month agreement.

9          What you just testified about was it sounded like a

10  three-month rent deferral.  Right?

11  A.  On a month-to-month basis.

12  Q.  What do you mean by on a month-to-month basis?

13  A.  So for every 30 days, we would not pay rent for up to three

14  months.

15  Q.  So, for three months, Frontier didn't not have to pay any

16  rent, is that right?

17  A.  No.  It would be an ongoing discussion on a month-to-month

18  basis.  So meaning that we're in communication with AMCK, the

19  agreement that Mr. Dempsey agreed with Paul Sheridan is that we

20  would be on a -- so for April, May, and June, on a

21  month-to-month, obviously Mr. Sheridan wanted to be kept

22  updated and Ms. O'Callaghan on our progress with Airbus based

23  on the AMCK request.  So it would be on a month-to-month basis.

24  So for every 30 days, for up to three months, Frontier would

25  not pay, make any payments for the 14 aircraft.

04A3FRO1                        Fanning - Cross

1    Q.  Was it something that would be reevaluated each month?

2    A.  It's possible.  But, again, with the request that AMCK had

3    made, we needed up to three months in order to -- we needed up

4    to three months in order to get Airbus to where the requests

5    made by AMCK, and see exactly what we could do in terms of

6    pushing the aircraft to the right to get what AMCK had

7    originally requested, which was three to six months on

8    deliveries.  So meaning that they wanted to delay the

9    deliveries by three to six months.

10   Q.  And the month-to-month deferral agreement you're testifying

11   about, would allow Frontier not to the pay any rent for three

12   months, period, or there would be a discussion each month about

13   whether rent would be owed that month?

14   A.  So, we didn't get into the context of how the mechanism

15   worked, but it was understood that we would not make any

16   payments for three months.

17   Q.  You said we didn't get into the context of that.  Who's

18   "we"?

19   A.  That would have been obviously, I mean, obviously myself

20   and Jane and Mr. Dempsey speaking to Paul Sheridan, may have --

21   so, normally when something like this is discussed high level,

22   we get into the details as to what that -- it's negotiated in

23   the draft agreements.  We didn't get into the context as to

24   what the month-to-month meant.

25   Q.  And you talked about getting into the context with

1    Mr. Dempsey or Ms. O'Callaghan.  And you testified earlier you

2    don't remember speaking about a month-to-month agreement with

3    Ms. O'Callaghan.  Right?

4    A.  That is correct.

5    Q.  And you don't remember any conversation with Mr. Dempsey

6    about a month-to-month agreement, correct?

7    A.  Other than his text, but as I mentioned, I would have had

8    many conversations with Mr. Dempsey.  But to be specific on

9    your question, I don't remember.

10   Q.  So, you testified a little bit about your understanding of

11   how long Frontier didn't have to pay rent.

12           What was your understanding of when the deferred rent

13   would have to be repaid?

14   A.  So, the understanding is, is that we needed time to speak

15   to -- we needed time to speak to Airbus in order to get a

16   position to where, based on AMCK's request, that we could delay

17   the aircraft as much as possible.  These -- I guess the

18   thinking was that we would pay -- we would -- we would pay once

19   we knew the second delivery date, based on AMCK's request on

20   that we make full payment for the 14 aircraft before the second

21   delivery.

22   Q.  And how did you come to that understanding?

23   A.  It's noted in multiple e-mails and texts that it was a

24   condition that AMCK had made.

25   Q.  But that wasn't anything that you heard about the

04A3FRO1                              Fanning - Cross

1   month-to-month agreement, was it?

2   A.  Say that again?

3   Q.  Well, your understanding of when rent should be repaid as

4   part of an overall agreement was not something you heard

5   discussed in connection with a month-to-month agreement on

6   April 7, correct?

7   A.  I wasn't on the phone call.  So, that was between

8   Mr. Dempsey and Mr. Sheridan.

9   Q.  Do you know what interest rate would be applied to the

10  deferred rent covered by this month-to-month agreement?

11  A.  Not to my knowledge, no.

12  Q.  Do you know if interest rate was discussed between

13  Mr. Sheridan and Mr. Dempsey?

14  A.  I do not.

15  Q.  Did you expect that Frontier would have to pay interest on

16  any deferred rent amounts?

17  A.  It wasn't discussed.

18  Q.  But did you have an expectation, Mr. Fanning, that if any

19  rent amounts Frontier owed were deferred, they would be repaid

20  with interest?

21  A.  Under normal circumstances, yes, that would be the case.

22  But it wasn't discussed as to what that interest rate would be.

23  Q.  So is it fair to say there was no agreement on the interest

24  rate to be charged?

25  A.  I wasn't part of the conversation between Mr. Dempsey and

1    Mr. Sheridan, so I can't answer that.

2    Q.  Now, you testified a moment ago about your understanding

3    that the month-to-month agreement covered a three-month

4    deferral period.  Is that right?

5    A.  That is correct.

6    Q.  And I believe you testified yesterday that you came to

7    learn that that was not actually what the month-to-month

8    agreement was.  Was that your testimony?

9    A.  Correct.

10   Q.  And so today you have a different understanding of what the

11   month-to-month agreement was?

12   A.  My understanding of the month-to-month was for up to three

13   months on a month-to-month basis.

14   Q.  I believe you were asked yesterday:  Did you come to learn

15   at any point in time that the month-to-month was to in some way

16   be tied to the delivery of aircraft; in other words, that rent

17   payments would resume before the delivery of aircraft?  And you

18   answered:  Yes, that is correct.

19   A.  That's correct.

20   Q.  At what point in time did you learn that that was the

21   month-to-month agreement?

22   A.  It would have -- I would have learned based on the text

23   that Mr. Dempsey had sent on April 7.

24   Q.  Well, you testified earlier that your understanding of

25   Mr. Dempsey's text was that it was a three-month deferral

04A3FRO1                        Fanning - Cross

period.  Right?

A.  On a month-to-month basis.

Q.  But you came to learn something different about what that meant, is that right?

A.  Look.  My understanding was that the deferral was up to three months on a month-to-month basis.  There was a reason for that.  And that, like I said, had to do with the -- the Airbus plant in Mobile, Alabama, shutting down, and we needed time to work out with Airbus, based on the request that AMCK had made.  So we needed three months total, on a month-to-month basis.

          THE COURT:  Was it your understanding at that time that the month-to-month basis meant at the beginning of each month there would be a re-agreement that it would continue to be deferred?

          THE WITNESS:  Yes, so, your Honor, so the 14 aircraft, they have specific due dates, they have specific due dates every month.  So, it's not necessarily where you would have maybe one aircraft or the third aircraft paid on the first of every month.  One aircraft may be paid on the 1st of let's say April, and the third aircraft may be paid on the 10th.  So it would be recurring --

          THE COURT:  It might be different for each aircraft.  But it had to be renewed at the beginning -- the understanding was it had to be renewed at the beginning of each of the three months.

1          THE WITNESS:  Your Honor, my interpretation was

2     that -- my interpretation was that we had a three-month

3     deferral but it was on a month-to-month basis.  Just simply

4     because Mr. Dempsey was asking Airbus, based on the request

5     made by AMCK, to push the aircraft, basically defer the

6     deliveries for up to, you know, three to six months.

7          THE COURT:  I'm trying to find out what month-to-month

8     meant in practical terms.

9          It's different from three months.  It's a

10    month-to-month basis.  And I take it that the difference is it

11    has to be renewed every month.  Or does it simply mean they

12    have a right to call it off every month?

13         THE WITNESS:  Mr. Sheridan --

14         THE COURT:  What was your understanding at the time?

15         THE WITNESS:  My --

16         THE COURT:  That month-to-month meant.

17         THE WITNESS:  To be specific, my understanding was for

18    every aircraft that was due on a specific date, the due date,

19    the payment date would be, for a period of three months, on a

20    month-to-month basis.

21         THE COURT:  What does month-to-month basis mean?

22         THE WITNESS:  Right.

23         THE COURT:  What happened at the end of every month?

24    Anything or nothing?

25         THE WITNESS:  It would have depended -- it would have

04A3FRO1                         Fanning – Cross

1  depended on when Airbus -- it would have depended on when

2  Airbus opened the facility.

3          THE COURT:  I see.  I see.  It meant that it could be

4  changed if necessary because of something Airbus did.

5          THE WITNESS:  Right.  Because it was an unknown of

6  when the facility was going to open.  They had initially put a

7  stop in production and building and delivering aircraft until

8  the end of April.  But it was unknown as to when exactly the

9  factory would open, which is why Mr. Dempsey had asked for a

10  three-month deferral.

11          The other assumption was that the second aircraft was

12  going to deliver in May.  Normally we get a delivery notice

13  from Airbus, but we had not got a delivery notice or some type

14  of notice from Airbus, because, your Honor, they didn't even

15  know when the factory was going to open.  So we needed time.

16          THE COURT:  So what it really meant was you might have

17  to adapt it before the end of the three months.

18          THE WITNESS:  Yes.

19          THE COURT:  Because of a development with Airbus.

20          THE WITNESS:  Correct.

21          THE COURT:  I see.  It's an agreement subject to a

22  condition subsequent.

23          THE WITNESS:  Correct.

24          THE COURT:  Okay.  Thank you.  Excuse me.

25          MR. ALEXANDER:  Thank you, your Honor.

1    BY MR. ALEXANDER:

2    Q.  Just to confirm, Mr. Fanning, your understanding that

3    you've been testifying about was not first-hand knowledge.  You

4    were just basing that on what you received from Mr. Dempsey in

5    this text message on screen, correct?

6    A.  That is correct.

7    Q.  You testified a moment ago, Mr. Fanning, about the Airbus

8    facility in Mobile, Alabama, closing.  Right?

9    A.  Yes.

10   Q.  When did it reopen?

11   A.  So, I don't know the specific date as to when it reopened.

12   But, I'm aware it was closed all the way until the end of

13   April, I believe.  April 29.

14   Q.  So the month-to-month agreement was tied to that reopening?

15   A.  No.  We didn't know when the -- when the agreement between

16   Mr. Dempsey and Mr. Sheridan was made, Mr. Dempsey had no

17   knowledge of when exactly the factory would reopen.  I mean, we

18   just did not know.  As to when it opened, I don't have a date

19   as to specifically what date it reopened.

20   Q.  But, that reopening was part of the agreement on April 7?

21   A.  No.  It was linked to the delivery of the second aircraft.

22   So, AMCK wanted the 14 payments made before the delivery date

23   of the second aircraft.  That was unknown at that time as to

24   when that would to occur.  At that point, again, AMCK were

25   asking for the aircraft to be pushed out beyond May, which is

1    what Mr. Dempsey was attempting to do at that time.  So my

2    assumption, or based on the conversation I had with

3    Mr. Dempsey, that we would repay the 14 aircraft, each rent for

4    14 aircraft would be paid on the next delivery, whenever that

5    was going to occur.

6    Q.  And when you referred to your conversation with

7    Mr. Dempsey, you're talking about this text exchange on screen,

8    right?

9    A.  Well, I mean, again, we would have had conversations within

10   during this time.  So, no.

11   Q.  Well, you testified earlier that you did not remember any

12   conversations with Mr. Dempsey?

13   A.  Specific to the context of the month-to-month.  But I had

14   many conversations with Mr. Dempsey.  He was talking to Airbus.

15   I needed to feed that information to Ms. O'Callaghan and from

16   time to time to Mr. Sheridan.  So I needed to be kept up to

17   date as to what Mr. Dempsey was discussing with Airbus.  This

18   was important to us.

19   Q.  Because that was motivating your request for a deferral,

20   right?

21   A.  No.  We had -- we had no choice to -- I mean, the airline

22   wasn't making money at the time.  It was a very fluid situation

23   as to what was going on with COVID.  It was just unknown when

24   that delivery was going to happen.

25            But, I am aware that, and Jane made it very clear

04A3FRO1                          Fanning - Cross

1    throughout the course of April, that they would not take

2    delivery of the second aircraft until we caught up on all 14

3    rent payments.

4    Q.  So I understand your testimony as to why Mr. Dempsey was

5    seeking a month-to-month deferral.  But, your understanding of

6    that agreement about a month-to-month that you testified about

7    comes only from this text message exchange, right?

8    A.  The way that you're asking me implies that I never had any

9    conversation with Mr. Dempsey.  And I cannot state that I did

10   not have any conversation with Mr. Dempsey.  I had daily

11   conversations with Mr. Dempsey.  Within those conversations,

12   AMCK would have came up like any other lessor.  He wanted to be

13   apprised and kept updated as to the progress that I was making

14   with our lessors.  AMCK would have been part of that

15   conversation.

16   Q.  Sure.  But you don't remember any of those conversations

17   about this month-to-month agreement, do you?

18   A.  I just want to be clear that I would have -- so 4 years on,

19   I do not remember.  But I want to make it for the record that I

20   spoke to Mr. Dempsey multiple times on a daily basis, and this

21   would have been part of that conversation.

22   Q.  When you say it would have been, you mean you assume it was

23   discussed?

24   A.  If you're asking me today do I remember, no.  But that's

25   not to state that I did not -- the way you are asking the

1    question infers I never spoke to Mr. Dempsey, and that is not

2    true.  I did speak to Mr. Dempsey.

3    Q.  Just not about the month-to-month agreement that you can

4    recall, right?

5    A.  I don't recall.  I don't recall.  But it's not to state

6    that I did not speak to Mr. Dempsey about this.  I just don't

7    remember.

8    Q.  Mr. Fanning, putting aside your understanding of what the

9    month-to-month deferral was, after you received this April 7

10   text message from Mr. Dempsey, did you subsequently learn that

11   AMCK had not agreed to an indefinite month-to-month deferral of

12   rent under the 15 lease agreements with Frontier?

13   A.  Sorry, can you repeat that?

14   Q.  Sure.  After you received this text from Jimmy Dempsey, did

15   you subsequently learn that AMCK had not agreed to an

16   indefinite deferral of rent under the 15 lease agreements with

17   Frontier?

18   A.  My recollection is that we did agree to a month-to-month

19   with AMCK.

20           THE COURT:  I think in light of the conversation to

21   this point, your insertion of the word "indefinite" really

22   clouds the meaning of the question.

23           MR. ALEXANDER:  I understand, your Honor.  I'll

24   rephrase.

25   Q.  Mr. Fanning, do you have any memory of AMCK and Frontier

1    actually entering a month-to-month rent deferral agreement?

2    A.  So, in the context of what you're asking, we were

3    eventually going to get into a month-to-month agreement.  But,

4    part of that was based on AMCK's ask to defer the aircraft for

5    three to six months.  We were -- this was going to be part of

6    the bigger agreement based on the conversations that were going

7    on at that time.  We were eventually going to sign an agreement

8    on a month-to-month basis.  No question about it.

9            But, to the context of when the aircraft were going to

10   deliver, we did not know during that time.  But, like every

11   other -- like every other deferment agreement, it was assumed

12   that we would eventually get there with AMCK.  We just did not

13   know at that time.  Mobile, Alabama was shut down.  There was

14   an uncertainty as to when it was going to open.  There was

15   still -- Mr. Dempsey was still speaking to Airbus about pushing

16   the aircraft beyond May, based on AMCK's request and to try to

17   get them into July.

18           So, answering your question, eventually we'd get

19   there, yes.  That's what we all assumed we would get to in

20   terms of an agreement, there would be an agreement in place.

21   Q.  And you expected that agreement to be in writing, correct?

22   A.  Yes.

23   Q.  And you testified that you expected it to be in writing and

24   you thought eventually you'd get there, but was there ever a

25   written month-to-month deferral agreement?

1    A.  Well, we couldn't get there because not every week, but

2    multiple times during the six, seven weeks that Mr. Dempsey was

3    making progress with Airbus, my recollection was that AMCK were

4    asking for additional requests.  It was hard to know what

5    exactly the requests were going to be as to how -- what would

6    go into the agreement.

7           So, again, eventually we would get there, but until we

8    reached an agreement, I mean, obviously it wasn't going to be

9    signed until an agreement was reached.  But more importantly,

10   when Airbus were going to basically put a final these are the

11   delivery dates, these are the final delivery dates and that is

12   all we're going to offer you.  That has still not occurred yet

13   because Mr. Dempsey was still in negotiations with Airbus.

14   Q.  Did you ever see any e-mail or text message from

15   Mr. Sheridan confirming a month-to-month agreement with

16   Mr. Dempsey?

17   A.  Well, why would I have when they had a conversation?

18   Q.  Earlier you testified about your phone call with

19   Mr. Sheridan on April 6, after which he sent a confirming

20   e-mail granting a 10-day grace period, right?

21   A.  Right.  But the difference is that we were eventually going

22   to get to an agreement based on the month-to-month basis, once

23   we had reached an agreement with Airbus based on AMCK's

24   request.  We hadn't got there yet, and that was a request made

25   by AMCK.  We were negotiating on behalf of AMCK to defer the

1    aircraft as far to the right, meaning that it was going to be

2    delayed as much as possible.  That was still ongoing with

3    Mr. Dempsey and Airbus.

4    Q.  Do you recall ever seeing any e-mail or text message from

5    Mr. Dempsey to Mr. Sheridan confirming a month-to-month

6    agreement?

7    A.  No.

8    Q.  Mr. Fanning, earlier we looked at some communications you

9    had with Mr. Sashikumar about the 10-day grace period on

10   April 6.  Do you recall that?

11   A.  Yes.

12   Q.  So that was just the day before this April 7 text exchange

13   we've been looking at, right?

14   A.  Correct.

15   Q.  And on April 6, you sent Mr. Sashikumar an e-mail and you

16   also sent him a text letting him know about the 10-day

17   deferral, right?

18   A.  That is correct.

19   Q.  And you did that because you testified earlier you wanted

20   him to be aware of the status of deferral discussions with

21   AMCK, right?

22   A.  So he was kept up to date, yes.

23   Q.  Did you send him any e-mail or text message regarding an

24   April 7 month-to-month deferral agreement?

25   A.  So, I communicate two ways, by phone and by text.  I was

04A3FRO1                        Fanning – Cross

1    obviously communicating.  Just because I didn't -- just because

2    I didn't send Sharath a text doesn't mean he wasn't notified.

3    We spoke multiple times daily.  And again, part of those

4    conversations would have been that Jimmy -- Mr. Dempsey -- had

5    reached an agreement with Paul Sheridan on a month-to-month

6    basis for three months.

7    Q.  Did you send Mr. Sashikumar an e-mail or a text about it?

8    A.  I would have made him aware, so I didn't have to send him a

9    text.

10   Q.  You said you would have made him aware.  Does that mean

11   you're testifying that you did make him aware?

12   A.  On my recollection, he would have been aware just like any

13   other lessor that was going on at that time.  Did I send him a

14   text?  No, I did not send him a text.  But he would have been

15   made aware shortly after Mr. Dempsey had sent a text based on

16   the agreement he had agreed with Mr. Sheridan.

17   Q.  You said he would have been made aware, but you don't

18   actually remember making him aware, do you?

19   A.  If you are asking me for a specific time and date, I do not

20   remember.

21   Q.  You testified yesterday, Mr. Fanning, about an April 9

22   draft rent deferral agreement that Jane O'Callaghan sent to

23   you.  Do you recall that?

24   A.  I do, yes.

25

O4ABFRO2                    Fanning - Cross

1   BY MR. BUTLER:

2   Q.  I'd like to show that to you.  It's Joint Trial exhibit 79.

3   A.  Okay.

4   Q.  And, Mr. Fanning, this is an April 9, 2020 email from Jane

5   O'Callaghan to you and others at Frontier, right?

6   A.  Yes.

7   Q.  Do you understand in this email Ms. O'Callaghan was sending

8   a draft rent deferral agreement for Frontier?

9   A.  That is correct.

10  Q.  And if you look at the subject of the email, it says,

11  forward Frontier, draft deferral in discussion for 14 of the 15

12  delivered aircraft.  Do you see that?

13  A.  I do.

14  Q.  What did you understand that to mean?

15  A.  This was for the 14 aircraft.  This was the first deferral

16  agreement for the first aircraft out of the 14 aircraft that we

17  had seek a deferral agreement on.

18  Q.  Did you understand that AMCK was providing a draft deferral

19  agreement regarding the deferral discussions?

20  A.  Well, this would have been the baseline for whatever that

21  agreement.  It wasn't final, again, for the reasons I had

22  mentioned.  There were ongoing discussions with Airbus.  We

23  didn't know the delivery date, but this was a baseline of a

24  draft, the first draft copy of that agreement.

25  Q.  Well, why don't we look at the draft agreement attached to

O4ABFRO2                         Fanning - Cross

1    this email which starts on the second page of this document.

2    And it's drafted as, from Wells Fargo.  Is that because Wells

3    Fargo was the lessor on some of the leases between AMCK and

4    Frontier?

5    A.  Owner trustees, yes.

6    Q.  Does this look like the sort of agreement Frontier would

7    sign for a rent deferral?

8    A.  That is correct.

9    Q.  I'd just like to walk through a few of the terms of this

10   draft agreement with you.  If we go down to the bottom of this

11   page you'll see section two forbearance, and Section 2.1

12   describes the rent that would be deferred under this draft

13   agreement; is that right?

14   A.  That is correct.

15   Q.  And at this time AMCK was proposing to defer only the rent

16   for this aircraft that was due in April, right?

17   A.  For the ten-day deferral agreement, that is correct.

18   Q.  I'm not sure I understood.  What did you say about the

19   ten-day deferral agreement, Mr. Fanning?

20   A.  This agreement was based on the ten-day deferral agreement

21   that we had.  Obviously the following day on April 7th, there

22   was an update.  But at that point in time that is what was

23   agreed, that we had a ten-day deferral with AMCK.

24   Q.  Well, do you recall that that ten-day deferral that AMCK

25   provided on April 6, lasted ten business days until April 21?

O4ABFRO2                         Fanning - Cross

A.  Yeah, but that changed on April 7th, because of the factory

shutting down.  Airbus were not going to deliver -- so Airbus

were not going to deliver an airplane before -- the second

airplane was not going to deliver on April 24th or before that.

Q.  But AMCK was proposing in this draft only to defer the

April rent, right?

A.  No.  They were asking -- so my understanding was that we

had an agreement in place that no rent should needed to be paid

on the 14 aircraft till the second aircraft got delivered.

Q.  But apart from your understanding what AMCK was proposing

in section 2.1 was to defer only the rent due in April for that

aircraft, right?

A.  Well, by the time this was reviewed, this proposal was

outdated.  It wasn't relevant to what was going on pretty

rapidly because of the developments that Mr. Dempsey had

learned about Airbus.  So this agreement was not relevant to

the current situation at that time.

Q.  And this agreement was sent to Frontier on April 9, right?

A.  Right.  But it still, like I said, Mr. Dempsey had a

conversation with Mr. Sheridan on April 7, and the agreement

hadn't caught up with the current developments that were going

on.

        This was used as a baseline.  This section 2.1 would

have got changed based again on the conversation Mr. Dempsey

and Mr. Sheridan had.  It just hadn't been updated.

O4ABFRO2                         Fanning - Cross

1    Q.  Just to confirm, Mr. Dempsey and Mr. Sheridan spoke on

2    April 7th, right?

3    A.  Correct.

4    Q.  And there was discussion in your text exchange on April 7th

5    about following up with Jane in a draft, right?

6    A.  That is correct.

7    Q.  And then on April 9th, Jane O'Callaghan sent you a draft

8    rent deferral agreement that covered the month of April, right?

9    A.  But in my mind this was already outdated cause it wasn't

10   relevant to what had been discussed.  Sure.  We were going to

11   use this form.  It just didn't reflect the current situation at

12   that time on April 9th, which we already knew -- because as I

13   mentioned, the second aircraft couldn't even deliver on April

14   24th because the Airbus facility was shutdown.

15          There's no delivery happening in April.  2.1 is

16   irrelevant at this point simply because we do not know when the

17   second aircraft is going to deliver.  Yes, we will use this

18   draft as a form, but it was not reflected as to when the second

19   aircraft was going to deliver.  And at that time of April 9th

20   when it was sent, nobody knew when that aircraft was going to

21   deliver.

22   Q.  I understand that you viewed it as irrelevant in light of

23   events, and I think you testified yesterday that this agreement

24   didn't make sense to you.  But did you understand that this is

25   what AMCK was proposing on April 9th?

O4ABFRO2                          Fanning – Cross

1    A.  What do you mean it didn't make sense to me.  I don't

2    understand.  What's that statement that it doesn't make sense?

3    It does make sense.  It's a deferral agreement.  It just wasn't

4    updated to where Mr. Dempsey and Mr. Sheridan had agreed on a

5    month to month.

6              Again, in my mind, it's pretty simple.  No aircraft is

7    going to deliver on the 24th of April.  It's not going to

8    happen.  Second aircraft is not going to deliver.  Airbus is

9    shut down.  Pure and simple.  When that aircraft is going to be

10   delivered, not even Airbus knew when that aircraft was going to

11   deliver.  This was a deferral form.  No question about it.  It

12   just wasn't updated during the current events that were going

13   on at this point in time.

14   Q.  Was this form ever updated?

15   A.  To my recollection, no.  Because again, AMCK made multiple

16   request, and we had not come to a final agreement with them.

17   So, no, it had not got updated.  To my recollection, it had not

18   got updated.  If AMCK updated it, they never sent it on.

19   Q.  Let's go to the next page of this document.  And at the top

20   do you see in section 2.1.1 AMCK was proposing a six percent

21   interest rate on the deferral on the rent deferred in April?

22   A.  That is correct.

23   Q.  And so did you understand that if Frontier agreed to this

24   proposal, it would have to pay six percent interest on the

25   deferred rent?

O4ABFRO2                        Fanning - Cross

1    A.  That is correct.

2    Q.  And do you see in section 2.1.2, AMCK was proposing that

3    the deferred April rent would have to be repaid with interest

4    by July 2020, right?

5    A.  That's what it says, yes.

6    Q.  So that would be a three-month repayment period, right?

7    A.  On a month-to-month basis, yes.

8    Q.  What do you mean on a month-to-month basis?

9    A.  So, again, for a total of three months on a month-to-month

10   basis.

11   Q.  Well, in this agreement that we're looking at, AMCK was

12   proposing to defer only the April rent, and that rent would

13   have to be repaid in July, right?

14   A.  That is correct.

15   Q.  So it was a three-month repayment period for that deferred

16   rent, right?

17   A.  So, again, the deferred amount would have been -- would

18   have had to have been paid based on the condition that

19   Ms. O'Callaghan had set out to me was on the next delivery

20   date.  But it would have went up to three months if we needed

21   it.

22   Q.  Does it say that in this agreement?

23   A.  No, but it doesn't -- but, again, this agreement at this

24   point in time is outdated.  It's not reflective of what was

25   going on, on April 9th.  As I have stated before, this is a

O4ABFRO2                    Fanning - Cross

1    point in time it's not current to what's going on with the

2    discussions between Airbus and the discussions between

3    Mr. Dempsey and Mr. Sheridan.

4    Q.   Although I think it's pretty clear, and you agree, that

5    this draft proposal was sent two days after the discussion

6    between Mr. Dempsey and Mr. Sheridan on April 7th, right?

7    A.   Even if we signed this agreement the way that you're

8    suggesting, we wouldn't have been able to -- I mean, we

9    wouldn't have been able to abide because we wouldn't have been

10   able to deliver the second aircraft.

11   Q.   In section 2.2 of this draft agreement it states that it

12   would be effective upon the signing of the acknowledgment to

13   this letter by the lessee and be subject to the terms and

14   conditions set forth in this letter.

15              What did you understand that to mean?

16   A.   That once the agreement is signed, what is in the context

17   of the deferral agreement is in enforcement and in effect.

18   Q.   And Frontier never signed this letter, did it?

19   A.   We couldn't sign it.

20   Q.   Why couldn't you sign it?

21   A.   Because we were still -- Mr. Dempsey was still negotiating

22   with Airbus on the request that AMCK had made to defer the

23   aircraft three to six months.

24   Q.   But if Frontier had signed this letter, there would have

25   been a deferral of the rent due in April, right?

O4ABFRO2                    Fanning – Cross

1          MR. HOSENPUD:  Excuse me, your Honor, objection.

2   Misstates the record and assumes facts.

3          THE COURT:  Strictly speaking it calls for speculation

4   too.  Sustained.

5   Q.  Mr. Fanning, you testified that this wouldn't work because

6   of the Airbus delivery schedule; is that right?

7   A.  For the second aircraft, correct.

8   Q.  If Frontier had agreed to a deferral of April rent, would

9   that have provided some deferral relief for Frontier in the

10  month of April?

11  A.  If Airbus didn't shut the facility down, we were -- I'll

12  say not forced, but pushed to take delivery.  Airbus had told

13  us we needed to take delivery of this airplane, then there's a

14  good chance this would have got signed.

15  Q.  If discussions were ongoing with Airbus in May of 2020, you

16  could have agreed on another deferral for the month of May, no?

17  A.  No, because AMCK were not agreeing to take the aircraft In

18  may and wanted to push -- wanted the aircraft to be pushed out

19  further than May, based on their original request.

20  Q.  But you testified earlier about the month-to-month

21  agreement on April 7th, right?

22  A.  For three months, correct.

23  Q.  Right.  Couldn't have this deferral been done on a

24  month-to-month basis with a new agreement each month?

25  A.  It could have been, but it's my understanding that this

O4ABFRO2                          Fanning - Cross

1   agreement would have been in force for three months.

2   Q.  So it could have been but your understanding based on what

3   Mr. Dempsey texted you on April 7th, was that it was a

4   three-month period, right?

5   A.  That is correct.

6   Q.  I'd like to show you your text messages with Jane

7   O'Callaghan which are in Joint Trial Exhibit 17.  I'd like to

8   direct you to page four of this document.

9           Do you recall looking at this text exchange yesterday

10  on April 1, 2020, between you and Ms. O'Callaghan?

11  A.  Yes.

12  Q.  And Ms. O'Callaghan says, Hi, Robert, can we talk today?

13  Need to understand how you are getting on with delivery

14  deferrals with Airbus.  We haven't had your feedback on draft

15  rent deferral agreement for April.

16          Do you see that?

17  A.  That is correct.

18  Q.  And you testified yesterday about a gap of about April 6 to

19  April 20th, in communications between you and Ms. O'Callaghan.

20  And I believe you testified it was because Frontier was working

21  with Airbus on requested delays, correct?

22  A.  Yes, we needed time with Airbus.

23  Q.  But you weren't asked about this message on April 21st, and

24  so I'd like to ask you, did you understand that Ms. O'Callaghan

25  was asking you about feedback on the draft rent deferral

O4ABFRO2                          Fanning - Cross

1   agreement she had sent on April 9th?

2   A.  As mentioned in some correspondence from AMCK, they were

3   aware that we needed time in order to negotiate deliveries

4   beyond the current delivery date based on AMCK's request.  She

5   obviously wanted an update, and she wanted feedback if we --

6   she wanted feedback on the draft deferral agreement.  The

7   reason she hadn't heard back because we were still in

8   negotiation with Airbus based on AMCK request.

9   Q.  The date of this text message is April 21, do you recall

10  that was the last day of the ten-day grace period that

11  Mr. Sheridan had provided?

12  A.  So my recollection was ten days was old news.  We were on a

13  month-to-month basis at that point.  So the ten days was not in

14  effect.  We were going to month-to-month for three months.

15  That was my recollection and my understanding on April 21st.

16  Q.  But do you agree that April 21st was the last day of the

17  ten business day period that Mr. Sheridan provided on April 6?

18  A.  As far as I was concerned, it was old news.  It wasn't

19  relevant.  It was not something that had crossed my mind.

20  Q.  Do you recall that the date that Mr. Sheridan provided as

21  the end of his ten business day grace period was April 21st?

22  A.  Wasn't even in my mind.  We were on a month-to-month basis

23  as far as I was concerned.  Given the fluid developments that

24  were going on with Airbus, I didn't even think about the ten

25  days.  Mr. Dempsey told me we were on a month-to-month, we were

O4ABFRO2                    Fanning - Cross

1   on a month to month.

2   Q.  Can we put up Joint Trial Exhibit 60.

3           Mr. Fanning, this is Mr. Sheridan's April 6th 2020

4   email which you testified about earlier.

5           Do you recall that?

6   A.  Yes.

7   Q.  And you testified that you didn't think this was relevant

8   anymore, but just to confirm the date in Mr. Sheridan's April

9   6th email, he was providing a rent deferral until 21 April for

10  the next ten working days, right?

11  A.  Based on April 6, that's what we had.  That's what we had

12  agreed, yes.

13  Q.  That was the day Ms. O'Callaghan reached out to you for

14  feedback on the draft rent deferral agreement for April?

15  A.  It's the same date, yes.

16  Q.  Let's go back to your text messages with Ms. O'Callaghan.

17  There's reference here to a phone call.  Do you remember

18  talking to Ms. O'Callaghan on April 21st?

19  A.  Says we had a phone call that day, we had a phone call that

20  day.  The context of the conversation, I do not recall.

21  Q.  And so you don't remember what, if anything, was discussed

22  on April 21st, do you?

23  A.  Well, specifically, no, but I would have had a -- I would

24  have remembered some things we would have talked about based on

25  the information that was given to us at that time.  On the

O4ABFRO2                    Fanning – Cross

1    progress that we were making with Airbus, I would have given

2    her an update as to where we were with Airbus.

3    Q.  You said you would have given her, do you recall giving her

4    any information?

5    A.  You ask me to the context.  As specific, no, I do not

6    remember.

7    Q.  So you don't remember whether there was any discussion

8    about extending a grace period on that call, do you?

9    A.  I didn't need to.  There was an understanding that we were

10   on a month-to-month.  Unless it was something that was brought

11   up by her, I didn't need to have a conversation about it.

12   Q.  But whether or not you needed it, you don't recall any

13   discussion about it, correct?

14   A.  I don't recall the discussion about it.

15   Q.  Let's take a step back, Mr. Fanning.  We've been talking

16   about the month-to-month agreement that you testified about.  I

17   just wanted to ask more generally, during April 2020, AMCK and

18   Frontier were discussing a potential agreement, correct?

19   A.  Yes.

20   Q.  And part of that involved Frontier's request for rent

21   deferral, right?

22   A.  Correct.

23   Q.  And part of that was that AMCK wanted some concessions

24   under the Framework Agreement, right?

25   A.  Correct.

O4ABFRO2                         Fanning – Cross

1    Q.  So AMCK had some asks of its own as part of this

2    negotiation, right?

3    A.  That is correct.

4    Q.  I'd like to show you Joint Trial exhibit 58.  This is an

5    April 3rd, 2020 email from Mr. Sheridan to Mr. Dempsey and

6    others including you.  Do you see that?

7    A.  Yes.

8    Q.  And do you understand that Mr. Sheridan was setting out

9    AMCK's position at this time on a rent deferral and what would

10   be required to reach that agreement?

11   A.  That is correct.

12   Q.  And Mr. Sheridan said that the deferral would be strictly

13   on the basis that we suspend the SLB for six months.

14            Do you see that?

15   A.  Correct, which Mr. Dempsey was discussing with Airbus,

16   correct.

17   Q.  Was Frontier able to suspend the SLB for six months?

18   A.  No, but that's was our attempt.  We were trying to

19   accommodate AMCK's request when Mr. Dempsey was talking to

20   Airbus.  He knew and was going to try and get six months for

21   AMCK.

22   Q.  So Frontier tried to get a six-month delay, but wasn't able

23   to achieve that; is that correct?

24   A.  We made best efforts.  And with all our leverage, we tried

25   to get six-month delay based on request by AMCK.

O4ABFRO2                         Fanning - Cross

1   Q.  And ultimately Frontier and Airbus agreed on some delivery

2   delays, right?

3   A.  There was no way that we could accommodate the six months

4   because the second aircraft had already been -- it was probably

5   near ready for delivery.  I believe there was a technical issue

6   with the aircraft that would have gotten solved sometime in

7   April.

8        The second aircraft or the third aircraft would have

9   been fairly close behind this, and same with the fourth

10  aircraft.  These aircraft were already built, but AMCK made

11  this request that they wanted to suspend delivery for six

12  months.  I mean, again, these airplanes were delivered in

13  Mobile, Alabama.  There was no way they were going to be able

14  to hold these planes for six months.

15       And based on the view that we had, we needed the

16  aircraft, but this is what AMCK requested.  My recollection is

17  that Jimmy was going to try best efforts to accommodate what

18  AMCK was looking for, even though it would have been a

19  financial burden on Frontier.

20  Q.  No matter how hard anybody tried, Frontier and Airbus did

21  not agree on a six-month delivery delay, did they?

22  A.  We did not, no.

23  Q.  I'd like to point you to the language at the bottom of this

24  email from Mr. Sheridan he states, For avoidance of doubt, this

25  email is for discussion purposes only.  This email and any

O4ABFRO2                              Fanning – Cross

1    subsequent discussions or correspondence we may have with you

2    are not intended to create and do not create any binding

3    obligations on the part of AMCK or any of its affiliates.  Do

4    you see that?

5    A.  I do.

6    Q.  What did you understand that to mean?

7    A.  It was not a binding letter.

8    Q.  I'd like to go back to your text messages with

9    Ms. O'Callaghan which is Joint Trial Exhibit 17, if we could go

10   to page four of this document.

11              On April 23, 2020, Ms. O'Callaghan informed you about

12   a shareholder unwillingness to fund a new purchase if there are

13   any payments at all outstanding.  Do you see that?

14   A.  I do.

15   Q.  Did you understand in your discussions with Ms. O'Callaghan

16   that she was trying to get the AMCK shareholder on board with

17   an agreement?

18   A.  So my recollection would have been, it would have been they

19   did not want any outstanding payments based on whatever the

20   second aircraft was going to occur.  They did not want any

21   outstanding payments for the 14 aircraft.  It had to be paid

22   prior to the second delivery.

23   Q.  But did you understand in your discussions with

24   Ms. O'Callaghan that she was talking to AMCK shareholder on the

25   back-end, right?

O4ABFRO2                          Fanning - Cross

1    A.  That's my understanding, yes.

2    Q.  And did you understand that she was trying to get their

3    approval or buy-in for an agreement, right?

4    A.  That's what she stated in her text, yes.

5    Q.  Let's look at page five of this document.  Do you see on

6    April 25th, 2020, Ms. O'Callaghan wrote you, Hi, Robert.  We

7    can chat later today.  We struggled at our board meeting last

8    week.  Here are the basic elements of our board and

9    shareholder's direction on how to approach the remaining

10   A320neo sale and leasebacks this year.  Do you see that?

11   A.  I do.

12   Q.  And there's two numbered points there.  The first one Is

13   that no deferred payments could be outstanding at closing.  And

14   you understood that?

15   A.  Yes.

16   Q.  And the second point Ms. O'Callaghan states is, We need

17   some quid pro quo to fund $250 million of capex on terms that

18   now appear to be wildly off market.  Do you see that?

19   A.  I do.

20   Q.  And Ms. O'Callaghan goes on to propose what she calls a

21   quid pro quo or QPQ here.  Do you see that?

22   A.  That is correct.

23   Q.  And what was the QPQ that she was proposing in this text?

24   A.  So we didn't know at the time what the QPQ was going to be,

25   but obviously it was a request to extend the 14 aircraft that

O4ABFRO2                    Fanning – Cross

1    had eight year leases to extend by another four years.

2    Q.  You testified yesterday that AMCK was making request to

3    Frontier that none of Frontier's other lessors were doing; is

4    that right?

5    A.  So in the context of the majority of the lessors, that is

6    correct.  But there were lessors that were current lessors with

7    Frontier that did make requests similar to wanting to extend

8    aircraft.

9    Q.  Was AMCK Frontier's only lessor signed up to take delivery

10   of aircraft in March of 2020?

11   A.  March 2020, that was the first aircraft from what I

12   remember, yes.

13   Q.  And AMCK made a request like this, and you testified that

14   there was some other lessors, not the majority, but some other

15   lessors who made request like this, right?

16   A.  To my recollection there may have been one or two.  There

17   wasn't many that made this type of request.

18   Q.  And you understood that AMCK was proposing these quid pro

19   quos as part of any overarching agreement on the sale and

20   leaseback agreement and rent deferral, right?

21   A.  At this point, there had been multiple -- my recollection

22   and the way I saw it was, every time Mr. Dempsey was making

23   progress with Airbus, AMCK came back with another ask, another

24   ask, another ask.  Every time we hear back from them, they

25   wanted something else.

O4ABFRO2                          Fanning – Cross

1    Q.  And in the text message exchange below this, you respond

2    and say, Well, that's a huge ask over 12 additional aircraft.

3    Do you see that?

4    A.  Yes.

5    Q.  And you go onto say, that's only that you're asking

6    Frontier to pay 100 percent of the deferred rent, which is a

7    huge amount of money for an airline that's not making much.

8              Do you see that?

9    A.  I do.

10   Q.  Was that true?

11   A.  I'm not in the accounting or treasury department that

12   manages cash, but my understanding Frontier Airlines was making

13   very, very little money on a day-to-day basis.

14   Q.  I'd like to show you Joint Trial Exhibit 120.  I believe

15   that you testified about this document yesterday, Mr. Fanning,

16   but it's an April 30th, 2020, email from Paul Sheridan to Jimmy

17   Dempsey and others including you.

18              Do you see that?

19   A.  I do.

20   Q.  Does this email from Mr. Sheridan set forth AMCK's

21   conditions at that time for funding upcoming deliveries under

22   the Framework Agreement?

23   A.  This was their revised -- another ask based on the multiple

24   asks they had asked, but that is correct.

25   Q.  And did you understand at this time that AMCK might

O4ABFRO2                         Fanning - Cross

terminate the Framework Agreement if these conditions were not

met?

A.  As I stated yesterday, we had a very, very strong close

relationship with Mr. Sheridan and Ms. O'Callaghan.  At this

point in time, I wasn't concerned that they were going to put

us in default.

Q.  So I understand you testified yesterday you were surprised

or shocked that the Framework Agreement was terminated, right?

A.  That is correct.  The way relationship work with lessors,

there's always the black and white.  There's always the

agreements, but you're always going to run into disagreements

and you're always going to work into scenarios where you need

to work together.  AMCK was no different.  They were going to

become potentially our largest lessor, and we wanted to work

with them, just like they wanted to work with us.

        I was under no impression -- and I believe Mr. Dempsey

had the same view to a certain extent -- obviously we needed to

plan in the event that they weren't going to show up.  But I

didn't believe, my own personal opinion, I didn't believe they

were going to put us in default.

Q.  You didn't believe they were going to, but you thought it

was certainly a possibility, right?

A.  That's putting words in my mouth.  I just stated I did not

believe in any way, shape or form over the eight weeks that

they were going to put us in default.  No way.

O4ABFRO2                          Fanning - Cross

1   Q.  Do you recall answering that question a little differently

2   in your deposition, Mr. Fanning?

3   A.  Well, I may have, but it doesn't change my position.  I

4   wasn't aware that they were going to -- I had no recollection

5   or in terms of my view based on the deposition or during that

6   time that they were going to put us in default.  There wasn't

7   even a discussion between myself, Sharath or Spencer.

8            I don't remember in any way, shape or form that I was

9   concerned that they were going to put us in default.  My own

10  view today is that if they were going to put us in default, I

11  would have got a notice, or Mr. Sheridan would have reached out

12  to Jimmy to let him know what was going on.  We were blindsided

13  with the default notice.  We had no idea.  And based on this

14  letter, this email, that opinion hadn't changed.

15  Q.  You said that you weren't concerned about it, but you did

16  recognize it was a possibility, right?

17  A.  Anything is a possibility in life.  But at this point in

18  time, I wasn't aware that they were going to put us in default.

19  Mr. Dempsey was still trying to get what Airbus were offering

20  based on the AMCK request.  And the view would have been

21  that -- my view would have been on a month-to-month basis based

22  on the text that I sent to Jane on the 25th and the 28th that,

23  hey, we don't want to be in default.

24           She never responded.  She never responded, hey, Robert

25  you need to make a payment.  I didn't think anything of it,

O4ABFRO2                      Fanning - Cross

which further supports that I wasn't concerned that they were

going to put us in default.  I even ask Jane, Ms. O'Callaghan,

if they wanted us to make a payment.  She never answered my

question.  I believe I asked three times, two times within the

25 and the 28th in text.  Hey, the current thing with this, we

don't want to be behind.  We gonna pay.  She never responded.

Q.  Mr. Sheridan, I'd like to show you --

A.  Mr. Fanning.

Q.  I'm sorry. Mr. Fanning.  I would like to show you a portion

of your deposition in this matter which is marked as Joint

Trial Exhibit 178, and I'd like to put up on screen page 105 of

that deposition.

        You were asked:  Did you understand at this time that

AMCK might terminate the Framework Agreement if these

conditions were not met?  There's an objection and an answer.

        Based on the discussions I had with Jane, it was

certainly a possibility, yes.

        Were you asked that question, and did you give that

answer?

A.  As I just stated, anything is a possibility.  It doesn't

mean it's going to happen.  But I mean, yeah, they could have

put us in default.  They potentially could have put us in

default.

        The way that the question was asked, that's how I

answered.  As I just stated, anything is a possibility.  But if

O4ABFRO2                          Fanning – Cross

1    you're asking me my own personal opinion, I did not feel that

2    they were going to put us in default.

3    Q.  Let's go back to Joint Trial exhibit 120 which is

4    Mr. Sheridan's April 30th email and walk through some of these

5    conditions that AMCK was proposing at this point.

6            The first bullet there refers to deliveries of

7    aircraft in July of 2020 and February of 2021.

8            Do you see that?

9    A.  Yes, I do.

10   Q.  And that was referring to a delay in aircraft delivery

11   schedule, right?

12   A.  That is correct.

13   Q.  And although this was the best Frontier had done, this was

14   not the original six month ask for Mr. Sheridan, right?

15   A.  Well, I would slightly disagree with that.  We had made

16   great strides, Mr. Dempsey had made great strides with Airbus.

17   So the original request made by AMCK was three to six months,

18   so April, May, June, July.  There's three months for three

19   aircraft.

20           And then we were able to, Mr. Dempsey, was able to

21   push two of the remaining five aircraft into 2021.  Given the

22   circumstances and the pressure that we were under, I would say

23   we came fairly close to the original request that was made by

24   AMCK.  Again, the goalpost shifted so many times.  But in my

25   way, you can only go back to the well so many times.

O4ABFRO2                         Fanning – Cross

1          What I mean by that is, is that based on the first
2     request made by AMCK to Frontier, Jimmy started discussing,
3     hey, can we push these airplanes to May, June, or July.  There
4     would have been an ongoing discussion of what Airbus could
5     accommodate.  Again, remembering the first three aircraft were
6     pretty much built.  They were painted.  They were going to be
7     delivered to Mobile, Alabama.  There wasn't going to be more
8     storage, and Airbus were pressuring us to take the airplanes
9     once the facility had opened.
10          I think we came fairly close and made best efforts on
11     the original request made by AMCK.  Ultimately we came to an
12     agreement that three aircraft would deliver in July, and the
13     remaining two would be sometime in Q1 of 2021.
14  Q.  So Mr. Sheridan in his April 3rd email that we looked at
15     before had asked for a six-month delay.  Frontier was able to
16     through its best efforts get the delivery schedule listed here,
17     and now Mr. Sheridan was including that as one of the
18     conditions for their proposal in this email, right?
19  A.  Their new conditions, yes.
20  Q.  And let's look at some of the other conditions.
21          The second bullet point I believe you testified about
22     yesterday, but that involved being current on rent as of May
23     15, 2020, right?
24  A.  Yeah, and this condition was a surprise because AMCK had
25     maintained that we needed to be current on all payments up to

O4ABFRO2                         Fanning – Cross

1    whenever the second aircraft was going to deliver, and this was

2    a new request made by AMCK.

3    Q.  And the third bullet includes another condition regarding

4    lease extensions of four years on certain of the aircraft.  Do

5    you see that?

6    A.  That is correct.

7    Q.  And what did you understand Mr. Sheridan was proposing in

8    this bullet?

9    A.  On the 12 aircraft that we had from AMCK, they were

10   extended -- their request was that we extend them for four more

11   years based on the current eight-year deal lease, agreement

12   deal we had in place. They wanted to extend these airplanes out

13   for 12 years total.

14   Q.  And the bullet also says, These extension will only apply

15   if there are any payment related defaults out to 15 May 2021,

16   right?

17   A.  That is correct.

18   Q.  So this lease extension Mr. Sheridan was talking about

19   would only come into play if Frontier failed to make rent

20   payments prior to May 15, 2021, right?

21   A.  That is correct.

22   Q.  Was Frontier concerned about not being able to make rent

23   payments?

24   A.  We were never concerned.  If AMCK at any point in time of

25   the discussions, if Ms. O'Callaghan or Mr. Sheridan came to

O4ABFRO2                        Fanning – Cross

1    Mr. Dempsey or myself and told us that we needed to make

2    payments, we would have made payments.

3              I asked Jane again on the 25th and 28th, our thinking

4    is, we'll make payments.  She never said, yeah, go ahead.  I

5    think it's good. She never stated that we needed to make the

6    payments.  And our position was, we didn't need to make the

7    payments because we were on the three month extension on a

8    month-to-month basis.  I would assume that Ms. O'Callaghan

9    would have reached out and said, hey, Robert, you need to make

10   the payment.

11             We heard this request from like I said two of our

12   other lessors.  I assume that they wanted us to make the

13   payment, we would have made the payment.  We did not want to

14   be -- as much as I can recall to the best of my knowledge, we

15   did not want to be in any type of situation or default

16   situation with AMCK.  And our belief was up to this point that

17   we would have to be current on all 14 aircraft in order for

18   them to fund the remaining aircraft so we would not be put in a

19   default situation.

20             Then oddly Mr. Sheridan sent this email on April 30th,

21   and again the goalpost had changed that they wanted to be made

22   on May 15th.

23   Q.  I'd like to direct your attention to the last line of this

24   email, Mr. Fanning, in which Mr. Sheridan says, For the

25   avoidance of doubt, this email is for discussion purposes only.

O4ABFRO2                        Fanning – Redirect

1   This email and any subsequent discussions or correspondence we

2   may have with you are not intended to create and do not create

3   any binding obligations on the part of AMCK or any of its

4   affiliates.  Do you see that?

5   A.  I do.

6   Q.  Mr. Fanning, did Frontier agree to all of the conditions in

7   this email?

8   A.  No.

9        MR. BUTLER:  Thank you, Mr. Fanning.  I have no

10  further questions.

11       THE WITNESS:  Thank you.

12  REDIRECT EXAMINATION

13  BY MR. HOSENPUD:

14  Q.  Good morning, Mr. Fanning.  I'd like to reread the question

15  and answer in your deposition that was read to you on cross and

16  I'm at page 105.

17       And the question reads: And did you understand at this

18  time, referring to April 30, that AMCK might terminate the

19  Framework Agreement if these conditions were not met?

20       And the answer is: Based on the discussions I had with

21  Jane, it was certainly a possibility, yes.

22       Did you understand that question to be asking whether

23  AMCK would put Frontier in default or terminate the Framework

24  Agreement and not show up?

25  A.  The way the question was asked to me, I assumed it was

1    based on were they going to put us in default and if they put

2    us in default.  Again, my recollection is that in my mind that

3    they could certainly try and put us in default.  But was I

4    fearful, was I kind of worried that they were going to put us

5    in default, the answer was no.

6            It was certainly a possibility.  My way of looking at

7    possibilities, like anything is possible.  I mean it's

8    certainly an option.  But is that what I felt at the time, no.

9    I would have queried Ms. O'Callaghan if I really felt they

10   would have put us in a default situation.

11   Q.  Despite having the desire to conserve capital, did Frontier

12   pay any lessor who said simply at the very beginning of these

13   discussions, no, I'm not going to give you a rent deferral?

14   A.  There were maybe two or three lessors that were borderline

15   that were considering us.  They were looking at our cash

16   position relative to other airlines, but they had not said no

17   at that point in time.  They needed more information to make

18   that determination.

19   Q.  Did any lessor who ultimately made the determination and

20   said no, what did Frontier do?

21   A.  We paid the rent when it was due.

22   Q.  You were asked questions about other lessors setting up

23   conditions.  Did any lessor -- strike that.

24           Were there lessors who had deliveries in 2020 other

25   than AMCK?

O4ABFRO2                        Fanning - Redirect

1  A.  Yes, there was.

2  Q.  Did that lessor ever make a condition to defer aircraft

3  delivery?

4  A.  To my recollection, no.

5  Q.  Now let's go back if you wouldn't mind to the April 3, 2020

6  email from Mr. Sheridan to Mr. Dempsey, and I believe that is

7  Exhibit 58.  This is the April 3 communication from Mr. Dempsey

8  setting up the six month SLB delivery deferral for the

9  remaining aircraft.  You see that?

10  A.  Yes.

11  Q.  And then he goes onto say, this deferral is to have a

12  repayment period over the subsequent four months once the three

13  months are done, right?

14  A.  Yes.

15  Q.  And did this change after April 3, 2020, to tying the

16  repayment of rents to the delivery of the first aircraft?

17  A.  The second aircraft.

18  Q.  The second aircraft.  Thank you.

19      Once that condition was put in place, did that remain

20  a constant timing condition that AMCK proposed in each of its

21  subsequent communications to Frontier?

22  A.  As far as I recall, there was never a conversation other

23  than in the month of April that the deferral payments were

24  linked to -- the payment of the deferral payments were linked

25  to the second aircraft.

O4ABFRO2                      Fanning - Redirect

1            There was never a conversation about the April 30

2    email letter that we got from AMCK for them to now seek payment

3    on May 15th.

4    Q.  So May 15 was the first date specified by AMCK for

5    repayment?

6    A.  That is correct.

7    Q.  Now, Exhibit 60 is the April 6, 2020, email where

8    Mr. Sheridan is confirming for Jimmy Dempsey what had been

9    discussed on the phone with you, correct?

10   A.  Correct.

11   Q.  And the fundamental message for that ten-day grace period

12   is noted as follows: Mindful of the time it might take you to

13   reach agreement with Airbus, or to make other arrangements,

14   therefore of the ability for us to reach a deferral agreement,

15   we can confirm we won't take any actions or call any defaults

16   linked to the nonpayment of rents on any aircraft where the

17   rent is due from today 21 April, i.e. for the next ten working

18   days.

19          What I'd like to focus on is the notion that needs

20   time to reach any agreement with Airbus.  Did you understand

21   this email that way?

22          MR. BUTLER:  Objection, leading.

23          THE COURT:  The statement of the affairs is a little

24   slanting.  It does not suggest a particular answer.  I don't

25   think it's leading.  Overruled.

1   Q.  Mr. Fanning, did you understand that Mr. Sheridan was

2   recognizing it would take time to reach any sort of agreement

3   with Airbus in this email?

4   A.  So Mr. Sheridan has been in the leasing business for a long

5   time.  He would have been aware knowing the complicated

6   discussions that were going on, not just with our airline, but

7   with many airlines around the world that had deliveries with

8   Airbus.  He would have been aware given that he was in the

9   business, he would have been aware that it was going to take

10  Frontier time to come to a meaningful resolution and agreement

11  based on the ask of AMCK.

12  Q.  And co-existing with that, there's a statement, Therefore

13  of the ability with us to reach a deferral agreement.

14          Do you see that reference?

15  A.  I do.

16  Q.  And so the time with Airbus and reaching agreement is

17  connected to AMCK reaching some sort of final deferral

18  agreement.  Did you understand it that way?

19  A.  My understanding is that once we came to an agreement with

20  Airbus that would have been documented, and at that point an

21  agreement would have been in force.

22  Q.  And the month-to-month agreement that you have been

23  testifying about, which the evidence in the record shows

24  occurred the very next day, did you consider that to be under

25  this structure where the rents would be deferred to allow that

O4ABFRO2                          Fanning - Redirect

1    conversation to go forward with Airbus?

2    A.   The way I would have viewed this was the -- how can I say

3    this?  The way I would have viewed this, that other than the

4    ten day, the month-to-month, because nothing had changed with

5    Airbus other than the discussions that were going on between

6    Airbus and Mr. Dempsey.  They were ongoing.

7             The way I would have viewed the way you're asking me

8    is that Paul Sheridan's mindset would have been that this would

9    have been an extension, not for the ten-day, but for the

10   month-to-month for up to three months.  Knowing that and

11   Ms. O'Callaghan had asked me at some point in the conversations

12   on whether we could find or whether I could find another lessor

13   to take delivery of the second aircraft.  They would have been

14   aware that these things wouldn't have happened overnight and

15   would have needed sometime in order to make the arrangements

16   that they put in to try and get a lessor to take delivery.  And

17   also Mr. Dempsey with Airbus to have the conversation to try

18   and come to an arrangement that would have been acceptable for

19   AMCK.

20   Q.   So there was a two prong approach?

21            Was there a two prong approach from Frontier Airlines

22   Airbus and potentially other lessors?

23   A.   I was responsible for speaking to the other lessors.

24   Mr. Dempsey was responsible for talking to Airbus.

25   Q.   And either of those eventualities, would they take time?

O4ABFRO2                        Fanning – Redirect

1    A.  Given the situation at the time where the world was, it was

2    going to take time.

3    Q.  Now you were asked about draft agreements that had been

4    circulated between Frontier to AMCK and AMCK back to Frontier,

5    had the condition of being current before the first aircraft

6    delivery even come into existence when the preliminary

7    agreements were circulated in March, the draft rent deferral

8    agreements?

9    A.  I'm sorry.  What is your question?

10   Q.  Had AMCK even mentioned in March 2020, that Frontier needed

11   to be current before the first delivery?  Was that even a

12   subject?

13   A.  My recollection was no.

14   Q.  And anything discussed before April 6, 2020, was AMCK's

15   condition of Frontier being current before the next delivery

16   even a subject?

17   A.  Correct.

18   Q.  It was or was not?

19   A.  It was.

20   Q.  So that started sometime when, in April?

21   A.  It would have been the early part of April.

22   Q.  Was that coming through communications by phone?

23   A.  It could have.

24   Q.  Could you bring up Exhibit 85, please.

25           I've got before you, sir, Exhibit 85, and we'll

O4ABFRO2                    Fanning - Redirect

1   identify it with just the sticker and then go back up, please.

2          Now this appears to be April 13 email from Paul

3   Sheridan to Jimmy Dempsey, and he is commenting on an earlier

4   email Mr. Dempsey sent to him, if we scroll down just a little

5   bit, where Mr. Dempsey is giving a progress update on April 13.

6          And Mr. Dempsey in this exhibit indicates that Airbus

7   is willing to move aircraft approximately two months in the

8   short-term.  The first aircraft would deliver in June and the

9   next two in July.

10          Do you see that reference?

11  A.  Yes.

12  Q.  And then he indicates he's keen to wrap it up, and that he

13  understands that Mr. Sheridan had been looking for six months,

14  but it's impractical given the advance nature of the aircraft

15  production.  Do you see that reference?

16  A.  I do.

17  Q.  If we scroll up to the top of this exhibit of April 13.

18  Mr. Sheridan is apologizing for his slow response, but was

19  waiting for shareholder feedback.

20          Do you see that reference?

21  A.  I do.

22  Q.  Then he says, essentially we want to tie the deliveries to

23  having no outstanding deferrals, so it would only work if we

24  recast the deferral agreement.  And I'll represent to you that

25  I think Mr. Sheridan testified in deposition that that meant

O4ABFRO2                      Fanning - Redirect

1    the rent deferral agreement.

2              And then he goes onto say, the six-month period was to

3    allow for repayments of the deferred rent, as well as to be

4    over the deferral period.  Is this concept where he's saying,

5    we wanted the deferred rent payment to be over and not existing

6    at the time of the first delivery?

7              THE COURT:  Mr. Hosenpud, I'm interrupting you for two

8    reasons.  One is technical and the other is personal.  The

9    technical one is, this is not only leading, it's making a

10   speech and then you're going to ask him if he would agree with

11   that.

12             MR. HOSENPUD:  I will revise.

13             THE COURT:  That is not proper redirect.  The personal

14   one is, I have a commitment to be in another part of this

15   building at 1:00, and we're already a little past that.  And

16   interesting though this is moment to moment, I've got to

17   conclude it, and we'll resume at 2:15.

18             MR. HOSENPUD:  Thank you, your Honor.  Understood.

19             THE COURT:  My apologies of breaking the thread of

20   this interesting point.

21             (Recess)

22

23

24

25

04A3FRO3                      Fanning - Redirect

                         AFTERNOON SESSION

1                                2:15 p.m.

2

3    BY MR. HOSENPUD:

4    Q.  Good afternoon, Mr. Fanning, just a few follow ups.

5            Were you ever requested by Jane O'Callaghan or anybody

6    at AMCK to pay rent on April 21, 2020?

7    A.  No.

8    Q.  Were you ever requested at the end of April by anybody at

9    AMCK to pay rent?

10   A.  No.

11   Q.  We're going to look at Exhibit 17.  And directing your

12   attention, sir, to the date April 29, 2020, or 29 April 2020,

13   page 6 of this exhibit.

14           Looking at that first text, it reads, "Hi Jane, just

15   following up from our previous conversations.  Before our first

16   delivery we would repay the full rent amounts for the current

17   14 aircraft."

18           Why were you stating that?

19   A.  We didn't want to be in default, and it was a requirement

20   for AMCK to take the next delivery, the thought process was

21   that we pay the full rent for the 14 aircraft.

22   Q.  Let's move on to the next page, page 7.

23           I'm focusing your attention on what is shown as option

24   2 where it says, "The current rent deferral would stay in

25   place."

1          What did you mean by that statement?

2     A.   What I meant by that statement was that the month-to-month

3     that was agreed by Mr. Dempsey and Mr. Sheridan, the rent

4     deferral would stay -- would stay in place, basically the

5     agreement that Mr. Sheridan and Mr. Dempsey had agreed upon, on

6     April 7.

7     Q.   And you have other conditions identified there as well,

8     correct?

9     A.   That is correct.

10    Q.   And those would be that for each of the three aircraft

11    delivering, we would pay six months of rent in advance of each

12    delivery.  Did I read that correctly?

13    A.   Yes.

14    Q.   Moving on, were you asked by Jane O'Callaghan or anybody at

15    AMCK to pay rent May 8, 2020?

16    A.   No.

17    Q.   Did you believe that Frontier was in default on May 8,

18    2020, when it received the termination notice?

19    A.   No.

20              MR. HOSENPUD:  Thank you, sir.  Nothing further.

21              MR. ALEXANDER:  Nothing from the defendants, your

22    Honor.

23              THE COURT:  Thank you, Mr. Fanning.  You are excused.

24              THE WITNESS:  Thank you.

25              (Witness excused)

O4A3FRO3

1          MR. HOSENPUD:  Your Honor, our next witness will be

2     Dr. Kevin Neels, and I want to just alert the Court that by

3     agreement between the parties, to accommodate the defendant's

4     expert, we agreed that defendant's expert would follow the

5     testimony of Dr. Neels, our expert, in this period of time,

6     today and tomorrow.  Just for efficiencies due to defendant's

7     expert being unavailable the following week.

8          THE COURT:  That's fine.

9          MR. HOSENPUD:  Thank you, sir.

10          MR. BUTLER:  Your Honor, I'd just like to raise to

11     address another housekeeping issue with respect to Dr. Neels,

12     the damages expert for the plaintiff.

13          We raised this in our trial brief.  We have a Daubert

14     objection, a rule, Federal Rule of Evidence 702 objection to

15     the admission of his opinions.

16          Of course, this being a bench trial, there are a lot

17     of ways in which this could be addressed, but I did want to

18     rise before Dr. Neels takes the stand to move to exclude

19     Dr. Neels, based on the principles of Rule 702 and Daubert.

20     I'm happy to make some argument on that point, we could reserve

21     it for later, whatever the Court would prefer.

22          THE COURT:  Well, I've read your submissions on that

23     as part of your briefs, and I don't see any chance of a Daubert

24     motion succeeding.  There are various arguments that could be

25     made pro and con to Dr. Neels' product, but I think it's a real

O4A3FRO3                            Neels – Direct

1    enough issue that it should be hammered out in court.  And we

2    can start that process.

3              MR. BUTLER:  Thank you, your Honor.

4              THE COURT:  But the Daubert motion is denied.

5              MR. BUTLER:  Thank you, your Honor.

6              THE COURT:  Thanks.

7     JOHN KEVIN NEELS,

8          called as a witness by the Plaintiff,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. HOSENPUD:

12   Q.  Good afternoon, Dr. Neels.

13   A.  Good afternoon.

14   Q.  Dr. Neels, did my office retain you to analyze Frontier

15   Airlines' damages in this case?

16   A.  It did.

17   Q.  Could you briefly outline for the Court your employment

18   history, qualifications, and higher education.  Starting first

19   with your employment history.

20   A.  I was, right out of graduate school, I was employed in the

21   transportation practice of the firm now known as KPMG.

22   Subsequently I worked in the transportation practice at the

23   Urban Institute, a policy research firm, and at the RAND

24   Corporation, another policy research firm.  Subsequent to that

25   I worked in a number of economic consulting firms.  I was the

O4A3FRO3                          Neels - Direct

1    practice leader for the transportation practice at the firm of

2    Charles River Associates.  I was also the transportation

3    practice leader at the Brattle Group.  When I stopped being

4    employed at the Brattle Group -- I'm self employed at this

5    point, although I still do work with Brattle.

6    Q.  Could you move the microphone slightly closer to you, just

7    the whole microphone.  Thank you.

8    A.  Thank you.  And in answer to the other part of your

9    question, I have a bachelor's degree and a PhD both from

10   Cornell University.

11   Q.  And in terms of your consulting work, have you been

12   qualified as an expert in various courts, arbitration settings?

13   A.  I have.  I've offered expert testimony on a number of

14   different occasions.  I think the total number would be in the

15   range of 70 or 80 probably.  The testimony I've given has been

16   in federal court, in state court, in arbitrations,

17   domestically, international arbitrations and before regulatory

18   bodies.  I've testified before legislative bodies on a couple

19   of occasions.

20   Q.  Could you please describe to the Court the scope of your

21   engagement in this matter.

22   A.  Well, as you indicated earlier, I was engaged to calculate

23   the injuries suffered by Frontier as a result of the

24   termination of the Framework Agreement by AMCK, and the amount

25   of damages that would have to be paid to Frontier in order to

1    make it whole.

2    Q.  Did you reach an opinion based on reasonable certainty

3    regarding the amount of damages incurred by Frontier Airlines

4    in this case?

5    A.  I did.

6    Q.  Based on your most recent calculations, what is your

7    opinion, what is in your opinion the current amount of those

8    damages?

9    A.  I think my current opinion, based on the most recent

10   calculations, is that those damages amount to $49 million,

11   $49,660,000.

12   Q.  Is that for as of April 8, 2024?

13   A.  It is.

14   Q.  Was that 48,660,000 or 49?

15   A.  It was 49, excuse me.  Yes.  49.  I misspoke, I apologize.

16   Q.  In the event that the Court determines that a -- and what

17   is that based on?  What type of discount rate and type of

18   discount methodology is that based on?

19   A.  That is based upon a discount rate which is derived from

20   Frontier's cost of debt at the time of the injury.

21   Q.  Did you do an alternative calculation of the amount of

22   damages, were the Court to choose to base the discount rate on

23   a weighted average cost of capital analysis?

24   A.  I did.

25   Q.  What was that?

1    A.  In that case the damages would come to $48,906,000.

2    Q.  Would you please summarize for the Court the methodology

3    you undertook to calculate those damages.

4    A.  The methodology I employed is what's called the but-for

5    methodology.  This methodology is laid out in the handbook on

6    scientific evidence.  The reference book on scientific

7    evidence.  It basically involves a contrast between the actual

8    situation of the injured party, given the injury, and what the

9    economic status of that party would have been in the instance

10   that the injury had never occurred.

11           So one can observe what the actual status is based

12   upon what we see in front of us.  The alternative scenario has

13   to be reconstructed using economic reasoning and principles.

14   That alternative scenario is sometimes called the world as it

15   would have been but for the injury, or, in shorthand, the

16   but-for world.

17   Q.  Understood.  And for the damages that you calculated, have

18   those damages all been incurred as we sit here today in court?

19   A.  Not as of this date.  The damages are based upon the

20   differences in leasing terms, the difference between the leases

21   that Frontier would have entered into under the Framework

22   Agreement, and the leases that it actually entered into, you

23   know, and the stream of payments associated with those leases.

24   Some occur prior to this date, some will occur in the future.

25   Q.  And what steps did you specifically use to calculate the

1   current value of Frontier Airlines' damages?

2   A.  Well, first of all, in the case of the actual leases

3   entered into by Frontier, those are, you know, you know, the

4   terms of those leases are actually available, and one can look

5   at the provisions of the leases and calculate what the lease

6   payments are.

7           One can also look at the amounts that Frontier is

8   actually paying.  The lease payments are constant over the term

9   of the lease, so we know what those payments are going to be.

10          In the case of the but-for world, there are formulas

11  contained in the Framework Agreement which specify what the

12  amounts of the leases, lease payments would have been under the

13  leases that were provided for by the Framework Agreement.  So

14  one can look at those formulas and calculate in the alternative

15  what the lease payments Frontier would have incurred would have

16  been.

17  Q.  And was there another step to your analysis in determining

18  the damages that were suffered by Frontier?

19  A.  Yes, because the lease payments extend over a multiyear

20  period, you know, they occur at different points in time.  And

21  in order to express the damages in terms of what they amounted

22  to at the time of the injury, one needs to discount that stream

23  of payments back to the point of injury.

24  Q.  And you mentioned that you have two analyses for discount

25  rates.  Let's stay with the one that you used.  How did you

O4A3FRO3                           Neels – Direct

1    determine which one to use?

2    A.   Well, if you look at the nature of the -- well, let me

3    start first by saying as a general rule, if you're discounting

4    a stream of payments, the discount rate that you use should

5    reflect the riskiness of those payments.

6         So one needs to look at the nature of the payments in

7    order to make judgments about that risk.

8         Now, to set up a contrast, if you were looking at the

9    future sort of annual income of Frontier, that could vary

10   because of a wide range of different factors.  But that same

11   variation is not true of the lease payments.  Both the actual

12   leases and the alternative leases it would have taken effect

13   under the Framework Agreement, both specified in great detail

14   what the payment streams would be into the future.  So those

15   payments are not subject to a great deal of risk and

16   uncertainty.  They're much more like debt payments than

17   payments to an investment in a business or the equity in a

18   business.

19        So I judged that the best -- the most appropriate

20   discount rate, given the characteristics of that stream of

21   payments, would have been a debt base discount rate.

22   Q.   And you mentioned that the payments were not subject to

23   other influencers in the marketplace.  What would those types

24   of influencers be?

25   A.   Well, for example, if you think about what might affect the

1  bottom line income of Frontier, could be changes in market

2  conditions, changes in fuel prices, changes in the structure of

3  the market or the degree of competition Frontier is facing.

4  These are all things that can happen to and do happen to

5  airlines in the normal course of their business.  None of that

6  would have had any effect on the payment obligations that

7  Frontier now faces or that it would have faced had the

8  Framework Agreement remained in effect.

9  Q.  How did you measure Frontier's aftertax cost of debt as of

10  the date of the alleged injury?

11  A.  Well, I initially, my assessment of the cost of debt was

12  based upon an examination of debt agreements entered into by

13  Frontier as reported in their financial statements.

14      There was a particular debt agreement that was entered

15  into late in 2020, that it was a secured debt agreement in that

16  it was backed by Frontier's credit card receivables, it had a

17  specific interest rate at the time it was entered into, and I

18  used that interest rate as my discount rate.

19      Subsequently I found an alternative source that I

20  thought to be more reliable, and in a supplemental report I

21  recalculated damages based on that alternative debt rate.

22  Q.  What was that other source that you relied upon?

23  A.  That was based upon a cost of debt reported by Bloomberg.

24  Bloomberg is a financial information service that's widely used

25  and well respected in the industry.

O4A3FRO3                        Neels - Direct

1          They publish routinely figures for the cost of capital

2     for publicly traded companies, and they will report separately

3     the cost of equity and the cost of debt.  The alternative

4     measure that I used was based upon the cost of debt as reported

5     by Bloomberg.

6     Q.  And so, what is changed between your original opinion and

7     the supplemental opinion?

8     A.  Well, Frontier's history was that it was a publicly traded

9     company, that it went private for a time, and then later it

10    went public again.

11         So initially, when I went to look for discount rates,

12    I looked into Bloomberg for the cost of capital and I looked

13    using the stock ticker that was associated with its original

14    public incarnation.

15         During my deposition, I was asked whether, you know,

16    which particular stock ticker I had searched for, and I became

17    aware then that there was a separate listing for the subsequent

18    public company.  Once I was aware of that, I looked into it,

19    and found that Bloomberg had in fact published both cost of

20    capital estimates and cost of debt estimates for the period I

21    was interested in.  So I revised my calculations based on that

22    alternative source.

23    Q.  Going back to the first analysis based on this loan.  What

24    was the percentage that you applied to the debt and then

25    subsequently adjusted?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  If I remember correctly, the aftertax discount rate was

2  2.2 percent.  And I think the figure that was reported by

3  Bloomberg on an aftertax basis was 1.1 percent.  To the best of

4  my recollection, as I sit here without my report in front of

5  me.

6  Q.  Do you have your report here?

7  A.  Not directly in front of me.

8  Q.  Is it here in the courtroom?

9  A.  I don't have a copy myself.  Someone on your staff may.

10  Q.  We'll move on.

11  A.  Okay.

12  Q.  You mentioned you considered other discount rates.  And is

13  this the rate that you used to support a second damage

14  calculation?

15  A.  Yes.  My second -- my alternative and second choice

16  discount rate was the Frontier's weighted average cost of

17  capital.  And for that I relied upon the figures published by

18  Bloomberg for the relevant time period.

19  Q.  Do you recall what you used for your weighted average cost

20  of capital for your September 2022 report?

21  A.  Yes.  Now, as I mentioned, Frontier had been publicly --

22  excuse me for a second.  I'm a little hoarse.

23      Frontier had been publicly traded and then it

24  subsequently went public.  So I found historical values for

25  Frontier's cost of capital, but nothing for the time period I

1    was interested in, which was in May of 2020.  So what I did in

2    my initial report was I gathered together all of the values I

3    could find in Bloomberg for airline weighted average cost of

4    capital, and I ran a statistical analysis based upon a variety

5    of independent variables, and came up with a statistical

6    prediction for what I thought Frontier's cost of capital would

7    have been in 2020.

8            As I recall that value came out to be 7.1 percent on

9    an aftertax basis.

10   Q.  You subsequently acquired the Bloomberg weighted average

11   cost of capital percentages based on the public -- the new

12   public information and that different ticker?

13   A.  That's right.  It was, at this time, I believe Frontier was

14   privately held, but once it went public, it had retroactively

15   published financial information that allowed Bloomberg to do a

16   calculation.  And if I remember correctly, I think that

17   discount rate that was published by Bloomberg for 2020 was more

18   in the neighborhood of -- I think it was 1.8 percent, if I

19   remember correctly.

20   Q.  And so, why did you choose for the weighted average cost of

21   capital to use the Bloomberg rate, versus the rate that you

22   developed through the analysis, the regression analysis?

23   A.  Well, I find, you know, if there is input to my damage

24   calculations that can be sourced to an independent third party

25   that is considered to be very reliable, I will typically use

1    the source like that, simply to narrow the range of issues in

2    dispute.

3    Q.  Now, are you aware in this case that Frontier employees

4    have stated that they internally use a discount rate of

5    10 percent?

6    A.  I am.

7    Q.  I'll represent, and counsel will correct me if I am

8    misstating the record, but there was a witness by the name of

9    Spencer Thwaytes who testified that the rate of 10 percent was

10   still in use when he left Frontier approximately nine months

11   ago.

12          Do you understand what a rate, a discount rate being

13   in use like that would mean if it's not changed for

14   three-and-a-quarter years?

15   A.  Well, if it hasn't changed in a number of years, then

16   obviously it's not being updated regularly to reflect changing

17   conditions.

18   Q.  And is there a method that you are aware of when a company

19   elects a discount rate, it doesn't change, and what they're

20   using it for?

21   A.  Well, I mean, I think it's a practice that I've seen on a

22   number of different occasions.  Many times -- many companies

23   have to repeatedly make, in the ordinary course of business,

24   financial decisions, and they will often have a rule of thumb

25   discount rate that they apply to inform those decisions.

1          It's often referred to as a hurdle rate.  It is

2    designed to give -- to make their internal decisions more

3    consistent, and more reflective of company policy.  It's often

4    been the case in my experience that these hurdle rates are set

5    in excess of a company's cost of capital.  But it is a

6    different animal from a cost of capital used for a different

7    purpose.

8    Q.  And to your knowledge, how often is a weighted average cost

9    of capital calculated by Bloomberg?

10   A.  That depends upon company policies.  It varies greatly.

11   And it's more of an informal measure, as I said, designed to

12   give consistency to internal decision making.

13   Q.  Separate from that analysis, focusing on Bloomberg, how

14   often is their reporting of various companies' weighted average

15   cost of capital?

16   A.  They typically update their calculations on a quarterly

17   basis.

18   Q.  Any more frequent than that?

19   A.  Well, I couldn't say that -- I haven't looked into all the

20   dark corners of Bloomberg, but in my experience it's usually

21   every quarter they will come up with a revised calculation.  It

22   seems to correspond to the issuance of quarterly financial

23   reports.

24   Q.  I'd like to ask you some questions about how you treated

25   taxes in the net present value calculation.

O4A3FRO3                          Neels - Direct

1          First of all, how did you analyze Frontier's damages,
2     on a pretax or on an aftertax basis?
3     A.  I followed what's known as an aftertax approach.  Which
4     is -- it's always been in my view and experience one of the
5     standard approaches one can take.
6     Q.  Is that approach recognized in any learned treatises in
7     your field?
8     A.  It is.  I mean, I will say initially I recall having a
9     discussion with a Professor Franklin Fisher of MIT who was a
10    well respected and renowned economist and also very experienced
11    expert witness.  And he explained the aftertax calculation to
12    me personally when I was working with him putting a damage
13    analysis together for purposes of his testimony.
14         It's also set forth in an article he wrote on
15    methodology for calculating damages, and it's also discussed in
16    the reference manual on scientific evidence.
17    Q.  All right.  And so, what is the purpose of that analysis?
18    A.  Well, it's -- I think the purpose of any damage analysis is
19    to come up with a damage award which, if it is awarded, will
20    put the injured party back into the position they would have
21    been but for the injury.
22         So, it's in my experience, there are -- it's
23    recognized that there are two different ways of getting at
24    that.  An aftertax approach or pretax approach.  The pretax
25    approach simply doesn't deal with taxes at all.  It calculates

O4A3FRO3                     Neels - Direct

the nature of the injury on a pretax basis, and then it

calculates a damage amount to compensate for those injuries.

In the aftertax approach, one calculates first the damages

suffered by the injured party on a pretax basis.  One then

adjusts them for the effect of those losses on the tax

liability of the juried party.  That has the effect of lowering

the amount of injury, because some of it is offset by tax

savings.

        Then when you sum those up, you have to recognize that

the amount that you have has been reduced because of tax

liability, and in order to make the injured party whole, the

compensation that's given has to be such that aftertax it will

cover all of the aftertax losses.

        So if you think about an injury and a damage award,

there is money going out with the injury, and then money coming

back in with the award.  So in an aftertax approach, recognize

the tax implications both of the injury, the money going out,

and the tax consequences of an award, part of which will

increase the tax liability of the injured party.

        So it's designed those cancel out and the injured

party is left where it would have been but for the injury.

Q.  All right.  So, Dr. Neels I want to just clarify one point.

I have in my notes that the amount suffered by Frontier was

48,660,000, and I heard you say 49,660,000.  I want to clarify

that for the record.  If you need to look at anything, you're

1    welcome with the Court's permission to look at your materials

2    that you have here.

3    A.  Just in order to make sure that the record is accurate, I

4    would like to take a peek at my report.

5    Q.  Is that in your folders?

6    A.  I don't have a copy with me, unfortunately.

7    Q.  All right.  I think we'll just -- I don't have your report

8    with the current interest as of April 8.

9    A.  Hmm-hmm.  I may have that with me.  If I could go check my

10   notes.  May I?

11            MR. HOSENPUD:  Your Honor, may the witness grab his

12   notes, please?

13            THE COURT:  Yes.

14            THE WITNESS:  Thank you.

15   A.  I sincerely apologize for the fuzziness of my memory about

16   this.  But, yes, the final -- the debt base number that it

17   calculated was 48,660,000.  So it was 48.660 million dollars.

18   The WAC base number was $46,906,000.

19   Q.  So, that's the earlier figures that you gave in the start

20   of your testimony, is that right?

21   A.  That's correct.

22   Q.  So, let's turn back to the tax -- the aftertax treatment

23   for present value calculation.

24            Does calculating the damages on an aftertax basis in

25   any way award Frontier Airlines for taxes?

O4A3FRO3                              Neels – Direct

```
 1   A.  It really does not.  All it does is to put both sides of
 2   the calculation on the same basis.
 3   Q.  What other factors go into the aftertax analysis of
 4   Frontier's damages?
 5   A.  Well, in any calculation of damages, there are, you know,
 6   in my view there are two steps involved.  One is to calculate
 7   what was the magnitude of the injury as of the time of injury,
 8   and where the effects of the injury play out over time.  That
 9   will require some discounting.  But then, if the injury
10   occurred some time ago, that means the injured party has been
11   denied the use of those resources for a period.  So, if
12   Frontier eventually receives compensation for its injury, that
13   compensation should reflect not just the amount of the original
14   injury, but the time value of money, the fact it wasn't able to
15   put those resources to work over a period of time.
16   Q.  And did you so calculate that as part of your figure?
17   A.  I did.  It's referred to sometimes as prejudgment interest.
18   Q.  And what did you look at as sources to guide that
19   determination of the prejudgment interest?
20   A.  Again, following what I regard as generally accepted
21   principles, the general view and the one I subscribe to is the
22   appropriate rate to apply in moving forward is the risk free
23   rate.  Because not only has Frontier been denied the use of
24   those funds, it's been denied the chance to incur the risk and
25   be compensated for that.  So, in bringing it forward and
```

1    calculating prejudgment interest, I used as a risk free rate I

2    think the federal T-bill rate on an aftertax basis.

3    Q.  What rate, what point in time did you analyze that federal

4    T-bill rate?

5    A.  I looked at it on a period-by-period basis from the point

6    of injury up to the 8th of this month.

7    Q.  And we may have touched it but I want to make sure I didn't

8    miss eliciting this information.

9           The date of injury that you used for the beginning of

10   your analysis was what?

11   A.  Was May 8, 2020.  The date when AMCK announced it was

12   terminating the Framework Agreement.

13   Q.  And why is that an appropriate date for this analysis?

14   A.  Well, that is the point in time when the actual world and

15   the but-for world began to diverge.  At that point in time

16   Frontier knew it couldn't count on AMCK to finance the purchase

17   of the new aircraft.  It had to begin scrambling to find

18   alternative lessors, and begin acting in various ways to deal

19   with the new situation it had.

20          So, I think that's the point where the, you know, the

21   two worlds one considers in the but-for approach start to

22   differ.

23   Q.  And in calculating the aftertax cash flows, and applying

24   this tax gross up, what tax rate did you use and was that an

25   effective rate or a marginal rate?

O4A3FRO3                           Neels – Direct

1   A.  Well, the specific number that I used is, as I recall, was

2   22.8 percent.  The specific way I derived that number was to

3   look at the effective tax rate of Frontier for the year 2019.

4   I picked that year specifically because that was the normal

5   year in which Frontier's tax liability wasn't moved around

6   dramatically by special considerations.

7   Q.  What considerations are they?

8   A.  Oh, well, for example, you know, during the period of the

9   pandemic, Frontier, like many airlines, received some amount of

10  public support.  It had losses which, you know, it was able to

11  carry forward.  Various provisions like that.

12           I picked 2019 as a normal year precisely for the

13  reason that in a normal tax year, one would expect the

14  effective rate to be very close to the company's marginal rate.

15  And conceptually it is the marginal rate that's appropriate in

16  this case.  That would be the rate, if Frontier's income were

17  to increase by a dollar in some year, by how much would its tax

18  liability go up.  That's the definition of the marginal rate.

19  And in 2019, that was very close to the effective rate.

20  Q.  Did you verify whether that marginal rate was something

21  that could be counted on for subsequent years, or did that

22  change from a rate of 22.8 percent?

23  A.  Well, I did look at that.  Subsequent to the publication of

24  my report, I asked the staff I was working with to look into

25  that.  And it turns out that the marginal rate is something

O4A3FRO3                          Neels - Direct

1    that Frontier publishes in its annual financial statements.  So

2    it actually published marginal rates for a number of years, and

3    those rates turned out to be very, very close to the rate that

4    I used, differing by only a few tenths of a percentage point.

5    The differences from year to year I think had to do with

6    changes in state tax provisions.  The federal rate over this

7    period was constant because it hasn't changed since the passage

8    of the 2017 Tax Act.

9              MR. BUTLER:  Your Honor, I'd just like to rise to

10   object.  Dr. Neels is testifying at this point about a marginal

11   tax rate that is not disclosed in any of his several expert

12   disclosures.  And there is no evidence in the record concerning

13   marginal tax rates.

14             MR. HOSENPUD:  May I ask a question to support that

15   testimony, your Honor?

16             Thank you.

17   Q.  Did you make reference in your report to an effective tax

18   rate as any sort of proxy for the marginal tax rate when you

19   did the analysis for 2019?

20   A.  Well, certainly in picking the effective tax rate for 2019,

21   I was very clear that I selected that precisely because it was

22   a normal year where the tax liability wasn't affected by

23   special changing circumstances.  So in that sense I did.

24             MR. BUTLER:  Your Honor --

25             THE COURT:  Was the rate set forth in the document you

O4A3FRO3                          Neels – Direct

1    were using or did you calculate it?

2              THE WITNESS:  The effective tax rate -- well, it is

3    calculated by dividing the tax liability by the pretax income.

4    So, I did the division.  But those two numbers were certainly

5    set forth in the documents I cited in my expert report.

6              THE COURT:  That's what you did.

7              THE WITNESS:  Yes.

8              MR. BUTLER:  Your Honor, just renew the objection.

9    He's talking about the estimate of tax rate which is disclosed

10   in the expert report, but there is no disclosure of marginal

11   tax rates, to my memory, anywhere in the expert disclosures

12   I've seen to date.

13             THE COURT:  What do you have to say about that,

14   doctor?  The division doesn't produce the marginal rate.  It

15   the produces the whole rate.

16             THE WITNESS:  Well, as I'm sure you know, your Honor,

17   a company's financial statements typically run on for 100 to

18   200 pages.  And you know, I cited those financial statements as

19   sources that I relied upon.  I didn't happen to discover that,

20   in Frontier's case, it reported its own marginal tax rate in

21   those same documents I cited.  So I did cite the source, but I

22   did not point out the specific page on which it could be found.

23             THE COURT:  Did you use Frontier's marginal rate?

24             THE WITNESS:  I used --

25             THE COURT:  Yes or no?

O4A3FRO3                              Neels - Direct

1          THE WITNESS:  Yes.

2          THE COURT:  The ones you found in its publications?

3          THE WITNESS:  Your Honor, to answer fully and

4    honestly, I wasn't aware at the time I prepared my report that

5    Frontier disclosed its marginal rate, but I did use the

6    information from its income statement in such a manner that I

7    was confident would bring me very close to the marginal rate.

8    What I was looking for was the kind of rate that would apply to

9    an additional dollar of income, not to -- you know, well, not

10   to the various kind of credits and additional taxes that come

11   into play given the complexity of the tax code.  So I was

12   certain -- it was certainly my intention in using the effective

13   rate to get at something that would be constant over time.  And

14   I was aware, too --

15         THE COURT:  This is going to the weight of his

16   opinion, but not disqualifying him as a whole.

17         MR. BUTLER:  Thank you, your Honor.  And I'll address

18   this in our cross as well.

19         THE COURT:  I assume it will be explored on cross.

20         MR. HOSENPUD:  Thank you, your Honor.

21         THE COURT:  While he's looking something up, let me

22   ask you a question, doctor.

23         Are you an economist?

24         THE WITNESS:  I am.

25         THE COURT:  What is the economist's definition of the

O4A3FRO3                        Neels - Direct

1   word "cost"?

2          THE WITNESS:  Well, it would be any expense incurred

3   in the course of producing the good or service, which is sold

4   for revenue.  It is a very broad term in that sense.

5          THE COURT:  I thought the definition was the value of

6   the most valuable thing, asset, forgone for lack of the

7   capital.

8          That's cost of capital, isn't it?

9          THE WITNESS:  It would -- well, certainly if -- if you

10  think about the inputs to a production process --

11         THE COURT:  Isn't that the economic definition of the

12  cost of capital?

13         THE WITNESS:  The cost of capital will be the -- as I

14  understand that, it's the amount that a business would have to

15  pay to encourage investors to provide financing, to put money

16  in the business.  Now, from the point of the view of the

17  investors, they will determine that by comparing what they

18  could earn by putting the money into Frontier, but what they

19  could earn by putting it into other uses.

20         So, I think you're right in that the value is

21  determined by the best alternative use of the resource.  But

22  that's looking at it from the point of the view of the people

23  supplying that resource.  From the point of view of Frontier,

24  that's what Frontier has to pay to get funds.  And if there are

25  lots of other attractive investments, Frontier will have to pay

1    more in order to attract the resources it needs to conduct its

2    business.

3            So it's true in economics, one man's cost is another

4    man's revenue.  That's part of it.

5            THE COURT:  Thank you.

6            MR. HOSENPUD:  Thank you, your Honor.

7    BY MR. HOSENPUD:

8    Q.  So, Dr. Neels, did you also as part of your analysis review

9    Mr. de Jounge's report?

10   A.  I did.

11   Q.  And did you come to an understanding of the discount rate

12   that Mr. de Jounge used in connection with his analysis of

13   Frontier's damages?

14   A.  I did.

15   Q.  What discount rate was used?

16   A.  He advocated the use of a 12 percent discount rate.

17   Q.  And what formed the basis of that 12 percent discount rate?

18   A.  My understanding of his argument is that he started with

19   the 10 percent rule of thumb rate that we discussed earlier.

20   And he characterized that as Frontier's own assessment of its

21   cost of capital.  And he added to that a 2 percent increase

22   which he said reflected general increases in interest rates

23   between the time of the injury and the time he was offering his

24   opinion.  If I recall his report correctly.

25   Q.  And did you find flaws in that analysis?

1    A.  I did.

2    Q.  What did you conclude?

3    A.  Well, I think as I stated earlier, I think it's incorrect

4    to calculate this rule that's used in internal decision making

5    with the cost of capital, and certainly with a cost of capital

6    at a particular point in time.  So I think that's, as a

7    starting point, that's probably incorrect.

8         I also think that in adjusting that rate upward based

9    upon movements in interest rate subsequent to the point of

10   injury, he's essentially using hindsight to increase the rate.

11   And I don't think that's conceptually appropriate.  The

12   conceptual sources I rely upon for methodology suggest that the

13   right discount rate to use is one as of the time of injury.

14   Q.  Did you also look at Mr. de Jounge's analysis of two of the

15   leases in this case and the methodology by which he calculated

16   the ultimate basic rent for those two leases?

17   A.  I did.

18   Q.  What did you determine was his methodology?

19   A.  Well, what his methodology was or what I thought of his

20   methodology?

21   Q.  First what was it.

22   A.  All of the lease documents that I examined, both the ones

23   that were laid out, the terms that were laid out in the

24   original Framework Agreement and the terms of the agreements

25   that Frontier entered into with CDB and JSA, had formulas for

1    calculating what the monthly lease payment would be.  And the

2    effect of those formulas was to adjust -- they all provided a

3    starting point for what the base rental would be, and then a

4    formula for moving that rate up or down, depending upon how

5    interest rates moved between the time the agreement was entered

6    into and when the lease actually took effect.

7              So, in the case of JSA, there was a formula that it

8    specified a band within which the base rent wouldn't change.

9    Outside that band it would change.

10             Now, Mr. de Jounge said he noted that the language was

11   slightly different in the basic agreement with JSA and the

12   leases in that one referred to a number as a percentage, and

13   the other just referred to it as a number.

14             So, the effect of that was that, you know, the

15   parameter that was defined as eight-tenths of a percentage

16   point in the original agreement, he interpreted that as

17   basically a fraction or 80 percent.  Another number that was

18   referred to as .59 something, and was regarded as 59-hundredths

19   of a percentage point in the original agreement, he interpreted

20   as 59.7 I think it was percent interest.  So he argued that the

21   actual leases specified that this sort of hold harmless band

22   spanned the range between 59 percent annual interest and

23   80 percent annual interest.

24   Q.  In your experience, has the United States, or your lifetime

25   ever experienced interest rates in the 60 to 80 percent range?

1   A.  Not that I've seen, and I'm old enough to remember the

2   inflation of the '80s when one can earn 17 percent on a money

3   market fund when inflation was running at 18 percent.  But I've

4   never seen anything like that.  Also it's very -- it seems

5   fairly inexplicable to me why the parties would suddenly change

6   their thinking so drastically between the original document and

7   the leases.

8   Q.  The use of 60 to 80 percent in the formula of the JSA

9   leases, would that still make available the three options that

10  that formula was designed to be a hedge for?

11  A.  Well, as a practical matter, no.  Because any interest rate

12  that we're likely to see or that we've seen over the past

13  10 years would have all fallen below the interest rate of

14  59.7 percent per year.  So essentially made the formula

15  meaningless for practical purposes.

16  Q.  Would it result in only a one-way direction for the rent

17  payments to go?

18  A.  Yes.

19  Q.  Which way was that?

20  A.  To take it down.

21  Q.  All right.  And did you have an opportunity to see

22  information about what Frontier was actually paying on those

23  leases?

24  A.  Yes.  And in fact, the amount that Frontier was paying JSA

25  was consistent with the formula -- the interpretation of the

O4A3FRO3                          Neels - Cross

formula I used, the formula that was laid out in the basic

agreement, and the interpretation of these .597 and .80 numbers

as percentage points rather than as fractions.

          MR. HOSENPUD:  Thank you.  I have nothing further at

this time.

CROSS-EXAMINATION

BY MR. BUTLER:

Q.  Good afternoon, Dr. Neels.  Again my name is Jeff Butler.

You may remember me from your deposition and I'll be asking you

some questions this afternoon.

          First I want to ask about your experience.  Have you

had any experience specifically in analyzing the terms of

commercial aircraft lease agreements, apart from your

experience in this case?

A.  I will say only since my deposition, I have -- was involved

in one matter in which I prepared a report that was used for

settlement purposes, and because the settlement is

confidential, I'm not really at liberty to disclose any

information about that.  Other than the fact to say yes, in one

instance.

Q.  And that one instance was after you prepared your initial

report in this case?

A.  Yes.

Q.  So is it correct that your first experience with commercial

aircraft leases in an expert capacity was in this case?

1    A.   The first time I've ever done calculations relating to

2    them.  I've done airline work before, and of course was aware

3    that was a commonly used source of financing, but I don't think

4    I've ever addressed it specifically before.

5    Q.   I'm talking about calculating the cash flows associated

6    with an aircraft lease agreement.  Have you done that before

7    this case?

8    A.   I don't believe so.

9    Q.   What has been your experience in calculating damages in

10   breach of contract cases?

11   A.   I have done that on a number of occasions.  You know, I

12   think it's actually it is a little bit hard to answer because

13   many cases there are multiple causes of action, and breach of

14   contract is one among a number of them.  But there have been a

15   number of occasions that I've specifically addressed simply

16   breach of contract issues as the main cause of action.

17   Q.   Could you give a ballpark estimate of the number of times

18   you have been retained as an expert in a breach of contract

19   case for the purpose of calculating damages?

20   A.   Probably in the neighborhood of five or six, something like

21   that.

22   Q.   In preparing your opinions for this case, did you have

23   access to any Frontier personnel, either by way of interview or

24   other interaction?

25   A.   I did.

1  Q.  Who were the Frontier employees you interacted with in

2  preparing your opinions?

3  A.  I spoke on a couple of occasion with one employee, his -- I

4  think his first name is Sharath.  His name has come up several

5  times.

6  Q.  Would that be Sharath Sashikumar?

7  A.  Yes.

8  Q.  So, you have you've spoken to Mr. Sashikumar.  Anybody else

9  at Frontier?

10  A.  Not that I can recall as I sit here, no.

11  Q.  You don't have to give me a blow by blow, but what was the

12  subject of your discussion with Mr. Sashikumar?

13  A.  On the first occasion, he had put together some sort of

14  calculation of damages, and he was explaining to me what he did

15  and the assumptions behind it.  And as part of that, he did

16  discuss this 10 percent rule of thumb that he used.

17  Q.  So, we've seen in this case Mr. Sashikumar's calculation of

18  damages from October 2020.  To the best of your recollection,

19  is that the damages model that you discussed with

20  Mr. Sashikumar?

21  A.  That sounds about right as far as the date.  I don't

22  remember the date specifically, but it was something that was

23  done early on.

24  Q.  Did you agree or disagree with the methodology used by

25  Mr. Sashikumar in that internal analysis of damages?

O4A3FRO3                          Neels - Cross

A.   I disagreed on a number of points with what he did.

Q.   And what were those points?

A.   Well, one was that I disagreed with -- I thought his choice
of a discount rate was fairly arbitrary.  As I recall, too, I
think it was the case that the Framework Agreement leases had a
provision that essentially allowed Frontier to opt out of the
lease after the eighth year.  And he had calculated some value
for, you know, for the -- how that would have affected the
lease payments for years 9 through 12.

         And in my calculations, I noted that the Framework
Agreement provided for this option, but I didn't put a value on
it.  I just noted that I hadn't taken it into account, and that
by -- in not taking it into account, that made my calculation
of damages more conservative.  But I didn't agree with the
valuation he put on it or at least didn't feel it was
sufficiently grounded in fact.

Q.   Did you have any other disagreements with the methodology
used by Mr. Sashikumar?

A.   There may have been -- I may have had -- taken issue with
the way in which he calculated what I would call the but-for
rental amounts.  I don't know that he got down into the
specific details of exactly the specific interest rates that
would have been at issue, but my memory on that isn't very
clear.

         The primary thing I remember is the discount rate.

O4A3FRO3                        Neels - Cross

The secondary thing is the valuation of this early termination

option.

Q.  In Mr. Sashikumar's calculation, did he attempt to

determine the tax effect of cash flows to Frontier?

A.  I don't recall that he did.

Q.  And did you have an issue with that or did you consider

that an alternative way of going about calculating damages?

A.  Well, I think the pretax approach and the aftertax approach

are alternative ways, yes.  So, I had no particular issue with

trying to do it on a pretax basis.

Q.  Dr. Neels, are you a certified public accountant?

A.  I'm not.

Q.  Do you have any professional experience as a tax preparer?

A.  No professional.

Q.  Do you consider yourself an expert on the calculation of

corporate income tax?

A.  I don't.

Q.  Are you an expert in any area of taxation?

A.  You know, I've certainly addressed tax issues over the

course of my work.  Taxes are the reality we all live with, and

they certainly affect lots of decisions and calculations and

returns and so forth.  So I've dealt with them a lot, but I've

never really considered myself to be a tax expert specifically

or put myself forward as an expert in taxes, if that's what

you're asking.

1          I have a working knowledge of taxes, not really a

2    nuanced understanding of all their details.

3    Q.  But you don't hold yourself out as an expert on any

4    particular area of taxation, correct?

5    A.  I believe that's just what I just said, yes.

6    Q.  Let me ask you about your methodology generally.  As I

7    understand it, your calculation is basically analyzing the

8    difference between two sets of cash flows, those under the

9    hypothetical AMCK leases and those under the actual CDB and JSA

10   leases.  Is that correct?

11   A.  That's correct.

12   Q.  And you're analyzing those cash flows over in each case a

13   12-year time period, right?

14   A.  That's correct.

15   Q.  Let me just put up for your viewing an exhibit from your

16   September 9 expert report.  This is your original expert report

17   in this case, and I want to show you Exhibit 1 just as an

18   example of your analysis.  And we'll just look at this zoomed

19   out.  We're not going to focus on the individual figures so we

20   don't need to see them just yet.

21          Do you recognize this to be Exhibit 1 from your

22   original expert report?

23   A.  That's what it looks like, yes.

24   Q.  Does this indicate how you analyzed all those different

25   cash flows -- well, strike that.

O4A3FRO3                              Neels – Cross

```
 1              Let me ask you, does this analysis relate to MSN 9549?
 2    A.  It does.
 3    Q.  Is that the first aircraft that was delivered to Frontier
 4    after the termination of the Framework Agreement?
 5    A.  I think it probably is because it has a lower number.  But
 6    I didn't memorize the MSN numbers.
 7    Q.  Well, at any rate this is one of the A320 aircraft that
 8    delivered in July of 2020; is that correct?
 9    A.  Yes.
10    Q.  Do you agree you can see the delivery date from the
11    upper-left hand of this complicated chart?
12    A.  Yes.
13    Q.  And this chart shows for, well, am I correct in
14    understanding that it looks like this chart is organized into a
15    number of different columns, and at the top there are headings
16    for the columns.  As a whole set of there are three columns
17    that have the heading "cash flows" in the middle of the page,
18    right there.  Cash flows under breached sale and leaseback
19    agreement AMCK.  Is that right?
20              I'm sorry to make you pull out your readers,
21    Dr. Neels.  I don't control the size of the print.
22    A.  Yes.
23    Q.  Would you agree those middle columns are analyzing the
24    hypothetical AMCK agreement?
25    A.  Yes.
```

O4A3FRO3                        Neels – Cross

1    Q.  And then moving over to the right a little bit, there are

2    three columns analyzing the actual agreement with CDB?

3    A.  Yes.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4ABFRO4                          Neels – Cross

1    BY MR. BUTLER:

2    Q.   And in this chart are you seeking to set forth all of the

3    cash flows over a 12 year time period for each of those leases?

4    A.   Yes, with the qualification that I noted in my report that

5    there were some provisions of the leases that I wasn't able to

6    put a number on.  Although as I explain in my report, I believe

7    that the specific things that I ignore had the effect of making

8    my calculations, the damages implied by my calculations lower

9    than they would have been.

10        For example, the provision for sharing the cost of air

11   worthiness directives I think it was one I wasn't able to put a

12   number on, so it doesn't appear here.  But other than that

13   calculation, this includes all the cash flows I was able to put

14   a number on.

15   Q.   And that includes both the purchase price at the delivery

16   date, as well as all of the lease payments over the 12-year

17   term, correct?

18   A.   Correct.

19   Q.   And do I understand correctly that for all of these cash

20   flows you applied a tax rate to determine the after-tax effect

21   of these cash flows on Frontier?

22   A.   I did.

23   Q.   And you applied the same tax rate to cash flows for all 12

24   years, correct?

25   A.   I did.

O4ABFRO4                          Neels - Cross

1   Q.  And that tax rate was approximately 22.8 percent, right?

2   A.  That's correct.

3   Q.  So your model assumes that Frontier has paid and will pay

4   that rate of taxes in each of the 12 years relevant to this

5   agreement, correct?

6   A.  I think that's not entirely correct.  I think that my

7   calculations assume that the incremental effect of these cash

8   flows on Frontier's tax liability will be in the magnitude of

9   22.8 percent of the incremental changes in the bottom line, not

10  that that would describe Frontier's overall tax liability

11  during this period.

12  Q.  But for purposes of your model, you are applying a tax rate

13  as some kind of proxy for Frontier's tax liability; is that

14  correct?

15  A.  Well, not for Frontier's overall tax liability.  I mean,

16  I'm trying to look at the -- in a way the incremental effect on

17  Frontier's bottom line from the change in lease terms.  And

18  what I'm interested in, therefore, not just the incremental

19  effect on its pretax income, but the incremental effect on this

20  after-tax income.

21           So I'm not really making a statement about its overall

22  tax liability, just about the effect of these changes on it.

23  Q.  I understand.  You're only analyzing the individual cash

24  flows, but for each individual cash flow is your model

25  attempting to estimate Frontier's tax liability associated with

O4ABFRO4                    Neels - Cross

1    that tax flow?

2    A.  Yes.  The incremental tax liability associated with each of

3    these cash flows.

4    Q.  Just to finish off your methodology.  So you calculate the

5    after-tax effects on Frontier of each of these cash flows for

6    both the hypothetical agreement and the actual agreement, and

7    then you subtract those to determine the difference as of the

8    date of each cash flow; is that correct?

9    A.  Yes.

10   Q.  And then I understand you employ the discount rate to

11   calculate the net present value of all those cash flows as of

12   May 8, 2020, correct?

13   A.  Correct.

14   Q.  And then you use a risk free interest rate to roll that

15   amount forward to roughly today's date; is that fair?

16   A.  Yes.

17   Q.  Did you employ the same methodology to cash flows for all

18   five of the aircraft?

19   A.  I did.

20   Q.  I want to focus on your application of a corporate tax rate

21   to cash flows over a 12-year time period.  Have you used that

22   approach to calculate damages in any other breach of contract

23   case?

24   A.  Not that I can recall, but I've always been aware that

25   pretax approach and the after-tax approach are all alternative

O4ABFRO4                        Neels - Cross

1   accepted ways of doing this.

2   Q.  I understand they are alternative approaches, but have you

3   ever used the after-tax approach that you're using here in any

4   breach of contract case?

5   A.  As I stated, not that I recall as I sit here.

6   Q.  Now, are you aware of any professional literature in your

7   area that recommends the approach you use in applying a tax

8   rate to analyze cash flows?

9   A.  Well, I certainly am aware of literature that endorses this

10  as a valid approach.  I think whether it's recommended that

11  depends upon the circumstances.  But as this is regarded, I can

12  identify literature that endorses this as a valid way of doing

13  things.

14  Q.  And what is that literature?  Can you identify a particular

15  publication?

16  A.  Two that come to mind.  One is the reference manual on

17  scientific evidence put out by the federal courts.  The other

18  is an article which I think I referred to in my deposition

19  which was the article by Professor fisher and Craig Romaine

20  which is entitled something like calculation of damages in

21  Janet Joplin's year book.  And it does lay out this after-tax

22  approach as a way of calculating damages.

23  Q.  Well, I'm glad you mentioned your deposition.  You recall

24  that you gave a different answer to that question at your

25  deposition?

O4ABFRO4                          Neels - Cross

1   A.  Which specific question are we talking about here now?

2   Q.  Well, I'll show you the question in a second.

3          Dr. Neels, do you recall giving a different answer at

4   your deposition?

5   A.  My recollection is that if I could cite specific literature

6   on this point, and I think I said at the time I couldn't call

7   one to mind because, for one thing, I remember personally

8   having a conversation with Professor Fisher about this

9   approach.  And he endorsed it and I regarded his opinions as

10  authoritative on this matter.

11         And if it had been perhaps 15 years since I had last

12  looked at Janis Joplin, so I forgot that the Janis Joplin paper

13  laid it out.  Then of course subsequent to my deposition, I

14  went to what I regard as the authoritative source which is the

15  reference manual on scientific evidence.  So I did, in response

16  to the question about my deposition, do a little bit of

17  additional work.

18  Q.  Let's go back to your deposition testimony to just review

19  the chronology.  I want to direct your attention to page 71 of

20  your deposition transcript, and I'm going to start with line

21  21.

22         I asked you, To your knowledge is this approach of

23  using of applying a tax rate to each cash flow a methodology

24  that's set forth in any kind of economic paper or publication?

25         And your answer was, goes over to the next page.  I

O4ABFRO4                          Neels - Cross

suspect it is because, but I couldn't name that publication

would be.  You know, in the various, you know, organizations

I've worked with, we've talked a lot about this kind of stuff.

And my sense is always been that this is, you know, an

absolutely standard way of doing it.  I recall having

discussed, you know, after tax calculations with Professor

Fisher, and how one had to, you know, if you calculated the

after tax damages, you had to gross up to account for the taxes

that would be paid on a damages award.  So this is -- I mean,

in my experience this is an absolutely standard approach.

         Do you recall giving that answer?

A.  Yes.

Q.  And I went on to ask you at line 17, But you're not aware

as you sit here today of any specific economic paper or

publication that endorses that approach to the calculation of

damages in a breach of contract case.  Is that correct?

         And you answered, If you're asking me to point towards

one, I couldn't name a title and an author.

         And I followed up by saying, Question, in the Fisher

paper that you referred -- I apologize.  The Fisher paper that

you referred to earlier, does it talk about the use of an

effective tax rate to adjust all of the cash flows in a damages

calculation.

         Your answer was, I don't think that it does.

         Do you recall giving that testimony?

O4ABFRO4                          Neels - Cross

1   A.  I see that's in the transcript, yes.

2   Q.  Was that accurate testimony at the time that you gave it?

3   A.  That was my understanding at the time I gave it.  The name

4   of the paper Janis Joplin focuses on another issues that

5   addressed in that paper which is, whether you should take into

6   account in calculating damages information that only becomes

7   available after the time of injury.

8            And because of the uniqueness of that name, I always

9   tend to think of it in terms of the view that says you focus on

10  damages as of the point of injury.

11  Q.  And this Janis Joplin paper that you're referring to from

12  Professor Fisher, does it recommend the use of using a single

13  effective tax rate to cash flows over a multi-year time period?

14  A.  If I remember correctly in the paper presents a number of

15  formulas, and I think it is the case that it has one tax rate

16  that it uses in those formulas.  I don't recall if it gets into

17  a discussion about what happens if tax rate vary over the

18  period of time.

19  Q.  Let me show you, sir, your declaration submitted in this

20  case as part of the pretrial order.  I want to direct your

21  attention to page 31 of that document where you talk about the

22  tax rate.

23           Do you recognize this as part of the declaration that

24  you have submitted?

25  A.  Yes.

O4ABFRO4                    Neels - Cross

1    Q.  And this shows your methodology for calculating what you

2    call the effective tax rate, correct?

3    A.  Yes.

4    Q.  And it looks like you took two figures from the Frontier

5    annual report on form 10K for 2021; is that correct?

6    A.  That's correct.

7    Q.  And the two figures are income before income taxes and

8    income tax expense, correct?

9    A.  Yes.

10   Q.  Did you calculate your effective tax rate by dividing

11   income tax expense by income before income taxes?

12   A.  Yes, I did.

13   Q.  And were those the figures for 2019?

14   A.  Yes.

15   Q.  And it shows here that the effective tax rate that you came

16   up with was 22.8 percent; is that right?

17   A.  Yes.

18   Q.  Were any of the cash flows that you analyzed in this case

19   from 2019?

20   A.  No.

21   Q.  So isn't it true that all of the cash flows you analyzed

22   were from 2020 and later?

23   A.  That's correct.

24   Q.  Well, let me show you the form 10K from 2021 and see if you

25   recognize it.  We marked this for identification as Defendant's

O4ABFRO4                    Neels - Cross

Exhibit 7.  We don't intend to offer it into evidence, but I'll

just make that statement for the record.

         This appears to be the 10K.  Do you recognize this as

the 10K for Frontier Airlines for the fiscal year ending

December 31, 2021?

A.  Yes, that's what it looks like.

Q.  Is this the 10K from which you obtained the information

that you used to calculate effective tax rate?

A.  Yes, I think it probably is.

Q.  I'm just showing you the cover page from that document, and

I just want to direct your attention to the middle parts of the

bottom of this page.

         Do you see the trading symbol for Frontier indicated

on this document?

A.  I do.

Q.  What is that trading symbol?

A.  ULCC.

Q.  I'd like to turn the page of this exhibit, and it will take

us to page 96 from this form 10K which I think is the page you

cited in your expert report.

         Do you recognize this chart as the source for your

data on income before income taxes and income tax expense?

A.  Yes.

Q.  And I see that focusing on the column for 2019 which is on

the right-hand side of the page.  I see that the numbers for

O4ABFRO4                         Neels - Cross

income before taxes, before income taxes and income tax expense

correspond to the figures that you cite in your report, right?

A.  Yes.

Q.  And dividing 74 by 325 that's how you come up with 22.8; is

that right?

A.  Yes.

Q.  Just focusing on the number income tax expense.  Does that

line from the 10K represent the actual amount paid of taxes

paid by Frontier in 2019?

A.  Well, it's listed there as the income tax expense for year

2019.  I just paid my income tax expense for 2023 and 2024, so

it's possible that that may not represent the amount of taxes

actually paid by Frontier in calendar year 2019.

Q.  So is it your testimony, sir, that you're not sure whether

that line from the 10K represents the actual taxes paid by

Frontier in 2019?

A.  Well, I'm not sure because, I mean, I would assume like

most public financials that that reflects accruals during the

year, so that would be the additional tax liability accrued

during the year.  That doesn't necessarily mean that all of the

payments out occurred at the same time, or that no payments

were made in 2019 for tax liability associated with other

operating years.  So I'm not really sure that that reflects the

actual amount in taxes paid by Frontier in that calendar year.

Q.  In preparing your analysis, did you review any other

O4ABFRO4                    Neels - Cross

documents to determine the amount of taxes actually paid by

Frontier in 2019?

A.  No, not in terms of a cash flow basis, not that I recall.

Q.  So you didn't review any of Frontier's tax filings in

preparing your report; is that right?

A.  I did not.

Q.  And as we pointed out or as I pointed out, you for 2019,

you calculated the estimated tax rate by dividing those two

numbers that are on right-hand side of the page.  Did you do

any analysis of the financial information for years prior to

2019?

A.  I don't believe so, no.

Q.  Did you review any of the financial data for Frontier for

years prior to 2019?

A.  Not that I recall.

Q.  Do you know what Frontier's estimated tax rate was for any

year prior to 2019?

A.  I don't.

Q.  Well, we have some other years shown on this page that also

shows the same data for 2021 and 2020.  Let's focus on 2020

first.

        Using the same methodology, what is the estimated tax

rate for 2020?

A.  Well, I can't really do the arithmetic in my head, but it

would be higher than that for 2019.

O4ABFRO4                    Neels - Cross

Q.  Let me help you with the arithmetic.  You would be dividing

a negative 147 by a negative 372, correct?

A.  Yes.

Q.  If I tell you the outcome of that calculation is negative

39.5 percent, would that sound approximately correct to you?

A.  39 percent, yeah, I guess that sounds like that could be.

Q.  Is that within the ballpark of 147 is 39.5 of 372?

A.  Yes.

Q.  What is it mean when an estimated tax rate is a negative

number?

A.  Well, the estimated tax rate is a negative number that

would correspond to a situation either where the operating

income was a loss, but there was nonetheless taxes paid; or

there was a positive income, and there was some refund on

taxes.

Q.  Explain to me the first of those situations.  How would

there be a situation where there was a loss, but there was

still taxes paid?

A.  This gets into the arcana of the tax code.  As we discussed

earlier, I don't put myself forward as a tax expert.  There

are -- I know lots of complicated reasons why the income one

calculates for under Gap could different from the income one

calculates for purposes of calculating tax liability.

        As a for instance, there can be the way -- think about

capital asset.  It might be depreciated in one way for purposes

O4ABFRO4                         Neels - Cross

1   of calculating financial statements, and a different way for

2   purposes of calculating taxes.  I know, for example, sometimes

3   the tax law allows accelerated depreciation of investments in

4   order to incentivize more investments by reducing the tax

5   burden on them.  Things like that can lead to differences

6   between operating income and taxable income.  And as is

7   well-known, the tax code is big as Asia, so I'm not familiar

8   with all the provisions of it.

9   Q.  Doesn't it suggest to you, Dr. Neels, that if the income

10  tax expense for 2020 was negative $147 million that Frontier

11  paid no taxes in 2020?

12  A.  That's what that would seem to imply.

13  Q.  Would you agree that it seems to imply that Frontier

14  experienced a tax benefit in 2020?

15  A.  Again that's what it would seem to imply.

16  Q.  Using your methodology what is the estimated tax rate for

17  2021?

18  A.  I mean, again, I don't have a calculator.  I'd say roughly

19  it looks like it's about one-third or 30 something percent.

20  Q.  I calculate the figure to be negative 29.1 percent.  Does

21  that seem roughly correct to you?

22  A.  No, because if you divide a negative number by a negative

23  number, you get a positive rate.

24  Q.  Well, setting aside whether it's a negative or positive

25  number, would you agree that in tax year 2021, Frontier

O4ABFRO4                          Neels - Cross

1   experience an income tax benefit of $42 million?

2   A.   That's what the financial statements imply.

3   Q.   Does that imply to you that Frontier did not pay any income

4   taxes in 2021?

5   A.   That's what that implies.

6   Q.   So this is the particular 10K that you looked at for

7   purposes of your original report, but we now have the benefit

8   of some additional financial data from subsequent years.  So I

9   want to show you the most recently 10K filed by Frontier which

10  we've marked for identification as Defendant's Exhibit 8.  And

11  we can just -- the cover page looks the same, except this is

12  for December 31, 2023, and let's go to the page of this report

13  that has data for additional years.

14       Do you see on the right-hand side of this report

15  there's the data from 2021, that we just looked at?

16  A.   Yes.

17  Q.   And Frontier had a tax benefit of that year of $42 million,

18  correct?

19  A.   That's correct.

20  Q.   For the following year 2002, it looks as though Frontier

21  had an income tax benefit of $8 million.  Do you agree with

22  that?

23  A.   That's what it implied.

24  Q.   Does that also imply to you that Frontier paid no taxes in

25  2022?

O4ABFRO4                    Neels - Cross

1    A.   That's what it would seem to imply.

2    Q.   And then we come to 2023.  It looks like in this year the

3    income tax expense is greater than Frontier's income before

4    income tax.  Do you see that?

5    A.   I see that.

6    Q.   Does that imply that the estimated tax rate in that year is

7    more than 100 percent?

8    A.   Well, I mean it depends on what you estimate the tax rate.

9    I define the effective tax rate as the tax expense divided by

10   the pre-tax operating income.  And what I'm calling effective

11   tax rate in this case would seem to be over 100 percent in that

12   year.

13   Q.   I'm sorry.  I might have used the wrong terminology.  The

14   terminology you used in your report is effective tax rate,

15   correct?

16   A.   Yes.

17   Q.   And that's the calculation that we've been talking about,

18   the one number divided over the other, correct?

19   A.   Yes.

20   Q.   Let me ask the question again.  Do the figures for 2023,

21   imply an effective tax rate of greater than 100 percent?

22   A.   They do.

23   Q.   Do you have any insight into how Frontier's tax expense

24   could be greater than its income before income tax?

25   A.   I can give an example.  I don't know the specifics of what

O4ABFRO4                        Neels – Cross

led to this particular outcome, but I mentioned earlier that

one thing that one sees in tax provisions is the tax law will

allow accelerated depreciation of a capital asset.

What that would mean is that for tax purposes you

could have something that's being depreciated on a straight

line basis, and thus you have the same amount showing up as an

expense year by year on the operating income statement.  But if

depreciation is being accelerated for tax purposes, that would

mean you would be showing higher depreciation than the earlier

years for tax purposes, which would reduce your tax liability

and lower your effective tax rate.  And then in later years for

that same capital asset, you'd be showing less depreciation for

tax purposes than you would show for purposes of calculating

operating income.  And so your tax liability would be greater

in the out years.  That's an example of how you could get such

a thing.  But again, there's lots of other special provisions

in the tax code that could lead to outcomes like that.

Q.  Having reviewed these figures with me today, Dr. Neels,

would you agree that Frontier's effective tax rate varied

wildly in the years 2019 to 2023?

A.  It did.  Those were very, very turbulent years for the

airline industry.

Q.  And in fact it varied from a benefit of 39.5 percent to an

expense of -- well, my calculation for 2023 was 134 percent; is

that correct?

O4ABFRO4                        Neels - Cross

1    A.  Well, certainly the rate varied quite a bit.  I mean, I

2    think it's -- yes.

3    Q.  Do you know what Frontier's effective tax rate is going to

4    be for this year, 2024?

5    A.  No, this year hasn't happened yet.

6    Q.  Is it fair to say you can't predict what's going to happen

7    with Frontier's effective tax rate for this year?

8    A.  Not for its effective tax rate.

9    Q.  And do you know what Frontier's effective tax rate is going

10   to be for any year after 2024?

11   A.  No, I don't.

12   Q.  Your model assumes that the effective tax rate is going to

13   be 22.8 percent for each of the years covered by your analysis;

14   is that's correct?

15   A.  No, that's not correct.  My model assumes that the

16   incremental tax liability associated on incremental changes in

17   Frontier's bottom line would be constant over the period at

18   22.8 percent.  I make no assumptions about the overall tax

19   liability of Frontier and how that might change over time.  So

20   my assumption here is much more limited than you characterized

21   it to be.

22   Q.  Let me put it this way, your model applies the same

23   estimated tax rates to cash flows over all of the years covered

24   by your analysis, correct?

25   A.  Well, to the incremental tax flows.  I'm not calculating

O4ABFRO4                    Neels - Cross

Frontier's overall cash flows. I'm just calculating the change

in cash flows associated with the change in lease terms.

Q. I understand, sir. I'm only talking about the cash flows

that you analyze and applied a tax rate to.

Would you agree with me that your model applies the

same 22.8 percent tax rate to all of those cash flows

regardless of which year they're expected to occur in?

A. Yes, I'm focusing on that small incremental change sitting

on top of all of the other sort of thrashing around the tax

liability that's provided for by the tax code, and by the

various special provisions put into effect to deal with the

pandemic.

So, yes, I'm just looking at that incremental tax

liability associated with incremental changes in income.

Q. Dr. Neels, isn't it pure speculation to assume that an

estimated or an effective tax rate of 22.8 percent should be

used for future years?

A. Well, it's not pure speculation. As I've noted, the

federal corporate tax rate hasn't changed since the passage of

the 2017 Act. And there's no discussion that I'm aware of

about changing that any time in the foreseeable future. So we

don't have any reason to expect major changes in those

provisions.

Q. Well, what expertise are you drawing on to reach the

conclusion that we cannot expect changes in the tax laws?

O4ABFRO4                    Neels - Cross

A.  I did not say that.  I did not say we cannot expect it.  I

said we have no particular reason to expect a change.  That's a

different statement.  There's no indication at the moment that

things are going to change or that the definition of income

will be altered in some way that might affect the tax status of

these incremental cash flows.

Q.  Would you agree that if there were a change in the tax code

in say the next eight years, that that might affect the

legitimacy of your assumption that a 22.8 percent rate should

apply to all those years?

A.  It would affect the legitimacy of my assumption that

those -- potentially affect the legitimacy of my assumption

that that same tax liability would apply.  It would also affect

the calculation of the gross-up, the calculation of the taxes

that would be owed by Frontier on whatever damage award is

finally provided.  So it's hard to say how that would come out.

Q.  Okay.  Well, I've only been focusing on the application to

cash flows.  I'm going to get to the gross-up, and we'll talk

about that a little bit later.

        Let me focus going back to the way that you analyzed

the individual cash flows in your analysis.  I want to just go

through a specific example to make sure that I understand it

correctly.  I want to show you, go back to Exhibit 1 that

complicated chart from Dr. Neels' original expert report.  As

we discussed these are the cash flows associated with a

O4ABFRO4                    Neels – Cross

1   particular aircraft delivery in July of 2020.  Do you recall

2   that?

3   A.  Yes.

4   Q.  I want to focus on one of these cash flows to make sure I

5   understand it.  The one I want to focus on is the actual

6   payment from CDB of the purchase price 48.5 million.

7            Do you see that?

8   A.  Yes.  Is there a question?

9   Q.  I just asked can you see the purchase price was 48.5

10  million in July of 2020?

11  A.  Yes.

12  Q.  And did you assume that that's a benefit for Frontier?

13  A.  Yes.  I mean, that would be positive income coming in.  I

14  should say positive revenue.

15  Q.  Does your model assume that Frontier paid taxes on that

16  positive revenue?

17  A.  It does.

18  Q.  And at the rate of 22.8 percent, correct?

19  A.  Correct.

20  Q.  And according to your model that effectively reduces the

21  amount of the benefit to Frontier to 37.456 million; is that

22  correct?

23  A.  That's correct.

24  Q.  Now, was that 48.5 million paid to Frontier or was it paid

25  to Airbus?

O4ABFRO4                      Neels - Cross

A.  That was my understanding of the mechanics, that that

amount was paid to Frontier.  Separately Frontier of course had

to pay Airbus for the purchase of the aircraft.  And my

understanding is that the amounts shown in this Exhibit 1 don't

correspond necessarily to the amounts paid by Frontier.

       Frontier had its own arrangements with Airbus, and

those arrangements governed how much it owed for the planes

that it acquired.  This is the amount that applies as I

understand it to the sale of the aircraft after Frontier took

possession of it to the lessor.

Q.  I want to unpack that a little bit.

       First, you assume that that 48.5 million went to

Frontier; is that correct?

A.  Yes.

Q.  If it turned out to be the case that that 48.5 million was

instead paid to Airbus, would that effect your analysis?

A.  I don't think that it necessarily would because I think as

I understood it, Frontier had entered into purchase agreements

with Airbus.  And those agreements, to my knowledge, at least

I'm not aware that those were connected to the leases directly.

       The leases, as I understood it, were separate

transactions where for perhaps a fleeting period of time,

Frontier took title of the aircraft and then sold it to the

lessors.  And it's entirely possible that the payment might

have gone directly to Airbus as a convenient way of meeting

O4ABFRO4                    Neels - Cross

1   Frontier's liability to Airbus, but my understanding is that

2   those are separate transactions.

3   Q.  Well, if we assume that the payment went directly to

4   Airbus, would Frontier owe any taxes on that payment?

5   A.  Well, I mean what's happening in this case is that the

6   overall tax liability reflects the net result of many, many

7   transactions, money coming in, money coming out.  And what

8   happens is each of those transactions can have the effect of

9   raising the tax liability or lowering the tax liability.

10          Now what you're positing is a situation where the

11  incremental effect of the money coming in with the purchase

12  price is offset by the incremental effect of the money going

13  out to settle Frontier's obligations to Airbus so that they

14  might cancel out.  But, of course, in the normal course of

15  business, revenues and expenses always cancel out.  So I think

16  it's still the case in each individual transaction has some

17  incremental effect on the company's overall tax liability.

18  Some airlines will own their aircraft outright, and they will

19  go ahead and make the payment to the manufacturer, take title

20  to the plane.  In that case, they have -- they get a tax

21  benefit from the cost of acquiring the plane.

22          So I think it's -- we're offering a little bit of

23  semantics I think here.  It is true that the two transactions

24  sort of net each other out, but it doesn't mean that the

25  individual transactions don't each have incremental effects on

O4ABFRO4                          Neels - Cross

1   the tax liability.

2   Q.  Let me ask my question again.  If CDB -- if we assume that

3   CDB made this $48.5 million payment directly to Airbus, would

4   Frontier owe any taxes on that payment, on that amount?

5   A.  Well, again, no, it wouldn't, but that's not the whole

6   story here because, suppose it were the case that the amount

7   that Frontier owed to Airbus for the purchase of this aircraft

8   was exactly 48,500,000.  So in that case, the revenue gain is

9   perfectly offset by the amount that Frontier owes to Airbus.

10          Now my understanding is that the agreement with Airbus

11  was entered into before the breach occurred.  So the amount

12  that Frontier owed to Airbus in the situation you're describing

13  is $48.5 million.  Now under the terms of the leases that would

14  have been entered into under the Framework Agreement, the

15  amount that Frontier was being paid was not 48.5 million, but I

16  believe it was 51 million.  So in that case, yes, 48.5 million

17  would have gone to settle Frontier's obligation to Airbus, but

18  there would have been an additional $2.5 million in gain

19  because under the terms of the Framework Agreement, the

20  purchase price paid by the lessor for the aircraft would have

21  been higher.

22  Q.  But your assumption is that this $48.5 million payment went

23  to Frontier, not to Airbus; is that correct?

24  A.  Well, I think the more crucial assumption is that it may

25  have gone to Airbus to settle obligations that Frontier had

O4ABFRO4                          Neels - Cross

1    with Airbus, but my understanding is those obligations had

2    nothing to do with this lease.  They were entered into before

3    this lease was entered into and in fact before the Framework

4    Agreement was agreed to.

5    Q.  And are you aware that in connection with the delivery of

6    an aircraft there might be circumstances in which Frontier

7    receives a payment back from Airbus?

8    A.  That is possible.  I mean, my understanding is, as I think

9    I indicated in my report, that in placing an order, it's

10   typical for an airline to put a deposit down and also to make

11   progress payments along the way as the aircraft is being built

12   and then the purchase price would have been agreed to between

13   the airline and Airbus in this case.  So all of that would have

14   effected the amount that was due at the time of delivery.

15   Q.  And so does that all imply that at the time of delivery

16   Frontier might be receiving a cash amount from Airbus?

17   A.  Possibly.

18   Q.  Did you calculate or try to determine the tax effect of

19   that payment on Frontier?

20   A.  I did not because my understanding was that that would have

21   been the same in both the actual and in the but-for world.  It

22   effected the agreement between Frontier and Airbus, which as I

23   understood it were entered into before the breach of the

24   Framework Agreement.

25   Q.  This payment of 48.5 million was made in 2020, correct?

O4ABFRO4                         Neels - Cross

1    A.  I believe that's right.  I'd have to see the column.

2    Q.  We have to scooch over to the left-hand side of this and

3    see.  Does that confirm for you that this payment was made on

4    July 29, 2020?

5    A.  It does.

6    Q.  We saw earlier though that the taxes paid by Frontier --

7    let me see the exact.  The income tax expense for Frontier was

8    a negative number, correct?

9    A.  That's correct.

10   Q.  And I believe you testified that your understanding of that

11   is that frontier didn't pay any taxes in 2020, correct?

12   A.  That's correct.

13   Q.  But your model assumes that Frontier did pay 22.8 percent

14   in taxes on this particular payment; isn't that correct?

15   A.  No, it doesn't necessarily say that.  I mean, it says that

16   the size of the tax benefit that Frontier enjoyed as a result

17   of whatever provisions effected its bottom line tax liability

18   in this year might have been incrementally different.

19          In other words, if it owed extra taxes because of this

20   transaction, that would have made the tax benefit that it

21   actually realized some what smaller, because part of that

22   benefit would have gone to offset the incremental tax

23   liability.

24   Q.  Dr. Neels, doesn't your model as shown on this page --

25   sorry.  We need to scooch back to where we were talking about

O4ABFRO4                         Neels - Cross

1    with the $48.5 million payment. In the first column here it

2    says undiscounted pretax cash flows, it says 48.5?

3    A.   Yes.

4    Q.   And then just to the right under the column undiscounted

5    post-tax cash flow, the figure is 37.4.  Do you see that?

6    A.   Yes.

7    Q.   Doesn't your model assume that on this cash flow of 48.5,

8    Frontier is going to pay taxes of 22.8 percent?

9    A.   No, it really doesn't.  As I explained before, the tax

10   liability reflects the incremental tax effect of all of the

11   different transactions entered into by Frontier.  And what this

12   calculation says is this particular transaction would have had

13   the effect of increasing incrementally the amount of tax that

14   Frontier finally owes.

15         So you really -- to say it would have paid 28 percent

16   more in taxes, you'd have to -- well, I suppose it would have

17   either paid 22.8 percent more of the difference in taxes, or it

18   would have lowered its tax benefit by that amount.  Its overall

19   tax liability would have increased as a result of this

20   particular transaction.  But, of course, the overall liability

21   reflects all of the transactions being entered into.

22   Q.   Dr. Neels, isn't it true that in your model you take this

23   $48.5 million benefit in 2020 and you reduce it using the rate

24   of 22.8 percent to 37.4 million?

25   A.   Yes.

O4ABFRO4                    Neels - Cross

1    Q.  And that's even though it appears that Frontier did not pay

2    any taxes in 2020, correct?

3    A.  That's correct.

4    Q.  I want to move to a different topic, but to talk about that

5    I just want to review for you the various reports and

6    submissions that you made in this case to make sure we're on

7    the same page.

8           You give an initial expert report in this case on

9    September 9, 2022.  Does that sound correct?

10   A.  That's correct.

11   Q.  And then your deposition took place on October 25, 2022,

12   correct?

13   A.  That's correct.

14   Q.  And shortly after your deposition you submit to us a

15   supplemental report on, I think it was October 28, 2022; is

16   that right?

17   A.  That sounds correct.

18   Q.  So thereafter as part of the pretrial order process, you

19   submitted a declaration on September 21, 2023, correct?

20   A.  Correct.

21   Q.  And finally we received an addendum to your declaration on

22   February 16, 2024, does that sound right to you?

23   A.  It does.

24   Q.  So you essentially provided four versions of your analysis

25   to us or four -- one version and three updates to your

O4ABFRO4                          Neels - Cross

analysis.  There's the initial report, a supplemental

statement, your declaration and an addendum; is that correct?

A.  That's correct.

Q.  So we'll be talking about all four of those things, and

I'll try to be clear what I'm talking about as we go through

them.  I want to talk about discount rates, and the discount

rate that you used in your net present value analysis.

        Pardon me.  Before we do that, I realize I forgot to

address one topic on the tax rates.  We saw your formula for

calculating effective tax rates.  Did your report include any

calculation of Frontier's marginal tax rate?

A.  Not that I recall.

Q.  So is it true that your -- the tax rate calculated and used

in your report was the effective tax rate that we've been

talking about, correct?

A.  It was the effective tax rate for that specific year which

was selected because it was not distorted by a lot of

significant pandemic-related special considerations.

Q.  I understand your position on that, but my question now is,

does your model use Frontier's marginal tax rate in any

capacity?

A.  Well, it uses that effective rate as a marginal rate.  And

as we've just been discussing and going through exhibit 1, I

think essentially what I'm doing is looking at a whole series

of transactions, some that occurred in the actual world, some

O4ABFRO4                          Neels - Cross

1   that looked and occurred in the but-for world.  And I'm

2   calculating an incremental change in tax liability associated

3   with all of those.  Then I add that up, and that brings me to

4   my overall conclusion.

5            So in terms of the way I use that rate, I am using it

6   as a marginal rate, but I didn't calculate it specifically as a

7   marginal rate or referred to it as a marginal rate in my

8   report.

9   Q.  Let me define my terms a little more carefully.  We saw the

10  estimated tax rate that you calculated and used in your report,

11  correct?

12  A.  The effective tax rate.

13  Q.  Let me ask the question again so the record is clear.

14           We saw the effective tax rate that you calculated and

15  used in your report, correct?

16  A.  Yes.

17  Q.  You testified today about a marginal tax rate calculated by

18  Frontier and included in their annual reports.  Do you recall

19  that?

20  A.  I do.

21  Q.  Focusing on that particular marginal tax rate, the one

22  calculated by Frontier and included in their reports, did you

23  use those rates anywhere in your analysis?

24  A.  Not specifically, but they only differ from the rate I did

25  use by one or 2/10 of a percentage point.

O4ABFRO4                    Neels - Cross

Q.  And is it also true that in your various expert reports

that you've submitted in this case, expert report and

amendments to your expert report, you do not discuss those

particular marginal tax rates that's are published by Frontier?

A.  That's correct.  I did not refer to them in my report.

Q.  Let me go back to your discount rates, and I want to show

you your initial expert report from September 9, 2022, page 23.

        This is the section of your report talking about the

two different -- beginning to talk about the two different

discount rates that you, and this one is talking about a debt

base discount rate.  Do you see that?

A.  Yes.

Q.  And how did you -- this discloses that you calculated that

based on a particular loan agreement involving Frontier; is

that correct?

A.  That's correct.

Q.  And the rate that you calculated I think is shown maybe on

the next page, paragraph 46, that's the carry over paragraph.

It looks like you calculated that rate to be 2.87 percent; is

that correct?

A.  That's correct.

Q.  As we said that was the interest rate from a particular

loan from the U.S. Treasury Department for up to $578 million.

Is that consistent with your memory?

A.  That's what I recall, yes.

O4ABFRO4                    Neels - Cross

1   Q.  And the date of that particular loan agreement was

2   September 28, 2020, correct?

3   A.  Yes.

4   Q.  And the interest rate that associated with that loan was

5   LIBOR plus 2.5 percent; is that right?

6   A.  Yes.

7   Q.  And that was as of September 28, 2020, correct?

8   A.  Yes.

9   Q.  Why did you use that particular loan to determine your

10  debt-base discount rate?

11  A.  At the time I was looking for a secured loan that was

12  entered into by Frontier in the normal course of its business

13  at a date close to the time of injury, and this was the closest

14  I could come.

15  Q.  Did Frontier have other secured loans outstanding in 2020?

16  A.  I believe that it did.  My recollection is that they were

17  entered into an earlier time period, so I was looking for a

18  transaction that actually occurred and was close as possible to

19  the date of the Framework Agreement, the date of the

20  termination of the Framework Agreement.

21  Q.  Are you aware of what happened to interest rates in 2020,

22  during the first year of the pandemic?

23  A.  Yes.

24  Q.  And what happened to them?

25  A.  They fell.

O4ABFRO4                    Neels - Cross

1  Q.  So you specifically chose a time period in which interest

2  rates overall had fallen to the lowest level that we've seen in

3  our lifetimes; is that correct?

4  A.  Again, following the principle that I should get a rate

5  that was as close as possible to the time of the act of injury,

6  yes, that's what led me to the specific rate.

7  Q.  Did you investigate the interest rates that Frontier was

8  paying on those other secured loans in 2020?

9  A.  Not that I recall.  I said I believe they were entered into

10  earlier.

11  Q.  Okay.  So I want to move to page 24 of your report.  We're

12  on it already.  We can just move up to your derivation of

13  weighted average of cost capital base discount rates.

14      And you say in paragraph 48, let's see, that you tried

15  to get this figure from Bloomberg, but that unfortunately --

16  this is in the third line, unfortunately Bloomberg contained no

17  information on Frontier.  Do you see that?

18  A.  Yes.

19  Q.  And we heard that story on your direct testimony, that's

20  because you were using the wrong ticker symbol for Frontier; is

21  that right?

22  A.  Yes.  I was using the ticker symbol it had prior to its

23  period as a privately held company.

24  Q.  And you didn't have the right ticker symbol even though the

25  ticker symbol was on the 10K that you used to calculate the

O4ABFRO4                         Neels - Cross

1   effective tax rate?

2   A.   That's correct.

3   Q.   As I understand it, weighted average cost of capital or

4   WACC as we refer to it is something that can be calculated by a

5   company from data of its capital structure.  Is that your

6   understanding as well?

7   A.   Yes.

8   Q.   Did you ask Frontier to tell you its weighted average cost

9   of capital?

10  A.   I did not.

11  Q.   Why not?

12  A.   Well, my preference is in preparing an expert report is to

13  rely on normal course of business information and information

14  produced by reliable third parties.  If I had asked Frontier to

15  come up with a weighted average cost of capital that I was

16  going to use in my -- for litigation purposes in preparation of

17  my expert report, I would have had to inquire into how they

18  were doing it.  I would have had to make sure that they were

19  not using assumptions that worked in their favor.  And I

20  thought it was simpler, more reliable to use published

21  third-party information and reliable statistical methods rather

22  than to involve Frontier in the preparation of my expert

23  report.

24  Q.   I raised this issue at your deposition, and you told me the

25  same thing that you did not make any inquiry of Frontier.

O4ABFRO4                    Neels - Cross

After your deposition did you make any inquiry to determine the
weighted average cost of capital that Frontier is calculating
itself?

A.  No, I didn't.  Immediately after the deposition, I
discovered that the figures public by Bloomberg fell under the
different ticker symbol, and I focus on those for the basis of
my opinion.

Q.  Focusing on your initial report which we're displaying on
the page here, at that time you did not have a weighted average
cost of capital from Bloomberg, and you did not have a weighted
average cost of capital from the company.  So what did you do
at that time to calculate weighted average cost of capital?

A.  I ran what's known as a regression analysis.  I constructed
a statistical model that enabled me to come up with a
prediction for Frontier for the specific time period I was
interested in.

Q.  And is that calculation shown in these subsequent pages of
your report, and maybe we could just flip through them and
maybe zoom out a little bit.  I see several pages describing
your regression analysis.  Go ahead and flip another page.
Please go ahead, one more page.  We finally come to a
conclusion several pages later, and there's another table.
Let's keep going with your regression analysis.

        Now we get to the conclusion I believe of this table.
Nine is the next page.  So keep going.  Right.  You do a

O4ABFRO4                          Neels - Cross

regression analysis which you describe over the course of a

number of pages of your report, and the outcome of that is a

figure of 7.09 percent; is that correct?

A.  That's correct.

Q.  So in your initial report you proposed two different

discount rates for calculating the present value of the cash

flows in this case, 2.87 and 7.09, correct?

A.  That's correct.

Q.  But you advocate the lower number and the higher number is

only an alternative, correct, at least at that time?

A.  Yes, I have not changed my opinion that the appropriate

discount rate should be a debt-base discount rate rather than a

weighted average cost of capital base discount rate.

Q.  I understand that. Does using the lower number increase

your calculation of Frontier's damages in this case?

A.  It has that effect, yes.

Q.  So the lower the discount rate, the higher the damages,

correct?

A.  Yes.

Q.  Let me go to the discount rates that you show in your

supplemental statement dated October 28.  And as we reviewed,

your deposition was on October 25th, 2022, and then a few days

later you served a supplemental report on October 28.

        Do you recall that?

A.  Yes.

O4ABFRO4                         Neels - Cross

Q.  And since this report was submitted after your deposition,

defendants haven't had any opportunity to ask you questions

about this supplemental statement so I have some for you today.

Isn't it correct that this was unavailable at your

deposition so this was not covered as a topic of your

deposition?

A.  That's correct.

Q.  So let's put that up on the screen.  Let's look at page

one, paragraphs two to three.  This describes the fact that you

weren't aware of the ticker symbol of Frontier, and you learned

that you might have been using the wrong one at the deposition

and you discovered the right one, correct?

A.  Well, I think that I put it a little bit differently.  I

found the correct one for Frontier for its first bought as a

public company before it went private.  I did not find the one

for the second period after it became public again.

Q.  Right.  Even though that was the one on the 10K, you

glossed over that when you were looking at that document,

correct?

A.  Well, yes, I mean, I didn't pick up on that for which I

apologize.

Q.  So looking at page two of this document, it looks like that

armed with the correct ticker symbol for Frontier, you were

able to find information about weighted average cost of capital

on Bloomberg, correct?

O4ABFRO4                    Neels - Cross

1    A.  That's correct.

2    Q.  And you display the information you found in this chart on

3    page two; is that right?

4    A.  That's correct.

5    Q.  And according to this chart, Frontier's weighted average

6    cost of capital varied from 1.8405 as of 12/31/2020, to 6.97 as

7    of June 30, 2022; would you agree with that?

8    A.  Yes.

9    Q.  And just moving down the page a little bit to paragraph

10   six.  You make some observations about this chart and you

11   say -- the first one that you make in paragraph six is that,

12   all but two of these weighted average cost of capital values

13   are similar in magnitude to the 7.09 percent rate that you came

14   up with in your original report; is that right?

15   A.  That's correct.

16   Q.  Were you making that observation to suggest that the rate

17   of 7.09 in your initial report is the correct rate?

18   A.  Well, using it to make the point that it was a reasonable

19   rate to use.

20   Q.  Turning to the page of your report in paragraph eight.  You

21   state "The results of discounted cash flow calculations are

22   generally sensitive to the discount rate used."  What did you

23   mean by that?

24   A.  We discussed this a bit earlier.  I think my goal in the

25   first step of my analysis is to calculate the present value of

O4ABFRO4                        Neels - Cross

damages as of the time of injury, that requires the use of a
discount rate.  And given the cash flows that are set forth
under the terms of the actual and but-for leases, if you change
the discount rate, it changes that present value.  And that's
the sense in which it's sensitive to the choice of discount
rate.

Q.  Would you agree that the discount rates used can make a big
difference in a discounted cash flow analysis of damages?

A.  Well, it can make a difference.

Q.  Then in this same paragraph in the next sentence of
paragraph eight it says "In table S2 below, I present the
results of my damages calculations using a variety of
defensible discount rates in order to quantify the effects on
damages if I had instead used discount rates based on recently
discovered information reported on Bloomberg."  Do you see
that?

A.  Yes.

Q.  And next page there's a table S2 which shows a total of six
damages calculation using different discount rates; is that
right?

A.  Yes.

Q.  And according to your supplemental report you say that all
of these results are defensible; is that right?

A.  Yes, I believe so.

Q.  And the lowest of these calculations is 35.9 million, and

O4ABFRO4                    Neels - Cross

that it looks like that was calculated using the 7.09 percent

regression calculated weighted average cost of capital from

your initial report; isn't that right?

A.  That's correct.

Q.  And the other figures in this chart are all larger because

you used lower discount rates for those calculations, correct?

A.  Yes.  I mean, lower, and certainly in the case of the WACC,

I used one based on an actual WACC calculation as opposed to a

statistical estimate.

Q.  Well, the lowest rate that you used was 1.0445 percent; is

that correct?

A.  I believe that's the debt-base rate that I used.

Q.  Is that the rate that you used, 1.0445 percent?

A.  That sounds -- yes.

Q.  And the rest of the rates that you used were between 1

percent and 7 percent?

A.  That's correct.

Q.  Was it your opinion at the time of this supplemental report

the discount rates between 1 percent and 7 percent were all

defensible for this calculation?

A.  Yes.  I mean, and I've explained a number of times with my

direct and here that I believe the debt-base rate is the most

appropriate because of the nature of the cash flows we're

looking at and the riskiness thereof.  But I recognize that

it's often -- I've recognized since the beginning that

O4ABFRO4                          Neels - Cross

reasonable people can differ and sometimes a WACC base rate is

used, so I do present a WACC base rate.  I think both of those

are defensible.

        I do believe that the actual calculated rates

published by Bloomberg are more reliable than -- certainly than

the statistical estimate that I used.  I also believe that the

most appropriate is the one as of the time of injury, which

would be the 2020 value one that's shown in the middle row of

that table.  They may all be defensible, but they're not all

created equal.

Q.  Let's move on to the discount rates that you show in your

declaration submitted in connection with the pretrial order.

I'm going to show you your declaration page 30, table D7.

        This table shows four -- now it shows four different

discount rates.  So you had six discount rates in your

supplemental report.  By the time of your declaration, you're

down to four; is that correct?

A.  Yes.

Q.  And again these rates range from just over 1 percent to

just over 7 percent at the high-end, correct?

A.  Yes.

Q.  And is it still your opinion that each of these rates is

defensible?

A.  I don't believe that the statistically base rate is

defensible given the ability of an actual rate, so I wouldn't

O4ABFRO4                        Neels - Cross

1   agree with that statement.

2   Q.  I was using your word from your supplemental report.  Did

3   something change between your supplemental report and your

4   declaration to make you conclude that the 7 percent rate was no

5   longer defensible?

6   A.  As we're discussing the meaning of the word "defensible," I

7   think there may be differences of opinion that would lead one

8   to consider a WACC base rate as opposed to debt-base rate.  But

9   I think it's conditional on a belief that a WACC base rate is

10  appropriate.

11          I can't see a justification for using a statistical

12  estimate when an actual value is available.  I would perhaps

13  qualify what I said in my supplemental report based on that

14  reasoning as we go into this in more detail here.

15  Q.  Is part of what you're saying that you no longer stand by

16  the regression based analysis that you did in your original

17  report?

18  A.  I feel an obligation to use the best available evidence,

19  and that obligation leads me to believe that the published WACC

20  is better than the statistical value that I used in my report.

21  Q.  And is the Bloomberg WACC better than the WACC calculated

22  by a company?

23  A.  Well, that would depend a lot on how the company calculated

24  it and for what purpose and when and all sorts of things like

25  that, so it's impossible for me to give a general answer to

O4ABFRO4                        Neels - Cross

1    that question.  I think for purposes of litigation, using a

2    third-party value has obvious -- it is highly respected, and

3    when you use third-party, it has obvious benefits.

4    Q.  Is it possible that the company has better information

5    about its capital structure at any particular point in time

6    than Bloomberg?

7    A.  It undoubtedly has more information about all the specific

8    of its capital structure.  On the other hand, Bloomberg is

9    taking a broad look at big market shifts in lots of companies,

10   and it brings that broad market perspective that I think would

11   be difficult for Frontier to achieve.  So it has some benefits,

12   but it also has some weaknesses too.  Bottom line is, I'm going

13   to go with Bloomberg as the more credible source.

14   Q.  And moving down the page in paragraph 66 of this

15   declaration.  You express that point of view, you think that

16   the right rate to use is the lowest of these rates, correct?

17   A.  I believe in paragraph 66 I believe the debt-base rate is

18   the most appropriate one.

19   Q.  Is that the lowest rate shown here?

20   A.  The lowest rate in the table is a debt-base rate.

21   Q.  Let me make sure I understand your opinion.  Is it your

22   opinion today that the lowest of these rates shown on this page

23   is the correct one to use?

24   A.  In my opinion, yes.

25   Q.  And that's the one that yields the highest amount of

O4ABFRO4                          Neels - Cross

1    damages for Frontier, correct?

2    A.  As it works out, yes.

3    Q.  You also present an alternative rate, which I believe is

4    the second lowest rate shown in this page; is that correct?

5    A.  Yes, that is the WACC base rate published by Bloomberg.

6    Q.  So if the Court rejects the lowest rate, you recommend the

7    second lowest rate, correct?

8    A.  Well, I recommend the second lowest rate if the Court

9    offers an opinion that a WACC base rate is the most appropriate

10   rate to use here.

11   Q.  And that would necessarily entail not using the debt-base

12   rate, correct?

13   A.  If the Court rules that a WACC base rate is appropriate,

14   then the use of the WACC base rate is appropriate.

15   Q.  Isn't it true, sir, that if the Court rejects the lowest

16   rate, your recommendation is to take the second lowest rate?

17   A.  Not necessarily.  I mean, it could be that the Court

18   rejects the 1.04 percent rate, but believes that the 2.2

19   percent rate which is based upon a specific debt instrument

20   entered into by Frontier is the more appropriate way to go, in

21   that case it would not be necessarily going into the second

22   lowest rate in the table.

23   Q.  But isn't it true that your alternative recommendation for

24   the Court is to use the second lowest rate on this chart?

25   A.  That is my recommendation.

O4ABFRO4                         Neels - Cross

1    Q.  If the court decides not to use the lowest rate or the

2    second lowest rate, what rate would you recommend?

3    A.  Well, I'd have to understand the Court's reasoning and the

4    reasoning why it may have rejected one or the other.  I think

5    in that case that would affect my decision here, and affect --

6    if I were asked to give advice to the Court, that would affect

7    the advice I would give.

8    Q.  Now, as we discussed earlier, Dr. Neels, you calculate the

9    net present value of all these cash flows as of the date of

10   termination May 2020, correct?

11   A.  That's correct.

12   Q.  And you use a risk free interest rate to calculate interest

13   from May 8 to 2020, to the present; is that right?

14   A.  Yes.

15   Q.  And the rate that you used has changed in your various

16   reports, but I gather that's because you updated it with

17   additional interest rate information, correct?

18   A.  That's correct.

19   Q.  And interest rates generally had been on the increase in

20   the past couple of years; is that correct?

21   A.  That's correct.

22   Q.  And the latest risk free rate you calculate is 1.9 percent,

23   1.928 percent to be specific, correct?

24   A.  That's correct.

25   Q.  And is it still your opinion today that 1.9285 percent is

O4ABFRO4                          Neels - Cross

1   the correct rate of interest to calculate prejudgment interest

2   as of today's date?

3   A.  Yes, that is the summary of the overall effect of

4   calculating interest at the risk free rate over the relevant

5   period up to the present.

6   Q.  Let me ask you about your final calculation of damages, and

7   I want to show you your declaration pages 44, start with page

8   44.

9           Is this a summary of your damages calculation using

10  the debt-base interest rates of 1.0445.  Percent I should say

11  you?

12  A.  I'm looking at the footnotes.  Yes, I can see that.  This

13  is based upon the debt-base rate.

14  Q.  This is based on the lowest of the interest rates that you

15  have calculated, correct?

16  A.  It's based upon the rate I believe is most appropriate

17  which happens to be the lowest rate.

18  Q.  I understand.  Turning to the next page, there's another

19  chart that's showing your alternative calculation using the

20  second lowest rate; is that correct?

21  A.  This is the calculation showing damages in which the

22  discounting is based upon the WACC rate published by Bloomberg.

23  Q.  And that's the second lowest rate in your chart we saw

24  earlier?

25  A.  Yes, it happens to be the second lowest rate.

O4ABFRO4                    Neels – Cross

Q.  Is the discount rate the only difference between these two

summary damages calculations?

A.  I believe that it is.

Q.  And in each of these summaries, you show the amounts

associated with each of the MSNs, and then immediately below

that you have a line that says after-tax value of payment

required to make Frontier whole.

       And in this chart at least that figure is $35,571,000;

is that correct?

A.  Yes.

Q.  Is that the amount that you calculate that would be

required today to compensate Frontier for all the differences

in the cash flows between the AMCK leases and the replacement

leases?

A.  I don't believe so simply because this is -- let's see.

Wait a second here.  Well, I guess it appears to be, yes.  The

pretax damages.  I'm a little unclear from this where the

prejudgment interest is.  I don't know whether that's included

in the calculations that are supporting lines one through five

which are exhibits D7 through D15.  So I don't know if this

includes prejudgment interest or not.  I can't tell from this

table.

Q.  Whether it includes prejudgment interest or not, does this

figure capture all of the cash flow differences between the

leases for all five aircraft and applying its discount rate to

O4ABFRO4                    Neels - Cross

1    calculate the net present value of those differences?

2    A.  As of the time of injury, yes, it does.

3    Q.  But you just said that you don't know whether this includes

4    prejudgment interest or not?

5    A.  I'm a little unclear about that.

6    Q.  Well, this chart is your summary of all the damages,

7    correct?

8    A.  As of September 21, 2023.

9    Q.  Right.  So wouldn't you assume that your prejudgment

10   interest is included in here somewhere?

11   A.  I would expect that, yes.

12   Q.  And wouldn't it be included in your payment required to

13   make Frontier whole figure?

14   A.  I would expect it to be, but that figure is the sum of

15   lines one through five which are both in those other exhibits.

16   I don't want to misspeak here, just that I probably have to

17   look at those exhibits to figure out whether they add in the

18   prejudgment interest or not.

19   Q.  I understand, but is there any place else in this chart

20   where you would expect the prejudgment interest to be added in?

21   A.  If it's in here, that's where it would be.

22   Q.  So you first provide that amount of the amount required to

23   make Frontier whole, and it looks like you apply a tax rate to

24   calculate taxes to be paid on damages award, correct?

25   A.  That's correct.

O4ABFRO4                       Neels - Cross

Q.  And that amount is just over $10 million, correct?

A.  Yes.

Q.  And then you come to a final figure of $46 million,

correct?

A.  Yes.

Q.  Is that the amount that you recommend, the total amount of

damages that you recommend?

A.  Well, conditional on the Court ruling that a WACC base

discount rate is the appropriate discount rate, and this is

only through September 21, 2023.  It doesn't include interest

all the way up to the present, but subject to those

qualifications, yes.

Q.  I just want to understand how you're getting to that

figure.  You're assuming that an award is appropriate in the

amount of 35.5 million.  And is it true you're also assuming

that Frontier will pay 22.8 percent in taxes on that damages

amount, on that damages award?

A.  That's not quite right.  As I described earlier in doing an

after-tax calculation, you take into account the taxes implicit

in the but-for cash flows.  And you also take into account the

taxes that would be implied by the award itself.  I think what

this particular table says is that the amount that would be

paid on the final award, which is the 46.058 million would be

10,487,00.

        And that taking that tax into account would mean that

O4ABFRO4                          Neels - Cross

1    on an after tax basis, Frontier would be left with 35,571,00
2    which I believe is the correct value conditional on a WACC
3    discount rate as of September 21 last year.
4    Q.  So is it your opinion that in order to compensate Frontier
5    fully the Court should award, not only the amount necessary to
6    make them whole, but also the taxes that Frontier's likely to
7    pay on that amount?
8    A.  Well, if you're doing an after-tax approach, you want to
9    make them whole on an after-tax basis.  And we haven't gone
10   into this, but if I had done it on a pretax basis, it would
11   have come out on a pretax basis with the same conclusion as to
12   how much should be awarded to Frontier.
13   Q.  Well, sir, you never performed the calculation on a pretax
14   basis; is that correct?
15   A.  No, I didn't.  But based on the manual on scientific
16   evidence, it points out that if the tax rates are the same, the
17   two methods give comparable results.
18   Q.  But, sir, you never done the pretax calculation?
19   A.  I haven't done that specifically, no.
20   Q.  And this chart shows the amount to make Frontier whole, and
21   a calculation of taxes at a rate of 22.8 percent on that
22   amount, correct?
23   A.  No, that's not what it says.  The amount to make Frontier
24   whole on an after-tax basis is 35 million.  And in order to
25   leave Frontier with 35 million on an after-tax basis given that

O4ABFRO4                          Neels - Cross

it will have to pay taxes on the award, the amount that should
be awarded is 46 million.  The tax is on the award, not on the
amount required to make Frontier whole.

Q.  I just want to be clear on this, sir.  Is it your opinion
that the Court in this case should award not only damages, but
the taxes that may be paid on the damages award?

A.  I'm not sure.  Again, the taxes are calculated not by
applying the tax rate to the after-tax value of payment
required to make Frontier whole, but rather taking into account
the taxes that would have to be paid on the award itself to
leave Frontier with that 35 million.

So when you keep talking about paying taxes on the
amount to make Frontier whole, I don't really see it that way.
I see it as taking into account the taxes so that after taxes,
Frontier is whole on an after-tax basis.

Q.  Aren't those the words that you use in your report, payment
required to make Frontier whole and taxes to be paid on damage
award?

A.  The amount required to -- well, yeah, I do use those words.

Q.  And, I'm sorry, I want to -- I should have asked this
directly after.  I asked you a moment ago.  Is it your opinion
that the Court should award not only damages, but the taxes
that may be paid on those damages, and I think your answer was
you're not sure.  Is that correct?

A.  I'm trying to answer your question.  I think the tax should

O4ABFRO4                        Neels – Cross

award damages in an amount such that Frontier is made whole.

And in calculating that amount, one of the things that has to

be taken into account is that part of the award will be paid

out in taxes.  So in order to make Frontier whole, one needs to

take those taxes into account.

Q.  Did you know how to answer that question when I asked it at

your deposition?

A.  I thought I did, but perhaps I may have misspoken.

Q.  Let me show your deposition transcript page 123, beginning

at line five. And this is the end of a question.  Let's go to

the preceding page to make sure I get the whole question.  We

can always read the whole thing in, I want to focus your

attention on the question that begins on line five.

          I asked you: An then you assume though that the Court

will award the future income taxes that Frontier will pay on

the damages report.  Is that correct?

          And what was your answer, sir?

A.  I said that's correct.

          MR. HOSENPUD:  Excuse me, your Honor.  For fairness

the next question and answer should be read.

          MR. BUTLER:  That's fine.  I'll be happy to read it.

Q.  The next question is, Because otherwise Frontier would have

to pay damages on its damages award, and it would be a little

worse off, perhaps, than it otherwise would be; is that right?

          Answer.  That's right.  It would not be made whole.

O4ABFRO4                    Neels - Cross

1   Did you give that answer as well?

2   A.  I did.

3   Q.  Was it your testimony at your deposition that you were

4   recommending to the Court not only to award damages, but taxes

5   payable by Frontier on those damages?

6   A.  Well, I mean part of the difficulty I'm having, it's a

7   little bit semantic.  But I think the damages award is what is

8   required to make Frontier whole.  I think of the taxes as part

9   of the damages, not as something on top of the damages, that's

10  where we're struggling back and forth.

11          To make Frontier whole, you want to leave Frontier

12  after tax with enough money to make up for the losses it

13  experienced on an after-tax basis.  So part of that means

14  you're putting it back in the position it would have been, and

15  you're recognizing that the award itself will be taxable, and

16  taking that into account to come up with the overall amount,

17  the overall damage award required to make Frontier whole.

18          Now to sit here and try to separate the damage award

19  from the taxes on the award and I see the taxes as part of the

20  award, that's just part of what one needs to do to make

21  Frontier whole.

22  Q.  To calculate that amount you use the rate of 22.8 percent,

23  correct?

24  A.  I did.

25  Q.  If there's a damages award in this case, when do you expect

O4ABFRO4                          Neels - Cross

1     it to be paid to Frontier?

2     A.  I don't have a specific opinion on that.

3     Q.  Would it be sometime this year or later?

4     A.  Sometime this year or later, yes.

5     Q.  And do you have any way of knowing what Frontier's

6     effective tax rate is going to be in this year or any later

7     year?

8     A.  I do not.  Although as I will repeat as I have said on

9     multiple occasions today, what's relevant is the incremental

10    effect on Frontier's taxes of the award, not the overall

11    average tax rate paid by Frontier which is not necessarily a

12    good measure of what the incremental tax rate would be.

13            MR. BUTLER:  Thank you very much, Dr. Neels.  I have

14    no further questions.

15            THE COURT:  Dr. Neels, if Frontier had been able to --

16    there'd been no breach, things had gone as planned and it was

17    able to earn the money in the open market, there would have

18    been a tax on that money, wouldn't there?

19            THE WITNESS:  It would have, yes, your Honor.

20            THE COURT:  Why is it any different whether it's

21    earned on the market or earned to remedy a breach as far as the

22    imposition of the tax?

23            THE WITNESS:  Well, I don't think there is any

24    difference.

25            THE COURT:  Excuse me.

O4ABFRO4                    Neels - Cross

1          THE WITNESS:  I don't think that there is a difference

2    because, as I said, if you're looking at things on an after-tax

3    basis, you recognize that the tax effect muted the harm to some

4    extent because part of it --

5          THE COURT:  But if it earned it in the market, it

6    would pay the tax routinely.

7          THE WITNESS:  That's correct, yes.

8          THE COURT:  And now since it obtained the money as a

9    solation instead of a salary, why should the tax effect be any

10   different?

11         Why should they be compensated for the tax which they

12   wouldn't have been if they earned it?

13         THE WITNESS:  I think if I had -- we've talked about

14   the pretax approach and the after-tax approach.  Using an

15   after-tax approach, I've essentially adjusted the injury to

16   account for the tax effects.  If the award doesn't recognize

17   the fact that it would be -- that the award will be taxable,

18   then in fact you're putting another tax on top of earnings that

19   have already been reduced because of tax.  Because, I mean, if

20   I were -- if I had ignored taxes entirely, I would have talked

21   about what's earned in the market.  I would have ignored tax

22   effects.  But if damages were awarded, that's when the taxes

23   would be paid on those earnings.

24         But because I calculated taxes along the way, in

25   effect they'd already been paid, and to not take into effect

O4ABFRO4                    Neels - Cross

1    the taxes on the award means you're basically taxing those

2    earnings a second time.

3              THE COURT:  Thank you.

4              MR. HOSENPUD:  Your Honor, would this be a good

5    stopping point?  We're at the 5:00 hour.

6              THE COURT:  Yes.  Is everybody through with Dr. Neels?

7    Is he excused or will he be back tomorrow?

8              MR. HOSENPUD:  He'll be back tomorrow with some

9    rebuttal, your Honor.

10             THE COURT:  That's the answer to that.  See you

11   tomorrow morning.

12             MR. HOSENPUD:  Thank you, your Honor.

13             (Adjourned to April 11, 2024 at 11 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                           Page
 3    ROBERT FANNING
 4   Cross By Mr. Alexander . . . . . . . . . . . 289
 5   Redirect By Mr. Hosenpud . . . . . . . . . . 347
 6    JOHN KEVIN NEELS
 7   Direct By Mr. Hosenpud . . . . . . . . . . . 359
 8   Cross By Mr. Butler  . . . . . . . . . . . . 385
 9                      JOINT EXHIBITS
10   Exhibit No.                            Received
11    69    . . . . . . . . . . . . . . . . . . . 290
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```