O4BBFRO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FRONTIER AIRLINES, INC.,

              Plaintiff,

        v.                    20 Civ. 9713 (LLS)

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT
4 LIMITED, VERMILLION AVIATION
(TWO) LIMITED,

              Defendants.

------------------------------x

                           Bench Trial

                           New York, N.Y.
                           April 11, 2024
                           11:00 a.m.

Before:

                 HON. LOUIS L. STANTON,

                           District Judge

                  APPEARANCES

LANE POWELL PC
     Attorneys for Plaintiff
BY:  DAVID G. HOSENPUD
     AARON SCHAER

CLIFFORD CHANCE US LLP
     Attorneys for Defendants
BY:  JEFF E. BUTLER
     JOHN P. ALEXANDER
     RISHIKA JIKARIA
     GINA CROSBY

O4BBFRO1                        Neels - Redirect

1                (Trial resumed)

2                THE COURT:  Good morning.  You're still under oath.

3                THE WITNESS:  I understand.

4    REDIRECT EXAMINATION

5    BY MR. HOSENPUD:

6    Q.  Good morning, Dr. Neels.  You may recall before the break

7    we took yesterday, you were explaining how Frontier would be

8    double taxed if you did not reapply the tax rate at the end of

9    your calculations.

10               Do you remember this discussion?

11   A.  I do.

12   Q.  Can you please explain this concept further?

13   A.  I think I can explain it by a very simple example.  To make

14   it a story I'll say, consider a contractor who agreed to

15   upgrade someone's kitchen for a cost of $100,000.  And let's

16   say also that the nature of his business is such that it

17   typically pays 20 percent of his earnings out in taxes.  That's

18   been consistent over time.

19               So let's say then he finishes the job and his customer

20   simply says, I'm not going to pay, so, deal with it.  So the

21   contractor takes his customer to court, and he's ordered

22   then -- the customer is ordered to pay the contractor and make

23   him whole.  The customer argues, well, to make you whole, I

24   really don't need to pay you $100,000 cause you would have paid

25   taxes on that.  I really only need to give you $80,000 to leave

O4BBFRO1                          Neels - Redirect

you in the same place you would have been.  If he were to do
that, then the contractor would receive the 80,000 and would
have to pay his 20 percent tax on that, which would be 16,000
in tax and would be left only with 64,000.  So he wouldn't
really be put back into the same position after taxes that he
would have been if the payment had been made upfront.

     And that's the exact sense in which I say if you don't
take into account the tax liability associated with the award,
you're effectively taxing it twice.  Once to take it down to
80,000, and then the second time to take it down to 64.  And
it's really as simple as that.

Q.  And is that the analysis that you've conducted in this case
for your damage calculation for Frontier?

A.  Basically it is.  There's more to it in that there are more
complicated streams of payment and there's discounting, but the
same basic principle applies to what I did.

Q.  And could you just briefly walk us through that discussion
of what you did and the interest rate applied, pretax and
post-tax?

A.  Well, certainly.  I looked at what were the streams of
payments that are associated with the leases Frontier actually
entered into, and then conversely what are the stream of
payments that Frontier would have entered into under the terms
of the Framework Agreement.  So there's money going both ways.

     As we discussed yesterday, Frontier was supposed to be

O4BBFRO1                          Neels – Redirect

1    paid the purchase price for the aircraft.  Frontier

2    subsequently made rent payments.  There were security deposits,

3    a few other things, and they played out over time.  But

4    basically what I did was to say, let's look at the net revenues

5    that Frontier would have, what's the net effect on Frontier's

6    bottom line under the original leases, what's the net effect on

7    Frontier's bottom line under the leases that actually entered

8    into.

9           Doing that, taking into account taxes at 22.8 percent,

10   the rate I explained yesterday, taking into discounting back

11   using, as I explained yesterday, the after-tax cost of debt.

12   So the result is the injury on an after-tax basis to Frontier.

13   And that is what I say gross-up by anticipating that Frontier

14   has to be paid an award such that after paying taxes on it, it

15   winds up in the same position after tax that it would have had

16   it entered into the AMCK leases instead of the replacement

17   leases.

18   Q.  And what would the effect on damages have been had you done

19   the calculation on a pretax basis?

20   A.  Well, if I had done the entire calculation on a pretax

21   basis, I would have wound up in the same place.

22   Q.  If that's the case, why did you take the step of analyzing

23   on a post-tax basis?

24   A.  It's a very simple reason as I explained yesterday, which

25   is simply that for the WACC-base discount rate, I wanted to

O4BBFRO1                        Neels - Redirect

1    rely on Bloomberg and their published results.  Those are on an

2    after-tax basis.  So to use the Bloomberg WACC as a discount

3    rate, I had to do the rest of the calculation on an after-tax

4    basis.

5    Q.  Had you not done the calculation on an after-tax basis

6    using an after-tax WACC rate, what impact would that have had

7    on the calculation?

8    A.  Well, I would have been discounting the cash flows back to

9    the time of injury using a lower interest rate, and that would

10   have increased the calculation of damages incorrectly.  So it

11   would have inflated the damages in an inappropriate way.

12   Q.  You mentioned that you had sourced as one of your reference

13   points a guide relating to the appropriateness of using before

14   and after tax.  Do you recall that?

15   A.  Yes.

16   Q.  And I've put up as a demonstrative only the reference

17   manual on scientific evidence.  Is that the source material

18   that you were referring to?

19   A.  Yes, this is something I cited in my report.

20   Q.  And if we scroll to the page at issue.  Is that the section

21   that is contained in this reference guide to scientific

22   evidence?

23   A.  That is one of many sections contained in the reference

24   guide to scientific evidence.

25   Q.  Is that the one that pertains to our losses measured before

O4BBFRO1                          Neels - Redirect

1   or after the plaintiff's income taxes?

2   A.  It is.

3   Q.  And is this an accepted authority in your field?

4   A.  I think in terms of calculating damages in litigation

5   settings, it is the authority I always turn to; and I think

6   it's widely recognized as being the word on these matters.

7   Q.  All right.  Now we're going to take a look at

8   Mr. de Jounge's report.  It's docket number 133, and we're

9   going to look at once we arrive at paragraph nine.  We have a

10  different report up.  Let me get to the point.

11          Do you recall in reading Mr. De Jounge's report that

12  he agreed or disagreed with using a post-tax analysis?

13  A.  If I recall his report correctly, he stated in it that if

14  you're using a single tax rate throughout the calculation doing

15  the damage calculation on an after-tax basis, leaves one in the

16  same place that one would get to if one had done the same

17  damage calculation on a pretax basis.  He argued, therefore,

18  that it was extra effort for no purpose if I recall correctly,

19  something to that effect.

20  Q.  And the purpose that you've identified here is the

21  after-tax WACC rate?

22  A.  Yes.  In order to do it on a pretax basis, I would have had

23  to adjust the Bloomberg WACC based on my own calculations and

24  judgment to make it reflect the pretax conditions.  And that

25  was not something I wanted to do in this case.

O4BBFRO1                         Neels - Redirect

1    Q.  Would it have been from your point of view as accurate as

2    having the Bloomberg after-tax WACC rates?

3    A.  As I explained, I think there's some value in going to a

4    respected third party for inputs to damage calculations when

5    one has the chance to do so.

6    Q.  Since you did consider taxes because you used an after-tax

7    discount rate -- and please remind us again what the tax rate

8    is that you determined to use?

9    A.  22.8 percent.

10   Q.  And why did you do that?

11   A.  I believed it was the tax rate that would be most

12   applicable to the incremental tax flows over the period covered

13   by the leases.

14   Q.  Yesterday counsel spent a great deal of time discussing the

15   moving effective rate of Frontier's taxes over the past handful

16   of years.  Do you recall that discussion?

17   A.  Yes, I do.

18   Q.  And counsel focused on a few years where Frontier's

19   effective tax rate reflected a tax benefit.  Do you recall

20   that?

21   A.  I do.

22   Q.  In the year 2023, there was a particularly enlarged

23   effective tax rate, and do you recall the percentage that that

24   reflected?

25   A.  If I recall correctly, it was something over a hundred

O4BBFRO1                      Neels - Redirect

1   percent, maybe like 130 percent, something of that nature.

2   Q.  Do you think that this is an appropriate amount of taxes to

3   be applied to Frontier's damages in this case?

4   A.  No.  I don't think -- that does not reflect the real tax

5   impact of the incremental cash flows that I focused on in my

6   damage calculation.

7   Q.  And the incremental impact is the 22.8 percent as you've

8   mentioned?

9   A.  That's what I believe to be the case, yes.

10  Q.  I'd like to show you what we'll mark as a demonstrative as

11  part of the S1 of Frontier Airlines that you indicated you

12  reviewed, that you had cited in your report.  It's for the year

13  2021.  And I'd like to turn to a particular page in that report

14  looking at Frontier's holdings consolidated financials for

15  years ending 2018, 2019 and 2020.

16          Do you see there the various tax rates that are noted

17  as the effective rates in those years?

18  A.  Yes.

19  Q.  And is the rate in 2019, 22.8 percent?

20  A.  Yes, it is.

21  Q.  And the rate in 2020 is 39.5 percent; is that correct?

22  A.  It is, yes.

23  Q.  Is there an explanation in the S1 that talks about the

24  potential impact of the tax rates in 2020 as it relates to the

25  pandemic?

O4BBFRO1                          Neels - Redirect

1    A.  Well, I mean, certainly looking at that table there's a

2    line labeled impact of the CARES's Act which said that had

3    almost the 17 percent effect on the affected tax rate in that

4    year.  That was a transient circumstance that would past and

5    would not be affecting Frontier's tax liability in the out

6    years.

7    Q.  In the corporate tax rate that's shown in 2018, 2019 and

8    2020, is what?

9    A.  21 percent in all three years.

10   Q.  Does that remain constant to the present date?

11   A.  Yes, it has.

12   Q.  Do you anticipate or are you aware of any legislation in

13   Congress that would change that tax rate going forward?

14   A.  None that I'm aware of, no.

15   Q.  And the state taxes as of those years, what is their range,

16   2018, 2019 and 2020?

17   A.  From 1.7 percent in 2018, to 2.1 percent in 2020, so within

18   a fairly narrow range.

19   Q.  And you used the 2019 rate as your effective tax rate; is

20   that correct?

21   A.  That's correct.

22   Q.  And was that an approximation or a proxy for a different

23   rate?

24   A.  Yes.  I mean, I used that as a proxy for what I would

25   anticipate the incremental tax rate to be; in other words, the

O4BBFRO1                          Neels - Redirect

1    effect on Frontier's overall tax liability of an additional

2    dollar of income, or an additional dollar of deductible

3    expense.

4    Q.  I'd like to turn now to the appendix to your declaration,

5    and we will be looking at exhibit 1.

6    A.  Yes.

7    Q.  So we're focused in on the calculations that Mr. Butler

8    spent sometime with yesterday relating to MSN 9549.

9            Does that chart look familiar to you?

10   A.  It does.

11   Q.  And in connection with this exhibit, Mr. Butler was asking

12   you questions about did you anticipate or calculate for the

13   possibility that the sum of 48,500,000 under this particular

14   lease was paid directly to Airbus.

15           Do you recall that exchange?

16   A.  I do.

17   Q.  And when you ran your calculations, did you in fact use all

18   aspects of the cash flow, including the difference between

19   purchase price between the AMCK but-for lease, AMCK but-for

20   lease, and the CDB lease in question?

21   A.  Yes, I did.  As I explained in my report and in my

22   testimony yesterday, I followed the but-for approach, which

23   measures the injury by looking at the difference between the

24   economic status of -- the actual economic status of Frontier,

25   and what its economic status would have been had it entered

O4BBFRO1                          Neels - Redirect

1    into the leases under the Framework Agreement.

2              So what really matters here is not the absolute

3    numbers, but the difference between the corresponding number

4    under the two alternative leases.

5    Q.  All right.  Let's go to D1 of the declaration.  Now this is

6    the history as reported by Bloomberg of the weighted average

7    cost of capital covering fiscal years '22 back to 2015.  Do you

8    see that?

9    A.  I see that.

10   Q.  What is the weighted average cost of debt as reported by

11   Bloomberg?

12   A.  Well, they have a different cost of debt, and it's shown --

13   the one that was relevant for my purposes was the one for

14   fiscal year 2020 which is that 1.044 percent.

15   Q.  And what is the weighted average cost of equity?

16   A.  That's shown in the first line of the table, and that's

17   8.55 percent.

18   Q.  And what weighted average cost of capital did you use as of

19   September 2022?

20             What weighted average cost of capital did you use as

21   of October 2022 for your analysis?

22   A.  As of October 2022?

23   Q.  Yes.

24   A.  Well, in using the WACC as a discount rate, I used the same

25   value.  I used the value as of the time of injury, which would

O4BBFRO1                        Neels – Redirect

1    have been the WACC shown under column 2020.  And I used that

2    same discount factor over the entire 12-year period covered by

3    the leases.

4    Q.  Is that how you were doing the calculation based on the

5    weighted average cost of capital?

6    A.  That's when I was doing my alternative calculation based on

7    the use of the weighted average cost of capital as a discounted

8    rate.

9    Q.  With respect to the weighted average cost of capital for

10   the debt base discount rate which I understand from your

11   testimony is the rate that you think is most appropriate?

12   A.  Yes.

13   Q.  What rate did you use?

14   A.  I used the 1.044 percent rate.  As I noted earlier today

15   that the figures presented by Bloomberg are on an after-tax

16   basis.

17   Q.  I'd like to focus on your chart that was prepared in

18   conjunction with MSN 9549 before you found the Bloomberg

19   material.  And if we look at the chart there, does it discuss

20   the cash flow differences between the leases in terms of

21   purchase price and payment stream?

22   A.  Well, it does.  I mean what you can see if you look at the

23   columns here, the first column shows the but-for cash flows for

24   AMCK.  The second, the but-for -- the actual cash flows under

25   the CDB lease.  The third column shows the difference between

the undiscounted values.  And you can see there that 2.5

million, which is the difference between the $51 million

purchase price that's applied in the Framework Agreement, and

the 48.5 million purchase price specified in the CDB lease.

        Then in the last column it shows the difference after

taking into account both the taxes associated with whatever

payment is being discussed and the discounting everything back

to the time of injury.

Q.  So if in fact in Mr. Butler's hypothetical that the payment

of 48,500,000 did in fact go directly to Airbus, does that

influence your analysis in any way?

A.  I don't think it does because it could well have been the

case that in the but-for world, 48.5 million of the 51 million

that AMCK would have paid might have gone, again, straight to

Airbus to settle Frontier's obligations to Airbus; but Frontier

would have still been left with an extra two and half million

dollars.

Q.  And you did the analysis for that cash flow?

A.  It's based on the difference in cash flows, yes.

Q.  Could you please bring up expert declaration.  I'd like you

to please turn to page 37.  Starting on this page, this is out

of your declaration, Dr. Neels.

        Is this the analysis conducted on the debt-base

discount rate?

A.  Yes, it is.

O4BBFRO1                        Neels - Redirect

1    Q.  And going through these briefly, is this the analysis based

2    on the 1.044 debt base?

3    A.  Yes, if this is from my declaration, that would be based on

4    the 1.0445 after-tax cost of debt reported by Bloomberg.

5    Q.  Do you engage in the same analysis of the cash flows

6    related to the difference between the leases at issue in this

7    case?

8    A.  Exactly the same structure for the calculation.  The only

9    difference comes in the discount rate used.

10   Q.  If we go onto the next analysis D11.  This is for the

11   second of the five leases at issue?

12   A.  Yes.

13   Q.  Does that reflect the same analysis that you've engaged in

14   for that?

15   A.  Exactly the same framework, yes, just changed to reflect

16   what's applicable to this specific aircraft.

17   Q.  And the same would be true for D12?

18   A.  Yes.

19   Q.  The third lease?

20   A.  Yeah.

21   Q.  And that's the end of the CDB leases.  Then D13?

22   A.  Yes.

23   Q.  That's the beginning of the -- is that still a CDB lease?

24   Looks like it is.

25   A.  JSA.

O4BBFRO1                          Neels - Redirect

1    Q.   All right.  And then 14?

2    A.   This would have been the other JSA lease.

3    Q.   All right.  We're going to turn to page 46 and look at the

4    table D15.  Is this the overall summary of those calculations

5    as of that point in time?

6    A.   Yes.

7    Q.   And it shows discounting to the pretax and then the amount

8    necessary to make Frontier whole; is that correct?

9    A.   That's correct.

10   Q.   And the figure today that you corrected for the court is

11   which?

12   A.   Well, this is damages, including prejudgment interest up to

13   September 21, of last year.  As I testified yesterday, I think

14   the appropriate number up to this past Monday was 49,660,000.

15   Q.   Did you correct that testimony after looking at your notes?

16   A.   I did.

17   Q.   And that number is, was that 48,660,000?

18   A.   I misspoke, yes.  It is 48, 660,000 as of April 8, 2024.  I

19   apologize for -- too many numbers running around, but that is

20   48,660,000.

21         MR. HOSENPUD:  Thank you, Dr. Neels.  No further

22   questions.

23         MR. BUTLER:  Your Honor, may I ask a few follow-up

24   questions of the witness?

25         THE COURT:  Yes.

1    RECROSS EXAMINATION

2    BY MR. BUTLER:

3    Q.  Dr. Neels, you were shown during your redirect a page from

4    an S1 registration report for Frontier Airlines.

5            Do you recall that?

6    A.  I do.

7    Q.  And this page shows three different effective tax rates for

8    Frontier for the years 2018, 2019, 2020, correct?

9    A.  Correct.

10   Q.  Do you know which of these numbers are benefits as opposed

11   to costs?

12   A.  I would assume that the numbers in parenthesis are

13   negatives, and that they would represent reductions in tax

14   liabilities and therefore benefits.

15   Q.  Speaking of the tax rates themselves though, I think we saw

16   yesterday that some of the tax rates that could be calculated

17   using your methodology are benefits, and some are losses; is

18   that right?

19   A.  You're talking about -- are we talking about this table or

20   a different table just to be clear?

21   Q.  I'm asking about using the methodology you used to

22   calculate effective tax rates, were some of the tax rates we

23   talked about yesterday benefits and some of them costs?

24   A.  Well, the methodology I used, I only applied to the year

25   2019.  And so looking at that, it appears that there was a

1    benefit associated with stock base compensation of 2/10 of a

2    percent of that year if that answers your question.

3    Q.  Let me move on.  You told me yesterday that you did not

4    consider for purposes of your model the tax rates for any years

5    prior to 2019.

6           Do you recall that?

7    A.  That's correct.

8    Q.  So this tax rate for 2018, would you agree that that is not

9    something that you considered in the preparation of your

10   opinion?

11   A.  2018, it certainly did not provide any direct input.  I did

12   make a judgment that 2019 was a relatively normal year.  And in

13   making that judgment, I had to compare 2019 to adjacent years

14   to find a period where there were not a lot of special

15   considerations.  So I think I did examine these other years,

16   but they did not feed directly into my calculation other than

17   to flag 2019 as an appropriate normal year.

18   Q.  Dr. Neels, did you use this figure of 23.7 percent for 2018

19   anywhere in your model?

20   A.  No, I did not.

21   Q.  The same question for the figure for 2020, did you use the

22   figure of 39.5 percent for 2020 anywhere in your model?

23   A.  No, I did not.

24   Q.  Mr. Hosenpud had asked you some questions about the manual

25   on scientific evidence.  Do you recall that?

1    A.   I do.

2    Q.   Does the manual on scientific evidence provide any guidance

3    on the determination of the right tax rate to use in a post-tax

4    analysis?

5    A.   The section we reviewed talked in general about the

6    comparison between the pretax and the post-tax approach.  And

7    in that section, it didn't offer any guidance as to the

8    specific rate.

9         The manual is a lengthy document.  And off the top of

10   my head, I can't say whether or not it may have discussed other

11   aspects of taxes somewhere else in the manual.

12   Q.   To the best of your knowledge as you sit here today, do you

13   know whether the manual on scientific evidence provides any

14   guidance on the right tax rate to use in a post-tax analysis?

15   A.   At the level we're talking about here about marginal versus

16   effective rates and for which years, I'm not aware of any

17   guidance that it provides.

18   Q.   Does the manual on scientific evidence recommend anywhere

19   using one rate for several different tax years in a damages

20   analysis?

21   A.   Again, I'm unaware of any guidance provided by the

22   reference manual on scientific evidence on that point.

23   Q.   Does the manual on scientific evidence provide any guidance

24   on determining the tax rate for future years?

25   A.   Again, same answer.  I am unaware of any guidance that it

O4BBFRO1                          Neels - Recross

1    provides.

2    Q.  Well, let's take a look at the guidance it does provide.

3    I'm going to show you the demonstrative that was handed to me

4    by Mr. Hosenpud, and I believe this is some of the text that

5    you relied upon in concluding that a post-tax analysis was the

6    best approach; is that right?

7    A.  This was a, as I recall when we were talking about this

8    section, the point I was taking from it was that both the

9    pretax and post-tax approaches are acceptable.  I don't think I

10   was making an argument that the after-tax approach was

11   superior.

12   Q.  Indeed this first paragraph of this section does talk about

13   the two alternatives, post-tax and pretax, correct?

14   A.  It does.

15   Q.  And starting on the fourth line of this I just want to read

16   you some text.  It says, "In practice, the tax rates applied to

17   the original loss and to the compensation are frequently the

18   same.  When the rates are the same, the two tax adjustments are

19   a wash."  Do you see that?

20   A.  Yes.

21   Q.  Does that describe the situation in your model?

22   A.  It does.

23   Q.  And is that because you used the same tax rate for all 12

24   years covered by the model, correct?

25   A.  That is correct.

O4BBFRO1                           Neels - Recross

 1  Q.  This paragraph goes onto say "In that case, the appropriate

 2  pretax compensation is simply the pretax loss, and the damages

 3  calculation may be simplified by the omission of tax

 4  considerations."  Do you see that?

 5  A.  I see that.

 6  Q.  Do you agree that the manual on scientific evidence

 7  recommends omitting tax considerations if the same tax rate is

 8  used?

 9  A.  No, I don't agree with that.  It says that the calculation

10  can be simplified.  It does not say that the -- and it says

11  earlier that the pretax method and the post-tax method in this

12  case give the same answer.  So I don't think it comes out

13  arguing that the appropriate method is the pretax method.  It

14  says simply that the calculation might be simpler if they were

15  done on a pretax basis.

16         MR. BUTLER:  Thank you, Dr. Neels.  I have nothing

17  further.

18         MR. HOSENPUD:  Nothing further, your Honor.

19         THE COURT:  Thank you, doctor.  You're excused.

20         (Witness excused)

21         MR. BUTLER:  Your Honor, as discussed yesterday, we're

22  taking defendant's expert witness out of order right now, so

23  I'd like to call to the stand Mr. Rikard de Jounge.

24         THE COURT:  Sure.

25

O4BBFRO1                        De Jounge- Direct

```
 1   RIKARD DE JOUNGE,
 2           called as a witness by the Defendant,
 3           having been duly sworn, testified as follows:
 4                THE DEPUTY CLERK:  Please state your full name and
 5   spell it.
 6                THE WITNESS:  Rikard De Jounge.  RIKARD DE JOUNGE.
 7   DIRECT EXAMINATION
 8   BY MR. BUTLER:
 9   Q.  Good morning, Mr. De Jounge.
10   A.  Good morning.
11   Q.  Would you please tell us a bit about your background
12   including your education and employment history?
13   A.  I'm Swedish by birth, and I was educated in Sweden and
14   graduated high school in Sweden.  I served in the Swedish
15   military, the navy, equivalent of the naval academy.
16           After that, I went to and got my master's in
17   aeronautical engineering at the Royal Institute of Technology
18   in Stockholm.  Completing my studies, I moved to California.  I
19   worked for McDonnell Douglas & Boeing in total for 11 years.  I
20   took a six year period helping out my parents running their
21   family company, and we sold that.
22           And since 2005, I'm back in aviation working for
23   Avitas, an aviation consultancy firm located in the Washington
24   area Virginia.
25   Q.  Do you have any professional qualifications?
```

O4BBFRO1                         De Jounge- Direct

A.  I'm ISTAT certified senior appraiser fellow. ISTAT stands

for International Society for Transport Aircraft Trading.  It's

approximately 5,000 members around the world.  The individuals

that buy, sell, trade, maintain, insure, appraise commercial

aircraft.

          There are 120 certified appraisers give or take a

couple, and about 150 of us are active appraisers like myself

that do day-to-day aircraft appraisal and aviation analysis.

Q.  So do I understand it correctly that you are a certified

appraiser under the aegis of ISTAT?

A.  That's correct.

Q.  What is your current position with Avitas?

A.  I'm vice president of asset valuation.

Q.  Could you tell us a little bit more about Avitas as a

company, what it does, etc?

A.  So Avitas is aviation consultancy firm.  We been in

business since the mid-80s.  Our biggest focus is aircraft

valuations.  We also have a technical arm, asset management

that take care of aircraft when investors become what we call

accidental owners and they need help with the taking care of

the hardware so to speak.  And we have a consultancy group that

will do the macro analysis that's 30,000-foot type analysis of

the aviation industry.

Q.  Does your work as a commercial aircraft appraiser involve

analyzing the financial terms of commercial aircraft lease

O4BBFRO1                          De Jounge- Direct

1    agreements?

2    A.  Yes.

3    Q.  And does your work also include calculating the net present

4    value of cash flows under aircraft lease agreements?

5    A.  Yes.

6    Q.  Mr. De Jounge, you were in the courtroom yesterday and also

7    this morning to hear the testimony of Dr. Neels, and I believe

8    you've also had the opportunity to review Dr. Neels' various

9    reports.

10        Could you briefly summarize your main areas of

11   disagreement with Dr. Neels?

12   A.  Yes.  I have three disagreement.  One being the use of

13   pretax consideration.  I disagree with the choice of a discount

14   rate, and I have calculated different rent for two of the

15   leases, the Jackson Square Aviation leases.

16   Q.  Focusing on the first of those issues, the calculation of

17   tax effects.  In your work is it the normal practice to

18   calculate net present value on an after-tax basis?

19   A.  No.

20   Q.  In your career as an aircraft appraiser, have you ever seen

21   that done for a commercial aircraft lease?

22   A.  No.

23   Q.  Do you have any idea how one would even determine the

24   after-tax effect of future cash flows?

25   A.  No.

O4BBFRO1                                    De Jounge- Direct

1  Q.  You also have an issue with the discount rate or rates used

2  by Dr. Neels.  Could you tell us a little bit more about that?

3  A.  At the time of my expert report, Dr. Neels had looked at a

4  secured loan secured by the Frontier's credit card calculating

5  an interest rate of I think about 2.8 percent.

6       I considered that unreasonably low since the credit

7  card being the secured part of the loan was maybe the most

8  safest investment one could consider under the umbrella of

9  Frontier, so I consider that unreasonably low.

10      The second part was the regression based analysis of

11 the weighted average cost of capital, and that too I found

12 faulty because of the variables used in his regression

13 analysis.

14 Q.  Now, we know that Dr. Neels has revised his original report

15 to use weighted average cost of capital information and debt

16 information from Bloomberg.

17      First, do you typically use Bloomberg data in your

18 work?

19 A.  No.

20 Q.  And what is your reaction to Dr. Neels' use of such data?

21 A.  I'm not an expert in Bloomberg's WACC and how they

22 calculate it, but my first reaction is that this is an

23 enterprise WACC and not an incremental WACC for incremental

24 cost or investment, and therefore too low.

25 Q.  Could you say a little bit more about the difference

O4BBFRO1                          De Jounge- Direct

between an enterprise weighted average cost of capital and an

incremental weighted average cost of capital?

A.  Well, the enterprise weighted average cost of capital is

what Bloomberg base their calculations on using forms K10 or

these things.  I don't know how they do the magic.

        When I say incremental cost of capital, I refer to

that what, as an investor would consider necessary at any one

point to do a capital investment, what kind of return of

equity, what kind of return on what is the cost of capital and

the calculation would be done separately, and that's what I

call incremental weighted average cost of capital.

Q.  In determining the right discount rate to use, in your

opinion is that an objective exercise or a subjective exercise?

A.  I think it's a subjective exercise.

Q.  And what is the range of discount rates that you have used

in your aircraft appraisal work?

A.  I have used discount rates as low as 4.5 percent.  That was

a very special case.  It was a sovereign nation credit that

we're buying portfolio aircraft, and I consider that legitimate

being a sovereign credit.  And I've gone all the way up to 15

percent in critical valuing the leases and cash flow.

Q.  What is the risk of using too low of a discount rate in an

analysis like this?

A.  Well, you're overvaluing future cash flows, not taking into

account the cost and the risk of those cash flows materializing

O4BBFRO1                         De Jounge- Direct

1    in the real world.

2    Q.  The third issue that you mention has to do with the

3    calculation of rent under the two Jackson Square Aviation

4    leases.  Can you explain a little bit more your disagreement

5    with Dr. Neels'?

6    A.  Yes.  The leases have a mathematical formula, which is, in

7    principle, they're in place to adjust the agreed upon rent at

8    the time of agreement to hedge for the future variations of

9    interest rates of some sort at time of delivery.  There's a

10   lead time between agreement and taking delivery.

11            Different leases uses different references for the

12   interest rates.  In this case, the JSA leases specified the

13   nine year swap rate, perfectly acceptable.  The swap rate is

14   quoted in percentage points on Bloomberg.  And in most leases,

15   I would say all leases except for this one, the adjustment

16   formula specifies either the adjustment with either in the

17   percentage form or in word such as basis points.  In this case

18   for the two JSA leases, it just wrote out in decimal form

19   effectively removing or taking away the adjustment.

20   Q.  Taking into account the difference of opinion you have with

21   Dr. Neels, did you prepare an alternative calculation of the

22   net present value of payment streams under the AMCK leases

23   versus the replacement leases?

24   A.  Yes, I calculated a cash flow based upon the difference in

25   monthly payments.

O4BBFRO1                          De Jounge – Cross

1    Q.  And what was the discount rate that you used to calculate

2    net present value?

3    A.  I used the 12 percent discount rate.

4    Q.  How did you come up with that rate?

5    A.  Well, from the testimony in 2020 with the employees from

6    Frontier, they testified that they used an internal discount

7    rate of 10 percent.

8             At the time of my report, the interest environment had

9    changed drastically, and I considered, therefore, that also

10   their internal discount rate would be reasonably adjusted up

11   from 10 to 12 percent, and that's what I used.

12   Q.  And what was the outcome of your alternative analysis?

13   What number did you derive?

14   A.  Bringing everything back to the termination date of May 8,

15   2020, using a 12 percent discount rate, I calculated a total

16   damage or cost increase of 24,950,000.

17   Q.  And in your opinion is that the amount of Frontier's actual

18   financial loss resulting from the termination of the Framework

19   Agreement as of that date May 8, 2020?

20   A.  Yes.

21            MR. BUTLER:  Thank you, Mr. De Jounge.  I have nothing

22   further.

23   CROSS-EXAMINATION

24   BY MR. HOSENPUD:

25   Q.  Good morning, Mr. De Jounge.

O4BBFRO1                          De Jounge – Cross

1    A.  Good morning.

2    Q.  You would agree that the swap rate in the JSA leases is

3    designed against a hedge of what might be the actual swap rate

4    and interest rate applied to the payment stream, correct?

5    A.  Yes.

6    Q.  And in particular the formula in the JSA leases would

7    potentially reduce the base rent as one option, correct?

8    A.  Not as written.

9    Q.  But as contemplated by the parties?

10   A.  Most likely so, yes.

11   Q.  And another option would be that the formula might leave

12   the base rent exactly the same and not alter it, correct?

13   A.  Yes.

14   Q.  And the third option would be that the base rent increases

15   by virtue of the application of the formula, correct?

16   A.  That's correct.

17   Q.  And you state that this is the first time you've seen a

18   formula potentially providing three outcomes, correct?

19   A.  Not three outcome, but having this in numeric form, the

20   adjustment variables in numeric form instead of a percentage or

21   with unit on it such as basis points, yes.

22   Q.  Didn't you observe that in your analysis of leases they

23   either go up or down?

24   A.  In my analysis the leases, the basic rent was reduced

25   because of this.

O4BBFRO1                         De Jounge – Cross

1    Q.  I'm not talking about this.  I'm talking about generally

2    when you analyze leases.  The formula will either increase or

3    decrease it, not have this safe space that it doesn't alter the

4    lease at all?

5    A.  I have seen all sorts of variance in how the leases rent is

6    hedged or adjusted.

7    Q.  You would also think that neither party to a lease

8    agreement with experience in aircraft financing through lessors

9    would negotiate a hedge tool that only went in one direction,

10   correct?

11   A.  I have seen hedge rules that only go in one direction.

12   Q.  You would contemplate though that if a party, if parties to

13   a lease have a hedge tool contemplating potentially three

14   different outcomes, they would not negotiate a formula that

15   would only result in one outcome favorable to one of the

16   parties, correct?

17   A.  That would seem reasonable, yes.

18   Q.  Now, in your report, I believe it's paragraph 14, you

19   indicated that you adopt a strict interpretation of the formula

20   in two leases; is that right?

21   A.  Yes.

22   Q.  And under that interpretation you have concluded that the

23   basic rents in both JSA leases is approximately $306,000 a

24   month, correct?

25   A.  I think so.

O4BBFRO1                        De Jounge – Cross

1    Q.  And you have reached this result by strictly construing the

2    figures in the formula 0.596 and 0.8 which is the assumed swap

3    rate range as decimals, correct?

4    A.  I don't know what you mean with the word "construing."  I

5    just applied it just as written.

6    Q.  In your view it is written just as decimals, and that's how

7    you applied it?

8    A.  Yes.

9    Q.  And you assume the swap rate in Bloomberg is in

10   percentages, correct?

11   A.  Correct.

12   Q.  And do you know if the Bloomberg chart when it's ticking

13   off the swap rate for any given particular of time has the word

14   "percent" written in it?

15   A.  Not the individual charts, but in the definitions of the

16   rate, it defines it as a percent.

17   Q.  If you were to take and convert the 0.596, which is one end

18   of the calculation, and the 0.8 into percentages, what outcome

19   would you reach?

20   A.  It would be 50 or 60 to 80 percent.

21   Q.  And have you ever seen an interest rate in the marketplace

22   in the range of 50 to 80 percent?

23   A.  No.

24   Q.  In the analysis that you've done, you keep the Bloomberg

25   rate as a percentage, but treat the decimals as they are

O4BBFRO1                        De Jounge - Cross

1   without any alteration; is that correct?

2   A.  That is correct.

3   Q.  Had you made an alteration and construed those as

4   percentages, the formula would work as it was negotiated,

5   wouldn't it?

6   A.  It would have worked differently.

7   Q.  Resulting in the potential for lease rates to go down,

8   lease rates to stay the same, or lease rates to go up the basic

9   rent, correct?

10  A.  Yes.

11  Q.  In your experience in this field, sir, and based on the

12  analysis that you have done of sale leasebacks, is it your

13  understanding that the parties negotiate a hedge agreement to

14  manage risk changes in the cost of borrowing?

15  A.  Yes.

16  Q.  And is it also your experience that the cost to borrow can

17  change from the time of a letter of intent to the time a lease

18  is signed and the aircraft are delivered?

19  A.  Yes.

20  Q.  In your experience would it be common for the parties to

21  adjust the lease to include clauses to adjust the basic rent to

22  take care of that potential change in the cost of borrowing?

23  A.  Yes, that is the clause we're discussing here as best as I

24  understand, are you referring to a different clause in addition

25  to this?

O4BBFRO1                          De Jounge – Cross

1    Q.  No, I'm not.  I'm referring generally to your analysis of

2    sale leasebacks leases when you see such a hedge clause for

3    interest rates.

4    A.  Okay.

5    Q.  And it's also your understanding that the parameters for

6    the adjustment to the basic rent are typically fixed by the

7    parties' expectations which are anchored in historical

8    experience of interest rate, correct?

9    A.  Correct.

10   Q.  Do you know the approximate range of the nine-year swap

11   rate reported by Bloomberg at the time of the letter of intent

12   which I'll represent was entered in October 2020?

13   A.  No.

14   Q.  But you do know the approximate swap rate two days before

15   the leases were signed; is that correct?

16   A.  Yes.

17   Q.  And those two swap rates in those leases respectively were

18   shortening it 1.5 percent and 1.57 percent, correct?

19   A.  Yes.

20   Q.  Do you think the nine-year swap rates in Bloomberg at the

21   time the leases were signed were closer to .956 to .8 percent

22   or closer to 59.6 to 80 percent?

23   A.  They were closer to the first former.

24   Q.  Could we put up exhibit 166, please, trial exhibit 166.

25   Thank you.  During the course of this case, Mr. De Jounge, you

O4BBFRO1                          De Jounge - Cross

1    were provided with some communications between the lessor

2    representative John Yanney and Sharath Sashikumar a

3    representative of Frontier; is that right?

4    A.  Yes, I was provided this after my report just prior to the

5    deposition.

6    Q.  And if we scroll down a bit in this document the subject

7    lease is for MSN 10384, correct?

8    A.  Yes.

9    Q.  And we are looking at the basic rent that is part of that

10   lease of 322,500; is that right?

11   A.  Yes.

12   Q.  If we can slide over to the right of this document.  Do you

13   see the reference that the 1.5745 being used as the adjustment

14   or as the nine-year swap rate is expressed as a number rather

15   than a percentage?

16   A.  Yes.

17   Q.  And then if we look back at the formula and see what the

18   assumed swap rate is.  The application is the 0.8 subtracting

19   from the nine-year swap rate; is that right?

20   A.  Yes.

21   Q.  And the difference in that calculation is 0.775, correct?

22   A.  Yes.

23   Q.  And that is the figure multiplied by the 27,500 to come up

24   with a rental adjustment of 21,298.75, correct?

25   A.  Yes.

O4BBFRO1                           De Jounge – Cross

1    Q.  And the parties then agreed to the adjusted fix rent of

2    343,798.75, correct?

3    A.  Yes.

4    Q.  Let's go onto exhibit 168 so we can go through the next

5    lease.  This is another series of communications between John

6    Yanney and Sharath Sashikumar on April 27, 2021, and that too

7    was provided to you before your deposition; is that right?

8    A.  That's correct.

9    Q.  Let's scroll down to the formula section.  Here we have the

10   basic rent again defined as 322,500, correct?

11   A.  Yes.

12   Q.  And the Bloomberg swap rate as of 12 Eastern or 9 a.m. was

13   1.5040, correct?

14   A.  Yes.

15   Q.  And it too has the designation to the right that the

16   Bloomberg swap rate is simply being expressed as a number

17   rather than a percentage, correct?

18   A.  Yes.

19   Q.  And the application in the formula if that swap rate is

20   above .08 means that you use .08 as the assumed swap rate to do

21   the calculation, correct?

22   A.  That's what they have done here, yes.

23   Q.  And then the difference is 0.704, correct?

24   A.  Yes.

25   Q.  Multiplied by 27,500 adds 19,360 to that basic rent,

O4BBFRO1                          De Jounge - Cross

1    correct?

2    A.  Yes.

3    Q.  Resulting in an adjusted fix rent of $341,860; is that

4    right?

5    A.  Yes.

6    Q.  So in both of these communications, the parties treated the

7    nine-year swap year rate figure as a number without needing any

8    further adjustments to run the calculation to adjust for basic

9    rent, correct?

10   A.  Yes.

11   Q.  Now the rent rates used in your damage calculations reflect

12   what you contend is a strict interpretation of what is written

13   in the leases, but does not reflect the actual cash out of

14   pocket to Frontier Airlines that it is paying on the two JSA

15   leases and will continue to pay into the future, does it?

16   A.  I have calculated different rent.

17   Q.  And you know -- you've seen information showing that

18   Frontier in fact is paying the rent rates that we just reviewed

19   per the formula adjusted by the parties?

20   A.  Yes, you have, during the deposition, showed me transaction

21   receipts, bank transfers, etc, yes.

22   Q.  Are you suggesting that Frontier that finances its entire

23   fleet through a sale leaseback is volunteering lease payments

24   in the millions of dollars it was never obligated to pay?

25   A.  The discrepancy here is, I don't know what happened between

O4BBFRO1                           De Jounge – Cross

1    the lease agreement and the first payment.  It doesn't

2    communicate here.  Obviously these individual are in agreement

3    as is Frontier with the lessor, but I don't have the

4    information to justify any change other than the contract from

5    the lease.

6    Q.  So by inference then are you contending that Frontier does

7    not understand how to calculate its sale leaseback swap rate

8    formula, correct?

9    A.  No, I'm just saying I don't have information to opine on

10   why.

11   Q.  Now, you have testified on direct that you started with a

12   baseline discount rate derived from the testimony of the two

13   Frontier depositions that you read and that was 10 percent,

14   correct?

15   A.  Yes.

16   Q.  The discount rate that you looked at was never

17   characterized as a weighted average cost of capital in those

18   depositions, was it?

19   A.  I don't recall exact words.

20   Q.  If the deposition testimony and the testimony in this

21   courtroom were that they were discount rates, would you have

22   any reason to disagree with that?

23   A.  No, I don't think so.

24   Q.  And you are relying on the testimony with respect to the

25   company knowing its internal discount rate used for its

O4BBFRO1                          De Jounge – Cross

1    business purposes; is that right?

2    A.  Yes.

3    Q.  And it's your practice to typically receive a discount rate

4    from your clients when performing consultative or evaluative

5    services; is that right?

6    A.  I wouldn't say typically.  It's not a variable or a

7    parameter that they necessarily volunteer.  But, yes, from time

8    to time, I receive their own internal discount rate.

9    Q.  And the times you don't receive that discount rate, you

10   resort to Bloomberg, a reliable source for that determination?

11   A.  No, I do not.

12   Q.  Do you calculate it yourself?

13   A.  I do not calculate weight for a discount rate in this

14   context, no.

15   Q.  And you haven't done it in any context; is that correct?

16           That's just not part of your area of expertise?

17   A.  No, I do it occasionally as an alternative method to

18   determine a discount rate.

19   Q.  Are you familiar with what is known as an internal hurdle

20   rate?

21   A.  Yes.

22   Q.  And do you agree that it can be different from a weighted

23   average cost of capital?

24   A.  Do you refer here to the Bloomberg type weight average cost

25   of capital?

O4BBFRO1                              De Jounge – Cross

1    Q.  Yes.

2    A.  Yes, I would expect them to be very different.

3    Q.  Your calculations do not account for that potential

4    difference in this case, a hurdle rate versus a weighted

5    average cost of capital by Bloomberg, correct?

6    A.  Can you restate that question.

7    Q.  If this 10 percent is really being used as a hurdle rate by

8    Frontier Airlines, your calculations don't factor that in, do

9    they?

10   A.  I think they appropriately describe the incremental capital

11   cost faced by Frontier in this case.

12   Q.  You say incremental, would you expect the discount rate to

13   change?

14   A.  Which discount rate?

15   Q.  Frontier's internal discount rate.

16   A.  Yes, over time, yes.

17   Q.  Were you in the courtroom when Dr. Neels testified?

18   A.  Yes.

19   Q.  Did you learn that Frontier's discount rate of 10 percent

20   has remained unchanged for at least three plus years?

21   A.  That was mentioned yesterday, yes.

22   Q.  Going back to the discount rate you applied, you then due

23   to the fluctuation in interest rates between 2020 and 2022,

24   decided to add an additional two percent and use that as your

25   discount rate; is that correct?

1    A.  Yes.

2    Q.  And in doing so, you arrived at that figure based on what

3    you termed as your choice; is that right?

4    A.  Yes.

5    Q.  You arrived at that figure notwithstanding what the

6    Bloomberg WACC rates may have been in reality, correct?

7    A.  Yes.

8    Q.  And did you even examine what those were?

9    A.  No.

10   Q.  Can we please put up exhibit D1 to the Neels' declaration.

11   I'm showing you here, Mr. De Jounge, the Bloomberg weighted

12   average cost of capital rates spanning the period 2022 and

13   going back to 2015.  You see that, sir?

14   A.  Yes.

15   Q.  And if we look at the rate in 2020, we can see that the

16   weighted average cost of capital in bold is 1.8405 percent.

17            Do you see that?

18   A.  Yes.

19   Q.  So if your analysis calculated the discount rate back in

20   2020, you would be in excess of 10 percent above that WACC rate

21   based on the 12 percent WACC rate, correct?

22   A.  My incremental cost of capital, yes.

23   Q.  And if you had calculated it in 2021, you would be just shy

24   of 5.6 percent higher than the discount rate?

25   A.  Yes.

O4BBFRO1                         De Jounge – Cross

1   Q.  And if you calculated it in 2020, the discount rate you

2   used would have been in the 4.4 range higher than the Bloomberg

3   discount rate, correct?

4   A.  Correct.

5   Q.  Now, you agree turning now to the tax effect.  You agree

6   though that as long as the same calculation of the taxes is

7   done before and after tax, your result might be the same,

8   correct?

9   A.  It would be the same if the tax rate is the same in both

10  directions.  If they're not the same, the result would be very

11  different.

12  Q.  And did you analyze Frontier Airlines taxes or tax rates?

13  A.  No.

14  Q.  And you are aware that the federal tax rate has remained

15  fixed at 21 percent for a number of years now back since '17,

16  correct?

17  A.  Other than being part of this case, I have never considered

18  the fact, so I have no experience there.

19  Q.  Are you aware that Frontier Airlines state tax rate has

20  hovered in the 2.4 to 2.8 percent?

21  A.  I have no comment on that.  It's not my expertise or

22  knowledge.

23  Q.  And when you are analyzing the leases for your clients, are

24  you looking at it from an investor perspective?

25  A.  Yes.

O4BBFRO1                          De Jounge - Cross

1   Q.  So you're not looking at it from a loss perspective to a

2   party potentially injured in a legal dispute, are you?

3   A.  Usually not.

4   Q.  And you analyzed your damages based on a discount rate as

5   you've testified and deeming it to be basically an internal

6   weighted average cost of capital, correct?

7   A.  I considered these damages to be incremental increases to

8   Frontier's cost, and that's how I consider it, yes.

9   Q.  All right.  And so you thought it inappropriate to analyze

10  this on a debt basis, the weighted average cost of debt; is

11  that right?

12  A.  Yes.

13  Q.  And if you look at the chart still before you, you can see

14  that the weighted average cost of debt is 1.0445, correct?

15  A.  Yes.

16  Q.  And the weight of that average given is rounding 90

17  percent; is that right?

18  A.  Yes.

19  Q.  And you can see just above it that the weighted average

20  cost of equity is 8.5 and potentially -- yeah, 8.5 and some

21  change on its weighted calculation?

22  A.  Cost of equity at 8.5, yes.

23  Q.  And that is given a weighting in the weighted average cost

24  of capital of approximately 10.6 percent; is that right?

25  A.  That's correct.

O4BBFRO1                          De Jounge - Cross

1    Q.   So rounding those numbers, 90 percent of the weight to

2    Frontier Airlines weighted average cost of capital is regulated

3    into the debt category; is that correct?

4    A.   Yes.

5    Q.   10 percent is regulated into the equity category; is that

6    correct?

7    A.   Reasonable, yes.

8    Q.   You have indicated that the loan in question that was first

9    considered by Dr. Neels was an inaccurate reference point

10   because the rate was unusually low; is that right?

11   A.   Yes.

12   Q.   And you deem the rate to be unusually low because it was

13   secured by a very valuable asset, in your words, the co-branded

14   credit card?

15   A.   Yes.

16   Q.   Do you know whether the loan banking institution or the

17   government in that case was secured by that ahead of the credit

18   card issuer?

19   A.   I don't understand the question.  Would you repeat.

20   Q.   You said the loan, you recognized the loan was secured by a

21   co-branded credit card; is that right?

22   A.   Yes.

23   Q.   Do you happen to know what position the lender was in with

24   respect to that co-branded credit card as far as being secured?

25   A.   No.

O4BBFRO1                          De Jounge - Cross

1    Q.   Wouldn't it be logical that the credit card company would

2    have the first position?

3    A.   It's outside of my expertise.  I cannot comment on that.

4    Q.   You would agree with me, would you not, sir, that the

5    leases, sale leasebacks are a secured transaction, are they

6    not?

7    A.   They're secured.

8    Q.   They're secured by the aircraft?

9    A.   Yes, that's the collateral.

10   Q.   And, in fact, the lease payments under a sale leaseback

11   agreement are fixed once the determination of what the basic

12   rent is, correct?

13   A.   In these lease agreements, they're fixed.

14   Q.   And they don't change over time, correct?

15   A.   In these lease agreement, they do not change.

16   Q.   In a market force that a business normally faces would be

17   inapplicable to change that risk of the basic rent, wouldn't

18   it?  Let me restate.

19        The market forces that a business usually encounters,

20   in this case an airline; are they fueling their planes, had

21   fuel cost gone up or down, do they have extra capital

22   expenditures, anything along the normal aspect of running a

23   business, that is not influencing these basic rent payments; is

24   it?

25   A.   No.

O4BBFRO1                            De Jounge - Cross

1    Q.   It's more along the lines of a mortgage; would it not be?

2    A.   Technically speaking, yes.

3    Q.   But you still contend that a debt-base discount rate is

4    inappropriate in this circumstance?

5    A.   Yes.

6             MR. HOSENPUD:   Thank you, sir.  Nothing further.

7             MR. BUTLER:  No questions, your Honor.

8             THE COURT:  Thank you, Mr. De Jounge.  You're excused.

9             (Witness excused)

10            MR. HOSENPUD:  Good morning, your Honor.  We're going

11   to put on some videos, but we need a little bit of time to get

12   them teed up.  And they are videos that the parties have no

13   dispute over in terms of any of the language or any of the

14   testimony being given.  We will clarify any disputes to the

15   Court when we get to those types of videos, which likely will

16   not be today.

17            THE COURT:  Okay.

18            MR. HOSENPUD:  Thank you.  Your Honor, we're going to

19   start it again due to the volume interruption.  Sorry about

20   that.

21            (Media played)

22            MR. HOSENPUD:  Your Honor, that will conclude the

23   deposition of Mr. Bachrach.  We're going to move on if the time

24   permits to one other short deposition for this session today.

25            (Media played)

O4BBFRO1                          De Jounge – Cross

1              MR. HOSENPUD:  That concludes the depo presentations

2    for today's session, your Honor.

3              THE COURT:  See you tomorrow morning.

4              MR. HOSENPUD:  Thank you, your Honor.

5              (Adjourned to April 12, 2024 at 11 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                         Page

3   Redirect By Mr. Hosenpud . . . . . . . . . . . 450

4   Recross By Mr. Butler  . . . . . . . . . . . 464

5   RIKARD DE JOUNGE

6   Direct By Mr. Butler . . . . . . . . . . . . 469

7   Cross By Mr. Hosenpud  . . . . . . . . . . . 475

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25