O4FBFRO1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    FRONTIER AIRLINES, INC.,

4                    Plaintiff,

5              v.                              20 Civ. 9713 (LLS)

6    AMCK AVIATION HOLDINGS IRELAND
     LIMITED, ACCIPITER INVESTMENT
7    4 LIMITED, VERMILLION AVIATION
     (TWO) LIMITED,
8
                    Defendants.
9
     ------------------------------x
10                                            Bench Trial

11                                            New York, N.Y.
                                              April 15, 2024
12                                            11:00 a.m.

13   Before:

14                    HON. LOUIS L. STANTON,

15                                            District Judge

16                         APPEARANCES

17   LANE POWELL PC
          Attorneys for Plaintiff
18   BY:  DAVID G. HOSENPUD
          AARON SCHAER
19
     CLIFFORD CHANCE US LLP
20        Attorneys for Defendants
     BY:  JEFF E. BUTLER
21        JOHN P. ALEXANDER
          RISHIKA JIKARIA
22        GINA CROSBY

23

24

25

O4BFBFRO1

1          (Trial resumed)

2          THE COURT:  Good morning.

3          MR. HOSENPUD:  Good morning, your Honor.  We will be

4    starting today with a video deposition, and it will be followed

5    by one more in the morning session, and then there will be a

6    short video beginning in the afternoon session, just to layout

7    the course of events that will be in our case.  Thank you.  We

8    would call Francis Lee via video.

9          (Media played)

10          MR. HOSENPUD:  That would conclude Mr. Lee's

11    deposition.  Your Honor, at this time we would call Jane

12    O'Callaghan by deposition, and I would offer at this time the

13    following joint exhibits, Exhibit 30, Exhibit 55, Exhibit 61,

14    Exhibit 136, Exhibit 147, and Plaintiff's Exhibit Number 6.

15          THE COURT:  Received.

16          (Joint Exhibits 30, 55, 61, 136, 147 received in

17    evidence)

18          (Plaintiff's Exhibit 6 received in evidence)

19          (Media played)

20          MR. HOSENPUD:  Your Honor, that will conclude the

21    depositions for the morning session.  If the Court is so

22    inclined, we would pick up that other deposition in the

23    afternoon session and then continue with a live witness.

24          THE COURT:  We'll resume at 2:15.

25          (Recess)

O4F3FRO2                         Dempsey – Direct

                            AFTERNOON SESSION

1

2                                  2:15 p.m.

3              THE COURT:  Good afternoon.

4              MR. HOSENPUD:  Good afternoon, your Honor.

5              Your Honor, at this time, we will be calling the last

6      video deposition, it is approximately 36 minutes.  And I'd like

7      with the Court's permission to offer evidence connected to that

8      deposition.  Offer the exhibits.

9              At this time, plaintiff offers Joint Exhibits 37, 38,

10     68, 71, 86, 87, 92, 94, 98, 110, 113, 115, and 144.

11             MR. ALEXANDER:  No objection, your Honor.

12             THE COURT:  Received.

13             MR. HOSENPUD:  Thank you.

14             (Joint Exhibits 37, 38, 68, 71, 86, 87, 92, 94, 98,

15     110, 113, 115, 144 received in evidence)

16             (Videotaped deposition of Michael McInerney played)

17             MR. HOSENPUD:  Your Honor, this concludes the

18     deposition.  At this time with the Court's permission the

19     plaintiff will call Mr. Jimmy Dempsey.

20      JAMES DEMPSEY,

21          called as a witness by the Plaintiff,

22          having been duly sworn, testified as follows:

23     DIRECT EXAMINATION

24     BY MR. HOSENPUD:

25     Q.  Good afternoon, Mr. Dempsey.

O4F3FRO2                      Dempsey - Direct

1   A.   Good afternoon.

2   Q.   Would you please tell us what your current position is with

3   Frontier Airlines.

4   A.   I'm the president of Frontier Airlines.

5   Q.   And taking you back to 2020, what was your position at that

6   time, sir?

7   A.   I was the executive vice president and chief financial

8   officer.

9   Q.   Could you give the Court just a general outline of your

10  duties as the chief financial officer.

11  A.   Yeah, I was in charge of all the typical finance-related

12  functions in an airline.  So, treasury, accounting, finance

13  planning and analysis, or financial planning and analysis,

14  properties, facilities management, negotiations of major

15  contracts with vendors, all of the supply chain management of

16  the organization.  Those sorts of things.

17  Q.   Did you have direct reports at that time?

18  A.   I did.

19  Q.   Who were they?

20  A.   So, I had chief accounting officer Mark Mitchell, I had the

21  VP of treasury, Spencer Thwaytes, I had Ashok Shah who was the

22  VP of financial planning and analysis.

23  Q.   Sir, do you hold any degrees or certifications?

24  A.   Yes, I have a bachelor of commerce degree from the

25  University College Dublin in Ireland, and I'm also a fellow of

O4F3FRO2                        Dempsey - Direct

1   the Institute of Chartered Accountants in Ireland.

2   Q.  How long were you with Frontier as of 2020?

3   A.  I joined Frontier in May 2014, so I would have been just

4   about 6 years.

5   Q.  And do you know Mr. Paul Sheridan?

6   A.  I do.

7   Q.  When did you come to meet him?

8   A.  I mean, I don't know the exact date.  I would have met him

9   earlier in both our careers, probably when he was in OBS and I

10  was in Ryanair working in Dublin.

11  Q.  How long have your interactions been with him, how long had

12  your interactions been with him as of 2020 as it relates to the

13  AMCK relationship with Frontier?

14  A.  I think I met him as soon as he became -- around the time

15  when he became chief executive of AMCK or Accipiter, is what

16  we've known at the time.

17  Q.  Taking you back to that timeframe, were you involved in

18  Frontier's business plans to address the challenges posed by

19  the unfolding pandemic?

20  A.  Yes.  I mean, as a member of the senior management team at

21  the airline, we were coming to terms with the developing

22  COVID-19 pandemic.  We were trying to figure out, quite

23  frankly, what was people's willingness to travel in the future.

24  We were dealing with a situation that passengers that had

25  already booked on our airline were choosing not to fly,

O4F3FRO2                        Dempsey - Direct

1    consistent with other airlines.

2            We had seen at this point the development of the

3    pandemic in Asia, particularly in China, and also then prior to

4    the United States, in Europe.  And so we had seen some actions

5    being taken in terms of reduction of traffic flows by airlines

6    around the world.

7            Because Frontier is largely a domestic airline in the

8    United States, we didn't see the international changes in

9    traffic flows up until you moved through March, and really when

10   you got to about the middle of March, and it was a declaration

11   of an emergency and the pandemic was declared here in the

12   United States, you saw real change in travel behavior going

13   forward.

14   Q.  And what was the fundamental goal of your business planning

15   around this time?

16   A.  It was very straightforward.  We were, I mean, Frontier and

17   any commercial airline is where cash flow moves from into the

18   industry.  We sell tickets to consumers, and then we buy all

19   sorts of aircraft and use third-party supplies across the

20   industry.  The cash flow that comes into commercial airlines

21   tends to feed the entire industry at the commercial aviation

22   industry.

23           In terms of cash flow, and our cash flow was starting

24   to reduce.  Prior to the pandemic being declared, we would have

25   been selling somewhere between 7 and 10 million dollars of

1   sales every day.  As that developed, that reduced to the point
2   around mid to late March, it was less than $200,000 a day.  So
3   you had seen a real change in people's willingness to buy
4   future tickets, and then also a change in people's willingness
5   to fly on a day-to-day basis for tickets they'd already
6   purchased.
7           So my task as the chief financial officer was to
8   preserve liquidity as much as possible in the airline.  We set
9   about a plan as a senior management team to -- because the cash
10  that comes into the commercial aviation space comes through
11  airlines, we set out a plan to discuss cash flow relief from
12  all of our suppliers, inclusive of the leasing community where
13  we had financed all of our fleet.
14          So around mid March, we embarked on a strategy of
15  reaching out to all of our suppliers to get that relief.
16  Q.  Exhibit 28, which is in evidence, is a concession letter
17  that has been established on other testimony that was sent by
18  Frontier to AMCK Aviation.
19          Did you have any role directly in the concession
20  letters that were sent out to lessors?
21  A.  I was involved in formulating the strategy to go out to all
22  of our suppliers.  I was not involved in drafting this request.
23  I did have input into some of the items that they inserted into
24  the letter, but I wasn't involved in drafting the document.
25  Q.  Did these requests go out to all of Frontier's lessors?

O4F3FRO2                     Dempsey - Direct

1    A.   Yes.

2    Q.   Approximately when did they go out?

3    A.   I think March 16.

4    Q.   Do you recall the date of the first delivery under the

5    Framework Agreement?

6    A.   I believe it was March 16 as well.

7    Q.   Typically, when does Frontier learn of a delivery, who does

8    it learn from it -- who does it learn from when it's going to

9    be getting a delivery from its supplier?

10   A.   Well, we have a purchase contract for a large number of

11   aircraft from Airbus.  So, at the inception of that contract,

12   it sets out dates upon which aircraft will be delivered over

13   multiple years.  So it could be for 5 to 7 years in the future

14   where you have aircraft delivering.  So they're set out in that

15   contract.

16        As you get closer to the aircraft delivery, that date

17   narrows from maybe a quarter to a month, and then, you know,

18   within four to six months of the delivery of the aircraft, you

19   typically get a period of a window when that aircraft will

20   deliver, maybe the first two weeks or the last two weeks of a

21   month.

22        Then as the aircraft is being produced, and you get

23   closer to the delivery date, more confidence is developed

24   within Airbus to give you a more accurate delivery date.  So

25   all the way up to actually the point of delivery of the

O4F3FRO2                         Dempsey - Direct

1    aircraft.

2    Q.  I'd like to turn to Exhibit 48, please, and ask you some

3    questions about it.  This is a March 26, 2020, e-mail from

4    Ms. O'Callaghan to several individuals at Frontier,

5    Mr. Fanning, Mr. Thwaytes, Mr. Sashikumar.  Did you receive --

6    did you become aware of this communication on March 26?

7    A.  This communication was not directly to me.  But, the way we

8    were managing at the time, which I'm sure a lot of

9    organizations were managing this way, we were having daily

10   calls with my direct reports.  So, my assumption is Spencer

11   Thwaytes would have discussed this with me probably the

12   following day on our daily call.

13   Q.  In this letter there is what I would refer to as a

14   preliminary exclusion in respect to the aircraft to which these

15   conditions apply.

16            Do you see that reference?

17   A.  Yeah, they excluded the aircraft delivered on March 16.

18   Q.  Did Frontier pay the rents on the aircraft that was

19   delivered on March 16?

20   A.  We did.

21   Q.  Did it continue to pay them timely up until the present

22   date?

23   A.  Yes, they specifically asked us to do that.

24            THE COURT:  I want to be sure I'm following you.

25            Exactly what do you mean by the word "excluded"?

1           THE WITNESS:  So, if you see in the second paragraph

2      of the note, in parentheses they say that is excluding the

3      A320neo delivered on 16 of March 2020.

4           THE COURT:  It is striking that language.  That's

5      where it comes from.

6           THE WITNESS:  That's the item that they excluded, yes,

7      your Honor.

8      Q.  So, the sentence reads, "We will agree to the Frontier

9      request for three months' rent deferral commencing April 2020

10     in respect of 14 of our 15 delivered aircraft."

11          Is that what you see there, sir?

12     A.  Yes.

13     Q.  And then it says, "Excluding the A320neo delivered on

14     March 16, 2020."

15          How did you understand that?

16     A.  Well, I did not receive this communication directly.  But I

17     understood in conversation with my team that they were

18     sensitive to the most recent aircraft delivery, and that we

19     would continue to make payment on that most recent aircraft

20     delivery because of their sensitivity to it.

21     Q.  The first term in this proposal suggests a lease holdback

22     of the purchase price and that is for the next scheduled

23     delivery, the total of which is $3 million.

24          Do you see that reference?

25     A.  Yes.

O4F3FRO2                        Dempsey - Direct

1    Q.  So in essence would that be front paying the rent such
2    that, essentially, front paying the rent before it is due?
3    A.  Yes, it would be a prepayment of rent, that they would fund
4    only $48 million of the $51 million that they had agreed to pay
5    for the aircraft.  So in effect, it would be a prepayment on
6    the lease.
7    Q.  Then the second term references the next four aircraft.
8    And what did you understand that request to be?
9    A.  So in, relation to the four aircraft left to be delivered
10   from May to July 2020, they were seeking us to delay those
11   aircraft with Airbus by between three and six months.
12   Q.  Did you begin, after being made aware of this proposal
13   coming back from AMCK, to take any steps to address that
14   request of delivery deferrals?
15   A.  Yeah, we spoke to Airbus as soon as we understood that AMCK
16   was seeking a deferral in the delivery date of the aircraft.
17   We did not control that conversation.  We had to speak with
18   Airbus in order to facilitate a delay, any delay in an aircraft
19   delivery.  Airbus controlled the timing of the aircraft
20   delivery under our contract.
21   Q.  Who in particular do you recall speaking with at Airbus?
22   A.  My contact in Airbus was a gentleman called Christopher
23   Jones.
24   Q.  So, what would be the time period that you made this first
25   overture to Mr. Jones on behalf of the request that was

1   being --

2   A.  It would have been around this time.

3   Q.  And what was his response to the notion of delaying

4   delivery of the next aircraft?

5   A.  Well, he would have advised me that the aircraft was in

6   advance production condition, so therefore once the aircraft is

7   ready to be delivered, they would be expecting us to turn up

8   and deliver the aircraft with them, and that they would receive

9   funds for that aircraft, which would be the normal course with

10  Airbus.

11  Q.  So, I take it was the message back essentially when they're

12  ready, you need to take them?

13  A.  Yeah, at this point in time Airbus were telling us that the

14  aircraft was nearing completion, and once it was put into the

15  delivery condition, they expected us to take delivery of the

16  aircraft with our financier.

17  Q.  Were you aware of anybody else's efforts at Frontier to

18  have discussions with Airbus around the time of late March or

19  early April regarding delaying deliveries?

20  A.  Yeah.

21  Q.  Of aircraft?

22  A.  The two people in Frontier who spoke to Airbus on a regular

23  basis was Spencer Thwaytes and myself.  And he would have had

24  conversations with Airbus at this time.

25  Q.  I am going to bring up Exhibit 56.  And before you is an

O4F3FRO2                          Dempsey - Direct

1   April 2 communication between Mr. Spencer Thwaytes and Matthew

2   Saks and Ray Bishop.

3          Do you know where those gentlemen work?

4   A.  Yes.  Matthew Saks at that time was our relationship

5   manager for Airbus or sales representative.  And Ray Bishop was

6   in charge of managing our contract with Airbus.  He was the

7   contract manager.

8   Q.  The first paragraph addresses the delay of one aircraft,

9   MSN 9549, and I think we've heard testimony about what was at

10  issue.  Was that a mechanical issue?

11  A.  Yes, I understand there was an issue with the bracket on an

12  aircraft that had to be rectified.  And that was effectively

13  delaying the aircraft delivery.

14  Q.  From your understanding, does that mechanical type of issue

15  mean months of delay or is it something that can be addressed

16  in the regular course of production?

17  A.  Typically, delays with aircraft deliveries, because of a

18  mechanical issue on the aircraft, would be, you know, anything

19  from one week to four, five weeks to rectify.  And it really

20  depends on the availability of the part to replace -- if the

21  part is required to be replaced on the aircraft.  And then you

22  have to do your delivery inspections that occur at the aircraft

23  delivery, so that takes time as well.

24          So, I mean, this issue was probably likely to be a

25  multi-week deferral because of the availability of a bracket

O4F3FRO2                        Dempsey - Direct

1    linked to this aircraft.

2    Q.  The final paragraph -- not the final paragraph, the

3    next-to-last paragraph in this note e-mail back to those

4    gentlemen, what is that conveying?

5    A.  He conveys that we received verbal notice this afternoon

6    that our financier is uncomfortable funding aircraft deliveries

7    in Q2 2020.  So we anticipate that the Airbus will work with us

8    to manage the timing of upcoming aircraft deliveries.

9            He was informing Airbus that AMCK had given us an

10   indication that they wanted us to defer aircraft.

11   Q.  Did the delay of deliveries help Frontier with its goal of

12   liquidity preservation?

13   A.  No, quite the opposite actually.  An aircraft delivery is,

14   from a liquidity perspective, is very positive to Frontier.  We

15   purchase aircraft in bulk from Airbus, so we have multiple

16   aircraft orders where we've ordered aircraft for around 80 to

17   140 aircraft, and so we get a bulk discount effectively off the

18   manufacturer to do that.  And then we typically sell them into

19   the market at market prices in any sizes from 5 to 15 aircraft,

20   so in much smaller packages and batches than you would buy from

21   Airbus.  And that's typically sold at market price.

22           And so, at the point of delivery of an aircraft, we

23   typically have a gain on that transaction.

24           In addition to funding the full aircraft purchase,

25   there's also a liquidity benefit from the repayment of the

O4F3FRO2                        Dempsey - Direct

1    predelivery payments to Airbus.  Because the aircraft asset is

2    being fully funded by the leasing company.  And so it is a very

3    cash positive event for Frontier.  So there was a big incentive

4    in the short term for Frontier to deliver these aircraft.

5    Q.  What does the PDP payment refund allow you to do?

6    A.  Well, we have a facility in place or at that time we had a

7    facility in place with a financial institution that funded our

8    predelivery payments.  So what it did was it enabled us to pay

9    down the financing that was linked to this particular asset,

10   and allowed us then to finance another asset into the facility.

11   So it provided for a better usage of our predelivery payment

12   facility, which lessened the amount of cash flow that Frontier

13   had to put into the predelivery payments with Airbus.  So it

14   was cash positive.

15   Q.  Do you recall having a call with AMCK in early April to

16   discuss the issues then pending between AMCK and Frontier?

17   A.  Yes, I do, I do.

18   Q.  And I'll show you just to orient for perhaps on time

19   Exhibit 17 at page 3.

20           Do you see a reference there -- and I'll represent

21   that these are text messages between Jane O'Callaghan and

22   Robert Fanning.

23           There is a reference right under the April 2 text date

24   inquiring about your and Robert's availability for a call.

25           Do you see that?

O4F3FRO2                           Dempsey - Direct

1   A.  Yes.

2   Q.  And did that call take place?

3   A.  Yes.

4   Q.  Who was on the call?

5   A.  Robert Fanning, Paul Sheridan, and Jane O'Callaghan.

6   Q.  Can you tell the Court what was discussed during that call?

7   A.  Two things really.  Firstly we gave them –– I gave them an

8   update on the financial position of Frontier at that time.  We

9   were extremely transparent with all our suppliers as to what

10  was going on during the pandemic.  And so, we had a lot of

11  calls with suppliers at that time to ensure that they were kept

12  abreast of how this was developing.

13          It was a very recent event, and so lessors and other

14  suppliers were interested to understand how we were going to

15  navigate through the COVID pandemic.  Granted it was just at

16  the beginning of April, so we were all learning what was

17  developing around the world.  But what we could give them was

18  transparency around our financial position, our liquidity

19  position, our strategy around operating the airline, the number

20  of aircraft that were in service, and the relationship with our

21  pilots, our flight attendants, and what we were doing with our

22  cash costs and our cash burn in the airline.  So that was

23  primarily the first part of the call.

24          The second part of that call was to discuss the

25  impending delivery with Airbus that we had with AMCK, together

O4F3FRO2                     Dempsey - Direct

1   with a rent deferral request that we had made with AMCK.

2   Q.  Did you know as of that time from communications Frontier

3   received from AMCK what their general position was on taking

4   the next delivery?

5   A.  Yeah, I mean it was -- Paul and Jane, but primarily my

6   conversations with Paul, he was very consistent.  He wanted us

7   to be -- to have no outstanding rent at the point of the next

8   aircraft delivery.

9   Q.  Did the discussion about the conditions set forth in that

10  earlier exhibit we saw of March 26 where the condition was a

11  holdback in the purchase price of 3 million.  Did that come up

12  in the conversation?

13  A.  Yeah, we would have talked about that, and their proposal

14  to us, and we would have explained to them that we were seeking

15  something different than that.

16  Q.  Did you apprise them of your preliminary conversations with

17  Airbus?

18  A.  Yes.  I mean, at this point I would have had multiple calls

19  with Airbus around the timing of aircraft deliveries and their

20  willingness to defer aircraft.  And I would have given Paul and

21  Jane an update as to how those conversations were going.

22  Q.  And at that point in time, were they going well or were you

23  getting resistance?

24  A.  No, we were getting resistance.  Airbus's reaction was they

25  wanted us to deliver the aircraft, and it would be a major

O4F3FRO2                        Dempsey - Direct

1    liquidity issue for Airbus if they were not to sell an aircraft
2    that was largely built and in delivery condition.
3    Q.   Let's please turn to Exhibit 58.  Exhibit 58 is in
4    evidence, Mr. Dempsey, and I'd like you to take a look at this.
5    This appears to be an e-mail from Paul Sheridan to yourself,
6    carbon copying others at Frontier as well as Ms. O'Callaghan.
7             Once you've had a chance to review, I'll ask you some
8    questions about it.
9    A.   Okay.
10   Q.   So, the first paragraph right after the salutation
11   indicates a discussion with the shareholder regarding the five
12   upcoming A320neo deliveries and having had that discussion the
13   prior night.
14            Do you see that reference?
15   A.   Yes.
16   Q.   And just taking this point right here, had something
17   changed between the March 26 e-mail from Ms. O'Callaghan
18   regarding funding or delaying aircraft and this e-mail in terms
19   of the number?
20   A.   Sorry.  You have to --
21   Q.   Yes.  It references the upcoming five neo aircraft
22   deliveries.
23            And do you recall that on March 26 they talked about
24   funding one and then delaying four?
25   A.   Oh, sorry.  Yes.  They were now dealing with all of the

O4F3FRO2                          Dempsey - Direct

1    aircraft deliveries in one package.

2    Q.  What was Mr. Sheridan proposing in connection with delaying

3    those five aircraft?

4    A.  Well, they've been authorized to grant us a three-month

5    rent deferral on 14 of the 15 aircraft leased by them.  They

6    requested repayment over four months at an interest rate of

7    6 percent.  But, they made a condition in this offer that they

8    needed us to suspend deliveries with aircraft or suspend the

9    sale and leaseback of the aircraft for six months, and that was

10   a change from the previous offer which was a period of between

11   three and six months.

12   Q.  How did you react to this new condition?

13   A.  Well, given my conversations I had with Airbus, I thought

14   this was unachievable to delay the aircraft by six months.

15   Particularly the aircraft that were very close to completion.

16   Q.  In terms of the timing of the repayment of the rent

17   deferral, did it coincide with the request for the delivery of

18   the aircraft to be deferred six months?

19   A.  I think so.  If you restart rent payments in July, you

20   would have had to repay it by the point of delivering the

21   aircraft to them after six months.  I think there is some

22   symmetry there, yeah.

23   Q.  What did that convey to you in terms of outstanding rents

24   and deliveries?

25   A.  Well, this is consistent with what they had told us on the

O4F3FRO2                          Dempsey - Direct

1    phone, that they would not deliver an aircraft with any

2    outstanding rents due from Frontier.

3    Q.  Did you take steps after receiving Mr. Sheridan's April 3

4    e-mail communication as it related to anything with Airbus?

5    Did you contact them again?

6    A.  Yeah, I would have been in contact with them probably the

7    very next day, and expressed the desire of AMCK to delay the

8    aircraft by six months.

9         What we were doing at this point was trying to

10   accommodate AMCK as best as we could, given the situation we

11   were in, where there were aircraft that were in advance stages

12   of production, they were setting us a task that was very

13   challenging to achieve.  And I'd explained that to Paul and

14   Jane multiple times, that asking for a six-month delay,

15   particularly in aircraft that were 95 percent complete at this

16   point, is very, very challenging to do.

17        They understood that.  I mean, both Jane and Paul are

18   very experienced operators in the airline space.  But they

19   wanted a deferral on aircraft deliveries, and I was endeavoring

20   to get them as long a deferral in aircraft deliveries as I

21   could possibly achieve.

22   Q.  When you communicated with Airbus, what was the reaction to

23   that communication of a deferral of up of six months?

24   A.  Their response was no, that's not going to work for us.

25   Q.  Was there anything at that point suggesting a threat as to

O4F3FRO2                    Dempsey - Direct

1    the relationship with Airbus?

2    A.  Yeah, I mean, they were -- I mean, I mean, they basically

3    told me if we didn't turn up for six months for an aircraft

4    delivery, that they would be capable of putting us in default.

5    Q.  And --

6            THE COURT:  Suppose the original schedule for

7    deliveries had been adhered to.

8            THE WITNESS:  Sure.

9            THE COURT:  Would you have been able to put the

10   aircraft that you were receiving on that schedule to a good use

11   or would it have been surplus in light of the COVID depression

12   in number of flights?

13           THE WITNESS:  So we had three types of aircraft.

14           THE COURT:  Excuse me?

15           THE WITNESS:  We had three types of aircraft.  So we

16   had what's called an A320ceo, which is an older version of the

17   engine technology which burns more fuel.  Those aircraft were

18   in storage at this point or going into storage at the beginning

19   of April 2020.  So we had 321 and A320ceos.  They were the

20   different sizes of aircraft.

21           The A320neo aircraft, which is the newest generation

22   aircraft, the most fuel efficient aircraft, was the one we were

23   operating.  So this aircraft would have gone into that pool,

24   and it would have flown -- it would have rotated within that

25   pool and flown whatever flying we could achieve at that time of

O4F3FRO2                         Dempsey - Direct

1      the pandemic.

2              So it would have been active, but less so than

3      pre-pandemic activity, but it still would have been an active

4      aircraft.

5              THE COURT:  It would not have been surplus and excess

6      in your inventory.

7              THE WITNESS:  It would have been used.  But it would

8      have been used at a lower frequency.

9              THE COURT:  I see.

10             THE WITNESS:  Than prior pre-COVID activity, because

11     the activity levels had dropped.

12             THE COURT:  But not enough to make it acutely

13     desirable to delay the delivery for your own interests.

14             THE WITNESS:  So no.  At this point, of the point of

15     delivery of the aircraft, we actually were in a cash positive

16     position when we delivered an aircraft.

17             THE COURT:  You were happy to have it.

18             THE WITNESS:  We were happy to have the aircraft, and

19     we were also happy to have the fuel efficient nature of that

20     aircraft.  It was a desirable aircraft to have at that time.

21     It still is a desirable aircraft to have today.

22             THE COURT:  That's the newer one.

23             THE WITNESS:  Yes.

24             THE COURT:  Well, that's what would have been

25     delivered.

O4F3FRO2                        Dempsey - Direct

1              THE WITNESS:  That's right.

2              THE COURT:  They weren't delivering the older models.

3              THE WITNESS:  No.

4              THE COURT:  Thanks a lot.

5              MR. HOSENPUD:  Thank you, your Honor.

6       BY MR. HOSENPUD:

7       Q.  So, I'd like to turn now to Exhibit 61.  To orient you,

8       Mr. Dempsey, we are going to scroll down so you can see the

9       prior e-mail chain.  And that is the e-mail we just got through

10      speaking about, the April 3 e-mail from Mr. Sheridan to you

11      with the request to delay deliveries by six months.  Now let's

12      scroll back up.

13              And I'd like you to take a look at this e-mail and let

14      me know when you've had an opportunity to read it.

15      A.  Yes.

16      Q.  How do you start out this e-mail with your response to

17      Mr. Sheridan?

18      A.  Well, I was disappointed, largely because I couldn't

19      achieve what they were asking me to achieve.

20      Q.  And then you continue.  What are you conveying when you use

21      the phrase "my reading of your e-mail" and then you continue?

22      A.  Yeah.  They were marrying the rent deferral that we had

23      asked and that they were offering, with deferring the aircraft

24      deliveries by six months with Airbus.  And that portion of the

25      ability to defer the aircraft by six months was very

O4F3FRO2                          Dempsey - Direct

1    challenging for me to achieve.

2    Q.   What are you conveying to him following that comment?

3    A.   We had a binding agreement in place with AMCK, and so in

4    the second half of that paragraph, I am reminding them of their

5    commitment to us and asking him would you honor his commitment

6    to Frontier.

7    Q.   Did you receive a response from Mr. Sheridan at this time

8    indicating that they would agree to honor their commitment if

9    you did not put a rent deferral in place?

10   A.   I did not receive a response.

11   Q.   You then in the second paragraph, what are you conveying to

12   him at this time, April 6, based on your communications with

13   Airbus?

14   A.   I mean, I was conveying to him exactly the conversation I

15   had with Airbus, which was effectively Airbus pointing out to

16   me their position -- what their position would be, if we were

17   not to deliver an aircraft for six months, that they would

18   threaten us with default.

19   Q.   How do you finish that paragraph?

20   A.   I was reminding Paul that would not be a palatable event

21   for Frontier or for them, quite frankly, because a default in

22   the Airbus contract is a material default by Frontier on its

23   commitments.   The Airbus contract is the single largest

24   contract we have in the airline.   And so, we had $250 million

25   of predelivery payments on deposit with Airbus, and we would --

O4F3FRO2                          Dempsey - Direct

1    if we were to default, they would have the ability to retain

2    those deposits in that default.  So that would not be

3    palatable, irrespective of whether it was in the pandemic or

4    outside of the pandemic.  That type of event is too meaningful

5    to the airline.

6                   (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FBFRO3                        Dempsey - Direct

1    BY MR. HOSENPUD:

2    Q.   And why were you referencing that it wouldn't be palatable

3    for AMCK?

4    A.   Well, it would force a default, which would likely force us

5    to have to repay a facility with Citibank, and potentially

6    would end up with us having to look for a Chapter 11 Bankruptcy

7    protection in the event -- at the timing of the Covid pandemic.

8    And this would not have been a very constructive thing to

9    happen.  And so those aircraft would have to go back to AMCK at

10   some point, and they would have to position them somewhere in

11   the market in an environment where air travel was depressed

12   across the world.

13   Q.   And throughout the course I'm just carrying you through

14   this entire time period.  The one statement you're saying, I

15   can only deduce that you will finance the aircraft deliveries

16   and honor your commitment if we do not put a rent deferral in

17   place.

18        Was there ever a communication from AMCK confirming

19   that they would honor their commitment if no rent deferral was

20   in place?

21   A.   I never got a positive communication from them on that

22   question.

23   Q.   Let's look now at exhibit 62, please.

24        MR. HOSENPUD:  Your Honor, I note an oversight on my

25   part.  I'd like to move to admit the following exhibits because

O4FBFRO3                        Dempsey - Direct

 1    62 is not in, but 61 was in.  So I'm going to move to admit

 2    Joint Exhibit 62, 63, 64, 83, 104, 122, 123, 124, 127, 128 and

 3    170.

 4              MR. BUTLER:  No objection.

 5              THE COURT:  The joint exhibits are admitted.

 6              (Joint Exhibits 62, 63, 64, 83, 104, 122, 123, 124,

 7    127, 128 and 170 received in evidence)

 8    BY MR. HOSENPUD:

 9    Q.  Now turning to exhibit 62, Mr. Dempsey.  This is a pickup

10    on your email we just discussed in exhibit 61, and I'm focusing

11    on the top of the email chain.  What event occurred that

12    prompted you to send this email on April 6, to Mr. Sheridan?

13    A.  Airbus had announced the closure of Mobile Alabama and the

14    production facility that the next aircraft delivery was

15    happening in.  They close it till April 29.

16    Q.  And then what else was happening in terms of any rents in

17    the relationship between Frontier and AMCK?

18    A.  Yeah, there were two rent payments that day that we were

19    seeking to defer.

20    Q.  Was there an effort to set up this call?

21    A.  Yes.

22    Q.  And did the call take place?

23    A.  The call took place, yes.

24    Q.  And were you able to participate in the call?

25    A.  My intention was to participate in the call.  At the time

O4FBFRO3                        Dempsey – Direct

1    the call was set up, I was on a conflicting call with Airbus

2    getting information about the likely reopening of Mobile

3    Alabama and what the plan was by Airbus to manage that

4    facility.

5    Q.  Let's turn to exhibit 63.  If we scroll down a little bit.

6    You can see your email to Mr. Sheridan.  Are you available for

7    a call at ASAP.  That's what we just got through discussing.

8    And then there is an email back from Mr. Sheridan?

9    A.  Yes.

10   Q.  And how did you understand that communication?

11   A.  Well, he followed up after the call with Robert to confirm

12   what they had discussed, and really Robert had agreed with him.

13   A rent deferral of 10 days in order to give us time to reach an

14   agreement with Airbus on deferring aircraft or to make

15   arrangements with alternative lessor, and then giving us time

16   to reach agreement with AMCK.  That was really the essence of

17   the communication that we received.

18   Q.  Let's look at -- now you mentioned some other arrangements.

19   Was that what you referenced as potentially working with other

20   lessors?

21   A.  Yeah, the comment, Or to make some other arrangements,

22   would have been to replace AMCK with another lessor at the

23   point of delivery of the aircraft where we, as an alternative,

24   to deferring aircraft with Airbus.

25   Q.  So did you just generally during this time period pursue

O4FBFRO3                      Dempsey – Direct

1    both those avenues?

2    A.  Yes, absolutely.

3    Q.  Let's look at exhibit 64, please.  I'm going to have you

4    please scroll down.  Is this your response to Mr. Dempsey's

5    recap of the phone call where he indicated that AMCK would

6    allow ten days to permit time to reach an agreement with

7    Airbus, as well as to reach a deferral agreement with Frontier,

8    a rent deferral agreement with Frontier?

9    A.  You mentioned Mr. Dempsey instead of Mr. Sheridan.

10   Q.  I misspoke.  I'm too busy focusing on the names.

11          Did Mr. Sheridan, is this response in response to

12   Mr. Sheridan's summary of the phone call wherein he said, ten

13   days to permit time to reach a deferral agreement with Airbus

14   and in turn a rent deferral with AMCK?

15   A.  Yeah, this is my response to his email from that day.

16   Q.  And what are you conveying there?

17   A.  I sent him a note to say I appreciated his efforts.  I just

18   wanted to remind him that it would continue to be a challenge

19   with Airbus in relation to the request that they have made.

20   And I was hoping that he would reconsider his position on the

21   financing structure that he wanted to put in place.  I did want

22   to catch up with him the following day.  And given the

23   conversation I'd had with Airbus, because I thought it would be

24   worthwhile for him to have a clear understanding of the time it

25   would take to get a deferral agreement with Airbus in place.

O4FBFRO3                      Dempsey - Direct

1    And also I'd had some insight into the timing of the reopening

2    of Mobile Alabama, and the likely time when that next aircraft

3    was likely to deliver, which I knew was a sensitive issue.

4    Q.  I'm going to deviate from that to exhibit 69, and then

5    we'll return to that topic momentarily.

6            Exhibit 69 is a series of emails between you,

7    Mr. Thwaytes and Robert Fanning, and there's a reference here

8    to an individual by the name of David Wang.  What is the

9    context of that communication as you understand it?

10   A.  We were looking at alternative lessors to see if we could

11   find source and alternative lessor to finance the upcoming

12   deliveries if AMCK was not to show up for those deliveries.

13   David Wang is part of an aircraft leasing company attached to

14   ICBC bank in China.

15   Q.  And was that -- did you pursue that also for the purpose of

16   seeing if there could be any lessor to change places with AMCK?

17   A.  That's right.  That's why we were pursuing David in order

18   to see if he would step in to the aircraft that they were

19   schedule to deliver.  And as a solution for AMCK, to defer AMCK

20   out and bring in a new lessor into that window for aircraft

21   going to be delivered.

22   Q.  Was he the only one Frontier approach or were there others?

23   A.  We approached multiple lessors.  We felt we may have some

24   traction with David given the conversations we had.

25   Q.  And that did not pan out for that particular lessor,

O4FBFRO3                    Dempsey - Direct

1    correct?

2    A.  It did not.

3    Q.  Let's go back to the subject of exhibit 64, and then we'll

4    move on.  So you indicated, Let's catch up tomorrow as the

5    final statement in that email of April 6, 2020 to Mr. Sheridan.

6    Is that right?

7    A.  That's correct.

8    Q.  And did you have a conversation the following day?

9    A.  I did.  We did.

10   Q.  Where were you incidentally at this time?

11   A.  At home.

12   Q.  Like everybody else?

13   A.  Like the other people in the Covid pandemic I was working

14   from home.

15   Q.  Was there anybody other than Mr. Sheridan on this call?

16   A.  I don't believe so.

17   Q.  And what did you discuss?

18   A.  We had a conversation about the rent deferral, the ten-day

19   rent deferral that was put in place, that it would not suffice

20   given the challenging conversation that we had to have with

21   Airbus.  That Airbus were very resistent to moving the

22   aircraft, and I gave him an update on the situation in Mobile,

23   the fact that the facility was closed to April 28th, which

24   meant that the next aircraft would deliver likely in May, more

25   likely in the second half of May given the fixes that had to

O4FBFRO3                        Dempsey - Direct

1    occur for the aircraft.  And that the normal inspection window

2    that would have to occur, including test flights and FAA

3    approval and various things like that, it would take a period

4    of time to get delivered so aircraft was unlikely to deliver at

5    that point until sometime in May, likely in the last two weeks

6    in May.

7           And we discuss the fact that the ten-day window that

8    had been provided by Paul the previous day to Robert would not

9    suffice and that we needed time.  And really it was

10   piggybacking on his email from the previous day where he

11   mentioned that we needed time to get an agreement in place,

12   deferral agreement in place with Airbus, and also time to get

13   an agreement in place with AMCK.  And so I asked him to move

14   this deferral because of the fluid nature of the conversations

15   with Airbus, to move it to a month-to-month basis at this time

16   in order to give us space and time to get an agreement in place

17   with Airbus and with AMCK on the overall challenges.

18          And in effect the way the month to month was to work

19   was to give us the outer-date of potentially July, which

20   corresponded with the earlier communications we had around the

21   three-month delay, but primarily focused on the next aircraft

22   delivery.  We would have a window to negotiate with Airbus and

23   AMCK, but that the sensitivity on AMCK side was that we would

24   be paid, have no outstanding rent at the point of the next

25   aircraft delivery.  He agreed to deferral to the earlier of

O4FBFRO3                          Dempsey – Direct

1   July or the next aircraft delivery, and so that next aircraft

2   delivery was now happening in May.

3   Q.  Were you confident in that assessment that May would be,

4   the latter part of May would be the first potential delivery as

5   of that time?

6   A.  There really was no chance of the aircraft delivering in

7   April, given that the production facility was opening right at

8   the end of April.  There were a lot of items that had to be

9   rectified in the aircraft.  And then the normal checks that

10  occur on the aircraft would move that delivery date into May,

11  likely to the second half of May, and that Airbus had confirmed

12  that to me.

13  Q.  You mentioned the checks, could you just explain to the

14  Court what you are referring to, any analogy that you could

15  give to make that apparent?

16  A.  So an aircraft delivers like, it's like a property

17  transaction where you do an inspection of the property and

18  there's a punch list that's put together.  And those items have

19  to be rectified or there's a negotiation around a compensation

20  structure to facilitate the delivery of the aircraft.  What's

21  different to a property transaction is that you have to do

22  multiple test flights on the aircraft in order for it to be

23  considered airworthy and in delivery condition, and so that

24  takes time.

25          And that inspection process would occur both with us,

O4FBFRO3                          Dempsey - Direct

1   Airbus, and the financier of the aircraft.  So AMCK would be

2   fully abreast of what is going on, on the aircraft so that they

3   can -- because they're effectively the ultimate purchaser of

4   the aircraft through the transaction that occurs.  And we

5   become the operator of the aircraft, that everybody is

6   understanding of the issues that are associated with that

7   aircraft at the point of delivery.  And so it is a task that

8   has to occur and takes a period of weeks.

9   Q.  So on this phone call you didn't have to lay it out in this

10  detail due to Mr. Sheridan's understanding of the industry, but

11  did you convey to him clearly that the next delivery in your

12  estimation would not be until the second half of May?

13  A.  Yes.

14  Q.  And what did Mr. Sheridan tell you when you asked for this

15  month-to-month delivery period in order -- month-to-month

16  deferral period in order to work out the arrangement that AMCK

17  wanted with Airbus?

18  A.  He agreed we needed time and he understood the timing of

19  the next aircraft delivery, and so he agreed to the deferral.

20  Q.  Did you inquire of Mr. Sheridan on this call what AMCK

21  would do if no delivery deferral was achieved with Airbus and

22  whether they'd show up?

23  A.  I don't recall that coming up on the call.

24  Q.  I'm going to turn now to exhibit 73.  We're going to get to

25  the more legible version of this text message between you,

O4FBFRO3                    Dempsey – Direct

Robert Fanning and Spencer Thwaytes.  This is dated April 7.

Is that the date of this phone call with Mr. Sheridan?

A.  Yes.

Q.  And what are you conveying to those two other individuals,

Robert Fanning and Spencer Thwaytes?

A.  I just sent them a short note just to let them know that

the deferral had been agreed to on a month to month with Paul.

Q.  And there is a reference immediately below that text

stating, No, but we should stick to nine months.

        If we look down at the other text to get a context,

Mr. Fanning appears to be saying, Anything mentioned on the

repayment period, and are they going to send over our

revised -- are they going to send our revised agreement over.

Do you see that reference?

A.  Yes.

Q.  And then back up to your comment.  What are you

communicating there?

A.  The text says, No, we should stick to nine months from July

1st.  Let's get a draft.  I was referring to the second part of

the tasks that we had coming out of the email and the April 7th

call which was to get an agreement in place with AMCK.

Q.  Did this have anything to do with the month to month?

A.  No.

Q.  In the call -- I think you said in the call with

Mr. Sheridan there was mention of when Frontier would need to

O4FBFRO3                        Dempsey - Direct

1    be current on this deferral of rent while you negotiated with

2    Airbus.

3            Did Mr. Sheridan have any -- demonstrate any issues

4    with that repayment before the first delivery or at the latest?

5    A.  No, Paul consistently his position was that we need to be

6    current on rent at the point of delivery of an aircraft.  He

7    was consistent with that in the call with me on the 7th and on

8    prior calls and on subsequent calls.

9    Q.  Did at any time after April 7, Mr. Sheridan come back and

10   attempt to clarify the month to month that had been agreed on

11   April 7th?

12   A.  No.

13   Q.  Did he ever tell you it meant only one month?

14   A.  He did not.

15   Q.  Did he ever inform you that he had spoken with the

16   shareholder and what he had talked to you about was only one

17   month?

18   A.  No.  My clear understanding coming out of this call was

19   that we had a deferral in place, and the earliest date that we

20   had to pay the rent was at the point of the next aircraft

21   delivery.  That was my clear understanding at that time.

22   Q.  Let's turn now to what has been marked as exhibit 79.  Now

23   this is an email from Jane O'Callaghan to Robert Fanning and

24   the other individuals, Sharath Sashikumar and Spencer Thwaytes.

25   You're not a recipient of this email; is that correct?

O4FBFRO3                        Dempsey - Direct

1    A.  I am not.

2    Q.  It attaches a draft of a deferral letter for one of 14

3    aircraft.  Did you become aware of this communication at some

4    point in April 2020?

5    A.  Yeah.  This would have been consistent with what I

6    understood that this was the second part of the tasks that we

7    needed to achieve.

8           Firstly, obviously Airbus had to defer an aircraft,

9    and secondly getting an agreement in place for rent, a longer

10   term rent deferral agreement in place.  This is consistent with

11   that.

12   Q.  And were the terms that it articulated, did they have any

13   connection to what you would discuss with Mr. Sheridan in the

14   April 7th, call?

15   A.  I wasn't the recipient of this note, so I wasn't reviewing

16   this.  I would have been made aware of it in my daily meetings

17   that they had put some terms in front of us, so I would have

18   been aware of the terms when I had my daily call, but I was not

19   reviewing this document.

20   Q.  Let's turn now to exhibit 81, please.  What I've shown you,

21   sir, is a communication between you and your team at the very

22   top.  But if we look down at the middle email, it's a gentleman

23   by the name of Chris Jones with I believe you testified with

24   whom you were speaking to at Airbus and you, dated April 11,

25   2020.  Do you see that reference in the center?

O4FBFRO3                        Dempsey - Direct

1   A.  Could you repeat that.

2   Q.  Do you see the reference to yourself receiving this from

3   Chris Jones on April 11, this email?

4   A.  Yes.

5   Q.  And in it was there a proposal concerning moving the

6   near-term deliveries, the next three aircraft that Frontier was

7   due to take delivery of?

8   A.  Yes.  I mean we had a series of calls with Airbus up until

9   this point.  They were offering on the back of our request to

10  defer the aircraft as long as possible and beyond six months.

11  They had offered to defer the aircraft whereby the first

12  aircraft that was originally due to deliver in April -- well,

13  in March, but now in May, they were moving that to June at our

14  request.  And the other two aircraft were moving into July, the

15  near term aircraft and there were other moves afoot.

16  Q.  And is Mr. Jones recapping a conversation that you had with

17  him that day?

18  A.  Yes.

19  Q.  All right.  Let's turn now to exhibit 170.

20          THE COURT:  Excuse me, Mr. Hosenpud, I hate to

21  interrupt you, but I have to get these things straight in my

22  own mind.  Abstractly what is the economic justification for

23  requiring rental payments for an aircraft which is not been

24  delivered; and therefore, isn't in your possession?

25          And by the same token for deferring rental payments on

O4FBFRO3                    Dempsey - Direct

1   airplanes that you possess that are operating, what is the

2   abstract conceptual economic justification for those?

3          THE WITNESS:  Well, the first example that you're

4   asking which is aircraft that are not delivered?

5          THE COURT:  Well, they're not in your possession.

6          THE WITNESS:  We would not be paying any rent on

7   those.

8          THE COURT:  Nobody would expect it or to pay it in

9   advance?

10          THE WITNESS:  That's right.  When you're paying in

11   advance is not to -- it's like a staged payment on the aircraft

12   production.  And so you make a payment to Airbus as that goes

13   through the stage of production.

14          THE COURT:  That's a production.

15          THE WITNESS:  That's a production issue.  To a

16   financier, you would not necessarily -- you would not pay to

17   the lessor rent in advance of an aircraft delivery.

18          THE COURT:  So the lessor wouldn't expect you to be

19   paying rent until you've received the aircraft?

20          THE WITNESS:  At the point of delivery of the

21   aircraft, you will pay rent typically in advance.  You'll pay

22   the next period of rent, plus a security deposit.  But that

23   occurs as a condition precedent on the delivery of an aircraft.

24   That typically occurs at the point of the delivery of the

25   aircraft.

O4FBFRO3                    Dempsey - Direct

1          THE COURT:  What's the economic justification for it?

2          THE WITNESS:  You're making advance payments on the

3     aircraft, so the aircraft is going into service.  And the

4     agreement you put in place with the lessor --

5          THE COURT:  I'm talking about between you and the

6     lessor.

7          THE WITNESS:  Yes.  You will only start making rent

8     payments at the point when they have taken ownership of the

9     aircraft and you become the operator of the aircraft.  So when

10    Airbus has delivered the aircraft to you --

11         THE COURT:  Yes, I can understand rent payment

12    starting then, but not before then?

13         THE WITNESS:  That's correct.

14         THE COURT:  Unless they can exert it as a matter of

15    economic power?

16         THE WITNESS:  Correct.  If they were seeking a

17    commitment fee or some other fee to put a facility in place,

18    they may seek a payment in advance of it, but in this case that

19    did not exist.

20         THE COURT:  I see.  Thank you.

21    BY MR. HOSENPUD:

22    Q.  So I may have confused you and the Court with asking about

23    the month to month.  What was a trigger for payment on the

24    month-to-month rent deferral that was being sought by AMCK?

25    What was one trigger?

O4FBFRO3                          Dempsey – Direct

1   A.  The next aircraft delivery.  The earliest that we would owe

2   rent on the month-to-month basis was at the point of the next

3   aircraft delivery.

4           THE COURT:  That's on the 14 planes that you're

5   operating?

6           THE WITNESS:  Correct, yes.

7           MR. HOSENPUD:  Thank you.

8   Q.  So let's turn to -- this is April 11.  This is where you

9   had chatted with Airbus and had been able to work out a

10  deferral of what would be the first three aircraft.  Would

11  those be deemed the near-term aircraft?

12  A.  Yes.

13  Q.  Would those be the aircraft that were either completed or

14  very close to completion from a manufacturing standpoint?

15  A.  Yes, with the April 2020, aircraft the most advanced in

16  completion.

17  Q.  There were two in April 2020?

18  A.  That's correct.

19  Q.  All right.  Let's look at exhibit 170, and we will scroll

20  down to the more legible section.  This is a text message from

21  you to Mr. Sheridan.

22          Would you please review it and then let me know when

23  you're ready?

24  A.  Yes.

25  Q.  What day was this in the week?

O4FBFRO3                          Dempsey - Direct

1   A.  It's on a Saturday.

2   Q.  And is this date April 11, the same day you had a

3   conversation with Airbus?

4   A.  I think this was probably immediately after a conversation

5   with Airbus.

6   Q.  So what were you trying to do with this text message?

7   A.  I was keeping Paul abreast of the conversations we were

8   having with Airbus given the sensitive nature of the timing for

9   the next aircraft delivery.

10  Q.  What did you communicate in this text?

11  A.  I basically said I don't have this agreed yet; however,

12  want to see if a two-month delay works for you into June for

13  the aircraft that should have delivered last week.  And I also

14  informed him that there were other changes or moves afoot later

15  in the year in relation to aircraft, timings, which were easier

16  to move than the near-term moves.

17  Q.  And did you receive a response to your text message on this

18  date?

19  A.  I don't believe so.

20  Q.  All right.  Let's look now at exhibit 83.  This is an email

21  from you to Mr. Sheridan carbon copying Mr. Fanning,

22  Mr. Thwaytes and Jane O'Callaghan.

23       Is this a follow-up to your text of April 11.  It's

24  dated April 13?

25  A.  Yes.

O4FBFRO3                          Dempsey - Direct

1    Q.  And what are you explaining to Mr. Sheridan in this email?

2    A.  I'm effectively repeating the text that I sent to him on

3    Saturday before.

4    Q.  And how did you convey your understanding of how this might

5    be different than what AMCK was looking for?

6    A.  It's in the second paragraph where I mention, I understand

7    that you're looking for a six-month delay; however, that isn't

8    practical given the advance nature of the aircraft production.

9    Please confirm you can support the revised schedule.

10   Q.  Did you hear back from Mr. Sheridan?

11   A.  I don't recall specifically.

12   Q.  Let me show you exhibit 85.

13        To orient you, Mr. Dempsey, the middle email is an

14   April 13, 2020, email from you to Mr. Sheridan updating him

15   what you had been able to accomplish with Airbus, a two-month

16   short-term delivery referral.  And I think you say, One in June

17   and the next two in July.  Is that correct?

18   A.  Yes.

19   Q.  All right.  Now let's go back up to what the response was

20   from Mr. Sheridan.  Take a moment to read it.

21   A.  Yes.

22   Q.  And what was Mr. Sheridan conveying to.

23    you?

24   A.  He was waiting for some feedback from the shareholders and

25   he repeated their request which was tied the delivery to having

O4FBFRO3                          Dempsey – Direct

1    no outstanding deferrals, so it would only work if we recast

2    the deferral agreements.

3    Q.  Was this any different from what Mr. Sheridan and AMCK had

4    been conveying to you in terms of the timing of repayment of

5    rent?

6    A.  I can only assume he was confirming to me that we had to

7    have no outstanding rent at the point of the delivery of an

8    aircraft and somewhat accepting the fact that it would not be

9    six months of a deferral.

10   Q.  And was that consistent with the April 7, month-to-month

11   discussion you had?

12   A.  Yes.

13   Q.  And how does he indicate that there would be a difference

14   from what he had originally requested of six months, the

15   language is, Essentially we want to tie the deliveries to

16   having no outstanding deferrals.  So it would only work if we

17   recast the deferral agreement.

18           How did you understand that?

19   A.  That was consistent with all conversations that I had with

20   him.  They were seeking a six-month deferral.  We were

21   achieving a two-month deferral for the next aircraft delivery.

22   So as a result, you would have -- in order to achieve no

23   outstanding deferral at the point of the next aircraft

24   delivery, that would have to change.

25   Q.  And this is in reference to the other 14 aircraft?

O4FBFRO3                    Dempsey – Direct

1    A.   That's correct.

2    Q.   Let's look at exhibit 88, please.  This is a communication

3    with Airbus that we'll talk about a bit.  I'm focusing in on

4    the email from Ray Bishop and others, Spencer Thwaytes and

5    Robert and Sharath at Frontier.  This is dated April 15,

6    correct?

7    A.   Yes.

8    Q.   And this gentleman Ray Bishop is recapping some of your

9    discussions with two Airbus individuals; is that right?

10   A.   Yes.

11   Q.   Now if we go down in this exhibit I believe there's a

12   schedule, exhibit 88.  There's a schedule towards the bottom.

13   What does this reflect in terms of the movement of aircraft

14   delivery date?

15          Does it show a delivery date based on the original

16   planned delivery date in what appears to be an amendment eight?

17   A.   Yeah.  So the legal document that governs the contract for

18   aircraft deliveries had an amendment called amendment eight

19   that listed aircraft deliveries.  And so in order to agree a

20   subsequent change in those aircraft deliveries, we had to

21   change amendment eight.

22          And so you can see if you look at rank 52, that

23   aircraft was due to deliver in March.  It obviously had been

24   pushed into April because of the bracket issues at that time,

25   and then subsequently had been moved out of April into May.

O4FBFRO3                        Dempsey - Direct

1    And then in this schedule into June 2020.

2    Q.  All right.  And you see a pattern for the next delivery in

3    March, and that one was then moved to July?

4    A.  That's correct.

5    Q.  And was Frontier successful in getting the later

6    aircraft -- pardon me.  I'm jumping ahead.

7            There was an original schedule in May 2020 delivery

8    that is now being proposed for delivery in July.  That's the

9    second of the two July deliveries, correct?

10   A.  Yes.

11   Q.  It's 55?

12   A.  Yes.

13   Q.  And at this time was there some movement of the later two

14   deliveries for the AMCK aircraft that were going to happen in

15   the middle of 2020?

16   A.  Yeah, I think there was some movement.  I don't recall the

17   actual rank of the aircraft, but there was certainly movement

18   toward the end of the year.  And I think one may have moved at

19   some point into 2021.

20   Q.  So as of April 15, you continue your negotiations with

21   Airbus?

22   A.  Yes, we continued negotiating.  We were negotiating two

23   things, what was going on at Airbus at this point which drove a

24   lot of changes to the aircraft delivery schedule.  Airbus in

25   addition to closing Mobile for the month of April, they also

O4FBFRO3                          Dempsey – Direct

announced around this time that they were cutting production by

40 percent.  And so in that cut of production by 40 percent,

aircraft, longer term aircraft, had to be moved around.  And so

you're seeing some moves in 2021 and 2022 that link to that

change in production.  That did not affect the near-term

aircraft delivery, but it was affecting aircraft that were

further out the delivery path in the contract.

Q.  Okay.  Let's look at exhibit 95.  This is an email exchange

between Chris Jones of Airbus and yourself as well as others

dated April 21, 2020.

          Do you see that?

A.  Yes.

Q.  In it there are further discussions about the aircraft and

some other terms that you had to deal with due to these later

movements in the delivery schedule of aircraft later in the

year and beyond.

          There's a statement that he makes at the very end

before his salutation.  What is he telling you?

A.  Are you talking about the very first paragraph?

Q.  Yes, I trust.

A.  I trust that these movements are positively received by

Frontier leadership as a sizeable gesture to help you navigate

the current climate and re-position for the turn around.  I am

also expectant that this satisfies AMCK to fund your 2020

deliveries.

O4FBFRO3                         Dempsey – Direct

1  Q.  Was this the last effort that you made with Airbus or did

2  those communications continue after April 21?

3  A.  We were continuing to push Airbus to defer aircraft further

4  to in order to satisfy AMCK.  That was ongoing all the way into

5  May.

6  Q.  Did around this time you have a conversation with

7  Mr. Sheridan and Ms. O'Callaghan for any sort of a status

8  update?

9  A.  I'm sure I did, yes.

10 Q.  Let's look at exhibit 99.  Scroll down, please.  This is

11 exhibit 99, and it appears to be a communication from

12 Ms. O'Callaghan to the shareholder and others, and the subject

13 matter is Frontier Airlines.  Do you see that?

14 A.  Yes.

15 Q.  There's items in here that, do you believe, were part of a

16 communication with AMCK coming from Frontier?

17 A.  Yes.

18 Q.  Focusing in on this, there's a reference in the middle of

19 the first paragraph that there'd been some movement in the

20 aircraft with Airbus starting at the section of that email, the

21 first of the five remaining.  You see that reference?

22 A.  Yes.

23 Q.  And would that be something that you conveyed to AMCK?

24 A.  Yes.

25 Q.  And it reads, The first of the five remaining deliveries

O4FBFRO3                      Dempsey - Direct

1  was notified by Airbus to deliver from Mobile Alabama last week

2  of April 2020.  Airbus has advised that they can defer this

3  aircraft by a maximum two months to June 2020.

4           Is that consistent with what you conveyed to AMCK on

5  this communication?

6  A.  We would have conveyed to AMCK that the aircraft was now

7  delivering in June, yeah.

8  Q.  And how about the other two aircraft that were supposed to

9  be delivered?

10  A.  We conveyed to them that they were now delivering in July.

11  Q.  Did you indicate in this communication -- and I'm focusing

12  in on the third paragraph -- what your belief was with respect

13  to these next three deliveries?

14  A.  Yeah.  We had been in discussions with Airbus about

15  deferring aircraft and the condition upon which Airbus was

16  willing to defer the aircraft was on the basis that we would

17  facilitate that aircraft delivery at the new time they were

18  trying to set up in an amendment to the contract.  And so that

19  resulted in us needing to turn up with financing in June for

20  that aircraft.

21  Q.  And that message was given you to by Chris Jones in a

22  communication email that we just got through looking at?

23  A.  That's correct.

24  Q.  And there's a reference to offering to pay 50 to 75 percent

25  of all outstanding deferred amounts prior to the first

O4FBFRO3                          Dempsey - Direct

1    delivery.  What does that relate to?

2    A.  We were continuing to negotiate the timing of repayment of

3    the deferral as part of the ongoing negotiations around

4    concessions that AMCK were looking from Frontier that we were

5    seeking from them in relation to the next aircraft delivery.

6    Q.  And this date is April 22?

7    A.  I think.

8    Q.  Let's scroll up so we can get the date.  As of this date

9    did anybody from AMCK tell you that the month to month is

10   terminated?

11   A.  No.

12   Q.  Did anybody from AMCK ask for you to pay all rents current

13   as of April 22?

14   A.  They did not.

15   Q.  Scrolling down in this exhibit where there are references

16   to a series of pieces of good news.  Do you see that?

17   A.  Yes.

18   Q.  And what were you conveying to them and why?

19   A.  Consistent with previous updates, we had tried to keep them

20   abreast of the financial condition of the airline.  And given

21   the pandemic, we had just received confirmation the government

22   was going to provide us with payroll support, payroll support

23   that would fund a portion of our payroll so that we would

24   not -- so that all the employees would retain their jobs

25   through the pandemic.  And so we had received confirmation of

O4FBFRO3                          Dempsey - Direct

1    over $200 million of aid from the government in order to

2    facilitate that, and it would be paid in stages.  And I also

3    gave them an update as to what we were seeing in terms of

4    future bookings in the business.  And I gave them pretty clear

5    information on what we were seeing in June, July, August and

6    beyond.

7    Q.  And the payroll support, was that a dedicated fund of money

8    for a specific purpose?

9    A.  Yes, it was payroll support.

10   Q.  You couldn't use it for any other purpose, correct?

11   A.  We were not allowed to use it for any other purpose.

12   Q.  Did you update on the A320neos and how much they had been

13   operating?

14   A.  I did.

15   Q.  And what information did you provide there?

16   A.  You can see it in the bullet point, the A220neo was

17   operating approximately four to six hours per day compared to

18   the usual ten plus hours per day.

19   Q.  And were the A320neos subject to the Framework Agreement

20   going to be rotated into that flight rotation?

21   A.  Yes.

22   Q.  You are referencing the rest of your fleet, how they are

23   serviceable so that they could be redeployed.  These are the

24   ones that went into storage; is that right?

25   A.  Yeah, we were keeping them airworthy, albeit in storage but

O4FBFRO3                          Dempsey - Direct

1    airworthy.  If you recall around this time people believe that

2    the pandemic would be a three to four-month event.  So at that

3    time we were, albeit the aircraft were in storage, they were

4    serviceable so that they could be flown relatively quickly if

5    we saw a return to some normal air travel by consumers.

6    Q.  Did you update them on your efforts to have other lessors

7    substitute in for their positions?

8    A.  We did, yeah.  You can see it in the second bullet point.

9    We confirm that we had asked someone to step into one of their

10   positions and they said no.

11   Q.  At this time was there any movement by Airbus in the

12   near-term deliveries from what you had understood, one in June

13   and two in July?

14   A.  This is April 22, right?

15   Q.  Yes.

16   A.  We were still working hard to try and move -- so we were

17   trying to move the aircraft into Q2, as far into Q2 as

18   possible.  At this point there was one aircraft -- sorry, into

19   Q3 as much as possible.  There was one aircraft still

20   delivering in June in Q2, and so we were attempting to get that

21   aircraft moved into July to move it out of this second quarter.

22   We had not achieved that yet.  But we were giving them an

23   insight.

24        If you look at the final bullet point, a change in

25   longer term, we'll call it longer term or medium term

O4FBFRO3                         Dempsey - Direct

1    deliveries where there was some Q4 deliveries of 2020 moving

2    into the following year.

3    Q.  Let's move now onto exhibit 104.  Exhibit 104 appears to be

4    a copy and paste into Mr. Fannings' text messages dated April

5    23, 2020, and the first text is something he copied from a

6    communication with Ms. O'Callaghan.  Do you see that?

7    A.  I do.

8    Q.  Had you been asking for an update on the information that

9    you had provided in the phone call that we just talked about?

10   A.  I don't recall.  I'm sure we were talking about it at the

11   time.  What I was trying to understand at that point was if we

12   agree a deal with Airbus to deliver an aircraft at this point

13   in June, is AMCK going to finance that aircraft for us or not.

14        And we were attempting to garner that information.

15   And what I can read from her response to Robert is consistent

16   with what we had heard already that they have unwillingness to

17   fund new purchase if there was any rent payments outstanding.

18   Q.  Is that consistent with the message you received from

19   Mr. Sheridan on April 7, when you reached this month by month

20   deferral to negotiate with Airbus?

21   A.  Yes.

22   Q.  At this time did AMCK ever make a request to pay all April

23   rent current?

24   A.  They did not.

25   Q.  And you're into April 23, 2020; is that correct?

O4FBFRO3                        Dempsey - Direct

1    A.  That's correct.

2    Q.  Had AMCK made such a statement at this time, what would

3    Frontier had done?

4    A.  We would have paid the rent.

5    Q.  Let's turn now to -- before I get there.  Close in time to

6    this period did Frontier offer to pay all rent current?

7    A.  I think we had offered at this point to make the rent

8    current.

9    Q.  Let's look at exhibit 17, page five.  This is a series of

10   text message on April 25, 2020, and there is a -- first of all,

11   there's a statement from Ms. O'Callaghan further up the change

12   slightly where she's communicating with Mr. Fanning and you see

13   that in the darker text on the right side.  Do you see that

14   reference?

15   A.  Yes.

16   Q.  And there are a few points being made, the first of which,

17   is that something you'd seen multiple times.  We'd be unable to

18   fund any new delivery unless all payments are up-to-date so

19   that there can be no deferred payments outstanding at closing?

20   A.  There was absolute consistency in that comment coming from

21   AMCK throughout the discussions.

22   Q.  And then there's a second reference to needing some sort of

23   quid pro quo in order to fund the aircraft.  You see that?

24   A.  Yes.

25   Q.  Was this the first time that this proposal had been

O4FBFRO3                    Dempsey - Direct

1    floated?

2    A.  I believe so, yes.  Although they had looked for a holdback

3    in rent or a prepaid rent structure in late March, this is the

4    first time they asked for a quid pro quo.

5    Q.  Regarding lease extensions.

6    A.  Regarding lease extensions.

7    Q.  Let's scroll down and see Mr. Fanning's response.  He says,

8    let me talk to Jimmy.  And he poses that he's going to be asked

9    are they financed by the same lender.

10           Do you see that reference?

11   A.  Where on the page are you?

12   Q.  I'm right at the top.

13   A.  Yes.  Could you repeat the question.

14   Q.  Does he say to her that he's going to check with you, but

15   he'll get asked the question, are they financed by the same

16   lender.  You see that reference?

17   A.  Yes.

18   Q.  And then this discussion goes on regarding the lease

19   extension, but I'd like to focus your attention to the text at

20   21:28.

21   A.  Yes.

22   Q.  And there Mr. Fanning indicates, Jane as you're aware, we

23   have signed leases on these five aircraft.  Thought process is

24   we pay you in full for the deferred rent.

25           Do you see that reference?

O4FBFRO3                        Dempsey - Direct

1    A.   Yes.

2    Q.   And is that when Frontier offered to pay in full for the

3    deferred rent on the 25th?

4    A.   I was not a party to these text, but clearly Robert had

5    offered to pay in full all of the deferred rent at that point,

6    yes.

7    Q.   And did AMCK indicate that it wanted to be paid in full in

8    any communication around this time?

9    A.   The only comment that they had made -- no is the answer.

10   But the only comment they made is that they wanted us to have

11   no outstanding deferrals at the point of delivery of the next

12   aircraft.  But no, I don't see a response saying, pay now.

13   Q.   Let's look at exhibit 111.  To put this into context, you

14   are sending an email to Paul Sheridan on April 27, and it is

15   responding to an April 13 email from Mr. Sheridan.

16        Do you see that?

17   A.   Yes.

18   Q.   Would you take a look at your email on April 27, and let me

19   know when you've concluded?

20   A.   Yep.

21   Q.   What are you communicating in this email?

22   A.   Well, I'd just been briefed by Robert, and I confirmed to

23   him that I was working under the assumption that we had to be

24   current on all rent for you to finance the upcoming delivery.

25   Q.   And what was the purpose of this email based on being

O4FBFRO3                      Dempsey - Direct

1   briefed by Robert?

2   A.  Because my understanding is Jane was looking for a quid pro

3   quos in relation to funding the upcoming deliveries, and that

4   was effectively the first time that they were looking for

5   meaningful quid pro quos that would change the structure of the

6   existing leases that were in place.

7   Q.  Was this the discussion related to the month-to-month rent

8   deferral or something else?

9   A.  I'm referring to honoring his agreement with us.  I had a

10  conversation with him on April 7, and it was very clear that he

11  had told me that I needed to be current on all rent to finance

12  the upcoming deliveries and that I would work very hard in

13  order to move those aircraft as far as I possibly could.  And

14  so that's what I'm referring to here.

15          I'm setting out that I put a scheme in place with

16  Airbus that would facilitate short-term deferrals of the

17  aircraft on the basis that you would honor your agreement.

18  Q.  Did he ever come back to you in a response and challenge

19  what you had said in this email?

20  A.  I think you see his response above.  He did not challenge

21  my email, no.

22  Q.  So that assumption was left untouched by Mr. Sheridan.  He

23  didn't say, no, we don't have any sort of arrangement for that

24  timing of the financing?

25  A.  Well, he did not contradict my email.  He says in his

O4FBFRO3                          Dempsey - Direct

1    email, following our board meeting last week, we've been in

2    discussion with our shareholders and we need to follow-up with

3    them again tomorrow morning, so I won't have an update until

4    then.  Apologies.

5    Q.  Did you continue to negotiate with Airbus as of April 27,

6    2020?

7    A.  Yes.

8    Q.  Did you continue to work with AMCK to meet their request

9    for delivery deferrals?

10   A.  Yes.

11   Q.  Do you have a memory of a call shortly following this email

12   exchange with AMCK?

13   A.  Yes.

14   Q.  Do you recall the purpose of that call with AMCK?

15   A.  Principally to give them an update of where we were with

16   Airbus and how negotiations were progressing with Airbus and to

17   discuss some of the request that they had made.

18   Q.  Let's look at exhibit 121, if we scroll down this exhibit.

19   We're going to look to a section that summarizes a call or a

20   communication.  It's dated April 30, 2020, and it indicates,

21   Frontier responded today as follows.  Do you see that

22   reference?

23   A.  Yes.

24   Q.  What was it that you were -- in this, there's item number

25   one.  What part of that is something that you conveyed to

O4FBFRO3                    Dempsey - Direct

1    Mr. Sheridan, Ms. O'Callaghan?

2    A.   I mean we -- in point one?

3    Q.   Yes.

4    A.   We understood that we must be current on all payments

5    before closing.

6    Q.   What else did you communicate in point one?

7    A.   We offered to immediately pay outstanding April rent.

8    Q.   And then looking down at the last sentence of point one,

9    they will pay?

10   A.   They will pay, I think he's paraphrasing.  We will pay May

11   June and July rent and be on time.

12   Q.   There's a statement in point one that starts with the

13   language, On which we agreed an informal deferral pending

14   agreement with Airbus on delivery delays.  Do you see that

15   statement?

16   A.   Yes.

17   Q.   Was that something you said?

18   A.   No, that I think is him referring to the agreement we put

19   in place on April 7th.

20   Q.   Mr. Sheridan?

21   A.   Mr. Sheridan, yeah.

22   Q.   You indicated at point two, you're giving him an update on

23   Airbus, what did you communicate?

24   A.   We were updating him.  We were continuing to push Airbus to

25   move the aircraft, and I had given him an update that we'd now

O4FBFRO3                        Dempsey - Direct

1    move the last aircraft that was due or the first aircraft, the

2    near-term aircraft from June to July.  And so we had now moved

3    the aircraft deliveries three months.

4    Q.  And there's also finally at point three a reference to a

5    swap.  Would you identify that, please?

6    A.  Yes, we had been working to try and find an alternative

7    lessor to step in to AMCK's shoes or into their deal for

8    aircraft deliveries.  We couldn't do it in the near-term, but

9    we had achieved one lessor to step in and take delivery of one

10   of their aircraft that were due later in the year.

11        And we also agreed with Airbus to move one of their

12   aircraft out of 2020 and into 2021.  And so originally AMCK was

13   obligated to deliver five remaining aircraft, six in total,

14   five remaining aircraft in 2020 to Frontier.  They were now

15   obligated to deliver three aircraft with the first aircraft

16   delayed three months into July 2020.  And they didn't have an

17   obligation until 2021.

18   Q.  Did the company that you succeeded in ultimately swapping

19   places, did they have a sale leaseback arrangement with

20   Frontier for 2020?

21   A.  Yes.

22   Q.  And did they alter their pricing in any way?

23   A.  No.

24   Q.  Did they change the terms in any way?

25   A.  They did not.

O4FBFRO3                    Dempsey - Direct

1   Q.  At this time on April 30, did anyone at AMCK ask you to pay

2   April rents immediately when that offer was made?

3   A.  They did not.

4   Q.  Given the timing of this communication on April 30, if they

5   had made that request, what would Frontier have done?

6   A.  We would have paid the rent that was due.

7   Q.  But was it due based on your understanding of your

8   communications with Mr. Sheridan on April 7th?

9   A.  No.  My clear understanding as of that call that we had a

10  rent deferral in place until the next aircraft delivery, which

11  at this point was now occurring in July.  And so, no, there was

12  no rent due based on that agreement at this point.

13  Q.  Why were you proposing paying immediately?

14  A.  We were trying to obtain a commitment from AMCK that they

15  would actually turn up and honor the binding agreement we had

16  with them to deliver the aircraft.  And we were offering them

17  to become current on rent in order to ascertain whether they

18  would show up, and we asked them multiple times, and they did

19  not respond.

20          MR. HOSENPUD:  Your Honor, I'm wondering given the

21  time whether this would be a good stopping point?

22          THE COURT:  If it is in your examination, then it is.

23          MR. HOSENPUD:  Thank you, your Honor.  I think so.

24  There is one small housekeeping issue that we wanted to bring

25  to the Court's attention.

O4FBFRO3                        Dempsey - Direct

Counsel and I have conferred, and the first question
is, does the Court want summations?  And if so, would the Court
be amendable to having that occur on the morning of Wednesday
because we think it could be accomplished in that period of
time, and we would be able to conclude the case at that time?

MR. BUTLER:  Your Honor, if I could comment on that.
We did have a discussion along those lines.  Based on
Mr. Dempsey's testimony and the need for the testimony of
Mr. Sheridan, I'm not at all sure as I stand here now whether
we'll be finish with live testimony by the end of the day
tomorrow.

THE COURT:  It's always hard to say at this point.
The thing you do is just take that as it turns out.  As to
summations, I would take very seriously the desire of counsel
to have a closing argument or not.  This is a facially very
complex case, but underneath it comes down to rather simple
principles, and I would not compel closing arguments if you
didn't want to do it.  So it's basically in your hands.  When
it happens, it happens, and it will probably be of some
benefit.  I can't imagine it not being, but I really basically
leave that up to you.  Your preferences.

MR. HOSENPUD:  Thank you, your Honor.

THE COURT:  You're the ones responsible for winning or
losing the case, not I.

MR. HOSENPUD:  Understood.

```
O4FBFRO3                        Dempsey – Direct
```

1              MR. BUTLER:  Thank you, your Honor.

2              THE COURT:  It can be done by summing up, and it can

3    be done by not summing up.  See you tomorrow.

4              (Adjourned to April 16, 2024, at 11 a.m.)

5                        JOINT EXHIBITS

6    Exhibit No.                              Received

7     30, 55, 61, 136, 147                        500

8     37, 38, 68, 71, 86, 87, 92, 94, 98, . . . . . 501

9              110, 113, 115, 144

10    62, 63, 64, 83, 104, 122, 123, 124, 127, 128 and 170
     525

11                       PLAINTIFF EXHIBITS

12   Exhibit No.                              Received

13    6  . . . . . . . . . . . . . . . . . . . 500

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                         Page

 3     JAMES DEMPSEY

 4    Direct By Mr. Hosenpud . . . . . . . . . . . 501

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```