O4G3FRO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FRONTIER AIRLINES, INC.,

4              Plaintiff,

5         v.                          20 Civ. 9713 (LLS)

6   AMCK AVIATION HOLDINGS IRELAND
    LIMITED, ACCIPITER INVESTMENT
7   4 LIMITED, VERMILLION AVIATION
    (TWO) LIMITED,
8
             Defendants.
9
    ------------------------------x
10                                        Bench Trial

11                                        New York, N.Y.
                                          April 16, 2024
12                                        11:00 a.m.

13  Before:

14                 HON. LOUIS L. STANTON,

15                                        District Judge

16                      APPEARANCES

17  LANE POWELL PC
         Attorneys for Plaintiff
18  BY:  DAVID G. HOSENPUD
         AARON SCHAER
19
    CLIFFORD CHANCE US LLP
20       Attorneys for Defendants
    BY:  JEFF E. BUTLER
21       JOHN P. ALEXANDER
         RISHIKA JIKARIA
22       GINA CROSBY

23

24

25

O4G3FRO1                    Dempsey – Direct

1              (Trial resumed; in open court)

2              THE COURT:  Good morning.

3    JAMES DEMPSEY,

4         called as a witness by the Plaintiff,

5         having been previously sworn, testified as follows:

6    DIRECT EXAMINATION (Continued)

7    BY MR. HOSENPUD:

8    Q.  Good morning, Mr. Dempsey.

9    A.  Good morning.

10   Q.  Mr. Dempsey, during the first part of your examination

11   yesterday, the Court asked you a few questions.  I'd just like

12   to return to those briefly.

13             I believe the first question was whether Frontier

14   wanted the airplanes under the AMCK Framework Agreement to

15   deliver.  What was your answer?

16   A.  Yes, we did want the aircraft to deliver.  It was a

17   material or meaningful cash positive event for Frontier to take

18   delivery of an aircraft.  Each aircraft that delivers, we, as I

19   said yesterday, we sell the aircraft at the market price, but

20   we have purchased the aircraft at a lower discounted price, so

21   there is an upfront gain that occurs at the point of the

22   delivery of the aircraft.  Plus it provides us PDP relief where

23   the PDPs are funded at the purchase of the aircraft by the

24   leasing company.  When the leasing company turns up to pay

25   $51 million for purchasing the asset, Airbus gets paid over

1    $10 million for the predelivery payments.  And those funds come

2    back to Frontier to fund future deliveries.

3              So it is a meaningful improvement in the liquidity to

4    the tune of 13 to 15 million dollars in this case.

5    Q.  Can you please explain the concept of prepaid rent in

6    relation to the context it was discussed here.  What does that

7    mean?

8    A.  Prepaid rent will be quite an unusual occurrence in a

9    lease, where you would pay in advance of the actual lease

10   occurring.

11             In the context of what we had discussed yesterday, and

12   what we had offered to AMCK, one of the concessions we were

13   making to AMCK was to provide them with incremental security so

14   that they would confident we would not come back and look for a

15   further deferral.  So the structure that we put in place was to

16   prepay rent.  And that prepaid rent would have happened at the

17   point of the delivery of the aircraft, for the aircraft that

18   was under the Framework Agreement.

19             So the next aircraft AMCK were due to pay us

20   $51 million for that aircraft.  We would have -- we offered to

21   them six months of prepaid rent or a holdback.  So instead of

22   providing $51 million, AMCK would have provided $51 million

23   less six months of rent.  So that would have been equivalent to

24   maybe 1.8, 1.9 million dollars.

25   Q.  So those six months in that scenario would have been

O4G3FRO1                         Dempsey - Direct

1    advance paid?

2    A.   Yes.

3    Q.   Based --

4    A.   We would effectively be paying rent in advance, which is

5    highly unusual in an aircraft leasing transaction.  We were in

6    a very unusual time.

7    Q.   Finally, could you please explain what the economic

8    benefits to AMCK were associated with waiving Frontier's rent

9    on 14 aircraft while the parties negotiated?

10   A.   Yeah.  So, AMCK was due to finance three aircraft in the

11   near term.  Each aircraft they would have been required to pay

12   $51 million for those aircraft.

13        What the waiver gave for AMCK was they did not have to

14   fund those aircraft until those aircraft delivered.  And our

15   task in the waiver structure was to defer those aircraft with

16   Airbus as long as possible.  So that would push out their

17   requirement to fund those aircraft deliveries and pay

18   $51 million for each aircraft or $153 million in total for the

19   three aircraft that were delivering in quarter 2 of 2020.

20   Q.   Was there rent interest associated with the rent that

21   Frontier was allowed to defer during the month-to-month?

22   A.   Yes, we would have paid interest on the deferred rent.

23   That was always part -- so the waiver as it existed, was

24   designed to give us time to negotiate with Airbus a deferral in

25   favor of AMCK.  And then it was also designed to give time to

1   AMCK and Frontier to negotiate a repayment agreement, and that

2   repayment agreement would have included interest.

3   Q.   I'd like to turn now to Exhibit 121 which is where we left

4   off yesterday.

5            I am going to have that in front of you momentarily.

6   We are going to scroll down to the section of that exhibit that

7   we had been discussing.

8            I'd like to finish out with a few questions, starting

9   with point one, there's language that says they understand they

10  must be current on all payments at and beyond closing.

11           Did you say this to Mr. Sheridan?

12  A.   Yes.

13  Q.   Was this is consistent within the understanding of the

14  month-to-month waiver?

15  A.   Yes.

16  Q.   When you told Mr. Sheridan this understanding, did he say

17  anything that called your understanding into question?

18  A.   No, he did not.

19  Q.   The next two sentences say, "They will immediately pay

20  outstanding April rents on which we agreed an informal deferral

21  pending agreement with Airbus on delivery delays.  They will

22  pay May, June, and July rents and all beyond on time."

23           A few questions with that.  Why were you offering to

24  pay outstanding April rents immediately if you understood that

25  AMCK wanted Frontier to pay rent at the next delivery at or

1    before the next delivery at this point?  You knew the next

2    delivery was not happening at this time.

3    A.  No, we understood that we had a waiver in place and it was

4    consistent with the first sentence.  We also wanted to bring

5    the negotiations to a conclusion, and that was quite important

6    to us as well.

7    Q.  Why is that?

8    A.  We were in the process of agreeing a deal with Airbus to

9    defer the aircraft deliveries.  We were keen to ensure that

10   AMCK was the financier for those aircraft deliveries.  So we

11   were keen to bring all these negotiations to a close around

12   this time.

13   Q.  Did AMCK accept Frontier's offer to pay immediately?

14   A.  They did not.

15   Q.  Did the negotiations continue after that?

16   A.  Yes, they did, yeah.

17   Q.  Part of the phrase that we just read through, "Outstanding

18   April rents on which we agreed an informal deferral pending

19   agreement with Airbus on delivery delays," what did you

20   understand this to refer to?

21   A.  Which portion of the sentence?

22   Q.  "On which we agreed an informal deferral pending agreement

23   with Airbus on delivery delays."

24   A.  I mean, that is I think Paul Sheridan paraphrasing the

25   agreement we had put in the place on the waiver.  The waiver

O4G3FRO1                        Dempsey – Direct

1    was in place to give us time to get an agreement in place with

2    Airbus and an agreement in place between Frontier and AMCK.

3    That's consistent with my understanding of the waiver, but I

4    think that's his words, not mine.

5    Q.  Do you have any sense of why he only says "outstanding

6    April rents" at this stage?

7    A.  I don't.  I can only deduce they were the rents that were

8    outstanding at that point.  But I don't, no.

9    Q.  So May rents had not yet become due?

10   A.  They had not.  It was April 30.

11   Q.  Did Mr. Sheridan ever tell you the month-to-month waiver

12   only pertained to April rents?

13   A.  He did not.

14   Q.  Did he ever say it was only for one month?

15   A.  He did not.

16   Q.  What was your understanding of when the month-to-month

17   waiver expired?

18   A.  The month-to-month waiver was designed in order to give us

19   time to get an agreement with Airbus and AMCK.  It was linked

20   to the next aircraft delivery.  And when we put in place on

21   April 7 the next aircraft delivery was in May, likely to be the

22   second half of May.  So that was at the point in April 7,

23   that's when it would need to be repaid subject to getting an

24   agreement elsewhere in terms of moving aircraft deliveries or

25   an agreement on rent deferrals with AMCK that was part of that

O4G3FRO1                           Dempsey - Direct

1   waiver.

2   Q.  I'd like to turn now to Exhibit 120.  This is an e-mail

3   from Mr. Sheridan to you and others dated April 30, 2020.

4          What do you understand this document to be?

5   A.  This is a continuation of the negotiation with us between

6   us and AMCK as part of the waiver framework that was put in

7   place.

8   Q.  What do these bullet points reflect?

9   A.  They reflect their updated proposal to us at that time.

10  Q.  Does this relate to the month-to-month deferral waiver?

11  A.  It doesn't specifically relate to the month-to-month

12  deferral waiver.  But the waiver gave us the ability to have

13  these discussions and negotiations at this time.

14  Q.  Did you think that this communication affected the

15  existence of the month-to-month waiver?

16  A.  No, it did not.

17  Q.  Why not?

18  A.  Because the waiver was put in place to enable a framework

19  for us to negotiate both with Airbus and with AMCK.

20  Q.  The --

21  A.  Those negotiations were continuing.

22  Q.  Pardon me for interrupting.

23          The first bullet point:  Deliveries in July 2020, 3

24  aircraft, February 2021, 2 aircraft.  What does that term

25  reflect?

O4G3FRO1                        Dempsey - Direct

1   A.   That is the updated deferral that we had achieved with

2   Airbus that was in the final stages of negotiation with Airbus

3   and that was -- that was Paul reflecting a conversation I had

4   with him updating him as to where the aircraft were moving to

5   in the discussions with Airbus.

6   Q.   The second point:  All payments to be current on May 15 and

7   to remain current.

8            What does that reflect?

9   A.   That was the first time a date, other than the next

10  aircraft delivery, that AMCK had posed to us, that we had to

11  have no outstanding rent.  So up until this time, there was a

12  consistency in their message to us that we had to be current

13  and have no outstanding rent at delivery of the next aircraft,

14  which at this point was in July, and this was the first time

15  they raised a prior date, which is May 15, 2020, that we had to

16  be current on all rent.

17  Q.   Now, the final term, could you briefly explain the

18  financial consequences of this term.

19  A.   Yeah.  This term effectively was a request by AMCK to have

20  an early termination -- option removal on the six aircraft in

21  the Framework Agreement, and extend the 12 aircraft that were

22  delivered in 2017, 2018, and 2019 to 12 years.  So in effect 18

23  aircraft will have been committed from 8 years to 12 years.

24  This request was an over $200 million request by AMCK to create

25  an obligation on Frontier at that time.  And that was very

1    onerous to us.

2    Q.  Does anything about this e-mail of April 30 from

3    Mr. Sheridan to you call into question the month-to-month rent

4    deferral?

5    A.  No.

6    Q.  Let me if we scroll down on this e-mail, let me focus your

7    attention on the language for avoidance of doubt in the final

8    paragraph.  What did you take this to mean?

9    A.  I think this is typical boilerplate language you see from

10   time to time in e-mails that are linked to proposals.

11   Q.  Did you think that the e-mail above it created a binding

12   agreement?

13   A.  No.

14   Q.  I'd like to return to Joint Exhibit 63 for a moment.

15   Mr. Dempsey, I'm showing you the April 6 document you testified

16   about yesterday.  Do you recall this?

17   A.  Yes.

18   Q.  And what is this document?

19   A.  This is an e-mail from Paul Sheridan to me cc'ing a series

20   of other people.  This e-mail sets out a call that Paul had

21   with Robert where he sets out the initial deferral agreement

22   that was put in place or initial waiver that was put in place

23   between them on April 6.

24   Q.  In this e-mail, do you see any of the boilerplate language

25   we just referred to?

1    A.  No.

2    Q.  You testified about a call on April 7 with Mr. Sheridan.

3    Do you recall that?

4    A.  Yes.

5    Q.  Briefly, please remind us of the content of that call.

6    A.  That call was an extension of this conversation and

7    follow-up e-mail to me.  Where we discussed putting in place a

8    waiver on a month-to-month basis that enabled us to reach

9    agreement with Airbus, and gave us time to reach an agreement

10   with Airbus that was badly needed, and also time to reach an

11   agreement with AMCK.  So that was the content of that call.

12   Q.  On April 7, did Mr. Sheridan recite to you anything

13   relating to the for avoidance of doubt this call is for

14   discussion purposes only or anything even close to that?

15   A.  He did not.

16   Q.  Let's go back to Joint Exhibit 120, please.  Did you

17   consider the last of these three points acceptable to Frontier,

18   the lease extensions?

19   A.  No.  I mean, as I said earlier, this was an onerous request

20   by AMCK.  It would have put Frontier in a position -- at a time

21   when we were trying to raise as much liquidity as possible,

22   this would have added an obligation, a debt obligation to our

23   balance sheet over $200 million, and effectively would have

24   reduced our debt capacity, our borrowing capacity of the

25   airline at a time when we needed to maximize the borrowing

1  capacity of the airline.  And at this stage we were in

2  discussions with the U.S. Treasury around a loan.  In addition

3  to the earlier payroll support that the government had given,

4  we were in discussions with them about a loan, and one of the

5  dynamics of that was understanding what our debt capacity was.

6  So we were very protective of our debt capacity at that time

7  because we were -- it was unclear as to how much debt we would

8  need in order to manage through the pandemic.

9  Q.  I'd like to turn your attention now to Joint Exhibit 122.

10           This is an e-mail dated April 30, 2020, from you to

11  Mr. Sheridan.  What is this?

12  A.  This is my reaction to his e-mail and I asked for a call.

13  And I pointed out that his request was overreach.

14  Q.  Why do you say that?

15  A.  Because of what I just told you in terms of I didn't think

16  it had any balance to the proposal.  Given we were negotiating

17  an agreement with each other, I thought this third clause was

18  very onerous on Frontier, given the request that we had made

19  for a short term deferral in rent.

20  Q.  Did you have a call with Mr. Sheridan after this e-mail?

21  A.  Yes.

22  Q.  When was it?

23  A.  That day.

24  Q.  What did you discuss on this call?

25  A.  We discussed an alternative -- we discussed this issue.

1  And I explained to him why Frontier could not accommodate his

2  request, and I made an alternative proposal.

3  Q.  What were the terms of that alternative proposal?

4  A.  I made a proposal at the point of delivery of an aircraft

5  to prepay rent for six months on the three aircraft that were

6  upcoming.  He in turn would give us time to repay rent on the

7  14 aircraft that were part of the waiver.  And I also set out

8  that we had moved aircraft into 2021 in that proposal.

9  Q.  Did you also renew what you had said to him in the phone

10  call regarding immediate rent payment?

11  A.  Yes, yes, that was one of the options.

12  Q.  On this call, did Mr. Sheridan say anything about the

13  waiver period being over?

14  A.  He did not.

15  Q.  Did he say anything about negotiations being over?

16  A.  No, he did not.  He said he would take my proposal and talk

17  to his shareholder.

18  Q.  Did you perceive the waiver period to be over as of this

19  phone call?

20  A.  I did not.

21  Q.  I am going to turn now to Joint Exhibit 127.  This is dated

22  May 1, 2020, and I think there may be a more legible image.

23       Sir, what is this document?

24  A.  I had sent Paul Sheridan a text on May 1st asking him for

25  an update on the status, that I had been expecting a call from

O4G3FRO1                          Dempsey - Direct

1   him that day.

2   Q.  What were you referring to on May 1 with respect to

3   expecting a call?

4   A.  The proposal I'd made to him the previous day.

5   Q.  How does Mr. Sheridan respond?

6   A.  He says "We're about to get on a call with the shareholders

7   it's at 4:30 our time."

8   Q.  What do you say at the bottom of this exchange?

9   A.  I said, "Okay.  Airbus is giving us an additional 24 hours

10  to get this done."

11  Q.  And what is that referring to?

12  A.  We were trying to make a commitment to Airbus that the July

13  deliveries would have a financier attached to them.

14  Q.  Was there anything about Mr. Sheridan's response here where

15  he says he's going to talk to his shareholder that led you to

16  believe that this month-to-month waiver was over?

17  A.  No.

18  Q.  Did it lead you to believe that negotiations with AMCK were

19  over?

20  A.  No, actually quite the contrary.  Negotiations were

21  continuing.

22  Q.  This is May 1, 2020, at this time?

23  A.  This is May 1st.

24  Q.  Did you eventually reach an agreement with Airbus to move

25  the deliveries at the schedules -- to the schedules you

1    represented to AMCK?

2    A.  Yes, we got to an agreement on May 5.

3    Q.  Did Mr. Sheridan ever respond to your May 1 text message

4    and get back to you?

5    A.  He did not.

6    Q.  I am going to show you now Joint Exhibit 142.  Scrolling

7    down to the bottom.

8            Did you reach out to Mr. Sheridan again in connection

9    with negotiations?

10   A.  Yes, I sent him a follow-up e-mail, I sent him a text on

11   May 1st and a follow-up e-mail on May 8.  The follow-up e-mail

12   on May 8th set out one of the two options that I proposed to

13   him in the call, which was effectively trying to create some

14   balance between prepaid rent and deferred rent, so that I could

15   get a commitment from them to deliver aircraft in July.

16   Q.  I see there is a fourth point on the top e-mail.  Are these

17   connected, points one through three and four?

18   A.  Yes, I noticed I had omitted point four, and I sent a

19   follow-up e-mail within an hour to inform him of the fourth

20   point.

21   Q.  So had Frontier succeeded in getting a financier to take a

22   position that AMCK would have had in 2020?

23   A.  Yes, we had replaced AMCK as financier on one of the

24   aircraft that Airbus had scheduled for the end -- for Q4.  So

25   we had replaced them with an alternative lessor to step into

O4G3FRO1                        Dempsey - Direct

1    their financing, so it gave AMCK more time on the final two

2    aircraft.

3    Q.  Going down to the first of the two e-mails on May 8.  Just

4    to the paragraph below point three.

5          What were you conveying there?

6    A.  Consistent with the phone call I had with him that the

7    operating lease obligation that we would have been taking on,

8    had we extended those aircraft to 12 years, was significant and

9    it would reduce our ability to raise debt elsewhere.  I was

10   reminding him of the conversation we had on the phone and why

11   we could not agree to their point three.

12   Q.  At this point, had Mr. Sheridan indicated that the delivery

13   schedule that was proposed was unacceptable to AMCK?

14   A.  He had not.

15   Q.  Previously, Mr. Sheridan had wanted six-month deferrals,

16   but what was presented here seemed to meet their requirements

17   at this time, correct?

18   A.  I had multiple conversations with Paul throughout April

19   where I had ensured he was aware of the challenges that getting

20   a six-month deferral with Airbus posed.  And we worked really

21   hard throughout the period in order to get Airbus to move the

22   aircraft at least three months, and also to move one aircraft

23   out of 2020 into 2021.  That was a significant ask, and a

24   significant concession on our behalf, and he had appreciated

25   that in phone calls, the effort we had made.

O4G3FRO1                        Dempsey - Direct

1    Q.  Did Mr. Sheridan provide a counter to this offer?

2    A.  He did not.

3    Q.  Did he tell you negotiations were over in any response to

4    this offer?

5    A.  He did not.

6    Q.  I am going to turn now to Exhibit 146.

7            This is an e-mail communication from Mr. Sheridan

8    copying to Mr. Thwaytes and Howard Diamond and copying you and

9    Mr. Fanning and Ms. O'Callaghan.  What is this document if we

10   scroll down, please.

11   A.  This is a termination notice.

12   Q.  And the date is?

13   A.  May 8.

14   Q.  Do you recall the day of the week this was?

15   A.  It was Friday.

16   Q.  The time that appears on this e-mail is what?

17   A.  It was 4:41 p.m. Mountain Daylight Time.

18   Q.  So Denver?

19   A.  Denver, yeah.

20   Q.  What time of day would that have been in Ireland or Dublin?

21   A.  Well, Ireland is seven hours ahead of Denver, so 11:41 p.m.

22   Q.  Can you summarize your understanding of this termination

23   notice.

24   A.  They put us in default on the Framework Agreement for

25   non-payment of rent on the 14 aircraft.

1    Q.  14 aircraft?

2            What was your reaction when you received this, sir?

3    A.  I was shocked.  I've worked in this industry for a long

4    time, and the industry is built on relationships.  And we had

5    had a very good relationship with AMCK to the point which they

6    had become our largest lessor.  So I was shocked because we had

7    a waiver agreement in place.  And in my opinion, that had not

8    been -- that had not ended.  So, I was extremely surprised that

9    this came in.

10   Q.  Just to be clear, did Frontier believe that the parties

11   eventually would reach a written agreement?

12   A.  Yes, that was the concept behind the waiver.  The waiver

13   was designed to give the parties time to obtain delivery delays

14   from Airbus, and also to agree a deal between -- Frontier and

15   AMCK to agree a deal.  It was always the intent to have that

16   documented.

17   Q.  If there had been no written agreement, when would, based

18   on your understanding of the month-to-month, repayment of rents

19   needed to be?

20   A.  The month-to-month was a fluid construct to align to the

21   next aircraft delivery.  And at the point when we put it in

22   place on April 7, the next aircraft delivery was happening

23   towards the end of May, and subsequently on April 11, 12, I had

24   notified Paul Sheridan that that aircraft in May had moved to

25   June.  So as a result of that move from May to June, AMCK did

O4G3FRO1                      Dempsey - Direct

1    not have to fund $51 million in relation to that aircraft.  And

2    we did not have to pay rent in relation to the 14 aircraft that

3    were already delivered to Frontier.  That's how the waiver

4    worked and it's effectively designed to give the parties time

5    to get an agreement in place with Airbus, which was a real

6    challenge, and subsequently with AMCK.

7    Q.  Prior to the time of receiving the termination notice, had

8    anyone from AMCK told Frontier that Frontier was in default?

9    A.  No.

10   Q.  Did you believe Frontier was in default on May 8?

11   A.  I did not.

12   Q.  Was Frontier monitoring its payment obligations to ensure

13   that it did not go into default with AMCK?

14   A.  Yes, we have always been very careful to manage any

15   interruption such as a default on our business with AMCK or any

16   other supplier into the business.

17   Q.  Besides this dispute, has Frontier ever been held in

18   default by another lessor?

19   A.  Nope.

20   Q.  Prior to the termination notice, had AMCK told Frontier

21   anyone at Frontier that the waiver period was over?

22   A.  They had not.

23   Q.  Prior to receiving this notice, had anyone at AMCK told

24   Frontier that negotiations were over?

25   A.  No.  Negotiations were clearly ongoing.

O4G3FRO1                          Dempsey – Cross

1    Q.  Prior to receiving the termination notice, had anyone at
2    AMCK told Frontier to pay outstanding rents immediately?
3    A.  No, we had not received that request.
4    Q.  After receiving the notice, did Frontier pay out all
5    outstanding rents?
6    A.  Yes, we paid all rent on May 13.
7    Q.  And has Frontier remained current on all rent with AMCK
8    since May 13?
9    A.  Yes, we have.
10            MR. HOSENPUD:  Thank you, sir.  Nothing further at
11   this time.
12   CROSS-EXAMINATION
13   BY MR. BUTLER:
14   Q.  Good morning, Mr. Dempsey.
15   A.  Good morning.
16   Q.  When you were the chief financial officer of Frontier
17   Airlines in 2020, who did you report to?
18   A.  Barry Biffle, the chief executive.
19   Q.  I understand that you were promoted to the position of
20   president of the company this past October.  Is that correct?
21   A.  That's correct.
22   Q.  Who was the previous president?
23   A.  Mr. Biffle.
24   Q.  Does Mr. Biffle still serve as the CEO of Frontier
25   Airlines?

O4G3FRO1                         Dempsey - Cross

1    A.  He does.

2    Q.  In your current position as president, do you still report

3    to Mr. Biffle?

4    A.  I do.

5    Q.  Now, you talked on direct about the fact that the first

6    delivery under the Framework Agreement occurred on March 16,

7    2020, correct?

8    A.  That's right.

9    Q.  And AMCK financed that delivery by paying $51 million to

10   Airbus, correct?

11   A.  Yes.

12   Q.  And you've characterized that transaction as a cash

13   positive event for Frontier, right?

14   A.  Yes.

15   Q.  How much cash did Frontier receive in connection with that

16   delivery?

17   A.  $51 million from AMCK, and then we had an onward payment to

18   make to Airbus, and as you know, those occur simultaneously, so

19   we would have, I think, I can't remember the exact numbers, but

20   probably closes to $5 million in a gain.

21   Q.  I thought I heard you testify just a little earlier this

22   morning that Frontier received 13 to 15 million dollars in

23   connection with that transaction?

24   A.  So, there's the upfront gain, and then there is also the

25   repayment of the predelivery payment to Airbus.  Which can be

O4G3FRO1                         Dempsey - Cross

1    somewhere between 9 and 13 million, depending on the aircraft

2    type.

3    Q.  So let's break down those two components.  Do you remember

4    for that transaction how much did Frontier receive as a gain?

5    A.  Close to $5 million.

6    Q.  How much did Frontier receive as refunds of predelivery

7    payments?

8    A.  Probably around 9 to 10 million dollars.

9    Q.  Would you agree, sir, in terms of cash flow, that event was

10    cash flow positive for Frontier to the tune of more than

11    $10 million?

12    A.  Yes.

13    Q.  And that was in the early days of the COVID-19 pandemic,

14    correct?

15    A.  Yes.

16    Q.  Would you agree there was a lot of uncertainty around that

17    time?

18    A.  It was developing at that time, yes, quite quickly.

19    Q.  We've also heard testimony in this case that there was some

20    urgency for Frontier to take delivery of this aircraft because

21    of a new tariff coming into effect; is that right?

22    A.  That's correct.

23    Q.  And who would have been responsible for paying that tariff?

24    A.  That first aircraft was delivering in Europe.  So the

25    responsibility to pay that tariff rested between either Airbus

O4G3FRO1                          Dempsey - Cross

1   or Frontier.

2   Q.  It rested between either Airbus or Frontier.  Did you have

3   an understanding at the time of who would actually pay it?

4   A.  Yeah, well, it was to deliver by a certain date in order to

5   avoid an increase in the tariff.  The tariff was being paid by

6   Airbus prior to that date.

7   Q.  And so, is it your testimony, sir, that Frontier would not

8   have been responsible for paying any part of the tariff if you

9   had missed that delivery date?

10  A.  We would have been responsible for paying the increased

11  part of the tariff if we had missed that delivery date.

12  Q.  So if you had missed that delivery date, it would have been

13  more expensive for Frontier, correct?

14  A.  It would, yes.

15  Q.  So was it important to Frontier to make the delivery at

16  that time?

17  A.  It was important to Frontier and to Airbus to make that

18  delivery at that time.

19  Q.  Did AMCK cooperate in making sure that that aircraft was

20  delivered on time?

21  A.  Yes, they were familiar with what was going on, and the

22  tariff situation was familiar to everybody in the industry, it

23  was a public issue, so everybody was familiar with the change

24  in tariff rates that was occurring that week.

25  Q.  Do I understand correctly, sir, after that first aircraft

O4G3FRO1                        Dempsey – Cross

1   delivered, there were five remaining deliveries to be financed

2   under the Framework Agreement?

3   A.  That's correct.

4   Q.  Let me show you what's been marked as Joint Trial

5   Exhibit 21.  This is a document that's headed Amendment No. 8

6   to the A320 family aircraft purchase agreement.

7           Do you recognize this document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It is an agreement between us and Airbus to amend the

11  original agreement that was dated September 30, 2011.

12  Q.  And was this agreement entered as of March 16, 2020?

13  A.  You'd have to go to the signature page, but I think you're

14  right.

15  Q.  Do you see on this page in the text --

16  A.  Sorry, yes.

17  Q.  You see that date?

18  A.  Yeah.

19  Q.  Does that refresh your memory this was entered on March 16?

20  A.  Yes.

21  Q.  That was the first date as the first delivery that was

22  financed by AMCK?

23  A.  Yes.

24  Q.  As of the date of this agreement, how many aircraft

25  remained to be delivered by Airbus under that purchase

O4G3FRO1                          Dempsey - Cross

1    agreement?

2    A.   Probably around 160 aircraft.

3    Q.   Does this Amendment No. 8 change the delivery dates for

4    some of those aircraft?

5    A.   It would have, yes.

6    Q.   Was it pushing delivery dates back in time or moving them

7    forward in time?

8    A.   It predominantly wasn't designed to change aircraft

9    deliveries in any material fashion.  It may have moved them by

10   a month here and there, but I don't recall this being a

11   material change in aircraft deliveries time-wise.

12   Q.   But you just testified that this did change delivery dates,

13   correct?

14   A.   I think it did to a small extent, yes.

15   Q.   My question, sir, was did it move the dates back in time or

16   did it move the dates forward in time?

17   A.   I would imagine it moved them later as opposed to earlier.

18   I don't have the details.  I don't recall.

19   Q.   This is amendment 8 to the agreement.  Were there also

20   amendments 1 through 7?

21   A.   Yes.

22   Q.   And did any of those earlier amendments change the delivery

23   dates for aircraft under this purchase agreement?

24   A.   I'm sure some of them do.  Some of them would have added

25   additional aircraft to the purchase agreement, some of them

1    would have changed the type of aircraft that were delivering

2    under the purchase agreement.  So, a series of different

3    changes to the purchase agreement that -- this is 9 years in

4    existence at this point, you've had multiple changes.  So

5    pretty typical.

6    Q.  And so for those earlier amendments that moved the delivery

7    dates, did they move deliveries date back in time or did they

8    move them forward in time?

9    A.  I don't recall.

10   Q.  Let me show you appendix A of this amendment.  And I think

11   we'll just start with the first page of that at the top.  This

12   appears to show the scheduled delivery dates for each of the

13   aircraft under this agreement.

14        Is that understanding correct?

15   A.  Yes.

16   Q.  And I want to go to I think it is the next page where we

17   start to see deliveries scheduled in 2020.  And I see at rank

18   52 there are three deliveries in March of 2020.

19        Which of these deliveries are the ones that were to be

20   financed under the Framework Agreement?

21   A.  I don't remember the exact sequence numbers of the

22   aircrafts.  I think 52, 53, 54 is familiar to me.  Maybe 58 and

23   59, but I don't remember exactly.

24   Q.  Your memory it was at least the three in March 2020, is

25   that correct?

1   A.  I think that's correct.

2   Q.  Let me show you what's been marked as Joint Trial

3   Exhibit 24 which is the Framework Agreement and schedule 1 from

4   that agreement.

5           And Rishika, if you can put those side by side so we

6   can see them.

7           First, if you could focus on the right-hand side of

8   the screen, do you see this is schedule 1 from the Framework

9   Agreement?

10  A.  Yes.

11  Q.  And this shows the delivery months for each of the aircraft

12  covered by that agreement, correct?

13  A.  Yes.

14  Q.  And I see there are three in March of 2020, and then one

15  each in May, June, and August of 2020.

16          Do you see that?

17  A.  Yes.

18  Q.  So would you agree that this corresponds to deliveries in

19  Amendment No. 8, the amendment that was entered on the same

20  day?

21  A.  I think so, yes.

22  Q.  And I see there are other deliveries in May, June, and

23  August of 2020.  Was there another leasing company expected to

24  finance those deliveries?

25  A.  Yes.

1    Q.  Do you remember which leasing company that was?

2    A.  I don't.

3    Q.  Would you agree with me that after the delivery that took

4    place on March 16, that AMCK was expected to finance at least

5    the nexts two deliveries from Airbus?

6    A.  Yes.

7    Q.  And would you agree that as of that time, AMCK was expected

8    to finance five out of the next eight deliveries from Airbus?

9    A.  Yes.

10   Q.  Let me show you what's been marked as Joint Trial

11   Exhibit 28.  It is the March 16 rent deferral letter that

12   Mr. Hosenbud showed you.

13          Now, you were cc'd on this letter, sir.  Did you

14   participate in the drafting of this letter?

15   A.  Not specifically, no.

16   Q.  But you do recall that this letter went out, correct?

17   A.  I do.

18   Q.  And do you recall that Frontier was seeking from AMCK

19   deferral of rent through June 30, 2020, with repayment over

20   nine months beginning in July of 2020?

21   A.  Is there a question?  Sorry?

22   Q.  I thought I --

23   A.  I must have missed it.

24   Q.  Let me ask it again.

25          Do you recall that this letter, in this letter

1    Frontier was seeking deferral of rent through June 30, 2020,

2    with repayment over nine months beginning in July of 2020,

3    question mark?

4    A.  Yes, that's correct.

5    Q.  And Frontier also said it was willing to pay interest on

6    that amount; is that right?

7    A.  Yes.

8    Q.  And these changes that are requested in this agreement

9    would have modifications to Frontier's lease agreements

10   involving AMCK, correct?

11   A.  Yes.

12   Q.  And down at the bottom, towards the bottom of this page

13   there is a paragraph that says "The above concessions would be

14   documented in a mutually agreed deferral and concession

15   agreement."

16           Do you see that language?

17   A.  Yes.

18   Q.  Was it your expectation that any deferral agreement with

19   AMCK would be documented in a written agreement?

20   A.  It was our expectation that we would eventually document a

21   deferral agreement with AMCK, and that's what the waiver

22   provided for on April 7.

23   Q.  Documenting it in writing, was that typical in your

24   experience for modifications to aircraft lease agreements?

25   A.  Yes.

1    Q.  They're usually documented in writing, correct?

2    A.  Eventually.

3    Q.  I believe that you testified that Frontier made similar

4    rent deferral requests to its other lessors.  Is that right?

5    A.  Yes, we did.

6    Q.  How many lessors was Frontier working with at that time?

7    A.  I don't have the exact number, but I think it's around 20.

8    Q.  And did Frontier reach agreement on rent deferral with

9    lessors other than AMCK?

10   A.  We did.

11   Q.  With all of them?

12   A.  I don't think with every single one of them.  But I think

13   with the vast majority of them, yes.

14   Q.  When Frontier did reach agreement on rent deferral with

15   those other lessors, did it document that agreement in writing?

16   A.  In most cases.

17   Q.  Do you remember cases in which a rent deferral agreement

18   with another lessor at this time was not captured in a written

19   agreement?

20   A.  Yes.

21   Q.  How many of those instances do you recall?

22   A.  This one on AMCK, and one other.

23   Q.  Well, sir, I was asking about rent deferral agreements that

24   you reached with lessors other than AMCK.

25   A.  One other.

Dempsey – Cross

1    Q.  So there is one you remember that was not committed to

2    writing?

3    A.  Correct.

4    Q.  What was the -- strike that.

5          But of the other roughly 20 lessors who agreed to rent

6    deferrals, those were all -- apart from that one case, the

7    agreements were captured in a written agreement, correct?

8    A.  In some form or other, yes.

9    Q.  Did the other lessors agree to the three months of rent

10   deferral that Frontier was requesting?

11   A.  Not in every case, no.

12   Q.  What was the range of deferral periods that was agreed with

13   other lessors?

14   A.  I mean, some agreed to two months, some agreed to three

15   months, some agreed to more than three months.  It really

16   depended on how the interaction went with them and the

17   negotiation around it.

18   Q.  How about repayment period?  What was the range of

19   repayment periods that Frontier agreed with other lessors?

20   A.  I don't know the exact detail on every single deferral

21   agreement.  But it was typically somewhere between six and nine

22   months after the deferral period had ended.

23   Q.  And in situations where Frontier reached agreement on

24   deferral, what was the interest rate that Frontier agreed to

25   pay?

1    A.  It was a range of interest rates.  I think as low as like

2    3 percent and maybe as high as 6, 7 percent.  I don't have

3    exact data on that.

4    Q.  You would agree that for the agreements reached with other

5    lessors, they all involved those three components, a deferral

6    period, a repayment period, and an interest rate on deferred

7    rent?

8    A.  Yes.

9    Q.  We've heard testimony in this case that AMCK had more

10   aircraft on lease to Frontier that any other lessor.  Is that

11   correct?

12   A.  I think that's accurate, yes.

13   Q.  Does that mean that Frontier's deferral request would have

14   a bigger impact on AMCK than it would have on any other lessor?

15   A.  I don't think that that's correct, no.  I think you have to

16   look at it proportionally on the size of the rent deferral

17   request to the other deferrals in the AMCK portfolio.

18   Q.  Well, we just established that AMCK had more aircraft on

19   lease to Frontier than any other lessor.  Correct?

20   A.  That's correct.

21   Q.  So did it have -- strike that.

22          Did Frontier pay more in monthly rent to AMCK than it

23   paid to any other lessor?

24   A.  I don't have that data.  I would anticipate that it was

25   close to, but it really depends on the rent for the aircraft

1   that you're comparing it to.  But it was, it's reasonable to

2   assume it was at or near the highest dollar value of rent that

3   we were paying each month.  But I can't tell you with accuracy

4   exactly if they were the highest total dollar rent value.

5   Q.  Was it one of the two highest?  Was AMCK one of the two

6   highest?

7   A.  I would say probably top three or four dollar rent that was

8   going out of Frontier.  It was the highest volume in terms of

9   aircraft numbers.

10  Q.  Would you at least agree with me, sir, that the rent

11  deferral request was going to have a -- would have had a bigger

12  impact on AMCK than many of Frontier's other lessors?

13  A.  No, I wouldn't agree with that.

14  Q.  Why not?

15  A.  Because it would really depend on the portfolio that they

16  had in place across their business, which I didn't have

17  visibility on.

18  Q.  Why would it depend on the portfolio -- why didn't it just

19  depend on the amount that Frontier paid every month to AMCK?

20  A.  But I have no way of telling how -- the impact it had on

21  their business.  You are asking me to ascertain the impact it

22  had on their business.  I don't have that data.

23          (Continued on next page)

24

25

O4GBFRO2                          Dempsey - Cross

1   BY MR. BUTLER:

2   Q.  Let me clarify, sir.  I'm just asking in pure dollar terms.

3   Did the deferral request have a bigger dollar effect on AMCK

4   than it had on other lessors used by Frontier?

5   A.  I don't have an answer to that question.  I don't know.

6   Q.  Did any of Frontier's other lessors finance an aircraft

7   delivery in March of 2020?

8   A.  I don't believe so, no.

9   Q.  And as of March 16, 2020, were any of Frontier's other

10  lessors expected to finance aircraft deliveries either later in

11  March or in April or May of 2020?

12  A.  Yes, I think we did have other lessors scheduled to deliver

13  aircraft.

14  Q.  We saw that there was another one scheduled for May at

15  least in that amendment number eight, correct?

16  A.  I think that's right.

17  Q.  I think we also established that AMCK was going to be

18  responsible for the next two deliveries, right?

19  A.  I actually think that they were responsible for the next

20  five.

21  Q.  Your memory is that AMCK was responsible for the next five

22  deliveries?

23  A.  That's my recall.  There may have been some noise around

24  the fourth or fifth aircraft in terms of another lessor

25  delivering it, but I do recall that they were -- those aircraft

O4GBFRO2                          Dempsey – Cross

were delivering in a very close proximity.  And so they were

either the next five or the next three plus very soon

thereafter an additional two.

Q.  So would you agree with me that in these early days of the

pandemic, AMCK was in a unique position among Frontier's

lessors, in that it had just delivered an aircraft in March,

and it was expected to finance the deliveries of the next five

aircraft to Frontier?

A.  Yes.  We were conscious of that, hence we were working with

AMCK to defer those aircraft deliveries with Airbus.

Q.  Let me show you what's been marked as Joint Trial Exhibit

47.  This is a March 25, email from Qingqing Miao of Lane

Powell attaching a draft rent deferral agreement.

        Do you know who Qingqing Miao was?

A.  She works in Lane Powell.

Q.  Was Lane Powell representing Frontier in this negotiation?

A.  Yes.

Q.  Did you review around the draft agreement that's attached

to this email around the time it was sent to AMCK?

A.  I didn't.

Q.  Let's look at the first page of that agreement.  I think

it's the next page.  And I want to focus your attention on the

first recital of this agreement.

        Do you see that -- well, it looks like this draft

applies to only one of the aircraft leased to Frontier.  Do you

O4GBFRO2                      Dempsey - Cross

1  agree with that?

2  A.  I would have to read it.  But, I mean, I assume you're

3  right.  I have not read this document.  Do you want me to read

4  it now?

5  Q.  Do you see in the recital --

6  A.  Help me where you are on the lease.

7  Q.  Certainly, sir.  I'm pointing you to the first recital, and

8  do you see that there's a reference to the aircraft described

9  on schedule one?

10 A.  Yes.

11 Q.  Let's go to schedule one of the agreement.

12        And do you see on schedule one there is a description

13 of aircraft, and it says one Airbus model three, A320?

14 A.  Yes.

15 Q.  Do you interpret that language in this schedule to mean

16 that this draft agreement applies to only one of the aircraft

17 leased to Frontier?

18 A.  I think that's correct, yes.

19 Q.  Going back to page one of the agreement.  I'd like to focus

20 your attention on the bottom of page one and carrying over to

21 page two.  So maybe we can put them up together.  It looks like

22 section two at the very bottom there refers to the deferred

23 lease of payments, and it looks like this drafts contemplates

24 the deferral of rent in April, May and June of 2020.

25        And then if you look below it talks about repayment

O4GBFRO2                        Dempsey - Cross

1   over the next nine months at an interest rate of three percent.

2   Do you see those terms?

3   A.  Yes.

4   Q.  Is this draft agreement consistent with the rent deferral

5   request that Frontier made on March 16, 2020?

6   A.  It does look consistent with it.

7   Q.  Would you agree that the fact that this draft agreement was

8   sent over is also consistent with your expectation that a

9   written agreement would be signed?

10  A.  It was always our expectation that eventually a written

11  agreement would be signed.

12  Q.  Let me show you Joint Trial Exhibit 53.  This is another

13  email from Qingqing Miao. This one dated April 1.  It looks

14  like here she's circulating another draft deferral agreement.

15  Do you see that?

16  A.  Yes.

17  Q.  And do you have an understanding that the first draft

18  agreement that covered one aircraft was revised to be two

19  omnibus agreements covering multiple aircraft leased to

20  Frontier from AMCK?

21  A.  I'm not aware of that.  I wasn't involved in these

22  discussions at this time.

23  Q.  So you don't recall a second draft agreement being sent

24  over that revised the original from one aircraft to 14

25  aircraft?

O4GBFRO2                    Dempsey - Cross

1  A.  I don't recall.

2  Q.  Let me show you Joint Trial Exhibit 58, and we're up now to

3  April 3, 2020, and some of your negotiations with Paul

4  Sheridan.

5        This is an email sent to you by Mr. Sheridan, and you

6  talked about this earlier.  You received this email, correct?

7  A.  I did, yeah.

8  Q.  The first line of this email says "We have discussed the

9  upcoming five, A320neo deliveries further with our shareholder

10  overnight."  Who was AMCK's shareholder?

11  A.  CK Assets.

12  Q.  Did you understand that AMCK's shareholder CK Asset

13  Holdings was involved in the decision making about Frontier's

14  rent deferral request?

15  A.  I assumed that the decision will be made at AMCK, and as

16  part of that decision, they may have to consult with their

17  shareholder, but I don't know their governing structure.

18  Q.  Isn't Mr. Sheridan communicating to you in this email that

19  the shareholder is involved?

20  A.  He's communicating that he has discussed it with his

21  shareholder.  He didn't say he needed to get approval from his

22  shareholder.

23  Q.  I understand he didn't say anything about approval, but was

24  your understanding at this time that AMCK's shareholder CK was

25  involved in some fashion in the discussions?

O4GBFRO2                         Dempsey - Cross

1    A.  Yes.

2    Q.  Did Mr. Sheridan in fact tell you at various points in time

3    that he was discussing these proposals with his shareholder?

4    A.  He did, yes.

5    Q.  And where is AMCK's shareholder located?

6    A.  I think Hong Kong.

7    Q.  And Mr. Sheridan was based in Dublin Ireland, correct?

8    A.  That's correct.

9    Q.  Do you know what the time difference is between Dublin and

10   Hong Kong?

11   A.  Now you're asking me a question I don't know, maybe eight

12   hours, seven hours, something like that.

13   Q.  I'm told it's sevens hours sometimes of the year and eight

14   hours at other times of the year.  Does that sound roughly

15   correct to you?

16   A.  I don't know.  All I know is that it's seven-hour time

17   difference from Denver to Ireland, and I know that it's about

18   11 hours from Denver to Hong Kong.  I don't think those times

19   work in terms of what you're saying.  Maybe it's 13 hours to

20   Denver, so six, seven hours to Hong Kong from Dublin, but I

21   don't know.

22   Q.  Did you understand at this time that because of the time

23   difference between Dublin and Hong Kong, it sometimes took

24   Mr. Sheridan sometime to communicate with his shareholder?

25   A.  I wasn't focused on it.

O4GBFRO2                          Dempsey - Cross

1    Q.  And this email from April 3, I think we discussed it at

2    length in this case.  Mr. Sheridan offers to agree to some of

3    the terms of rent deferral that you requested, but strictly on

4    the basis that the sale leaseback arrangement is suspended for

5    six months.  Was that your understanding of AMCK's position at

6    this time?

7    A.  Yes.

8    Q.  And at the bottom of this email it's been discussed again

9    at length in this cases, there's some avoidance of doubt

10   language.

11          Did you understand this to mean that Mr. Sheridan did

12   not intend this offer to be binding in any way on AMCK?

13   A.  I mean, I said it earlier, this is typical boilerplate

14   language that you see from time to time in proposals that are

15   made.

16   Q.  My question, sir, is did you understand that language,

17   whether it's boilerplate or not, to mean that Mr. Sheridan did

18   not intend to be bound in this email?

19   A.  I understood that this was a proposal.

20   Q.  And did you understand that it was a proposal that was not

21   binding on AMCK?

22   A.  Well, that's what a proposal is.  I understood it was a

23   proposal, yes.

24   Q.  Is it your view that a proposal means that it's something

25   that is not binding?

O4GBFRO2                    Dempsey – Cross

1   A.  In this case I understood that it was a proposal that was

2   not binding if that helps you.

3   Q.  Did you understand the fact that Mr. Sheridan included this

4   language in his email to you, did you understand that

5   Mr. Sheridan was being cautious at this time about having his

6   communications construed as binding commitments?

7   A.  I did not focus on his language at the bottom of his email.

8   Q.  Let me show you Joint Trial Exhibit 61, which appears to be

9   your response to Mr. Sheridan on April 6; is that correct?

10  A.  Yes.

11  Q.  And you're rejecting Mr. Sheridan's proposal and asking him

12  to reconsider; is that right?

13  A.  Yes, we are negotiating.

14  Q.  You say in the second line of this email "I can only deduce

15  that you will finance the aircraft deliveries and honor your

16  commitment to Frontier if we do not put a rent deferral in

17  place."  Did I read that correctly?

18  A.  Yes.

19  Q.  What did you mean by that?

20  A.  Exactly what I said.  I can only deduce that you will

21  finance the aircraft deliveries and honor your commitment to

22  Frontier if we do not put a rent deferral in place.

23  Q.  Was Frontier considering dropping its request for rent

24  deferral from AMCK?

25  A.  We were negotiating with AMCK at this time, and so those

O4GBFRO2                          Dempsey – Cross

negotiations were ongoing.  AMCK was asking for a significant

concession from Frontier, which we had to then ask for

significant concession from Airbus.  And so we were trying

to -- in the interest of the relationship we had with AMCK, we

were trying to accommodate their request as best we could.  And

in return for that, we were looking for a rent deferral.  There

was concessions on both sides that we were seeking, that they

were seeking from us, and we were seeking from them, and this

was part of that negotiation.

Q.  Was one option for Frontier to drop its request for rent

deferral altogether?

A.  That was always an option.

Q.  Were you considering that option at this time?

A.  At this time I don't believe so.

Q.  Around this time, around April 6, did Frontier reach out to

alternative leasing companies because Frontier doubted that

AMCK would finance the upcoming deliveries?

A.  Actually, we reached out to other lessors because AMCK told

us that they would like to have a deferral in time.  In this

case if you look at the earlier email six months, so it's

incumbent on us to source an alternative lessor if they did not

show for the aircraft because we had an obligation with Airbus

to turn up for the aircraft delivery, for an aircraft that was

very close to completion.

         And so the way this works is, once the aircraft is in

O4GBFRO2                          Dempsey – Cross

delivery condition, it's tendered for deliver by Airbus, and so

this was happening at this time.  So we were trying to

ascertain from AMCK if they were going to finance that next

delivery, and that was part of the discussions that we were

having.

Q.  And was that because you had concern at this time that AMCK

would not finance the next delivery?

A.  Well, they had asked us to put a six-month deferral in

aircraft delivery in place.  So, yes, I did have concern.

Q.  Were you concerned by April 6, that AMCK might terminate

the Framework Agreement?

A.  No.  The discussions that were going on at this time were

linked to them looking for relief from aircraft deliveries and

us trying to find a path to achieve that relief.  It was not in

my mind that they would terminate the agreement.

Q.  So you had concern that they might not finance the next

delivery, but not that they would terminate the Framework

Agreement; is that your testimony?

A.  I was endeavoring to achieve a deferral in aircraft

deliveries so that AMCK could get relief from delivering

aircraft in the near-term.

        I understood at that time the challenges that existed

in the marketplace given the pandemic was in full force at this

point.

Q.  Did you understand at this time that if Frontier paid all

O4GBFRO2                        Dempsey - Cross

1   of its rent on time, that AMCK would have no choice under the

2   Framework Agreement but to finance the upcoming deliveries?

3   A.  Yes, but they had always -- they had a choice.  They could

4   default on that agreement as well, but that was not in

5   discussion at this time.

6   Q.  Did Frontier have the practical ability to pay rent to AMCK

7   in the month of April?

8   A.  Yes, we did.

9   Q.  So if you were concerned about AMCK financing the upcoming

10  delivery under the Framework Agreement, why didn't Frontier

11  just honor its commitment under the lease agreements and pay

12  the rent that was due?

13  A.  We were in a discussion with AMCK at the time where AMCK

14  was looking for a concession of us to defer aircraft

15  deliveries, and we were looking for a concession of them to

16  defer rent.  That was the discussion.

17  Q.  Wouldn't you agree with me, sir, that Frontier could have

18  taken the approach of simply paying the rent and forcing AMCK

19  to perform under the Framework Agreement?

20  A.  We could have done that, but we were operating on the basis

21  that they were looking for relief from that, and we were

22  looking for relief from rent.  So there was symmetry in terms

23  of the concessions that we're trying to achieve between the two

24  parties.

25  Q.  You emphasize in your testimony that the Framework

O4GBFRO2                    Dempsey - Cross

1    Agreement was a binding commitment by AMCK?

2    A.  Yes.

3    Q.  Do you recall that?

4    A.  Yes.

5    Q.  Were the lease agreements for the 14 aircraft also binding

6    commitments?

7    A.  Yes.

8    Q.  And by asking for rent deferral, Frontier was asking for

9    concessions under those lease agreements, correct?

10   A.  That's correct.

11   Q.  And in reaction to that request, AMCK was asking Frontier

12   for concessions under the Framework Agreement, right?

13   A.  That's correct.

14   Q.  Was there anything wrong with AMCK asking for concessions

15   under the Framework Agreement?

16   A.  No, we were negotiating.

17   Q.  Let me show you Joint Trial Exhibit 62.  This is on the

18   same day, April 6, and it appears to be sometime after your

19   email to Mr. Sheridan rejecting his proposal, and you ask for a

20   call ASAP.  Do you see that?

21   A.  Yes.

22   Q.  And it looks like Frontier had two payments due on April 6;

23   is that right?

24   A.  Yes.

25   Q.  Would you agree that there was some urgency to your request

O4GBFRO2                    Dempsey – Cross

1  for a call?

2  A.  Yes.

3  Q.  Without a deferral of some kind, Frontier could have been

4  in default after April 6; is that right?

5  A.  Yes.

6  Q.  Let me show you Joint Trial Exhibit 63, and this is

7  Mr. Sheridan's email to you a little bit later in the day

8  telling you about the ten business day deferral or the ten

9  working day deferral.  Do you recall receiving that?

10  A.  Yes, I do.

11  Q.  And did you understand this agreement or waiver to mean

12  that Frontier didn't have to make any payments for at least the

13  ten business days through the 21st of April 2020?

14  A.  Yes, I understood that.  And I followed up with Paul

15  following this to have a conversation with him because ten

16  working days would not suffice to do the task that we had,

17  which is we needed time to get an arrangement in place with

18  Airbus to defer aircraft, and then time to negotiate between

19  AMCK and Frontier.

20  Q.  Focusing on this email, would you agree there's no

21  ambiguity here, ten working days, no more, no less?

22  A.  I agree.

23  Q.  Let's talk about the April 7, call that you had with

24  Mr. Sheridan.  On that call you say Mr. Sheridan agreed to a

25  month-to-month rent deferral; is that right?

O4GBFRO2                          Dempsey - Cross

1    A.  Yes.

2    Q.  Who suggested the idea of month-to-month, was that you or

3    Mr. Sheridan?

4    A.  I think it was me.  It was linking it to aircraft

5    deliveries.  His sensitivity was that we would be -- we'd have

6    no outstanding payments on rent at the point of the next

7    aircraft delivery.  And so we were attempting to move those

8    aircraft from May into June into July and beyond at their

9    request.

10           And so the nature of the waiver that was put in place

11   was to facilitate that move in aircraft that was happening in

12   real-time as negotiations proceeded with Airbus.  And so what

13   the April 7th call was effectively an extension of this email

14   where we needed time or space to get an agreement with Airbus

15   and actually have a discussion with AMCK around an agreement

16   with them, formal agreement with them on rent deferral.  It in

17   effect gave us a window to the next aircraft delivery, a waiver

18   to the next aircraft delivery.

19   Q.  Mr. Dempsey, my question was very simple, who suggested the

20   idea of month-to-month, was that you or Mr. Sheridan?

21   A.  I think it was me.

22   Q.  What were the exact words used by Mr. Sheridan when he

23   supposedly agreed to a month-to-month deferral?

24   A.  His sensitivity was that we would be fully paid and current

25   on rent at the delivery of the next aircraft.

O4GBFRO2                    Dempsey – Cross

1  Q.  Were those his exact words, sir?

2  A.  He said that consistently to me, including on that call.

3  Q.  Do you recall that you said something different at your

4  deposition in this case in April of 2022?

5  A.  I don't recall what I said in my deposition.

6  Q.  Let me show you page 76 of your deposition.  First, you do

7  recall your deposition, sir?

8  A.  Say that again.

9  Q.  You do recall your deposition, correct?

10 A.  Yes.

11 Q.  And you recall that you were under oath during that

12 deposition?

13 A.  Yes.

14 Q.  Page 76, line 10, I asked you, Do you remember what

15 Mr. Sheridan said about the month-to-month deferral idea?

16         You answered, Yes.  He said that he would agree to a

17 month-to-month rent deferral.

18         Then I asked, Were those his exact words?  What was

19 your answer?

20 A.  I don't recall his exact words, but that was the essence of

21 what he said.

22 Q.  Now, I want to try to understand what you understood

23 month-to-month to mean in the context of that call.  You

24 testified yesterday that Mr. Sheridan agreed to deferral to the

25 earlier of July or the next aircraft delivery.  Do you recall

O4GBFRO2                          Dempsey – Cross

1   that?

2   A.  Yes, but the primary date that we were looking at in the

3   waiver was the next aircraft delivery.  That was the nearest

4   date that we were looking at.

5   Q.  And then you said, and I'll point you to page 534 of the

6   transcript from yesterday, line 18.  You said "My clear

7   understanding coming out of this call was that we had a

8   deferral in place, and that the earliest date that we had to

9   pay the rent was at the point of the next aircraft delivery.

10  That was my clear understanding at that time."

11          Do you recall that testimony from yesterday?

12  A.  Yes.

13  Q.  And then Mr. Hosenpud asked you, we're going to page 538,

14  line 22.  He asked at the bottom of the page.  Question, so I

15  may have confused you and the Court by asking about the

16  month-to-month.  What was a trigger for payment on the

17  month-to-month rent deferral that was being sought by AMCK?

18  What was one trigger?

19          And your answer is on the next page at the top, and

20  you said, The next aircraft delivery.  The earliest that we

21  would owe rent on the month-to-month basis was at the point of

22  the next aircraft delivery." Do you recall that testimony, sir?

23  A.  Yes.

24  Q.  So your understanding of the month-to-month that was

25  discussed on the April 7th call was a deferral of rent under

O4GBFRO2                      Dempsey – Cross

1    the 14 lease agreements until the next aircraft delivery from

2    Airbus; is that right?

3    A.  The next aircraft delivery with AMCK from Airbus.

4    Q.  At this point did you know when that would be?

5    A.  On April 7th, yes.  We knew that it would be sometime in

6    May, likely the second half of May.

7    Q.  Were you still negotiating with Airbus as of April 7th?

8    A.  Yes, we were.

9    Q.  So was the next delivery date still up in the air?

10   A.  No.  The earliest that the aircraft could deliver given the

11   closure of the Mobile plant was in May because the aircraft had

12   to go through its variety of inspections in order to achieve

13   delivery of the aircraft, and they would happen after the plant

14   in Mobile opened on April 29.

15   Q.  I'm asking you, sir, about the actual delivery date.  Was

16   the actual delivery date still to be determined by your

17   negotiations with Airbus?

18   A.  Yes, but the earliest that the aircraft could deliver was

19   in May, and I informed Paul Sheridan of that and he understood.

20   Q.  Maybe I should go back to your understanding because there

21   sounds like there might be a nuance to it.

22          Was your agreement -- was your understanding of the

23   month-to-month that it was tied to the earliest delivery date

24   as of April 7th?

25   A.  It was tied to the next aircraft delivery which was now in

O4GBFRO2                          Dempsey - Cross

1    May.

2    Q.  It was then in May, but it changed, right?

3    A.  Around April 11, I had following series of calls with

4    Airbus.  They had agreed to move aircraft, that aircraft from

5    May to June, and other aircraft from June to July.  And I

6    informed Paul Sheridan of that at that time immediately upon

7    receiving that news from Airbus.

8    Q.  Did you know as of that call that that would be the actual

9    delivery date?

10   A.  Paul was asking me to push them to move the aircraft as

11   long as possible, and I was continuing to negotiate with Airbus

12   to see if we could move that aircraft later than June.  And I

13   recall around April 29, April 30, that I got confirmation of

14   Airbus that they maybe able to move it to July.

15   Q.  So it sounds like you would agree that the next aircraft

16   delivery date was yet to be determined; is that right?

17   A.  The earliest that the aircraft could deliver was in May

18   given the inspected that needed to occur on that aircraft in

19   order to ensure it was airworthy.  The various test flights

20   that have to occur on that aircraft, including Airbus and their

21   pilots flying the aircraft to confirm it's airworthy, and our

22   pilots flying the aircraft to ensure that it's airworthy.  And

23   to rectify any issues that exist in the inspection of the

24   aircraft, and that takes time.

25            And so with the Mobile plant opening on April 29th,

O4GBFRO2                         Dempsey - Cross

1    the aircraft was slated to deliver at the earliest in May,

2    likely the second half of May.

3    Q.  You keep responding about the earliest date.  I'm asking

4    you, sir, about the actual date.

5              Did you know the actual date of the next delivery from

6    Airbus as of April 7, 2020?

7    A.  This is how aircraft get delivered. You identify a month

8    that the aircraft is delivering.  Closer to that time the

9    manufacturer identifies a date, and it's all dependent on the

10   inspection of the aircraft and the aircraft can move as a

11   result of that.

12             What we were informed by Airbus at this point was that

13   the aircraft would deliver in May, and potentially -- sorry.

14   The aircraft would deliver in May, likely the second half of

15   May, and we were still negotiating with Airbus to achieve the

16   concession that AMCK was asking us to do, and those

17   negotiations were ongoing.

18   Q.  Let me try this a different way.  What was the month of the

19   actual next delivery from Airbus?

20   A.  The actual delivery date of that aircraft was July.

21   Q.  Did you know on April 7, 2020, that that aircraft would

22   deliver in July?

23   A.  No.  I was told by Airbus that that aircraft would deliver

24   in May.

25   Q.  So isn't it true, Mr. Dempsey, that as of April 7th, you

O4GBFRO2                    Dempsey – Cross

1  did not know when the next aircraft would be delivered by

2  Airbus?

3  A.  I was informed by Airbus that that aircraft would deliver

4  at the earliest in May, likely the second half of May.

5  Q.  But your understanding of the month-to-month was that it

6  would extend until the actual delivery of the first aircraft,

7  correct?

8  A.  Yes, it was fluid based on the date that the actual

9  delivery of the -- when the actual aircraft -- the delivery of

10  the aircraft would occur.

11  Q.  It was fluid, so the period of time was uncertain; is that

12  right?

13  A.  Yes.

14  Q.  Do you recall that you took a different position on that at

15  your deposition in April of 2022?

16  A.  You can show me the deposition of April.

17  Q.  Certainly.  Let's look at page 77 of your deposition.  I'll

18  direct your attention to line 15.

19        I asked you, So was it your understanding that this

20  was an indefinite deferral of rent under your agreement with

21  AMCK.  What was your response?

22  A.  No, it was a fluid situation, but clearly at this point it

23  was for the month of April.

24  Q.  And when you used the word "fluid" here, did you mean that

25  the timing of the next delivery was uncertain?

O4GBFRO2                          Dempsey - Cross

1    A.   Yes.

2    Q.   But you said at your deposition that the agreement with

3    Mr. Sheridan was for the month of April, correct?

4    A.   The aircraft, the timing of the aircraft delivery was

5    fluid, and the repayment of the deferral or the waiver was tied

6    to the aircraft -- the next aircraft delivery.  That was at

7    this point by April 7th in May.

8    Q.   Mr. Dempsey, did you testify at your deposition that at

9    this point it was for the month of April?

10   A.   April ran towards the outstanding item at that time.

11   Q.   Let me direct your attention to page 79 of your deposition,

12   line 10.  I asked you, When you use the term "month-to-month,"

13   does that mean that basically you're agreeing one month at a

14   time.  So first let's agree to the end of April, then later

15   we'll agree to the end of May if it's necessary?  What was your

16   answer?

17   A.   Correct.

18   Q.   So at your deposition you told me that the month-to-month

19   arrangements would begin with an agreement on rent deferral for

20   the month of April; isn't that true?

21   A.   The waiver that was put in place on April 7th contemplated

22   a repayment of that rent outstanding at the next aircraft

23   delivery.  And so if the aircraft delivery went from the end of

24   April through to the end of May, from the end of May through to

25   the end of June, the waiver would move with that.  That was why

O4GBFRO2                         Dempsey - Cross

it was termed a month-to-month because it was linked to the

aircraft delivery, the repayment of that rent deferral was

linked to the aircraft delivery.

Q.  Mr. Dempsey, didn't you tell me at your deposition that the

month-to-month arrangement would begin with an agreement for

the month of April?

A.  The rent was outstanding for the month of April, that's

what we were talking about at the time.  But the way the waiver

worked, as the aircraft -- it was based on when the aircraft

would deliver.  And the aircraft was rolling because it was a

fluid discussion with Airbus.  That aircraft at the point when

I put an agreement in place with Paul Sheridan was now in May,

and so the aircraft would need to move out of May to June, and

that month-to-month deferral waiver would move with that

aircraft.

        AMCK was getting a concession of Frontier that they

didn't have to finance that AMCK, and we were getting a

reciprocal concession of AMCK that we didn't have to pay rent

until the delivery of that aircraft, and that's when the waiver

would end.

Q.  Mr. Dempsey, did you say any of that at your deposition

when you answered my question about whether the first agreement

was to the end of April?

A.  I answered your question because you caveated with, If it's

necessary, and I answered it correct.

O4GBFRO2                        Dempsey – Cross

1              MR. HOSENPUD:  Your Honor, sorry to interrupt,

2      counsel.  May the testimony following that testimony

3      highlighted by counsel be read from the point of line 16 on 79

4      to the point of page 79 to page 80, line 6.  So line 16 on 79

5      through page 80, line 6.

6              THE COURT:  Sure.

7              MR. BUTLER:  We'd be happy to display it if

8      Mr. Hosenpud would like to read it.

9              MR. HOSENPUD:  Yes.

10     "Q.  And what is the -- so if that's the deferral that you

11     talked about with Mr. Sheridan, what did you discuss about

12     repayment?

13     "A.  We said that we would solve that in the overall deal we

14     were putting together.

15     "Q.  Did you discuss during your call on April 7, the repayment

16     period for the rent deferred for the month of April?

17     "A.  I don't recall it being as granular as discussing exactly

18     when we would repay it and what AMCK at the time were proposing

19     to us or developed into and around that time was -- and we had

20     to be current on all our rent in order to deliver the

21     aircraft."

22     BY MR. BUTLER:

23     Q.  Mr. Dempsey, did your understanding of the month-to-month

24     arrangement change between the time of your deposition in April

25     2022 and today?

O4GBFRO2                         Dempsey – Cross

1   A.   No.

2   Q.   Do you recall that you took a slightly different position

3   on what month-to-month means in the declaration that you signed

4   in connection with summary judgment in this case?

5   A.   I don't recall.

6   Q.   Well, let me show you your declaration from this case.

7   It's dated December 9, 2022, and I want to direct your

8   attention to paragraph 15 of that declaration.

9        And you say beginning in the third line "My

10  understanding was that this month-to-month agreement would last

11  until all negotiations were complete.  And that during that

12  time, Frontier did not need to make monthly rent payments on

13  the original leases."  Did I read that correctly?

14  A.   Yes.

15  Q.   Would you agree that this understanding of the

16  month-to-month is different from the understanding you're

17  expressing today that it would last until the next aircraft

18  delivery whenever that might be?

19  A.   If you read the second sentence it says, Even on this April

20  7th call, we both expected this month-to-month arrangement to

21  extend into May 2020, because it would take a long time to work

22  out a delivery deferral with Airbus, and it was already

23  apparent that the next aircraft under the Framework Agreement

24  would not be delivered until May 2020 at the earliest.

25       So, yes, that's my understanding.  That's what I've

O4GBFRO2                    Dempsey - Cross

1    testified to.

2    Q.  In this declaration you testified that the month-to-month

3    would last until all negotiations were complete, correct?

4    A.  Yes, and that we would need to -- the earliest we would

5    make a repayment was at the next aircraft delivery.

6    Q.  But was the month-to-month an agreement to defer rent until

7    all negotiations with Airbus and AMCK were complete?

8            THE COURT:  Would delivery be made if all arrangements

9    had not yet been agreed on?

10           THE WITNESS:  Potentially, but it would have been --

11   it would have occurred if all negotiations had been complete,

12   yes.

13           THE COURT:  That would be before the delivery in the

14   completion of negotiation?

15           THE WITNESS:  We were endeavoring to complete a

16   negotiation as soon as possible.  We were continuing to

17   negotiate in May with Airbus and with AMCK on this agreement.

18   So, yes, my understanding and clear understanding at the time

19   was that we had a waiver that was in place until the aircraft

20   delivered.  And at the point of the delivery of an aircraft, if

21   we didn't reach an agreement with AMCK on -- if we didn't reach

22   an agreement to defer aircraft with Airbus and we didn't reach

23   an agreement with AMCK, that we would have to --

24           THE COURT:  My question is very simple.  When you said

25   all negotiations would be complete, was it not your concept

O4GBFRO2                          Dempsey - Cross

1    that that would occur before the delivery of the plane?

2              THE WITNESS:  Yes, that would occur before the

3    delivery of the plane.

4              THE COURT:  Sounds to me like common sense.

5              THE WITNESS:  Yes, that's correct.

6    BY MR. BUTLER:

7    Q.  Was it possible, Mr. Dempsey, that the next delivery from

8    Airbus could occur without any agreement with AMCK?

9    A.  The waiver that was put in place basically gave a space to

10   get an agreement in place with Airbus to defer aircraft.  If

11   that agreement failed and the aircraft was due to deliver in

12   May, like Airbus had indicated to us, then we would have had to

13   repay the rent at that aircraft delivery, the rent that was

14   deferred in the waiver period.

15   Q.  My question, sir, is suppose that you had never been able

16   to reach agreement with AMCK and the next delivery arose, what

17   would be the end date of the deferral in that scenario?

18   A.  At the point of delivery of the next aircraft.

19   Q.  Regardless of whether negotiations were complete, correct?

20   A.  That's correct.

21   Q.  Setting aside the time period for the deferral which is

22   what we've been talking about, did you discuss with

23   Mr. Sheridan on that April 7th, call the repayment period for

24   deferred rent?

25   A.  We discuss that he wanted us to be current on rent, on all

O4GBFRO2                        Dempsey – Cross

1    outstanding rent at the point of the next aircraft delivery.

2    Q.  Let me show you page 79 from your deposition beginning at

3    line 22.  I asked you, Did you discuss during your call on

4    April 7th, the repayment period for the rent deferred for the

5    month of April?

6         And your answer was -- goes onto the next page.  You

7    said, "I don't recall it being as granular as discussing

8    exactly when we would repay it, and what AMCK at the time was

9    proposing to us or developed into around that time was a -- and

10   we had to be current on all our rent in order to deliver the

11   aircraft."  Did I read that answer correctly?

12   A.  Yes.

13   Q.  So which was it, was it not as granular as that, or did you

14   have a discussion of the repayment period?

15   A.  So the waiver was put in place in order to give us time to

16   negotiate an agreement with Airbus, but also with AMCK.  And

17   that agreement with AMCK would have governed the repayment of

18   rent.

19        The overriding condition in the waiver was if we

20   didn't get to an agreement on the repayment of rent in that

21   negotiation, that we would have to be current in all our rent

22   in order to deliver the aircraft, and that is what I'm saying

23   there.

24   Q.  Was there any discussion on your call with Mr. Sheridan

25   about the interest rate Frontier would pay on deferred rent?

O4GBFRO2                          Dempsey - Cross

1    A.  I don't recall a discussion on it at that time.

2    Q.  Did you expect to pay interest on deferred rent?

3    A.  Yes, we did.

4    Q.  And did you have any interest rate in mind at that time?

5    A.  That was for negotiation.  We were flexible.

6    Q.  When Frontier actually did pay the rent for the month of

7    April, which I believe you said was the middle of May 2020, did

8    Frontier pay any interest on that amount?

9    A.  We did not.  We paid the rent that was due.

10   Q.  Did you expect the month-to-month arrangement that you

11   discussed with Mr. Sheridan to be documented in a written

12   agreement?

13   A.  I had a verbal agreement with Mr. Sheridan on the call on

14   April 7th, so I didn't expect that aspect of it to be

15   documented.

16          I did expect the written agreement that we were

17   negotiating as part of the framework around the waiver that we

18   were negotiating with Airbus and AMCK, I did expect that to be

19   documented.

20   Q.  Well, the supposed verbal agreement that you had with

21   Mr. Sheridan, why didn't you expect to document that in writing

22   in some form?

23   A.  Well, I was talking to the chief executive of AMCK.

24   Q.  What difference does that make?

25   A.  He's an officer of AMCK, and so he had given us a verbal

O4GBFRO2                          Dempsey - Cross

agreement to have a waiver at that time.

Q.  When you agreed on other rent deferral agreements with

other lessors, weren't you also dealing with senior executives

of those companies?

A.  Yes.

Q.  And yet your practice was to document those agreements in

writing, correct?

A.  Well, I testified earlier that we didn't in all occasions

that, one, discussion with another similar leasing company, we

had a verbal agreement in that case as well.

Q.  After your April 7th call with Mr. Sheridan, did you send

an email or any other kind of communication to confirm what you

had discussed?

A.  I did not.

Q.  And why didn't you send any email to confirm the terms of

your supposed verbal agreement?

A.  I have known Paul for sometime, and I trusted that his word

was good.  He was the chief executive of AMCK.

Q.  Was it because you expected this verbal discussion to be

documented in a written agreement to be negotiated?

A.  It didn't need to be documented in a written agreement.  It

was an agreement between two principals that were parties to

it.  I certainly expected the formal agreement that we were

negotiating with Airbus and also the formal agreement that we

would have negotiated with AMCK on the back of Airbus, that

O4GBFRO2                        Dempsey – Cross

1   those two documents were negotiated and documented.

2   Q.  And I guess you would agree that AMCK and Frontier never

3   did enter a written agreement on this month-to-month

4   arrangement, correct?

5   A.  We were continuing to negotiate in early May.

6   Q.  My question, sir, is, was there ever a written agreement

7   reflecting the month-to-month arrangement?

8   A.  No, we were continuing to negotiate in May.

9   Q.  All right.  I'd like to move onto events immediately after

10  this April 7th call.  And on the Frontier side of things,

11  there's an exchange of text messages that is relevant, so I'm

12  going to show you Joint Trial Exhibit 73.  And we'll put these

13  up side by side because we have them produced in this manner

14  with all of your text on one page and all Mr. Fanning's on

15  another page.

16          Do you recognize this to be a text exchange that you

17  had with Mr. Fanning after your discussion with Mr. Sheridan?

18  A.  Yes.

19  Q.  And you say in your message that you just spoke to Paul

20  Sheridan and he has agreed to do the deferral on a

21  month-to-month basis, correct?

22  A.  That's correct.

23  Q.  And Mr. Fanning responds, "Okay.  Good.  Anything mentioned

24  on the repayment period?  And are they going to send our

25  revised agreement over?"

O4GBFRO2                      Dempsey – Cross

1    Did you understand Mr. Fanning to be asking about your

2    call with Mr. Sheridan?

3    A.  Yes.

4    Q.  Do you know what Mr. Fanning was referring to by, "Our

5    revised agreement?"

6    A.  I think he would have been referring to the rent deferral

7    agreement that was drafted by Lane Powell.

8    Q.  And we saw earlier that there was a revised agreement from

9    Lane Powell sent over on April 1, 2020, correct?

10   A.  I think that's correct, yes.

11   Q.  And you respond to Mr. Fanning, "No, but we should stick to

12   nine months from July 1.  Let's get a draft to him." Did I read

13   that correctly?

14   A.  Yes.

15   Q.  And I believe you testified yesterday that this response

16   had nothing to do with the month-to-month arrangements

17   discussed with Mr. Sheridan.  Is that still your testimony

18   today?

19   A.  My understanding of this text is that it is linked to the

20   agreement with AMCK on the deferral of rent; that the

21   month-to-month waiver allowed this to happen.  So we're capable

22   of getting time to negotiate with Airbus, and also time with

23   AMCK.  And so the formal revised agreement I was referring to

24   was linked to –– I assume was linked to that formal agreement

25   that we were talking about.

O4GBFRO2                          Dempsey - Cross

Q.  Mr. Dempsey, please focus on my question.  Is it still your

testimony that this text response to Mr. Fanning had nothing to

do with the month-to-month arrangement?

A.  Well, the month-to-month arrangement was a framework that

enabled negotiations to occur with Airbus and with AMCK.  And

when we're talking about a draft agreement with AMCK, it's part

of that framework where we would actually negotiate a payment

period with AMCK.

Q.  Do you recall at your deposition you indicated that this

response did relate to the month-to-month arrangement?

A.  I don't recall.

Q.  Well, let me show you your deposition, page 83, line 13.

I said "Going back to your side of the conversation, it looks

like you write back at 11:03 a.m., No, but we should stick to

nine months from July 1.  Let's get a draft to him."

        Did I read your response correctly?

A.  Yes.

Q.  And you answered yes.  Thank you.

        And I started the next question, Does that refresh

your recollection -- and you interrupted me, and what did you

say?

A.  Sorry.  I mean, I think that answers your earlier question,

so we must not have spoken about the repayment period, and my

suggestion was nine months from July.

Q.  So in that answer you indicated that your response to

O4GBFRO2                     Dempsey - Cross

1   Mr. Fanning related to the discussion that you had with

2   Mr. Sheridan, correct?

3   A.  Yes.

4   Q.  And then I asked you at the beginning of the page, or the

5   end of the page, sorry, line 25, and then carrying over to the

6   next page:  My question, sir, is does this refresh your

7   recollection that you expected a written agreement to be

8   entered reflecting the month-to-month arrangement?

9           What was your answer?

10  A.  I suggested that we get a draft of that arrangement, yes,

11  to them.

12  Q.  So at your deposition you told me that you suggested

13  getting a draft of the month-to-month arrangement to AMCK,

14  correct?

15  A.  I agree, yes.

16  Q.  Well, did something change between your deposition and

17  today to effect your memory of what occurred on that April 7

18  call?

19  A.  No.  My recollection is we had moved on from the waiver

20  that was put in place, and we were now dealing with -- quickly

21  dealing with an Airbus request from AMCK to defer aircraft, and

22  a formal agreement with AMCK, and that's what we were working

23  on.  So that's what I had understood that that text was

24  referring to, and that's what I was referring to nine months.

25  Q.  At your deposition line nine I went onto ask you, And in

O4GBFRO2                          Dempsey – Cross

1   your response to Mr. Fanning, you also clarify that you did not

2   discuss the repayment period with Mr. Sheridan, correct?

3           What was your answer?

4   A.  That's correct.

5   Q.  And then I asked, And your direction to Mr. Fanning is that

6   you should insist, that Frontier should insist on a nine-month

7   repayment period.  Is that right?

8   A.  That's correct.

9   Q.  What was your answer?

10  A.  That was my suggestion.

11  Q.  By the way, I thought that you said that your understanding

12  of the month-to-month was that Frontier needed to be current on

13  all rent before the next delivery; is that right?

14  A.  That is correct.

15  Q.  At this point, April 7th, when was the next delivery

16  expected from Airbus?

17  A.  Towards the end of May.

18  Q.  Towards the end of May.  That's much sooner than nine

19  months from July 1, correct?

20  A.  Yes.  My recollection is that the longer-term agreement was

21  being negotiated with AMCK as part of the waiver framework that

22  was put in place.  And that's what the repayment period is

23  linked to.  And you see negotiations back and forth throughout

24  April in relation to the repayment period, which was nine

25  months, six months, four months, and a variety of different

O4GBFRO2                      Dempsey – Cross

1    negotiations between us and AMCK.  And this was an internal

2    conversation discussing what our next steps were with AMCK.

3    Q.  Well, sir, when you proposed to Mr. Fanning in this text

4    exchange that we should stick to nine months, weren't you

5    proposing a repayment period that went far beyond the next

6    expected delivery from Airbus?

7    A.  That was part of the negotiations that we were having with

8    AMCK.  In fact, I made multiple different suggestions

9    throughout April where I was paying back 50 percent of the rent

10   at the next aircraft delivery, and 75 percent of the rent on a

11   further aircraft delivery.  I made an offer to pay all

12   outstanding rent.

13          We made multiple offers and proposals to AMCK

14   throughout April, and this was just an internal dialogue linked

15   to negotiations that were ongoing.

16   Q.  Mr. Dempsey, isn't it true that as of April 7 you were

17   proposing to not repay the rent until long after the next

18   delivery from Airbus?

19   A.  In the context of the Framework Agreement, yes.  In the

20   context of the framework for the waiver agreement, yes.  We

21   were proposing at that point to repay the rent with interest

22   over nine months.

23   Q.  Going back to Mr. Fanning side of the conversation on the

24   right-hand side of this text exchange.  He says, he responds to

25   you, "They have our draft.  I'll follow-up with Jane."

O4GBFRO2                          Dempsey - Cross

1          Did you understand Mr. Fanning to be telling you that

2    AMCK already had a draft rent deferral agreement from Frontier?

3    A.   Yes.

4    Q.   And I guess, did you expect that draft to be modified to

5    reflect the month-to-month arrangement that you say

6    Mr. Sheridan agreed to?

7    A.   It could have been adopted to reflect an agreement that we

8    were putting in place, yes.

9    Q.   And you respond to him "He was going to call Jane after we

10   spoke."  Did I read that correctly?

11   A.   Yeah.

12   Q.   Do you recall Mr. Sheridan telling you that he was going to

13   speak to Jane O'Callaghan about this after his call?

14   A.   Yes.

15   Q.   Did you expect Mr. Fanning to follow-up with Jane

16   O'Callaghan about the month-to-month arrangement?

17   A.   I was expecting him to follow-up with Jane about the

18   longer-term agreement that we were trying to put in place with

19   AMCK.

20   Q.   My question, sir, is did you also expect him to follow-up

21   with Ms. O'Callaghan about the month-to-month arrangement?

22   A.   I didn't instruct him to do so, but he may have discussed

23   it with her.  That's not something I'm aware of.

24   Q.   That was going to be my next question.

25          Do you know whether Mr. Fanning did follow-up on the

O4GBFRO2                         Dempsey - Cross

1    month-to-month arrangement?

2    A.  I have no idea if he did.

3    Q.  Did you ever follow-up with Mr. Fanning on the

4    month-to-month arrangement?

5    A.  We would have spoken at that time.

6    Q.  Well, after the call, did you describe the month-to-month

7    concept to others at Frontier?

8    A.  Yes.

9    Q.  Did you discuss it with Mr. Thwaytes?

10   A.  I would have discussed it with Mr. Thwaytes, yes.

11   Q.  Did you discuss it with Mr. Fanning?

12   A.  I would have, yes.

13   Q.  Would you expect that Mr. Thwaytes and Mr. Fanning would

14   have the same understanding of month-to-month as you do?

15   A.  I would expect them to have a similar understanding.

16   Q.  Let me show you what's been marked as Joint Trial Exhibit

17   79.  This is an email from Jane O'Callaghan dated April 9th to

18   Robert Fanning, Sharath Sashikumar and Spencer Thwaytes, and it

19   attaches a draft deferral letter for one of the 14 aircraft.

20   Do you see that?

21   A.  Yes.

22   Q.  Did you receive a copy of this email and the attached

23   agreement around the time that it was sent?

24   A.  I don't recall.

25   Q.  But Mr. Fanning, Mr. Sashikumar, Mr. Thwaytes all report to

O4GBFRO2                         Dempsey - Cross

1   you directly or indirectly; is that right?

2   A.  That's correct.

3   Q.  Going to the first page of the agreement, or the letter

4   agreement, I want to direct your attention to the bottom of the

5   first page section 2.1.

6           Would you agree that this proposal from the AMCK side

7   proposes to defer only one payment of rent, the one that's due

8   in April?

9   A.  That's their proposal, yes.

10  Q.  Did anyone on your team tell you that AMCK had forwarded a

11  draft agreement proposing a rent deferral for the month of

12  April only?

13  A.  They may have discussed it with me at the time, yes.

14  Q.  Who told you about that?

15  A.  I don't recall.  I would assume it was either Robert or

16  Spencer.

17  Q.  But you do have a recollection that you received a draft

18  agreement proposing deferral for the month of April from AMCK;

19  is that right?

20  A.  I don't recall.  I assume I was made aware of it.  I didn't

21  receive it directly.

22  Q.  Well, going to the next page of this exhibit section 2.1.2

23  at the top.  Do you see that AMCK was asking for six percent

24  interest on deferred rent?

25          I'm sorry.  I said 2.1.2, but I started with 2.1.1A.

O4GBFRO2                          Dempsey – Cross

1    Do you see that AMCK was requesting six percent rent on

2    deferred interest?

3    A.   Yes.

4    Q.   And going down to 2.1.2, do you see that they were

5    proposing repayment on or before the 24th of July, 2020?

6    A.   Yes.

7    Q.   Did anyone tell you that AMCK had offered to defer the

8    April rent with a repayment period of three months and an

9    interest rate of six percent?

10   A.   I'm sure I was made aware of it at the time.

11   Q.   To your knowledge did Frontier ever respond to this

12   proposed agreement from AMCK?

13   A.   Not to my knowledge specifically on this proposed

14   agreement, but there were multiple proposals going in either

15   direction throughout the month of April that would have altered

16   some of these terms in the wider discussion around the

17   agreement on repayment and any concessions that AMCK was

18   seeking.

19          MR. BUTLER:  Your Honor, I see we're coming up to the

20   1:00 hour, and this would be a good breaking point for me if it

21   suits your Honor.

22          THE COURT:  Very good.  We'll resume at 2:15.  We're

23   in recess.

24          (Recess)

25

                          AFTERNOON SESSION

                              2:15 p.m.

             MR. BUTLER:  May I proceed, your Honor?

             THE COURT:  Yes.

BY MR. BUTLER:

Q.  Mr. Dempsey, I gather that you were negotiating with Airbus

throughout the month of April 2020 to defer deliveries under

the purchase agreement.  Is that right?

A.  That's correct.

Q.  And the final agreement that you reached with Airbus was

entered on I think you said May 5, 2020.  Is that right?

A.  Yes.

Q.  Was that Amendment No. 9 to the purchase agreement?

A.  I don't recall, but I think sequentially it makes sense.

Q.  And I think that you testified yesterday that Amendment

No. 9 was negotiated in response to AMCK's request to defer the

deliveries under the Framework Agreement, is that right?

A.  It's covered AMCK's aircraft moves and other aircraft moves

that were afoot with Airbus given their change in production

capacity across the world.  So they reduced their production

capacity by 40 percent in response to the COVID pandemic, and

so, that had to be reflected in delivery schedules in our

contract.

Q.  So some of the changes in that amendment arose from the

deferrals requested by AMCK, and some of them resulted from

1   issues at Airbus.  Is that right?

2   A.  That's correct.

3   Q.  Did Frontier have any other reason for negotiating those

4   deferrals from Airbus?

5   A.  We were at the time trying to make sure that the growth

6   profile of the airline as we emerge from the pandemic was sort

7   of a clean growth percentage trajectory.  And that's driven by

8   the aircraft deliveries.  And so what we were attempting to do

9   is take aircraft that were being moved for AMCK and for other

10  reasons, and smooth out that growth profile so you had a

11  consistent growth profile in the airline over the next couple

12  of years.

13  Q.  So were some of the deferrals negotiated with Airbus for

14  Frontier's own business reasons?

15  A.  They were two fold.  Setting aside the AMCK aircraft that

16  were negotiated, there were aircraft that were moved either for

17  production reasons in Airbus, or for Frontier's reasons, yes.

18  Q.  So it sounds like at least some of those deferrals were for

19  Frontier's own business reasons, correct?

20  A.  Yes, yes, that's correct.

21  Q.  I want to show you what's been marked as Plaintiff's

22  Exhibit 2.  Which I believe is a text exchange with Robert

23  Fanning.  I think you've looked at before.

24          Do you recognize this as a text that you received from

25  Robert Fanning on the 25th of April, 2020?

O4G3FRO3                          Dempsey - Cross

1   A.  It was sent to my number, yes.

2   Q.  And Mr. Fanning writes, "Jimmy, finally a reply from Jane

3   this morning."

4           Then there is some text below that.  Do you understand

5   that Mr. Fanning pasted texts from a texts from Jane

6   O'Callaghan into this text to you?

7   A.  Yes, I think that's implied in his opening sentence.

8   Q.  And she says in the first sentence of her portion of the

9   text, "We struggled at our board meeting last week."  Do you

10  see that?

11  A.  Yes.

12  Q.  Were you aware that AMCK held a board meeting during the

13  week of April 20, 2020, to discuss Frontier's rent deferral

14  request?

15  A.  I don't recall at that time.  Probably not.  No.

16  Q.  Do you have any reason to doubt that AMCK had a board

17  meeting that week?

18  A.  I have no reason to doubt.

19  Q.  She goes on to describe two basic elements of what AMCK's

20  board and shareholder want.  Do you see that?

21  A.  Yes.

22  Q.  And number 1 is that all rent payments are up to date by

23  the time of the next financing.  Is that right?

24  A.  It actually says, "All to fund any new delivery unless all

25  payments are up to date."  Yes, that's consistent with what

O4G3FRO3                         Dempsey - Cross

1   they have said previously.

2   Q.  I want to ask you that.  Number 1 is consistent with what

3   you said was a consistent message from Paul Sheridan, correct?

4   A.  This conversation was between Robert and Jane.  But I had

5   heard that consistently throughout the process, that they would

6   like all outstanding rent to be paid at the next aircraft

7   delivery.

8   Q.  Element number 2 as described here is some additional quid

9   pro quo with respect to the remaining financing under the

10  Framework Agreement.  Do you see that?

11  A.  Yes.

12  Q.  Did you understand from this message that AMCK's board and

13  shareholder were asking for more than just getting rent current

14  by the time of the next aircraft delivery?

15  A.  Yes, there was an ongoing negotiation going on.

16  Q.  Let me show you Joint Trial Exhibit 111.  And I want to

17  focus on the e-mail at the middle of the page from you to

18  Mr. Sheridan, looks like it's dated April 27, 2020.

19          The first sentence you write, "I've just been briefed

20  by Robert."  Do you see that?

21  A.  Yes.

22  Q.  And pardon me.  Let me start that over.  So you say in the

23  first sentence, "I have just been briefed by Robert and I was

24  working on the assumption that we had to be current on all rent

25  for you to finance the upcoming deliveries."

1              Did I read that correctly?

2     A.  You did.

3     Q.  My question is, when you were briefed by Robert, did you

4     discuss the two elements described by Jane O'Callaghan in her

5     text message on April 25?

6     A.  I would have, yes.

7     Q.  You seem to be indicating in this e-mail that Frontier is

8     agreeable to the first of those two elements, correct?

9     A.  Well, I was working on the assumption we had to be current

10    on all the rent for you to finance the upcoming delivery, yes.

11    Q.  That's the first element from Jane O'Callaghan's text,

12    right?

13    A.  I don't see it now, but I think it's consistent with that,

14    yes.

15    Q.  Did you offer anything here to address the second element

16    in Ms. O'Callaghan's text, the additional quid pro quo?

17    A.  I did not respond to that element of it.

18    Q.  In the second line of this e-mail towards the end of the

19    sentence you write, "I put a scheme in place with Airbus that

20    would facilitate short-term deferrals of the aircraft on the

21    basis that you would honor your agreement.  Please confirm this

22    is the case as we have a lease signed for these aircraft and

23    are willing to ensure the deferred rent is paid as a CP of

24    delivery."

25              Did I read that correctly?

O4G3FRO3                          Dempsey - Cross

1    A.  You did.

2    Q.  Are you asking Mr. Sheridan here to confirm that Frontier

3    didn't not have to pay until the next delivery?

4    A.  The waiver agreement that was put in place between Paul and

5    I required that the next aircraft delivery -- sorry -- the

6    outstanding rents would be paid at the next aircraft delivery,

7    yes.

8    Q.  Well, are you saying that that had already been agreed with

9    Mr. Sheridan?

10   A.  That was agreed on the April 7 call that we've discussed.

11   Q.  What are you asking Mr. Sheridan to confirm here?

12   A.  I am actually asking him in the prior sentence will he

13   honor his agreement.  Please confirm this is the case.

14   Q.  And you are talking about the Framework Agreement there?

15   A.  No -- sorry, yes, yes.  The Framework Agreement, yes.

16   Q.  Did Mr. Sheridan provide that confirmation to you?

17   A.  He did not.

18   Q.  We can see at the top of the page Mr. Sheridan's response.

19   He refers to the board meeting last week and the need to follow

20   up, correct?

21   A.  That's correct.

22   Q.  He did not provide the confirmation you were looking for,

23   right?

24   A.  He did not.

25   Q.  I believe that you testified that you made an offer to

O4G3FRO3                         Dempsey - Cross

1     Mr. Sheridan on April 30 to pay all outstanding rent

2     immediately.  Did I hear that correctly?

3     A.  Yes.

4     Q.  And that offer was made on a phone call with Mr. Sheridan,

5     is that correct?

6     A.  I believe so, yes.

7     Q.  Was that some time in the morning, at least your time, on

8     April 30?

9     A.  I assume that it was probably earlier Denver time, yeah.

10    Q.  You didn't need an agreement from AMCK to pay outstanding

11    rent immediately, did you?

12    A.  No, we did not.

13    Q.  Frontier could have just done that unilaterally, correct?

14    A.  Yes, but we were in a negotiation with AMCK at this time

15    where we were attempting to move aircraft with Airbus, and they

16    were providing us with a waiver on rent while we did that.

17    Q.  So what agreement were you seeking on that telephone call?

18    A.  I was seeking confirmation that he would honor his

19    agreement with us, because it was unclear at that point as to

20    whether they would actually finance the upcoming aircraft

21    deliveries.

22    Q.  Let me show you what's been marked as Joint Trial

23    Exhibit 121.  And I'll focus your attention on the second page

24    of this exhibit which is an e-mail from Paul Sheridan.  He's

25    not sending this to you, though, he's sending to people at CK

1   and AMCK, correct?

2   A.  That's my understanding, yes.

3   Q.  Before this lawsuit, you never saw this e-mail, right?

4   A.  No, I did not.

5   Q.  But this does purport to describe a response from Frontier

6   from earlier that day, correct?

7   A.  Portions of it, yes.

8   Q.  Well, that was my question, sir.  Does this accurately

9   reflect the offer that you made to Mr. Sheridan on the morning

10  of April 30?

11  A.  Portions of that.  Those three points do reflect an offer I

12  made to Mr. Sheridan.

13  Q.  Which portions?

14  A.  We went through this earlier.

15       They understand they must be current on all payments

16  at and beyond closing.  They will immediately pay outstanding

17  April rents.  They will pay May, June, and July rents and all

18  beyond on time.  They can get Airbus to agree to defer the next

19  three deliveries, all AMCK's, to July 2020 as part of a much

20  bigger negotiation to defer deliveries from 2020, '21 and '22

21  and they will swap our last two deliveries in September and

22  October 2020 to February 2021 with another lessor or they will

23  get Airbus to agree to push out, not 100 percent clear.

24       So, all of those were consistent with what I had said.

25  The item that I believe was communicated by Paul which is not

1    said by me is we agreed an informal deferral pending agreement

2    with Airbus on delivery delays.  That I believe was Paul's

3    language.

4    Q.  So you didn't mention an informal deferral pending

5    agreement with Airbus in your telephone call, is that right?

6    A.  I believe he's paraphrasing the waiver agreement that was

7    in place on April 7.

8    Q.  You don't know what Mr. Sheridan was paraphrasing in this

9    e-mail, in this internal AMCK e-mail, do you?

10    A.  No.

11    Q.  Did your offer to Mr. Sheridan that morning include any

12    other elements?

13    A.  I don't recall.

14    Q.  Did your offer include any other quid pro quo for AMCK?

15    A.  I don't recall.

16    Q.  You testified earlier today that Mr. Sheridan did not

17    accept this proposal to pay all rent immediately.  Did he

18    reject that on the call itself or some time later?

19    A.  He didn't respond.

20    Q.  He didn't respond to your offer, is that correct?

21    A.  That's correct.

22    Q.  Later in the day, he sent you a counteroffer, is that

23    right?

24    A.  That's correct.

25    Q.  So let's take a look at that.  It's Joint Trial

1    Exhibit 122.

2             I think we looked at this a lot during the course of

3    the case.  Did you understand this to be a rejection of your

4    proposal?

5    A.   It was an updated proposal from Paul or AMCK to me.

6    Q.   Right.

7    A.   This is a typical back and forth you get in negotiations

8    like this.

9    Q.   This is a counterproposal.  So he's not accepting your

10   earlier proposal and he's proposing this instead, correct?

11   A.   Yeah.

12   Q.   And did Frontier agree to this proposal from AMCK?

13   A.   No, we did not.

14   Q.   To the contrary, you e-mailed Mr. Sheridan back

15   immediately -- and we can go up to the message on April 30 --

16   calling it an overreach, correct?

17   A.   Yes.

18   Q.   And then you had another telephone call with Mr. Sheridan,

19   is that right?

20   A.   Yes.

21   Q.   What do you remember about that second telephone call with

22   Mr. Sheridan?

23   A.   I recounted it earlier.  We had a phone call about --

24   particularly about -- if you scroll down, please, the

25   introduction of point two, where it was the first time that

1    they had introduced a date certain, other than the next

2    aircraft delivery, for Frontier to remain -- to get current and

3    remain current on rent payments.  And then we discussed at

4    length the point three, which was their desire for us to

5    effectively move all of the aircraft from eight year leases to

6    12 year leases, which would have been a significant obligation

7    on behalf of Frontier, and my opinion was that that was an

8    onerous ask, given the situation that we were in at that point.

9    It was an approximately $200 million of increased obligations

10   on the airline at a time when our debt capacity or our

11   borrowing capacity was very important to the airline in order

12   to manage the pandemic that was occurring.

13   Q.  So you didn't like that request, right?

14   A.  I did not.

15   Q.  Were you angry with Mr. Sheridan on this call?

16   A.  No, I actually explained to him that we couldn't do it.

17   Q.  Was it an emotional call?

18   A.  I explained to him that this was an onerous condition and

19   that we could not do it.

20   Q.  Do you recall speaking with Mr. Sheridan again after this

21   second April 30 call?

22   A.  I think on this call, I proposed an alternative quid pro

23   quo where we would prepay rent and try to create some balance

24   between prepaying rent on upcoming deliveries at the point of

25   delivering the aircraft, and the outstanding rent balances that

1    were due to AMCK under the waiver agreement.  And so, I think I

2    proposed that to him.  And he said to me that he would speak to

3    the shareholder and come back.

4    Q.  My question, sir, is did you speak to Mr. Sheridan again

5    after this call and before the termination that occurred on

6    May 8?

7    A.  I don't believe so.

8    Q.  Let me show you the termination notice that's Joint Trial

9    Exhibit 146.  This is an e-mail dated May 8, 2020, copied to

10    you and attached to it.  If we go to the second page of the

11    exhibit, Rishika.

12        Do you recognize this to be the termination notice

13    delivered by AMCK?

14    A.  Yes.

15    Q.  You testified that you were shocked when you received this

16    because I believe you said we had a waiver agreement in place.

17    Do I remember that correctly?

18    A.  Yes.

19    Q.  Is that a reference to the month-to-month arrangement

20    discussed on April 7?

21    A.  Yes.

22    Q.  After you received this notice, did you participate in

23    internal discussions at Frontier concerning how to respond?

24    A.  I would have had some discussions, yes, internally, with

25    our external counsel on what we should do next given the --

O4G3FRO3                         Dempsey - Cross

1    Q.  Mr. Dempsey, Mr. Dempsey, I don't want you to go to any

2    privileged communications so I am going to ask you yes or no.

3           Did you participate in discussions about how to

4    respond to this after the notice was received?

5    A.  Yes.

6    Q.  And did those discussions involve other people at Frontier?

7    A.  Yes, they would have.

8    Q.  Did they involve Mr. Thwaytes?

9    A.  I would assume so, yes.  I don't have a clear recollection

10   of exactly who we spoke to.

11   Q.  Did they involve Mr. Fanning?

12   A.  I assume they would have involved them plus our counsel.

13   Q.  And you indicated they did involve external counsel as

14   well.  Does that include your internal counsel Mr. Howard

15   Diamond?

16   A.  They would have included internal and external counsel,

17   yes, all those discussions.

18   Q.  This termination notice was received on a Friday, May 8, is

19   that right?

20   A.  Yes.

21   Q.  And do you recall that Frontier responded to this

22   termination the next day, Saturday, May 9?

23   A.  I don't recall exactly.

24   Q.  Let me show you what's been marked as Joint Trial

25   Exhibit 148.  And maybe we can zoom out a little bit so

O4G3FRO3                          Dempsey - Cross

1   Mr. Dempsey can see a little bit more of the letter.

2           Do you recognize this as Frontier's response to the

3   termination notice?

4   A.  I assume so.

5   Q.  This is dated May 9 which would have been a Saturday,

6   correct?

7   A.  Yes.

8   Q.  And it looks like if you go to the next page at the bottom,

9   this was -- or maybe it is the next page after that -- this

10  letter was signed by Frontier's general counsel Howard Diamond,

11  correct?

12  A.  Yes.

13  Q.  So I don't want to get into any privileged matter,

14  Mr. Dempsey, but can you tell me yes or no, did you participate

15  in the drafting of this letter?

16  A.  I did not.  Not to any great extent.

17  Q.  Let me show you your testimony from your deposition.  At

18  page 161, line 15, I asked you:

19  "Q.  So just to make sure there's no attorney-client issue, can

20  you tell me yes or no did you participate in the drafting of

21  this letter?"

22          What was your answer?

23  A.  Yes.

24  Q.  And Mr. Dempsey, did you review this letter before it was

25  sent?

1   A.  I did, yes.

2   Q.  Now, without going into the contents of any of your

3   comments, did you provide comments on the draft letter to

4   Mr. Diamond?  So that's a yes or no question.

5   A.  I don't recall.  I may well have provided comments at that

6   time, yes.

7   Q.  So let's go back and look at the letter.  I want to direct

8   your attention to I think the first page of the letter and the

9   third paragraph on the page.  In the second line of that

10  letter, Mr. Diamond states, "AMCK clearly and unequivocally

11  temporarily waived Frontier's payment obligations under our

12  existing aircraft leases pending the outcome of our active and

13  ongoing good faith negotiations over rent deferral and deferral

14  of new upcoming aircraft deliveries."

15          Did I read that sentence correctly?

16  A.  Yes.

17  Q.  And then this letter goes on to provide a chronology of

18  relevant events starting with the March 16 rent deferral

19  request in the next paragraph.  Do you see that?

20  A.  Yes.

21  Q.  At the bottom of page 1, there is a paragraph devoted to

22  Paul Sheridan's April 6 e-mail with the 10 working day grace

23  period.  Do you see that?

24  A.  Yes.

25  Q.  And the next paragraph, which is on the next page at the

O4G3FRO3                         Dempsey - Cross

1    top, it talks about subsequent discussions, and it says at the

2    end, so it's the fourth line from the bottom of this paragraph,

3    in the middle of the line, "During this time, it was made clear

4    by Mr. Sheridan's e-mails and many subsequent communications

5    between AMCK and Frontier that AMCK was not going to require

6    rent payments on the existing aircraft leases while the parties

7    worked out a global solution that addressed both the rent

8    deferral and the deferral of new upcoming aircraft deliveries."

9             Do you see that?

10   A.  Yes.

11   Q.  And then there is a paragraph describing the April 30

12   e-mail sent by Paul Sheridan.  Do you see that?

13   A.  Yes.

14   Q.  Is there any description in this letter of your April 7

15   telephone conversation with Mr. Sheridan?

16   A.  I don't see it specifically on this page that you're

17   showing me at the moment.  Although, at the end of the

18   paragraph starting with since Mr. Sheridan's April 6 e-mail, it

19   has a sentence that says, "During this time it was made clear

20   by Mr. Sheridan's e-mails and many subsequent communications

21   between AMCK and Frontier that AMCK was not going to require

22   rent payments on the existing aircraft leases while the parties

23   worked out a global solution that addressed both rent deferral

24   and the deferral of new upcoming aircraft deliveries."

25   Q.  Right, and I just read that sentence to you.  Do you agree?

1   A.  Yes.

2   Q.  And does that sentence say anything about your April 7

3   telephone call with Mr. Sheridan?

4   A.  It doesn't specifically date it.  But it does address the

5   contents of that call.

6   Q.  Is there any mention in this letter of a month-to-month

7   agreement between yourself and Mr. Sheridan?

8   A.  I do not know, I haven't read the letter in full.  I have

9   no -- I'm just looking at three paragraphs.

10  Q.  Let me show you Joint Trial Exhibit 150, which is AMCK's

11  response to your letter or to Frontier's letter.

12          So this is dated a few days later, May 12, 2020.  Have

13  you seen this letter before?

14  A.  I'm sure I have but I don't recall.  I don't recall its

15  contents right now.

16  Q.  Did you review this letter on or about May 12, 2020?

17  A.  I would assume that I probably did.

18  Q.  In the second paragraph of this letter -- this is a

19  response from Mr. Ernie Yu, the general counsel of AMCK, and I

20  could show that on the second page at the top.  Do you see

21  that?

22  A.  Yes.

23  Q.  And going back to the first page, second paragraph, Mr. Yu

24  writes, "Your letter states that AMCK is not entitled to

25  terminate because AMCK temporarily waived Frontier's payment

1    obligations under the leases.  That is incorrect.  The

2    discussions between the parties have not resulted in any

3    binding commitments, and AMCK has not waived any rights under

4    the Framework Agreement."

5         Here's my question.  Did you understand that AMCK's

6    position was that there had been no waiver and the discussions

7    between the parties had not resulted in any binding

8    commitments?

9    A.  I think it's clear in this letter that that was their

10   position after terminating our agreement with us.

11   Q.  And the next paragraph of Mr. Yu's letter discusses the

12   April 6 e-mail and the 10 working day grace period.  And it

13   says, at the end of that paragraph, "This is the only

14   commitment made by AMCK with respect to non-payment of rent by

15   Frontier, and that commitment obviously expired after April 21,

16   2020."

17        And again my question to you, sir, is did you

18   understand AMCK's position to be the only commitment made by

19   AMCK expired on April 21, 2020?

20   A.  I could only determine, given the letter they sent on

21   May 12 that you are showing me, that that was their position.

22   Q.  Now let me show you Frontier's response to this letter,

23   which is Joint Trial Exhibit 151.

24        And do you recognize this as Frontier's response on

25   the next day to the letter from Mr. Yu?

1    A.  Yes.

2    Q.  Did you review a draft of this letter before it was sent

3    out?

4    A.  I'm sure I did at the time, yes.

5    Q.  Focusing on the fourth paragraph of the letter, it says, "I

6    would like to remind AMCK of the following facts that support

7    our claim that AMCK both expressly and impliedly deferred

8    Frontier's payment obligations with regard to the leased

9    aircraft." And then that language is followed by several

10   enumerated paragraphs carrying over to the next page.  Do you

11   see that?

12   A.  Yes.

13   Q.  Turning to the next page, which Rishika's already helpfully

14   done for me, paragraph 3 discusses Mr. Sheridan's April 6

15   e-mail.  Do you see that?

16   A.  Yes.

17   Q.  And paragraph 4 discusses Mr. Sheridan's April 30 e-mail.

18   Do you see that?

19   A.  Yes.

20   Q.  Is there any mention here of your April 7 telephone

21   conversation with Mr. Sheridan?

22   A.  Again, the very final sentence of this paragraph mentions

23   an express deferral is given by a lessor to facilitate ongoing

24   and complex business negotiations with rent and delivery

25   deferrals.  It is reasonable for the other party to temporarily

1  withhold performance while the parties are both working

2  diligently to reach a final agreement.

3          In the prior letter and in this letter we referred to

4  the fact that there were rent deferrals provided to us.

5  Q.  Mr. Dempsey, is there any expresses reference in this

6  letter to an April 7 telephone call?

7  A.  I do not see an April 7 date listed.

8  Q.  Is there any mention of a month-to-month rent deferral

9  agreement?

10 A.  I don't see that on this page.

11         MR. BUTLER:  Just as a housekeeping matter, I would

12 like to move a few items into evidence.  They are Joint Trial

13 Exhibit 53, 85, 150, and 151, and also Plaintiff's Exhibit 2.

14         MR. HOSENPUD:  No objection.

15         THE COURT:  Received.

16         (Plaintiff's Exhibit 2 received in evidence)

17         (Joint Exhibit 53, 85, 150, 151 received in evidence)

18         MR. BUTLER:  Thank you very much, Mr. Dempsey.  I have

19 no further questions.

20 REDIRECT EXAMINATION

21 BY MR. HOSENPUD:

22 Q.  Mr. Dempsey, just a few questions.

23         First, I'd like to pull up Exhibit 63.  You've seen

24 this before.  This is when the 10-day grace period was offered

25 by Mr. Sheridan or confirmed based on the phone call by

O4G3FRO3                           Dempsey – Redirect

1    Mr. Sheridan.

2              Did Mr. Sheridan indicate at any time that he needed

3    shareholder approval in this communication?

4    A.  He did not.

5    Q.  As it relates to your April 7 phone conversation with

6    Mr. Sheridan relating to month-to-month, did he indicate to you

7    that he needed shareholder approval to grant such an extension?

8    A.  He did not.

9    Q.  You were asked some questions about a declaration you put

10   into evidence in connection with the motion for summary

11   judgment.  And I believe Mr. Butler asked if you said anything

12   about the repayment period being linked to the delivery

13   deferrals.  Do you recall that series of questions?

14   A.  Yes.

15   Q.  Let's turn now to paragraph 16, the one right below the one

16   that was shown to you.  And it indicates that "Around this

17   time," and you're referring to the April 7 call, "my

18   understanding from speaking with Mr. Sheridan was that AMCK's

19   main position regarding when Frontier needed to pay its

20   deferred rent was that Frontier needed to be current on all

21   rent prior to the next aircraft delivery."

22             Is that what you put into the record with your sworn

23   declaration?

24   A.  Yes.

25   Q.  And paragraph 17 goes on to say "Frontier's negotiations

1    with both AMCK and Airbus continued past the end of April 2020

2    and into May 2020.  Throughout this time, on multiple

3    occasions, AMCK confirmed its central position on deferred

4    rent.  Frontier's rent remained deferred and only needed to be

5    paid back prior to the next aircraft delivery, which Frontier

6    eventually was able to move to July 2020.  No later than

7    April 27, 2020, Frontier agreed to this term."

8              Do you see that?

9    A.  Could you just scroll back up, please.

10   Q.  Yes.

11   A.  Yes.

12   Q.  Now you were also asked questions about your deposition

13   testimony with respect to this same topic so let's get that up.

14   I'm turning to page 80, line 13.  At line 13, you were asked

15   the following question by Mr. Butler.

16   "Q.  And I think I asked you this question before, but just to

17   be clear, did you expect that month-to-month agreement with

18   Mr. Sheridan to be documented in a written agreement between

19   the parties?

20   "A.  We were working towards a more formalized agreement over

21   all, and so, I mean, I took his word given that he was the

22   chief executive of the company that he had provided us with

23   that."

24             Was that your testimony at the time?

25   A.  Yes.

O4G3FRO3                     Dempsey - Redirect

1   Q.  Now, you were asked a question, and I'm going to see if I

2   can paraphrase it correctly, that all Frontier had to do to

3   compel AMCK to show up is pay its rent.  Do you recall that

4   line of questioning?

5   A.  Yes.

6   Q.  And I believe your response was that AMCK might not

7   necessarily be compelled to show up, even if Frontier paid its

8   rent current.  Do you recall that?

9   A.  Yes, we had concern as to whether they were going to honor

10  their agreement, hence we asked them multiple times.

11  Q.  I am going to turn now to Exhibit 101, and I am going to

12  represent to you that this is an internal communication from

13  Ms. O'Callaghan to Paul Sheridan and she states the following:

14  "I think they would be appalled if we said no even after they

15  got completely current and than would have a devastating effect

16  on longer term relationship.  Particularly if we left so late

17  that they couldn't arrange an alternative SLB financing and had

18  to fund themselves.  So we would be better off telling them now

19  that we can't get SH comfortable with funding at 2019

20  contracted pricing, even if they are completely current on all

21  payments."

22       I know you don't know this statement, but is that

23  informing what you testified to here today, that even if you

24  were current, they may not show up?

25  A.  Yes.

O4G3FRO3

1   Q.  Let's turn now to Joint 146.  And this is the notice of

2   termination, and at the end of this notice on May 8, there

3   seems to be a schedule of payments and it focuses solely on the

4   April rents.  Do you see that, sir?

5   A.  Yes.

6   Q.  You were asked a question, did you repay the moneys on

7   March 13 with interest.  Do you recall that question?

8   A.  Yes.

9   Q.  And I believe your answer was no, is that correct?

10  A.  That's correct.

11  Q.  Is there a request for any interest in this schedule?

12  A.  No.

13          MR. HOSENPUD:  That's all I have, sir.  Thank you.

14          MR. BUTLER:  No further questions, your Honor.

15          THE COURT:  Anything further?

16          MR. BUTLER:  Nothing further from me, your Honor.

17          THE COURT:  Thank you, Mr. Dempsey.  You are excused.

18          THE WITNESS:  Thank you, your Honor.

19          (Witness excused)

20          MR. HOSENPUD:  Excuse me, your Honor.  With the

21  exception of keeping the record open for putting in the

22  excerpts of the depositions, the plaintiff rests.  And we are

23  still working out with counsel, unless we've come to a

24  consensus on the excerpts that were actually played by video.

25  That's why I'd like to leave the record open to put those

1  excerpts in, in their exhibit numbers.

2            THE COURT:  Thank you, Mr. Hosenbud.

3            MR. BUTLER:  Thank you, your Honor.

4            Defendants call Mr. Paul Sheridan.

5   PAUL SHERIDAN,

6        called as a witness by the Defendant,

7        having been duly sworn, testified as follows:

8  DIRECT EXAMINATION

9  BY MR. BUTLER:

10 Q.  Good afternoon, Mr. Sheridan.

11 A.  Good afternoon.

12 Q.  At the beginning of March 2020, were you working for the

13 defendant in this case, AMCK Aviation Holdings Ireland?

14 A.  Yes, I was.

15 Q.  What was your position at that time?

16 A.  I was CEO of the company and a director also.

17 Q.  So were you also on the board of AMCK?

18 A.  I was on the board of AMCK and its subsidiaries, yes.

19 Q.  At that point, how long had you worked in the aviation

20 industry?

21 A.  Since 1999, so it makes 21 years at that point.

22 Q.  If you make sure you're speaking directly into the

23 microphone, Mr. Sheridan.

24 A.  Okay.

25 Q.  Where were you based at that time?

O4G3FRO3                         Sheridan – Direct

1   A.  I was based in Dublin, in Ireland.

2   Q.  And when did you leave that position?

3   A.  In middle of April 2022.

4   Q.  What were the circumstances of your departure?

5   A.  The business was sold to funds managed by Carlyle Aviation

6   Partners, and as a result of that, the staff of AMCK Aviation

7   was made redundant, myself included.  So I finished up on the

8   date of the sale.

9   Q.  Are you employed today?

10  A.  Yes.

11  Q.  What is your job?

12  A.  I head up an advisory team within PwC Ireland specializing

13  in aircraft finance and aircraft leasing.

14  Q.  Is it correct to say you're still in the aircraft leasing

15  business?

16  A.  Yes, yeah.

17  Q.  At the beginning of March of 2020, who were the

18  shareholders of AMCK?

19  A.  So, AMCK had three shareholders at that time.  It was CK

20  Asset Holdings, there was -- if I get the name correct, the Li

21  Ka Shing Overseas Foundation which held 10 percent, CK Assets

22  Holdings held 50 percent, and Mitsubishi Corporation, which

23  held 40 percent.

24  Q.  Was it correct at that time that CK Assets Holdings was

25  AMCK's largest shareholder?

O4G3FRO3                         Sheridan - Direct

1    A.  They were affiliated with Li Ka Shing Foundation and they

2    were effectively the controlling shareholder, yes.

3    Q.  Who was your main contact at CK Asset Holdings?

4    A.  It was Gerald Ma.

5    Q.  And what role did CK play in AMCK's business?

6    A.  I would characterize them as being a very active

7    shareholder.  They took a lot of interest in the day-to-day

8    business.  There were certain individuals within the CK team

9    that I had conversations with on at least a weekly basis, and

10   then during more stressful times, like the start of the

11   pandemic, we probably had in a lot of cases daily conversations

12   about what was happening.

13   Q.  Did you consult with Gerald Ma and the CK team on

14   significant decisions at AMCK?

15   A.  Yes, all the time.

16   Q.  Why did you do that?

17   A.  It was in essence how they liked to operate.  They ran most

18   of their business in a very similar manner.  They're very

19   active.  They liked having very regular updates on what was

20   going on, and they liked being a part of the decision process.

21   Q.  Did CK own some of the aircraft that were serviced by AMCK?

22   A.  Yes, that's correct.  There were aircraft owned through

23   what we called the Accipiter group of companies, which was

24   100 percent owned by CK Assets Holdings, and they were managed

25   by AMCK.

O4G3FRO3                           Sheridan - Direct

1   Q.  Did CK also provide capital to AMCK?

2   A.  Yes, they did.

3   Q.  And did CK representatives sit on AMCK's board?

4   A.  Yes, there was a majority CK representatives on the AMCK

5   board.

6   Q.  Could you just tell me generally, what kind of business is

7   AMCK or was AMCK at the time?

8   A.  AMCK was a -- we would term it as an aircraft leasing

9   business, which in essence meant owning and managing aircraft

10  that were on long-term operating leases to airlines around the

11  world.  In commercial aircraft I should say.

12  Q.  And I've seen the term servicer under lease agreements.

13  What does a servicer do?

14  A.  So a servicer typically will manage the contracts of the

15  operating lease, so collecting rents, making sure that the

16  obligations of the leasing company or the owner company and

17  the -- and the airline as the lessee are all fulfilled, dealing

18  with any issues that arise from them not being fulfilled, and

19  sometimes doing more on a corporate basis, like fundraising or

20  accounting.

21  Q.  Was a part of AMCK's business to be a servicer under

22  aircraft leases?

23  A.  It was, both for the Accipiter Group and for a small number

24  of third parties that had no direct relationship, but with

25  aircraft that the company managed on their behalf.

1   Q.  Another defendant in this case is Accipiter Investments

2   Aircraft 4 Limited.  Are you familiar with that entity?

3   A.  Yes, I am.

4   Q.  What was that?

5   A.  That was what we would term an aircraft owning company.  So

6   it would directly generally own the aircraft that were on lease

7   to a certain number of airlines.

8   Q.  Was that entity a subsidiary of CK Asset Holdings in March

9   of 2020?

10  A.  Ultimately, yes, through the Accipiter Holdings company.

11  Q.  And I think you mentioned that Accipiter was the beneficial

12  owner of some of the aircraft -- strike that.  I don't think

13  you did say that so let me ask the question.

14          Was Accipiter the beneficial owner of some of the

15  aircraft that were on lease to Frontier?

16  A.  Yes, they were.  It was 14 aircraft.

17  Q.  14 aircraft.  Were those the 14 aircraft that were on lease

18  before March of 2020?

19  A.  Yes, that's correct.

20  Q.  And do I understand correctly that therefore CK Asset

21  Holdings was the indirect owner of those 14 aircraft?

22  A.  Yes, that's correct.

23  Q.  The third remaining defendant in this case is Vermillion

24  Aviation (Two) Limited.  Are you familiar with that entity?

25  A.  Yes, I am.

1    Q.  In March of 2020, was that an affiliate of AMCK?

2    A.  That should have been a direct subsidiary of AMCK.

3    Q.  It was a direct subsidiary of AMCK?

4    A.  Yes.

5    Q.  And was Vermillion also the beneficial owner of an aircraft

6    leased to Frontier?

7    A.  Yes, that's correct.

8    Q.  Was that the aircraft that was delivered in March of 2020?

9    A.  Yes, it was.

10   Q.  So, of the 15 aircraft leased to Frontier, 14 were

11   beneficially owned by Accipiter, and one was beneficially owned

12   by Vermillion.  Is that right?

13   A.  That's right.

14   Q.  And were all of those aircraft serviced by AMCK?

15   A.  Yes, they were.

16   Q.  Another entity that has come up in this case is Accipiter

17   Holdings DAC.  What was that entity?

18   A.  That was the holding entity for the Accipiter group of

19   companies, so it would have been the owner of Accipiter

20   Investments 4, if I have their name correct.

21   Q.  So, it sounds like that was a subsidiary of CK Asset

22   Holdings.  Is that correct?

23   A.  Yes.

24   Q.  Was it a parent or subsidiary of AMCK?

25   A.  No, it was an affiliate.

Q.  I want to ask you about the Framework Agreement in this case.  And Rishika, I'm not sure we have to put this on the screen, we're all pretty familiar with it.

In your own words, how would you describe the Framework Agreement that was entered in March of 2020?

A.  It was the agreement that governed the purchase of six aircraft that were part of the Frontier Airlines order book with Airbus.  And so, a nominee company of AMCK would purchase those aircraft and then lease them directly from Airbus and then lease them to Frontier for a predefined period.

Q.  Do you remember how much AMCK agreed to pay for each those aircraft?

A.  It was $51 million per aircraft I think.

Q.  We've seen in this case that the first delivery under the Framework Agreement took place on March 16, 2020.  Is that your recollection?

A.  Yes, that is.

Q.  Did AMCK make a payment of $51 million on that date?

A.  Yes.

Q.  Was that payment made to Frontier or to Airbus?

A.  I believe it should have been made to Airbus.

Q.  Did the shareholder CK provide any of the funding for that $51 million payment?

A.  I don't recall the precise funding mechanism that was used for that aircraft.  But it was typical that we would use some

1    combination of either the company's own money or funds drawn

2    down from the shareholders or some bank financing for any

3    aircraft purchases.

4    Q.  And were the same sources of funding expected to be used

5    for the other five aircraft deliveries that were expected under

6    the Framework Agreement?

7    A.  Some combination of those, yes.

8    Q.  Let me show you what's been marked as Joint Trial

9    Exhibit 28, which is the March 16 deferral request from

10   Frontier.  Do you recall receiving this request on March 16,

11   2020?

12   A.  Yes, I do.

13   Q.  And what was your understanding of what was proposed in

14   this letter?

15   A.  What was being requested was to -- as a result of the COVID

16   pandemic, to defer -- for the airline to defer paying rent on

17   the aircraft that had been delivered for a period of three

18   months with the repayment of that deferred rent to take place

19   after the deferral period.

20   Q.  This rent deferral request, did it cover the aircraft that

21   had just been delivered that very same day?

22   A.  Yes, it did.

23   Q.  And what was the time period of the rent deferral requested

24   by Frontier?

25   A.  It would have been just over three months, so from the date

O4G3FRO3                      Sheridan - Direct

1    of the 16th of March up to the end of June of 2020.

2    Q.  What was the repayment period proposed here?

3    A.  The requested repayment period was nine months.

4    Q.  I think this letter also indicates that Frontier was going

5    to pay interest, is that right?

6    A.  That's correct, but not specified.

7    Q.  In your experience, are those the typical limits of a rent

8    deferral agreement?

9    A.  Yes, yeah.

10   Q.  And other than unspecified interest, was Frontier offering

11   anything in return for this rent deferral?

12   A.  Nothing in particular, no.

13   Q.  What was the reaction at the shareholder CK Asset

14   Management to this rent deferral request from Frontier?

15   A.  I think probably characterize it as being probably a bit

16   angry, based on the timing of the request, that it came in just

17   after the aircraft got delivered.  And it felt that it was

18   timed to be done that way, so that the delivery could happen

19   without any issues, and then the deferral was requested.

20           It was, yeah, that's probably how I would characterize

21   it.

22   Q.  Were people at CK unhappy that AMCK had just paid

23   51 million at the time during the pandemic, and on the same day

24   Frontier was asking to defer all rent payments for a period of

25   three months?

1    A.  Yes, they were very unhappy about that.

2    Q.  Did AMCK receive other rent deferral requests from other

3    airlines around this time?

4    A.  Yes.

5    Q.  Did AMCK reach agreement on rent deferral with some of

6    those other airlines?

7    A.  Yes.

8    Q.  Did it reach agreement with all of the airlines that made

9    the request?

10   A.  I don't think it was in all cases, no.

11   Q.  Where AMCK did reach agreement, was the rent deferral

12   documented in a written agreement?

13   A.  Yes, it was.

14   Q.  Was that true for all of them where an agreement was

15   reached?

16   A.  Yes, it was.

17   Q.  Did each of those other rent deferral agreements, did they

18   include the elements of a deferral period, a repayment period,

19   and an interest rate?

20   A.  Yes, it would have contained at least those.

21   Q.  Let me show you what's been marked as Joint Trial

22   Exhibit 58.  Do you recall, sir, that on April 3, 2020, you

23   made a proposal for rent deferral to Frontier?

24   A.  Yes.

25   Q.  Is this the e-mail in which you make that proposal?

1   A.  Yes, it is.

2   Q.  Were there previous proposals from the AMCK side?

3   A.  I don't recall having any previous proposals.  I don't

4   remember.

5   Q.  For this proposal, what were the terms that you were

6   offering?

7   A.  We were offering the three month deferral request on 14 of

8   the 15 aircraft, so that would exclude the one that was

9   delivered on the 16th of March.  But the repayment would have

10  been over a four-month period at a 6 percent interest rate, but

11  also that the remaining aircraft under the Framework Agreement

12  would not be funded for a period of six months.

13  Q.  And is that the reference to suspending the SLB?

14  A.  That's correct.

15  Q.  Is that something that Frontier would have to negotiate

16  with Airbus?

17  A.  Yes, I think they would have to negotiate with Airbus or

18  with some of the other financing providers who could have

19  potentially stepped in to take the slots that were notionally

20  allocated to us.

21  Q.  Was there more than one way for Frontier to comply to this

22  request to suspend the SLB for six months?

23  A.  Yes.

24  Q.  What would those have been?

25  A.  They would have been to negotiate with Airbus on the one

1  hand, to delay the deliveries.  And on the other hand, to

2  discuss with other financiers, either existing or new, to take

3  the delivery slots in that six-month period.

4  Q.  So focusing on that first option, negotiation with Airbus

5  for delays.  Did AMCK have any involvement in Frontier's

6  discussions with Airbus?

7  A.  No.  We would not have been involved in those discussions.

8  Q.  Did you know at this time whether Frontier would be able to

9  negotiate a six-month delay with Airbus?

10 A.  We didn't know if it was going to be possible.

11 Q.  At the bottom of your e-mail you include some language that

12 begins "for the avoidance of doubt."  Do you see that?

13 A.  I do, yes.

14 Q.  Do you include that on all your e-mails?

15 A.  We would typically have included them on e-mails of this

16 nature that were proposing changes to be agreed, so that it

17 could be understood that they were raised for discussion, and

18 to separate it from anything that we were committing to.

19 Q.  You are kind of getting to my next question.  Let me ask

20 the first question again.

21         Did you include this language on all of your e-mails?

22 A.  No.

23 Q.  And I gather from your answer that you just included it in

24 proposals to make changes to lease agreements, is that right?

25 A.  That's correct.

O4G3FRO3                          Sheridan - Direct

```
1   Q.  Let me show the response to this proposal.  Joint Trial
2   Exhibit 61.  This is an e-mail from James Dempsey dated Monday,
3   April 6, 2020.  Do you recall this as Mr. Dempsey's response to
4   your April 3 proposal?
5   A.  Yes.
6   Q.  He begins by saying "This is very disappointing news."
7           Did the Mr. Dempsey reject your proposal?
8   A.  I think in essence, yes, he did.
9   Q.  Mr. Dempsey says in this e-mail, the second line beginning
10  in the middle of the page, "I can only deduce that you will
11  finance the aircraft deliveries and honor your commitment to
12  Frontier if we do not put a rent deferral in place."
13          What did you understand him to be saying here?
14  A.  That we would only be financing the aircraft if rents were
15  paid in full and there were no rents deferred.
16  Q.  Did Mr. Dempsey make any counterproposal to AMCK in this
17  e-mail?
18  A.  No.
19  Q.  Let me go to Joint Trial Exhibit 62.  And I'll ask you
20  first about the e-mail in the middle of the page.  That was the
21  e-mail we just looked at where he says "disappointing news."
22  Do you see that?
23  A.  Yes, I do.
24  Q.  It looks like later the same day, he asked for a phone call
25  ASAP.  Do you see that?
```

1   A.  Yes.

2   Q.  And he refers to the fact that Airbus has closed Mobile

3   until April 29.  Do you see that?

4   A.  Yes.

5   Q.  Did you have a telephone call with Mr. Dempsey later that

6   day?

7   A.  I don't recall if it was -- we had telephone calls later

8   that day, I don't think it was with Mr. Dempsey.  But, we had

9   follow-up phone calls about the subject of the e-mail.

10  Q.  Focusing on telephone calls later on the day on April 6.

11  Do you recall having a call with somebody at Frontier on that

12  day?

13  A.  Yes.

14  Q.  Who did you have a phone call with?

15  A.  With Robert Fanning.

16  Q.  Was anyone else on that call?

17  A.  Jane O'Callaghan.

18  Q.  What do you remember about that telephone call on April 6?

19  A.  I remember that we agreed on that call that, because there

20  were rent payments that were due on that day, and because the

21  discussions with Airbus were going to be difficult, and take a

22  little bit of time, that we grant them a 10-day grace period

23  where we said we would not take action under the lease

24  agreements or the other agreements if there was no -- if there

25  were no rent payments during that 10 business day period.

1  Q.  Let me show Joint Trial Exhibit 63.  Is this an e-mail from

2  you to Mr. Dempsey confirming the agreement reached on that

3  April 6 call?

4  A.  Yes, it is.

5  Q.  Why did you take the time to confirm that arrangement in

6  writing to Mr. Dempsey?

7  A.  Firstly, it was because of the importance of it.  It was my

8  practice to do that anyway, when it's something of this nature.

9  That we were effectively telling them that we weren't going to

10  take action for this time period in order to allow them a bit

11  of leeway to try to come up with some arrangement with Airbus

12  or with another financier.

13  Q.  Did you want to make sure that there was a clear end point

14  to this grace period?

15  A.  Yes.

16  Q.  Is that why you express it in your e-mail in two different

17  ways, 10 working days and also 21 April?

18  A.  Yes, that's correct.

19  Q.  You say in the middle of this e-mail, let's see the first

20  line towards the end of the page, "Mindful of the time it might

21  take to reach agreement with Airbus or to make some other

22  arrangements."  What were you referring to as other

23  arrangements?

24  A.  That is likely to have been arrangements with any other

25  leasing companies who might have been able to take delivery of

1  aircraft in that six-month period.

2  Q.  Did you inform the shareholder CK about this 10 working day

3  grace period?

4  A.  Yes, I did.

5  Q.  Let me show you what's been marked as Joint Trial

6  Exhibit 64.  And let me start with the e-mail in the middle of

7  the page, and if you go to the bottom of the page you'll see

8  this is your April 6 e-mail describing the 10 working day

9  period.

10        Then if we go up a little bit, this is an e-mail from

11  Mr. Dempsey saying, "I appreciate this.  Let's catch up."  And

12  then at the top it looks like you forward this exchange to

13  Mr. Gerald Ma.

14        Is that correct?

15  A.  Yes, that's correct.

16  Q.  And you refer to the 10 working days in this e-mail as a

17  grace period.  Was that the way that you were thinking about

18  this agreement at the time?

19  A.  Yes, it was.

20  Q.  Why did you send this e-mail to Mr. Ma?

21  A.  It would have been part of the regular updates.  It was

22  also a very important concession on our part, and it was

23  something that I felt he needed to be updated on.

24  Q.  Were you seeking Mr. Ma's approval of this 10 working day

25  grace period?

1   A.  No.

2   Q.  Is that because you had already agreed to it on your call

3   with Mr. Fanning?

4   A.  Yes.

5   Q.  Now let's talk about the next day, April 7, 2020.

6          Did you have a telephone call with Mr. Dempsey on that

7   day?

8   A.  Yes, I did.

9   Q.  On that call, do you remember discussing a month-to-month

10  deferral?

11  A.  Well, I don't remember the precise details of the call.

12  But from reviewing the follow-up e-mails and the summary

13  e-mails, yes, I did discuss a month-to-month deferral.

14  Q.  Well, do you remember, did Mr. Dempsey propose the

15  month-to-month deferral or did you propose it?

16  A.  I believe it was Mr. Dempsey.

17  Q.  And what did you understand a month-to-month deferral to

18  mean?

19  A.  I understood it to mean taking to the end of that month,

20  and reviewing the situation to see if it would be extended

21  beyond that month.

22  Q.  Did you agree to a month-to-month deferral on that call

23  with Mr. Dempsey?

24  A.  No, I did not.

25  Q.  Well, what did you say in response to the proposal?

1    A.  I don't recall exactly what I said.  I might have said

2    something along the lines of "that might work" or something

3    like that.  But I don't recall the precise wording.

4    Q.  If you don't recall the exact words, how can you be sure

5    that you didn't agree to the month-to-month discussion?

6    A.  I would say because it's not how I would have -- not how I

7    would have done it.  I would have followed up if I had agreed

8    to it.  The e-mail that I sent to the shareholder afterwards

9    was a very different nature to the e-mail of the day before.

10   And that there was still uncertainty around what that deferral

11   agreement might mean as well.

12   Q.  Well, did you discuss on the call with Mr. Dempsey how long

13   the month-to-month deferral would last?

14   A.  I don't think so, no.

15   Q.  Did you discuss on your call with Mr. Dempsey what the

16   repayment period of the -- would apply to the month-to-month

17   arrangement?

18   A.  I don't believe so either.

19   Q.  Did you discuss with Mr. Dempsey the interest rate that

20   would apply on deferred rent?

21   A.  I don't believe so, no.

22   Q.  Did you discuss with Mr. Dempsey whether a written

23   agreement would be entered to document or memorialize the

24   month-to-month agreement?

25   A.  I don't recall, no.

1    Q.  Setting aside the words that were used on the call, I want

2    to focus on your state of mind during that call.

3              Did you intend to agree to anything on that call with

4    Mr. Dempsey?

5    A.  No, I did not.

6    Q.  Did you intend to waive any rights to payment on that call?

7    A.  No.

8    Q.  Was it your expectation that anything that you might have

9    agreed with Mr. Dempsey would be further negotiated and

10   committed to a written agreement?

11   A.  Yes, it is.

12   Q.  So you mentioned that you followed up on this

13   month-to-month idea with Gerald Ma and the shareholder at CK,

14   is that correct?

15   A.  Yes, that's correct.

16   Q.  So let me show you Joint Trial Exhibit 76.  This is an

17   April 8 e-mail that you sent to Gerald Ma, cc to Francis Lee

18   and Lillian Kiang.  Do you see that?

19   A.  Yes, I do.

20   Q.  It looks like you're giving a quick update on the situation

21   with Frontier.  And then in the second paragraph, in the first

22   paragraph you say at the end of the first line, "I spoke with

23   the CFO again yesterday."

24              Is that a reference to your telephone call with

25   Mr. Dempsey?

1    A.  Yes, it would be.

2    Q.  And at the very end of the third line, it says, "I said

3    that I wouldn't tell him at this stage what we would do if that

4    didn't happen --"

5         Pardon me.  I think I need to read the previous

6    sentence.  Let me read it completely.

7         It says, "I spoke with the CFO again yesterday to

8    reiterate that our aim at this stage is to find a way to work

9    with them to get the deliveries deferred, and that since

10   between us, Frontier and Airbus, one of the three has to take

11   the hit.  Our aim was to make sure that it would be Airbus.  I

12   said that I wouldn't tell him at this stage what we would do if

13   that didn't happen, because I think that it would require a

14   board approval for us to walk away."

15        Was that message conveyed on your call with

16   Mr. Dempsey?

17   A.  I don't recall exactly how it was conveyed, but given it's

18   in the summary here, I would imagine it was, yes.

19   Q.  What did you mean when you said you thought it would

20   require a board approval for us to walk away?

21   A.  At the time there was discussion about all the scenarios

22   because of the extremity of the situation with the pandemic,

23   that there was a possibility of us just not financing the

24   aircraft no matter what circumstances that was discussed.

25   Obviously something of that magnitude would require a board

professional.  There is no -- there was no way I was going to

unilaterally make a decision like that.  It's of the magnitude

that would have required a board approval.

Q.  In the second paragraph of this e-mail, towards the end of

the first line, you refer to Indigo Partners and you say,

"Indigo Partners hasn't entered the conversation yet.  But he

expects this to happen soon."

       What did you mean by that?

A.  That Indigo Partners was the controlling shareholder of

Frontier Airlines at the time.  And as the shareholder of

Frontier, plus a number of quite successful airlines as a group

would have had some significant influence we believed within

Airbus.  So that if it was possible they could have -- they

could potentially have helped with the deferral discussions.

Q.  The next sentence you write, "In the meantime, he asked for

us to do the deferral on a month by month basis (they are all

conscious that they don't want to be in default with us.)"

       Does that reflect the fact that Mr. Dempsey proposed

the month-to-month idea?

A.  Yes, it does.

Q.  Then you say to Mr. Ma, "Since the next delivery isn't

going to be in April now that the Mobile plant is shut, I think

we can agree to this and give them a bit more time to work with

Airbus."

       Did you write that to Mr. Ma?

1    A.  Yes, I did.

2    Q.  Why did you tell Mr. Ma I think we can agree to this?

3    A.  Because I wanted to get their opinion.  I wanted -- I was

4    proposing the idea to them that we could agree to it.  And I

5    wanted to make sure that they agreed also.

6    Q.  So, is it the case you were looking for some approval from

7    your shareholder CK for this month-to-month idea?

8    A.  Yes.

9    Q.  And in your request for approval or your statement that you

10   can agree, are you describing a deferral to the end of April?

11   A.  Yes, I am.

12   Q.  Did Mr. Ma give his approval for the month-to-month

13   deferral?

14   A.  Yes, he did.

15   Q.  And let me show you what's been marked as Joint Trial

16   Exhibit 77.  And it looks like if we scroll down or we go to

17   the second page, actually to the top, I think we are going to

18   see your report to Gerald Ma.  You see the April 8 e-mail where

19   you say "A quick update on the situation with Frontier"?

20   A.  Yes, I do.

21   Q.  Then just above that there is an e-mail from Gerald Ma who

22   asks is it 6 percent interest, and it looks like at the very

23   top you respond at 6 percent, yes.  Do you see that?

24   A.  I do.

25   Q.  Going to the first page of this exhibit, there is some more

1    e-mail traffic on the CK side, so let's go to the bottom of

2    this page to see the next e-mail.  I see there is an e-mail

3    from Gerald Ma dated April 9.  And he says "Personally, I think

4    as long as we don't have to take delivery this month, giving

5    them one month deferral seems okay."

6            Do you see that?

7    A.  I do.

8    Q.  Did you understand that Gerald Ma was agreeable to the idea

9    of a one-month rent deferral?

10   A.  Yes, I do.

11   Q.  And he then says at the bottom of e-mail, "Francis and

12   Lillian?"

13   A.  Yes.

14   Q.  Above that is a response from Francis Lee.  And he

15   expresses the view that he think it's also okay to accept their

16   month-to-month deferral at 6 percent interest.  Correct?

17   A.  That's correct.

18   Q.  And then Lillian Kiang chimes in, in the e-mail just above,

19   and she says she agrees if no delivery in April, we can agree

20   to a one-month deferral.  Do you see that?

21   A.  Yes, I do.

22   Q.  And you're copied on all of these e-mails, correct?

23   A.  That's correct.

24   Q.  Did you understand that CK was agreeable to this idea as

25   long as it's limited to a one-month deferral for the month of

1  April, at 6 percent interest?

2  A.  Yes, I do.

3  Q.  And was that communicated to Frontier in some form?

4  A.  Yes, it was.  Jane O'Callaghan sent a draft deferral

5  agreement that deferred the rents for the month of April.

6  Q.  Let me show you Joint Trial Exhibit 79.  This is an e-mail

7  from Jane O'Callaghan to Robert Fanning, Sharath Sashikumar,

8  and Spencer Thwaytes dated April 9, 2020.  Is this the e-mail

9  in which Jane O'Callaghan attaches a draft agreement

10 implementing the month-to-month deferral?

11 A.  Yes.

12 Q.  And let me just show you the letter itself, so the next

13 page, if you go down to the bottom of the first page of this

14 letter, there is a Section 2.1, and do you see that this

15 forbearance that's proposed here is just for the payment due in

16 April 2020?

17 A.  Yes, I do.

18 Q.  Do you remember the repayment period that was proposed at

19 this time?

20 A.  I don't recall exactly.  I think it was three months.

21 Q.  Let's refresh your memory.  The next page has that in the

22 draft, towards the top of the page, Section 2.1.2.  It looks

23 like the repayment is on or before July of 2020.  Do you see

24 that?

25 A.  I do, yes.

O4G3FRO3                          Sheridan - Direct

1    Q.  Is there a three-month repayment period?

2    A.  Yes.

3    Q.  I see at the top of the page there is an interest rate of

4    6 percent.  Was that also part of AMCK's proposal at this time?

5    A.  Yes, that's correct.

6    Q.  To the best of your knowledge, did Frontier ever respond to

7    this draft agreement?

8    A.  No, they didn't.

9    Q.  Did anyone from Frontier even mention it to you after it

10   was sent?

11   A.  No, I don't think so.

12   Q.  Okay.  Let me ask you about Joint Trial Exhibit 78 which

13   has been shown to at least one other witness in this case.

14          This is an April 9 e-mail from you to Gerald Ma where

15   it looks like you've drafted an e-mail to send to Bill Franke.

16   First, who was Bill Franke?

17   A.  Bill Franke was the -- I don't know the precise title, but

18   controlling shareholder or in charge of Indigo Partners.  And

19   so as a result, I think he was also director of Frontier, and

20   effectively controlling shareholder of the group.

21          (Continued on next page)

22

23

24

25

O4GBFRO4                        Sheridan – Direct

1   BY MR. BUTLER:

2   Q.  So what was going on here?

3   A.  The intention behind this was to solicit partner support

4   for the delivery deferrals from Airbus, and also that Gerald Ma

5   and Bill Franke had built up a relationship over the years so

6   it was trying to build bridges when the CK Assets Holding

7   shareholder and Indigo Partners Airline shareholder.

8   Q.  And what were you trying to get Indigo Partners to do?

9   A.  The principle aim is in that second last sentence to add

10  the pressure on Airbus to defer the deliveries, to see if there

11  was a way -- any way we could get those delivery deferrals in

12  place.

13  Q.  And was there -- well, let me show you Joint Trial Exhibit

14  80, which is an email dated April 10 from Gerald Ma to

15  Mr. Franke.  Do you recognize this as the email that was

16  actually sent to Mr. Franke?

17  A.  Yes, I do.

18  Q.  So the previous email was a draft.  This is the real email,

19  right?

20  A.  Yes, that's correct.

21  Q.  Do you know whether Mr. Franke ever responded to this

22  overture?

23  A.  I don't think he did, no.

24  Q.  Let me show you Joint Trial Exhibit 107 which is a text

25  from Mr. Dempsey on April 11, 2020.  It looks like this text

O4GBFRO4                        Sheridan - Direct

1   was sent on a Saturday because he says, Sorry to bug you on a

2   Saturday.  Do you recall receiving this on Saturday, April 11?

3   A.  Yes, I do.

4   Q.  And it looks like he wants to know from you whether a

5   two-month delay in deliveries from Airbus would work.  Is that

6   right?

7   A.  Yes, that's correct.

8   Q.  And now let me show you Joint Trial Exhibit 84.  I want to

9   focus your attention on the email, the second email on the

10  page.

11          So it looks like on April 13 you sent an email to

12  Mr. Ma in which you cut and paste the text from Mr. Dempsey; is

13  that right?

14  A.  Yes, that's correct.

15  Q.  And you call that a short note from Frontier, right?

16  A.  Yes.

17  Q.  And were you trying to get Mr. Ma's reaction to this

18  two-month delay proposal from Frontier?

19  A.  Yes, I was.

20  Q.  Now, if we scroll up on the page or scooch the page down.

21  Mr. Ma reacts.  He says, "Here is my first reaction.

22  Essentially, we cannot support delivery if our partner is not

23  current with us."  What did you understand that to mean?

24  A.  I understand that to mean that all rents had to be paid in

25  full before a delivery could happen.

O4GBFRO4                    Sheridan – Direct

Q.  And was that the message that your shareholder CK was

consistently delivering to you?

A.  Yes, at this time it was, yeah.

Q.  So was it your job at the time to try to figure out how to

reach agreement with Frontier in a way that would satisfy that

parameter?

A.  Yes.

Q.  Let me show you Joint Trial Exhibit 85 which is an email

from the same date April 13 that you sent to Mr. Dempsey.

        First let me focus your attention on the email in the

middle of the page from Mr. Dempsey.  It looks like he followed

up with you on Monday April 13 about his Saturday text.  Do you

see that?

A.  I do, yes.

Q.  And then your response is up above, and you apologize for

the slow response.  You say you were waiting for some feedback

from the shareholders, correct?

A.  Yes, that's correct.

Q.  And you go onto say "Essentially, we want to tie the

deliveries to having no outstanding deferrals, so it would only

work if we recast the deferral agreement."  What did you mean

by that?

A.  I think what I meant by that is that if the deferral

agreement that we sent had a three-month repayment period, that

it wouldn't work with a two-month delay on delivery because

O4GBFRO4                        Sheridan - Direct

1    there would be no -- because there would be outstanding

2    deferrals at the time of the delivery.

3    Q.  So in Mr. Dempsey's email from that day he's really only

4    talking about the two-month delivery delay.  It sounds like you

5    wanted to connect that back to the deferral request.  Is that

6    right?

7    A.  Sorry, could you repeat that question.

8    Q.  Let me withdraw the question.  That's a bad question.

9         Let me show you another email exchange from the late

10   April time period, or going into the late April time period.

11   I'd like to show you Joint Trial Exhibit 101.  This is an email

12   exchange between yourself and Jane O'Callaghan on April 22,

13   2020.  Do you recall that there was an AMCK board meeting on

14   that date?

15   A.  Yes, I do.

16   Q.  And do you remember that the Frontier situation was

17   discussed during that board meeting?

18   A.  Yes, I do.

19   Q.  Was any decision reached on what to do on the AMCK side?

20   A.  No, there wasn't.

21   Q.  I'd like to direct your attention to your email that's

22   about a third of the way down the page, or maybe even a bit

23   further, two thirds of the way down the page.  You say, "One

24   thing that was clear was that the directors didn't want to

25   answer the question of what happens if Frontier gets current on

O4GBFRO4                          Sheridan – Direct

1   all rents and we come up to a delivery.  I think they are happy
2   to kick that one into next month."  What did you mean by that?
3   A.  I think I would have meant that the board meeting itself
4   was the regular quarters board meeting, so it wasn't specific
5   to the topic of Frontier, but it was obviously discussed.  And
6   that there was no direction or decision made on anything
7   related to Frontier, but specifically whether that idea of
8   potentially walking away was not discussed in any -- there was
9   no direction given on that option.
10  Q.  There was no direction from the board on that hypothetical
11  scenario; is that right?
12  A.  That's correct.
13  Q.  So let's take a look at Ms. O'Callaghan's response, so it's
14  just above that.  And she says, I think it's one or the other.
15  Do you understand what she's saying there?
16  A.  It may have been in relation to the request for repricing
17  the five aircraft as well as looking for the quid pro quo on
18  the 12, but I'm not certain.
19  Q.  It doesn't refer to the sentence we were just talking
20  about; is that right?
21  A.  I don't know.
22  Q.  She goes on to say "I think they would be appalled if we
23  said no even after they got completely current, and that would
24  have a devastating effect on longer-term relationship."  What
25  did you understand Ms. O'Callaghan to be saying here?

O4GBFRO4                    Sheridan - Direct

1    A.  That if we did ever exercise -- if we did ever walk away

2    from the deliveries, that it would just be an extremely serious

3    event.

4    Q.  Was that just walking away from deliveries, or did it

5    mean -- was she talking about walking away from deliveries if

6    they were fully current on rent?

7    A.  If they were fully current on rent.

8    Q.  Is that a hypothetical scenario at this point in time?

9    A.  It was, yes.

10   Q.  Was Frontier current on its rent as of April 22, 2020?

11   A.  No, it wasn't.

12   Q.  Is that because of the ten-day grace period had expired the

13   preceding day on April 21?

14   A.  That's correct.

15   Q.  Ms. O'Callaghan goes on to say in this same paragraph "So

16   we would be better off telling them now that we can't get SH

17   comfortable with funding at 2019/contracted pricing even if

18   they are completely current on all payments."  Do you see that?

19   A.  I do, yes.

20   Q.  What did you understand Ms. O'Callaghan to be saying here?

21   A.  I think she wanted to -- if it was likely that we were

22   going to walk away, that she would want to try to tell the

23   airline in advance.

24   Q.  Did you agree with that comment?

25   A.  I don't think I did, no.

O4GBFRO4                         Sheridan - Direct

1  Q.  Why not?

2  A.  Because there was no decision taken.  It would have created

3  unnecessary stress to the discussions that were already

4  stressful enough.

5  Q.  Let me ask you about another document.  It's Joint Trial

6  Exhibit 111.  I believe this is an exchange of emails with

7  Mr. Dempsey on April 27, and I want to focus on the email in

8  the middle of the page.

9        In the second line of this email towards the end

10  Mr. Dempsey writes "I put a scheme in place with Airbus that

11  would facilitate short-term deferrals of the aircraft on the

12  basis that you would honor your agreement.  Please confirm this

13  is the case as we have a lease signed for these aircraft and

14  are willing to ensure the deferred rent is paid as a CP of

15  delivery." Do you see that?

16  A.  I do, yes.

17  Q.  When Mr. Dempsey refers to a lease signed for these

18  aircraft, what is he referring to?

19  A.  I would guess it's the Framework Agreement that would have

20  been a form of the lease agreement in there that would have

21  been created on the delivery.

22  Q.  And Mr. Dempsey asked you for confirmation or please

23  confirm.  What did you understand Mr. Dempsey to be asking you

24  to confirm?

25  A.  That we were okay with allowing the two-month deferral of

O4GBFRO4                        Sheridan – Direct

1    the rents and to confirm also that we were okay to have the

2    rent paid as a condition present for delivery.

3    Q.  And were you okay with those terms?

4    A.  No.

5    Q.  So did you provide the confirmation that Mr. Dempsey asked

6    for?

7    A.  No, I didn't.

8    Q.  At this point in time April 27, did you know when the next

9    aircraft delivery would be from Airbus?

10   A.  We had an estimated date, but we had no certainty of when

11   it would happen.

12   Q.  And is that because Frontier was still negotiating with

13   Airbus at this point?

14   A.  I would say that, plus the delays that would have happen

15   because of the pandemic related shutdown of the plant would

16   have probably made it uncertain also.

17   Q.  At this point was it still uncertain how long the Mobile

18   facility would be closed?

19           MR. HOSENPUD:  Objection, leading.

20           THE COURT:  Sustained as to form.  You can lead a

21   little bit from time to time and get away with it.  That's

22   okay.

23           MR. BUTLER:  Understood, your Honor.  I'll try to do

24   better.

25   Q.  Mr. Sheridan --

O4GBFRO4                        Sheridan – Direct

1              THE COURT:  It adds stress to a situation where

2    there's enough stress already.

3              MR. BUTLER:  I understand, your Honor.  Thank you.

4    Q.  Let me show you what's been marked as Joint Trial Exhibit

5    121.  I want to direct your attention to the second page of

6    this exhibit, an email in the middle of the page where you

7    appear to be describing a proposal from Frontier on that day;

8    is that correct?

9    A.  Yes, that's correct.

10   Q.  In the first line item one it says, towards the end of that

11   line.  They will immediately pay outstanding April rents on

12   which we agreed an informal deferral pending agreement with

13   Airbus on delivery delays.

14              Do you see that language?

15   A.  Yes, I do.

16   Q.  What did you mean by an informal deferral pending agreement

17   with Airbus on delivery delays?

18   A.  I would have meant the grace period that we granted that

19   expired on the 21st of April.

20   Q.  In item two, item two of this proposal is that they can get

21   Airbus to agree to defer the next deliveries, all AMCKs, to

22   July 2020, as part of a much bigger negotiation to defer

23   deliveries from 2020, '21 and '22.  Do you see that?

24   A.  Yes, I do.

25   Q.  Was that the delivery delay that you were seeking from

O4GBFRO4                        Sheridan - Direct

 1   Frontier?

 2   A.  It wasn't, no.

 3   Q.  At the top of the page it looks like you forward this email

 4   to -- well, this email you're sending to Gerald Ma and to

 5   others at the CK team; is that correct?

 6   A.  Yes.

 7   Q.  And at the top of the page is Mr. Ma's response, correct?

 8   A.  Yes.

 9   Q.  And he has a number of comments.  He also says in the,

10   looks like fourth paragraph to the end in all capitals, Is this

11   the best we can do.  Do you see that?

12   A.  I do, yes.

13   Q.  Is it fair to say that Mr. Ma was asking you for more in

14   the way of concessions from Frontier?

15   A.  Yes, it is fair.

16   Q.  And did you understand that -- what additional concessions

17   did Mr. Ma want at this time?

18   A.  I think he was looking for some way of ensuring that

19   deferral request or nonpayment of rents wouldn't happen again

20   after the deliveries that were happening in July of that year

21   or even out to 2021.

22   Q.  Let me show you Joint Trial Exhibit 120.  This is an April

23   30 email.  We've seen this many times in the case which has

24   your proposal to Mr. Dempsey.

25          Do you see that?

O4GBFRO4                    Sheridan - Direct

1   A.  Yes, I do.

2   Q.  Was this a new proposal that you made based on your

3   discussions with CK?

4   A.  Yes, it was.

5   Q.  And we don't need to go through all the terms of this

6   proposal.  You propose a lease extension scheme in this email;

7   is that right?

8   A.  That's correct.

9   Q.  And what was the purpose of that element of your proposal?

10  A.  It was a conditional change to the -- it would have been a

11  conditional change to the lease agreements on the aircraft that

12  would only stay in effect if there were any payment-related

13  defaults out to that date of the 15th of May 2021.

14  Q.  And what would that accomplish?

15  A.  It would incentivize Frontier to pay on time all the time

16  if there were any difficulties.  So that if there was a

17  shortage of cash to go around, for example, that we would get

18  priority.

19  Q.  Did Mr. Dempsey accept this proposal?

20  A.  No, he did not.

21  Q.  Do you recall having a telephone call with him later that

22  day, April 30, 2020?

23  A.  I do, yes.

24  Q.  What do you remember about that call?

25  A.  It was a very difficult call. I think the proposal was

O4GBFRO4                          Sheridan – Direct

1    rejected in no uncertain terms.

2    Q.  Do you remember speaking to Mr. Dempsey again after that

3    telephone call?

4    A.  Not exactly, no.

5    Q.  Do you recall that there was a board meeting on May 8th

6    2020, to discuss the possibility of terminating the Framework

7    Agreement?

8    A.  Yes, I do.

9    Q.  Let me show you Joint Trial Exhibit 145.  Were these the

10   minutes of that board meeting?

11   A.  Yes, they were.

12   Q.  Were you the chair of that meeting?

13   A.  I was.

14   Q.  Was the termination of the Framework Agreement approved at

15   this meeting?

16   A.  It was.

17   Q.  I want to direct your attention to page four of these

18   minutes.  It looks like section 4.5 towards the bottom.

19   There's something here about approval of the Frontier

20   recommended plan.  Do you see that?

21   A.  I do, yes.

22   Q.  Was that the plan to terminate the Framework Agreement?

23   A.  Yes, it was.

24   Q.  Was that plan recommended by AMCK's management?

25   A.  Yes, it was.

O4GBFRO4                        Sheridan – Direct

Q.  When did AMCK's management decide to make that

recommendation to the board?

A.  It would have been sometime in the few days leading up to

this board meeting.

Q.  Was it after your telephone conversation with Mr. Dempsey

on April 30th?

A.  Yes.

Q.  Let me show you Joint Trial Exhibit 42, which are some text

between yourself and Gerald Ma.  I want to direct your

attention to page 10 of this exhibit just to show you that this

is the start of text with Mr. Ma on the 8th of May 2020.

        Do you see that?

A.  Yes, I do.

Q.  And that's the day that the AMCK board authorized

termination of the Framework Agreement.  Do you agree?

A.  Yes.

Q.  In these text with Mr. Ma were you talking about that

decision?

A.  Yes.

Q.  I want to direct your attention to a couple of pages later,

page 12 of the exhibit.  And there are some text from Gerald Ma

at the bottom.

        He writes, "Remember Frontier is the one who has money

and decided not to pay us and gave us the right to follow the

spirit of the contract.  We did not do anything wrong.  We

O4GBFRO4                          Sheridan – Direct

1   cannot take new deliveries from somebody who is not paying us

2   and has no regard to our own ability to survive."  Did Mr. Ma

3   send you those messages?

4   A.  Yes, he did.

5   Q.  And you respond on the next page it seems and it looks like

6   you write.  I don't feel bad about it, just want to get it done

7   before they complicate anything.  Did you send those text to

8   Mr. Ma?

9   A.  Yes, I did.

10  Q.  What did you mean by that?

11  A.  What I meant by that, that we had made the decision, myself

12  included, to recommend the termination of the Framework

13  Agreement.  It was a very difficult decision, but it was one

14  that I felt comfortable with because of the circumstances.  And

15  that once we had set our minds to it, we wanted to make sure it

16  got done.

17       The reference to complicate anything would have been

18  to pay rents and to become current and cure the defaults.

19  Q.  Well, at this time were you actually concerned that

20  Frontier might pay the rent that was due?

21  A.  I guess I would probably describe it as mixed emotions if

22  they had, concerned because we had a plan.  But if they paid

23  the rent, then we at least got paid our rent.

24  Q.  If Frontier had paid the rent prior to termination, would

25  you have been able to proceed with your plan?

O4GBFRO4                    Sheridan – Direct

1    A.  No.

2    Q.  Let me show you Joint Trial Exhibit 146 which is the May

3    8th termination notice.  The last document I have for you

4    today, Mr. Sheridan.

5            Let's go to the second page of this exhibit which is

6    the first page of the notice.  Is this the termination notice

7    that was sent to Frontier on May 8th?

8    A.  Yes.

9    Q.  Looking at the second page toward the bottom I believe.  Is

10   that your signature?

11   A.  Yes, it is.

12   Q.  Does this termination notice set forth AMCK's understanding

13   of the contractual basis for termination?

14   A.  Yes, it does.

15   Q.  And there's a schedule 1 attached to this notice.  What

16   does this schedule show?

17   A.  This I believe shows the outstanding rents from the month

18   of April that were outstanding at the time that the notice was

19   sent.

20   Q.  At this point in time had Frontier also missed some

21   payments that were due in May?

22   A.  I believe they would have done, yes, if there would have

23   been rent due on the 3rd of May for example.

24   Q.  Can you see that because the rents are due on the same day

25   each month, correct?

O4GBFRO4                      Sheridan - Cross

1   A.  Yes, correct.

2               MR. BUTLER:  Thank you very much, Mr. Sheridan.  I

3   have no further questions.

4               THE WITNESS:  Thank you.

5               THE COURT:  Mr. Hosenpud.

6               MR. HOSENPUD:  Thank you, your Honor.

7   CROSS-EXAMINATION

8   BY MR. HOSENPUD:

9   Q.  Good afternoon, Mr. Sheridan.

10  A.  Good afternoon.

11  Q.  You held your role of Accipiter Holdings as CEO from

12  approximately 2017, correct?

13  A.  Correct.

14  Q.  And then you became at CEO of AMCK Aviation and held that

15  position until approximately 2022; is that right?

16  A.  That's correct.

17  Q.  And in your role as CEO, you've guided the direction of the

18  company, dealt with the shareholders, and served as a director

19  and chairman of AMCK; isn't that correct?

20  A.  Correct, except that chairman wasn't formal title.  It

21  didn't have any particular governance attached to it, so it was

22  really for convenience at board meetings depending on who was

23  available.

24  Q.  You typically chaired the board meetings though, didn't

25  you?

1   A.  No.  Only as it relates.  Typically if there was a

2   particular director called Robert Finnegan was available, he

3   chaired.  So it was usually only on the times that he was

4   unavailable that I chaired.

5   Q.  And in connection with the sale of AMCK to Carlyle, you

6   would receive a severance agreement, correct?

7   A.  That's correct.

8   Q.  Part of the terms of that agreement required you to

9   cooperate in this action that we're sitting here in court

10  about, correct?

11  A.  I don't recall whether it was mention specifically, but

12  there was a requirement to cooperate for a particular period of

13  time after the termination agreement.

14  Q.  And Ms. O'Callaghan also had a similar term in her

15  severance agreement, didn't she?

16  A.  I would imagine so.  It was written by some fairly standard

17  wording.

18  Q.  Isn't it true that in 2020, AMCK only had Frontier Airlines

19  and Volaris for whom it had obligations to purchase aircraft?

20  A.  Yes, that's correct.

21  Q.  And isn't it also true that Frontier defaulted both --

22  pardon me.  Isn't it true that AMCK defaulted both Frontier and

23  Volaris in connection with their Framework Agreements?

24  A.  Yes, that's correct.

25  Q.  Let's turn to Exhibit 30.  No, strike that.

O4GBFRO4                         Sheridan - Cross

1              Isn't it true that for funding of the second aircraft
2    and third aircraft under the Framework Agreement shareholder
3    funding was being considered?
4    A.  I think that's correct, yes.
5    Q.  And 6 million was to come from AMCK's cash balance,
6    correct?
7    A.  I don't recall the details of how the money was going to be
8    made up.
9    Q.  All right.  Let's take a look at exhibit 44, please.  Could
10   you scroll down.  Were you aware of the combination of how it
11   was to be funded for these upcoming aircraft?
12   A.  I was aware of the plans at the time, yes.
13   Q.  Isn't it correct that you were thinking about the concept
14   of prepaid rent for the April and May deliveries of a Frontier
15   aircraft?
16   A.  Yes.
17   Q.  And isn't it also true that you were communicating with
18   Mr. Francis Lee of CK Assets as of March 24 about withholding
19   rent from the purchase price in the form of prepaid rent?
20   A.  Again, I don't recall exactly who I would have discussed it
21   with.  I remember having discussions about the possibility of
22   prepaid rent being part of --
23   Q.  Let's look at Joint 46, please.  I will represent to you
24   that these are text messages that were produced by AMCK.  And
25   this is Francis Lee's communications with you?

1    A.  Yes.

2    Q.  Take a look at that, and then I'll ask you some questions,

3    sir.

4    A.  Okay.

5    Q.  Now, in this text Mr. Lee is conveying to you that he had

6    another chat with Gerald after the call, and Gerald would think

7    that if we can negotiate to withhold about 24-months rent from

8    the money to give to Frontier, we may convince our board not to

9    stop taking the first delivery.  Then he runs through the math.

10   Is that right?

11   A.  Yes, that's correct.

12   Q.  So already at this time in March AMCK and CK Assets were

13   considering a withhold of 24-months rent from the first

14   delivery that would be about $6 million, wouldn't it?

15   A.  Probably a little bit more.  It was something we were

16   considering negotiating, yes.

17   Q.  And Frontier on March 24, 2020, was completely current in

18   its rent payments to AMCK, wasn't it?

19   A.  Yes.

20   Q.  And you had conferred with Gerald Ma, isn't it correct,

21   that you and Francis Lee had a solution or a potential solution

22   to the taking of the next aircraft in and around this time?

23   A.  Again, you have to remind me if that was -- it's very

24   likely I would have conferred with Gerald Ma on that topic,

25   yes.

1    Q.  Let's look at Joint Exhibit 42 just so we can close that

2    loop.  You state on March 24, 2020, to Mr. Ma, Francis and I

3    have a suggestion to solve short-term delivery issue.  Hope it

4    works.  He will give you a call.  You see that reference?

5    A.  Yes, but I think that would have been from Gerald Ma to me

6    if I'm reading that correctly.

7    Q.  I think that is correct.  But was that communicated to you

8    then that prepaid rent would be a solution to your next

9    delivery?

10   A.  Yes.

11   Q.  And you indicated that you want to talk to Jane and Ernie

12   on a call tomorrow.  And Mr. Ma says, like to see the MAC

13   clause.  That's the material adverse change clause; is that

14   right?

15   A.  I would imagine, yes.

16   Q.  And to see the MAC clause suggest that Mr. Ma was looking

17   for a way not to perform the Framework Agreement; isn't that

18   so?

19   A.  Well, I think, again, since we were at the very beginning

20   of the pandemic lockdown, it was just also understanding

21   whether it was in the documents and whether it was something

22   that could actually be used.

23   Q.  To terminate the Framework Agreement?

24   A.  Yes.

25   Q.  Turning back to exhibit 44, please.  Mr. Kelleher, he's the

O4GBFRO4                    Sheridan - Cross

1    CFO of AMCK, correct?

2    A.  Yes.

3    Q.  This is where we talk about rents in advance of deduction

4    from purchase price.  And he said, We may be able to get

5    through this delivery if we achieve that.  Do you see that?

6    A.  Yes.  I would say it was probably broader than just the

7    potential for rents in advance because we were looking at quite

8    extreme circumstances given the start of the pandemic about the

9    potential for more rent deferrals or nonpayment from other

10   airlines and what that would do to the company's cash position

11   over the 12-month period.

12   Q.  But this he's focusing on Frontier for the next two

13   deliveries, correct?

14   A.  Yes.

15   Q.  Because those deliveries were originally scheduled to

16   happen in March 2020, weren't they?

17   A.  I believe so, yes.

18   Q.  And then he goes on to say after that we would have a

19   little time to see how everything develops before having to

20   take the nuclear option.  Did I read that accurately?

21   A.  Yes.

22   Q.  And the nuclear option you understood was terminating the

23   Framework Agreement, correct?

24   A.  Yes.

25   Q.  And then he goes onto say, Delivery delays would also help.

1    Is that right?

2    A.  Yes.

3    Q.  And as throughout March of 2020, Frontier Airlines remain

4    current on all of its lease payments, didn't it?

5    A.  Yes.

6    Q.  Let's go back to 42, please.  These are Gerald Ma's text

7    messages to you.  And on the 25th of March he is communicating

8    that he would like to see 12-months from Frontier for the

9    delivery, meaning prepaid rent, correct?

10   A.  Yes.

11   Q.  And he said it cannot be something normal or we'll lose

12   credibility if they ask for a second deferral for the 15; is

13   that right?

14   A.  That's correct.

15   Q.  In early April you proposed to Ms. O'Callaghan to let

16   Robert Fanning know that rent deferrals were off the table if

17   Frontier took deliveries; isn't that correct?

18   A.  I don't recall precisely that.

19   Q.  Do you recall your deposition was taken in this case, sir?

20   A.  Yes, I do.

21   Q.  And let's put up Joint 54 first.

22          This is an April 1, 2020 exchange between you and

23   Ms. O'Callaghan.  Do you see that at the top, sir?

24   A.  Yes, I do.

25   Q.  In it you -- I'm focusing you now on that second sentence.

1    We will need to force them on this one though as you say.  If

2    you let Robert know that three months deferral is off the table

3    if they are taking deliveries, do you think this will set

4    things in motion.  You see that reference?

5    A.  Yes.

6    Q.  Your intention was to move things along with a notion of

7    deferring deliveries, correct?  That's what you wanted to set

8    in motion, delivery deferral?

9    A.  I think I was asking Jane her opinion.  If you excuse me

10   for one second, can you lower the email.

11          So, yes, I would imagine I was asking Jane's opinion

12   about whether that would force the issue of it more about the

13   delivery deferrals.

14   Q.  And in connection with delivery deferrals, that would

15   involve discussions between Frontier and Airbus, correct?

16   A.  Yes.

17   Q.  And that would take time as you knew from even April 1,

18   2020, correct?

19   A.  Correct.

20   Q.  And not taking deliveries was also the shareholders'

21   position in April 2 of 2020, correct?

22   A.  I think if you're referring to the text message, yeah, we

23   believe that it was in our interest as well as Frontier's

24   interest to defer the deliveries.

25   Q.  Did you know if Frontier believed it was in its interest

1    not to take delivery?

2    A.  I didn't know, but I believed it at the time, yeah.

3    Q.  You didn't know how much time it would take for Frontier to

4    negotiate with Airbus, did you?

5    A.  No.

6    Q.  These were complicated negotiations on an aircraft that

7    were ready to be delivered, were they not?

8    A.  Yes.

9    Q.  And in your experience there weren't very many lessors who

10   had the ability to defer aircraft that were already

11   manufactured; isn't that correct?

12   A.  Well, in this case it wasn't necessarily a lessor's ability

13   to defer aircraft.

14   Q.  The airlines ability to defer aircraft?

15   A.  No, but given the extremity of the situation with the

16   pandemic, we thought that it could be possible.

17   Q.  It would be difficult though, correct?

18   A.  It would be difficult, yes.

19   Q.  And you knew that going in with making your request for,

20   first, a three to six-month delivery deferral through

21   Ms. O'Callaghan on March 26, correct?

22   A.  Yes, we did also believe that it was possible for them to

23   find other financiers to take deliveries instead of us.

24   Q.  You didn't know of any airline other than perhaps one that

25   had been successful in deferring near-term deliveries with

1    Airbus; isn't that right?

2    A.  I believe that's correct.

3    Q.  And that one likely had clause in its agreement with Airbus

4    that permitted that type of delay, correct?

5    A.  I don't know if I've seen that in an email or in a news

6    article, maybe.  I don't know if that's the case.

7    Q.  Let's look at exhibit 58, please.  Exhibit 58 comes after a

8    phone call that you had with Mr. Dempsey and Mr. Fanning and

9    Jane O'Callaghan the prior day.  Isn't that true?

10   A.  Yes, I think so.

11   Q.  And in that phone call Mr. Dempsey gave you information

12   about how difficult it was going to be to convince Airbus to

13   move aircraft at this point in time; isn't that the case?

14   A.  I don't recall the details of that phone call.

15   Q.  Do you recall you had prior to this time a prepayment of

16   rent request that came through Ms. O'Callaghan as of March 26,

17   2020, in a proposal to Frontier?

18   A.  I don't recall the details of that proposal.

19   Q.  Let's look at exhibit 51, please.  This is an email from

20   Ms. O'Callaghan to all, and it's got four points listed in it.

21   It's dated March 26, 2020.  Do you see that, sir?

22   A.  Yes, I do.

23   Q.  The first point is the requirement of a 12-month rent

24   holdback to be prepaid on closing lease commencement, and it

25   would equate to approximately three million, correct?

O4GBFRO4                        Sheridan - Cross

1    A.   Yes.

2    Q.   And then at that time Ms. O'Callaghan was seeking a three

3    to six-month delivery on the remaining four aircraft under the

4    Framework Agreement, correct, second bullet point?

5    A.   Yes, that's correct.

6    Q.   Let's go forward now to April 3.  If you look at the very

7    first paragraph under the, We have discussed sentence relating

8    to discussions with a shareholder overnight?

9    A.   Yes.

10   Q.   You say unfortunately their position has not changed.

11   We've been authorized to grant you a three-month rent deferral

12   requested on 14 of the 15 aircraft leased by AMCK, excluding

13   the one delivered on March 16, with repayment over the

14   subsequent four months at 6 percent, but strictly on the basis

15   that we suspend the SLB for six months by when we hope the

16   market to return to more normal conditions.

17            Did I capture that accurately?

18   A.   Yes, you did.

19   Q.   And that was designed to have the rent deferral repaid

20   before any delivery; is that correct?

21   A.   Yes, that is correct.

22   Q.   And that was a consistent request from AMCK through the

23   course of April 2020, wasn't it?

24   A.   Yes, it was.

25   Q.   You go on to say in the second paragraph, basically you're

O4GBFRO4                         Sheridan - Cross

1   capturing the call from the discussion the prior day that you

2   were hearing on a daily basis that many airlines and lessors

3   have agreed deferrals and in some cases cancellations.  And

4   indeed Airbus has just alluded to cutting production in order

5   to avoid a glut of undelivered aircraft.  You see that

6   reference?

7   A.  Yes.

8   Q.  You were just getting information from the market about

9   cancellation?

10  A.  It would have been from new stories from contacts in the

11  market, yes.

12  Q.  And again you didn't know the circumstances involved in

13  those cancellation of deliveries from Airbus, did you?

14  A.  No.

15  Q.  You did not know the state of production that the aircraft

16  were in, did you?

17  A.  No.

18  Q.  Let's turn to Joint 66, please.  Pardon me, 65.  We're

19  going to scroll down a little bit.

20          Mr. Sheridan, this is a communication to Jimmy Dempsey

21  related to a call that occurred with Robert Fanning on the 6th

22  of April 2020, correct?

23  A.  Yes, that's correct.

24  Q.  And that you testified about on direct examination which

25  was for the purpose of granting a ten-day grace period,

O4GBFRO4                        Sheridan - Cross

1    correct?

2    A.  That's correct.

3    Q.  And the purpose of granting that grace period, that waiver,

4    was that you were mindful of the time it might take for

5    Frontier to reach agreement with Airbus or make some other

6    arrangements and therefore of the ability for AMCK to reach a

7    deferral agreement, correct?

8    A.  That's correct.

9    Q.  So there were two related concepts here.  Frontier needed

10   time to negotiate with Airbus, correct?

11   A.  Or to make other arrangements, correct, yes.

12   Q.  And in order to make arrangements with Airbus to defer

13   deliveries or get lessors to swap into your place, time was

14   needed?

15   A.  Yes.

16   Q.  And only after that was accomplished would you be in a

17   position to discuss working on finalizing a rent deferral;

18   isn't that correct?

19   A.  I'm sorry.  Could you repeat that question?

20   Q.  Yes.  Once you knew whether or not either the aircraft had

21   been delivered through an arrangement with Airbus or lessors

22   were swapping into your positions for the balance of the five

23   aircraft would you have been able to formalize a written

24   agreement on rent deferrals, correct?

25   A.  For the larger rent deferral that they were talking about

1    that was originally requested, yes, we had linked it to the

2    delay of the sale leaseback for that six-month period.

3    Q.  And you wanted Frontier to proceed ahead and start talking

4    to Airbus, correct?

5    A.  That's correct.

6    Q.  Were you aware that Frontier had already reached out to

7    Airbus by the end of March 2020?

8    A.  I don't recall whether I was aware of that at the time.

9    Q.  Were you aware that they also spoke to Airbus in early

10   April 2020 before you extended this grace period of ten days?

11   A.  I don't recall.

12   Q.  But this was the construct of this grace period, work with

13   Airbus or other lessors, and then we can see if we'll enter a

14   formal rent deferral; is that right?

15   A.  Given that the conditions that we were placing on granting

16   the rent deferral were to delay sale leaseback by that

17   six-month period, and unless it was some other commitment that

18   Frontier could have made to suspend the Framework Agreement or

19   suspend the Framework Agreement without having these agreements

20   in place, then I think, yes, that was probably the only course

21   of action.

22   Q.  Yeah, but to suspend the Framework Agreement would only

23   have been doable by getting delivery delays; is that right?

24   A.  No.  That's not correct.  I think the Framework Agreement

25   could have been suspended.  It would have put more risk on

O4GBFRO4                        Sheridan - Cross

1    Frontier.  The Framework Agreement could have been suspended

2    and other financiers could have been found or the Framework

3    Agreement could have been suspended and deferrals were agreed

4    with Airbus.

5    Q.  The more risk on Frontier to suspend the Framework

6    Agreement would mean that Frontier would not take deliveries

7    when aircraft were ready, right?

8    A.  Not necessarily.  What I meant by more risk would have

9    meant being that if there were no financiers at the time, they

10   would have to pay their own cash to fund the deliveries.

11   Q.  And you knew that Frontier finance 100 percent of its

12   aircraft through sale leasebacks, correct?

13   A.  Correct.

14   Q.  You also knew that Frontier was in a position where it was

15   seeking to preserve cash due to the Covid pandemic?

16   A.  Correct.

17   Q.  So funding the aircraft itself was not a very tenable idea

18   given Frontier's condition at that time, correct?

19   A.  Again, it would have been quite a difficult thing, yes.

20   Q.  Scrolling up, please.

21        Now, Mr. Sheridan indicates he appreciates the fact

22   that pardon me.  Mr. Dempsey indicates to you that he

23   appreciates the fact that a ten-day grace period was provided,

24   and he's indicating it's going to continue to be a challenge

25   with Airbus, correct?

O4GBFRO4                         Sheridan - Cross

1    A.  That's correct.

2    Q.  And he states, I hope you would reconsider your position on

3    financing.  You see that?

4    A.  I do, yes.

5    Q.  And what he was asking you was to reconsider the deferral

6    that you had been requesting; isn't that right?

7    A.  I think it is, yes.

8    Q.  Because you'd ask for six months at that point?

9    A.  Yes.

10   Q.  And then he says, let's catch up tomorrow; is that correct?

11   A.  That's correct.

12   Q.  When you gave this ten-day grace period to Frontier, did

13   you tell him that you needed any sort of approval from the

14   shareholder in order to have the authority to do that?

15   A.  I don't think I did, no.

16   Q.  Did you ever tell Mr. Dempsey that you needed shareholder

17   approval to engage in a waiver of any kind?

18   A.  I don't remember if I ever said that.

19   Q.  As of this time on April 6, it had been communicated to you

20   that Airbus was closing for the month of April; isn't that

21   right?

22   A.  After this time or around this time, yes.

23   Q.  And as of April 6th, you also understood that delivery

24   deferrals would be difficult to obtain with Airbus, but not

25   impossible; isn't that right?

1    A.  That's correct.

2    Q.  You had a conversation with Mr. Dempsey on April 7; isn't

3    that correct?

4    A.  That's correct.

5    Q.  And in it Mr. Dempsey propose a month-to-month, and you

6    didn't disagree with that, did you?

7    A.  I would say I didn't agree or disagree with it, yeah.

8    Q.  And if Mr. Dempsey contends that you agreed with it, you

9    would deny that; is that correct?

10   A.  That's correct.

11   Q.  And you claim that you said, well, I'll check or something

12   to that effect?

13   A.  I don't recall what I said.

14   Q.  You certainly didn't say you didn't have the authority to

15   grant that, did you?

16   A.  I don't recall.

17   Q.  If Mr. Dempsey has testified here that you never made any

18   statement along those lines, would you disagree with that?

19   A.  That I never made any statement along the lines of it being

20   outside my authority or --

21   Q.  Yes.

22   A.  I guess, yeah, I would accept it, but I don't recall.

23   Q.  Let's look at Joint Exhibit 71, please.  Let's go to page

24   two, please.

25              First, I'd like to focus to your Catch Up email to the

1    shareholders.  And that's what you were telling them on April

2    7th what you discussed on April 6 with Robert Fanning and

3    confirmed with Mr. Dempsey on April 6; is that correct?

4    A.  Yes, that's correct.

5    Q.  And your goal is to give a bit of time to reach an amicable

6    agreement and reach a discussion -- and achieve a discussion

7    relating -- achieve results relating to delivery deferrals with

8    Airbus, correct?

9    A.  Excuse me.  Could you repeat that question.

10   Q.  Yes.  You said to catch you up there talking with Airbus

11   and with other financiers for the upcoming deliveries, correct?

12   A.  Correct.

13   Q.  You further state, To give us a bit of time to reach an

14   amicable agreement, we extended them a grace period of 10

15   working days on nonpayment of rent, correct?

16   A.  Correct.

17   Q.  I'm shifting forward now to April 7, and this conversation

18   that you had with Mr. Dempsey.

19           Isn't it true that he told you that it would take

20   longer than ten days to reach an agreement with Airbus?

21   A.  I don't recall.

22   Q.  If he testified to having so stated that to you, you have

23   no basis to suggest that that did not happen, correct?

24   A.  Correct.

25   Q.  Let's scroll up slightly right here where Mr. Ma is saying

1  to you, Thanks, Paul, have you managed to find the answer to my

2  questions, like anyone in the world taking deliveries or anyone

3  taking deliveries from Frontier. We really cannot. That's

4  what he communicated to you, correct?

5  A.  Yes.

6  Q.  And that was a constant position of the shareholder that

7  they didn't want to take these deliveries; isn't that right?

8  A.  I wouldn't quite characterize it as a constant, but it came

9  up from time to time, yes.

10  Q.  Let's move up in this email chain to the top. You then

11  said, Not quite a full answer, but we haven't found anyone who

12  definitively will take deliveries unless they are really forced

13  into it. You see that reference?

14  A.  I do, yes.

15  Q.  So AMCK's learning of this was from marketplace

16  information?

17  A.  In all probability, yes.

18  Q.  And it was precisely the position that AMCK did not want to

19  be in, isn't that correct?

20        You didn't want to be forced into it?

21  A.  I don't know if I quite characterize it that way. I think

22  what I'm expressing here is that the leasing world and the

23  airline world was trying not to take delivery of aircraft. It

24  was theme of the time because it was right in the middle of the

25  pandemic, the first shutdown.

1    Q.  The question to you is, have you found anyone, like anyone

2    in the world taking deliveries that was relating to the

3    lessors, was it not?

4    A.  It may have been lessors and airlines.  I can't remember.

5    Q.  But you already knew that lessors could only defer

6    deliveries in very rare instances, isn't that so?

7    A.  I think the answer is a little more complicated because if

8    it was a lessor with a sale leaseback as oppose to a lessor

9    with its own order position under a purchase agreement with

10   Airbus in the first case where the lessor is a sale leaseback

11   that's governed by the airlines agreement rather than the

12   lessor agreement, so it may be more complicated.

13   Q.  Focusing on lessors who have sale leasebacks.  You knew

14   that the taking of deliveries from the manufacturer was

15   governed by the airline and the manufacturer agreement,

16   correct?

17   A.  Yes, that's correct.

18   Q.  And you knew that the only way not to take a delivery is if

19   the airline had a specific clause in its primary agreement with

20   the manufacturer that allowed it; isn't that true?

21   A.  Well, absent an additional agreement with Airbus to allow

22   it, yes.

23   Q.  And you did not want to be in the position of being forced,

24   AMCK did not want to be in the position of being forced to take

25   a delivery; isn't that right?

A.   That's not necessarily the case.  I think what I meant by

that wording was more that leasing companies were reluctantly

taking aircraft because they were tending to go straight into

storage.  And often with airlines that didn't have the

financial strength to pay the rents, but they decided they

didn't have any choice.

Q.   Knew you that Frontier intended to fly these A320neos,

correct?

A.   I don't remember exactly.  At the time we didn't know what

was going to be allowed for the course of that year, so there

may have been an intention to fly them, but we couldn't predict

even one month beyond whether they'd still be allowed to or

not.

Q.   Didn't Mr. Fanning report to you and Jane O'Callaghan that

these aircraft would fly?

A.   I think he did.  I don't recall exactly.

Q.   And did Mr. Dempsey report to you that the aircraft would

fly?

A.   I think so.  I don't recall precisely.

Q.   Let's turn to exhibit 76, please.  This is April 8 email

from you to Gerald Ma.  You were asked about it on direct

examination.

     You indicate you were giving a quick update situation

with Frontier.  They will formally ask Airbus for a deferral

this week; is that right?

1   A.  That's what it says, yes.

2   Q.  It says you spoke to the CFO, that would be Mr. Dempsey?

3   A.  Yes.

4   Q.  And that was yesterday April 7, correct?

5   A.  Yes, correct.

6   Q.  And you indicate that you wanted to reiterate your aim at

7   this stage was try to find a way to work with them to get the

8   deliveries deferred.  And that since between AMCK, Frontier and

9   Airbus, one of the three of us has to take the hit.  And your

10  aim was to make sure it would be Airbus; is that right?

11  A.  That's correct.

12  Q.  Now, you testified on direct that you said to him that you

13  wouldn't tell him at this stage what we would do if that didn't

14  happen because you say, I think it would require board approval

15  to walk away.  You see that statement to your shareholder?

16  A.  I do, yes.

17  Q.  Isn't it true, sir, that you did not say anything about

18  board approval in that conversation with Mr. Dempsey?

19  A.  I don't recall.

20  Q.  Let's take a look at your deposition, page 113, please.

21  We're going to look at line 18.  Pardon me.  I'll frame it up

22  with line 12.

23          I'm referring to this very exhibit.  It goes onto say,

24  I said that I wouldn't tell him at this stage that what we

25  would do if that didn't happen because I think that it would

1    require a board approval for us to walk away.

2            Question:  So my question is this:  Did you simply say

3    to Mr. Dempsey -- he's the CFO, correct?

4            Answer:  Correct.

5            Did you simply say to Mr. Dempsey, I won't say what we

6    would do if a deferral does not happen?

7            And the answer was, I don't recall the specifics of

8    the conversation, but what I reported here is, he looks like he

9    would have ask me what would happen in the circumstance.  And I

10   said, I don't know.  I can't tell you what we'd be doing.  Is

11   that your answer to those questions?

12   A.  It was, yes.

13   Q.  And you did not mention the approval of the board in

14   responding to Mr. Dempsey, did you?

15   A.  No, but I don't think it would have been necessary.

16   Q.  Back to exhibit 76.  You go on to describe in the second

17   paragraph that Frontier was not arguing against you, but were

18   understandably worried about being in a default position with

19   Airbus, correct?

20   A.  Correct.

21   Q.  And then you go onto say in the third sentence, In the

22   meantime he is asked us for us to do the deferral on a

23   month-by-month basis there, also conscious that they don't want

24   to be in default with us.  That was expressed to you by

25   Mr. Dempsey, correct?

O4GBFRO4                    Sheridan - Cross

1    A.   That's correct.

2    Q.   And then you go on, since the next delivery isn't going to

3    be in April now that the Mobile plant is shut, I think we can

4    agree to this and give them a bit more time to work with

5    Airbus; correct?

6    A.   That's correct.

7    Q.   So you understood that it would take time to work with

8    Airbus as of April 8, immediately following the conversation

9    with Jimmy Dempsey on April 7, correct?

10   A.   That's correct.

11   Q.   You never went back to Mr. Dempsey and told him that there

12   was no month-to-month rent deferral, correct?

13   A.   Well, we went back to Robert Fanning with a draft agreement

14   to document and execute a deferral for the end of April.

15   Q.   You did not go back to Mr. Dempsey and tell him that there

16   would be no month-to-month rent deferral, did you?

17   A.   I'm not sure that there was any -- there was never any

18   agreement on what month-to-month even meant.  Month-to-month

19   for us was for the month of April, which, once we had got the

20   shareholders to agree with the approach, we put to Robert

21   Fanning in form of deferral agreement that they didn't respond

22   to.

23   Q.   My question is simple.  Did you ever go back to Mr. Dempsey

24   after reporting to your shareholder that Mr. Dempsey had asked

25   for a month to month, did you ever go back to Mr. Dempsey and

O4GBFRO4                     Sheridan - Cross

1   say, We're not going to give you a month to month?

2   A.  I didn't say it in those terms, no.

3   Q.  Let's turn to 77, please.  I believe this exhibit was

4   also -- we'll scroll down and see if we can get into I believe

5   April 8.  This was discussed with you on direct examination.

6           This is where you're giving the update to the

7   shareholder of the call that you had, and we've been through

8   most of this in my prior questioning.  Let's look above it.

9   And Gerald Ma was in agreement with this; is that correct?

10  A.  That's correct.

11  Q.  And then he sought the input from Francis Lee and Lilian

12  Kiang.  And they were also in agreement, were they not?

13  A.  They were in agreement with a deferral to the end of April,

14  yes.

15  Q.  Did you ever go back to Mr. Dempsey and say the deferral

16  period would only be to the end of April?

17  A.  Well, we assume that by sending the draft deferral

18  agreement to Robert Fanning as well as Spencer and Sharath that

19  that was our way of communicating how the deferral was going to

20  work.

21  Q.  Wasn't it the case that as of April 6, April 7, April 8 and

22  April 9, the consistent message from AMCK was you, Frontier,

23  need to be current before the next delivery?

24  A.  The consistent message in those periods?  Would you mind

25  repeating those questions.

1  Q.  The consistent message as of this point in time from AMCK

2  to Frontier was that they had to be current before the next

3  delivery on any outstanding rent?

4  A.  Yes, that's correct.

5  Q.  Let's look at Joint Exhibit 78.

6          MR. HOSENPUD:  Your Honor, I think I can get through

7  this exhibit and then perhaps we recess for the afternoon.

8  Thank you.

9  Q.  So we're looking at Joint Exhibit 78.

10          Now, this is an email from you.  The subject is email

11  for Bill Franke, and you're writing to Gerald Ma; is that

12  right?

13  A.  That's correct.

14  Q.  And you are saying to him, This is an email below that I

15  drafted for you to send to Bill Franke to hopefully advance the

16  discussions on the deferrals to the next stage, correct?

17  A.  Correct.

18  Q.  Now, in the body of what you drafted, I'm going to focus

19  you on the second paragraph where you say, you ghost drafted,

20  The aircraft leasing team has been discussing this with the two

21  airlines with the aim of deferring these deliveries as well as

22  offering support through rent deferrals for near-term.  We are

23  sure that neither airline wants the deliveries, and we don't

24  want to fund them, but that Airbus do want to complete them.

25  You see that sentence?

O4GBFRO4                    Sheridan - Cross

1    A.  I do, yes.

2    Q.  And did you ever confirm with Frontier that it did not want

3    deliveries?

4    A.  Not to my recollection, no.

5    Q.  And you say, And we don't want to fund them.  That was

6    AMCK's position, correct?

7    A.  In the context of the pandemic shutdowns, we thought that a

8    deferral of those deliveries was the best outcome for us, and

9    that maybe a slightly short time to say that, yes.

10   Q.  But then you note that Airbus do want to complete them,

11   that's because you recognize these were short.  These were

12   deliveries in the immediate short-term period, correct?

13   A.  Not necessarily correct, no.  I would say Airbus, it was in

14   Airbus interest to deliver aircraft to people and get cash in

15   themselves.  So whether they were nearly complete or not,

16   Airbus would have still wanted to complete them.

17   Q.  But your focus was on the near-term, as well as those that

18   were going to be in the second half of 2020, correct?

19   A.  Yes, correct.

20           MR. HOSENPUD:  All right.  I think, your Honor, this

21   may be a good stopping point if the Court approves.

22           THE COURT:  Very good.  See you tomorrow morning.

23           MR. HOSENPUD:  Thank you.

24           MR. BUTLER:  Thank you, your Honor.

25           (Adjourned to April 17, 2024, at 11:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                Page

 JAMES DEMPSEY

Direct By Mr. Hosenpud . . . . . . . . . . . 564

Cross By Mr. Butler  . . . . . . . . . . . . 582

Redirect By Mr. Hosenpud . . . . . . . . . . 654

 PAUL SHERIDAN

Direct By Mr. Butler . . . . . . . . . . . . 659

Cross By Mr. Hosenpud  . . . . . . . . . . . 699

PLAINTIFF EXHIBITS

Exhibit No.                                 Received

 2   . . . . . . . . . . . . . . . . . . . 654

JOINT EXHIBITS

Exhibit No.                                 Received

 53, 85, 150, 151   . . . . . . . . . . . . 654