O4HBFRO1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  FRONTIER AIRLINES, INC.,

4              Plaintiff,

5         v.                              20 Civ. 9713 (LLS)

6  AMCK AVIATION HOLDINGS IRELAND
   LIMITED, ACCIPITER INVESTMENT
7  4 LIMITED, VERMILLION AVIATION
   (TWO) LIMITED,
8
                Defendants.
9
   ------------------------------x
10                                       Bench Trial

11                                       New York, N.Y.
                                         April 17, 2024
12                                       11:00 a.m.

13 Before:

14               HON. LOUIS L. STANTON,

15                                       District Judge

16                      APPEARANCES

17 LANE POWELL PC
        Attorneys for Plaintiff
18 BY:  DAVID G. HOSENPUD
        AARON SCHAER
19
   CLIFFORD CHANCE US LLP
20      Attorneys for Defendants
   BY:  JEFF E. BUTLER
21      JOHN P. ALEXANDER
        RISHIKA JIKARIA
22      GINA CROSBY

23

24

25

O4HBFRO1                         Sheridan- Cross

1            (Trial resumed)

2            THE COURT:  Good morning, Mr. Sheridan.  You're

3    reminded you're still under oath.

4            THE WITNESS:  Good morning.  Okay.

5    PAUL SHERIDAN,

6    CROSS-EXAMINATION CONTINUED

7    BY MR. HOSENPUD:

8    Q.  Good morning, Mr. Sheridan.  I want to touch on a few

9    things from yesterday.

10           Isn't it true that you do not recall and testified

11   what your response was to Mr. Dempsey's request for a month to

12   month.

13   A.  That's correct.

14   Q.  And you don't recall telling Mr. Dempsey that a written

15   agreement for a month to month would be entered, correct?

16   A.  That's correct.

17   Q.  And you never told Mr. Dempsey in this phone call that you

18   lack the authority as chief executive to grant a month to

19   month, correct?

20   A.  Correct.

21   Q.  Now, you communicated to Mr. Ma about this, and he approved

22   a month to month, correct?

23   A.  Correct.

24   Q.  And you never told Mr. Dempsey of Gerald Ma's approval,

25   correct?

O4HBFRO1                          Sheridan- Cross

1    A.  Correct.

2    Q.  Let's look at exhibit 84, please.

3          You were questioned yesterday, Mr. Sheridan, about

4    this exhibit and asked about Mr. Ma's first reaction, correct?

5    A.  Correct.

6    Q.  And you understood that to be that rents had to be paid in

7    full before the first delivery; isn't that correct?

8    A.  Correct.

9    Q.  And that was a consistent message that you had conveyed or

10   Ms. O'Callaghan had conveyed to Frontier, correct?

11   A.  That's correct.

12   Q.  Let's now look at Joint Exhibit 85.  You were shown Joint

13   Exhibit 85 yesterday, and I'd like to just scroll down to

14   orient you, sir.

15         This is Mr. Dempsey's communication to you on April

16   13, 2020, correct?

17   A.  Correct.

18   Q.  And in it he's updating you that Airbus was willing to move

19   two aircraft in the short-term, two month in the short-term,

20   first aircraft in June, next two in July; is that right?

21   A.  That's correct.

22   Q.  And this is when you knew at this point that there would be

23   no May delivery, this is April 13, 2020, correct?

24   A.  Correct.

25   Q.  And he had sent you a text over Saturday indicating the

O4HBFRO1                        Sheridan- Cross

1    same information, which was April 11; is that right?

2    A.   That's right.

3    Q.   Your response is listed above in the email chain.  You

4    apologize for the delay, and you state, Essentially we want to

5    tie the deliveries to having no outstanding deferrals, so it

6    would only work if we recast the deferral agreement.  You see

7    that reference?

8    A.   Yes.

9    Q.   I'm sorry, sir?

10   A.   Yes, I see that, yes.

11   Q.   Thank you.  And that is your effort to make consistent the

12   delivery deferral and repayment period, but you never sent

13   anything to Frontier in writing to match the delivery time of

14   the next aircraft, did you?

15   A.   We never updated the deferral, the draft deferral agreement

16   that we had previously sent that had the longer repayment

17   period, no.

18   Q.   Right.  Because that repayment period was no longer

19   applicable given that AMCK wanted Frontier to be current with

20   the next delivery, correct?

21   A.   Correct.

22   Q.   I'd like to move forward to another point that you

23   discussed on direct examination.  We're going to look at

24   exhibit 101.  Let's scroll down to the email I'm focusing on in

25   the section of exhibit 101, page one.

1          You stated that one thing was clear, on thing that was

2     clear, the directors didn't want to answer the question of what

3     happens if Frontier gets current on all rent and we come up to

4     a delivery.

5          Isn't it true, sir, that they never answered the

6     question, and that is why you were making that observation?

7     A.  I don't recall how the discussion went at the board

8     meeting, but I think nobody wanted to make a decision on what

9     would happen if Frontier had paid the overdue rents at that

10    point.

11    Q.  You say they're overdue at that point, but did you say they

12    were overdue in this email?

13    A.  I didn't, but it was the 22nd of April, so we would have

14    known they were overdue at that point.

15    Q.  Did you say anything to Frontier that the rents were

16    overdue at that point?

17    A.  No.

18    Q.  Let's look at exhibit 100.  These are the minutes that you

19    chaired on April 22, 2020; is that correct?

20    A.  That's correct.

21    Q.  Turning to paragraph 7.13.  There's a reference relating to

22    you, the chairman.  You were chairing the meeting, correct?

23    A.  Correct.

24    Q.  The chairman advised that it was intended to revert to the

25    airlines and renegotiate as to whether deliveries needed to

O4HBFRO1                         Sheridan- Cross

1   take place during the period of rent deferrals; correct?

2   A.  That's what it says, yes.

3   Q.  And you were still in negotiation with Frontier, correct?

4   A.  Correct.

5   Q.  And Frontier, as you knew, was still in negotiation with

6   Airbus, weren't they?

7   A.  Yes, correct.

8   Q.  Let's go back to 101, please.  I'm focusing your attention,

9   sir, on the second paragraph of this email exchange at the top.

10  And this is Ms. O'Callaghan telling you that it would be better

11  to tell Frontier that AMCK cannot get the shareholder

12  comfortable with funding at 2019 contracted pricing, even if

13  they are completely current on all payments.  You see that

14  reference?

15  A.  I do.

16  Q.  You never authorized her to do so, did you?

17  A.  I don't think I did, no.

18  Q.  And you knew that if Frontier had any inclination about

19  AMCK's position, it would have paid rent, correct?

20  A.  I think it's likely, but we didn't know what their mindset

21  was at that point.

22  Q.  Right.  But if they knew that even if they were current the

23  shareholder was not agreeable to funding these aircraft --

24  A.  No.

25  Q.  Just a minute, sir.  -- do you have any doubt in your mind

O4HBFRO1                    Sheridan- Cross

1  that Frontier would have made payment?

2  A.  Well, I would just not characterize it that I knew that the

3  shareholder would not fund.  But if there was a warning of it,

4  I would imagine they wouldn't make payments of the overdue

5  rent, yes.

6  Q.  Let's move on.  We're going to look at exhibit 111.

7  Mr. Sheridan, I'm focusing your attention on the April 27 email

8  from Mr. Dempsey in the center of the front page of this

9  exhibit where he says to you he's been briefed by Robert and

10  was working on the assumption that we had to be current on all

11  rent for you to finance the upcoming deliveries.  And that is

12  consistent with AMCK's position as of April 27, correct?

13  A.  That is correct.  I would say when you see some of these --

14  the term "current" can mean a lot of things.  And so really

15  what we wanted was no deferred rent and no overdue rents.

16  Q.  And he's pointing out to your email below, which the idea

17  was to tie the outstanding deliveries to having no outstanding

18  deferrals of rent, so it would only work if we recast the

19  deferral agreement; isn't that right?

20  A.  That's right.

21  Q.  So the subject matter in your understanding and in

22  Mr. Dempsey's understanding was being current with rent before

23  the next delivery and funding would ensue?

24  A.  Well, I think having no outstanding deferrals at the

25  delivery, being current in terms of not having any overdue rent

O4HBFRO1                      Sheridan- Cross

1    is a given.

2    Q.  No outstanding deferrals and being current on rent, that's

3    how you constructed this message to Mr. Dempsey, isn't it?

4    A.  I would say that I constructed the message to say no

5    outstanding deferrals at the time.

6    Q.  And then it says the six-month period was set to allow for

7    repayments of deferred rent as to be over the deferral period.

8    That's what you say in your April 13 email, correct?

9    A.  Correct, the six-month period in the deferral agreement

10   that we had sent.

11   Q.  The six-month period in the ask that you had made?

12   A.  Yes.  Sorry, excuse me, yes.

13   Q.  So there's an integrated linkage between being current on

14   the rent deferrals at the time of the first delivery, that's

15   all we're talking about here, isn't it?

16   A.  I would say that there's a linkage in agreed deferrals of

17   rent and the delivery.  Overdue rent are a separate category.

18   Q.  You mentioned nothing about overdue rent, did you?

19   A.  I did not.

20   Q.  You didn't tell Mr. Dempsey that there was rent due on the

21   27th, did you?

22   A.  On the 27th, no, I did not.

23   Q.  And nobody from AMCK did so, did they?

24   A.  No.

25   Q.  Let's turn now to exhibit 121, please.  All right.

O4HBFRO1                        Sheridan- Cross

Mr. Sheridan, you were asked some questions about exhibit 121

yesterday.  This is an email from you to Gerald Ma dated April

30, 2020.  You see that?

A.  I do.

Q.  And you are reflecting to Mr. Ma that Frontier responded

today as follows: They understand they must be current on all

payments at and beyond closing.  They will immediately pay

outstanding April rents on which we agreed an informal deferral

pending agreement with Airbus on delivery delays.

        Do you see that language?

A.  I do.

Q.  And the language that is yours in this communication is the

language, On which we agreed an informal deferral pending

agreement with Airbus on delivery delays, correct?

A.  That's what it says.

Q.  And yesterday I believe you testified that that language

meant the ten day April 6 deferral?

A.  Yes, correct.

Q.  You don't say that here, do you?

A.  I don't.

Q.  And your language is tied to having a pending agreement

with Airbus on delivery delays, correct?

A.  That's correct.

Q.  And to your knowledge there was no pending agreement at

that time, was there?

O4HBFRO1                        Sheridan- Cross

1    A.  At the time we knew that the discussions had only gone to a

2    point of having the give or take two-month delay of delivery.

3    Q.  You knew that the discussions were still ongoing, did you

4    not?

5    A.  I don't remember by the 30th of April if any of the

6    discussions were still ongoing, but at that stage we were still

7    just talking about whether we would accept the proposed

8    deliveries of July 2020 as discussed here.

9    Q.  Let's look at point three, sir.  It says, They will swap

10   our last two deliveries in September, Sept and Oct 2020 to

11   February 2021 with another lessor, or they will get Airbus to

12   agree to pushout, not a hundred percent clear.  That's what you

13   said at that time, correct?

14   A.  Correct.

15   Q.  And so you knew the negotiations were ongoing with Airbus

16   to satisfy the condition of AMCK to push aircraft deliveries as

17   far out as possible?

18   A.  Yes, I can accept that is correct.

19   Q.  Now, going back up to item one where we were.

20           At no time did you ask Frontier to pay rent when they

21   told you they would immediately pay all outstanding April

22   rents, correct?

23   A.  That's correct.

24   Q.  Now, up above this Mr. Ma is saying, Can you confirm this

25   is their firm offer.  Do you see that reference?

1    A.  Yes.

2    Q.  And he ask, Nothing else, no extension and compensation or

3    penalty to them if they're overdue again.  And then in all

4    caps, Is this the best we can do.  All caps again, We only have

5    one shot at this.  You see that reference?

6    A.  Yes.

7    Q.  Typically in your experience in communicating by email are

8    all capital statements kind of like screaming or yelling?

9    A.  Typically, although Mr. Ma did use them reasonably

10   regularly.  Not that he was screaming reasonably regularly, but

11   that he use them for emphasis.

12   Q.  Now, isn't it true you also ultimately confirmed that this

13   was the firm offer from Frontier to Mr. Ma, correct?

14   A.  I don't recall that.  If you can show me an email that says

15   it.

16   Q.  Didn't you testify in your deposition to that effect?

17   A.  I don't recall.  You'd have to show me.  If I did, I can

18   accept it.

19   Q.  We'll go back to that.  Before responding to Mr. Ma, isn't

20   it true that Jane O'Callaghan had an email exchange with you on

21   April 30 relating to Frontier Airlines' proposal that is

22   reflected in exhibit 121?

23   A.  Yes, that's correct.

24   Q.  And isn't it true that Ms. O'Callaghan tells you in that

25   email exchange that she believes the Frontier proposal is final

1   and firm and AMCK has to go with it?

2   A.  I think you have to show me that email.  I don't recall.

3   Q.  You don't have a memory at this point?

4   A.  Not of that specific email, no.

5           MR. HOSENPUD:  May I approach the clerk, your Honor?

6   Your Honor, I would like to know if we have permission to

7   publish?  We can do so.  We have it.

8           THE COURT:  Thank you.  Is this a joint exhibit?

9           MR. HOSENPUD:  It is not, your Honor.

10          THE COURT:  Very well.  It is received.  You can

11  publish it.

12          MR. HOSENPUD:  Will you please publish plaintiff

13  exhibit 11.

14          (Plaintiff's Exhibit 11 received in evidence)

15  BY MR. HOSENPUD:

16  Q.  Let's look at this.  Ms. O'Callaghan on April 30, 2020 is

17  indicating to you that the discussions had been going on for

18  two weeks, and that she believed, she do believe this is their

19  final and firm position and states, I think we have to go with

20  it.  Does that refresh your recollection?

21  A.  I don't recall the email, but I can see that is what it

22  says, yes.

23  Q.  Then she goes onto discuss the downside if AMCK notifies

24  Frontier that AMCK cannot do the next three deliveries in July

25  because you can't get your shareholder on board.  You see that

O4HBFRO1                          Sheridan- Cross

1    reference?

2    A.   Yes, I do.

3    Q.   And she starts to itemize the consequences.  Do they sue us

4    for breach of contract?  You see that reference?

5    A.   Yes.

6    Q.   This could prove a terrible distraction and waste of

7    internal resources if they do, and I suspect they will.  You

8    see that reference?

9    A.   Yes, I do.

10   Q.   Isn't it true that at that time you were aware that if

11   Frontier paid its rent and AMCK did not show up for the next

12   three deliveries, Frontier would likely sue?

13   A.   Yes.

14   Q.   Now, let me take you to your deposition to close the loop

15   on the question if you in fact notified Mr. Ma that this was

16   their firm position.  I'll do it this way if this helps.  And,

17   counsel, I'll tell you the page and line I'm on.  We've got it

18   up electronically, and I'm turning to page 156.

19          Were you asked this question and gave this answer at

20   page 156, line six:  I'm going back to the prior exhibit where

21   Mr. Ma had asked you to confirm if this was a firm offer from

22   Frontier, and you thought you probably had done so in a phone

23   call.

24          Answer yeah.

25          Does that give you reference?  Yes.  Did you give that

O4HBFRO1                    Sheridan- Cross

1    answer at your deposition?

2    A.  Yes, I did.

3    Q.  So you notified Mr. Ma that you believed in answering his

4    question in the email chain, you believed this was a firm

5    offer?

6    A.  Yes.

7    Q.  And in connection with this phone call, isn't it true that

8    Mr. Ma suggested to you that immediate payment eliminating

9    outstanding April rent would obligate AMCK Aviation to move

10   ahead with the Framework Agreement?

11   A.  I can imagine he would have said that.  We would have

12   discussed that, yes.

13   Q.  It's what you testified to, correct?

14   A.  Yes, correct.

15        MR. BUTLER:  Your Honor, could I just read into the

16   record another portion of Mr. Sheridan's transcript around this

17   time for completeness?

18        THE COURT:  Very well.

19        MR. BUTLER:  I'd like to read from page 152, line

20   nine.  Question:  Did you respond to Gerald Ma's statement,

21   "Can you confirm that this is their firm offer?"  Answer:  I

22   don't recall it.  Maybe I said it in a phone call.  I don't

23   remember.  Thank you, your Honor.

24   BY MR. HOSENPUD:

25   Q.  Following your phone call with Mr. Gerald Ma on Frontier

O4HBFRO1                          Sheridan- Cross

1    Airlines' most recent offer which was to pay April's rent

2    current, May, June, July and beyond on time, you had a text

3    message exchange with him, didn't you?

4    A.   I believe yes.  I don't recall the precise chronology.

5    Q.   Let's put up Joint Exhibit 42, please.  We're going to go

6    to page three.  So I'll represent to you that these were

7    produced in this litigation.  They are your text to Gerald Ma.

8    We're on the date of April 30, 2200.  You see that?

9    A.   Yes, I do.

10   Q.   In this text you say, For Frontier.  I would suggest that

11   we go back to them with, get back current up to July before the

12   delivery, move the deliveries as they have offered, three this

13   year and two in Q1, 2021, have extensions on the 14 delivered

14   and remove the early termination options on the six from the

15   new deal that disappear if the airline has no missed payments

16   between now and May 2021.

17        Did I capture that accurately?

18   A.   Yes, you did.

19   Q.   And in this text exchange nowhere do you say Frontier is

20   not current in terms of owing rent, do you?

21   A.   Well, I think I say it in the next paragraph, but it

22   wouldn't have necessarily been needed to be said in this text

23   exchange.

24   Q.   But you don't say it here?  You don't say Frontier is now

25   in default because it's past the ten-day grace period, do you?

1    A.  I don't say it.

2    Q.  The final paragraph of this email, of this text exchange,

3    Is if they say no tonight, then we have to consider the nuclear

4    option.  This is to terminate the SLB because of nonpayment of

5    lease rent, correct?

6    A.  Correct.

7    Q.  So at this time the notion of the nuclear option was

8    revised again, wasn't it?

9    A.  Yes, because Frontier was in default on the lease

10   agreements.

11   Q.  And you said nothing about that in this communication or in

12   any other communication to Gerald Ma as of April 30, 2020,

13   correct?

14   A.  Well, I think I say it in this paragraph, terminate the

15   sale and leaseback because of nonpayment of lease rents in

16   April.

17   Q.  You are saying here though that you're activating the

18   potential nuclear option, right?

19   A.  Well, I think maybe the original terminology used in March

20   was a walkaway.  In this case, it's a termination based on

21   nonpayment.  So it's still a termination of the Framework

22   Agreement, but just for reasons here of nonpayment of lease

23   rent.

24   Q.  And these rents are April rents and we're still in April on

25   April 30; is that correct?

O4HBFRO1                           Sheridan- Cross

1    A.  That's correct.

2    Q.  And you do not say nonpayment of rents after April 21,

3    2020, do you?

4    A.  It's just a text message exchange, no.  We were speaking in

5    shorthand.

6    Q.  At no place do you say in any of your communications,

7    either in email or shorthand, that the termination is for

8    nonpayment of rent after April 2021, correct?

9    A.  I'm not sure I quite understand the question.

10   Q.  You don't say it here in this text message.  You didn't say

11   it in the prior email that we saw on the same date, did you?

12   A.  Well, I'm sorry, I do -- I'm still a little confused

13   because I do say it in this text message, but I wouldn't have

14   laid out precise details within text message or an email when

15   we were having ongoing discussions with the shareholders on so

16   many occasions.

17   Q.  And ongoing discussions with Frontier?

18   A.  Yes.

19   Q.  And knowing Frontier was having ongoing discussions with

20   Airbus?

21   A.  Yes.

22   Q.  Isn't it true, sir, that you received a text message from

23   Francis Lee indicating that Gerald Ma wanted you to arrange a

24   phone call between CK Assets, Mr. Ma, and Indigo Partners, the

25   shareholder of Frontier?

O4HBFRO1                         Sheridan- Cross

1   A.  Yes, I recall it.

2   Q.  And isn't it also true that Mr. Lee wanted you to do this

3   because Mr. Ma had requested so that Mr. Ma could say to

4   somebody at Indigo Partners, this is an unwanted nuclear

5   option; is that right?

6   A.  I think that was -- if you can show me the exhibit with the

7   wording.

8   Q.  Happy to.  Let's look at exhibit 46 at page seven.  At the

9   bottom here it says, Paul, Gerald just added, If Frontier don't

10  agree anything, please arrange a call between GM and Indigo

11  Partners before our IC.  GM is Gerald Ma, correct?

12  A.  Correct.

13  Q.  Indigo Partners is one of the shareholders of Frontier,

14  correct?

15  A.  Correct.

16  Q.  And IC is your, what, committee?

17  A.  It would be the investment committee at CK Assets Holdings.

18  Q.  Mr. Lee goes onto say, We have only one shot.  We want them

19  to know that this is an unwarranted nuclear path.  You see that

20  reference?

21  A.  I do.

22  Q.  Did you ever make that arrangement for that call?

23  A.  No.

24  Q.  Isn't it true that you had a conversation with Mr. Dempsey

25  on April 30 after he received your proposal in response to the

1    one made by Frontier on April 30?

2    A.  Yes, correct.

3    Q.  And in that proposal you were accepting of the three

4    aircraft in July, prior to that it was two aircraft in July and

5    one in June; but now it was three aircraft in July, and two in

6    Q1 of 2021, correct?

7    A.  Among other conditions, correct.

8    Q.  And then you stated that you wanted payment to be done by

9    May 15 of the rents that had been deferred, correct?

10   A.  Could I see the wording precisely so I can answer that.

11   Q.  Certainly.  Exhibit 123, scroll down.  This is the preface.

12   I misspoke.  This is the preface to your call summary with

13   Mr. Dempsey.  Let me move on.  We have it up now.  Thank you.

14          This is exhibit for the record 120.  All right.  So

15   you laid out three conditions, deliveries in July, three

16   aircraft; and February, two aircraft, correct?

17   A.  Correct.

18   Q.  All payments to be current on May 15, 2020, and to remain

19   current, correct?

20   A.  Correct.

21   Q.  You don't say all payments that's are in default to be

22   current on May 15, 2020, do you?

23   A.  I don't.

24   Q.  And then you have the lease extensions as well?

25   A.  That's correct.

O4HBFRO1                         Sheridan- Cross

1    Q.  You concede that this was a very unusual provision,

2    correct?

3    A.  That's correct.

4    Q.  Following this you had a call with Mr. Dempsey to discuss

5    this?

6    A.  That's correct.

7    Q.  And in that discussion he made a different proposal which

8    was to agree to the schedule for the deliveries, agree to the

9    May 15, 2020, deadline for repayment, and finally to prepay

10   rent on all five of the aircraft by six months.  Is that

11   correct?

12   A.  I think it is.  But, again, if you can show me the email

13   that he followed up with on that.

14   Q.  Yes.  We'll get there.  He was calling you -- he was

15   talking to you about what he could advance, and you decided to

16   take that back to the shareholder, correct?

17   A.  I imagine that is correct, yes.

18   Q.  And isn't it true that Mr. Dempsey on May 1, texted you and

19   said, Could I get an update for that proposal?

20   A.  I don't recall that text.  Again, if you could show me.

21   Q.  Let's look at Joint Exhibit 127. And we're going to scroll

22   down to a more legible version of that.

23          It's dated May 1, 2020, to you, and you recognize that

24   it's being sent by Mr. Dempsey?

25   A.  Yes.

1   Q.  He states, I had expected a call today.  What's the status?

2   And you respond, We're about to get on a call with the

3   shareholders.  It's at 4:30 our time.

4           And then he indicates, Okay. Airbus gave us an

5   additional 24 hours to get this done, correct?

6   A.  Correct.

7   Q.  You never called Mr. Dempsey back, did you?

8   A.  I don't think so.  I don't recall.

9   Q.  And you never communicated with him in writing, did you?

10  A.  I don't think so, no.

11  Q.  And in this communication you understood that negotiations

12  were ongoing with Airbus, correct?

13  A.  Correct.

14  Q.  And further you didn't state anything about getting current

15  on April rents, did you?

16  A.  I did not.

17  Q.  Let's look at exhibit 42, page 13, please.

18          You were asked some questions about this text message

19  exchange with Mr. Ma regarding the termination of the Framework

20  Agreement, correct?

21  A.  That's correct.

22  Q.  And you stated you just want to get it done before they can

23  complicate anything; is that right?

24  A.  That's right.

25  Q.  And your desire was to make sure that Frontier didn't pay

1    the rent before a termination could happen, correct?

2    A.  I think like I said yesterday that at that point, we were

3    quite focused on getting the termination done.  We especially

4    didn't want to have any complicated factors within the day of

5    the termination that might have made it difficult; for example,

6    the rent payment arriving at the same time as the termination

7    notice going out.  And so once the decision had been taken, we

8    wanted to get it executed quickly.

9    Q.  But you didn't want Frontier to complicate it by making

10   rent payments; is that correct?

11   A.  I think that's correct, yes.

12   Q.  Because if they had made the payment, you would have

13   received rents, and you couldn't do the termination, correct?

14   A.  That's correct.

15   Q.  Now, Mr. Dempsey sent you another communication on May 8,

16   exhibit 142; isn't that right.  This is comprised of two

17   emails, one on May 8, at 7:51, and I believe this is in the

18   morning, it's Denver time, wherein Mr. Dempsey says, Been

19   waiting patiently for your response to our call whereby I

20   offered the following solution:  The next aircraft delivery to

21   be moved to July 2020.

22           So that was a change to confirm what Mr. Dempsey

23   thought he could get as of April 30; is that right?

24   A.  That's right.

25   Q.  And a prepayment of rent six months on the near-term

1    aircraft deliveries; three aircraft delivering in July, and

2    seeking deferred rent for April and May, and having that being

3    repaid from July through December 2020, correct?

4    A.  That's what he offered.

5    Q.  And then he followed up with the fourth concession which is

6    at the top of this chain:  Replacing AMCK as a financier on two

7    aircraft to deliver in Q4 2020, and moving those deliveries to

8    Q1 021?

9    A.  As well as reiterating his rejection of our previous

10   proposal, yes.

11   Q.  Yes. He told you why it was impractical?

12   A.  Yes.

13   Q.  And he explained that the economic cost to Frontier would

14   be astronomical, didn't he.

15   A.  I'm not sure he said astronomical, but he explained that he

16   was rejecting the proposal because of that, yes.

17   Q.  You never responded to this email, correct?

18   A.  That's correct.

19           MR. HOSENPUD:  Nothing further.

20   REDIRECT EXAMINATION

21   BY MR. BUTLER:

22   Q.  Good morning, Mr. Sheridan.  I just have a couple of

23   follow-up questions, and I want to ask you about this document

24   that you were just shown which is an email from Mr. Dempsey.

25   It appears to be reiterating a proposal that was made on that

O4HBFRO1                          Sheridan - Redirect

1  April 30th call; is that correct?

2  A.  Yes, that's correct.

3  Q.  I want to ask in particular about the third item on this

4  proposal.  Deferred rent for April and May 2020 is repaid from

5  July through December 2020.

6         Is that element of this proposal consistent with your

7  request that all deferred rent be repaid before the next

8  aircraft delivery?

9  A.  It's not consistent.

10  Q.  Did you view this latest proposal from Mr. Dempsey as a

11  step forward or step back in the negotiation?

12  A.  Probably a step back.  It made me realize we were not going

13  to reach an agreement.

14  Q.  We're finish with that document so you can take it down.

15         Yesterday Mr. Hosenpud asked you whether you had

16  ever -- whether on the April 7th call you told Mr. Dempsey that

17  you needed authority from CK to agree to the month-to-month

18  proposal. Do you recall that?

19  A.  I do.

20  Q.  Whether you said anything to Mr. Dempsey about it or not,

21  did you want approval from CK for that proposal?

22  A.  I did.

23  Q.  Why?

24  A.  A more significant concession than just the ten-day grace

25  period, I thought it's generally my style to be more

O4HBFRO1                       Sheridan - Redirect

collaborative anyway as well.  I would have wanted to have a

collective view on what to do next, rather than anything

unilateral on my part.

Q.  Mr. Hosenpud also ask you some questions yesterday about

some messages talking about a MAC clause or a material adverse

change.  And he asked you about whether the shareholder was

interested in walking away from financing upcoming deliveries.

Do you remember that testimony?

A.  I do, yes.

Q.  In early April 2020, did you want to walkaway from the

upcoming financing?

A.  I don't think I did, but it was a very difficult time.  I

was trying my best to make sure that we could have -- bring the

shareholder together with the airline and ourselves to have

something that would work for all parties.

Q.  Mr. Hosenpud also asked you today about some documents that

refer to the nuclear option, and at least one of those text was

your use of the term.

        So why did you refer to termination of the Framework

Agreement as the nuclear option?

A.  I guess in short, two reasons.  One is the magnitude, and I

think the reality of a nuclear option is one that hurts both

parties in some way.  So, yes, mainly because of the magnitude

of what we were contemplating.

Q.  In your use of the term, is a nuclear option a desirable

1  option or an undesirable option?

2  A.  I would say undesirable option.

3      MR. BUTLER:  Thank you, Mr. Sheridan.  I have nothing

4  further.

5      MR. HOSENPUD:  Your Honor, may I have just a few

6  questions on redirect?  Recross, pardon me?

7      THE COURT:  Yes.

8      MR. HOSENPUD:  Thank you.

9  RECROSS EXAMINATION

10 BY MR. HOSENPUD:

11 Q.  Mr. Sheridan, at the time of the May 8 set of emails that

12 you received from Mr. Dempsey, isn't it true that Mr. Dempsey

13 had not taken payment immediately off the table from his

14 communication with you of April 30?

15 A.  Excuse me.  It doesn't look like he wasn't offering to pay

16 the overdue rent immediately at that point.

17 Q.  He had left that open on April 30, to which there had been

18 no response; isn't that correct?

19 A.  That's correct.

20 Q.  He never took it off the table though, did he?

21     He knew that that was an option?

22 A.  I would say it's always an option to pay overdue rent, yes.

23 Q.  The second term, prepayment for six-months rent for the

24 next three deliveries.  That had a value to AMCK of

25 approximately five million per aircraft total?

O4HBFRO1                          Sheridan - Recross

1   A.  No, approximately --

2   Q.  Five million total?

3   A.  No.  Six months, the request would be $300,000 per month,

4   so six months is somewhere between 1.8 and $2 million per

5   aircraft.

6   Q.  Times five aircraft?

7   A.  Three aircraft in this case.

8   Q.  Which would get you over five million, correct?

9   A.  Yes.

10            MR. HOSENPUD:  That's all I have.

11            MR. BUTLER:  Nothing further, your Honor.

12            THE COURT:  Thank you, Mr. Sheridan.  You're excused.

13            THE WITNESS:  Thank you very much.

14            (Witness excused)

15            MR. BUTLER:  Your Honor, with Mr. Sheridan's

16   testimony, the defense rests.

17            THE COURT:  That just leaves closing arguments, and

18   when would you prefer to do those?

19            MR. HOSENPUD:  Your Honor, we have conferred, and it

20   is the preference to start those up after the second session,

21   in the second session today, 2:15.

22            THE COURT:  Oh, today?

23            MR. HOSENPUD:  Yes.

24            THE COURT:  In other words, this afternoon?

25            MR. HOSENPUD:  This afternoon.

O4HBFRO1                        Sheridan – Recross

1              THE COURT:  And we'll take a recess now and resume at

2      2:15.

3              MR. HOSENPUD:  Thank you, your Honor.  We are just

4      keeping the record open just to tidy up some last exhibits to

5      put them in the record.

6              THE COURT:  Yes.

7              MR. HOSENPUD:  Thank you.

8              THE COURT:  You want to put in scattered things that

9      you didn't have in hand?

10             MR. HOSENPUD:  Yes.  We'll pick that up right at the

11     beginning.

12             THE COURT:  Okay.  Can't remain open forever.

13             MR. HOSENPUD:  Understood.  We'll put it in right at

14     the beginning of the afternoon session.  Thank you.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

                            AFTERNOON SESSION

                                2:30 p.m.

1           THE COURT:  Good afternoon.

2           MR. HOSENPUD:  Your Honor, if I could just supplement

3    the record now very briefly with the exhibits we've been

4    speaking of.

5           THE COURT:  Sure.

6           MR. HOSENPUD:  Yes.  Joint Exhibit 27, Joint

7    Exhibit 52, Joint Exhibit 54, Joint Exhibit 135, Joint

8    Exhibit 171, Joint Exhibit 172, Joint Exhibit 173, Joint

9    Exhibit 174, Joint Exhibit 180, and Joint Exhibit 181.

10

11          MR. BUTLER:  No objection, your Honor.

12          THE COURT:  Received.

13          (Joint Exhibits 27, 52, 54, 135, 171, 172, 173, 174,

14   180, 181 received in evidence)

15          MR. HOSENPUD:  Thank you.

16          THE COURT:  Mr. Butler.

17          MR. BUTLER:  Your Honor, good afternoon.  I'd like to

18   start this afternoon by reviewing some of the facts that are

19   not in dispute.

20          AMCK terminated the Framework Agreement on May 8,

21   2020, by sending a formal notice setting forth the grounds for

22   termination.  The grounds were that Frontier failed to pay rent

23   under 14 aircraft leases during the month of April 2020.

O4H3FRO2                    Summation - Mr. Butler

1          And there is no dispute that Frontier did not make

2     these rent payments in the month of April.  That's obvious from

3     the fact that Frontier actually did pay all of that rent in

4     May, after the termination by AMCK.

5          There is also no dispute that Frontier knew the due

6     date and amount of each rent payment.  The monthly rent was

7     agreed at the time that each lease was entered, and we heard

8     from Mr. Sashikumar that Frontier kept careful track of that,

9     and AMCK also sent invoices well before the due date specifying

10    the amounts due.

11         Now, the non-payment of rent under the 14 leases was a

12    cross default under the lease for the 15th aircraft.  That's

13    the one that delivered in March of 2020, MSN 10038.  And a

14    default under the MSN 10038 lease was an event of default under

15    the Framework Agreement, that gave AMCK the right to terminate

16    the Framework Agreement without prior notice to Frontier.

17         Now, Frontier contends in this case that the

18    termination by AMCK was improper, and therefore, constituted a

19    breach of the Framework Agreement.  The claim is that AMCK

20    waived the right to timely payment under the 14 leases through

21    its communications with Frontier.

22         The parties agree, I believe, that Frontier has the

23    burden of proof on that issue.  That's why I'm speaking first

24    on these summations.  Frontier must show by a preponderance of

25    the evidence that a waiver occurred and was continuing as of

O4H3FRO2                    Summation – Mr. Butler

1    the termination date, May 8, 2020.

2            Now, waiver of a contract right depends on intent.  It

3    is the voluntary abandonment or relinquishment of a known

4    right.  To prove waiver, there must be a clear manifestation of

5    intent to give up a contract right.

6            Now, under New York contract law, a waiver can be

7    express or implied, meaning it could be established by words or

8    conduct.  But here, the 14 lease agreements in question require

9    a waiver to be express.  And the Court has already observed

10   that in the summary judgment ruling earlier in this case, but I

11   want to remind everyone of the language involved, so I'd like

12   to put up Joint Trial Exhibit 2, which is a representative

13   sample of the lease agreements, and I am going to go to

14   page 97, section 20.4, the section that deals with waivers.

15           So if we look at 20.4(a), on the third line in the

16   middle of the page, it says, "The rights of both parties

17   against the other or in relation to the aircraft" then there is

18   a paren "shall not be capable of being waived or varied

19   otherwise by an express waiver or variation in writing."

20           And then a little further down the page, three lines

21   from the bottom, or sorry, of this section, three lines from

22   the bottom of this section, "And no act or course of conduct or

23   negotiation on the part of such party or on its behalf shall in

24   any way preclude it from exercising any such right or

25   constitute a suspension or any variation of such right."

1          So that deals with waiver, and there's also some

2     relevant language just below dealing with variations to the

3     agreement.  It says -- this is in 20.4(b) "The provisions of

4     this agreement shall not be varied otherwise than by an

5     instrument in writing executed by or on behalf of lessor and

6     lessee."

7          So those contractual provisions restrict the waiver,

8     any waiver that might be possible in this case.

9          Now, the Court has already ruled that a waiver does

10    not have to be in writing, but it does have to be express.  So

11    an implied waiver is not enough.  And a waiver in this case, as

12    I just read, cannot be based on any act, course of conduct, or

13    negotiation.  That means that conduct alone is not enough for a

14    waiver.  And by the same token, silence or inaction does not

15    qualify as a waiver.

16         And of course, a waiver must always be clear.  That's

17    part of the basic legal standard.  A waiver requires a clear

18    manifestation of intent.  So ambiguous records are not enough,

19    and words susceptible to multiple meanings are not enough for a

20    waiver.

21         Now the claim of Frontier in this case is that AMCK

22    expressly waived right to payment during a telephone call

23    between James Dempsey and Paul Sheridan on April 7, 2020.  But

24    in evaluating whether an express waiver occurred on that call,

25    we believe it is important to look at the events of the

1  preceding day, April 6, 2020, and the reason for that is that

2  both sides agree that an express waiver occurred on that day.

3  And it is important to compare what happened on April 6 to what

4  happened on April 7.

5         So, what happened on April 6?  Well, there was a

6  request from Frontier for relief from two rent payments that

7  were due that day.  And there then was a telephone call

8  involving Robert Fanning and Paul Sheridan, in which

9  Mr. Sheridan agreed to a forbearance or grace period of 10

10 business days ending on April 21.  And let me just show you, he

11 confirmed that in an e-mail the same day, that's Joint Trial

12 Exhibit 63.

13        He confirmed all this in writing, setting forth the

14 terms of the waiver very clearly.  So you don't get more

15 express than the waiver in this April 6 e-mail.

16        Now, also, on the AMCK side, Mr. Sheridan reported

17 this 10-day grace period to the shareholder CK in an e-mail to

18 Gerald Ma.  That's Exhibit 64.

19        Here he's catching him up on the discussions with

20 Frontier, and he talks about the grace period of 10 working

21 days, which he talks about in the past tense.  He says we

22 extended them a grace period.  So he's reporting something that

23 had already been done.

24        On the Frontier side, information about the 10-day

25 grace period was disseminated within the Frontier organization.

O4H3FRO2                     Summation – Mr. Butler

1    And remember Mr. Sashikumar, the gentleman who's responsible

2    for getting authorizations for rent payments.  As Mr. Fanning

3    stated, Mr. Sashikumar needed to be kept in the loop with

4    respect to rent payments.  Well, after the April 6 call,

5    Mr. Fanning informed Mr. Sashikumar about the 10-day grace

6    period, both by text and by e-mail.  And I'll just remind the

7    Court the text is JTX 67, Mr. Fanning to Mr. Sashikumar.  And

8    then the e-mail is Joint Trial Exhibit 60, where the e-mail is

9    forwarded as well to Mr. Sashikumar.

10          So in these two ways, Mr. Sashikumar was informed on

11    April 6 about this 10-day deferral period.

12          So, let's get to the April 7 call.  This is the key

13    disputed factual issue in this case.  But the evidence shows

14    that there were only two people on that call, Mr. Sheridan and

15    Mr. Dempsey.  And there are two different accounts of what

16    happened.  Mr. Dempsey says Mr. Sheridan agreed to a

17    month-to-month deferral on the call.  He says that

18    month-to-month meant deferral until the next delivery from

19    Airbus, which was expected to be in late May, but might be even

20    later.  Mr. Sheridan says that a month-to-month deferral was

21    discussed, but not agreed.  He says that month-to-month meant

22    deferral on April rent first, with May rent to be considered

23    later if necessary.

24          Now, the words used during this call are in dispute,

25    but the written communications that took place after the call

1   speak for themselves.  So let's start with the Frontier side.

2   Communications within Frontier.

3         The same day as that call, and we'll just put up Joint

4   Trial Exhibit 73, Mr. Dempsey sent a text message to

5   Mr. Fanning about the call.  And we've seen this exchange of

6   text messages before.  He talks about the month-to-month

7   deferral in the message to Mr. Fanning on the upper-left-hand

8   side.  And Mr. Fanning -- he talks about it, but he doesn't

9   explain what it means.  Mr. Fanning responds, "Okay, good.

10  Anything mentioned about repayment and are they going to send

11  our revised agreement?"  Mr. Dempsey responds, "No, but we

12  should stick to nine months from July 1, let's get a draft to

13  him."  Mr. Fanning responds, "They have our draft.  I'll follow

14  up with Jane."  Referring to Jane O'Callaghan at AMCK.  And

15  then Mr. Dempsey mentions that Paul was going to call Jane

16  after we spoke.

17        Now, as I mentioned, Mr. Dempsey does not explain what

18  month-to-month means on this call.  And we've heard from

19  Mr. Fanning that he got a mistaken impression that it was a

20  three-month agreement.  In fact, different people on the

21  Frontier side have a different understanding of what

22  month-to-month means.  And so it wasn't even clear on the

23  Frontier side what the meaning of that term might be.

24        It's also clear from this text exchange that no

25  repayment period had been discussed or agreed on the call with

O4H3FRO2                    Summation - Mr. Butler

1    Mr. Sheridan, and we've heard from Mr. Dempsey and other

2    witnesses that the interest rate that would apply to this

3    deferred rent also was not discussed at this call.

4            We've also seen evidence or heard evidence that both

5    Mr. Sheridan and Mr. Dempsey expected this to be documented in

6    writing, and in fact this text exchange shows that.

7    Mr. Dempsey says let's get a draft to him, and then Mr. Fanning

8    talks about the draft that had already been delivered to AMCK.

9    And Mr. Fanning notes that he is going to follow up with Jane

10   O'Callaghan about documenting this month-to-month arrangement.

11           One other point on the Frontier side.  There has been

12   no evidence presented of any text or e-mail to Mr. Sashikumar

13   about this supposed month-to-month deferral.  He says he heard

14   about it orally, it's true, but in contrast to the April 6

15   call, there was no written message delivered to Mr. Sashikumar

16   about this.

17           Now, on the AMCK side, we have a different set of

18   communications and documents about the month-to-month deferral.

19   And I'll show you Joint Trial Exhibit 76.  This is

20   Mr. Sheridan's e-mail to Gerald Ma at the shareholder CK Asset

21   Holdings reporting on the situation with Frontier.  And he

22   reports in the second paragraph that "In the meantime,

23   Mr. Dempsey has asked us to do the deferral on a month-to-month

24   basis, conscious that they don't want to be in default."  And

25   he goes on to say, "Since the next delivery isn't going to be

1  in April now that the Mobile plant is shut, I think we can

2  agree to this and give them a bit more time to work with

3  Airbus."

4          This, your Honor, is the best evidence of what

5  Mr. Sheridan understood month-to-month to mean on that call.

6  What he understood month-to-month, the month-to-month request

7  to mean.  It also indicates that there had not yet been an

8  agreement reached.  He doesn't report the agreement as

9  something that has already happened.  He reports it is

10  something we can agree to.  And as Mr. Sheridan has testified,

11  he was sending this e-mail in order to get approval from CK for

12  this additional deferral.

13          And I think we've also seen evidence and heard from

14  Mr. Sheridan that it was generally important to get CK's

15  approval.  They were a very active shareholder, they were very

16  active in AMCK's business, and it is also important that the 14

17  aircraft for which Frontier was seeking deferral were aircraft

18  that were owned by CK.  So it would have been particularly

19  important to get CK's buy in to any rent deferral with respect

20  to those aircraft.

21          Now, after Mr. Sheridan sent this e-mail, there was an

22  exchange of e-mails within the CK organization, so let's show

23  that.  Joint Trial Exhibit 77.  And let's see the e-mail from

24  Paul I think is on the second page, if I remember correctly.

25          And we scooch it over so we can see we see Paul's

1     e-mail we just looked at, Gerald Ma asks for input from Francis

2     and Lillian and ask if there is going to be 6 percent interest.

3     Then going back to the first page at the bottom.  We can see

4     Mr. Ma says, "Personally, I think as long as we don't have to

5     take delivery this month, giving them one-month deferral seems

6     okay."

7            So this is evidence that, at least on the CK AMCK

8     side, they thought what was being discussed was a one-month

9     rent deferral.  Francis Lee chips in to say he thinks it's

10    okay.  And the e-mail towards the top of the page, Lillian

11    Kiang also says that she agrees if no delivery in April, we can

12    agree to a one-month deferral.

13           After this exchange of e-mails with the shareholder at

14    CK, Mr. Sheridan testified that he asked Jane O'Callaghan to

15    put together an agreement.  And in fact Jane O'Callaghan did

16    send a draft agreement, Joint Trial Exhibit 79, over to

17    Frontier.  And she says in her cover e-mail that this is a

18    draft deferral letter for one of the 14 aircraft, but we are in

19    the process of cloning the letter out for the other 14.  Or for

20    the other 13, rather, aircraft.

21           And let's take a look at the letter itself.  The

22    forbearance letter itself.  On the first page towards the

23    bottom, you can see that the forbearance here is only for the

24    rent payment due in the month of April.  And then if we go to

25    the top of the next page, Rishika, we can see the other terms.

O4H3FRO2                          Summation – Mr. Butler

1    AMCK was proposing an interest rate of 6 percent per annum, and

2    they're proposing a repayment period of three months ending in

3    July of 2020.

4          Now, I think I said earlier that another document was

5    the best evidence of AMCK's understanding of the month-to-month

6    deferral, but I misspoke.  Really, this is the best evidence of

7    it.  This is the draft agreement that AMCK put together, and it

8    is perfectly consistent with Mr. Sheridan's understanding of

9    the month-to-month discussion, that it was only going to be for

10   the month of April at first, and that there are other terms

11   that were not discussed, but from AMCK's perspective, they

12   wanted a three-month repayment period, and 6 percent interest.

13         One other document on the AMCK side is Joint Trial

14   Exhibit 17.  That's a series of text messages from Jane

15   O'Callaghan with Robert Fanning.  And on page 4 of that

16   exhibit, we can see a text message from April 21, 2020, recall

17   that is the last day of the 10-day grace period offered by

18   AMCK.  And Ms. O'Callaghan says to Mr. Fanning, "We haven't had

19   your feedback on draft rent deferral agreement for April.

20   Thank, Jane."

21         So on the last day of the 10 working day grace period,

22   Ms. O'Callaghan clearly reached out to Mr. Fanning about the

23   rent deferral agreement for April because she hadn't heard

24   anything back from the Frontier side.  Once again, even after

25   sending this reminder text, there was no word from the Frontier

1     side about that draft agreement.  Clearly, they never accepted

2     the agreement or entered that one-month deferral with AMCK.

3            So those are the two versions of that April 7 call,

4     and I've walked through really all of the evidence that is

5     relevant to or almost all of the evidence that is relevant to

6     what happened on that call.

7            And I want to point out that there are reasons to

8     question Mr. Dempsey's version of events that day.  The first

9     thing I would note is in Exhibit 73, and well, why don't you

10    put up Exhibit 73, the first text from Mr. Sheridan.  His

11    statement was that there was an agreement on rent deferral on

12    that call.  "Agreement" is the term that he used.  And that's

13    not credible, your Honor, because the material terms of rent

14    deferral were not discussed on that call.  As this exchange

15    with Mr. Fanning makes clear, the repayment terms were not

16    discussed at all.  And as I said, we've heard from other

17    witnesses that the interest rate was not discussed either.

18           Now, and we know that there was no meeting of the

19    minds on one of these material terms, because, as indicated in

20    this text exchange, Mr. Dempsey wanted a nine-month repayment

21    period.  And as we know from the draft agreement sent over from

22    AMCK, AMCK wanted only a three-month repayment period.

23           One other point is that any agreement on rent deferral

24    would have needed to be in writing.  And indeed, there is

25    evidence that both Mr. Dempsey and Mr. Fanning expected this

O4H3FRO2                        Summation - Mr. Butler

1    agreement to be reduced to writing and it never was.

2            So, whatever happened on that April 7 call, there

3    certainly was no agreement on rent deferral.  And that

4    contradicts Mr. Dempsey's testimony and the statement in this

5    text message.

6            Second reason for doubting Mr. Dempsey's version is

7    that his understanding of what month-to-month means is not

8    plausible.  He says month-to-month meant deferral until the

9    next aircraft delivery.  But he didn't use those terms at the

10   time.  He didn't describe it as a deferral until the next

11   aircraft delivery.  He used the term month-to-month.  And

12   month-to-month is not shorthand for until the next aircraft

13   delivery.  Month-to-month means first one month, and then

14   potentially the next month, and so on.

15           So his use of the word month-to-month itself is not

16   consistent with his current position that what was discussed

17   was a deferral until the next aircraft delivery.

18           There is another reason to question his version of

19   events, and that is that he changed his story on the meaning of

20   month-to-month between his deposition and his testimony here in

21   court.  So let me show Mr. Dempsey's deposition, I'll start

22   with page 77, line 15.  Mr. Dempsey was asked:

23   "Q.  So was it your understanding that this was an indefinite

24   deferral of rent under your agreements with AMCK?

25   "A.  No, it was a fluid situation, but clearly, at this point,

O4H3FRO2                      Summation - Mr. Butler

it was for the month of April."

I'll show you page 79, two pages later.  Line 10 I
asked the question:
"Q.  When you use the term month-to-month, does that mean that
basically you're agreeing one month at a time?  So first, let's
agree to the end of April, then later we'll agree to the end of
May if it's necessary?
"A.  Correct."

Those descriptions of a month-to-month deferral are
precisely consistent with Mr. Sheridan's understanding of
month-to-month.  But, deferral for the month of April would not
be enough for Frontier to win this case.  The termination took
place on May 8th.  So any waiver that was limited to the month
of April would have expired by that time.

So now we have different testimony from Mr. Dempsey.
He says month-to-month doesn't mean at first to the end of
April.  He says until the next delivery and he has another
variation of until all negotiations are complete.  Your Honor,
the fact that Mr. Dempsey has changed his story is another
reason to doubt it.

Just another point I'd like to make is Mr. Dempsey's
account of the April 7 call is also quite incongruous or
inconsistent with what happened the day before, on April 6.  So
on April 6, Mr. Sheridan agreed to a waiver, and -- well, I'm
sorry.  He agreed to a waiver or a forbearance that was narrow,

1    and carefully defined.  It's 10 working days, until April 21.

2    And he documented that forbearance in a written e-mail shortly

3    after the call.

4            Now, according to Mr. Dempsey, on the very next day,

5    Mr. Sheridan agreed to an open ended deferral with no clear end

6    date.  And according to Mr. Dempsey, Mr. Sheridan did not

7    memorialize the agreement in any way.  He just agreed to it on

8    a phone call.  So to believe Mr. Dempsey, we really would have

9    to conclude that Mr. Sheridan underwent a kind of personality

10   transplant between April 6 and April 7.  According to

11   Mr. Dempsey, his behavior on these two days was completely

12   different.

13           Now, it makes no sense that Mr. Sheridan would have

14   acted so differently on two consecutive days of April 2020.

15   Since it makes no sense, it probably did not happen that way.

16           One other reason to question Mr. Dempsey's account is

17   that there are no internal communications apart from that one

18   text message that we looked at, confirming the month-to-month

19   arrangement from within the Frontier organization.  And

20   remember, Mr. Sashikumar, the gentleman who needed to be kept

21   in the loop, there's no text message or e-mail to him about a

22   deferral past that 10-day deferral to April 21.  And there are

23   no other internal memorializations on the Frontier side of the

24   month-to-month agreement, no other documents from the Frontier

25   side that clarify what month-to-month means.

1          Now, to be sure, Frontier witnesses have all testified

2     that they believed a deferral was in place while negotiations

3     with AMCK are underway, but they all got that information from

4     Mr. Dempsey.  Mr. Dempsey was the only one on the April 7 call

5     with Mr. Sheridan.  So if Mr. Dempsey's story is not

6     believable, then none of the other Frontier witnesses are

7     credible on this point either.

8          The last point I'll make, your Honor, the last reason

9     to question Mr. Dempsey's credibility with respect to the

10    April 7 call, is the correspondence that took place immediately

11    after the termination.  Mr. Dempsey said he was shocked when he

12    got the termination notice from AMCK, because there was this

13    month-to-month waiver in place.  But in the two letters written

14    by Frontier immediately after the termination, there is no

15    mention of the April 7 call, and no mention of a month-to-month

16    agreement.  Mr. Dempsey testified that he was involved in the

17    preparation of both these letters.  He at least reviewed them

18    before they were sent.

19         And I want to show you first Joint Trial Exhibit 150.

20    This is a letter from Mr. Ernie Yu of AMCK.  This is actually

21    after the first letter.  But I just want to emphasize that in

22    AMCK's response, it was emphasized that no waiver took place,

23    and in fact in that third paragraph of this letter, at the

24    bottom, Mr. Yu says, this -- he's referring to the April 6

25    agreement, the 10-day waiver, and he writes "This is the only

commitment made by AMCK with respect to non-payment of rent by
Frontier, and that commitment obviously expired after April 21,
2020."

So now let's go to Joint Exhibit 151.  This is the
response from Frontier, and obviously this letter was sent in
order to rebut the contention of AMCK that no waiver had
occurred, and that the only waiver was the April 6 agreement.

And in fact, that's what the letter says.  And
Mr. Diamond, the author of this letter, says in the fourth
paragraph, "I would like to remind AMCK of the following facts
that support our claim that AMCK both expressly and impliedly
deferred Frontier's payment obligation with regard to the
leased aircraft."  And what follows is a chronology of numbered
paragraphs describing the events that support Frontier's claim
that a waiver occurred.

And I'll direct the Court's attention to numbered
paragraph 3 where the April 6 e-mail is discussed, and the
position taken here is that, in the second sentence, it says,
"And thus any deferral given should reasonably be interpreted
to survive while Frontier and Airbus were finalizing the
aircraft delivery deferrals requested by AMCK."

So the position taken here is that the April 6 10-day
waiver should be reasonably interpreted to survive.  And then
the next paragraph goes on to the April 30, 2020, letter from
Mr. Sheridan, and then subsequent paragraphs talk about other

O4H3FRO2                     Summation – Mr. Butler

events.  But, the letter jumps from April 6 to April 30,
without any mention of an April 7 telephone call, and without
any mention of a month-to-month deferral.

        Now, on the other side of the coin, we believe there
are a number of reasons to believe Mr. Sheridan's testimony
that there was no agreement on April 7, and that month-to-month
deferral meant at least in first, at first, deferral for the
month of April.

        For example, there is evidence that rent deferral
agreements are almost always documented in writing in this
industry.  And there is evidence that both sides expected any
rent deferral between Frontier and AMCK to be documented in
writing.  There's also evidence that Mr. Sheridan was being
particularly cautious around this time about having his words
construed as a binding commitment.  And you may recall that
language that Mr. Sheridan appended to the bottom of some of
his proposals to Frontier.  He did not want his words to be
casually interpreted as binding commitments.

        Mr. Sheridan in fact had already resisted any kind of
open ended deferral when he constructed the 10-day grace period
for April 6.  He was very careful to say that it only lasted
until April 21.  He was very careful to define his terms.

        There's also considerable evidence that Mr. Sheridan
wanted to run important decisions past the shareholder, CK
Asset Holdings.  As I said, that was especially true for this

O4H3FRO2                         Summation – Mr. Butler

1    rent deferral decision, because the rent proposed to be

2    deferred was for aircraft owned by CK.  So the financial impact

3    of this rent deferral would affect CK as an individual

4    shareholder.

5          We've also seen evidence that Mr. Sheridan was under

6    pressure from his shareholder to not give anything away in this

7    negotiation and to extract the best possible deal from

8    Frontier.  We've seen some of those e-mails from Gerald Ma.

9    Some of them have exclamation marks and all caps, where

10   Mr. Sheridan was asked to -- was told we only have one shot at

11   this negotiation.

12         So for that reason, there is reason to think it's

13   unlikely that Mr. Sheridan would have agreed to any open ended

14   deferral on the spot, without checking first with CK Asset

15   Holdings.

16         I'd also add that Mr. Sheridan's testimony is fully

17   corroborated by the written communications immediately after

18   April 7.  He reports it to CK as something that can be agreed

19   to, not something that was agreed to.  And the draft agreement

20   prepared by Ms. O'Callaghan is perfectly consistent with

21   Mr. Sheridan's understanding of what month-to-month means.  And

22   the fact that a draft agreement was sent at all confirms

23   Mr. Sheridan's expectation that whatever was discussed on

24   April 7 would be committed to a written agreement.

25         I'd just add that Mr. Sheridan's understanding of

O4H3FRO2                    Summation - Mr. Butler

month-to-month deferral is also the most natural and plausible

understanding of that term.  Month-to-month implies that you

start with one month, and then you may or may not agree on the

next month, you may or may not agree on the month after that,

and so on.  That's just the natural meaning of that term, and

it's consistent with Mr. Sheridan's version of events.

            Finally, Mr. Sheridan has been consistent and has not

changed his story in any material way between his deposition

back in 2022 and his testimony yesterday and today.  His story

is also perfectly consistent with the correspondence from AMCK

immediately after the termination in 2020.

            Now, your Honor, the April 7 waiver is Frontier's main

argument, and we submit it's really the only factual issue that

needs to be determined in this case.  But there are some other

I'll call them themes explored by Frontier in their questioning

of witnesses.

            Our position is that these themes are all irrelevant

to the issue of waiver, particularly the issue of waiver on

April 7, but I want to touch on a few of them.

            First, there is a theme in the questioning that

Frontier negotiated with Airbus at AMCK's request.  And

Frontier witnesses have testified that Frontier did not want to

do this negotiation with Airbus, and that it was a tough

negotiation to try to move the dates of these aircraft.

            There seems to be a suggestion that somehow, that this

1    somehow binds AMCK to a rent deferral, until the next aircraft

2    delivery.  Now as a legal matter, Frontier's conduct vis-a-vis

3    Airbus should not bind AMCK in any way.  Frontier's conduct

4    cannot create a waiver by AMCK or a rent deferral agreement.

5           And I'd also ask the Court to remember that Frontier

6    testified that it started these discussions with Airbus before

7    the April 7 call, so they're not directly related to whatever

8    was discussed on that call.

9           Another point I'd make is Frontier had its own reasons

10   for negotiating delays from Airbus.  We saw evidence that

11   Frontier in the end negotiated dozens of aircraft deferrals,

12   and Mr. Dempsey testified yesterday that Frontier had its own

13   business reasons for some of those aircraft deferrals.

14          One more thing on this topic.  AMCK did suggest

15   pursuing delivery delays from Airbus, but they did so in

16   response to Frontier's request for rent deferral.  So Frontier

17   clearly had its own incentive to pursue these talks with

18   Airbus.  Frontier wanted the rent deferral from AMCK, and these

19   talks were one way to achieve that goal.

20          Another theme that has developed in the questioning by

21   the -- on the Frontier side is there may be arguments about

22   AMCK's silence, and the fact that AMCK did not respond to

23   certain requests or queries from the Frontier side.

24          There are a number of variations on this theme.  It's

25   been emphasized that AMCK never asked Frontier to pay the rent

1    that was due.  It's been pointed out that they stopped sending

2    chase e-mails during a period of time.  Another variation is

3    that when Frontier offered to get current, AMCK did not say

4    anything.  There has also been testimony that Frontier asked

5    AMCK if they would finance deliveries if Frontier got to up to

6    date on its rent payments, and AMCK did not respond.  And this

7    morning we heard testimony from Mr. Sheridan and a number of

8    questions from Mr. Hosenbud establishing that AMCK never told

9    Frontier that its rent was overdue, and it certainly never told

10   Frontier in advance that there was going to be a termination of

11   the Framework Agreement.

12          These arguments about AMCK's non-responses, about

13   AMCK's silence, are red herrings for two reasons.  First, the

14   lease agreements require an express waiver as I indicated.  An

15   implied waiver is not enough.  So AMCK's silence with respect

16   to payment of rent cannot be construed as a waiver of payment

17   of rent.

18          And second, I'd just add that Frontier knew when all

19   these payments were due.  The amount and due dates were

20   established when the lease agreements were entered, and as I

21   pointed out, Mr. Sashikumar maintained a database to tell

22   Frontier when all these payments were due.  So Frontier didn't

23   need reminder e-mails or questions from AMCK to know when its

24   lease payments were due.  There was just no secret about that.

25          Another theme that has been advanced through

1    questioning is that AMCK delivered a consistent message that

2    Frontier needed to be current by the next delivery date.  Now

3    it's true there is evidence that Mr. Sheridan and

4    Ms. O'Callaghan delivered that message, and there were

5    variations on the message, but the gist of it was that Frontier

6    needed to pay all the past due rent before any further

7    deliveries from Airbus.  Those statements, however, arose in

8    the context of negotiation over the rent deferral requested by

9    Frontier.  Those statements describe a limit on what AMCK could

10   agree to in the negotiation, so they were not made in a vacuum.

11   And Frontier, it appears, wants the Court to read those

12   statements as standalone concessions that Frontier did not have

13   to pay the rent.  But they should not be read in isolation,

14   your Honor, and they should not be read out of context of the

15   ongoing negotiation.

16        Remember, the agreement says that negotiation cannot

17   constitute a waiver.  So statements made plainly in the context

18   of a negotiation cannot just be snatched out of context and

19   made into binding waivers.

20        The last point I'll discuss, your Honor, has to do

21   with the argument that AMCK never wanted to take delivery or

22   that AMCK always wanted to terminate.  We've seen evidence that

23   at least some individuals on the AMCK side, particularly at the

24   shareholder, had some questions about whether delivery was

25   appropriate.  There was evidence about Gerald Ma asking about a

1    MAC clause, clearly exploring the possibility of terminating

2    the Framework Agreement early on.

3            THE COURT:  Mr. Butler, before you develop that point,

4    let me ask you a question about the points you've made so far.

5            Let's assume that because of the incoherence and

6    internal conflicts about dates and extensions of time, there

7    was never a coherent waiver reached to pay the rent on the 14

8    planes.  And therefore, the right to payment continued

9    unimpaired.  Let's assume all of that in your favor.  And it

10   may be easy to reach and it may be impossible to reach, but

11   let's assume that.

12           Would not you still face liability under the law for

13   the failure to give the notice and opportunity to cure?

14           MR. BUTLER:  Your Honor, no.  Simply because the lease

15   agreement provides no notice -- there is no provision of the

16   lease agreements that allows or that requires notice and

17   opportunity to cure when a default occurs.  It's the nature of

18   these agreements that they're extremely strict --

19           THE COURT:  Isn't there such an obligation in the law?

20           MR. BUTLER:  I don't believe so, your Honor.  I don't

21   believe so.  There is an obligation that arises when there has

22   been a waiver, if it is going to be withdrawn, there must be a

23   reasonable opportunity to cure, after the waiver is withdrawn.

24   But that presumes the existence of a waiver in the first place.

25   I thought we had addressed this in our trial brief, but that's

1    our position certainly, that where there is no waiver at all,

2    unless there is some provision of the agreement that requires

3    prior notice, the party is free to terminate the contract,

4    based on the default.

5            THE COURT:  Of course, the contract says that for

6    non-payment in the manner of stipulated within five business

7    days of written notice must be given.

8            MR. BUTLER:  If you could tell me the provision, I can

9    take a look at the contract.

10           THE COURT:  My larger point is, isn't that simply a

11   statement of the general law?

12           MR. BUTLER:  I don't believe it is, your Honor.  I

13   don't believe it is.  I think where there is a payment default

14   in particular in these lease agreements, the lease agreements

15   are very strict, and I don't believe there is any common law or

16   contract law general provision that requires, once a default

17   occurs, that requires some kind of notice that you are going to

18   act on the default.

19           It may seem kind of harsh, but that's the business

20   reality in this industry, that the rent payment provisions are

21   very strict, so there's no requirement -- yeah.  Absent

22   something in the agreement, I don't believe there is any

23   requirement under New York law that you provide prior notice of

24   a termination where a default condition exists and is

25   continuing.

O4H3FRO2                    Summation - Mr. Butler

1          THE COURT:  I interrupted you.  You were on your way

2     to your final point.

3          MR. BUTLER:  Very close to it, your Honor.  I was

4     talking about the theme that AMCK never wanted to take delivery

5     of these aircraft.  And I want to point out that the record

6     does not indicate that this was some kind of plot on the part

7     of AMCK to terminate from the beginning.

8               In fact, there's evidence that AMCK viewed termination

9     of the Framework Agreement as a terrible option.  They called

10    it a nuclear option, something you don't want to do unless you

11    have to do it.

12              And in the end, this option was taken only after

13    careful consideration and after a meeting of the AMCK board

14    authorizing the termination.  Before that time, there was no

15    official decision on the AMCK part -- on the AMCK side, to

16    terminate the agreement.

17              And before that decision, the evidence indicates that

18    AMCK was negotiating in good faith to try to avoid this

19    outcome, to try to reach an agreement with Frontier.

20              So, your Honor, I'll end by just saying, in sum, that

21    the only waiver in this case is the 10 working day forbearance

22    that was agreed on April 6, and that expired on April 21.  And

23    because Frontier was in payment default, beginning after

24    April 21, AMCK had every right to terminate when continue did,

25    on May 8th.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4H3FRO2                    Summation - Mr. Butler

1              I want to thank you, your Honor, for the time and

2      attention that you've given to this case, and for your careful

3      consideration of our arguments.  Thank you.

4              THE COURT:  Thank you, Mr. Butler.

5              MR. SCHAER:  Just one moment, your Honor, while we get

6      situated here.

7              MR. BUTLER:  Your Honor, while the other side is

8      getting situated, I have an answer to your question now that

9      the provision is in front of me.  Your question was about the

10     five business day period in Section 16.1(a) I believe.  And --

11             THE COURT:  That's the one in the Framework Agreement,

12     yes.

13             MR. BUTLER:  This one is one in the lease agreements,

14     so the lease agreements that required the rent to be paid.  And

15     the five business day period that you referred to, your Honor,

16     towards the end of Section 16.1(a), applies to any other sum

17     due under this agreement, but it does not apply to any basic

18     rent or security.

19             THE COURT:  What's your point?

20             MR. BUTLER:  My point, your Honor, is that the five

21     business days that you asked about, that doesn't apply to basic

22     rent which is a defined term.

23             THE COURT:  I was simply asking if it didn't apply.  I

24     wasn't -- I wasn't asking what it said.

25             MR. BUTLER:  Pardon me, your Honor.  I misunderstood.

O4H3FRO2                      Summation - Mr. Schaer

Forgive me.

MR. SCHAER:  Good afternoon, your Honor.

Time.  This case is about time.  The time Frontier
wanted for rent deferrals, the time AMCK wanted for delivery
deferrals, and the time it would take each of them to reach
formal agreements on both of those key items.

So what did the parties do?  They gave themselves
time.  Specifically, AMCK granted Frontier an informal
deferral, or a waiver, as us lawyers or the law calls it, to
provide the time necessary to first negotiate and reach an
agreement with Airbus, delaying deliveries of the remaining
five aircraft due under the Framework Agreement, and second,
only after reaching that agreement with Airbus, negotiate and
finalize an agreement with each other on the terms of a formal
written rent deferral.

But while the waiver was ongoing, while negotiations
were ongoing, and without ever saying it was withdrawing the
waiver or expecting a payment, AMCK terminated the Framework
Agreement, abandoning its remaining obligations to pay for, and
take delivery of, the five aircraft that we know it didn't
want.  As a matter of law, it cannot do that.  And that is why
we are here today.

Now, as the Court astutely observed, this case is
facially complicated but the principles are quite simple.  Was
there a waiver?  If so, what is the scope of that waiver?  Was

1    the waiver properly withdrawn and was Frontier provided a

2    reasonable time to repay?  And finally, damages.

3            I want to walk through each of those now, but before I

4    do, I will just ground us in the familiar breach of contract

5    elements.  Those four elements, of course, there is a valid

6    contract, a breach of that contract, performance by the party

7    trying to hold the other in breach, and damages.

8            Now, there is no dispute that there is a valid

9    contract in the case, that is the Framework Agreement, the

10   Court saw that at length and the Court also saw all of the

11   interrelated contemporaneous contracts involving all of the

12   other parties relating to lease agreements.

13           Nor is there any real dispute, factual dispute on the

14   second element, that AMCK terminated its obligations under the

15   valid Framework Agreement.

16           So the real dispute in this case is on the third

17   element, whether Frontier performed its contractual duties

18   consistent with the waiver, such that it can hold AMCK in

19   breach for that termination of the valid contract.

20           Of course, there is a disagreement about the extent of

21   damages, which I will address at the end.

22           So, what is a waiver?  It is a clear manifestation of

23   a party's intent to relinquish a contractual right.  That's it.

24   It can occur through express statements, which we have many of

25   in this case.  It can also occur through affirmative conduct or

O4H3FRO2                        Summation - Mr. Schaer

1   by failure to act so as to evince an intent not to claim a

2   purported advantage.

3           Even when there is a complete non-waiver clause in a

4   contract, which we do not have in this case, but even where

5   there is a complete non-waiver clause in a contract, New York

6   courts still find that a waiver exists when a party has clearly

7   manifested an intent to provide one, be that through express

8   statements or through conduct.

9           Now, as discussed previously, waiver is a part of

10  contract law.  When there is a dispute as to material terms,

11  which we have here, courts are instructed to look to that

12  extrinsic circumstantial evidence to discover whether the

13  waiver existed, and its scope.

14          Also like contract law, any alleged subjective,

15  secret, unstated intent by one of the parties is irrelevant to

16  the pertinent question of what did the defendant clearly

17  manifest to the plaintiff.

18          Now, counsel explained a couple other principles

19  related to waiver.  One of them is that silence is not enough.

20  First, the full quote is mere silence is not enough.  When

21  there are other things combined with silence, silence is an

22  important factor here.  But no one, at least we are not saying

23  that all they provided was silence.  There is a lot in the

24  record on top of their repeated silence, in response to our

25  questions about their commitments.

1            There is also a comment that uncertain terms in a

2      waiver are not enough to create a waiver.  No one is saying

3      that.  We are just saying when there is some dispute over

4      material terms, which is here, the Court employs the usual

5      contract interpretation principles to discover what those

6      disputed terms meant.

7            So that bring us to the question, what did AMCK

8      clearly manifest to Frontier?  Everything it communicated to

9      Frontier underscored that there was a waiver in place.

10            Now, what was the scope of that waiver?  First it was

11      10 days, and then it was extended on a month-to-month basis.

12      With the understanding, reinforced many times over, in many

13      mediums, that so long as there was no delivery of an aircraft,

14      the waiver could continue.

15            Now what was the purpose of the waiver?  AMCK has

16      actually put that in writing for us.  It was to provide the

17      parties the time to negotiate and reach an agreement with

18      Airbus on delivery deferrals, and second to negotiate and reach

19      an agreement with AMCK on rent deferrals.

20            Darcy, will you unmute the video for a second.

21            I just want to show the Court a demonstrative that we

22      looked at earlier in the case to clarify this point.  This is

23      the construct.  This is the waiver.  It was a month-to-month

24      rent deferral, a month-to-month waiver to provide the parties

25      with the time to do the things on the bottom.  First it was

O4H3FRO2                              Summation – Mr. Schaer

1   Airbus delivery deferrals, and to negotiate the terms of a rent

2   deferral repayment.  Later, near the end, AMCK starts asking

3   for additional lease concessions, we saw those, the lease

4   extensions for all 18 aircraft, or for 18 of the aircraft that

5   would have amounted to about $200 million.

6           Now, of course, the area in red or to use the nuclear

7   option and terminate the Framework Agreement, that is not

8   something that Frontier knew.  But, everything else, this is

9   the construct, we need a waiver to provide us time to do these

10  things on the bottom.  So long as there was no delivery, the

11  parties still had the time and the waiver continued.

12          Now the Court has seen a lot of evidence that

13  corroborates this.  We've seen testimony from AMCK's own

14  witnesses that corroborates this, including Ms. O'Callaghan

15  saying the waiver was in place to allow Frontier time to reach

16  agreement with Airbus.  We've seen contemporaneous documents

17  from the parties, including the one from Mr. Sheridan on

18  April 6 that establishes the first waiver laying out the

19  understanding and the construct.  And I quote his words,

20  "Mindful of the time it might take to you reach agreement with

21  Airbus or to make some other arrangements and therefore of the

22  ability for us to reach a deferral agreement, you have 10

23  business days.  You have until April 21."

24          We have Mr. Dempsey's testimony about the April 7 call

25  explaining the extension of the waiver to the month-to-month

1    understanding, using that same construct reached and expressed

2    on April 6.  He also explained why it was extended.  Because

3    there was no chance that there was going to have an airplane

4    delivery in the next 10 business days.  Airbus was closed until

5    April 29.  Nothing was going to happen on April 21.  And with

6    the concern being there cannot be a delivery before payment,

7    the parties could push that out.

8          We've also heard from Mr. Sheridan that he has no

9    memory of what was said on that call, so we have one account.

10          But we did hear from Mr. Sheridan this morning that he

11   wanted the month-to-month waiver.  And we know that he then

12   reached out to his shareholder who then approved that, what he

13   says had him seeking approval.  We'll come back to that

14   momentarily.

15          Now, I want to be clear that none of Mr. Dempsey's

16   deposition testimony is out of step with that understanding.

17   We saw some snippets, we tried to put in the larger portions

18   during the actual testimony, but what is clear is that on

19   April 7, when the parties reached the month-to-month

20   understanding, Frontier had not yet gotten the next airplane

21   out of May.  That next plane was delivering into May.  So when

22   asked the question to Mr. Dempsey, hey, first you'll agree to

23   the end of April, and then you'll later have to agree to the

24   end of May, and he says that's correct, that's because he

25   didn't have until the end of May.  He needed to go back to

1    Mr. Sheridan and say I have moved the delivery and, therefore,

2    the repayment moves along with it.  That is the waiver.  So

3    long as there is no delivery, there is no payment.  The

4    delivery was still in May when they first agreed, it moved into

5    June, and then later it moved into July.  And so, too, with it,

6    the waiver period.

7           We also have the contemporaneous text message by

8    Mr. Dempsey to his team at Frontier stating unequivocally:

9    Just spoke to Paul Sheridan, he has agreed to do the deferral

10   on a month-to-month basis.

11          We have repeated references from AMCK that their

12   consistent concern all the way back on April 1st in a text

13   message between Ms. O'Callaghan and Mr. Fanning is that rent

14   deferrals on the 14 aircraft must be linked to delivery

15   deferrals of the remaining five neos in 2020.  That's Joint

16   Exhibit 17.

17          That was reiterated ad nauseam as the Court saw

18   throughout the parties' conversation.  Repayment is linked to

19   deliveries.

20          You also have Mr. Fanning telling Ms. O'Callaghan on

21   April 29 that one solution to the parties' negotiations is that

22   "the current rent deferral would stay in place."

23   Ms. O'Callaghan says nothing to alter that understanding, that

24   there is still a rent deferral in place on April 29.

25          We have Mr. Dempsey telling Mr. Sheridan both on

1    April 27 and April 30 that we, Frontier, understood and were

2    operating under the assumption that you just wanted no

3    outstanding payments at the time of the next delivery.  On

4    April 27 and April 30, Mr. Sheridan says nothing to disabuse

5    Frontier of its understanding and assumption of the waiver.

6         We have Mr. Sheridan's internal communication to his

7    shareholders on April 30, saying in his own words, "Frontier

8    will immediately pay outstanding April rents on which we agreed

9    an informal deferral pending agreement with Airbus on delivery

10   delays."  That's the waiver in his own words to his

11   shareholders on April 30.

12        He testified this morning that when he said April,

13   what he really meant was April 21 and 10 business days.  That

14   is not what he wrote to his shareholder on April 30 when he

15   says "on which we agreed an informal deferral pending agreement

16   with Airbus on delivery delays." Says nothing about the waiver

17   being over on the 21st.  Says nothing about it expired at that

18   time.  He echos exactly what the parties have reached.  That as

19   long as there is no delivery, the waiver continues, to allow

20   the parties time to complete negotiations with Airbus, and then

21   each other.

22        In the record, the only date that AMCK ever gives to

23   Frontier, besides the next delivery, is on May 15, or that date

24   is provided on April 30, and AMCK requests repayment by May 15.

25   The parties never got to May 15.

1          And we've seen that the negotiations were ongoing

2    between the parties into May.  After having an April 30 phone

3    call, Mr. Dempsey is waiting for Mr. Sheridan's response, and

4    he sends him a text message on May 1st saying what's the

5    status, I'm waiting for your response.  Does Mr. Sheridan say,

6    the waiver's over?  We're now past April 21, we're now past

7    April 30.  No, he says I need to talk to my shareholder, I'll

8    get back to you.  We saw Mr. Dempsey then had to follow up with

9    him again on May 8 because Mr. Sheridan still did not respond,

10   knowing Mr. Dempsey was looking for a response.  Did he respond

11   to that May 8 query?  Of course not.  The next thing from AMCK

12   is the termination notice.

13         Now, we also have testimony from all of Frontier's

14   witnesses that corroborate the understanding of the

15   month-to-month deferral.  They understood the scope of the

16   waiver.  They all said that no one ever told them anything that

17   called into question their understanding, and that they were

18   all incredibly conscious of not going into default with AMCK.

19   Mr. Dempsey said this in the text messages to Mr. Sheridan, or,

20   sorry, the e-mails to Mr. Sheridan on April 6, that's Joint

21   Exhibit 63.  Mr. Dempsey reiterates this to Mr. Sheridan on

22   their April 7 phone call where they agreed to the

23   month-to-month deferral.  And we know that because Mr. Sheridan

24   communicates that to his shareholders that Frontier is

25   incredibly conscious of going into default with us.  That's

1    Joint Exhibit 77.

2            And indeed, Frontier paid all of the rent due through

3    the end of March, even after asking for a rent deferral on

4    May 16, it is still paying its rent, because there was no

5    waiver in place yet.  But once a waiver was put in place, only

6    then did Frontier stop paying.

7            Though to be clear, Frontier actually continued to pay

8    rent on MSN 10038.  Even while that waiver was in place, that

9    payment coming on April 16, because that was the only aircraft

10   that AMCK clearly manifested that it was excluding from the

11   waiver, and Frontier was conscious to pay that one always on

12   time.

13           Of course, we have all of those chase alerts, those

14   are at Plaintiff's Exhibit 7 and 8.  Reflecting that every time

15   AMCK believed Frontier was behind by even one day, it would

16   send a chase alert, and Frontier would pay immediately.  Now,

17   of course, AMCK was not sending those alerts for exactly our

18   waiver period.  It sent them right before, it sends them right

19   after, but conspicuously it does not send them while we

20   understand that there is a rent waiver in place.

21           Finally, I should just say that month-to-month is not

22   a new term.  These are sophisticated and smart parties, but

23   they did not invent that idea.  Now, counsel says that

24   month-to-month obviously means it ends at the first month and

25   you have to talk about moving it to the next month.  New York

1    case law says otherwise.  We put this in our trial briefing,

2    I'll reiterate it here so the point is clear.  New York case

3    law explains that a month-to-month tenancy has an indefinite

4    term and continues until terminated by notice.  That is the

5    definition of month-to-month.

6         Now, there is a reason this well known month-to-month

7    term was used in this case.  And than is because, as I alluded

8    to, the parties did not know when the next delivery would occur

9    when they agreed to it, and therefore they didn't have an exact

10   date by which to peg the waiver.  They always knew it was after

11   April, but at that point, it was in the back half of May.  But

12   if Frontier could move the deliveries out into June, into July,

13   the waiver would go with it.  That is why they called it a

14   month-to-month, and not to the end of April, and not a one

15   month.  Because it was pegged to a moving target.

16        Every act in this case manifested to Frontier clearly

17   that there was a month-to-month waiver linked to the next

18   delivery.  And so long as there was no delivery, the waiver

19   continued, repayments did not need to be made, and the parties

20   still had what they wanted, which was time to complete their

21   negotiations.

22        Now, what does AMCK say about this waiver?  Two main

23   things and both of which speak for themselves.  The first is

24   that the parties only ever agreed to a waiver until April 21.

25   Now, for this to work, Mr. Sheridan needs to have acted

completely differently on April 6 and April 7. I was surprised
that counsel made a similar point in his presentation that our
idea is Mr. Sheridan needed to act completely different on
those two dates. Seemingly that he sent a follow-up e-mail on
April 6, but he doesn't send a follow-up e-mail on April 7, and
therefore it is impossible to reconcile these two things. Of
course, the explanation being that he didn't have the phone
call with Mr. Dempsey on April 6. He wasn't talking to the
executive on April 6, so he needed to inform him of what he
agreed to. But on April 7, he is talking directly to
Mr. Dempsey. This is executive to executive level
conversation. There was no need to inform Mr. Dempsey on what
was agreed upon, because he agreed to it with Mr. Dempsey.

          Now, our understanding, or as they have explained what
happens with Mr. Sheridan -- and I'll put up our second
demonstrative now -- is that on April 6, Mr. Sheridan -- let me
try to make it a little bigger. On April 6, Mr. Sheridan felt
that he had the authority, felt he had the ability to get on a
phone call with Frontier and reach an agreement. There is no
dispute that that happens. And directly after he reaches out
to his shareholder and he leads to catch you up, and the key
language there being "to give us a bit of time to reach an
amicable agreement, we extended them a grace period of 10
working days on non-payment of rents."

          So on April 6, Mr. Sheridan testifies he agrees on the

1    call with Frontier to give them the waiver, and then he follows

2    up with his shareholder only to say, I reached the agreement.

3    He's not asking for approval on the 6th.  He is not asking for

4    permission on the 6th.  He is telling the shareholder what he

5    did.

6         Now, April 7, something seems to have happened to

7    Mr. Sheridan's authority, ability, understanding of his job.

8    He has the phone call with Mr. Dempsey, where Mr. Dempsey

9    remembers they agreed, he provides a month-to-month waiver, but

10   Mr. Sheridan's testimony is that he didn't do that.  Well, I

11   don't remember exactly, but I don't think I would have done

12   that.  What I did is actually I had to then reach out to my

13   shareholder, and now, one day later, I need approval for these

14   types of things.

15        Now, it's curious because he uses almost the exact

16   same language that he uses on April 6.  A quick update on the

17   situation with Frontier.  He's not saying I need your advice, I

18   need your approval.  Then again we'll go down here, the key

19   language is highlighted.  In the meantime, he, meaning

20   Mr. Dempsey, "asked for us to do the deferral on a

21   month-to-month basis.  They are also conscious that they don't

22   want to be in default with us.  Since the next delivery isn't

23   going to be in April now that the Mobile plant is shut, I think

24   we can agree to this and give them a bit more time to work with

25   Airbus."

1          There is no request for approval here.  There is no

2     request for permission here.  There is no question mark here.

3     It mirrors exactly what Mr. Sheridan does with the shareholder

4     on April 6.  Hey, this is what I've agreed to, I am giving you

5     an update on it.

6          And if there were any doubt as to what Mr. Sheridan's

7     role is, let's go to the next page of the demonstrative.  This

8     is the testimony of Gerald Ma, AMCK's shareholder.  And the

9     question to him, is "My question to you, sir, it wasn't the

10    idea or wasn't the idea of prepaid rent yours?"  And here's his

11    answer:  "no, I'm not so sure.  I -- probably not.  I don't get

12    into the details, I don't run the company.  It's Paul was the

13    CEO.  So how we -- how we negotiate, how we discuss with

14    lessees not -- not my job."  That is from the shareholder.

15         Now, even countenancing Mr. Sheridan's understanding

16    that he needed to get this permission, it is then curious that

17    he never actually follows up with Frontier.  He reaches out to

18    the shareholder on April 8.  Each of them in their own way says

19    this is fine.  One says one month, one says the month of April.

20    One says month by month.  They all tie it to there being no

21    risk of delivery.

22         But Mr. Sheridan's understanding, their case, his

23    testimony is that after he gets this permission that he was

24    seeking, he then never goes back to Mr. Dempsey and says

25    anything to him ever again about this month-to-month waiver

1    that they discussed.  That's their construct.  Instead, instead

2    of Mr. Sheridan going back, their allegation is that the only

3    response they ever had between the phone call only between

4    Mr. Dempsey and Mr. Sheridan, is that Jane O'Callaghan, who is

5    not on that call, and not on this thread with the shareholder,

6    reaches out to Robert Fanning, who was also not on the April 7

7    call, and sends a draft rent deferral agreement which is

8    completely silent about the Airbus deferrals which was the

9    centerpiece of the phone call on April 7.  To them, that is the

10   response to the question for month-to-month waiver tied to

11   deliveries.  Again, that speaks for itself.

12        And I will say that under the law, once there is a

13   waiver, the notice of the withdrawal, which is necessary, that

14   notice must be clear, distinct, and unequivocal.  It must fix a

15   reasonable time within which to act, and inform the other party

16   that failure to perform by that date will be considered a

17   default.  That April 9 e-mail between Jane O'Callaghan and

18   Robert Fanning meets none of that criteria.

19        Now, also to buy this construct that Mr. Sheridan had

20   authority on one day, didn't need permission, but the next day

21   totally different, we have to ignore that throughout the end of

22   April, and into May, they met continuously to say internally

23   that the waiver is still in place.  We gave them through April.

24   We have Ms. O'Callaghan's notes on an internal document that

25   they just need get back to Frontier by April 30 on the deferral

O4H3FRO2                      Summation – Mr. Schaer

request.  Not April 21, nor that it is expiring, just we need
to get back to them.

        We also have to ignore all of the internal documents
we saw in Mr. McInerney's a bit arduous deposition video from
late March through May 8th, all of which say rent deferral
requested under negotiation.

        And of course we have to ignore that AMCK never said
anything to Frontier on April 21, on April 22, on April 30, on
May 1st, or at any other time that called into question that
there was a continuing waiver, despite the parties being in
near constant communication.  Again, the question for waiver is
clear manifestation and that is obvious.  There was a
continuing waiver.

        Now, AMCK's other main contention is that there needed
to be a written agreement.  And that written agreement needed
to contain three terms.  The length of the rent deferral, the
length of the repayment, and the interest due.

        No one disputes that there eventually needed to be a
written agreement.  That was always intended as far back as the
March 16 letter that Frontier sent.  That is in fact the focus
of the parties' communications after April 7 when they reached
that month-to-month waiver.  But that was also the basis of the
waiver.  It was to give the parties time to do that
negotiation, which could only occur after the Airbus
negotiations were done, and only then reach a written

O4H3FRO2                        Summation - Mr. Schaer

1    agreement.

2            And we've seen in the record a lot about Frontier

3    negotiating different terms for what would eventually be that

4    formal written agreement.  We see Frontier asking for nine

5    months of a repayment period, first in its March 16 draft, and

6    then in Mr. Dempsey asking or commenting to Mr. Fanning after

7    Mr. Fanning asked about what should we do about the revised

8    agreement.  They're clearly discussing the formal written

9    agreement.

10           Later we see Frontier talking about, hey, maybe we'll

11   just pay you 50 percent, 50 to 75 percent at the first

12   delivery, the remaining 25 percent at the second delivery.

13   These are just their negotiations on that formal agreement.

14   And of course we have Frontier at the end saying, forget

15   linking repayments to delivery, we will repay you right now.

16   We will repay you immediately and we will stay current forever.

17   Let's bring this negotiation to a close.

18           That was the negotiating of the eventual written

19   agreement that Frontier was trying to get to.

20           Now, we also have AMCK negotiating different terms.

21   Now, they stayed reasonably consistent with their request that

22   we just want you to pay at the next delivery.  But then they

23   start adding new terms at the end such as we want significant

24   extensions on all of your aircraft to the tune of a

25   $200 million commitment.  Now, of course the difference between

1    the parties' negotiations is that while Frontier's continued to

2    get better, or continued to bridge the gap, AMCK's demands

3    continued to get more extreme.  Which, as it turns out

4    intentionally, but unknown to Frontier at the time, kept the

5    parties from being able to finalize that written agreement that

6    Frontier was trying to get to.

7           Now, we heard some talk about the attorney letters

8    that came in after the fact.  Your Honor, those are letters

9    that were drafted by counsel.  They were drafted by in-house

10   counsel, they were drafted by outside counsel, none of whom

11   were involved in the actual negotiations here.  Mr. Dempsey

12   couldn't answer many questions about it due to privilege.  But,

13   that is just the fact.  They are signed by the in-house

14   counsel, and he did testify that that's who was involved in

15   drafting them, and outside counsel.  And they're clearly

16   summarizing the events that had happened over the previous

17   month and a half.  And they are two to three page documents

18   that obviously cannot capture the more than 100 exhibits that

19   we have gone over in this case.  But nevertheless, they clearly

20   state that Frontier understood that it was still within a

21   waiver period at the time that AMCK terminated on May 8.

22          These letters in many ways support all of the actual

23   evidence that we've seen in this case between the actual

24   players involved and the testimony that you've heard and you've

25   seen.  And they certainly do not supersede any of it.

1          Now, how did the parties actually act?  Again, we have

2     disputed material terms, so actions matter in understanding

3     those disputed material terms.  They acted completely

4     consistent with the understanding that the waiver was to

5     provide time to negotiate with Airbus, and then negotiate with

6     each other.  Frontier uses that time that the parties provided

7     with the waiver to immediately and tirelessly start working

8     with Airbus to move out airplane deliveries, even though it was

9     to a significant financial detriment.  It was not able to

10     collect its purchase price proceeds which were about 5 million

11     per aircraft.  It wasn't able to recollect its PDP refunds

12     which was about 10 million per aircraft.  So it's 15 million

13     per aircraft that Frontier is pushing out at a time when it is

14     desperate for liquidity at the beginning of the pandemic that

15     the airlines are on the front lines and nobody knows how long.

16     That's what Frontier is doing.

17          And of course, it is weathering threats of default

18     from Airbus at the same time, saying if you don't show up,

19     we're going to put you in default.  This is the central tenet

20     of Frontier's business.  It would have ruined it.

21          What else is Frontier doing?  It is communicating

22     constantly the feedback that it's getting from Airbus to AMCK.

23     It is being as transparent as possible.  Hey, they'll only move

24     us to June, will that satisfy you?  We'll keep working on that.

25     It is telling AMCK all the time, hey, these are the funds we

1   have.  These are our constraints.  This is what the

2   government's going to provide to us.  These are when the

3   payments are going to come.  It is being as transparent with

4   its business partner as possible, under that idea of the

5   waiver, to provide time to complete negotiations.

6           Now, when Frontier finally provides the exact deferral

7   months it is able to get out of Airbus, AMCK is actually fine

8   with it.  Says great.  We'll do three in July, we'll do two in

9   February.  There is no issue on that piece.  But still, without

10  an actual delivery in place during this time, there were no

11  chase alerts, there were no demands for payments, there were no

12  comments that the waiver was over, there were no comments that

13  negotiations were over.  The parties continued to act as if the

14  waiver, the month-to-month waiver, was there.

15          Now what did AMCK do with its time?  Let's look at

16  that and let's look at why.  Now, to be clear, this does not

17  affect the central question of what AMCK clearly manifested to

18  Frontier.  But it does help explain why they acted the way they

19  did, which is otherwise inexplicable.

20          Now, we have testimony, a lot of which from Gerald Ma,

21  that AMCK and its shareholder were upset with Frontier due to

22  the timing of the rent deferral request coming on the same day

23  that the first aircraft delivered.  Now, of course, Frontier

24  has no control over that aircraft delivery date, which is

25  largely governed by Airbus, and was also being influenced by a

1    tariff regime that was being put in place at the same time, and

2    of course Frontier has no control over the pandemic, and the

3    timing of that, let alone the emergency orders that were going

4    in place just at this time.

5         But AMCK is upset about this timing, and even more so

6    its shareholder is upset about this timing.

7         We know that AMCK didn't like the terms of the

8    Framework Agreement.  It says "ouch" when it sees the terms of

9    the first aircraft are going to be about 269,000, compared to

10   the 340,000 for pretty much all of the other aircraft that were

11   within its portfolio.  We know they wanted out as early as

12   March 23 and March 24, already mentioning the nuclear option

13   and the MAC clause to try to not take deliveries.

14        And just a comment on the nuclear option.  We've heard

15   that what the nuclear option means is that this is the last

16   option, this is not what we want to do, this is AMCK's

17   understanding, we want to do everything but avoid the nuclear

18   option.

19        Your Honor, they could have asked for payment.  That

20   was an option.  They could have said the waiver is over.  That

21   was an option.  The nuclear option that they chose was not the

22   last option, it was their preferred option to get them what

23   they wanted.

24        We also know their internal financing was drying up.

25   That the bank loan discussions for the aircraft had all been

1    put on hold.  That the terms were getting worse and worse, and

2    that shareholder funding was likely the way that they would

3    have to move forward.

4          We know they thought, well, maybe if we can get some

5    really significant QPQs.  In their terms, it cannot be normal.

6    And maybe if we can mark the Framework Agreement to the market

7    now, instead of what we actually agreed to, we won't stay in

8    the Framework Agreement.  And from that comes the $200 million

9    ask at the end.

10          We know they believed that terminating the agreement

11    with Frontier actually gave them the best chance of getting the

12    terms they wanted, that they couldn't achieve in

13    straightforward negotiations, using the crisis of their

14    termination as leverage in following negotiations.  And we know

15    that they followed through on that plan to a T.  That is

16    exactly what they did.

17          We also know from Mr. Sheridan's testimony and AMCK's

18    internal documents that the one thing that could ruin that plan

19    was if Frontier paid the waived rent.

20          Now, their story is built around how badly they wanted

21    to be paid, but again, they never asked to be paid.  They never

22    accepted Frontier's repeated offers to pay.  We will pay you

23    right now.  We will pay you immediately.  Because they didn't

24    want to be paid.  Because they needed to not be paid.  Because

25    that eventually became the pretext for their plan.  And that's

1  why they acted the way they did and intentionally never

2  clarified or followed up on the waived rent.

3          Now thankfully for the law, and for equity, and for

4  common sense, that doesn't matter for the question of whether

5  or not there is a waiver.  Again, subjective, withheld, secret

6  beliefs are irrelevant to what AMCK clearly manifested, which

7  was that there was a month-to-month waiver linked to deliveries

8  to give the parties time to negotiate with Airbus and each

9  other.

10         So, we have a waiver.  Now, how do you actually

11 withdraw it?  It depends on the type of waiver.  There is one

12 type of waiver that is supported by consideration and justified

13 or justified reliance.  Or there is a waiver that's not

14 supported by consideration or justified reliance.  And the way

15 to withdraw is different depending on what you have.

16         Our waiver here is supported by consideration and

17 justified reliance.  The consideration of course is the Airbus

18 piece.  We are holding off on collecting $15 million per

19 aircraft at a time when we need cash, and we are weathering

20 these threats of default from our most important partner.  We

21 also have the justified reliance, of course, which is Frontier

22 thinks that it doesn't have to make these payments while being

23 incredibly conscious not to go into default with AMCK.

24         Now, it's black-letter law that of course -- this is a

25 quote -- a waiver supported by consideration or a substitute

1    such as reasonable and justified reliance may not be retracted

2    without mutual consent.

3            That is the law.  Such a waiver, it basically forms a

4    new contract, and it cannot be withdrawn by unilateral action.

5    AMCK obviously did not have Frontier's assent, and it acted

6    unilaterally, so any withdrawal or retraction was ineffective

7    as a matter of law.  Even if AMCK could withdraw it though,

8    they still needed to provide Frontier a reasonable time to

9    cure, which they did not do.

10           And that bring us to the second category of waiver,

11   the one that are not supported by consideration or justified

12   reliance.  Now, if it's one of those types of waivers, a party

13   can unilaterally relinquish it or withdraw it, but to do so

14   they have to provide notice of the withdrawal, and a reasonable

15   time to pay.

16           Now, our trial brief contains scores of cases and the

17   UCC, and the New York UCC, and Williston on Contracts that

18   reinforces this basic, basic principle.  Again, the withdrawal

19   must be clear, distinct and unequivocal, fix a reasonable time

20   within which to act, and inform the other party that failure to

21   perform by that date will be considered a default.  There is no

22   notice like that in this case, your Honor.  In fact, we know

23   that AMCK contemplated giving us that type of notice, but

24   specifically didn't because they knew we would pay.  They

25   discussed this at their board meeting in April, saying we know

1  they'll cure if we ask them to pay.

2          Mr. Sheridan says it to Mr. Ma on May 8 before

3  actually sending the termination notice.  Hey, I just want to

4  get this done before Frontier can complicate anything.  Before

5  they can pay.

6          Now, at best, in the light most favorable, that May 8

7  termination letter should be construed as a notice to Frontier

8  of a withdrawal of the waiver period.  But then we paid within

9  a reasonable time.  We paid within three business days, which

10  is the grace period provided for in these contracts.  And now

11  in these types of circumstances, courts are allowed to impose

12  what they believe are a reasonable time, and we suggest to the

13  Court that the three business day period provided already in

14  the contracts is such a reasonable time.

15          A quick note about the termination letter that they

16  sent.  It only cites outstanding April rents.  At that point on

17  May 8, no May rents were past the grace period.  They weren't

18  the basis of their letter in any event.

19          Now, Mr. Sheridan testified that there was a rent that

20  would have been due on May 3, because there was actually one

21  that was due on April 3.  That is wrong.  The Court should look

22  at Joint Exhibit 192, which clearly specifies the dates, the

23  due dates for all of the payments.  There was one due on

24  April 3, but that's because of the weekend and holiday

25  provision where payment is due on the prior business day.  So

O4H3FRO2                    Summation - Mr. Schaer

the first one in May was due on May 5 with a grace period
extending to May 8.  So it was not past due when they sent
their termination notice.  But in any event, that is irrelevant
because their termination notice solely is based on the April
rents.

          So in sum, your Honor, there was a waiver, it was on a
month-to-month basis, linked to deliveries, and so long as
there was no delivery, the waiver continued to give the parties
time to first negotiate with Airbus, and then negotiate with
each other.

          This waiver was supported by Frontier's consideration
and justified reliance.  It did not expire on May 8.  AMCK did
not have Frontier's mutual assent to withdraw it, nor did they
even try to give Frontier notice to withdraw it in any of the
many ways they could have.  The opposite in fact is true.  And
yet we still paid within a reasonable time.

          So that bring us to damages.  We heard from the
experts in this case, Dr. Neels and Mr. de Jounge, and they
came to vastly different amounts.  Dr. Neels calculated damages
at 48,660,000 as of April 8.  And Mr. de Jounge calculated
damages at about half of that, 24,950,000 as of September 21,
2023.

          Now, there are three real disputes between them that
give rise to this significant discrepancy.  The first is how to
even calculate the monthly rent for the replacement leases.

O4H3FRO2                     Summation - Mr. Schaer

Now, they agree on how you calculate the CDB replacement

leases, the three that delivered in July.

        The large variance however is on the two Jackson

Square aviation leases, the JSA ones, leading to Mr. de Jounge

calculating these at about a combined 72,000 less per month

over 144 months for two separate aircraft than the figure

reached by Dr. Neels, as well as Frontier and JSA themselves.

        Now, how did he do that?  Well, he says we need to

ignore the following items.  We need to ignore Frontier's

understanding of how its swap rates in its contracts work.  We

need to ignore JSA's understanding of how the swap rates in its

contracts work.  We need to ignore how these swap rates are

used in these contracts.  We need to ignore that swap rates

have historically been in the low single digits, never more

than 18 percent at the absolute height of inflation in the

1970s.  And of course we need to ignore the amount that

Frontier has actually been paying to JSA under these leases.

        Instead he says we need to believe that Frontier and

JSA intended to include assumed swap rates of 59.6 percent and

80 percent into their monthly rent adjustment calculation.

Now, this just so happens to depress the rent by 72,000 per

month.

        Now what did Frontier's expert do?  He doesn't ignore

any of that.  He runs the common sense calculation with a

realistic swap rate based how these contracts always work, and

1    voila, he just so happens to reach the exact same amount that

2    Frontier and JSA reached when they did their own independent

3    calculation.

4             Now, second, the disagreement is whether to use a

5    discount rate that is debt based or WACC based.  A weighted

6    average cost of capital.  Mr. de Jounge says it must be the

7    WACC.  Now a WACC is put in place to consider and to account

8    for the significant and ever-changing risks that are in the

9    marketplace.  Stocks going up, stocks going down, interest

10   rates moving all over the place.  But Mr. de Jounge admits that

11   these leases have nothing to do with that, that they are

12   inherently debt-like instruments.  They are not subject to any

13   market fluctuations.  The market goes up, it goes down, the

14   lease rates stay the same.  Interest rates move around, the

15   lease rates stay the same.  These are debt instruments.  But he

16   says let's still use the WACC.

17            What does our expert say?  This is a debt instrument.

18   It is a mortgage.  It is a car lease.  The payment is always

19   the same until it's done.  Treat it exactly like it is.  So use

20   the debt based rate.

21            Now, third, the third disagreement between them.  What

22   is the actual discount rate to use?  Mr. de Jounge says, well,

23   listen, although we ignored Frontier completely in calculating

24   their lease rates and understanding swap rates, we must only

25   listen to Frontier for their internal discount rate.  And

1    that's 10 percent which we know really reflects an internal

2    what's called a hurdle rate or a rate at which Frontier will or

3    won't make an investment.  So not what we're doing here.  But

4    Mr. de Jounge says, let's actually just add 2 percent to that.

5    Because interest rates at the time I am doing my calculation

6    are higher than when I looked at this document that Frontier

7    included 10 percent.

8           Now, of course, Frontier was still using that

9    10 percent internal hurdle rate at the time Mr. de Jounge says

10   I should be using a 12 percent rate.  So, once again, we have

11   Mr. de Jounge saying, well, sometimes we should completely

12   ignore Frontier, sometimes we should only listen to Frontier,

13   and coincidentally, in my selections, the damages only go down

14   significantly.

15          Now what did we do?  What did our expert do?  He

16   looked at a neutral third party, Bloomberg, which is the same

17   authority cited in the parties' lease agreements for swap

18   rates.  And he said okay, what is Frontier's discount rate?

19   Well, its debt based rent is 1.0445 percent, and its WACC rate

20   is 1.8405 percent.  That's at the time of the damages in this

21   case.

22          Now, to be sure, this is lower than Frontier's usual

23   discount rate as calculated by Bloomberg, caused in part by the

24   unique circumstances of COVID.  Though, I also want to be clear

25   that the debt based rate, if you look at what's in evidence, it

 1    stays nearly constant, it is almost always right around that

 2    1 percent figure.  And the WACC rate never has exceeded

 3    7 percent in what we have in front of us, even in the years of

 4    the highest inflation.

 5           But importantly, it was also AMCK's decision to injure

 6    Frontier at this specific time, in large part because of the

 7    circumstances caused by this specific time.  And to use the

 8    crisis of this specific time as leverage to gain an advantage

 9    that it is now answering for.

10           And calculating damages at the time of injury, which

11    is the accepted method, results in the rates I just discussed.

12           Now, a quick note about taxes.  I promise it will be

13    quick, but I know there was a lot of testimony about it.  There

14    really isn't a disagreement between the experts here.  Both

15    agree that if you use the same tax rate on the front end as you

16    do the back end, you will reach the same amount in the end.

17    And that's what Dr. Neels did.  Now, the reason he did this is

18    because the neutral discount rates provided by Bloomberg are

19    after tax discount rates.  So to do the calculations properly,

20    you must compare apples to apples.  You must apply the after

21    tax discount rate to an after tax sum of money.  If you don't

22    do that, it would have actually inflated our damages.  And that

23    is not something that Dr. Neels was interested in doing.

24    Accuracy was what was important.  So there is no real dispute

25    on this piece of the taxes.

O4H3FRO2                          Summation - Mr. Schaer

1          Now, you need to also, and finally, I should say you

2     need to also consider the taxes that Frontier will pay on a

3     damage award in order to make that whole.  Now that is New York

4     law.  And you can look at the *Gulino* case out of the Southern

5     District of New York, and I quote, "A tax gross-up is necessary

6     to make a claimant whole."

7          Now, Dr. Neels provided us the helpful analogy of the

8     contractor who gets stiffed on a contract for $100,000, who

9     would have actually only ever had $80,000 after taxes, but then

10    if you just paid him 80,000, well, he is going to pay tax on

11    that, so he'd only end up with 64,000.  So therefore we need to

12    consider the taxes, and we need to pay him the 100,000 to make

13    him whole.

14         Now, our expert used 22.8 percent as the rate which

15    reflects the incremental tax effect of the next dollar that

16    Frontier receives.  This matches the federal constant rate of

17    21 percent, and the state rates that are around 1 to 2 percent.

18    Now this 22.8 percent impact is the case, even if Frontier

19    shows a tax benefit in a given year, because that benefit will

20    be reduced by 22.8 percent for every next dollar.  AMCK showed

21    that the effective rates have been fluctuating recently, which

22    we know is due in large part to COVID, and the financing

23    anomalies and laws that have passed with it.  That has resulted

24    in some years of tax benefits for Frontier.

25         That said, the most recent year Frontier has an

1    effective tax rate for is 2023, and that is at 134.4 percent.

2    Of course we are not advocating that the Court should apply a

3    134.4 percent tax rate to the damages in this case.  We are not

4    saying the Court needs to more than double the actual damages.

5    That would be absurd.  What we are saying is to use the real

6    world, common sense, actual rate that Frontier will pay on the

7    damages award, which would be 22.8 percent.

8            So, in the end, then, when you use the appropriate

9    lease rates, the appropriate discount rates, and the

10   appropriate tax rates, it results in an award of

11   $48.66 million.

12           Your Honor, this case, as I stated at first, is about

13   time.  The parties entered a waiver because they wanted time

14   before deliveries, time before paying rent, and time to

15   negotiate both of those deals.  So, they provided a waiver on a

16   month-to-month basis linked to the next delivery to accomplish

17   those tasks.  With its time Frontier did exactly what it said

18   it would, at a significant cost to its business.

19           And in turn with its time, AMCK and its shareholder

20   began to scheme ways to get out of the Framework Agreement that

21   it was already looking to terminate.  Calling the nuclear

22   option, using the MAC, way back in March while there is no

23   dispute that Frontier was fully paid.

24           Now, after a waiver was created, AMCK intentionally

25   never said anything that would call it into question, because

O4H3FRO2

1    if it did, and Frontier paid, like AMCK knew it would if it was

2    ever asked, AMCK's plan would be ruined.

3           As a matter of fact, and as a matter of law, that is

4    wrong.  The Court should therefore return a decision of

5    48.66 million in Frontier's favor.

6           Now, before I sit down, I want to mention the time

7    theme one last time.  We want to thank the Court for its time

8    and its patience while we've presented the robust factual

9    record in what, as your Honor noted, is really a

10   straightforward case.

11          Thank you.

12          THE COURT:  Thank you, Mr. Schaer.  I have one

13   question for you.  The 22.8 percent, if Frontier was making

14   that on its business in normal course, at the end of the day,

15   it would be taxed and nobody would reimburse it for that tax.

16          MR. SCHAER:  That's correct, your Honor.  That's as I

17   understand it, though.

18          THE COURT:  Therefore, why now that it gets the money,

19   why should it be reimbursed for the tax?  Why shouldn't it

20   simply get the amount of money as though it had earned it under

21   more peaceful circumstances?

22          MR. SCHAER:  You know, I don't know if I fully

23   understood the question, though I do think how the calculation

24   is done, is that if Frontier had a certain amount of money at a

25   given point, that money had already been taxed.  And now it

O4H3FRO2

doesn't have that, and so to then compensate it for that, well, that compensation is going to be taxed again. And so we would actually bring it lower than what Frontier actually had in the -- I think it is the but-for world as Dr. Neels said. So to get us to that but-for world, where Frontier actually ends with the same amount of money that it would have had, we need to consider the taxes it's going to pay on the compensation award.

Again it goes back to that double tax theory I believe that Dr. Neels explained with the contractor, where he has a contract for 100,000, but he would have paid 20 percent taxes on it. So, the contractor only would have 80,000. Now, if the defendant in that case says I should only be liable for 80,000, and the contractor gets paid 80,000, well, then the contractor is going to have to pay taxes on that 80,000, so he is going to be left with 64,000. So that's why when you say all right, contractor, I know you only would have ended with 80,000, but we need to consider the taxes that you would pay in order to get you down to 80,000. So, consider your taxes, in that case it was 20 percent, the damage award is 100,000, which the contractor pays 20 percent on, and then he or she would then be left only with 80,000, the same position he or she should have been in, and that's what would make the contractor whole. I hope that makes sense.

THE COURT: I think simply that I should not be

O4H3FRO2

1  allowed to discuss taxes.  But I don't understand where the

2  concept of double taxation comes in.  It seems to me it would

3  have paid one tax under normal conditions.

4          MR. SCHAER:  That's right.

5          THE COURT:  But it didn't get that money, therefore it

6  was not taxed on that money.  And now it does get that money,

7  and therefore, it pays a tax on it.  And it seems to me that

8  they're two single processes.

9          MR. SCHAER:  You know, I absolutely understand the

10  Court's concern.  I echo the Court's caution that I should not

11  be talking about tax much more than I do know.  If your Honor

12  would like some supplemental briefing to further explain this

13  issue, we are happy to provide it.

14          I believe that Dr. Neels also attempted to really

15  clarify this in his declaration, but we're happy to give -- I

16  understand the Court's question, and to give it a targeted

17  accurate response, we're happy to provide that.

18          THE COURT:  Okay.  I appreciate your addressing that

19  point.  And do it with the thought that it must be explained in

20  terms that you would use if you were explaining it to a rather

21  slow child.

22          MR. SCHAER:  It will be --

23          THE COURT:  Okay.

24          MR. SCHAER:  -- absorbed that way as well, your Honor.

25          THE COURT:  Thank you all.

O4H3FRO2

1          Do you want to file briefs or do you regard that as

2    having been covered?

3          MR. BUTLER:  Your Honor, I don't believe we intended

4    to submit post-trial briefs, especially with the summations

5    that we've done.  If the Court would find post-trial briefing

6    valuable, of course we would be happy to do it.

7          THE COURT:  I have asked the questions that gave me

8    pause as I read your submissions.  And if you could address

9    those two questions, I would appreciate it.

10          MR. BUTLER:  Certainly.

11          THE COURT:  Beyond that, I don't think we have any

12    need for a general discussion of the case.

13          MR. BUTLER:  Your Honor, can --

14          THE COURT:  We have it pretty well in mind.

15          MR. BUTLER:  Can we confer and propose a briefing

16    schedule for that, those submissions?

17          THE COURT:  Sure.

18          MR. BUTLER:  Thank you, your Honor.

19          THE COURT:  Sure.

20          MR. SCHAER:  Thank you, your Honor.

21          THE COURT:  Don't overdo it.  Short, brief,

22    comprehensible answers on those points, I think we would

23    appreciate.  But we're not trying to conduct a legal seminar on

24    either of them.  Okay.

25          MR. BUTLER:  Thank you, your Honor.

O4H3FRO2

1              MR. HOSENPUD:  Thank you, your Honor.

2              THE COURT:  Thanks a lot.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

PAUL SHERIDAN

Cross By Mr. Hosenpud  . . . . . . . . . . . 728

Redirect By Mr. Butler . . . . . . . . . . . 749

Recross By Mr. Hosenpud  . . . . . . . . . . 752

                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 11     . . . . . . . . . . . . . . . . . . 738

                      JOINT EXHIBITS

Exhibit No.                                    Received

 27, 52, 54, 135, 171, 172,  . . . . . . . . 755

          173, 174, 180, 181