ORIGINAL



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  7/1/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X
FRONTIER AIRLINES, INC.,

                  Plaintiff,

      - against -

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION
(TWO) LIMITED, WELLS FARGO TRUST
COMPANY, N.A., solely in its
capacity As OWNER TRUSTEE, and
UMB BANK, N.A., solely in its
capacity as OWNER TRUSTEE,

                 Defendants.
- - - - - - - - - - - - - - - - - - -X

          20 Civ. 9713 (LLS)

    AMENDED OPINION & ORDER

### **Introduction**

    This is a breach of contract action between plaintiff Frontier Airlines, Inc. ("Frontier"), a commercial passenger airline, and defendant AMCK Aviation Holdings Ireland Limited ("AMCK"), an aircraft leasing company. AMCK buys and leases aircraft through various affiliates, subsidiaries, and owner trustee entities, including Accipiter Investments 4 Limited ("Accipiter") and Vermillion Aviation (Two) Limited ("Vermillion"), the other defendants in this case. In late 2019, AMCK and Frontier entered into the Framework Agreement, which required AMCK to purchase six new Airbus aircraft and lease them back to Frontier.

    After the COVID-19 pandemic severely limited air travel in March of 2020, the parties began negotiating changes to the

Framework Agreement, including deferral of monthly aircraft
rents. In May of 2020, after the parties failed to reach a
formal agreement, AMCK held Frontier in default and terminated
the Framework Agreement. Frontier brought this action alleging
breach of the Framework Agreement, among other claims that were
dismissed on summary judgment.

After a bench trial, and for the reasons that follow, the
Court finds that AMCK breached the Framework Agreement, and
Accipiter and Vermillion are proper defendants.

## Factual Findings

All background facts are incorporated from the Summary
Judgment Opinion & Order (Dkt. No. 123), and familiarity is
assumed. The findings of fact necessary to resolve the remaining
issues are made as follows.

### I.   Parties

Frontier is a Colorado-headquartered passenger airline that
operates commercial passenger aircraft leased from various
aircraft lessors. Agreed Findings of Fact ¶ 1 ("AFF") (Dkt. No.
135). During the relevant timeframe, Jimmy Dempsey was
Frontier's Executive Vice President and Chief Financial Officer,
and he is currently Frontier's President. Id. ¶ 2. Spencer
Thwaytes was Frontier's former Vice President and Treasurer,
reporting to Mr. Dempsey. Id. Robert Fanning was Frontier's
Director of Fleet, responsible for overseeing the making of rent

2

payments and reporting to Mr. Dempsey. _Id._ He is currently Frontier's Vice President for Fleet. _Id._

During the relevant timeframe, defendant AMCK was an aircraft leasing company organized under the laws of Ireland and with its principal place of business in Ireland. _Id._ ¶ 3. Paul Sheridan was AMCK's Chief Executive Officer, and Jane O'Callaghan was the Chief Commercial Officer. _Id._ ¶ 4. Gerald Ma was an Executive Committee Member at CK Asset Holdings, which was AMCK's largest shareholder, and a member of the AMCK Board of Directors. _Id._ Francis Lee was a Chief Manager of Corporate Business Development at CK Asset Holdings, reporting to Mr. Ma, and served as an alternative member of the AMCK Board of Directors. _Id._

## II.  Framework Agreement

Sale and leaseback ("SLB") arrangements are a common method used by airlines to finance new aircraft acquisitions. _Id._ ¶ 5. Frontier relies on SLBs for 100% of its fleet. _Id._ An SLB arrangement is comprised of multiple parts: First, an airline (such as Frontier) has an existing purchase agreement with an airline manufacturer (such as Airbus), which obligates the airline to take delivery of aircraft pursuant to a delivery schedule. The airline makes pre-delivery payments ("PDP") to the manufacturer as the construction of each aircraft progresses. _Id._ ¶ 6.

3

Second, around six months prior to an aircraft delivery, the airline enters an SLB arrangement with an aircraft lessor (such as AMCK or an affiliate), in which the lessor agrees to (i) buy the aircraft from the manufacturer when the aircraft delivers and (ii) simultaneously lease the aircraft to the airline in return for monthly rent payments. Id. The purchase price and rent payments of the aircraft are negotiated solely between the airline and the lessor. Id.

Third, shortly before or on the date of delivery, the lessor pays the purchase price to the manufacturer and takes title to the aircraft, the airline accepts delivery of the aircraft from the lessor under the lease, and the airline begins making monthly rent payments to the lessor. Id. Depending on the purchase price, the airline may receive a refund from the manufacturer for PDP overpayments. Id. Until the lessor pays the manufacturer, the airline remains responsible for purchasing the aircraft and will not receive any PDP overpayment refunds. Id. ¶ 7. If the lessor fails to pay, the airline must use its own funds, enter an SLB arrangement with another lessor, or risk defaulting on its purchase agreement with the manufacturer. Id.

Frontier is a party to the Airbus Purchase Agreement (with amendments, "Airbus Agreement") with Airbus, whereby Frontier is obligated to purchase more than 150 aircraft, and make PDPs, according to a decade-long schedule. Id. ¶ 8. By the end of

4

September 2019, AMCK, through subsidiaries and owner trustees, owned and leased 14 aircraft to Frontier that were delivered under the Airbus Agreement pursuant to 14 individual lease agreements ("Original Leases"). Id. ¶ 9; Joint Exhibit 2 ("JX") (MSN 8402 Lease); JX-7 (MSN 9177 Lease).

On September 10, 2019, Frontier and AMCK's affiliate, Accipiter Holdings, DAC, the parent company of Accipiter, signed a letter of intent to enter into a sale and leaseback arrangement for six additional aircraft under the Airbus Agreement. AFF ¶ 12; JX-5. On March 16, 2020, Frontier and AMCK executed the Framework Agreement, which incorporated the key terms from the September 2019 letter of intent. AFF ¶ 13; JX-24. The Framework Agreement obligated AMCK to purchase six aircraft and lease them back to Frontier through Owner Trustee/Lessor UMB Bank, N.A., according to the following schedule: (i) three aircraft in March 2020; (ii) one in May 2020; (iii) one in June 2020; and (iv) one in August 2020. AFF ¶ 7; JX-24, Schedule 1.

Also on March 16, 2020, AMCK purchased the first of these six aircraft, MSN 10038. AFF ¶ 7. AMCK, by and through its affiliates, executed corresponding lease documents with Frontier. Id. ¶ 14. In particular, Vermillion executed a trust agreement with UMB, relating to the ownership of MSN 10038. Id.; JX-25 (MSN 10038 Trust Agreement). UMB, not in its individual capacity but solely as owner trustee, executed a corresponding

lease with Frontier. AFF ¶ 14; JX-29 (MSN 10038 Lease).
Vermillion provided a guaranty in favor of Frontier. AFF ¶ 14;
JX-26 (MSN 10038 Guaranty). Under the Framework Agreement and
resulting lease documents, AMCK paid Airbus $51 million for MSN
10038, and Frontier agreed to pay AMCK $269,525.94 in monthly
rent. AFF ¶ 15. Frontier received delivery of MSN 10038 from
Airbus on this same day. Id. ¶ 16. Under the Framework
Agreement, the five remaining aircraft would be purchased at the
same price and leased at a similar monthly rent. Id. ¶ 17.

The contracts at issue — including the Framework Agreement,
as well as the Lease Agreements, Trust Agreements, Guarantees,
and all other "Operative Documents" (as defined in the Framework
Agreement) relating to the 15 aircraft under lease between
Frontier and AMCK — are deeply intertwined and make numerous
cross-references to each other. JX-1-4; JX-7; JX-24, §§ 1.1,
2.1.1, 3.3.1; JX-25, §§ 1, 2, 8.01-.02, 9.01(b); JX-26 at 1,
§ 1; JX-29 at 1, 15.

**III. Rent Deferral Agreement**

Also on March 16, 2020, Frontier sent a letter to AMCK
requesting a temporary deferral of monthly rent payments under
the Original Leases and the MSN 10038 Lease due to the COVID-19
pandemic. JX-28. Frontier requested a voluntary (i) one-time,
three-month aircraft rent deferral on the 15 aircraft under
lease; and (ii) return of one-month's security deposit for each

aircraft. Id. Frontier explained it would fully repay those amounts, with interest, over a nine-month period starting on July 1, 2020. Id. Frontier also represented that it had a "strong balance sheet with $685 million of free cash" in order to assure AMCK that it could make its payments, with interest, when the proposed deferral expired. Id.

Deferral requests of this nature were common given the sudden impact of the COVID-19 pandemic on air travel. Frontier sent concession request letters to all of its lessors, and AMCK received concession request letters from 32 of its 34 airline partners, prompting AMCK to create an inter-company deferral team. JX-12; JX-15; JX-36.

As part of the negotiations, AMCK requested that Frontier achieve delivery delays with Airbus for the upcoming aircraft. JX-61. This was a substantial request for Frontier. The Airbus contract was its "single largest contract," and Frontier had $250 million of PDPs on deposit with Airbus. Trial Transcript 522:23-25 ("Tr."). Airbus also had little incentive to grant deferrals, as the aircraft were nearly complete, and Airbus had no space at its Mobile, Alabama assembly facility to store them. JX-60; Tr. 50:14-23. When Frontier initially asked for a delivery deferral, Airbus's "immediate reaction ha[d] been to threaten Frontier with default" of the greater Airbus Agreement. JX-61; Tr. 76:7-13. If Airbus declared a default, Frontier would

lose all of its PDP payments for upcoming aircraft, and it "could cripple the airline to where it may potentially put [it] out of business" and need to seek Chapter 11 bankruptcy protection. JX-190 at 85-90; JX-17 at 2-3; JX-65; Tr. 524:4-7. Delivery delays would benefit AMCK by lessening and delaying its payment obligations. JX-40; JX-44; JX-55.

## IV. **Waiver**

To reach a formal agreement on rent deferral with AMCK, Frontier needed additional time to negotiate with Airbus. On April 6, Sheridan sent an email to Dempsey granting a waiver of timely rent payment for ten business days, from April 6, 2020, to April 21, 2020. JX-60. Sheridan stated that AMCK "won't take any actions or call any defaults linked to non payment of rents on any aircraft where the rent is due." Id. Sheridan specified that he was "[m]indful of the time it might take [Frontier] to reach agreement with Airbus or to make some other arrangements and therefore of the ability for us to reach a deferral agreement." Id.

Dempsey and Sheridan spoke again on April 7, 2020, this time by phone. Tr. 529:8-9. Dempsey explained the complex negotiation process with Airbus and the fact that the Mobile, Alabama factory would be closed until at least April 28, 2020, meaning that the next aircraft delivery would not be until May at the earliest. Tr. 529:18-25; Tr. 530:1-6. These factors

necessitated a deferral beyond the initial ten-day period, which was set to end on April 21, 2020. Tr. 530:7-13. Dempsey formally asked Sheridan to move the deferral to a month-to-month basis to give Frontier time to get an agreement in place with Airbus and, in turn, reach a formal rent deferral with AMCK. Tr. 530:13-17. Dempsey said that Sheridan understood the need for time and agreed to a month-to-month deferral, with no outstanding rent at the point of the next aircraft delivery. Tr. 532:9-19; Tr. 534:18-21.

Immediately after, Dempsey confirmed this with his team, texting Fanning and Thwaytes, "Just spoke to Paul Sheridan. He has agreed to do the deferral on a month to month basis." JX-73. Thereafter, Sheridan and other Frontier associates continued to negotiate with Airbus about delivery delays, inform AMCK of their progress, and make offers to become current on rent.

On April 8, 2020, Sheridan emailed Gerald Ma, Francis Lee, and other representatives of AMCK's shareholder about the April 7 phone call, explaining that Frontier "asked for us to do the deferral on a month by month basis (they are also conscious that they don't want to be in default with us). Since the next delivery isn't going to be in April now that the Mobile plant is shut I think we can agree to this and give them a bit more time to work with Airbus." JX-76.

AMCK associates referenced this informal rent deferral agreement multiple times thereafter. For example, on April 30, Mr. Sheridan cited "an informal deferral pending agreement with Airbus on delivery delays." JX-121. AMCK also knew Frontier did not want to be in default, and Frontier repeatedly offered to become current on all rent. AMCK associates did not once ask Frontier to pay or express that they might be in default.

After those discussions about a waiver, the parties continued to engage in substantial negotiations over a formal rent deferral agreement from March through May of 2020. They exchanged numerous proposals, and both parties understood that any deferral of rent pursuant to this request would be documented in a written agreement. JX-28; JX-53; JX-73; JX-79. However, they never reached a formal written agreement on rent deferral. Tr. 625:6-8.

## V.    **Termination**

On May 8, 2020, AMCK sent Frontier a Notice of Termination due to non-payment of rent in April 2020. JX-146. This was based on the interconnection of AMCK and Frontier's various contracts: Frontier's alleged failure to pay rent on the Original Leases created a breach of the MSN 10038 Lease and a cross-default under the Framework Agreement. Id.; JX-2; JX-7; JX-24; JX-29. On May 13, 2020, three business days and five calendar days later,

10

Frontier paid all outstanding rent. JX-14; JX-148; JX-150-51.
AMCK nonetheless terminated the Framework Agreement and did not
consummate the SLB arrangements for the remaining five aircraft.
JX-14; JX-148; JX-150-51.

    As a result of this termination, Frontier began looking for
alternate leasing companies to finance the five remaining
aircraft. Given the changed market conditions, their proposed
terms were substantially worse for Frontier than those in the
Framework Agreement. PX-6; JX-156-59; Tr. 107:10-15. In fact,
AMCK itself reached out to Frontier on June 18, 2020 and offered
to enter SLBs for the three July 2020 aircraft. PX-6. The terms
were much less favorable for Frontier than those in the
Framework Agreement, and AMCK's proposal was "conditioned on the
release and waiver of any potential legal claims by Frontier
arising from the termination of the Framework Agreement." Id.;
Tr. 108:17-110:14.

    Frontier ultimately found other lessors to enter SLB
arrangements for all five remaining aircraft. It contracted with
China Development Bank (CDB) for the three July aircraft and
Jackson Square Aviation (JSA) for the remaining two aircraft.
JX-156; JX-158-59; PX-10; JX-162; JX-164; JX-166-69. While the
terms were better than those offered by AMCK on June 18, 2020,
they were still much worse for Frontier than the terms of the

11

Framework Agreement. JX-156; JX-158-59; PX-10; JX-162; JX-164; JX-166-69.

## **Procedural History**

Frontier brought this suit to recover losses from AMCK's termination of the Framework Agreement. This Court dismissed all of Frontier's claims on summary judgment, except for its claim against AMCK, Accipiter, and Vermillion for breach of the Framework Agreement. A bench trial took place from April 8 to 16, 2024, to resolve whether AMCK breached that contract, with a specific focus on whether it waived its right to timely payment during an April 7, 2020 phone call or in other communications.

## **Legal Standards**

### I.   **Waiver**

A right can be waived under the Framework Agreement only "by an express waiver or variation in writing...and no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right." JX-24, § 8.4.1. The Framework Agreement further states that the "provisions of this Agreement shall not be varied otherwise than by an instrument in writing executed by or on behalf of AMCK Aviation and Frontier." Id. § 8.4.2.

"A party may, by words or conduct, waive a provision in a

12

contract," including the time of performance or time of payment.
Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F. Supp.
821, 831-32 (S.D.N.Y. 1969); see Beth Israel Med. Ctr. v.
Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573,
585 (2d Cir. 2006) ("A breach of contract may be waived by the
non-breaching party."). A waiver is "the voluntary abandonment
or relinquishment of a known [contract] right." Randolph
Equities, LLC v. Carbon Cap., Inc., 648 F. Supp. 2d 507, 516
(S.D.N.Y. 2009) (alteration in the original) (quoting Jefpaul
Garage Corp. v. Presbyterian Hosp., 462 N.E.2d 1176, 1177
(1984)). The party asserting waiver has the burden of proving
the non-breaching party expressed a clear manifestation of its
intent to relinquish its right. Id. Because it is a question of
intent, whether a party waived is generally a matter of fact.
Id. "[A]ny alleged subjective and unstated intent" is
irrelevant. Natale v. Ernst, 63 A.D.3d 1406, 1409 (2009). An
express waiver can be "established by affirmative conduct or by
failure to act so as to evince an intent not to claim a
purported advantage." Fundamental Portfolio Advisors, Inc. v.
Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 (2006). On
Summary Judgment, this Court held that an express waiver need
not be in writing. Dkt. No. 123 at 23.

When a waiver is supported by consideration or reasonable
and justified reliance, it "form[s] a new contract or a binding

13

modification of the original contract and may not be retracted without mutual consent." 13 Williston on Contracts § 39:20 (4th ed.). "Where an executory contract fixes the time within which it is to be performed and performance within that time is waived by the parties to the agreement, neither party can thereafter rescind the contract on account of such delay without notice to the other." Sherwood v. Gordon Bros., 116 N.Y.S.2d 306, 308 (City Ct. 1952). "The notice must be clear, distinct and unequivocal; fix a reasonable time within which to act; and inform the other party that failure to perform by that date will be considered a default." Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc., 241 F. Supp. 2d 246, 270 (S.D.N.Y. 2002); see also N.Y. U.C.C. Law § 2-A-208(4) (McKinney 2023) ("A party who has made a waiver affecting an executory portion of a lease contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."); U.C.C. § 2-209(5) (2022) (same); 13 Williston on Contracts § 39:20 (4th ed.) ("[H]aving once waived strict compliance with the terms of a contract, a party can assert its right to strict compliance in the future only by notifying the other party of its intent to do so and by allowing a reasonable time for the other party to comply.").

14

"The requirement of reasonable notice to the party whose nonperformance has been excused by waiver, as well as a reasonable opportunity to comply, are generally not obviated by an antiwaiver clause in the parties' contract." 13 Williston on Contracts § 39:20 (4th ed.).

## II.  **Proper Defendants**

"It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." Ferring B.V. v. Allergan, Inc., 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) (internal quotation marks omitted). However, under New York law, contemporaneous writings are to be read together, even if they are not between the same parties, when they form part of a single transaction, relate to the same subject matter, and are intended to effectuate the same purpose. This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); Nau v. Vulcan Rail & Constr. Co., 286 N.Y. 188, 197 (1941) (finding those agreements at issue "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one"). It is for the factfinder to determine whether contemporaneous writings were intended to impose on separate parties the same binding obligations, even though the obligations were defined in different documents.

15

TVT Recs. v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005).

## Discussion

### I.    AMCK Waived Its Right to Timely Payment.

There is no debate that the parties did not reach a formal deferral agreement. Both sides agree that it is common industry practice to document formal rent deferral agreements in writing, and the Framework Agreement requires as much. JX-24, § 8.4.2; JX-28; Tr. 624:23-625:1. A formal deferral agreement also would have required "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms," including how long the rent deferral would last, what the payment period would be, and what the interest rate would be. Stonehill Cap. Mgmt., LLC v. Bank of the W., 28 N.Y.3d 439, 448-49 (2016) (internal quotation marks omitted). All parties acknowledge that they did not solidify these material terms orally or in writing. However, they disagree over whether there was a waiver of timely payment in place while the parties were negotiating the specific contours of the deferral agreement.

There is no dispute that AMCK instituted an initial waiver on April 6, 2020. In an email to Dempsey, Sheridan stated clearly that they "won't take any actions or call any defaults linked to non payment of rents on any aircraft where the rent is

16

due from today to 21 April." JX-60. Sheridan confirmed this at trial, explaining that, "because there were rent payments that were due on that day, and because the discussions with Airbus were going to be difficult, and take a little bit of time, that we grant them a 10-day grace period where we said we would not take action under the lease agreements or the other agreements...if there were no rent payments during that 10 business day period." Tr. 672:19-25. The central debate is whether that waiver was modified — or whether a new waiver was created — during a phone call between the same parties the next day. After testimony from both key witnesses, the Court finds that it was.

Dempsey, a generally reliable and honest witness, recounted his call with Sheridan in detail. After explaining the intricacies of Frontier's negotiations with Airbus, and the resulting delivery delays from the closing of the Mobile factory, Dempsey asked Sheridan for a month-to-month waiver while negotiations were ongoing. Tr. 525:13-15; Tr. 529:18-530:17; Tr. 612:10-14. Dempsey confidently stated that Sheridan had agreed: "My clear understanding coming out of this call was that we had a deferral in place, and the earliest date that we had to pay the rent was at the point of the next aircraft delivery. That was my clear understanding at that time." Tr. 534:18-21. While Dempsey "certainly expected the formal

17

agreement that we were negotiating with Airbus and also the formal agreement that we would have negotiated with AMCK" to be in writing, he did not feel this informal waiver needed to be written: "I have known Paul for sometime, and I trusted that his word was good. He was the chief executive of AMCK...It didn't need to be documented in a written agreement. It was an agreement between two principals that were parties to it." Tr. 624:17-25.

Dempsey's actions after the call confirm this account, as he texted Thwaytes and Fanning, "Just spoke to Paul Sheridan. He has agreed to do the deferral on a month to month basis." JX-73. Thereafter, Dempsey and his team continued to negotiate with Airbus about delivery delays, inform AMCK of their progress, and work towards a formal agreement with AMCK – all consistent with there being a month-to-month deferral in place.

Sheridan, on the other hand, contested this account. He testified that he did not remember what his response to Dempsey's request for a month-to-month deferral was or whether he told Dempsey that a written agreement would be entered. Tr. 728:10-16. However, he said that he did not intend to waive any rights to payment. Tr. 677:3-7. Sheridan claimed that his email to the shareholder's representatives after the call confirmed that he did not agree to a month-to-month deferral, as he described it as something that "we *can* agree to," not that

they had agreed to. JX-76 (emphasis added). He also stated that he would have needed to receive higher approval from the shareholder before implementing that waiver. Tr. 680:2-8.

Sheridan's account is the less credible one for a few reasons. First, it is notably lacking in detail, as he did not recall the conversation with nearly as much specificity as Dempsey did. Sheridan's shareholder approval argument falls flat because there is no indication that he received shareholder approval for the April 6 waiver already in place. JX-63; JX-65. Sheridan also never suggested to Dempsey that he lacked authority as chief executive to grant a month-to-month deferral. Tr. 714:16-18; Tr. 728:17-20.

Additionally, Sheridan and other AMCK employees' communications and actions after April 7 reveal that they did in fact understand that a longer deferral was in place, even if Sheridan's initial email to the shareholder used less definite language. On April 30, Sheridan clearly referenced "an informal deferral pending agreement with Airbus on delivery delays" in an internal email to Ma and others. JX-121. When asked at trial what he meant by an "informal deferral," Sheridan claimed he was referring to the April 6 deferral. Tr. 692:16-19. However, this is inconsistent considering that the April 6 deferral had expired on April 21, 9 days before that email was sent.

19

Additionally, Dempsey and Sheridan had repeated contact after April 7, and Sheridan did not once attempt to clarify what he meant on that call. On April 27, Dempsey told Sheridan he was operating under the impression that Frontier just needed to have no outstanding payments at the time of the next delivery, and Sheridan did not dispute that. JX-111. Similarly, on April 29, Fanning told O'Callaghan that one solution to their negotiation was that the "current rent deferral would stay in place," and she said nothing to alter that understanding. JX-17. AMCK associates knew Frontier was continuing to negotiate with Airbus, and they continued to negotiate with Frontier themselves, yet they did not once tell Frontier to cease negotiations because they were in default. Frontier also repeatedly offered to pay, with AMCK consistently declining its offers and failing to send any chase alerts or payment requests. JX-120-21; JX-123; PX-7-8.

AMCK argues that, to the extent anything said on the April 7 call could be construed as an express waiver, that waiver was withdrawn on April 9, when AMCK sent a draft forbearance agreement indicating that, absent agreement, AMCK expected Frontier to be bound by the lease terms. JX-79. However, this is also inconsistent, as the communications referenced above, which clearly allude to the existence of an informal rent deferral, all occurred well after that April 9 email.

While the Framework Agreement forbids looking at course of conduct for the creation of a waiver, the parties' actions after April 7 help to confirm Dempsey's account that a waiver was made on that phone call. If Sheridan's subjective intent was not to grant a month-to-month deferral, he did not make that sufficiently clear to Dempsey or anyone else at Frontier. All parties acted as if a month-to-month waiver was in place following the phone call. Ultimately, Dempsey's descriptions of what the parties said on the April 7 call are consistent with what the parties actually did, while Sheridan's are not.

The Court finds that AMCK waived its right to timely payment during the April 7 phone call. That waiver was supported by consideration, as Frontier made a substantial sacrifice to achieve deferrals with Airbus. It risked default on its single largest contract, which could have exposed the company to Chapter 11 bankruptcy proceedings and resulted in the loss of $250 million in PDPs. Tr. 518:3-519:4; Tr. 521:7-524:12. With each aircraft deferral, Frontier also lost repayment of $15 million, at a time when it was desperate for liquidity. Tr. 564:10-565:4. In turn, AMCK received the benefit of delaying its payments of $51 million per aircraft. Tr. 566:7-567:19.

Withdrawal of that waiver required mutual assent or, at a minimum, notice and a reasonable opportunity to cure. AMCK did not provide any of those elements, and it terminated the

21

Framework Agreement even after Frontier became current on all rent on May 13, 2020. JX-14; JX-148; JX-150-51. This was a reasonable time period well within the three-day grace period and five-day cure provisions in other contracts between the parties. JX-2 (MSN 8402 Lease); JX-7 (MSN 9177 Lease); JX-24 (Framework Agreement); JX-29 (MSN 10038 Lease).

AMCK is therefore liable for breach of the Framework Agreement.

**II.   Accipiter and Vermillion Are Proper Defendants.**

AMCK argues that Accipiter and Vermillion, AMCK's affiliates, are not parties to the Framework Agreement and therefore cannot be held liable for breach of contract. However, the Court finds that they are proper defendants.

Accipiter and Vermillion's related contracts should be read as one with the Framework Agreement. Vermillion entered into its agreements - the MSN 10038 Trust Agreement (JX-25) and the MSN 10038 Guaranty (JX-26) - on the same day that the Framework Agreement was executed, and the agreements related to the purchase of the first aircraft under the Framework Agreement. Tr. 54:20-22; Tr. 55:20-23. Accipiter similarly signed a letter of intent to finance six aircraft under the Framework Agreement, and the letter's key terms were incorporated into the Framework Agreement. Tr. 44:15-49:2. All documents were intended to effectuate the same purpose: the financing and leasing of

22

aircraft between Frontier and AMCK through the Framework Agreement. They therefore "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one." Vulcan Rail, 286 N.Y. at 197.

The Framework Agreement imposes binding obligations on Accipiter and Vermillion. All of the contracts at issue are interconnected and have numerous cross-references. In fact, it was through this very interrelation that AMCK held Frontier to be in default of the Framework Agreement, using Frontier's alleged outstanding rent payments on the Original Leases (to which Accipiter Holdings DAC, Accipiter's parent company, was a party) to create a breach of the MSN 10038 Lease and a cross-default under the Framework Agreement. JX-1-4; Tr. 32:12-43:4. The May 8 Termination Notice specifically relied on the interrelatedness of those contracts and the relevant parties, with numerous references to them. JX-146, ¶¶ 2, 4, 7. It would make little sense to allow Accipiter and Vermillion to avoid the very mechanism of interconnection through which AMCK claimed Frontier to be in default.

Accipiter and Vermillion are proper parties to this action and are liable for breach of the Framework Agreement.

## Conclusion

For the foregoing reasons, AMCK breached the Framework Agreement, and Accipiter and Vermillion are proper defendants. Accordingly, judgment will be entered in favor of Frontier and against AMCK, Accipiter, and Vermillion in the amount of $48,660,000, plus interest from April 8, 2024 at a rate of 9%. The Court accepts Dr. Neels's damages calculation because, while a pre-tax approach is standard, his use of a constant tax rate yielded the same result, and his rent computations comported with Frontier's internal estimates and actual payments. Additionally, AMCK is liable to Frontier for all losses, fees, costs, and expenses — including attorneys' fees — under the Original Leases and the Framework Agreement. JX-2 & 7, § 17.1(a); JX-24, § 7.1.

The Clerk is directed to enter judgment accordingly.

So ordered.

Dated:  New York, New York
        July 1, 2024

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.